**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| REPUBLIC SERVICES OF INDIANA LIMITED PARTNERSHIP, )<br>)<br>)<br>        Plaintiff, )<br>vs. )<br>)<br>COE HEATING & AIR CONDITIONING, )<br>INC. )<br>)<br>        Defendants. ) | **Case No. 1:21-cv-108-HAB-SLC** |

## DEFENDANT COE HEATING & AIR CONDITIONING, INC.'S LIST OF EXHBITS SUPPORTING COE HEATING & AIR CONDITIONING, INC.'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT JAMES FOSTER

COMES NOW Defendant, Coe Heating & Air Conditioning, Inc. ("Coe"), by counsel, Christopher J. Uyhelji and Martin J. Gardner of Gardner & Rans P.C., and in support of its Motion to Exclude Testimony of Plaintiff's Expert James Foster submits the following List of Exhibits:

1.  James Foster's December 2019 Report and CV, attached as Exhibit A;

2.  James Foster's November 2022 Report, attached as Exhibit B;

3.  James Foster's Deposition, attached as Exhibit C;

4.  Trevor Miller's Deposition and Korte Proposal, attached in relevant part as Exhibit D;

5.  Michael Vergon's Deposition, attached in relevant part as Exhibit E;

6.  Michael Agosti's Report and CV, attached as Exhibit F;

7.  Sharee Wells' Deposition and FAST Worksheet, attached in relevant part as Exhibit G;

8.  Laurel Mason's Deposition and MSDS, attached as Exhibit H;

1

9.      Laurel Mason's Report and CV, attached as Exhibit I;

10.     Michael Vergon's Report and CV, attached as Exhibit J;

11.     Michael Agosti's Deposition, attached in relevant part as Exhibit K;

12      Scott Jones' Expert Report and CV, attached as Exhibit L;

13.     Scott Jones' Deposition, attached in relevant part as Exhibit M;

14.     John Diggle's Deposition attached in relevant part as Exhibit N;

15.     Terry Reader's Deposition, attached in relevant part as Exhibit O;

16.     Samir Dizdarevic, attached in relevant part as Exhibit P; and

17.     Plaintiff's Amended Complaint, previously submitted to the Court.

Respectfully submitted,

_/s/ Christopher J. Uyhelji_
Christopher J. Uyhelji, Attorney No.: 28814-53
Martin J. Gardner, Attorney No.: 11557-49
Gardner & Rans P.C.
117 Perspective Drive Suite 2
Granger, Indiana 46530
Phone: (574) 233-6035
cuyhelji@gardnerandrans.com
mgardner@gardnerandrans.com
Attorneys for Defendant
Coe Heating & Air Conditioning, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 28th day of April, 2023 a true and complete copy of the above and foregoing pleading or paper was made upon each party or attorney of record herein by depositing same in the United States Mail in envelopes properly addressed and with sufficient postage affixed, electronic mail or the CM/ECF system thereto:

Thomas Jones
James E. Zoccola
Lewis & Kappes
One American Square, Suite 2500
Indianapolis, Indiana 46282-0003
TJones@lewis-kappes.com
JZoccola@lewis-kappes.com

Date: April 28, 2023

*/s/ Christopher J. Uyhelji*
Christopher J. Uyhelji, #28814-53



Rimkus Consulting Group, Inc.
5804 West 74th Street
Indianapolis, IN 46278
Telephone: (317) 510-6484

December 3, 2019

Mr. Glenn Bell
CCMSI
17015 North Scottsdale Road, Ste. 325
Scottsdale, AZ 85255

Re:   Insured:            Republic Services
      Rimkus File No:      058406186
      **Subject:**            **Report of Findings**

Dear Mr. Bell:

On March 3, 2019, a fire occurred at the Republic Services facility located at 6231 MacBeth Road in Fort Wayne, Indiana.  The structure was used for maintenance work on bins and had space for employee lockers and offices.

Rimkus Consulting Group, Inc. (Rimkus) was retained by CCMSI to determine the origin and cause of the fire and to determine if recently installed heaters contributed to the cause.  This report was reviewed by Otto Soyk, Jr, IAAI-CFI, (V). Fire division manager.

In the course of our work, the facility was inspected and photographed on March 21, 2019.  A second site examination was completed on May 10, 2019, to uncover heaters recently installed from fire debris.  A joint examination was completed at the site on July 2, 2019, involving representatives of Coe Heating and Air conditioning company.

During our investigation, we applied the methodology of fire investigation using the systematic approach as recommended in the current edition of National Fire Protection Association, N.F.P.A. 921 - "Guide for Fire and Explosion Investigations and N.F.P.A. 1033 "Standard for professional Qualifications for Fire Investigator".

## Conclusions

1.  A fire occurred inside of the maintenance structure located along the west side of the property. The fire involved the south end of the structure where trash dumpsters are repaired and repainted.

2.  The fire involved the south end of the facility where ceiling tube heaters had recently been installed.

Exhibit A

1

December 3, 2019
Rimkus File No. 058406186                                                         Page 2

3. The cause and origin of the fire is a direct result of open infrared tube heaters installed in an area where painting and other procedures are performed. The installation of this type of heater is not recommended in this environment. Paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited.

# Discussion

A fire occurred at the Republic Services facility located at 6231 Mac Beth Road, Fort Wayne, Indiana. The facility is a waste and recycling business. The building involved in the fire loss was a maintenance repair and employee locker and office building. The area where the fire originated was at the south end of the building where trash dumpsters were repaired and repainted.

The dumpster maintenance included repairing, sanding, patching, and repainting the dumpsters. Work in this area included the use of flammable and other combustible materials. Welding was also done when needed to repair metal components. On the date of the fire, work had been completed in the area of origin. This work included welding to repair trash dumpsters. Sanding and painting operation had been done during the day. Work was completed around 3:00 p.m., and employees had cleaned up the area following the completed work day.

There were no indications of any problems at the time the employees left the facility at 4-4:30 p.m. A facility manager had completed a walkaround that included the maintenance facility and the area where work had been done. There was no indication of any problems when that observation was completed at 6:00 to 6:30 p.m.

Three Space Ray Ceiling tube infrared heaters, model PT125-30L5 had been installed in the paint and welding shop area within the past two months. The heaters were supplied by electrical power and propane fuel. There had been no problems related to the heat prior to the fire event.

Coe Heating and Air Conditioning company had installed the heaters around January 19, 2019. Another unidentified heating and air company had been consulted to install the style of heat in the building and advised against this type of heater use in the area due to welding and paint operations. The instruction manual related to the model installed further states that "this heater is not an explosion proof heater. Where the possibility of exposure to volatile and low flash point materials exist, it could result in property damage or death. This heater must not be installed in a spray booth where the heater can operate during the spraying process. The heater is a self-contained infrared radiant tube heater for use in location where flammable gases or vapors area not generally present."

The area there the heaters were installed was considered the welding and paint area. The facility did not meet NFPA code or compliances of a spray booth. The location

where work was performed allowed paint and other materials to accumulate on the hot surfaces of the heaters and other areas of the heater.

Other potential ignition sources were in the general area of fire origin however were not considered a potential due to their location and origin location. The fire origin was reportedly high in the structure when first observed which would place it at or near the ceiling. The use of these style of heaters installed by Coe Heating and Air Conditioning contributed to the ignition of paint and other combustible vapors and paint dust and particles located on the heater components over the time period when they were installed and when the fire occurred.

All other ignition sources were turned off prior to the employees leaving for the day at 4:00 p.m. The only ignition source identified was the tube heaters that was thermostat controlled. When the hearer activated, the spark to ignite the gas and heat ignited the combustibles that had accumulated on the surface and burners of the tube heaters.

There was no destructive examination done with the heaters. The heaters were uncovered from the fire debris for examination. Paint and debris were observed on the tube heaters, the deflectors, and inside of the ventilation tubes of the heaters. Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This would indicate the fire origin occurred in the east heater near the control box associated with the ignition of the propane fuel. A buildup of paint was observed in the ventilation pipe and reflector assembly of other tube heaters and in the tube heater of fire origin.

The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees indicted the fire was high in the building upon discovery. This combined with the fire damage to the south heater that was at ceiling level indicated the possible location of fire origin. Other potential ignition sources from other electrical components were turned off at the time of the fire loss. According to employees, everything had been turned off when leaving at 4:30 p.m. on the date of fire.

Welding operations that had occurred earlier in the day had stopped at 11:00 a.m. on the day of the fire, and no combustibles were in the area where welding had been taking place. The fire was reported at 11:15 p.m. There were no indications of any problems or issues regarding the welding operations for the over 12 hours following the welding operations. Several employees had indicated over the time period following the welding operation, there were no odors or indications of fire potential. The area was cleaned at 4:00 p.m. and checked again at 6:00 p.m. with no indication of problems.

A joint examination at the site was conducted on July 2, 2019, with Coe Heating and Air Conditioning company. Following the joint examination, a letter was received requesting information on several products and items that were inside of the facility and

December 3, 2019
Rimkus File No. 058406186                                                  Page 4

nearby the origin. The information was forwarded to Republic Services for them to respond to the request.

On November 15, 2019, Republic Service requested a short-written report of our findings.

Photographs taken during our work were retained in our files and are available to you upon request.

This report was prepared for the exclusive use of CCMSI and was not intended for any other purpose. Our report was based on the information available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call.

*THE ORIGINAL OF THIS REPORT, SIGNED BY THE PROFESSIONAL WHOSE NAME APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*

Sincerely,
RIMKUS CONSULTING GROUP, INC.

James P. Foster, IAAI-CFI
Fire Consultant


Attachments: Photographs, Curriculum Vitae

December 3, 2019
Rimkus File No. 058406186

**Photograph 1**
East end of building at location identified as the paint room.



**Photograph 2**
Paint and other combustibles material inside ventilation pipe of tube system



December 3, 2019
Rimkus File No. 058406186

### Photograph 3
Tube heater components and paint on reflector of unit, In area of fire origin.



### Photograph 4
Tube heater and paint on reflector along with charring and more heat on this heater unit than others. Indication origin area.



December 3, 2019
Rimkus File No. 058406186

**Photograph 5**
Paint on reflector of another tube heater assembly.



**Photograph 6**
Paint and other products on tube heater components in another location.



December 3, 2019
Rimkus File No. 058406186

**Photograph 7**
Paint and charring on tube heater assembly in area of fire origin.



**Photograph 8**
Tube heater reflector top side and damage observed in area of fir origin.



8



# James P. Foster, CFI, CFEI, CVFI
Fire Consultant

Jim.Foster451@aol.com
7850 Parkdale Drive
Zionsville, IN 46077

## Background

Mr. Foster is a Certified Fire Investigator, a Certified Fire and Explosion Investigator, and a Certified Vehicle Fire Investigator.

He received his Pro Board certification through the National Board on Fire Service Professional Qualifications as a Fire Investigator, NFPA 1033. He has received certifications through the National Fire Academy, Public Agency Training Council, and other agencies. Mr. Foster was also a reserve officer with the Noblesville, Cicero, and the Hamilton County Sheriff Departments. He was the chief investigator with the Madison County Indiana Fire Investigation task force.

As a prior State of Indiana certified fire instructor, he has instructed courses throughout the state related to fire service topics and certification courses related to fire, investigations, firefighter, EMS, and hazardous materials.

Mr. Foster has performed fire origin and cause investigations, interviews, and interrogations of suspects and witnesses and has testified in criminal cases involving law enforcement activities. He has given depositions and court testimony in findings and technical related issues as an expert witness. Areas of expertise include, management of fire scene investigations, fire scene analysis, evidence and data collection, monitoring of destructive and non-destructive testing, investigative interviews and scene photography. Mr. Foster has conducted over 1,400 fire investigations encompassing residential and commercial structures, vehicles to include farm and industrial vehicles, farm structures, RV's, alternative fuel vehicles, and fatal fires.

JAMES FOSTER CV
Page 2

## Professional Engagements

- **Fire/Arson Investigations**
  - Fire Investigator – Carmel, IN (1995 – 2016), Worked directly with other shift investigators to investigate fires in the city of Carmel and in Hamilton County, IN.
  - Fire/Arson Investigations – Markleeville, IN (1985 – 1996), Investigated fires and arson throughout the Adams Township.
  - The Madison County Fire Investigation Taskforce – Madison County, IN (1990 – 1996) Fire/Arson Investigator / Chief Investigator for taskforce.
  - Fire Investigator – varied locations (2014 – 2018), Investigated cause and origin of fires throughout Indiana

- **Instructor/Subject Matter Expert**
  - Fire Fighter and EMS Certification – varied locations (1975 – 2018), Taught courses to fire and police to meet certification requirements of the State of Indiana certifications; Over 2000 hours
  - EMT Courses – Indiana, Taught courses to certify fire personnel along with others as an EMT in Indiana. Over 1,400 students certified throughout the time of Instruction.
  - Fire Certification Education – Indiana, Taught courses on firefighting, investigations, inspection, and hazardous materials.

## Forensic Engagements

- **Fire, Arson and Explosion Investigations**
  - Commercial, residential, industrial, vehicles, marine vessels, farm equipment, construction equipment, off road vehicles
  - Fire fatality and burn victim investigations
  - Fire protection/alarm systems analysis

- **Instructor/Subject Matter Expert**
  - Classroom and hands-on classes in fire origin and cause identification to fire and police departments

- **Field Research for Fire Scenarios**
  - Appliance failures
  - Ignitable liquids
  - Chemical fires
  - Explosions, NG, LPG, Hazardous Materials, Incendiary
  - Vehicles, automotive, truck, motor homes, marine, off road, heavy equipment, industrial equipment

## Professional Experience

- **Independent Fire Consultant**                                           **2020 - Present**

- **Rimkus Consulting Group, Inc.**                                         **2018 – 2020**

  - Fire Consultant – Fire Division
    Responsible for investigating fire and explosion causation in commercial structures and facilities, residential structures, automobiles, industrial and heavy equipment. Investigate fires involving appliances and electrical devices. Assess potential liability issues. Collect, document and preserve evidence to ensure chain of custody, conduct interviews with witnesses, responding firefighters, state fire marshal agencies and other pertinent third-party individuals and organizations.

2

**JAMES FOSTER CV**
Page 3

Prepare detailed, written investigative reports pertaining to the origin and cause of fire losses. Provide expert technical and scientific support to clients for litigation purposes.

- **EFI Global**                                                                    2014 – 2018
  - Senior Fire Investigator
  Responsible for investigating fire and explosion causation in commercial structures and facilities, residential structures, automobiles, industrial and heavy equipment. Investigate fires involving appliances and electrical devices. Assess potential liability issues. Collect, document and preserve evidence to ensure chain of custody, conduct interviews with witnesses, responding firefighters, state fire marshal agencies and other pertinent third-party individuals and organizations. Prepare detailed, written investigative reports pertaining to the origin and cause of fire losses. Provide expert technical and scientific support to clients for litigation purposes.

- **Carmel Fire Dept.**                                                              1995 – 2016
  - Lieutenant, Firefighter, Paramedic, Shift Fire Investigator
  Provide EMS and Fire services to the residents of Carmel and responding areas through 911 emergency calls. Fire Officer responsible for station and engine response and personnel assigned. Shift fire investigator responsible for investigating fires in the response district and community where requested. Fire response responsibilities include incident command, size-up and fire attack and fire scene safety. EMS response responsibilities include providing emergency medical care to medical or trauma related patients. Fire and EMS instructor providing education to other departments in the community and surrounding counties. Computer and data entry responsibilities as an officer entering reports and response CAD system. Continuing education requirements to maintain EMS, fire, Haz-mat and investigation certifications.

- **Hamilton County Emergency Medical Services**                                     1975 – 1995
  - Shift Supervisor, Paramedic, EMS Instructor
  Responsibilities included responding to EMS related calls in Hamilton County Indiana. Providing Advanced Life Support to residents and citizens of the county and response area. Providing education and training to members of the service and to other communities and the county fire services. EMS related instruction to various agencies including EMT, paramedic and fire certification courses.

- **Madison County Emergency Management**                                            1985 – 1995
  - Chief Fire Investigator
  Responsibilities included responding in Madison County Indiana to assist local fire departments investigating fires and explosions. Responsible for the fire investigation task force members scheduling and maintaining education requirements. Report writing and data entry related to the investigation and provide testimony in court related to the investigation and findings. Interviews with witnesses and firefighters and third parties related to events and to the investigation.

- **Hamilton County Sheriff Dept.**                                                  1987 – 1996
  - Reserve Officer
  As a member of the reserve division was responsible for providing law enforcement activities for the Hamilton County community including, Road patrol, Investigate accidents, criminal arrest and courtroom testimony. As a sergeant was responsible for other reserve members in the division. Review reports and provide education to members. Responsible for the Hamilton County Court system providing security and safety. Responding to emergencies within the community involving accidents and criminal activity. Conducting interviews and arrest. Collecting evidence related to criminal or accidental activities.

- **Fire Departments**                                                               1973 – 2016
  - Firefighter, Paramedic, Instructor and Fire Investigator

JAMES FOSTER CV
Page 4

Worked as part-time employee and volunteer for a number of fire departments.

Fishers Fire Dept: Part-time employment responsible for response to 911 related calls for fire and EMS. Providing education and training for members to obtain and maintain certifications. Provide fire inspections to local businesses using fire and building codes.

Noblesville Fire Dept.: Part-time employment responsible for response to 911 related calls for fire and EMS.

Westfield Fire Dept.: Part-time employment responsible for response to 911 related calls for fire and EMS.

Adams Township Fire Dept.: Volunteer member of the department responsible for fire and EMS response to emergency calls in the community. Captain of the department responsible for fire investigations and incident command when needed.

Chesterfield Union-Township Fire Dept.: Volunteer member of the department responsible for fire and EMS response to emergency calls in the community. Fire Marshal for the department responsible for business inspections and fire investigations.

## Education and Certifications
- **Certified Fire Investigator:** Internal Association of Arson Investigators, Inc.,#14-101758 (2016)
- **Certified Fire Investigator:** National Board on Fire Service Professional Qualifications, #10688- 10659 (2015)
- **Certified Vehicle Fire Investigator:** National Association of Fire Investigators, #10688-10659v (2014)
- **Certified Safety Officer:** State of Indiana, #6656-1339 (2014)
- **Instructor II and III:** State of Indiana, #14111 (2005)
- **EMT-Primary Instructor:** State of Indiana, #6656-1339 (2004)
- **Paramedic license:** State of Indiana, #6656-1339 (2004)
- **Fire Inspector I and II:** State of Indiana, #14111 (2003)
- **Fire Medic IV #14111 & Driver Operator Pumper:** State of Indiana, #14111 (2001)
- **Instructor II and III:** State of Indiana, #14111 (2000)
- **Fire Officer I and II (NFPA) / Firefighter I and II (NFPA) / Instructor First Class:** State of Indiana, #14111 (1999)
- **Fire Investigator I (NFPA):** State of Indiana, #14111 (1998); Illinois (#129.433174)
- **Hazmat Technician & Instructor Second Class:** State of Indiana, #14111 (1994)
- **Fire Service Management:** State of Indiana, #14111 (1992)
- **Fire Arms Qualification (Sharpshooter):** Hamilton County Sheriff's Department, (1991)
- **Law Enforcement Academy (Reserve):** Hamilton County Sheriff's Department (1989)
- **EMS Management Development Program:** Indiana University, (1986)
- **EMS Primary Instructor Course:** State of Indiana, (1985)
- **Second Class Firefighter Certification Course:** State of Indiana, (1980)

## Continuing Education
- **CFI Trainer.net:** Over 230 hours (tested) NFPA 921 and 1033 compliant (2006-2018)
- **Public Agency Training Council:** Forensic Pathology for Investigators (2017); Investigative Techniques Using Social Networking Sites & Vehicle Fires Investigation, 24 hours (tested) (2016); Detective and New Criminal Investigator &

4

**JAMES FOSTER CV**
**Page 5**

Arson Scene Search (2014); Fire and Arson Fatality Fire Scene Investigation & Meeting the Requirements of NFPA® 1033 (2013); Fire Service Leadership and Ethics (2012); Cults, Occults and Satanic Crimes Investigation, 16 hours (tested) (1999)

- **National Fire Academy:** Interviewing/Interrogation Techniques and Courtroom Testimony (2014); Indianapolis Fire. Electrical for the Fire Investigator, 16 hours (tested) (2013); Forensic Evidence Collection (2011); Fire / Arson Origin and Cause Investigations (2008); Plans Review for Inspectors & Hazardous Materials Operating Site Practices (2003); Principles of Fire Protection Structures and Systems (2002); Fire Inspection Principles (2001); ALS Response to Hazardous Materials Incidents (1999)

- **IAAI:** Ohio IAAI Chapter, NFPA 921 Update 8 hours (tested) & Alternative Fuel Vehicles NFPA, Fire Investigation Edition, 8 hours (tested) (2017); Indiana IAAI Chapter Conference, Live Burn Cells, Vehicle Fires, Fire Pattern Progression and Analysis, Evidence Collection, Sampling and Spontaneous Heating, 21 hours (tested) (2017); Illinois IAAI Chapter Conference, 24 hours (tested), Case Studies, Ventilation and Flow Effects, Fire Dynamics, Arc Mapping, Fire Patterns, Fire Scene Reconstruction, NFPA 921 / 1033 Related to Explosion Scene Examination and Documentation, Household Appliance, Gas Fires, Identify Evidence of Failure (2016); Indiana IAAI Conference, 21 hours (tested) (2015); Indiana IAAI Chapter Conference, 21 hours (tested) Indiana IAAI Conference,
21 hours (tested) (2014); Illinois IAAI Chapter, Vehicle Fire Investigations, 16 hours (tested) (practical) (2014); Indiana IAAI Chapter Conference, 21 hours (tested) Basics of Fire Investigation, Forensic Scene Examination and Evidence Collection, Fire Debris Analysis, Truck and Bus Fires, Origin and Cause in Diesel, Alternate Fuel and Hybrid Vehicles, Use of Alternate Light Sources (2012); Indiana IAAI Chapter Conference, 21 hours (tested) NFPA 921 / 1033 Updates, Fatal Fire Investigations, Building's Electrical System Assisting in Area of Origin (Arc Mapping), Post- Flashover Fires, Ventilation Importance, Propane and Natural Gas Systems and Fires, CSST Investigations and Litigation, Propane and Natural Gas Appliance Fires (2011); Ohio IAAI Chapter, Vehicle Fire Investigations, 32 hours (tested) (practical) (1996)

- **International Code Council:** IDHS Fire-Resistive Construction Provisions of the IBC, 8 hours (tested) (2003); IDHS Means of Egress Provisions of the IBC, 7 hours (tested) (2003); Overview of the International Fire Code, 14 hours (tested), Indiana General Administrative Rules, 8 hours (tested), Structures & Systems IBC, 4 hours (practical) (2003); 2000 IBC Hazardous Materials Course, 6 hours (tested) (2005);

- **Fire Department Instructors Conference:** Cause and Origin, A Systematic and Comprehensive Investigation, 4 hours, Axiom of Leadership, 8 hours (tested) (2003); Cause and Origin Systematic Investigation, 4 hours, Truck Company Operations, 4 hours, Hazardous Materials Chemistry, 4 hours, Public Information Management, 4 hours, Inspection of Covered Malls with Assembly Occupancies, 4 hours (practical) (2002); Fire Department Instructors Conference, Advanced Origin and Cause, 4 hours, Incident Safety Officers Academy, 8 Hours (tested), Gathering Building Intelligence 4 Hours, Building Fire Pump Testing, 4 hours (practical) (2004);

- **Fire Department Courses:** DFL Honor Guard Training, Carmel Fire Department 40 hours (tested) (practical) (2010); St. Vincent's Hospital, Carmel Fire Department, Human Cadaver Lab Practical (2009); Carmel Fire Department, Leadership Course, 8 hours (tested) (practical) (2008); Fire Department Instructors Conference, Reading Buildings/ Size-up, 4 hours (2012); CSX Transportation, Emergency Response to Railroad Incidents, 21 hours (tested) (2008); Cicero Fire Department, State of Indiana, Master Firefighter Tactics Course 80 hours (Tested) (1998); Indiana Fire Instructors Association, Indianapolis Fire School, Fire Death Investigation, 8 hours (1995); Anderson Fire Department, State of Indiana, Fire Service Management Course, 60 hours (tested) (1992); Richmond Fire Department, State of Indiana, Fire/Arson Investigation Course, 64 hours (tested) (1990); Fishers Fire Department, State of Indiana, Fire Prevention Course, 60 hours (tested) (1990); Target Solutions, Carmel Fire Department, NFPA 1500 Hazard Communication, 4 hours (tested) (2015); Target Solutions, Carmel Fire Department, NFPA 1001 Personal Protection Equipment, 4 hours (tested) (2014); Carmel Police Department, Who, What, When, Where and How Fire Death Investigation, 8 hours (1996);

- **Federal Programs:** National Insurance Crime Training Academy, Smoke and Ash Fraud Investigation, 4 hours (tested) (2018); U.S. Department of Justice, Communication Skills, Report Writing and Courtroom Testimony for Forensic Analysts, 4 hours (tested) (2017); Emergency Management Institute (FEMA) IS-100 Incident Command, 40 hours (tested), IS-700 Incident Command, 16 hours (tested) (2005); US Department of Homeland Security, WMD Hazardous Materials Evidence Collection, 16 hours (tested) (practical), WMD Crime Scene Management, 8 hours (tested) (practical) (2004); Federal Bureau of Investigations, Legal Matters, Probable Cause, Evidence, Search and Seizure, Arrest Procedures, Liabilities and Interrogation, 6 hours (1986);

**JAMES FOSTER CV**
Page 6

- **Forensic:** West Virginia University, Forensic Science 101, 8 hours (tested), Principles of Death Investigation, 4 hours (tested), Forensic Evidence Collection, 8 Hours (tested) (practical), Forensic Photography, 8 Hours (tested) (practical), Interviewing/Courtroom Testimony, Expert Witness (2013); International Association of Special Investigation Units, Arson Investigative techniques, 6 hours (tested) (2012)
- **Other:** I Sight , Investigating on the Dark Web, 1 hour (2018); Indianapolis Fire, Police and GMRC Special Investigations, Origin and Cause and Burn Cell Demonstration, 7 hours (tested) (2016); National Insurance Crime Training Academy, Using Social Networking for Investigations, 4 hours (tested) (2016); Improvised Explosive Devices, Health Issues at the Investigation Scene, Public v/s Private Fire Investigations, Cadaver Dogs, Investigating Fatal Line of Duty Deaths, Ethics Review (2016); National Insurance Crime Training Academy: Insurance Fraud Investigation, 4 hours (tested) (2016); Investigating Vehicle Theft Fraud, 4 hours (tested) (2016); Wayne Twp FD, Indianapolis Fire, State of Indiana FMO, Practical Fire Scene Investigation Course, 16 hours (tested) (2014); Blue Card Incident Command Program Certification, 80 hours (tested) Practical (2013); Insurance Fraud Seminar, NSPII, IAAI, IASIU, ATF, From the Fire Scene to the Courtroom, 8 hours (tested) (practical) (2013); Fire Department Training Network, Engine Company Operations I, 24 hours (tested) (2011); Indiana Alliance of Hazardous Materials Responders, Response to Cargo Tank Truck Emergencies, 16 hours (tested) (2004); Ward Manufacturing, CSST Gas Line Installation Training, 4 hours (2001); National Technology Transfer, National Fire Alarm Code, 14 hours (tested) (practical) (2001); EL Du Pont Company, Hazardous Materials Technician Refresher Training, 16 hours (tested) (practical) (1993); State of Indiana, Hazardous Materials Technician Course, 80 Hours (tested) (1991); State of Indiana, Fire/Arson Investigation & Fire Prevention/Inspection & Strategy and Tactics #14111 (1990)

# **EXPERT REPORT**

*Republic Services of Indiana, Limited Partnership*

*vs.*

*Coe Heating & Air Conditioning, et al.*

Case No. 1:21-CV-00108

United States District Court, Northern District of Indiana, Fort Wayne Division

**Prepared for:**

Lewis Kappes, P.C.
One American Square, Ste. 2500
Indianapolis, Indiana 46282

**Prepared by:**

James P. Foster, CFI, CEFI, CVFI
7850 Parkdale Drive
Zionsville, Indiana 46077

November 18, 2022

Exhibit B

<u>Qualifications and Publications</u>

I am a Certified Fire Investigator, a Certified Fire and Explosion Investigator, and a Certified Vehicle Fire Investigator. Throughout my career, I have conducted more than 1,400 fire investigations including numerous residential and commercial structure fires. I hold a Pro Board certification through the National Board on Fire Service Professional Qualifications as a Fire Investigator, NFPA 1033. I have also received certifications through the National Fire Academy, Public Agency Training Council, and many other agencies. A copy of my *Curriculum Vitae*, which includes all publications I have authored in the past ten (10) years and a description of my qualifications, is attached as **Appendix 1**.

<u>Overview of Opinions</u>

On December 3, 2019, after thorough analysis of the site and artifacts from the site, I provided my opinions to Republic Services about the cause and origin of the March 19, 2019 fire which is the subject of this lawsuit. Additional examinations have been conducted since that time and more information has been analyzed. However, my initial conclusions from the December 3, 2019 report remain unchanged. Those conclusions are as follows:

1. A fire occurred inside the maintenance structure located along the west side of the property. The fire involved the south end of the structure where trash dumpsters were repaired and finished.

2. The fire involved the south end of the facility where ceiling tube heaters had recently been installed.

3. The cause and origin of the fire is a direct result of the open infrared tube heaters installed in an area where painting and other procedures were performed. The installation of this type of heater is not recommended in this environment. (*See* expert report of Nicholas Ozog). Paint and other flammable products used in the repair of trash dumpsters collected on and inside the tube heaters and ignited.

<u>Factual History</u>

A fire occurred at the Republic Services ("Republic") facility located 6231 MacBeth Road, Fort Wayne Indiana on March 19, 2019. At the time, I was employed as a Fire Consultant at Rimkus Consulting Group, Inc. ("Rimkus"). A representative from Republic retained Rimkus after the fire to evaluate the origin and cause of the fire and to determine if recently installed heaters may have contributed to cause the fire.

The building which suffered the fire loss was a maintenance repair and employee locker and office building. The area where the fire appeared to have originated was at the south end of the building where Republic's trash dumpsters were repaired and repainted.

The dumpster maintenance included operations such as repairing, sanding, patching, and repainting dumpsters. Work in this included the use and storage of flammable and other combustible materials. Welding was also done when needed to repair metal components on the dumpsters. Painting operations occurred in the area on a daily basis using commercial spray paint machines. Witnesses described the room as being covered in blue overspray and paint "dust" from painting activities. Photographs of the interior of the paint area before the fire are depicted below:

 

The painting area, according to employees, operates during the daytime hours and the area is cleaned each day. Based on interviews with witnesses on scene, on the day of the fire, work had been completed in the south end of the building. This work included welding to repair trash dumpsters, as well sanding and painting throughout the day. Work in the paint area was completed around 3:00 p.m. and employees had cleaned the area following the completed work day.

There were no indications of any problems at the time the employees left the facility at 4:00 – 4:30 p.m. A facility manager, Fred Jones, completed a walk through that included the maintenance facility where work had been done. He observed all lights and doors secured. Nothing was observed that was out or ordinary. There was no indication of any problems when that observation was completed at approximately 6:00 – 6:30 p.m.

Based on information obtained from witnesses, including Republic employees on scene, 3 Space-Ray infrared gas tube heaters had been installed in the paint and welding area within the past two months. The heaters were supplied by electrical power and propane fuel. There had been no problems related to these heaters prior to the fire event.

Based on information obtained from witnesses and other documents, Coe Heating and Air Conditioning ("COE") had installed the heaters around January 19, 2019. The instruction and installation manual for the heaters contain the following warning:

> This heater is not an explosion proof heater. Where the possibility of exposure to volatile and low flash point materials exist, it could result in property damage or death. This heater must not be installed in a spray booth where the heater can operate during the spraying process. Consult your local fire marshal or insurance company.

A fire was reported to 911 after employees working outside the building observed fire and smoke coming from the building near the Middle East overhead door. They indicated flames appeared to be coming from the top of the building. The fire increased and upon fire department arrival had spread throughout the painting area throughout the south end. The fire was extinguished and most of the south end of the building area had collapsed.

On March 20, 2019, I was employed by Rimkus Consulting as a Fire Consultant. Republic Services engaged Rimkus to investigate the fire to determine if the cause and origin could be determined. I visited the site on March 20, 2019. During my initial examination and throughout the investigation, I applied the methodology of fire investigation using a systematic approach as recommended by the National Fire Protection Association, NFPA 921 – "Guide for Fire and Explosion Investigations" and NFPA 1033 "Standard for professional Qualifications for Fire Investigator."

After arriving, I determined that the loss and time required to investigate the scene would take more time and would require heavy equipment to evaluate the damage and secure evidence from the scene. Photographs and additional information was obtained from Republic Services' employees, including the site manager, Kyle Orr. I interview Mr. Orr and other witnesses on scene. After my initial investigation, it was determined that additional parties, including Coe Heating and Air Conditioning, Inc. (Coe) and Gas Fired Products, Inc. (Space-Ray) needed to be notified and a joint examination of the site was needed.

A joint examination of the site was conducted on March 3, 2020. During this inspection, the heaters were uncovered from the fire debris for examination. I observed paint and other debris on the tube heaters, on the reflector assembly around the tube heaters, and inside the ventilation tubes of the heaters. Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This indicates the fire origin occurred in the east heater near the control box associated with the ignition of the propane fuel. A buildup of paint was observed in the ventilation pipe and reflector assembly of other tube heaters and in the tube heater of fire origin. The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees was high in the building upon discovery. This combine with the fire damage to the south heater that was at ceiling level indicated the possible location of origin.

Based on witness interviews, other potential ignition sources from other electrical components were turned off at the time of the fire loss. According to employees, everything had been turned off when leaving at 4:30 p.m. on the date of the fire. While there is evidence individuals may have smoked inside or near the facility on occasion, all individuals finished working in the maintenance area by late afternoon. Accordingly, the passage of time between any employees being inside or near the maintenance area and the time of the fire loss remove potential cigarettes as a potential source. Similarly, while welding operations had occurred earlier in the morning of the day of the fire, all operations had ceased for more than 12 hours before the fire occurred. Several employees had indicated over the time period following the welding operation that there were no odors or indications of fire potential. The area was cleaned at 4:00 p.m. and checked again at 6:00 p.m. with no indication of problems.

Information provided at the time of the fire site examination indicated temperatures prior to the fire were higher than what the settings were for the thermostat. Once the temperature dropped the ignition of the infrared gas tube heaters ignited. This occurred prior to the fire discovery. The heaters were the only source of ignition in the area of origin. In summary, other potential ignition sources were identified in the general area of the fire origin. However, these other potential sources were ruled out due to their location and origin location.

During the joint examination on site, I retrieved paint samples and other debris samples from inside the tube heaters. I packaged them securely and sent them to Forensic & Scientific Testing, Inc. for laboratory analysis. On April 14, 2020, Ms. Sharee B. Wells, F-ABC (Forensic Scientist) provided the results of the laboratory analysis. The samples came back positive for petroleum distillate, consistent with ignitable liquids. (See Lab Results, attached as **Appendix 2**).

During joint examination, the three (3) gas tube heaters were securely retrieved and transported to Rimkus' secure facility in Indianapolis.

At the request of Lewis Kappes, I prepared an initial investigation report, dated December 3, 2019, based on information available at the time, including but not limited to my own visual observations of the site and debris on scene, lab results from the debris analysis, as well as interviews I conducted with multiple witnesses on scene. My initial report is incorporated in this report and attached as **Appendix 3**.

The following images and descriptions were contained in my initial report:

**Photograph 1**
East end of building at location identified as the paint room.



**Photograph 2**
Paint and other combustibles material inside ventilation pipe of tube system



**Photograph 3**
Tube heater components and paint on reflector of unit, In area of fire origin.



**Photograph 4**
Tube heater and paint on reflector along with charring and more heat on this heater unit than others. Indication origin area.



7

A laboratory examination of the tube heaters and other evidence from the site was conducted on February 24, 2022 at Rimkus' facility in Indianapoliis. The items were inspected and were stored back in the indoor evidence storage room after the examination. Procedures for multi-party examinations were followed in accordance with ASTM E860. (*See* November 18, 2022 letter from Louis Inendino, attached as **Appendix 4**).

A second laboratory joint examination took place at Rimkus' secure facility on August 23, 2022. I observed burn patterns on the testers, which showed fire damage more severe at the middle or center heater and fire and heat damage on the north heater showed heat and fire spread from the south side or middle or center heater. The fire and heat damage pattern on the south heater showed heat and fire spread from the north side or middle or center heater. Based on my training and experience, these patterns indicate the spread of heat and damage as it related to the origin. The lab examinations of the tube heaters did not change my opinion of the ignition source of the fire from my initial report (*see* **Appendix 3**).

### Materials Considered

In accordance with NFPA 921, I considered all information I observed during the multiple site investigations and laboratory examinations. I also have relied upon statements and information provided by witnesses on site immediately following the fire, including but not limited to Kyle Orr. I have also considered transcripts from certain depositions which have occurred in this case, including the depositions of Kyle Orr, Samir D., Fred Jones, etc. I have considered the photographs and other files retained by Rimkus in the file relating to this fire loss.

I have considered the Occupational Safety and Health Administration's 1910-107 Spray Finishes guidance. I have considered the MSDS sheet from the product manufacturer. I have relied on my training and experience as a Certified Fire Investigator with 40 years of experience as a fire and hazardous materials technician and fire service. I reserve the right to supplement this portion of my report as additional information becomes known or available.

### Methodology and Basis of Opinions

All inspections were conducted pursuant to NFPA 921. My opinions were formulated using NFPA 921 as a guide. I also relied on my personal observations, interviews with eyewitnesses, deposition transcripts from witnesses in this case, laboratory results from FAST, and other available information provided to me.

Specifically, I observed build-up of paint and debris on the three Space-Ray heaters, the deflectors, and inside the ventilation tubes of the heaters. I also observed the charring and burn patterns on the heaters and on and around the structure. I also considered the positive results from the laboratory. My observations are reinforced by photographs taken on scene and in the laboratory inspection at Rimkus.

<u>Statement of Compensation</u>

My hourly rate for work on this assignment and any testimony is $150 per hour, excluding expenses.

<u>Previous Testimony</u>

I have testified in the following case(s) in the past four (4) years:

- o *Newegg, Inc., et al. v. Inland Products, Inc., et al.,* Cause No. 49D07-CT-005221 Marion Superior Court 7, Indianapolis, Indiana.

<u>Conclusions</u>

My initial conclusions from the December 3, 2019 report remain unchanged. Those conclusions include the following:

1. A fire occurred inside the maintenance structure located along the west side of the property. The fire involved the south end of the structure where trash dumpsters [were] repaired and finished.

2. The fire involved the south end of the facility where ceiling tube heaters had recently been installed.

3. The cause and origin of the fire is a direct result of the open infrared tube heaters installed in an area where painting and other procedures [were] performed. The installation of this type of heater is not recommended in this environment. (See expert report of Nicholas Ozog). Paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited.

*I reserve the right to supplement this report as additional information becomes known.*


*James Foster*
_____
James P. Foster

Date: November 18, 2022

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
2                    FORT WAYNE DIVISION
3                   CASE NO. 1:21-CV-00108
4    REPUBLIC SERVICES OF INDIANA,      )
     LIMITED PARTNERSHIP,               )
5                                       )
             Plaintiff,                 )
6                                       )
     vs.                                )
7                                       )
     COE HEATING & AIR CONDITIONING,    )
8    INC.; and GAS-FIRED PRODUCTS,      )
     INC. d/b/a SPACE-RAY,              )
9                                       )
             Defendants.                )
10   _____

11

12          The video deposition upon oral examination of
13       JAMES P. FOSTER, CFI, CFEI, CVFI, a witness
14       produced and sworn before me, Lisa C. Pierce, a
15       Notary Public in and for the County of Hamilton,
16       State of Indiana, taken on behalf of the Defendants
17       at Lewis Kappes, One American Square, Suite 2500,
18       Indianapolis, Marion County, Indiana, on
19       January 24, 2023, commencing at the hour of
20       11:16 a.m., pursuant to Applicable Rules of
21       Procedure, with written notice as to time and place
22       thereof.

23

24

25   Job No. CS5675427

Page 2

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3      Thomas Jones
        James E. Zoccola
 4      LEWIS KAPPES
        One American Square
 5      Suite 2500
        Indianapolis, IN 46282
 6      P: 317.639.1210
        F: 317.639.4882
 7      E: tjones@lewiskappes.com
        jzoccola@lewiskappes.com
 8
 9  FOR THE DEFENDANTS:
10      Martin J. Gardner
        GARDNER & RANS, P.C.
11      117 Perspective Drive
        Suite 2
12      Granger, IN 46530
        P: 574.233.6035
13      E: mgardner@gardnerandrans.com
14      James W. Hehner
        Ben Katchur
15      CLENDENING JOHNSON & BOHRER, P.C.
        225 North Delaware Street
16      Indianapolis, IN 46204-2137
        P: 812.382.8559
17      E: jhehner@lawcjb.com
18
19  THE VIDEOGRAPHER:
20      Greg Dupuis
21
22
23
24
25
```

Page 3

```
 1         INDEX OF EXAM
 2              Page
 3  DIRECT EXAMINATION..................
        Questions by Martin J. Gardner     6
 4      Questions by James W. Hehner     384
 5  CROSS-EXAMINATION...................
        Questions by Thomas Jones        389
 6
    REDIRECT EXAMINATION...............
 7      Questions by Martin J. Gardner    399
        Questions by James W. Hehner     404
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          INDEX OF EXHIBITS
 2                              Page
 3  Deposition Exhibits:
 4  Exhibit G - Two Color Photos.........    72
    Exhibit Z, Page 3 - Color Aerial Photo    47
 5  Exhibit Z, Page 2 - Color Aerial Photo    54
    Exhibit DD - Twelve Color Photos......   137
 6  Exhibit SS - Second Amended Notice of
        Video Deposition.........    20
 7  Exhibit TT - Second Amended Subpoena
        Duces Tecum..............    20
 8
 9
    Deposition Exhibits Retained by Counsel:
10
    Exhibit C - Invoice 6624965 CCMSI....    87
11  Exhibit D - Handwritten Notes, 7 Pages    34
    Exhibit E - Fred Jones Document.......   188
12  Exhibit F - Letter Dated December 3, 2019  67
    Exhibit P - Product Specification.....   351
13  Exhibit R - Modine Installation and
        Service Manual Sheet......   270
14  Exhibit S - Modine 6-189.9 November 2014  271
    Exhibit V - Korte Does It All Proposal   271
15  Exhibit W - 6231 MacBeth Diagram.....   276
    Exhibit Y - December 15, 2022 Email...   281
16  Exhibit AA - Color Photographs........   211
    Exhibit CC - Color Photographs.......   235
17  Exhibit FF - Color Photographs........   248
    Exhibit GG - Letter Dated November, 2022  311
18  Exhibit HH - Evidence Custody Form....   315
    Exhibit KK - Color Photographs.......   317
19  Exhibit LL - Color Photographs.......   321
    Exhibit MM - Color Photographs.......   324
20  Exhibit NN - Color Photographs.......   325
    Exhibit PP - Color Photographs.......   341
21
22
23
24
25
```

Page 5

```
 1                11:16 a.m.
 2           January 24, 2023
 3      THE VIDEOGRAPHER:  Good morning.  We are going
 4  on the record at 11:16 a.m. on January 24th, 2023.
 5  Please note that the microphones are sensitive and
 6  may pick up whispering and private conversation.
 7  Please mute your phones at this time.  Audio and
 8  video recording will continue to take place unless
 9  all parties agree to go off the record.
10      This is media unit one of the video-recorded
11  deposition of James P. Foster taken by counsel for
12  the defendant in the matter of Republic Services of
13  Indiana, Limited Partnership, versus COE Heating &
14  Air Conditioning, Inc., et al., filed in the
15  US District Court, Northern District of Indiana,
16  Fort Wayne Division, Case Number 1:21-CV-00108.
17  The location of this deposition is Lewis & Kappes
18  law firm, Indianapolis, Indiana 46282.
19      My name is Greg Dupuis representing Veritext,
20  and I'm the videographer.  The court reporter is
21  Lisa Pierce from the firm Veritext.  I'm not
22  related to any party in this action nor am I
23  financially interested in the outcome.  If there
24  are any objections to proceeding, please state them
25  at the time of your appearance.  Counsel and all
```

2 (Pages 2 - 5)

Page 6

1 present will now state their appearances and
2 affiliations for the record beginning with the
3 noticing attorney.
4     MR. GARDNER:  Martin Gardner for Defendant
5 COE Heating & Air Conditioning, Inc.
6     MR. JONES:  Thomas Jones and Jim Zoccola for
7 the plaintiff.
8     MR. HEHNER:  James Hehner and Ben Zoccola
9 [sic] for Gas-Fired Products, Inc. doing business
10 as Space-Ray.
11     THE VIDEOGRAPHER:  Will the court reporter now
12 swear in the witness, and then we may proceed.
13     THE STENOGRAPHIC REPORTER:  Would you raise
14 your right hand, please.
15     JAMES P. FOSTER, CFI, CFEI, CVFI,
16 having been first duly sworn to tell the truth, the
17 whole truth, and nothing but the truth relating to
18 said matter, was examined and testified as follows:
19     THE WITNESS:  Yes, I do.
20 DIRECT EXAMINATION,
21 QUESTIONS BY MR. GARDNER:
22 Q.  Can you please state your full name on the record.
23 A.  James P. Foster.
24 Q.  You and I have met a couple of times in this case
25     and maybe even earlier in our careers.  Can I call

Page 7

1     you Jim today?
2 A.  Yes, you can, sir.
3 Q.  You can call me Marty; just makes the dep go
4     faster.  How old are you, Jim?
5 A.  I am 67.
6 Q.  Your date of birth?
7 A.  7-3 of 1955.
8 Q.  And what's your current address, home address?
9 A.  7850 Parkdale Drive, Zionsville, Indiana 46077.
10 Q.  Who's your current employer?
11 A.  My current employer I -- that I work for on a
12     regular basis right now is Northside Trailer.  And
13     I work there as a mechanic.
14 Q.  How long have you worked at Northside Trailer, Jim?
15 A.  Two -- almost year-and-a-half, since June of 2021,
16     I guess is it.
17 Q.  What is the business address of Northside Trailer?
18 A.  Ooh, I don't know offhand.  It's on State Road 32.
19     It's about 14,000 block.  But I don't know --
20     it's -- it's next to the Indianapolis Executive
21     Airport, if you know where that's at, Hamilton
22     County.
23 Q.  Unfortunately I don't.
24 A.  Okay.
25 Q.  All right.  And are you -- did you say full-time or

Page 8

1     part-time?
2 A.  I'm full-time there.
3 Q.  And what days and hours do you work?
4 A.  Monday through Friday.
5 Q.  Your shift?
6 A.  Just eight to five.
7 Q.  Hourly?
8 A.  Yes.
9 Q.  You -- oh, here come some papers.  You said you
10     were a mechanic.  Can you give us your job duties
11     at Northside Trailer.
12 A.  Basically we do all types of mechanical work on
13     trailers for -- at this point in time.
14 Q.  Do you have any certification as a mechanic?
15 A.  No, I do not.
16 Q.  And in the last year-and-a-half, have you had --
17     I'm not gonna ask your income here.  But have you
18     had any other sources of income other than working
19     with Northside Trailer?
20 A.  Yes.  I have Social Security and a pension from the
21     City of Carmel Fire Department.
22 Q.  Your curriculum vitae and your information on your
23     LinkedIn indicates reference to doing some private
24     work as a fire investigator after leaving Rimkus?
25 A.  Yes.

Page 9

1 Q.  Can you tell us about that.
2 A.  I still do that kind of on a very part-time basis
3     when asked.  I have a -- there's a company out of
4     Florida that has a -- an insurance company here in
5     Indiana that they occasionally need someone to do
6     fire investigations for.  And that's called Fire
7     Forensics.  So I'm still involved in the
8     investigation aspect of things.
9 Q.  When were you last employed with Rimkus?
10 A.  Ooh.  June --
11 Q.  Just a month and year.
12 A.  In June of 2021, I believe it was.
13 Q.  The curriculum vitae that you provided indicates
14     your dates of employment with Rimkus Consulting
15     Group, Inc. was 2018 to 2020.
16 A.  So be over a year-and-a-half, whatever that would
17     be.  I can't -- it's 2020 then.  So I'm sorry.
18 Q.  Okay.  That's all right.
19 A.  Yeah.
20 Q.  You think it was June of 2020?
21 A.  2020, yes.
22 Q.  All right.  And when did you start working
23     part-time doing fire investigation work independent
24     of Rimkus?  And after your employment with Rimkus,
25     when did you --

3 (Pages 6 - 9)

Page 10

1   A.  Well, after my employment with Rimkus, I still
2       followed up on a lot of cases that were still --
3       that would occasionally come about --
4   Q.  You mean, that you started with --
5   A.  -- from -- from past --
6   Q.  -- Rimkus?
7   A.  Yeah.
8   Q.  I'm sorry.
9   A.  After I left Rimkus.
10  Q.  How many?
11  A.  I've had five or six cases come up that I've had to
12      do followup work with as well as two depositions.
13  Q.  In the five or six cases that you continued to work
14      on after leaving Rimkus in June of 2020, is this
15      case one of the five or six?
16  A.  Yes.
17  Q.  All right.  Have you, since leaving Rimkus in June
18      of 2020, prepared any expert reports in connection
19      with those five or six cases, outside of the one
20      you produced in December of 2022 in this case?
21  A.  I -- I don't think I've prepared any expert reports
22      that I haven't already completed prior to leaving
23      Rimkus.
24  Q.  So the only new expert report -- report you've
25      prepared since leaving Rimkus was the one in this

Page 11

1       case --
2   A.  Yes.
3   Q.  -- dated December 2022, right?
4   A.  Yes.
5   Q.  I think you mentioned giving a couple of
6       depositions.  When were those?
7   A.  One was three weeks ago in a case in Chicago.  I --
8       I don't have the date in front of me.  But ...
9   Q.  You could find that on --
10  A.  And I don't --I don't --
11  Q.  -- look at your calendar?
12  A.  I -- I can if you --
13  Q.  Yeah.  Hold on.  When's the last time you had your
14      deposition taken?  Three weeks ago.
15  A.  Three weeks ago.
16  Q.  Okay.  Let's go over a couple of ground rules.
17      You've been giving depositions for how many years?
18  A.  Well, I've been a fire investigator for 44 years.
19  Q.  How long ago was your first deposition?
20  A.  And my first deposition was actually when I began
21      at Rimkus, which would have been in -- my beginning
22      date there would have been 2000 --
23  Q.  Fourteen?
24  A.  No, it was -- '16, I think, it was when I was --
25  Q.  Oh.  So your first deposition was while you were

Page 12

1       with Rimkus?
2   A.  Yes.
3   Q.  Your curriculum vitae says that started in 2018.
4   A.  That -- yeah, okay.  That was '18.  I'm sorry.
5   Q.  So you never gave a deposition prior to calendar
6       year 2018.
7   A.  No, for Rimkus, that was when I first give one for
8       them.  I give one for EFI when I worked for them
9       in -- about 2016 was my first deposition.
10  Q.  How many depositions total do you think you've
11      given --
12  A.  In the --
13  Q.  -- in your career?
14  A.  -- 44 years I've been in the fire investigator,
15      it's -- I've given, like, six depositions total.
16  Q.  And in those six depositions total, were you
17      involved in the case in terms of determining cause
18      and origin?
19  A.  Yes, sir.
20  Q.  Okay.  So just a couple of ground rules.  If you
21      and I were having coffee together, we would talk at
22      the same time, and we would talk over top of each
23      other, and neither of us would care or notice.  But
24      our court reporter has to finish typing up a
25      question before she can start typing up an answer?

Page 13

1   A.  Okay.
2   Q.  So try your best, Jim, to slow down a little bit
3       and wait until the question's finished.  And we'll
4       try our best to make sure your answer's finished
5       before we start the next question.  Okay?
6   A.  Okay.
7   Q.  All right.  If there's a question you don't
8       understand, please let us know so that we can
9       rephrase it and get on the same page.
10  A.  Okay.
11  Q.  Otherwise I'll presume you understood the question.
12      All right?
13  A.  Okay.
14  Q.  We're going to take some breaks throughout today.
15      We might go as long as 5:00 today.  If you need to
16      take a break for an important phone call or
17      something, just let us know.  And we can
18      accommodate that so long as you answer the pending
19      question.  All right?
20  A.  Yes.
21  Q.  Are you on any medications today that could in any
22      way affect your ability to give a deposition that
23      might go through 5:00 today?
24  A.  No, sir.
25  Q.  The deposition you gave in Chicago approximately

4 (Pages 10 - 13)

Page 14

1      three weeks ago, how long did the deposition last?
2   A.   Four-and-a-half hours.
3   Q.   Is that case pending in Illinois or Indiana or
4      somewhere else?
5   A.   In Michigan.
6   Q.   I threw a dart and missed everything.  All right.
7      How long have you been involved in that case?
8   A.   Since 2020.
9   Q.   But you have not issued a cause-and-origin report
10      in that case?
11   A.   Yes.  I've issued a cause-and-origin report --
12   Q.   But you issued it --
13   A.   -- personally.
14   Q.   -- before leaving Rimkus.
15   A.   Yes.
16   Q.   I got it.  In the case where you were deposed three
17      weeks ago, were you retained by the plaintiff or
18      one of the -- a, sorry, a defendant?
19   A.   By the plaintiff.
20   Q.   Just in broad, general terms, what kind of fire
21      case are we talking about there?  You can make it
22      quick.
23   A.   This is a restaurant fire that involved spontaneous
24      ignition of rags.
25   Q.   And you rendered an opinion on cause and origin?

Page 15

1   A.   Yes.
2   Q.   Okay.  And did you use the word "probable" in your
3      report?
4   A.   Yes, sir.
5   Q.   And did you state your opinion in that report to
6      any degree of scientific or fire investigation
7      certainty?
8   A.   Yes, sir.
9   Q.   Okay.  And then you mentioned a -- that you took
10      two -- you sat for two depositions since leaving
11      Rimkus.  What was the other one?
12   A.   I had one for -- in Indianapolis, on the south side
13      of Indianapolis, at -- in Decatur area, for a
14      Newegg facility that caught fire.
15   Q.   The company called Newegg?
16   A.   Yes.
17   Q.   And you ren -- had you rendered, prior to your
18      deposition, a re -- final report rendering your
19      opinion as to origin and cause?
20   A.   Yes.
21   Q.   And did you utilize the word "probable" in that
22      report?
23   A.   Yes, sir.
24   Q.   And did you make reference to your degree of
25      scientific certainty or fire investigation

Page 16

1      certainty in that report?
2   A.   Yes, sir.
3   Q.   What -- what is the name of the law firm or lawyer
4      that re -- you worked with in connection with the
5      Michigan fire case for which you gave a deposition
6      about three weeks ago?
7   A.   Corsin -- I can't remember the name of the --
8      Corsin was the lawyer -- law firm.
9   Q.   Are they out of Chicago?
10   A.   Yeah.  123 Wacker Drive is their address I know.
11   Q.   Before we move away from that, do you remember the
12      name of the attorney who took your deposition three
13      weeks ago?
14   A.   No, I do not.
15   Q.   Okay.  Going back to the other deposition you
16      mentioned that involved a -- a fire pertaining to
17      the new -- a Newegg facility --
18   A.   Yes.
19   Q.   -- were you retained by the plaintiff or a
20      defendant?
21   A.   A defendant.
22   Q.   Was it an insurance company paying your bill?
23   A.   Yes, sir.
24   Q.   Which insurance company?
25   A.   Actually, it wasn't.  I guess it was not insurance

Page 17

1      company.  It was an attorney's office that --
2   Q.   Okay.
3   A.   -- they were working for an insurance company.
4      But --
5   Q.   And -- and I don't want to dwell on it much.  Just
6      can you summarize quickly what your determination
7      of the fire at the Newegg facility was.
8   A.   It was a -- a projector that caught fire due to
9      lack of maintenance.
10   Q.   Thanks.  How long did that deposition last?
11   A.   I believe it was approximately four hours.
12   Q.   And about what month and year did that deposition
13      take place?
14   A.   I don't know exactly the month.  But it was in 2000
15      and -- or 2020.  Off the top of my head, I believe
16      it was in, like, March.  But ...
17   Q.   Okay.  Do you remember the name of the lawyer --
18      the lawyer who took your deposition in connection
19      with the Newegg case?
20   A.   His -- his name was Jim -- James Johnson out of
21      Chicago.
22   Q.   That's the one who took the deposition?
23   A.   Yes.  Or that -- no.  That was our attorney.  That
24      was our --
25   Q.   The one that you were working for?

5 (Pages 14 - 17)

Veritext Legal Solutions

Page 18

1  A.  -- we were working for, yes.
2  Q.  Do you remember --
3  A.  I don't know the attorney for -- that did the
4     deposition.
5  Q.  And what county and state is that litigation
6     pending, that Newegg case?
7  A.  In Indianapolis, Marion County.
8        Got -- I've got to make one statement for
9     that.  That case has already been settled.  So it
10    is not --
11 Q.  Is not what?
12 A.  Is not going -- going any farther at this point.
13 Q.  All right.  Did you -- were you ever presented with
14    a transcription of your deposition given in perhaps
15    March of 2020?
16 A.  No, sir.
17 Q.  Do you keep anywhere, including not -- but not
18    limited to your home, copies of any depositions
19    you've given in your career?
20 A.  No.  I do not have any copies.
21 Q.  Has the deposition that was taken in Chicago been
22    transcribed and given to you yet?
23 A.  No, sir.
24 Q.  So you've told us in your career, prior to today,
25    you've given about five or six depositions.  This

Page 19

1     might make number seven, right?
2  A.  No.  This would be inclusive of --
3  Q.  Oh, that's right.
4  A.  -- of those.
5  Q.  How many times have you testified in court?
6  A.  Multiple times.  I -- is -- in reference to court
7     proceedings --
8  Q.  Let me refine the question.  How many times have
9     you testified in court as an origin-and-cause
10    expert?
11 A.  I've never had to go to trial.
12 Q.  And so the depositions you've given have involved
13    other matters outside of you giving expert opinion
14    on cause and origin, correct?
15 A.  Yes.
16 Q.  Okay.  And were some of those depositions because
17    you -- you were a fireman?
18 A.  In one particular case, yes, as a firefighter I was
19    deposed involving an arson fire that I responded
20    to.  I was a lieutenant on engine company.  The
21    other cases would involve when I was a Hamilton
22    County Sheriff Officer.  Been numerous court
23    appearances in reference to multiple types of court
24    cases.
25 Q.  Were you a reserve officer?

Page 20

1  A.  Yes.
2  Q.  What's the difference between a reserve officer and
3     a non-reserve officer?
4  A.  The title.
5  Q.  That's all?
6  A.  Yes.
7  Q.  Okay.  So we've issued a couple of deposition
8     notices for you -- for your deposition, including,
9     most recently, a Second Amended Deposition Notice
10    by video.  I jumped to exhibit marking SS.  I don't
11    have -- have copies with me.  Have you seen this
12    before, Jim?
13 A.  Yes, I have seen this.
14 Q.  Okay.  I appreciate you coming today.
15        MR. GARDNER:  We'll just move this over for
16    her.  Okay?
17 QUESTIONS BY MR. GARDNER:
18 Q.  Attached to that is -- was a Subpoena Duces Tecum
19    requesting certain documents.  I've marked this as
20    Exhibit TT dated today.  Take a look at that; let
21    me know if you've seen that before.  Oops.
22 A.  Yes, I have.
23 Q.  Okay.  Is there anything listed in the subpoena,
24    any documents or records or property as enumerated
25    and listed in Exhibit TT, that you haven't already

Page 21

1     produced to either Jim Zoccola or Thomas Jones?
2  A.  No.  I have -- I have no records of anything that
3     hasn't already been produced.
4  Q.  Okay.  And so some of these things can be -- could
5     be in the custody of Rimkus, like, on their
6     computer files, correct?
7  A.  Possibly.  I -- I have no knowledge of that at --
8     at the present time.
9  Q.  Codefendant in this case, I'll call them Space-Ray
10    for today, some time ago issued a subpoena duces
11    tecum for production to Rimkus and they responded.
12    Did you -- have you ever seen the so-called Rimkus
13    file that was produced in response to Space-Ray's
14    subpoena?
15 A.  No, I have not.
16        MR. GARDNER:  I'll tell you what, let's leave
17    that one right here.
18 QUESTIONS BY MR. GARDNER:
19 Q.  Have you ever been excluded as being an expert
20    witness in any case?
21 A.  No, I have not.
22 Q.  What, if anything, did you review in preparation
23    for today's deposition?
24 A.  I reviewed my reports.  I've reviewed reports of --
25    of Mike Vergon, Vergon and Associates.  And I

6 (Pages 18 - 21)

Page 22

1    reviewed report of, is it, Agotti?  How do you --
2    how do you pronounce his name?
3    Q.  Mike -- Mike Agosti.
4    A.  Mike Agosti.
5    Q.  This case is loaded with Mikes and Jims.  So --
6    A.  Yes, it is.
7    Q.  -- you examined your December 2019 -- sorry, I
8    think it's November 2019 and December 2022 reports?
9    A.  Yes.
10   Q.  And Mr. Mike Vergon's expert report and Mr. Michael
11   Agosti's expert report.  Anything else?
12   A.  And I've had meetings with my --
13   Q.  I'm just asking --
14   A.  -- counsel.
15   Q.  -- things you looked at, not about meetings.
16   A.  Oh, okay.  No, I have not.
17   Q.  You did not examine any photographs in preparation
18       for --
19   A.  Oh, yes.  That would be part of our file, our
20       reports.
21   Q.  When you say "our," who are you referring to?
22   A.  The file, the case file of the -- reference to this
23       case that I have access to.
24   Q.  Okay.  And when did you read your two expert
25       reports --

Page 23

1    A.  It's been --
2    Q.  -- sorry, in preparation for the deposition?
3    A.  Over the last week.
4    Q.  And when did you read Mr. Mike Vergon's report in
5        preparation for the deposition?
6    A.  Same -- same time --
7    Q.  Same holds --
8    A.  -- same -- same --
9    Q.  -- true for Mr. Agosti's?
10   A.  I received them both at the same time and reviewed
11       them.
12   Q.  And that was during this past week?
13   A.  Yes.
14   Q.  Okay.  And you said photographs.  Were some of the
15       those Bates stamped?  You know what a Bates stamp
16       looks like?  Like, marked for reference, page
17       numbers?
18   A.  They're all -- all the photographs I reviewed are
19       the photographs that I have on the file that has
20       been submitted to you, counsel, and have been
21       submitted to your off -- to you as well.
22   Q.  Okay.
23   A.  I don't think any of them are date stamped that I
24       know of --
25   Q.  Are these --

Page 24

1    A.  -- other than --
2    Q.  I apologize.  Do you remember looking at any
3        photographs that had Bates stamps that began with
4        the word "Republic"?
5    A.  Not to my knowledge, no.
6    Q.  Did you look at any photographs that were Bates
7        stamped beginning with the word "Rimkus"?
8    A.  Just a Rimkus file of photos that I have.  I'm not
9        sure there -- there's nothing on the photograph
10       that would indicate Rimkus.  But -- to my
11       knowledge.
12   Q.  And when did you look -- look at those in
13       preparation for the deposition, the photographs,
14       Mike?  I'm -- Jim?
15   A.  I've had those -- those in my possession for
16       probably a couple months.  And off and on I would
17       review some photographs and so forth when things
18       would come up.
19   Q.  When -- these photographs that you reviewed that
20       we're talking about, were you looking at them in a
21       digital format, like on a computer, or printed?
22   A.  Digital format.
23   Q.  Okay.  And did you bring those today?
24   A.  No, I did not.
25   Q.  Why not?

Page 25

1    A.  I didn't have any records to -- to bring.  I don't
2        have a computer to do something.  And so I --
3        they're all -- they're all been given to counsel.
4    Q.  Okay.
5        MR. JONES:  Yeah, Marty, everything has been
6        produced that he's got --
7        MR. GARDNER:  Right.
8        MR. JONES:  -- to our knowledge.  So
9        everything responsive to the subpoena that you
10       referenced earlier I think has already been
11       produced.
12       MR. GARDNER:  Thanks.
13   QUESTIONS BY MR. GARDNER:
14   Q.  Any other photographs you looked at besides the
15       ones that you've had for months?
16   A.  The only other photographs is the photographs that
17       were with -- that were attached to the reports of
18       Vergon and Agosti.
19   Q.  Right.  And the photographs -- setting those two
20       aside, or setting the photographs in those other
21       two reports aside, the photographs that you
22       reviewed, so far as you know, were those all taken
23       by you and/or some other Rimkus employee in the
24       investigation of this case?
25   A.  Yeah.  All of -- all photos that were taken by me

7 (Pages 22 - 25)

Page 26

1   or by, I think, Lou -- I'm not sure how to
2   pronounce his last name, but he's a mechanical
3   engineer with Rimkus that was at the joint scene
4   exam.
5   Q.   Inendino?
6   A.   Inendino, yes.
7   Q.   Anybody else?
8   A.   And also I had a video and photographs that were
9        from the --
10  Q.   -- night of the fire?
11  A.   Yeah.  The -- a pers -- one of the employees of
12       the -- Republic Services.
13  Q.   And those videos and photos from an employee of
14       Republic Services were taken the night of the fire,
15       March 19th --
16  A.   Yes.
17  Q.   -- 2019?
18  A.   Yes, at the time of the fire.
19  Q.   Okay.  Did any -- the photos that you reviewed in
20       preparation for the deposition, you said you took
21       some of them.  Mr. Inendino, Lou Inendino, took
22       some.  Were any taken by a fella named John Diggle?
23  A.   I don't have his photos that -- to my knowledge.
24       They may have come from Rimkus, if they were
25       presented to you.  But I don't have a copy of his

Page 27

1        photos.
2   Q.   And do those photos include those taken at -- at
3        the scene up -- up in -- on the facil -- the
4        Republic facility on MacBeth Road in Fort Wayne?
5   A.   Yeah.  There were multiple photographs taken at
6        different times at that facility.
7   Q.   Over a thousand, right?
8   A.   I don't know the -- know the total count but
9        probably close to that.
10  Q.   And other photos that you looked at were taken
11       during a couple of examinations conducted -- I'll
12       use the word "lab" -- at the Rimkus facility in
13       Indianapolis?
14  A.   Yes.
15  Q.   Okay.  Have we covered all the things that you
16       reviewed in preparation for the deposition?
17  A.   Yes.  To my knowledge, yes.
18  Q.   Okay.  So you didn't read any depositions in
19       preparation for the dep -- this deposition.
20  A.   No.  I have no acc -- I did not have any access to
21       depositions.
22  Q.   Have you read any of the depositions taken by the
23       attorneys in this case of any witnesses?
24  A.   I have not.
25  Q.   Let's circle back to your private work as a fire

Page 28

1        investigator subsequent to ending employment with
2        Rimkus.  How many total cases do you have currently
3        pending, in -- including this one?
4   A.   The -- to my knowledge there's three cases that are
5        still outstanding, I guess you could say.
6   Q.   And in that reference, Jim, are you talking about
7        outstanding from -- from when you were with Rimkus?
8   A.   Yes.
9   Q.   And how many are you currently working on now that
10       are different than the three that were outstanding
11       from Rimkus?
12  A.   I'm not currently working on any other cases at
13       this point on my own.
14  Q.   When's the last -- would be the last time you
15       worked on an independent case that didn't flow over
16       from your time with Rimkus?
17  A.   Again, it would be three weeks ago on Saturday.
18       I -- I did a fire investigation in Evansville for
19       Fire Forensics.
20  Q.   So that's a new case?
21  A.   Yes.
22  Q.   Okay.
23  A.   That's a closed case now, however, so --
24  Q.   Okay.  How long was it open for you?
25  A.   They just needed a second opinion, so I was asked

Page 29

1        to go to the location for a second opinion.  And
2        then once we were there, and I give a report to the
3        insurance adjuster, then they ended up closing the
4        file.
5   Q.   So your involvement for most recent case,
6        independent of any case you ever had from Rimkus,
7        was short lived.
8   A.   Yes.
9   Q.   Lasted less than a week --
10  A.   Yes.
11  Q.   -- your involvement?  All right.  Did you prepare a
12       written report in that case where --
13  A.   That was not with Rimkus.
14  Q.   I understand.
15  A.   Okay.
16  Q.   Yeah.  That -- that is the subject now, cases that
17       you have worked on --
18  A.   Since --
19  Q.   -- since ending employment with Rimkus.
20  A.   Yes.
21  Q.   That's our subject.
22  A.   Right.
23  Q.   Did you issue a written report in that case?
24  A.   Yes, I did.
25  Q.   Was it a preliminary report, so to say?

8 (Pages 26 - 29)

Page 30

1  A.  Yes.  It was just a short report and the findings.
2  Q.  Of cause and origin?
3  A.  Yes.
4  Q.  Were you able to determine the origin?
5  A.  Yes.
6  Q.  And the cause?
7  A.  Yes.
8  Q.  Were you working -- were you hired by the
9     defendant?
10 A.  We were hired by the insurance company representing
11    the homeowner.  Or the insurance on the property, I
12    guess you could say.
13 Q.  In other words, the insurance company might be
14    making or was making a claim.
15 A.  Yes.
16 Q.  Okay.  Did you use the terminology or the word
17    "probable" in that report?
18 A.  I don't think so with that.  Didn't use any
19    terminology in regards to --
20 Q.  Level of certainty?
21 A.  -- probable or -- or level of certainty.  Just let
22    them know what was found.
23 Q.  What?
24 A.  I just let them know what we found.
25 Q.  So you didn't state your opinion in the short

Page 31

1     report prepared within the last three weeks for
2     that insurance company for the homeowner to any
3     degree of scientific certainty or fire investigator
4     certainty, right?
5  A.  I give them opinion of the -- what I determined at
6     the time I had looked at the fire scene and also
7     spoke with the fire investigator.  And there was --
8     the scene had been disturbed.  So it made it
9     difficult to determine exactly what transpired and
10    only what witnesses said.
11       So I give them a -- and what the fire
12    department investigators told me.  So I just
13    relayed information of what I had -- I had to
14    determine by witness statements.  And I gave no
15    official opinion on which one of those three
16    determinations that they had or that three
17    potential issues that were given.  And left it at
18    that.
19 Q.  The scene in this case was a home -- a home?
20 A.  Yes.
21 Q.  And residential --
22 A.  Yes.
23 Q.  -- dwelling?  Okay.  In what way was it disturbed?
24 A.  There had been prior investigations done at the
25    site.  And the area of origin had already been

Page 32

1     swept, I guess you could say, and cleaned up.  And
2     some of the information that was given that certain
3     items in that area had -- were not able to be
4     evaluated, had already been destroyed.
5  Q.  Okay.  So what would you -- be your best estimate
6     of the total number of cases you've taken since
7     ending employment with Rimkus as an independent
8     investigator?
9  A.  I've only had two cases with this company in
10    Indianapolis -- or in Florida, rather.  I'm sorry.
11 Q.  So the answer to the question is two cases.
12 A.  Two, yes.
13 Q.  Your only source of cases since leaving Rimkus was
14    that of the Florida insurance company?
15 A.  Yes.  Other than the -- following up cases with --
16    that I've had with Rimkus.
17 Q.  Right, okay.  So I had earlier asked you what
18    depositions you read in preparation for today's
19    deposition.  Have you ever read any depositions in
20    this case?
21 A.  Not in this case I have not.
22 Q.  Okay.  So I'm going to give a list.  And you just
23    let me know if I say a name, and you think you did
24    read the dep.  All right?  You haven't read Terry
25    Reader's deposition?

Page 33

1  A.  Not to my knowledge.  I don't recognize the name.
2  Q.  You don't know who Terry Reader is?
3  A.  No, I do not.
4  Q.  And you'll concede his name does not appear in any
5     of your reports?
6  A.  Yes.
7  Q.  You'll concede his name does not appear in any
8     field notes in this case?
9  A.  Yes.
10 Q.  And you have no idea what his role was as a
11    Republic employee?
12 A.  No, I do not know.
13 Q.  And you don't know anything he said in his
14    deposition?
15 A.  No.
16 Q.  Mr. John Shadow.  You've met with him, right?  That
17    name sound familiar?
18 A.  The name sounds familiar.  But I don't -- I did not
19    read anything as for as his deposition is
20    concerned.
21 Q.  All right.  So you don't know the contents of his
22    deposition at all, right?
23 A.  No.
24 Q.  Is it true that neither you nor any employee of
25    Rimkus ever obtained a video or electronically --

9 (Pages 30 - 33)

Page 34

1 electronically recorded statement of Terry Reader?
2 A. That would be true, to my knowledge.
3 Q. Is it true that neither you nor any employee of
4 Rimkus, or anyone else that you're aware of, not
5 including depositions, ever took a video or
6 electronically recorded statement of Terry Reader
7 or John Shadow or Fred Jones or Greg Toling or
8 Trevor Miller or Dan Kelly or Charles Golden or Ron
9 Danzer or Michael Sharefield or Scott Kleinight?
10 Is that all true?
11 MR. JONES: Objection to form --
12 THE WITNESS: Yes.
13 MR. JONES: -- compound.
14 QUESTIONS BY MR. GARDNER:
15 Q. There's been some discussions in this case amongst
16 the lawyers concerning the topic of field notes.
17 And we have been given, I don't know, seven or nine
18 pages of field notes in this case. Have you seen
19 those?
20 A. I saw field notes, I think, of -- that was of --
21 Lou, I believe, had some field notes. And John
22 Diggle had some field notes, I believe. I did see
23 those.
24 Q. All right. Those are Exhibit D, 1 through 7. None
25 of those are in your handwriting?

Page 35

1 A. No.
2 Q. Did you ever create field notes or handwritten
3 notes of any kind during your -- during your
4 investigation of this case, you?
5 A. There are -- at the time I was at the site, I know
6 I -- there was handwritten information that -- that
7 I was taking at the time. Those are all have --
8 all were -- would have been part of the Rimkus
9 file. And once they complete a report, most of
10 the -- those notes are not part of the record
11 anymore. And they're -- they're thrown -- they
12 discard them or shred them.
13 That is not from -- from me; that is from
14 Rimkus' standpoint.
15 Q. And why weren't the handwritten notes of Lou
16 Inendino and John Diggle destroyed?
17 A. I don't know for sure about that. Because I -- I'm
18 sure that they probably put those into -- to the
19 file themselves. I don't have any information
20 about that on why they were maintained. Other than
21 the fact I -- I did the written report. And
22 they -- their reports, they didn't make any written
23 reports. So they could have kept those on so they
24 would have some record of their involvement.
25 Q. During your investigation of this case, did you

Page 36

1 make any electronic recordings of any kind?
2 A. No, I did not.
3 Q. And I'm setting aside photos, right?
4 A. Well, other than, yeah, the digital photos, yes.
5 Q. Okay. You made no video ever, did you?
6 A. No.
7 Q. In the two cases that you've worked on since
8 leaving Rimkus, have you also destroyed your field
9 notes?
10 A. I -- no, I have not.
11 Q. Has it been your custom and practice in the
12 preparation of over 1400 cause-and-origin reports
13 to discard your field notes before your
14 deposition's taken?
15 MR. JONES: Objection to form, foundation.
16 MR. GARDNER: I'll change the question.
17 QUESTIONS BY MR. GARDNER:
18 Q. Has it been your custom and practice, Jim, during
19 your career as a cause-and-origin investigator,
20 which started about 2000, what, 14?
21 A. No. It started in 19 --
22 Q. Eight --
23 A. -- in --
24 Q. -- '18?
25 A. -- 1979.

Page 37

1 Q. Oh. Okay.
2 A. As for as cause and origin --
3 Q. Right.
4 A. -- investigations.
5 Q. Are you saying that since 1979 you have been
6 preparing cause-and-origin reports?
7 A. Yes.
8 Q. And that's why you've prepared over 1400, right?
9 A. Yes. It's -- it's actually more than that now.
10 But that's just at the -- hasn't been updated in
11 the --
12 Q. Right.
13 A. -- the CV yet. So --
14 Q. We have your CV --
15 MR. HEHNER: Are you gonna finish that other
16 question?
17 MR. GARDNER: I've got thousands of other
18 questions.
19 MR. HEHNER: Well, the one -- the one about
20 whether it's his practice to destroy.
21 MR. GARDNER: Yeah. I'm on -- I'm still on
22 that, right.
23 MR. HEHNER: Okay. I'm sorry.
24 MR. GARDNER: Okay.
25 QUESTIONS BY MR. GARDNER:

10 (Pages 34 - 37)

Page 38

1  Q.  So in what percentage of cases you've been involved
2      in as a cause and in -- origin investigator have
3      you destroyed your field notes before the case
4      closed?
5        MR. JONES:  Objection to form.  I think that
6      misstates his prior testimony.
7        MR. GARDNER:  I'll ask it a different way.
8  QUESTIONS BY MR. GARDNER:
9  Q.  Has it always been the case that you've preserved
10     your field notes in cases, except for when Rimkus
11     destroys them?
12       MR. JONES:  Objection to the form.
13       THE WITNESS:  If it was my case in, like, the
14     fire department or through my personal -- like, the
15     last couple cases I've had, I would -- I would keep
16     field notes personally.
17       But Rimkus had a policy that I was not
18     allowed, as an investigator, to keep personal
19     information and personal files, things of that
20     nature.  So they -- they would all have been turned
21     over to Rimkus at the time.
22  QUESTIONS BY MR. GARDNER:
23  Q.  When did you first learn, during your employment
24     with Rimkus that started in 2018, that your field
25     notes would be destroyed if you gave them to

Page 39

1      Rimkus?
2  A.  Initially they -- they did not.  But there -- I
3      guess, apparently, at some port -- some -- at some
4      point during the process, they elected not to keep
5      all the information on file.  I -- I was instructed
6      at the time that they would be des -- destroying
7      any handwritten files, and they would keep
8      electronic files in place.
9  Q.  Except for those by Lou Inendino and Fred -- I'm
10     sorry -- Mr. Diggle, John Diggle?
11  A.  I -- I have no clue of why those are still there,
12     for -- for example.  Unless they requested them
13     personally to be kept so that they would have some
14     information and knowledge that they were there,
15     since they were, you know, compensated by the
16     insurance company to be there.
17  Q.  Your first report is dated December 3rd, 2019,
18     correct?
19  A.  Yes.
20  Q.  And your second report is dated November 18th,
21     2022, correct?
22  A.  Yes.
23  Q.  Were your field notes destroyed by Rimkus before
24     December 3rd, 2019 or after?
25  A.  I am not sure of the exact date where they would

Page 40

1      have been destroyed.  I -- I think once I -- once I
2      produced a written report, I was informed that they
3      would -- there would be no -- those were all turned
4      in to Rimkus.  And then once I do a written report,
5      then they would have destroyed any type of --
6  Q.  What --
7  A.  -- handwritten notes.
8  Q.  Did Rimkus destroy any other evidence in this case
9      besides your handwritten notes?
10       MR. JONES:  Objection to form, foundation.
11       THE WITNESS:  Not to my knowledge.  I don't --
12     I don't think so.
13  QUESTIONS BY MR. GARDNER:
14  Q.  So it's your understanding Rimkus has preserved all
15     evidence in this case in connection with the
16     investigation of this fire with the exception of
17     your field notes.
18       MR. JONES:  Objection to form, foundation.
19       THE WITNESS:  I don't know that for a fact.
20     But I would assume they would have the file.  And
21     whatever they've kept in the file is their -- what
22     they've decided to keep in the file.  I have not
23     been there for several years.  So ...
24  QUESTIONS BY MR. GARDNER:
25  Q.  What dates did you prepare field notes in

Page 41

1      connection with your investigation of this case?
2  A.  From the very first day I was there.
3  Q.  And do you keep them in a -- some sort of a binder?
4      How do you do it?
5  A.  I have a file folder that the front of the file
6      gives the information about the -- my -- my case.
7      And I put the requested information in there.  And
8      I also then make notes on that, time stamped when I
9      was at the site and when I was -- and who I spoke
10     to, who to contact, things of that nature.  So I
11     have all that information readily available.
12  Q.  I'm really not tracking with you here.  I'm not
13     asking if you had a file folder, but I am asking
14     you about field notes.  I mean, did you take them
15     on a legal pad?  How did you -- how did you take
16     your field notes in this case?
17  A.  No.  There's a file folder that I have that has --
18     basically the front of it has information -- had
19     information about the -- the case.
20  Q.  Like the basic --
21  A.  -- location, all the basic information.  And then
22     it had sections lined off that had, like, the dates
23     and times.  And I would write the date, time, and I
24     could note out to the side any -- those are just
25     general notes.

11 (Pages 38 - 41)

Page 42

1    And then on the back side of that I would
2    draw, like, a diagram, maybe, of the facility,
3    things of that nature, and then transfer those over
4    to another diagram at a later date and -- on a
5    computer system. And then I would obviously use
6    those notes to -- to make my report.
7    And then it would be a folder. So if there
8    was any other information I obtained, like a copy
9    of the fire report, things of that nature, other
10   information, I would go into that folder, file
11   folder. If I did a re -- speak to someone, I would
12   make notes on usually a notepad of some kind,
13   usually a legal pad.
14 Q.  You're talking, like, if you were to speak with a
15   -- an eyewitness, witness, or an employee of
16   Rimkus [sic], you would put notes on a notepad.
17   Would you --
18 A.  Well, the employee of Republic, you mean? Is that
19   who you're --
20 Q.  Did I say --
21 A.  -- referring to?
22 Q.  -- Rimkus? I meant Republic; I apologize.
23 A.  Yeah, I -- yes. I would have made notes on there
24   who I -- who I spoke to, if they would give me that
25   information. A couple people in this particular

Page 43

1    case would not -- did not want their name to be
2    available because they were -- they were not
3    employees that were probably able to give that
4    information out for --
5  Q.  I am not tracking that at all. Are you telling me
6    that you spoke with some Rimkus, sorry, Re --
7    Republic employees who told you they didn't want
8    their names in the file?
9  A.  Yes.
10 Q.  How many?
11 A.  Two.
12 Q.  Do you remember who they are today?
13 A.  I don't recall their names. And I wasn't given
14   their name. 'Cause they -- at the time I was
15   there, the day of the -- of the fire, they -- they
16   did give me the information that they were there at
17   the night of the fire. Actually, one of them even
18   give me a video of the -- prior to the fire
19   department arrival. But I don't know the -- know
20   the name of the person.
21 Q.  Can you describe -- I'm sorry.
22 A.  Kind of a -- short guy with glasses. I'm not
23   sure what his --
24   MR. JONES: I think you're talking about
25   Samir.

Page 44

1    THE WITNESS: Samir?
2    MR. GARDNER: And you --
3    MR. JONES: Or --
4  QUESTIONS BY MR. GARDNER:
5  Q.  You weren't at the facility the day of the fire
6    March 19th, 20 -- you were there March 20th.
7  A.  Well, yes, the 20th, yes. The day of the fire
8    was -- it was 11:00 at night. So it actually
9    continued -- initially I was told by the fire
10   department it was the 20th because of the fact that
11   the initial -- it carried over way into the -- to
12   that morning. So ...
13 Q.  Would you -- would this comport with your memory,
14   that the fire was reported to the local fire
15   department somewhere between 11:00 p.m. and
16   midnight on March 19th, 2019?
17 A.  It was 11:01 -- or 3, I believe, is the --
18 Q.  Good job. And then they were there suppressing the
19   fire for about six hours until about five in the
20   morning --
21 A.  Yes.
22 Q.  -- on the 20th of March, right?
23 A.  Yes.
24 Q.  Okay. And Thomas has helped us in connection with
25   a -- witness who you spoke with the day after the

Page 45

1    fire at the scene up there in Fort Wayne as being
2    Samir -- I'm gonna probably mispronounce his last
3    name -- Dizdarevic, D-i-z-d-a-r-e-v-i-c.
4    You believe you spoke to him the day after the
5    fire.
6  A.  Yes.
7  Q.  Okay. I think his deposition is the only one I did
8    not attend in this case, so I -- I don't know what
9    he looks like. Could you -- I -- I know you
10   started to give a physical description and I turned
11   my back. What was your physical description?
12   MR. HEHNER: Swallow it.
13   THE WITNESS: I knew he was a really short guy
14   with glasses, probably in his 50s. I don't know --
15   I knew he was not of US heritage, I guess you could
16   say. He looked like an --
17 QUESTIONS BY MR. GARDNER:
18 Q.  He looked something like me?
19 A.  -- Indian -- Indian heritage, in that nature, is
20   all I know of.
21 Q.  What time did you meet with him on March 20th,
22   2019?
23 A.  I was actually there about 3:00 in the afternoon.
24   We were contacted around 1:00 in -- in reference to
25   the fire loss. And they said they wanted somebody

Page 46

1    there as soon as possible.  So I left as soon as I
2    got the fire call or the fire information and a
3    location and went to the site.  It's about an hour
4    and a half away from our office.
5  Q.  And you were let through a guard -- like a guard
6    gate of some sort?
7  A.  Yeah.  There was no one at the guard gate, but
8    there -- there is a guard gate there.
9  Q.  So my question is:  What time did you speak with
10    Samir?
11  A.  I -- I initially went to the office.  I'm not sure
12    exact time I spoke with him.  But it was roughly
13    around 4:00 in the afternoon.
14  Q.  And where did you speak with Samir?
15  A.  Right outside of the building where the loss
16    occurred, near the gas pumps.
17  Q.  What gas pumps?
18  A.  Right -- right in by the building itself there's
19    gas pumps where they fill the -- the garbage
20    trucks.
21  Q.  There's a lot of buildings at the -- at the site in
22    this case.  Can you be more specific, which
23    building?
24  A.  The fire building --
25  Q.  The building --

Page 47

1  A.  -- that the fire was -- was that the fire occurred
2    in.
3  Q.  Okay.
4  A.  The pumps are directly across the -- the aisle from
5    that.  And then he -- we were standing on the --
6    would have -- would have been the east side of the
7    pumps.
8      MR. GARDNER:  Pull up Exhibit Z.  Thanks, Ben.
9      Jim, up on the screen, one of the attorneys in
10    this case for Space-Ray has displayed a -- an
11    image.  I'm gonna hand it to you unless, I think,
12    Thomas might be --
13      MR. JONES:  Page 3?
14      MR. GARDNER:  He can mark on this one.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Before you mark on it, Jim, does that photograph --
17    would that photograph help you tell us where you
18    were standing, talking to Samir --
19  A.  Yes.
20  Q.  -- the day after the fire?
21  A.  Uh-huh.
22  Q.  And can you point -- for right now just point for
23    me.
24  A.  About right in this area right here.
25  Q.  Okay.

Page 48

1  A.  There's the gas pumps right here.
2  Q.  All right.  And is that the only area you ever were
3    with Samir, speaking with Samir about this fire?
4  A.  Yes.
5  Q.  Okay.  Can you put a circle around that area and
6    put the initial S in it.  And then we'll show it up
7    to the camera.
8  A.  Okay.
9  Q.  I need you to hold it up to the camera.
10  A.  Oh.
11  Q.  So on -- on Ex -- on Exhibit Z, Page 3, you have
12    made a circle with an S in it as to where you and
13    Samir were standing at approximately 4:00 p.m. on
14    March 20th, 2019, right?
15  A.  Yes.
16  Q.  Anybody else around?
17  A.  Not to my knowledge, there wasn't anyone else
18    standing there at the time.
19  Q.  Is that my pen?  Yeah, thanks.  And how long did
20    you speak with Samir?
21  A.  Maybe five to ten minutes.
22  Q.  And did you take notes of what he told you?
23  A.  No, I did not.  I had just gotten out of my
24    vehicle.  And he was standing there, and I spoke to
25    him.  And my comment to him was -- I asked him if

Page 49

1    he was -- he -- he made a comment about the -- the
2    fire and asked me if I was there for that.  And I
3    said yes.  And I said, Were you here the day of the
4    fire?  Just to start up conversation.  And he said,
5    Yes, I was.  He said, I actually took pictures.
6  Q.  And he gave you the pictures?
7  A.  Yes.  And a vid --
8  Q.  You've --
9  A.  -- and a video of the --
10  Q.  Okay.  You've seen reference to the -- his photo in
11    both Mr. Agosti's and Mr. Vergon's reports, haven't
12    you?
13  A.  Yes.
14  Q.  That's the last time you ever talked to Samir in
15    connection with this case, right?
16  A.  Yes.
17  Q.  And you didn't audio record that conversation?
18  A.  No, I did not.
19  Q.  You didn't videotape it?
20  A.  No.
21  Q.  You took no notes.
22  A.  No.
23  Q.  You obtained no handwritten statement from him.
24  A.  No, he -- his comment to me at the time is he
25    didn't know for sure if he should be saying

13 (Pages 46 - 49)

Page 50

1    anything because he was not really officially able
2    to say anything. So I -- he asked me not to --
3    that he -- he actually didn't give me his name. I
4    just -- he didn't want to --
5  Q.  You --
6  A.  -- he didn't want to --
7  Q.  -- coincidentally ran into guy who took a photo and
8    video of the fire when you first arrived at the
9    scene?
10 A.  Right. Correct.
11 Q.  Was he the first person you spoke to when you
12   arrived at the MacBeth facility that day around --
13 A.  No, I --
14 Q.  -- 4:00, 3:00?
15 A.  No, I did not. I spoke to Kyle Orr, I think's his
16   last name, I believe.
17 Q.  And where -- where did you speak to Kyle Orr at?
18 A.  In the office. I went to the office.
19 Q.  Is the office you're referring to shown on the
20   Exhibit Z, Page 3? Probably isn't.
21 A.  It doesn't appear to be on here. But I -- I know
22   as you come in, you -- I think it's on -- on the
23   other side of this, right side of the screen over
24   in here somewhere.
25 Q.  Okay. That's where you went first when you --

Page 51

1  A.  Yes.
2  Q.  -- arrived? All right. And so about what time did
3    you talk to -- meet Kyle?
4  A.  Kyle was the name of the person I was given as a
5    contact. So that -- I went to the office; I asked
6    for Kyle.
7  Q.  I said -- my question is: What time?
8  A.  That would have been at around 3:00 in the
9    afternoon.
10 Q.  How long did you speak with Kyle Orr on March 20th,
11   2019 at the MacBeth facility?
12 A.  Probably no more than ten minutes.
13 Q.  Had you ever spoken to him before?
14 A.  On the phone I had, yes.
15 Q.  Okay. Did you speak with anyone else that day
16   besides Kyle Orr and Samir at the scene?
17 A.  I spoke to -- I believe it would have been Fred
18   Jones, is it? I think that's his -- the manager of
19   the -- of the facility.
20 Q.  Did you speak with him in the same office you spoke
21   with Kyle Orr?
22 A.  No. I actually spoke to him at a later time that
23   day, right out in front of the building itself.
24 Q.  That's a little vague. You mean the building that
25   burned?

Page 52

1  A.  The burn -- the -- the burned building, yes.
2  Q.  Right. Which is shown on the left side of
3    Exhibit Z, Page 3, correct?
4  A.  Yes.
5  Q.  You guys get up pretty close to it?
6  A.  We were fairly close.
7  Q.  Did you speak with anybody else that day at the
8    Republic facility besides Samir, Kyle Orr, and Fred
9    Jones?
10 A.  I can't recall anyone at the present time.
11 Q.  Okay. And I think you said you arrived about
12   three -- 3:00 p.m. on March 20th, 2019? What
13   time --
14 A.  Yes.
15 Q.  -- did you leave?
16 A.  Yes, I -- I probably --
17 Q.  What time did you leave?
18 A.  -- leave -- I -- I would say probably around 5:00
19   in the evening. Was there for --
20 Q.  Drove back to --
21 A.  -- a couple hours.
22 Q.  Okay. Did you audio or video record your
23   statements of either Kyle Orr or Fred Jones?
24 A.  No.
25 Q.  Did you obtain handwritten statements from either

Page 53

1    Kyle Orr or Fred Jones --
2  A.  No, I did not.
3  Q.  -- that day or any other day?
4  A.  No.
5  Q.  And did anyone from Rimkus, besides you, do such a
6    thing?
7  A.  No.
8  Q.  How long did you talk to Kyle Orr on March 20,
9    2019?
10 A.  I told you I was with him for about ten minutes.
11 Q.  Thank you. Did you take field notes of what he
12   told you?
13 A.  I wrote down informa -- general information, like
14   the address and just -- and time of fire, who
15   responded, things like that, and when he was
16   notified about the fire, for example --
17 Q.  Had you obtained --
18 A.  -- and what he knew --
19 Q.  Go ahead.
20 A.  -- and what information he knew about the fire.
21 Q.  Okay. So what do you remember him telling you,
22   March 20th, 2019?
23 A.  He was not physically present at the site at the
24   time, but he was notified of the fire. I think
25   there -- I -- he give me a -- a person's name that

14 (Pages 50 - 53)

Page 54

1    called him and informed him of the fire.  I think
2    it was one of the managers there at the facility.
3        And I don't recall too much more of a
4    conversation with him, other than the fact that he
5    was the manager of the facility and that -- and
6    told me basically what they did in that particular
7    building that the fire originated in.
8    Q.  And what did he tell you about that?  What they did
9    in that particular building where the --
10   A.  Well, the building is a long building that has
11   several -- they do several things within that
12   building.  The one --
13   Q.  Like what?
14   A.  -- north end of the building is -- is -- was
15   basically used as a large dumpster repair.  The
16   center part of the --
17   Q.  I'm gonna pause you for just a second.  I
18   apologize.  This will help us.
19        MR. GARDNER:  Ben, can you pull up Z, Page 2.
20   Okay.  I'm gonna hand you what we have
21   previously identified, I think yesterday and during
22   a lot of other depositions.
23        THE WITNESS:  Uh-huh.
24        MR. GARDNER:  But today it's marked Exhibit Z,
25   Page 2.  And as we -- you do your deposition today,

Page 55

1    we'll be referencing that -- those structures.
2    QUESTIONS BY MR. GARDNER:
3    Q.  And you recognize the -- so that's a Googler [sic]
4    photo taken prior to the fire, correct?
5    A.  Yes --
6    Q.  All right.
7    A.  -- uh-huh.
8    Q.  And so you see the numbers starting from left to
9    right, 1, 2, 3 and 4?
10   A.  Yes.
11   Q.  Okay.  So you -- we were talking about what Kyle
12   Orr told you that you remember from your
13   conversation with him --
14   A.  Right.
15   Q.  -- December 20th, 2019.  So continue with your
16   answer about what activities they were doing in
17   these buildings, and make reference to the
18   buildings as you do so, numbers.
19   A.  He was -- he told me that -- I didn't have the
20   separation of the building.  He just told me that
21   the north end, they did heavy work on large
22   dumpsters, things of that nature, repair work.  And
23   then -- and on trucks and stuff like that.
24   Q.  So then the --
25   A.  Mechanical facility basically.

Page 56

1    Q.  Right.  So in terms of the orientation of the
2    photograph, two orange clad buildings, 3 and 4,
3    those are -- that's the north end --
4    A.  Yes --
5    Q.  -- you understand?
6    A.  -- right, number 3 and number 4.
7    Q.  And the far left building, number 1, has a -- a
8    white door on the most extreme south side and then
9    two sort of bluish doors.  See those?
10   A.  Yes.
11   Q.  Okay.  So Kyle Orr told you about op -- operations
12   again in 3 and 4 unit --
13   A.  Right.
14   Q.  -- buildings 3 and 4.  And you've answered
15   question, right?
16   A.  Right.
17   Q.  Okay.
18   A.  And then -- and Section 2 was a -- kind of an
19   employee area where they had, like, employee --
20   Q.  Offices?
21   A.  -- offices and lockers, things of that nature.  And
22   also they -- there was a section in there where
23   drivers kept their laptops and things like that
24   they had for their computers in their trucks.
25   And --

Page 57

1    Q.  What did he tell you --
2    A.  -- that's where they would clock in and out and
3    things of that nature.
4    Q.  And skip building 2 --
5        MR. JONES:  If you could let him finish his
6    answer.
7        THE WITNESS:  Okay.
8        MR. GARDNER:  Yeah.  So -- yeah, if I ask you
9    about one of the moons of Pluto, I -- we don't need
10   to talk about all the moons of Pluto.  And then we
11   have a lot to get through today.  So I'm going
12   to --
13        THE WITNESS:  Okay.
14        MR. GARDNER:  -- take you off of what he told
15   you about building 2 and just ask you specifically,
16   and I apologize I didn't previously.
17   QUESTIONS BY MR. GARDNER:
18   Q.  What did Kyle Orr tell you in the about ten minutes
19   you spoke with him at the premises on December --
20   I'm sorry -- November 20th, 2019 about the
21   operations in building number 1?
22   A.  He told me that building number 1 was a -- a repair
23   shop for dumpsters; that they would bring dumpsters
24   in, sand them down, repaint them or re -- do minor
25   repairs.  Like, if a panel would be off, they would

15 (Pages 54 - 57)

Page 58

1 repair that panel and then repaint them, things of
2 that nature.
3     And they had been doing that in this facility,
4 I believe, for approximately five to six years.
5 And that's where the fire -- in that section of the
6 building, the Section 1, was where the fire
7 originated at.
8 Q. Kyle Orr told you that?
9 A. That's -- well, he told me that's where the biggest
10    part of the damage was at, yes.
11 Q. All right. So in terms of the minor repairs, can
12    you give me any details of what Mr. Orr was telling
13    you about?
14 A. What they usually did in that building, as I
15    already offered. And that was where they did minor
16    repairs on dumpsters. And then they also did
17    painting in that -- that area --
18 Q. Did he --
19 A. -- for --
20 Q. -- did he tell you that they had used or sometimes
21    used welding machines inside of building number 1?
22 A. Yes. He said occasionally -- that's where they
23    repair the panels. They sometimes would have to
24    weld a new panel onto a -- a dumpster.
25 Q. A panel made of steel.

Page 59

1 A. Yes.
2 Q. And so before re -- welding it on -- by the way,
3    did he tell you it was a MIG welding or TIG welding
4    or what kind of --
5 A. No, he didn't say what type.
6 Q. Did you ever figure it out during your
7    investigation?
8 A. No. I did not know.
9 Q. Did you photograph any MIG or TIG welding units in
10    the fire debris rubble of building number 1 on any
11    occasion?
12 A. I believe I have photographs of a welding unit
13    that's in -- in my photographs.
14 Q. Inside the fire debris.
15 A. Right.
16 Q. Okay. And did Kyle Orr tell you December -- I'm
17    sorry -- November 20th of 2019 that they also used
18    acetylene torches inside of building number 1 in
19    terms of repairing dumpsters?
20 A. Occasionally they would have to. They -- they said
21    that the acetylene, the torches, they had not used
22    them that particular day, however, is what he told
23    me.
24 Q. Have you ever read any -- heard or read or learned
25    anything in the case to the contrary of that?

Page 60

1 A. No, I have not.
2 Q. So so far as you know, when you made your two
3    reports in this case, you moved from the
4    presumption that acetylene torches had not been
5    used inside of building number 1 at any time on
6    March 19th, 2019, correct?
7 A. Yes, sir.
8 Q. What about plasma cutters? Did Kyle Orr mention to
9    you the use of plasma cutters?
10 A. No, sir.
11 Q. So as far as you know, no one had operated a plasma
12    cutter inside of building number 1 on March 19th,
13    2019, before the fire.
14 A. No, sir.
15 Q. And do you know con -- who conducted any -- sorry.
16    Do you know if any welding was conducted on
17    March 9 -- 19th, 2019?
18 A. Yes. I was told that there was some welding that
19    occurred early in the morning of the 19th and that
20    they -- and he thought that the welding was all --
21    was pretty much completed by the early morning.
22    Like, between eight and 10:00 is what I was told.
23 Q. And who was doing the welding?
24 A. The -- one of the workers in the --
25 Q. I'm asking for the name.

Page 61

1 A. -- shop. I don't know.
2 Q. Did he identify this person when you met with him
3    the day after the fire?
4 A. No, he did not.
5 Q. Did you ask who it was?
6 A. At the time I did not ask, only because of the fact
7    that by looking at the -- or realizing what was
8    occurring here, I -- we were going to have to come
9    back to this fire scene and --
10 Q. You'd have to --
11 A. -- do the investigation. Because I --
12 Q. Go ahead.
13 A. -- it was too large of a scene to -- to do an
14    investigation like they -- they wanted me to come
15    up there, do an investigation that evening. And so
16    it's too late at this point in time to really --
17    due to the large scene that --
18 Q. And that's what stopped you -- that's what stopped
19    you from getting the name of the fellow that did
20    the welding on the day of the fire?
21 A. Well, I -- I would've assumed that I would be able
22    to get that information later on down the line,
23    yes.
24 Q. You didn't though, did you?
25 A. I did not get it, no.

16 (Pages 58 - 61)

Page 62

1 Q. Ever.
2 A. No.
3 Q. Wouldn't it have been important to obtain
4 information from the fellow working and doing
5 welding inside of building number 1 on March 19th,
6 2019 before the fire started?
7 MR. JONES: Objection to form.
8 THE WITNESS: There -- there's a lot of
9 information that would have been nice to have
10 obtained at that point. However, due to the -- to
11 the time nature and due to the aspect of we're
12 gonna come back to this scene, then I was going to
13 try to catch up -- to have these people available
14 to talk to.
15 But -- and then -- so I decided that I needed
16 to go ahead and get some pictures while the
17 daylight was still available and go ahead and start
18 looking at the scene to see what all we needed to
19 have done at that point in time. So I went to the
20 site to look at it.
21 QUESTIONS BY MR. GARDNER:
22 Q. Yeah. According to Rimkus's billing records, the
23 second time you went to the Rimkus [sic] facility
24 was roughly two months later on May 10th, 2019.
25 That sound about right?

Page 63

1 A. Yes.
2 Q. Between March 20th, 2019 and May 10th, 2019, tell
3 us all the attempts you made to determine the name
4 of the fella that was working inside of building 1,
5 including performing welding operations.
6 A. I did not make any attempts to get any information
7 at that point in time. Because initially I was --
8 they were -- I was under the impression by -- that
9 they weren't sure they were gonna go ahead and go
10 through -- through with anything at this point in
11 time until they had some additional information.
12 And that -- I told them that I would not be able to
13 do this scene investigation at this particular
14 point in time; I'd have to come back.
15 And I was told that they would -- that we
16 would also have to get people placed on notice to
17 come back. And that's the first time that I spoke
18 to them about that. And due to the time nature of
19 them delaying some -- some of that contact, they --
20 I was not back at the site until the second -- that
21 second day.
22 Q. You had access to a phone though in those two
23 months, didn't you?
24 A. Yes, sir.
25 Q. Would it be fair to say that you made no attempt to

Page 64

1 contact any witnesses or Rimkus [sic] employees who
2 might have worked inside of building number 1 on
3 March 19th, 2019 --
4 MR. JONES: Did you say Rimkus employees?
5 MR. GARDNER: I'm sorry. Republic employees.
6 THE WITNESS: I did not contact anyone at that
7 point in time. Other than speak to Kyle, by phone,
8 to -- I actually called and double-checked a few
9 times if -- how the case -- you know, if we needed
10 to get moving on this, or whatever, to try to push
11 it along. But a lot of the information and contact
12 of people were up in the air, so to speak, of who
13 to get in contact with.
14 QUESTIONS BY MR. GARDNER:
15 Q. But to be clear, when you were at the scene the day
16 after the fire, you failed to ask Kyle Orr the name
17 of the fella that was doing welding inside of
18 building number 1 the day of the fire.
19 MR. JONES: Objection to form.
20 MR. HEHNER: What's wrong -- can you tell me
21 what's wrong --
22 MR. GARDNER: I'm -- I'm comfortable with my
23 question.
24 MR. HEHNER: Okay. That's fine.
25 THE WITNESS: I did not obtain the name or the

Page 65

1 information of the person who did the welding at
2 that time.
3 QUESTIONS BY MR. GARDNER:
4 Q. Do you know a time that fella -- strike the
5 question.
6 Have you ever heard of a fella named Terry
7 Reader?
8 A. I've heard that name before, yes.
9 Q. But you haven't read his deposition at all, have
10 you?
11 A. No, I have not.
12 Q. And you've never spoke with him, have you?
13 A. No. I have not spoken to him.
14 Q. You did not obtain either a video or audio-recorded
15 statement of Terry Reader ever, correct?
16 A. No, sir.
17 Q. Do you know when -- did you ever find out the name
18 of the guy that was welding that day?
19 A. I don't personally know who it was. I -- I think I
20 might have read something somewhere in somebody's
21 report that --
22 Q. Dale Calle sound familiar?
23 A. -- that --
24 Q. Does Dale Calle sound familiar to you?
25 A. The name sounds familiar, yes.

17 (Pages 62 - 65)

1 Q. Do you know when Dale Calle was first employed --
2 A. No, I don't.
3 Q. -- at Republic? No idea.
4 A. No.
5 Q. And do you know when he was last employed by
6 Republic?
7 MR. JONES: Objection to foundation.
8 THE WITNESS: No, I do not.
9 QUESTIONS BY MR. GARDNER:
10 Q. Because you never talked to him.
11 A. I've never spoken to him.
12 Q. And nobody with Rimkus ever gave you that data.
13 A. No.
14 Q. According to his file he left employment with
15 Republic approximately two months after the fire,
16 by my memory. I could be off. But there -- his
17 records say May of 2019. Did you ever contact him
18 after he left Rimkus?
19 A. I didn't --
20 Q. I'm sorry, Republic?
21 A. I did not have any contact information related to
22 him.
23 Q. Isn't it important, according to NFP 921, to obtain
24 statements of witnesses who had been conducting
25 activities in a room where you might -- you think

1 might be the origin of the fire?
2 A. It's always important to try to obtain information.
3 And also witnesses. But a lot of time it's also
4 equally important to do an investigation before you
5 speak to too many witnesses. Because you want to
6 try to develop your own opinions of the fire and
7 what caused the fire as well.
8 Q. It's important --
9 A. Witnesses are --
10 Q. -- to talk to them before they die, isn't it?
11 A. That's true.
12 Q. Do you know when he died?
13 A. No.
14 Q. Your report mentions reference to NFP 921, correct?
15 A. Yes.
16 Q. Both your reports say that, don't they?
17 A. Yes, they do.
18 Q. Exhibit F is a report dated December 3rd, 2019.
19 That's your report of findings. You've seen that,
20 right?
21 A. Yes, I have.
22 MR. HEHNER: Which one? Which one, Marty?
23 The first one?
24 MR. GARDNER: Yeah.
25 MR. HEHNER: Okay. Thank you.

1 QUESTIONS BY MR. GARDNER:
2 Q. Do you have it in front of you?
3 A. Yes.
4 Q. Okay. You're more than free to look at it as we go
5 through.
6 You address this December 3rd, 2019 report to
7 Mr. Glenn Bell, correct?
8 A. Yes.
9 Q. Is he the gentlemen that first contacted you about
10 this case?
11 A. Yes, sir.
12 Q. What?
13 A. Yes, sir.
14 Q. He's out in Scottsdale, Arizona?
15 A. That's his address, yes. I don't know whether
16 that's his office address or whether it's his
17 personal address.
18 Q. Got it. You've never met with Mr. Bell?
19 A. No.
20 Q. Approximately how many times have you spoke to him?
21 A. I spoke to him the day of the assignment to let him
22 know I would go ahead and -- 'cause they wanted
23 someone there. And also then after I was there, I
24 con -- recontacted him that same day on the
25 night -- or on the 20th and let him know what --

1 that there was no way I was going to be able to do
2 a fire investigation in the short amount of time
3 that they wanted this done to -- without having
4 other people notified.
5 Q. What was the short amount of time that they wanted
6 it done?
7 A. That day.
8 Q. Oh, okay. So you've only talked to Glenn twice,
9 both on March 20th, 2019?
10 A. Yes, on --
11 Q. Never again --
12 A. -- by phone.
13 Q. -- never again, right?
14 A. No.
15 Q. You've not read his deposition?
16 A. No, I have not.
17 Q. Okay.
18 MR. JONES: Are you saying Glenn Bell has been
19 deposed in this case? Is that what --
20 MR. GARDNER: I apologize. Again, getting
21 things mixed up. Withdraw that question.
22 QUESTIONS BY MR. GARDNER:
23 Q. Tell me if you agree with this statement, Jim:
24 NFPA 1933 lays out the minimum qualifications for a
25 fire investigator while NFPA 921 contains the basic

18 (Pages 66 - 69)

1    knowledge base and methodology required to comply
2    with NFPA 1033 requirements, correct?  Is that
3    accurate?
4    A.  Well, with -- there's -- there's a -- one's a
5    standard and one's a guideline, yes.
6    Q.  All right.
7    A.  And I didn't hear the term "guideline."  So 21 --
8    921 is a guide; 9 -- 1033 is a standard for
9    qualification.
10   Q.  For your -- for your qualifications.
11   A.  Yes.
12   Q.  All right.  By the way, when -- when were you first
13   qualified it as a cause -- cause-and-origin
14   investigator?
15   A.  I was first certified in 1979 through the State of
16   Indiana.  And then after -- following that I worked
17   for various volunteer departments as I was --
18   and -- and also did fire investigations for them,
19   so to speak --
20   Q.  I only asked you the year you were first certified.
21   A.  1979.
22   Q.  Thanks.  How did you --
23   A.  But there are several certification processes
24   through this.  So --
25   Q.  So the one in 1979, did you take a test?

1    A.  Yes, I did.
2    Q.  Did you pass the first --
3    A.  A course and a test, yes.
4         MR. HEHNER:  You said something standard test?
5         MR. GARDNER:  He said a course and a test.
6         MR. HEHNER:  Thank -- oh, thank you.
7         THE WITNESS:  Through the State of Indiana.
8         MR. GARDNER:  Got it.
9         MR. HEHNER:  Thank you.
10   QUESTIONS BY MR. GARDNER:
11   Q.  So what's the date of this fire?
12   A.  Date of the fire is actually March the 19th of
13   2019.
14   Q.  Why did you record that it was March 3rd?
15   A.  I don't know how that is listed there as March the
16   3rd.  I -- I think on this particular thing was
17   just a mis -- misprint or -- 'cause this is all --
18   when I do a report, what happens is I do -- it gets
19   sent in to someone to eval -- to read the report
20   and so forth and evaluate it.  And I don't know how
21   that date got overlooked.  But --
22   Q.  Could it be because --
23   A.  -- I typed the report --
24   Q.  Okay.
25   A.  -- and the date's wrong.

1    Q.  Yeah.
2    A.  And also the -- it didn't get -- there's two
3    processes of review.  And it never got caught.  And
4    usually anything like that would normally get
5    caught.  So --
6    Q.  Might have been helpful if you had your field notes
7    to look at.
8         MR. JONES:  Objection to form.
9    QUESTIONS BY MR. GARDNER:
10   Q.  Might have got the date right.
11        MR. JONES:  Objection to form.
12        THE WITNESS:  Well, I knew what the date was.
13   It's just an -- an error on my part --
14   QUESTIONS BY MR. GARDNER:
15   Q.  Are there any other --
16   A.  -- typing error.
17   Q.  -- errors in this report?
18   A.  There's a couple of errors that I --
19   that I know of that I -- one of them is -- okay.
20   I'll -- I'll wait till we get to that point.
21   Q.  I'm sure we will.
22        I'm gonna skip ahead just a hair.  Your most
23   recent and last report, so far as I understand, is
24   marked as Exhibit G, Pages 1 through 9, dated
25   November 18th, 2022, right?

1    A.  Yes.
2    Q.  And on Page 2 of that report you again put the date
3    of the fire -- wait.  See if you did.  No, you got
4    the date right.  Okay.
5         Have you, since preparing your November 18th,
6    '22 report, prepared any supplemental or additional
7    reports in this case?
8    A.  This report was initiated following the -- the lab
9    report of the space heaters.
10   Q.  Yeah, I know that.  My question is:  Have you
11   prepared any supplemental or --
12   A.  No.
13   Q.  -- additional reports --
14   A.  No, I have not.
15   Q.  -- since this one?
16   A.  No, I have not.
17   Q.  Have you reached any additional opinions not
18   already expressed in either of your two reports
19   produced in this case?
20   A.  No, I have not.
21   Q.  Did you express all of the opinions that you had in
22   this case connection -- in connection with the
23   origin cause of this fire in your November 18th,
24   '22 report, or did you hold some back?
25   A.  I don't think I held back any opinions.  I think

19 (Pages 70 - 73)

Page 74

1    I -- there's probably not everything that I did in
2    that fire investigation is in the report
3    necessarily.  But -- 'cause there would be multiple
4    things involved --
5  Q.  I -- I only asked you opinions.
6  A.  No.
7  Q.  This report, your last report, November 18th, 2022,
8    contains all of your opinions about the cause and
9    origin of this fire.
10  A.  Yes, sir.
11  Q.  And you've not developed any different or
12    additional opinions since then, right?
13  A.  No, sir.
14  Q.  Okay.  Referencing again, Jim, your first report,
15    marked as Defendant's Exhibit F, dated
16    December 3rd, 2019.  In the second paragraph you
17    talk about Rimkus -- I'll use that just as a --
18    keep the deposition shorter -- was retained by
19    CCMSI, right?
20  A.  Yes.
21  Q.  Is that -- do you know what those initials stand
22    for?
23  A.  No, I do not.
24  Q.  Do you know if that's some division or alternative
25    name of Republic?

Page 75

1  A.  I know Republic -- I was told that Republic
2    Services was -- self-insures.  So I -- I'm not
3    sure -- I assumed it was somebody associated with
4    the company by those initials.
5  Q.  Your second paragraph of Exhibit F, the information
6    in it, you can just read it to yourself right now.
7    And -- and setting aside Mr. Otto Soyk --
8  A.  Uh-huh.
9  Q.  -- did that information come from Glenn Bell?
10  A.  Yes, sir.
11  Q.  Okay.  So you and Glenn Bell first spoke the day
12    after this fire.
13  A.  Yes.  It was on the 20th.
14  Q.  Okay.  And he asked you to determine the origin and
15    cause of the fire and to determine if recently
16    installed heaters contributed to the cause,
17    correct?
18  A.  Yes.
19  Q.  And did you ask him why he thought -- or he -- he
20    or his company thought that the recently installed
21    heaters might have something to do with the fire?
22  A.  They -- he was given information, I think, by the
23    people on -- at the site that stated that that was
24    one of the things that had recently been done at
25    the facility, within the last couple months.  And

Page 76

1    they were wondering if that would have anything to
2    do with the cause of the fire.  And that
3    information was given to check into that
4    possibility along with, obviously, determine a
5    cause and origin of the fire.
6  Q.  Didn't Glenn Bell also tell you, the day after the
7    fire, when he first contacted you, that an
8    unidentified heating and air company had been
9    consulted to install the style of heat in the
10    building and advised against this type of heater
11    used in the area due to welding and paint
12    operations?
13  A.  I never got that information from Glenn --
14  Q.  Where did you --
15  A.  -- no.
16  Q.  -- get it from?
17  A.  I got that from Kyle Orr.
18  Q.  When?
19  A.  The day I was there.
20  Q.  The first day.
21  A.  The first day.  The 19th, or the 20th, rather.
22  Q.  And you wrote -- skipping to Page 2 of your report.
23    We'll skip back to 1 here in a minute.  It's the
24    last big paragraph near the bottom, the sentence I
25    just wrote to you -- read to you.

Page 77

1    You don't have any field notes left from your
2    conversation with Kyle Orr about this unidentified
3    company that advised against this type of heater,
4    do you?
5  A.  No.  I didn't know the name of the company.  I
6    presently know the name of the company.  But I did
7    not know the name of the company at the time.
8    Because --
9  Q.  When did you first learn it?
10  A.  -- 'cause Kyle didn't have that information readily
11    available to give to me --
12  Q.  Okay.
13  A.  -- at that time.
14  Q.  When did you first learn it?
15  A.  On the day of the joint scene exam.
16  Q.  What day is that?
17  A.  Like, March the 3rd of 2020, I believe it was.
18  Q.  Who told you?
19  A.  Not March -- or not 2020.  It would have been
20    March -- the day I was there for collecting from
21    the heater.  The -- I collected the samples from
22    the heaters.  That date would have been --
23  Q.  May 10th?
24  A.  -- May the 10th, 2019.  Sorry.  'Cause that's when
25    I was informed that those heaters -- about the

Page 78

1   heaters.
2   Q.   That some other company had recommended against the
3        installation of that style heater.
4   A.   Yes.
5   Q.   Who told you that on May 10th, 2019?
6   A.   That would have been also Kyle at that time.
7   Q.   Has anybody else besides Kyle Orr ever given you
8        that information?
9   A.   Fred Jones is also another manager there that give
10       me that information on the day I was there for
11       the --
12   Q.  May 10th, 2019?
13   A.  May the 10th, yes.
14   Q.  That's the day you collected your gauze swabs and
15       scrapings and --
16   A.  Yes.
17   Q.  -- such, right?  So you don't have any field notes
18       left from talking to Kyle Orr or Fred Jones on
19       May 10th, 2019 about this company that recommended
20       against the installation of these heaters, do you?
21   A.  No, I do not.
22   Q.  What name did they give you that day?
23   A.  Korte, I believe, is the -- starts with a K,
24       o-r-t-i, I believe.
25   Q.  Korte Does It All?

Page 79

1   A.   Yeah.
2   Q.   So I imagine this sounded important to you, that
3        another company had looked at this facility, with
4        expertise, and had recommended against using closed
5        infrared Space-Ray heaters?  Sorry, closed infrared
6        tube heaters?
7   A.   Well, all the information I received was -- I
8        consider important, yes.  And that would have been
9        an important --
10   Q.  Right.
11   A.  -- also.
12   Q.  So you probably followed up on that pretty quickly.
13   A.  No, I did not.  I -- I treated it like I would any
14       other information, which would have been just
15       taking that information in.  And also, you know,
16       put on a shelf, so to speak, as part of the
17       investigation.
18   Q.  Did you ever take it off the shelf and talk to
19       Korte about this?
20   A.  I did not talk to Korte about that except for in
21       a -- a phone conversation I had.  I can't recall
22       the guy's name, that stated that they had also
23       installed, I believe, some lighting equipment in
24       the facility, and things of that nature.  But had
25       advised against putting those type of space heaters

Page 80

1   in.
2   Q.   What -- what day was that, this phone call with
3        Korte?
4   A.   I'm not sure what date that would be.  That would
5        have been prior to my --
6   Q.   First report?
7   A.   -- first report -- or, yeah, first report.
8   Q.   You can't even say the month?
9        MR. JONES:  Objection to form.
10       THE WITNESS:  That would have been December.
11   QUESTIONS BY MR. GARDNER:
12   Q.  Of what year?
13   A.  Of 2019, I believe.
14   Q.  All right.  How long did that phone call last?
15   A.  Just a very few minutes.
16   Q.  Who did you talk to?  What was the name?
17   A.  I don't recall the name offhand.
18   Q.  So surely you put that information in -- in some
19       sort of notes, didn't you?
20   A.  Yes, I did.
21   Q.  Those are the notes that are destroyed.
22   A.  I assume so, yes.  I personally did not destroy any
23       notes.  But --
24   Q.  Yeah.  Do you think when Rimkus adopted the new
25       policy of destroying field notes after a

Page 81

1   preliminary report is prepared that that was
2   incongruent with the guide -- NFP 921 guidelines?
3   A.   I, you know, obviously, working for a company, I
4        don't control what they do or what they don't do.
5        But I -- yes, I think it would probably be helpful
6        to keep any type of information and notes available
7        to -- to have to refer back to.
8        I can see some of their understanding in
9        regards to keeping information when they have
10       thousands and thousands of pieces of information
11       that they'd have to keep on file.  That if the
12       information is -- is -- for them is too much.
13   Q.  Your resumé speaks to you teaching courses, for
14       decades I think, in fire scene investigation
15       techniques and methodology, doesn't it?
16   A.  Yes, sir.
17   Q.  Have you ever taught anyone in any of your classes
18       that they should destroy their field notes?
19   A.  I have never --
20   Q.  You've --
21   A.  -- stated that fact, no.
22   Q.  You've done just the opposite, haven't you, that
23       all field notes should be maintained throughout the
24       course of the investigation.
25   A.  Right.  All field notes should be -- in my opinion,

21 (Pages 78 - 81)

Page 82

1    yes, all field notes should be kept --
2 Q.  'Cause NFP 921 --
3       MR. JONES:  He can answer.  He's -- he's
4    answering.  If you could let him finish --
5       MR. GARDNER:  His answers are going on
6    forever.  We're gonna be here till midnight.
7       MR. JONES:  But you're -- you're asking these
8    questions.  He has the right to answer them.
9    So ...
10      THE WITNESS:  Yes.  I would've -- I would
11   expect to -- anyone to keep any information that
12   they've obtained --
13      MR. GARDNER:  I'm sorry.  I'm stepping on the
14   court reporter.
15      THE WITNESS:  -- as for as their information
16   that they -- they written down in any capacity,
17   whether it's typed or written --
18 QUESTIONS BY MR. GARDNER:
19 Q.  There are multiple --
20 A.  -- handwritten.
21 Q.  -- several sections of NFP 921 that indicate that
22   those field notes should be maintained throughout
23   the course of the investigation, aren't there?
24 A.  Yes.  I -- I think there -- the feeling that I had
25   whenever we discussed that with our general office

Page 83

1    was that once the report's written, that they feel
2    like that that was completion of the investigation
3    and therefore if it was -- those written things,
4    all those written stuff didn't need to be kept
5    anymore.
6       Now, unless, I guess you could -- I --
7    hindsight would have been -- would have been I
8    could have asked and requested that they been kept.
9    But at the time it -- I did not do that.
10 Q.  Didn't John Shadow or Kyle Orr ever tell you that
11   the reason they selected my client, COE Heating &
12   Air Conditioning, to install the three closed
13   infrared tube heaters, rather than Korte Does It
14   All, was for price reasons alone?
15 A.  No, I did not -- they did not say anything to me --
16 Q.  That's news --
17 A.  -- about that.
18 Q.  -- to you today, isn't it?
19 A.  Yes.
20 Q.  'Cause you didn't read the deposition of Ron
21   Danzer, did you?
22 A.  No, I have not.
23 Q.  Where that's talked about.
24 A.  No.
25 Q.  And you didn't read the deposition of John Shadow

Page 84

1    or Kyle Orr, where both -- that's talked about, did
2    you?
3 A.  No, I did not.
4 Q.  So if in the depositions of -- of --
5       (A discussion was held off the record.)
6       MR. GARDNER:  I'm gonna take Jim Z's so --
7    recommendation of regular breaks about now.  Is
8    that okay?
9       MR. JONES:  Perfect -- that's great.
10      THE VIDEOGRAPHER:  The local time is 12:41.
11   This ends media one.  We are off the record.
12      (A brief recess was taken.)
13      THE VIDEOGRAPHER:  This begins media two.  The
14   local time is 12:52.  We are on the record.
15      MR. GARDNER:  Thanks.  Can you read back the
16   last question.
17      (The requested text was read by the court
18   reporter.)
19      MR. GARDNER:  I meant John Shadow.
20 QUESTIONS BY MR. GARDNER:
21 Q.  Correct?
22 A.  Yes.
23 Q.  Okay.  Prior to your employment with Rimkus, you
24   were employed by a company called EFI Global.  And
25   from looking at, I believe, your LinkedIn profile,

Page 85

1    you left EFI Global in June of 2018, and that same
2    month started with Rimkus in June of 2018.  That
3    sound right?
4 A.  Yes, sir.
5 Q.  Why did you leave EFI Global to go to Rimkus?
6 A.  EFI Global had purchased Unified and Fire
7    Investigations.  They -- they basically became one
8    entity.  They had five other investigators that
9    came on board.  And at the time they were
10   considering going to part-time status with
11   everybody so no longer would have a contract,
12   written contract.
13      So -- and at the same time I received an email
14   from Rimkus who said that -- or offered me
15   additional income, $25,000 actually more per year
16   than what I was making under -- under contract.
17   And so I elected to leave from there and go to
18   Rimkus.  They did not have an investigator in
19   Indiana at the time.
20 Q.  Thank you.  Why did you leave employment in 2020
21   with Rimkus?
22 A.  From Rimkus, after the -- during period of COVID
23   and things of that nature, they started having
24   some -- receiving -- lack of receiving fire
25   investigations.  And so they decided to put

22 (Pages 82 - 85)

Page 86

1  everybody -- all their fire investigators on
2  part-time status, and actually hired two additional
3  part-time people. So that way we -- they would
4  have sufficient number of people to cover the state
5  in different areas, one up in Fort Wayne and one
6  south.
7     So I at that point in time, due to the fact I
8  had -- no longer had a contract with them and --
9  and a guaranteed income, I decided to leave their
10  employment there.
11  Q. But your income since leaving has been far less
12  than while with them, hasn't it?
13     MR. JONES: Objection. I don't think he's
14  testified to that yet.
15     THE WITNESS: No, it has -- had not been.
16  Because at the time, whenever I went part-time with
17  them initially, and basically my income from them
18  was in -- a lot less than what it was originally.
19  And also the fact that I could not live on that
20  type of an income, other than my retirement and
21  Social Security. But I did not want to continue
22  to -- so I -- I left them.
23     And actually at the time my father-in-law
24  owned a company for -- a construction company. And
25  I went and worked for him for a while until I

Page 87

1  decided to go off on my own and get this other job
2  actually.
3  QUESTIONS BY MR. GARDNER:
4  Q. Exhibit C are various invoices from Rimkus --
5  A. C.
6  Q. -- from this case?
7  A. Is that here?
8  Q. You're not really gonna need to look at it.
9  A. Okay.
10  Q. Just, for instance, the first day you were on site,
11  March 20th, 2019, Rimkus billed its client in this
12  case for you at the rate of $195 an hour, correct?
13  A. Yes, sir.
14  Q. All right. And since leaving Rimkus, what is your
15  billable rate in this case?
16  A. One-fifty an hour.
17  Q. And what are you charging me an hour -- my client
18  today for this deposition an hour?
19  A. One-fifty an hour.
20  Q. So is your rate 150 an hour whether you're on site,
21  talking to witnesses, giving depositions,
22  testifying in trial?
23  A. Yes. They -- I know Rimkus has a -- like a $225
24  for any type of legal, so they jump it up even
25  higher than that. And I thought it would be fair

Page 88

1  to keep it at 150 for any type of work that was
2  being done, personally, as well -- except for
3  travel time I only -- is -- I reduce that to $50 an
4  hour travel time.
5  Q. And since ending that -- those couple of recent
6  cases that we talked about near the beginning of
7  this deposition, you're down to just this one case,
8  aren't you?
9  A. Yes.
10  Q. Okay. And what do you earn hourly as a mechanic at
11  that Northside Trailer place?
12     MR. JONES: Objection to form. I don't know
13  that he testified earlier that he's an hourly
14  worker there.
15  QUESTIONS BY MR. GARDNER:
16  Q. Are you an --
17  A. Yes, I am an hourly worker there. But I make
18  approximately $1,000 a week.
19  Q. I'm just asking hourly.
20     MR. JONES: What -- what -- Marty, what --
21  what's the relevance of his earnings in his job?
22     MR. GARDNER: Comparison to what he earns
23  during this case --
24     MR. JONES: Okay. Well --
25     MR. GARDNER: -- when he's not working on this

Page 89

1  case.
2     MR. JONES: Okay. Well, we object to form.
3  You can answer.
4  QUESTIONS BY MR. GARDNER:
5  Q. My only question right now is, Jim, what are you
6  paid hourly, by the hour, at Northside Trailer?
7  A. Well, they --
8     MR. JONES: Objection.
9     THE WITNESS: -- it's a variation of -- of --
10  of things. I get paid a hourly, which is $25 an
11  hour. And I also get paid a bonus, depending on
12  how much work is being done and so forth. So
13  roughly my paychecks run in -- or the gross amount
14  is around $1,000 a month -- or a week.
15  QUESTIONS BY MR. GARDNER:
16  Q. So today you're making 150 an hour. And setting
17  aside bonuses, when you work at the Northside
18  Trailer, you make 25 an hour.
19     MR. JONES: Same objections.
20  QUESTIONS BY MR. GARDNER:
21  Q. Right?
22  A. Well, I don't -- I don't work as a fire
23  investigation on a regular basis. So I'll have to
24  have income coming in. This is just following up
25  with old cases and things of that nature, yes. And

23 (Pages 86 - 89)

Page 90

1  trying to be fair to every -- everything involved
2  here.
3  Q.  Referring, Jim, to Exhibit F, which is your first
4      report, dated December 3rd, 2019.  Second paragraph
5      states, last sentence, as follows:  This report was
6      reviewed by Otto Soyk --
7  A.  Uh-huh.
8  Q.  -- Junior, IAAI, hyphen, CFI, common -- comma, V in
9      parentheses, Fire Division Manager.  Do you see
10     that?
11 A.  Yes.
12 Q.  Why was that done?
13 A.  Every fire report that we did with Rimkus that I
14     had to -- I had to send to a division manager for
15     review.  It was just a peer review.
16 Q.  He didn't catch the date of the fire wrong, did he?
17 A.  No, he did not.
18 Q.  He didn't catch any errors, did he?
19 A.  Not to my knowledge.
20 Q.  There's a billing in the Rimkus file which we have
21     at Exhibit C, Page 7, dated -- you don't have to
22     look at it, Jim, really -- dated November 19th,
23     2019 by Otto Soyk.  It says, Review report for
24     technical content, eight-tenths of an hour at 195
25     an hour.  Does that sound about right?  It's

Page 91

1  page --
2  A.  I would assume so, yes.  It sounds right.
3  Q.  You've not had your December '22 report technically
4      reviewed, have you?
5      MR. JONES:  Did you say December '22?
6      MR. GARDNER:  Yeah.
7      MR. ZOCCOLA:  It's November.
8      MR. JONES:  I don't -- I don't think he did
9  one --
10     MR. GARDNER:  I apologize; it's November '22.
11     THE WITNESS:  No, I did not.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Why?
14 A.  I no longer worked for Rimkus.
15 Q.  You had nobody to --
16 A.  That was a requirement from Rimkus.  And, also, I
17     don't have anyone to review that re -- that as a
18     peer.
19 Q.  Okay.  You'll concede that in your investigation of
20     this -- the fire in this case, you used the
21     systematic approach as recommended in the current
22     edition of the National Fire Protection
23     Association, NFPA 921?
24 A.  Yes, sir.
25 Q.  Guide for Fire and Explosion Investigations,

Page 92

1  correct?
2  A.  Yes, sir.
3  Q.  And in compliance with NFPA 1033 Standard for
4      Professional Qualifications of a Fire Investigator?
5  A.  Yes.
6      MR. JONES:  Are you -- you asked current.
7  What -- are you talking about this year or current
8  as of the date of fire?
9      MR. GARDNER:  The date of this report.  He put
10 it right in his report.
11     MR. JONES:  Are -- you're asking him -- okay.
12 Never mind.
13 QUESTIONS BY MR. GARDNER:
14 Q.  Did you reference NFPA 921 in connection with
15     preparing either of your reports?  In other words,
16     did you open it up and look at it?
17 A.  I open it up and look at it all the time.  I don't
18     know -- I'm -- almost on every time I do a report,
19     I -- and also even when I'm not doing reports, I
20     observe and read the manual.
21 Q.  It must be really important then for a fire --
22 A.  It is important.  Yes, I --
23     MR. JONES:  Objection.
24     THE WITNESS:  It is a -- matter of -- a
25 guideline that we -- we use.  And it changes.  It's

Page 93

1  an ongoing and changing guideline.
2  QUESTIONS BY MR. GARDNER:
3  Q.  Right.  And so when you wrote your December 3rd,
4      2019 report, it was the 2017 edition in -- in
5      place, wasn't it?
6  A.  Yes, sir.
7  Q.  And when you wrote your next report, which I'll get
8      the date right, November 18th, 2022, the 2021
9      NFPA 921 edition was out, wasn't it?
10 A.  Yes, it was out.
11 Q.  Were there any significant changes made in the 2021
12     edition of NFPA 921 that you used as compared to
13     the 2017 edition?
14     MR. JONES:  Objection to form, foundation.
15     THE WITNESS:  There are several changes that
16 were made in that -- in the differences.  And just
17 a couple of the major changes, one was that they
18 took away all of the categories of --
19     MR. GARDNER:  My only question is:  Did you --
20     MR. JONES:  He -- he -- he's answering your
21 question.
22     THE WITNESS:  Prior investigation --
23     MR. GARDNER:  He -- he's not.  My question is:
24 Did you utilize the change in your --
25     MR. JONES:  And he's telling you what he

1   utilized and what changes. So I think it's fair
2   for him to get to actually tell you --
3       MR. GARDNER: I'll withdraw the question.
4       MR. JONES: -- what changes he utilized.
5       MR. ZOCCOLA: Well, let him finish his
6   quest -- let him finish his answer.
7   QUESTIONS BY MR. GARDNER:
8   Q. What were you trying to say?
9   A. I was just letting you know what changes that I
10      recognized as some major changes in the -- from the
11      '17 to the -- the '22.
12  Q. Okay. And did you make reference to any of those
13      changes in either of your reports?
14  A. No, I did not.
15  Q. And other than indicating that you applied the
16      method -- methodology for fire investigations as
17      recommended by the National Fire Protection
18      Association 9F -- NFP 9 -- A 921, you made no
19      further reference to any section in either reports,
20      did you?
21  A. No, I did not.
22  Q. Is that how you usually make your reports without
23      reference to any NFPA 921 sections?
24  A. We make a reference to the -- we use in those as a
25      guidelines and -- and initially so there --

1   therefore -- this was -- this report from Rimkus
2   was generated from an automatic -- basically a
3   standard format that they use for reports. And we
4   just fill in the sections as -- as we do that.
5       We don't utilize every single -- we utilize
6   the -- the re -- NFP 921. However, we don't
7   particularly utilize it in word form on every
8   situation as we go through. It's always utilized,
9   put it that way, some form or another.
10  Q. How does NFPA 921 define area of origin?
11      MR. JONES: Objection to form.
12      THE WITNESS: They refer to it as a general
13      area where the fire originated from.
14  QUESTIONS BY MR. GARDNER:
15  Q. How does NFPA 921 identify -- or I'm sorry --
16      define the word "char"?
17      MR. JONES: Objection to form. I don't think
18      he -- you're looking at something right now.
19      You're asking -- are you quizzing him on it? Or
20      are you asking him to say verbatim? Or you asking
21      him to give a summary? Or what are you asking?
22      MR. GARDNER: I stand with my question. I
23      like it.
24      MR. JONES: You can answer.
25      THE WITNESS: Well --

1       MR. JONES: Same objection.
2       THE WITNESS: I -- again, I don't know exactly
3   word for word for what it says. But it -- char is
4   basically the remains of combustible products that
5   have been involved in a -- in the fire scene. And
6   it's usually identified as the -- the charred
7   remains of the combustible material that's burnt.
8   QUESTIONS BY MR. GARDNER:
9   Q. Would you agree that the definition per NFPA 921 of
10      "char" is a carbonaceous material that has been
11      burned or pyrolyzed and has blackened appearances.
12      MR. JONES: Same objections.
13      THE WITNESS: Yeah.
14  QUESTIONS BY MR. GARDNER:
15  Q. What does the word "pyrolyzed" mean?
16      MR. JONES: Same objection.
17      THE WITNESS: Are you talking about
18      pulmerization (phonetic) or pulmerized (phonetic)?
19  QUESTIONS BY MR. GARDNER:
20  Q. I'll spell if for you, p-y-r-o-l-y-z-e-d.
21  A. Pulmerized (phonetic)? That is where a -- a
22      chemical or a -- or a -- or a product, basically
23      when exposed to air, can suddenly explode or
24      rupture, a container or whatever. I don't know of
25      their --

1   Q. Do you --
2   A. Excuse me. I don't know their exact wording that
3       they use, but that's what it does.
4   Q. All right. Would you agree that the definition per
5       NFPA 921 of the word "combustible" is something
6       capable of undergoing combustion?
7   A. That is part of it, yes.
8   Q. Would you agree that per NFPA 921 the defini --
9       definition of competent ignition source is, quote,
10      an ignition source that has sufficient energy and
11      is capable of transferring that energy to the fuel
12      long enough to raise the fuel to its ignition
13      temperature?
14      MR. JONES: Same objections.
15      THE WITNESS: Yes. That would be the
16      definition of -- as you're reading it.
17      MR. GARDNER: What?
18      THE WITNESS: Yes. That would be the
19      definition --
20      MR. GARDNER: Okay.
21      THE WITNESS: -- that you're reading.
22  QUESTIONS BY MR. GARDNER:
23  Q. NFPA 921, Section 3.3.42 is -- we're in the
24      definitional section, which I'm sure you've looked
25      at, haven't you?

25 (Pages 94 - 97)

1  A.  I've -- yeah, looked at --
2  Q.  Okay.
3  A.  I don't know all the definitions by their def -- I
4      guess that's why we have the book to refer to --
5  Q.  That's right.
6  A.  -- if we need to.
7  Q.  It defines data analysis as the process of
8      systematically utilizing logical techniques to
9      dissect, reorder, evaluate, and interpret data?
10     Would you agree with that?
11        MR. JONES:  Same objections.
12        THE WITNESS:  Yes, sir.
13        MR. GARDNER:  Okay.
14 QUESTIONS BY MR. GARDNER:
15 Q.  Do you know what deductive reasoning is?
16 A.  Deductive reasoning is using information that
17     you're given to form hypothesis in different areas
18     that we -- that is utilized to -- there's in --
19     there's inductive reasoning and there's deductive
20     reasoning.  And the -- in the -- the pattern of
21     fire investigation or methodology.
22        And you use those to determine, like, witness
23     statements, data that you receive, everything that
24     you utilize, wit -- in the process to make -- to
25     form an opinion and to form a hypothesis.

1  Q.  And did you do that in this case?
2  A.  Yes, sir.
3  Q.  Tell me if you agree with this as the definition of
4      explosion per NFPA 921.
5        MR. ZOCCOLA:  Where are you reading from?
6      Is --
7        MR. GARDNER:  I don't have to tell you that.
8      Work product.
9        MR. ZOCCOLA:  So you're gonna -- you're gonna
10     ask questions about --
11        MR. GARDNER:  I've got a lot of questions
12     about this.
13        MR. ZOCCOLA:  -- about written product, and
14     you're not gonna identify what you're --
15        MR. GARDNER:  I just did.
16        MR. ZOCCOLA:  -- what you're reading?
17        MR. GARDNER:  I just did.
18        MR. ZOCCOLA:  Okay.
19        MR. JONES:  Same objections as before.
20 QUESTIONS BY MR. GARDNER:
21 Q.  Will you agree that NFPA 921, Section 3.3.58
22     defines an explosion as, quote, the sudden
23     conversion of potential energy, paren, chemical or
24     mechanical, closed paren, into kinetic energy with
25     the production and release of gasses under

1      pressure, further release of gas under pressure?
2        MR. JONES:  Just to clarify, are you asking if
3      he agrees with the definition?  Or are you asking
4      whether or not --
5        MR. GARDNER:  Asking if he agrees -- that is
6      the definition.
7        MR. ZOCCOLA:  And -- and there's no foundation
8      of what he's reading.
9        MR. JONES:  I don't know that you've laid any
10     foundation for what you're reading from.  You've
11     not identified what you're reading from.  And I
12     don't know if you're asking -- if -- you know, if
13     he agrees with NFPA's definitions as you're reading
14     them?
15        MR. GARDNER:  I'm holding NFPA --
16        MR. JONES:  Right.  And if -- if --
17        MR. GARDNER:  -- 921, Thomas.  What do you
18     think I'm doing?
19        MR. JONES:  My point is, if we're gonna sit
20     here and read through whether or not you're reading
21     all these correctly, we're gonna be here a while.
22     And if you want to --
23        MR. GARDNER:  Just asking if he agrees or not.
24        MR. JONES:  -- if you want to ask all those
25     questions, you know, have at it.  But we -- keeping

1      all those objections.
2        THE WITNESS:  I will agree that those -- the
3      definition as you read it in their -- in that book
4      is true -- is true definition that the ...
5  QUESTIONS BY MR. GARDNER:
6  Q.  Do you agree that the definition of "fuel" per
7      NFPA 921, Section 3.3.95 is, quote, a material that
8      will maintain combustion under specified
9      environmental conditions?
10        MR. JONES:  Same objections.
11        THE WITNESS:  Yes, sir.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Does NFPA 21 [sic], in the definitional section,
14     give a definition for a fire scene reconstruction?
15        MR. JONES:  Objection to foundation.
16        THE WITNESS:  Yes, they do.
17 QUESTIONS BY MR. GARDNER:
18 Q.  Okay.  Do you agree that NFPA Section 921 --
19     Section 3.3.80 defines "fire scene reconstruction"
20     as the process of recreating the physical scene
21     during fire scene analysis investigation or through
22     the removal of debris in the placement of contents
23     for structural elements in their prefire positions?
24        MR. JONES:  Same objections.
25        THE WITNESS:  I agree that's the definition --

26 (Pages 98 - 101)

Page 102

1    MR. GARDNER: Okay.
2    THE WITNESS: -- that's in that book, yes.
3  QUESTIONS BY MR. GARDNER:
4  Q.  Did you do that in this case?
5  A.  The -- in this particular case -- obviously, every
6     fire scene's different.  And we treat every --
7     every fire scene that's there.  We can't -- we
8     don't utilize every single thing in that book on
9     every single fire.
10 Q.  I know that.
11 A.  We try to do it -- the -- the best job we can to
12    facilitate the fire investigation based on all
13    facts and all information that's given.  And we
14    utilize reconstruction as one of those, if we're
15    able to do that.
16 Q.  I'll move to strike that as nonresponsive.  And if
17    you don't listen to my questions, I'll have to move
18    the Court for more time over seven hours here.
19    MR. JONES:  I think he's answer -- he's
20    answering your questions.
21    MR. GARDNER:  No, he hasn't.
22    MR. JONES:  You've gone --
23    MR. GARDNER:  -- yes or no questions.
24    MR. JONES:  -- you've gone through definitions
25 in a book that we --

Page 103

1    MR. GARDNER:  Thomas, that was a yes-or-no
2  question.
3    MR. JONES:  -- that we all agree on.  You're
4  asking whether or not -- I mean, if you're
5  concerned about conserving time, I -- I don't know
6  why we're going through all these definitions and
7  asking whether or not you read them correctly out
8  of a book you're not gonna show him.
9    MR. GARDNER:  That's not what I did.  I asked
10 him if he -- he -- I read it to him and asked him
11 if he did it.  He hasn't said yes --
12    MR. ZOCCOLA:  That's not what you did.  You --
13 you -- you're quizzing him on --
14    MR. GARDNER:  Hold on.  Only one lawyer.
15    MR. ZOCCOLA:  Yeah.  I got it.
16    MR. JONES:  Our -- our point's just that --
17    MR. GARDNER:  -- object.
18    MR. JONES:  -- our point's just that if you're
19 gonna spend a significant portion of this depo --
20 deposition quizzing him on --
21    MR. GARDNER:  Thomas, my use of time --
22    MR. JONES:  -- definitions --
23    MR. GARDNER:  -- is up to me.
24    MR. JONES:  Okay.  Well, then, by all means.
25 But if you're gonna ask --

Page 104

1    MR. GARDNER:  -- answer yes or no or not.
2    THE WITNESS:  I agree with the definition,
3    yes, that's in the book.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Did you do that?
6  A.  Yes.
7  Q.  Did you reconstruct the scene?
8  A.  We -- I -- I can't say yes or no.  Because we -- in
9     my opinion, we try to do everything that we can do
10    to -- to reconstruct the scene if it's feasibly
11    possible.
12 Q.  Did you do that in this case, reconstruct the scene
13    to its prefire --
14 A.  To a certain degree, yes.  But in -- for the most
15    part no.
16 Q.  You'll concede that the word "reconstructed" or
17    words "reconstructed" or "reconstruct" are in
18    neither of your reports.
19    MR. JONES:  Objection.  They speak for
20    themselves.
21    THE WITNESS:  No.  That is not in my report.
22    MR. GARDNER:  'Cause you didn't do it.
23    MR. JONES:  Same -- same objections.
24    THE WITNESS:  Not physically, no.
25 QUESTIONS BY MR. GARDNER:

Page 105

1  Q.  NFPA 921, Section 3.3.131 defines material first
2     ignited as, quote, the fuel that is first set on
3     fire by the heat ignition, semicolon, to be
4     meaningful, comma, both a type of material and a
5     form of material should be identified.  You'd agree
6     with that, wouldn't you?
7     MR. JONES:  Objection to form, foundation.
8     THE WITNESS:  Yes.
9     MR. GARDNER:  Okay.
10 QUESTIONS BY MR. GARDNER:
11 Q.  In this case did you determine the material first
12    ignited?
13 A.  In my opinion the first material that was ignited
14    would -- would have been the heater which would
15    have been fueled by propane.
16 Q.  Material was the heater?  Is that what you're
17    saying?
18    MR. JONES:  Objection.
19    THE WITNESS:  No, I didn't say that.  I said
20    the first fuel that was ignited was propane.
21 QUESTIONS BY MR. GARDNER:
22 Q.  And what ignited second?
23 A.  Would have been the product that was on the heater
24    and in the heater and in the tubes that was
25    combustible materials, then suppically (phonetic)

27 (Pages 102 - 105)

Page 106

1    it ignited and -- which was -- which -- which
2    basically ended up, my opinion, as the cause of
3    this fire as for as ignition of the fire.
4  Q.  And what was the product on and in the heaters that
5      you're talking about?
6  A.  The residue from paint and other material that's
7      used in the -- in the -- in their process of
8      repairing dumpsters.
9  Q.  And what are the other materials identified as?
10 A.  Well, they told me occasionally they use paint
11     thinners there.  They also utilized -- primarily
12     the paint that's a blue-color paint.  I don't have
13     the name offhand.  But I have that information, the
14     MSDS sheet on that particular product.
15 Q.  You're talking about the Blue Sheboygan paint,
16     aren't you?
17 A.  Yes.
18 Q.  Okay.  And what -- what size are those --
19 A.  In the past, which is not effect -- not related to
20     this particular fire.  But in the past they've also
21     used the Hercul -- Hercules bed liner that they use
22     on some of the dumpsters.  Certain -- certain
23     customers request that to happen --
24 Q.  Had they used Herculiners in -- on March 19th, 2019
25     in that room -- building?

Page 107

1  A.  To my knowledge they have not used that for a
2      couple of years at least.  And I was told at one
3      point it was five years that they hadn't used it.
4      So --
5  Q.  Who told you that?
6  A.  -- there were some discrepancies in that aspect.
7  Q.  Who told you that?
8  A.  That was -- Fred Jones was one.
9  Q.  Okay.  Do you know if any Herculiner product was
10     stored inside of building number 1 on the day of
11     the fire?
12 A.  I did not see any Herculine material.
13 Q.  Okay.  Were you aware that Terry Reader testified
14     that there was -- there were can -- one-gallon cans
15     of Herculiner inside of building number 1 on the
16     day of the fire?
17     MR. JONES:  Objection to form.  Misstates
18     prior testimony.
19     THE WITNESS:  No.  I was told that they had
20     not used Herculine material for several years.
21     MR. GARDNER:  I'm not talking about using it;
22     I'm talking about storing it in respect to --
23     THE WITNESS:  No.  I don't know that it was
24     present.
25     MR. GARDNER:  Okay.

Page 108

1  QUESTIONS BY MR. GARDNER:
2  Q.  So it might have been.  You just didn't read Terry
3      Reader's deposition.
4  A.  I did not read his deposition.
5  Q.  Did you utilize the scientific -- any scientific
6      method in this case?
7  A.  We always use a scientific method on every fire
8      that we go to, the extent of what we can utilize of
9      the -- that method based on what we're presented
10     with.
11 Q.  Can you explain for us the scientific method that
12     you utilized in this case?
13 A.  Obviously the first --
14     MR. JONES:  Objection, foundation.  You can
15     answer.
16     MR. HEHNER:  I didn't understand what you
17     said.
18     MR. JONES:  Form and foundation objections.
19     MR. HEHNER:  Thank you.
20     THE WITNESS:  Obviously the first thing of any
21     scientific method is, as they -- as they say,
22     determine the need, which is obviously -- those two
23     are -- the first two are already -- steps are
24     already pretty much given -- a given.
25     The need of it, 'cause there's a fire.  And

Page 109

1  two is determine the -- the cause and origin of the
2  fire.  And then, obviously, to collect data.  And
3  that could be any type of data that would be
4  presented:  Witness statements, physical data, fire
5  patterns, things of that nature.  And then any type
6  of other data that you receive from laboratories,
7  things that -- all those are applied.  And you
8  develop initial hypothesis.  Develop initial
9  hypothesis, then you try to utilize that and see if
10 the data that you received fits that hypothesis.
11     And then you go -- if that, for some reason,
12 is not possible or unreliable, then you try to
13 determine if there's any other hypothesis and
14 rule -- try to rule those out.  And then you come
15 up with a most common or a cause -- a cause of the
16 fire based on a percent of accuracy or percent of
17 trying to use -- I can't remember the -- what my
18 term was.  But --
19 QUESTIONS BY MR. GARDNER:
20 Q.  How about scientific certainty?
21 A.  Right, scientific certainty.
22 Q.  Have you fully explained for us your understanding
23     of the scientific method as you utilized it in
24     investigation of this fire?
25 A.  In this particular fire, yes.

28 (Pages 106 - 109)

Page 110

1  Q.  You're familiar with the idea of expectation bias
2      and confirmation bias?
3  A.  Yes, I am.
4  Q.  And you kept those in mind and avoided those during
5      your investigation in reaching your conclusions in
6      this case?
7  A.  Yeah.  I all -- every fire I do, I don't go into it
8      with any type of expectations, or even if someone
9      has said something to me about it.  That's not why
10     we investigate fires.  We want to know what we feel
11     is, in our expert opinion, the true cause of the
12     fire.
13 Q.  So to avoid presumption, would you agree that until
14     data has been collected, no specific hypothesis can
15     be reasonably formed or tested?
16 A.  To avoid presumption, yes.
17 Q.  Would you agree that to avoid confirmation bias
18     that the failure to consider alternate or opposing
19     hypotheses or prematurely discounting seemingly
20     contradictory data without appropriate analysis and
21     casting can result in incorrect conclusions?
22     MR. JONES:  Objection to foundation, form.
23     THE WITNESS:  Yes.  I agree that any other
24     possible hypothesis should be looked at and
25     discarded or become part of your overall

Page 111

1      investigation --
2      MR. GARDNER:  Were you --
3      THE WITNESS:  -- with that statement.  I'm
4      sorry.
5  QUESTIONS BY MR. GARDNER:
6  Q.  Were you able to eliminate an electrical --
7      electrical system or component as the cause of this
8      fire?
9  A.  To answer, yes, based on several aspects of this
10     particular fire.
11 Q.  Explain.
12 A.  Number one is the -- there was information that was
13     given to me by Kyle, as well as too by Fred Jones,
14     that the last person in the area was at 4:00 in the
15     evening, and any work would have been done.
16     Everything gets shut off on a routine basis.  And
17     all the electricity to the facility was shut off,
18     with exception of the fact of the power going to
19     the heaters.
20     Second of all, it was rechecked again at
21     approximately two-and-a-half hours later by
22     Mr. Jones.  And he confirmed that the -- all the
23     power to -- to lights and to other things and
24     equipment had been stored properly and everything
25     had been shut off.

Page 112

1  Q.  Did you just now testify that you determined that
2      all electrical supply going into the facility had
3      been shut off?
4  A.  Not all electrical going into the facility.  I said
5      the only thing in -- in that particular area of the
6      building that I was informed by Mr. Jones was
7      that -- the -- was the power going to the heaters.
8  Q.  You're not suggesting that the power into the
9      facility was off, are you?
10 A.  No.  I'm talking -- not to the box itself, no.  I'm
11     not saying that.
12 Q.  Okay.
13 A.  I'm saying to the -- any components in the
14     building.  I'm sure the receptacles, things like
15     that, still had power.  But there was nothing
16     operating in the building that -- that had power.
17     Lights were off, no equipment was running, things
18     of that nature.
19     And all the electrical wiring was in -- in
20     conduit as well.  And that makes a pretty big
21     difference when it comes to electrical causes of
22     fires, for the most part, due to wiring issues.
23 Q.  And when did you reach that conclusion?
24 A.  That's just general knowledge of -- of fire --
25 Q.  I'm sorry.  Let me retract the question.

Page 113

1      About when did you learn from Kyle Orr, and I
2      think you said Fred Jones, that basically all the
3      electrical components and systems inside of
4      building number 1 were turned off, other than the
5      heaters, on the day -- at the time of the fire?
6  A.  That was when I talked to Mr. Jones at the site.
7  Q.  The day after the fire.
8  A.  The day -- no.  That was -- Mr. Jones wasn't
9      contacted until or talked to until the --
10 Q.  May 10th of --
11 A.  May the -- yeah, when I went there the second time.
12 Q.  Okay.  So by May 10th, 2019, when you went there
13     the -- for the second time, you had been informed
14     by Kyle Orr and Fred Jones that nothing
15     electrical -- no electrical products or components
16     were on other than the heaters inside of building
17     number 1 at the time of the fire?
18 A.  Yes.
19 Q.  Then why did you bring John Diggle or Mr. Inendino
20     to the fire scene?
21 A.  Well, there's -- first of all talk about John
22     Diggle.  June Diggle is electrical engineer with
23     Rimkus based out of Chicago.  And the fire
24     examination site, there were several other
25     electrical engineers that were going to be there

29 (Pages 110 - 113)

Page 114

1 with other representations. So I felt that it
2 should be possible that we have representation for
3 -- for electrical engineer in case there was some
4 electrical issue that came up that we could discuss
5 it with him, and also he could guide us on certain
6 issues regarding electricity of the building.
7     So I asked him to attend the -- first of all
8 asked our client, then I asked him to attend the --
9 that examination.
10 Q.   And did Mr. John Diggle, electrical engineer,
11 examine the electrical components in and around the
12 fire scene of building number 1?
13     MR. JONES:  Objection, foundation.
14     THE WITNESS:  What I had him do is I had him
15 in contact with the other electrical engineers that
16 was there and had them to discuss any electrical
17 issues that they wanted to discuss. And if there
18 was anything that they needed from me, then let me
19 know. And we could've try to obtain anything that
20 we -- they wanted to obtain.
21 QUESTIONS BY MR. GARDNER:
22 Q.   Were you present when Lou Inendino informed a group
23 inclu -- that would have included Mike Vergon that
24 he could not exclude an electrical cause of this
25 fire?

Page 115

1     MR. JONES:  Objection to form, foundation.
2     THE WITNESS:  Lou Argino (phonetic) is a
3 mechanical engineer, number one. He's not an
4 electrical engineer. So I'm not sure he would
5 have -- in my knowledge I don't know why he would
6 have ever made that statement. I don't recall.
7 There was -- I was not present when that statement
8 was made by any -- to anybody. And I'm surprised
9 that statement would be something he -- knowing
10 Lou, that would ever be said.
11     MR. GARDNER:  You haven't read Mike Vergon's
12 deposition. I think we just took it.
13     THE WITNESS:  No, I have not.
14     MR. JONES:  There's no transcript.
15 QUESTIONS BY MR. GARDNER:
16 Q.   Did you -- were you in the presence of -- of John
17 Diggle when he informed other experts at the scene,
18 including Mike Vergon, that he could exclude -- I'm
19 sorry -- he could not exclude an electrical cause
20 of this fire?
21     MR. JONES:  Objection to form, foundation.
22     THE WITNESS:  No. I was not in the presence
23 of him. And I'm surprised, again, that anybody on
24 our team would have even made that suggestion to
25 anyone else at the site.

Page 116

1 QUESTIONS BY MR. GARDNER:
2 Q.   Can you reference Exhibit F, which is your first
3 report. Your --
4 A.   I'm on F right now.
5 Q.   Yea. Do you see conclusions there at the top? I'm
6 sorry. At the bottom?
7 A.   Yeah.
8 Q.   Yeah. In this report is the word "conclusion"
9 synonymous with the word "opinions"? Is that what
10 you mean?
11 A.   Yes.
12 Q.   And basically you listed three opinions, bottom of
13 Page 1, top of Page 2, correct?
14 A.   Uh-huh.
15 Q.   Your first conclusion, number one, you can read it
16 to yourself. But, as I understand it, you're sort
17 of giving a general origin of the fire in
18 conclusion number one, right?
19 A.   That's just a general conclusion that a fire
20 occurred, yes, and where it occurred.
21 Q.   Yeah. And number two you're talking about it
22 involved the south end of the facility. So that's
23 more of a general area of origin instead of a
24 specific area of origin, right?
25 A.   Yes.

Page 117

1 Q.   Okay. So your -- your true cause-and-origin
2 opinions are contained in Paragraph 3, correct?
3     MR. JONES:  Objection to form.
4     THE WITNESS:  Yes.
5     MR. JONES:  Yeah.
6     THE WITNESS:  Yes, sir.
7     MR. GARDNER:  Did you say yes? All right.
8 QUESTIONS BY MR. GARDNER:
9 Q.   And did you state that the cause and origin of the
10 fire is a direct -- direct result of open infrared
11 tube heaters installed in an area where painting
12 and other procedures are performed? That's part of
13 the paragraph, right.
14 A.   Yes.
15 Q.   Why did you use the word "open"?
16 A.   'Cause it's not a tightly sealed unit.
17 Q.   For writing this report, particularly opinion
18 number three we're talking about here, had you
19 consulted with any experts regarding closed
20 infrared tube heaters?
21 A.   No, I have not.
22 Q.   Have you ever --
23 A.   Consulted --
24 Q.   -- in this case?
25 A.   No. I'm just familiar with those type of heaters,

30 (Pages 114 - 117)

Page 118

1   how it --
2   Q.  And you think they're open.
3   A.  They're not -- they're not -- I would say they're
4      not open to things.  But you can actually -- when
5      you view -- view one of those heaters, you can
6      actually see the flame through some of the openings
7      and stuff that's in the heaters themselves,
8      particularly from the bell and things of that
9      nature.
10  Q.  From the what?
11  A.  There's a bell that comes out.  I refer to it as a
12     bell.  It's a cone-shaped device where the -- the
13     flame comes out of the heater.
14  Q.  So you've seen these three heaters that you saw at
15     the fire scene and then you gathered up and trucked
16     down to Rimkus, right?
17  A.  Yes.
18  Q.  And you've seen the three heater box -- heater
19     boxes, haven't you?
20  A.  Yes.
21  Q.  What nomenclature or terminology are you
22     comfortable with using in referencing the boxes,
23     the square boxes of the heaters?
24  A.  My definition --
25        MR. JONES:  Objection, foundation.

Page 119

1         THE WITNESS:  Okay.  My definition would be
2      that they were -- it's a closed system; however,
3      it's not tightly sealed system.
4   QUESTIONS BY MR. GARDNER:
5   Q.  No, no.  I'm just talking about how to -- how
6      what's -- you and I to come to an agreement on the
7      word we use for the -- the box where the ignition
8      occurs.
9   A.  The heater unit.
10  Q.  Heater unit.
11  A.  Yeah.
12  Q.  Okay.  It's kind of rectangular in shape, isn't it?
13  A.  Yes.
14  Q.  And is it sealed with silicone?
15        MR. JONES:  Objection to foundation.
16        MR. GARDNER:  I'm -- I'm talking before a fire
17     starts.  Are they still --
18        THE WITNESS:  Not to my knowledge.
19        MR. JONES:  Same objection.
20        THE WITNESS:  I don't know that.  I didn't --
21     I was not present at the time they were installed,
22     so I have no knowledge of that.
23  QUESTIONS BY MR. GARDNER:
24  Q.  Do you have any expertise in the field of HVAC?
25  A.  No, just general knowledge.

Page 120

1   Q.  Have you ever installed a closed infrared tube
2      heater?
3   A.  No, I have not.
4   Q.  Have you ever maintained or worked on a closed
5      infrared tube heater?
6   A.  No.
7   Q.  Have you ever installed a regular household
8      furnace?
9   A.  Yes, sir.
10  Q.  Okay.  Did you consult with any kind of an expert
11     as to the operation of the closed infrared
12     Space-Ray tube heaters that were used in -- I'm
13     sorry -- that my client installed at Republic?
14  A.  No.  The only thing that I referred to and assisted
15     me was their offer -- installation manual of a --
16     of a particular heater that they had installed
17     there.
18  Q.  And in terms of the word -- your use of the word
19     "open," if I'm following you right, you mean open
20     to the -- the air in the room where they're
21     mounted.  Is that what you mean?
22  A.  I'm just talking about them being ope -- they're --
23     yeah, they're -- the whole thing is open.  It's not
24     en -- enclosed, except for the burner units
25     themselves are in a -- in an enclosed container.

Page 121

1      However, that enclosed container is not totally
2      a -- a sealed container.
3   Q.  And you -- are you saying that -- let's say you and
4      I were together at Republic's facility on MacBeth
5      Road the -- the day before the fire, that would be
6      March 18th, 2019, climbed up a ladder and looked at
7      these burner unit boxes of the Space-Ray heaters.
8      We could physically see a flame without opening it
9      anywhere?  Is that when you think?
10        MR. JONES:  Objection to foundation.
11        THE WITNESS:  I -- I cannot attest to these
12     particular heaters because I don't know how they
13     were installed.  I can only attest to -- 'cause
14     our -- our fire station, for example, has this type
15     of heaters installed in them, as well as other
16     shops and other areas that I've been involved with.
17     And you can actually physically see the burner
18     units burning even though they're technically in a
19     closed box.
20        And another thing that I saw in this
21     particular situation was remnants of paint that was
22     inside of the tubes and inside of the heater units
23     themselves that indicated that the paint got in
24     there some way or another.  So obviously they were
25     not sealed totally to prevent fumes, vapors, paint,

31 (Pages 118 - 121)

Page 122

1   small products from getting in too.
2   Q.   Do you know when this paint got inside of the
3        heaters and the tubes?
4   A.   Some -- sometime within the two months they been --
5        they were there.
6   Q.   How did you exclude this paint that you claim you
7        see and debris getting inside of them during the
8        fire or during fire suppression or in the months
9        they were laying out there?
10  A.   Because I wit -- physically witnessed the paint
11       being basically baked onto the product or to the --
12       refer to it as a product, I -- to the heater units
13       and to the -- all -- all of it, all around the
14       place.  And as well as the employees that were
15       there basically was said that there was -- told me
16       that the place was covered in blue.
17  Q.   You switched to the word "on."  I'm dwelling in --
18       in reference to "in."  What goes on -- what was
19       found in the firebox of the heaters in the -- in
20       the tubes.  And you said there was --
21  A.   There was some --
22  Q.   -- in.
23  A.   -- some blue -- yeah, blue -- remnants of blue --
24       blue paint dried and also had been adhered to the
25       surfaces in -- inside the tubes.

Page 123

1   Q.   And it was still blue?
2   A.   As well as everywhere else, yes.
3   Q.   Despite being in a fire for six hours.
4   A.   Well, not all of it had been involved in the fire
5        for six hours.  That's the whole fire.  That --
6        that particular unit itself or, you know, those
7        units themselves may -- may or may not have been.
8   Q.   Had you --
9        MR. HEHNER:  When you use "unit" -- I need to
10       be -- understand.  When you use "unit," are you
11       talking about the heaters?
12       THE WITNESS:  The heaters, yes.
13       MR. HEHNER:  Okay.  I'm sorry.  Thank you.
14  QUESTIONS BY MR. GARDNER:
15  Q.   Have you ever attempted to ignite or combust the
16       Blue Sheboygan paint in a liquid form?
17  A.   No, I have not.
18  Q.   Has anyone done that to your knowledge in this
19       case?
20  A.   No.  I'm not saying in liquid form, but it would
21       have ignited.
22  Q.   Sharee Wells didn't tell you that she tried to
23       ignite this Blue Sheboygan paint in its liquid
24       form?
25       MR. JONES:  Objection to form, foundation.

Page 124

1        THE WITNESS:  No, she did not tell me that.
2   The only thing as I referred to in the aspect of
3   the MSDS sheets, other than the paint itself, is
4   once the paint dries, the products that remain on
5   surfaces and things like that, which would be the
6   surface of the heaters, the -- wherever this paint
7   is at, would -- it becomes a similar to properties
8   of a Class II and Class III liquid.
9   Q.   Doesn't the MDS data sheet for Blue Sheboygan paint
10       say once the paint -- sorry -- water boils off, it
11       doesn't use the word dry, does it?
12       MR. JONES:  Objection to foundation.
13       THE WITNESS:  Well, that's technically dried
14   is what that -- is what it boils off to be is the
15   dry surface.
16  QUESTIONS BY MR. GARDNER:
17  Q.   So your opinion in this case rests to some degree
18       on your belief that the drying of the Blue
19       Sheboygan paint is the same things as boiling Blue
20       Sheboygan paint.
21       MR. JONES:  Objection to form.  Misstates his
22   testimony.
23       THE WITNESS:  No.  I don't think -- I think
24   there's two -- it's two different things.  But in
25   technicality, when you dry something, you expel the

Page 125

1   water from it, which is what happened in this case.
2   The heaters basically dried off or boiled off
3   the -- the water which became adhered to the
4   surfaces and basically dried on those surfaces.
5   It's not a liquid product anymore; it's dried.
6   QUESTIONS BY MR. GARDNER:
7   Q.   Okay.  So your opinion in this case as to the
8        ignitability or combustibility of Blue Sheboygan is
9        regarding its dry form, right, instead of its wet
10       form?
11  A.   I would say yes.
12  Q.   Tell me about all the tests you've done to confirm
13       that dry Blue Sheboygan paint can ignite or combust
14       or sustain combustion.
15       MR. JONES:  Objection to form.
16       THE WITNESS:  I've not done any tests.  I've
17   only went by what the company's -- the
18   manufacturers of paints stated.  And --
19       MR. GARDNER:  (Unintelligible.)
20       THE WITNESS:  -- their MSDS sheets.
21       MR. JONES:  Let him finish.
22       MR. GARDNER:  Go ahead.  Done?
23       THE WITNESS:  Yep.
24  QUESTIONS BY MR. GARDNER:
25  Q.   Okay.  So you have not tested the hypothesis that

32 (Pages 122 - 125)

Page 126

1 you have that dry Blue Sheboygan paint is
2 ignitable, combustible, or sustains combustion.
3     MR. JONES:  Objection to form.
4     THE WITNESS:  I have not tested that
5 hypothesis.  The only thing I have is the MSDS
6 sheets and also lab report that says there was
7 medium and heavy -- and I think aromatic or aromic
8 (phonetic) material that was found in those con --
9 in the samples that was sent in.
10     MR. GARDNER:  The word's aromatic.
11     THE WITNESS:  Aromatic, yeah.
12 QUESTIONS BY MR. GARDNER:
13 Q.  So in connection with your conclusion, a/k/a
14     opinion, stated in your December 3rd, 2019,
15     Paragraph 3, Page 2 report, you -- you indicate at
16     the end, the last sentence -- you can read it if
17     you want -- Paint and other flammable products used
18     in the repair of trash dumpsters collected in the
19     tube heaters and ignited, right?
20 A.  Right.
21 Q.  You didn't use the word "in" there, did you?
22 A.  I didn't use the word "in," no.  I --
23 Q.  I thought in your -- your last report, which is
24     Exhibit G, dated November 18th, 2022, you indicated
25     that none of your opinions had changed from your

Page 127

1 first report.
2     MR. JONES:  Objection to form.
3     THE WITNESS:  No.  I indicated that the
4 examination of the tube heaters did not change my
5 opinion of what I originally -- or a conclusion
6 that I came to.
7 QUESTIONS BY MR. GARDNER:
8 Q.  Could you please, Jim, go to Exhibit G, Page 2, top
9     overview of opinions.
10 A.  Okay.
11 Q.  Last sentence.  Tell me if I read this verbatim
12     correctly.  However, comma, my initial conclusions
13     from the December 3rd, 2019 report remain
14     unchanged, period.
15 A.  I'm trying to see where you were at here so I --
16 Q.  It's the last sentence -- close to the last
17     sentence of overview of opinions.
18 A.  Overview of opinions.
19     MR. HEHNER:  At -- at the main paragraph.  Not
20 the one, two, three.
21     THE WITNESS:  Oh, up here.  I'm sorry.
22     MR. JONES:  However --
23     THE WITNESS:  Additional examination has been
24 conducted and -- and information has been analyzed.
25 My initial conclusions from the December the 3rd

Page 128

1 report remains unchanged.  Yes.  I agree with that.
2 QUESTIONS BY MR. GARDNER:
3 Q.  Which is that the paint and other flammable
4     products used in the repair of trash dumpers
5     coll -- dumpsters collected on the tube heaters and
6     ignited, right?
7 A.  Yes.
8 Q.  Okay.  How did the paint collect on the tube
9     heaters?  How did it rise up from, say, floor level
10     or the level of a human spray painting,
11     14-and-a-half feet up in the air and get on these
12     heaters in 43 days?
13     MR. JONES:  Objection to form --
14     THE WITNESS:  The best --
15     MR. JONES:  -- foundation.
16     THE WITNESS:  -- the best way for me to state
17 that would be how it accumulated on everything else
18 inside the building.  There was all -- there was
19 paint there.  And if you went to where the -- there
20 actually was -- had moved that paint -- paint
21 facility to, the same thing is occurring there.
22 QUESTIONS BY MR. GARDNER:
23 Q.  Paint all over the place.
24 A.  Yeah.  It's a -- it's a blue paint everywhere.
25 Q.  All up and down the walls?

Page 129

1 A.  Not -- not as bad as it probably would be over a
2     period of time.  But it -- since -- but it -- it's
3     everywhere in the facility.  And I was told by
4     employee that it was everywhere in the facility.
5 Q.  I'm talking about this -- referencing now this --
6     the new place where they --
7 A.  Right.  I have pictures -- I have pictures
8     associated with that.
9 Q.  Right.
10 A.  So ...
11 Q.  And how is that room heated?
12 A.  By the tube heaters as well.  And I suggested that
13     to them.
14 Q.  Suggested what?
15 A.  That they should not be moving that over there
16     if -- because of the fact that the same thing can
17     occur to that building as occurred to the other
18     building.
19 Q.  Do you know when Republic, after the fire that
20     we're talking about, started painting their
21     dumpsters across the parking lot over in what used
22     to be the old wash bay in the big maintenance
23     building?
24     MR. JONES:  Objection to form.
25     THE WITNESS:  I don't know exactly the date

33 (Pages 126 - 129)

1    that they moved.  But I think they did some work

2    there at the same time they did work at the other

3    facility as well.

4        MR. GARDNER:  Checking my memory here.

5        THE WITNESS:  They didn't say any dates-wise

6    to me.

7  QUESTIONS BY MR. GARDNER:

8  Q.  Correct me if I'm wrong, but I believe Greg Tolle

9    testified in his deposition that Republic started

10    painting, using the same Blue Sheboygan paint about

11    two to three weeks after the fire across the

12    parking lot --

13  A.  Right.

14        MR. JONES:  Objection, misstates --

15        MR. GARDNER:  -- in what used to be -- hold

16    on, Thomas -- in what used to be the old wash --

17    truck wash bay, right?

18        MR. JONES:  Objection, misstates prior

19    testimony.

20        THE WITNESS:  Yes, sir.

21        MR. GARDNER:  Okay.

22  QUESTIONS BY MR. GARDNER:

23  Q.  You were there and you took photos inside of that

24    new paint bay, didn't you?

25  A.  Yes.

1  Q.  Including of -- of the heaters used in there,

2    didn't you?

3  A.  Yes.  A couple months later, yes, when I --

4  Q.  How many heaters were in there?

5  A.  I noticed -- I believe as there's one long heater

6    along the away wall.  And I -- if memory -- I have

7    pictures.  But if there -- the -- I believe there's

8    another heat -- I believe there's two heaters in

9    that particular area of the wash bay.

10  Q.  Did you take pictures of them?

11  A.  Yes, sir.

12        MR. JONES:  Objection, form.

13  QUESTIONS BY MR. GARDNER:

14  Q.  Do you know the manufacturer of those two heaters

15    in the new wash -- paint facility?

16        MR. JONES:  Objection to foundation.

17        THE WITNESS:  No, I do not.

18  QUESTIONS BY MR. GARDNER:

19  Q.  Did you climb up and look at them?

20  A.  No.

21  Q.  Did you see any blue paint on them?

22  A.  Yes, sir.

23        MR. JONES:  Marty, I'm -- I'm objecting to

24    your whole line of questioning on --

25        MR. GARDNER:  I'll give you --

1        MR. JONES:  -- relevance.  It's --

2        MR. GARDNER:  -- a continuing objection

3    relevance --

4        MR. JONES:  Thank you.

5        MR. GARDNER:  -- if that's what you're talking

6    about.

7        MR. JONES:  Thank you.

8  QUESTIONS BY MR. GARDNER:

9  Q.  You saw blue paint on the two heaters that you saw

10    on the --

11  A.  From the -- from the -- on the deflectors.  Not

12    inside it.  I didn't get in -- climb up and look

13    inside the tubes or anything of that nature, no.

14  Q.  Isn't the date you took those photographs

15    March 3rd, 2020, inside the new paint --

16  A.  The date I took that photograph is when I was asked

17    by the lab to get a sample of the -- if I could get

18    a sample of the paint.

19  Q.  Uh-huh.

20  A.  And also they wanted me to send them a sample of my

21    swab.  So I went back up there and got a sample of

22    the paint itself.  And the -- the only location

23    they had the paint was in that particular room.  So

24    they directed me there, and that's when I noticed

25    all the material.  I wasn't there to investigate

1    any fire in that situation.  But I was there to get

2    a sample of the paint.  So I was there a very short

3    amount of time.

4        And at the same time I actually told -- I

5    think -- I believe it was Kyle at the time.  I

6    mentioned to him, I said, you know, obviously this

7    was moved over here, and most of your paint's over

8    here now, and so it has the same type of heaters.

9    I don't know who the -- he said they'd been in

10    there -- that area for a lot much longer than the

11    other area.  But I said they're becoming -- the

12    room is becoming like the other room was described

13    to me, blue.

14  Q.  A lot of blue.

15  A.  Yes.

16  Q.  All over the place.

17  A.  Not necessarily all over the place at -- at present

18    time I was there.  But obviously it -- it could

19    be -- end up being that way if they use that room

20    for any length of time.

21  Q.  There are two evidence custody forms in this case

22    referencing your collection of blue paint.  One's

23    dated March 4th, 2020; and the other's dated

24    March 6th, 2020.  Does that sound familiar to you?

25  A.  I don't know where -- does he have a copy of those?

Page 134

1 Q. Yeah. But for the time being take me -- we'll --
2   we're gonna get to those.
3 A. Okay.
4 Q. There's billing in the Rimkus invoices in Exhibit C
5   that indicates that Mr. John Diggle and that you,
6   James Foster, and Lou Inendino went to the Republic
7   MacBeth facility on March 3rd, 2020?
8     MR. JONES: Do you have a page number?
9     MR. GARDNER: Yeah. It's Page 10, Thomas.
10    MR. JONES: Okay. Thanks.
11    THE WITNESS: Yeah. We -- I think at that
12   particular timeframe we had a -- we had initially
13   set a joint examination up for -- for that date,
14   and everybody showed up. And then there was
15   information given to us that the other parties
16   wanted additional things. So there -- there was
17   not a whole lot of time involved in --
18 QUESTIONS BY MR. GARDNER:
19 Q. I'm just trying to establish the day you took these
20   photographs --
21 A. Yes.
22 Q. -- inside the new -- the new paint room.
23 A. Okay.
24 Q. Got it?
25 A. Yes.

Page 135

1 Q. All right. And if you'll look on that same page,
2   Jim, Exhibit C, Page 10. The next entry is
3   March 6th, 2020.
4 A. Right.
5 Q. Evidence prepared for shipping to F.A.S.T. Labs for
6   testing, right?
7 A. Yes, right.
8 Q. And that was the Blue Sheboygan paint you collected
9   at the facility on March 3rd, 2020, right?
10 A. And the -- a swab that --
11 Q. Okay.
12 A. -- was used too --
13 Q. Okay.
14 A. -- so they could have a comparison sample.
15 Q. So that's almost a year after the fire when you're
16   gathering this blue paint across the parking lot
17   over in where they resumed painting operations,
18   right?
19 A. Yes.
20 Q. Okay.
21 A. Also might add that that particular building was a
22   little taller than the other building was, as well,
23   the ceiling level was.
24 Q. Did you -- you personally have any diagrams or
25   schematics available that you prepared in

Page 136

1   connection with your investigation of this case?
2 A. The only thing I did was I -- on my file report I
3   did a -- a drawling [sic] of the site itself.
4 Q. Do you have it today?
5 A. No, I do not. I don't have any information with me
6   today.
7 Q. Right. Despite the subpoena asking you to bring
8   it.
9     MR. JONES: Objection to form. We produced
10   everything that he's got.
11    THE WITNESS: I -- I was told everything was
12   being --
13    MR. GARDNER: Hold on. There's no diag --
14   diagram or schematic attributable to him --
15    MR. JONES: I'm not sure if he understands the
16   question. If you're asking did he ever prepare one
17   or does he still have one in his physical
18   possession?
19    MR. GARDNER: I'll break it down.
20 QUESTIONS BY MR. GARDNER:
21 Q. Did you ever prepare a diagram or schematic in
22   connection with investigating this case?
23 A. I had -- yes, I did. On the -- on the back of my
24   file folder, I had the diagram of the building
25   itself. It was a rough-sketch diagram; it was not

Page 137

1   a computer diagram or anything of that nature but
2   yes.
3 Q. Did --
4 A. And the measurements of the building, the external
5   measurements.
6 Q. When's the last time you've seen this?
7 A. Since I left Rimkus or -- yeah.
8 Q. Did you contact Rimkus in preparation for this
9   deposition and ask that you be allowed to look at
10   their file that they maintain in this case?
11 A. I contacted Rimkus to have the file sent to -- or
12   sent to me. And I received cert -- I received
13   limited information, and that was my report and
14   my -- and a copy of the lab report that I
15   'pecifically requested and also a copy of the
16   photo -- photos that weres -- were taken.
17 Q. Can you pull up Exhibit DD.
18 A. Which one?
19 Q. DD.
20    MR. JONES: Oh, it's the other one. I'm
21   sorry. You're right.
22    THE WITNESS: Oh, sorry.
23    MR. JONES: You can close that one.
24   I'll trade you binders.
25    THE WITNESS: Okay. Okay.

35 (Pages 134 - 137)

Page 138

1  QUESTIONS BY MR. GARDNER:
2  Q.  The exhibit -- Defendants' Exhibit DD has twelve
3      pages numbered 1 through 12.  These are the photos
4      that you took at the Rimkus facility, and the --
5      the new, it's called paint room, on March 3rd,
6      2020?
7  A.  They appear to be, yes.
8  Q.  You can look at the screen if that's -- I can't
9      tell how good -- sometimes --
10 A.  Okay.
11 Q.  -- these don't copy so well.  Depends on the
12     printer.
13 A.  Okay.
14 Q.  And does this first page accurately depict the
15     condition of the old wash bay, then current paint
16     bay, on March 3rd, 2020?
17 A.  Yeah.  There was nothing in the -- inside the bay
18     at the time that they were painting.
19 Q.  Do you see any blue paint anywhere in this picture
20     other than the bottom half of that garage door?
21 A.  As for as a large amount of it, no, I haven't.  I
22     don't.
23 Q.  Can you circle any small amounts other than what I
24     just said?
25 A.  Not by this photograph, I can't.

Page 139

1  Q.  Okay.  How about Page 2?  Can you circle on Page 2
2      of Exhibit DD any blue paint anywhere?  The walls,
3      the ceiling, or the heater?
4      MR. JONES:  Objection to form, relevance.
5      THE WITNESS:  I -- I don't see anything on
6  these -- on this photograph.  But it look -- it
7  appears on the photograph right below the heater
8  tube that there might be some blue there.  But I
9  can't tell for sure by these photographs.  On the
10 bottom side of that tube.
11 QUESTIONS BY MR. GARDNER:
12 Q.  I'm gonna hand you my Exhibit DD so you can draw on
13     it and give it to the court reporter.  On Page 2
14     would you -- we'll just give you a blue pen.  Got a
15     blue pen there?  Circle the alleged blue paint you
16     see in that --
17     MR. JONES:  Same -- same objections.
18     THE WITNESS:  Right in that area.  I don't
19 know if I can -- right in that area there.
20     MR. GARDNER:  I can tell --
21     THE WITNESS:  It might be lightly -- I can't
22 quite tell for sure though.
23 QUESTIONS BY MR. GARDNER:
24 Q.  You're uncertain.  You're uncertain.
25 A.  As for as the looks on these pic -- on these

Page 140

1  pictures, yes.
2      MR. JONES:  Same objections.
3      MR. GARDNER:  Same question --
4      THE WITNESS:  As you can see on the ceiling
5  there, there's blue paint on the ceiling.  So ...
6      MR. HEHNER:  Which -- which one are you
7  looking at on -- it's DD but --
8      THE WITNESS:  Number 2.
9      MR. HEHNER:  Number 2.  Thank you.
10     MR. GARDNER:  Would you circle the blue paint
11 on the ceiling that you're talking about.
12     MR. JONES:  Same objections.
13     THE WITNESS:  Here's B up here.
14     MR. JONES:  Okay.
15     MR. GARDNER:  You guys can watch -- oh, I see
16 here.  Thomas, I'm gonna -- that didn't come out
17 very good.
18     MR. JONES:  What part are you circling?
19     MR. GARDNER:  The same part he circled.  I'm
20 gonna write the initial B in here --
21     THE WITNESS:  Okay.
22     MR. GARDNER:  -- for your claim that you see
23 blue paint in that area.  Not coming out real --
24     MR. JONES:  He take a look at it real quick.
25 Make sure it looks the same.

Page 141

1      THE WITNESS:  I mean, in this photograph it
2  appears to be blue paint there.  And there appears
3  to be even some light dusting of paint on --
4  QUESTIONS BY MR. GARDNER:
5  Q.  And you --
6  A.  -- the ceiling.
7  Q.  -- you told -- you told Republic employees that you
8      had concern, grave concern probably, that here they
9      are still painting almost a year later with this
10     same Blue Sheboygan paint with an air sprayer in a
11     room with the same style heater, that it might
12     catch on fire?
13     MR. JONES:  Objection to form, foundation
14 and --
15     MR. GARDNER:  Fire.
16     MR. JONES:  -- relevance.
17     THE WITNESS:  I made a comment to them, yes,
18 that there -- there -- they could potentially have
19 some of the same issues in this particular building
20 by what they were doing in there.  And also the
21 fact that -- the reason why I would -- this is
22 not -- it's not the same conditions obviously.  But
23 it is similar to the conditions that existed in the
24 other building.  'Cause this didn't -- this was not
25 described as blue all over the walls, blue all over

36 (Pages 138 - 141)

Page 142

1  everything like the other place was.
2      But I saw remnants of blue paint pretty much
3  everywhere in the facility, not necessarily stand
4  out. It was light, dusting-type paint in the
5  ceil -- in there.
6  QUESTIONS BY MR. GARDNER:
7  Q. Are you aware that Rim -- Republic continued to use
8  their blue -- use Blue Sheboygan paint, the same
9  kind that they had used previously across the
10 parking lot, for at least three-and-a-half years
11 without any fire or explosion?
12     MR. JONES: Objection to foundation,
13 relevance.
14     THE WITNESS: I don't know. I don't have any
15 information related to that. The only thing I was
16 based on was what I found and what was presented to
17 us at the site and the statements that were made
18 there and the lab results that were obtained by the
19 samples that I took.
20 QUESTIONS BY MR. GARDNER:
21 Q. I'm gonna hand you Exhibit DD. And just go through
22 each page here, and put a circle around any blue
23 paint you see.
24     MR. JONES: Same objections.
25     THE WITNESS: Well, obviously it is showing

Page 143

1  there.
2      MR. GARDNER: Probably on Page 3 by now.
3      THE WITNESS: I already did that. And there's
4  actually some light stuff in here, looks like.
5  This is all over the place in that particular -- on
6  the top. I mean, the room where the paint was at,
7  it was -- there's a lot of blue there. I can't --
8      MR. GARDNER: Apparently -- yeah, I know. I
9  apologize. I only meant --
10     THE WITNESS: Entire --
11     MR. GARDNER: Hold on.
12     THE WITNESS: -- entirely covered.
13     MR. GARDNER: Jim, I only meant the walls,
14 ceiling, and heaters.
15     THE WITNESS: Oh, okay.
16     MR. GARDNER: I apologize. I know there's
17 blue paint -- I think you've already done it with
18 your giant circles.
19     THE WITNESS: And the one -- one thing about
20 these particular pictures is the -- this position
21 of this heater is not in the same position as were
22 the other heaters were while they were doing the
23 painting in the other thing. This is off to the
24 side, against the wall. And this is actual --
25 the -- where they did most of their painting would

Page 144

1  have been out in the center of this. Not -- it's
2  not the same position nor is it in the same manner
3  as the other one was.
4  QUESTIONS BY MR. GARDNER:
5  Q. What's the difference to you in terms -- as you're
6  referencing not in the same position, how does that
7  play in --
8  A. I don't know how the ventilation --
9      MR. JONES: Same -- same objection and
10 relevance.
11     THE WITNESS: I don't know how the ventila --
12     MR. GARDNER: Hold on a second. The case law
13 clearly states you -- all relevancy objections are
14 preserved without any requirement to make it.
15 We're not in trial today.
16     MR. JONES: All right. Well --
17     MR. GARDNER: So I --
18     MR. JONES: -- form and relevance.
19     THE WITNESS: First of all, the deflector is
20 not the same as it was in -- in the other one.
21 'Cause they were directly on top. They were not
22 turned. And this is almost to a 90-degree turn.
23 And it's forcing the air out this way from that.
24 So that would obviously keep some -- any paint from
25 accumulating to a certain degree.

Page 145

1      And, also, I don't know the ventilation system
2  of this building or if there's any other
3  ventilation [sic] systems at all.
4  QUESTIONS BY MR. GARDNER:
5  Q. You didn't check for that when you were in there
6  taking --
7  A. No, I didn't.
8  Q. -- these pictures --
9  A. I didn't -- I --
10     MR. JONES: Objection to form.
11     THE WITNESS: -- I just took pictures of what
12 was there. This building had no bearing on what my
13 investigation was. It basically did show me
14 that -- and I took pictures only to show them that
15 this -- similar things could happen in here if it
16 wasn't resolved and taken care of, or -- or
17 properly cleaned, one way or the other.
18 QUESTIONS BY MR. GARDNER:
19 Q. You had some concerns that another fire could
20 occur --
21 A. Yes.
22 Q. -- in that --
23     MR. JONES: Objection to form.
24 QUESTIONS BY MR. GARDNER:
25 Q. 'Cause you think this dry blue paint can ignite and

37 (Pages 142 - 145)

Page 146

1    combust when it gets on these heaters.
2  A.  Once -- yeah, once it -- the -- the liquid or the
3      water base boils off, yes.  And that's by the --
4      the company's own information that they provided.
5  Q.  Did -- do you know from the photos or from being in
6      the room, roughly a year after the fire, whether
7      the Vantage combustion boxes were open or closed?
8        MR. JONES:  Same objections, foundation.
9        THE WITNESS:  I don't know.  They were not
10     operating at the time I was there, so I could not
11     see whether or not they were.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Page 9 of Exhibit DD.  That's a salamander heater,
14     isn't it?
15 A.  Yes.
16       MR. JONES:  Objection to foundation.
17 QUESTIONS BY MR. GARDNER:
18 Q.  And it has blue paint on it, doesn't it?
19 A.  Yes.
20 Q.  And do you know what the fuel is that -- that
21     salamander heater in this photograph runs from?
22       MR. JONES:  Same objection.
23       THE WITNESS:  I don't personally know but
24     likely kerosene.
25       MR. GARDNER:  Right.

Page 147

1  QUESTIONS BY MR. GARDNER:
2  Q.  And do you know if a -- if Republic had been
3      utilizing a salamander heater to heat any space
4      inside of building number 1 prior to March 20th,
5      2019?
6  A.  You're talking about the building that the fire
7      originated --
8  Q.  Yeah.  And --
9  A.  -- correct?  Okay.
10 Q.  -- building number 1, Jim.
11 A.  Okay.  I do know that they had a salamander heater
12     in there.  But I was told that that hadn't been
13     used for quite some time since they had the
14     overhead heaters.  And they had three of those
15     in --
16 Q.  Who told you that?
17 A.  I think that was Mr. Jones.
18 Q.  When?
19 A.  When I spoke to him on the -- was it the 20th?  I
20     can't remember exact dates.  But --
21 Q.  What year?
22 A.  When I spoke to him when we were standing out there
23     in front of the -- in May when I -- when I was
24     there doing the --
25 Q.  Okay.

Page 148

1  A.  -- thing.  So that would have been --
2  Q.  May 10th, 2020?
3  A.  -- 2019.
4  Q.  I'm sorry.  May 10th, 2019.
5  A.  2019.
6  Q.  And we do have some notes from Fred Jones in the
7      file, don't we?  You've seen those, right?  Written
8      by Lou Inendino?
9  A.  I --
10       MR. JONES:  Objection to form, foundation.
11       THE WITNESS:  -- I don't know that I've seen
12     those, no.
13 QUESTIONS BY MR. GARDNER:
14 Q.  Have you seen any field notes of witnesses'
15     statements in -- in this file taken by John Diggle?
16 A.  I've seen them, yes.  I have not --
17 Q.  Did you refer to those and utilize any of the field
18     notes prepared by John -- either John Diggle or Lou
19     Inendino in reaching any of your conclusions?
20       MR. JONES:  Objection to form.
21       THE WITNESS:  I did -- I personally based my
22     opinion on my investigation and my opinions of what
23     I saw while I was -- information I was given.  And
24     they did not offer any opinion to me, either one,
25     as for as a cause or origin of the fire.

Page 149

1  QUESTIONS BY MR. GARDNER:
2  Q.  I'm not talking about --
3  A.  That's my opinion.
4  Q.  -- their opinions.  They're lay witnesses.  I'm
5      talking about the facts from them.
6        MR. JONES:  Same objections.
7        THE WITNESS:  I'm not for sure exactly what
8      you're referring to.  But the --
9  QUESTIONS BY MR. GARDNER:
10 Q.  Wait a second.  You think Lou Inendino and John
11     Diggle wrote down opinions from Fred Jones --
12       MR. JONES:  Objection to form.
13       MR. GARDNER:  -- and -- I apologize -- any
14     other witness in their --
15       THE WITNESS:  I don't -- I don't think --
16       MR. JONES:  Same objections.
17       THE WITNESS:  I think they would just write
18     down facts as they would see them.
19       MR. GARDNER:  Right.
20       THE WITNESS:  I don't think they would write
21     down facts just because somebody gave them
22     information.  They might say a certain person told
23     them this or something.  But --
24       MR. GARDNER:  Okay.
25       THE WITNESS:  -- I don't think they would

38 (Pages 146 - 149)

Page 150

1    utilize that as factual information that they
2    would -- they would give a conclusion to, I guess,
3    I would speak about --
4        MR. GARDNER: You and I are not --
5        THE WITNESS: -- offer an an --
6        MR. GARDNER: -- on the same page.
7        THE WITNESS: -- investigation.
8    QUESTIONS BY MR. GARDNER:
9    Q.  Did you, as the cause-and-origin expert, the only
10    one involved in this case for the plaintiff, rely
11    on any, way, shape or form, on any of the
12    information obtained by either Lou Inen -- Inendino
13    or John Diggle when they talked to Fred Jones or
14    any other witness?
15        MR. JONES: Objection to form.
16        THE WITNESS: No, I did not.
17        MR. GARDNER: Okay.
18    QUESTIONS BY MR. GARDNER:
19    Q.  Do you know if kerosene has as a -- is produced by
20    the distillation of petroleum?
21        MR. JONES: Objection to foundation.
22        THE WITNESS: Yes, as similar diesel fuel.
23        MR. GARNER: Right.
24        THE WITNESS: It's a combustible material that
25    has a higher flash point, so to speak, than

Page 151

1    gasoline, for example.
2    QUESTIONS BY MR. GARDNER:
3    Q.  And its residue could include and be interpreted as
4    a heavy petroleum distillate?
5        MR. JONES: Objection to foundation.
6        THE WITNESS: Yes. It would -- that's similar
7    to the -- the -- to any other products as well, as
8    for as --
9    QUESTIONS BY MR. GARDNER:
10    Q.  -- any product can -- can leave the residue of a
11    heavy petroleum distillate?
12    A.  No --
13        MR. JONES: Objection to form --
14        THE WITNESS: -- I'm not saying that --
15        MR. JONES: -- foundation.
16        THE WITNESS: -- at all.
17        MR. GARDNER: Okay.
18        THE WITNESS: The -- like paint thinners, for
19    example, gives off the same type class --
20    Class II-type vein, which was evident. And also
21    the -- if it's burning efficiently, it's -- they
22    typically would not do that. It would have to be
23    some contact. This is at floor level.
24    QUESTIONS BY MR. GARDNER:
25    Q.  What is?

Page 152

1    A.  This heater would be at floor level, number one.
2    And, number two, the fire originated at ceiling
3    level, according to the witnesses.
4    Q.  You mean Shamir -- Samir?
5    A.  Yes.
6    Q.  You didn't read in his deposition -- well, you
7    didn't read his deposition at all, did you?
8    A.  I don't recall that, no.
9    Q.  Okay. Do you know if he -- when you looked and
10    went outside, he was located acloss -- across in
11    the fleet maintenance office at the time he was
12    alerted to something going on, do you know if he
13    saw fire first or if he saw smoke first or if he
14    saw both at the same time?
15        MR. JONES: Objection to foundation, form.
16        THE WITNESS: I don't know. He saw smoke, I
17    think initially, obviously. And then it -- 'cause
18    it was pretty heavy smoke involvement. And then he
19    saw flames.
20    QUESTIONS BY MR. GARDNER:
21    Q.  Okay. Do you know if he went inside in either
22    building, 1 or 2 or 3 or 4, as we've got in this
23    Exhibit Z?
24        MR. JONES: Same objections.
25        THE WITNESS: To my knowledge, I think they

Page 153

1    attempted to. But I think they decided not to and
2    contacted 9-1-1 to --
3    QUESTIONS BY MR. GARDNER:
4    Q.  So you're not aware he went inside with the
5    security guard and got keys to vehicles and went
6    outside and moved vehicles?
7    A.  I'm -- I'm aware of that fact. But I --
8    Q.  Well, how could he get the keys if he didn't go
9    inside --
10        MR. JONES: If you will let him finish his
11    answer.
12        THE WITNESS: But I'm -- I'm not aware that --
13    where those were located at as for as in the
14    building themselves.
15        MR. GARNER: Oh.
16        THE WITNESS: So ...
17    QUESTIONS BY MR. GARDNER:
18    Q.  Go on my memory from his deposition is he only
19    entered building number 2. Were you aware of that,
20    Shamir [sic]?
21        MR. JONES: Objection to form.
22        THE WITNESS: I was not aware of that, no.
23        MR. GARDNER: Okay.
24    QUESTIONS BY MR. GARDNER:
25    Q.  And were you aware that after he came outside,

39 (Pages 150 - 153)

Page 154

1    he -- I think I called John Shadow and 9-1-1?
2  A.  He said --
3        MR. JONES:  Objection, foundation.
4        THE WITNESS:  -- he made several phone calls.
5    So he didn't tell me who he called.
6  QUESTIONS BY MR. GARDNER:
7  Q.  All right.  And you didn't read his deposition that
8    when he first saw fire, it was predominantly coming
9    out of this white door, the most southern garage
10    door on building number 1, rather than out of the
11    two doors that are blue in Exhibit C?
12        MR. JONES:  Objection, form; asked and
13    answered.
14        THE WITNESS:  Well, the -- yeah, the -- I'm
15    assume -- I'm assuming -- saying that he -- they
16    saw fire coming out of the vent here on the front
17    of the building and around the doors.  But on the
18    south door particularly.
19        MR. GARDNER:  The white door.
20        THE WITNESS:  The only -- the only thing that
21    that could -- that tells me is not that the fire
22    originated there necessarily.  All it tells me is
23    fire seeks oxygen.  And those doors are -- there's
24    cracks in garage doors everywhere, that that door
25    could have possibly been a lot more open than the

Page 155

1    other doors were.
2        MR. GARDNER:  Sounds like you're speculating.
3        THE WITNESS:  I don't know.
4        MR. GARDNER:  You're speculating --
5        THE WITNESS:  That's speculation, yes.
6        MR. JONES:  Objection to form.
7        THE WITNESS:  But that's one of the -- the
8    known facts that fire seeks oxygen, and they're
9    going seek an open spot.
10  QUESTIONS BY MR. GARDNER:
11  Q.  What is the -- I'm on exhibit, I think it's DD,
12    Page 9.  There's a little red can here at the
13    bottom.  Do you see that?
14  A.  Yes.
15        MR. JONES:  Same objection.
16  QUESTIONS BY MR. GARDNER:
17  Q.  Is that full of kerosene?
18        MR. JONES:  Objection, foundation.
19        THE WITNESS:  I don't know what's in it.
20  QUESTIONS BY MR. GARDNER:
21  Q.  'Cause you didn't look.
22  A.  No, I did not look in there.
23        MR. JONES:  Same objection.
24  QUESTIONS BY MR. GARDNER:
25  Q.  Do your photographs taken at some point of the

Page 156

1    debris field in building number 1 show a -- a --
2    the remains of a salamander unit?
3        MR. JONES:  Objection --
4        THE WITNESS:  Yes, it does.
5        MR. JONES:  -- foundation.
6  QUESTIONS BY MR. GARDNER:
7  Q.  And do you know if that salamander heater was used
8    on the day of the fire or not?
9  A.  I was told --
10        MR. JONES:  Same objection.
11        THE WITNESS:  -- it had not been used for
12    quite some time.
13  QUESTIONS BY MR. GARDNER:
14  Q.  By Fred Jones?
15  A.  Yes.
16  Q.  But you didn't talk to the fella that was actually
17    working in the room, Dale Calle, about that, did
18    you?
19  A.  No, I did not.
20        MR. JONES:  Same objections.
21  QUESTIONS BY MR. GARDNER:
22  Q.  If you would have talked to Dale Calle or had
23    someone talk to him and get any kind of a
24    statement, then you could, one, rule out or rule in
25    the use of a kerosene salamander heater on the day

Page 157

1    of the fire --
2        MR. JONES:  Objection to form.
3  QUESTIONS BY MR. GARDNER:
4  Q.  -- couldn't you?
5  A.  I -- if I did not believe his statement to me that
6    it had not been used, him being the manager, I
7    probably would have followed through with that a
8    little bit more.  But given the fact that he told
9    me that since the other heaters have not been --
10    had only been installed for two months, they have
11    not had to utilize those -- the salamander heaters
12    because of sufficient heat in the building.
13  Q.  So you thought Fred Jones -- statements of Fred
14    Jones were reliable and dependable, correct?
15        MR. JONES:  Objection to form.
16        THE WITNESS:  Yes.  I would say so, yes.
17  QUESTIONS BY MR. GARDNER:
18  Q.  Can you go to Exhibit D?  It's a seven-page
19    exhibit.
20  A.  D itself?
21  Q.  Yes, sir.
22        MR. GARDNER:  It might be in the other binder.
23        THE WITNESS:  The other book.
24        MR. JONES:  Yep.  Trade you again.
25        THE WITNESS:  Okay.

40 (Pages 154 - 157)

Page 158

1  QUESTIONS BY MR. GARDNER:
2  Q.  Apologize.  I do have to wrap up some more
3      questions or at least one question on Exhibit DD,
4      Page 10.  I'm just gonna hand it to you.  You don't
5      have to find it.
6  A.  Okay.
7  Q.  There is a machine in the -- sort of the right side
8      of the photograph with some large yellow, I don't
9      know, yellow and red swirly paints.  Do you know
10     what kind of that machine is?
11         MR. JONES:  Objection to foundation,
12     relevance.
13         THE WITNESS:  I'm not for sure, but I believe
14     it's a pressure washer.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Okay.  On Page 11 of Exhibit DD -- here you go --
17     on the far left top side of the photograph, Jim,
18     there's another type of device.  Do you know what
19     that -- you can hold it.
20  A.  That's a spray paint --
21         MR. JONES:  Same objections.
22         THE WITNESS:  -- machine.
23  QUESTIONS BY MR. GARDNER:
24  Q.  Okay.  Do you know what type of spray paint machine
25     had been used in building number 1 prior to the

Page 159

1      fire on March 19th, 2019?
2          MR. JONES:  Objection, foundation.
3          THE WITNESS:  I have photographs of it.  It
4      was inside of a metal container.
5  QUESTIONS BY MR. GARDNER:
6  Q.  It was an airless sprayer, wasn't it?
7  A.  Yes.
8          MR. JONES:  Objection, foundation.
9  QUESTIONS BY MR. GARDNER:
10  Q.  What does that mean, an airless sprayer?
11         MR. JONES:  Objection, foundation.
12         THE WITNESS:  It was under pressure and didn't
13     require air to operate.
14  QUESTIONS BY MR. GARDNER:
15  Q.  So it didn't require a compressor, right?
16  A.  Right, right.
17         MR. JONES:  Same objection.
18  QUESTIONS BY MR. GARDNER:
19  Q.  Are you on Exhibit D?
20  A.  Yes.
21  Q.  All right.  It's on Rimkus letterhead, Page 1.
22  A.  Yes.
23  Q.  And it's sheet 1 of 3?
24  A.  Yes.
25  Q.  You just look at the first page for now.  Do you

Page 160

1      see the initials LVI at the top?
2  A.  Yes.
3  Q.  Okay.  And says Republic Waste Service, fire site
4      inspection, right?
5  A.  Yes.
6  Q.  Dated March 3rd, 2020, right?
7  A.  Yes.
8  Q.  Just two week -- couple weeks short of a year after
9      the fire.
10  A.  Yes, sir.
11  Q.  Are you aware of any field notes created by either
12     you or Lou Inendino or John Diggle --
13         MR. HEHNER:  Diggle.
14  QUESTIONS BY MR. GARDNER:
15  Q.  -- created at any date prior to March 3rd, 2020
16     that are still in existence?
17  A.  No, I do not.
18  Q.  All right.  So at the top left, Fred Jones' name is
19     underlined, isn't it?
20  A.  Yes.
21  Q.  To tell you that the information Mr. Inendino's
22     recording on Page 1 comes from Fred Jones?
23         MR. JONES:  Objection to foundation.  He
24     didn't write this.
25         THE WITNESS:  I don't know anything about this

Page 161

1      particular note.  And -- and there might -- he --
2      it appears that Fred Jones is underlined.  That's
3      all I can say to this.  So -- but I don't know why.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Were you present when Mr. Jones spoke -- sorry --
6      when Mr. Inendino spoke to Fred Jones on March 3rd,
7      2020?
8  A.  I don't recall any conversation.  I mean, that must
9      have been something he did on his own.
10  Q.  Did Mr. Inendino record, on Page 1 of the
11     Exhibit D, that the main electrical power came in
12     at the southeast corner of the building?
13         MR. JONES:  Objection to foundation.
14         THE WITNESS:  I don't see where it's at here
15     real quick.
16         MR. GARDNER:  Near the top.
17         THE WITNESS:  Okay.  Yeah, third line down
18     you're talking about.
19         MR. GARDNER:  Yeah.
20  QUESTIONS BY MR. GARDNER:
21  Q.  Does that comport with your exam -- site
22     examinations?
23  A.  Yes.
24  Q.  All right.
25  A.  Main --

41 (Pages 158 - 161)

1 Q. The next line beneath it, Jim, says, Generator used
2    to run on methanol from the landfill. I think it
3    says terminated. You see that?
4 A. Yes.
5 Q. Did you ever observe a generator in building
6    number 1 that ran on methanol?
7       MR. JONES: Objection to foundation.
8       THE WITNESS: No, I did not observe the
9    generator.
10 QUESTIONS BY MR. GARDNER:
11 Q. Can you comment or elaborate any further on that
12    sentence?
13       MR. JONES: Same objection.
14       THE WITNESS: I was -- I was just told they
15    transferred everything over to electric power, and
16    they just no longer used that system in the
17    building --
18       MR. GARDNER: Okay, thanks.
19       THE WITNESS: -- for several reasons.
20 QUESTIONS BY MR. GARDNER:
21 Q. Next sentence, Jim, says, New -- I think it says
22    corners or covers done a while back. Do you know
23    what that's in reference to?
24       MR. JONES: Objection to foundation. Calls
25    for --

1       THE WITNESS: No --
2       MR. JONES: -- speculation.
3       THE WITNESS: -- I do not.
4 QUESTIONS BY MR. GARDNER:
5 Q. The next says, A number of electrical panels for
6    building. Do you see that?
7 A. Yes.
8 Q. You agree with that, don't you?
9 A. Yes.
10       MR. JONES: Objection to foundation.
11 QUESTIONS BY MR. GARDNER:
12 Q. You observed numerous electrical panels inside of
13    building number 1 in your site inspections.
14 A. Yes.
15 Q. And you photographed them.
16 A. I photographed some that -- in the -- exterior
17    of the building and also photographed some
18    throughout the building.
19 Q. Yeah. I'm just referring to building number --
20 A. Building 1 as well, yes.
21 Q. Right. But you didn't collect any of that, did
22    you?
23 A. No, we did not.
24 Q. It was never tested, was it?
25       MR. JONES: Objection to foundation.

1       THE WITNESS: There was no testing done.
2 QUESTIONS BY MR. GARDNER:
3 Q. Of the electrical components including these
4    electrical panels, right?
5 A. Correct.
6       MR. JONES: Same objections.
7 QUESTIONS BY MR. GARDNER:
8 Q. It next says, Three overhead doors and one on the
9    other side. Far door had electric. All others
10    were manual. Do you see that?
11 A. Yes.
12 Q. Would that be your understanding that the white
13    door on the far south side of the building number 1
14    in Exhibit Z is -- was electrically operated, but
15    the two blue ones were not?
16       MR. JONES: Objection to form, foundation.
17       MR. GARDNER: He --
18       MR. JONES: Misstates the document. It
19    doesn't say --
20       THE WITNESS: I don't know anything about this
21    pape -- paper. But I -- I assume that there --
22    they would have to be correct, yes. If it came
23    from Fred Jones; he knows about the facility.
24 QUESTIONS BY MR. GARDNER:
25 Q. So these seven pages of Exhibit D, you never looked

1    at and never read, never considered nor took into
2    consideration, when reaching your cause-and-origin
3    opinions expressed, I think it was December of
4    2022. Right?
5 A. No. I've never seen these -- this information.
6 Q. So you couldn't have utilized it or considered it
7    when you reached your cause-and-origin opinions,
8    could you?
9 A. No, I could not.
10 Q. Okay. Just barely past the halfway down Page 1,
11    Exhibit D, Jim, Lou Inendino recorded, Korte Does
12    It All --
13 A. Uh-huh.
14 Q. -- did lighting upgrade just in the two paint bays.
15    Do you see that?
16 A. Yes.
17 Q. Were you aware of that before today?
18 A. Yes, I was.
19 Q. Okay. It's recorded that the structure had a
20    shingle roof, right? You see that?
21 A. That's what's recorded, yes.
22 Q. Did you know that --
23 A. Corrugated metal underneath of it.
24 Q. Yeah. What kind of shingles, asphalt?
25 A. Yes.

42 (Pages 162 - 165)

1 Q. Do you know the components of asphalt, the asphalt
2   shingles that were on top of building 1 at the time
3   of the fire?
4       MR. JONES: Objection to foundation.
5       THE WITNESS: I did not see any remains of any
6   asphalt shingles.
7 QUESTIONS BY MR. GARDNER:
8 Q. They were consumed by the fire?
9 A. Yes.
10 Q. Because it was made out of tar and var -- tar
11   components combust?
12       MR. JONES: Objection foundation, form.
13       THE WITNESS: Yeah. They're made out of
14   petroleum products, yes.
15       MR. GARDNER: Yeah.
16       THE WITNESS: They don't --
17 QUESTIONS BY MR. GARDNER:
18 Q. How did you exclude the tar shingles as being the
19   source of either the medium or heavy petroleum
20   distillates found as a result of Sharee Wells'
21   testing of the items you sent down to her?
22       MR. JONES: Objection to foundation.
23       MR. GARDNER: Dur -- as a result of cross
24   contamination during fire -- during the fire.
25       MR. JONES: Objection to form, foundation.

1       THE WITNESS: Well, I -- obviously the
2   shingles were com -- completely destroyed 'cause
3   there wasn't any shingles remaining, number one.
4   Number two, all the elect -- the electrical or the
5   metal panels were -- that made up the roof were
6   laying on top of everything. So there -- there
7   would not have been any residue likely to -- to get
8   down inside of the -- of the heaters or inside of
9   the tubes of -- that circumstance.
10       And number -- I guess the third thing is, when
11   I sent the lab report in to confirm everything for
12   the paint sample, the paint sample came back as
13   positive as well. The liquid version of it.
14 QUESTIONS BY MR. GARDNER:
15 Q. The room, building number 1, had some ventilation
16   systems, didn't it? You can look at Exhibit Z for
17   the question.
18 A. Okay. Yes.
19 Q. You're aware of that, right?
20 A. Yes.
21 Q. How many exhaust fans or intake fans were there on
22   the day of the fire in building 1 in Exhibit Z?
23       MR. JONES: Objection to foundation.
24       THE WITNESS: I was told there was one at the
25   rear and one at the front. It was kind of a cross

1   ventilation --
2 QUESTIONS BY MR. GARDNER:
3 Q. Which one brought air in -- oh, sorry, strike that.
4   Did they both bring air into this building 1, or
5   did they both exhaust air out of building 1, or --
6 A. No.
7 Q. -- some other combination?
8       MR. JONES: Objection to foundation.
9       THE WITNESS: They -- the rear one brought air
10   in, and the front one brought air out, is the way I
11   always understand it.
12 QUESTIONS BY MR. GARDNER:
13 Q. Okay. And that's recorded by Lou Inendino on
14   Page 1 of Exhibit D, isn't it? Fan on the back
15   brought fresh air in.
16 A. I don't --
17       MR. JONES: Objection to foundation.
18       THE WITNESS: Yes.
19       MR. GARDNER: Okay.
20 QUESTIONS BY MR. GARDNER:
21 Q. At the bottom it's recorded, New heaters. Didn't
22   pay attention to overspray --
23 A. Yes.
24 Q. -- because they weren't there long. Paint came
25   out, 55-gallon drum, all blue. You see that?

1 A. Yes.
2 Q. Okay. So as far as you know, any paint inside of
3   building number 1 at the day of the fire was in
4   55-gallon drums.
5 A. Yes.
6       MR. JONES: Objection to foundation.
7 QUESTIONS BY MR. GARDNER:
8 Q. None -- none of it was in gallon cans, was it?
9       MR. JONES: Same objection.
10       THE WITNESS: To my knowledge, no. They had
11   it in 55-gallon drums.
12       MR. GARDNER: Okay.
13 QUESTIONS BY MR. GARDNER:
14 Q. Page 2 of Exhibit D, Jim.
15 A. Yes.
16 Q. Again, this -- these notes are handwritten by Lou
17   Inendino on March 3rd, 2020.
18 A. Yes.
19 Q. All right. Near the top it says, Tool room doorway
20   still there. Do you know what he's talking about?
21       MR. JONES: Objection to foundation; calls for
22   speculation.
23       THE WITNESS: Well, they -- yeah, I know what
24   room he's talking about. They had a -- a room, a
25   storage room and a thing to the south, very south

43 (Pages 166 - 169)

1  end with a dividing wall, separated that room from
2  the other bay areas. And they stored tools in
3  'cause they could lock the doors.
4  QUESTIONS BY MR. GARDNER:
5  Q. Okay. And so for reference, looking at Exhibit Z,
6  Page 2, the tool room, as you understand it to be,
7  was located -- would have been located in the space
8  behind the most southern white door, correct?
9  A. Correct.
10 Q. And that was an unheated space, wasn't it?
11     MR. JONES: Objection to foundation.
12     THE WITNESS: As for as I know, yes, it was
13 unheated. There was no tube heaters in that -- in
14 the space.
15 QUESTIONS BY MR. GARDNER:
16 Q. Maybe a salamander heater?
17     MR. JONES: Objection to foundation; calls
18 for --
19     THE WITNESS: There was no --
20     MR. JONES: -- speculation.
21     THE WITNESS: -- salamander heaters located in
22 that space either.
23 QUESTIONS BY MR. GARDNER:
24 Q. Where was the salamander heater located?
25 A. It was --

1      MR. JONES: Same objections.
2      THE WITNESS: -- it was back towards the back
3  about probably 25 feet.
4  QUESTIONS BY MR. GARDNER:
5  Q. In the room where they spray painted?
6  A. Yes.
7  Q. Further down Page 2, Exhibit D, notes by Lou
8  Inendino from talking to Fred Jones. It says,
9  Always -- always turned off -- wait a minute. Old
10 heaters always turned off for painting. Do you see
11 that?
12     MR. JONES: Objection to form.
13     THE WITNESS: Yes.
14 QUESTIONS BY MR. GARDNER:
15 Q. Near it it says, Used salamanders for paint cans.
16 Do you see that?
17 A. I don't know where that's at for sure. Okay.
18 Always heaters turned off for painting. Used
19 salamanders.
20 Q. For paint cans.
21 A. For paint cans.
22 Q. Right.
23     MR. JONES: Objection to foundation --
24     THE WITNESS: I don't know when --
25     MR. JONES: -- form.

1      THE WITNESS: -- if and when they used them.
2  Because --
3  QUESTIONS BY MR. GARDNER:
4  Q. This notation makes no reference to when, does it?
5  A. No.
6  Q. Because you didn't talk to Dale Calle or Terry
7  Reader, right?
8      MR. JONES: Objection to form --
9      THE WITNESS: I talked to the manager --
10     MR. JONES: -- foundation.
11     THE WITNESS: -- of the facility. He said
12 they hadn't been used.
13 QUESTIONS BY MR. GARDNER:
14 Q. Okay. Then it says the heaters were -- I think it
15 says at 70 or 75 degrees per Fred?
16 A. Yes.
17 Q. And then Jim Foster and Kyle said the heaters were
18 at 60 -- set at 60 degrees Fahrenheit?
19 A. That's what Kyle told me, yes.
20 Q. All right.
21 A. They turn them down of an -- of an evening.
22 Q. Right. And then beneath that it says, Fred thinks
23 thermostat higher than that, right? Higher than
24 60.
25 A. Right.

1  Q. Okay. And then it says, MIG welder kept in the
2  tool room, right?
3  A. Yes.
4  Q. Did you find the remains of a MIG welder in the
5  tool room that we've already talked about?
6  A. There was remains in there. I don't know what type
7  of welder it was. But there was remains in that
8  tool room.
9  Q. And you didn't collect it, did you?
10 A. No, I did not.
11 Q. And you didn't collect the salamander, did you?
12 A. No.
13 Q. And then it says, Minor welding done near southeast
14 corner. You see that?
15 A. Yes.
16 Q. You have any reason to dispute that?
17 A. No.
18 Q. Okay. Next, Page 3 of Exhibit D, about halfway --
19 roughly halfway down, Jim. It says, Main circuit
20 panel located southeast corner?
21 A. Yes. It would be --
22 Q. You agree with that --
23     MR. JONES: Objection to form, foundation.
24 QUESTIONS BY MR. GARDNER:
25 Q. -- based on your investigation?

44 (Pages 170 - 173)

Page 174

1   A.  Yes.
2   Q.  Okay.  It says heaters mounted nine feet above
3       slab.  Do you see that?
4           MR. JONES:  Objection to form.
5           THE WITNESS:  I'm assuming that's -- I don't
6       see that on here.  But --
7           MR. GARDNER:  It's right next to the main
8       circuit southeast corner.
9           MR. JONES:  It's right here.
10          THE WITNESS:  Okay.  Heater mounted nine feet
11      above -- yes.
12  QUESTIONS BY MR. GARDNER:
13  Q.  Do you have any reason to dispute it?
14          MR. JONES:  Objection --
15          THE WITNESS:  No.
16          MR. JONES:  -- to foundation.
17  QUESTIONS BY MR. GARDNER:
18  Q.  You've seen no evidentiary basis or deposition
19      testimony that indicates otherwise?
20  A.  No.
21  Q.  Is the fact that they were located nine feet off
22      the floor important or relative at all to your
23      cause-and-origin opinions?
24          MR. JONES:  Objection to form.
25          THE WITNESS:  I -- I think nine feet off the

Page 175

1       floor is -- you know, it's only basically three to
2       four feet above an awe -- a human being basically,
3       five feet above your head.  Or four foot above your
4       head; depends on how tall somebody is.  And this is
5       why I was mentioning the fact that in the other
6       building I referred to earlier with the heater,
7       it's, like, 14 feet up.
8   QUESTIONS BY MR. GARDNER:
9   Q.  So it's --
10  A.  So it's much higher.
11  Q.  -- way harder to stand on heaters, like, 14,
12      15 feet up than nine feet, right?
13          MR. JONES:  Objection to form and foundation.
14          THE WITNESS:  Right.  It would probably come
15      down before it continued up.
16  QUESTIONS BY MR. GARDNER:
17  Q.  Yeah.  And if they're 15-feet high, 14-feet high,
18      paint's gonna hit the floor rather than drift all
19      the way up, right?
20          MR. JONES:  Same objections.
21          THE WITNESS:  I -- I'm -- I'm not privy to how
22      much weight the -- the paint weighs, or whatever,
23      and the particles weigh.  But it would --
24      obviously, the weight of the particles would affect
25      how high it would go, number one.  And ventilation

Page 176

1       in this -- the room would also affect how -- where
2       it goes and where it lands.
3   QUESTIONS BY MR. GARDNER:
4   Q.  Was the ventilation in building number 1 on
5       March 19th, 2019 operating the fans?
6           MR. JONES:  Objection to --
7           THE WITNESS:  I have no knowledge --
8           MR. JONES:  -- foundation.
9           THE WITNESS:  -- of that, if it was functional
10      or not.  I was -- I was told that they -- the --
11      sometimes they're used and sometimes not.  Depends
12      on how much --
13  QUESTIONS BY MR. GARDNER:
14  Q.  So when they're --
15  A.  -- water they use.
16  Q.  -- draw air in from the back through a fan and
17      expel it through the front --
18  A.  Right.
19  Q.  -- which would be the east side, that would stir up
20      the paint in the room and allow it to maybe get up
21      higher.  Is that what you're saying?
22          MR. JONES:  Objection to --
23          THE WITNESS:  I'm not saying --
24          MR. JONES:  -- foundation.
25          THE WITNESS:  -- that at all.  I'm just saying

Page 177

1       I don't know the circulation is in the room and how
2       it affects that.  I wasn't there when the building
3       was obviously operational so -- to know.
4   QUESTIONS BY MR. GARDNER:
5   Q.  Next line, it says, Paint on mist, in quotes, would
6       go up 24 inches.  You see that?
7   A.  Yes.
8   Q.  Then tell the -- tell the jury what the next words
9       are after that.  Just read that out loud.
10  A.  And then come back down?
11          MR. JONES:  Objection.
12          MR. GARDNER:  Come back down to the floor.
13          MR. JONES:  Same objections.
14  QUESTIONS BY MR. GARDNER:
15  Q.  Right?
16  A.  That's what statement is on here, yes.
17  Q.  Right.
18  A.  That doesn't explain though the fact that there was
19      heat -- or paint on the deflectors and on the --
20      the heater tubes themselves --
21  Q.  It's incongruent with that.
22  A.  -- and how that --
23  Q.  It's incongruent information, isn't it?
24  A.  Right.  It's not information that I would deem
25      liable [sic] based on what I saw.

45 (Pages 174 - 177)

Page 178

1 Q. After the fire.
2 A. After the fire.
3 Q. 'Cause you're never in the room before the fire.
4 A. No.
5 Q. And at no time did you ever obtain -- did you ever
6   obtain any photos taken inside building -- building
7   number 1 taken before the fire showing the
8   conditions, did you?
9 A. I did not.
10 Q. Have you ever seen any?
11 A. I -- I don't think I have. Except for I think one
12   of the -- I thought I saw something about inside
13   of -- online or something or --
14 Q. Yeah, okay.
15 A. -- on the -- one of the report.
16 Q. Continuing after the phrase, written by Lou
17   Inendino, after talking to Fred Jones, that starts
18   out with, Paint on mist would go up 24 inches then
19   come back down. Sprayer not too old from
20   Sherwin -- Sherwin Williams, airless. And could
21   you read the rest of the sentence.
22 A. It says here, It could not spray up and hit
23   heaters.
24 Q. And that came from Fred Jones, didn't it?
25   MR. JONES: Same objections, form, foundation.

Page 179

1   THE WITNESS: Yeah. He's talking 'pecifically
2   about the sprayer. Depend on how they have it
3   ang -- there's a lot of issues involved in that and
4   explanations that that does not cover. Number one
5   is, where does the vapors go? How would the
6   ventilation affect where the -- everything goes?
7   And why did everybody say that they had blue paint
8   everywhere in the facility, all over the place?
9   So if that would have been the case, then
10   obviously it would not have been just -- it only
11   been 24 inches away from where they were painting.
12   And that's not what the --
13 QUESTIONS BY MR. GARDNER:
14 Q. So you understand --
15 A. -- information was.
16 Q. -- say you and I had been in there a month before
17   the fire taking pictures inside of building
18   number 1, as low -- as shown on Exhibit Z, we would
19   have seen blue paint floor to ceiling, up on the
20   ceiling, on the heaters. That's what you're
21   saying.
22 A. That's the --
23   MR. JONES: Objection to foundation, form.
24   THE WITNESS: -- that's the description I was
25   given by the employees working --

Page 180

1 QUESTIONS BY MR. GARDNER:
2 Q. And you've never --
3 A. -- there.
4 Q. -- seen any photographs contradicting that
5   information --
6 A. No --
7 Q. -- have you?
8 A. -- I have not.
9 Q. Okay. Continuing with that sentence and finishing.
10   Lou Inendino recorded March 3rd, 2020, in talking
11   to Fred Jones, who you said you relied on,
12   Overspray would be --
13   MR. JONES: Object --
14   MR. GARDNER: -- drawn into the filters.
15   MR. JONES: Objection to -- objection to form,
16   foundation.
17   THE WITNESS: Well, the filters were at --
18   were at the -- the fans that -- particularly the
19   front fan that blows the -- to circulate out. And
20   the filter was there, and it filtered the air going
21   to the outside. And that's an environmental
22   requirement, so to speak, for any type of a paint
23   booth or paint area.
24 QUESTIONS BY MR. GARDNER:
25 Q. Do you have some idea there was a paint booth in

Page 181

1   building number 1?
2   MR. JONES: Objection to foundation.
3   THE WITNESS: I don't think it's a paint
4   booth, obviously. It doesn't meet any requirements
5   for a paint booth. It does meet requirement for a
6   painting area or a spray area.
7 QUESTIONS BY MR. GARDNER:
8 Q. And then Fred Jones' phone number's recorded?
9 A. Yes.
10   MR. JONES: Objection to foundation.
11 QUESTIONS BY MR. GARDNER:
12 Q. Why didn't you include in either of your reports
13   the information obtained from Lou Inendino on
14   March 3rd, 2020 from the manager of the facility in
15   question, Fred Jones, about the blue paint could
16   not spray up and hit the heaters? Why didn't you
17   put that in your report?
18   MR. JONES: Objection to form.
19   THE WITNESS: Because it -- they -- I'm not
20   saying that they took the spray gun and -- and
21   sprayed the heaters with it. I'm saying that the
22   overspray and the air ventilation systems and the
23   -- the overs -- the -- was sprayed in a manner to
24   which the circulation of those products landed on
25   everything in the building, according to

46 (Pages 178 - 181)

Page 182

1    information that I was given.
2        MR. GARDNER: When you say --
3        THE WITNESS: And I think in this thing
4    they're talking about 24 inches is how far the --
5    the sprayer will actually spray as for as to paint.
6    They're not talking about spraying -- whether the
7    mist that's generated would go.
8    QUESTIONS BY MR. GARDNER:
9    Q. Did you go over these notes before this deposition
10   started?
11   A. No, I did not. I haven't seen these notes before.
12   Q. Can you go to the next page, Page 4 of Exhibit D.
13   Now, these notes are also dated March 3rd, 2020.
14   You were -- you were at the site that day, right?
15   A. Yes.
16   Q. And these are by JDHD, right?
17   A. Yes.
18   Q. You and I (unintelligible) John Diggle?
19   A. Yes.
20   Q. The EE you brought with you.
21   A. Uh-huh.
22   Q. Yes?
23   A. Yes.
24   Q. All right. And couple lines down, doesn't --
25   didn't he record, that is John Diggle, Republic

Page 183

1    bought the building in 1965?
2        MR. JONES: Objection to foundation. Document
3    speaks for itself.
4        THE WITNESS: Yes.
5    QUESTIONS BY MR. GARDNER:
6    Q. Down at the bottom it says -- you see the reference
7    to time, 10:50?
8    A. Yes.
9    Q. Bottom left, Jim.
10   A. Uh-huh.
11   Q. And Mr. Diggle recorded, SERVPRO at north end of
12   building, smelled smoke, found fire, took cell
13   phone videos? You see all that?
14   A. Yes.
15   Q. All right. Tell us about your efforts or anybody
16   from Rimkus efforts to speak with these SERVPRO
17   people.
18       MR. JONES: Objection to form.
19       THE WITNESS: I made contact with SERVPRO on
20   the -- the day of the fire, first inspection. But
21   they would not give me any information about who
22   the employees were, any information at all. They
23   -- they said that they could not release any
24   information in that regard.
25   QUESTIONS BY MR. GARDNER:

Page 184

1    Q. Can you go to the next Page 5, Exhibit D.
2    A. Uh-huh.
3    Q. Still these are the handwritten notes of John
4    Diggle taken March 3rd, '20 and talking to Fred
5    Jones, right?
6    A. Yes.
7    Q. Fred Jones referred to as the container shop lead,
8    right?
9    A. Uh-huh.
10   Q. He'd worked there for 11 years, right?
11   A. Yeah, he -- they -- he referred to me as he was a
12   manager. But I'm sure that's --
13   Q. Right. And did Mr. Diggle make this diagram on
14   Page 5 of Exhibit D?
15       MR. JONES: Objection to form, foundation.
16       THE WITNESS: I would assume so since this is
17   his documentation.
18   QUESTIONS BY MR. GARDNER:
19   Q. All right. Go to the last page of Exhibit D,
20   Page 7. Why is it that John Diggle and Lou
21   Inendino were the ones taking notes from Fred Jones
22   instead of you?
23       MR. JONES: Objection to form, foundation;
24   calls for speculation.
25       THE WITNESS: Well, I had already spoken to

Page 185

1    him, but I think -- he was there the day of the
2    examination. And obviously I did not -- I was
3    involved in the aspect of collecting evidence and
4    things of that nature. And John Diggle obviously
5    was not involved in the -- doing that. So I'm
6    assuming, by this notation, he was talking to
7    people and utilizing his time to get information
8    from them or whatever. I don't know.
9    QUESTIONS BY MR. GARDNER:
10   Q. You don't let people employed with Rimkus take
11   notes that aren't accurate note takers, do you?
12       MR. JONES: Objection to form.
13       THE WITNESS: No, I don't.
14   QUESTIONS BY MR. GARDNER:
15   Q. See, this is the first time I've seen John Diggle's
16   writing in my whole life. You've seen it prior in
17   other cases, haven't you?
18   A. Yes.
19   Q. Okay. See if I read it right. Page 7, Electric
20   enters at south end of building. Extensive thermal
21   dam -- damage to the breakers. All charred.
22   Switch boxes in four-inch junction box destroyed.
23   Have I read that right?
24   A. Yes.
25       MR. JONES: Objection to form, foundation.

47 (Pages 182 - 185)

Page 186

1 QUESTIONS BY MR. GARDNER:
2 Q. Conduit is destroyed and in pieces. Fire melt
3     extensive to copper conductors? Conductor?
4        MR. JONES: Objection, foundation --
5        THE WITNESS: Yeah. I --
6        MR. JONES: -- document speaks for itself.
7        THE WITNESS: That -- that could be the,
8     obviously, what his -- what there was visual at the
9     time of the examination. That doesn't mean that
10    was the cause of the fire or anything.
11       MR. GARDNER: Nobody asked you about cause of
12    the fire at this point.
13       THE WITNESS: Okay.
14 QUESTIONS BY MR. GARDNER:
15 Q. To your understanding that -- wait a minute. Is it
16    the case that none of the electrical systems,
17    including those mentioned on Page 7 of Exhibit D,
18    were collected due to the amount of extensive
19    damage to them? That play a role in not collecting
20    it?
21 A. It did not play a role in not collecting it. The
22    information that was obtainable to us was where the
23    fire originated from and was stated to us it was
24    high in the building. And it was, at the time,
25    based on the electrical components being in --

Page 187

1     with -- in conduit, and things of that nature, that
2     the likelihood of this would be very minimal.
3        All this here was a hypothesis that we looked
4     at, same -- using the scientific method. And that
5     hypothesis was ruled out basically on the aspect of
6     there was nothing that would indicate that the fire
7     started in the electrical by those that are in
8     attendance. And, second of all, is everybody in
9     attendance had an opportunity, if they wanted
10    something collected, no matter whether it was me or
11    anybody, we -- we always do that.
12 Q. Now, wait a minute. Are you denying that you were
13    asked by the electrical engineers, by -- by the
14    defendants and the cause and origin -- my
15    cause-and-origin expert asked you for, and Rimkus,
16    to collect the electrical systems? Are you
17    denying --
18 A. No. I did not deny anything, and I would never
19    deny anything like that. They have an opportunity
20    to request it.
21 Q. And they did.
22 A. And nobody did.
23 Q. Are you sure?
24 A. I'm positive.
25 Q. Okay.

Page 188

1 A. Or it would have been collected.
2 Q. Can you go to the Exhibit E. It's just a one-page
3    exhibit.
4 A. (Witness complies.)
5 Q. This is a typed-up page rather than handwritten
6    notes. It looks like it's attributed to Fred
7    Jones, container shop manager. Have you seen this
8    before?
9 A. No, I have not.
10 Q. Who -- who prepared this? Who typed this up?
11       MR. JONES: Objection to foundation.
12       THE WITNESS: I have no knowledge --
13       MR. JONES: He just said he's never seen it.
14       THE WITNESS: -- of that.
15 QUESTIONS BY MR. GARDNER:
16 Q. What?
17 A. I have no knowledge of who typed this up.
18 Q. You've never seen it before today?
19 A. No, I have not.
20       MR. JONES: Asked and answered.
21       MR. GARDNER: Would this be a good time to
22    take a --
23       THE STENOGRAPHIC REPORTER: Yes.
24       MR. JONES: Yeah. Now's a great time to take
25    a break.

Page 189

1        THE VIDEOGRAPHER: This ends media two. The
2     local time's 2:33. We are off the record.
3        (A brief recess was taken.)
4        THE VIDEOGRAPHER: This begins media three.
5     The local time is 2:45, and we are on the record.
6 QUESTIONS BY MR. GARDNER:
7 Q. Jim, on Page 2 of your first report, marked as
8     Exhibit F, roughly two-thirds of the way down --
9     tell me when you're there, Page 2.
10 A. Okay. Uh-huh.
11 Q. It says there had been no problems related to the
12    heat prior to the fire event. You see that?
13       MR. ZOCCOLA: What paragraph are you reading
14    from?
15       MR. GARDNER: Fifth.
16       THE WITNESS: The third paragraph?
17       MR. GARDNER: Fifth.
18       THE WITNESS: The fifth one? Oh, that would
19    be the fourth one you're talking about. Three
20    space heaters?
21       MR. GARDNER: Yeah, that's the one.
22       THE WITNESS: Okay. All right.
23 QUESTIONS BY MR. GARDNER:
24 Q. You wrote at the end, There had been no problems
25    related to the heat prior to the fire event.

48 (Pages 186 - 189)

Page 190

1  A.  Yes.
2  Q.  Do you mean the heaters or you mean the heat --
3     heat system?  What are you talking about?
4  A.  The heat -- the units themselves I'm talking about
5     there.
6  Q.  According to the information from my client, they
7     be -- these Space-Ray closed infrared tube heaters
8     first became operational on February 4th, 2019.
9     And this fire was 43 days later on March 19th,
10    2019.  Can you explain why there had not been a
11    fire in the previous 43 days?
12    MR. JONES:  Objection to foundation.
13    THE WITNESS:  I cannot explain that type of
14    sit -- I don't know how they were installed.  I
15    don't know if they were installed properly.  I'm
16    assuming they were, but I don't know that for a
17    fact.  And also the fact that I don't know how -- I
18    was told that they spray paint seventeen to
19    nineteen containers in there a day.  So that's a
20    lot of -- a lot of painting going on.
21    So I don't know.  There's certainly
22    circumstances involved in that that I don't know.
23    You know, it's just given the right conditions and
24    the right time, that's when things happen.
25  QUESTIONS BY MR. GARDNER:

Page 191

1  Q.  Tell us what conditions existed on March 19th, 2019
2     that had not existed or were different from the
3     previous 43 days.
4     MR. JONES:  Objection to foundation; misstates
5     prior testimony.
6     MR. GARDNER:  Hold on a second.  I'm gonna
7     move for additional time for this deposition, if
8     you don't knock it off with objections that aren't
9     legally recognized, Thomas.  You're taking up the
10    whole deposition.  Her fingers are --
11    MR. JONES:  They've been concise the whole
12    deposition.  I -- yours in other depos have been
13    the opposite.  I -- I'm keeping it to, like, two
14    words.
15    MR. GARDNER:  I'm just warning you.
16    MR. ZOCCOLA:  You read from notes for --
17    MR. GARDNER:  I'm allowed to read from notes.
18    MR. ZOCCOLA:  -- like, three hours.
19    MR. JONES:  No.  The notes relying on --
20    you're asking his opinion about what other people
21    said in their notes.  I'm going to object on that
22    every day.  Because he can't speculate as to what
23    John Diggle may or may not have thought when he
24    wrote his notes.  And if your questions are
25    gonna -- I -- I'm going to object.  But they're

Page 192

1     concise and --
2     MR. GARDNER:  I just made my record --
3     MR. JONES:  -- proper objections.
4     MR. GARDNER:  -- that's all.
5     MR. JONES:  That's fine.
6     MR. GARDNER:  We'll be moving for more time,
7     if this doesn't --
8     Can you read the last question.
9     (The requested text was read by the court
10    reporter.)
11    MR. JONES:  And if you'd like --
12    MR. GARDNER:  Recognize his --
13    MR. JONES:  -- same objection.
14    MR. GARDNER:  She just read it, Tom.  You
15    don't have to do it.
16    MR. JONES:  Well, I -- you're complaining --
17    MR. GARDNER:  Your objections were recorded.
18    MR. JONES:  If you can let met state my
19    objection.
20    MR. GARDNER:  You already did.
21    MR. JONES:  You're -- you're asking a question
22    about what conditions have changed.  And I don't
23    think he testified that any conditions had changed
24    on the day of the fire.  That's my objection.
25    THE WITNESS:  I don't know that any conditions

Page 193

1     have changed.  I just know that they're -- under
2     certain conditions things happen.  Other conditions
3     they don't happen.
4  QUESTIONS BY MR. GARDNER:
5  Q.  You're -- but you're not aware --
6  A.  It --
7  Q.  -- of any changes?
8  A.  I'm not a -- aware of any changes that -- that
9     occurred in this particular situation.  But
10    everything occurs given under certain conditions.
11    And in these particular situation, I feel the
12    conditions were right for this to -- to have
13    happened.
14  Q.  But they weren't the right conditions for it to
15    happen in the previous 43 days.
16  A.  Given the circumstances, obviously it didn't
17    happen.  So I'm assuming that the conditions
18    weren't right at those -- at that time.
19  Q.  So far as you know, the heaters had been
20    operational during the prior -- the 43 days after
21    installation until the time of the fire?
22  A.  Yes, I would --
23  Q.  What I mean by that, Jim, is the temperatures were
24    low enough in the room to call for heat.
25  A.  Yeah.  It was in the winter time, actually.

49 (Pages 190 - 193)

Page 194

1  Q.  Right.  You -- you didn't obtain any weather
2      records, did you, in this case?
3  A.  I checked with weather.  There -- the temp at the
4      time of day on this particular day was that --
5      during the daytime was 47 degrees.
6  Q.  What about the overnight low?
7  A.  Overnight low went down to, like, 28, I believe it
8      was, on that particular day.  Don't quote me.
9  Q.  Did you look at the -- did you look at the weather
10     records all the way back to the date of first
11     operation of February 4th, 2019?
12 A.  No.  It's -- I'm -- that's during the wintertime,
13     so, I mean, it would be likely that those would be
14     operational almost 24 hours a day at certain times.
15 Q.  Right.  And so explain the ignition sequence of
16     these Space-Ray heaters that my client installed.
17     So the temperature drops and the thermostat calls
18     for the -- the room to be heated.
19 A.  Right.
20 Q.  Explain how that operates.  What happens inside the
21     heater box?
22 A.  Well, I'm not a mechanical engineer.  But
23     generally -- the general knowledge that I know
24     about is there's electronic ignition that occurs.
25     Once the temperature drops, the thermostat calls

Page 195

1      for more heat and sends it to the -- a heater unit.
2      And basically it causes electronic ignition to
3      occur.  There's a -- I believe a thermal resistor
4      in there that heats up and causes ignition to -- to
5      occur in the heater.
6  Q.  Of propane gas?
7  A.  Yes, of pro -- calls for pro -- a valve that opens
8      up and allows propane to come through and the
9      ignition occurs.
10 Q.  Ignition of the propane gas.
11 A.  Yes.
12 Q.  Inside the box.
13 A.  Inside the box.  The -- that's the heater box, yes.
14 Q.  Right.  And then so this heat blows down through
15     the -- the tube.  I think they're, like, 30 feet
16     long, right?
17 A.  Yes.
18 Q.  How -- do you know how it is propelled down inside
19     the tube?  Is there a force of air or something?
20 A.  I -- there's a fan --
21 Q.  Blowing --
22 A.  -- that blows it --
23 Q.  And --
24 A.  -- down through there.
25 Q.  -- in this case -- in building number 1, in the

Page 196

1      43 days before the fire, the source of the
2      combustible air was from outside of the room,
3      wasn't it --
4  A.  Yes.
5  Q.  -- rather than inside air.
6  A.  As for as the air that's supplied down through the
7      tube, yes.
8  Q.  Yeah, okay.  So have you done any research into the
9      preexisting Modine heaters that my client replaced.
10     There were three of them in the room.
11 A.  I have not done any research on them as I was told
12     those were not -- no longer in operation or used
13     under normal circumstances unless it gets really
14     cold.  And in this situation that they relied on
15     the three heaters that were installed.
16 Q.  The new ones.
17 A.  Yes.
18 Q.  Do you know why, from any witness testimony or
19     deposition testimony, the three preexisting Modine
20     heaters were not functioning and needed replaced?
21     MR. JONES:  Objection --
22     THE WITNESS:  No, I do not know why.
23 QUESTIONS BY MR. GARDNER:
24 Q.  You hadn't been told they had clogged up with blue
25     paint mist and no longer could ignite?

Page 197

1  A.  It would not surprise me that that would be the
2      case.
3  Q.  And what was the source of combustible air inside
4      of the preexisting three Modine heaters that had
5      been in there for over a decade?
6      MR. JONES:  Objection to foundation.
7      THE WITNESS:  Well, they were standalone
8      heaters.  So there was vents inside -- or in those
9      heaters that would've probably pulled just room air
10     in --
11     MR. GARDNER:  Including the paint.
12     THE WITNESS:  -- as opposed to outside air --
13     MR. GARDNER:  Right.
14     THE WITNESS:  -- yes.
15 QUESTIONS BY MR. GARDNER:
16 Q.  So the old ones pulled in room air --
17 A.  Yes.
18 Q.  -- correct?  And the new ones did not.
19 A.  Yes.
20 Q.  Right.  And do you know if in any of the buildings
21     currently -- strike that.  Any of the buildings at
22     the Republic MacBeth facility still have those
23     different mode -- I'm sorry -- Modine heaters?
24 A.  I did -- I did not go in any other of the buildings
25     other than the -- the -- that fire building and

50 (Pages 194 - 197)

Page 198

1     the -- the --
2  Q.  Office?
3  A.  -- office.
4  Q.  So you didn't go --
5  A.  I think --
6  Q.  -- inside -- I'm sorry.  I'm following you.
7  A.  Go ahead.
8  Q.  You didn't go inside building 3 or 4, did you?
9  A.  Yeah, I did.
10 Q.  Oh, you did?  Did --
11 A.  They have some -- they have some heaters in there
12    from -- similar to that.  I didn't know what the
13    brand were.  But that was --
14 Q.  But they were --
15 A.  -- one of them --
16 Q.  -- the kind that combust from room air.
17 A.  Yes.
18 Q.  And let's say you and I had been in -- met together
19    on March 18th, 2019 inside of building number 1 at
20    the MacBeth facility where they were sometimes
21    spray painting dumpsters, climbed up a ladder and
22    examined these Modine heaters, would we be able to
23    look without opening anything and see the open
24    flames?
25        MR. JONES:  Objection to form, foundation.

Page 199

1        THE WITNESS:  I don't -- can't account for
2     these particular heaters.  I don't know how they
3     were installed or how -- if there was any openings
4     of -- in that -- that system or not.  As for as
5     what I'm basing some of my opinion on, obviously,
6     is that type of heater being installed is not a
7     completely closed system.
8  QUESTIONS BY MR. GARDNER:
9  Q.  The Modines.
10 A.  No, the -- the Space-Ray heaters, if --
11 Q.  You think --
12 A.  -- that's what you're referring to.
13 Q.  -- Space-Ray heaters are -- are less closed than
14    the old Modines?
15 A.  Oh, no.  I think they're probably more closed.  But
16    there are still openings that aren't sealed tight,
17    and you get air -- you get products of combus --
18    not products of combustion.  But you get products
19    of -- of paint fumes, paint vapors, paint mist and
20    spray inside of those particular units, which was
21    evidenced by the pictures and by what I saw.
22 Q.  So one of your hypothesis or theories -- strike
23    that.  One of your opinions is that Blue Sheboygan
24    water-based paint got inside of tube heaters and
25    the heat -- the burner box and caught on fire?

Page 200

1  A.  It didn't just -- it didn't catch on fire,
2     basically.  It -- it ignited by the fact that it --
3     it boiled off, the water boiled off of the paint.
4     Which is, by their own statement, it becomes a
5     Class II to Class, I think, IIIA and IIIB flammable
6     material or combustible material.
7  Q.  Did you ever have a chemist check that, the
8     difference between paint drying and boiling?
9  A.  Basically the -- I'm refer -- basically drying is
10    going to take over a period of time and dry off.
11    Boiling is actually boiling it off, so to speak.
12    But essentially what you're doing is -- I -- better
13    choice of words might be to just -- it basically
14    would be dried on the -- on the system.
15 Q.  I'm talking about in the system.  So you understand
16    that in the burner boxes of the three Space-Ray
17    units that my client installed, there was a fire
18    when they were operating correctly.
19 A.  Right.
20 Q.  And you're saying that blue paint got in there and
21    cause -- caused a different kind of fire?
22 A.  I don't --
23        MR. JONES:  Objection to form.
24        THE WITNESS:  -- that it caught fire inside
25    the box itself.  But it was close to the box within

Page 201

1     the -- the tubes.  I -- there was evidence of blue
2     paint in the tube that had basically dried onto
3     the -- or had -- was on the system.  And -- and it,
4     by its own definition, it had boiled off and -- and
5     stayed -- and had dried on the system, and it
6     becomes a combustible material.
7  QUESTIONS BY MR. GARDNER:
8  Q.  And just -- and combusted, in your opinion.
9  A.  Yes.
10 Q.  And still stayed bright blue.
11 A.  It wasn't bright blue in the -- in the area where
12    it would think.  But it was in other areas of the
13    -- the -- not all the paint had boiled off or had
14    burnt off.
15 Q.  You'll concede that you --
16 A.  That's what I'm basing my opinion on.
17 Q.  You'll concede you didn't identify a single witness
18    in your report of December 3rd, 2019 by name,
19    correct?
20        MR. JONES:  Objection --
21        THE WITNESS:  I don't have --
22        MR. JONES:  -- to the form.  Document
23    speaks --
24        THE WITNESS:  -- those names --
25        MR. JONES:  -- for itself.

51 (Pages 198 - 201)

Page 202

1     THE WITNESS: -- available to me, no.
2  QUESTIONS BY MR. GARDNER:
3  Q.  You didn't name anybody in this report by name.
4  A.  No, I did not name anybody in the report.
5  Q.  And so on Page 3 of your first report, be the third
6     paragraph from the bottom, you wrote, This combined
7     with the fire damage to the south heater that was
8     at ceiling level indicated the possible location of
9     fire origin, right?
10 A.  Yeah.  That -- there's a couple things about this.
11    I -- you mentioned earlier, I had a couple of
12    issues with things that were -- comments that were
13    on that I made that this should have been stated as
14    a -- instead of possible a probable location of
15    origin, not --
16 Q.  You've been a fire investigator for forty -- how
17    many years?
18 A.  Forty-four.
19 Q.  And you accidentally wrote the word "possible"
20    instead of "probable"?
21    MR. JONES:  Objection to form.
22    THE WITNESS:  Yeah.  I -- I put it by error.
23 I did that apparently.  I did not catch that at the
24 time, just like I didn't catch the March the 3rd.
25 But that was one of those things that were -- was

Page 203

1     not --
2  QUESTIONS BY MR. GARDNER:
3  Q.  So roughly --
4  A.  It should have been "probable."
5  Q.  So roughly three years later you wrote another
6     report.
7  A.  It was a continuation of the report --
8  Q.  Yeah.  Dated November --
9  A.  -- original.
10 Q.  -- 2022.
11 A.  Yes.
12 Q.  Show me in that report where you corrected the
13    records to "possible" to the word "probable."
14    MR. JONES:  Objection to form.  He didn't say
15 that he made that correction in that report.
16    MR. GARDNER:  Well, he had --
17    THE WITNESS:  Yeah.
18    MR. GARDNER:  -- three years to do it.
19    MR. JONES:  Well ...
20    THE WITNESS:  I -- I --
21    MR. JONES:  What's -- what's your -- what's
22 your question?
23    THE WITNESS:  -- I did not make the
24 correction, that particular correction.  I didn't
25 catch it.  So ...

Page 204

1  QUESTIONS BY MR. GARDNER:
2  Q.  So you didn't say anything about a probable origin
3     of the fire in any -- either of these.  In both
4     reports you used possible point of origin, didn't
5     you?
6  A.  I used that term.  And that term was wrongly used,
7     in my opinion.  Because NFPA also states that
8     the -- there's a distinguishing between probable
9     and possible.  And if you feel like something is
10    more than 51 percent, it could become possible --
11    or not possible but probable.  And that's -- in
12    this case I feel this was more than that 51 percent
13    actually.  So it -- I should have used the word
14    "probable."
15 Q.  But you didn't --
16 A.  And having read this report, I never even noticed
17    that as an issue.
18 Q.  And you've written 1400 reports.
19    MR. JONES:  Objection.
20    MR. GARDNER:  I'm sorry.  You've written over
21 1400 reports.
22    MR. JONES:  Objection to form.
23    THE WITNESS:  Well, I've never -- most of the
24 time the reports are based on the -- on what you
25 see and what you -- and I don't know that that term

Page 205

1     is always used on every single report.
2  QUESTIONS BY MR. GARDNER:
3  Q.  Would you agree and concede that the vast majority
4     of your expert cause-and-origin reports that you've
5     prepared, your final report, you've expressed your
6     opinions regarding the origin of the fire to a
7     degree of probability?
8  A.  Degree of certain bit --
9  Q.  Yes.
10 A.  -- cert -- certainty, yes.
11 Q.  And you didn't do that in this case.
12 A.  Not necess -- no, I -- I did -- I didn't say those
13    in those exact words.  But I did reference to the
14    fact of what I felt the origin of the fire occurred
15    and how it occurred.
16 Q.  Would you agree with this statement:  The retention
17    of original notes, diagrams, photographs, and
18    measurements is the best practice --
19    MR. JONES:  Objection, form, foundation.
20 QUESTIONS BY MR. GARDNER:
21 Q.  -- fire -- cause-and-origin fire investigation?
22 A.  I would agree that that would be the best practice,
23    yes.
24 Q.  Would you agree that this data constitute a body of
25    factual information that should be retained until

52 (Pages 202 - 205)

Page 206

1    all reasonable -- sorry -- reasonably perceived
2    litigation processes are resolved?
3        MR. JONES: Same objections.
4        THE WITNESS: That's what that guideline says,
5    yes.
6    QUESTIONS BY MR. GARDNER:
7    Q.  Would you read -- agree with this statement:  The
8    entire fire scene should be considered physical
9    evidence and should be protected and preserved?
10        MR. JONES: Same objections.
11        MR. GARDNER: Section 17.3.1.1.
12        THE WITNESS: In an ideal world, yes, that
13    would be the case.
14    QUESTIONS BY MR. GARDNER:
15    Q.  Did you obtain any architectural drawings in your
16    investigation of this case?
17    A.  No, I did not.
18    Q.  Did you obtain any engineering drawings in your
19    investigation of this case?
20    A.  No.
21    Q.  Did you obtain any wiring schematics in your
22    investigation of this case?
23    A.  No.
24    Q.  Would you agree with this statement:  Most
25    contamination of physical evidence occurs during

Page 207

1    its collection?
2    A.  Yeah.  I would agree that that's possibly the case,
3    yes.  That doesn't always -- that is a guideline
4    that they use, and those are statements that are
5    general.  But given certain circumstances and
6    certain conditions, in this case a large fire that
7    was -- basically occurred a fourth of the building,
8    so to speak, or maybe even more affected, is --
9    there's so much area to cover that there's not any
10    way you can protect everything 100 percent.
11    Q.  And this doesn't refer to everything.  I just
12    read -- I'm talking about physical evidence during
13    its collection.  That's all.
14    A.  There's like --
15    Q.  Like your swabs.
16    A.  -- we did; is that right?  Not -- I didn't -- I --
17    there was no damage of anything that I saw in
18    collection of evidence in that particular
19    situation.
20    Q.  And you documented that thoroughly --
21    A.  I doc --
22    Q.  -- with photography.
23    A.  Yes.  I have it on -- it was in the photos that was
24    taken at the time I collected it.
25    Q.  And so as a general rule in your collection, when

Page 208

1    you're collecting evidence, sometimes you'll put it
2    in gallon cans, right?
3    A.  Most always, yes.
4    Q.  Sometimes --
5    A.  It depends on the evidence, obviously, you're
6    collecting.  If it's a liquid or if it's a small
7    item that could fit in there.
8    Q.  My --
9    A.  Obviously tube heaters couldn't go in there.
10    Q.  I understand.  So things smaller than a gallon --
11    A.  Yes.
12    Q.  -- can, right?
13    A.  (Nods head.)
14    Q.  And in this case you obtained some swabs that you
15    say were on -- from on and in the heaters, right?
16    A.  Yes.  The -- inside the tubes primarily.
17    Q.  They primarily came from inside the tubes.
18    A.  Right.
19    Q.  And was there any one of the three tubes that had
20    more material to collect than the other three?
21    A.  I would say the middle heater probably had more
22    that I noticed.  And also the south heater had more
23    damage done to the deflectors than the -- any of
24    the other heaters did.  So there are several --
25    several variations to why that could be the case.

Page 209

1    But ...
2    Q.  Which of the three heaters, in your opinion, first
3    ignited in this fire?  The north heater, center
4    heater, the south heater, or the east heater?
5    A.  Well, I think -- I think the most likely source of
6    ignition was in the south heater.  However, the
7    middle heater received the most damage.  And I --
8    that is due to the fact that that heater is in the
9    center of the room.  And obviously the heat goes
10    up, and that was -- the heat affected that worse.
11    'Cause there doesn't necessarily mean that's where
12    the area of origin occurred.
13    Q.  Have you ever looked at the Herculiner safety data
14    sheet?
15    A.  Yes, I have.
16    Q.  Why?
17    A.  I was told that they used that occasionally.
18    And -- but they hadn't used it for over five years.
19    So I did go ahead and pull that online just to
20    check it to see, and it is petroleum-based product.
21    Q.  Did it also have xylene in it as its main
22    ingredient?
23    A.  So there's a lot of ingredients in that.  And I
24    did -- I searched a lot of those products that
25    was -- that had listed in those type of things as

53 (Pages 206 - 209)

Page 210

1 well. Just read online anyway.
2 Q. Had a little trouble following you. But the only
3 questions right now is: Will you concede that
4 product Herculiner has an ingredient -- has as an
5 ingredient xylene?
6 A. Yes, sir.
7 Q. And that's one of the things Sharee Wells
8 determined as a result of her testing.
9 MR. JONES: Objection to form.
10 THE WITNESS: I don't recall anything on the
11 report that says xylene. But I do recall there's a
12 heavier or light --
13 MR. GARDNER: Petroleum.
14 THE WITNESS: -- medium, heavy distillates.
15 QUESTIONS BY MR. GARDNER:
16 Q. Okay. What other things did you research and pull
17 up the data sheets or safety sheets besides
18 Herculiner?
19 A. That was primarily that because of the fact that
20 that's what was mentioned to me that was used in
21 the facility. And then I found out, obviously the
22 second time that I went, that the -- that sys --
23 that had not been used. Because there was -- there
24 was only one, maybe a couple customers that they
25 had that liked to have that or requested that be

Page 211

1 put on the containers. So it hadn't been utilized
2 for five years. So I never ...
3 Q. Can you go to Exhibit AA.
4 MR. GARDNER: Thomas, AA.
5 MR. HEHNER: AA?
6 MR. JONES: Oops.
7 THE WITNESS: AA you said?
8 MR. GARDNER: Yes, sir. Six pages.
9 QUESTIONS BY MR. GARDNER:
10 Q. Have you -- have you seen this first page of AA
11 before today?
12 A. No, I have not.
13 MR. ZOCCOLA: Hold on a second.
14 MR. JONES: Just pull it up real quick. Oh,
15 he's got it up there.
16 MR. GARDNER: Well, he's got it upside-down.
17 MR. ZOCCOLA: Let us -- let us get it up for a
18 second.
19 MR. GARDNER: Here you go.
20 MR. JONES: Okay.
21 QUESTIONS BY MR. GARDNER:
22 Q. Can you see that, Jim?
23 A. Apparently it's upside-down in this picture here
24 so --
25 Q. Yeah.

Page 212

1 A. Yeah.
2 Q. All right. Have you seen this before today?
3 A. No, I have not.
4 Q. Do you know who took these pictures --
5 A. No.
6 Q. -- in Exhibit AA?
7 A. No.
8 Q. Tell us all the efforts you made to obtain
9 photographs taken inside of building number 1 prior
10 to the fire.
11 A. I asked if there was any photos available, and I
12 was told no at the time.
13 Q. I thought you talked to Korte. You said you talked
14 to people at Korte.
15 A. Briefly about -- I didn't ask them about pictures
16 or anything. I didn't -- but I asked Kyle and
17 Mr. Jones about pictures.
18 Q. But you contacted them to see if they were the
19 other competitor company of my client that -- that
20 allegedly told Republic not to go with closed
21 infrared tube heaters.
22 A. Right.
23 Q. And you didn't ask them if they took pictures.
24 A. I didn't ask them if they took pictures, no.
25 Q. All right. You haven't read the deposition of

Page 213

1 Trevor Miller who's the one that sent me these
2 pictures.
3 MR. JONES: Objection, asked and answered.
4 THE WITNESS: No, I have not.
5 QUESTIONS BY MR. GARDNER:
6 Q. Okay. Do you see a lot of paint on the ceiling in
7 photograph one of Exhibit AA?
8 MR. JONES: Objection to form.
9 THE WITNESS: Not in this photograph I don't
10 see it.
11 QUESTIONS BY MR. GARDNER:
12 Q. Do you see a rather clear demarcation roughly
13 halfway up the wall in the -- would be the most
14 northern east garage door separating white from
15 blue?
16 MR. JONES: Objection to form.
17 THE WITNESS: I see that line of -- line
18 across there, yes.
19 QUESTIONS BY MR. GARDNER:
20 Q. Did you know Terry Reader testified that blue paint
21 in this photograph on the bottom half of the wall
22 was painted intentionally --
23 MR. JONES: Objection to form; asked and
24 answered.
25 QUESTIONS BY MR. GARDNER:

54 (Pages 210 - 213)

Page 214

1  Q.  -- as opposed to spray mist?
2  A.  I -- I am sure.  It looks like it's sprayed
3      intentionally.  Looks like it's -- it's like a --
4      dividing the wall.
5  Q.  I didn't sprayed, painted.  If I said sprayed I
6      meant to say painted.
7  A.  Okay.
8  Q.  Right.
9  A.  Painted.
10 Q.  Not gonna get a clear line like that just spraying
11     it, are you?  Unless you use a guard --
12 A.  -- some type of protection.
13 Q.  Right.  So go to Page 2 of Exhibit AA.  I'll
14     represent to you my understanding of the photo is
15     that photographer's aiming his lens to the east.
16     You see that exhaust fan?
17 A.  Uh-huh, yes.
18 Q.  And this is in a room where they sometimes painted
19     Blue Sheboygan paint, right?  Do you know?
20 A.  I'm assuming that but I don't know.
21 Q.  I'll hold it out to you --
22 A.  I don't know where this room was at for sure.
23     So ...
24 Q.  I'll hold out that Trevor Miller testified he took
25     these photos roughly two months before the fire

Page 215

1      when he visited the site to give Republic a quote
2      for the -- for --
3          MR. JONES:  Objection, lack -- sorry.
4          MR. GARDNER:  Hold on.  For closed infrared
5      heaters.
6          MR. JONES:  Objection, lack of foundation.
7          THE WITNESS:  I don't know anything about
8      these photos so I couldn't tell you.
9  QUESTIONS BY MR. GARDNER:
10 Q.  Does that look like a blue dumpster --
11 A.  Yes, sir.
12 Q.  -- in the photo near the bottom?
13     But you'll concede, looking at this photo,
14     Page 2 of Exhibit AA, it's hard to discern the
15     existence of any blue paint on the ceiling or
16     higher than, say, halfway or two-thirds up the
17     wall, right?
18         MR. JONES:  Objection, form.
19         MR. GARDNER:  It's essentially white.
20         THE WITNESS:  It's essentially white.  But
21     there is dust, appears to be, on the door, for
22     example, the front -- above the front door or on
23     the door.
24         MR. GARDNER:  And on --
25         THE WITNESS:  And it comes down.

Page 216

1  QUESTIONS BY MR. GARDNER:
2  Q.  Yeah.  And on the blue -- you can see that fan's
3      blue.
4  A.  On the fan, yes.
5  Q.  Correct.  So the ceiling of building number 1 was
6      corrugated metal, right?
7  A.  Yes.
8  Q.  Was it white metal or was it painted white?
9  A.  I don't know.
10 Q.  In the outside of the building, building number 1,
11     it's also con -- constructed out of corrugated
12     metal?
13 A.  Yes.
14 Q.  And this is just my failure to understand the
15     construction of this building.  Is it just one
16     layer of metal, Jim, so far as you understand, from
17     being out at the fire scene multiple times, it
18     constituted both the inside and outside wall?  Or
19     was it the case that there was sheets of corrugated
20     metal on the outside that are different than the
21     ones that are on the inside of building 1?
22         MR. JONES:  Objection, form --
23         MR. GARDNER:  Follow me?
24         MR. JONES:  -- foundation.
25         THE WITNESS:  Yeah.  A void space between the

Page 217

1      two you're talking about --
2  QUESTIONS BY MR. GARDNER:
3  Q.  Was there -- do you know if there was or wasn't?
4  A.  No, I do not.  It appears to be only on the outside
5      of the building.
6  Q.  So, in other words --
7  A.  And then there was some -- there was -- in some
8      areas of the building it was a wood-frame structure
9      that actually supported the metal.
10 Q.  So are you saying that in some areas of building
11     number 1 there was corrugated steel on the outside
12     and then -- and then a different piece of
13     corrugated steel on the inside separated by some
14     wood framing members?
15 A.  I did not see any -- any indication of whether
16     there was one on the in -- I know there was on
17     outside.  I did not see indication of one on the
18     inside.  There was an inside wall that was a -- a
19     wood -- made out of wood and wood frame.
20 Q.  Inside where?  What do you mean inside wall?  Which
21     one?
22 A.  That separated the -- the storage unit from the
23     rest of the facility.
24 Q.  Okay.  Now, how about the far south side, the most
25     extreme south wall of the storage building?  I'm

55 (Pages 214 - 217)

Page 218

1  looking at Exhibit Z, Page 2. Was the outside of
2  that -- that would be the south end of the
3  building. Was that made out of corrugated metal?
4  A. Yes, sir.
5  Q. And was it just one sheet, or was there another
6  sheet inside?
7  A. I believe on the outside wall there was a sheet on
8  the inside. But I -- I'd have to look at my
9  photographs to find that -- to determine that for
10  sure.
11  Q. You don't know one way or the other. Right?
12  A. No, I don't know at the present time, no.
13  Q. Could you go to page. Well --
14     It's Exhibit AA, Page 4. It looks like this,
15  Jim.
16  A. Let me see here. Next one coming up here. Okay.
17  Q. Have you seen that before today?
18  A. No, I have not.
19  Q. Trevor Miller from Korte Does It All provided this
20  to me in response to a subpoena that I sent him.
21  And he testified about it during his deposition.
22     Do you know what these materials are that are
23  stacked up on the left side of the photo that have
24  some blue paint on them here and there?
25  A. These are --

Page 219

1     MR. JONES: Objection, foundation.
2     THE WITNESS: -- on the left-hand side
3  you're --
4     MR. GARDNER: Yes, sir.
5     THE WITNESS: -- talking about?
6     MR. GARDNER: Yes, sir.
7     THE WITNESS: I think it's just wood material,
8  I believe, like at -- in that -- or I -- I don't
9  know what they are for sure.
10  QUESTIONS BY MR. GARDNER:
11  Q. Just to be clear, I'm talking about the stuff
12  that -- it's white on the edges.
13  A. Box -- looks like boxes.
14  Q. Okay. To the right of that looks like some
15  cardboard, doesn't it, piece of --
16  A. Yes.
17  Q. -- cardboard?
18  A. Uh-huh.
19  Q. And then there's -- looks like a -- a crate or
20  pallet full of boxes with blue spray paint on top
21  of them?
22  A. Uh-huh.
23  Q. Do you know what's in the boxes?
24  A. No, I do not.
25  Q. And then I'll represent to you that the right side

Page 220

1  of this photograph would constitute the inside
2  south wall of the storage room.
3  A. Okay.
4  Q. Okay. Can you go to the same exhibit, Page 6. It
5  looks like this.
6     MR. JONES: Keep the binder off your
7  microphone.
8     THE WITNESS: Oh, sorry. This one?
9     MR. GARDNER: Yes. Yeah, you got it.
10     MR. ZOCCOLA: What page?
11     MR. HEHNER: Six.
12     MR. ZOCCOLA: Thanks.
13  QUESTIONS BY MR. GARDNER:
14  Q. Do you know who the gentleman is in the yellow
15  jacket?
16  A. No, I don't.
17  Q. And Trevor Miller took this photograph and -- and
18  supplied it to us in response to a subpoena to
19  Korte and he testified about it.
20     So it's inside of the so-called container --
21  southern container shop where they spray painted
22  the dumpsters sometimes, right?
23  A. Okay.
24  Q. You understand that?
25     MR. JONES: Objection to form.

Page 221

1  QUESTIONS BY MR. GARDNER:
2  Q. Do you see the dumpsters?
3  A. Yes.
4  Q. Do you see blue paint on the floor?
5  A. Yes, sir.
6  Q. Do you know if at the time of this fire there was
7  blue paint on the floor accumulated as is -- as is
8  shown in this photograph?
9  A. I don't know that for a fact, no. I'm just going
10  by what people said, yes.
11  Q. This -- and did people tell you there was blue
12  paint on the floor at the time of this fire?
13  A. I was just informed that it was everywhere in the
14  building is what I was told.
15  Q. We talked to a fella named Justin Davis, who was
16  the plaintiff's -- one of the plaintiff's two FRCP
17  30(b)(6) representatives. He testified that they
18  cleaned up -- when they would clean up this bay,
19  they wouldn't require that this blue paint be
20  removed. Have you read that deposition?
21  A. No.
22     MR. JONES: Objection to form.
23     THE WITNESS: No, I have not.
24  QUESTIONS BY MR. GARDNER:
25  Q. Okay. And so this fire was a total collapse,

56 (Pages 218 - 221)

Page 222

```
1    wasn't it?  This building number 1, the roof
2    completely collapsed, the walls collapsed down,
3    correct?
4  A.  Yes, sir.
5  Q.  And so sometime during the fire, the three
6    Space-Ray heater assemblies collapsed and fell to
7    the floor?
8  A.  Yes.  They were all under the debris, yes.
9  Q.  Right.  The middle one actually landed on top of a
10   fire locker, didn't it?
11 A.  Yes.
12 Q.  What were the contents of the first locker?
13      MR. JONES:  Objection to foundation.
14      THE WITNESS:  Well, one of the lockers that
15   was there was the contents of the -- the spray
16   machine that they had.
17      MR. GARDNER:  Yeah.
18      THE WITNESS:  And there was also a -- I think
19   there was a --
20      MR. GARDNER:  Paint thinner?
21      THE WITNESS:  Yeah.  There was -- there was
22   other containers inside of there.  I don't know --
23 QUESTIONS BY MR. GARDNER:
24 Q.  You didn't collect any of those, did you?
25 A.  No, we did not.
```

Page 223

```
1  Q.  And so you didn't test any of them, did you?
2  A.  No.
3  Q.  And I'm talking about the gallon cans that were
4    inside the -- center metal so-called fire safe
5    upon which the center heater fell onto, right?
6  A.  Correct.
7  Q.  So you do not know what was in those cans, do you?
8    Except for the one you took back.
9  A.  On the one I took back.  What --
10 Q.  You collected one of them.  You guys collected the
11   -- the rectangular one.
12 A.  Over at -- on the opposite end of those.  That's
13   only because it was requested that it be retained.
14 Q.  You're saying it wasn't in the locker?
15 A.  No, it was not.
16 Q.  Where was it?  I'm mixed up on the opposite end.
17 A.  On the -- were -- it was over by the wall on the
18   C -- under the C -- what I classify as the -- the
19   north end of that room.
20 Q.  Okay.
21 A.  Not in the area of origin.
22 Q.  So this blue paint, according to Sharee Wells, when
23   she tested it, showed the presence of an aromatic
24   product and medium and -- I'm sorry -- medium
25   petroleum distilling, but not heavy, right?
```

Page 224

```
1  A.  Correct.
2  Q.  Okay.
3  A.  Well, they showed heavy in the --
4  Q.  I'm talking about --
5  A.  -- heaters.
6  Q.  -- no, blue paint.
7  A.  Not -- in the blue paint, yes.
8  Q.  Right.  So what so the source of the heavy
9    petroleum distillate she found on a couple of the
10   heaters --
11      MR. JONES:  Objection to foundation.
12 QUESTIONS BY MR. GARDNER:
13 Q.  -- if it wasn't the blue paint?
14 A.  I don't know for sure what the -- what it was.
15   Whether it was something else that they had used
16   some point in time or what.  But the -- the sample
17   came from the heaters.  And that's what was tested.
18 Q.  But you don't know the source of it, do you?
19 A.  I don't know what all was being used in that
20   facility.  And -- and I was told it was -- there
21   was paint thinner occasionally.  And there was also
22   other, like, welding going on in the facility.  And
23   that -- there's also welding situation that -- and
24   components from welding that could accumulate in
25   the building, dust and so forth.
```

Page 225

```
1  Q.  Welding dust?
2  A.  So there -- yes.
3  Q.  Do you know if anybody ever welded through a -- a
4    blue painted Republic dumpster prior to the fire,
5    cut right through the -- the blue paint?
6  A.  No, I do not.
7  Q.  Do you know if anybody ever used an acetylene torch
8    or a plasma cutter to cut through the -- any parts
9    of the dumpsters right through the blue paint?
10      MR. JONES:  Objection to form.
11      THE WITNESS:  I'm sure it -- it probably could
12   have happened if they uti -- utilized that -- other
13   than welding.  Welding typically you have clean off
14   anything before you would weld.  So --
15 QUESTIONS BY MR. GARDNER:
16 Q.  Okay.  Well, restricted to using acetylene torches
17   and plasma cutters.
18   Can you explain to us why, when employees of
19   Republic, prior to the fire, would cut through with
20   torches, parts of the dumpsters that were painted
21   blue, why didn't the blue paint catch on fire in
22   its dry form?
23      MR. JONES:  Objection, foundation.
24      THE WITNESS:  Well, that -- that would be in a
25   dry form.  But it -- actually it -- given the
```

57 (Pages 222 - 225)

Page 226

1    situation here, you're -- you're talking about
2    between dry and -- and boiled off.  Obviously it
3    was not boiled off.  It didn't get hot enough to
4    dry it out completely.  It probably takes a -- most
5    likely would take a long time for that to happen.
6  QUESTIONS BY MR. GARDNER:
7  Q.  For what to happen?
8  A.  But once it's boiled off in a fire or in a heated
9    area, then obviously it becomes a whole different
10   situation at that point versus just sprayed on it.
11 Q.  You mean just recently sprayed on.
12 A.  Right.
13 Q.  I'm not talking about that.
14 A.  Not recently sprayed on it, just on the components
15   themselves.
16 Q.  I'm only talking about the dumpsters.  Is that what
17   you mean when you say "component"?
18 A.  On -- on --
19 Q.  You haven't read Terry Reader's deposition, so
20   you're at a disadvantage.
21 A.  Right.
22 Q.  He testified that he and other employees, including
23   Dale Calle, on occasions prior to the fire, used
24   acetylene torches and plasma cutters to cut
25   through, to make repairs, dumpsters that had been

Page 227

1    out in the field for I don't know how long, longer
2    than a day, and at no time did the dry blue paint
3    on the dumpster ever catch on fire.  How -- how do
4    you explain that?
5      MR. JONES:  Objection to form, foundation.
6      THE WITNESS:  I can't explain any -- there's
7    always circumstances that can -- can happen that
8    can -- I'm going based on what the -- the company
9    that supplies the paint even says on the container,
10   that the paint can boil off.  And once the water's
11   boiled off, it becomes a Class II liquid or similar
12   prop -- properties of a Class II, IIIA and IIIB
13   liquid.  And what could be --
14 QUESTIONS BY MR. GARDNER:
15 Q.  And you're using that synonymous with --
16     MR. JONES:  If he could finish his answer.
17   Go --
18     MR. GARDNER:  I'm sorry.  Go ahead, Jim.
19     THE WITNESS:  I guess I'm -- I mean, I'm using
20   the same word.  This would be dry paint, yes.
21     MR. GARDNER:  Uh-huh.
22     THE WITNESS:  But not necessarily boiled off.
23   Using a torch possibly could do that.  But I think
24   over a long period of time that there has to be --
25   in this particular situation that that occurred

Page 228

1    frequently, every day possibly.
2  QUESTIONS BY MR. GARDNER:
3  Q.  Cutting.
4  A.  So --
5  Q.  You mean cutting through the --
6  A.  Right.  I don't know if it occurred every day.
7    They -- they were saying that that -- the only
8    thing they did that day, other -- other than
9    painting, was they did some welding earlier on in
10   the -- the morning, but -- on that particular day
11   of the fire.
12 Q.  Do you know the temperature of -- of an acetylene
13   torch when it's cutting through steel?
14     MR. JONES:  Objection to foundation.
15     THE WITNESS:  Very hot.
16 QUESTIONS BY MR. GARDNER:
17 Q.  Over 3,000 --
18 A.  I mean, it's probably -- yeah.  Probably likely
19   twenty-five to 3,000, yes.
20 Q.  Right.  And how about a plasma torch?  What is the
21   contact temperature of cutting with a plasma torch
22   through steel?
23 A.  I'm not sure what the temperature would be.  But
24   I -- I personally use one on a regular basis, so I
25   understand it's hot.

Page 229

1  Q.  What was the temperature -- I'm sorry.  What
2    temperature does it require for Blue Sheboygan
3    paint to ignite or combust?
4  A.  Well, it -- it -- the paint itself doesn't combust.
5    I'm talking about the properties in the paint that
6    they say becomes a Class II or Class IIIA and IIIB
7    liquid, similar properties.  Those properties being
8    like diesel fuel, kerosene, and paint thinner.
9    Those particular properties are combustible
10   materials.
11 Q.  You think paint thinner was in the blue paint?
12 A.  I don't know what was in the blue paint, whether
13   they thinned it with paint thinners or not.  I
14   don't know that for a fact.  But I'm not saying
15   it -- over a period of time they said they used
16   paint thinners occasionally.  That's what I was
17   told.  So that could have been possibly there at
18   some point in time.
19 Q.  So the --
20 A.  How --
21 Q.  -- so the source of combustibility in the blue
22   paint could be these additives you're talking
23   about, right?
24 A.  No.  It becomes -- it becomes similar to those
25   properties that I just described.

58 (Pages 226 - 229)

Page 230

1  Q.  These type two and type three --
2  A.  Right.
3  Q.  -- liquids?
4  A.  The dried or the boiled off paint becomes a
5      combustible material.  And those -- like kerosene,
6      diesel fuel, things like that, can ignite at a
7      hundred degrees temperature or more -- or higher.
8      Or be -- below 140 degrees temperature, put it that
9      way.
10 Q.  Do you think the temperatures in and on the three
11     Space-Ray heaters exceeded 140 -- 140 degrees in
12     the 43 days prior to the fire?
13     MR. JONES:  Objection to foundation; calls for
14     speculation.
15     THE WITNESS:  Well, there's -- yeah, I -- I do
16     believe that they -- obviously propane burns at a
17     higher -- high rate, high temperature.
18 QUESTIONS BY MR. GARDNER:
19 Q.  So it would be over 140?
20 A.  Right --
21     MR. JONES:  Same objections.
22     THE WITNESS:  But the only thing is about that
23     is, there's conditions.  I could have a match here,
24     and if those conditions are right, it's not gonna
25     catch anything on fire.  But given the certain

Page 231

1      circumstances, particularly the oxygen
2      concentration in the air, the ventilation that's in
3      the syst -- that's in the room, everything can --
4      can change those conditions.
5  QUESTIONS BY MR. GARDNER:
6  Q.  None of which you're aware of in this case as they
7      existed on March 19th, 2019.
8  A.  I'm -- I'm never aware of any condition changes on
9      any fire 'cause I don't know the circumstances.  I
10     don't know the conditions at the time of the fire.
11     Only thing I have to go on is based on what I see.
12 Q.  What direction was the wind blowing at the time of
13     the fire?
14     MR. JONES:  Objection to foundation.
15     THE WITNESS:  So -- I don't know that for
16     sure.
17 QUESTIONS BY MR. GARDNER:
18 Q.  You didn't check it, did you?
19     MR. JONES:  Same objections.
20     THE WITNESS:  I -- I did check that.  But I --
21     I don't have that information in front of me --
22 QUESTIONS BY MR. GARDNER:
23 Q.  And you didn't put it in --
24 A.  -- at the time.
25 Q.  -- either of your reports, did you?

Page 232

1      MR. JONES:  Objection --
2      THE WITNESS:  I did not put that in --
3      MR. JONES:  -- asked and answered.
4      THE WITNESS:  -- a report.
5  QUESTIONS BY MR. GARDNER:
6  Q.  And you didn't record any of the temperature
7      conditions in your -- either of your reports, did
8      you?
9      MR. JONES:  Same objections.
10     THE WITNESS:  I did not stipulate any type of
11     temperatures in a report.  The only thing that I
12     did stipulate is the fact that I believe I -- I'd
13     have to look.  But the -- when the heaters kicked
14     on, that's what ignited the -- under -- under that
15     condition.
16 QUESTIONS BY MR. GARDNER:
17 Q.  Your second report suggests, correct me if I'm
18     wrong, that you think that during the day, while
19     the employees were working inside of building
20     number 1, on March 19th, 2019, the heaters were
21     not -- work -- were not activated.
22     MR. JONES:  Objection to form.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Am I reading your report wrong?
25 A.  I don't know that they were not.  I'm just saying

Page 233

1      that due -- the temperatures during the day, I was
2      told, was 47 degrees.  And also confirmed that with
3      the -- the weather in Fort Wayne, Indiana, which is
4      not too far from that airport, I guess you could
5      say, where I think where that came from.
6  Q.  I did too.  So weren't these thermostats --
7      MR. JONES:  I don't think he's finished with
8      his answer.
9      MR. GARDNER:  -- 60 or 75 degrees?
10     MR. JONES:  Were you finished with your answer
11     on your last question?
12     THE WITNESS:  Yes.
13     MR. JONES:  Okay.
14 QUESTIONS BY MR. GARDNER:
15 Q.  Weren't these thermostats set, according to Fred
16     Jones, at 75 degrees?
17 A.  I had different -- conflicting different
18     information on that actually.
19 Q.  You didn't talk about that though in your report,
20     did you?  This --
21 A.  No.  'Cause I was told it was turned down to
22     50 degrees of a night, is what I was told.
23 Q.  By who?
24 A.  Mr. Jones, when I talked to him.
25 Q.  Okay.

59 (Pages 230 - 233)

Page 234

1  A.  So my opinion would have been based on that.  And
2     based on that -- that information being told,
3     during the daytime, the temperatures inside would
4     have been high enough to possibly -- the -- the
5     system may not even function because of the
6     temperatures being -- 'cause the inside of my
7     garage is not heated at home, and it runs usually
8     about 20 degrees warmer in my garage than it does
9     outside.  So, I mean, that's just an example.
10        So I would -- they -- in this situation, it's
11    47 outside, if the temperatures were set at 50,
12    like I was told, then obviously -- and even made a
13    comment to me that he -- they even check that when
14    they do their routine --
15 Q.  They check to see if they're on 50 at night.  Is
16    that what you're saying?
17 A.  The -- the temper -- thermostat's turned down, yes.
18 Q.  Okay.  So referring you back to Exhibit AA, 6, you
19    see this blue paint on the floor, right?
20 A.  Uh-huh.  Yes, sir.
21 Q.  There's testimony in the case that Dale Calle and
22    Terry Reader sometimes would use their acetylene
23    torches and welders at floor level or near -- I'm
24    sorry, near floor level.  And at no time did any of
25    the blue paint on the floor or paint dust on the

Page 235

1     floor ignite.  Can you account for that?
2        MR. JONES:  Objection to form and foundation.
3        THE WITNESS:  Again I go all back to the -- to
4     the situation where the -- all the conditions
5     coming together at the right time, at the right
6     place, there could be vary -- varying reasons why
7     that would not happen.  Or -- or possibly could
8     happen as well.
9  QUESTIONS BY MR. GARDNER:
10 Q.  Can you go to Exhibit CCC?
11 A.  Yes, sir.
12 Q.  Page 10.
13 A.  (Witness complies.)
14 Q.  Looks like this, Jim.
15    MR. ZOCCOLA:  It's CCC?
16    MR. JONES:  CCC?
17    MR. HEHNER:  CC.
18    MR. GARDNER:  I'm sorry.  It is CC, Page 10.
19    MR. HEHNER:  Thank you very much.
20    MR. JONES:  What page are you on again?
21    MR. GARDNER:  Ten.
22    MR. JONES:  Okay.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Did you take that picture?
25 A.  I -- I recall this picture, yes.  This is the -- of

Page 236

1     the trash can?
2  Q.  Yeah.
3  A.  Yes.
4  Q.  And this was collected into evidence, taken down to
5     Rimkus' facility, right?
6  A.  Yes, it was.
7  Q.  All right.  Was the trash can plastic?
8  A.  Yes.
9  Q.  It was --
10 A.  I -- I don't know about what we refer to as
11    plastic.  It was a comb --
12 Q.  Some sort of --
13 A.  -- poly, yeah.
14 Q.  Yeah.  You see pack of -- packet, a package with --
15    might have been an empty pack of cigarettes in that
16    photo?
17 A.  Yes.
18 Q.  Okay.  You see this blue all over the place in the
19    picture?
20 A.  Yes.
21 Q.  And did you see blue like that spread out
22    throughout the floor of this facility during your
23    inspections?
24 A.  In different areas.  It seemed to be in piles.
25 Q.  Yeah.  How do you exclude the transfer of the blue

Page 237

1     paint onto the components of the heaters, as a
2     result of this room heating up during the fire,
3     with this blue paint on the floor, and they've --
4     these heaters falling to the floor, and there
5     for a year?  How do you know the blue paint that
6     you found wasn't from cross contamination?
7        MR. JONES:  Objection to form.
8        THE WITNESS:  By what I saw in the -- the
9     paint that I saw on the -- these components I felt
10    like was not -- particularly in those ones that
11    were not involved directly in a -- the -- the major
12    heat or major fire, 'cause there was some areas
13    that the metal was perfectly good, that had the
14    product on it and it was baked on.  So that -- that
15    give me the -- the feeling that or the thought,
16    well, maybe there is.  I -- I didn't -- I didn't
17    think it was possible either.
18 QUESTIONS BY MR. GARDNER:
19 Q.  Maybe there is what?
20 A.  Product in there -- in there that would be
21    flammable or be combustible.  That's why I decided
22    at the time I was there, and given that situation,
23    was that I needed to go ahead and probably swab
24    these in order to get those -- that sample so
25    that -- 'cause it's gonna -- I didn't know when we

60 (Pages 234 - 237)

Page 238

1    would be able to be back, based on everything that
2    was going on.
3  Q.  And that's your answer to how you excluded cross
4    contamination from heaters falling into blue --
5    blue paint during a fire?
6  A.  I didn't see any heaters --
7       MR. JONES:  Objection.
8       THE WITNESS:  -- in blue paint.
9  QUESTIONS BY MR. GARDNER:
10 Q.  You didn't?
11 A.  No.
12 Q.  You don't -- haven't seen photos showing heaters
13    laying in the blue paint.
14 A.  Well, they're near -- it's nearby.  But it's not
15    laying in the paint --
16 Q.  So --
17 A.  -- in the areas where I collected the samples, put
18    it that way.
19 Q.  By your -- by yourself, right?
20 A.  Yes.
21 Q.  It's the only time -- well, strike that.  It's the
22    only time you collected evidence from the scene
23    when you were alone, May 10th, 2019?
24 A.  Yes.
25 Q.  You didn't have John Diggle with you, did you?

Page 239

1  A.  No, I did not.
2  Q.  And you didn't have Lou Inen -- Inendino with you,
3    did you?
4  A.  No, I did not.
5  Q.  And you didn't video it, did you?
6  A.  I photographed it.
7  Q.  But you didn't --
8  A.  Several photographs.
9  Q.  -- video it, did you?
10 A.  No.
11 Q.  So this blue paint on the floor here in this trash
12    barrel that's burned to the floor on Page 10 of
13    Exhibit CC, how do you account for that still being
14    bright blue paint if it's been subjected to
15    combustion.
16 A.  'Cause it was in an area totally away from the area
17    of origin.  It was not in the area of origin.
18 Q.  Despite the fact that the container melted and is
19    gone.
20 A.  It burnt down from the top down, and this was
21    inside the container.
22 Q.  Okay.  On this same exhibit, Jim, can you go to
23    Page 16.  It's this one.
24 A.  Okay.
25 Q.  What is that --

Page 240

1       MR. JONES:  Objection to foundation.
2  QUESTIONS BY MR. GARDNER:
3  Q.  -- in the photo?
4  A.  It's a -- I don't know.  This is inside of a
5    dumpster, looks like.
6  Q.  You sure it's not inside of that fire locker in the
7    middle of the room that the center heater --
8  A.  Yeah that --
9  Q.  -- fell on?
10 A.  -- that could be possible as well.  'Cause it's --
11    I don't --
12 Q.  Did you collect it as evidence?
13 A.  No, we did not.
14 Q.  Doesn't that look like a 55-gallon drum of some
15    sort?
16 A.  Yes.
17 Q.  Do you know if that's plastic or metal?
18 A.  It's metal.
19 Q.  Okay.  You see, like, a -- a hose kind of attached
20    to it?  But ...
21 A.  Yes.
22 Q.  And do you know what the purpose of that hose was?
23 A.  I'm assuming to get material out of the container.
24 Q.  The paint you mean.
25 A.  I don't know what was in that container, no.

Page 241

1  Q.  'Cause you never swabbed it, did you?
2  A.  No, I did not.
3  Q.  What about this silvery-looking stuff on top of the
4    container, Exhibit CC, 16?  Do you know what that
5    stuff is?
6  A.  No, I don't.
7  Q.  Do you know if it's a byproduct of Herculiner --
8  A.  No.
9  Q.  -- that's been burned?
10 A.  I don't --
11      MR. JONES:  Objection, foundation.
12 QUESTIONS BY MR. GARDNER:
13 Q.  You didn't collect it or test it, did you?
14 A.  No, I did not.  It was not in the area of where I
15    believe the fire origin occurred.  So that's why
16    I -- I didn't collect it at the time.
17 Q.  Go to the next page, CC, Page 18.  Do you see these
18    containers?
19 A.  Yes, sir.
20 Q.  The one on the far right is sort of rectangular as
21    opposed to the cylinder shape on the left?
22 A.  Yes.
23 Q.  Did -- this container on the far right, was that
24    collected into evidence?
25 A.  No.

61 (Pages 238 - 241)

Page 242

1   Q. You sure?
2   A. No, it was not -- I -- well, yeah, it was
3      collected. I'm sorry.
4   Q. Yeah.
5   A. Yes.
6   Q. We just paid a fellow to take pictures of it.
7   A. Yeah.
8   Q. And so what kind of can is that? What was in there
9      at the time of the fire?
10     MR. JONES: Objection to foundation.
11     THE WITNESS: I don't know what was in that
12     container.
13  QUESTIONS BY MR. GARDNER:
14  Q. But it was collected and taken to Indianapolis,
15     wasn't it?
16  A. Yes.
17  Q. And it was recently photographed by one of the
18     Rimkus employees, right?
19  A. I -- I don't know. I don't know.
20  Q. So you can't exclude that can as -- as being --
21     having paint thinner in it at the time of the fire,
22     can you?
23  A. The only thing I can exclude is -- is that that did
24     not have -- was not in the area of fire origin.
25     So ...

Page 243

1   Q. Well, what is the area of fire origin then?
2   A. The south section of the building.
3   Q. The south heater?
4   A. Yeah, correct.
5   Q. Okay. Not the east heater.
6   A. No. It was the south heater.
7   Q. Why did you say in your -- your reports that it was
8      in the east heater?
9   A. At the time when I was doing my report, I was -- I
10     did not have -- I looked at some of the directions,
11     and I -- I misdocumented the fact that it was east
12     instead of south. I was thinking east side -- east
13     of the -- east side of the building where the --
14     where the -- the heaters were at. And my
15     terminology was not used properly to describe the
16     location of the -- of the heater itself.
17  Q. On Page 3 of Exhibit F -- you don't have to go to
18     it -- your first report, December 3rd, 2019, you
19     reference the poi -- the pornt of origin -- point
20     of origin as the east two heater twice in one
21     paragraph, didn't you?
22  A. Right. It should have been south heater.
23  Q. Yeah. And in the very next paragraph you use the
24     word south heater.
25  A. Yes.

Page 244

1   Q. So which one's wrong? East or south?
2   A. The east is wrong.
3      MR. JONES: Objection, asked and answered.
4   QUESTIONS BY MR. GARDNER:
5   Q. Okay. So you meant south the whole time.
6      MR. JONES: Asked and answered.
7   QUESTIONS BY MR. GARDNER:
8   Q. Correct?
9   A. Yes.
10  Q. Did you correct that in your next report?
11  A. I don't believe I did because I didn't catch it at
12     the time for the difference.
13     My second report was based on the -- after the
14     tube heaters were evaluated, that it didn't change
15     -- that particularly documented that that didn't
16     change the -- my opinion. And most of the other
17     documentation I'd already given a report to, I
18     didn't change. And at the time I didn't catch it.
19  Q. Still back on Exhibit CC, Page 19. You see the
20     couple, they look to me like gallon can cylin --
21     cylinders. You see them?
22  A. Yes, sir.
23  Q. Do you know what was in those at the time of the
24     fire?
25  A. No, I don't.

Page 245

1   Q. Did you collect those?
2   A. No.
3   Q. Never tested them?
4   A. Again, I didn't -- there wasn't there any reason
5      for me to collect them based on the fact that I did
6      not believe they were in an area of fire origin.
7      And all evidence that -- or anything that would be
8      in this -- the whole facility, and particularly in
9      the area of origin, or anything anybody thought was
10     area of origin, I would have collected had anybody
11     wanted it collected as well.
12  Q. So your -- your -- because of the size of this
13     fire, you were collecting things in the area of
14     origin. Has that got it? That's why --
15  A. That's usually why -- you want to try to collect
16     things in the area of origin because of the fact
17     that there's potential for those things to be
18     evaluated. If it's outside the area of origin,
19     then it could be collected. But it doesn't
20     necessarily have anything to do with determining
21     fire cause.
22  Q. Then why did you collect the rectangular can shown
23     on Page 19 of Exhib CC -- Exhibit CC?
24  A. I -- someone brought it to me and wanted to
25     collected it --

62 (Pages 242 - 245)

Page 246

1  Q.  Okay.
2  A.  -- wanted it collected.
3  Q.  Okay.  But you had determined the south heater was
4      the area of origin.
5  A.  The south end of the building, yes, in -- up in
6      the -- the heater.
7  Q.  Which explains why you went to the trouble and
8      expense of collecting the north and central
9      heaters.
10 A.  No.  I was asked by our client to collect all the
11     heaters.  So that's why I collected all of them.  I
12     just felt, because of the damage that was done, and
13     also to that south end of the building, that the
14     south heater was the -- the area of or -- fire
15     origin.
16 Q.  Could you go to Page 20 of Exhibit CC, Jim.
17 A.  Okay.
18 Q.  There's a couple of cans.  One's tipped over.  Do
19     you see that?
20 A.  Yes.
21 Q.  There's some silver-ish-looking, dried-up gook?
22 A.  Yes.
23     MR. JONES:  Objection to form.
24     MR. GARDNER:  I apologize for my terminology.
25     You can use whatever term you want.  What is

Page 247

1      that --
2      MR. JONES:  Objection --
3      MR. GARDNER:  -- silver stuff?
4      MR. JONES:  Objection to foundation.
5      THE WITNESS:  Well, looks like similar to the
6      type of material that was on top of the other
7      container of --
8  QUESTIONS BY MR. GARDNER:
9  Q.  So you didn't collect that?
10 A.  No.
11 Q.  Didn't test it?
12 A.  In this particular picture it also -- it looks like
13     that the -- that heat was applied to that
14     container.  And it also -- all -- caused it to
15     explode out.  So it was probably --
16 Q.  What explode -- what explode out?
17 A.  The top of the -- the lid.
18 Q.  No, by what element?  What --
19 A.  These -- the product that was inside of that.
20 Q.  But you don't know what it is.
21 A.  No.
22 Q.  And so you -- it could have been Herculiner.
23     MR. JONES:  Objection to form, foundation.
24 QUESTIONS BY MR. GARDNER:
25 Q.  You can't rule out --

Page 248

1  A.  I don't -- I don't know what it could have been.
2      Put it that way.
3  Q.  You can't rule out that it was Herculiner, can you?
4      MR. JONES:  Same objections.
5      THE WITNESS:  No, I cannot.
6      MR. GARDNER:  Did you get his answer?
7  QUESTIONS BY MR. GARDNER:
8  Q.  Can you go to Exhibit FF.  Do you know what the
9      product PB B'laster is?
10 A.  Yes.
11 Q.  What is it?
12 A.  It's a spray can usually to spray bolts and nuts to
13     loosen them up and things of that nature to --
14 Q.  Right.
15 A.  -- to --
16 Q.  Do you know the comp -- do you know the ingredients
17     of it?
18 A.  No, I don't.
19 Q.  You haven't ever looked at the technical sheets for
20     that?
21 A.  No.
22 Q.  Or the data sheets?
23 A.  No, I have not.
24 Q.  Do you know if it has either xylene or petroleum
25     distillates as an ingredient?

Page 249

1      MR. JONES:  Objection to form.
2      THE WITNESS:  I know it would have petroleum
3      distillants [sic], possibly, as an ingredient based
4      on the fact that, you know, if you measured the
5      actual liquid in it because it's got hexane or
6      propane in it.
7  QUESTIONS BY MR. GARDNER:
8  Q.  Have you read the report of -- of Space-Ray's
9      expert per hexalent (phonetic)?
10 A.  I don't recall that report, no.
11 Q.  He's a chemist in the case.
12 A.  Okay.
13 Q.  And you didn't hire a chemist, did you?
14 A.  No, I did not.
15 Q.  All right.  So did you collect any cans of
16     PB B'laster from the fire scene debris?
17 A.  No.
18 Q.  Are you sure?
19 A.  Yes, sir.
20 Q.  Did you see any?
21 A.  I did not see any.
22 Q.  Do you know if any cans of PB B'laster were in the
23     room at the time of the fire?
24 A.  No.
25     MR. JONES:  Objection to form and foundation.

63 (Pages 246 - 249)

Page 250

1     THE WITNESS: I don't know. That's at ground
2     level. And I -- the fire, by all definition and
3     all that -- by all opinions of everybody that I
4     spoke to, occurred high in the ceiling. So it was
5     not in the area of fire origin. So I didn't
6     collect it. And no one at the site requested any
7     of this information to be collected as well.
8  QUESTIONS BY MR. GARDNER:
9  Q. How did you rule out this fire happening somewhere
10     other than at ceiling height, like ground level or
11     somewhere higher, but below the ceiling? How did
12     you rule that out? And how did you rule out that
13     moving upwards to the ceiling --
14     MR. JONES: Objection.
15     MR. GARDNER: -- like a lot of fires do?
16     MR. JONES: Objection to form.
17     THE WITNESS: The -- the fact that I was told
18     that the fire -- they saw the fire at ceiling --
19     high level in the building, near the ceiling.
20     Combine that with the fact that a lot of times when
21     we go to visit -- of the multiple fires that I've
22     investigated, we -- one of the first thing we try
23     to do is determine what's new to the building,
24     what's been introduced to it. A lot of times
25     something new has occurred which changes the

Page 251

1     dynamics of the building. And I was told that
2     these space heaters were recently installed within
3     a couple months. And that by -- and I started
4     researching the heaters just to -- to add to that
5     the, you know, the bookshelf, so to speak, as I
6     referred to.
7        And when I did that, I noticed that it was
8     talking about the -- these heaters should not be
9     installed in paint areas or paint booths, so to
10     speak. Even though this does not def -- meet the
11     definition of paint booth, that's what was
12     occurring there.
13        Second thing was the fact that when I did the
14     lab test of the products that were inside the
15     tubes, they came up with combustible materials.
16     And then the same thing on the side of the
17     container of the paint. Once it boils off it
18     becomes combustible. Given all those types of
19     things, that's a part of the big puzzle. And it
20     fit the -- the occasion that, you know, in my
21     opinion, more than 51 percent likely to have
22     happened or probable to have happened.
23  QUESTIONS BY MR. GARNER:
24  Q. NFPA 921, Section 4.5, speaks to a fire
25     investigator's level certainty, doesn't it?

Page 252

1  A. Yes, it does.
2  Q. And it states, The level of certainty describes how
3     strongly someone holds an opinion or conclusion.
4     Correct?
5  A. Yes.
6  Q. Further it states, Someone may hold an opinion to a
7     higher or lower level of certainty, period.
8     Correct?
9  A. Yes.
10  Q. That level is determined by assessing the
11     investigator's confidence in the data, in the
12     analysis of that data, and testing of hypothesis
13     formed. That level of certainty may be determined,
14     sorry, may determine the practical application of
15     the opinion, comma, especially in legal
16     proceedings. Do you agree with that?
17  A. Yes.
18  Q. And then it says, The investigator should know the
19     level of certainty that is required for providing
20     expert opinions, period. Two levels of certainty
21     commonly used are probable and possible. Correct?
22  A. Yes.
23  Q. Then it -- it says, Possible. At that level of
24     certainty, the hypothesis can be demonstrated to be
25     feasible but cannot be declared probable. Do you

Page 253

1     agree with that --
2  A. That's what it says --
3  Q. -- in general? Correct.
4  A. -- general.
5  Q. If two or more hypotheses are equally likely, then
6     the level of certainty must be possible. Correct?
7  A. Yes.
8  Q. And then in terms of definition of probable,
9     according to this book you relied on, NFPA 921,
10     probable is defined as, quote, this level of
11     certainty corresponds to being more likely true
12     than not, period. This level of certainty, the
13     likelihood of hypothesis being true, is greater
14     than 50 percent. Right?
15     MR. JONES: Objection to form and --
16     THE WITNESS: 51 percent, I think.
17     MR. GARDNER: Right.
18     MR. JONES: Objection to form and foundation.
19  QUESTIONS BY MR. GARDNER:
20  Q. Neither the words "probable" or "likely" are
21     anywhere in either of your two reports, are they?
22  A. No. The word "likely" is not used in any official
23     report.
24  Q. And your -- your --
25  A. Any -- should not be used anywhere according to --

64 (Pages 250 - 253)

Page 254

1  Q. But the word "probable" should be.
2  A. "Probable" or "possible" is two -- two words that
3     could be used.
4  Q. Yeah.
5  A. Of course, I already addressed at that earlier in
6     the aspect of it was misused in this situation. At
7     the time I typed it, I -- there was -- I just made
8     an error in that aspect.
9  Q. You -- you said probable -- sorry. You said
10    possible when you meant probable.
11  A. Yes.
12  Q. And you had two reports, and three years between,
13    you never fixed.
14  A. I did not.
15    MR. JONES: Objection, asked and answered.
16    MR. GARDNER: Okay.
17    MR. HEHNER: I did not hear his answer.
18    MR. GARDNER: He said, "I did not."
19    MR. HEHNER: Okay. Thank you.
20  QUESTIONS BY MR. GARDNER:
21  Q. Same manual, in NFPA 921, Section 4.5.2. Quote, if
22    the level of certainty of an opinion is merely
23    suspected, the opinion does not qualify as an
24    expert opinion. You agree with that?
25  A. I agree with that statement, yes.

Page 255

1  Q. Okay. Continuing: If the level of certainty is
2     only possible, then the opinion should be
3     specifically expressed as possible. Do you agree
4     with that?
5  A. Yes.
6  Q. Continuing and ending: Only when the level of
7     certainty is considered probable should an opinion
8     be expressed with reasonable certainty, correct?
9  A. Yes.
10  Q. Section 4.5.3 is referring to expert opinions,
11    which you've given in this case, correct?
12  A. Yes.
13  Q. Right. And you'll agree that your opinions are
14    based on facts.
15  A. Based on everything: Facts, statements that are
16    given to me, the whole scene, what I saw -- what I
17    see.
18  Q. Right.
19  A. Things likes that.
20  Q. You haven't expressed any opinions in your 1400
21    reports that weren't based on facts, have you?
22  A. No, I have not.
23  Q. And you'll agree that the strength of the opinion
24    is no better than the strength of the facts.
25    MR. JONES: Objection to form.

Page 256

1    THE WITNESS: I would have to agree with that
2    statement, yes.
3  QUESTIONS BY MR. GARDNER:
4  Q. In other words, if the facts are wrong, the opinion
5     could be wrong.
6    MR. JONES: Objection to form.
7    THE WITNESS: I would say that if you had the
8    wrong facts, yes, that would probably be the case.
9  QUESTIONS BY MR. GARDNER:
10  Q. Yeah. And -- and the strength of the facts or the
11    quality of the facts will affect the quality of the
12    opinion, correct?
13    MR. JONES: Same objections.
14    THE WITNESS: Oh, I personally think that you
15    have to take everything in consideration. You
16    don't just take one fact. There has to be multiple
17    facts that you put together versus --
18  QUESTIONS BY MR. GARDNER:
19  Q. You shouldn't exclude any facts either --
20    MR. JONES: If he could --
21  QUESTIONS BY MR. GARDNER:
22  Q. -- should you? Okay.
23  A. You know what I'm saying? I mean, you could -- you
24    could -- obviously, you have ten facts, nine of
25    those facts prove to be true and one is

Page 257

1    questionable, then you -- you'd have to cons --
2    make -- my opinion would be it's more likely true
3    than not, so to speak, or level of certainty
4    becomes true.
5  Q. Do you judge the veracity of the witness
6     statements?
7    MR. JONES: Objection --
8    THE WITNESS: If they have -- if they have --
9    if I have a reason -- no reason to believe that
10    they would not be lying to me, yes. And I don't
11    have any reason to believe that or any evidence to
12    support that. Sometimes I don't believe clients'
13    statements or -- or a -- people's statements --
14  QUESTIONS BY MR. GARDNER:
15  Q. Witness statements you mean?
16  A. -- by witness statements --
17  Q. Okay.
18  A. -- based on why they're wanting to make the
19    statement.
20  Q. Did you believe Shamir -- Samir?
21  A. I -- I believed his comments and his statements to
22    be what he -- what he felt was true. I -- that
23    was, again, one of those other things I put in the
24    book on the shelf. And then as I see the situation
25    and see the sites and see the -- the scene itself,

65 (Pages 254 - 257)

Page 258

1  then I add to that or subtract from that, one way
2  or the other.
3  Q.  And the thing you subtracted in this case is the
4      statement taken from Fred Jones that said the spray
5      paint wouldn't go up and get on heaters.
6      MR. JONES: Objection to form.
7      THE WITNESS: First of all, he didn't tell me
8  that, number one.  And, number two, is the --
9  there's no -- there is no specul -- I say
10 speculating the fact that based on the 24-inch
11 spray pattern.  And that's not totally entirely
12 true in this situation.
13     MR. GARDNER: So you determined --
14     THE WITNESS: The overspray is --
15     MR. GARDNER: So --
16     THE WITNESS: -- what we're talking about.
17 QUESTIONS BY MR. GARDNER:
18 Q.  -- you determined that some of the witness
19     statements in this case were speculative.
20     MR. JONES: Objection to form.  Misstates
21 testimony.
22     THE WITNESS: I did not see his witness
23 statement, so I can't attest to his witness
24 statement as for as what he's re -- he's referring
25 to the spray, not the overspray --

Page 259

1      MR. GARDNER: Did you have --
2      THE WITNESS: -- or the mist.
3      MR. GARDNER: I apologize.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Did you have any witness statements or statements
6      from witnesses at all before you preempted and
7      discarded your field notes when you prepared your
8      first report?
9      MR. JONES: Objection to form; asked and
10 answered.
11     THE WITNESS: The -- the only thing I had was
12 statements that were made to me at the scene
13 initially when I was there.
14 QUESTIONS BY MR. GARDNER:
15 Q.  The day after the fire?
16 A.  Which no one wanted to get involved, so to speak.
17     And then I had a -- statements made to me by Fred
18     Jones while I was at the site doing some collection
19     of the evidence.
20 Q.  So Fred Jones didn't directly tell you this thing
21     that I think was Mr. Inendino and Mr. Diggle
22     recorded about the paint, that sprayer wouldn't
23     allow the paint to go -- defy the law of gravity
24     and get up 14 feet in the air on these heaters.
25     MR. JONES: Objection to form.

Page 260

1      THE WITNESS: I did not see their reports.  I
2  did not see them talking.  I did not get that
3  information from them at that point in time because
4  the -- I didn't realize that they had even had that
5  communication with them.
6  QUESTIONS BY MR. GARDNER:
7  Q.  Did you drive up to Indianapolis that day with
8      Mr. Inendino, or did you guys drive separate?
9  A.  No.  We drove separately.
10 Q.  And -- and Mr. Diggle came in from Chicago.
11 A.  Yes.
12     MR. HEHNER: And you said Indianapolis.  You
13 meant Fort Wayne, didn't you?  You said --
14     MR. GARDNER: No, they drove up from
15 Indianapolis.
16     MR. HEHNER: Oh, from.  I'm sorry; pardon me.
17 QUESTIONS BY MR. GARDNER:
18 Q.  So NFPA 921 has a Section 4.5.3 entitled Expert
19     Opinions.  And it states as follows:  Many courts
20     have a threshold of certainty for the investigator
21     to be able to render opinions in court such as,
22     quote, proven to an acceptable level of certainty,
23     quote, or, quote, a reasonable degree of scientific
24     and engineering certainty, quote, or, quote,
25     reasonable degree of certainty within my

Page 261

1  profession, quote.  You're familiar with that,
2  aren't you?
3  A.  Yes.
4  Q.  But you failed to state your opinions with any
5      degree -- stating any degree of certainty in any
6      field, didn't you?
7      MR. JONES: Objection to form.
8      THE WITNESS: Those words were not used.  But
9  that's my opinion.  And I -- I feel I have the
10 level of degree of certainty by giving those
11 opinions.
12 QUESTIONS BY MR. GARDNER:
13 Q.  But the phrase "degree of certainty" is nowhere in
14     either of your reports, correct?
15 A.  It is not in the report, no, that -- those
16     particular words are not.
17 Q.  I'm gonna read -- so you're -- you're -- NFPA 921
18     guideline that you refer to in both your reports,
19     it suggests keeping an open mind, doesn't it,
20     throughout --
21 A.  Yeah.
22 Q.  -- the investigation?
23 A.  Right.  Throughout the investigation, yes.
24 Q.  Okay.  I'm gonna read to you just a little bit out
25     of Samir's deposition taken October --

Page 262

1  October 31st, 2022, which you've never read.
2      MR. JONES:  Which page are you on --
3      MR. GARDNER:  36 --
4      MR. JONES:  -- of the depo?
5      MR. GARDNER:  -- 36.
6  QUESTIONS BY MR. GARDNER:
7  Q.  The question is:
8      "So initially you said you didn't see any
9      flames.  Did you, at some point in time, see flames
10     coming from the operations building?
11     "A.  Yes.  You could see the flames.  As soon
12     as we got done pulling the supervisor trucks away
13     from the south side of the building, you could see
14     flames.  The very tip-top of the building where the
15     roof and, you know, obviously the rafters met, you
16     could see flames coming out of there.  And then
17     from the overhead doors, the closest one to the
18     exterior of that building on the south side.  That
19     one had flames coming out of it as well."
20     Have you ever heard that before today?
21 A.  No.
22 Q.  So you didn't have that information when you
23     prepared your opinions, did you?
24     MR. JONES:  Objection, asked and answered.
25     THE WITNESS:  Well, I didn't have the

Page 263

1  paperwork.  I had the verbal information that there
2  was flames coming from the roof and that the --
3  they observed -- well, put it this -- no, flames
4  coming -- it appeared to be coming from the roof of
5  the -- or the ceiling level.
6  QUESTIONS BY MR. GARDNER:
7  Q.  So you had different information than the entirety
8      of Samir's answer to that question.
9      MR. ZOCCOLA:  Objection --
10     MR. JONES:  Objection to form.  You can
11     answer.
12     THE WITNESS:  Yes.  I had different
13     information given to me even by him, yes, from
14     that -- at that point.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Same deposition, Samir Dizdarevic, taken
17     October 31st, '22.  Page 59, questions by counsel
18     for Space-Ray, Line 13.
19     "Did you see flames coming out of either of
20     the garage doors on the southern side of that
21     building?
22     "A.  Yes, sir.
23     "Q.  In which?  Was it both?  One, can you
24     explain that for me?
25     "A.  It was the furthest one away from the

Page 264

1  main entrance to the operations building."
2      You've never heard that before today, have
3      you?
4  A.  No.  Other than the fact that you said before on
5      the first one that he saw flames coming from the
6      roof first.
7  Q.  That's -- I disagree --
8  A.  Fires were coming from the -- that opening from the
9      south side.
10     MR. GARDNER:  I'll move to strike the answer
11     as not being what I said, let alone what Samir
12     said.
13     Page 60, Line 1.
14     "Q.  I'm sorry.  So it would be the one to the
15     furthest south; is that correct?
16     "A.  Yes, sir.  The furthest south, yes, sir.
17     That door."
18 QUESTIONS BY MR. GARDNER:
19 Q.  Have you ever heard that before today?
20 A.  No.
21 Q.  Did you ask Republic to provide you with
22     depositions?
23 A.  I did not, no.
24 Q.  Did you ask Republic's attorneys to provide you
25     with any depositions?

Page 265

1  A.  No.  I based my opinion on what facts I gather and
2      what facts I collected and on -- and I did not --
3      first of all, I didn't even know some of these
4      dep -- these people were de -- deposed until, you
5      know, I was getting prepared for this.  And then
6      I -- I was -- it -- my understanding that some of
7      them were -- had been dis -- deposed already.
8      So --
9  Q.  So Exhibit FF, there's some writing on that can.
10     Do you see that?  Look at the writing there.
11 A.  Yes.
12 Q.  I've never -- I have not seen an evidence
13     collection form from Rimkus referencing this can,
14     have you?
15 A.  I don't know what it says.  So I can't tell you.
16 Q.  Isn't that your handwriting?
17 A.  Yeah.  But I can't tell what it says on there.
18 Q.  I believe the Rimkus file number's at the top.  And
19     then it says, Wipes on small desk north something.
20     Isn't that your handwriting?
21     MR. JONES:  Objection to form.
22     MR. HEHNER:  On Page 1 --
23     MR. GARDNER:  Yes, sir.
24     MR. HEHNER:  -- of 3?  Thank you.
25     MR. GARDNER:  Date May 11 --

67 (Pages 262 - 265)

Page 266

1    THE WITNESS: Yeah. On the C section or
2  whatever --
3    MR. GARDNER: Yeah.
4    THE WITNESS: -- it says on there.
5    MR. GARDNER: May --
6    THE WITNESS: I see C section but -- Section C
7  of the building that I -- that I referred to, the
8  north --
9    MR. GARDNER: What --
10   THE WITNESS: -- north end of the structure.
11   MR. GARDNER: Okay.
12 QUESTIONS BY MR. GARDNER:
13 Q. And it says May 11, 2020?
14 A. On this -- yeah. It says that on the -- on the
15   can, yes.
16 Q. And then your name, Jim, looks like --
17 A. Yeah.
18 Q. -- F-O-S-T, right?
19 A. Right.
20 Q. So it's your handwriting.
21 A. Yes.
22 Q. Where's this can today?
23   MR. JONES: Objection to foundation.
24   THE WITNESS: Should be in -- at Rimkus
25   Consulting Group. Ever -- all our information

Page 267

1  goes -- or all our --
2    MR. GARDNER: Can you go to the next page.
3    THE WITNESS: -- evidence goes there.
4  QUESTIONS BY MR. GARDNER:
5  Q. Exhibit FF, Page 2. Another can. You see it?
6  A. Yes.
7  Q. Is that your handwriting?
8  A. Yes.
9  Q. Can you read it to us?
10 A. No.
11 Q. Was this taken into evidence? And is there a
12   custody form for it?
13 A. There was a custody for everything that is taken
14   into evidence.
15 Q. What is inside the cans shown in Exhibit FF,
16   Pages 1 and 2?
17   MR. JONES: Objection to foundation.
18   THE WITNESS: I cannot read what's on the top
19   of this thing. But it would tell you on there what
20   it would -- what it would -- where it came from.
21 QUESTIONS BY MR. GARDNER:
22 Q. So you don't know what's in the cans.
23 A. Not by -- unless I'd be able to read it, yes, I
24   cannot -- don't know what's in that.
25 Q. If you go to the third page of this exhibit.

Page 268

1    Exhibit FF, Page 3. You see --
2  A. Uh-huh.
3  Q. -- looks like part of a tape measure?
4  A. Yes.
5  Q. A gallon can with no writing on it?
6  A. Uh-huh.
7  Q. Yes?
8  A. Yes.
9  Q. And do you see, it looks like a can that's exploded
10   or rusted through --
11 A. Spray can?
12   MR. JONES: Objection to form.
13 QUESTIONS BY MR. GARDNER:
14 Q. Do you know what that spray can is?
15 A. No, I do not.
16 Q. Why is it photographed?
17   MR. JONES: Objection to form.
18 QUESTIONS BY MR. GARDNER:
19 Q. Why was it photographed?
20 A. I think I was coming out -- at that point in time
21   out to where the -- showing where the -- I
22   collected the evidence and in this -- in this
23   container. But it -- I'm just measuring it out
24   from the wall. 'Cause you're not -- overall did
25   not show the picture; it just shows the first two

Page 269

1  feet of where the -- the --
2  Q. So you didn't take this picture because of this
3  partially exploded -- or whatever --
4  A. No, I didn't take it because of the can.
5    MR. JONES: Objection to form.
6  QUESTIONS BY MR. GARDNER:
7  Q. Well, what were you trying to document if not this
8    weird can that looks like it's burned and rusted?
9    MR. JONES: Same objection.
10   THE WITNESS: Wherever we take evidence at,
11   typically what we do is we measure from two points
12   of location. Like, either from the front of the
13   building to the evidence or from the, you know,
14   either east or west side -- however you want to
15   refer to it as -- or from a point of origin. And
16   we measure out. Sometimes we cannot get the whole
17   thing in a -- the photograph and so we measure out.
18   In this particular picture I was just -- I was
19   just doing measurements of this pile of stuff that
20   was here and how far away it was from the wall.
21 Q. Did you collect that?
22 A. So I did not collect that, no.
23 Q. On --
24 A. I -- I was going to. But I -- at the time I was
25   there, I decided to just limit my -- limit to the

68 (Pages 266 - 269)

Page 270

1    Space-Ray heaters. Because I didn't want to
2    disturb any evidence more than what was --
3  Q.  Was this May 10th, 2019?
4  A.  Yes. I believe so. I can't -- I don't know for
5    sure in this particular photograph. It could have
6    been on the day of the examination. I'm not sure.
7        MR. GARDNER: Time for a five-minute break?
8        MR. JONES: That's great.
9        MR. ZOCCOLA: Yeah.
10       THE VIDEOGRAPHER: This ends media three. The
11   time is 3:59, and we are off the record.
12       (A brief recess was taken.)
13       THE VIDEOGRAPHER: This begins media four.
14   The time is 4:13. We are on the record.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Jim, we're just back from a break. And I'm
17   directing your attention quickly to Exhibit R,
18   32 pages. It's the Modine -- one of the Modine
19   installation and service manuals?
20  A.  Uh-huh.
21  Q.  Do you see it?
22  A.  Yes.
23  Q.  Did you ever -- have you ever, during your course
24   of the investigation, preparing your reports, refer
25   to this manual?

Page 271

1  A.  No, I have not.
2  Q.  Okay. You're never read any of it, correct?
3  A.  No.
4  Q.  And the contents of it then were not in any way,
5    shape, or form considered by you in preparing your
6    opinions in this case?
7  A.  No, it was not.
8  Q.  Okay. Same question for the next Exhibit S. It's
9    a different Mo -- Modine style manual for gas-fired
10   power vented unit heaters, propeller, and blower
11   models. Do you see that?
12  A.  Yes.
13  Q.  It's 28 pages. Have you ever seen this before
14   today?
15  A.  No, I have not.
16  Q.  Never read it before today?
17  A.  No.
18  Q.  So you couldn't have considered any of the contents
19   of this manual when you prepared your opinions in
20   this case, correct?
21  A.  I did not.
22  Q.  Can you go to Exhibit V?
23  A.  D?
24  Q.  V --
25  A.  V.

Page 272

1  Q.  -- as in victory. It should be next or close.
2    It's two pages. Do you see this?
3  A.  Yes.
4  Q.  This one's undated. I questioned Mr. Trevor Miller
5    of Korte Does It All about it during his
6    deposition. And he indicated he prepared this
7    quote -- the record can correct me if I'm wrong --
8    a couple of months before this fire and in
9    connection with removing the old Modine units from
10   building 1 and installing gas infrared tube
11   heaters. That's what he told us anyway. Have you
12   seen this before?
13  A.  No.
14  Q.  All right. Did you ask Korte, when you called them
15   up, to produce a copy of their bid for installing
16   gas infrared tube heaters inside of building
17   number 1?
18  A.  No, I did not. I did ask Kyle if they had a copy
19   of the bid, since that's what they referred to.
20   And they were not able to produce that at the time.
21  Q.  You mean at any time.
22  A.  At any time, they didn't produce it.
23  Q.  Okay. Can you think of any reason for Trevor
24   Miller, whose name's identified at the bottom of
25   Exhibit V, to quote Republic for the cost of Korte

Page 273

1    Does It All for removing the existing hanging unit
2    heaters in the paint shop and installing gas
3    infrared tube heaters if they recommended against
4    it?
5        MR. JONES: Objection to form.
6        THE WITNESS: I don't have any information
7    about what the discussions were between Korte and
8    between Republic. The only thing that I was given
9    information by was the fact that Korte was doing
10   other things there, and they were in the process of
11   kind of remodeling those -- that whole building
12   technically. And Korte had given them -- and they
13   want these new heaters put in. And I was told
14   that, according to Korte, that the type of heaters
15   that were installed was not appropriate for that
16   type of facility due to the painting that was
17   involved in the facility.
18       MR. GARDNER: I'm --
19       THE WITNESS: That's all I was told.
20       MR. GARDNER: -- I'm lost in your answer.
21  QUESTIONS BY MR. GARDNER:
22  Q.  At the end of it you said that type of heater was
23   not the right type of heater. Are you talking
24   about the Modines or the Space-Rays?
25  A.  No, not the Modine. The Space-Ray tile -- style --

69 (Pages 270 - 273)

Page 274

1  Q.  So my question to you is --
2  A.  -- style heaters.
3  Q.  -- and I don't -- listen carefully.  Why -- do you
4      know why Korte would bid to remove the Modine
5      heaters from building -- inside building number 1,
6      there were three of them, and install gas-fired
7      tube heaters if they were recommending against the
8      installation of that style heater?
9          MR. JONES:  Objection to form; asked and
10     answered.
11         MR. GARDNER:  It's a yes-or-no question.
12  QUESTIONS BY MR. GARDNER:
13  Q.  Do you know?
14  A.  I -- no, I don't know.  I have no reason to know
15      what they discussed or what they decided to do.
16  Q.  But you were told that they recommended against it,
17      and here you're looking at a bid for it.  Correct?
18      Exhibit V?
19  A.  Yeah.  I was -- I -- I have not -- I didn't know
20      anything about a bid was -- other than I was told
21      that they had bid earlier on -- or they had
22      contacted them to see if they would be able to do
23      that.  And they were told -- I was told that they
24      had told Republic Services that they could not --
25      that they would -- would not want to install that

Page 275

1      type of heater in that type of environment.
2  Q.  And in -- and indeed --
3  A.  I don't --
4  Q.  -- you included that commentary in your reports,
5      didn't you?
6  A.  So -- the only commentary I had in my report was
7      the fact the type of heaters were not suitable for
8      that, and it was a prior company.  I didn't mention
9      Korte by name, but a prior company was contacted --
10  Q.  Told them not --
11  A.  -- and told them not -- that those type of heaters
12      were not utilized in that type of environment.
13  Q.  I think your word in your report was "not
14      recommended."
15  A.  Yes.
16  Q.  So you didn't have access to this report when you
17      prepared your two expert opinions, did you?
18  A.  I did not have access to this, no.
19  Q.  If I called it a report I meant it -- this bid,
20      Exhibit V.  You didn't have access to Exhibit V,
21      did you?
22  A.  Right.  And I have no reason -- no knowledge of why
23      it exists.
24  Q.  You can't explain it, can you?
25  A.  I cannot.

Page 276

1  Q.  Exhibit W is a diagram.
2  A.  Okay.
3  Q.  Have you seen that before today?
4  A.  No, I have not.
5  Q.  You didn't prepare it, did you, Jim?
6  A.  No.
7  Q.  So far as you know, no one from Rimkus prepared it,
8      right?
9  A.  To my knowledge, no.
10  Q.  Do you know when it was prepared?
11         MR. JONES:  Objection to form, foundation.
12         THE WITNESS:  No, I don't.
13  QUESTIONS BY MR. GARDNER:
14  Q.  All right.  This exhibit sticker is covering up the
15      -- the word Korte.  And I know that -- and I
16      apologize for that.  There is another copy that's
17      been circulated.  'Cause we got this, I think, from
18      Korte.
19         Anyway, Korte -- it's my understanding, Jim,
20      and the record will correct me if I'm wrong, that
21      this diagram in Exhibit W and these words were
22      written by someone from Korte Does It All.  You --
23      but you've -- you didn't rely on it, did you?
24  A.  I did not.  Not --
25         MR. JONES:  Objection, foundation.

Page 277

1          THE WITNESS:  The first time I've seen this
2      document was today.
3  QUESTIONS BY MR. GARDNER:
4  Q.  All right.  So if you look at the top of the page,
5      which would be that -- that square that says 48 by
6      48 by 48; do you see that?
7  A.  Yes, sir.
8  Q.  And the word "paint" is inside of there?
9  A.  Yes.
10  Q.  Skipping over the rectangular building number 2,
11      and skipping to building number 3, on the more
12      northern end, do you see the words "paint" inside
13      there?
14  A.  Yes.
15  Q.  Does that conflict with what you had been told by
16      Republic employees that painting was only conducted
17      in building number 1 and not buildings 3 and 4?
18         MR. JONES:  Objection to form, foundation.
19      Document speaks for itself.
20         THE WITNESS:  The way I understand it, they
21      did paint in the south end of the building.  And
22      then they would move the containers from there into
23      the next section over, just to get them out of the
24      way to paint other containers.  Because they were
25      painting multiple containers a day --

70 (Pages 274 - 277)

Page 278

1    MR. GARDNER: Right. So you don't know --
2    THE WITNESS: -- to try to --
3  QUESTIONS BY MR. GARDNER:
4  Q.  -- if they ever painted inside of building number 3
5    shown in Exhibit Z, Page 2, do you?
6  A.  No, I do not.
7    MR. JONES: Same objections.
8  QUESTIONS BY MR. GARDNER:
9  Q.  So the Page 2 of Exhibit W is a -- kind of a
10    rough -- you can turn that page, I think. Should
11    be a Page 2.
12  A.  Uh-huh.
13  Q.  Yeah. Have you seen this diagram today that's
14    labeled on the top left Korte Does It All, Inc.?
15    Do you see that?
16  A.  Yes.
17  Q.  Have you seen it before today?
18  A.  No.
19  Q.  It shows some very rough dimensions. Do you see
20    the 30 on the top of the drawing and 60 along this
21    right side?
22  A.  Yes.
23  Q.  And there's a kind of a square sticking out of the
24    top left. Looks like it's 17 foot 3 inches by
25    17 feet 5 inches; do you see that?

Page 279

1  A.  Yes.
2  Q.  Do you have any notion of what -- I'll just point
3    to it for you. Do you have any notion what was in
4    this place?
5    MR. JONES: Objection to form, foundation.
6    THE WITNESS: I don't know what this --
7    MR. GARDNER: Thomas is right.
8    THE WITNESS: I don't know what these are --
9    are these reference to --
10    MR. GARDNER: Hold on, Jim. I'm gonna --
11    Thomas's objection's right. He laid an objection
12    on foundation, so let me give it to you.
13  QUESTIONS BY MR. GARDNER:
14  Q.  We obtained or I obtained Exhibit W, Page 2
15    responsive to a subpoena to Korte Does It All, and
16    then I asked Trevor Miller what this was. And he
17    told me when he went out to Republic space to bid
18    the installa -- removal and installation of new
19    heaters inside of building number 1 couple months
20    before the fire, he prepared this diagram. So
21    that's the foundation.
22  A.  Okay.
23  Q.  Okay. So do you see at the top where he writes 30
24    by 60?
25  A.  Yes.

Page 280

1  Q.  And then 15 feet 4 inches tall?
2  A.  Yes.
3  Q.  All right. And he told us that that was his
4    measurement inside of building number 1 where they
5    did welding and cutting and spraying operations
6    from floor to ceiling. That's what he said in his
7    dep.
8  A.  Okay.
9  Q.  Did you know that before today?
10  A.  I -- roughly I knew the height of the building.
11    But the -- I was also told that the heaters were
12    only about nine to ten feet above the ground.
13  Q.  Right.
14  A.  So --
15  Q.  And that -- that comported with kind of what you
16    conclude here in your -- you all right?
17  A.  Yes.
18  Q.  -- your origin and cause report that these heaters
19    were nine feet off the floor.
20    MR. JONES: Objection to form.
21    THE WITNESS: I didn't say that in my report.
22    All I knew is that they were not at -- touching the
23    ceiling. They were hanging from the ceiling.
24  QUESTIONS BY MR. GARDNER:
25  Q.  Do you know if prior to the fire Republic was

Page 281

1    soliciting bids from different contractors to move
2    the paint operations over into the fleet
3    maintenance building?
4    MR. JONES: Objection to form.
5    THE WITNESS: I have no knowledge of that.
6  QUESTIONS BY MR. GARDNER:
7  Q.  No -- nobody from Republic ever told you that?
8  A.  No, sir.
9  Q.  Can you go to Exhibit X.
10  A.  (Witness complies.)
11  Q.  I may not have it here.
12    Skip that exhibit. I'm not going to have any
13    questions on it. Go to Exhibit Y, please, Jim.
14  A.  All right.
15  Q.  This is -- some of this, the beginning of it or
16    couple of emails between counsel in the case, more
17    particularly me and Thomas Jones, who's sitting to
18    your right, regarding my questions about where you
19    obtained your samples. And he referred us to some
20    photos.
21  A.  Yes.
22  Q.  Okay. Did you assist Thomas in doing that?
23  A.  He already had -- I already had the photos. Well,
24    I -- I don't think the photos had been produced yet
25    as for as that part's concerned. And I -- and I

71 (Pages 278 - 281)

Page 282

1    produced those photos from that -- from my file,
2    yes.
3  Q. Okay. Can you go to Page 4 of Exhibit Y. At the
4    top --
5  A. Four?
6  Q. Yeah, you're --
7  A. Okay.
8  Q. -- on the right page. At the top left it says
9    F.A.S.T. And then the top heading is
10    F.A.S.T. Laboratory Worksheet. Do you see that?
11  A. Yes.
12  Q. Case 6224 --
13  A. Nine?
14  Q. It could be a 9. Have you worked with Miss Sharee
15    Wells in prior cases -- in cases prior to this?
16  A. Yes, I have.
17  Q. All right. Do you recognize this as being her
18    handwriting?
19  A. We don't -- I don't get this paperwork from her,
20    this particular sheet.
21  Q. You just got her page-and-a-half --
22  A. Just the --
23  Q. Final report --
24  A. -- final report, yes.
25  Q. Right. Yeah.

Page 283

1  A. And it's a typed report. So I don't have any idea
2    about her --
3  Q. Right.
4  A. -- handwriting.
5  Q. And you relied on her report as part of your -- the
6    foundation for your opinions in this case?
7  A. Yes. A typical lab report, yes.
8  Q. You'll concede that neither of your reports, one of
9    which you pared -- prepared in 2019, and one which
10    you prepared in 2022, don't make any reference to a
11    flame test being negative.
12    MR. JONES: Objection to form.
13    THE WITNESS: I have no information regarding
14    that.
15 QUESTIONS BY MR. GARDNER:
16  Q. You can just look at the first page there. If you
17    page --
18  A. Number.
19  Q. I'm sorry, Page 4. See on the left where she
20    wrote, on her F.A.S.T. Laboratory Worksheet, flame
21    test negative, number four?
22  A. Yes.
23  Q. Do you know what that means?
24  A. They've used some sort of a flame to ignite
25    something that the -- the evidence, I guess. I

Page 284

1    don't know.
2  Q. Did you ask Sharee Wells, as part of your request,
3    that she perform testing in this case to perform a
4    flame test of the Blue Sheboygan paint?
5  A. No, I did not.
6  Q. You sure?
7  A. I did not ask her.
8  Q. Okay. You didn't ask her to perform a -- a flame
9    test of the Blue Sheboygan paint in a wet stage?
10  A. Yes, I -- there -- she act -- she actually
11    contacted me because she wanted to continue on
12    with -- to just try to determine if there was
13    anything particularly with the swab -- the swab.
14    Because typically they could control samples,
15    anytime there's a question that comes up about
16    something.
17    And so I sent her a control sample of the
18    swab. It's actually sterile. And then also sent
19    her a control sample of the paint. And those are
20    what I sent to have tested just to -- is what she
21    requested.
22  Q. Try to listen a little carefully. I didn't ask you
23    any of that. I'm just asking you about flame
24    tests. Did you ask her to perform a flame test to
25    the paint in a wet state?

Page 285

1  A. I'm just -- I don't -- I don't ask for what test
2    they do. All I do is send the -- send the -- the
3    test to them to have it -- to have it tested. As
4    for as my samples, I have -- I send it to them to
5    have it tested for any type of residue for ignition
6    source. Or ignition -- or not ignition. But --
7  Q. How about flamm --
8  A. -- ignitable liquids, I guess you could say.
9  Q. Okay.
10  A. But in this particular case where I sent -- where I
11    sent the samples separate to her, she performs
12    whatever tests she wants to perform on those for a
13    control sample --
14  Q. You -- you --
15  A. -- based on what was sent before.
16  Q. Okay. And you did not request Sharee Wells, nor
17    anyone else, to ever try to burn, ignite, or
18    combust the Blue Sheboygan paint in either -- in
19    either a wet stage or a dry stage or any stage,
20    correct?
21  A. No, I did not --
22  Q. Okay.
23  A. -- 'pecifically request that.
24  Q. Why had you never or had anyone on your behalf or
25    behalf of Republic attempt to burn this Blue

72 (Pages 282 - 285)

Page 286

1 Sheboygan paint in any state, whether it be wet,
2 dry, or boiled?
3     MR. JONES: Objection to form.
4     THE WITNESS: My personal opinion, based on my
5 years of -- of being a fire investigator, and also
6 with the scene that presented itself, that the
7 tests that were done and the samples that were
8 taken, give me credibility to what occur -- what
9 would have occurred in that situation. And that's
10 basically what I -- with -- we're supposed to do
11 with a degree of certainty. And that's what I try
12 to always do in any fire scene that I investigate.
13     And the degree of certainty in this case
14 surpassed what I would have rec -- what I -- if I
15 decided that this wasn't a poten -- a -- a possible
16 cause of the fire, then I would have changed it
17 to -- you know, went maybe a little bit farther.
18     But the aspect of this was that everything led
19 to -- to this being the potential, or not the
20 potential, but the probable cause of the fire. And
21 when I got the information from the lab that
22 these -- all these swabs -- you know, if there was
23 only one of them that contained it, I probably
24 wouldn't have went as -- as strong as I would
25 have --

Page 287

1 QUESTIONS BY MR. GARDNER:
2 Q. Do you remember the question?
3 A. No. But I was -- I was trying to answer --
4     MR. GARDNER: Strike the rest of this answer
5 here. I'm asking you about flame tests --
6     THE WITNESS: I --
7     MR. GARDNER: -- and I think you've answered.
8     THE WITNESS: -- and I told you I didn't
9 request a flame test.
10     MR. GARDNER: Okay. And then the question
11 was: Why? And I think you've answered. Okay. I
12 could save Space-Ray some time tonight and ask --
13 or some other day.
14 QUESTIONS BY MR. GARDNER:
15 Q. Would you be willing to reconsider your hypothesis
16 that Blue -- Blue Sheboygan paint ignited or
17 combusted after it became dry if a chemist or some
18 expert can show you that it is not combustible or
19 ignitable or -- nor will sustain combustion in a
20 dry form or after it's boiled?
21     MR. JONES: Objection to form, foundation.
22     THE WITNESS: I can only base my opinion on
23 the facts that were presented to me. And the facts
24 that were presented to me was the -- even by the
25 company's paint and by the comp -- by -- on the

Page 288

1 label of the container, it says if it's boiled off,
2 it presents a -- the properties of a flammable, or
3 not flammable, but combustible liquid. Which
4 basically, when you look those up, that's
5 equivalent to, like, diesel fuel, other -- other
6 flammable products, or combustible products, that
7 would have been easily ignited.
8     And given the situation that this occurred and
9 by what I saw at the site, then I -- that's what I
10 made -- based my decision on.
11 QUESTIONS BY MR. GARDNER:
12 Q. I got a little mixed up on whether Sharee Wells
13 ever told you verbally that she performed a flame
14 test on the Blue Sheboygan paint, and the result
15 was negative. Did she ever tell you that?
16 A. No.
17 Q. That's why it's not included in your report --
18 A. Information.
19 Q. -- right?
20 A. Yes. But it was on the -- I'm assuming it was on
21 the liquid part of the paint that would've she
22 tested it; is that correct? Or was it dry tested?
23 I don't know.
24 Q. That's my main point.
25 A. Or boiled off.

Page 289

1 Q. You don't know, do you?
2 A. No, I don't.
3 Q. And you've never had the paint boiled off to see
4 what happens, have you?
5 A. I've never done that. But in this particular case
6 it obviously was on the products that I saw and --
7 or on the heater units that I saw. And also it was
8 dried on there. So there's no reason for me not to
9 believe that this paint accumulated prior to the
10 fire and was a source of combustible material to --
11 once the heaters kicked on to -- that ignited the
12 fire.
13     That was my opinion. And that's based on the
14 scientific method of trying to eliminate everything
15 else involved to a certain degree, or degree of
16 certainty, I should say, as well as the fact that
17 that certain degree or degree of certainty was
18 overwhelmingly -- everything I looked at was
19 pointing more towards these heaters than anything
20 else.
21 Q. Right. The degree of certainty about which you
22 failed to put in your reports.
23 A. I did not fail to put --
24     MR. JONES: Objection to form; asked and
25 answered.

73 (Pages 286 - 289)

1 QUESTIONS BY MR. GARDNER:
2 Q.  You failed to put the words in there.
3 A.  Those particular words.  But those particular words
4    does not mean that I didn't use that degree of
5    certainty to form my opinions.
6 Q.  Can you go to Page 5 of Exhibit Y.  This is a --
7 A.  Okay.
8 Q.  -- Rimkus evidence custody form.  Your handwriting,
9    isn't it?
10 A.  Yes.
11 Q.  Dated date of collection May 10, 2019?
12 A.  Yes.
13 Q.  Exhibits A, B, C?
14 A.  Yes.
15 Q.  Did you label multiple samples using the same
16    letters as A, B, C, as you did this page?
17 A.  The only thing I did was if it was a different
18    date, then they might have been labeled the same.
19 Q.  Turn the page over, Page 6 of the same exhibit,
20    top, same date, isn't it, May 10, 2019?
21 A.  Right.
22 Q.  And these are referencing the swabs --
23    MR. JONES:  It's a different date.  Are you on
24    Page 7.
25    MR. GARDNER:  No.  Page 6, Thomas.

1    THE WITNESS:  Page 6?
2    MR. GARDNER:  I think it's Page 6.  Yeah.
3    MR. JONES:  Okay.  Got you.  Thanks.
4 QUESTIONS BY MR. GARDNER:
5 Q.  So at the top -- yeah.  So at the top it says,
6    May 10th, 2019, right?
7 A.  Dated collected?
8 Q.  Yes, sir.
9    MR. HEHNER:  Oh, date collected, 5-10.  Yeah.
10    THE WITNESS:  5-10?
11    MR. GARDNER:  They're both May 10th, 2019.
12    THE WITNESS:  Right.
13 QUESTIONS BY MR. GARDNER:
14 Q.  The date you collected the samples.
15 A.  Yes.
16 Q.  The only date you went up there and collected any
17    samples from the heaters.
18 A.  Yes.
19 Q.  Okay.  And isn't it a fact that you labeled
20    multiple cans as A, B, C on May 10th, 2019?
21    MR. JONES:  Objection to form.
22    THE WITNESS:  It appears to me that the lay --
23    the A, B, C on Page 2 was marked out.
24 QUESTIONS BY MR. GARDNER:
25 Q.  And who did that?

1 A.  I don't know.
2 Q.  Well, when you -- when you wrote --
3 A.  It was possibly done by the laboratory, based on
4    the fact that it was -- I think they used the
5    same -- used the --
6 Q.  You just guessing?
7 A.  I don't know who -- who marked those out for sure.
8 Q.  I'm not asking you that at this point.  I'm asking
9    you:  Did you write down A, B, C on Page 6 of
10    Exhibit Y?
11 A.  Exhibit Y.  Is this Exhibit Y here?
12 Q.  Yeah.
13 A.  Okay.  Oh, okay.  I would -- I would have written
14    down -- yes.  It was --
15 Q.  So you marked two cans as Exhibit A on May 10th,
16    2019, two separate cans.
17    MR. JONES:  Objection to form, foundation.
18    THE WITNESS:  This one here was the -- the
19    first page here was done initially when I collected
20    the samples.
21    And the second page is the one -- what I sent
22    to the lab.  But that was done at a a -- a later time
23    in -- in the --
24    MR. GARDNER:  Oh, okay.
25    THE WITNESS:  -- the time frame.

1 QUESTIONS BY MR. GARDNER:
2 Q.  So you just used three -- you used one can A, one
3    can B --
4 A.  Right.  Yeah, right.  There's no -- there's no
5    other cans of -- of --
6 Q.  No -- no dupli --
7 A.  No -- no duplicates; put it that way.
8 Q.  'Cause that would violate NFP standards in -- 921
9    standards.
10 A.  Well, if it occurred --
11    MR. JONES:  Objection to form and foundation.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Doesn't NFPA Sec -- 921 indicate that you should,
14    as a fire investigator collecting evidence, should
15    separately mark every piece of evidence differently
16    with a different label --
17    MR. JONES:  Same objection.
18 QUESTIONS BY MR. GARDNER:
19 Q.  -- so as -- so as to avoid confusion later?
20 A.  That's just normal practice that we would normally
21    do to -- to every -- every piece of evidence --
22 Q.  It's important, isn't it?
23 A.  -- unless it ties together into one unit where they
24    put it all in a box and label it as --
25 Q.  Yes.

74 (Pages 290 - 293)

Page 294

1   A.   -- this is -- this is an -- an alternator, for
2       example.
3   Q.   Okay.
4   A.   But --
5   Q.   So --
6   A.   -- yes.
7   Q.   -- Pages 5 and 6 of Exhibit Y are referring to the
8       same three cans.
9   A.   Yes.
10  Q.   Okay.  So would you look at Page 5 of Exhibit Y?
11  A.   Okay.
12  Q.   All right.  It's dated May 10th, 2019?
13  A.   Yes.
14  Q.   All right.  You labeled Exhibit A.  You put
15      quantity, one, right?
16  A.   Yes.
17  Q.   And didn't you write metal can of sample of
18      interior flue south?
19  A.   Yes.
20  Q.   Next line, Exhibit B-1, interior -- sorry -- metal
21      can with sample inside flue center?
22  A.   Yes.
23  Q.   I -- from my question is, what do you mean with
24      this little swiggle?  You're using swiggles here.
25      Is that of or and --

Page 295

1   A.   Of.  Metal can of sample.
2   Q.   Oh.  Oh, sorry.
3   A.   No, that's --
4   Q.   That's the word "of."
5   A.   Yes.
6   Q.   Thank you.  And then the third line where you
7       reference Exhibit C, you wrote, didn't you, Jim,
8       quantity, one, metal can of sample of interior flue
9       sou -- north.
10  A.   Yes.
11  Q.   All samples were collected from scraping inside the
12      pipe.  Well, you can read the rest to me.
13  A.   From -- let's see here.  Heaters in the south
14      garage area of the painting room.
15  Q.   What's the word between from and heaters?
16  A.   Propane heaters.
17  Q.   Okay.  All right.  So these are scrapings, these
18      are -- these aren't gauze samples.
19  A.   It was everything from inside, yes.  I -- I did --
20      whatever was inside of that container, I reached up
21      inside.  It wasn't at the -- near the opening
22      necessarily.  But the -- whatever I would see
23      inside of there, as I would get out with a -- the
24      gauze pad.
25  Q.   You -- the word "gauze" isn't in this page -- isn't

Page 296

1       on this page at all.  Page 5, Exhibit Y.  You don't
2       write the word gauze at all.
3   A.   There's no -- there was no --
4   Q.   No need for it?
5       MR. JONES:  If you could let him finish his
6       answer.
7       THE WITNESS:  First of all, is it -- at --
8       there's no -- no indication of how the samples were
9       collected on here.
10  QUESTIONS BY MR. GARDNER:
11  Q.   Yes, there is.  It says --
12  A.   Scraping --
13  Q.   -- scraping inside the pipe.
14  A.   Well, using the -- gauze pad --
15  Q.   Okay.
16  A.   -- scraping -- I did not --
17  Q.   You think this was the gauze.
18  A.   -- yes.
19  Q.   Okay.
20  A.   I did not use anything else to scrape --
21  Q.   And you think --
22  A.   -- inside --
23  Q.   -- was sent --
24  A.   -- this container.
25  Q.   -- to Sharee Wells?

Page 297

1   A.   Yes.
2   Q.   And why isn't there a change of evidence custody --
3       custodian change after May 10th, 2019 at the
4       bottom?
5       MR. JONES:  Objection to form, foundation.
6       THE WITNESS:  The only thing that I can --
7       that I can recall is that this form was -- I -- the
8       only reason why this would've happened would be
9       that this form could not be located or found when I
10      sent the -- the year -- it was almost like a few
11      months later.  I can't remember exact timeframe
12      when this was all sent in to the lab.  And they
13      kept a copy of this form once it was located 'cause
14      I'd already read -- read in another form.
15  QUESTIONS BY MR. GARDNER:
16  Q.   Let's go to the next page of Exhibit Y, Page 6.
17  A.   Okay.
18  Q.   Are you there, Jim?
19  A.   Yes.
20  Q.   That's another evidence custody form from Rimkus
21      dated the same date as Page 5, as May 10th, 2019?
22  A.   Yes.
23  Q.   And in your handwriting you wrote Exhibits A, B, C,
24      correct?
25  A.   Yes.

75 (Pages 294 - 297)

Page 298

1  Q.  And each one you wrote quantity, one, right?
2  A.  Yes.
3  Q.  And in first line in Exhibit A, you wrote, One
4      gallon metal can, slash, swabs up south end heater
5      tube, right?
6  A.  Yes.
7  Q.  There's some more handwriting that says "and
8      inside." Is that yours, the word "inside"?  Is
9      that your handwriting?
10 A.  That's not my handwriting.
11 Q.  Whose is it?
12 A.  I don't know.
13 Q.  And just like you don't know who crossed out your
14     A, B, C and put in P, Q, R.
15 A.  I don't know who did that either.
16 Q.  And you don't know when it happened, do you?
17 A.  No.
18 Q.  All right.  The next item on the list, Exhibit B,
19     Page 6 of Y, you wrote, One gallon metal can,
20     slash, swabs off tube heater, middle unit, correct?
21 A.  Of tube heater, middle unit, yes.
22 Q.  Thanks.  And then thirdly, Exhibit C, one metal
23     container can?  What is that?  What -- what did you
24     write there?  I can't read it.
25 A.  One metal gallon can, slash, swabs of tube heater

Page 299

1      north end.  And then somebody wrote "heater" on
2      there.  I didn't -- that's not my writing.
3  Q.  And then in paren you wrote, Hold for testing
4      possibly or something?
5  A.  Yes.
6  Q.  March 6th, 2020, test for flammable -- what's the
7      rest of it say?
8  A.  For flammable or liquid for -- or ignitable
9      liquid --
10 Q.  Approve --
11 A.  -- abbreviation for --
12 Q.  Approval?
13 A.  -- ignitable.  Approval.
14 Q.  All right.  And you think that Exhibit --
15 A.  It's -- it's been approved; put it that way.
16     That's where it was --
17 Q.  Right.
18 A.  -- approved.
19 Q.  And this Page 5 of Exhibit Y, has a chain -- chain
20     of evidence, custody, showing that it was sent down
21     to Miss Sharee Wells?
22 A.  Yes.
23 Q.  And then returned to Rimkus by Sharee?
24 A.  Yes.
25     MR. HEHNER:  It's actually 6 of Exhibit Y that

Page 300

1      we're on that shows that.
2      MR. GARDNER:  Okay, sorry.
3      THE WITNESS:  Thank you.
4      MR. HEHNER:  That's okay.
5      MR. GARDNER:  I'm missing a page.
6      MR. HEHNER:  Isn't it?
7  QUESTIONS BY MR. GARDNER:
8  Q.  So you're convinced, Jim, that the -- the cans you
9      sent to Sharee Wells, the gallon-size cans --
10 A.  Yes.
11 Q.  -- were the materials you collected, indicated on
12     Page 6 of Exhibit Y and Page 5 of Exhibit Y.
13 A.  Yes.
14 Q.  It was all in the same can.
15 A.  Yes.  It was the same can.
16 Q.  Page 7 of Exhibit Y.  Can you go to that, Jim.
17     Collected a different date, March 6th, 2020.  Do
18     you see that?
19 A.  Yes.
20 Q.  Is that your handwriting?
21 A.  Yes.
22 Q.  And, again, you wrote Exhibit A in your
23     handwriting, didn't you?
24 A.  Yes.
25 Q.  And somebody, who you don't know and you don't know

Page 301

1      when, crossed it out and put an S --
2      MR. JONES:  Objection to form --
3      MR. GARDNER:  -- right?
4      MR. JONES:  -- foundation.
5      THE WITNESS:  I don't know who would have
6      crossed it out.
7  QUESTIONS BY MR. GARDNER:
8  Q.  How often are your evidence custody forms norm --
9      labeling changed --
10 A.  Well, I know --
11 Q.  -- in your career?
12     MR. JONES:  Objection to form.
13     THE WITNESS:  -- I -- I've not really had any
14     changes that I know of 'pecifically.  The only --
15     without me knowing about it; put it that way.  The
16     second part of that would be that sometimes the --
17     there is -- they did have a -- a person that was in
18     charge of the evidence.
19 QUESTIONS BY MR. GARDNER:
20 Q.  Like who?
21 A.  Maria, I think.  Forget her last name now.  But I
22     think her initials was actually on this one.
23     Stoner, Maria Stoner re -- received --
24 Q.  You -- you think she might be the one crossing out
25     your A, B, Cs and putting in --

76 (Pages 298 - 301)

Page 302

1  A.  She is the --
2       MR. JONES:  Object -- objection to form.
3       THE WITNESS:  She is the person that's in
4    charge of the evidence room.
5       MR. GARDNER:  Yeah.
6       THE WITNESS:  So there might have been
7    something that -- in there -- in the aspect of that
8    where she would have changed it.
9  QUESTIONS BY MR. GARDNER:
10  Q.  So you can see how this would create confusion for
11    the lawyers and experts in this case when your
12    references to Exhibits As and Bs and Cs are -- are
13    ten -- are turned into different letters, can't
14    you?
15  A.  And I have no --
16       MR. JONES:  Objection to form and foundation.
17       THE WITNESS:  Okay.  I don't -- I don't know
18    why they were changed.  And this is the first time
19    I've seen them in that -- where they've --
20  QUESTIONS BY MR. GARDNER:
21  Q.  It isn't recommended pursuant to NFPA 921, is it?
22  A.  I would say --
23       MR. JONES:  Objection -- objection to
24    foundation.
25       THE WITNESS:  Okay.  I would say that it's not

Page 303

1    recommended.  But I would say, on -- on top of
2    that, would it -- likely should have a -- if there
3    is something that's changed or -- there should be
4    a -- a reason as to why it was.
5  QUESTIONS BY MR. GARDNER:
6  Q.  Can you go to Page 9 of Exhibit Y.  This was an
7    exhibit produced some time ago, along with multiple
8    other photographs, by the plaintiff, Republic,
9    to -- to counsel in this record.  It also has a
10    Bates stamp, I'll just use -- say 603.  Do you see
11    that?
12  A.  Oh, okay.  Yes, uh-huh.
13  Q.  Right.  Do you see an empty can there?
14  A.  Yes, uh-huh.
15  Q.  You took this picture?
16  A.  Yes.
17  Q.  You -- you put that evidence Temp A on top -- top
18    of this?
19  A.  On that pipe, yes.
20  Q.  What was the evidence you collected -- you're
21    trying to document that you collected in this
22    photograph?
23  A.  This is the A can where it's positioned at, and
24    that's the area where the -- the sample was
25    collected.

Page 304

1  Q.  From the two pages we were looking at that you
2    collected on May 10th, 2019?
3  A.  Yes.
4  Q.  Okay.  Well, which pipe is this in Republic 603
5    also marked Defendants' Exhibit Y, Page 9?
6       MR. JONES:  Objection to form.
7  QUESTIONS BY MR. GARDNER:
8  Q.  Center heater? middle heater? south heater?
9  A.  A is -- refers to the south heater.
10  Q.  Okay.  What part of the south heater assembly?
11  A.  Yes.  B would be referred to the middle heater.
12  Q.  No.  My question is:  What part of the heater
13    assembly piping is Exhibit A?
14  A.  Where A -- where the A is -- actually sit on is
15    part of the tube heater.  This would be the, I
16    believe, the third section, which would be the east
17    side of that.
18  Q.  All right.  You said it's not -- neither the in --
19    no component of either the intake or the exhaust
20    piping?
21  A.  No.
22       MR. JONES:  Objection to form and foundation.
23  QUESTIONS BY MR. GARDNER:
24  Q.  So did you collect all the evidence from one
25    location that you marked as Exhibit A in your forms

Page 305

1    dated May 10th, 2019?
2  A.  Yes.  There's multiple pictures other than just one
3    picture related to these.
4  Q.  But it's all the same location.
5  A.  Yes.  A would be the same spot.  B would be the
6    same spot.
7  Q.  Okay.  Can you flip to page -- the next page?
8  A.  Yes.
9  Q.  Twelve, Exhibit Y, Republic 632.
10  A.  Yes.
11  Q.  You're telling us that this photograph of this can
12    that's open in Republic 632 is the same location as
13    Republic 603?
14  A.  Well, I -- actually the area is the -- the same.
15    It's just that the tube was -- it was a lower
16    section of the -- of the same tube.
17  Q.  Yeah.  You'll -- you'll concede that Republic 603
18    with Exhibit 10-A shows no shield, does it?
19       MR. JONES:  Objection --
20       MR. GARDNER:  Deflector shield.
21       MR. JONES:  -- objection to form.
22       THE WITNESS:  There is a shield there.  It's
23    just underneath of it.
24  QUESTIONS BY MR. GARDNER:
25  Q.  Oh, Okay.  Do you see the blue paint on the ground

77 (Pages 302 - 305)

Page 306

1   in Republic 60 -- 632?
2   A.  Yeah, I do see some blue paint there.
3   Q.  And was there -- do you know if there was blue
4       paint underneath the tube heater assembly,
5       particularly the top -- would be the top of the
6       reflector, after it landed onto the floor into this
7       area that has blue paint that's depicted by you in
8       photograph 632?
9           MR. JONES:  Objection to form.
10          THE WITNESS:  This is -- obviously the blue
11      paint there has not been a -- not been contaminated
12      by fire and so forth.  So I'm not sure there's a --
13      I did not collect any -- that type of paint as for
14      as what was on the floor.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Why not?
17  A.  I was collecting it off of the heaters that was
18      there to see if that's hypothesis was credible.
19  Q.  But this tube heater assembly that's laying on the
20      floor -- ground I mean -- in Republic 00632,
21      Defendants' Exhibit Y-12 today, is laying on the
22      ground on -- on top of blue paint, isn't it?
23  A.  But the -- the paint was collected from inside the
24      tube, not from the reflector on the --
25  Q.  Okay.  You didn't collect any paint from the

Page 307

1       reflectors.
2   A.  No.
3   Q.  Ever.
4   A.  I -- I don't recall collecting anything from those,
5       no.
6   Q.  Okay.  Neither on the tops nor bottoms of them?
7   A.  No.
8   Q.  So in either Page 9 -- I apologize.  I'm just gonna
9       use Republic for reference.  Neither photograph
10      marked Republic 603 nor Republic 632 do you show
11      any swabs before or after collection.
12  A.  I don't -- I don't know that I show in the swabs in
13      my photos, no.
14  Q.  You'll concede that there's not a single photograph
15      that you took or was taken by any employee of
16      Republic of -- I'll rephrase the question.
17          You were alone on May 10th, 2019 when you
18      gathered these swabs and scrapings, weren't you?
19  A.  Yes, I was.
20  Q.  And you understand collection of evidence is
21      critical in a case like this, that you were relying
22      the results of these samplings and testings by
23      Sharee Wells.
24          MR. JONES:  Objection to form.
25          THE WITNESS:  Yeah.  Collection of any

Page 308

1       evidence is important.  And I try to re -- maintain
2       that throughout this whole category by not moving
3       as -- as least as possible and by not uncovering
4       everything as -- as least as possible --
5   QUESTIONS BY MR. GARDNER:
6   Q.  Why didn't you take a picture of the swabs or the
7       scrapings inside of cans A, B, or C in any -- any
8       photo you ever took?
9   A.  I was just trying to dict -- predict, or not
10      predict, indicate where those -- where those
11      samples were taken from.
12  Q.  Right.  And you'll --
13  A.  That's my only re --
14  Q.  Go ahead.
15  A.  -- only reason for marking them and letting them
16      know where the -- the swab was taken from.
17          At the time I -- due to the environmental
18      conditions and so forth, I was not -- not -- you
19      know, it was extremely cold outside that day, for
20      example.  So I did not -- I just wanted to collect
21      enough to where I could run a sample of the inside
22      of the tubes just to confirm any hypothesis that
23      was there.  Because I didn't want to disturb any
24      more evidence.
25          And I was already there.  'Cause I was -- I

Page 309

1       was contacted by Republic to see if I could recover
2       the heaters.  That was the main reason why I was --
3   Q.  It was extremely cold on May 10th, 2019?
4   A.  Well, it was cold.  It was -- I don't know that it
5       was extremely cold.  I don't know what you would
6       refer --
7   Q.  Too cold for you --
8   A.  -- to as extremely cold.
9   Q.  -- to take photos of either the scrapings or the
10      samp -- or the gauze pads.
11          MR. JONES:  Objection to form; misstates his
12      testimony.
13          THE WITNESS:  I -- I did not take photographs
14      of what I put in the can.  Would it have been ideal
15      situation?  Yeah.  But it -- it -- I don't know
16      that that would have affect -- I'm not -- I just
17      took -- took the samples out of those areas and
18      samp -- and kept them for quite some time before
19      they even agreed to go ahead and send them in to
20      the lab.
21  QUESTIONS BY MR. GARDNER:
22  Q.  On Republic Bates stamp 00632, where precisely did
23      you take your sample from, this part of the --
24  A.  I'm just mark -- on this particular thing, I was
25      just marking the heater.

78 (Pages 306 - 309)

1  Q.  I know that.  I'm asking you where you took the
2      sample from.
3  A.  I did not take any samples from that particular
4      area.  It was all from inside the heater, as
5      indicated on my report.  I'm just showing where the
6      heater -- the same heater as -- as it goes -- as it
7      goes down.
8  Q.  All right.  So the --
9  A.  'Cause I identify the heater that I took the sample
10     from.
11 Q.  Okay.  So none of your sample came from anything
12     shown in 632, rather somewhere inside of some pipe?
13 A.  Yes.
14 Q.  And same answer for looking at Republic 603?  You
15     didn't take the sample from the outside of that
16     tube, rather somewhere from the inside?
17 A.  602 you said?
18 Q.  603.
19        MR. HEHNER:  603.
20        THE WITNESS:  All my samples were taken from
21     inside the heaters tube or tubes, one of the two.
22     Or heater tubes, sorry.
23 QUESTIONS BY MR. GARDNER:
24 Q.  And you'll concede you -- you did not take a
25     photograph of any of the swabs in their clean state

1      prior to swabbing.
2        MR. JONES:  Objection to form.
3        THE WITNESS:  I did not take a photograph of
4      the -- any of the swabs.  They were in sterile
5      packaging so I did not.
6  QUESTIONS BY MR. GARDNER:
7  Q.  And you didn't photograph any of the gauze swabs
8      inside of the cans with the lid open prior to you
9      sealing the cans, did you?
10       MR. JONES:  Objection to form.
11       THE WITNESS:  Not -- no, I did not.
12 QUESTIONS BY MR. GARDNER:
13 Q.  And before putting them in the cans, you didn't
14     take any pictures of them on May 10th, 2019, or you
15     personally at any time, showing what you -- what
16     was on the swabs after you took your samples.
17 A.  No, I did not.
18 Q.  Can you go to Exhibit GG.  It might be in a
19     different binder.
20 A.  GG?
21 Q.  Yeah.  You might have it --
22       MR. JONES:  I'll trade you.
23       THE WITNESS:  GG right here.
24 QUESTIONS BY MR. GARDNER:
25 Q.  This is a three-page exhibit, Jim.  If you skip to

1      the third page, you'll see it was digitally signed
2      by Lou Inendino --
3  A.  Uh-huh.
4  Q.  -- right?
5  A.  Yes.
6  Q.  And did you -- have you ever seen this before
7      today?
8  A.  I've seen this at the -- I think he had this
9      available at the --
10 Q.  Sinus --
11 A.  -- heater examination that we did.
12 Q.  In the time that you collected them and took them
13     in Indy, right?
14 A.  Yes.
15 Q.  He has been identified by Plaintiffs as a
16     non-retained expert.  Other than his methodology or
17     a recording of the manner in which the -- I'll say
18     the heater assembly units were tagged as evidence,
19     did you rely on any opinions of him in reaching
20     your opinions?
21       MR. JONES:  Objection to foundation.
22       THE WITNESS:  No.  He is a mechanical engineer
23     that was sent with me to also -- to help.  'Cause
24     we -- I anticipated collecting a lot of evidence.
25     And we tried to utilize people in the office to

1      help out doing that, if necessary.  And he was one
2      of the persons that said that he would go help --
3  QUESTIONS BY MR. GARDNER:
4  Q.  I didn't ask you if Mr. Inendino went and helped
5      you.  I asked you if you relied on any of his
6      opinions.
7  A.  No, I did not.
8  Q.  Would you agree, Jim, that Exhibit GG, Pages 1
9      through 3, is a recording by Mr. Inendino of the
10     labeling he utilized during the collection of the
11     various items gathered at Republic facility
12     during -- I can't find the date.  During some --
13     during the time you guys were there to collect the
14     evidence.
15 A.  Yes.  This would have been done on May -- collected
16     on May 11th.
17 Q.  What year?
18 A.  2020.
19 Q.  I see it.  Thanks.  You were there that day, right?
20 A.  Yes.  Everybody was there that day, I think.
21 Q.  Did Mr. Inendino -- I apologize if I say his name
22     wrong -- give you any opinions that you did not
23     rely on in this case?
24 A.  No.  He was -- he did not give me any opinions.
25 Q.  Okay.  You said he was a mechanical engineer,

79 (Pages 310 - 313)

Page 314

1    right?
2  A.  Yes.
3  Q.  Do you have an opinion as to whether my client --
4      setting aside from this question whether the nature
5      of the activities in the room was such that the
6      heaters were appropriate or not in the room; I'm
7      not asking you that.  Setting that aside, do you
8      have any evidence that would suggest the heaters,
9      in and of themselves, were installed incorrectly?
10  A.  I have no evidence of that.  I wasn't there --
11  Q.  Okay.
12  A.  -- when they were installed.
13  Q.  Have you read Space-Ray's expert report by
14      Mr. Davis?
15      MR. HEHNER: Jones.
16      MR. GARDNER: Mr. Jones?
17      MR. HEHNER: Jones.
18      MR. GARDNER: David Jones?
19      THE WITNESS: No, I have not.
20      MR. JONES: Jones, Scott Jones.
21      MR. GARDNER: Scott Jones.  Thanks.
22      THE WITNESS: No, I have not.
23      MR. GARDNER: Okay.
24      THE WITNESS: I do know Scott Jones, however.
25  QUESTIONS BY MR. GARDNER:

Page 315

1  Q.  You've encountered him in other cases?
2  A.  Yes.
3  Q.  And the record will correct my if I'm wrong, but my
4      memory of the summarization of his conclusion,
5      Mr. Scott Jones, was that the Space-Ray heaters, in
6      and of themselves, were installed correctly by my
7      client.  And I'm not talking about whether they
8      should or should not have been in the room.  Do you
9      have any reason to doubt that?
10  A.  I have no reason to -- I have no evidence to prove
11      they weren't installed correctly --
12  Q.  Okay.
13  A.  -- as for as the installation is concerned.
14  Q.  Did you only collect blue paint, Blue Sheboygan
15      paint, from Republic's facility once or twice?
16  A.  Just once.
17  Q.  Okay.  I think that was March -- March 4th, 2020 or
18      March 3rd?
19  A.  I believe so.  Whenever they requested it from the
20      lab.
21  Q.  Can you go to Page 5 of -- of HH.
22  A.  HH?
23  Q.  Yes, sir.
24  A.  Page 5?
25  Q.  Yeah.  That's not your handwriting, is it?

Page 316

1  A.  No, sir.
2  Q.  Wait a second.  It says, Collected by Jim Foster.
3      But whose handwriting is this?
4  A.  This is Lou.
5  Q.  Okay.  Again, this looks to me like his attempt to
6      record the exhibit labels to certain parts of the
7      Space-Ray heaters that he collected -- you guys
8      collected.  Do you see Exhibit C-4, C-5, D-1, D-2,
9      et cetera, down?
10  A.  Yes.
11  Q.  And then it says RL.  And then there's different
12      lettering down the left side.  Who's RL?
13  A.  I don't know who that is.
14  Q.  Do you know why Page 6 of Defendants' Exhibit HH
15      has two sets of labels as exhibit identifiers?
16  A.  No, I do not.
17  Q.  Does that fit with the guidelines of NFPA 921 --
18      MR. JONES: Objection to form.
19      MR. GARDNER: -- you have these exhibits
20      different --
21      THE WITNESS: It could be --
22      MR. GARDNER: -- label --
23      THE WITNESS: -- there could --
24      MR. JONES: Objection to form, foundation.
25      THE WITNESS: Okay.

Page 317

1      MR. JONES: You can answer.
2      THE WITNESS: There could be reasons why
3      it's -- why it's been changed to that.  But I have
4      no knowledge of why.
5      MR. GARDNER: Okay.
6  QUESTIONS BY MR. GARDNER:
7  Q.  Can you go to Exhibit KK.
8  A.  KK? Okay.
9  Q.  At defendants' request, recently some folks at --
10      at Rimkus, I think it was Lou Inendino and
11      Mr. Jacobs, opened up some of the evidence and took
12      photographs for us in stages.  Are you aware of
13      that?
14  A.  Yes.  Their new evidence collection -- a room,
15      technician or whatever they call them, I think --
16  Q.  Yeah.
17  A.  -- is that person.
18  Q.  Right.  All right.  Are you aware that happened?
19  A.  Yes, I am.
20  Q.  Have you looked at the photos?
21  A.  I saw two or three photos --
22  Q.  We're gonna go --
23  A.  -- earlier today.
24  Q.  -- through them really fast so -- so, Jim, we're on
25      Exhibit KK.

80 (Pages 314 - 317)

Page 318

1   A.  Okay.
2   Q.  Page 4 shows an object, it's like saran wrap or
3       something.
4   A.  Is that it right here?
5   Q.  Yes, sir.
6   A.  Yes.
7   Q.  Do you know what that is?
8   A.  It appears to be one of the tube heaters wrapped in
9       plastic that we examined.  I'm not sure.
10  Q.  Go to Page 6 of the same exhibit, and tell me if
11      you still think that's a tube heater.
12  A.  Looks like some sort of a can.
13  Q.  Yeah.  Go to the next Page 7.  It's a rectangular
14      can, isn't it?
15  A.  Yes, it is.
16  Q.  This one, Jim.
17  A.  J?
18  Q.  Yeah.
19  A.  Yes.
20  Q.  All right.  And the next Page 8 of Exhibit KK.
21  A.  Uh-huh.
22  Q.  Is this not a picture of the can collected from
23      inside that fire locker underneath the center tube
24      heater?
25      MR. JONES:  Objection to foundation.

Page 319

1       THE WITNESS:  It -- it appears to be, yes.
2   QUESTIONS BY MR. GARDNER:
3   Q.  And can you look at the top of the photo?  I mean,
4       this looks like it's been subjected to rain and has
5       rusted the can, right?
6   A.  Uh-huh.
7       MR. JONES:  Objection to foundation.
8   QUESTIONS BY MR. GARDNER:
9   Q.  Trying to direct your attention to Page 8 of KK,
10      Jim.  Are you there?
11  A.  This one here?
12  Q.  Yes, sir.  No, no.  The prior --
13  A.  So the prior page?
14  Q.  Yeah.
15      MR. JONES:  The numbers are on --
16      THE WITNESS:  Oh, okay.
17      MR. JONES:  -- right here.
18      MR. GARDNER:  Look to the right-hand side
19      where your right thumb is.  You're holding your
20      right thumb --
21      THE WITNESS:  I see --
22  QUESTIONS BY MR. GARDNER:
23  Q.  You see that?
24  A.  Yeah, 116?
25  Q.  What is the darker gray material that's inside of

Page 320

1       the rusted-out rectangular can on Page 8 of
2       Exhibit KK?
3       MR. JONES:  Objection to foundation.
4       THE WITNESS:  I have no knowledge of what that
5       product is.
6   QUESTIONS BY MR. GARDNER:
7   Q.  Okay.  Can you go to the next Page 9 of Exhibit KK.
8       You see a hole in the can?
9   A.  Yes.
10  Q.  An opening in the can.
11  A.  Yes.
12  Q.  Do you know what caused that?
13  A.  That's a rusted area.
14  Q.  Do you think that's just from rust?
15  A.  I'm sure it prob -- possibly was from rust.
16  Q.  So Page 12 of the same Exhibit KK.  Tell me when
17      you're there, Jim.
18  A.  KK?
19  Q.  Yes, sir.
20      MR. JONES:  You're there.
21      THE WITNESS:  Twelve?  Yeah.
22  QUESTIONS BY MR. GARDNER:
23  Q.  You can see that's different angle, the same rusty
24      rectangular-shaped can?
25  A.  Yeah, it's some type of product that's in the can

Page 321

1       that would -- that has solidified, basically --
2   Q.  And you don't know what it is?
3   A.  -- become hard.  No, I don't.
4   Q.  And the next page shows the opening.  Page 13, KK.
5       Does this look like this -- that can we looked at
6       earlier from photos you took at the scene inside of
7       the fire locker beneath the center tube heater?
8   A.  Yes, it appears to be.
9   Q.  Okay.  You believe it was turpentine or paint
10      thinner?
11  A.  I don't know what it was.  I don't have any idea.
12  Q.  Have you ever seen a can that looks like this
13      before though --
14  A.  Yes.
15  Q.  -- that had paint thinner in it?
16  A.  A lot of cans similar to that have this shape of a
17      can.
18  Q.  That have paint thinner in them.
19  A.  Yes.
20  Q.  So moving forward, Exhibit LL, Jim.
21  A.  Okay.
22  Q.  Page 2 references an evidence custody form dated
23      March 6th, 2020 about a metal can of -- quart metal
24      can of paint, doesn't it?
25  A.  Yes.

81 (Pages 318 - 321)

1  Q.  Then the next Page 3 shows the F.A.S.T. Lab red
2      sticker?
3  A.  Yes.
4  Q.  You expect Sharee Wells, or someone on her behalf,
5      put her label on this can prior to shipping it back
6      up to Rimkus, right?
7        MR. JONES:  Objection to form.
8        THE WITNESS:  I don't have any knowledge.  But
9      that would be a possibility, yeah.  That -- that's
10     where this would've came from, I would assume.
11 QUESTIONS BY MR. GARDNER:
12 Q.  I didn't see any picture you ever took that had any
13     evidence sealing tape on the cans.  Is that because
14     you didn't take the pictures or because you didn't
15     use the evidence sealing tape?
16       MR. JONES:  Objection to form.
17       THE WITNESS:  The day that I was there and I
18     decided to go ahead and collect -- they wanted the
19     heater collected.  The day I was there, while I was
20     already there, so that the evidence would not be
21     destroyed in any additional environmental issues
22     and things like that, I decided to go ahead and
23     collect them.
24       I probably could have been more prudent about
25     what I've done.  But I went ahead and collected the

1      evidence.  And, no, I did not use any evidence tape
2      to go across the thing similar to this.  I put them
3      in the container, sealed the container.  And I was
4      not involved with any contact with the container --
5  QUESTIONS BY MR. GARDNER:
6  Q.  Just so we're clear, you're talking about your
7      swabs and scrapings --
8  A.  Yes.
9  Q.  -- on May 10, 2019.
10 A.  Yes.
11 Q.  All right.  So if we continue with these recent
12     photos kindly taken by Rimkus at the co --
13     codefendants' request.  Go to Page 6 of KK.
14     There's a gauze pad in there, isn't there?
15 A.  Yes.
16 Q.  It's not paint, is it?
17 A.  No.
18 Q.  Can you explain why the evidence custody form talks
19     about paint but the evidence in the can is a swab?
20       MR. JONES:  Objection to form.
21       THE WITNESS:  They're referring to it as a --
22     as a paint can, I believe.  But I don't know that
23     for a fact.  What -- what -- I didn't -- this is
24     not what I -- I didn't anything -- this is not my
25     photograph.  So --

1  QUESTIONS BY MR. GARDNER:
2  Q.  Okay.  Can you go to Page 9 of Exhibit KK?
3  A.  Yeah.  Page 7 does show the swab and how it was
4      packaged.
5  Q.  Shows the package, doesn't it?  We're going to
6      Page 9 to show all of it.
7  A.  Okay.
8  Q.  So what is this?  What does Page 9 represent here,
9      Jim, on Exhibit --
10 A.  This is what was sent to the lab to have tested for
11     a controlled sample for the swab that was used.
12 Q.  Okay.  Thanks.
13 A.  It was in a sterile package.
14 Q.  Can you go to Exhibit MM?
15 A.  Okay.
16 Q.  Page 2 is an evidence custody form dated March 4th,
17     2020.
18 A.  Uh-huh.
19 Q.  Your handwriting?
20 A.  Yes.
21 Q.  One metal can containing paint sample collected at
22     joint examination, right?
23 A.  I -- I can't read what it says but yes.
24 Q.  I've read it so much -- I'm bad at reading your
25     writing as you are.

1      And if you go -- skip to Page 9 of Exhibit MM.
2      Tell me when you're there, Jim.
3  A.  Okay.  Page 9?  Yes.
4  Q.  What is that?
5        MR. JONES:  Objection --
6        THE WITNESS:  That's --
7        MR. JONES:  -- foundation.
8  QUESTIONS BY MR. GARDNER:
9  Q.  I'll ask it another way.  Do you know what it is?
10 A.  It appears to be the blue paint that was collected
11     to send in to the lab for testing at their request.
12 Q.  At F.A.S.T. Lab?
13 A.  Yes.
14 Q.  Can you go to Exhibit NN, and skip all the way to
15     Page 94.
16 A.  (Witness complies.)  Right here?
17 Q.  Looks like you're there.  Again, this is a -- a
18     photograph recently provided through Plaintiffs'
19     counsel.  And these were taken out at the Rimkus
20     lab.  Do you see five gauze swabs in this photo?
21 A.  Yeah.  There's -- there's --
22 Q.  I'm sorry, seven.  There's seven, isn't there?
23 A.  One, two, three, four, five, six, seven.  Yeah,
24     some -- or --
25 Q.  I'm just asking --

Page 326

1  A.  -- together --
2  Q.  -- there are seven --
3  A.  Yes.
4  Q.  -- right?  And you took these samples?
5  A.  Yes.
6  Q.  From -- from where?
7  A.  These are the samples that are taken from the north
8      heater.
9  Q.  And that's because -- you can tell that 'cause --
10 A.  Yeah.  It's stamped that, yes.
11 Q.  What part of the north heater was the top right
12     swab taken from?
13     MR. JONES:  Objection to foundation.  There's
14 no markings of what this gauze --
15     THE WITNESS:  Yeah.  I -- the heat -- the
16     heater was -- there was multiple --
17     MR. GARDNER:  Thomas --
18     THE WITNESS:  -- locations --
19     MR. GARDNER:  -- Thomas made -- hold on.
20 Thomas made a good objection.  Not that the others
21 weren't good either.
22 QUESTIONS BY MR. GARDNER:
23 Q.  So I was oriented to the photo different than you.
24     So orienting the photo, Jim, such that the
25     legal pad, it says Exhibit C, is at the bottom.

Page 327

1      Are you doing that?
2  A.  Yes.
3  Q.  Okay.  So the very top gauze pad, can you
4      specifically tell us where that came from inside of
5      the tube heater?
6      MR. JONES:  Same objections.
7      THE WITNESS:  The picture of where these areas
8      were collected, there was just more than one swab
9      used in -- in that particular area.  I only
10     collected from one area.  I didn't collect from the
11     whole tube itself in different areas.  I just
12     collected from the one area.
13 QUESTIONS BY MR. GARDNER:
14 Q.  That's shown in your picture?
15 A.  Yes.
16 Q.  All right.  And you took -- you took seven swabs?
17 A.  Took multi -- multiple swabs from --
18 Q.  More than seven?
19 A.  Yeah.  From -- from inside the tube.  I just
20     reached as for as I could go to get multiple swabs
21     out of it.
22 Q.  Well, where are the others in addition to -- other
23     than these seven shown on Page 94?
24 A.  But I don't -- I don't know where the other --
25     other --

Page 328

1      MR. GARDNER:  Jim, we have to -- we have to go
2  off the record for some technical issues.
3      THE WITNESS:  Okay.
4      THE VIDEOGRAPHER:  The time is 5:10.  We are
5  off the record.
6      (A brief recess was taken.)
7      THE VIDEOGRAPHER:  This begins media five.
8  The time is 5:14.  We are on the record.
9  QUESTIONS BY MR. GARDNER:
10 Q.  Jim, referring again to Page 94 of Exhibit MM, can
11     you show us precisely where you obtained these
12     seven swabs, other than where you've already showed
13     us where those exhibit tabs were in the photos we
14     looked at the other film.
15 A.  First of all, I want to clarify one thing, is that
16     I -- this is not my photograph.  I don't know where
17     these swabs technically came from.  I'm assuming
18     that they came from the north can or basically from
19     the C heater.  But unless there's other diagrams
20     somewhere else or whether somebody took these and
21     put all the swabs together in the same picture, I
22     can't attest to these pictures, only because of the
23     fact I didn't take them.  And I didn't --
24 Q.  Did you say I can't or I can?
25 A.  I can't.

Page 329

1  Q.  Okay.
2  A.  I -- I can te -- attest to the fact that I did use
3      swabs to collect the samples.  I just don't know
4      where -- I don't know that I would have used seven
5      swabs in one --
6  Q.  -- one-gallon can?
7  A.  In -- yeah, at -- at one time.  But I don't know.
8      Some case -- cases I would have.  I didn't count
9      the number of swabs.  I just used the swabs as I
10     was getting material out.  I just went ahead and
11     continued to use them.  It could have been possible
12     that I could have used seven.
13 Q.  Okay.  Well --
14 A.  I don't know that.  I don't know --
15 Q.  I think 93 will help you out.  No, the other way.
16 A.  93?
17 Q.  It's my understanding that a couple of employees,
18     that I believe included Lou Inendino, took this
19     photograph marked 99 of Exhibit NN of the swabs in
20     the can prior to dumping them out and taking the
21     next picture.  Sound reasonable to you?
22 A.  I guess it sounds reasonable.  I -- but I wasn't
23     there, physically present to know.
24 Q.  We'd have to depose Mr. Inendino to figure that
25     out.

Page 330

1   A.   I would assume so, yes.
2   Q.   'Cause you don't know.
3   A.   'Cause I don't know.
4   Q.   All right.
5   A.   I've not seen them in this --
6   Q.   Last time you saw --
7   A.   -- picture before.
8   Q.   -- when you sealed the can --
9   A.   Yes.
10  Q.   -- and that was it, right?
11  A.   Yes.
12  Q.   Okay.  So the next, Page 94 of Exhibit NN, can you
13       tell us where each of these seven swabs were taken
14       from inside of the north two heater?
15       MR. JONES:  Objection to foundation; asked and
16       answered.
17       THE WITNESS:  There is a picture of where the
18       C swabs were taken from.
19  QUESTIONS BY MR. GARDNER:
20  Q.   The ten photos we already looked at?
21  A.   Yes.
22  Q.   Okay.  Other than that --
23  A.   In that area.  That's -- that's the only area that
24       the swabs would have been coming from, for me,
25       where the -- where the tube was apart.  And it came

Page 331

1        from both sides -- both sides of that tube, as for
2        as I could reach back into the tube with the swab.
3   Q.   So you're referring to, for example, pictures we
4        already looked at, Exhibit Y, Page 16, where you
5        have this Exhibit C, tent, right?
6   A.   Yes.
7        MR. JONES:  Can you pull those up real quick.
8        Okay.  Ben's got it up there, if you can see
9        it.
10       THE WITNESS:  Yes.
11  QUESTIONS BY MR. GARDNER:
12  Q.   So all the swabs that you put in the container next
13       to tent Exhibit marker C came from the pipe that's
14       shown on Page 16 of Exhibit Y.
15  A.   Yes.
16  Q.   That's -- that's about right there.
17  A.   There and from the other end -- other end of the
18       pipe, both sections.
19  Q.   Okay.
20  A.   Where the pipe was split.
21  Q.   Continuing in the same exhibit, Jim, MM.  Going
22       past 94, it shows the seven swabs.  You go
23       Page 97 --
24  A.   Uh-huh.
25  Q.   -- it still references Exhibit C, sample north

Page 332

1        flue.  Page 97.
2   A.   97?
3   Q.   That's --
4   A.   Yes.  North unit.
5   Q.   -- it here.  Page 97.
6   A.   Oh, that's 96.
7   Q.   They're red, Jim.
8        MR. JONES:  On the bottom left from where
9        you're sitting.  There you go.
10       THE WITNESS:  97.
11  QUESTIONS BY MR. GARDNER:
12  Q.   Yeah, okay.  So this is a different --
13  A.   Yeah, in that --
14  Q.   -- Exhibit C photograph.  And then the next Page 98
15       of Exhibit NN --
16  A.   Uh-huh.
17  Q.   -- is a yellow label on the can?
18  A.   Yes.
19  Q.   Is that in your handwriting?
20  A.   Yes.
21  Q.   Okay.  And the next Page 99 is the top of the can?
22  A.   Yes.  That is not my handwriting on the top of the
23       can.  Oh, yes, it is.  I'm sorry.  That's the C I
24       put under there --
25  Q.   Okay.

Page 333

1   A.   -- U 1, I couldn't -- I would've not put that.  But
2        it's actually a C with a -- with a line under to
3        show how it coordinates with the --
4   Q.   Go to Page 101 and tell me what that depicts, the
5        bottom of that can.
6   A.   What -- the products that came out of the tube
7        itself.
8        MR. HEHNER:  Oh, yeah.  We're looking at the
9        same thing.
10       MR. GARDNER:  NN, Page 101.
11  QUESTIONS BY MR. GARDNER:
12  Q.   And that came from inside of the tube shown --
13  A.   Yes.
14  Q.   -- on Defendants' Exhibit Y, Page 16?
15  A.   Yes.
16  Q.   How do you know that the material you claim to have
17       collected from the inside of the pipe shown on
18       Page 16 of Exhibit Y isn't just debris from the
19       fire that got into the pipe after the pipes fell to
20       the ground into the debris that's shown on this
21       photograph Y-16?
22       MR. JONES:  Objection to form.
23       THE WITNESS:  I had no reason to believe that
24       this -- the products inside the tube were not
25       consistent with what was in the lining of the tube.

84 (Pages 330 - 333)

1    And when I did the swab, I reached in to do the
2    swab, these came out.  So I didn't -- I wasn't
3    aware really what all was in that -- inside the
4    heater.  They were out -- actually covered over at
5    the time with the metal.
6    QUESTIONS BY MR. GARDNER:
7    Q.  Sorry.  For clarity, you mean the heater tube.
8    A.  The heater tube, yes.
9    Q.  You didn't collect anything to send to Sharee Wells
10    from inside the heater -- heating assembly box, did
11    you?
12    A.  No, I did not.
13    Q.  Okay.
14    A.  Other than I have the photographs of some of
15    that --
16    Q.  So is it your understanding then that when Sharee
17    Wells tested samples that you sent to her, it
18    included the debris shown in the bottom of the can
19    on Page 101 of Defendants' Exhibit NN?
20    A.  Yes.  'Cause the way they test this is they don't
21    take anything out of the can necessarily --
22    Q.  So the swabs --
23    A.  -- test it.
24    Q.  -- were in the same cans --
25    A.  Yes.

1    Q.  -- as the -- the debris.
2    A.  Right.
3    Q.  You sure?
4    A.  Yes.
5    Q.  You remember seeing any reference to debris, other
6    than swabs, in F.A.S.T. Lab's worksheet?
7    A.  I -- I swabbed -- used the swabs to --
8    Q.  I know you did.  I'm asking:  Did she reference any
9    other material other than swabs in the F.A.S.T. Lab
10    worksheet?
11    A.  I don't re --
12        MR. JONES:  Objection to form.
13        THE WITNESS:  -- I don't recall that offhand.
14    I don't think so.  But everything was in one can
15    that I used the swab to get out.  And everything
16    was in -- brought down into that can.
17    QUESTIONS BY MR. GARDNER:
18    Q.  From that one heater's part --
19    A.  From --
20    Q.  -- the north heater?
21    A.  Right.  If it's -- if it's like the C heater, it
22    would be the -- from that particular area.
23    Q.  So you believe you -- you shipped three gallon cans
24    to Sharee Wells, labeled A, B, C, that included
25    both debris scraped from inside these sections of

1    the tube heaters and also swabs taken from inside.
2    A.  Yes.  I know --
3    Q.  So each of the --
4    A.  -- I did.
5    Q.  -- three would have had swabs and debris.
6    A.  Yes.
7    Q.  You sure?
8    A.  I'm pretty sure about that, yes.  I -- I don't have
9    any reason not to know that that wasn't the case.
10    Q.  Can you explain then why in Exhibit NN the swabs
11    were in the one gallon container alone and this
12    debris's in a completely different gallon container
13    alone?
14        MR. JONES:  Objection to form and foundation.
15    He's already said he wasn't there when the photos
16    were taken --
17        MR. GARDNER:  Well, he was there when the
18    evidence --
19        MR. JONES:  You can answer.
20        THE WITNESS:  Well, the only thing I can -- it
21    doesn't show the side of the can here on this,
22    necessarily.  Unless this is it right here that
23    shows the Rimkus can.
24        MR. HEHNER:  When you say "this right here,"
25    what -- look at the yellow -- I mean, the red

1    numbers.  What page --
2        MR. GARDNER:  He's pointing to 100.
3        THE WITNESS:  Yeah, 100.
4        MR. HEHNER:  Okay.  Thank you.
5        THE WITNESS:  North flue.  Where is the --
6    QUESTIONS BY MR. GARDNER:
7    Q.  Let me help you.  Go to Page 88 and compare that to
8    Page 100.  And you tell me --
9    A.  88?
10    Q.  -- do you still think the debris shown in the can
11    in Page 101 was sent to Sharee Wells along with the
12    swabs, the blue swabs that we were looking at
13    earlier?
14    A.  88, swabs, north heater.
15        MR. JONES:  Same objections to foundation and
16    form.
17        THE WITNESS:  Swabs.  C.
18        MR. JONES:  To clarify --
19        THE WITNESS:  I don't see the inside of this
20    container so --
21        MR. JONES:  Which -- which page numbers are
22    you asking him to compare?  It is 88 --
23        MR. GARDNER:  88.
24        MR. JONES:  -- and 100?
25        MR. GARDNER:  Yes.

85 (Pages 334 - 337)

Page 338

1    MR. JONES:  Okay.
2    THE WITNESS:  88 and 100?
3    MR. HEHNER:  88 for me is a label.
4    MR. GARDNER:  Page 88 says swab north.
5    MR. HEHNER:  Right.
6    MR. GARDNER:  Page 100 says sample flue north.
7  So they're different.
8    MR. JONES:  Go to Page 88.
9    THE WITNESS:  86.
10   MR. JONES:  These are the two.
11   THE WITNESS:  88, basically it says custody
12  form, swabs and north.
13  QUESTIONS BY MR. GARDNER:
14  Q.  Right.  And then they opened -- the folks,
15   including Lou Inendino, and I think his last name
16   was Jacobs, opened these cans sequentially for
17   us -- at about 2,000-dollar charge -- to show us
18   what's inside these cans.  And one can had, as I'm
19   interpreting these, only swabs.  And another can
20   had only debris.  But you think you shipped --
21   shipped them to Sharee Wells together?
22   MR. JONES:  Objection to form, foundation.
23   THE WITNESS:  I know the -- the three I sent
24   from the day I collected it was all -- only from
25   one can A, B, and C.

Page 339

1  QUESTIONS BY MR. GARDNER:
2  Q.  And it contain -- you think you sent her -- can A
3   had swabs and debris; can B had swabs and debris;
4   can C had --
5  A.  Right.
6  Q.  -- swabs and debris.
7  A.  That was correct.
8  Q.  And she converted --
9  A.  From what I collected.
10  Q.  And she converted those to items one, two, three.
11   MR. JONES:  Objection to foundation.
12   THE WITNESS:  I don't know how she converted
13   them.  But I'm assuming that's how it was on the --
14   she listed --
15   MR. GARDNER:  That's the point.
16   THE WITNESS:  -- she listed them on her file
17   of what -- on her lab report of what she received.
18  QUESTIONS BY MR. GARDNER:
19  Q.  You have some idea that Sharee Wells separated the
20   debris from the swabs when she returned them to
21   Rimkus, so she shipped back six cans instead of
22   three gallon cans?
23  A.  I -- I don't --
24   MR. JONES:  Objection to foundation; calls for
25   speculation.

Page 340

1    THE WITNESS:  I don't know anything about
2  that.  But I know I was not there when the cans
3  came back, so I couldn't attest to that.
4  QUESTIONS BY MR. GARDNER:
5  Q.  When did the cans come back?
6  A.  I don't know.
7    MR. JONES:  Objection to foundation.
8  QUESTIONS BY MR. GARDNER:
9  Q.  Didn't they come back right after they were sent?
10   Sorry.  Soon after they were sent?
11  A.  We have to request them -- okay.
12    MR. JONES:  Objection to form.  You can
13  answer.
14    THE WITNESS:  We have -- if -- once they're --
15   the lab's been tested, then they have to be --
16   they -- we have to request them back.  She asked
17   for more information and more -- more testing to be
18   done.  So that put the timeframe well past the time
19   that I was there to -- to have -- to request them
20   back or whatever.
21    Like, we don't typically request them back
22   right away.  They do send them back, but they
23   don't -- sometimes that takes a while for that to
24   come back.
25  QUESTIONS BY MR. GARDNER:

Page 341

1  Q.  So your belief is that when Sharee Wells shipped
2   the three gallon cans that had you shipped to her
3   labeled A, B, C, you were no longer employed with
4   Rimkus.
5  A.  I don't know when these came back; I could not tell
6   you.
7  Q.  You haven't looked at the evidence custody forms to
8   see the answer to that.
9    MR. JONES:  Objection to form.
10    THE WITNESS:  No.  I don't have the evidence
11   custody sheets.
12  QUESTIONS BY MR. GARDNER:
13  Q.  So you've prepared your two -- your second report
14   in 2022 without knowing whether Sharee Wells
15   shipped back to Rimkus after her -- she was
16   finished with the samples, six gallon cans or three
17   gallon cans?
18    MR. JONES:  Objection to form.
19    THE WITNESS:  I don't know that.  Only thing
20   I'm going by is a report that I received from the
21   lab regarding the samples that were sent.  That's
22   only -- that's information I have to rely on.
23  QUESTIONS BY MR. GARDNER:
24  Q.  Jim, can you -- same exhibit -- sorry.  New
25   Exhibit PP, Page 112.

86 (Pages 338 - 341)

1  A. 112?
2  Q. Yes, sir.
3  A. Exhibit A, swabs from --
4  Q. South number 16.
5  A. South, yes.
6  Q. Okay. Exhibit A crossed out letter P, right?
7  A. Yes.
8  Q. And you don't know who did that?
9  A. No, I do not.
10 Q. Page 114, the same exhibit. Is that your
11    handwriting?
12 A. Yes.
13 Q. And you put this yellow label on before shipping
14    this can to Sharee Wells?
15 A. No. This -- the label is on there. The -- the red
16    label wasn't on there.
17    MR. JONES: We're on the next page --
18    THE WITNESS: Oh.
19    MR. JONES: -- 114.
20    THE WITNESS: This one, yes.
21 QUESTIONS BY MR. GARDNER:
22 Q. Was that yellow label on that can when you shipped
23    it to Sharee Wells?
24 A. Yes.
25 Q. Can you go to Page 115? Is that your handwriting

1     on top of that can?
2  A. Yes.
3  Q. And at this point the can has a F.A.S.T. Lab --
4  A. Yes.
5  Q. -- sticker on it, right?
6  A. Yes.
7  Q. What's the purpose of that?
8     MR. JONES: Objection to foundation.
9     THE WITNESS: What they do is -- it's
10    basically an evidence tape that's put on to assure
11    that the -- that no one has tampered with it, I
12    guess. Anti-tamper tape, I guess you could say.
13    MR. GARDNER: Right.
14    THE WITNESS: So this tape is real, real
15    thin --
16    MR. GARDNER: Yeah.
17    THE WITNESS: -- and the -- if someone would
18    open the can, they would obviously rupture the
19    tape.
20 QUESTIONS BY MR. GARDNER:
21 Q. But you didn't put any such tape like that on these
22    three -- three gallon cans before you shipped them
23    to Sharee Wells, did you?
24 A. No, I did not.
25 Q. And it's recommended that you do such according to

1     NFPA 921, isn't it?
2     MR. JONES: Objection to form and foundation.
3     THE WITNESS: I don't think there's anything
4     that in -- in their NFP 921 that mentions the fact
5     that we have to have -- use red tape. It has to be
6     secured.
7     MR. GARDNER: I didn't say anything about red
8     tape. I meant to say just taped to prevent
9     tampering.
10    MR. JONES: Same objections.
11    THE WITNESS: NFP guidelines, yes, that would
12    be the -- the best way to do it.
13 QUESTIONS BY MR. GARDNER:
14 Q. Best practice then?
15 A. If you -- particularly in a criminal case
16    necessarily. But in this particular situation, I
17    did not have the tape available at the time I was
18    at the site. And so I went ahead and secured
19    the -- the evidence and took it to Rimkus to have
20    it secured in our evidence locker.
21 Q. Did you have the time between returning to Rimkus
22    with the gallon cans that you marked Exhibits A, B,
23    C, to put any tape on them before you shipped them
24    to Sharee Wells?
25 A. I could have, yes.

1  Q. But you didn't.
2  A. I did not do that.
3  Q. Okay. Could you go to Page 117, Exhibit PP?
4  A. Yes.
5  Q. Looks like about eight swabs in this photograph?
6  A. Yes.
7  Q. And if you skip back one page to 116, it's a
8     picture taken by an employee of Rimkus -- Rimkus
9     showing the swabs before they took -- took them out
10    of the can, right?
11 A. Uh-huh.
12    MR. JONES: Objection to foundation.
13 QUESTIONS BY MR. GARDNER:
14 Q. And where did you take these swabs shown in -- hold
15    on, Jim -- shown on Page 117 of Exhibit PP? Where
16    did you take them from?
17 A. According to this they came from the south heater.
18 Q. Where on the south heater?
19 A. There's a photograph, again, that shows where
20    that -- those were taken from in the photographs.
21 Q. We already looked at those, didn't we?
22 A. Yes.
23 Q. So that would include Defendants' Exhibit Y, Bates
24    stamped Republic 603? Right?
25 A. Yes. That would be it.

87 (Pages 342 - 345)

Page 346

1  Q.  And the Defendants' Exhibit Y, Page 12, Bates
2      stamped Republic 632?
3  A.  That shows the -- the pipe that I took that sample
4      from.
5  Q.  The swab shown on Page 117 of Exhibit PP.
6      MR. JONES:  Objection --
7      THE WITNESS:  That's --
8      MR. JONES:  -- foundation.
9      THE WITNESS:  The swabs that are shown here is
10     from the south heater.  And they're -- they were
11     used to swab the inside of the pipe -- the -- that
12     pipe --
13     MR. GARDNER:  I'm talking about where you got
14     them from.  I know what they are.
15     THE WITNESS:  From the first picture you had,
16     where it shows the pipe separation.  Right there.
17 QUESTIONS BY MR. GARDNER:
18 Q.  Talking about Republic 603?
19 A.  Yes.
20 Q.  And also part of this pipe that you put a --
21 A.  I did not take any swabs from there.
22 Q.  You took no --
23 A.  I --
24 Q.  Hold on, Jim.  It's going to be too confusing.
25     You took no swabs from the area located in the

Page 347

1      part of the Space-Ray heater on the ground located
2      in Republic 632?
3      MR. JONES:  Let me get that photo in front of
4      him before he answers.
5      THE WITNESS:  No.  And I've -- I've mentioned
6      this earlier that this is only to label the pipe,
7      showing the pipe.  And I wanted to take a picture
8      of some of the -- the paint that was in that area.
9      MR. GARDNER:  On the ground, Jim.
10     THE WITNESS:  Trying -- no.  Well, on the
11     ground as well as relationship to where the pipe
12     was in the -- I took the reflectors, any reflector
13     that was available.  Because the reflectors would
14     show -- and -- and also show the tape.  And also
15     this is a piping where A was collected from.
16     Not -- I did not collect anything from outside of
17     the pipe.
18 QUESTIONS BY MR. GARDNER:
19 Q.  But inside the pipe with evidence tent label A,
20     Republic 632 is where you took some of those swabs.
21 A.  Yes.
22     MR. JONES:  Asked and answered.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Can you go to Page 124, Exhibit PP.
25     MR. JONES:  Let's switch these binders out

Page 348

1      again.
2      MR. ZOCCOLA:  What exhibit?
3      MR. GARDNER:  PP.
4      MR. HEHNER:  PP.
5      MR. JONES:  Which page number did you say?
6      MR. GARDNER:  124.
7      THE WITNESS:  Okay.
8  QUESTIONS BY MR. GARDNER:
9  Q.  For fear of cutting off Space-Ray from a question,
10     I'm going to ask you a couple questions off the
11     topic we're on now.
12 A.  Okay.
13 Q.  Do you hold any opinion as to whether the Space-Ray
14     heaters were defective in any way in relation to
15     design or manufacture?
16 A.  I don't have anything to -- evidence to show that
17     they were not working properly or installed
18     properly at the time as for as the installation of
19     the heaters.
20 Q.  I understand.  I think we were miscommunicating.
21     So Space-Ray -- I mean, Gas-Fired Products
22     d/b/a Space-Ray is sued in this case under products
23     liability theory, under Indiana's products
24     liability statute.  Are you an expert in products
25     liability cases?

Page 349

1      MR. JONES:  Objection to form.
2      MR. GARDNER:  Outside of the realm of fire
3  investigation.
4      MR. JONES:  Objection to form.
5      THE WITNESS:  No.  And I -- the -- and my --
6      well, no.  I don't -- I don't have anything to
7      dispute that their -- that they were -- they were
8      installed properly or they weren't functioning
9      properly.
10     MR. GARDNER:  I understand.
11 QUESTIONS BY MR. GARDNER:
12 Q.  Do you or any other expert that you've consulted
13     with or that's been used in this case on behalf of
14     the plaintiff have any opinion as to whether or not
15     these Space-Ray heaters in question were defective
16     in their manufacture?
17 A.  I don't -- I do not have anything to support that
18     opinion.
19 Q.  Okay.  And do either you or any other experts you
20     consulted with or that have been retained by
21     Republic hold the opinion that there was anything
22     wrong with the design of the Space-Ray heaters?
23     MR. JONES:  Objection to foundation.
24     THE WITNESS:  I don't have any information
25     from anyone that would say that they were not

88 (Pages 346 - 349)

Page 350

1  designed properly or weren't installed properly or
2  used properly as for as they worked op -- they
3  worked.
4      MR. GARDNER: Yeah, okay.
5  QUESTIONS BY MR. GARDNER:
6  Q.  And, lastly, you have consulted the installation
7      manual for the Space-Ray heaters, haven't you?
8  A.  Yes.
9  Q.  And there's reference in your report to some
10     language on Page 3 from that binder, I'm sorry,
11     that manual?
12 A.  Yes. I'm assuming it's from Page 3.
13 Q.  Other than that language, are -- is there any other
14     parts of that manual that you relied on to form
15     your opinions of cause and origin in this case?
16 A.  No. I did not rely on anything as for as -- other
17     than the -- I did look at the manual. And the
18     manual stated that it should not be installed in --
19     that's what prompted me to go ahead and do a sample
20     testing, and things of that nature, to see if there
21     was any product on this that would potentially
22     cause a fire.
23     MR. JONES: And, Marty, I know this is a late
24     objection. But I'm not sure that we're all on the
25     same page of what page from the manual you're

Page 351

1  talking about. So I'm just preserving that
2  objection.
3  QUESTIONS BY MR. GARDNER:
4  Q.  You've referred -- I'm skipping. I'll come back to
5      where we were in a minute.
6      You've recurred [sic] repeatedly during this
7      deposition to some language that comes from the
8      product specifications we've marked as Exhibit P
9      today regarding the Blue Sheboygan paint in
10     terms -- in terms of it boiling, right?
11 A.  Yes.
12 Q.  But when you wrote your letter to Sharee Wells
13     asking her what to do, you didn't use the word
14     "boiling," did you --
15     MR. JONES: Objection to form.
16 QUESTIONS BY MR. GARDNER:
17 Q.  -- or "boiled off," did you? You said "dry," when
18     the paint dries.
19 A.  I might have said -- I might have used the word
20     "dry." Essentially the -- what I was --
21 Q.  I'm just asking --
22 A.  Yes, okay.
23 Q.  Yes.
24 A.  I might have used that -- that terminology, yes.
25 Q.  You didn't say "boiled off," you said "dry" in your

Page 352

1  letter to Sharee Wells about what --
2  A.  Right.
3  Q.  -- how this paint can change through some -- you
4      said the drying process, but you meant the boiling
5      process.
6  A.  Well, I meant the boiling off.
7      MR. JONES: Objection to form.
8      MR. GARDNER: Jim, referring back to
9  Exhibit PP, Page 124. Let me know when you're
10     there.
11     MR. ZOCCOLA: What exhibit?
12     MR. GARDNER: PP --
13     MR. ZOCCOLA: PP.
14     MR. GARDNER: -- Page 124.
15     THE WITNESS: Okay.
16 QUESTIONS BY MR. GARDNER:
17 Q.  That's a legal pad that says, Exhibit A, number 13,
18     sample flue south, right?
19 A.  Yes.
20 Q.  The next Page 125 shows the can with your permanent
21     black marker A with a line under it, correct?
22 A.  Uh-huh.
23 Q.  And your handwriting --
24 A.  Yes.
25 Q.  -- on the yellow label? And so then one

Page 353

1  Page 26 [sic], that's your handwriting on this
2  yellow label?
3  A.  Yes.
4  Q.  Sample taken from flue pipe propane tube heater
5      south end, right?
6  A.  Yes.
7  Q.  Inside two Peter flue pipe, right?
8  A.  Yes.
9  Q.  May 10th, 2019?
10 A.  Yes.
11 Q.  If you go to the -- the next Page 127 of
12     Exhibit PP.
13 A.  Yes.
14 Q.  There aren't any blue swabs in there, are there?
15 A.  Not in this photograph there's not.
16 Q.  And the next page shows the debris spilled out on
17     the top of a table with a measuring device?
18     Page 128?
19 A.  Yes, yeah.
20     MR. JONES: Objection to foundation.
21 QUESTIONS BY MR. GARDNER:
22 Q.  No blue swabs in this photo either, right?
23 A.  Not in this photo.
24 Q.  So isn't it the case that this can that you labeled
25     on May 10th, 2019 had no blue swabs in it but only

89 (Pages 350 - 353)

Page 354

1   some -- some kind of debris?
2     MR. JONES: Objection to foundation.
3     THE WITNESS: I don't -- I can't attest to the
4   fact of where the swabs are. Everything I did was
5   by swabs and sweeping them out. So I don't know
6   anything about these photos or about where the
7   swabs might be. Obviously there were swabs in all
8   the other exhibits that they had here. And I don't
9   know what -- what would have happened to those or
10   where they would have been.
11  QUESTIONS BY MR. GARDNER:
12  Q. But you're -- you're gonna stick with the three --
13   you only mailed -- sorry. You only shipped three
14   one-gallon cans, plus two quart cans, to Sharee
15   Wells for testing at F.A.S.T. Lab. And each of the
16   cans contained both fire debris that you claim you
17   got out of these two heaters and swabs, right?
18  A. Yes. I only sent three containers to them
19   myself. I don't know anything about any other --
20  Q. You're confusing the question --
21  A. -- containers.
22  Q. -- with the way you're answering it. Am I right?
23   The three cans you --
24  A. Yes.
25  Q. -- the only cans you sent had -- each one had

Page 355

1   swabs, samples, and scrapings, and debris --
2  A. Yes.
3  Q. -- correct?
4  A. Yes.
5     MR. JONES: Objection, asked and answered.
6     MR. GARDNER: Correct?
7     THE WITNESS: Okay. Yes.
8     MR. HEHNER: I am confused. Because there was
9   another can that had paint in it, right?
10     MR. GARDNER: That's a quart can.
11     MR. HEHNER: Okay. So -- okay.
12     MR. GARDNER: He mentioned those --
13     MR. HEHNER: Yeah.
14     MR. GARDNER: -- before that. So --
15     MR. HEHNER: Thank you. I'm just not the
16   brightest.
17     THE WITNESS: I wouldn't say that.
18  QUESTIONS BY MR. GARDNER:
19  Q. So could you go to your expert report, Exhibit G.
20   It's your second one. It's dated November 18th,
21   2022, Page 4.
22  A. Wrong way here. P is upside-down.
23     (Mr. Zoccola left the conference room.)
24     THE WITNESS: G?
25     MR. GARDNER: Yes, sir.

Page 356

1     THE WITNESS: Okay.
2  QUESTIONS BY MR. GARDNER:
3  Q. Near the top there's a quote where it says, This
4   heater is not an explosion-proof heater.
5  A. Which one are you talking about?
6  Q. Page 4.
7  A. Page 4? Okay.
8  Q. Do you see it?
9  A. Yes.
10  Q. You typed this report up, didn't you?
11  A. Yes.
12  Q. And you -- this language that you have quoted, it's
13   more bold, it's centered, starts off with, This
14   heater. That came from the installation manual for
15   the Space-Ray heaters, didn't it?
16  A. Yes.
17  Q. But you don't remember what page.
18  A. I don't -- at this -- at this point I don't. I --
19   I --
20  Q. That's all right.
21  A. -- came -- would have come from the manual.
22  Q. Okay. And you typed this up verbatim, didn't you,
23   from the manual?
24  A. Yes, I believe so.
25  Q. And the first two words is "this heater." And the

Page 357

1   last two words is "insurance company"?
2  A. Yes.
3  Q. Okay. Would you read the first sentence out loud
4   to the first period.
5  A. This heater is not an explosion-proof heater.
6  Q. And read the rest of this quote here to yourself.
7   Let me know when you're done.
8  A. Okay.
9  Q. Do you see the word "fire" anywhere in this
10   particular language that you quoted on Page 4 out
11   of the Space-Ray installation and product manual?
12     MR. JONES: Objection. Document speaks for
13   itself.
14     MR. GARDNER: There's no such objection as the
15   document speaks --
16     MR. JONES: Okay. Doc -- objection, form.
17     THE WITNESS: There is reference to potential
18   fire by definition of low flash point. Flash point
19   would be --
20     MR. GARDNER: That's not what I asked you.
21  QUESTIONS BY MR. GARDNER:
22  Q. I said: Do you see the word "fire" in this --
23  A. I don't see the word "fire," no.
24  Q. Okay. Do you see the word "flammable"?
25     MR. JONES: Same objections.

90 (Pages 354 - 357)

Page 358

1      THE WITNESS:  No.
2   QUESTIONS BY MR. GARDNER:
3   Q.  Do you see the word "combust"?
4   A.  No.
5   Q.  Do you think this language is referencing fires and
6       explosions?
7   A.  Potentially both.  The language says --
8   Q.  But the only word it uses is "explosion," isn't it?
9   A.  The data says it's not explosion proof, which means
10      there's openings that vapors and things like that
11      can get into the system.  It's not a sealed up
12      container or a sealed unit.  That's what basically
13      explosion proof would be.  It would have to be
14      totally sealed with no availability of any vapor or
15      anything to be entered in the computer -- or into
16      the heater.
17  Q.  Other than your reference to the word "heater,"
18      which you took out of Page 3 of the Space-Ray
19      manual, the word "explosion" doesn't exist in
20      either of your reports, does it?
21      MR. JONES:  Objection to foundation.
22      THE WITNESS:  No.  I don't -- I don't have any
23      reason to suspect that an explosion necessarily
24      occurred.
25      MR. GARDNER:  Right.

Page 359

1      THE WITNESS:  It's totally different.
2      MR. GARDNER:  I couldn't agree more.
3   QUESTIONS BY MR. GARDNER:
4   Q.  So you did not determine, as a result of your
5       investigation, that there was an explosion
6       involving these Space-Ray heaters, did you?
7   A.  There was -- not to my knowledge, there was no
8       explosion.
9   Q.  Other than damage --
10  A.  I don't know what occurred.
11  Q.  Other than damage from falling on the ground and
12      some collapse damage, the three heater boxes or the
13      propane gas ignites inside the Space-Ray heaters,
14      they were fairly intact, weren't they?
15      MR. JONES:  Objection to form.
16      MR. GARDNER:  They weren't exploded.
17      MR. JONES:  Same objection.
18      THE WITNESS:  Yeah, there was -- they were
19      fairly intact, I would say.  They were damage --
20      damaged by heat and --
21  QUESTIONS BY MR. GARDNER:
22  Q.  But they were -- they weren't damaged by an
23      explosion, were they?
24      MR. JONES:  Objection to form and foundation.
25      THE WITNESS:  Not that I could tell.

Page 360

1   QUESTIONS BY MR. GARDNER:
2   Q.  Isn't it your opinion that there was no explosion
3       of these -- any part of these three Space-Ray
4       heaters that my client installed during this fire?
5   A.  That there was no explosion, you said?
6   Q.  Yeah.
7   A.  I -- I don't have any reason or evidence to support
8       an explosion occurred, no.
9   Q.  Okay.  In fact, you concluded that there was no
10      explosion as to any component of the three
11      Space-Ray heaters that my client installed,
12      correct?
13  A.  There did not appear to be any explosion.
14  Q.  Okay.  Have you ever consulted with a fire marshal
15      about this case?
16  A.  No, I have not.
17  Q.  Have you spoken with or communicated in any way
18      with any fire marshal about this case prior to
19      issuing either of your two reports?
20  A.  No.
21  Q.  Have you consulted with any personnel from any
22      insurance company about this case during your
23      investigation and prior to preparing your two
24      reports?
25  A.  No, I have not.

Page 361

1   Q.  Can you go to -- go to Page 7 of your second
2       report, Defendants' Exhibit G.
3   A.  Page 7 of the report?
4   Q.  Yeah.
5   A.  Okay.
6   Q.  The top photograph you wrote, reference photo --
7       photograph three, Two heater components and paint
8       on reflector unit in area of fire origin.  Is that
9       what you wrote?
10  A.  Yes.
11  Q.  There's a lot of blue paint in this photograph,
12      isn't there?
13  A.  Yes.
14  Q.  It's bright blue, isn't it?
15  A.  Yes.
16  Q.  Is all of it on the tube heater components and
17      reflector, or is some of it on the ground?
18  A.  Some of it's on the ground.
19  Q.  Most of it's on the ground.
20  A.  Yeah.  Some of it, yeah.
21  Q.  I --
22  A.  That's just a general picture of a thousand
23      pictures that I took.
24  Q.  I'm just talking about this one.  You -- you
25      thought it was important enough to put in your

91 (Pages 358 - 361)

Page 362

1   report, didn't you?
2       MR. JONES: Objection to form.
3       MR. GARDNER: Of the thousands of pictures.
4       MR. JONES: Same objection.
5       THE WITNESS: Yeah. It was an -- it was a
6   photograph just to show that the paint was present
7   throughout the facility, for the most part, and
8   at -- in the area of origin as well.
9   QUESTIONS BY MR. GARDNER:
10  Q. Your second report and final report has exactly
11  five photographs in it, correct?
12  A. Yes.
13  Q. Take my word for it.
14  A. Okay.
15  Q. All right. Well, you can see it and look at it on
16  Page 7, Exhibit G, your second report, that this
17  blue paint in the photo on the floor looks exactly
18  like, at least in color and contrast, to the blue
19  paint that you're claiming is on the reflector
20  unit.
21      MR. JONES: Objection to form.
22      THE WITNESS: I -- on this -- yeah. The
23  paint -- the -- the bright blue paint on the right
24  side of the picture is on the floor. But there is
25  paint -- this photograph here is not -- doesn't

Page 363

1   demonstrate adequately to that photograph, I guess.
2   But there is paint on the interior of the units
3   themselves.
4   QUESTIONS BY MR. GARDNER:
5   Q. In this photograph --
6   A. Not --
7   Q. -- or just others?
8   A. No, in others as well. These are just general
9   photographs of the -- of the fire origin.
10  Q. Jim, I'm gonna hand you what I've marked Exhibit G,
11  Page 7.
12  A. Yes.
13  Q. Same photo you're looking at. And take your time.
14  Please circle on that photograph what part of the
15  blue paint is on any part of the heater or the
16  heater shield. And then hold it up to the camera
17  so he can zoom in.
18  A. I can't quite tell with this photograph here.
19  But --
20      Probably could have used a more demonstrative
21  picture, I guess, a more reflective. But I
22  don't -- I can't quite tell what's re -- what
23  the -- I mean, obviously, the blue --
24  Q. (Unintelligible.)
25  A. I -- I can't see anything on there --

Page 364

1   Q. Okay.
2   A. -- right offhand.
3   Q. You can't see anything. So you'll concede,
4   however, on Page 7 of your ex -- your second and
5   final expert report, so far in this case, that you
6   created in, I think, November 2022, all the blue
7   paint in this photograph, is it the same
8   brightness, consistency, saturation --
9   A. In --
10  Q. -- it's all bright blue, isn't it?
11  A. In these photographs, yes. They -- these were
12  taken much soon -- much sooner in the process
13  though than what obviously the -- we saw at the
14  examination of the heaters.
15  Q. The bottom --
16  A. This is -- this is at the time I was there
17  collecting the evidence and things like that.
18  Q. May 10th, 2019.
19  A. Yes.
20  Q. Bottom photograph 4 --
21  A. Uh-huh.
22  Q. -- Exhibit G, Page 7. You wrote, Two heater and
23  the paint on reflector along with charring, and
24  more heat on this heater unit than others,
25  indication -- I'm sorry, yeah -- indication origin

Page 365

1   area.
2       You think this photograph shows blue paint on
3   any part of the heaters rather than just showing
4   blue paint on the floor?
5   A. I think --
6       MR. JONES: Objection to form. You can
7   answer.
8       THE WITNESS: I think on the heater unit
9   itself, right there at the -- where it comes out of
10  the -- the heater burner unit itself, there is --
11  you can kind of almost see it right in that picture
12  right here.
13  QUESTIONS BY MR. GARDNER:
14  Q. I can't see it at all. You go ahead and circle it
15  and show the camera. We've got to move on.
16  A. Okay.
17  Q. Take your time. Is that visible, Jim? I can't
18  tell.
19  A. It doesn't show up very well on there but there --
20  Q. Try red.
21  A. -- right in that area. It doesn't show up either.
22      MR. HEHNER: Try that.
23      THE WITNESS: Nope.
24      MR. HEHNER: Show up? Try that.
25      MR. JONES: Do you have a paint brush in

92 (Pages 362 - 365)

Page 366

1   there?
2       THE WITNESS: I don't -- there's about four
3   our five circles there. Can you see that?
4       MR. GARDNER: I'll take it back. We're gonna
5   give it to the court reporter.
6       THE WITNESS: Okay.
7       MR. GARDNER: Thanks, Jim Hehner. And thanks,
8   Jim Foster.
9   QUESTIONS BY MR. GARDNER:
10  Q. So this bottom photo, Jim, Defendants' Exhibit G,
11     your report, Page -- I'm sorry.
12  A. Seven.
13  Q. It's Page 6 of your report. It's Page 7 of the
14     exhibit. That is the south heater?
15  A. Yes.
16  Q. Okay. And this heater --
17  A. I believe so, yes.
18  Q. -- was examined in the laboratory at Rimkus twice?
19  A. Yes.
20  Q. In February and August of 2022?
21  A. I don't know about twice. I don't -- somebody
22     looked at it. I wasn't present at that. I was
23     only present at one.
24  Q. You were there at the August --
25  A. Yes.

Page 367

1   Q. -- 2022 --
2   A. Right.
3   Q. -- when I was there.
4   A. Yes.
5   Q. And I asked you in the presence of all the experts
6      and the attorneys in assembly if you could show us
7      on any of the heaters, any component of the
8      Space-Ray heaters that my client installed, any
9      blue paint, and you told us no.
10      MR. JONES: Objection.
11  QUESTIONS BY MR. GARDNER:
12  Q. What did you mean by that answer?
13      MR. JONES: Objection to form, foundation.
14      THE WITNESS: I did not say no as for that --
15   you asked me where I took samples from.
16      MR. GARDNER: I asked you that too. But I
17   also asked you where --
18      MR. JONES: If you could let him finish.
19      MR. GARDNER: He's answering a different
20   question. He's answering the next question.
21      THE WITNESS: The only -- only answer that I
22   give to where I -- I didn't know was the -- where
23   the sample were collected. Samples were collected
24   because of -- of the --
25      MR. GARDNER: I'm not on the samples.

Page 368

1       THE WITNESS: -- positioning of the heaters.
2       MR. GARDNER: Just asking for: Could you show
3   us blue paint? That was my question.
4       THE WITNESS: Yes. I could show you blue
5   paint on those heaters.
6       MR. GARDNER: You said no in that room.
7       THE WITNESS: I did not say no.
8   QUESTIONS BY MR. GARDNER:
9   Q. You sure?
10  A. Yes.
11  Q. Okay.
12  A. I have pictures to prove otherwise.
13  Q. To prove that you said yes?
14  A. No. That there's paint on the units themselves.
15  Q. Okay. Pictures taken in the lab that day?
16  A. Yes.
17  Q. You believe would show paint on the south heater?
18  A. Yes, I do. I don't know about the south heater,
19     which one offhand it was. But there's -- it shows
20     paint on the heater.
21  Q. Are you telling me that in the August '22 lab exam
22     at Rimkus, when we were all looking at the south
23     heater that you depicted at the bottom of your
24     report, Page 6 of your report of 2022, that
25     there's -- the blue paint isn't there anymore?

Page 369

1       MR. JONES: Objection to form.
2       THE WITNESS: I have no idea which -- in what
3   area and what photographs I have as for as at the
4   examination. But I do know that there were several
5   areas where I took pictures of that had blue paint
6   on the heaters and the heater exam, when we did the
7   examination of the heaters.
8   QUESTIONS BY MR. GARDNER:
9   Q. Was it as bright blue as depicted on the top of --
10     on photograph three of your second report?
11  A. No. It was not bright blue. It was baked-on
12     blue -- baked-on blue. Kind of a light blue.
13  Q. It was light blue.
14  A. Yes.
15  Q. Can you show us any pictures -- can you show us any
16     pictures today of this bright blue, sorry,
17     light-blue paint on --
18  A. I -- I don't have any --
19  Q. Hold on -- on any components of the Space-Ray
20     heaters?
21  A. If -- if there's pictures available that I -- from
22     the examination, yes. I --
23      MR. GARDNER: Yeah, okay. We can just go off
24   now.
25      THE VIDEOGRAPHER: This ends media five. The

93 (Pages 366 - 369)

Page 370

1  local time is 5:55. We are off the record.
2      (A brief recess was taken.)
3      THE VIDEOGRAPHER: This begins media six. It
4  is 6:05 p.m., and we are on the record.
5  QUESTIONS BY MR. GARDNER:
6  Q.  So before we broke, I believe the subject was --
7      you were telling me about photographs you took in
8      August of 2022 at the Rimkus examination of the
9      heaters?
10  A.  Yes.
11  Q.  That you believe show light-blue paint?
12  A.  Yes.
13  Q.  How many photos do you think you took that showed
14      light-blue paint on any of the three heaters on --
15      in August of 2022 at Rimkus?
16  A.  Probably overall at least three photos that I can
17      recall.
18  Q.  So that would be easy for you to find and give to
19      Thomas, wouldn't it?
20  A.  Yes, sir.
21  Q.  And, do you remember, were they all from the north
22      heater, all from the center heater, all from the
23      south, or some combination?
24  A.  I don't know exactly which one they're from at this
25      point. I could look it up -- I mean, I have them

Page 371

1      sequential as for as, you know, the north heater.
2      What -- the way we examine them at the lab exam.
3      But I don't know exactly which one showed residue
4      of paint.
5  Q.  But it was just one?
6  A.  I think it was two of them that I noticed the paint
7      was on, yes.
8  Q.  And what components of the two of them was it on?
9  A.  On the tube itself.
10  Q.  Not the -- not the heater box?
11  A.  Not that I could recall on the heater box.
12  Q.  And not the deflectors?
13  A.  Not the deflectors. Well, there -- there was one
14      deflector, I think, that had some residue on it.
15      But I -- I can't recall which --
16  Q.  I'm not asking about residue. I'm asking about
17      visible, light-blue paint.
18  A.  Yeah, that's what I'm referring to is paint
19      residue.
20  Q.  And do you think that the three pictures you took
21      at the Rimkus facility in August of last year,
22      2022, you're telling us now show light-blue paint
23      on these heater tubes.
24  A.  Yes.
25  Q.  Was combusted blue paint?

Page 372

1  A.  I don't know what it -- what -- if it's combusted.
2      It's similar to the paint that was on there
3      whenever I made -- got the collections off and what
4      I saw on the --
5  Q.  Regardless of --
6  A.  -- reflectors --
7  Q.  -- of some prior sequence, I'm asking you: This
8      light-blue paint that you took photographs in
9      August of last year at Rimkus --
10  A.  Yes.
11  Q.  -- there's still light blue after combustion? Or
12      is it your opinion that blue paint was not
13      combusted?
14  A.  I don't think it was combusted, no.
15  Q.  Okay. So the rest of the blue paint other -- that
16      wasn't -- that you couldn't find on the heaters, it
17      was 'cause it had been combusted and was gone? Is
18      that what you're saying?
19  A.  I'm -- I'm saying the environment probably had a
20      lot to do with some of the res -- but there was
21      several -- initial -- the initial exam showed a lot
22      of paint on the reflectors and on the tubes
23      initially.
24  Q.  What -- what initial one?
25  A.  The first one, the examination that I -- when I was

Page 373

1      there the first time and -- and also the second
2      time.
3  Q.  So -- hold on. We get our dates right here. So
4      you're talking March 20th, 2019 to May 10th, 2019?
5  A.  Yes.
6  Q.  And you took pictures of all that.
7  A.  Yes.
8  Q.  All this blue paint on these heaters.
9  A.  Not on -- not on the first day I was there, on the
10      19th, but on the --
11  Q.  The 10th?
12  A.  -- the heat -- the day -- the heat, yeah. The day
13      I did the examination of the heaters.
14  Q.  You mean you took the samples.
15  A.  Yes.
16  Q.  You had --
17  A.  I also took several pictures that day as well.
18  Q.  I know. And you had to remove debris off the top
19      of heaters to get it, didn't you?
20  A.  Yes.
21  Q.  All right.
22  A.  The metal components of the roof.
23  Q.  I'm -- I'm in -- wait a minute. You referenced
24      NFPA 921 in both of your reports.
25  A.  Uh-huh.

94 (Pages 370 - 373)

Page 374

1   Q.   At the time you wrote your first report, the only
2        one in existence was the 2017 edition, correct?
3   A.   Yeah, other than prior editions.  But that --
4   Q.   Yeah.
5   A.   -- was the one that was effective, yeah, or active
6        in that --
7   Q.   And when you wrote your second report, it was the
8        2021 edition, right?
9   A.   Yes.
10  Q.   But wouldn't it be fair to say that since the
11       time -- time of the fire was 2019.
12  A.   Yes.
13  Q.   And the bulk of your investigation was prior to you
14       issuing your 2022 report, the edition that you were
15       referring to was the 2017 edition.
16  A.   Yes.
17  Q.   Okay.  Good thing I brought it.
18       So in that edition, in Chapter 18,
19       Section 18.4.6, it says, Analysis of sequential
20       events.  You're familiar with that term, phrase?
21  A.   Yes.
22  Q.   All right.  The analysis of the timing or sequence
23       of events during a fire can be useful in
24       determining the origin, period.  Much of the data
25       for this analysis will come from witnesses, period.

Page 375

1        You agree with all that?
2   A.   Yes.
3   Q.   In some instances, comma, a witness may be found
4        who saw the fire in its inception stage and can
5        provide the investigator with an area of fire
6        origin.  Do you agree with that?
7   A.   Yes.
8   Q.   Okay.  Such circumstances create a burden on the
9        fire investigator to conduct a thorough and
10       investigation as possible to find facts that can
11       support or refute the witnesses' statements.  Do
12       you agree with that?
13  A.   Yeah, I -- yeah, I think you have an obligation to
14       see if that's the potential hypothesis or not, yes.
15  Q.   Continuing:  Quote, Means to verify such statements
16       could include pattern analysis, arc mapping -- you
17       didn't do you any arc mapping, did you?
18  A.   I did not.
19  Q.   Matching smoke detectors.  There weren't any smoke
20       detectors, were there?
21  A.   Not to my knowledge, no.
22  Q.   A heat detector?  You didn't use any heat -- there
23       weren't any heat detectors --
24  A.   No.
25  Q.   -- were there?

Page 376

1        So tell me your opinion, in terms of the
2        sequence of combustion, assuming your hypothesis is
3        correct, that this blue paint and other products
4        were caused to ignite when the heater activated, as
5        you say in your second report, once that this first
6        fuel burns.  You say the first fuel's propane,
7        don't you?
8   A.   That would be the first thing that ignited, yes.
9   Q.   And the second -- second thing to ignite is this
10       blue paint?
11  A.   Would be the remnants of blue paint that was
12       combustible, according to the company --
13  Q.   Okay.  Then --
14  A.   -- off.
15  Q.   -- what's next?  What's the next fuel?
16  A.   Well, we had a lot of that blue paint, number one,
17       throughout the process.  And then you had other
18       combustibles.  Once that caught fire, it just
19       spread throughout the --
20  Q.   I'm asking you --
21  A.   -- building.
22  Q.   -- what the -- I want exactly your sequence of
23       events of combustibles.  You said number one was
24       propane, and number two was blue paint.  What --
25  A.   Right.

Page 377

1   Q.   After those burned, what is there left up there,
2        anywhere near any of these heaters, to -- to
3        sustain combustion to burn this building?
4        MR. JONES:  Objection to form; asked and
5        answered.
6        THE WITNESS:  Because of the blue paint and
7        the res -- there was -- residue was everywhere in
8        this facility, according to the witnesses, that I
9        base my opinions on, which is the first number one
10       thing as for as in the -- a cause and origin
11       decisionmaking process is obviously witness
12       statements --
13  Q.   So it's the blue --
14  A.   -- and that --
15  Q.   -- paint all the rest of the room is what you're --
16  A.   Well, it's -- it's partly that as well as the fact
17       that once you -- it -- that heater was over near
18       the south wall.  And that south wall is actually
19       combustible.  That -- it's got -- it's a wooden --
20       wooden wall to the storage unit.
21  Q.   So that's, you think, was the second fuel -- sorry,
22       the third fuel was the --
23  A.   I -- I don't know the -- total sequence of how
24       that all occurred.  But I'm just saying that the --
25       the ignition source is all compatible with the --

95 (Pages 374 - 377)

1  Q.  You're on a different question.  I'm asking you the
2      sequence of events of -- of combustion in this
3      room, not for your entire opinion here again.  I've
4      got to leave Space-Ray some time.
5  A.  I don't know what the sequence of events amounted
6      to.  I do know --
7  Q.  No, wait.  Sequence of events of combustion is what
8      I'm talking about.  Combustible --
9  A.  Right.
10  Q.  -- materials.  You've told me number one is
11      propane.
12  A.  Right.
13  Q.  Number two is blue paint inside --
14  A.  Right.
15  Q.  -- the tube heaters.
16  A.  Correct.
17  Q.  Okay.  Not inside the heater.
18  A.  Well, inside the tube heater --
19          MR. JONES:  Objection to form.
20          MR. GARDNER:  Right.
21          MR. JONES:  You can answer.
22          MR. GARDNER:  Inside the tube heater -- go
23      ahead.
24          THE WITNESS:  Inside the tube heaters.  And
25      then obviously there's the same type of material

1      outside the tube heaters which would --
2  QUESTIONS BY MR. GARDNER:
3  Q.  You mean on the tube heaters?
4  A.  On the tube heaters and --
5  Q.  Okay.
6  A.  -- on the reflectors and everywhere around that
7      area.
8  Q.  Okay.  Then what?
9  A.  And those would ignite and basically cause and
10      produce other things nearby to continue to express.
11  Q.  What are the other things precisely?
12  A.  Primarily the paint, the -- and the -- as well as
13      the -- being that it's -- it's close to other areas
14      involvement.
15  Q.  What other areas?
16  A.  And it's a wood frame --
17          MR. JONES:  If he could finish his answer.
18          MR. GARDNER:  He's giving vague answers.  He
19      said --
20          THE WITNESS:  It's a wood -- it's a wood-frame
21      construction.
22  QUESTIONS BY MR. GARDNER:
23  Q.  The third thing that combusted was the wood wall
24      that separated the paint bay from the storage room?
25          MR. JONES:  Objection, asked and answered.

1      He's already answered that question.
2          THE WITNESS:  I'm saying is --
3          MR. GARDNER:  You're right, Thomas.  He said
4      he doesn't know the sequence of events, of -- other
5      than number one was propane and number two was blue
6      paint in the heater tubes, and number three was
7      blue paint on the tubes and the reflectors.
8          THE WITNESS:  The residue of the paint, the
9      combustible --
10  QUESTIONS BY MR. GARDNER:
11  Q.  Beyond that you don't know.
12  A.  -- of the paint and of the construction of the
13      building was primarily -- a lot of wood
14      construction as well of the -- the structure --
15  Q.  So the wood building --
16  A.  -- itself.
17  Q.  -- just caught on fire after the blue paint
18      ignited.  Is that it?
19  A.  No, that's not -- I'm not -- well, it did catch on
20      fire eventually.  But --
21  Q.  Yeah.  But you don't the sequence --
22  A.  I don't know the sequence past the fact that I
23      think ignition source was the heaters kicking on at
24      the certain time.
25  Q.  Okay.  The sequence that you don't -- you said I

1      don't know the sequence past the fact, you're
2      talking about the sequence of combustion,
3      combustible materials igniting, correct?
4  A.  There -- yeah.  There was other combustible
5      materials that would have potentially ignited.
6      There's also a drop-down from the -- from the
7      ceiling area.  That could have potentially ignited
8      other combustibles that -- down on the ground as
9      well.
10  Q.  You think during this fire --
11  A.  -- all --
12  Q.  This is just a different question.  You're
13      conceding that during this fire materials on the
14      ground combusted, like the paint thinner?
15          MR. JONES:  Objection to --
16          THE WITNESS:  I'm just --
17          MR. JONES:  -- objection to form.
18          THE WITNESS:  -- I'm just saying there's a
19      possibility of that, yes.  I don't know.  I wasn't
20      inside the facility when it caught fire, number
21      one.  I'm only --
22  QUESTIONS BY MR. GARDNER:
23  Q.  But you're the fire investigator.
24  A.  I'm -- I'm basing my opinion on --
25          MR. JONES:  Let him -- let him finish his

96 (Pages 378 - 381)

Page 382

1   answer.
2      THE WITNESS: -- on what witnesses stated and
3   basically what the lab results stated --
4      MR. GARDNER: Okay.
5      THE WITNESS: -- and what I saw and the facts
6   that were presented to me at the scene.
7   QUESTIONS BY MR. GARDNER:
8   Q. The lab results helped you figure out the sequence
9      of fire events subsequent to ignitial -- ignition
10     of propane, blue paint inside the heater tubes, and
11     blue paint on the heater tubes and reflectors.
12  A. No.
13  Q. You think -- and past that you -- you'll concede
14     that any combustion past that would be in no way,
15     shape, or form affected by Sharee Wells' opinions,
16     correct?
17     MR. JONES: Objection to form. It's a
18  compound question.
19     THE WITNESS: The only thing that would affect
20  Sharee Wells' opinion was the presence of
21  combustible materials on the heaters and in the
22  heaters. That's my opinion.
23  QUESTIONS BY MR. GARDNER:
24  Q. On them? I thought you only sent her materials --
25  A. I -- I mean, yeah. I -- she confirmed that that

Page 383

1   was -- the material that I sent to her inside was
2   -- was combustible.
3   Q. Wait. The only material you sent to her was from
4   inside --
5   A. That I can confirm, yes, as a lab result.
6   Q. You're -- you're -- isn't it true, the only thing
7      you ever sent to Sharee Wells was materials
8      collected from inside the tube heaters?
9   A. Yes, sir.
10  Q. Pipes.
11  A. Yes.
12  Q. Not the box.
13  A. Not the box.
14  Q. And did you inspect the inside of the three burner
15     boxes at the Rimkus facility in August of 2022?
16  A. Yes, I did.
17  Q. And did you see -- did you see blue paint inside
18     any of those?
19  A. No. And I wouldn't've expected to see blue paint
20     inside of it.
21  Q. Why not?
22  A. Not inside of the burner box 'cause it's gonna burn
23     all -- if there was anything in there, it was gonna
24     burn off, number one, because of the heat. And --
25  Q. I'll accept that.

Page 384

1   A. -- because of the combustible materials.
2   Q. Thank you.
3      MR. GARDNER: I'll pass the witness.
4      MR. HEHNER: Mr. Foster, my name is Jim
5   Hehner. I represent Gas-Fired Products doing
6   business as Space-Ray.
7   QUESTIONS BY MR. HEHNER:
8   Q. I think I understand your answers to Mr. Gardner's
9      questions. But I'm going to ask them a little
10     different way. I want to ask you about my client's
11     product.
12  A. Uh-huh.
13  Q. Do you have -- from your investigation, do you have
14     any information or evidence that would cause you to
15     believe that the tube heaters failed to perform or
16     operate properly?
17  A. I have no information that would lead me to suspect
18     that the heaters didn't perform properly.
19  Q. Okay. That's what I thought your answer would be
20     based on your other answers. Let me ask it a
21     slightly different way. Do you have any evidence
22     or information that -- that there was any failure
23     to operate properly by the tube heaters that caused
24     the fire?
25  A. No. I do not have any reason to suspect there's a

Page 385

1   failure --
2   Q. Okay.
3   A. -- of the heaters.
4   Q. You talked about photos with -- you remember where
5      the A cards were and the B cards and the C cards?
6   A. Yes.
7   Q. And you said those helped indicate where the
8      samples were taken from. Do you have any
9      photographs, diagrams, videos, anything that shows
10     you actually in the process of retrieving the
11     materials that came from those sites and ended up
12     in the cans?
13  A. No, I do not.
14  Q. Okay.
15  A. And the reason I do -- did not have any photo or
16     any --
17     MR. GARDNER: He didn't -- hold on. I object.
18  He didn't ask -- object to the answer. He didn't
19  ask you the reason.
20     MR. JONES: You're object --
21     MR. GARDNER: -- again.
22     MR. JONES: To be clear --
23     MR. HEHNER: I'll ask him. I'll just ask him.
24     MR. JONES: Right. But to be clear --
25  QUESTIONS BY MR. HEHNER:

97 (Pages 382 - 385)

Page 386

1  Q.  You have no photos; is that right?  No videos, no
2      diagrams, no photos.
3  A.  Not from inside of the -- when I was collecting --
4  Q.  The process of retrieval.
5  A.  Right.
6  Q.  And the -- and the -- and you wanted to tell me
7      why.  Why is it?
8  A.  The -- the reason why is because it was a -- it was
9      a kind of an afterthought, the day that I was
10     there.  They asked me to come up to retrieve the
11     heaters, is what they wanted me to do.
12 Q.  Okay.
13 A.  To preserve them.  And when I got there, I -- I
14     told them that I did not feel that the heaters
15     should be disturbed be -- until we have proper
16     examination of the heaters.
17 Q.  Okay.
18 A.  And then before I left, I thought, well, I maybe
19     should go ahead and collect the sample real quick,
20     so just to have that available.  Because I wasn't
21     sure when I could get back in order to preserve the
22     evidence that -- that was in the heaters.
23 Q.  I've heard -- I've heard reference to the words
24     sampling, gauze, swab, swabbing gauze, scraping.
25     Are the -- are you using all those terms

Page 387

1      interchangeably?
2  A.  Yeah.  I'm scraping it out with the gauze pad
3      basically is what I'm --
4  Q.  So you're not using a -- a device other than your
5      hand or a gauze pad.
6  A.  Correct.  Other than my fingers.
7  Q.  Okay.  You mentioned heaters in the fire stations.
8      You said that the fire -- some of the fire stations
9      you've worked it have very similar gas tube heaters
10     mounted up on the ceilings; is that right?
11 A.  I don't believe they're Space-Ray.  But I do
12     believe they have -- they're the similar-type
13     heaters that you can actually see the burners --
14 Q.  And that's --
15 A.  -- when they're burning, you can actually see the
16     flame inside of them.
17 Q.  That's my question.  Where do you see that flame?
18     Did you see it in the con -- what I -- my client
19     calls the control box, which you guys have called
20     the fire box or the heat box or something like
21     that.  It's the area where the -- where the fuel is
22     supplied.  Do you see that flame in that area?
23 A.  At the front of the control box is -- is your
24     terminology.
25 Q.  Is there an opening or a hole or a gap or a --

Page 388

1  A.  It's just --
2  Q.  -- space?
3  A.  -- you can see the flame, kind of like you would a
4      furnace.  It's closed up but you can look inside --
5  Q.  Okay.
6  A.  -- and see it burning.  So --
7  Q.  But you can't see any flame along the tube itself.
8      All you can see is an indication of heat like
9      blowing or something; is that right?
10 A.  Not in the reference to what I was referring to,
11     the fire --
12         MR. GARDNER:  Jim, you're talking about the
13     ones at his fire station.
14         MR. HEHNER:  Right.
15         MR. GARDNER:  Not the ones in the building.
16         MR. HEHNER:  That's correct.
17 QUESTIONS BY MR. HEHNER:
18 Q.  Yeah.  And what I'm saying is, you don't see open
19     flames in those tubes because they're solid metal.
20     You just see heat.
21 A.  Correct.
22 Q.  Okay.  You can't see heat.  You see indications of
23     heat 'cause they're glowing.
24 A.  Right.
25 Q.  Okay.

Page 389

1          MR. HEHNER:  That's all I have.  Thank you
2      very much.
3          MR. JONES:  Just a few.  I think you --
4          MR. HEHNER:  How much time do we have?  Can we
5      go off the -- I don't want to eat up time finding
6      out how much time we have.  So how much time do we
7      have?
8          THE VIDEOGRAPHER:  In a half hour we will be
9      at seven hours.
10         MR. HEHNER:  Okay.  Thank you.
11         MR. JONES:  Okay.
12 CROSS-EXAMINATION,
13 QUESTIONS BY MR. JONES:
14 Q.  Just to be clear on the numbers, how many fire
15     scenes have you been -- fire investigations have
16     you been involved in in your career?
17 A.  As -- as a fire investigator, I would say probably
18     around 2,000 to 2500.  I don't have an exact count
19     because it was -- been several -- over 44 years.
20     And we didn't really keep track of things years
21     ago.
22 Q.  And -- and in those investigations, what has your
23     role been?
24 A.  As a fire investigation -- investigator with the
25     fire departments, either volunteer-wise initially.

98 (Pages 386 - 389)

Page 390

1    And then I was also the shift investigator with the
2    City of Carmel Fire Department for ten years.
3  Q.  Have you been involved as a -- both as a -- like, a
4    facilitator at investigations, like you were in
5    this case, for all the other experts who showed up,
6    and as a participant?
7  A.  Yeah.  I've attended several joint scene
8    examinations and participated in them and also ran
9    a few of those in similar situations as this one
10    here where these -- where multiple parties are
11    involved.
12  Q.  Okay.  There was discussion earlier about another
13    expert in the case who says that he requested that
14    additional, I think it was demolition to be done.
15    And you can find it in his report, if I'm
16    misstating it at all.
17      But it's your testimony that -- that the
18    statement in Mr. Agosti's report about that is
19    false; is that correct?
20  A.  My statement of that is everybody has a chance to
21    request anything at the site to be collected
22    before -- as a site wraps up, everybody's back
23    together.  And my question to everyone is:  Is
24    there anything here that anybody wants us to
25    uncover or they want us to evaluate or they want us

Page 391

1    to take as samples or evidence, whatever, speak now
2    or -- 'cause the scene's gonna be turned back over
3    to the owner.
4      And if there's something we need to do, if
5    it's -- if it's within reason.  You know, we can't
6    collect the whole building.  But if it's in reason,
7    we would -- we would obviously collect that item
8    for that person.
9  Q.  You -- you --
10    MR. HEHNER:  His answer was -- I'm going to
11    move to strike his answer as unresponsive to your
12    question.  You asked him if it was false and he
13    never answered.
14    MR. GARDNER:  I'll object.  It's also --
15    MR. JONES:  Okay.
16    MR. GARDNER:  -- inappropriate in Indiana or
17    federal court to ask another witness whether
18    somebody else said something false.
19    MR. JONES:  Okay.
20    MR. GARDNER:  You can use the word "incorrect"
21    if you want to.
22  QUESTIONS BY MR. JONES:
23  Q.  You don't agree with that statement that we were
24    just talking about --
25  A.  No --

Page 392

1  Q.  -- is that fair?
2  A.  -- I do not.
3  Q.  Okay.
4    MR. HEHNER:  Thank you.
5  QUESTIONS BY MR. JONES:
6  Q.  At some point in your investigation you spoke with
7    Fred Jones, right?
8  A.  Yes.
9  Q.  Can you tell us what Mr. Jones told you about his
10    walkthrough at the end of the day and -- and
11    whether or not -- what way -- well, let me back up.
12    Strike that question.
13    Tell me about your conversation with Fred
14    Jones and what you learned from him.
15  A.  What he told me was that on the day of the fire --
16    and he went through basically the timeframe of the
17    situation, like, whenever they were in there
18    working, when they did some welding earlier that
19    morning, and things of that nature.
20    And then at the end of the day they're
21    required, the last hour of the day, to clean
22    everything up, sweep the floor, check and be sure
23    everything's turned off.  And also the fact that
24    they -- to be sure that the facility is locked up,
25    turn the lights off, things of that nature.

Page 393

1    And then before he goes home, his job
2    basically, he walks around the facility to be sure
3    that that -- and he went into this, the paint area,
4    to double check to be sure all that stuff was done.
5  Q.  Is it your understanding Fred Jones was the last
6    person to walk through the paint -- what we've been
7    calling the paint bay?
8  A.  Yes.  That's the last person that I have known
9    to -- prior to the fire.
10  Q.  Okay.  Based on what you learned -- well, how did
11    the information you learned from Fred Jones about
12    his walkthrough impact your investigation and
13    conclusions, if at all?
14  A.  Well, one thing that it did help was the fact that
15    there was nothing running or nothing in operation
16    inside the facility, other than obviously the
17    electricity going to the heaters for the fan blower
18    motors and things of that nature.  The lights were
19    turned off.  And as for as any electric --
20    electrical motors, things like that, or fans, they
21    were all in the off position.
22  Q.  Did you follow the scientific method throughout the
23    course of your investigation?
24  A.  In every investigation I do, and including this
25    investigation, the scientific method is always

99 (Pages 390 - 393)

Page 394

1 followed. And sometimes those -- as for as the
2 steps are concerned, it may not always be step two
3 versus step three and three versus four. Sometimes
4 we get information initially.
5    And in this particular case I was given
6 information prior to the fire that we just tuck
7 away and put on a shelf, so to speak, until we can
8 use that as a potential hypothesis. And if all the
9 evidence points to where that could be a -- the
10 potential ignition source or cause of the fire,
11 then as long as it's a -- comes underneath that
12 probable cause to suspect that, then we would
13 select that as a potential or as the probable cause
14 of the fire, based on all the evidence put together
15 and facts.
16 Q. Sure. And you mentioned earlier that you often,
17 throughout your work, reference NFPA 921; is that
18 right?
19 A. Yes, I do.
20 Q. Did you reference NFPA 921 throughout the course of
21 this investigation at effort?
22 A. I didn't obviously have the book available 'cause
23 I'm knowledgeable with the book. I've had several
24 classes. And training obviously shows that you
25 have -- and questions in regard to NFP 921. But I

Page 395

1 do read it periodically just to keep up on the --
2 some of the information as well as -- because it is
3 a unit that we need -- or a book that we use to
4 guide us in our investigations. And every
5 investigation is from day one that I've ever
6 done -- I guess not from day one because it
7 actually in '79 there was no NFPA 921 --
8 Q. Sure.
9 A. -- but since it came out and was involved in the
10 fire investigation world, since that day one we
11 have used that as a guide.
12 Q. Do -- do you have any recollection whether or not
13 in this particular case, and in this particular
14 investigation, if at any point you would have
15 referenced NFPA 921?
16 A. I've all -- obviously referenced the -- I've read
17 the certain sections of the book and so forth and
18 things of that nature. And in -- in one capacity I
19 noticed that they -- the -- Mr. Agosti, whatever,
20 referenced art mapping and other things that may be
21 used. And in 2017 that was still in the -- the
22 book. But actually in 2021 edition, they took that
23 out of the fire origin category and put it under
24 fire --
25    MR. GARDNER: Cause.

Page 396

1    THE WITNESS: Well, not fire cause. Fire
2 spread or fire -- I can't think of the name of it.
3    MR. JONES: That's -- that's okay. That's
4 okay.
5 QUESTIONS BY MR. JONES:
6 Q. Quick question --
7 A. Patterns.
8 Q. -- on the MSDS sheets for this -- that we were
9 looking at earlier. We've -- we've looked at a
10 number of MSDS sheets in this case. One of them --
11 and I don't know what exhibit number it was, but it
12 was for the Blue Sheboygan paint. Do you remember
13 looking at that?
14 A. Yes.
15 Q. Okay. Do you have any reason to doubt the
16 representations the manufacturer made in that MSDS
17 sheet?
18 A. No, I do not. The same information was actually on
19 the container itself that contained the paint.
20 Q. And -- and just to clarify. There was some
21 discussion about the level of certainty that you
22 have on your conclusions in this case. Is it your
23 testimony that you -- you hold the opinions -- or
24 strike that.
25    The opinions you hold in this case are held to

Page 397

1 a degree of fire science certainty; is that
2 correct?
3 A. Yes.
4    MR. GARDNER: Objection, asked and answered.
5 Furthermore, Plaintiff's counsel have the option to
6 contact him after seeing his report to get
7 clarification, yet they released it without any
8 statement like that initially.
9    MR. JONES: What -- what exactly is your
10 objection? Asked and answered?
11    MR. GARDNER: That's part of it, yeah.
12    MR. JONES: Okay. What was the -- all of the
13 other commentary? Is that ...
14    MR. GARDNER: Form of the -- form of the
15 question.
16    MR. JONES: Okay.
17 QUESTIONS BY MR. JONES:
18 Q. You were shown on exhibit -- Defendants' Exhibit G,
19 Page 7 -- I'm gonna put that in front of you.
20 You've got it still in front of you?
21 A. Yeah.
22 Q. It's part of your initial report. And we were
23 looking at photograph three. And you were asked to
24 identify in both photograph three and photograph
25 four where you see the paint residue that you

100 (Pages 394 - 397)

Page 398

1  observed the date that you took those photographs.
2  Do you remember that?
3  A. Yes.
4  Q. During a break I showed you these photos on a
5  digital format with increased brightness. And when
6  you observed that, were you able to more clearly
7  see the paint residue that you were referencing
8  earlier on both photograph three and photograph
9  four?
10 A. Yes, sir.
11 Q. So it's -- is it your testimony that photograph
12 three and photograph four, as represented in
13 Exhibit G, Page 7 -- it -- are you saying that it
14 doesn't allow you to -- the way these are printed
15 don't allow you to as clearly see the -- the paint
16 residue that you observed the day that you took the
17 photographs?
18 A. Yes.
19 Q. Okay. The last thing. We were looking through
20 several pictures under Defendants' Exhibit NN. And
21 these were several photos that Mr. Gardner told you
22 Rimkus took in the -- I think it was in the last
23 couple of weeks. Do you remember that?
24 A. Yes.
25 Q. Okay. And all of those photographs that you were

Page 399

1  asked about, those were all taken outside of your
2  presence, correct?
3  A. Yes.
4  Q. You were not involved in any subsequent lab exam in
5  the last couple of weeks, right?
6  A. No, I was not.
7  MR. JONES: Okay. Those are all the questions
8  I have.
9  MR. GARDNER: I just have couple really quick.
10 REDIRECT EXAMINATION,
11 QUESTIONS BY MR. GARDNER:
12 Q. Chapter 18 in NFPA 921, either Edition 17 or 21, is
13 entitled Origin Determination, isn't it?
14 A. Uh-huh. Yes, sir.
15 Q. And there's an introductory Paragraph 818.1. I'm
16 sure you've read it many times, haven't you?
17 A. I haven't totally read the '21 book at this point.
18 But --
19 Q. I'm --
20 A. -- '17 I have.
21 Q. Seventeen, okay.
22 I'm gonna read this, and tell me if you agree
23 with it. Quote, The point of origin is defined as
24 the exact physical location within the area of
25 origin where a heat source and the fuel interact,

Page 400

1  comma, resulting in a fire or explosion. Do you
2  agree with that?
3  A. I agree with the point of origin definition, yes.
4  Q. Continuing: Quote, The origin of a fire is one of
5  the most important hypotheses that an investigator
6  develops and tests during the investigation. Do
7  you agree with that?
8  A. Yes.
9  Q. Quote, Generally, comma, if the origin cannot be
10 determined, comma, the cause cannot be determined,
11 comma, and generally, comma, if the correct origin
12 is not identified, comma, the subsequent cause
13 determination will also be incorrect. Do you agree
14 with that?
15 A. Yes.
16 Q. Did you prepare an origin matric [sic] analy --
17 analysis in this case?
18 A. No.
19 Q. Did -- did you measure char depth of anything in
20 this case?
21 A. No.
22 Q. So you did not prepare a depth-of-char diagram,
23 right?
24 A. In this particular fire there's no indication of a
25 char depth would be something you could use.

Page 401

1  Because most of it was noncombustible material.
2  Wasn't wood, which usually chars. You cannot
3  measure char on metal.
4  Q. Did you measure any of the char on the wood that
5  you have told us you think might have been one of
6  the things that combusted during this --
7  A. No, I did not measure any char.
8  Q. So did you not do a depth-of-char analysis,
9  correct?
10 A. No, I did not.
11 Q. Mr. Jones asked you some questions about how many
12 fire scene investigations you've done. I think you
13 said roughly 2,500?
14 A. Yes, close.
15 Q. And you've written in excess of four -- 1,400
16 cause-and-origin reports, right?
17 A. Yes.
18 Q. Okay. How many of those investigations or reports
19 involved as -- as a cause or origin of the fire a
20 closed infrared tube heater, besides this case?
21 A. I've only had one other fire that involved the
22 infrared. I don't know whether -- it was not
23 really totally closed, but it was a heater that
24 caused the fire in a -- a garage --
25 Q. What year?

101 (Pages 398 - 401)

1  A.  -- workshop garage, so to speak.  I don't know when
2      that was.  It has been a -- long time ago.
3  Q.  So it wasn't at -- wasn't it -- if it was a long
4      time ago, are we talking about one of those styled
5      like the Mo -- preexisting Modine heaters as
6      opposed to a closed infrared --
7  A.  When they -- when it first came out, the tube
8      heater, this particular tube heater was actually
9      installed too close to combustibles, which was what
10     the -- the findings of the -- of the fire was.
11 Q.  That's not your opinion in this case.
12 A.  No, it's not.
13 Q.  Okay.  There -- you probably remember seeing in the
14     Space-Ray installation manual a couple of pages
15     about distance requirements?  In other words, where
16     my -- my client's installer should locate the three
17     Space-Ray heaters in -- inside of building number 1
18     relative to the height from the floor, the space
19     between the top of the heater deflector shields in
20     the ceiling and the side walls.
21 A.  Yes --
22 Q.  You remember reading that?
23 A.  -- there is.
24 Q.  You have no basis to contradict that my client
25     followed those distance spacings as recommended by

1      the manufacturer to combustibles, do you?
2  A.  I don't have any reason to --
3  Q.  Okay.
4  A.  -- dispute that, no.
5  Q.  How many of your in excess of 1400 cause-and-origin
6      expert reports involved noncombustible water-based
7      paint --
8      MR. JONES:  Objection to foundation.
9  QUESTIONS BY MR. GARDNER:
10 Q.  -- as a -- as a fuel source?
11 A.  I've had several -- not -- as for as the paint?
12     I -- I don't know that it actual being water based
13     necessarily.  I can't -- I can't generally say that
14     anything water based has been related to a fire
15     cause and a fire spread.
16 Q.  So, in other words, in the 2500 investigations
17     and -- and in the in excess of 1400
18     cause-and-origin reports, you've never determined,
19     other than in this case, that one of the
20     combustible fuels was dry water-based paint, have
21     you?
22 A.  I have not.  And that's based on the -- on the
23     facts that I came -- came on as for as the
24     paperwork and the manufacturer's statements.
25 Q.  If I asked you this earlier, I apologize.  Thomas

1      made me think of it.
2      But you did not, and neither did Rimkus,
3      process the store -- the area of the storage room
4      in the most extreme south end of the building
5      number 1 shown on Defendants' Exhibit Z-2 -- Z-2,
6      correct?
7  A.  We didn't --
8      MR. JONES:  Objection to form.
9      MR. GARDNER:  You didn't process that --
10     MR. JONES:  You can answer.
11     MR. GARDNER:  -- as part of the space.
12     THE WITNESS:  We did not process that --
13     process that area.  And no one present at the scene
14     requested that area to be processed.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Based on your memory, huh?
17 A.  No.  I mean, that's -- that was for facts.  That's
18     not just my memory.
19     MR. GARDNER:  That's all I've got.
20 QUESTIONS BY MR. HEHNER:
21 Q.  Have there -- sir, have there been investigations
22     where you could not determine the origin of the
23     fire?
24 A.  Yes.  There has been information --
25 Q.  Have -- have there been investigations where you

1      could not determine the cause of the fire?
2  A.  Yes.
3  Q.  Is it common?
4  A.  Fairly common --
5  Q.  Okay.
6  A.  -- yes.  It's not always common.  But it's -- it's
7      something that, obviously, if you come up with a
8      couple of -- of hypotheses that you can't really
9      rule out either one without a certain -- certain
10     degree of certainty, I guess you could say, then
11     you would have to list it as an undetermined fire,
12     which is no longer obviously being utilized by
13     NFPA.  But --
14 Q.  This may not be possible.  But is there -- can you
15     give me a percentage?  Is it half the time?  Is
16     it -- is it 25 percent of the time?  Is it -- do
17     you have an opinion?
18 A.  I think in -- in the past it probably was about
19     half the time.
20 Q.  All right.
21 A.  But now it's becoming more -- less than that
22     because of the fact -- because of videos and things
23     like that.  And a lot of -- a lot of fires anymore
24     are basically -- almost video is a good thing.  So
25     it's be -- we get surveillance videos, security

Page 406

1 videos, and things like that.
2 MR. HEHNER: That's all I have. Thank you
3 very much.
4 MR. JONES: Good?
5 MR. HEHNER: Anybody else?
6 MR. JONES: I'm good.
7 MR. HEHNER: Off the record. We done?
8 MR. GARDNER: Yeah.
9 MR. JONES: Good.
10 THE VIDEOGRAPHER: This ends media six and
11 concludes the deposition. The local time is
12 6:39 p.m. We are off the record.
13 (A discussion was held off the record.)
14 THE STENOGRAPHIC REPORTER: Do you want
15 signature?
16 MR. JONES: We do, yes.
17 THE STENOGRAPHIC REPORTER: And your orders.
18 MR. HEHNER: Electronic for me with -- with
19 exhibits.
20 THE STENOGRAPHIC REPORTER: Same?
21 THE VIDEOGRAPHER: Similarly I need to know
22 wants videos.
23 MR. HEHNER: I'm sor -- I do not want a video.
24 I don't know who does.
25 MR. JONES: I'll get back to you.

Page 407

1 THE VIDEOGRAPHER: You have a card.
2 MR. JONES: Yeah. So no for now.
3 MR. GARDNER: I have to get back to you too.
4 THE VIDEOGRAPHER: You've got my card, and it
5 has the case number when you call to order.
6 THE STENOGRAPHIC REPORTER: And you want
7 electronic, Marty?
8 MR. GARDNER: Yes.
9 MR. JONES: Same.
10
11 AND FURTHER DEPONENT SAITH NOT.
12 (6:42 p.m.)
13
14 _____
15 JAMES P. FOSTER, CFI, CFEI, CVFI
16
17
18
19
20
21
22
23
24
25

Page 408

1 STATE OF INDIANA )
2 ) SS:
3 COUNTY OF HAMILTON )
4
5 I, Lisa C. Pierce, a Notary Public in and for
6 the County of Hamilton, State of Indiana at large,
7 do hereby certify that JAMES P. FOSTER, CFI, CFEI,
8 CVFI, the deponent herein, was by me first duly
9 sworn to tell the truth, the whole truth, and
10 nothing but the truth in the aforementioned matter;
11 That the foregoing video deposition was taken
12 on behalf of the Defendants at Lewis Kappes, One
13 American Square, Suite 2500, Indianapolis, Marion
14 County, Indiana, on January 24, 2023, commencing at
15 the hour of 11:16 a.m., pursuant to Rules of
16 Applicable Procedure;
17 That said video deposition was taken down in
18 stenographic notes and afterwards reduced to
19 typewriting under my direction, and that the
20 typewritten transcript is a true record of the
21 testimony given by said deponent; and thereafter
22 presented to said deponent for his signature;
23 That the parties were represented by their
24 aforementioned counsel.
25 I do further certify that I am a disinterested

Page 409

1 person in this cause of action; that I am not a
2 relative or attorney of any party, or otherwise
3 interested in the event of this action, and am not
4 in the employ of the attorneys for any party.
5 IN WITNESS WHEREOF, I have hereunto set my
6 hand and affixed my notarial seal this 1st day of
7 February, 2023.
8
9
10
11
12
13 N O T A R Y   P U B L I C
14
15
16 My Commission Expires:
March 14, 2029
17
18 County of Residence:
Hamilton
19
20
21
22
23
24
25

103 (Pages 406 - 409)

Page 410

1  Thomas Jones, Esq.
2  tjones@lewiskappes.com
3           February 1, 2023
4  RE: Republic Services Of Indiana Limited Partnership v. Coe
5     1/24/2023, James P. Foster , CFI, CFEI, CVFI (#5675427)
6     The above-referenced transcript is available for
7  review.
8        Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19     If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 412

1  Republic Services Of Indiana Limited Partnership v. Coe Heating
2  James P. Foster , CFI, CFEI, CVFI (#5675427)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, James P. Foster , CFI, CFEI, CVFI, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  James P. Foster , CFI, CFEI, CVFI            Date
13  *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 411

1  Republic Services Of Indiana Limited Partnership v. Coe Heating
2  James P. Foster , CFI, CFEI, CVFI (#5675427)
3     E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  James P. Foster , CFI, CFEI, CVFI            Date
25

Veritext Legal Solutions

800-567-8658                                                    973-410-4098

**[& - 18th]**                                                    Page 1

| & |
|---|
| **&**   1:7 2:10,15 5:13,17 6:5 83:11 |

| 0 |
|---|
| **00108**   1:3 5:16 |
| **00632**   306:20 309:22 |

| 1 |
|---|
| **1**   34:24 55:9 56:7 57:21,22 58:6,21 59:10 59:18 60:5,12 62:5 63:4 64:2 64:18 72:24 76:23 107:10 107:15 113:4 113:17 114:12 116:13 138:3 147:4,10 152:22 154:10 156:1 158:25 159:21,23 160:22 161:10 162:6 163:13 163:20 164:13 165:10 166:2 167:15,22 168:4,5,14 169:3 176:4 178:7 179:18 181:1 195:25 198:19 212:9 216:5,10,21 |

217:11 222:1
232:20 264:13
265:22 267:16
272:10,17
274:5 277:17
279:19 280:4
294:20 313:8
316:8 333:1
402:17 404:5
410:3

**1,000**   88:18 89:14

**1,400**   401:15

**1/24/2023** 410:5

**10**   134:9 135:2 158:4 235:12 235:18 239:12 290:11,20 305:18 323:9

**100**   207:10 337:2,3,8,24 338:2,6

**101**   333:4,10 334:19 337:11

**1033**   70:2,8 92:3

**10:00**   60:22

**10:50**   183:7

**10th**   62:24 63:2 77:23,24 78:5 78:12,13,19 113:10,12 148:2,4 238:23 270:3 291:6,11

291:20 292:15
294:12 297:3
297:21 304:2
305:1 307:17
309:3 311:14
353:9,25
364:18 373:4
373:11

**11**   158:16 184:10 265:25 266:13

**112**   341:25 342:1

**114**   342:10,19

**115**   342:25

**116**   319:24 345:7

**117**   2:11 345:3 345:15 346:5

**11:00**   44:8,15

**11:01**   44:17

**11:16**   1:20 5:1 5:4 408:15

**11th**   313:16

**12**   138:3 306:21 320:16 346:1

**123**   16:10

**124**   347:24 348:6 352:9,14

**125**   352:20

**127**   353:11

**128**   353:18

**12:41**   84:10

**12:52**   84:14

**13**   263:18 321:4 352:17

**137**   4:5

**14**   36:20 128:11 175:7 175:11,17 259:24 409:16

**14,000**   7:19

**140**   230:8,11,11 230:19

**1400**   36:12 37:8 204:18,21 255:20 403:5 403:17

**15**   4:15 175:12 175:17 280:1

**150**   87:20 88:1 89:16

**16**   11:24 239:23 241:4 331:4,14 333:14,18,21 342:4

**17**   94:11 278:24,25 399:12,20

**17.3.1.1.**   206:11

**18**   12:4 36:24 241:17 374:18 399:12

**18.4.6**   374:19

**188**   4:11

**18th**   39:20 72:25 73:5,23

**[18th - 20th]**                                                    Page 2

74:7 93:8
121:6 126:24
198:19 355:20
**19**   36:21
244:19 245:23
**1933**   69:24
**195**   87:12
90:24
**1955**   7:7
**1965**   183:1
**1979**   36:25
37:5 70:15,21
70:25
**19th**   26:15 44:6
44:16 60:6,12
60:17,19 62:5
64:3 71:12
76:21 90:22
106:24 159:1
176:5 190:9
191:1 231:7
232:20 373:10
**1:00**   45:24
**1:21**   1:3 5:16
**1st**   409:6

**2**

**2**   2:11 4:5
54:19,25 55:9
56:18 57:4,15
73:2 76:22
116:13 126:15
127:8 139:1,1
139:13 140:8,9
152:22 153:19
169:14 170:6

171:7 189:7,9
214:13 215:14
218:1 267:5,16
277:10 278:5,9
278:11 279:14
291:23 316:8
321:22 324:16
404:5,5
**2,000**   338:17
389:18
**2,500**   401:13
**20**   4:6,7 44:6
53:8 184:4
234:8 246:16
412:15
**2000**   11:22
17:14 36:20
**2014**   4:14
**2016**   12:9
**2017**   93:4,13
374:2,15
395:21
**2018**   9:15 12:3
12:6 38:24
85:1,2
**2019**   4:12 22:7
22:8 26:17
39:17,24 44:16
45:22 48:14
51:11 52:12
53:9,22 55:15
57:20 59:17
60:6,13,17
62:6,24 63:2,2
64:3 66:17

67:18 68:6
69:9 71:13
74:16 77:24
78:5,12,19
80:13 87:11
90:4,23 93:4
106:24 113:12
121:6 126:14
127:13 147:5
148:3,4,5
159:1 176:5
190:8,10 191:1
194:11 198:19
201:18 231:7
232:20 238:23
243:18 270:3
283:9 290:11
290:20 291:6
291:11,20
292:16 294:12
297:3,21 304:2
305:1 307:17
309:3 311:14
323:9 353:9,25
364:18 373:4,4
374:11
**2020**   9:15,17,20
9:21 10:14,18
14:8 17:15
18:15 77:17,19
85:20 132:15
133:23,24
134:7 135:3,9
138:6,16 148:2
160:6,15 161:7

169:17 180:10
181:14 182:13
266:13 299:6
300:17 313:18
315:17 321:23
324:17
**2021**   7:15 9:12
93:8,11 374:8
395:22
**2022**   4:15,17
10:20 11:3
22:8 39:21
72:25 74:7
93:8 126:24
165:4 203:10
262:1 283:10
341:14 355:21
364:6 366:20
367:1 368:24
370:8,15
371:22 374:14
383:15
**2023**   1:19 5:2,4
408:14 409:7
410:3
**2029**   409:16
**20th**   44:6,7,10
44:22 45:21
48:14 51:10
52:12 53:22
55:15 57:20
59:17 63:2
68:25 69:9
75:13 76:21
87:11 147:4,19

**[20th - 5]**

373:4

**21**   70:7 101:13
399:12,17

**211**   4:16

**21173**   409:12

**22**   73:6,24 91:3
91:5,10 94:11
263:17 368:21

**225**   2:15 87:23

**235**   4:16

**24**   1:19 5:2
177:6 178:18
179:11 182:4
194:14 258:10
408:14

**248**   4:17

**24th**   5:4

**25**   89:10,18
171:3 405:16

**25,000**   85:15

**2500**   1:17 2:5
389:18 403:16
408:13

**26**   353:1

**270**   4:13

**271**   4:14,14

**276**   4:15

**28**   194:7
271:13

**281**   4:15

**2:33**   189:2

**2:45**   189:5

---

**3**

**3**   4:4,12 44:17
47:13 48:11
50:20 52:3
55:9 56:2,6,12
56:14 117:2
126:15 143:2
152:22 159:23
173:18 198:8
202:5 243:17
265:24 268:1
277:11,17
278:4,24 313:9
322:1 350:10
350:12 358:18

**3,000**   228:17,19

**3.3.131**   105:1

**3.3.42**   97:23

**3.3.58**   99:21

**3.3.80**   101:19

**3.3.95**   101:7

**30**   195:15
221:17 278:20
279:23 410:17

**311**   4:17

**315**   4:18

**317**   4:18

**317.639.1210**
2:6

**317.639.4882**
2:6

**31st**   262:1
263:17

**32**   7:18 270:18

---

**321**   4:19

**324**   4:19

**325**   4:20

**34**   4:11

**341**   4:20

**351**   4:12

**36**   262:3,5

**384**   3:4

**389**   3:5

**399**   3:7

**3:00**   45:23
50:14 51:8
52:12

**3:59**   270:11

**3rd**   39:17,24
67:18 68:6
71:14,16 74:16
77:17 90:4
93:3 126:14
127:13,25
132:15 134:7
135:9 138:5,16
160:6,15 161:6
169:17 180:10
181:14 182:13
184:4 201:18
202:24 243:18
315:18

---

**4**

**4**   55:9 56:2,6
56:12,14
152:22 182:12
198:8 218:14
277:17 280:1
282:3 283:19

---

316:8 318:2
355:21 356:6,7
357:10 364:20

**4.5**   251:24

**4.5.2.**   254:21

**4.5.3**   255:10
260:18

**404**   3:7

**43**   128:12
190:9,11 191:3
193:15,20
196:1 230:12

**44**   11:18 12:14
389:19

**46077**   7:9

**46204-2137**
2:16

**46282**   2:5 5:18

**46530**   2:12

**47**   4:4 194:5
233:2 234:11

**48**   277:5,6,6

**4:00**   46:13
48:13 50:14
111:14

**4:13**   270:14

**4th**   133:23
190:8 194:11
315:17 324:16

---

**5**

**5**   184:1,14
278:25 290:6
294:7,10 296:1
297:21 299:19
300:12 315:21

---

**[5 - able]**

315:24 316:8
**5-10** 291:9,10
**50** 88:3 233:22
234:11,15
253:14
**50s** 45:14
**51** 204:10,12
251:21 253:16
**54** 4:5
**55** 168:25
169:4,11
240:14
**5675427** 410:5
411:2 412:2
**574.233.6035**
2:12
**59** 263:17
**5:10** 328:4
**5:14** 328:8
**5:55** 370:1

**602** 310:17
**603** 303:10
304:4 305:13
305:17 307:10
310:14,18,19
345:24 346:18
**6224** 282:12
**6231** 4:15
**632** 305:9,12
306:1,8 307:10
310:12 346:2
347:2,20
**6624965** 4:10
**67** 4:12 7:5
**6:05** 370:4
**6:39** 406:12
**6:42** 407:12
**6th** 133:24
135:3 299:6
300:17 321:23

**7850** 7:9
**79** 395:7

## 8

**8** 318:20 319:9
320:1
**812.382.8559**
2:16
**818.1.** 399:15
**86** 338:9
**87** 4:10
**88** 337:7,9,14
337:22,23
338:2,3,4,8,11

## 9

**9** 60:17 70:8
72:24 94:18
146:13 155:12
282:14 303:6
304:5 307:8
320:7 324:2,6
324:8 325:1,3
**9-1-1** 153:2
154:1
**90** 144:22
**921** 66:23
67:14 69:25
70:8 81:2 82:2
82:21 91:23
92:14 93:9,12
94:18,23 95:6
95:10,15 96:9
97:5,8,23 99:4
99:21 100:17
101:7,18 105:1

251:24 253:9
254:21 260:18
261:17 293:8
293:13 302:21
316:17 344:1,4
373:24 394:17
394:20,25
395:7,15
399:12
**93** 329:15,16
**94** 325:15
327:23 328:10
330:12 331:22
**96** 332:6
**97** 331:23
332:1,2,5,10
**98** 332:14
**99** 329:19
332:21
**9f** 94:18

## a

**a.m.** 1:20 5:1,4
408:15
**aa** 4:16 211:3,4
211:5,7,10
212:6 213:7
214:13 215:14
218:14 234:18
**abbreviation**
299:11
**ability** 13:22
**able** 30:4 32:3
43:3 50:1
61:21 63:12
69:1 102:15

## 6

**6** 3:3 220:4
221:17 234:18
290:19,25
291:1,2 292:9
294:7 297:16
298:19 299:25
300:12 316:14
318:10 323:13
366:13 368:24
**6-189.9** 4:14
**60** 172:18,18,24
233:9 264:13
278:20 279:24
306:1

## 7

**7** 4:11 34:24
90:21 184:20
185:19 186:17
290:24 300:16
318:13 324:3
361:1,3 362:16
363:11 364:4
364:22 366:13
397:19 398:13
**7-3** 7:7
**70** 172:15
**72** 4:4
**75** 172:15
233:9,16

111:6 198:22
238:1 260:21
267:23 272:20
274:22 398:6
**above** 174:2,11
175:2,3,3
215:22 280:12
410:6 412:7
**acc** 27:20
**accept** 383:25
**acceptable**
260:22
**access** 22:23
27:20 63:22
275:16,18,20
**accidentally**
202:19
**accommodate**
13:18
**account** 199:1
235:1 239:13
**accumulate**
224:24
**accumulated**
128:17 221:7
289:9
**accumulating**
144:25
**accuracy**
109:16 410:9
**accurate** 70:3
185:11
**accurately**
138:14

**acetylene** 59:18
59:21 60:4
225:7,16
226:24 228:12
234:22
**acknowledge...**
412:3
**acknowledg...**
410:12
**acloss** 152:10
**act** 284:10
**action** 5:22
409:1,3
**activated**
232:21 376:4
**active** 374:5
**activities** 55:16
66:25 314:5
**actual** 143:24
249:5 403:12
**actually** 11:20
16:25 37:9
43:17 44:8
45:23 49:5
50:3 51:22
64:8 71:12
85:15 86:2,23
87:2 94:2
118:4,6 121:17
128:20 133:4
143:4 156:16
182:5 193:25
200:11 204:13
217:9 222:9
225:25 233:18

284:10,18
299:25 301:22
304:14 305:14
333:2 334:4
377:18 385:10
387:13,15
395:7,22
396:18 402:8
**add** 135:21
251:4 258:1
**addition**
327:22
**additional**
63:11 73:6,13
73:17 74:12
85:15 86:2
127:23 134:16
191:7 322:21
390:14
**additions** 412:6
**additives**
229:22
**address** 7:8,8
7:17 16:10
53:14 68:6,15
68:16,17
**addressed**
254:5
**adequately**
363:1
**adhered** 122:24
125:3
**adjuster** 29:3
**adopted** 80:24

**advised** 76:10
77:3 79:25
**aerial** 4:4,5
**affect** 13:22
175:24 176:1
179:6 256:11
309:16 382:19
**affected** 207:8
209:10 382:15
**affects** 177:2
**affiliations** 6:2
**affixed** 409:6
**aforemention...**
408:10,24
**afternoon**
45:23 46:13
51:9
**afterthought**
386:9
**ago** 11:7,14,15
11:19 14:1,17
16:6,13 21:10
28:17 303:7
389:21 402:2,4
**agosti** 22:3,4
25:18 395:19
**agosti's** 22:11
23:9 49:11
390:18
**agotti** 22:1
**agree** 5:9 69:23
96:9 97:4,8
98:10 99:3,21
101:2,6,18,25
103:3 104:2

105:5 110:13
110:17,23
128:1 163:8
173:22 205:3
205:16,22,24
206:7,24 207:2
252:16 253:1
254:24,25
255:3,13,23
256:1 313:8
359:2 375:1,6
375:12 391:23
399:22 400:2,3
400:7,13
**agreed**  309:19
**agreement**
  119:6
**agrees**  100:3,5
  100:13,23
**ahead**  53:19
  61:12 62:16,17
  63:9 68:22
  72:22 125:22
  198:7 209:19
  227:18 237:23
  308:14 309:19
  322:18,22,25
  329:10 344:18
  350:19 365:14
  378:23 386:19
**aiming**  214:15
**air**  1:7 5:14 6:5
  64:12 76:8
  83:12 96:23
  120:20 128:11

141:10 144:23
159:13 168:3,4
168:5,9,10,15
176:16 180:20
181:22 195:19
196:2,5,6
197:3,9,12,16
198:16 199:17
231:2 259:24
**airless**  159:6,10
  178:20
**airport**  7:21
  233:4
**aisle**  47:4
**al**  5:14
**alerted**  152:12
**alleged**  139:15
**allegedly**
  212:20
**allotted**  410:20
**allow**  176:20
  259:23 398:14
  398:15
**allowed**  38:18
  137:9 191:17
**allows**  195:8
**alternate**
  110:18
**alternative**
  74:24
**alternator**
  294:1
**amended**  4:6,7
  20:9

**american**  1:17
  2:4 408:13
**amount**  69:2,5
  89:13 133:3
  138:21 186:18
**amounted**
  378:5
**amounts**
  138:23
**analy**  400:16
**analysis**  98:7
  101:21 110:20
  252:12 374:19
  374:22,25
  375:16 400:17
  401:8
**analyzed**
  127:24
**ang**  179:3
**angle**  320:23
**answer**  12:25
  13:18 32:11
  55:16 57:6
  82:3,8 89:3
  94:6 95:24
  102:19 104:1
  108:15 111:9
  153:11 227:16
  233:8,10 238:3
  248:6 254:17
  263:8,11
  264:10 273:20
  287:3,4 296:6
  310:14 317:1
  336:19 340:13

341:8 365:7
367:12,21
378:21 379:17
382:1 384:19
385:18 391:10
391:11 404:10
**answer's**  13:4
**answered**
  56:14 154:13
  188:20 213:3
  213:24 232:3
  244:3,6 254:15
  259:10 262:24
  274:10 287:7
  287:11 289:25
  330:16 347:22
  355:5 377:5
  379:25 380:1
  391:13 397:4
  397:10
**answering**  82:4
  93:20 102:20
  354:22 367:19
  367:20
**answers**  82:5
  347:4 379:18
  384:8,20
**anti**  343:12
**anticipated**
  312:24
**anybody**  26:7
  48:16 52:7
  78:7 115:8,23
  183:15 187:11
  202:3,4 225:3

225:7 245:9,10
390:24 406:5

**anymore**  35:11
83:5 125:5
368:25 405:23

**anytime**  284:15

**anyway**  210:1
272:11 276:19

**apart**  330:25

**apologize**  24:2
42:22 54:18
57:16 69:20
91:10 143:9,16
149:13 158:2
246:24 259:3
276:16 307:8
313:21 403:25

**apparently**
39:3 143:8
202:23 211:23

**appear**  33:4,7
50:21 138:7
360:13

**appearance**
5:25

**appearances**
6:1 19:23
96:11

**appeared**  263:4

**appears**  139:7
141:2,2 161:2
215:21 217:4
291:22 318:8
319:1 321:8
325:10

**appended**
412:7

**applicable**  1:20
408:16 410:8

**application**
252:14

**applied**  94:15
109:7 247:13

**appreciate**
20:14

**approach**
91:21

**appropriate**
110:20 273:15
314:6

**approval**
299:12,13

**approve**  299:10

**approved**
299:15,18

**approximately**
13:25 17:11
48:13 58:4
66:15 68:20
88:18 111:21

**arc**  375:16,17

**architectural**
206:15

**area**  15:13
31:25 32:3
47:24 48:2,5
56:19 58:17
76:11 95:10,13
111:14 112:5
116:23,24

117:11 131:9
133:10,11
139:18,19
140:23 180:23
181:6,6 201:11
207:9 209:12
223:21 226:9
239:16,16,17
241:14 242:24
243:1 245:6,9
245:10,13,16
245:18 246:4
246:14 250:5
295:14 303:24
305:14 306:7
310:4 320:13
327:9,10,12
330:23,23
335:22 346:25
347:8 361:8
362:8 365:1,21
369:3 375:5
379:7 381:7
387:21,22
393:3 399:24
404:3,13,14

**areas**  86:5
98:17 121:16
170:2 201:12
217:8,10
236:24 237:12
238:17 251:9
309:17 327:7
327:11 369:5
379:13,15

**argino**  115:2

**arizona**  68:14

**aromatic**  126:7
126:10,11
223:23

**aromic**  126:7

**arrival**  43:19

**arrived**  50:8,12
51:2 52:11

**arson**  19:19

**art**  395:20

**aside**  25:20,21
36:3 75:7
89:17 314:4,7

**asked**  9:3 28:25
32:17 48:25
49:2 50:2 51:5
70:20 74:5
75:14 83:8
92:6 103:9,10
114:7,8,8
132:16 154:12
186:11 187:13
187:15 188:20
212:11,16
213:3,23 232:3
244:3,6 246:10
254:15 259:9
262:24 274:9
279:16 289:24
313:5 330:15
340:16 347:22
355:5 357:20
367:5,15,16,17
377:4 379:25

386:10 391:12
397:4,10,23
399:1 401:11
403:25
**asking** 22:13
41:13,13 60:25
82:7 88:19
92:11 95:19,20
95:20,21 100:2
100:3,5,12,23
103:4,7 136:7
136:16 191:20
192:21 284:23
287:5 292:8,8
310:1 314:7
325:25 335:8
337:22 351:13
351:21 368:2
371:16,16
372:7 376:20
378:1
**aspect** 9:8
62:11 107:6
124:2 185:3
187:5 254:6,8
286:18 302:7
**aspects** 111:9
**asphalt** 165:24
166:1,1,6
**assemblies**
222:6
**assembly**
304:10,13
306:4,19
312:18 334:10

367:6
**assessing**
252:10
**assignment**
68:21
**assist** 281:22
**assisted** 120:14
**associated** 75:3
129:8
**associates**
21:25
**association**
91:23 94:18
**assume** 40:20
80:22 91:2
154:15 164:21
184:16 322:10
330:1
**assumed** 61:21
75:3
**assuming**
154:15 174:5
185:6 190:16
193:17 214:20
240:23 288:20
328:17 339:13
350:12 376:2
**assure** 343:10
**attached** 20:18
25:17 240:19
410:11
**attempt** 63:25
285:25 316:5
**attempted**
123:15 153:1

**attempts** 63:3,6
**attend** 45:8
114:7,8
**attendance**
187:8,9
**attended** 390:7
**attention**
168:22 270:17
319:9
**attest** 121:11
121:13 258:23
328:22 329:2
340:3 354:3
**attorney** 6:3
16:12 17:23
18:3 409:2
410:13
**attorney's** 17:1
**attorneys** 27:23
47:9 264:24
367:6 409:4
**attributable**
136:14
**attributed**
188:6
**audio** 5:7 49:17
52:22 65:14
**august** 366:20
366:24 368:21
370:8,15
371:21 372:9
383:15
**automatic** 95:2
**availability**
358:14

**available** 41:11
43:2 62:13,17
77:11 81:6
135:25 202:1
212:11 312:9
344:17 347:13
369:21 386:20
394:22 410:6
**avoid** 110:13
110:16,17
293:19
**avoided** 110:4
**aware** 34:4
107:13 142:7
153:4,7,12,19
153:22,25
160:11 165:17
167:19 193:5,8
231:6,8 317:12
317:18 334:3
**awe** 175:2

| **b** |
|---|

**b** 1:8 140:13,20
221:17 290:13
290:16 291:20
291:23 292:9
293:3 294:20
297:23 298:14
298:18 301:25
304:11 305:5
308:7 335:24
338:25 339:3
341:3 344:22
348:22 385:5
409:13

**b'laster** 248:9 249:16,22

**back** 16:15 27:25 42:1 45:11 52:20 61:9 62:12 63:14,17,20 73:24,25 76:23 81:7 84:15 132:21 136:23 162:22 167:12 168:14 171:2,2 176:16 177:10 177:12 178:19 194:10 223:8,9 234:18 235:3 238:1 244:19 270:16 322:5 331:2 339:21 340:3,5,9,16,20 340:21,22,24 341:5,15 345:7 351:4 352:8 366:4 386:21 390:22 391:2 392:11 406:25 407:3

**bad** 129:1 324:24

**baked** 122:11 237:14 369:11 369:12

**barely** 165:10

**barrel** 239:12

**base** 70:1 146:3 287:22 377:9

**based** 102:12 108:9 109:16 111:9 113:23 142:16 148:21 173:25 177:25 186:25 199:24 204:24 209:20 227:8 231:11 234:1,2 238:1 244:13 245:5 249:3 255:14 255:15,21 257:18 258:10 265:1 285:15 286:4 288:10 289:13 292:3 384:20 393:10 394:14 403:6 403:12,14,20 403:22 404:16

**basic** 41:20,21 69:25

**basically** 8:12 41:18 54:6,15 55:25 85:7 86:17 95:2 96:4,22 106:2 113:2 116:12 122:11,15 125:2,4 145:13 175:1,2 187:5 195:2 200:2,9 200:9,13 201:2

207:7 286:10 288:4 321:1 328:18 338:11 343:10 358:12 379:9 382:3 387:3 392:16 393:2 405:24

**basing** 199:5 201:16 381:24

**basis** 7:12 9:2 89:23 111:16 174:18 228:24 402:24

**bates** 23:15,15 24:3,6 303:10 309:22 345:23 346:1

**bay** 129:22 130:17,24 131:9 138:15 138:16,17 170:2 221:18 379:24 393:7

**bays** 165:14

**bearing** 145:12

**becoming** 133:11,12 405:21

**bed** 106:21

**began** 11:20 24:3

**beginning** 6:2 11:21 24:7 88:6 281:15

**begins** 84:13 189:4 270:13 328:7 370:3

**behalf** 1:16 285:24,25 322:4 349:13 408:12

**belief** 124:18 341:1

**believe** 9:12 17:11,15 34:21 34:22 44:17 45:4 50:16 51:17 58:4 59:12 77:17 78:23,24 79:23 80:13 84:25 130:8 131:5,7 131:8 133:5 157:5 158:13 194:7 195:3 218:7 219:8 230:16 232:12 241:15 244:11 245:6 257:9,11 257:12,20 265:18 270:4 289:9 304:16 315:19 321:9 323:22 329:18 333:23 335:23 356:24 366:17 368:17 370:6 370:11 384:15 387:11,12

**believed**  257:21
**bell**  68:7,18
  69:18 75:9,11
  76:6 118:8,11
  118:12
**ben**  2:14 6:8
  47:8 54:19
**ben's**  331:8
**beneath**  162:1
  172:22 321:7
**best**  13:2,4 32:5
  102:11 128:14
  128:16 205:18
  205:22 344:12
  344:14
**better**  200:12
  255:24
**beyond**  380:11
**bias**  110:1,2,17
**bid**  272:15,19
  274:4,17,20,21
  275:19 279:17
**bids**  281:1
**big**  76:24
  112:20 129:22
  251:19
**biggest**  58:9
**bill**  16:22
**billable**  87:15
**billed**  87:11
**billing**  62:22
  90:20 134:4
**binder**  41:3
  157:22 220:6
  311:19 350:10

**binders**  137:24
  347:25
**birth**  7:6
**bit**  13:2 157:8
  205:8 261:24
  286:17
**black**  352:21
**blackened**
  96:11
**block**  7:19
**blower**  271:10
  393:17
**blowing**  195:21
  231:12 388:9
**blows**  180:19
  195:14,22
**blue**  106:12,15
  122:16,23,23
  122:23,24
  123:1,16,23
  124:9,18,19
  125:8,13 126:1
  128:24 130:10
  131:21 132:9
  133:13,14,22
  135:8,16
  138:19 139:2,8
  139:14,15,15
  140:5,10,23
  141:2,10,25,25
  142:2,8,8,22
  143:7,17
  145:25 146:18
  154:11 164:15
  168:25 179:7

179:19 181:15
196:24 199:23
200:20 201:1
201:10,11
213:15,20
214:19 215:10
215:15 216:2,3
218:24 219:20
221:4,7,11,19
223:22 224:6,7
224:13 225:4,5
225:9,21,21
227:2 229:2,11
229:12,21
234:19,25
236:18,21,25
237:3,5 238:4
238:5,8,13
239:11,14
284:4,9 285:18
285:25 287:16
287:16 288:14
305:25 306:2,3
306:7,10,22
315:14,14
325:10 337:12
351:9 353:14
353:22,25
361:11,14
362:17,18,23
363:15,23
364:6,10 365:2
365:4 367:9
368:3,4,25
369:5,9,11,12

369:12,12,13
369:16,17
370:11,14
371:17,22,25
372:8,11,12,15
373:8 376:3,10
376:11,16,24
377:6,13
378:13 380:5,7
380:17 382:10
382:11 383:17
383:19 396:12
**bluish**  56:9
**board**  85:9
**body**  205:24
**bohrer**  2:15
**boil**  227:10
**boiled**  125:2
  200:3,3 201:4
  201:13 226:2,3
  226:8 227:11
  227:22 230:4
  286:2 287:20
  288:1,25 289:3
  351:17,25
**boiling**  124:19
  200:8,11,11
  351:10,14
  352:4,6
**boils**  124:10,14
  146:3 251:17
**bold**  356:13
**bolts**  248:12
**bonus**  89:11

**bonuses**  89:17
**book**  98:4
  101:3 102:2,8
  102:25 103:8
  104:3 157:23
  253:9 257:24
  394:22,23
  395:3,17,22
  399:17
**bookshelf**
  251:5
**booth**  180:23
  180:25 181:4,5
  251:11
**booths**  251:9
**bottom**  76:24
  116:6,12
  138:20 139:10
  155:13 168:21
  183:6,9 202:6
  213:21 215:12
  272:24 297:4
  326:25 332:8
  333:5 334:18
  364:15,20
  366:10 368:23
**bottoms**  307:6
**bought**  183:1
**box**  112:10
  118:18 119:7
  121:19 185:22
  194:21 195:12
  195:13,13
  199:25 200:25
  200:25 219:13

293:24 334:10
371:10,11
383:12,13,22
387:19,20,20
387:23
**boxes**  118:19
  118:22,23
  121:7 146:7
  185:22 200:16
  219:13,20,23
  359:12 383:15
**brand**  198:13
**break**  13:16
  136:19 188:25
  270:7,16 398:4
**breakers**
  185:21
**breaks**  13:14
  84:7
**brief**  84:12
  189:3 270:12
  328:6 370:2
**briefly**  212:15
**bright**  201:10
  201:11 239:14
  361:14 362:23
  364:10 369:9
  369:11,16
**brightest**
  355:16
**brightness**
  364:8 398:5
**bring**  24:23
  25:1 57:23
  113:19 136:7

168:4
**broad**  14:20
**broke**  370:6
**brought**  168:3
  168:9,10,15
  182:20 245:24
  335:16 374:17
**brush**  365:25
**bs**  302:12
**building**  46:15
  46:18,23,24,25
  51:23,24 52:1
  54:7,9,10,10,12
  54:14 55:20
  56:7 57:4,15
  57:21,22 58:6
  58:14,21 59:10
  59:18 60:5,12
  62:5 63:4 64:2
  64:18 76:10
  106:25 107:10
  107:15 112:6
  112:14,16
  113:4,16 114:6
  114:12 128:18
  129:17,18,23
  135:21,22
  136:24 137:4
  141:19,24
  145:2,12 147:4
  147:6,10
  152:22 153:14
  153:19 154:10
  154:17 156:1
  157:12 158:25

161:12 162:5
162:17 163:6
163:13,17,18
163:19,20
164:13 166:2
167:15,22
168:4,5 169:3
175:6 176:4
177:2 178:6,6
179:17 181:1
181:25 183:1
183:12 185:20
186:24 195:25
197:25 198:8
198:19 207:7
212:9 216:5,10
216:10,15,21
217:5,8,10,25
218:3 221:14
222:1 224:25
232:19 243:2
243:13 246:5
246:13 250:19
250:23 251:1
262:10,13,14
262:18 263:21
264:1 266:7
269:13 272:10
272:16 273:11
274:5,5 277:10
277:11,17,21
278:4 279:19
280:4,10 281:3
376:21 377:3
380:13,15

388:15 391:6
402:17 404:4
**buildings** 46:21
55:17,18 56:2
56:14 197:20
197:21,24
277:17
**bulk** 374:13
**burden** 375:8
**burn** 52:1
285:17,25
377:3 383:22
383:24
**burned** 51:25
52:1 96:11
239:12 241:9
269:8 377:1
**burner** 120:24
121:7,17
199:25 200:16
365:10 383:14
383:22
**burners** 387:13
**burning** 121:18
151:21 387:15
388:6
**burns** 230:16
376:6
**burnt** 96:7
201:14 239:20
**business** 6:9
7:17 384:6
**byproduct**
241:7

**c**

**c** 1:14 2:1 4:10
45:3 87:4,5
90:21 134:4
135:2 154:11
223:18,18
266:1,6,6
290:13,16
291:20,23
292:9 295:7
297:23 298:14
298:22 308:7
316:8,8 326:25
328:19 330:18
331:5,13,25
332:14,23
333:2 335:21
335:24 337:17
338:25 339:4
341:3 344:23
385:5 408:5
409:13
**calendar** 11:11
12:5
**call** 6:25 7:3
13:16 21:9
46:2 80:2,14
193:24 317:15
407:5
**calle** 65:22,24
66:1 156:17,22
172:6 226:23
234:21
**called** 9:6 15:15
21:12 54:1

64:8 84:24
138:5 154:1,5
220:20 223:4
272:14 275:19
387:19
**calling** 393:7
**calls** 154:4
162:24 169:21
170:17 184:24
194:17,25
195:7 230:13
339:24 387:19
**camera** 48:7,9
363:16 365:15
**cans** 107:14
169:8 171:15
171:20,21
208:2 223:3,7
246:18 249:15
249:22 267:15
267:22 291:20
292:15,16
293:5 294:8
300:8,9 308:7
311:8,9,13
321:16 322:13
334:24 335:23
338:16,18
339:21,22
340:2,5 341:2
341:16,17
343:22 344:22
354:14,14,16
354:23,25
385:12

**capable** 97:6,11
**capacity** 82:16
395:18
**carbonaceous**
96:10
**card** 407:1,4
**cardboard**
219:15,17
**cards** 385:5,5,5
**care** 12:23
145:16
**career** 12:13
18:19,24 36:19
301:11 389:16
**careers** 6:25
**carefully** 274:3
284:22
**carmel** 8:21
390:2
**carried** 44:11
**case** 1:3 5:16
6:24 10:15,20
11:1,7 12:17
14:3,7,10,16,21
16:5 17:19
18:6,9 19:18
21:9,20 22:5
22:22,23 25:24
27:23 28:15,20
28:23 29:5,6
29:12,23 31:19
32:20,21 33:8
34:15,18 35:4
35:25 38:3,9
38:13 40:8,15

41:1,6,16,19
43:1 45:8
46:22 47:10
49:15 59:25
60:3 64:9
68:10 69:19
73:7,19,22
87:6,12,15
88:7,23 89:1
91:20 99:1
102:4,5 104:12
105:11 108:6
108:12 110:6
114:3 117:24
123:19 124:17
125:1,7 133:21
136:1,22
137:10 144:12
150:10 179:9
186:16 194:2
195:25 197:2
204:12 205:11
206:13,16,19
206:22 207:2,6
208:14,25
216:19 231:6
234:21 249:11
255:11 256:8
258:3,19 271:6
271:20 281:16
282:12 283:6
284:3 285:10
286:13 289:5
302:11 307:21
313:23 329:8

336:9 344:15
348:22 349:13
350:15 353:24
360:15,18,22
364:5 390:5,13
394:5 395:13
396:10,22,25
400:17,20
401:20 402:11
403:19 407:5
**cases**   10:2,11
10:13,19 19:21
19:24 28:2,4
28:12 29:16
32:6,9,11,13,15
36:7 38:1,10
38:15 88:6
89:25 185:17
282:15,15
315:1 329:8
348:25
**casting**   110:21
**catch**   62:13
90:16,18
141:12 200:1
202:23,24
203:25 225:21
227:3 230:25
244:11,18
380:19
**categories**
93:18
**category**   308:2
395:23

**caught**   15:14
17:8 72:3,5
199:25 200:24
376:18 380:17
381:20
**cause**   12:17
14:9,11,25
15:19 19:9,14
30:2,6 36:12
36:19 37:2,6
38:2 43:14
68:22 70:13,13
71:17 73:23
74:3,8 75:15
75:16 76:2,5
77:10,24 82:2
83:20 104:22
106:2 108:25
109:1,15,15
110:11 111:7
114:24 115:19
117:1,9,16
121:13 141:24
144:21 145:25
148:25 150:9
152:17 155:21
165:2,7 167:2
170:3 174:23
178:3 186:10
186:11 187:14
187:15 200:21
205:4,21
209:11 231:9
233:21 234:6
237:12,25

239:16 240:10
241:1 245:21
268:24 276:17
280:18 286:16
286:20 293:8
297:13 308:25
310:9 312:23
326:9 330:2,3
334:20 350:15
350:22 372:17
377:10 379:9
383:22 384:14
388:23 391:2
394:10,12,13
394:22 395:25
396:1 400:10
400:12 401:16
401:19 403:5
403:15,18
405:1 409:1
**caused**   67:7
200:21 247:14
320:12 376:4
384:23 401:24
**causes**   112:21
195:2,4
**cc**   4:16 235:17
235:18 239:13
241:4,17
244:19 245:23
245:23 246:16
**ccc**   235:10,15
235:16
**ccmsi**   4:10
74:19

**ceil** 142:5
**ceiling** 135:23
  139:3 140:4,5
  140:11 141:6
  143:14 152:2
  179:19,20
  202:8 213:6
  215:15 216:5
  250:4,10,11,13
  250:18,19
  263:5 280:6,23
  280:23 381:7
  402:20
**ceilings** 387:10
**cell** 183:12
**center** 54:16
  144:1 209:3,9
  223:4,5 240:7
  294:21 304:8
  318:23 321:7
  370:22
**centered**
  356:13
**central** 246:8
**cert** 137:12
  205:10
**certain** 20:19
  32:2 104:14
  106:22,22
  114:5 144:25
  149:22 193:2
  193:10 194:14
  205:8 207:5,6
  230:25 289:15
  289:17 316:6

380:24 395:17
405:9,9
**certainly**
  190:21
**certainty** 15:7
  15:25 16:1
  30:20,21 31:3
  31:4 109:20,21
  205:10 251:25
  252:2,7,13,19
  252:20,24
  253:6,11,12
  254:22 255:1,7
  255:8 257:3
  260:20,22,24
  260:25 261:5
  261:10,13
  286:11,13
  289:16,17,21
  290:5 396:21
  397:1 405:10
**certification**
  8:14 70:23
**certified** 70:15
  70:20
**certify** 408:7,25
**cetera** 316:9
**cfei** 1:13 6:15
  407:15 408:7
  410:5 411:2,24
  412:2,4,12
**cfi** 1:13 6:15
  90:8 407:15
  408:7 410:5
  411:2,24 412:2

412:4,12
**chain** 299:19
  299:19
**chance** 390:20
**change** 36:16
  93:24 127:4
  231:4 244:14
  244:16,18
  297:2,3 352:3
  411:4,7,10,13
  411:16,19
**changed**
  126:25 192:22
  192:23 193:1
  286:16 301:9
  302:8,18 303:3
  317:3
**changes** 92:25
  93:11,15,17
  94:1,4,9,10,13
  193:7,8 231:8
  250:25 301:14
  410:10 412:6
**changing** 93:1
**chapter** 374:18
  399:12
**char** 95:16 96:3
  96:10 400:19
  400:22,25
  401:3,4,7,8
**charge** 301:18
  302:4 338:17
**charging** 87:17
**charles** 34:8

**charred** 96:6
  185:21
**charring**
  364:23
**chars** 401:2
**check** 76:3
  145:5 200:7
  209:20 231:18
  231:20 234:13
  234:15 392:22
  393:4
**checked** 64:8
  194:3
**checking** 130:4
**chemical** 96:22
  99:23
**chemist** 200:7
  249:11,13
  287:17
**chicago** 11:7
  13:25 16:9
  17:21 18:21
  113:23 260:10
**choice** 200:13
**cigarettes**
  236:15
**circle** 27:25
  48:5,12 138:23
  139:1,15
  140:10 142:22
  363:14 365:14
**circled** 140:19
**circles** 143:18
  366:3

circling 140:18
circuit 173:19
  174:8
circulate
  180:19
circulated
  276:17
circulation
  177:1 181:24
circumstance
  167:9
circumstances
  190:22 193:16
  196:13 207:5
  227:7 231:1,9
  375:8
city 8:21 390:2
clad 56:2
claim 30:14
  122:6 140:22
  333:16 354:16
  372:9
claiming
  362:19
clarification
  397:7
clarify 100:2
  328:15 337:18
  396:20
clarity 334:7
class 124:8,8
  151:19,20
  200:5,5 227:11
  227:12 229:6,6

classes 81:17
  394:24
classify 223:18
clean 221:18
  225:13 310:25
  392:21
cleaned 32:1
  145:17 221:18
clear 64:15
  213:12 214:10
  219:11 323:6
  385:22,24
  389:14
clearly 144:13
  398:6,15
clendening
  2:15
client 83:11
  87:11,17 114:8
  120:13 190:6
  194:16 196:9
  200:17 212:19
  246:10 314:3
  315:7 360:4,11
  367:8 387:18
  402:24
client's 384:10
  402:16
clients 257:12
climb 131:19
  132:12
climbed 121:6
  198:21
clock 57:2

clogged 196:24
close 27:9 52:5
  52:6 127:16
  137:23 200:25
  272:1 379:13
  401:14 402:9
closed 28:23
  38:4 79:4,5
  83:12 99:24
  117:19 119:2
  120:1,4,11
  121:19 146:7
  190:7 199:7,13
  199:15 212:20
  215:4 388:4
  401:20,23
  402:6
closest 262:17
closing 29:3
clue 39:11
codefendant
  21:9
codefendants
  323:13
coe 1:7 5:13 6:5
  83:11 410:4
  411:1 412:1
coffee 12:21
coincidentally
  50:7
cold 196:14
  308:19 309:3,4
  309:5,7,8
coll 128:5

collapse 221:25
  359:12
collapsed 222:2
  222:2,6
collect 109:2
  128:8 163:21
  173:9,11
  187:16 208:20
  222:24 240:12
  241:13,16
  245:1,5,15,22
  246:10 247:9
  249:15 250:6
  269:21,22
  304:24 306:13
  306:25 308:20
  313:13 315:14
  322:18,23
  327:10 329:3
  334:9 347:16
  386:19 391:6,7
collected 77:21
  78:14 110:14
  126:18 128:5
  135:8 186:18
  187:10 188:1
  207:24 223:10
  223:10 236:4
  238:17,22
  241:24 242:3
  242:14 245:10
  245:11,19,25
  246:2,11 250:7
  265:2 268:22
  291:7,9,14,16

292:19 295:11
296:9 300:11
300:17 303:20
303:21,25
304:2 306:23
312:12 313:15
316:2,7,8
318:22 322:19
322:25 324:21
325:10 327:8
327:10,12
333:17 338:24
339:9 347:15
367:23,23
383:8 390:21
**collecting**
77:20 185:3
186:19,21
208:1,6 245:13
246:8 293:14
306:17 307:4
312:24 364:17
386:3
**collection**
133:22 207:1
207:13,18,25
259:18 265:13
290:11 307:11
307:20,25
313:10 317:14
**collections**
372:3
**color**   4:4,4,5,5
4:16,16,17,18
4:19,19,20,20

106:12 362:18
**com**   167:2
**comb**   236:11
**combination**
168:7 370:23
**combine**
250:20
**combined**
202:6
**combus**   199:17
**combust**
123:15 125:13
146:1 166:11
198:16 229:3,4
285:18 358:3
**combusted**
201:8 287:17
371:25 372:1
372:13,14,17
379:23 381:14
401:6
**combustibility**
125:8 229:21
**combustible**
96:4,7 97:5
105:25 126:2
150:24 196:2
197:3 200:6
201:6 229:9
230:5 237:21
251:15,18
287:18 288:3,6
289:10 376:12
377:19 378:8
380:9 381:3,4

382:21 383:2
384:1 403:20
**combustibles**
376:18,23
381:8 402:9
403:1
**combustion**
97:6 101:8
125:14 126:2
146:7 199:18
239:15 287:19
372:11 376:2
377:3 378:2,7
381:2 382:14
**come**   8:9 10:3
10:11 24:18
26:24 50:22
61:8,14 62:12
63:14,17 75:9
109:14 119:6
140:16 175:14
177:10,12
178:19 195:8
340:5,9,24
351:4 356:21
374:25 386:10
405:7
**comes**   112:21
118:11,13
160:22 215:25
284:15 351:7
365:9 394:11
**comfortable**
64:22 118:22

**coming**   20:14
89:24 140:23
154:8,16
218:16 235:5
262:10,16,19
263:2,4,4,19
264:5,8 268:20
330:24
**comma**   90:8
105:4 127:12
252:15 375:3
400:1,9,10,11
400:11,12
**commencing**
1:19 408:14
**comment**   48:25
49:1,24 141:17
162:11 234:13
**commentary**
275:4,6 397:13
**comments**
202:12 257:21
**commission**
409:16
**common**   90:8
109:15 405:3,4
405:6
**commonly**
252:21
**communicated**
360:17
**communication**
260:5
**comp**   248:16
287:25

**company**  9:3,4
  15:15 16:22,24
  17:1,3 19:20
  30:10,13 31:2
  32:9,14 39:16
  75:4,20 76:8
  77:3,5,6,7 78:2
  78:19 79:3
  81:3 84:24
  86:24,24
  212:19 227:8
  275:8,9 357:1
  360:22 376:12
**company's**
  125:17 146:4
  287:25
**compare**  337:7
  337:22
**compared**
  93:12
**comparison**
  88:22 135:14
**compatible**
  377:25
**compensated**
  39:15
**competent**  97:9
**competitor**
  212:19
**complaining**
  192:16
**complete**  35:9
  412:8
**completed**
  10:22 60:21

410:17
**completely**
  167:2 199:7
  222:2 226:4
  336:12
**completion**
  83:2
**compliance**
  92:3
**complies**  188:4
  235:13 281:10
  325:16
**comply**  70:1
**component**
  111:7 226:17
  304:19 360:10
  367:7
**components**
  112:13 113:3
  113:15 114:11
  164:3 166:1,11
  186:25 224:24
  226:14 237:1,9
  361:7,16
  369:19 371:8
  373:22
**comport**  44:13
  161:21
**comported**
  280:15
**compound**
  34:13 382:18
**compressor**
  159:15

**computer**  21:6
  24:21 25:2
  42:5 137:1
  358:15
**computers**
  56:24
**con**  60:15
  68:24 126:8
  216:11 387:18
**concede**  33:4,7
  91:19 104:16
  201:15,17
  205:3 210:3
  215:13 283:8
  305:17 307:14
  310:24 364:3
  382:13
**conceding**
  381:13
**concentration**
  231:2
**concern**  141:8
  141:8
**concerned**
  33:20 103:5
  281:25 315:13
  394:2
**concerning**
  34:16
**concerns**
  145:19
**concise**  191:11
  192:1
**conclude**
  280:16

**concluded**
  360:9
**concludes**
  406:11
**conclusion**
  112:23 116:8
  116:15,18,19
  126:13 127:5
  150:2 252:3
  315:4
**conclusions**
  110:5,21 116:5
  127:12,25
  148:19 393:13
  396:22
**condition**
  138:15 231:8
  232:15
**conditioning**
  1:7 5:14 6:5
  83:12
**conditions**
  101:9 141:22
  141:23 178:8
  190:23 191:1
  192:22,23,25
  193:2,2,10,12
  193:14,17
  207:6 230:23
  230:24 231:4
  231:10 232:7
  235:4 308:18
**conduct**  375:9
**conducted**
  27:11 60:15,16

127:24 277:16
**conducting**
66:24
**conductor**
186:3
**conductors**
186:3
**conduit**   112:20
186:2 187:1
**cone**   118:12
**conference**
355:23
**confidence**
252:11
**confirm**   125:12
167:11 308:22
383:5
**confirmation**
110:2,17
**confirmed**
111:22 233:2
382:25
**conflict**   277:15
**conflicting**
233:17
**confused**   355:8
**confusing**
346:24 354:20
**confusion**
293:19 302:10
**connection**
10:18 16:4
17:18 40:15
41:1 44:24
49:15 73:22,22

92:14 126:13
136:1,22 272:9
**cons**   257:1
**conserving**
103:5
**consider**   79:8
110:18
**consideration**
165:2 256:15
**considered**
165:1,6 206:8
255:7 271:5,18
**considering**
85:10
**consistency**
364:8
**consistent**
333:25
**constitute**
205:24 220:1
**constituted**
216:18
**constructed**
216:11
**construction**
86:24 216:15
379:21 380:12
380:14
**consult**   120:10
**consulted**   76:9
117:19,23
349:12,20
350:6 360:14
360:21

**consulting**   9:14
266:25
**consumed**
166:8
**contact**   41:10
51:5 63:19
64:1,6,11,13
66:17,21
114:15 137:8
151:23 183:19
228:21 323:4
397:6
**contacted**
45:24 68:9
76:7 113:9
137:11 153:2
212:18 274:22
275:9 284:11
309:1
**contain**   339:2
**contained**
117:2 286:23
354:16 396:19
**container**
96:24 120:25
121:1,2 159:4
184:7 188:7
220:20,21
227:9 239:18
239:21 240:23
240:25 241:4
241:23 242:12
247:7,14
251:17 268:23
288:1 295:20

296:24 298:23
323:3,3,4
331:12 336:11
336:12 337:20
358:12 396:19
**containers**
190:19 211:1
222:22 241:18
277:22,24,25
354:18,21
**containing**
324:21
**contains**   69:25
74:8
**contaminated**
306:11
**contamination**
166:24 206:25
237:6 238:4
**content**   90:24
**contents**   33:21
101:22 222:12
222:15 271:4
271:18
**continuation**
203:7
**continue**   5:8
55:15 86:21
284:11 323:11
379:10
**continued**
10:13 44:9
142:7 175:15
329:11

continuing
  132:2 178:16
  180:9 255:1,6
  331:21 375:15
  400:4
contract  85:11
  85:12,16 86:8
contractors
  281:1
contradict
  402:24
contradicting
  180:4
contradictory
  110:20
contrary  59:25
contrast  362:18
contributed
  75:16
control  81:4
  284:14,17,19
  285:13 387:19
  387:23
controlled
  324:11
conversation
  5:6 49:4,17
  54:4 55:13
  77:2 79:21
  161:8 392:13
conversion
  99:23
converted
  339:8,10,12

convinced
  300:8
coordinates
  333:3
copies  18:18,20
  20:11 410:14
copper  186:3
copy  26:25
  42:8 133:25
  137:14,15
  138:11 272:15
  272:18 276:16
  297:13
corner  161:12
  173:14,20
  174:8
corners  162:22
correct  19:14
  21:6 39:18,21
  50:10 52:3
  55:4 60:6
  65:15 67:14
  68:7 70:2
  75:17 84:21
  87:12 92:1
  116:13 117:2
  130:8 147:9
  157:14 164:5
  164:22 170:8,9
  197:18 201:19
  216:5 222:3
  223:6 224:1
  232:17 243:4
  244:8,10 252:4
  252:8,21 253:3

253:6 255:8,11
  256:12 261:14
  264:15 271:2
  271:20 272:7
  274:17 276:20
  285:20 288:22
  297:24 298:20
  315:3 339:7
  352:21 355:3,6
  360:12 362:11
  374:2 376:3
  378:16 381:3
  382:16 387:6
  388:16,21
  390:19 397:2
  399:2 400:11
  401:9 404:6
  412:8
corrected
  203:12
correction
  203:15,24,24
corrections
  412:6
correctly
  100:21 103:7
  127:12 200:18
  315:6,11
corresponds
  253:11
corrugated
  165:23 216:6
  216:11,19
  217:11,13
  218:3

corsin  16:7,8
cost  272:25
could've
  114:19
counsel  4:9
  5:11,25 22:14
  23:20 25:3
  263:17 281:16
  303:9 325:19
  397:5 408:24
  410:14
count  27:8
  329:8 389:18
county  1:15,18
  7:22 18:5,7
  19:22 408:3,6
  408:14 409:18
couple  6:24
  11:5,16 12:20
  20:7 24:16
  27:11 38:15
  42:25 52:21
  72:18 75:25
  88:5 93:17
  107:2 131:3
  160:8 182:24
  202:10,11
  210:24 224:9
  244:20 246:18
  251:3 272:8
  279:19 281:16
  329:17 348:10
  398:23 399:5,9
  402:14 405:8

**course** 71:3,5
81:24 82:23
254:5 270:23
393:23 394:20
**courses** 81:13
**court** 1:1 5:15
5:20 6:11
12:24 19:5,6,9
19:22,23 82:14
84:17 102:18
139:13 192:9
260:21 366:5
391:17
**courts** 260:19
**cover** 86:4
179:4 207:9
**covered** 27:15
122:16 143:12
334:4
**covering**
276:14
**covers** 162:22
**covid** 85:22
**cracks** 154:24
**crate** 219:19
**create** 35:2
302:10 375:8
**created** 160:11
160:15 364:6
**credibility**
286:8
**credible** 306:18
**criminal**
344:15

**critical** 307:21
**cross** 3:5
166:23 167:25
237:6 238:3
389:12
**crossed** 298:13
301:1,6 342:6
**crossing** 301:24
**cs** 301:25
302:12 410:15
**cs5675427** 1:25
**current** 7:8,10
7:11 91:21
92:6,7 138:15
**currently** 28:2
28:9,12 197:21
**curriculum**
8:22 9:13 12:3
**custodian**
297:3
**custody** 4:18
21:5 133:21
267:12,13
290:8 297:2,20
299:20 301:8
321:22 323:18
324:16 338:11
341:7,11
**custom** 36:11
36:18
**customers**
106:23 210:24
**cut** 225:5,8,19
226:24

**cutter** 60:12
225:8
**cutters** 60:8,9
225:17 226:24
**cutting** 228:3,5
228:13,21
280:5 348:9
**cv** 1:3 5:16
37:13,14
**cvfi** 1:13 6:15
407:15 408:8
410:5 411:2,24
412:2,4,12
**cylin** 244:20
**cylinder** 241:21
**cylinders**
244:21

---

**d**

---

**d** 1:8 4:11
34:24 45:3,3
96:20 157:18
157:20 159:19
161:11 164:25
165:11 168:14
169:14 171:7
173:18 182:12
184:1,14,19
186:17 271:23
316:8,8 348:22
**dale** 65:22,24
66:1 156:17,22
172:6 226:23
234:21
**dam** 185:21

**damage** 58:10
185:21 186:19
202:7 207:17
208:23 209:7
246:12 359:9
359:11,12,19
**damaged**
359:20,22
**dan** 34:8
**danzer** 34:9
83:21
**darker** 319:25
**dart** 14:6
**data** 66:12 98:7
98:9,23 109:2
109:3,4,6,10
110:14,20
124:9 205:24
209:13 210:17
248:22 252:11
252:12 358:9
374:24
**date** 7:6 11:8
11:22 23:23
39:25 41:23
42:4 71:11,12
71:21 72:10,12
73:2,4 77:22
80:4 90:16
92:8,9 93:8
129:25 132:14
132:16 134:13
160:15 194:10
265:25 290:11
290:18,20,23

291:9,14,16
297:21 300:17
313:12 398:1
411:24 412:12
**date's** 71:25
**dated** 4:12,17
11:3 20:20
39:17,20 67:18
72:24 74:15
90:4,21,22
126:24 133:23
133:23 160:6
182:13 203:8
290:11 291:7
294:12 297:21
305:1 321:22
324:16 355:20
**dates** 9:14
40:25 41:22
130:5 147:20
373:3
**david** 314:18
**davis** 221:15
314:14
**day** 41:2 43:15
44:5,7,25 45:4
47:20 49:3
50:12 51:15,23
52:7 53:3,3
59:22 61:3,20
63:21 64:15,18
65:18 68:21,24
69:7 75:11
76:6,19,20,21
77:15,16,20

78:10,14,22
80:2 87:10
107:10,16
113:5,7,8
121:5 134:19
156:8,25
167:22 169:3
182:14 183:20
185:1 190:19
191:22 192:24
194:4,4,8,14
227:2 228:1,6
228:8,10
232:18 233:1
259:15 260:7
270:6 277:25
287:13 308:19
313:19,20
322:17,19
338:24 368:15
373:9,12,12,17
386:9 392:10
392:15,20,21
395:5,6,10
398:16 409:6
412:15
**daylight** 62:17
**days** 8:3 128:12
190:9,11 191:3
193:15,20
196:1 230:12
410:17
**daytime** 194:5
234:3

**dd** 4:5 137:17
137:19 138:2
139:2,12 140:7
142:21 146:13
155:11 158:3
158:16
**de** 265:4
**debris** 59:10,14
101:22 122:7
156:1 222:8
249:16 333:18
333:20 334:18
335:1,5,25
336:5 337:10
338:20 339:3,3
339:6,20
353:16 354:1
354:16 355:1
373:18
**debris's** 336:12
**decade** 197:5
**decades** 81:14
**decatur** 15:13
**december** 4:12
4:15 10:20
11:3 22:7,8
39:17,24 55:15
57:19 59:16
67:18 68:6
74:16 80:10
90:4 91:3,5
93:3 126:14
127:13,25
165:3 201:18
243:18

**decided** 40:22
62:15 85:25
86:9 87:1
153:1 237:21
269:25 274:15
286:15 322:18
322:22
**decision** 288:10
**decisionmaki...**
377:11
**declare** 412:4
**declared**
252:25
**deductive**
98:15,16,19
**deem** 177:24
**deemed** 412:6
**def** 98:3 251:10
**defective**
348:14 349:15
**defendant** 5:12
6:4 14:18
16:20,21 30:9
**defendant's**
74:15
**defendants** 1:9
1:16 2:9 138:2
187:14 304:5
306:21 316:14
317:9 333:14
334:19 345:23
346:1 361:2
366:10 397:18
398:20 404:5
408:12

**define** 95:10,16
**defined** 253:10
  399:23
**defines** 98:7
  99:22 101:19
  105:1
**defini** 97:8
**definition** 96:9
  97:4,9,16,19
  99:3 100:3,6
  101:3,4,6,14,25
  104:2 118:24
  119:1 201:4
  250:2 251:11
  253:8 357:18
  400:3
**definitional**
  97:24 101:13
**definitions** 98:3
  100:13 102:24
  103:6,22
**deflector**
  144:19 305:20
  371:14 402:19
**deflectors**
  132:11 177:19
  208:23 371:12
  371:13
**defy** 259:23
**degree** 15:6,24
  31:3 104:14
  124:17 144:22
  144:25 205:7,8
  260:23,25
  261:5,5,10,13

286:11,13
289:15,15,17
289:17,21
290:4 397:1
405:10
**degrees** 172:15
  172:18 194:5
  230:7,8,11
  233:2,9,16,22
  234:8
**delaware** 2:15
**delaying** 63:19
**demarcation**
  213:12
**demolition**
  390:14
**demonstrate**
  363:1
**demonstrated**
  252:24
**demonstrative**
  363:20
**deny** 187:18,19
**denying** 187:12
  187:17
**dep** 7:3 27:19
  32:24 265:4
  280:7
**department**
  8:21 31:12
  38:14 43:19
  44:10,15 390:2
**departments**
  70:17 389:25

**depend** 179:2
**dependable**
  157:14
**depending**
  89:11
**depends** 138:11
  175:4 176:11
  208:5
**depict** 138:14
**depicted** 306:7
  368:23 369:9
**depicts** 333:4
**depo** 103:19
  262:4
**deponent**
  407:11 408:8
  408:21,22
  410:13 412:3
**depos** 191:12
**depose** 329:24
**deposed** 14:16
  19:19 69:19
  265:4,7
**deposing**
  410:13
**deposition** 1:12
  4:3,6,9 5:11,17
  11:14,19,20,25
  12:5,9 13:22
  13:25 14:1
  15:18 16:5,12
  16:15 17:10,12
  17:18,22 18:4
  18:14,21 20:7
  20:8,9 21:23

23:2,5 24:13
26:20 27:16,19
32:19,25 33:14
33:19,22 45:7
54:25 65:9
69:15 74:18
83:20,25 87:18
88:7 103:20
108:3,4 115:12
130:9 137:9
152:6,7 153:18
154:7 174:18
182:9 191:7,10
191:12 196:19
212:25 218:21
221:20 226:19
261:25 263:16
272:6 351:7
406:11 408:11
408:17
**deposition's**
  36:14
**depositions**
  10:12 11:6,17
  12:10,15,16
  15:10 18:18,25
  19:12,16 27:18
  27:21,22 32:18
  32:19 34:5
  54:22 84:4
  87:21 264:22
  264:25
**depth** 400:19
  400:22,25
  401:8

**des** 39:6
**describe** 43:21
  243:15
**described**
  133:12 141:25
  229:25
**describes** 252:2
**description**
  45:10,11
  179:24
**design** 348:15
  349:22
**designed** 350:1
**desk** 265:19
**despite** 123:3
  136:7 239:18
**destroy** 37:20
  40:8 80:22
  81:18
**destroyed** 32:4
  35:16 36:8
  38:3,25 39:23
  40:1,5 80:21
  167:2 185:22
  186:2 322:21
**destroying** 39:6
  80:25
**destroys** 38:11
**details** 58:12
**detector** 375:22
**detectors**
  375:19,20,23
**determination**
  17:6 399:13
  400:13

**determinations**
  31:16
**determine** 30:4
  31:9,14 63:3
  75:14,15 76:4
  98:22 105:11
  108:22 109:1
  109:13 218:9
  250:23 252:14
  284:12 359:4
  404:22 405:1
**determined**
  31:5 112:1
  210:8 246:3
  252:10,13
  258:13,18
  400:10,10
  403:18
**determining**
  12:17 245:20
  374:24
**develop** 67:6
  109:8,8
**developed**
  74:11
**develops** 400:6
**device** 118:12
  158:18 353:17
  387:4
**diag** 136:13
**diagram** 4:15
  42:2,4 136:14
  136:21,24,25
  137:1 184:13
  276:1,21

278:13 279:20
  400:22
**diagrams**
  135:24 205:17
  328:19 385:9
  386:2
**dict** 308:9
**die** 67:10
**died** 67:12
**diesel** 150:22
  229:8 230:6
  288:5
**difference** 20:2
  112:21 144:5
  200:8 244:12
**differences**
  93:16
**different** 27:6
  28:10 38:7
  74:11 86:5
  98:17 102:6
  124:24 191:2
  197:23 200:21
  216:20 217:12
  226:9 233:17
  233:17 236:24
  263:7,12 271:9
  281:1 290:17
  290:23 293:16
  300:17 302:13
  311:19 316:11
  316:20 320:23
  326:23 327:11
  332:12 336:12
  338:7 359:1

367:19 378:1
  381:12 384:10
  384:21
**differently**
  293:15
**difficult** 31:9
**diggle** 26:22
  34:22 35:16
  39:10,10
  113:19,22,22
  114:10 115:17
  134:5 148:15
  148:18 149:11
  150:13 160:12
  160:13 182:18
  182:25 183:11
  184:4,13,20
  185:4 191:23
  238:25 259:21
  260:10
**diggle's** 185:15
**digital** 24:21,22
  36:4 398:5
**digitally** 312:1
**dimensions**
  278:19
**direct** 3:3 6:20
  117:10,10
  319:9
**directed** 132:24
**directing**
  270:17
**direction**
  231:12 408:19

directions
  243:10
directly  47:4
  144:21 237:11
  259:20
dis  265:7
disadvantage
  226:20
disagree  264:7
discard  35:12
  36:13
discarded
  110:25 259:7
discern  215:14
discounting
  110:19
discrepancies
  107:6
discuss  114:4
  114:16,17
discussed  82:25
  274:15
discussion  84:5
  390:12 396:21
  406:13
discussions
  34:15 273:7
disinterested
  408:25
displayed
  47:10
dispute  173:16
  174:13 349:7
  403:4

dissect  98:9
distance  402:15
  402:25
distillants
  249:3
distillate  151:4
  151:11 224:9
distillates
  166:20 210:14
  248:25
distillation
  150:20
distilling
  223:25
distinguishing
  204:8
district  1:1,1
  5:15,15
disturb  270:2
  308:23
disturbed  31:8
  31:23 386:15
dividing  170:1
  214:4
division  1:2
  5:16 74:24
  90:9,14
dizdarevic  45:3
  263:16
doc  207:21
  357:16
document  4:11
  164:18 183:2
  186:6 201:22
  269:7 277:2,19

303:21 357:12
  357:15
documentation
  184:17 244:17
documented
  207:20 244:15
documents
  20:19,24
doing  6:9 8:23
  9:23 55:16
  58:3 60:23
  62:4 64:17
  92:19 100:18
  141:20 143:22
  147:24 185:5
  200:12 243:9
  259:18 269:19
  273:9 281:22
  313:1 327:1
  384:5
dollar  338:17
door  56:8
  138:20 154:9
  154:10,18,19
  154:24 164:9
  164:13 170:8
  213:14 215:21
  215:22,23
  264:17
doors  56:9
  154:11,17,23
  154:24 155:1
  164:8 170:3
  262:17 263:20

doorway
  169:19
double  64:8
  393:4
doubt  315:9
  396:15
draw  42:2
  139:12 176:16
drawing
  278:20
drawings
  206:15,18
drawling  136:3
drawn  180:14
dried  122:24
  124:13 125:2,4
  125:5 200:14
  201:2,5 230:4
  246:21 289:8
dries  124:4
  351:18
drift  175:18
drive  2:11 7:9
  16:10 260:7,8
drivers  56:23
drop  381:6
drops  194:17
  194:25
drove  52:20
  260:9,14
drum  168:25
  240:14
drums  169:4,11
dry  124:11,15
  124:25 125:9

**[dry - electrical]** Page 25

125:13 126:1
145:25 200:10
225:22,25
226:2,4 227:2
227:20 285:19
286:2 287:17
287:20 288:22
351:17,20,25
403:20
**drying** 124:18
200:8,9 352:4
**duces** 4:7 20:18
21:10
**due** 17:8 61:17
62:10,11 63:18
76:11 86:7
112:22 186:18
209:8 233:1
273:16 308:17
**duly** 6:16 408:8
**dumpers** 128:4
**dumping**
329:20
**dumpster**
54:15 58:24
215:10 225:4
227:3 240:5
**dumpsters**
55:22 57:23,23
58:16 59:19
106:8,22
126:18 128:5
129:21 198:21
220:22 221:2
225:9,20

226:16,25
**dupli** 293:6
**duplicates**
293:7
**dupuis** 2:20
5:19
**dur** 166:23
**dust** 215:21
224:25 225:1
234:25
**dusting** 141:3
142:4
**duties** 8:10
**dwell** 17:5
**dwelling** 31:23
122:17
**dynamics**
251:1

**e**

**e** 2:1,1,3,7,13
2:17 4:11 45:3
96:20 188:2
411:3,3,3
**earlier** 6:25
25:10 32:17
88:13 175:6
202:11 228:9
254:5 274:21
317:23 321:6
337:13 347:6
390:12 392:18
394:16 396:9
398:8 403:25
**early** 60:19,21

**earn** 88:10
**earnings** 88:21
**earns** 88:22
**easily** 288:7
**east** 47:6
176:19 209:4
213:14 214:15
243:5,8,11,12
243:12,13,20
244:1,2 269:14
304:16
**easy** 370:18
**eat** 389:5
**edges** 219:12
**edition** 91:22
93:4,9,12,13
374:2,8,14,15
374:18 395:22
399:12
**editions** 374:3
**ee** 182:20
**effect** 106:19
**effective** 374:5
**efficiently**
151:21
**effort** 394:21
**efforts** 183:15
183:16 212:8
**efi** 12:8 84:24
85:1,5,6
**eight** 8:6 36:22
60:22 90:24
345:5
**either** 21:1
52:23,25 65:14

73:18 92:15
94:13,19
148:18,24
150:12 152:21
160:11 166:19
170:22 181:12
204:3 231:25
232:7 237:17
248:24 253:21
256:19 261:14
263:19 269:12
269:14 285:18
285:19 298:15
304:19 307:8
309:9 326:21
349:19 353:22
358:20 360:19
365:21 389:25
399:12 405:9
**elaborate**
162:11
**elect** 167:4
**elected** 39:4
85:17
**electric** 162:15
164:9 185:19
393:19
**electrical** 111:6
111:7 112:2,4
112:19,21
113:3,15,15,22
113:25 114:3,4
114:10,11,15
114:16,24
115:4,19

161:11 163:5
163:12 164:3,4
167:4 186:16
186:25 187:7
187:13,16
393:20
**electrically**
164:14
**electricity**
111:17 114:6
393:17
**electronic** 36:1
39:8 194:24
195:2 406:18
407:7
**electronically**
33:25 34:1,6
**element** 247:18
**elements**
101:23
**eliminate** 111:6
289:14
**email** 4:15
85:13
**emails** 281:16
**employ** 409:4
**employed** 9:9
66:1,5 84:24
185:10 341:3
**employee** 25:23
26:13 33:11,24
34:3 42:15,18
56:19,19 129:4
307:15 345:8

**employees**
26:11 43:3,7
64:1,4,5
122:14 141:7
179:25 183:22
225:18 226:22
232:19 242:18
277:16 329:17
**employer** 7:10
7:11
**employment**
9:14,24 10:1
28:1 29:19
32:7 38:23
66:14 84:23
85:20 86:10
**empty** 236:15
303:13
**en** 120:24
**enclosed**
120:24,25
121:1
**encountered**
315:1
**ended** 29:3
106:2 385:11
**ends** 84:11
189:1 270:10
369:25 406:10
**energy** 97:10
97:11 99:23,24
**engine** 19:20
**engineer** 26:3
113:22 114:3
114:10 115:3,4

194:22 312:22
313:25
**engineering**
206:18 260:24
**engineers**
113:25 114:15
187:13
**entered** 153:19
358:15
**enters** 185:20
**entire** 143:10
206:8 378:3
**entirely** 143:12
258:11
**entirety** 263:7
**entitled** 260:18
399:13
**entity** 85:8
**entrance** 264:1
**entry** 135:2
**enumerated**
20:24
**environment**
275:1,12
372:19
**environmental**
101:9 180:21
308:17 322:21
**equally** 67:4
253:5
**equipment**
79:23 111:24
112:17
**equivalent**
288:5

**errata** 410:11
410:13,17
**erratas** 410:15
**error** 72:13,16
202:22 254:8
**errors** 72:17,18
90:18
**especially**
252:15
**esq** 410:1
**essentially**
200:12 215:19
215:20 351:20
**establish**
134:19
**estimate** 32:5
**et** 5:14 316:9
**eval** 71:19
**evaluate** 71:20
98:9 390:25
**evaluated** 32:4
244:14 245:18
**evansville**
28:18
**evening** 52:19
61:15 111:15
172:21
**event** 189:12,25
409:3
**events** 374:20
374:23 376:23
378:2,5,7
380:4 382:9
**eventually**
380:20

**everybody**
85:11 86:1
134:14 179:7
187:8 250:3
313:20 390:20
**everybody's**
390:22
**everything's**
392:23
**evidence** 4:18
40:8,15 133:21
135:5 185:3
201:1 206:9,25
207:12,18
208:1,5 236:4
238:22 240:12
241:24 245:7
257:11 259:19
265:12 267:3
267:11,14
268:22 269:10
269:13 270:2
283:25 290:8
293:14,15,21
297:2,20
299:20 301:8
301:18 302:4
303:17,20
304:24 307:20
308:1,24
312:18,24
313:14 314:8
314:10 315:10
317:11,14
321:22 322:13

322:15,20
323:1,1,18,19
324:16 336:18
341:7,10
343:10 344:19
344:20 347:19
348:16 360:7
364:17 384:14
384:21 386:22
391:1 394:9,14
**evidenced**
199:21
**evident** 151:20
**evidentiary**
174:18
**ex** 48:11 364:4
**exact** 39:25
46:12 97:2
147:20 205:13
297:11 389:18
399:24
**exactly** 17:14
31:9 96:2
129:25 149:7
362:10,17
370:24 371:3
376:22 397:9
**exam** 3:1 26:4
77:15 161:21
368:21 369:6
371:2 372:21
399:4
**examination**
1:12 3:3,5,6
6:20 113:24

114:9 127:4,23
134:13 185:2
186:9 270:6
312:11 324:22
364:14 369:4,7
369:22 370:8
372:25 373:13
386:16 389:12
399:10
**examinations**
27:11 161:22
390:8
**examine** 22:17
114:11 371:2
**examined** 6:18
22:7 198:22
318:9 366:18
**example** 39:12
53:16 121:14
151:1,19
215:22 234:9
294:2 308:20
331:3
**exceeded**
230:11
**except** 38:10
39:9 79:20
88:2 120:24
178:11 223:8
**exception**
40:16 111:18
**excess** 401:15
403:5,17
**exclude** 114:24
115:18,19

122:6 166:18
236:25 242:20
242:23 256:19
**excluded** 21:19
238:3
**excuse** 97:2
**executive** 7:20
**exhaust** 167:21
168:5 214:16
304:19
**exhib** 245:23
**exhibit** 4:4,4,5
4:5,6,7,10,11
4:11,12,12,13
4:14,14,15,15
4:16,16,17,17
4:18,18,19,19
4:20,20 20:10
20:20,25 34:24
47:8 48:11
50:20 52:3
54:24 67:18
72:24 74:15
75:5 87:4 90:3
90:21 116:2
126:24 127:8
134:4 135:2
137:17 138:2,2
139:2,12
142:21 146:13
152:23 154:11
155:11 157:18
157:19 158:3
158:16 159:19
161:11 164:14

164:25 165:11
167:16,22
168:14 169:14
170:5 171:7
173:18 179:18
182:12 184:1
184:14,19
186:17 188:2,3
189:8 211:3
212:6 213:7
214:13 215:14
218:1,14 220:4
234:18 235:10
239:13,22
241:4 243:17
244:19 245:23
246:16 248:8
265:9 267:5,15
267:25 268:1
270:17 271:8
271:22 272:25
274:18 275:20
275:20 276:1
276:14,21
278:5,9 279:14
281:9,12,13
282:3 290:6,19
292:10,11,11
292:15 294:7
294:10,14,20
295:7 296:1
297:16 298:3
298:18,22
299:14,19,25
300:12,12,16

300:22 303:6,7
304:5,13,25
305:9,18
306:21 311:18
311:25 313:8
316:6,8,14,15
317:7,25
318:10,20
320:2,7,16
321:20 324:2,9
324:14 325:1
325:14 326:25
328:10,13
329:19 330:12
331:4,5,13,14
331:21,25
332:14,15
333:14,18
334:19 336:10
341:24,25
342:3,6,10
345:3,15,23
346:1,5 347:24
348:2 351:8
352:9,11,17
353:12 355:19
361:2 362:16
363:10 364:22
366:10,14
396:11 397:18
397:18 398:13
398:20 404:5
**exhibits**   4:1,3,9
290:13 297:23
302:12 316:19

344:22 354:8
406:19
**exist**   358:19
**existed**   141:23
191:1,2 231:7
**existence**
160:16 215:15
374:2
**existing**   273:1
**exists**   275:23
**expect**   82:11
322:4
**expectation**
110:1
**expectations**
110:8
**expected**
383:19
**expel**   124:25
176:17
**expense**   246:8
**expert**   10:18,21
10:24 19:10,13
21:19 22:10,11
22:24 110:11
120:10 150:9
187:15 205:4
249:9 252:20
254:24 255:10
260:18 275:17
287:18 312:16
314:13 348:24
349:12 355:19
364:5 390:13
403:6

**expertise**   79:4
119:24
**experts**   115:17
117:19 302:11
349:19 367:5
390:5
**expires**   409:16
**explain**   108:11
111:11 177:18
190:10,13
194:15,20
225:18 227:4,6
263:24 275:24
323:18 336:10
**explained**
109:22
**explains**   246:7
**explanations**
179:4
**explode**   96:23
247:15,16,16
**exploded**   268:9
269:3 359:16
**explosion**   91:25
99:4,22 142:11
356:4 357:5
358:8,9,13,19
358:23 359:5,8
359:23 360:2,5
360:8,10,13
400:1
**explosions**
358:6
**exposed**   96:23

**express** 73:21
379:10
**expressed**
73:18 165:3
205:5 255:3,8
255:20
**extensive**
185:20 186:3
186:18
**extent** 108:8
**exterior** 163:16
262:18
**external** 137:4
**extreme** 56:8
217:25 404:4
**extremely**
308:19 309:3,5
309:8
**eyewitness**
42:15

**f**

**f** 2:6 4:12 67:18
74:15 75:5
90:3 116:2,4
189:8 243:17
266:18
**f.a.s.t.** 135:5
282:9,10
283:20 322:1
325:12 335:6,9
343:3 354:15
**facil** 27:3
**facilitate**
102:12

**facilitator**
390:4
**facility** 15:14
16:17 17:7
27:4,6,12 42:2
44:5 50:12
51:11,19 52:8
54:2,5 55:25
58:3 62:23
75:25 79:3,24
111:17 112:2,4
112:9 116:22
121:4 128:21
129:3,4 130:3
131:15 134:7
135:9 138:4
142:3 164:23
172:11 179:8
181:14 197:22
198:20 210:21
217:23 224:20
224:22 236:5
236:22 245:8
273:16,17
313:11 315:15
362:7 371:21
377:8 381:20
383:15 392:24
393:2,16
**fact** 35:21
40:19 44:10
54:4 61:6
81:21 86:7,19
111:18 129:16
141:21 153:7

157:8 174:21
175:5 177:18
190:17,17
200:2 205:14
209:8 210:19
221:9 229:14
232:12 239:18
243:11 245:5
245:16 249:4
250:17,20
251:13 256:16
258:10 264:4
273:9 275:7
289:16 291:19
292:4 323:23
328:23 329:2
344:4 354:4
360:9 377:16
380:22 381:1
392:23 393:14
405:22
**facts** 102:13
149:5,18,21
155:8 255:14
255:15,21,24
256:4,8,10,11
256:17,19,24
256:25 265:1,2
287:23,23
375:10 382:5
394:15 403:23
404:17
**factual** 150:1
205:25

**fahrenheit**
172:18
**fail** 289:23
**failed** 64:16
261:4 289:22
290:2 384:15
**fails** 410:19
**failure** 110:18
216:14 384:22
385:1
**fair** 63:25
87:25 90:1
94:1 374:10
392:1
**fairly** 52:6
359:14,19
405:4
**falling** 237:4
238:4 359:11
**false** 390:19
391:12,18
**familiar** 33:17
33:18 65:22,24
65:25 110:1
117:25 133:24
261:1 374:20
**fan** 168:14
176:16 180:19
195:20 214:16
216:4 393:17
**fan's** 216:2
**fans** 167:21,21
176:5 180:18
393:20

**far** 25:22 56:7
60:2,11 72:23
86:11 158:17
164:9,13 169:2
182:4 193:19
216:16 217:24
233:4 241:20
241:23 269:20
276:7 364:5
**farther** 18:12
286:17
**fast** 317:24
**faster** 7:4
**father** 86:23
**fear** 348:9
**feasible** 252:25
**feasibly** 104:10
**february** 190:8
194:11 366:20
409:7 410:3
**federal** 391:17
**feel** 83:1 110:10
193:11 204:9
204:12 261:9
386:14
**feeling** 82:24
237:15
**feet** 128:11
171:3 174:2,10
174:21,25
175:2,3,7,12,12
175:17,17
195:15 259:24
269:1 278:25
280:1,12,19

**fell** 222:6 223:5
240:9 333:19
**fella** 26:22 63:4
64:17 65:4,6
156:16 221:15
**fellow** 61:19
62:4 242:6
**felt** 114:1
205:14 237:9
246:12 257:22
**ff** 4:17 248:8
265:9 267:5,15
268:1
**field** 33:8 34:16
34:18,20,21,22
35:2 36:8,13
38:3,10,16,24
39:23 40:17,25
41:14,16 53:11
72:6 77:1
78:17 80:25
81:18,23,25
82:1,22 119:24
148:14,17
156:1 160:11
227:1 259:7
261:6
**fifth** 189:15,17
189:18
**fifty** 87:16,19
**figure** 59:6
329:24 382:8
**file** 21:13 22:19
22:22,22 23:19
24:8 29:4 35:9

35:19 39:5
40:20,21,22
41:5,5,13,17
42:10 43:8
66:14 81:11
90:20 136:2,24
137:10,11
148:7,15
265:18 282:1
339:16
**filed** 5:14
**files** 21:6 38:19
39:7,8
**fill** 46:19 95:4
**film** 328:14
**filter** 180:20
**filtered** 180:20
**filters** 180:14
180:17
**final** 15:18
205:5 282:23
282:24 362:10
364:5
**financially** 5:23
**find** 11:9 65:17
158:5 173:4
218:9 313:12
370:18 372:16
375:10 390:15
**finding** 389:5
**findings** 30:1
67:19 402:10
**fine** 64:24
192:5

**fingers** 191:10
387:6
**finish** 12:24
37:15 57:5
82:4 94:5,6
125:21 153:10
227:16 296:5
367:18 379:17
381:25
**finished** 13:3,4
233:7,10
341:16
**finishing** 180:9
**fire** 8:21,24 9:6
9:6,23 11:18
12:14 14:20,23
15:6,14,25
16:5,16 17:7,8
19:19 26:10,14
26:18 27:25
28:18,19 31:3
31:6,7,11
38:14 40:16
42:9 43:15,17
43:18 44:5,7,9
44:14,14,19
45:1,5,25 46:2
46:2,24 47:1,1
47:20 48:3
49:2,4 50:8
53:14,16,20,24
54:1,7 55:4
58:5,6 59:10
59:14 60:13
61:3,9,20 62:6

| | | | |
|---|---|---|---|
| 64:16,18 66:15 | 146:6 147:6 | 243:1 244:24 | 402:10 403:14 |
| 67:1,6,7 69:2 | 148:25 152:2 | 245:6,13,21 | 403:15 404:23 |
| 69:25 70:18 | 152:13 154:8 | 246:14 249:16 | 405:1,11 |
| 71:11,12 73:3 | 154:16,21,23 | 249:23 250:2,5 | **firebox** 122:19 |
| 73:23 74:2,9 | 155:8 156:8 | 250:9,18,18 | **fired** 1:8 6:9 |
| 75:12,15,21 | 157:1 159:1 | 251:24 259:15 | 271:9 274:6 |
| 76:2,5,7 81:14 | 160:3,9 166:3 | 272:8 279:20 | 348:21 384:5 |
| 85:6,24 86:1 | 166:8,24,24 | 280:25 286:5 | **firefighter** |
| 89:22 90:9,13 | 167:22 169:3 | 286:12,16,20 | 19:18 |
| 90:16 91:20,22 | 178:1,2,3,7 | 289:10,12 | **fireman** 19:17 |
| 91:25 92:4,8 | 179:17 183:12 | 293:14 306:12 | **fires** 110:10 |
| 92:21 94:16,17 | 183:20 186:2 | 318:23 321:7 | 112:22 250:15 |
| 95:13 96:5 | 186:10,12,23 | 333:19 349:2 | 250:21 264:8 |
| 98:21 101:14 | 187:6 189:12 | 350:22 354:16 | 358:5 405:23 |
| 101:19,21 | 189:25 190:9 | 357:9,18,22,23 | **firm** 5:18,21 |
| 102:6,7,9,12 | 190:11 192:24 | 360:4,14,18 | 16:3,8 |
| 105:3 106:3,3 | 193:21 196:1 | 361:8 363:9 | **first** 6:16 11:19 |
| 106:20 107:11 | 197:25 199:25 | 374:11,23 | 11:20,25 12:7 |
| 107:16 108:7 | 200:1,17,21,24 | 375:4,5,9 | 12:9 38:23 |
| 108:25 109:2,4 | 202:7,9,16 | 376:18 380:17 | 39:17 41:2 |
| 109:16,24,25 | 204:3 205:6,14 | 380:20 381:10 | 50:8,11,25 |
| 110:7,12 111:8 | 205:21,21 | 381:13,20,23 | 63:17 66:1 |
| 111:10 112:24 | 206:8 207:6 | 382:9 384:24 | 67:23 68:9 |
| 113:5,7,17,20 | 209:3 212:10 | 387:7,8,8,20 | 70:12,15,20 |
| 113:23 114:12 | 214:25 216:17 | 388:11,13 | 71:2 74:14 |
| 114:25 115:20 | 221:6,12,25 | 389:14,15,17 | 75:11 76:7,20 |
| 116:17,19 | 222:5,10 223:4 | 389:24,25 | 76:21 77:9,14 |
| 117:10 118:15 | 225:4,19,21 | 390:2 392:15 | 80:6,7,7 87:10 |
| 119:16 121:5 | 226:8,23 227:3 | 393:9 394:6,10 | 90:3 105:1,2 |
| 121:14 122:8,8 | 228:11 230:12 | 394:14 395:10 | 105:11,13,20 |
| 123:3,4,5 | 230:25 231:9 | 395:23,24 | 108:13,20,23 |
| 129:19 130:11 | 231:10,13 | 396:1,1,2 | 113:21 114:7 |
| 133:1 135:15 | 237:2,12 238:5 | 397:1 400:1,4 | 116:2,15 127:1 |
| 141:12,15 | 240:6 241:15 | 400:24 401:12 | 138:14 144:19 |
| 142:11 145:19 | 242:9,21,24 | 401:19,21,24 | 152:13,13 |

154:8 159:25
183:20 185:15
189:7 190:8
194:10 202:5
209:2 211:10
222:12 243:18
250:22 258:7
259:8 264:5,6
265:3 268:25
277:1 283:16
292:19 296:7
298:3 302:18
328:15 346:15
356:25 357:3,4
372:25 373:1,9
374:1 376:5,6
376:8 377:9
402:7 408:8
**fit**  208:7 251:20
316:17
**fits**  109:10
**five**  8:6 10:11
10:13,15,19
18:25 44:19
48:21 58:4
85:8 107:3
175:3 209:18
211:2 228:19
270:7 325:20
325:23 328:7
362:11 366:3
369:25
**fixed**  254:13
**flame**  118:6,13
121:8 283:11

283:20,24
284:4,8,23,24
287:5,9 288:13
387:16,17,22
388:3,7
**flames**  152:19
198:24 262:9,9
262:11,14,16
262:19 263:2,3
263:19 264:5
388:19
**flamm**  285:7
**flammable**
126:17 128:3
200:5 237:21
288:2,3,6
299:6,8 357:24
**flash**  150:25
357:18,18
**fleet**  152:11
281:2
**flip**  305:7
**floor**  128:9
151:23 152:1
174:22 175:1
175:18 177:12
179:19 221:4,7
221:12 222:7
234:19,23,24
234:25 235:1
236:22 237:3,4
239:11,12
280:6,19 306:6
306:14,20
362:17,24

365:4 392:22
402:18
**florida**  9:4
32:10,14
**flow**  28:15
**flue**  294:18,21
295:8 332:1
337:5 338:6
352:18 353:4,7
**folder**  41:5,13
41:17 42:7,10
42:11 136:24
**folks**  317:9
338:14
**follow**  216:23
393:22
**followed**  10:2
79:12 157:7
394:1 402:25
**following**  32:15
70:16 73:8
89:24 120:19
198:6 210:2
**follows**  6:18
90:5 260:19
**followup**  10:12
**foot**  175:3
278:24
**force**  195:19
**forcing**  144:23
**foregoing**
408:11 412:5
**forensics**  9:7
28:19

**forever**  82:6
**forget**  301:21
**form**  4:18
34:11 36:15
38:5,12 40:10
40:18 62:7
64:19 72:8,11
80:9 88:12
89:2 93:14
95:7,9,11,17
98:17,25,25
105:5,7 107:17
108:18 110:22
115:1,21 117:3
123:16,20,24
123:25 124:21
125:9,10,15
126:3 127:2
128:13 129:24
131:12 136:9
139:4 141:13
144:18 145:10
145:23 148:10
148:20 149:12
150:11,15
151:13 152:15
153:21 154:12
155:6 157:2,15
164:16 166:12
166:25 171:12
171:25 172:8
173:23 174:4
174:24 175:13
178:25 179:23
180:15 181:18

183:18 184:15
184:23 185:12
185:25 198:25
200:23 201:22
202:21 203:14
204:22 205:19
210:9 213:8,16
213:23 215:18
216:22 220:25
221:22 225:10
225:22,25
227:5 232:22
235:2 237:7
246:23 247:23
249:1,25
250:16 253:15
253:18 255:25
256:6 258:6,20
259:9,25 261:7
263:10 265:13
265:21 267:12
268:12,17
269:5 271:5
273:5 274:9
276:11 277:18
279:5 280:20
281:4 283:12
286:3 287:20
287:21 289:24
290:5,8 291:21
292:17 293:11
297:5,7,9,13,14
297:20 301:2
301:12 302:2
302:16 304:6

304:22 305:21
306:9 307:24
309:11 311:2
311:10 316:18
316:24 321:22
322:7,16
323:18,20
324:16 333:22
335:12 336:14
337:16 338:12
338:22 340:12
341:9,18 344:2
349:1,4 350:14
351:15 352:7
357:16 359:15
359:24 362:2
362:21 365:6
367:13 369:1
377:4 378:19
381:17 382:15
382:17 397:14
397:14 404:8
**format**   24:21
24:22 95:3
398:5
**formed**   110:15
252:13
**forms**   133:21
301:8 304:25
341:7
**fort**   1:2 5:16
27:4 45:1 86:5
233:3 260:13
**forth**   24:17
71:20 89:12

224:25 306:12
308:18 395:17
**forty**   202:16,18
**forward**   321:20
**foster**   1:13 5:11
6:15,23 134:6
172:17 316:2
366:8 384:4
407:15 408:7
410:5 411:2,24
412:2,4,12
**found**   30:22,24
122:19 126:8
142:16 166:20
183:12 210:21
224:9 237:6
297:9 375:3
**foundation**
36:15 40:10,18
66:7 93:14
100:7,10
101:15 105:7
108:14,18
110:22 114:13
115:1,21
118:25 119:15
121:10 123:25
124:12 128:15
131:16 141:13
142:12 146:8
146:16 148:10
150:21 151:5
151:15 152:15
154:3 155:18
156:5 158:11

159:2,8,11
160:23 161:13
162:7,24
163:10,25
164:16 166:4
166:12,22,25
167:23 168:8
168:17 169:6
169:21 170:11
170:17 171:23
172:10 173:23
174:16 175:13
176:8,24
178:25 179:23
180:16 181:2
181:10 183:2
184:15,23
185:25 186:4
188:11 190:12
191:4 197:6
198:25 205:19
215:6 216:24
219:1 222:13
224:11 225:23
227:5 228:14
230:13 231:14
235:2 240:1
241:11 242:10
247:4,23
249:25 253:18
266:23 267:17
276:11,25
277:18 279:5
279:12,21
283:6 287:21

292:17 293:11
297:5 301:4
302:16,24
304:22 312:21
316:24 318:25
319:7 320:3
325:7 326:13
330:15 336:14
337:15 338:22
339:11,24
340:7 343:8
344:2 345:12
346:8 349:23
353:20 354:2
358:21 359:24
367:13 403:8
**four**   14:2 17:11
175:2,3 185:22
202:18 270:13
282:5 283:21
325:23 366:2
394:3 397:25
398:9,12
401:15
**fourteen**   11:23
**fourth**   189:19
207:7
**frame**   217:8,19
292:25 379:16
379:20
**framing**   217:14
**frcp**   221:16
**fred**   4:11 34:7
39:9 51:17
52:8,23 53:1

78:9,18 107:8
111:13 113:2
113:14 148:6
149:11 150:13
156:14 157:13
157:13 160:18
160:22 161:2,6
164:23 171:8
172:15,22
178:17,24
180:11 181:8
181:15 184:4,7
184:21 188:6
233:15 258:4
259:17,20
392:7,13 393:5
393:11
**free**   68:4
**frequently**
228:1
**fresh**   168:15
**friday**   8:4
**front**   11:8 41:5
41:18 51:23
68:2 147:23
154:16 167:25
168:10 176:17
180:19 215:22
215:22 231:21
269:12 347:3
387:23 397:19
397:20
**fuel**   97:11,12
101:6 105:2,20
146:20 150:22

229:8 230:6
288:5 376:6,15
377:21,22
387:21 399:25
403:10
**fuel's**   376:6
**fueled**   105:15
**fuels**   403:20
**full**   6:22 7:25
8:2 155:17
219:20
**fully**   109:22
**fumes**   121:25
199:19
**function**   234:5
**functional**
176:9
**functioning**
196:20 349:8
**furnace**   120:8
388:4
**further**   94:19
100:1 162:11
171:7 252:6
407:11 408:25
**furthermore**
397:5
**furthest**   263:25
264:15,16

**g**

**g**   4:4 72:24
126:24 127:8
355:19,24
361:2 362:16
363:10 364:22

366:10 397:18
398:13
**gallon**   107:14
168:25 169:4,8
169:11 208:2
208:10 223:3
240:14 244:20
268:5 298:4,19
298:25 300:9
329:6 335:23
336:11,12
339:22 341:2
341:16,17
343:22 344:22
354:14
**gap**   387:25
**garage**   138:20
154:9,24
213:14 234:7,8
263:20 295:14
401:24 402:1
**garbage**   46:19
**gardner**   2:10
2:10 3:3,7 6:4
6:4,21 20:15
20:17 21:16,18
25:7,12,13
34:14 36:16,17
37:17,21,24,25
38:7,8,22
40:13,24 44:2
44:4 45:17
47:8,14,15
54:19,24 55:2
57:8,14,17

| | | | |
|---|---|---|---|
| 62:21 64:5,14 | 127:7 128:2,22 | 164:7,17,24 | 211:21 213:5 |
| 64:22 65:3 | 130:4,7,15,21 | 166:7,15,17,23 | 213:11,19,25 |
| 66:9 67:24 | 130:22 131:13 | 167:14 168:2 | 215:4,9,19,24 |
| 68:1 69:20,22 | 131:18,25 | 168:12,19,20 | 216:1,23 217:2 |
| 71:5,8,10 72:9 | 132:2,5,8 | 169:7,12,13 | 219:4,6,10 |
| 72:14 80:11 | 134:9,18 | 170:4,15,23 | 220:9,13 221:1 |
| 82:5,13,18 | 136:13,19,20 | 171:4,14 172:3 | 221:24 222:17 |
| 84:6,15,19,20 | 138:1 139:11 | 172:13 173:24 | 222:20,23 |
| 87:3 88:15,22 | 139:20,23 | 174:7,12,17 | 224:12 225:15 |
| 88:25 89:4,15 | 140:3,10,15,19 | 175:8,16 176:3 | 226:6 227:14 |
| 89:20 91:6,10 | 140:22 141:4 | 176:13 177:4 | 227:18,21 |
| 91:12 92:9,13 | 141:15 142:6 | 177:12,14 | 228:2,16 |
| 93:2,19,23 | 142:20 143:2,8 | 179:13 180:1 | 230:18 231:5 |
| 94:3,7 95:14 | 143:11,13,16 | 180:14,24 | 231:17,22 |
| 95:22 96:8,14 | 144:4,12,17 | 181:7,11 182:2 | 232:5,16,23 |
| 96:19 97:17,20 | 145:4,18,24 | 182:8 183:5,25 | 233:9,14 235:9 |
| 97:22 98:13,14 | 146:12,17,25 | 184:18 185:9 | 235:18,21,23 |
| 99:7,11,15,17 | 147:1 148:13 | 185:14 186:1 | 237:18 238:9 |
| 99:20 100:5,15 | 149:1,9,13,19 | 186:11,14 | 240:2 241:12 |
| 100:17,23 | 149:24 150:4,6 | 188:15,21 | 242:13 244:4,7 |
| 101:5,12,17 | 150:8,17,18 | 189:6,15,17,21 | 246:24 247:3,8 |
| 102:1,3,21,23 | 151:2,9,17,24 | 189:23 190:25 | 247:24 248:6,7 |
| 103:1,9,14,17 | 152:20 153:3 | 191:6,15,17 | 249:7 250:8,15 |
| 103:21,23 | 153:17,23,24 | 192:2,4,6,12,14 | 253:17,19 |
| 104:1,4,22,25 | 154:6,19 155:2 | 192:17,20 | 254:16,18,20 |
| 105:9,10,21 | 155:4,10,16,20 | 193:4 196:23 | 256:3,9,18,21 |
| 107:21,25 | 155:24 156:6 | 197:11,13,15 | 257:14 258:13 |
| 108:1 109:19 | 156:13,21 | 199:8 201:7 | 258:15,17 |
| 111:2,5 114:21 | 157:3,17,22 | 202:2 203:2,16 | 259:1,3,4,14 |
| 115:11,15 | 158:1,15,23 | 203:18 204:1 | 260:6,14,17 |
| 116:1 117:7,8 | 159:5,9,14,18 | 204:20 205:2 | 261:12 262:3,5 |
| 119:4,16,23 | 160:14 161:4 | 205:20 206:6 | 262:6 263:6,15 |
| 123:14 124:16 | 161:16,19,20 | 206:11,14 | 264:10,18 |
| 125:6,19,22,24 | 162:10,18,20 | 210:13,15 | 265:23,25 |
| 126:10,12 | 163:4,11 164:2 | 211:4,8,9,16,19 | 266:3,5,9,11,12 |

267:2,4,21
268:13,18
269:6 270:7,15
273:18,20,21
274:11,12
276:13 277:3
278:1,3,8
279:7,10,13
280:24 281:6
283:15 287:1,4
287:7,10,14
288:11 290:1
290:25 291:2,4
291:11,13,24
292:24 293:1
293:12,18
296:10 297:15
300:2,5,7
301:3,7,19
302:5,9,20
303:5 304:7,23
305:20,24
306:15 308:5
309:21 310:23
311:6,12,24
313:3 314:16
314:18,21,23
314:25 316:19
316:22 317:5,6
319:2,8,18,22
320:6,22
322:11 323:5
324:1 325:8
326:17,19,22
327:13 328:1,9

330:19 331:11
332:11 333:10
333:11 334:6
335:17 336:17
337:2,6,23,25
338:4,6,13
339:1,15,18
340:4,8,25
341:12,23
342:21 343:13
343:16,20
344:7,13
345:13 346:13
346:17 347:9
347:18,23
348:3,6,8
349:2,10,11
350:4,5 351:3
351:16 352:8
352:12,14,16
353:21 354:11
355:6,10,12,14
355:18,25
356:2 357:14
357:20,21
358:2,25 359:2
359:3,16,21
360:1 362:3,9
363:4 365:13
366:4,7,9
367:11,16,19
367:25 368:2,6
368:8 369:8,23
370:5 378:20
378:22 379:2

379:18,22
380:3,10
381:22 382:4,7
382:23 384:3
385:17,21
388:12,15
391:14,16,20
395:25 397:4
397:11,14
398:21 399:9
399:11 403:9
404:9,11,15,19
406:8 407:3,8
**gardner's**
384:8
**gardnerandra...**
2:13
**garner** 150:23
153:15 251:23
**gas** 1:8 6:9
46:16,17,19
48:1 100:1
195:6,10 271:9
272:10,16
273:2 274:6
348:21 359:13
384:5 387:9
**gasoline** 151:1
**gasses** 99:25
**gate** 46:6,7,8
**gather** 265:1
**gathered**
118:15 307:18
313:11

**gathering**
135:16
**gauze** 78:14
295:18,24,25
296:2,14,17
309:10 311:7
323:14 325:20
326:14 327:3
386:24,24
387:2,5
**general** 14:20
41:25 53:13
82:25 95:12
112:24 116:17
116:19,23
119:25 194:23
207:5,25 253:3
253:4 361:22
363:8
**generally**
194:23 400:9
400:11 403:13
**generated** 95:2
182:7
**generator**
162:1,5,9
**gentleman**
220:14
**gentlemen** 68:9
**getting** 61:19
69:20 122:1,7
265:5 329:10
**gg** 4:17 311:18
311:20,23
313:8

giant   143:18
give   8:10 12:7,8
  13:22 29:2
  31:5,11 32:22
  42:24 43:3,16
  43:18 45:10
  50:3 53:25
  58:12 77:11
  78:9,22 95:21
  101:14 131:25
  139:13,14
  149:21 150:2
  183:21 215:1
  237:15 279:12
  286:8 313:22
  313:24 366:5
  367:22 370:18
  405:15
given   12:11,15
  18:14,19,22,25
  19:12 25:3
  31:17 32:2
  34:17 43:13
  51:4 75:22
  76:3 78:7
  98:17 102:13
  108:24,24
  111:13 134:15
  148:23 157:8
  179:25 182:1
  190:23 193:10
  193:16 207:5
  225:25 230:25
  237:22 244:17
  251:18 255:11

255:16 263:13
273:8,12 288:8
394:5 408:21
412:9
gives   41:6
  151:19
giving   11:5,17
  19:13 87:21
  116:17 261:10
  379:18
glasses   43:22
  45:14
glenn   68:7 69:8
  69:18 75:9,11
  76:6,13
global   84:24
  85:1,5,6
glowing   388:23
go   5:9 7:3
  11:16 13:15,23
  19:11 29:1
  42:10 53:19
  61:12 62:16,17
  63:9,9 68:4,22
  85:5,17 87:1
  95:8 108:8
  109:11 110:7
  125:22 127:8
  142:21 153:8
  153:18 157:18
  158:16 175:25
  177:6 178:18
  179:5 182:7,9
  182:12 184:1
  184:19 188:2

197:24 198:4,7
198:8 208:9
209:19 211:3
211:19 212:20
214:13 218:13
220:4 227:17
227:18 231:11
235:3,10
237:23 239:22
241:17 243:17
246:16 248:8
250:21 258:5
259:23 267:2
267:25 271:22
281:9,13 282:3
290:6 297:16
300:16 303:6
308:14 309:19
311:18 313:2
315:21 317:7
317:22 318:10
318:13 320:7
322:18,22
323:2,13 324:2
324:14 325:1
325:14 327:20
328:1 331:22
332:9 333:4
337:7 338:8
342:25 345:3
347:24 350:19
353:11 355:19
361:1,1 365:14
369:23 378:22
386:19 389:5

goes   122:18
  176:2 179:6
  209:9 267:1,3
  310:6,7 393:1
going   5:3 13:14
  16:15 18:12,12
  32:22 57:11
  61:8 62:12
  69:1 82:5
  85:10 103:6
  111:18 112:2,4
  112:7 113:25
  152:12 155:9
  180:20 190:20
  191:21,25
  200:10 221:9
  224:22 227:8
  238:2 269:24
  281:12 324:5
  331:21 341:20
  346:24 348:10
  384:9 391:10
  393:17
golden   34:8
gonna   8:17
  37:15 45:2
  47:11 54:17,20
  62:12 63:9
  72:22 82:6
  84:6 87:8 99:9
  99:9,14 100:19
  100:21 103:8
  103:19,25
  134:2 139:12
  140:16,20

142:21 158:4
175:18 191:6
191:25 214:10
230:24 237:25
261:17,24
279:10 307:8
317:22 354:12
363:10 366:4
383:22,23
391:2 397:19
399:22
**good**   5:3 44:18
138:9 140:17
188:21 237:13
326:20,21
374:17 405:24
406:4,6,9
**googler**   55:3
**gook**   246:21
**gotten**   48:23
**granger**   2:12
**grave**   141:8
**gravity**   259:23
**gray**   319:25
**great**   84:9
188:24 270:8
**greater**   253:13
**greg**   2:20 5:19
34:7 130:8
**gross**   89:13
**ground**   11:16
12:20 250:1,10
280:12 305:25
306:20,22
333:20 347:1,9

347:11 359:11
361:17,18,19
381:8,14
**group**   9:15
114:22 266:25
**guaranteed**
86:9
**guard**   46:5,5,7
46:8 153:5
214:11
**guess**   7:16
16:25 28:5
30:12 32:1
39:3 45:15
83:6 98:4
150:2 167:10
227:19 233:4
283:25 285:8
329:22 343:12
343:12 363:1
363:21 395:6
405:10
**guessing**   292:6
**guide**   70:8 81:2
91:25 114:5
395:4,11
**guideline**   70:5
70:7 92:25
93:1 206:4
207:3 261:18
**guidelines**   81:2
94:25 316:17
344:11
**gun**   181:20

**guy**   43:22
45:13 50:7
65:18
**guy's**   79:22
**guys**   52:5
140:15 223:10
260:8 313:13
316:7 387:19

**h**

**h**   411:3
**hair**   72:22
**half**   7:15 8:16
9:16 14:2 46:4
111:21 128:11
138:20 142:10
213:21 282:21
389:8 405:15
405:19
**halfway**   165:10
173:18,19
213:13 215:16
**hamilton**   1:15
7:21 19:21
408:3,6 409:18
**hand**   6:14
47:11 54:20
139:12 142:21
158:4 219:2
319:18 363:10
387:5 409:6
**handwriting**
34:25 265:16
265:20 266:20
267:7 282:18
283:4 290:8

297:23 298:7,9
298:10 300:20
300:23 315:25
316:3 324:19
332:19,22
342:11,25
352:23 353:1
**handwritten**
4:11 35:2,6,15
39:7 40:7,9
49:23 52:25
82:20 169:16
184:3 188:5
**hanging**   273:1
280:23
**happen**   106:23
145:15 190:24
193:2,3,15,17
226:5,7 227:7
235:7,8
**happened**
125:1 193:13
225:12 251:22
251:22 297:8
298:16 317:18
354:9
**happening**
250:9
**happens**   71:18
194:20 289:4
**hard**   215:14
321:3
**harder**   175:11
**head**   17:15
175:3,4 208:13

heading   282:9
hear   70:7
   254:17
heard   59:24
   65:6,8 262:20
   264:2,19
   386:23,23
heat   76:9 105:3
   131:8 147:3
   157:12 177:19
   189:12,25
   190:2,3,4
   193:24 195:1
   195:14 199:25
   209:9,10
   237:12 247:13
   326:15 359:20
   364:24 373:12
   373:12 375:22
   375:22,23
   383:24 387:20
   388:8,20,22,23
   399:25
heated   129:11
   194:18 226:8
   234:7
heater   76:10
   77:3,21 78:3
   105:14,16,23
   105:24 118:13
   118:18,18
   119:9,10 120:2
   120:5,16
   121:22 122:12
   131:5 139:3,7

141:11 143:21
146:13,21
147:3,11 152:1
156:7,25
170:16,24
174:10 175:6
177:20 194:21
195:1,5,13
199:6 202:7
208:21,22
209:3,4,4,4,6,7
209:8 222:6
223:5 240:7
243:3,5,6,8,16
243:20,22,24
246:3,6,14
273:22,23
274:8 275:1
289:7 298:4,20
298:21,25
299:1 304:8,8
304:8,9,10,11
304:12,15
306:4,19
309:25 310:4,6
310:6,9,22
312:11,18
318:11,24
321:7 322:19
326:8,11,16
327:5 328:19
330:14 334:4,7
334:8,10
335:20,21
337:14 345:17

345:18 346:10
347:1 353:4
356:4,4,14,25
357:5,5 358:16
358:17 359:12
361:7,16
363:15,16
364:22,24
365:8,10
366:14,16
368:17,18,20
368:23 369:6
370:22,22
371:1,10,11,23
376:4 377:17
378:17,18,22
380:6 382:10
382:11 401:20
401:23 402:8,8
402:19
heater's   335:18
heaters   73:9
   75:16,21 77:22
   77:25 78:1,20
   79:5,6,25
   83:13 106:4
   111:19 112:7
   113:5,16
   117:11,20,25
   118:5,7,14,23
   120:12 121:7
   121:12,15
   122:3,19
   123:11,12
   124:6 125:2

126:19 127:4
128:5,9,12
129:12 131:1,4
131:8,14 132:9
133:8 143:14
143:22 146:1
147:14 157:9
157:11 167:8
168:21 170:13
170:21 171:10
171:18 172:14
172:17 174:2
175:11 178:23
179:20 181:16
181:21 189:20
190:2,7 193:19
194:16 196:9
196:15,20
197:4,8,9,23
198:11,22
199:2,10,13,24
208:9,15,24
209:2 212:21
215:5 224:5,10
224:17 230:11
232:13,20
237:1,4 238:4
238:6,12
243:14 244:14
246:9,11 251:2
251:4,8 258:5
259:24 270:1
271:10 272:11
272:16 273:2,3
273:13,14

274:2,5,7
275:7,11
279:19 280:11
280:18 289:11
289:19 291:17
295:13,15,16
306:17 309:2
310:21 314:6,8
315:5 316:7
318:8 336:1
348:14,19
349:15,22
350:7 354:17
356:15 359:6
359:13 360:4
360:11 364:14
365:3 367:7,8
368:1,5 369:6
369:7,20 370:9
370:14 372:16
373:8,13,19
377:2 378:15
378:24 379:1,3
379:4 380:23
382:21,22
383:8 384:15
384:18,23
385:3 386:11
386:14,16,22
387:7,9,13
393:17 402:5
402:17
**heating**   1:7
5:13 6:5 76:8
83:11 237:2

334:10 411:1
412:1
**heats**   195:4
**heavier**   210:12
**heavy**   55:21
126:7 151:4,11
152:18 166:19
210:14 223:25
224:3,8
**hehner**   2:14 3:4
3:7 6:8,8 37:15
37:19,23 45:12
64:20,24 67:22
67:25 71:4,6,9
108:16,19
123:9,13
127:19 140:6,9
160:13 211:5
220:11 235:17
235:19 254:17
254:19 260:12
260:16 265:22
265:24 291:9
299:25 300:4,6
310:19 314:15
314:17 333:8
336:24 337:4
338:3,5 348:4
355:8,11,13,15
365:22,24
366:7 384:4,5
384:7 385:23
385:25 388:14
388:16,17
389:1,4,10

391:10 392:4
404:20 406:2,5
406:7,18,23
**height**   250:10
280:10 402:18
**held**   73:25 84:5
396:25 406:13
**help**   47:17
54:18 312:23
313:1,2 329:15
337:7 393:14
**helped**   44:24
313:4 382:8
385:7
**helpful**   72:6
81:5
**hercul**   106:21
**hercules**
106:21
**herculine**
107:12,20
**herculiner**
107:9,15
209:13 210:4
210:18 241:7
247:22 248:3
**herculiners**
106:24
**hereto**   412:7
**hereunto**   409:5
**heritage**   45:15
45:19
**hexalent**   249:9
**hexane**   249:5

**hh**   4:18 315:21
315:22 316:14
**high**   175:17,17
175:25 186:24
230:17,17
234:4 250:4,19
**higher**   87:25
150:25 172:23
172:23 175:10
176:21 215:16
230:7,17
250:11 252:7
**hindsight**   83:7
**hire**   249:13
**hired**   30:8,10
86:2
**hit**   175:18
178:22 181:16
**hold**   11:13 48:9
73:24 103:14
130:15 136:13
143:11 144:12
158:19 191:6
211:13 214:21
214:24 215:4
252:6 279:10
299:3 326:19
345:14 346:24
348:13 349:21
363:16 369:19
373:3 385:17
396:23,25
**holding**   100:15
319:19

**holds** 23:7
   252:3
**hole** 320:8
   387:25
**home** 7:8 18:18
   31:19,19 234:7
   393:1
**homeowner**
   30:11 31:2
**hose** 240:19,22
**hot** 226:3
   228:15,25
**hour** 1:19 46:3
   87:12,16,17,18
   87:19,20 88:4
   89:6,11,16,18
   90:24,25 389:8
   392:21 408:15
**hourly** 8:7
   88:10,13,17,19
   89:6,10
**hours** 8:3 14:2
   17:11 44:19
   52:21 102:18
   111:21 123:3,5
   191:18 194:14
   389:9
**household**
   120:7
**huh** 47:21
   54:23 55:7
   75:8 90:7
   116:14 132:19
   165:13 182:21
   183:10 184:2,9

189:10 214:17
219:18,22
227:21 234:20
268:2,6 270:20
278:12 303:12
303:14 312:3
318:21 319:6
324:18 331:24
332:16 345:11
352:22 364:21
373:25 384:12
399:14 404:16
**human** 128:10
   175:2
**hundred** 230:7
**hvac** 119:24
**hyphen** 90:8
**hypotheses**
   110:19 253:5
   400:5 405:8
**hypothesis**
   98:17,25 109:8
   109:9,10,13
   110:14,24
   125:25 126:5
   187:3,5 199:22
   252:12,24
   253:13 287:15
   306:18 308:22
   375:14 376:2
   394:8

**i**

**iaai** 90:8
**idea** 33:10 66:3
   110:1 180:25

283:1 321:11
339:19 369:2
**ideal** 206:12
   309:14
**identified**
   54:21 96:6
   100:11 105:5
   106:9 272:24
   312:15 400:12
**identifiers**
   316:15
**identify** 61:2
   95:15 99:14
   201:17 310:9
   397:24
**ignitability**
   125:8
**ignitable** 126:2
   285:8 287:19
   299:8,13
**ignite** 123:15
   123:23 125:13
   145:25 196:25
   229:3 230:6
   235:1 283:24
   285:17 376:4,9
   379:9
**ignited** 105:2
   105:12,13,20
   105:22 106:1
   123:21 126:19
   128:6 200:2
   209:3 232:14
   287:16 288:7
   289:11 376:8

380:18 381:5,7
**ignites** 359:13
**ignitial** 382:9
**igniting** 381:3
**ignition** 14:24
   97:9,10,12
   105:3 106:3
   119:7 194:15
   194:24 195:2,4
   195:9,10 209:6
   285:5,6,6
   377:25 380:23
   382:9 394:10
**ii** 124:8 151:20
   200:5 227:11
   227:12 229:6
**iii** 124:8
**iiia** 200:5
   227:12 229:6
**iiib** 200:5
   227:12 229:6
**illinois** 14:3
**image** 47:11
**imagine** 79:2
**impact** 393:12
**important**
   13:16 62:3
   66:23 67:2,4,8
   79:2,8,9 92:21
   92:22 174:22
   293:22 308:1
   361:25 400:5
**impression**
   63:8

inappropriate
  391:16
inception  375:4
inch  185:22
  258:10
inches  177:6
  178:18 179:11
  182:4 278:24
  278:25 280:1
inclu  114:23
include  27:2
  151:3 181:12
  345:23 375:16
included
  114:23 275:4
  288:17 329:18
  334:18 335:24
including  18:17
  20:8 28:3 34:5
  63:5 115:18
  131:1 164:3
  186:17 197:11
  226:22 338:15
  393:24
inclusive  19:2
income  8:17,18
  85:15 86:9,11
  86:17,20 89:24
incongruent
  81:2 177:21,23
incorrect
  110:21 391:20
  400:13
incorrectly
  314:9

increased
  398:5
independent
  9:23 28:15
  29:6 32:7
index  3:1 4:1
indian  45:19,19
indiana  1:1,4
  1:16,18 5:13
  5:15,18 7:9 9:5
  14:3 70:16
  71:7 85:19
  233:3 391:16
  408:1,6,14
  410:4 411:1
  412:1
indiana's
  348:23
indianapolis
  1:18 2:5,16
  5:18 7:20
  15:12,13 18:7
  27:13 32:10
  242:14 260:7
  260:12,15
  408:13
indicate  24:10
  82:21 126:15
  187:6 293:13
  308:10 385:7
indicated
  121:23 126:24
  127:3 202:8
  272:6 300:11
  310:5

indicates  8:23
  9:13 134:5
  174:19
indicating
  94:15
indication
  217:15,17
  296:8 364:25
  364:25 388:8
  400:24
indications
  388:22
inductive  98:19
indy  312:13
inen  150:12
  239:2
inendino  26:5,6
  26:21,21 35:16
  39:9 113:19
  114:22 134:6
  148:8,19
  149:10 150:12
  160:12 161:6
  161:10 165:11
  168:13 169:17
  171:8 178:17
  180:10 181:13
  184:21 239:2
  259:21 260:8
  312:2 313:4,9
  313:21 317:10
  329:18,24
  338:15
inendino's
  160:21

informa  53:13
information
  8:22 31:13
  32:2 35:6,19
  38:19 39:5,14
  41:6,7,11,18,19
  41:21 42:8,10
  42:25 43:4,16
  46:2 53:13,20
  61:22 62:4,9
  63:6,11 64:11
  65:1 66:21
  67:2 75:5,9,22
  76:3,13 77:10
  78:8,10 79:7
  79:14,15 80:18
  81:6,9,10,12
  82:11,15 98:16
  102:13 106:13
  111:12 127:24
  134:15 136:5
  137:13 142:15
  146:4 148:23
  149:22 150:1
  150:12 160:21
  165:5 177:23
  177:24 179:15
  180:5 181:13
  182:1 183:21
  183:22,24
  185:7 186:22
  190:6 205:25
  231:21 233:18
  234:2 250:7
  260:3 262:22

263:1,7,13
266:25 273:6,9
283:13 286:21
288:18 340:17
341:22 349:24
384:14,17,22
393:11 394:4,6
395:2 396:18
404:24

**informed**  40:2
54:1 77:25
112:6 113:13
114:22 115:17
221:13

**infrared**  79:5,5
83:13 117:10
117:20 120:1,5
120:11 190:7
212:21 215:4
272:10,16
273:3 401:20
401:22 402:6

**ingredient**
209:22 210:4,5
248:25 249:3

**ingredients**
209:23 248:16

**initial**  44:11
48:6 109:8,8
127:12,25
140:20 372:21
372:21,24
397:22

**initially**  39:2
44:9 46:11

63:7 86:17
94:25 134:12
152:17 259:13
262:8 292:19
372:23 389:25
394:4 397:8

**initials**  74:21
75:4 160:1
301:22

**initiated**  73:8

**inside**  58:21
59:14,18 60:5
60:12 62:5
63:4 64:2,17
107:10,15
113:3,16
121:22,22
122:2,7,25
128:18 130:23
132:12,13,15
134:22 138:17
147:4 152:21
153:4,9 159:4
163:12 167:8,8
169:2 178:6,12
179:17 194:20
195:12,13,18
196:5 197:3,8
198:6,8,19
199:20,24
200:24 208:16
208:17 212:9
216:18,21
217:13,18,18
217:20,20

218:6,8 220:1
220:20 222:22
223:4 232:19
234:3,6 239:21
240:4,6 247:19
251:14 267:15
272:16 274:5
277:8,12 278:4
279:19 280:4
294:21 295:11
295:19,20,21
295:23 296:13
296:22 298:8,8
306:23 308:7
308:21 310:4
310:12,16,21
311:8 318:23
319:25 321:6
327:4,19
330:14 333:12
333:17,24
334:3,10
335:25 336:1
337:19 338:18
346:11 347:19
353:7 359:13
378:13,17,18
378:22,24
381:20 382:10
383:1,4,8,14,17
383:20,22
386:3 387:16
388:4 393:16
402:17

**inspect**  383:14

**inspection**
160:4 183:20

**inspections**
163:13 236:23

**install**  76:9
83:12 274:6,25

**installa**  279:18

**installation**
4:13 78:3,20
120:15 193:21
270:19 274:8
279:18 315:13
348:18 350:6
356:14 357:11
402:14

**installed**  75:16
75:20 79:23
117:11 119:21
120:1,7,13,16
121:13,15
157:10 190:14
190:15 194:16
196:15 199:3,6
200:17 251:2,9
273:15 314:9
314:12 315:6
315:11 348:17
349:8 350:1,18
360:4,11 367:8
402:9

**installer**  402:16

**installing**
272:10,15
273:2

| instance 87:10 | investigate | 400:6 | 38:1 74:4 90:1 |
|---|---|---|---|
| instances 375:3 | 110:10 132:25 | investigations | 96:5 116:22 |
| instructed 39:5 | 286:12 | 9:6 31:24 37:4 | 121:16 123:4 |
| insurance 9:4 | investigated | 70:18 85:7,25 | 134:17 150:10 |
| 16:22,24,25 | 250:22 | 91:25 94:16 | 179:3 185:3,5 |
| 17:3 29:3 | investigating | 389:15,22 | 190:22 237:11 |
| 30:10,11,13 | 136:22 | 390:4 395:4 | 259:16 273:17 |
| 31:2 32:14 | investigation | 401:12,18 | 289:15 323:4 |
| 39:16 357:1 | 9:8,23 15:6,25 | 403:16 404:21 | 389:16 390:3 |
| 360:22 | 25:24 28:18 | 404:25 | 390:11 395:9 |
| insures 75:2 | 35:4,25 40:16 | investigator | 399:4 401:19 |
| intact 359:14 | 41:1 59:7 | 8:24 11:18 | 401:21 403:6 |
| 359:19 | 61:11,14,15 | 12:14 28:1 | involvement |
| intake 167:21 | 63:13 67:4 | 31:3,7 32:8 | 29:5,11 35:24 |
| 304:19 | 69:2 74:2 | 36:19 38:2,18 | 152:18 379:14 |
| intentionally | 79:17 81:14,24 | 69:25 70:14 | involving 19:19 |
| 213:22 214:3 | 82:23 83:2 | 85:18 92:4 | 359:6 |
| interact 399:25 | 89:23 91:19 | 202:16 252:18 | ish 246:21 |
| interchangea... | 93:22 98:21 | 260:20 286:5 | issue 29:23 |
| 387:1 | 101:21 102:12 | 293:14 375:5,9 | 114:4 204:17 |
| interested 5:23 | 109:24 110:5 | 381:23 389:17 | issued 14:9,11 |
| 409:3 | 111:1 136:1 | 389:24 390:1 | 14:12 20:7 |
| interior 294:18 | 145:13 148:22 | 400:5 | 21:10 |
| 294:20 295:8 | 150:7 173:25 | investigator's | issues 31:17 |
| 363:2 | 205:21 206:16 | 251:25 252:11 | 112:22 114:6 |
| interpret 98:9 | 206:19,22 | investigators | 114:17 141:19 |
| interpreted | 261:22,23 | 31:12 85:8 | 179:3 202:12 |
| 151:3 | 270:24 349:3 | 86:1 | 322:21 328:2 |
| interpreting | 359:5 360:23 | invoice 4:10 | issuing 360:19 |
| 338:19 | 374:13 375:10 | invoices 87:4 | 374:14 |
| introduced | 384:13 389:24 | 134:4 | item 208:7 |
| 250:24 | 392:6 393:12 | involve 19:21 | 298:18 391:7 |
| introductory | 393:23,24,25 | involved 9:7 | items 32:3 |
| 399:15 | 394:21 395:5 | 12:17 14:7,23 | 166:21 313:11 |
| | 395:10,14 | 16:16 19:12 | 339:10 |

**[j - jones]** Page 45

| j | | | |
|---|---|---|---|
| **j** 2:10 3:3,7 | 266:16 270:16 | 185:15 191:23 | 104:23 105:7 |
| 318:17 | 276:5,19 | 238:25 | 105:18 107:8 |
| **jacket** 220:15 | 279:10 281:13 | **johnson** 2:15 | 107:17 108:14 |
| **jacobs** 317:11 | 295:7 297:18 | 17:20 | 108:18 110:22 |
| 338:16 | 300:8,16 | **joint** 26:3 | 111:13,22 |
| **james** 1:13 2:3 | 311:25 313:8 | 77:15 134:13 | 112:6 113:2,6 |
| 2:14 3:4,7 5:11 | 316:2 317:24 | 324:22 390:7 | 113:8,14 |
| 6:8,15,23 | 318:16 319:10 | **jones** 2:3 3:5 | 114:13 115:1 |
| 17:20 134:6 | 320:17 321:20 | 4:11 6:6,6 21:1 | 115:14,21 |
| 407:15 408:7 | 324:9 325:2 | 25:5,8 34:7,11 | 117:3,5 118:25 |
| 410:5 411:2,24 | 326:24 328:1 | 34:13 36:15 | 119:15,19 |
| 412:2,4,12 | 328:10 331:21 | 38:5,12 40:10 | 121:10 123:25 |
| **january** 1:19 | 332:7 341:24 | 40:18 43:24 | 124:12,21 |
| 5:2,4 408:14 | 345:15 346:24 | 44:3 47:13 | 125:15,21 |
| **jdhd** 182:16 | 347:9 352:8 | 51:18 52:9,23 | 126:3 127:2,22 |
| **jhehner** 2:17 | 363:10 365:17 | 53:1 57:5 62:7 | 128:13,15 |
| **jim** 6:6 7:1,4,14 | 366:7,8,10 | 64:4,19 66:7 | 129:24 130:14 |
| 13:2 17:20 | 384:4 388:12 | 69:18 72:8,11 | 130:18 131:12 |
| 20:12 21:1 | **jims** 22:5 | 78:9,18 80:9 | 131:16,23 |
| 24:14 28:6 | **job** 1:25 8:10 | 82:3,7 84:9 | 132:1,4,7 |
| 36:18 47:9,16 | 44:18 87:1 | 86:13 88:12,20 | 134:8,10 136:9 |
| 69:23 74:14 | 88:21 102:11 | 88:24 89:2,8 | 136:15 137:20 |
| 84:6 89:5 90:3 | 393:1 | 89:19 91:5,8 | 137:23 139:4 |
| 90:22 127:8 | **john** 26:22 | 92:6,11,23 | 139:17 140:2 |
| 135:2 143:13 | 33:16 34:7,21 | 93:14,20,25 | 140:12,14,18 |
| 147:10 158:17 | 35:16 39:10 | 94:4 95:11,17 | 140:24 141:13 |
| 162:1,21 | 83:10,25 84:19 | 95:24 96:1,12 | 141:16 142:12 |
| 165:11 169:14 | 113:19,21 | 96:16 97:14 | 142:24 144:9 |
| 172:17 173:19 | 114:10 115:16 | 98:11 99:19 | 144:16,18 |
| 183:9 189:7 | 134:5 148:15 | 100:2,9,16,19 | 145:10,23 |
| 193:23 211:22 | 148:18,18 | 100:24 101:10 | 146:8,16,22 |
| 216:16 218:15 | 149:10 150:13 | 101:15,24 | 147:17 148:6 |
| 227:18 235:14 | 154:1 160:12 | 102:19,22,24 | 148:10,20 |
| 239:22 246:16 | 182:18,25 | 103:3,16,18,22 | 149:6,11,12,16 |
| | 184:3,20 185:4 | 103:24 104:19 | 150:13,15,21 |

| | | | |
|---|---|---|---|
| 151:5,13,15 | 184:15,21,23 | 246:23 247:2,4 | 314:16,17,18 |
| 152:15,24 | 185:12,25 | 247:23 248:4 | 314:20,20,20 |
| 153:10,21 | 186:4,6 188:7 | 249:1,25 | 314:21,24 |
| 154:3,12 155:6 | 188:11,13,20 | 250:14,16 | 315:5 316:18 |
| 155:15,18,23 | 188:24 190:12 | 253:15,18 | 316:24 317:1 |
| 156:3,5,10,14 | 191:4,11,19 | 254:15 255:25 | 318:25 319:7 |
| 156:20 157:2 | 192:3,5,11,13 | 256:6,13,20 | 319:15,17 |
| 157:13,14,15 | 192:16,18,21 | 257:7 258:4,6 | 320:3,20 322:7 |
| 157:24 158:11 | 196:21 197:6 | 258:20 259:9 | 322:16 323:20 |
| 158:21 159:2,8 | 198:25 200:23 | 259:18,20,25 | 325:5,7 326:13 |
| 159:11,17 | 201:20,22,25 | 261:7 262:2,4 | 327:6 330:15 |
| 160:18,22,23 | 202:21 203:14 | 262:24 263:10 | 331:7 332:8 |
| 161:2,5,6,13 | 203:19,21 | 265:21 266:23 | 333:22 335:12 |
| 162:7,13,24 | 204:19,22 | 267:17 268:12 | 336:14,19 |
| 163:2,10,25 | 205:19 206:3 | 268:17 269:5,9 | 337:15,18,21 |
| 164:6,16,18,23 | 206:10 210:9 | 270:8 273:5 | 337:24 338:1,8 |
| 166:4,12,22,25 | 211:6,14,20 | 274:9 276:11 | 338:10,22 |
| 167:23 168:8 | 212:17 213:3,8 | 276:25 277:18 | 339:11,24 |
| 168:17 169:6,9 | 213:16,23 | 278:7 279:5 | 340:7,12 341:9 |
| 169:21 170:11 | 215:3,6,18 | 280:20 281:4 | 341:18 342:17 |
| 170:17,20 | 216:22,24 | 281:17 283:12 | 342:19 343:8 |
| 171:1,8,12,23 | 219:1 220:6,25 | 286:3 287:21 | 344:2,10 |
| 171:25 172:8 | 221:22 222:13 | 289:24 290:23 | 345:12 346:6,8 |
| 172:10 173:23 | 224:11 225:10 | 291:3,21 | 347:3,22,25 |
| 174:4,9,14,16 | 225:23 227:5 | 292:17 293:11 | 348:5 349:1,4 |
| 174:24 175:13 | 227:16 228:14 | 293:17 296:5 | 349:23 350:23 |
| 175:20 176:6,8 | 230:13,21 | 297:5 301:2,4 | 351:15 352:7 |
| 176:22,24 | 231:14,19 | 301:12 302:2 | 353:20 354:2 |
| 177:11,13 | 232:1,3,9,22 | 302:16,23 | 355:5 357:12 |
| 178:17,24,25 | 233:7,10,13,16 | 304:6,22 | 357:16,25 |
| 179:23 180:11 | 233:24 235:2 | 305:19,21 | 358:21 359:15 |
| 180:13,15 | 235:16,20,22 | 306:9 307:24 | 359:17,24 |
| 181:2,8,10,15 | 237:7 238:7 | 309:11 311:2 | 362:2,4,21 |
| 181:18 183:2 | 240:1 241:11 | 311:10,22 | 365:6,25 |
| 183:18 184:5,7 | 242:10 244:3,6 | 312:21 314:15 | 367:10,13,18 |

369:1 377:4
378:19,21
379:17,25
381:15,17,25
382:17 385:20
385:22,24
389:3,11,13
391:15,19,22
392:5,7,9,14
393:5,11 396:3
396:5 397:9,12
397:16,17
399:7 401:11
403:8 404:8,10
406:4,6,9,16,25
407:2,9 410:1
**judge** 257:5
**jump** 87:24
**jumped** 20:10
**junction**
185:22
**june** 7:15 9:10
9:12,20 10:14
10:17 85:1,2
113:22
**junior** 90:8
**jury** 177:8
**justin** 221:15
**jzoccola** 2:7

**k**

**k** 78:23 126:13
**kappes** 1:17 2:4
5:17 408:12
**katchur** 2:14

**keep** 18:17
38:15,18 39:4
39:7 40:22
41:3 74:18
81:6,11 82:11
88:1 144:24
220:6 389:20
395:1
**keeping** 81:9
100:25 191:13
261:19
**kelly** 34:8
**kept** 35:23
39:13 40:21
56:23 82:1
83:4,8 110:4
173:1 297:13
309:18
**kerosene**
146:24 150:19
155:17 156:25
229:8 230:5
**keys** 153:5,8
**kicked** 232:13
289:11
**kicking** 380:23
**kind** 9:2 14:20
35:3 36:1
42:12 43:22
56:18 59:4
119:12 120:10
142:9 156:23
158:10 165:24
167:25 198:16
200:21 240:19

242:8 273:11
278:9,23
280:15 354:1
365:11 369:12
386:9 388:3
**kindly** 323:12
**kinetic** 99:24
**kk** 4:18 317:7,8
317:25 318:20
319:9 320:2,7
320:16,18
321:4 323:13
324:2
**kleinight** 34:9
**knew** 45:13,15
53:18,20 72:12
280:10,22
**knock** 191:8
**know** 7:18,19
7:21 13:8,17
16:10 17:14
18:3 20:21
23:15,24 25:22
27:8,8 30:22
30:24 32:23
33:2,12,13,21
34:17 35:5,17
39:15 40:19
43:19,19 45:8
45:9,14,20
49:25 50:21
59:8 60:2,11
60:15,16 61:1
64:9 65:4,17
65:19 66:1,5

67:12 68:15,22
68:25 71:15,20
72:19 73:10
74:21,24 75:1
77:5,6,7 79:15
81:3 87:23
88:12 92:18
94:9 96:2,24
97:2 98:3,15
100:9,12,12,25
102:10 103:5
107:9,23
110:10 114:19
115:5 119:20
121:12 122:2
123:6 129:19
129:25 131:14
133:6,9,25
139:19 142:14
143:8,16 144:8
144:11 145:1
146:5,9,20,23
147:2,11
148:11 150:19
152:9,12,16,21
155:3,19 156:7
158:9,9,18,24
160:25 161:3
162:22 164:20
165:22 166:1
169:2,20,23
170:12 171:17
171:24 173:6
175:1 177:1,3
185:8 190:14

190:15,16,17
190:21,22,23
192:25 193:1
193:19 194:23
195:18 196:18
196:22 197:20
198:12 199:2
204:25 212:4
213:20 214:19
214:20,22
215:7 216:9
217:3,16
218:11,12,22
219:9,23
220:14 221:6,9
222:22 223:7
224:14,18,19
225:3,7 227:1
228:6,12
229:12,14
231:9,10,15
232:25 236:10
237:5,25 240:4
240:17,22,25
241:4,7 242:11
242:19,19
244:23 247:20
248:1,8,16,16
248:24 249:2,4
249:22 250:1
251:5,20
252:18 256:23
262:15 265:3,5
265:15 267:22
267:24 268:14

269:13 270:4
274:4,13,14,14
274:19 276:7
276:10,15
278:1 279:6,8
280:9,25
283:23 284:1
286:17,22
288:23 289:1
292:1,7 298:12
298:13,15,16
300:25,25
301:5,10,14
302:17 306:3
307:12 308:16
308:19 309:4,5
309:15 310:1
314:24 316:13
316:14 318:7
320:12 321:2
321:11 323:22
325:9 327:24
328:16 329:3,4
329:7,14,14,23
330:2,3 333:16
335:8 336:2,9
338:23 339:12
340:1,2,6
341:5,19 342:8
346:14 350:23
352:9 354:5,9
354:19 357:7
359:10 366:21
367:22 368:18
369:4 370:24

371:1,3 372:1
373:18 377:23
378:5,6 380:4
380:11,22
381:1,19 391:5
396:11 401:22
402:1 403:12
406:21,24
**knowing** 115:9
301:15 341:14
**knowledge**
21:7 24:5,11
25:8 26:23
27:17 28:4
33:1 34:2
39:14 40:11
48:17 70:1
90:19 107:1
112:24 115:5
119:18,22,25
123:18 152:25
169:10 176:7
188:12,17
194:23 275:22
276:9 281:5
317:4 320:4
322:8 359:7
375:21
**knowledgeable**
394:23
**known** 155:8
393:8
**knows** 164:23
**korte** 4:14
78:23,25 79:19

79:20 80:3
83:13 165:11
212:13,14
218:19 220:19
272:5,14,25
273:7,9,12,14
274:4 275:9
276:15,18,19
276:22 278:14
279:15
**kyle** 50:15,17
51:3,4,6,10,16
51:21 52:8,23
53:1,8 55:11
56:11 57:18
58:8 59:16
60:8 64:7,16
76:17 77:2,10
78:6,7,18
83:10 84:1
111:13 113:1
113:14 133:5
172:17,19
212:16 272:18

**l**

**l** 96:20 409:13
**lab** 27:12 73:8
126:6 132:17
137:14 142:18
167:11 251:14
283:7 286:21
292:22 297:12
309:20 315:20
322:1 324:10
325:11,12,20

335:9 339:17
341:21 343:3
354:15 368:15
368:21 371:2
382:3,8 383:5
399:4
**lab's** 335:6
340:15
**label** 288:1
290:15 293:16
293:24 316:22
322:5 332:17
338:3 342:13
342:15,16,22
347:6,19
352:25 353:2
**labeled** 278:14
290:18 291:19
294:14 335:24
341:3 353:24
**labeling** 301:9
313:10
**labels** 316:6,15
**laboratories**
109:6
**laboratory**
282:10 283:20
292:3 366:18
**labs** 135:5
**lack** 17:9 85:24
215:3,6
**ladder** 121:6
198:21
**laid** 100:9
279:11

**landed** 181:24
222:9 306:6
**landfill** 162:2
**lands** 176:2
**language**
350:10,13
351:7 356:12
357:10 358:5,7
**laptops** 56:23
**large** 54:15
55:21 61:13,17
138:21 158:8
207:6 408:6
**lasted** 29:9
**lastly** 350:6
**late** 61:16
350:23
**law** 5:18 16:3,8
86:23 144:12
259:23
**lawcjb.com**
2:17
**lawyer** 16:3,8
17:17,18
103:14
**lawyers** 34:16
302:11
**lay** 149:4
291:22
**layer** 216:16
**laying** 122:9
167:6 238:13
238:15 306:19
306:21

**lays** 69:24
**lead** 184:7
384:17
**learn** 38:23
77:9,14 113:1
**learned** 59:24
392:14 393:10
393:11
**leave** 21:16
52:15,17,18
85:5,17,20
86:9 151:10
378:4
**leaving** 8:24
10:14,17,22,25
14:14 15:10
32:13 36:8
86:11 87:14
**led** 286:18
**left** 10:9 31:17
46:1 52:2 55:8
56:7 66:14,18
77:1 78:18
85:1 86:22
137:7 158:17
160:18 183:9
218:23 219:2
241:21 278:14
278:24 282:8
283:19 316:12
332:8 355:23
377:1 386:18
**legal** 41:15
42:13 87:24
252:15 326:25

352:17 410:23
**legally** 191:9
**length** 133:20
**lens** 214:15
**letter** 4:12,17
342:6 351:12
352:1
**letterhead**
159:21
**lettering**
316:12
**letters** 290:16
302:13
**letting** 94:9
308:15
**level** 30:20,21
128:9,10
135:23 151:23
152:1,3 202:8
234:23,24
250:2,10,19
251:25 252:2,7
252:10,13,19
252:23 253:6
253:10,12
254:22 255:1,6
257:3 260:22
261:10 263:5
396:21
**levels** 252:20
**lewis** 1:17 2:4
5:17 408:12
**lewiskappes....**
2:7,7 410:2

liability 348:23
348:24,25
liable 177:25
lid 247:17
311:8
lieutenant
19:20
life 185:16
light 141:3
142:4 143:4
210:12 369:12
369:13,17
370:11,14
371:17,22
372:8,11
lighting 79:23
165:14
lightly 139:21
lights 111:23
112:17 392:25
393:18
liked 210:25
likelihood
187:2 253:13
likely 146:24
167:7 194:13
209:5 226:5
228:18 251:21
253:5,11,20,22
257:2 303:2
likes 255:19
limit 269:25,25
limited 1:4 5:13
18:18 137:13
410:4 411:1

412:1
line 61:22
131:24 161:17
162:1 177:5
213:17,17
214:10 263:18
264:13 294:20
295:6 298:3
333:2 352:21
411:4,7,10,13
411:16,19
lined 41:22
liner 106:21
lines 182:24
lining 333:25
linkedin 8:23
84:25
liquid 123:16
123:20,23
124:8 125:5
146:2 167:13
208:6 227:11
227:13 229:7
249:5 288:3,21
299:8,9
liquids 230:3
285:8
lisa 1:14 5:21
408:5
list 32:22
298:18 405:11
listed 20:23,25
71:15 116:12
209:25 339:14
339:16

listen 102:17
274:3 284:22
litigation 18:5
206:2
little 13:2 51:24
135:22 155:12
157:8 210:2
261:24 284:22
286:17 288:12
294:24 384:9
live 86:19
lived 29:7
loaded 22:5
local 44:14
84:10,14 189:2
189:5 370:1
406:11
locate 402:16
located 152:10
153:13 170:7,7
170:21,24
173:20 174:21
297:9,13
346:25 347:1
location 5:17
29:1 41:21
46:3 132:22
202:8,14
243:16 269:12
304:25 305:12
399:24
locations
326:18
lock 170:3

locked 392:24
locker 222:10
222:12 223:14
240:6 318:23
321:7 344:20
lockers 56:21
222:14
logical 98:8
long 7:14 11:19
13:15,18 14:1
14:7 17:10
28:24 48:19
51:10 53:8
54:10 80:14
97:12 131:5
168:24 195:16
226:5 227:1,24
394:11 402:2,3
longer 85:11
86:8 91:14
133:10 162:16
196:12,25
227:1 341:3
405:12
look 11:11
20:20 24:6,12
24:12 62:20
68:4 72:7 87:8
90:22 92:16,17
131:19 132:12
135:1 137:9
138:8 139:6
140:24 155:21
155:22 159:25
167:16 194:9,9

198:23 215:10
218:8 232:13
240:14 244:20
265:10 277:4
283:16 288:4
294:10 319:3
319:18 321:5
336:25 350:17
362:15 370:25
388:4
**looked**  22:15
25:14 27:10
31:6 45:16,18
79:3 97:24
98:1 110:24
121:6 152:9
164:25 187:3
209:13 243:10
248:19 289:18
317:20 321:5
328:14 330:20
331:4 341:7
345:21 366:22
396:9
**looking**  24:2,20
61:7 62:18
84:25 95:18
140:7 170:5
215:13 218:1
241:3 246:21
274:17 304:1
310:14 333:8
337:12 363:13
368:22 396:9
396:13 397:23

398:19
**looks**  23:16
45:9 139:25
140:25 143:4
188:6 214:2,3
218:14 219:13
219:14,19
220:5 235:14
240:5 247:5,12
266:16 268:3,9
269:8 278:24
316:5 318:12
319:4 321:12
325:17 345:5
362:17
**loosen**  248:13
**loss**  45:25
46:15
**lost**  273:20
**lot**  10:2 46:21
54:22 57:11
62:8 64:11
67:3 86:18
99:11 129:21
130:12 133:10
133:14 134:17
135:16 142:10
143:7 154:25
179:3 190:20
190:20 209:23
209:24 213:6
250:15,20,24
312:24 321:16
361:11 372:20
372:21 376:16

380:13 405:23
405:23
**lou**  26:1,21
34:21 35:15
39:9 114:22
115:2,10 134:6
148:8,18
149:10 150:12
160:12 165:11
168:13 169:16
171:7 178:16
180:10 181:13
184:20 239:2
312:2 316:4
317:10 329:18
338:15
**loud**  177:9
357:3
**low**  179:18
193:24 194:6,7
357:18
**lower**  252:7
305:15
**lvi**  160:1
**lying**  257:10

**m**

**macbeth**  4:15
27:4 50:12
51:11 121:4
134:7 197:22
198:20
**machine**  158:7
158:10,22,24
222:16

**machines**  58:21
**made**  31:8 36:5
42:23 48:12
49:1 58:25
60:2 63:3,25
93:11,16 94:18
115:6,8,24
141:17 142:17
154:4 166:10
166:13 167:5
183:19 192:2
202:13 203:15
212:8 217:19
218:3 234:12
254:7 259:12
259:17 288:10
326:19,20
372:3 396:16
404:1 412:5
**mailed**  354:13
**main**  127:19
161:11,25
173:19 174:7
209:21 264:1
288:24 309:2
**maintain**  101:8
137:10 308:1
**maintained**
35:20 81:23
82:22 120:4
**maintenance**
17:9 129:22
152:11 281:3
**major**  93:17
94:10 237:11

237:12
**majority** 205:3
**make** 13:4
  14:21 15:24
  18:8 19:1
  35:22 36:1
  41:8 42:6,12
  55:17 63:6
  88:17 89:18
  94:12,22,24
  98:24 140:25
  144:14 184:13
  203:23 226:25
  257:2,18
  283:10
**makes** 7:3
  112:20 172:4
**making** 30:14
  30:14 85:16
  89:16
**manager** 51:18
  54:5 78:9 90:9
  90:14 157:6
  172:9 181:14
  184:12 188:7
**managers** 54:2
**manner** 144:2
  181:23 312:17
**manual** 4:13
  92:20 120:15
  164:10 254:21
  270:25 271:9
  271:19 350:7
  350:11,14,17
  350:18,25

356:14,21,23
357:11 358:19
402:14
**manuals**
  270:19
**manufacture**
  348:15 349:16
**manufacturer**
  131:14 396:16
  403:1
**manufacturer's**
  403:24
**manufacturers**
  125:18
**mapping**
  375:16,17
  395:20
**march** 17:16
  18:15 26:15
  44:6,6,16,22
  45:21 48:14
  51:10 52:12
  53:8,22 60:6
  60:12,17 62:5
  63:2 64:3 69:9
  71:12,14,15
  77:17,19,20
  87:11 106:24
  121:6 132:15
  133:23,24
  134:7 135:3,9
  138:5,16 147:4
  159:1 160:6,15
  161:6 169:17
  176:5 180:10

181:14 182:13
184:4 190:9
191:1 198:19
202:24 231:7
232:20 299:6
300:17 315:17
315:17,18
321:23 324:16
373:4 409:16
**maria** 301:21
  301:23
**marion** 1:18
  18:7 408:13
**mark** 47:14,16
  293:15 309:24
**marked** 20:19
  23:16 54:24
  72:24 74:15
  189:7 291:23
  292:7,15 304:5
  304:25 307:10
  329:19 344:22
  351:8 363:10
**marker** 331:13
  352:21
**marking** 20:10
  308:15 309:25
**markings**
  326:14
**marshal** 360:14
  360:18
**martin** 2:10 3:3
  3:7 6:4
**marty** 7:3 25:5
  67:22 88:20

131:23 350:23
407:7
**match** 230:23
**matching**
  375:19
**material** 96:7
  96:10 101:7
  105:1,4,5,11,13
  105:16 106:6
  107:12,20
  126:8 132:25
  150:24 200:6,6
  201:6 208:20
  219:7 230:5
  240:23 247:6
  289:10 319:25
  329:10 333:16
  335:9 378:25
  383:1,3 401:1
**materials**
  105:25 106:9
  218:22 229:10
  251:15 300:11
  378:10 381:3,5
  381:13 382:21
  382:24 383:7
  384:1 385:11
**matric** 400:16
**matter** 5:12
  6:18 92:24
  187:10 408:10
**matters** 19:13
**mds** 124:9
**mean** 10:4
  41:14 42:18

51:24 96:15
103:4 116:10
120:19,21
141:1 143:6
152:4 159:10
161:8 186:9
190:2,2 193:23
194:13 209:11
217:20 226:11
226:17 227:19
228:5,18 234:9
240:24 256:23
257:15 272:21
290:4 294:23
306:20 319:3
334:7 336:25
348:21 363:23
367:12 370:25
373:14 379:3
382:25 404:17
**meaningful**
105:4
**means**  103:24
283:23 358:9
375:15
**meant**  42:22
84:19 143:9,13
214:6 244:5
254:10 260:13
275:19 344:8
352:4,6
**measure**  268:3
269:11,16,17
400:19 401:3,4
401:7

**measured**
249:4
**measurement**
280:4
**measurements**
137:4,5 205:18
269:19
**measuring**
268:23 353:17
**mechanic**  7:13
8:10,14 88:10
**mechanical**
8:12 26:2
55:25 99:24
115:3 194:22
312:22 313:25
**media**  5:10
84:11,13 189:1
189:4 270:10
270:13 328:7
369:25 370:3
406:10
**medications**
13:21
**medium**  126:7
166:19 210:14
223:24,24
**meet**  45:21
51:3 181:4,5
251:10
**meetings**  22:12
22:15
**melt**  186:2
**melted**  239:18

**members**
217:14
**memory**  44:13
66:16 130:4
131:6 153:18
315:4 404:16
404:18
**mention**  60:8
275:8
**mentioned**  11:5
15:9 16:16
133:6 186:17
202:11 210:20
347:5 355:12
387:7 394:16
**mentioning**
175:5
**mentions**  67:14
344:4
**merely**  254:22
**met**  6:24 33:16
61:2 68:18
192:18 198:18
262:15
**metal**  159:4
165:23 167:5
216:6,8,12,16
216:20 217:9
218:3 223:4
237:13 240:17
240:18 294:17
294:20 295:1,8
298:4,19,22,25
321:23,23
324:21 334:5

373:22 388:19
401:3
**methanol**  162:2
162:6
**method**  94:16
108:6,7,9,11,21
109:23 187:4
289:14 393:22
393:25
**methodology**
70:1 81:15
94:16 98:21
312:16
**mgardner**  2:13
**michael**  22:10
34:9
**michigan**  14:5
16:5
**microphone**
220:7
**microphones**
5:5
**middle**  208:21
209:7 222:9
240:7 298:20
298:21 304:8
304:11
**midnight**  44:16
82:6
**mig**  59:3,9
173:1,4
**mike**  21:25
22:3,3,4,10
23:4 24:14
114:23 115:11

115:18
**mikes** 22:5
**miller** 34:8
  213:1 214:24
  218:19 220:17
  272:4,24
  279:16
**mind** 92:12
  110:4 261:19
**minimal** 187:2
**minimum**
  69:24
**minor** 57:24
  58:11,15
  173:13
**minute** 76:23
  171:9 186:15
  187:12 270:7
  351:5 373:23
**minutes** 48:21
  51:12 53:10
  57:18 80:15
**mis** 71:17
**miscommuni...**
  348:20
**misdocument...**
  243:11
**misprint** 71:17
**mispronounce**
  45:2
**missed** 14:6
**missing** 300:5
**misstates** 38:6
  107:17 124:21
  130:14,18

164:18 191:4
258:20 309:11
**misstating**
  390:16
**mist** 177:5
  178:18 182:7
  196:25 199:19
  214:1 259:2
**misused** 254:6
**mixed** 69:21
  223:16 288:12
**mm** 4:19
  324:14 325:1
  328:10 331:21
**mo** 271:9 402:5
**mode** 197:23
**models** 271:11
**modine** 4:13,14
  196:9,19 197:4
  197:23 198:22
  270:18,18
  271:9 272:9
  273:25 274:4
  402:5
**modines** 199:9
  199:14 273:24
**monday** 8:4
**month** 9:11
  17:12,14 80:8
  85:2 89:14
  179:16
**months** 24:16
  25:15 62:24
  63:23 66:15
  75:25 122:4,8

131:3 157:10
214:25 251:3
272:8 279:19
297:11
**moons** 57:9,10
**morning** 5:3
  44:12,20 60:19
  60:21 228:10
  392:19
**motors** 393:18
  393:20
**mounted**
  120:21 174:2
  174:10 387:10
**move** 16:11
  20:15 102:16
  102:17 191:7
  264:10 277:22
  281:1 365:15
  391:11
**moved** 60:3
  128:20 130:1
  133:7 153:6
**moving** 64:10
  129:15 192:6
  250:13 308:2
  321:20
**msds** 106:14
  124:3 125:20
  126:5 396:8,10
  396:16
**multi** 327:17
**multiple** 19:6
  19:23 27:5
  74:3 82:19

216:17 250:21
256:16 277:25
290:15 291:20
303:7 305:2
326:16 327:17
327:20 390:10
**mute** 5:7

**n**

**n** 2:1 409:13
**name** 5:19 6:22
  16:3,7,12
  17:17,20 22:2
  26:2 32:23
  33:1,4,7,17,18
  43:1,14,20
  45:3 50:3,16
  51:4 53:25
  60:25 61:19
  63:3 64:16,25
  65:8,17,25
  74:25 77:5,6,7
  78:22 79:22
  80:16,17
  106:13 160:18
  201:18 202:3,3
  202:4 266:16
  275:9 301:21
  313:21 338:15
  384:4 396:2
**name's** 272:24
**named** 26:22
  65:6 221:15
**names** 43:8,13
  201:24

**national** 91:22
94:17
**nature** 38:20
41:10 42:3,9
45:19 55:22
56:21 57:3
58:2 62:11
63:18 79:24
85:23 89:25
109:5 112:18
118:9 132:13
137:1 185:4
187:1 248:13
314:4 350:20
392:19,25
393:18 395:18
**near** 46:16
76:24 88:6
161:16 169:19
171:15 173:13
215:12 234:23
234:24 238:14
250:19 295:21
356:3 377:2,17
**nearby** 238:14
379:10
**necess** 205:12
**necessarily**
74:3 133:17
142:3 154:22
209:11 227:22
245:20 295:22
334:21 336:22
344:16 358:23
403:13

**necessary**
313:1 412:6
**need** 9:5 13:15
48:9 57:9 83:4
87:8 98:6
108:22,25
123:9 296:4
391:4 395:3
406:21
**needed** 28:25
62:15,18 64:9
114:18 196:20
237:23
**negative**
283:11,21
288:15
**neither** 12:23
33:24 34:3
104:18 253:20
283:8 304:18
307:6,9 404:2
**never** 12:5
19:11 65:12
66:10,11 68:18
69:11,13 72:3
76:13 81:19
92:12 163:24
164:25 165:1,1
165:5 178:3
180:2 187:18
188:13,18
204:16,23
211:2 231:8
241:1 245:3
254:13 262:1

264:2 265:12
271:2,16
285:24 289:3,5
391:13 403:18
**new** 10:24
16:17 28:20
58:24 80:24
129:6 130:24
131:15 132:15
134:22,22
138:5 162:21
168:21 196:16
197:18 250:23
250:25 273:13
279:18 317:14
341:24
**newegg** 15:14
15:15 16:17
17:7,19 18:6
**news** 83:16
**nfp** 66:23 67:14
81:2 82:2,21
94:18 95:6
293:8 344:4,11
394:25
**nfpa** 69:24,25
70:2 91:23
92:3,14 93:9
93:12 94:23
95:10,15 96:9
97:5,8,23 99:4
99:21 100:15
101:7,13,18
105:1 204:7
251:24 253:9

254:21 260:18
261:17 293:13
302:21 316:17
344:1 373:24
394:17,20
395:7,15
399:12 405:13
**nfpa's** 100:13
**nice** 62:9
**night** 26:10,14
43:17 44:8
68:25 233:22
234:15
**nine** 34:17
174:2,10,21,25
175:12 256:24
280:12,19
282:13
**nineteen**
190:19
**nn** 4:20 325:14
329:19 330:12
332:15 333:10
334:19 336:10
398:20
**nods** 208:13
**nomenclature**
118:21
**non** 20:3
312:16
**noncombusti...**
401:1 403:6
**nonresponsive**
102:16

nope   365:23
norm   301:8
normal   196:13
   293:20
normally   72:4
   293:20
north   2:15
   54:14 55:21
   56:3 183:11
   209:3 223:19
   246:8 265:19
   266:8,10 295:9
   299:1 326:7,11
   328:18 330:14
   331:25 332:4
   335:20 337:5
   337:14 338:4,6
   338:12 370:21
   371:1
northern   1:1
   5:15 213:14
   277:12
northside   7:12
   7:14,17 8:11
   8:19 88:11
   89:6,17
notarial   409:6
notary   1:15
   408:5 412:13
   412:19
notation   172:4
   185:6
note   5:5 41:24
   161:1 185:11
   410:10

noted   412:7
notepad   42:12
   42:16
notes   4:11 33:8
   34:16,18,20,21
   34:22 35:2,3
   35:10,15 36:9
   36:13 38:3,10
   38:16,25 39:23
   40:7,9,17,25
   41:8,14,16,25
   42:6,12,16,23
   48:22 49:21
   53:11 72:6
   77:1 78:17
   80:19,21,23,25
   81:6,18,23,25
   82:1,22 148:6
   148:14,18
   160:11 169:16
   171:7 182:9,11
   182:13 184:3
   184:21 185:11
   188:6 191:16
   191:17,19,21
   191:24 205:17
   259:7 408:18
notice   1:21 4:6
   12:23 20:9
   63:16
noticed   131:5
   132:24 204:16
   208:22 251:7
   371:6 395:19

notices   20:8
noticing   6:3
notified   53:16
   53:24 69:4
notion   279:2,3
november   4:14
   4:17 22:8
   39:20 57:20
   59:17 72:25
   73:5,23 74:7
   90:22 91:7,10
   93:8 126:24
   203:8 355:20
   364:6
now's   188:24
number   5:16
   19:1 32:6 56:6
   56:6,7 57:21
   57:22 58:21
   59:10,18 60:5
   60:12 62:5
   64:2,18 86:4
   107:10,15
   111:12 113:4
   113:17 114:12
   115:3 116:15
   116:18,21
   117:18 134:8
   140:8,9 147:4
   147:10 152:1,2
   153:19 154:10
   156:1 158:25
   162:6 163:5,13
   163:19 164:13
   167:3,4,10,15

169:3 175:25
   176:4 178:7
   179:4,18 181:1
   195:25 198:19
   212:9 216:5,10
   217:11 222:1
   232:20 258:8,8
   272:17 274:5
   277:10,11,17
   278:4 279:19
   280:4 283:18
   283:21 329:9
   342:4 348:5
   352:17 376:16
   376:23,24
   377:9 378:10
   378:13 380:5,5
   380:6 381:20
   383:24 396:10
   396:11 402:17
   404:5 407:5
number's
   181:8 265:18
numbered
   138:3
numbers   23:17
   55:8,18 319:15
   337:1,21
   389:14
numerous
   19:22 163:12
nuts   248:12

| **o** | 142:12 144:9 | 192:13,19,24 | 280:20 281:4 |
|---|---|---|---|
| **o** 78:24 96:20 | 145:10,23 | 196:21 197:6 | 283:12 286:3 |
| 266:18 409:13 | 146:16,22 | 198:25 200:23 | 287:21 289:24 |
| **object** 89:2 | 148:10,20 | 201:20 202:21 | 291:21 292:17 |
| 103:17 180:13 | 149:12 150:15 | 203:14 204:19 | 293:11,17 |
| 191:21,25 | 150:21 151:5 | 204:22 205:19 | 297:5 301:2,12 |
| 302:2 318:2 | 151:13 152:15 | 210:9 213:3,8 | 302:2,16,23,23 |
| 385:17,18,20 | 153:21 154:3 | 213:16,23 | 304:6,22 |
| 391:14 | 154:12 155:6 | 215:3,6,18 | 305:19,21 |
| **objecting** | 155:15,18,23 | 216:22 219:1 | 306:9 307:24 |
| 131:23 | 156:3,10 157:2 | 220:25 221:22 | 309:11 311:2 |
| **objection** 34:11 | 157:15 158:11 | 222:13 224:11 | 311:10 312:21 |
| 36:15 38:5,12 | 159:2,8,11,17 | 225:10,23 | 316:18,24 |
| 40:10,18 62:7 | 160:23 161:13 | 227:5 228:14 | 318:25 319:7 |
| 64:19 66:7 | 162:7,13,24 | 230:13 231:14 | 320:3 322:7,16 |
| 72:8,11 80:9 | 163:10,25 | 232:1,22 235:2 | 323:20 325:5 |
| 86:13 88:12 | 164:16 166:4 | 237:7 238:7 | 326:13,20 |
| 89:8 92:23 | 166:12,22,25 | 240:1 241:11 | 330:15 333:22 |
| 93:14 95:11,17 | 167:23 168:8 | 242:10 244:3 | 335:12 336:14 |
| 96:1,16 101:15 | 168:17 169:6,9 | 246:23 247:2,4 | 338:22 339:11 |
| 104:19 105:7 | 169:21 170:11 | 247:23 249:1 | 339:24 340:7 |
| 105:18 107:17 | 170:17 171:12 | 249:25 250:14 | 340:12 341:9 |
| 108:14 110:22 | 171:23 172:8 | 250:16 253:15 | 341:18 343:8 |
| 114:13 115:1 | 173:23 174:4 | 253:18 254:15 | 344:2 345:12 |
| 115:21 117:3 | 174:14,24 | 255:25 256:6 | 346:6 349:1,4 |
| 118:25 119:15 | 175:13 176:6 | 257:7 258:6,20 | 349:23 350:24 |
| 119:19 121:10 | 176:22 177:11 | 259:9,25 261:7 | 351:2,15 352:7 |
| 123:25 124:12 | 179:23 180:15 | 262:24 263:9 | 353:20 354:2 |
| 124:21 125:15 | 180:15 181:2 | 263:10 265:21 | 355:5 357:12 |
| 126:3 127:2 | 181:10,18 | 266:23 267:17 | 357:14,16 |
| 128:13 129:24 | 183:2,18 | 268:12,17 | 358:21 359:15 |
| 130:14,18 | 184:15,23 | 269:5,9 273:5 | 359:17,24 |
| 131:12,16 | 185:12,25 | 274:9 276:11 | 362:2,4,21 |
| 132:2 136:9 | 186:4 188:11 | 276:25 277:18 | 365:6 367:10 |
| 139:4 141:13 | 190:12 191:4 | 279:5,11 | 367:13 369:1 |

377:4 378:19
379:25 381:15
381:17 382:17
397:4,10 403:8
404:8
**objection's**
279:11
**objections**  5:24
89:19 96:12
97:14 98:11
99:19 101:1,10
101:24 104:23
108:18 139:17
140:2,12
142:24 144:13
146:8 149:6,16
152:24 156:20
158:21 164:6
171:1 175:20
177:13 178:25
191:8 192:3,17
206:3,10
230:21 231:19
232:9 248:4
256:13 278:7
327:6 337:15
344:10 357:25
**obligation**
375:13
**observe**  92:20
162:5,8
**observed**
163:12 263:3
398:1,6,16

**obtain**  52:25
62:3 64:25
65:14 66:23
67:2 114:19,20
178:5,6 194:1
206:15,18,21
212:8
**obtainable**
186:22
**obtained**  33:25
42:8 49:23
53:17 62:10
82:12 142:18
150:12 181:13
208:14 279:14
279:14 281:19
328:11
**obviously**  42:5
76:4 81:3
102:5 108:13
108:20,22
109:2 121:24
133:6,18
141:22 142:25
144:24 152:17
167:1 175:24
177:3 179:10
181:4 185:2,4
186:8 193:16
199:5 208:5,9
209:9 210:21
226:2,9 230:16
234:12 256:24
262:15 289:6
306:10 343:18

354:7 363:23
364:13 377:11
378:25 391:7
393:16 394:22
394:24 395:16
405:7,12
**occasion**  59:11
251:20
**occasionally**
9:5 10:3 58:22
59:20 106:10
209:17 224:21
229:16
**occasions**
226:23
**occur**  129:17
145:20 195:3,5
286:8
**occurred**  46:16
47:1 60:19
116:20,20
129:17 193:9
205:14,15
207:7 209:12
227:25 228:6
241:15 250:4
250:25 286:9
288:8 293:10
358:24 359:10
360:8 377:24
**occurring**  61:8
128:21 251:12
**occurs**  119:8
193:10 194:24
195:9 206:25

**october**  261:25
262:1 263:17
**offer**  120:15
148:24 150:5
**offered**  58:15
85:14
**offhand**  7:18
80:17 106:13
335:13 364:2
368:19
**office**  17:1 46:4
46:11 50:18,18
50:19 51:5,20
68:16 82:25
152:11 198:2,3
312:25
**officer**  19:22,25
20:2,3
**offices**  56:20,21
**official**  31:15
253:22
**officially**  50:1
**oh**  8:9 11:25
19:3 22:16,19
37:1 48:10
69:8 71:6
127:21 137:20
137:22 140:15
143:15 153:15
168:3 189:18
198:10 199:15
211:14 220:8
256:14 260:16
291:9 292:13
292:24 295:2,2

| | | | |
|---|---|---|---|
| 303:12 305:25 | 98:2,13 99:18 | 211:20 213:6 | 315:17 316:5 |
| 319:16 332:6 | 101:18 102:1 | 214:7 217:24 | 316:25 317:5,8 |
| 332:23 333:8 | 103:24 105:9 | 218:16 219:14 | 318:1 319:16 |
| 342:18 | 106:18 107:9 | 220:3,4,23 | 320:7 321:9,21 |
| **okay**   7:24 9:18 | 107:13,25 | 221:25 223:20 | 324:2,7,12,15 |
| 11:16 12:4,20 | 112:12 113:12 | 224:2 225:16 | 325:3 327:3 |
| 13:1,5,6,10,13 | 117:1 119:1,12 | 233:13,25 | 328:3 329:1,13 |
| 15:2,9 16:15 | 120:10 123:13 | 234:18 235:22 | 330:12,22 |
| 17:2,17 19:16 | 125:7,25 | 236:18 239:22 | 331:8,19 |
| 20:7,14,16,23 | 127:10 128:8 | 239:24 240:19 | 332:12,21,25 |
| 21:4 22:16,24 | 130:21 134:3 | 243:5 244:5 | 334:13 337:4 |
| 23:14,22 24:23 | 134:10,23 | 246:1,3,17 | 338:1 340:11 |
| 25:4 26:19 | 135:11,13,20 | 249:12 254:16 | 342:6 345:3 |
| 27:15,18 28:22 | 137:25,25 | 254:19 255:1 | 348:7,12 |
| 28:24 29:15 | 138:10,13 | 256:22 257:17 | 349:19 350:4 |
| 30:16 31:23 | 139:1 140:14 | 261:24 266:11 | 351:22 352:15 |
| 32:5,17,22 | 140:21 143:15 | 271:2,8 272:23 | 355:7,11,11 |
| 36:5 37:1,23 | 147:9,11,25 | 276:2 279:22 | 356:1,7,22 |
| 37:24 44:24 | 149:24 150:17 | 279:23 280:8 | 357:3,8,16,24 |
| 45:7 47:3,25 | 151:17 152:9 | 281:22 282:3,7 | 360:9,14 361:5 |
| 48:5,8 49:10 | 152:21 153:23 | 284:8 285:9,16 | 362:14 364:1 |
| 50:25 51:15 | 157:25 158:6 | 285:22 287:10 | 365:16 366:6 |
| 52:11,22 53:21 | 158:16,24 | 287:11 290:7 | 366:16 368:11 |
| 54:20 55:11 | 160:3 161:17 | 291:3,19 | 368:15 369:23 |
| 56:11,17 57:7 | 162:18 165:10 | 292:13,13,24 | 372:15 374:17 |
| 57:13 59:16 | 165:19 167:18 | 294:3,10,11 | 375:8 376:13 |
| 64:24 67:25 | 168:13,19 | 295:17 296:15 | 378:17 379:5,8 |
| 68:4 69:8,17 | 169:2,12 170:5 | 296:19 297:17 | 380:25 382:4 |
| 71:24 72:19 | 171:17 172:14 | 300:2,4 302:17 | 384:19 385:2 |
| 73:4 74:14 | 173:1,18 174:2 | 302:25 303:12 | 385:14 386:12 |
| 75:11,14 77:12 | 174:10 178:14 | 304:4,10 305:7 | 386:17 387:7 |
| 84:8,23 87:9 | 180:9 185:19 | 305:25 306:25 | 388:5,22,25 |
| 88:10,24 89:2 | 186:13 187:25 | 307:6 310:11 | 389:10,11 |
| 91:19 92:11 | 189:10,22 | 313:25 314:11 | 390:12 391:15 |
| 94:12 97:20 | 196:8 210:16 | 314:23 315:12 | 391:19 392:3 |

393:10 396:3,4
396:15 397:12
397:16 398:19
398:25 399:7
399:21 401:18
402:13 403:3
405:5
**old**   7:4 89:25
129:22 130:16
138:15 171:9
178:19 197:16
199:14 272:9
**once**   29:2 35:9
40:1,1,4 83:1
124:4,10 146:2
146:2 194:25
226:8 227:10
251:17 289:11
297:13 315:15
315:16 340:14
376:5,18
377:17
**one's**   70:4,5
133:22 244:1
246:18 272:4
**ones**   25:15
164:15 184:21
196:16 197:16
197:18 216:21
237:10 388:13
388:15
**ongoing**   93:1
**online**   178:13
209:19 210:1

**ooh**   7:18 9:10
**oops**   20:21
211:6
**op**   56:11 350:2
**ope**   120:22
**open**   28:24
92:16,17
117:10,15
118:2,4 120:19
120:19,23
146:7 154:25
155:9 198:23
261:19 305:12
311:8 343:18
388:18
**opened**   317:11
338:14,16
**opening**   121:8
198:23 264:8
295:21 320:10
321:4 387:25
**openings**   118:6
199:3,16
358:10
**opens**   195:7
**operate**   159:13
384:16,23
**operated**   60:11
164:14
**operates**
194:20
**operating**
112:16 146:10
176:5 200:18

**operation**
120:11 194:11
196:12 393:15
**operational**
177:3 190:8
193:20 194:14
**operations**
56:11 57:21
63:5 76:12
135:17 262:10
264:1 280:5
281:2
**opinion**   14:25
15:5,19 19:13
28:25 29:1
30:25 31:5,15
81:25 98:25
104:9 105:13
106:2 110:11
117:17 124:17
125:7 126:14
127:5 148:22
148:24 149:3
191:20 199:5
201:8,16 204:7
209:2 234:1
244:16 251:21
252:3,6,15
254:22,23,24
255:2,7,23
256:4,12 257:2
261:9 265:1
286:4 287:22
289:13 314:3
348:13 349:14

349:18,21
360:2 372:12
376:1 378:3
381:24 382:20
382:22 402:11
405:17
**opinions**   67:6
73:17,21,25
74:5,8,12
116:9,12 117:2
126:25 127:9
127:17,18
148:22 149:4
149:11 165:3,7
174:23 199:23
205:6 250:3
252:20 255:10
255:13,20
260:19,21
261:4,11
262:23 271:6
271:19 275:17
283:6 290:5
312:19,20
313:6,22,24
350:15 377:9
382:15 396:23
396:25
**opportunity**
187:9,19
**opposed**   197:12
214:1 241:21
402:6
**opposing**
110:18

opposite 81:22
191:13 223:12
223:16
option 397:5
oral 1:12
orange 56:2
order 237:24
386:21 407:5
orders 406:17
orientation
56:1
oriented
326:23
orienting
326:24
origin 12:18
14:9,11,25
15:19 19:9,14
30:2,4 31:25
36:12,19 37:2
37:6 38:2 67:1
70:13 73:23
74:9 75:14
76:5 95:10
109:1 116:17
116:23,24
117:1,9 148:25
150:9 165:2,7
174:23 187:14
187:15 202:9
202:15 204:2,4
205:4,6,14,21
209:12 223:21
239:17,17
241:15 242:24

243:1,19,20
245:6,9,10,14
245:16,18
246:4,15 250:5
269:15 280:18
350:15 361:8
362:8 363:9
364:25 374:24
375:6 377:10
395:23 399:13
399:23,25
400:3,4,9,11,16
401:16,19
403:5,18
404:22
original 203:9
205:17
originally
86:18 127:5
originated 54:7
58:7 95:13
147:7 152:2
154:22 186:23
orr 50:15,17
51:10,16,21
52:8,23 53:1,8
55:12 56:11
57:18 58:8,12
59:16 60:8
64:16 76:17
77:2 78:7,18
83:10 84:1
113:1,14
otto 75:7 90:6
90:23

outcome 5:23
outside 10:19
19:13 46:15
152:10 153:6
153:25 180:21
196:2 197:12
216:10,18,20
217:4,11,17
218:1,7 234:9
234:11 245:18
308:19 310:15
347:16 349:2
379:1 399:1
outstanding
28:5,7,10
overall 110:25
268:24 370:16
overhead
147:14 164:8
262:17
overlooked
71:21
overnight
194:6,7
overs 181:23
overspray
168:22 180:12
181:22 258:14
258:25
overview 127:9
127:17,18
overwhelmin...
289:18
own 28:13 67:6
87:1 146:4

161:9 200:4
201:4
owned 86:24
owner 391:3
oxygen 154:23
155:8 231:1

**p**

p 1:13 2:1,1,6
2:12,16 4:12
5:11 6:15,23
96:20 298:14
342:6 351:8
355:22 407:15
408:7 409:13
410:5 411:2,24
412:2,4,12
p.c. 2:10,15
p.m. 44:15
48:13 52:12
370:4 406:12
407:12
pack 236:14,15
package 236:14
324:5,13
packaged
324:4
packaging
311:5
packet 236:14
pad 41:15
42:13 295:24
296:14 323:14
326:25 327:3
352:17 387:2,5

**pads** 309:10
**page** 3:2 4:2,4,5
  13:9 23:16
  47:13 48:11
  50:20 52:3
  54:19,25 73:2
  76:22 90:21
  91:1 116:13,13
  126:15 127:8
  134:8,9 135:1
  135:2 138:14
  139:1,1,13
  142:22 143:2
  146:13 150:6
  155:12 157:18
  158:4,16
  159:21,25
  160:22 161:10
  165:10 168:14
  169:14 170:6
  171:7 173:18
  182:12,12
  184:1,14,19,20
  185:19 186:17
  188:2,5 189:7
  189:9 202:5
  211:10 214:13
  215:14 218:1
  218:13,14
  220:4,10
  235:12,18,20
  239:12,23
  241:17,17
  243:17 244:19
  245:23 246:16

  262:2 263:17
  264:13 265:22
  267:2,5,25
  268:1 277:4
  278:5,9,10,11
  279:14 282:3,8
  282:21 283:16
  283:17,19
  290:6,16,19,19
  290:24,25
  291:1,2,23
  292:9,19,21
  294:10 295:25
  296:1,1 297:16
  297:16,21
  298:19 299:19
  300:5,12,12,16
  303:6 304:5
  305:7,7 307:8
  311:25 312:1
  315:21,24
  316:14 318:2
  318:10,13,20
  319:9,13 320:1
  320:7,16 321:4
  321:4,22 322:1
  323:13 324:2,3
  324:6,8,16
  325:1,3,15
  327:23 328:10
  330:12 331:4
  331:14,23
  332:1,5,14,21
  333:4,10,14,18
  334:19 337:1,7

  337:8,11,21
  338:4,6,8
  341:25 342:10
  342:17,25
  345:3,7,15
  346:1,5 347:24
  348:5 350:10
  350:12,25,25
  352:9,14,20
  353:1,11,16,18
  355:21 356:6,7
  356:17 357:10
  358:18 361:1,3
  362:16 363:11
  364:4,22
  366:11,13,13
  368:24 397:19
  398:13 411:4,7
  411:10,13,16
  411:19
**pages** 4:11
  34:18 72:24
  138:3 164:25
  211:8 267:16
  270:18 271:13
  272:2 294:7
  304:1 313:8
  402:14
**paid** 89:6,10,11
  242:6
**paint** 76:11
  106:6,10,12,12
  106:15 121:21
  121:23,25
  122:2,6,10,24

  123:16,23
  124:3,4,6,9,10
  124:19,20
  125:13 126:1
  126:17 128:3,8
  128:19,20,20
  128:23,24
  130:10,24
  131:15,21
  132:9,15,18,22
  132:23 133:2
  133:22 134:22
  135:8,16 138:5
  138:15,19
  139:2,15 140:5
  140:10,23
  141:2,3,10
  142:2,4,8,23
  143:6,17
  144:24 145:25
  146:18 151:18
  158:20,24
  165:14 167:12
  167:12 168:24
  169:2 171:15
  171:20,21
  175:22 176:20
  177:5,19
  178:18 179:7
  179:19 180:22
  180:23,25
  181:3,5,15
  182:5 190:18
  196:25 197:11
  199:19,19,19

199:24 200:3,8
200:20 201:2
201:13 213:6
213:20 214:19
215:15 218:24
219:20 221:4,7
221:12,19
222:20 223:22
224:6,7,13,21
225:5,9,21
227:2,9,10,20
229:3,4,5,8,11
229:11,12,13
229:16,22
230:4 234:19
234:25,25
237:1,3,5,9
238:5,8,13,15
239:11,14
240:24 242:21
251:9,9,11,17
258:5 259:22
259:23 273:2
277:8,12,21,24
281:2 284:4,9
284:19,25
285:18 286:1
287:16,25
288:14,21
289:3,9 305:25
306:2,4,7,11,13
306:22,23,25
315:14,15
321:9,15,18,24
323:16,19,22

324:21 325:10
347:8 351:9,18
352:3 355:9
361:7,11 362:6
362:17,19,23
362:23,25
363:2,15 364:7
364:23 365:2,4
365:25 367:9
368:3,5,14,17
368:20,25
369:5,17
370:11,14
371:4,6,17,18
371:22,25
372:2,8,12,15
372:22 373:8
376:3,10,11,16
376:24 377:6
377:15 378:13
379:12,24
380:6,7,8,12,17
381:14 382:10
382:11 383:17
383:19 393:3,6
393:7 396:12
396:19 397:25
398:7,15 403:7
403:11,20
**paint's**   133:7
175:18
**painted**   171:5
213:22 214:5,6
214:9,18 216:8
220:21 225:4

225:20 278:4
**painting**   58:17
117:11 128:10
129:20 130:10
135:17 138:18
141:9 143:23
143:25 171:10
171:18 179:11
181:6 190:20
198:21 228:9
273:16 277:16
277:25 295:14
**paints**   125:18
158:9
**pallet**   219:20
**panel**   57:25
58:1,24,25
173:20
**panels**   58:23
163:5,12 164:4
167:5
**pape**   164:21
**paper**   164:21
**papers**   8:9
**paperwork**
263:1 282:19
403:24
**paragraph**
74:16 75:5
76:24 90:4
117:2,13
126:15 127:19
189:13,16
202:6 243:21
243:23 399:15

**pardon**   260:16
**pared**   283:9
**paren**   99:23,24
299:3
**parentheses**
90:9
**parkdale**   7:9
**parking**   129:21
130:12 135:16
142:10
**part**   8:1 9:2,23
22:19 35:8,10
54:16 58:10
72:13 79:16
85:10 86:2,3
86:16 97:7
104:15 110:25
112:22 117:12
140:18,19
251:19 268:3
283:5 284:2
288:21 301:16
304:10,12,15
309:23 326:11
335:18 346:20
347:1 360:3
362:7 363:14
363:15 365:3
397:11,22
404:11
**part's**   281:25
**partially**   269:3
**participant**
390:6

**participated**
  390:8
**particles**
  175:23,24
**particular**
  19:18 42:25
  54:6,9 59:22
  63:13 71:16
  102:5 106:14
  106:20 109:25
  111:10 112:5
  120:16 121:12
  121:21 123:6
  131:9 132:23
  134:12 135:21
  141:19 143:5
  143:20 161:1
  193:9,11 194:4
  194:8 199:2,20
  203:24 207:18
  227:25 228:10
  229:9 247:12
  261:16 269:18
  270:5 282:20
  285:10 289:5
  290:3,3 309:24
  310:3 327:9
  335:22 344:16
  357:10 394:5
  395:13,13
  400:24 402:8
**particularly**
  95:7 117:17
  118:8 154:18
  180:18 231:1

237:10 244:15
  245:8 281:17
  284:13 306:5
  344:15
**parties**  5:9
  134:15 390:10
  408:23
**partly**  377:16
**partnership**
  1:4 5:13 410:4
  411:1 412:1
**parts**  225:8,20
  316:6 350:14
**party**  5:22
  409:2,4
**pass**  71:2 384:3
**past**  10:5 23:12
  106:19,20
  165:10 331:22
  340:18 380:22
  381:1 382:13
  382:14 405:18
**pattern**  98:20
  258:11 375:16
**patterns**  109:5
  396:7
**pause**  54:17
**pay**  168:22
**paychecks**
  89:13
**paying**  16:22
**pb**  248:9
  249:16,22
**pecifically**
  137:15 179:1

285:23 301:14
**peer**  90:15
  91:18
**pen**  48:19
  139:14,15
**pending**  13:18
  14:3 18:6 28:3
**pension**  8:20
**people**  42:25
  62:13 63:16
  64:12 69:4
  75:23 86:3,4
  183:17 185:7
  185:10 191:20
  212:14 221:10
  221:11 265:4
  312:25
**people's**  257:13
**perceived**
  206:1
**percent**  109:16
  109:16 204:10
  204:12 207:10
  251:21 253:14
  253:16 405:16
**percentage**
  38:1 405:15
**perfect**  84:9
**perfectly**
  237:13
**perform**  284:3
  284:3,8,24
  285:12 384:15
  384:18

**performed**
  117:12 288:13
**performing**
  63:5
**performs**
  285:11
**period**  85:22
  127:14 129:2
  200:10 227:24
  229:15 252:7
  252:20 253:12
  357:4 374:24
  374:25
**periodically**
  395:1
**permanent**
  352:20
**pers**  26:11
**person**  43:20
  50:11 51:4
  61:2 65:1
  111:14 149:22
  301:17 302:3
  317:17 391:8
  393:6,8 409:1
**person's**  53:25
**personal**  38:14
  38:18,19 68:17
  286:4
**personally**
  14:13 38:16
  39:13 65:19
  80:22 88:2
  135:24 146:23
  148:21 228:24

256:14 311:15
**personnel**
360:21
**persons**  313:2
**perspective**
2:11
**pertaining**
16:16
**peter**  353:7
**petroleum**
150:20 151:4
151:11 166:14
166:19 209:20
210:13 223:25
224:9 248:24
249:2
**phone**  13:16
51:14 63:22
64:7 69:12
79:21 80:2,14
154:4 181:8
183:13
**phones**  5:7
**phonetic**  96:18
96:18,21
105:25 115:2
126:8 249:9
**photo**  4:4,5
49:10 50:7
55:4 137:16
214:14 215:12
215:13 218:23
236:16 240:3
308:8 319:3
325:20 326:23

326:24 347:3
353:22,23
361:6 362:17
363:13 366:10
385:15
**photograph**
24:9 47:16,17
56:2 59:9
132:16 138:25
139:6,7 141:1
146:21 158:8
158:17 213:7,9
213:21 220:1
220:17 221:8
269:17 270:5
303:22 305:11
306:8 307:9,14
310:25 311:3,7
323:25 325:18
328:16 329:19
332:14 333:21
345:5,19
353:15 361:6,7
361:11 362:6
362:25 363:1,5
363:14,18
364:7,20 365:2
369:10 397:23
397:24,24
398:8,8,11,12
**photographed**
163:15,16,17
239:6 242:17
268:16,19

**photographer's**
214:15
**photographs**
4:16,16,17,18
4:19,19,20,20
22:17 23:14,18
23:19 24:3,6
24:13,17,19
25:14,16,16,19
25:20,21 26:8
27:5 59:12,13
132:14 134:20
139:9 155:25
159:3 180:4
205:17 212:9
218:9 239:8
303:8 309:13
317:12 334:14
345:20 362:11
363:9 364:11
369:3 370:7
372:8 385:9
398:1,17,25
**photography**
207:22
**photos**  4:4,5
24:8 25:25
26:13,19,23
27:1,2,10 36:3
36:4 130:23
137:16 138:3
146:5 178:6
207:23 212:11
214:25 215:8
238:12 281:20

281:23,24
282:1 307:13
309:9 317:20
317:21 321:6
323:12 328:13
330:20 336:15
354:6 370:13
370:16 385:4
386:1,2 398:4
398:21
**phrase**  178:16
261:13 374:20
**physical**  45:10
45:11 101:20
109:4 136:17
206:8,25
207:12 399:24
**physically**
53:23 104:24
121:8,17
122:10 329:23
**pic**  139:25
**pick**  5:6
**picture**  138:19
211:23 235:24
235:25 236:19
247:12 268:25
269:2,18
303:15 305:3
308:6 318:22
322:12 327:7
327:14 328:21
329:21 330:7
330:17 345:8
346:15 347:7

361:22 362:24
363:21 365:11
**pictures**  49:5,6
62:16 129:7,7
131:7,10 140:1
143:20 145:8
145:11,14
179:17 199:21
212:4,15,17,23
212:24 213:2
242:6 305:2
311:14 322:14
328:22 331:3
361:23 362:3
368:12,15
369:5,15,16,21
371:20 373:6
373:17 398:20
**piece**  217:12
219:15 293:15
293:21
**pieces**  81:10
186:2
**pierce**  1:14
5:21 408:5
**pile**  269:19
**piles**  236:24
**pipe**  295:12
296:13 303:19
304:4 310:12
331:13,18,20
333:17,19
346:3,11,12,16
346:20 347:6,7
347:11,17,19

353:4,7
**pipes**  333:19
383:10
**piping**  304:13
304:20 347:15
**place**  1:21 5:8
17:13 39:8
88:11 93:5
122:14,16
128:23 129:6
133:16,17
142:1 143:5
179:8 235:6
236:18
**placed**  63:16
**placement**
101:22
**plaintiff**   1:5 2:2
6:7 14:17,19
16:19 150:10
303:8 349:14
**plaintiff's**
221:16,16
397:5
**plaintiffs**
312:15 325:18
**plasma**  60:8,9
60:11 225:8,17
226:24 228:20
228:21
**plastic**  236:7
236:11 240:17
318:9
**play**  144:7
186:19,21

**please**  5:5,7,24
6:14,22 13:8
127:8 281:13
363:14
**plus**  354:14
**pluto**  57:9,10
**poi**  243:19
**point**  8:13
18:12 28:13
39:4 47:22,22
61:16 62:10,19
63:7,10,14
64:7 72:20
86:7 100:19
107:3 150:25
155:25 186:12
204:4 224:16
226:10 229:18
243:19 260:3
262:9 263:14
268:20 269:15
279:2 288:24
292:8 339:15
343:3 356:18
357:18,18
370:25 392:6
395:14 399:17
399:23 400:3
**point's**  103:16
103:18
**pointing**
289:19 337:2
**points**  269:11
394:9

**policy**  38:17
80:25
**poly**  236:13
**pornt**  243:19
**port**  39:3
**portion**  103:19
**position**  143:20
143:21 144:2,6
393:21
**positioned**
303:23
**positioning**
368:1
**positions**
101:23
**positive**  167:13
187:24
**possession**
24:15 136:18
**possibility**  76:4
322:9 381:19
**possible**  46:1
104:11 109:12
110:24 114:2
202:8,14,19
203:13 204:4,9
204:10,11
237:17 240:10
252:21,23
253:6 254:2,10
255:2,3 286:15
308:3,4 329:11
375:10 405:14
**possibly**  21:7
154:25 207:2

227:23 228:1
229:17 234:4
235:7 249:3
292:3 299:4
320:15
**poten**  286:15
**potential**  31:17
99:23 245:17
286:19,20
357:17 375:14
394:8,10,13
**potentially**
141:18 350:21
358:7 381:5,7
**power**  111:18
111:23 112:7,8
112:15,16
161:11 162:15
271:10
**pp**  4:20 341:25
345:3,15 346:5
347:24 348:3,4
352:9,12,13
353:12
**practical**
252:14
**practice**  36:11
36:18 37:20
205:18,22
293:20 344:14
**precisely**
309:22 328:11
379:11
**predict**  308:9
308:10

**predominantly**
154:8
**preempted**
259:6
**preexisting**
196:9,19 197:4
402:5
**prefire**  101:23
104:13
**preliminary**
29:25 81:1
**prematurely**
110:19
**premises**  57:19
**preparation**
21:22 22:17
23:2,5 24:13
26:20 27:16,19
32:18 36:12
137:8
**prepare**  29:11
40:25 136:16
136:21 276:5
400:16,22
**prepared**  10:18
10:21,25 31:1
37:8 73:6,11
81:1 135:5,25
148:18 188:10
205:5 259:7
262:23 265:5
271:19 272:6
275:17 276:7
276:10 279:20
283:9,10

341:13
**preparing**  37:6
73:5 92:15
270:24 271:5
360:23
**presence**
115:16,22
223:23 367:5
382:20 399:2
**present**  6:1
21:8 52:10
53:23 107:24
114:22 115:7
119:21 133:17
161:5 218:12
329:23 362:6
366:22,23
404:13
**presented**
18:13 26:25
108:9 109:4
142:16 286:6
287:23,24
382:6 408:22
**presently**  77:6
**presents**  288:2
**preserve**
386:13,21
**preserved**  38:9
40:14 144:14
206:9
**preserving**
351:1
**pressure**  100:1
100:1 158:14

159:12
**presume**  13:11
**presumption**
60:4 110:13,16
**pretty**  52:5
60:21 79:12
108:24 112:20
142:2 152:18
336:8
**prevent**  121:25
344:8
**previous**
190:11 191:3
193:15
**previously**
54:21 57:16
142:9
**price**  83:14
**primarily**
106:11 208:16
208:17 210:19
379:12 380:13
**printed**  24:21
398:14
**printer**  138:12
**prior**  10:22
12:5 15:17
18:24 31:24
38:6 43:18
55:4 80:5
84:23 93:22
107:18 130:18
147:4 158:25
160:15 185:16
189:12,25

191:5 193:20
212:9 225:4,19
226:23 230:12
275:8,9 280:25
282:15,15
289:9 311:1,8
319:12,13
322:5 329:20
360:18,23
372:7 374:3,13
393:9 394:6
**private** 5:6
8:23 27:25
**privy** 175:21
**pro** 195:7,7
**prob** 320:15
**probability**
205:7
**probable** 15:2
15:21 30:17,21
202:14,20
203:4,13 204:2
204:8,11,14
251:22 252:21
252:25 253:8
253:10,20
254:1,2,9,10
255:7 286:20
394:12,13
**probably** 24:16
27:9 35:18
43:3 45:2,14
50:20 51:12
52:16,18 74:1
79:12 81:5

129:1 141:8
143:2 157:7
171:3 175:14
197:9 199:15
208:21 225:11
226:4 228:18
228:18 237:23
247:15 256:8
286:23 322:24
363:20 370:16
372:19 389:17
402:13 405:18
**problems**
189:11,24
**procedure** 1:21
408:16
**procedures**
117:12
**proceed** 6:12
**proceeding**
5:24
**proceedings**
19:7 252:16
**process** 39:4
98:7,24 101:20
106:7 273:10
352:4,5 364:12
376:17 377:11
385:10 386:4
404:3,9,12,13
**processed**
404:14
**processes** 70:23
72:3 206:2

**produce** 272:15
272:20,22
379:10
**produced** 1:14
10:20 21:1,3
21:13 25:6,11
40:2 73:19
136:9 150:19
281:24 282:1
303:7
**product** 4:12
96:22 99:8,13
105:23 106:4
106:14 107:9
122:11,12
125:5 151:10
209:20 210:4
223:24 237:14
237:20 247:19
248:9 320:5,25
350:21 351:8
357:11 384:11
**production**
21:11 99:25
**products** 1:8
6:9 96:4
113:15 122:1
124:4 126:17
128:4 151:7
166:14 181:24
199:17,18,18
209:24 251:14
288:6,6 289:6
333:6,24
348:21,22,23

348:24 376:3
384:5
**profession**
261:1
**professional**
92:4
**profile** 84:25
**projector** 17:8
**prompted**
350:19
**pronounce**
22:2 26:2
**proof** 356:4
357:5 358:9,13
**prop** 227:12
**propane**
105:15,20
195:6,8,10
230:16 249:6
295:16 353:4
359:13 376:6
376:24 378:11
380:5 382:10
**propelled**
195:18
**propeller**
271:10
**proper** 192:3
386:15
**properly**
111:24 145:17
190:15 243:15
348:17,18
349:8,9 350:1
350:1,2 384:16

384:18,23
**properties**
124:7 227:12
229:5,7,7,9,25
288:2
**property** 20:24
30:11
**proposal** 4:14
**protect** 207:10
**protected**
206:9
**protection**
91:22 94:17
214:12
**prove** 256:25
315:10 368:12
368:13
**proven** 260:22
**provide** 264:21
264:24 375:5
**provided** 9:13
146:4 218:19
325:18
**providing**
252:19
**prudent** 322:24
**public** 1:15
408:5 412:19
**pull** 47:8 54:19
137:17 209:19
210:16 211:14
331:7
**pulled** 197:9,16
**pulling** 262:12

**pulmerization**
96:18
**pulmerized**
96:18,21
**pumps** 46:16
46:17,19 47:4
47:7 48:1
**purchased** 85:6
**purpose** 240:22
343:7
**pursuant** 1:20
302:21 408:15
**push** 64:10
**put** 35:18 41:7
42:16 48:5,6
73:2 79:16
80:18 85:25
92:9 95:9
142:22 181:17
202:22 208:1
211:1 230:8
231:23 232:2
238:17 248:2
256:17 257:23
263:3 273:13
289:22,23
290:2 293:7,24
294:14 298:14
299:15 301:1
301:15 303:17
309:14 322:5
323:2 328:21
331:12 332:24
333:1 340:18
342:13 343:10

343:21 344:23
346:20 361:25
394:7,14
395:23 397:19
**putting** 79:25
301:25 311:13
**puzzle** 251:19
**pyrolyzed**
96:11,15

**q**

**qualification**
70:9
**qualifications**
69:24 70:10
92:4
**qualified** 70:13
**qualify** 254:23
**quality** 256:11
256:11
**quantity**
294:15 295:8
298:1
**quart** 321:23
354:14 355:10
**quest** 94:6
**question** 12:25
13:5,7,11,19
19:8 32:11
36:16 37:16
46:9 51:7
56:15 64:23
65:5 69:21
73:10 84:16
89:5 93:19,21
93:23 94:3

95:22 103:2
112:25 136:16
140:3 158:3
167:17 181:15
192:8,21
203:22 233:11
262:7 263:8
271:8 274:1,11
284:15 287:2
287:10 294:23
304:12 307:16
314:4 348:9
349:15 354:20
367:20,20
368:3 378:1
380:1 381:12
382:18 387:17
390:23 391:12
392:12 396:6
397:15
**question's** 13:3
**questionable**
257:1
**questioned**
272:4
**questioning**
131:24
**questions** 3:3,4
3:5,7,7 6:21
20:17 21:18
25:13 34:14
36:17 37:18,25
38:8,22 40:13
40:24 44:4
45:17 47:15

| | | | |
|---|---|---|---|
| 55:2 57:17 | 149:1,9 150:8 | 201:7 202:2 | 270:15 273:21 |
| 62:21 64:14 | 150:18 151:2,9 | 203:2 204:1 | 274:12 276:13 |
| 65:3 66:9 68:1 | 151:24 152:20 | 205:2,20 206:6 | 277:3 278:3,8 |
| 69:22 71:10 | 153:3,17,24 | 206:14 210:3 | 279:13 280:24 |
| 72:9,14 80:11 | 154:6 155:10 | 210:15 211:9 | 281:6,13,18 |
| 82:8,18 84:20 | 155:16,20,24 | 211:21 213:5 | 283:15 287:1 |
| 87:3 88:15 | 156:6,13,21 | 213:11,19,25 | 287:14 288:11 |
| 89:4,15,20 | 157:3,17 158:1 | 215:9 216:1 | 290:1 291:4,13 |
| 91:12 92:13 | 158:3,15,23 | 217:2 219:10 | 291:24 293:1 |
| 93:2 94:7 | 159:5,9,14,18 | 220:13 221:1 | 293:12,18 |
| 95:14 96:8,14 | 160:14 161:4 | 221:24 222:23 | 296:10 297:15 |
| 96:19 97:22 | 161:20 162:10 | 224:12 225:15 | 300:7 301:7,19 |
| 98:14 99:10,11 | 162:20 163:4 | 226:6 227:14 | 302:9,20 303:5 |
| 99:20 100:25 | 163:11 164:2,7 | 228:2,16 | 304:7,23 |
| 101:5,12,17 | 164:24 166:7 | 230:18 231:5 | 305:24 306:15 |
| 102:3,17,20,23 | 166:17 167:14 | 231:17,22 | 308:5 309:21 |
| 104:4,25 | 168:2,12,20 | 232:5,16,23 | 310:23 311:6 |
| 105:10,21 | 169:7,13 170:4 | 233:14 235:9 | 311:12,24 |
| 108:1 109:19 | 170:15,23 | 235:23 237:18 | 313:3 314:25 |
| 111:5 114:21 | 171:4,14 172:3 | 238:9 240:2 | 317:6 319:2,8 |
| 115:15 116:1 | 172:13 173:24 | 241:12 242:13 | 319:22 320:6 |
| 117:8 119:4,23 | 174:12,17 | 244:4,7 247:8 | 320:22 322:11 |
| 123:14 124:16 | 175:8,16 176:3 | 247:24 248:7 | 323:5 324:1 |
| 125:6,24 | 176:13 177:4 | 249:7 250:8 | 325:8 326:22 |
| 126:12 127:7 | 177:14 179:13 | 251:23 253:19 | 327:13 328:9 |
| 128:2,22 130:7 | 180:1,24 181:7 | 254:20 256:3,9 | 330:19 331:11 |
| 130:22 131:13 | 181:11 182:8 | 256:18,21 | 332:11 333:11 |
| 131:18 132:8 | 183:5,25 | 257:14 258:17 | 334:6 335:17 |
| 134:18 136:20 | 184:18 185:9 | 259:4,14 260:6 | 337:6 338:13 |
| 138:1 139:11 | 185:14 186:1 | 260:17 261:12 | 339:1,18 340:4 |
| 139:23 141:4 | 186:14 188:15 | 262:6 263:6,15 | 340:8,25 |
| 142:6,20 144:4 | 189:6,23 | 263:17 264:18 | 341:12,23 |
| 145:4,18,24 | 190:25 191:24 | 266:12 267:4 | 342:21 343:20 |
| 146:12,17 | 193:4 196:23 | 267:21 268:13 | 344:13 345:13 |
| 147:1 148:13 | 197:15 199:8 | 268:18 269:6 | 346:17 347:18 |

347:23 348:8
348:10 349:11
350:5 351:3,16
352:16 353:21
354:11 355:18
356:2 357:21
358:2 359:3,21
360:1 362:9
363:4 365:13
366:9 367:11
368:8 369:8
370:5 379:2,22
380:10 381:22
382:7,23 384:7
384:9 385:25
388:17 389:13
391:22 392:5
394:25 396:5
397:17 399:7
399:11 401:11
403:9 404:15
404:20
**quick**  14:22
140:24 161:15
211:14 331:7
386:19 396:6
399:9
**quickly**  17:6
79:12 270:17
**quite**  139:22
147:13 156:12
309:18 363:18
363:22
**quizzing**  95:19
103:13,20

**quote**  97:9
99:22 101:7
105:2 194:8
215:1 253:10
254:21 260:22
260:23,23,24
260:24 261:1
272:7,25 356:3
357:6 375:15
399:23 400:4,9
**quoted**  356:12
357:10
**quotes**  177:5

**r**

**r**  2:1 4:13 45:3
78:24 96:20
270:17 298:14
409:13 411:3,3
**rafters**  262:15
**rags**  14:24
**rain**  319:4
**raise**  6:13
97:12
**ran**  50:7 162:6
390:8
**rans**  2:10
**rate**  87:12,15
87:20 230:17
**rather**  32:10
76:21 83:13
154:10 175:18
188:5 196:5
213:12 310:12
310:16 365:3

**ray**  1:8 6:10
21:9 47:10
79:5 120:12
121:7 190:7
194:16 199:10
199:13 200:16
222:6 230:11
263:18 270:1
273:25 287:12
315:5 316:7
347:1 348:9,13
348:21,22
349:15,22
350:7 356:15
357:11 358:18
359:6,13 360:3
360:11 367:8
369:19 378:4
384:6 387:11
402:14,17
**ray's**  21:13
249:8 314:13
**rays**  273:24
**reach**  112:23
331:2
**reached**  73:17
165:7 295:20
327:20 334:1
**reaching**  110:5
148:19 165:2
312:19
**read**  22:24 23:4
27:18,22 32:18
32:19,24,24
33:19 59:24,24

65:9,20 69:15
71:19 75:6
76:25 83:20,25
84:15,17 92:20
100:20 101:3
103:7,10 108:2
108:4 115:11
116:15 126:16
127:11 152:6,7
154:7 165:1
177:9 178:21
185:19,23
191:16,17
192:8,9,14
204:16 206:7
207:12 210:1
212:25 221:20
226:19 249:8
261:17,24
262:1 267:9,18
267:23 271:2
271:16 295:12
297:14,14
298:24 314:13
324:23,24
357:3,6 395:1
395:16 399:16
399:17,22
410:9 412:5
**reader**  33:2
34:1,6 65:7,15
107:13 172:7
213:20 234:22
**reader's**  32:25
108:3 226:19

**readily** 41:11
77:10
**reading** 97:16
97:21 99:5,16
100:8,10,11,13
100:20 189:13
232:24 324:24
402:22
**real** 140:23,24
161:15 211:14
331:7 343:14
343:14 386:19
**realize** 260:4
**realizing** 61:7
**really** 41:12
45:13 50:1
61:16 87:8
90:22 92:21
196:13 301:13
317:24 334:3
389:20 399:9
401:23 405:8
**realm** 349:2
**rear** 167:25
168:9
**reason** 83:11
109:11 141:21
173:16 174:13
245:4 257:9,9
257:11 272:23
274:14 275:22
289:8 297:8
303:4 308:15
309:2 315:9,10
333:23 336:9

358:23 360:7
384:25 385:15
385:19 386:8
391:5,6 396:15
403:2 410:11
411:6,9,12,15
411:18,21
**reasonable**
206:1 255:8
260:23,25
329:21,22
**reasonably**
110:15 206:1
**reasoning**
98:15,16,19,20
**reasons** 83:14
162:19 235:6
317:2
**rec** 286:14
**recall** 43:13
52:10 54:3
79:21 80:17
115:6 152:8
161:8 210:10
210:11 235:25
249:10 297:7
307:4 335:13
370:17 371:11
371:15
**receipt** 410:18
**receive** 98:23
109:6
**received** 23:10
79:7 85:13
109:10 137:12

137:12 209:7
301:23 339:17
341:20
**receiving** 85:24
85:24
**recent** 29:5
72:23 88:5
323:11
**recently** 20:9
75:15,20,24
226:11,14
242:17 251:2
317:9 325:18
**receptacles**
112:14
**recess** 84:12
189:3 270:12
328:6 370:2
**rechecked**
111:20
**recognize** 33:1
55:3 192:12
282:17
**recognized**
94:10 191:9
**recollection**
395:12
**recommendat...**
84:7
**recommended**
78:2,19 79:4
91:21 94:17
273:3 274:16
275:14 302:21
303:1 343:25

402:25
**recommending**
274:7
**reconsider**
287:15
**reconstruct**
104:7,10,12,17
**reconstructed**
104:16,17
**reconstruction**
101:14,19
102:14
**recontacted**
68:24
**record** 5:4,9
6:2,22 35:10
35:24 49:17
52:22 71:14
84:5,11,14
161:10 182:25
189:2,5 192:2
232:6 270:11
270:14 272:7
276:20 303:9
315:3 316:6
328:2,5,8
370:1,4 406:7
406:12,13
408:20
**recorded** 5:10
34:1,6 65:14
165:11,19,21
168:13,21
180:10 181:8
183:11 192:17

259:22
**recording**  5:8
160:22 312:17
313:9
**recordings**
36:1
**records**  20:24
21:2 25:1
62:22 66:17
194:2,10
203:13
**recover**  309:1
**recreating**
101:20
**rectangular**
119:12 223:11
241:20 245:22
277:10 318:13
320:1,24
**recurred**  351:6
**red**  155:12
158:9 322:1
332:7 336:25
342:15 344:5,7
365:20
**redirect**  3:6
399:10
**reduce**  88:3
**reduced**  408:18
**refer**  81:7
95:12 98:4
118:11 122:12
148:17 200:9
207:11 236:10
261:18 269:15

270:24 309:6
**reference**  8:23
15:24 19:6,23
22:22 23:16
28:6 45:24
49:10 55:17
67:14 92:14
94:12,19,23,24
116:2 122:18
162:23 170:5
172:4 183:6
205:13 243:19
279:9 283:10
295:7 307:9
335:5,8 350:9
357:17 358:17
361:6 386:23
388:10 394:17
394:20
**referenced**
25:10 373:23
395:15,16,20
410:6
**references**
302:12 321:22
331:25
**referencing**
55:1 74:14
118:22 129:5
133:22 144:6
265:13 290:22
358:5 398:7
**referred**  120:14
124:2 175:6
184:7,11 251:6

266:7 272:19
281:19 304:11
351:4
**referring**  22:21
42:21 50:19
90:3 149:8
163:19 199:12
234:18 255:10
258:24 294:7
323:21 328:10
331:3 352:8
371:18 374:15
388:10
**refers**  304:9
**refine**  19:8
**reflective**
363:21
**reflector**  306:6
306:24 347:12
361:8,17
362:19 364:23
**reflectors**
307:1 347:12
347:13 372:6
372:22 379:6
380:7 382:11
**refute**  375:11
**regard**  183:24
394:25
**regarding**
114:6 117:19
125:9 205:6
281:18 283:13
341:21 351:9

**regardless**
372:5
**regards**  30:19
81:9
**regular**  7:12
84:7 89:23
120:7 228:24
**related**  5:22
66:21 106:19
142:15 189:11
189:25 305:3
403:14
**relating**  6:17
**relation**  348:14
**relationship**
347:11
**relative**  174:22
402:18 409:2
**relayed**  31:13
**release**  99:25
100:1 183:23
**released**  397:7
**relevance**
88:21 132:1,3
139:4 141:16
142:13 144:10
144:18 158:12
**relevancy**
144:13
**reliable**  157:14
**relied**  180:11
196:14 253:9
283:5 313:5
350:14

**rely** 150:10
  276:23 312:19
  313:23 341:22
  350:16
**relying** 191:19
  307:21
**remain** 124:4
  127:13
**remaining**
  167:3
**remains** 96:4,7
  128:1 156:2
  166:5 173:4,6
  173:7
**remember** 16:7
  16:11 17:17
  18:2 24:2
  43:12 53:21
  55:12 109:17
  147:20 287:2
  297:11 335:5
  356:17 370:21
  385:4 396:12
  398:2,23
  402:13,22
**remnants**
  121:21 122:23
  142:2 376:11
**remodeling**
  273:11
**removal** 101:22
  279:18
**remove** 274:4
  373:18

**removed**
  221:20
**removing**
  272:9 273:1
**ren** 15:17
**render** 260:21
**rendered** 14:25
  15:17
**rendering**
  15:18
**reorder** 98:9
**repaint** 57:24
  58:1
**repair** 54:15
  55:22 57:22
  58:1,23 126:18
  128:4
**repairing** 59:19
  106:8
**repairs** 57:25
  58:11,16
  226:25
**repeatedly**
  351:6
**rephrase** 13:9
  307:16
**replaced** 196:9
  196:20
**report** 10:24,24
  14:9,11 15:3,5
  15:18,22 16:1
  22:1,10,11
  23:4 29:2,12
  29:23,25 30:1
  30:17 31:1

35:9,21 39:17
39:20 40:2,4
42:6,9 65:21
67:14,18,19
68:6 71:18,19
71:23 72:17,23
73:2,6,8,9,24
74:2,7,7,14
76:22 80:6,7,7
81:1 90:4,5,13
90:23 91:3
92:9,10,18
93:4,7 95:1
104:21 116:3,8
117:17 126:6
126:15,23
127:1,13 128:1
136:2 137:13
137:14 167:11
178:15 181:17
189:7 201:18
202:3,4,5
203:6,7,12,15
204:16 205:1,5
210:11 232:4
232:11,17,24
233:19 243:9
243:18 244:10
244:13,17
249:8,10
253:23 259:8
261:15 275:6
275:13,16,19
280:18,21
282:23,24

283:1,5,7
288:17 310:5
314:13 339:17
341:13,20
350:9 355:19
356:10 361:2,3
362:1,10,10,16
364:5 366:11
366:13 368:24
368:24 369:10
374:1,7,14
376:5 390:15
390:18 397:6
397:22
**report's** 83:1
**reported** 44:14
**reporter** 5:20
  6:11,13 12:24
  82:14 84:18
  139:13 188:23
  192:10 366:5
  406:14,17,20
  407:6
**reports** 10:18
  10:21 21:24,24
  22:8,20,25
  25:17,21 33:5
  35:22,23 36:12
  37:6 49:11
  60:3 67:16
  73:7,13,18
  92:15,19 94:13
  94:19,22 95:3
  104:18 181:12
  204:4,18,21,24

205:4 231:25
232:7 243:7
253:21 254:12
255:21 260:1
261:14,18
270:24 275:4
283:8 289:22
358:20 360:19
360:24 373:24
401:16,18
403:6,18
**represent**
214:14 219:25
324:8 384:5
**representation**
114:2
**representations**
114:1 396:16
**representatives**
221:17
**represented**
398:12 408:23
**representing**
5:19 30:10
**republic** 1:4
5:12 24:4
26:12,14 27:4
33:11 42:18,22
43:7 52:8 64:5
66:3,6,15,20
74:25 75:1,1
120:13 129:19
130:9 134:6
141:7 142:7
147:2 160:3

182:25 197:22
212:20 215:1
225:4,19
264:21 272:25
273:8 274:24
277:16 279:17
280:25 281:7
285:25 303:8
304:4 305:9,12
305:13,17
306:1,20 307:9
307:10,10,16
309:1,22
310:14 313:11
345:24 346:2
346:18 347:2
347:20 349:21
410:4 411:1
412:1
**republic's**
121:4 264:24
315:15
**request** 106:23
187:20 284:2
285:16,23
287:9 317:9
323:13 325:11
340:11,16,19
340:21 390:21
**requested**
39:12 41:7
83:8 84:17
137:15 192:9
210:25 223:13
250:6 284:21

315:19 390:13
404:14
**requesting**
20:19
**require** 159:13
159:15 221:19
229:2
**required** 70:1
252:19 392:21
412:13
**requirement**
91:16 144:14
180:22 181:5
**requirements**
70:2 181:4
402:15
**res** 372:20
377:7
**research** 196:8
196:11 210:16
**researching**
251:4
**reserve** 19:25
20:2,3
**residence**
409:18
**residential**
31:21
**residue** 106:6
151:3,10 167:7
285:5 371:3,14
371:16,19
377:7 380:8
397:25 398:7
398:16

**resistor** 195:3
**resolved**
145:16 206:2
**respect** 107:22
**responded**
19:19 21:11
53:15
**response** 21:13
218:20 220:18
**responsive** 25:9
279:15
**rest** 178:21
217:23 287:4
295:12 299:7
357:6 372:15
377:15
**restaurant**
14:23
**restricted**
225:16
**rests** 124:17
**result** 110:21
117:10 166:20
166:23 210:8
237:2 288:14
359:4 383:5
**resulting** 400:1
**results** 142:18
307:22 382:3,8
**resumed**
135:17
**resumé** 81:13
**retained** 4:9
14:17 16:19
74:18 205:25

| | | | |
|---|---|---|---|
| 223:13 312:16 | 32:17,24 33:16 | 144:16 146:25 | 222:9 223:5,25 |
| 349:20 | 33:21,22 34:24 | 148:7 149:19 | 224:8 225:5,9 |
| **retention** | 36:3 37:3,8,12 | 150:23 154:7 | 226:12,21 |
| 205:16 | 37:22 44:22 | 158:7 159:15 | 228:6,20 |
| **retirement** | 46:15,18,18 | 159:16,16,21 | 229:23 230:2 |
| 86:20 | 47:22,24,24 | 160:4,6,18 | 230:20,24 |
| **retract** 112:25 | 48:1,2,14 | 161:24 163:21 | 234:19 235:5,5 |
| **retrieval** 386:4 | 49:15 50:10,23 | 164:4 165:4,20 | 236:5,7 238:19 |
| **retrieve** 386:10 | 51:2,23 52:2 | 167:19 169:19 | 241:20,23 |
| **retrieving** | 55:6,9,14 56:1 | 171:22 172:7 | 242:18 243:22 |
| 385:10 | 56:6,13,15,16 | 172:20,22,23 | 248:14 249:15 |
| **return** 410:13 | 58:11 59:15 | 172:25 173:2 | 253:14,17 |
| 410:17 | 62:25 67:20 | 174:7,9 175:12 | 255:13,18 |
| **returned** | 69:13 70:6,12 | 175:14,19 | 261:23 266:18 |
| 299:23 339:20 | 72:10,25 73:4 | 176:18 177:15 | 266:19 272:14 |
| **returning** | 74:12,19 75:6 | 177:17,24 | 273:23 275:22 |
| 344:21 | 78:17 79:10 | 182:14,16,24 | 276:8,14 277:4 |
| **review** 21:22 | 80:14 81:25 | 183:15 184:5,8 | 278:1,21 279:7 |
| 24:17 72:3 | 82:8 85:3 | 184:10,13,19 | 279:11 280:3 |
| 90:15,15,23 | 87:14 89:5,21 | 185:19,23 | 280:13,16 |
| 91:17 410:7 | 90:25 91:2 | 189:22 190:23 | 281:14,18 |
| **reviewed** 21:24 | 92:10 93:3,8 | 190:24 193:12 | 282:8,17,25 |
| 21:24 22:1 | 95:18 97:4 | 193:14,18 | 283:3 288:19 |
| 23:10,18 24:19 | 98:5 100:16 | 194:1,15,19 | 289:21 290:21 |
| 25:22 26:19 | 109:21 116:4 | 195:14,16 | 291:6,12 293:4 |
| 27:16 90:6 | 116:18,24 | 197:13,20 | 293:4 294:12 |
| 91:4 | 117:7,13 | 200:19 202:9 | 294:14,15 |
| **right** 6:14 7:12 | 118:16 120:19 | 207:16 208:2 | 295:17 298:1,5 |
| 7:25 9:18,22 | 125:9 126:19 | 208:12,15,18 | 298:18 299:14 |
| 10:17 11:3 | 126:20 128:6 | 210:3 212:2,22 | 299:17 301:3 |
| 13:7,12,19 | 129:7,9 130:13 | 212:25 214:8 | 303:13 304:18 |
| 14:6 18:13 | 130:17 135:1,4 | 214:13,19 | 308:12 310:8 |
| 19:1,3 21:17 | 135:6,7,9,18 | 215:17 216:6 | 311:23 312:4 |
| 25:7,19 27:7 | 136:7 137:21 | 218:11 219:14 | 312:13 313:19 |
| 29:11,22 31:4 | 139:7,18,19 | 219:25 220:22 | 314:1 317:18 |

317:18 318:4
318:20 319:5
319:17,18,19
319:20 322:6
323:11 324:22
325:16 326:4
326:11 327:16
330:4,10 331:5
331:16 335:2
335:21 336:22
336:24 338:5
338:14 339:5
340:9,22 342:6
343:5,13
345:10,24
346:16 351:10
352:2,18 353:5
353:7,22
354:17,22
355:9 356:20
358:25 362:15
362:23 364:2
365:9,11,12,21
367:2 373:3,21
374:8,22
376:25 378:9
378:12,14,20
380:3 385:24
386:1,5 387:10
388:9,14,24
392:7 394:18
399:5 400:23
401:16 405:20
**rim**   142:7

**rimkus**   8:24
9:9,14,24,24
10:1,6,9,14,17
10:23,25 11:21
12:1,7 14:14
15:11 21:5,11
21:12 24:7,8
24:10 25:23
26:3,24 27:12
28:2,7,11,16
29:6,13,19
32:7,13,16
33:25 34:4
35:8,14 36:8
38:10,17,21,24
39:1,23 40:4,8
40:14 42:16,22
43:6 53:5
62:23 64:1,4
66:12,18 74:17
80:24 84:23
85:2,5,14,18,21
85:22 87:4,11
87:14,23 90:13
90:20 91:14,16
95:1 113:23
118:16 134:4
137:7,8,11
138:4 159:21
183:16 185:10
187:15 236:5
242:18 265:13
265:18 266:24
276:7 290:8
297:20 299:23

317:10 322:6
323:12 325:19
336:23 339:21
341:4,15
344:19,21
345:8,8 366:18
368:22 370:8
370:15 371:21
372:9 383:15
398:22 404:2
**rimkus's**   62:22
**rise**   128:9
**rl**   316:11,12
**road**   7:18 27:4
121:5
**role**   33:10
186:19,21
389:23
**ron**   34:8 83:20
**roof**   165:20
167:5 222:1
262:15 263:2,4
264:6 373:22
**room**   66:25
106:25 120:20
129:11 132:23
133:12,12,19
134:22 138:5
141:11 143:6
146:6 156:17
167:15 169:19
169:24,24,25
170:1,6 171:5
173:2,5,8
176:1,20 177:1

178:3 193:24
194:18 196:2
196:10 197:9
197:16 198:16
209:9 214:18
214:22 220:2
223:19 231:3
237:2 240:7
249:23 295:14
302:4 314:5,6
315:8 317:14
355:23 368:6
377:15 378:3
379:24 404:3
**rough**   136:25
278:10,19
**roughly**   46:12
62:24 89:13
146:6 173:19
189:8 203:3,5
213:12 214:25
280:10 401:13
**routine**   111:16
234:14
**rubble**   59:10
**rule**   109:14,14
156:24,24
207:25 247:25
248:3 250:9,12
250:12 405:9
**ruled**   187:5
**rules**   1:20
11:16 12:20
408:15

run  89:13
  162:2 308:21
running  112:17
  393:15
runs  146:21
  234:7
rupture  96:24
  343:18
rust  320:14,15
rusted  268:10
  269:8 319:5
  320:1,13
rusty  320:23

**s**

s  2:1 4:14 48:6
  48:12 266:18
  271:8 301:1
  411:3
safe  223:4
safety  209:13
  210:17
saith  407:11
salamander
  146:13,21
  147:3,11 156:2
  156:7,25
  157:11 170:16
  170:21,24
  173:11
salamanders
  171:15,19
samir  43:25
  44:1 45:2
  46:10,14 47:18
  48:3,3,13,20

49:14 51:16
52:8 152:4
257:20 263:16
264:11
samir's  261:25
263:8
samp  309:10,18
sample  132:17
132:18,20,21
133:2 135:14
167:12,12
224:16 237:24
284:17,19
285:13 294:17
294:21 295:1,8
303:24 308:21
309:23 310:2,9
310:11,15
324:11,21
331:25 338:6
346:3 350:19
352:18 353:4
367:23 386:19
samples  77:21
126:9 142:19
238:17 281:19
284:14 285:4
285:11 286:7
290:15 291:14
291:17 292:20
295:11,18
296:8 308:11
309:17 310:3
310:20 311:16
326:4,7 329:3

334:17 341:16
341:21 355:1
367:15,23,25
373:14 385:8
391:1
sampling
386:24
samplings
307:22
sand  57:24
saran  318:2
sat  15:10
saturation
364:8
saturday  28:17
save  287:12
saw  34:20
118:14 121:20
132:9,9 142:2
148:23 152:13
152:13,14,16
152:19 154:8
154:16 177:25
178:12 199:21
207:17 237:8,9
250:18 255:16
264:5 288:9
289:6,7 317:21
330:6 364:13
372:4 375:4
382:5
saying  37:5
49:25 69:18
105:17 112:11
112:13 121:3

123:20 151:14
154:15 176:21
176:23,25
179:21 181:20
181:21 200:20
217:10 223:14
228:7 229:14
232:25 234:16
256:23 372:18
372:19 377:24
380:2 381:18
388:18 398:13
says  12:3 90:23
96:3 126:6
160:3 162:1,3
162:21,21
163:5 164:8
169:19 171:8
171:15 172:14
172:15,22
173:1,13,19
174:2 177:5
178:22 183:6
189:11 206:4
210:11 227:9
252:18,23
253:2 265:15
265:17,19
266:4,13,14
277:5 282:8
288:1 291:5
296:11 298:7
316:2,11
324:23 326:25
338:4,6,11

352:17 356:3
358:7,9 374:19
390:13
**scene** 26:3 27:3
31:6,8,19 45:1
50:9 51:16
61:9,13,17
62:12,18 63:13
64:15 77:15
81:14 96:5
101:14,19,20
101:21 102:7
104:7,10,12
113:20 114:12
115:17 118:15
206:8 216:17
238:22 249:16
255:16 257:25
259:12 286:6
286:12 321:6
382:6 390:7
401:12 404:13
**scene's** 102:6
391:2
**scenes** 389:15
**schematic**
136:14,21
**schematics**
135:25 206:21
**science** 397:1
**scientific** 15:6
15:25 31:3
108:5,5,7,11,21
109:20,21,23
187:4 260:23

289:14 393:22
393:25
**scott** 34:9
314:20,21,24
315:5
**scottsdale**
68:14
**scrape** 296:20
**scraped** 335:25
**scraping**
295:11 296:12
296:13,16
386:24 387:2
**scrapings**
78:15 295:17
307:18 308:7
309:9 323:7
355:1
**screen** 47:9
50:23 138:8
**seal** 409:6
**sealed** 117:16
119:3,14 121:2
121:25 199:16
323:3 330:8
358:11,12,14
**sealing** 311:9
322:13,15
**searched**
209:24
**sec** 293:13
**second** 4:6,7
20:9 28:25
29:1 39:20
54:17 62:23

63:20,21 74:16
75:5 90:4
105:22 111:20
113:11,13
144:12 149:10
187:8 191:6
210:22 211:13
211:18 232:17
244:13 251:13
292:21 301:16
316:2 341:13
355:20 361:1
362:10,16
364:4 369:10
373:1 374:7
376:5,9,9
377:21
**section** 56:18
56:22 58:5,6
94:19 97:23,24
99:21 101:7,13
101:18,19
105:1 206:11
243:2 251:24
254:21 255:10
260:18 266:1,6
266:6 277:23
304:16 305:16
374:19
**sections** 41:22
82:21 94:23
95:4 331:18
335:25 395:17
**secured** 344:6
344:18,20

**security** 8:20
86:21 153:5
405:25
**see** 34:22 55:8
56:9 62:18
73:3 81:8 90:9
107:12 109:9
116:5 118:6
121:8,17 122:7
127:15 131:21
138:19 139:5
139:16 140:4
140:15,22
142:23 146:11
149:18 155:13
160:1 161:14
162:3 163:6
164:10 165:15
165:20 166:5
168:25 171:10
171:16 173:14
174:3,6 177:6
183:6,13
185:15,19
189:12 198:23
204:25 209:20
211:22 212:18
213:6,10,12,17
214:16 216:2
217:15,17
218:16 221:2,4
231:11 234:15
234:19 236:14
236:18,21
238:6 240:19

241:17 244:19
244:21 246:19
249:20,21
255:17 257:24
257:25,25
258:22 260:1,2
262:8,9,11,13
262:16 263:19
265:10 266:6
267:5 268:1,9
270:21 271:11
272:2 274:22
277:6,12
278:15,19,25
279:23 282:10
283:19 289:3
295:13,22
300:18 302:10
303:10,13
305:25 306:2
306:18 309:1
312:1 313:19
316:8 319:21
319:23 320:8
320:23 322:12
325:20 331:8
337:19 341:8
350:20 356:8
357:9,22,23,24
358:3 362:15
363:25 364:3
365:11,14
366:3 375:14
383:17,17,19
387:13,15,17

387:18,22
388:3,6,7,8,18
388:20,22,22
397:25 398:7
398:15
**seeing**  335:5
397:6 402:13
**seek**  155:9
**seeks**  154:23
155:8
**seemed**  236:24
**seemingly**
110:19
**seen**  20:11,13
20:21 21:12
34:18 49:10
67:19 118:14
118:18 137:6
148:7,11,14,16
165:5 174:18
178:10 179:19
180:4 182:11
185:15,16
188:7,13,18
211:10 212:2
218:17 238:12
265:12 271:13
272:12 276:3
277:1 278:13
278:17 302:19
312:6,8 321:12
330:5
**select**  394:13
**selected**  83:11

**self**  75:2
**semicolon**
105:3
**send**  90:14
132:20 285:2,2
285:4 309:19
325:11 334:9
340:22
**sends**  195:1
**sensitive**  5:5
**sent**  71:19
126:9 137:11
137:12 166:21
167:11 213:1
218:20 284:17
284:18,20
285:10,11,15
292:21 296:23
297:10,12
299:20 300:9
312:23 324:10
334:17 337:11
338:23 339:2
340:9,10
341:21 354:18
354:25 382:24
383:1,3,7
410:14
**sentence**  76:24
90:5 126:16
127:11,16,17
162:12,21
178:21 180:9
357:3

**separate**  260:8
285:11 292:16
**separated**
170:1 217:13
217:22 339:19
379:24
**separately**
260:9 293:15
**separating**
213:14
**separation**
55:20 346:16
**sequence**
194:15 372:7
374:22 376:2
376:22 377:23
378:2,5,7
380:4,21,22,25
381:1,2 382:8
**sequential**
371:1 374:19
**sequentially**
338:16
**service**  4:13
160:3 270:19
**services**  1:4
5:12 26:12,14
75:2 274:24
410:4 411:1
412:1
**servpro**  183:11
183:16,19
**set**  105:2
134:13 172:18
233:15 234:11

**[set - showing]**

409:5
**sets** 316:15
**setting** 25:19
  25:20 36:3
  75:7 89:16
  314:4,7
**settled** 18:9
**seven** 19:1
  34:17 102:18
  157:18 164:25
  325:22,22,23
  326:2 327:16
  327:18,23
  328:12 329:4
  329:12 330:13
  331:22 366:12
  389:9
**seventeen**
  190:18 399:21
**several** 40:23
  54:11,11 70:23
  82:21 93:15
  107:20 111:9
  113:24 154:4
  162:19 208:24
  208:25 239:8
  369:4 372:21
  373:17 389:19
  390:7 394:23
  398:20,21
  403:11
**shadow** 33:16
  34:7 83:10,25
  84:19 154:1

**shamir** 152:4
  153:20 257:20
**shape** 119:12
  150:11 241:21
  271:5 321:16
  382:15
**shaped** 118:12
  320:24
**sharee** 123:22
  166:20 210:7
  223:22 282:14
  284:2 285:16
  288:12 296:25
  299:21,23
  300:9 307:23
  322:4 334:9,16
  335:24 337:11
  338:21 339:19
  341:1,14
  342:14,23
  343:23 344:24
  351:12 352:1
  354:14 382:15
  382:20 383:7
**sharefield** 34:9
**sheboygan**
  106:15 123:16
  123:23 124:9
  124:19,20
  125:8,13 126:1
  130:10 135:8
  141:10 142:8
  199:23 214:19
  229:2 284:4,9
  285:18 286:1

287:16 288:14
  315:14 351:9
  396:12
**sheet** 4:13
  106:14 124:9
  159:23 209:14
  218:5,6,7
  282:20 396:17
  410:11
**sheets** 124:3
  125:20 126:6
  210:17,17
  216:19 248:19
  248:22 341:11
  396:8,10
**shelf** 79:16,18
  257:24 394:7
**sheriff** 19:22
**sherwin** 178:20
  178:20
**shield** 305:18
  305:20,22
  363:16
**shields** 402:19
**shift** 8:5 390:1
**shingle** 165:20
**shingles** 165:24
  166:2,6,18
  167:2,3
**shipped** 335:23
  338:20,21
  339:21 341:1,2
  341:15 342:22
  343:22 344:23
  354:13

**shipping** 135:5
  322:5 342:13
**shop** 57:23
  61:1 184:7
  188:7 220:21
  273:2
**shops** 121:16
**short** 29:7 30:1
  30:25 43:22
  45:13 69:2,5
  133:2 160:8
**shorter** 74:18
**show** 48:6
  103:8 145:13
  145:14 156:1
  203:12 268:25
  287:18 307:10
  307:12 324:3,6
  328:11 333:3
  336:21 338:17
  347:14,14
  348:16 362:6
  365:15,19,21
  365:24 367:6
  368:2,4,17
  369:15,15
  370:11 371:22
**showed** 134:14
  223:23 224:3
  328:12 370:13
  371:3 372:21
  390:5 398:4
**showing** 142:25
  178:7 238:12
  268:21 299:20

310:5 311:15
345:9 347:7
365:3
**shown**  50:19
52:2 179:18
221:8 245:22
267:15 278:5
310:12 327:14
327:23 331:14
333:12,17,20
334:18 337:10
345:14,15
346:5,9 397:18
404:5
**shows**  268:25
278:19 300:1
305:18 318:2
321:4 322:1
324:5 331:22
336:23 345:19
346:3,16
352:20 353:16
365:2 368:19
385:9 394:24
**shred**  35:12
**shut**  111:16,17
111:25 112:3
**sic**  6:9 42:16
55:3 62:23
64:1 101:13
136:3 145:3
153:20 177:25
249:3 351:6
353:1 400:16

**side**  15:12
41:24 42:1
47:6 50:23,23
52:2 56:8
139:10 143:24
158:7,17 164:9
164:13 176:19
217:24 218:23
219:2,25
243:12,13
251:16 262:13
262:18 263:20
264:9 269:14
278:21 304:17
316:12 319:18
336:21 362:24
402:20
**sides**  331:1,1
**sign**  410:12
**signature**
406:15 408:22
409:12
**signed**  312:1
410:20
**significant**
93:11 103:19
**silicone**  119:14
**silver**  246:21
247:3
**silvery**  241:3
**similar**  124:7
141:23 145:15
150:22 151:6
198:12 227:11
229:7,24 247:5

321:16 323:2
372:2 387:9,12
390:9
**similarly**
406:21
**single**  95:5
102:8,9 201:17
205:1 307:14
**sinus**  312:10
**sir**  7:2 12:19
13:24 15:4,8
15:23 16:2,23
18:16,23 60:7
60:10,14 63:24
65:16 68:11,13
74:10,13 75:10
81:16 85:4
87:13 91:24
92:2 93:6
98:12 99:2
101:11 117:6
120:9 130:20
131:11,22
157:21 160:10
210:6 211:8
215:11 218:4
219:4,6 221:5
222:4 234:20
235:11 241:19
244:22 249:19
263:22 264:16
264:16 265:23
277:7 281:8
291:8 315:23
316:1 318:5

319:12 320:19
342:2 355:25
370:20 383:9
398:10 399:14
404:21
**sit**  100:19
190:14 304:14
**site**  31:25 35:5
41:9 46:3,21
53:23 62:20
63:20 75:23
87:10,20 113:6
113:24 115:25
136:3 142:17
160:3 161:21
163:13 182:14
215:1 250:6
259:18 288:9
344:18 390:21
390:22
**sites**  257:25
385:11
**sitting**  281:17
332:9
**situation**  95:8
121:21 133:1
193:9,11
196:14 207:19
224:23 226:1
226:10 227:25
234:10 235:4
237:22 254:6
257:24 258:12
286:9 288:8
309:15 344:16

392:17

**situations**
390:9

**six** 10:11,13,15
10:19 12:15,16
18:25 44:19
58:4 123:3,5
211:8 220:11
325:23 339:21
341:16 370:3
406:10

**size** 106:18
245:12 300:9

**sketch** 136:25

**skip** 57:4 72:22
76:23 281:12
311:25 325:1
325:14 345:7

**skipping** 76:22
277:10,11
351:4

**slab** 174:3

**slash** 298:4,20
298:25

**slightly** 384:21

**slow** 13:2

**small** 122:1
138:23 208:6
265:19

**smaller** 208:10

**smelled** 183:12

**smoke** 152:13
152:16,18
183:12 375:19
375:19

**social** 8:20
86:21

**soliciting** 281:1

**solid** 388:19

**solidified** 321:1

**solutions**
410:23

**somebody**
45:25 75:3
149:21 175:4
299:1 300:25
328:20 366:21
391:18

**somebody's**
65:20

**soon** 46:1,1
262:11 340:10
364:12

**sooner** 364:12

**sor** 406:23

**sorry** 9:17 10:8
12:4 14:18
22:7 23:2
32:10 37:23
39:10 43:6,21
57:20 59:17
60:15 64:5
66:20 77:24
79:5 82:13
95:15 111:4
112:25 115:19
116:6 120:13
123:13 124:10
127:21 137:21
137:22 148:4

161:5 168:3
197:23 198:6
204:20 206:1
215:3 220:8
223:24 227:18
229:1 234:24
235:18 242:3
252:14 254:9
260:16 264:14
283:19 294:20
295:2 300:2
310:22 325:22
332:23 334:7
340:10 341:24
350:10 354:13
364:25 366:11
369:16 377:21

**sort** 41:3 46:6
56:9 80:19
116:16 158:7
236:12 240:15
241:20 283:24
318:12

**sou** 295:9

**sound** 33:17
62:25 65:22,24
85:3 90:25
133:24 329:21

**sounded** 79:2

**sounds** 33:18
65:25 91:2
155:2 329:22

**source** 32:13
97:9,10 166:19
196:1 197:3

209:5 224:8,18
229:21 285:6
289:10 377:25
380:23 394:10
399:25 403:10

**sources** 8:18

**south** 15:12
56:8 86:6
116:22 154:18
164:13 169:25
169:25 185:20
202:7 208:22
209:4,6 217:24
217:25 218:2
220:2 243:2,3
243:6,12,22,24
244:1,5 246:3
246:5,13,14
262:13,18
264:9,15,16
277:21 294:18
295:13 298:4
304:8,9,10
342:4,5 345:17
345:18 346:10
352:18 353:5
366:14 368:17
368:18,22
370:23 377:18
377:18 404:4

**southeast**
161:12 173:13
173:20 174:8

**southern** 154:9
170:8 220:21

263:20
**soyk**  75:7 90:6
90:23
**space**  1:8 6:10
21:9,13 47:10
73:9 79:5,25
120:12 121:7
147:3 170:7,10
170:14,22
189:20 190:7
194:16 199:10
199:13 200:16
216:25 222:6
230:11 249:8
251:2 263:18
270:1 273:24
273:25 279:4
279:17 287:12
314:13 315:5
316:7 347:1
348:9,13,21,22
349:15,22
350:7 356:15
357:11 358:18
359:6,13 360:3
360:11 367:8
369:19 378:4
384:6 387:11
388:2 402:14
402:17,18
404:11
**spacings**
402:25
**speak**  42:11,14
46:9,14 48:20

50:17 51:10,15
51:20 52:7
64:7,12 67:5
70:19 79:16
104:19 150:3
150:25 180:22
183:16 200:11
207:8 251:5,10
257:3 259:16
391:1 394:7
402:1
**speaking**  48:3
**speaks**  81:13
183:3 186:6
201:23 251:24
277:19 357:12
357:15
**specific**  46:22
110:14 116:24
**specifically**
57:15 255:3
327:4
**specification**
4:12
**specifications**
351:8
**specified**  101:8
**specul**  258:9
**speculate**
191:22
**speculating**
155:2,4 258:10
**speculation**
155:5 163:2
169:22 170:20

184:24 230:14
339:25
**speculative**
258:19
**spell**  96:20
**spend**  103:19
**spilled**  353:16
**split**  331:20
**spoke**  31:7 41:9
42:24 43:6
44:25 45:4
46:12 48:24
50:11,15 51:17
51:20,22 57:19
63:17 65:12
68:20,21 75:11
147:19,22
161:5,6 250:4
392:6
**spoken**  51:13
65:13 66:11
184:25 360:17
**spontaneous**
14:23
**spot**  155:9
305:4,5,6
**spray**  128:10
158:20,24
171:5 178:22
181:6,16,20
182:5 190:18
198:21 199:20
214:1 219:20
220:21 222:15
248:12,12

258:4,11,25
268:11,14
**sprayed**  181:21
181:23 214:2,5
214:5 226:10
226:11,14
**sprayer**  141:10
159:6,10
178:19 179:2
182:5 259:22
**spraying**  182:6
214:10 280:5
**spread**  236:21
376:19 396:2
403:15
**square**  1:17 2:4
118:23 277:5
278:23 408:13
**ss**  4:6 20:10
408:2
**stacked**  218:23
**stage**  284:9
285:19,19,19
375:4
**stages**  317:12
**stamp**  23:15
303:10 309:22
**stamped**  23:15
23:23 24:7
41:8 326:10
345:24 346:2
**stamps**  24:3
**stand**  74:21
95:22 142:3
175:11

standalone
  197:7
standard  70:5
  70:8 71:4 92:3
  95:3
standards
  293:8,9
standing  47:5
  47:18 48:13,18
  48:24 147:22
standpoint
  35:14
start  9:22
  12:25 13:5
  49:4 62:17
started  10:4
  12:3 36:20,21
  38:24 45:10
  62:6 85:2,23
  129:20 130:9
  182:10 187:7
  251:3
starting  55:8
starts  78:23
  119:17 178:17
  356:13
state  1:16 5:24
  6:1,22 7:18
  15:5 18:5
  30:25 70:15
  71:7 86:4
  117:9 128:16
  192:18 261:4
  284:25 286:1
  310:25 408:1,6

stated  75:23
  79:22 81:21
  125:18 126:14
  186:23 202:13
  350:18 382:2,3
statement  18:8
  34:1,6 49:23
  65:15 69:23
  111:3 115:6,7
  115:9 156:24
  157:5 177:16
  200:4 205:16
  206:7,24
  254:25 256:2
  257:19 258:4
  258:23,24
  390:18,20
  391:23 397:8
statements
  31:14 52:23,25
  66:24 98:23
  109:4 142:17
  148:15 157:13
  207:4 255:15
  257:6,13,13,15
  257:16,21
  258:19 259:5,5
  259:12,17
  375:11,15
  377:12 403:24
states  1:1 90:5
  144:13 204:7
  252:2,6 260:19
stating  261:5

station  121:14
  388:13
stations  387:7
  387:8
status  85:10
  86:2
statute  348:24
stayed  201:5,10
steel  58:25
  217:11,13
  228:13,22
stenographic
  6:13 188:23
  406:14,17,20
  407:6 408:18
step  394:2,3
stepping  82:13
steps  108:23
  394:2
sterile  284:18
  311:4 324:13
stick  354:12
sticker  276:14
  322:2 343:5
sticking  278:23
stipulate
  232:10,12
stir  176:19
stoner  301:23
  301:23
stopped  61:18
  61:18
storage  169:25
  217:22,25
  220:2 377:20

379:24 404:3
store  404:3
stored  107:10
  111:24 170:2
storing  107:22
street  2:15
strength
  255:23,24
  256:10
strike  65:4
  102:16 168:3
  197:21 199:22
  238:21 264:10
  287:4 391:11
  392:12 396:24
strong  286:24
strongly  252:3
structural
  101:23
structure
  165:19 217:8
  266:10 380:14
structures  55:1
stuff  55:23 83:4
  118:7 143:4
  219:11 241:3,5
  247:3 269:19
  393:4
style  76:9 78:3
  141:11 271:9
  273:25 274:2,8
styled  402:4
subject  29:16
  29:21 370:6

**subjected**
  239:14 319:4
**submitted**
  23:20,21
**subpoena**  4:7
  20:18,23 21:10
  21:14 25:9
  136:7 218:20
  220:18 279:15
**subscribed**
  412:14
**subsequent**
  28:1 382:9
  399:4 400:12
**subtract**  258:1
**subtracted**
  258:3
**sudden**  99:22
**suddenly**  96:23
**sued**  348:22
**sufficient**  86:4
  97:10 157:12
**suggest**  314:8
**suggested**
  129:12,14
**suggesting**
  112:8
**suggestion**
  115:24
**suggests**  232:17
  261:19
**suitable**  275:7
**suite**  1:17 2:5
  2:11 408:13

**summarization**
  315:4
**summarize**
  17:6
**summary**  95:21
**supervisor**
  262:12
**suppically**
  105:25
**supplemental**
  73:6,11
**supplied**  196:6
  220:18 387:22
**supplies**  227:9
**supply**  112:2
**support**  257:12
  349:17 360:7
  375:11
**supported**
  217:9
**supposed**
  286:10
**suppressing**
  44:18
**suppression**
  122:8
**sure**  13:4 24:9
  26:1 35:17,18
  39:25 43:23
  46:11 49:25
  63:9 72:21
  75:3 80:4
  97:24 112:14
  115:4 136:15
  139:9,22

140:25 149:7
158:13 171:17
184:12 187:23
214:2,22
218:10 219:9
224:14 225:11
228:23 231:16
240:6 242:1
249:18 270:5,6
284:6 292:7
306:12 318:9
320:15 335:3
336:7,8 350:24
368:9 386:21
392:22,24
393:2,4 394:16
395:8 399:16
**surely**  80:18
**surface**  124:6
  124:15
**surfaces**  122:25
  124:5 125:4,4
**surpassed**
  286:14
**surprise**  197:1
**surprised**
  115:8,23
**surveillance**
  405:25
**suspect**  358:23
  384:17,25
  394:12
**suspected**
  254:23

**sustain**  125:14
  287:19 377:3
**sustains**  126:2
**swab**  132:21
  135:10 237:23
  284:13,13,18
  308:16 323:19
  324:3,11
  326:12 327:8
  331:2 334:1,2
  335:15 338:4
  346:5,11
  386:24
**swabbed**  241:1
  335:7
**swabbing**
  311:1 386:24
**swabs**  78:14
  207:15 208:14
  286:22 290:22
  298:4,20,25
  307:11,12,18
  308:6 310:25
  311:4,7,16
  323:7 325:20
  327:16,17,20
  328:12,17,21
  329:3,5,9,9,19
  330:13,18,24
  331:12,22
  334:22 335:6,7
  335:9 336:1,5
  336:10 337:12
  337:12,14,17
  338:12,19

339:3,3,6,20
342:3 345:5,9
345:14 346:9
346:21,25
347:20 353:14
353:22,25
354:4,5,7,7,17
355:1
**swallow** 45:12
**swear** 6:12
**sweep** 392:22
**sweeping** 354:5
**swept** 32:1
**swiggle** 294:24
**swiggles** 294:24
**swirly** 158:9
**switch** 185:22
347:25
**switched**
122:17
**sworn** 1:14
6:16 408:9
412:14
**synonymous**
116:9 227:15
**sys** 210:22
**syst** 231:3
**system** 42:5
111:7 119:2,3
145:1 162:16
190:3 199:4,7
200:14,15
201:3,5 234:5
358:11

**systematic**
91:21
**systematically**
98:8
**systems** 113:3
145:3 167:16
181:22 186:16
187:16

**t**

**t** 78:24 266:18
409:13 411:3,3
**table** 353:17
**tabs** 328:13
**tagged** 312:18
**take** 5:8 13:14
13:16 17:13
20:20 41:14,15
48:22 53:11
57:14 70:25
79:18 84:6
131:10 134:1
140:24 185:10
188:22,24
200:10 226:5
235:24 242:6
256:15,16
269:2,4,10
308:6 309:9,13
309:23 310:3
310:15,24
311:3,14
322:14 328:23
334:21 345:14
345:16 346:21
347:7 362:13

363:13 365:17
366:4 391:1
**taken** 1:16 5:11
11:14 18:21
25:22,25 26:14
26:22 27:2,5
27:10,22 32:6
36:14 55:4
84:12 137:16
145:16 148:15
155:25 178:6,7
184:4 189:3
207:24 212:9
236:4 242:14
258:4 261:25
263:16 267:11
267:13 270:12
286:8 307:15
308:11,16
310:20 323:12
325:19 326:7
326:12 328:6
330:13,18
336:1,16 345:8
345:20 353:4
364:12 368:15
370:2 385:8
399:1 408:11
408:17
**takers** 185:11
**takes** 226:4
340:23
**talk** 12:21,22
51:3 53:8
57:10 62:14

67:10 74:17
79:18,20 80:16
113:21 156:16
156:23 172:6
233:19
**talked** 49:14
66:10 69:8
83:23 84:1
88:6 113:6,9
150:13 156:22
172:9 173:5
212:13,13
221:15 233:24
385:4
**talking** 14:21
24:20 28:6
42:14 43:24
47:18 55:11
78:18 87:21
92:7 96:17
106:5,15
107:21,22
112:10 116:21
117:18 119:5
119:16 120:22
123:11 129:5
129:20 132:5
140:11 147:6
149:2,5 161:18
169:20,24
171:8 178:17
179:1 180:10
182:4,6 184:4
185:6 189:19
190:3,4 200:15

207:12 217:1
219:5,11 223:3
224:4 226:1,13
226:16 229:5
229:22 251:8
258:16 260:2
273:23 315:7
323:6 346:13
346:18 351:1
356:5 361:24
373:4 378:8
381:2 388:12
391:24 402:4
**talks** 323:18
**tall** 175:4 280:1
**taller** 135:22
**tamper** 343:12
**tampered**
343:11
**tampering**
344:9
**tape** 268:3
322:13,15
323:1 343:10
343:12,14,19
343:21 344:5,8
344:17,23
347:14
**taped** 344:8
**tar** 166:10,10
166:18
**taught** 81:17
**te** 329:2
**teaching** 81:13

**team** 115:24
**technical** 90:24
248:19 328:2
**technicality**
124:25
**technically**
91:3 121:18
124:13 273:12
328:17
**technician**
317:15
**techniques**
81:15 98:8
**tecum** 4:7
20:18 21:11
**tell** 6:16 9:1
21:16 47:17
54:8 57:1,18
58:20 59:3,16
63:2 64:20
69:23 76:6
83:10 94:2
99:3,7 123:22
124:1 125:12
127:11 138:9
139:9,20,22
154:5 160:21
177:8,8 183:15
189:9 191:1
212:8 215:8
221:11 258:7
259:20 265:15
265:17 267:19
288:15 318:10
320:16 325:2

326:9 327:4
330:13 333:4
337:8 341:5
359:25 363:18
363:22 365:18
376:1 386:6
392:9,13
399:22 408:9
**telling** 43:5
53:21 58:12
93:25 305:11
368:21 370:7
371:22
**tells** 154:21,22
**temp** 194:3
303:17
**temper** 234:17
**temperature**
97:13 194:17
194:25 228:12
228:21,23
229:1,2 230:7
230:8,17 232:6
**temperatures**
193:23 230:10
232:11 233:1
234:3,6,11
**ten** 48:21 51:12
53:10 57:18
235:21 256:24
280:12 302:13
330:20 390:2
**tent** 331:5,13
347:19

**tenths** 90:24
**term** 70:7
109:18 204:6,6
204:25 246:25
374:20
**terminated**
162:3
**terminology**
30:16,19
118:21 243:15
246:24 351:24
387:24
**terms** 12:17
14:20 56:1
58:11 59:19
120:18 144:5
253:8 351:10
351:10 376:1
386:25
**terry** 32:24
33:2 34:1,6
65:6,15 107:13
108:2 172:6
213:20 226:19
234:22
**test** 70:25 71:3
71:4,5 223:1
241:13 247:11
251:14 283:11
283:21 284:4,9
284:24 285:1,3
287:9 288:14
299:6 334:20
334:23

**tested**   110:15
125:25 126:4
163:24 223:23
224:17 245:3
284:20 285:3,5
288:22,22
324:10 334:17
340:15
**testified**   6:18
19:5,9 86:14
88:13 107:13
130:9 192:23
213:20 214:24
218:21 220:19
221:17 226:22
**testify**   112:1
**testifying**   87:22
**testimony**   38:6
107:18 124:22
130:19 174:19
191:5 196:18
196:19 234:21
258:21 309:12
390:17 396:23
398:11 408:21
410:9,18 412:8
**testing**   135:6
164:1 166:21
210:8 252:12
284:3 299:3
325:11 340:17
350:20 354:15
**testings**   307:22
**tests**   125:12,16
284:24 285:12

286:7 287:5
400:6
**text**   84:17
192:9
**thank**   53:11
67:25 71:6,6,9
85:20 108:19
123:13 132:4,7
140:9 235:19
254:19 265:24
295:6 300:3
337:4 355:15
384:2 389:1,10
392:4 406:2
**thanks**   17:10
25:12 47:8
48:19 70:22
84:15 134:10
162:18 220:12
291:3 298:22
313:19 314:21
324:12 366:7,7
**theories**   199:22
**theory**   348:23
**thereof**   1:22
**thermal**   185:20
195:3
**thermostat**
172:23 194:17
194:25
**thermostat's**
234:17
**thermostats**
233:6,15

**thin**   343:15
**thing**   53:6
71:16 102:8
108:20 112:5
120:14,23
121:20 124:2
126:5 128:21
129:16 136:2
142:15 143:19
143:23 148:1
154:20 167:10
169:25 182:3
228:8 230:22
231:11 232:11
242:23 250:22
251:13,16
258:3 259:11
259:20 267:19
269:17 273:8
290:17 297:6
309:24 323:2
328:15 333:9
336:20 341:19
374:17 376:8,9
377:10 379:23
382:19 383:6
393:14 398:19
405:24
**things**   9:8 21:4
22:15 24:17
27:15 38:19
41:10 42:3,9
53:15 54:11
55:22 56:21,23
57:3 58:1

69:21 74:4
75:24 79:24
83:3 85:23
89:10,25 109:5
109:7 111:23
112:14,17
118:4,8 124:5
124:19,24
134:16 145:15
185:4 187:1
190:24 193:2
202:10,12,25
208:10 209:25
210:7,16 230:6
245:13,16,17
248:13 251:19
255:19 257:23
273:10 322:22
350:20 358:10
364:17 379:10
379:11 389:20
392:19,25
393:18,20
395:18,20
401:6 405:22
406:1
**think**   9:20
10:21 11:5,24
12:10 22:8
23:23 25:10
26:1 30:18
32:23 34:20
38:5 40:1,12
43:24 45:7
47:11 50:22

51:18 52:11
53:24 54:1,21
65:19 66:25
71:16 73:25,25
75:22 80:24
81:5,14 82:24
86:13 91:8
94:1 95:17
100:18 102:19
113:2 115:12
118:2 121:9
124:23,23
126:7 130:1
133:5 134:11
143:17 145:25
147:17 149:10
149:15,17,20
149:25 152:17
152:25 153:1
154:1 155:11
162:2,21 165:3
172:14 174:25
178:11,11
181:3 182:3
185:1 192:23
195:15 198:5
199:11,15
200:5 201:12
209:5,5 219:7
222:18 227:23
229:11 230:10
232:18 233:5,7
237:17 253:16
256:14 259:21
268:20 272:23

275:13 276:17
278:10 281:24
287:7,11 291:2
292:4 296:17
296:21 299:14
301:21,22,24
312:8 313:20
315:17 317:10
317:15 318:11
320:14 329:15
335:14 337:10
338:15,20
339:2 344:3
348:20 358:5
364:6 365:2,5
365:8 370:13
371:6,14,20
372:14 375:13
377:21 380:23
381:10 382:13
384:8 389:3
390:14 396:2
398:22 401:5
401:12 404:1
405:18
**think's** 50:15
**thinking**
   243:12
**thinks** 172:22
**thinned** 229:13
**thinner** 222:20
   224:21 229:8
   229:11 242:21
   321:10,15,18
   381:14

**thinners**
   106:11 151:18
   229:13,16
**third** 161:17
   167:10 189:16
   202:5 267:25
   295:6 304:16
   312:1 377:22
   379:23
**thirdly** 298:22
**thirds** 189:8
   215:16
**thomas** 2:3 3:5
   6:6 21:1 44:24
   47:12 100:17
   103:1,21
   130:16 134:9
   140:16 191:9
   211:4 279:7
   281:17,22
   290:25 326:17
   326:19,20
   370:19 380:3
   403:25 410:1
**thomas's**
   279:11
**thorough** 375:9
**thoroughly**
   207:20
**thought** 60:20
   75:19,20 87:25
   126:23 157:13
   178:12 191:23
   212:13 237:15
   245:9 361:25

382:24 384:19
   386:18
**thousand** 27:7
   361:22
**thousands**
   37:17 81:10,10
   362:3
**three** 11:7,14
   11:15 14:1,16
   16:6,12 28:4
   28:10,17 31:1
   31:15,16 52:12
   83:12 116:12
   117:18 118:14
   118:18 127:20
   130:11 142:10
   147:14 164:8
   175:1 189:4,19
   191:18 196:10
   196:15,19
   197:4 200:16
   203:5,18
   208:19,20
   209:2 222:5
   230:1,10
   254:12 270:10
   274:6 293:2
   294:8 311:25
   317:21 325:23
   335:23 336:5
   338:23 339:10
   339:22 341:2
   341:16 343:22
   343:22 354:12
   354:13,18,23

359:12 360:3
360:10 361:7
369:10 370:14
370:16 371:20
380:6 383:14
394:3,3 397:23
397:24 398:8
398:12 402:16
**threshold**
260:20
**threw** 14:6
**thrown** 35:11
**thumb** 319:19
319:20
**ties** 293:23
**tig** 59:3,9
**tight** 199:16
**tightly** 117:16
119:3
**tile** 273:25
**till** 72:20 82:6
**time** 1:21 5:7
5:25 7:25 8:1,2
8:13 9:2,23
11:13 12:22
21:8,10 23:6
23:10 26:18
28:14,16 31:6
35:5,7 38:21
39:6 41:8,23
43:14 45:21
46:9,12 48:18
49:14,24 51:2
51:7,22 52:10
52:13,17 53:14

53:24 60:5
61:6,16 62:11
62:19,23 63:7
63:11,14,17,18
64:7 65:2,4
67:3 69:2,5
77:7,13 78:6
83:9 84:10,14
85:9,10,13,19
86:2,3,7,16,16
86:23 88:3,4
92:17,18
102:18 103:5
103:21 113:5
113:11,13,17
119:21 129:2
130:2 133:3,4
133:5,18,20
134:1,17 137:6
138:18 146:10
147:13 152:11
152:14 156:12
166:2 178:5
183:7 185:7,15
186:9,24
188:21,24
189:5 190:24
191:7 192:6
193:18,21,25
194:4 200:10
202:24 204:24
207:24 210:22
212:12 218:12
221:6,12
224:16 226:5

227:2,24
229:15,18
231:10,12,24
234:24 235:5
237:22 238:21
238:22 241:16
242:9,21 243:9
244:5,12,18,23
249:23 254:7
260:3 262:9
268:20 269:24
270:7,11,14
272:20,21,22
277:1 287:12
292:22,25
302:18 303:7
308:17 309:18
311:15 312:12
313:13 328:4,8
329:7 330:6
334:5 340:18
344:17,21
348:18 363:13
364:16 365:17
370:1 373:1,2
374:1,11,11
378:4 380:24
389:4,5,6,6
402:2,4 405:15
405:16,19
406:11 410:19
**time's** 189:2
**timeframe**
134:12 297:11
340:18 392:16

410:8
**times** 6:24 19:5
19:6,8 27:6
41:23 64:9
68:20 194:14
216:17 250:20
250:24 399:16
**timing** 374:22
**tip** 262:14
**tipped** 246:18
**title** 20:4
**tjones** 2:7
410:2
**today** 7:1 13:14
13:15,21,23
18:24 20:14,20
21:10 24:23
43:12 54:24,25
57:11 83:18
87:18 89:16
136:4,6 144:15
165:17 188:18
211:11 212:2
218:17 262:20
264:2,19
266:22 271:14
271:16 276:3
277:2 278:13
278:17 280:9
306:21 312:7
317:23 351:9
369:16
**today's** 21:23
32:18

together   12:21
121:4 198:18
235:5 256:17
293:23 326:1
328:21 338:21
390:23 394:14
told   18:24
31:12 43:7
44:9 48:22
53:10,12 54:6
55:12,19,20
56:11 57:14,22
58:8,9 59:22
60:18,22 63:12
63:15 75:1
77:18 78:5
106:10 107:2,5
107:7,19
122:15 129:3
133:4 136:11
141:7,7 147:12
147:16 149:22
156:9 157:8
162:14 167:24
172:19 176:10
190:18 196:11
196:24 209:17
212:12,20
221:14 224:20
229:17 233:2
233:21,22
234:2,12
250:17 251:1
272:11 273:13
273:19 274:16

274:20,23,23
274:24 275:10
275:11 277:15
279:17 280:3
280:11 281:7
287:8 288:13
367:9 378:10
386:14 392:9
392:15 398:21
401:5
toling   34:7
tolle   130:8
tom   192:14
tonight   287:12
took   15:9 16:12
17:18,22 26:20
26:21 34:5
49:5,21 50:7
93:18 115:12
130:23 132:14
132:16 134:19
138:4 142:19
145:11,14
165:1 181:20
183:12 212:4
212:23,24
214:24 220:17
223:8,9 303:15
307:15 308:8
309:17,17
310:1,9 311:16
312:12 317:11
321:6 322:12
326:4 327:16
327:16,17

328:20 329:18
344:19 345:9,9
346:3,22,25
347:12,20
358:18 361:23
367:15 369:5
370:7,13
371:20 372:8
373:6,14,17
395:22 398:1
398:16,22
tool   169:19
170:6 173:2,5
173:8
tools   170:2
top   12:22 17:15
116:5,13 127:8
143:6 144:21
158:17 160:1
160:18 161:16
166:2 167:6
169:19 219:20
222:9 239:20
241:3 247:6,17
262:14 265:18
267:18 277:4
278:14,20,24
279:23 282:4,8
282:9 290:20
291:5,5 303:1
303:17,17
306:5,5,22
319:3 326:11
327:3 332:21
332:22 343:1

353:17 356:3
361:6 369:9
373:18 402:19
topic   34:16
348:11
tops   307:6
torch   225:7
227:23 228:13
228:20,21
torches   59:18
59:21 60:4
225:16,20
226:24 234:23
total   12:10,15
12:16 27:8
28:2 32:6
221:25 377:23
totally   121:1,25
239:16 258:11
358:14 359:1
399:17 401:23
touching
280:22
towards   171:2
289:19
track   389:20
tracking   41:12
43:5
trade   137:24
157:24 311:22
trailer   7:12,14
7:17 8:11,19
88:11 89:6,18
trailers   8:13

**training** 394:24
**transcribed**
  18:22
**transcript**
  115:14 408:20
  410:6,20 412:5
  412:8
**transcription**
  18:14
**transfer** 42:3
  236:25
**transferred**
  162:15
**transferring**
  97:11
**transpired** 31:9
**trash** 126:18
  128:4 236:1,7
  239:11
**travel** 88:3,4
**treat** 102:6
**treated** 79:13
**trevor** 34:8
  213:1 214:24
  218:19 220:17
  272:4,23
  279:16
**trial** 19:11
  87:22 144:15
**tried** 123:22
  312:25
**trouble** 210:2
  246:7
**truck** 130:17

**trucked** 118:15
**trucks** 46:20
  55:23 56:24
  262:12
**true** 23:9 33:24
  34:2,3,10
  67:11 101:4,4
  110:11 117:1
  253:11,13
  256:25 257:2,4
  257:22 258:12
  383:6 408:20
  412:8
**truth** 6:16,17
  6:17 408:9,9
  408:10
**try** 13:2,4
  62:13 64:10
  67:2,6 102:11
  104:9 109:9,12
  109:14 114:19
  245:15 250:22
  278:2 284:12
  284:22 285:17
  286:11 308:1
  365:20,22,24
**trying** 90:1
  94:8 109:17
  127:15 134:19
  269:7 287:3
  289:14 303:21
  308:9 319:9
  347:10
**tt** 4:7 20:20,25

**tube** 79:6 83:13
  117:11,20
  120:1,5,12
  126:19 127:4
  128:5,8 129:12
  139:8,10
  170:13 190:7
  195:15,19
  196:7 199:24
  201:2 208:9
  212:21 244:14
  272:10,16
  273:3 274:7
  298:5,20,21,25
  304:15 305:15
  305:16 306:4
  306:19,24
  310:16,21
  318:8,11,23
  321:7 327:5,11
  327:19 330:25
  331:1,2 333:6
  333:12,24,25
  334:7,8 336:1
  353:4 361:16
  371:9 378:15
  378:18,22,24
  379:1,3,4
  383:8 384:15
  384:23 387:9
  388:7 401:20
  402:7,8
**tubes** 105:24
  121:22 122:3
  122:20,25

  132:13 167:9
  177:20 201:1
  208:16,17,19
  251:15 308:22
  310:21,22
  371:23 372:22
  380:6,7 382:10
  382:11 388:19
**tuck** 394:6
**turn** 144:22
  172:21 278:10
  290:19 392:25
**turned** 38:20
  40:3 45:10
  113:4 144:22
  171:9,10,18
  233:21 234:17
  302:13 391:2
  392:23 393:19
**turpentine**
  321:9
**twelve** 4:5
  138:2 305:9
  320:21
**twenty** 228:19
**twice** 69:8
  243:20 315:15
  366:18,21
**two** 4:4 7:15
  10:12 15:10,10
  22:24 25:19,21
  32:9,11,12
  36:7 43:11
  56:2,9 60:2
  62:24 63:22

66:15 72:2
73:18 84:13
86:2 108:22,23
109:1 111:21
116:21 122:4
124:24,24
127:20 130:11
131:8,14 132:9
133:21 152:2
154:11 157:10
160:8 164:15
165:14 167:4
189:1,8 191:13
214:25 215:16
217:1 221:16
230:1 243:20
252:20 253:5
253:21 254:2,2
254:12 258:8
268:25 269:11
272:2 275:17
292:15,16
304:1 310:21
316:15 317:21
325:23 330:14
338:10 339:10
341:13 353:7
354:14,17
356:25 357:1
360:19,23
361:7 364:22
371:6,8 376:24
378:13 380:5
394:2

**type** 40:5 59:5
76:10 77:3
79:25 81:6
86:20 87:24
88:1 105:4
109:3,5 110:8
117:25 121:14
133:8 142:4
151:19,20
158:18,24
173:6 180:22
190:13 199:6
209:25 214:12
230:1,1 232:10
247:6 273:14
273:16,22,23
275:1,1,7,11,12
285:5 306:13
320:25 378:25
387:12
**typed** 71:23
82:17 188:5,10
188:17 254:7
283:1 356:10
356:22
**types** 8:12
19:23 251:18
**typewriting**
408:19
**typewritten**
408:20
**typical** 283:7
**typically**
151:22 225:13
269:11 284:14

340:21
**typing** 12:24,25
72:16

**u**

**u** 333:1 409:13
**uh** 47:21 54:23
55:7 75:8 90:7
116:14 132:19
165:13 182:21
183:10 184:2,9
189:10 214:17
219:18,22
227:21 234:20
268:2,6 270:20
278:12 303:12
303:14 312:3
318:21 319:6
324:18 331:24
332:16 345:11
352:22 364:21
373:25 384:12
399:14
**uncertain**
139:24,24
**unchanged**
127:14 128:1
**uncover** 390:25
**uncovering**
308:3
**undated** 272:4
**under** 63:8
85:16,16 99:25
100:1 101:8
159:12 193:1
193:10 196:13

222:8 223:18
232:14,14
332:24 333:2
348:22,23
352:21 395:23
398:20 408:19
**undergoing**
97:6
**underlined**
160:19 161:2
**underneath**
165:23 305:23
306:4 318:23
394:11
**understand**
13:8 29:14
56:5 72:23
108:16 116:16
123:10 168:11
170:6 179:14
200:15 208:10
216:14,16
220:24 228:25
277:20 307:20
348:20 349:10
384:8
**understanding**
40:14 81:8
109:22 164:12
186:15 214:14
265:6 276:19
329:17 334:16
393:5
**understands**
136:15

**understood**
13:11
**undetermined**
405:11
**unfortunately**
7:23
**unheated**
170:10,13
**unidentified**
76:8 77:2
**unified** 85:6
**unintelligible**
125:19 182:18
363:24
**unit** 5:10 56:12
59:12 117:16
119:9,10 121:7
123:6,9,10
156:2 195:1
217:22 271:10
273:1 293:23
298:20,21
332:4 358:12
361:8 362:20
364:24 365:8
365:10 377:20
395:3
**united** 1:1
**units** 59:9
120:24 121:18
121:22 122:12
123:7 190:4
199:20 200:17
272:9 289:7
312:18 363:2

368:14
**unreliable**
109:12
**unresponsive**
391:11
**updated** 37:10
**upgrade**
165:14
**upside** 211:16
211:23 355:22
**upwards**
250:13
**use** 15:2 27:12
30:16,18 42:5
60:9 74:17
92:25 94:24
95:3 97:3
98:22 103:21
106:10,21
108:7 109:17
117:15 119:7
120:18 123:9
123:10 124:11
126:21,22
133:19 142:7,8
156:25 176:15
207:4 214:11
228:24 234:22
243:23 246:25
290:4 296:20
303:10 307:9
322:15 323:1
329:2,11 344:5
351:13 375:22
391:20 394:8

395:3 400:25
**used** 54:15
58:20,21 59:17
59:21 60:5
76:11 91:20
93:12 106:7,21
106:24 107:1,3
107:20 120:12
126:17 128:4
129:21 130:15
130:16 131:1
135:12 142:9
147:13 156:7
156:11 157:6
158:25 162:1
162:16 171:15
171:18 172:1
172:12 176:11
196:12 204:4,6
204:6,13 205:1
209:17,18
210:20,23
224:15,19
225:7 226:23
229:15 243:15
252:21 253:22
253:25 254:3
261:8 283:24
292:4,5 293:2
293:2 324:11
327:9 329:4,9
329:12 335:7
335:15 346:11
349:13 350:2
351:19,24

363:20 395:11
395:21 410:20
**useful** 374:23
**uses** 358:8
**using** 79:4
98:16 107:21
118:22 130:10
187:4 225:16
227:15,19,23
290:15 294:24
296:14 386:25
387:4
**usually** 42:12
42:13 58:14
72:4 94:22
96:6 234:7
245:15 248:12
401:2
**uti** 225:12
**utilize** 15:21
93:24 95:5,5,7
98:24 102:8,14
108:5,8 109:9
148:17 150:1
157:11 312:25
**utilized** 94:1,4
95:8 98:18
106:11 108:12
109:23 165:6
211:1 225:12
275:12 313:10
405:12
**utilizing** 98:8
147:3 185:7

| v | | | |
|---|---|---|---|
| **v**  4:14 45:3 | 179:6 181:22 | 405:24 406:23 | **wacker**  16:10 |
| 90:8 271:22,24 | 231:2 | 408:11,17 | **wait**  13:3 72:20 |
| 271:25 272:25 | **ventilization** | **videographer** | 73:3 149:10 |
| 274:18 275:20 | 145:3 | 2:19 5:3,20 | 171:9 186:15 |
| 275:20 410:4 | **vents**  197:8 | 6:11 84:10,13 | 187:12 316:2 |
| 411:1 412:1 | **veracity**  257:5 | 189:1,4 270:10 | 373:23 378:7 |
| **vague**  51:24 | **verbal**  263:1 | 270:13 328:4,7 | 383:3 |
| 379:18 | **verbally**  288:13 | 369:25 370:3 | **walk**  393:6 |
| **valve**  195:7 | **verbatim**  95:20 | 389:8 406:10 | **walks**  393:2 |
| **vantage**  146:7 | 127:11 356:22 | 406:21 407:1,4 | **walkthrough** |
| **vapor**  358:14 | **vergon**  21:25 | **videos**  26:13 | 392:10 393:12 |
| **vapors**  121:25 | 21:25 25:18 | 183:13 385:9 | **wall**  131:6 |
| 179:5 199:19 | 114:23 115:18 | 386:1 405:22 | 143:24 170:1 |
| 358:10 | **vergon's**  22:10 | 405:25 406:1 | 213:13,21 |
| **var**  166:10 | 23:4 49:11 | 406:22 | 214:4 215:17 |
| **variation**  89:9 | 115:11 | **videotape** | 216:18 217:18 |
| **variations** | **verify**  375:15 | 49:19 | 217:20,25 |
| 208:25 | 410:9 | **view**  118:5,5 | 218:7 220:2 |
| **various**  70:17 | **veritext**  5:19,21 | **violate**  293:8 | 223:17 268:24 |
| 87:4 313:11 | 410:14,23 | **visible**  365:17 | 269:20 377:18 |
| **vary**  235:6 | **veritext.com** | 371:17 | 377:18,20 |
| **varying**  235:6 | 410:15 | **visit**  250:21 | 379:23 |
| **vast**  205:3 | **version**  167:13 | **visited**  215:1 | **walls**  128:25 |
| **vehicle**  48:24 | **versus**  5:13 | **visual**  186:8 | 139:2 141:25 |
| **vehicles**  153:5 | 226:10 256:17 | **vitae**  8:22 9:13 | 143:13 222:2 |
| 153:6 | 394:3,3 | 12:3 | 402:20 |
| **vein**  151:20 | **victory**  272:1 | **void**  216:25 | **want**  17:5 43:1 |
| **vent**  154:16 | **vid**  49:7 | **volunteer** | 43:7 50:4,6 |
| **vented**  271:10 | **video**  1:12 4:6 | 70:17 389:25 | 67:5 86:21 |
| **ventila**  144:11 | 5:8,10 20:10 | **vs**  1:6 | 100:22,24 |
| **ventilation** | 26:8 33:25 | | 110:10 126:17 |
| 144:8 145:1 | 34:5 36:5 | w | 245:15 246:25 |
| 167:15 168:1 | 43:18 49:9 | **w**  2:14 3:4,7 | 269:14 270:1 |
| 175:25 176:4 | 50:8 52:22 | 4:15 276:1,21 | 273:13 274:25 |
| | 65:14 239:5,9 | 278:9 279:14 | 308:23 328:15 |

[want - whispering]                                    Page 97

376:22 384:10
389:5 390:25
390:25 391:21
406:14,23
407:6
**wanted** 45:25
61:14 68:22
69:3,5 114:17
114:20 132:20
134:16 187:9
245:11,24
246:2 259:16
284:11 308:20
322:18 347:7
386:6,11
**wanting** 257:18
**wants** 285:12
390:24 406:22
**warmer** 234:8
**warning**
191:15
**wash** 129:22
130:16,17
131:9,15
138:15
**washer** 158:14
**waste** 160:3
**watch** 140:15
**water** 124:10
125:1,3 146:3
176:15 199:24
200:3 403:6,12
403:14,20
**water's** 227:10

**way** 13:22
31:23 38:7
44:11 59:2
69:1 70:12
86:3 95:9
121:24 128:16
133:19 144:23
145:17 150:11
168:10 175:11
175:19 189:8
194:10 207:10
218:11 230:9
238:18 248:2
258:1 271:4
277:20,24
293:7 299:15
301:15 325:9
325:14 329:15
334:20 344:12
348:14 354:22
355:22 360:17
371:2 382:14
384:10,21
392:11 398:14
**wayne** 1:2 5:16
27:4 45:1 86:5
233:3 260:13
**we've** 20:7
152:22 173:5
351:8 365:15
393:6 396:9,9
**weather** 194:1
194:3,9 233:3
**week** 23:3,12
29:9 88:18

89:14 160:8
**weeks** 11:7,14
11:15 14:1,17
16:6,13 28:17
31:1 130:11
160:8 398:23
399:5
**weigh** 175:23
**weighs** 175:22
**weight** 175:22
175:24
**weird** 269:8
**weld** 58:24
225:14
**welded** 225:3
**welder** 173:1,4
173:7
**welders** 234:23
**welding** 58:21
59:2,3,3,9,12
60:16,18,20,23
61:20 62:5
63:5 64:17
65:1,18 76:11
173:13 224:22
224:23,24
225:1,13,13
228:9 280:5
392:18
**wells** 123:22
166:20 210:7
223:22 282:15
284:2 285:16
288:12 296:25
299:21 300:9

307:23 322:4
334:9,17
335:24 337:11
338:21 339:19
341:1,14
342:14,23
343:23 344:24
351:12 352:1
354:15 382:15
382:20 383:7
**went** 46:3,11
50:18,25 51:5
62:19,23 86:16
86:25 113:11
113:12 125:17
128:19 132:21
134:6 152:10
152:21 153:4,5
194:7 210:22
246:7 279:17
286:17,24
291:16 313:4
322:25 329:10
344:18 392:16
393:3
**weres** 137:16
**west** 269:14
**wet** 125:9
284:9,25
285:19 286:1
**when's** 11:13
28:14 137:6
**whereof** 409:5
**whispering** 5:6

| | | | |
|---|---|---|---|
| **white**  56:8 | 95:25 96:2,13 | 150:22,24 | 196:18,22 |
| 154:9,19 | 96:17 97:15,18 | 151:6,14,16,18 | 197:7,12,14 |
| 164:12 170:8 | 97:21 98:12,22 | 152:16,25 | 199:1 200:24 |
| 213:14 215:19 | 101:2,11,16,25 | 153:12,16,22 | 201:17,21,24 |
| 215:20 216:8,8 | 102:2 104:2,21 | 154:4,14,20 | 202:1,22 |
| 219:12 | 104:24 105:8 | 155:3,5,7,19 | 203:17,20,23 |
| **williams** | 105:19 107:19 | 156:4,11 | 204:23 206:4 |
| 178:20 | 107:23 108:20 | 157:16,23,25 | 206:12 210:10 |
| **willing**  287:15 | 109:4 110:23 | 158:13,22 | 210:14 211:7 |
| **wind**  231:12 | 111:3 114:14 | 159:3,12 | 213:4,9,17 |
| **winter**  193:25 | 115:2,13,22 | 160:25 161:14 | 215:7,20,25 |
| **wintertime** | 117:4,6 119:1 | 161:17 162:8 | 216:25 219:2,5 |
| 194:12 | 119:18,20 | 162:14,19 | 219:7 220:8 |
| **wipes**  265:19 | 121:11 123:12 | 163:1,3 164:1 | 221:23 222:14 |
| **wiring**  112:19 | 124:1,13,23 | 164:20 166:5 | 222:18,21 |
| 112:22 206:21 | 125:16,20,23 | 166:13,16 | 225:11,24 |
| **wise**  130:5 | 126:4,11 127:3 | 167:1,24 168:9 | 227:6,19,22 |
| 389:25 | 127:21,23 | 168:18 169:10 | 228:15 230:15 |
| **wit**  98:24 | 128:14,16 | 169:23 170:12 | 230:22 231:15 |
| 122:10 | 129:25 130:5 | 170:19,21 | 231:20 232:2,4 |
| **withdraw** | 130:20 131:17 | 171:2,13,24 | 232:10 233:12 |
| 69:21 94:3 | 134:11 136:11 | 172:1,9,11 | 235:3,13 237:8 |
| **witness**  1:13 | 137:22,25 | 174:5,10,15,25 | 238:8 242:11 |
| 6:12,19 21:20 | 139:5,18,21 | 175:14,21 | 247:5 248:5 |
| 31:14 34:12 | 140:4,8,13,21 | 176:7,9,23,25 | 249:2 250:1,17 |
| 38:13 40:11,19 | 141:1,17 | 179:1,24 | 253:16 256:1,7 |
| 42:15 44:1,25 | 142:14,25 | 180:17 181:3 | 256:14 257:5,8 |
| 45:13 54:23 | 143:3,10,12,15 | 181:19 182:3 | 257:15,16 |
| 57:7,13 62:8 | 143:19 144:11 | 183:4,19 | 258:7,14,16,18 |
| 64:6,25 66:8 | 144:19 145:11 | 184:16,25 | 258:22,22,23 |
| 71:7 72:12 | 146:9,23 | 185:13 186:5,7 | 259:2,5,11 |
| 80:10 82:10,15 | 148:11,21 | 186:13 188:4 | 260:1 261:8 |
| 86:15 89:9 | 149:7,14,15,17 | 188:12,14 | 262:25 263:12 |
| 91:11 92:24 | 149:20,25 | 189:16,18,22 | 266:1,4,6,10,24 |
| 93:15,22 95:12 | 150:5,7,14,16 | 190:13 192:25 | 267:3,18 |

269:10 273:6
273:19 276:12
277:1,20 278:2
279:6,8 280:21
281:5,10
283:13 286:4
287:6,8,22
291:1,10,12,22
292:18,25
296:7 297:6
300:3 301:5,13
302:3,6,17,25
305:22 306:10
307:25 309:13
310:20 311:3
311:11,23
312:22 314:19
314:22,24
316:21,23,25
317:2 319:1,16
319:21 320:4
320:21 322:8
322:17 323:21
325:6,16
326:15,18
327:7 328:3
330:17 331:10
332:10 333:23
335:13 336:20
337:3,5,17,19
338:2,9,11,23
339:12,16
340:1,14
341:10,19
342:18,20

343:9,14,17
344:3,11 346:7
346:9,15 347:5
347:10 348:7
349:5,24
352:15 354:3
355:7,17,24
356:1 357:17
358:1,22 359:1
359:18,25
362:5,22 365:8
365:23 366:2,6
367:14,21
368:1,4,7
369:2 375:3
377:6,11
378:24 379:20
380:2,8 381:16
381:18 382:2,5
382:19 384:3
391:17 396:1
404:12 409:5
410:8,10,12,19
**witnessed**
122:10
**witnesses**  27:23
31:10 64:1
66:24 67:3,5,9
87:21 148:14
149:4 152:3
259:6 374:25
375:11 377:8
382:2
**wondering**
76:1

**wood**  217:8,14
217:19,19,19
219:7 379:16
379:20,20,23
380:13,15
401:2,4
**wooden**  377:19
377:20
**word**  15:2,21
24:4,7 27:12
30:16 95:7,16
96:3,3,15 97:5
104:16 116:8,9
117:15 119:7
120:18,18
122:17 124:11
126:21,22
202:19 203:13
204:13 227:20
243:24 253:22
254:1 275:13
276:15 277:8
295:4,15,25
296:2 298:8
351:13,19
357:9,22,23,24
358:3,8,17,19
362:13 391:20
**word's**  126:10
**wording**  97:2
**words**  30:13
92:15 104:17
177:8 191:14
200:13 205:13
217:6 253:20

254:2 256:4
261:8,16
276:21 277:12
290:2,3,3
356:25 357:1
386:23 402:15
403:16
**work**  7:11,13
8:3,12,24 9:23
10:12,13 27:25
55:21,22 88:1
89:12,17,22
99:8 111:15
130:1,2 232:21
394:17
**worked**  7:14
12:8 16:4
28:15 29:17
36:7 64:2
70:16 86:25
91:14 120:4
184:10 282:14
350:2,3 387:9
**worker**  88:14
88:17
**workers**  60:24
**working**  8:18
9:22 17:3,25
18:1 28:9,12
30:8 62:4 63:4
81:3 88:25
156:17 179:25
232:19 348:17
392:18

| | | | |
|---|---|---|---|
| **worksheet**<br>282:10 283:20<br>335:6,10<br>**workshop**<br>402:1<br>**world** 206:12<br>395:10<br>**worse** 209:10<br>**would've** 61:21<br>82:10 197:9<br>288:21 297:8<br>322:10 333:1<br>**wouldn't've**<br>383:19<br>**wrap** 158:2<br>318:2<br>**wrapped** 318:8<br>**wraps** 390:22<br>**write** 41:23<br>140:20 149:17<br>149:20 160:24<br>292:9 294:17<br>296:2 298:24<br>**writes** 279:23<br>**writing** 117:17<br>185:16 265:9<br>265:10 268:5<br>299:2 324:25<br>**written** 1:21<br>29:12,23 35:21<br>35:22 40:2,4<br>82:16,17 83:1<br>83:3,4 85:12<br>99:13 148:7<br>178:16 204:18 | 204:20 276:22<br>292:13 401:15<br>**wrong** 64:20,21<br>71:25 90:16<br>130:8 232:18<br>232:24 244:1,2<br>256:4,5,8<br>272:7 276:20<br>313:22 315:3<br>349:22 355:22<br>**wrongly** 204:6<br>**wrote** 53:13<br>76:22,25 93:3<br>93:7 149:11<br>189:24 191:24<br>202:6,19 203:5<br>283:20 292:2<br>295:7 297:23<br>298:1,3,19<br>299:1,3 300:22<br>351:12 361:6,9<br>364:22 374:1,7<br><br>**x**<br><br>**x** 281:9<br>**xylene** 209:21<br>210:5,11<br>248:24<br><br>**y**<br><br>**y** 4:15 96:20,20<br>281:13 282:3<br>290:6 292:10<br>292:11,11<br>294:7,10 296:1<br>297:16 298:19 | 299:19,25<br>300:12,12,16<br>303:6 304:5<br>305:9 306:21<br>331:4,14<br>333:14,18,21<br>345:23 346:1<br>409:13<br>**yea** 116:5<br>**yeah** 9:19 10:7<br>11:13 12:4<br>16:10 25:5,25<br>26:11 27:5<br>29:16 36:4<br>37:21 42:23<br>46:7 48:19<br>57:8,8 62:22<br>67:24 72:1<br>73:10 79:1<br>80:7,24 91:6<br>96:13 98:1<br>103:15 110:7<br>113:11 116:7,8<br>116:21 117:5<br>119:11 120:23<br>122:23 126:11<br>128:24 134:1,9<br>134:11 137:7<br>138:17 143:8<br>146:2 147:8<br>154:14 161:17<br>161:19 163:19<br>165:24 166:13<br>166:15 169:23<br>175:17 178:14 | 179:1 184:11<br>186:5 188:24<br>189:21 193:25<br>196:8 198:9<br>202:10,22<br>203:8,17 207:2<br>211:25 212:1<br>216:2,25 220:9<br>222:17,21<br>228:18 230:15<br>236:2,13,14,25<br>240:8 242:2,4<br>242:7 243:4,23<br>254:4 256:10<br>261:21 265:17<br>266:1,3,14,17<br>270:9 274:19<br>278:13 282:6<br>282:25 291:2,5<br>291:9 292:12<br>293:4 302:5<br>305:17 306:2<br>307:25 309:15<br>311:21 315:25<br>317:16 318:13<br>318:18 319:14<br>319:24 320:21<br>320:25 322:9<br>324:3 325:21<br>325:23 326:10<br>326:15 327:19<br>329:7 332:12<br>332:13 333:8<br>337:3 343:16<br>350:4 353:19 |

355:13 359:18
360:6 361:4,20
361:20 362:5
362:22 364:25
369:23 371:18
373:12 374:3,4
374:5 375:13
375:13 380:21
381:4 382:25
387:2 388:18
390:7 397:11
397:21 406:8
407:2
**year**  7:15 8:16
9:11,16 12:6
17:12 70:20
80:12 85:15
92:7 135:15
141:9 146:6
147:21 160:8
237:5 297:10
313:17 371:21
372:9 401:25
**years**  11:17,18
12:14 40:23
58:4 107:2,3
107:20 142:10
184:10 202:17
203:5,18
209:18 211:2
254:12 286:5
389:19,20
390:2
**yellow**  158:8,9
220:14 332:17

336:25 342:13
342:22 352:25
353:2
**yep**  125:23
157:24
**yesterday**
54:21

|   z   |
|---|

**z**  4:4,5 45:3
47:8 48:11
50:20 52:3
54:19,24 96:20
152:23 164:14
167:16,22
170:5 179:18
218:1 278:5
404:5,5
**z's**  84:6
**zionsville**  7:9
**zoccola**  2:3 6:6
6:8 21:1 91:7
94:5 99:5,9,13
99:16,18 100:7
103:12,15
189:13 191:16
191:18 211:13
211:17 220:10
220:12 235:15
263:9 270:9
348:2 352:11
352:13 355:23
**zoom**  363:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 1

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
2                     FORT WAYNE DIVISION
3               CIVIL ACTION NO. 1:21-cv-00108
4   REPUBLIC SERVICES OF INDIANA,    )
    LIMITED PARTNERSHIP,             )
5                                    )
            Plaintiff,               )
6                                    )
               -vs-                  )
7                                    )
    COE HEATING & AIR CONDITIONING,  )
8   INC.; and GAS-FIRED PRODUCTS,    )
    INC. d/b/a SPACE-RAY,            )
9                                    )
            Defendants.              )
10
11
            REMOTE DEPOSITION OF TREVOR MILLER
12
13
14      The deposition upon oral examination of
    TREVOR MILLER, a witness remotely sworn before me,
15   Janine A. Ferren, RMR, CRR, CSR-IL No. 84-4852,
    Notary Public in and for the County of Hamilton,
16   State of Indiana, taken on behalf of the Defendant,
    at the offices of Korte Does It All, 10920
17   Stellhorn Road, New Haven, Allen County, Indiana,
    on the 21st day of October, 2022, scheduled to
18   commence at 10:30 a.m., pursuant to the Federal
    Rules of Civil Procedure with written notice as to
19   time and place thereof.
20
21
22
23
24                         Exhibit D
25      Job No. CS5542196

1         on December 19, 2018, or before, had Kyle Orr or

2         anyone else associated with Republic told you

3         that the reason that their Modine room

4         combustion open flame heaters weren't working or

5         weren't working correctly?

6    A    No.

7    Q    Did they ever tell you they were clogging with

8         blue spray paint?

9    A    No.

10             MR. GARDNER:   That's all the questions I

11        have for you.   Other lawyers may have some.

12             Thank you.

13             THE WITNESS:   Okay.

14   CROSS-EXAMINATION,

15        QUESTIONS BY JAMES W. HEHNER:

16   Q    Trevor, my name is Jim Hehner.   As I told you at

17        the very beginning, I represent Gas-Fired

18        Products doing business as Space-Ray.

19   A    Uh-huh.

20   Q    One of the reasons you go out and look in the

21        room and look around for sizing, I assume, is to

22        make sure that there's sufficient size and

23        clearance for the products you want to install;

24        is that right?

25   A    That is correct.

Page 48

1    Q    Did you conclude that there was sufficient

2         clearance to properly and safely be able to

3         install closed infrared tube heaters in that

4         room, based on the size and the measurements you

5         observed?

6    A    Yes.

7    Q    If, in fact, Gas-Fired Products, doing business

8         as Space-Ray, closed infrared tube heaters had

9         been installed in there, would that have been an

10        appropriate application, installation, and safe,

11        in your opinion, for --

12   A    Yes, in my opinion, yes.

13             MR. JONES:  Objection to form.

14   Q    I'm not going to lead you.

15             If, in fact, the evidence shows that

16        gas-fired closed infrared tube heaters had been

17        installed, do you have an opinion as to whether

18        that would have been a safe application?

19             MR. JONES:  Jim, my objection is just that

20        I think it calls for an expert.

21             MR. HEHNER:  I'll let him answer it again.

22        He already said yes, didn't you?

23   BY MR. HEHNER:

24   Q    You shook your head.  When you shook your head,

25        does that mean yes?

Page 59

1   A   I do not recall if he chose -- I cannot put that

2       on someone else.   I do not remember.

3   Q   Oh.

4   A   Okay?

5   Q   But there was a discussion about it, about the

6       options?

7   A   Correct.

8   Q   And it sounds to me like, whenever these

9       gas-fired tube heaters, not only at Republic's

10      fleet maintenance buildings but at other places,

11      due to lack of propane or lack of pressure or no

12      propane that can build up the soot, there's a

13      safety system inside that makes them stop

14      working; right?

15  A   Correct.

16  Q   So the buildup of soot is going to make a

17      gas-fired closed infrared tube system stop

18      working instead of catching on fire; right?

19  A   Correct.

20  Q   You mentioned the installation of a double

21      split?   I think that's what you said.

22  A   Mini.

23  Q   Mini split.

24          Where was that installed at?

25  A   At the temporary locker room after the fire.

Page 60

1    Q    Your diagram where you have your measurements,

2         it's at KORTE 00009, did you write at the top 30

3         by 60 by 15 feet 4 inches tall?

4    A    Correct.

5    Q    So the ceiling was just over 15 feet high?

6    A    Correct.

7    Q    You felt that that ceiling height gave

8         sufficient space for these gas-fired infrared

9         tube heaters to be suspended from the ceiling

10        and meet required social distance to materials;

11        right?

12   A    Correct.

13   Q    As part of your training, experience, knowledge

14        base, et cetera, education in the realm of

15        heating and cooling systems, including infrared

16        gas tube heaters, have you heard the term "spray

17        booth"?

18            MR. JONES:  Objection to form.

19   A    Yes.

20   Q    You didn't recommend or estimate infrared gas

21        tube heaters for Republic's spray booth, did

22        you?  They didn't have a spray booth in that

23        room, did they?

24   A    No.  They had a room that they were painting in.

25            MR. JONES:  Marty, if I could -- I don't

1      know if you're going to go on any more questions

2      about that, but I would just have a standing

3      objection on that, if it's easier.  I don't know

4      if you have any more questions on that.  I don't

5      want to keep interrupting.

6          MR. GARDNER:  I don't really have more

7      questions.

8          MR. HEHNER:  I would ask, Tom, what is your

9      objection?

10         MR. JONES:  I think it calls for expert

11     opinion.  I think it's also leading, lacks

12     foundation.

13         MR. HEHNER:  So part of it is form on

14     leading, okay.

15         MR. GARDNER:  So let me work with it a

16     little bit more.

17         MR. JONES:  I didn't mean to interrupt you,

18     Marty.  I'm just preserving it.

19         MR. GARDNER:  I understand.

20  BY MR. GARDNER:

21  Q   So how long have you been in the field of

22      heating and air conditioning, Trevor?

23  A   Nine years.

24  Q   And four of the years you were certified and

25      qualified to be a technician to work on closed

Page 63

1    years; right?

2  A  Correct.

3  Q  So you've been out in the field doing these

4     things; right?

5  A  Yes.

6  Q  Have you worked for any other companies besides

7     Korte doing this?

8  A  Yes.

9  Q  Who else?

10  A  A & A Mechanical.

11  Q  Do they do the same thing as Korte?

12  A  Yes.

13  Q  What years were you employed with A & A

14     Mechanical?

15  A  2011, 2012.

16  Q  Any other employers in the realm of heating and

17     cooling systems?

18  A  No.

19  Q  Have the opinions you've expressed today been

20     based on your knowledge, skill, experience,

21     training, and/or education in the field of

22     heating and cooling?

23  A  Yes.

24         MR. GARDNER:  That's all I have.

25

Page 64

1  RECROSS-EXAMINATION,

2     QUESTIONS BY JAMES W. HEHNER:

3  Q   Trevor, I had a couple just to circle back on

4     something Marty was asking you before.  I'm not

5     going to ask this question leading.

6          Was this area a spray booth, in your

7     opinion?

8  A   No.

9          MR. JONES:  Jim, I'm just objecting because

10     Marty's stated before that that's a term of art

11     that's subject to definition through different

12     associations.

13          MR. HEHNER:  I understand, but I'm working

14     around --

15          Trevor, ignore what I'm saying here because

16     I'm talking to Thomas.

17          I'm working around your form objection.

18     Okay?  So I'm asking if he believes it was a

19     spray booth.

20          MR. JONES:  Got it.

21  BY MR. HEHNER:

22  Q   You can answer the question, Trevor.

23  A   And I said no.

24  Q   Thank you very much.

25          You also said in some questioning that

Page 68

1   STATE OF INDIANA                )

                                    )  SS:

2   COUNTY OF HAMILTON              )

3        I, Janine A. Ferren, a Notary Public in and

4   for the County of Hamilton, State of Indiana at

5   large, do hereby certify that TREVOR MILLER, the

6   deponent herein, was by me first remotely sworn to

7   tell the truth, the whole truth, and nothing but

8   the truth in the aforementioned matter;

9        That the foregoing deposition was remotely

10  taken on behalf of the Defendant, at the offices of

11  Korte Does It All, 10920 Stellhorn Road, New Haven,

12  Allen County, Indiana, on the 21st day of October

13  2022, commencing at the hour of 10:33 a.m.,

14  pursuant to the Federal Rules of Civil Procedure;

15       That said deposition was taken down

16  stenographically and transcribed under my direction

17  as accurately as possible, considering the quality

18  of the videoconference communication, and that the

19  typewritten transcript is a true record of the

20  testimony given by the said deponent; that the

21  signature of said deponent to his deposition was

22  waived by the deponent and all parties present, the

23  deposition to be read with the same force and

24  effect as if signed by him;

25       That the parties were represented by their

Page 69

1    counsel as aforementioned.

2        I do further certify that I am a disinterested

3    person in this cause of action; that I am not a

4    relative or attorney of any party, or otherwise

5    interested in the event of this action, and am not

6    in the employ of the attorneys for any party.

7        IN WITNESS WHEREOF, I have hereunto set my

8    hand and affixed my notarial seal on this 31st

9    day of October, 2022.

10

11

12

13   Janine A. Ferren

14   Seal, Notary Public              My Commission Expires:

     State of Indiana                 April 22, 2024

15

     Janine A. Ferren                 County of Residence:

16   Commission No. NP0681591         Hamilton

17

18

19

20

21

22

23

24

25

# 𝕻𝖗𝖔𝖕𝖔𝖘𝖆𝖑

(260) 493-1604 Fax
(260) 493-2596 Phone
10920 Stellhorn Road
New Haven, IN 46774



**KORTE INC.**
**Does it all**
Heating & Air • Electrical • Plumbing & Sewer

• 24 Hour Service
• www.kortedoesitall.com
• Celebrating 50 Years Svc.
• Residential & Commercial
• Family Owned & Operated
• PC88600961

---

PROPOSAL SUBMITTED TO (INCLUDE ADDRESS & PHONE)

Republic Services 442-3-3243
6231 MacBeth Rd
Fort Wayne, IN 46809

JOB INFO/DATE

korr@republicservices.com

---

**𝖂𝖊 𝖕𝖗𝖔𝖕𝖔𝖘𝖊** hereby to furnish material and labor - complete in accordance with below specifications:

Remove existing hanging unit heaters in the paint shop.

Install two  100k BTU LP gas infrared tube heater with 30 ft tube, new thermostat for each and combustion air ducts.
Reconnecting to existing gas line, electrical and flue piping
Install one 50k BTU LP gas infrared tube heater along the back side of the paint shop, new thermostat and combustion air duct. Connect for gas line

The total investment to perform the above work will be $ 

Three years parts warranty
One year labor warranty



---

All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs will be an extra charge over and above the estimate. Owner to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workman's Compensation Insurance.

Payment due as follows: _____ Upon Completion

Authorized Signature: _____ *Trevor Miller*

Valid for: _____ 30 _____ days.

---

**𝕬𝖈𝖈𝖊𝖕𝖙𝖆𝖓𝖈𝖊 𝖔𝖋 𝕻𝖗𝖔𝖕𝖔𝖘𝖆𝖑 & 𝖂𝖔𝖗𝖐 𝕬𝖚𝖙𝖍𝖔𝖗𝖎𝖟𝖆𝖙𝖎𝖔𝖓:** I, the undersigned, am owner/authorized representative/tenant of the premises at which the work above is being done. I hereby authorize you to perform the above work and to use such labor and materials as you deem advisable. Unless prior-authorization for billing, payment for all work done is due upon completion (C.O.D.). A $10.00 BILLING CHARGE is due thereafter. An office billing charge and/or finance charge of 1.75% per month (21% per annum) will be added after 10 days past due. I agree to pay reasonable attorney's fees, court costs and collection fees in the event of legal action. I have read this contract and agree to be bound by all the terms contained herein. In cases of repair work, all old parts will be removed from premises and discarded, unless otherwise specified here.

Signature: _____

Date: _____

TMS 09-14

Page 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF INDIANA

3                    FORT WAYNE DIVISION

4     _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7            Plaintiff,

8        v.                           Case No.

9    COE HEATING & AIR CONDITIONING,      1:21-cv-108-HAB-SLC

10   INC. and GAS-FIRED PRODUCTS, INC.

11   d/b/a SPACE-RAY,

12           Defendants.

13   _____

14             VIDEOCONFERENCE DEPOSITION OF

15                   MICHAEL VERGON

16   DATE:          Thursday, January 19, 2023

17   TIME:          3:05 p.m.

18   LOCATION:      Remote Proceeding

19                  Indianapolis, IN 46204

20   REPORTED BY:   Andrew Pronschinske, Notary Public

21   JOB NO.:       5673406

22

23

24

25

Exhibit E

Page 36

1      A     Yes, I do.

2      Q     It's that second-to-last paragraph, and it

3   says, "It is my opinion that Investigator Foster

4   cannot eliminate other potential ignition sources

5   merely because there is no obvious evidence for them."

6   Did you in the course of your investigation find any

7   evidence suggesting that, for example, failed

8   electrical components caused the fire?

9      A     No, but that's the point; right?  I mean,

10  there -- you couldn't eliminate electrical.  I mean,

11  there's -- there's actually data and witness testimony

12  in the depositions that they were -- the public was

13  having problems with outlets, I think they're referred

14  to, at the south side of the building where the

15  vehicles were plugged in.  And they kept having them

16  repaired, so -- but there was nothing left to look at

17  of the electrical system.

18          There -- the circuits couldn't be traced,

19  they couldn't be examined, you know, if there were

20  any -- if there was any evidence of electrical arc

21  activity, it was probably destroyed by melting of the

22  copper wires or conductors that point by the time the

23  fire progressed to the point that it progressed.  So

24  you -- electrical couldn't be eliminated.  There was

25  no way at that point.  In fact, at the scene, I asked

Page 37

1   their own, Rimkus' electrical engineer, about it.   And

2   he said that he couldn't eliminate electrical.

3        Q    So I want to talk about that conversation in

4   a minute.   But was there any evidence that you found

5   suggesting that discarded smoking materials caused the

6   fire in this case?

7        A    Did it cause the fire?   No.   But it did not

8   cause the fire?   Same thing.

9        Q    Have you found any evidence in this case

10  showing that improperly stored rags containing paint

11  thinner caused the fire?

12       A    No, but same answer.

13       Q    Okay.   Is it your position that it's

14  impossible to eliminate discarded smoking materials as

15  being the cause of the fire?

16       A    Impossible?   Yes.

17       Q    And are there cases where --

18            MR. HEHNER:   I just want to make sure I

19  understand.   Is the answer impossible, or it's

20  impossible to eliminate smoking?   Is that what you

21  understood the answer to be, Thomas?

22            MR. JONES:   Yeah.

23            MR. HEHNER:   Okay.   That's all.   Thank

24  you.

25  BY MR. JONES:

Page 42

1    Republic Services?  Do you understand that?

2         A    If that's what you're telling me, yes.

3         Q    And you understand Mr. Inendino has not

4    given any opinions in this case, in this lawsuit that

5    we're talking about, as to cause and origin?

6                   MR. HEHNER:  Let me just -- are you

7    asking him if he's aware of Lou Inendino's opinions or

8    whether he's given any?  Is that your question?

9                   MR. JONES:  I'm asking if he

10   understands that Mr. Inendino's not provided any cause

11   and origin opinions in this case.

12                  MR. HEHNER:  He can only understand

13   something based upon conversations with me.

14                  MR. JONES:  Okay.  I don't want to ask

15   you -- I'll rephrase the question.

16                  Sorry about that, Jim.

17   BY MR. JONES:

18        Q    Mike, are you aware of Mr. Inendino

19   providing any cause and origin opinions in this

20   lawsuit?

21        A    Yes.

22        Q    And what is the form that those opinions

23   exist?

24        A    At the scene when I asked him point-blank if

25   he could eliminate electrical based on the extent of

Page 43

1   damage, even if we collected electrical items and took

2   them to a laboratory examination.  And he said no, he

3   could not eliminate them.  And that's to me a

4   professional opinion based upon his expertise.

5       Q    Do you have any records of that conversation

6   with Mr. Inendino like field notes, or I don't know if

7   you recorded it or anything like that?

8       A    No.

9       Q    Do you have any -- sorry.

10      A    We were standing in a large group of people

11  with probably a dozen to 15 or more witnesses

12  discussing, debating the origin and cause of the fire

13  when that question was asked.

14      Q    Do you have any field notes from that day

15  that you just had a conversation with Lou?

16      A    I'm not sure from the joint scene date or if

17  it was -- I have to look at my report.  I don't think

18  I have any -- I know I had field notes from the first

19  day I was there, but not the second day.

20      Q    Got it.  To your knowledge, there's no kind

21  of recording of this conversation you had with Lou

22  other than in your report and your own memory, I'm

23  assuming; correct?

24      A    Correct.

25      Q    Okay.  I understand that you reviewed the

Page 47

1    A    Yes.

2    Q    Do you know how far away these tube heaters

3  hung underneath the ceiling?

4    A    No.  Again, I don't recall the exact

5  distance.  But I -- I know it exceeded -- just based

6  on witness testimony, not by me actually knowing and

7  seeing them, but witness testimony in the depositions

8  that they exceeded the minimum clearance distances

9  recommended by the manual.

10    Q    And just so I'm clear.  When you say

11  "exceeded," you mean it was more than what the manual

12  says you have a distance in between the tube heaters

13  and the ceiling, you're saying it was greater than

14  that; correct?

15    A    That's correct.

16    Q    Okay.  In that next paragraph, it starts

17  with "Investigator Foster."  We're on page 26.  Second

18  sentence says, "It is not probable fire progressed

19  from his" -- Investigator Foster's -- "determined area

20  to an adjoining room that is separated by a steel

21  wall, fully involving the adjoining room, before fire

22  progresses throughout the paint bay area."  Can you

23  elaborate on that and describe why that's not

24  probable?

25    A    Yes.  It's -- it's going to come down a lot

Page 63

1      Q    Is it uncommon for the site inspections to

2  be spaced out by, you know, several months?

3      A    Not -- it's not common, but it's also not

4  unheard of.

5      Q    You mentioned earlier that you had consulted

6  with Scott Jones in this case.  And we've got his

7  report and review it.  But can you tell me generally

8  what your discussions with Scott Jones have been about

9  this case?

10     A    Well, we talked about the function and

11 manufacturing of the tube heaters, and how the tube

12 heaters were a closed system, and how they -- the

13 intake air was brought in from the outside of the

14 structure rather than the inside of the structure like

15 the former heaters were, and how the exhaust was

16 exhausted outside of the structure, that the igniter

17 and the burner were in an enclosed burner box, and

18 talked about the possibility potential of foreign

19 debris, like -- is depicted in one of my photographs I

20 used from Investigator Foster in my report.  That may

21 have gotten into the tube, and -- and Scott's opinion

22 is that it'd be impossible.

23     Q    And you're relying on Scott's opinion to

24 support your opinion that you just described; correct?

25     A    Well, correct.  And based on what I know and

Page 68

1       Q     I'm going to jump back.  Well, hang on, I

2   forgot to ask you.  Scott Jones, how did your

3   communications with Scott Jones take place in this

4   case when you guys were discussing this case?

5       A     Both at the laboratory examination and also

6   over the telephone.

7       Q     Did you ever exchange any emails with Scott

8   Jones regarding this case?

9       A     I don't recall, other than I sent him a copy

10  of my opinion report.  He sent me a copy of his

11  opinion report.  And then I let him know that I was

12  being deposed.  And other than that, we didn't

13  exchange or trade opinions via email, no.

14      Q     I think I'm getting close to done.  So I'm

15  still going to jump around a little bit here.  I want

16  to go to page 8 of your report.

17      A     Okay.

18      Q     And on the top paragraph, it starts with

19  "Investigator Foster does not identify."  And towards

20  the bottom, it says, "Further, Investigator Foster did

21  not collect swab samples for more than seven weeks

22  after the fire.  It is most probable this material

23  accumulated within the interior of the end of the tube

24  during firefighting operations, or sometime

25  post-fire."  My question is, why is that most

Page 69

1   probable?

2       A    Again, speaking with Scott Jones that

3   the -- there's no explanation how this material would

4   have ended up in a closed system as it's been

5   explained to me and Scott Jones understands it.  And

6   so the tube heaters became -- I call it

7   disassociated -- they came apart, basically, during

8   the fire and during the collapse of the building.

9   They fell down in different sections with the open

10  ends exposed to the environment of the fire and all

11  the fire debris and -- and fire suppression of water

12  on a concrete slab with -- with who knows what flowing

13  on the slab and on the surfaces of materials.  And

14  these were open and exposed tubes.

15      Q    So just so I'm clear.  It's your opinion

16  that's stated there, is that based on what Scott Jones

17  has told you?

18      A    Well, based on my own observations as well.

19  I mean, I've looked at the photographs.  And

20  these -- there were tube -- and I don't know where

21  this -- there's no way to identify where this

22  particular section of tube was located in the fire

23  scene.  I think I recall, based on looking at some

24  photographs, it may have been one that was found at

25  slab level with who knows what flowing around the

Page 70

1    opening of the tube.  So I -- I don't know.  So it is

2    based on my own observations.  But it's also based on,

3    you know, conversation with Scott Jones that

4    the -- it's not possible this material, the way it's

5    designed, would have ended up in this tube just by

6    general day-to-day operation.

7         Q    And going back to the question I asked you

8    earlier about the Space-Ray video that I know you

9    haven't watched yet.  But is your answer still the

10   same, that even if -- well, strike that.  That's a bad

11   question, Mike.

12             You're saying in this paragraph basically

13   that it's a closed system, you understand from Scott

14   Jones and your own observations that it's a closed

15   system.  Therefore, it's unlikely that paint or any

16   other debris would get in there.  It's more likely,

17   and what you would say is it's most probable that

18   those materials accumulated within the interior of the

19   end tube during firefighting operations or sometime

20   post-fire.  You're basing that opinion on the

21   assumption that debris, paint, other things can't

22   enter in the box or the tube on their own without it

23   breaking open.  Is that fair?

24        A    Well, the burn box and the tubes are

25   separate.  I mean, completely separate.  I mean, yeah,

Page 71

1   the heat flows through the tube from the burner box.

2   But if dust -- I mean, we're talking about dust maybe

3   getting into the burner box if you're talking about

4   the video.  But how does the -- how -- how the dust

5   particles -- the size of particles of dust doesn't

6   equate or translate to what's shown in the photograph

7   on page 7 of my report.  I mean, it just can't -- it

8   can't happen.

9        Q     Sorry.  Could you explain that a little bit

10  more?

11       A     Well, yeah.  We talked about the

12  construction and operation of the tube heaters.  And

13  now, again, I'm relying on a large part what Scott

14  Jones explained to me about the system and how it's a

15  closed system.  So -- and you were talking about the

16  video and the repair guy talking about dust getting in

17  the burner box; right?  And that's just very small

18  particulate matter.  It's dust.  We all know what dust

19  is.  But these are large -- this is debris in the end

20  of the tube.  This isn't dust.  Not dust particles.

21  It's not the accumulation of dust particles.  This

22  is -- this is debris that came from somewhere other

23  than inside the tube.

24            And again, I'm basing that on my own

25  observations because in the photographs that I have on

Page 72

1   the fire scene and -- and where Jim Foster took some

2   photographs of the tubes at concrete level, this exact

3   same type of material is in the photographs on the

4   concrete slab right next to the tube.

5        Q    Let me go down to page -- back on page 8,

6   under "Joint Scene Examination (March 3, 2020)."  You

7   say, "Prior to beginning any further scene

8   examination."  You talk about how Mr. Foster called a

9   brief and some additional information was relayed.

10  And we got this list of different things that you

11  outlined.  On the very bottom, it says, "There has

12  been no scene security and the scene was left

13  uncovered."  Is that information that you got from Mr.

14  Foster?

15       A    No.  I mean, it was obvious the scene was

16  left uncovered.  I mean, there was nothing covering

17  the scene.  It's a -- it's a large scene exposed to

18  the weather, the elements.  And I pulled some random

19  weather data from the seven-week period it was left

20  since the time of the fire to the time that

21  Investigator Foster collected samples.  You had a

22  couple days in there of half-inch rain, an inch of

23  rain.  So you've had some inclement weather in that

24  seven-week period.  So that would only add to pooling

25  and puddling of water and debris floating around.  So,

Page 73

1    you know, can we say, you know, that didn't happen?

2    Can we say it did happen?  It's a -- but it's

3    definitely a possibility that it happened.  And it's

4    probably more likely that it happened than -- than the

5    debris got into that -- into the tube in that

6    photograph other than by -- by dust collecting inside

7    of the burner box.

8        Q    Do you think that Republic should have done

9    anything more to adequately secure the scene prior to

10   that March 3, 2020, site examination?

11       A    Well, I don't know if they could have or

12   not.  I mean, it's a large --

13       Q    Should they have is what I'm asking.  Do you

14   have the opinion that they should have done more, or

15   do you not have that opinion?

16            MR. HEHNER:  I'm going to object to the

17   form.  It's an improper hypothetical.  You mean should

18   have based upon fire investigation techniques?  Should

19   have based upon spoliation?  Should have based upon

20   getting us there in time?  I think it's an improper

21   hypothetical.  I object to the form.

22   BY MR. JONES:

23       Q    So, Mike, as a fire investigator, you

24   understand preservation of scenes; right?

25       A    Yes.

Page 74

1      Q    And you understand, you know, NFPA has a

2  number of standards that relate to preserving scenes;

3  correct?

4      A    Yes.

5      Q    And NFPA has standards relating to

6  spoliation; correct?

7      A    Correct.

8      Q    Okay.  Based on your knowledge and your

9  understanding of NFPA's standards, did Republic

10  adequately preserve the scene from the date of the

11  fire through March 3, 2020?

12      A    I don't know that it was a matter of them

13  being able to adequately preserve the scene.  But by

14  virtue of the scene being exposed to the elements for

15  close to a year, that all your fire pattern evidence

16  is completely destroyed, and we didn't have a chance

17  to see the scene the same way that Jim Foster did,

18  oxidation, rust.  We got to the scene and there was a

19  blue trash bin in the fire scene that was not burned.

20          So obviously the scene was being used

21  to -- well, I'll just say it wasn't secure in the

22  sense that someone had just put a, you know,

23  introduced other materials post-fire into the scene;

24  right?  What else do we know that was introduced into

25  the scene or taken from the scene or -- or anything.

Page 75

1    It was a long -- it was a long time.  It was about

2    close to a year.

3         Q    To be clear, in this case, do you have an

4    opinion on whether or not, based on NFPA standards,

5    whether or not Republic should have done more to

6    preserve the scene?  Do you have an opinion, one way

7    or another?

8         A    No, I don't know that it's Republic's

9    responsibility or -- or whose responsibility.  I just

10   know that it wasn't secure.  I don't know whose

11   responsibility that is.  But we just know the scene

12   wasn't secure for a year.  And it wasn't secure in the

13   seven-week period from the time that Jim Foster first

14   went to the scene to the time that he collected

15   evidence.

16        Q    Do you know whether or not there's any

17   security at Republic's Fort Wayne facility?

18        A    I think I heard their security guards were

19   there because that's who alerted the -- one of the

20   witnesses to the fire.  So -- but again, when you have

21   the facility employees or the security guard to keep

22   unauthorized people out or -- or they're there to keep

23   the employees going into certain areas or certain

24   buildings.  So, you know, that -- I don't know that

25   that matters.

Page 76

1      Q     You're saying it doesn't matter whether or

2  not Republic had security, like at this front gate?

3  Is that what you're saying?

4      A     Right.

5      Q     But do you know whether or not Republic gave

6  any instructions to its employees or whether or not

7  the security team had any direction given to them

8  about making sure people didn't go and mess with the

9  scene?  Do you know one way or another?

10     A     No, but I don't think that matters either

11 because we know that they had a policy against smoking

12 in the buildings too, but we know that didn't get

13 followed.  So I don't know that policies or procedure

14 really mattered much.

15     Q     So is your opinion that because in your

16 opinion, the smoking policy was not followed, other

17 policies would not be followed?  Is that what you're

18 saying?

19     A     You just can't -- it's hard to say.  You

20 can't say if they were or not.

21     Q     Would you agree that there was -- well, let

22 me ask you, would there have been any feasible way to

23 cover the scene?

24     A     In this case, probably -- could it have been

25 done?  I mean, to some great expense, probably.

Page 77

1      Q     Right.

2      A     But generally speaking, probably not, a

3  scene of this size and scope.  But I -- it's my

4  opinion the scene never got -- should have got to this

5  point anyway.  I mean, it -- it probably never should

6  have got to the point where we came back and had to do

7  a joint scene examination a year later.

8      Q     And why is that?

9      A     Just the extent of damage, like I testified

10  to you just earlier in -- earlier, that after

11  gathering the data that I would have gathered at the

12  scene and -- and even if it wasn't at the scene,

13  I -- I would have reached out to the last employee who

14  had been working in that area because you can't -- you

15  can't not -- you can't not interview that guy.  He was

16  the last one there, we don't know his last actions in

17  the scene, we don't know -- we know he's a smoker, we

18  don't know exactly what he was doing where in the

19  building, you know, hot work welding, anything.  The

20  amount of electrical destruction of -- of the circuits

21  and components was such that there's just no way.

22  It's one of those cases where I would have told my

23  client that based on what I know and based on -- on

24  the data, that we could be here a day or a week and

25  probably come up with the same conclusion on this

Page 78

1    particular fire scene.

2        Q    And in Jim Foster's report, he talks about

3    fire patterns.  In your report, you critique that and

4    you make the statement on page 7, if you turn back to

5    that.  You say, "Given the amount of destruction,

6    building collapse and burning in this case, any fire

7    patterns observed in a case such as this should not be

8    given any weight regarding the fire's origin."  Do you

9    stand by that statement?

10       A    Absolutely.

11       Q    And tell me why.

12       A    Because when you have full collapse, burning

13   of a building, patterns really don't mean anything.

14   There's no localized pattern.  The whole building is a

15   burn pattern.  The whole building is gone.  Everything

16   in it is burned.  So how can you look at one -- it's

17   not, I'll say, it's not possible to look at one little

18   area of a pattern on a piece of metal and say, this is

19   more discolored than another piece because fire

20   dynamics is such that if the fire had been contained

21   into a certain area and -- and patterns had developed,

22   oxidation patterns on metal or charring on wood were

23   preserved and localized, absolutely you can say that

24   those patterns matter and you could tell where the

25   fire originated.  Then likely maybe get to determine a

Page 79

1    cause of the fire eventually down the road.  But in a

2    case like this, you might have a fire develop in,

3    let's just say the west side of the building.  And

4    then as the fire progresses and the building collapses

5    and the fire department's arriving, they're trying to

6    extinguish the fire wherever they best can.

7            The east side of the building at that point

8    may have been collapsed and stuff is continuing to

9    burn there that the fire department can get to, maybe

10   buried under a roof or debris.  And that's continuing

11   to burn and create patterns that's far, far removed

12   from the area of origin of the fire.  And so you could

13   have actually worse and more severe burning and -- and

14   more, I'd say, greater, you know, greater fire extent

15   damage at the side of the building that's complete

16   opposite side of the building from your area of origin

17   by that point -- by that point in the fire.

18           So -- so for anyone to say that they

19   can -- they could have gone to this fire scene and

20   looked at patterns and I don't want -- I'm trying not

21   to be too critical of Investigator Foster's

22   investigation or him personally.  But it's -- it's

23   kind of ludicrous.

24      Q    I think we're just about wrapping up.  I

25   know I said that a minute ago.  But if you could turn

Page 80

1    to page 27.  I've got a couple more questions on that

2    page.

3          A    Okay.

4          Q    On the bottom of the page, you say that

5    "Investigator Foster does not document making any

6    attempt to discount these possibilities, and ignored

7    the opinion of his electrical engineer, who stated

8    that the structure's electrical system could not be

9    eliminated as a cause to the fire."  When you say he

10   ignored the opinion of his electrical engineer, are

11   you talking about the statements that you say that Lou

12   made during the site inspection on scene?

13         A    Yeah.  That -- in part, that.  But as part

14   of -- if -- if Investigator Foster says he follows

15   NFPA 921 as he does in his report, as -- as he -- he

16   does state he follows 921.  And a large part of 921 in

17   origin determination and cause determination has to do

18   with process of elimination, the proper process of

19   elimination and considering alternate sources of

20   causes -- causes of the fire.  So he doesn't even

21   address these other issues.

22              We, you know, there is electrical in the

23   building.  He can't just say, well, they told me the

24   lights were off and eliminate electrical.  He -- he

25   makes no effort in his report to give an explanation

Page 81

1    according to 921 why -- that he considered these other

2    potential causes, how he eliminated them, and -- and

3    then the final basis for his final hypothesis.

4          Q     If you turn to the next page, third

5    paragraph.

6                MR. HEHNER:   Page 28; is that right?

7    BY MR. JONES:

8          Q     Yeah, page 28 which is I think the last page

9    of the report before the attachment of CV.   On page

10   28, third paragraph, it says, "NFPA 921 also contains

11   a section, 17.5.2 titled, Documenting the Collection

12   of Physical Evidence.   This sections consists of

13   several sub-sections, which have to do with

14   documenting evidence collection via, field notes,

15   diagrams, photography, etc.., none of which has yet

16   been presented by Investigator Foster or Rimkus

17   Consulting Group."   Did I read that right?

18         A     Yes.

19         Q     And do you stand by that statement?

20         A     A hundred percent.

21         Q     I want to show you what's been marked as

22   Exhibit B.   I'm going to share my screen.   Do you see

23   my screen okay?

24                (Exhibit B was marked for

25                 identification.)

Page 87

1    said no.

2       Q    So you're assuming he said no because of the

3    extent of the damage; is that?

4       A    Right.  I asked a specific question, and he

5    pretty much answered my question.

6       Q    Okay.  If we can jump real quick to page 6

7    of your report.  I'm at the middle of the page

8    underneath "Page 3," the section that says "Page 3."

9    And again, this is page 6 of Exhibit A which is your

10   report.  It says "Page 3 - The fire origin was

11   reportedly high in the structure when first observed,

12   which would place it at or near the ceiling."  And

13   then -- oh, I'm sorry.  The one right before that.

14   "Page 3 - Other potential ignition sources were in the

15   general area of fire origin however were not

16   considered a potential due to their location and

17   origin location."  Can you explain to me your

18   understanding of what Mr. Foster means by that?

19      A    I have no idea what he's talking about.  It

20   doesn't make sense.  I mean, he's putting potential

21   ignition sources in the origin, and then he's saying

22   they were not considered because of their origin -- or

23   their location.  So I -- I have no idea what he means.

24      Q    This sentence just doesn't make sense to

25   you.  Is that what you're saying?

Page 102

1        Q    The part that you were trying to burn at the

2   scene exam, was it a dry part?

3        A    It was kind of gooey, blue, you know, like

4   bubblegum-type texture.

5        Q    Taken from in the fire scene, perhaps off

6   the floor?

7        A    Somewhere.  I think in where they were

8   currently doing the painting.  So in the newer -- in

9   the newer paint area, yes.

10       Q    And did it catch on fire?

11       A    Did not.

12       Q    Okay.  Have you read anything in this case

13  that would indicate that this blue Sheboygan paint in

14  question in this case is combustible in any form?

15            MR. JONES:  Objection to foundation.

16       A    The paint in and of itself, no.  No.

17       Q    Mr. Jones asked you about the property the

18  paint may take on if water is boiled off.  You

19  remember him asking you that?

20       A    I do.

21       Q    And I think you deferred that point to the

22  opinion of a chemist.  And in this case, I think

23  Space-Ray's hired a fellow named Dirk Hedglin.  Aside

24  that point, do you know of any evidence in this case

25  that this blue Sheboygan paint got up on top of these

1    or on these Space-Ray heater tubes in 43 days and

2    boiled on the date of the fire?

3        A    No, not at all.  That doesn't seem likely.

4    And again, we're talking about dust particles.  That,

5    I mean, we can all picture a layer of dust on a

6    surface and however possibly that dust may ignite, you

7    can imagine what dust particles the flame height could

8    even be.  Would be miniscule.

9        Q    And there's no reference in the facts of

10   this case, I think you've already testified, nor in

11   Mr. Foster's two reports of the next

12   flammable/combustible material, is there?

13       A    No, and that's something he should have

14   explained and laid out in his origin and in -- with

15   respect to fire progression, what's the next ignited

16   material, then how did fire progress throughout the

17   rest of the structure.

18       Q    And there's nothing like that in either of

19   his reports, is there?

20       A    No, there's not.

21       Q    Okay.  And in connection with Mr.

22   Jones -- I'm so used to calling him Thomas -- Thomas

23   questions to you about dust inside of the heater box

24   assembly which we know is sealed.  I think you told us

25   that.  And you made some reference to a different

Page 104

1    expert in the case.  Nonetheless, is it your

2    fundamental understanding, that inside of the

3    Space-Ray boxes which are sealed, there's an igniter

4    in there; correct?

5        A    That's correct.

6        Q    And what it ignites is propane gas; correct?

7        A    That's correct.

8        Q    So in a sense, or at least in layman terms,

9    that box is designed for combustion; correct?

10       A    It is designed for combustion, yes.

11       Q    Does it make any sense to you that some dust

12   or blue paint dust could get inside that box and cause

13   a fire in that room?

14            MR. JONES:  Objection to foundation.

15       A    No, but that's something I thought of as

16   well.  Even if dust did or something did ignite in

17   that combustion box, then it's going to burn up.  Then

18   so how would that material flow downstream to

19   accumulate as -- as in the big particle form we're

20   seeing in the photographs taken by Jim Foster?

21       Q    Right.  Near the end of your deposition, you

22   indicated that in the realm of this particular fire

23   scene, you stated something like whether we were there

24   for a day or there for a week, it would end up the

25   same.  I think you said something like that.  Can you

Page 112

CERTIFICATE OF TRANSCRIBER

I, PROMY ISLAM, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

PROMY ISLAM

# Curriculum Vitae of Michael Agosti

# Michael Agosti (IAAI-CFI, NAFI-CFEI & CVFI)

Fire Analyst

(847) 340-9559

michael.agosti@agosti-fire.com

In the field of fire origin and cause investigation, I have conducted several thousand fire and explosion investigations. These include structural, vehicle and marine origins. I currently conduct fire origin and cause investigations in the private sector with Agosti Fire Investigations and have 25 years of experience in the public sector as a municipal fire department investigator. I also have 25 years of experience as a municipal fire department firefighter, paramedic and fire apparatus engineer. I have extensive experience in fire department practices, to include:

Fire Department tactics/operations

Hazardous materials

Fire apparatus engineering

Rescue/extrication

Training

Incident command system

EMS/Paramedicine

## Work Experience

John Michael Agosti & Associates (Fire Analyst) 2001-Current

Skokie Fire Department (Firefighter/Paramedic/Fire Investigator) 1994-2019

United States Postal Service-Glenview (Letter Sorter) 1991-1994

United States Marine Corps (E-4) Honorable Discharge 1987-1991

## Education

Niles North High School 1983-1987

Exhibit F

Oakton Community College 1991-Present

# Certifications

Certified Fire Investigator-I.A.A.I.-2013

Certified Fire & Explosion Investigator-N.A.F.I. 2009

Certified Vehicle Fire Investigator-N.A.F.I. 2009

Certified Fire Investigator-O.S.F.M. Illinois 2001

Certified Paramedic-Illinois 1996

Certified Rope Rescue-O.S.F.M. Illinois

Certified Trench Rescue- O.S.F.M. Illinois

Certified Confined Space Rescue-O.S.F.M. Illinois

Certified Collapse Rescue-O.S.F.M. Illinois

Certified Hazardous Materials Operations-O.S.F.M. Illinois

Certified Fire Apparatus Engineer-O.S.F.M. Illinois

Certified Vehicle/Machinery Operations-O.S.F.M. Illinois

# Testimony

March 23, 2017-Deposition- John Neely V. Rick Tucker D.B.A. Tucker Plumbing, Heating & Refrigeration

Livingston County, Illinois- Case # 2013-L-36


November 20, 2015-Deposition- Del's Restaurant & Pub, Inc. V. Owners Insurance Company

Scott County, Iowa-Case # LACE124551


December 2, 2014-Trial- Daniel Redfearn & Jan Redfearn V. Custom Built Commercial Fence Company

Lake County, Illinois-Court Case # 2013 L 000635-Origin and cause

May 7, 2014-Deposition-Daniel Redfearn & Jan Redfearn V. Custom Built Commercial Fence Company

Lake County, Illinois-Court Case # 2013 L 000635-Origin and cause

August 5, 2013-Deposition- Greif, Inc. V. Advanced Waste, Inc.; AMS Environmental, Inc.

Cook County Illinois-Court Case # 09L-9544-Origin and cause

September 16, 2008-Trial- Sanhareeb Marooki V. Allstate Insurance Company -

Cook County Illinois-Court Case # 06L-10327, testified as origin and cause expert

for the Skokie Fire Department-Fire Origin and Cause.

April 11, 2008-Deposition-State Farm A/S/O Pike V. Orren Picknell Builders.

Lake County, Illinois, for Plaintiff Attorney William Hoffman of Grotefeld & Hoffman-Fire Origin and Cause.

April 4, 2008-Deposition- State farm A/S/O Pike V. Orren Picknell Builders.

Lake County, Illinois, for Plaintiff Attorney William Hoffman of Grotefeld & Hoffman-

Origin and Cause.

November 27, 2007- Deposition-Sanhareeb Marooki V. Allstate Insurance Company-

Cook County, Illinois-Court Case # 06L-10327-Testified as an origin and cause expert

for the Skokie Fire Department-Origin and Cause.

## Training

Investigating Natural Gas Systems- IAAI- CFI Trainer.net- May 4, 2021

Accidental Common Cause- IAAI-CFI Trainer.net- May 4, 2021

Scientific method- IAAI-CFI Trainer.net- May 4, 2021

Understanding Undetermined- IAAI-CFI Trainer.net- May 4, 2021

Fundamentals of Residential Electrical Systems- MSD Engineering- April 9-12, 2018

Advanced Arc Fault Analysis- MSD Engineering- April 12-13, 2018

Managing Complex Fire Scene Investigation-IAAI-CFI Trainer.net- Feb. 2018

Explosion Dynamics-IAAI-CFI Trainer.net- Feb. 2018

Investigating Motor Vehicle Fires-IAAI-CFI Trainer.net-Feb. 2016

Quarterly Training Meeting-Skokie Fire Department-Jan., April, July & Oct. – 2015- Origin and Cause

Arson Case Management-Public Agency Training Council-Oct. 15-17, 2014

Quarterly Training Meeting-Skokie Fire Department-Jan., April, July & Oct. – 2014- Origin and Cause

Solid Fuel Burning Appliance Fire-Fire Findings-October 9-13, 2013

Post Flashover Fires-IAAI-CFI Trainer.net-June 2013

NFPA 1033 & Your Career-CFI Trainer.net- May 2013

Quarterly Training Meeting-Skokie Fire Department-Jan., April, July & Oct. – 2013- Origin and Cause

Quarterly Training Meeting-Skokie Fire Department-Jan., April, July & Oct. – 2012-Origin and Cause

Quarterly Training Meeting-Skokie Fire Department-Jan., April, July & Oct. - 2011-Origin and Cause

2011 Annual Training Conference-IAAI-34 hour-May 2011

Arc Mapping Basics-IAAI-4 hour-Feb. 2011

Vehicle Fire Seminar-NAFI-32 hour-Sept. 2009

Investigation of Gas and Electric Appliance Fires- Fire Findings- April 12-15, 2005

## Affiliations

International Association of Arson Investigators

National Association of Fire Investigators

International Association of Fire fighters

# Agosti Fire Investigations
### Fire Related Analysis & Expert Testimony

2481 Savanna Drive
Wauconda, Illinois 60084
O: 847.487.5776
F: 847.487.8142

# Investigation Report

**Republic Service of Indiana,**
**Limited Partnership**
**Plaintiff**
**v.**
**COE Heating & Air Conditioning, Inc.**
**&**
**Gas-Fired Products, Inc.**
**D/B/A Space-Ray**
**Defendants**




24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

AGOSTI 00001

December 28, 2022


Mr. Martin Gardner
Gardner & Rans
117 Perspective Drive-Suite 2
Granger, Indiana 46530


RE:  Republic Service of Indiana,
       Limited Partnership
       Plaintiff
       v.
       COE Heating & Air Conditioning, Inc.
       &
       Gas-Fired Products, Inc.
       D/B/A Space-Ray
       Defendants


Dear Mr. Gardner,

The following report summarizes my involvement in the March 19, 2019, fire incident which occurred at 6231 Macbeth Rd., Fort Wayne, Indiana.


# ASSIGNMENT

I was contacted by you on or about June 26, 2019 regarding the subject fire incident. I was requested to conduct an analysis of the origin and cause for the referenced fire incident. I agreed to the assignment and have been working on the matter as needed to date. Shortly after my engagement, a site inspection was coordinated with Plaintiffs expert Mr. Jim Foster who was employed with Rimkus Consulting Group Inc. at that time. I attended that site inspection which took place on July 2, 2019.

I am currently a fire analyst with Agosti Fire Investigations based out of Wauconda, Illinois. I have 25 years fire department experience and 20 years of forensic fire investigation experience. I have conducted over fifteen hundred fire investigations. I have been qualified as a fire expert in state courts for plaintiffs, as well as defendants. I am a Certified Fire Investigator with the International Association of Arson Investigators and a Certified Fire and Explosion Investigator with the National Association of Fire Investigators.




24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

## <u>INVESTIGATION/CASE ANALYSIS</u>

During my analysis of this fire incident I have reviewed the following documents, referenced the following materials and publications and performed the following tasks:

1. Southwest Fire District NFIRS fire report

2. "Report of Findings" authored by Jim Foster- Dated December 3, 2019

3. Expert Report authored by Jim Foster- Dated November 18, 2022

4. Rimkus Consulting Group Inc. file provided as discovery

5. Rimkus Consulting Group Inc. Evidence Custody Forms

6. Rimkus Consulting Group Inc. Evidence transmittal w/ cover letter

7. Rimkus Consulting Group Inc. Field Notes by electrical engineer John Diggle

8. Rimkus Consulting Group Inc. Field Notes by Louis V. Inendino

9. Forensic and Scientific Testing (FAST) Certified Laboratory Report- Dated April 14, 2020

10. Attendance at the following site inspections:

    a) July 2, 2019
    b) March 3, 2020
    c) May 11, 2020

11. Attendance at the following evidence examinations:

    a) February 24, 2022
    b) August 23, 2022

12. Review of provided witness video

13. Review of Depositions of:

    Dan Kelley, Gerald Depold, Greg Tolley, Jason Kelley, John Shatto, Kyle Orr, Mike Sherfield, Samir Dizdareic, Scott Kleinknight, Sharee Wells, Terry Reader, Trevor Miller, Fred Jones



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

14. Report authored by Nicholas Ozog with Wiss, Janney, Elstner Associates Inc.- Dated November 18, 2022

I reviewed the following literature, standards and reference manuals, etc.

a) National Fire Protection Association (NFPA) 921 Guide for Fire and Explosion Investigations- 2017 & 2021 editions.

b) National Fire protection Association (NFPA) 1033 Standard for Professional Qualifications for Fire Investigator- 2014 & 2022 editions.

c) ASTM E1188- Practice for the collection and preservation of information and physical items by a technical investigator.

d) ASTM E860- Standard practice for examining and testing items that are or may be involved in litigation.

## **FIRE INCIDENT SUMMARY**

The subject fire incident took place on March 19, 2019 at 6231 Macbeth Rd., Fort Wayne, Indiana. The subject property consisted of multiple buildings which were mostly shops for vehicle maintenance and dumpster repairs. The fire incident took place at or around 11:03 p.m. and was within a large industrial building which was located on the west side of the property. The subject building was quite large and had several additions. The subject building sustained severe heat and flame damage to the south half portion. The south, approximate 1/4 of the building sustained the most severe heat and flame damage. This included almost complete consumption of the roof structure and wall structures. The subject building was constructed of wood frame with metal corrugated exterior walls and metal corrugated interior ceiling and walls. There was an asphalt shingled roof. There were three large, overhead doors located on the east side of the subject building's south 1/4. The building had propane gas and electric service at the time of the fire.




24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



Overall view of property- Pre-fire (Google Earth Image)



Overall view of subject building- Pre-fire (Google Earth Image)



View of south end of subject building (Google Earth Image)



Overall view of subject building- post fire (Google Earth Image)

## <u>SUMMARY OF MY OPINIONS</u>

1) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **<u>origin</u>** of the fire incident. Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the incident fire **<u>origin</u>**, are flawed, inaccurate, unreliable and incomplete. Jim Foster's fire origin opinions are not based on the scientific method as required by NFPA 921, NFPA 1033 and accepted forensic fire investigation industry practices and standards.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

2) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **cause** of the fire incident. Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the incident fire **cause**, are flawed, inaccurate, unreliable and incomplete. Jim Foster's fire cause opinions are not based on the scientific method as required by NFPA 921, NFPA 1033 and accepted forensic fire investigation practices and standards.

3) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **origin** related to the fire incident which occurred on March 19, 2019 at the property located at 6231 Macbeth Rd., Fort Wayne, Indiana was only able to be determined within a general area of fire origin. This included the south 1/4 of the subject building. This area of fire origin was very broad and was not able to be brought down to a more specific area and or point of fire origin. Though, based on witness video, the fire is clearly more advanced and well progressed in the southeast corner, at or near floor level and had not yet progressed to the middle or north portion of the south 1/4 of the building. Based on this, the area is to be considered a potential area of fire origin and warranted further examination and analysis.

4) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **cause** is undetermined. A specific area and/or point of fire origin were not able to be determined. Additionally, all potential, competent ignition sources were not eliminated.

5) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff expert Jim Foster's evidence collection from the subject fire scene, which took place on May 10, 2019, while no other parties were present, was conducted in a manner which does not follow recommended procedures in NFPA 921 or comply with accepted or recommend practices or procedures. Additionally, the aforementioned evidence collection was not properly documented.

6) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the Sheboygan Blue Aqua Enamel Paint- Product number 73-4383C, is a water based, zero flammability rating, non-combustible product which does not sustain combustion.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



## OPINION #1:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **origin** of the fire incident. Mr. Jim Foster's investigation did <u>not</u> follow a systematic approach based on the scientific method, as recommended in NFPA 921. It is my opinion that Mr. Jim Foster's investigation was incomplete and the fire scene and potential areas of interest related to fire origin were not properly or thoroughly processed. Given the scope and size of the subject fire scene and potential area of interest, a thorough, controlled demolition of the fire scene should have been conducted in attempt to determine an area of fire origin and possibly a point of fire origin. Mr. Jim Foster states on page 1 of his Expert Report that *"On December 3, 2019, after thorough analysis of the site and artifacts from the site, I provided my opinions to Republic Services about the cause and origin of the March19, 2019 fire which is the subject of this lawsuit."* It is my opinion that this statement is inaccurate and Mr. Jim Foster's investigation was not thorough or complete. Mr. Jim Foster failed to conduct any excavation or reconstruction of the fire scene. This would have included the examination, layering, and removal of debris.

NFPA 921- 2017 edition-18.3.2 states in part *"Fire scene excavation (the examination, layering, and removal of debris) and reconstruction allows for the investigator to observe patterns on exposed surfaces and to locate evidence that can assist in making an accurate origin analysis. The purpose of fire scene reconstruction is to recreate as nearly as practicable the pre-fire positions of contents and structural components."*

Mr. Jim Foster failed to secure the fire scene and overall site and or/area of interest. This failure to secure and limit access allowed for potential removal, destruction, or loss of items of evidentiary value and did not prevent undue change or additional damage to the scene. Mr. Jim Foster was initially out to conduct his initial, first inspection on March 20, 2019. He returned on May 10, 2019. This is approximately forty days. He made no attempt to secure and or preserve the site or subject fire scene. Furthermore, the next site inspection was not until July 2, 2019. The first joint scene inspection with multiple parties was next on March 3, 2020. At the time of the March 3, 2020 site inspection, I observed and documented that the subject fire scene was altered. The ground along the east wall of the subject building and within the area of interest had been cleared utilizing heavy equipment, with evidence of track marks on the ground. It was also observed and documented that some debris from the cleared area was placed into the fire scene. Additionally, several items to include an ice machine, garbage can and cigarette disposal container, all which were not fire damaged and clearly from another area, were placed into the fire scene on top of debris and within the area of interest. It is my opinion that the lack of fire scene security and preservation led to additional damage in the form of extensive corrosion, allowed for partial clean-up of the perimeter with debris thrown into the fire scene. This also



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

allowed for further cross contamination. It is my opinion that this could be considered spoliation as defined in NFPA 921.

NFPA 921- 2017 edition-12.3.5 states in part *"Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change, or destruction of evidence, or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did any prior investigator."*


View of southeast corner with evident track marks and cleared debris


View of east side of the south portion of the subject building Depicting items foreign to the area

NFPA 921- 2017 edition-29.5.2.1 states in part *"One of the first tasks to be completed is the establishment of investigation site security. Entrance should be limited to those individuals necessary to provide for safety, prevent the removal, destruction, or loss of items of evidentiary value; and prevent undue change or additional damage to the scene. It may be necessary to hire private security personnel or install barriers to obtain the level of security needed. Security should be maintained continuously until the investigation site activities are complete."*

NFPA 921- 2017 edition-18.1, states in part *"This chapter recommends a methodology to follow in determining the origin of a fire. The area of fire origin is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located. The point of origin is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be*



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



AGOSTI 00008

*determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect."*

NFPA 921-2017 edition-Figure 18.2 outlines some examples when applying the scientific method to origin determination. These include but are not limited to; determine pre-fire conditions, excavation/examination/reconstruction of the scene, witness statement and observations, heat and flame vector analysis, electrical arc mapping, initial origin hypotheses, alternate hypotheses, origin insufficient to determine cause. See chart below.



Mr. Jim Foster states on page 1 in his "Report of Findings" that *"Rimkus Consulting Group, Inc. was retained by CCMSI to determine the origin and cause of the fire and to determine if the recently installed heaters contributed to the cause." and "A second site examination was completed on May 10, 2019, to uncover heaters recently installed from fire debris."* It is my opinion Mr. Jim Foster's investigation, from the onset was guided by and subject to expectation bias. In essence, the scene was not processed and Mr. Jim Foster only had concern with three infrared gas-fired tube heaters. Mr. Jim Foster's focus on the heaters was not based on first identifying an area of fire origin. Mr. Jim Foster did not utilize a systematic approach utilizing and considering the scientific method during his investigation related to fire origin.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



AGOSTI 00009

Mr. Jim Foster states on page 1 of his Expert Report that *"A representative from Republic retained Rimkus after the fire to evaluate the origin and cause and determine if the recently installed heaters may have contributed to the cause of the fire."* It is my opinion that this statement is reflective of Mr. Jim Foster's expectation bias from the onset of his investigation. His expectation bias led him to reach a premature conclusion without having examined or considered all relevant data.

NFPA 921- 2017 edition-4.3.9, states in part *"Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigators (s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator (s) uses the premature determination to dictate investigative processes, analyses, and ultimately, conclusions, in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports the previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method."*

Mr. Jim Foster does not state or identify a clear, concise and scientific based fire origin. Mr. Jim Foster states on page 1 of his Expert Report *"The area where the fire appeared to have originated was at the south end of the building where Republic's trash dumpsters were repaired and repainted."* This is a broad, general area of fire origin. Mr. Jim Foster states on page 3 of his Expert Report *"Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This indicates the fire origin occurred in the east heater near the control box associated with the ignition of the propane fuel."* This is an inaccurate and flawed statement. In fact there is no east heater. The three identified heaters are a north, middle and south heater. They run lengthwise east to west. Mr. Jim Foster states on page 3 of his Expert Report *"The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees was high in the building upon discovery. This combined with the fire damage to the south heater that was at ceiling level indicated the possible location of origin."* Mr. Jim Foster inaccurately and unreliably identifies metal portions of the building. The subject building was collapsed or consumed by the fire. Corrugated metal building components were down at or near floor level with no discernable way to differentiate where they were from or which metal panels they were (exterior wall, interior wall or interior ceiling). There were no fire patterns or indicators to indicate a fire originating up high in the building. A witness video depicts the fire well advanced in the southeast corner of the building, with only smoke showing and no fire involvement in the middle and north portion of the area. Mr. Jim Foster states a <u>possible</u> location of origin. This speaks to his level of certainty. A "possible" level of certainty is only feasible but cannot be declared probable. Mr. Jim Foster's level of certainty


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.


AGOSTI 00010

related to the fire origin is not at a reasonable degree of scientific certainty. There are numerous possible areas of fire origin in the building.

NFPA 921-2017 edition-4.5.1- states in part *"The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible.*

> *1) Probable. This level of certainty corresponds to being more likely true then not. At this level of certainty the likelihood of the hypothesis being true is greater than 50 percent.*
>
> *2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."*

Mr. Jim Foster does <u>not</u> set forth a clear, concise, fire origin opinion based on the scientific method as required by NFPA 921 and the accepted forensic fire investigation practices and standards. Mr. Jim Foster did not utilize a systematic approach utilizing and considering the scientific method during his investigation related to fire origin.

## OPINION #2:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **cause** of the fire incident. Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the fire incident fire **cause**, are flawed, inaccurate, unreliable and incomplete. Mr. Jim Foster does not definitively state an opinion, scientifically based, as related to the fire cause. Mr. Jim Foster states on page 1 of his Expert Report *"The cause and origin of the fire is a direct result of the open infrared heaters installed in an area where painting and other procedures were performed."* This statement is and of itself is not a fire cause determination. Mr. Jim Foster states on page 4 of his Expert Report *"Information provided at the time of the fire site examination indicated temperatures prior to the fire were higher than what the settings were for the thermostat. Once the temperature dropped the ignition of the infrared heaters ignited. This occurred prior to the fire discovery. The heaters were the only source of ignition in the area of origin. In summary, other potential ignition sources were identified in the general area of fire origin. However, these other potential sources were ruled out due to their location and origin location."* This statement is speculative and not based on sufficient, reliable data. Mr. Jim Foster



simply states that paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited. Mr. Jim Foster opinion does not describe or articulate the exact cause hypothesis. The first fuel ignited, ignition source, ignition sequence are not described, explained or substantiated.  Mr. Jim Foster's photographs clearly identify and depict smoking materials in and around the subject area of interest. He does not clearly explain or articulate how, if at all he was able to eliminate them as a possible, competent ignition source. Mr. Jim Foster's photographs clearly identify and depict large quantities of electrical components, to include branch circuit wiring, junction boxes, light fixtures, circuit breaker panels. He does not clearly explain or articulate how, if at all he was able to eliminate them as a possible, competent ignition source. Additionally, Mr. Jim Foster does not accurately determine or define an area of fire origin to specifically identify and narrow down potential ignition sources within an area to rule in or rule out. Mr. Jim Foster failed to examine, analyze, document and collect for further examination, the gas system within the area of interest. This gas system fueled the subject three infrared gas-fired heaters. Mr. Jim Foster's Expert Report dated November 18, 2022, states on page 1, "The cause and origin of the fire is a direct result of the open infrared tube heaters installed in an area where painting and other procedures were performed." Mr. Jim Foster's opinions related to the fire cause are not based on the scientific method as recommended in NFPA 921.


NFPA 921-2017 edition-19.1, states in part *"Fire cause determination is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire. Fire cause determination generally follows origin determination. Generally, a fire cause determination can be considered reliable only if the origin has correctly been determined."*


NFPA 921-2017 edition-Figure 19.2 outlines some examples when applying the scientific method to cause determination. These include but are not limited to; origin has been determined, identify fuels in area of origin, identify potential ignition sources, analyze fuel(ignition temperature, quantity), analyze ignition source(temperature, energy, time), separate hypothesis for each ignition source, consider alternate hypothesis, can the hypothesized ignition source ignite the first fuel, insufficient information to determine cause. See chart below.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



AGOSTI 00012



Mr. Jim Foster had present with him at the joint scene inspection which took place on march 3, 2020, electrical engineer John Diggle with Rimkus Consulting Group, Inc. Mr. Jim Foster's reports fail to describe or articulate how he utilized the assistance of an electrical engineer. He failed to state that he used the engineering analysis of his electrical engineer to assist him in eliminating other electrical fire causes in the area of fire origin.

Mr. Jim Foster does <u>not</u> set forth a clear, concise, fire cause opinion based on the scientific method as required by NFPA 921 and the accepted forensic fire investigation practices and standards.

## OPINION #3:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **origin** related to the fire incident which occurred on March 19, 2019 at the property located at 6231 Macbeth Rd., Fort Wayne, Indiana was only able to be determined to be within a general area of fire origin. This included the south 1/4 of the subject building. This area of fire origin was very broad and was <u>not</u> able to be brought down to a more specific area and or point of fire origin. Significant, severe heat and flame damage, to include the almost complete consumption and collapse of the roof structure and walls, resulted in a difficult fire scene to determine a more specific area or point of fire origin. My opinion and opinion expressed at the time of the scene

 24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

AGOSTI 00013

inspections, is that a controlled, demolition of the area of interest needed to be conducted in attempt to possibly determine a specific area or point of fire origin. The scene and area of interest was not thoroughly processed. In fact plaintiff expert Mr. Jim Foster who was coordinating and running the joint inspections made it clear he had no intention and was not processing the entire area of interest. In fact, Mr. Jim Foster's limited action during the course of the joint scene inspections was to enter his area of interest and collect three infrared gas-fired heaters. I objected and requested that the controlled demolition and processing be conducted. A fire scene reconstruction was not attempted to possibly determine a more specific area of fire origin. Given a broad area of fire origin, there were many possible areas of fire origin.

NFPA 921- 2017 edition-18.1, states in part *"This chapter recommends a methodology to follow in determining the origin of a fire. The area of fire origin is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located. The point of origin is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect."*

Based on my assessment and evaluation of a witness video, it is my opinion that the video depicts the fire involvement of the southeast corner, at or near floor level. The video also depicts only smoke showing from the middle and north portion of the south 1/4 of the building. The fire had not progressed to those areas yet. It is my opinion that the southeast corner is an area of interest and possible area of fire origin which needed to be processed and further analyzed in attempt to determine a specific area of fire origin. Mr. Jim Foster's investigation did not examine process or consider this area as a possible fire origin. Of note, the incoming electric service and circuit breaker panels for the subject building are in the area of the southeast corner along the south wall.

See the photographic comparison below depicting the east side of the south portion of the subject building. Three overhead doors can be seen for comparison.




24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

AGOSTI 00014



Witness video screenshot (note arrow depicting curved downspout)



Google earth image (note arrow depicting curved downspout)

It is my opinion that the fire origin is within the south 1/4 of the subject building. A more specific area or point of fire origin was not determined.

## <u>OPINION #4:</u>

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **<u>cause</u>** is undetermined. Firstly, an area of fire origin was not able to be determined, thus a cause was not determined. Within the fire origin and area of interest, there were several potential ignition sources which were unable to be eliminated as causing this fire. A thorough processing and examination of the fire scene and area of interest was <u>not</u> conducted or completed. This left several identified, potential ignition sources, to include branch circuit wiring, junction boxes w/



conductors, circuit breaker panels, lighting fixtures, electric fans and other building electrical components not being examined, evaluated or analyzed. None of these aforementioned items were collected and removed from the fire scene as evidence for further analysis. It is my opinion that these items remain potential ignition sources which were <u>not</u> ruled out as being the cause of the fire. Other identified potential ignition sources include discarded and or improperly disposed of smoking materials. I observed and documented smoking materials in the form of cigarette packaging and cigarette butts within a melted down garbage can located at floor level on the interior of the south 1/4 of the building and immediately below the north infrared gas-fired heater. Additionally, discarded cigarette butts were observed and documented on the ground and in close proximity to the exterior of the southeast corner of the subject building. It is my opinion that smoking materials improperly discarded or disposed of are unable to be eliminated as being a potential cause for this fire loss.


View depicting electrical components within area of interest


View depicting electrical components within area of interest


View depicting electrical components within area of interest


View depicting electrical components within area of interest


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.


AGOSTI 00016

NFPA 921- 2017 edition- 18.8, states in part *"There are occasions when it is not possible to form a testable hypothesis defining an area that is useful for identifying potential causes. "*

It is my opinion that after my examination of the three infrared gas-fired heaters collected and removed from the fire scene, during evidence exams on February 24, 2022 & August 23, 2022, that there was no evidence of the presence of or the build-up of blue paint on any of the three heaters or their associated components.

It is my opinion that any theory related to the ignition of flammable and or combustible materials collecting on the infrared gas-fired heaters is flawed and incomplete, as there are other potential ignition sources which are potentially capable of igniting any identified materials suspected as being ignited. These other ignition sources include gas torches, grinders, welding, electric switches, electric fans, torpedo heaters and smoking. Additionally, based on information provided and photographic evidence, the previously installed suspended heaters, which were in place within the same space as the three infrared gas-fired heaters, since 2008 and were operating under the same conditions, with the application of Sheboygan blue paint, reportedly never caused any problems, to include fire or explosion. Furthermore, it was observed that in an adjacent building from the subject fire building, that painting operations were reportedly taking place, to include the application of Sheboygan blue paint. There were two infrared gas-fired heaters in place. There were no reported problems, to include fire or explosion.

It is my opinion that Mr. Jim Foster should have considered this data related to the previous heaters when developing, testing and selecting a final hypothesis, as recommended in NFPA 921.

Mr. Jim Foster states on page 2 of his Expert Report "The dumpster maintenance included operations such as repairing, sanding, patching and repainting dumpsters. Work in this included the use and storage of flammable combustibles materials."

It is my opinion that the three infrared heaters in place at the time of the fire and located within the south 1/4 of the building were installed in a manner adhering to and following the manufactures installation and operations instructions. Additionally, at the time of installation the heaters were installed in such an application and environment that did not expose the heaters to volatile and low flash point materials. At the time of installation, the subject building and area the heaters were installed was <u>not</u> an NFPA 33 compliant spray booth/spray area. At the time of installation, the subject building and area the heaters were installed was <u>not</u> an approved or certified spray booth/spray area as deemed by any local or state government agency or entity, such as the city, county or state.

NFPA 921- 2017 edition- 17.3.1.1, states in part "*Generally, the cause of a fire or explosion is not known until near the end of the investigation. Therefore, the evidentiary or interpretative value of various pieces of physical evidence observed at the scene may not be known until, at, or*



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

AGOSTI 00017

*near the end of the fire scene examination, or until the end of the complete investigation. As a result, the entire fire scene should be considered physical evidence and should be protected and preserved."*

It is my opinion that the Forensic and Scientific Testing (FAST) Certified Laboratory Report indicating the presence of medium and heavy petroleum distillates, can be explained as being expected to be present or common to the area in the subject work shop area and subject building. This is based on the documented presence of asphalt shingles and tar paper, lens wipe packets, other solvents and flammable liquids. There were several containers observed and documented which possibly contained flammable liquids. Additionally, it is my opinion that given the collapse of the roof, ceiling and all unburned components ultimately resting on or near floor level, with the tens of thousands of gallons of water utilized to extinguish the fire, any liquids within the area of fire damage would have become dispersed or floating to other areas than they were originally. This clearly caused cross-contamination.




View of containers in metal storage cabinet          View of containers in metal storage cabinet

It is my opinion that based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire <u>cause</u> is undetermined. A specific area and/or point of fire origin were not able to be determined. Additionally, all potential, competent ignition sources were not examined, analyzed or collected as evidence and were unable to be eliminated.

## **OPINION #5:**

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that




24/7 phone 847-682-6793  •  John.Agosti@Agosti-Fire.com  •  www.arsonexpert.com
Based in the Midwest  •  Serving clients across the U.S.

plaintiff expert Jim Foster's evidence collection was not conducted following accepted guidelines and procedures as set forth in NFPA 921. Additionally, Mr. Jim Foster did not follow or comply with accepted practices or procedures. It is my opinion that Mr. Jim Foster failed to properly document his evidence collection from the subject fire scene. With no other parties present, it is of the utmost importance to properly document evidence collection.

NFPA 921- 2017 edition- 17.1, states in part that *"During the course of any fire investigation, the fire investigator is likely to be responsible for locating, collecting, identifying, storing, examining, and arranging for testing of physical evidence. The fire investigator should be thoroughly familiar with the recommended and accepted methods of processing such physical evidence."*

NFPA 921- 2017 edition- 17.5.2.1, states in part that *"Physical evidence should be thoroughly documented before it is moved. This documentation can be best accomplished through field notes, written reports, sketches, and diagrams, with accurate measurements and photography. The diagramming and photography should always be accomplished before the physical evidence is moved or disturbed. The investigator should strive to maintain a list of all evidence removed and who removed it."*

It is my opinion that Mr. Jim Foster failed to properly document his evidence collection through photography, diagramming or field notes. It is my opinion that Mr. Jim Foster failed to produce any sketches, measurements or field notes related to his evidence collection. Additionally, his photographs of his evidence collection are very minimal and incomplete. It is my opinion that Mr. Jim Foster's evidence collection fail to depict accurately his evidence collection. The photographs fail to depict all evidence collection performed and do not depict accurately the locations where evidence was collected. It is my opinion that Mr. Jim Foster's Evidence Custody Forms indicate two separate forms with date collected as being May 10, 2019. Each form indicates Exhibit A, B & C, with separate and different descriptions on each form. It is my opinion that this indicates two sets of evidence labeled A, B & C. This indicates a discrepancy in Mr. Jim Foster's evidence documentation. Additionally, it is unclear which evidence was submitted for laboratory analysis.

## OPINION # 6:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the Sheboygan Blue Aqua Enamel Paint- Product number 73-4383C, is a water based, zero flammability rating, non-combustible product which does not sustain combustion. This opinion is based on the manufactures label and MSDS sheets for the subject product. The paint is not a



flammable finish. Additionally, it was noted and observed that throughout the subject building and area of interest, that there was evidence of unburned, pristine blue paint remnants in the form of chunk pieces. These pieces and remnants were throughout and completely unburned or consumed by the fire. It is also my opinion that there was no build up or even slight presence of blue paint on any of the three infrared gas-fired heaters removed from the fire scene.



Drum of blue paint from subject site



Drum of blue paint from subject site



Drum of blue paint from subject site



Drum of blue paint from subject site

All of my opinions are based on my review of documents, photographs and videos. Additionally, my opinions are based on my examination of the subject fire scene and my education, training and experience as a fire and explosion investigator. All opinions are based on scientifically accepted and well documented indicators and are within a reasonable degree of fire science



certainty. As addendums to this report and in separate documents are partial photograph documents with representative photographs from my complete set of photographs taken.

If and when more or additional information become available to me, I reserve the right to amend my opinions as stated above. If you have any questions or need further assistance please feel free to contact me.

Respectfully submitted,

*Michael J. Agosti*

Technical review by:

*John Agosti*

Michael Agosti- IAAI CFI, NAFI CFEI & CVFI
Fire Analyst

John Agosti-IAAI CFI, NAFI CFEI
Fire Analyst


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.


AGOSTI 00021

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF INDIANA

3                      FORT WAYNE DIVISION

4        _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7             Plaintiff,

8        v.                                Case No.

9    COE HEATING & AIR CONDITIONING,       1:21-CV-00108

10   INC.; and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY,

12            Defendants.

13       _____

14              VIDEOCONFERENCE DEPOSITION OF

15                 SHAREE WELLS, MS, F-ABC

16   DATE:         Wednesday, August 31, 2022

17   TIME:         1:34 p.m.

18   LOCATION:     Remote Proceeding

19                 Indianapolis, IN 46204

20   REPORTED BY:  Suzannah Clemons, Notary Public

21   JOB NO.:      5384665

22

23

24

25

Page 21

1    case of anything after April 14, 2020?

2         A    After April 14?

3         Q    That's the date of your report.

4         A    No.  No.

5         Q    Have you been asked to perform any more

6    tests in the last two years?

7         A    No.

8         Q    In preparing for the deposition, did you

9    reach any opinions not already expressed on the second

10   page of Exhibit B, which is your report?

11        A    No.  I did not.  But I did notice that on my

12   laboratory worksheet I did not include the flame test

13   for item number four.  Sometimes we report it;

14   sometimes we don't.  In this case, it looks like I did

15   not report that.  But if you look on my worksheet, the

16   flame test for item number four was negative.

17        Q    And can you explain in detail to four

18   lawyers that aren't laboratory experts like you what a

19   flame test is and how you did it in as much detail as

20   you can?

21        A    Okay.  So when I'm asked to perform a flame

22   test, we're simply trying to determine whether or not

23   the liquid that I have is ignitable.  And so one of

24   the first things that we will do is just take, like, a

25   Q-Tip -- a long Q-Tip and submerge it into the liquid

Page 22

1    just enough to wet the -- the applicator tip of the

2    cotton.

3            And then we just take a lighter and we light

4    that off to see whether or not it will ignite; whether

5    or not it will sustain a flame.  And then we notate

6    the color of the flame.  If I do not notate it, it

7    would have been negative.

8            If it would've been positive, I would've

9    notated a black or a blue color on that.

10   Q     Right.  And I believe in connection with

11   this flame test, you said it was from item number

12   four, which is the medium blue WR protective enamel by

13   Sheboygan Paint Company?

14   A     Correct.

15   Q     All right.  When that was delivered to you,

16   was that delivered with the first -- you got

17   everything other than the swab all at once, correct?

18   The test swab came second on April 13 of '20?

19   A     Let me check and make sure that is correct.

20   Q     I think if you look on the first page it

21   says evidence delivered on March 11; I assume that's

22   2020, correct?

23   A     Yes.  And --

24   Q     And on 13th of 2020 you received item 5?

25   A     Yes.  It appears that's the way that worked.

Page 23

1    Yes.

2         Q    Okay.  Back to the flame test, did you

3    perform any other flame tests in this case to anything

4    other than as you've just described?

5         A    No.

6         Q    All right.  Did you ever attempt to conduct

7    the flame test with that same paint -- that same

8    medium blue WR protective enamel; item number four in

9    your report -- when it was dry; in a dry form?

10        A    No.  I did not.

11        Q    Do you mind me asking why not?

12        A    I was never asked to do any further testing.

13   And at the time, we were just trying to determine the

14   makeup of the paint.

15        Q    Did you conclude that the paint, as we're

16   describing here -- I'm just going to say the Sheboygan

17   paint to make the deposition a little easier.  Did you

18   determine that -- it does not have a component

19   petroleum or petroleum distillate?

20        A    No.  I did not conclude that.  My

21   conclusions -- is it does actually have ignitable

22   liquid residues, but the paint itself is nonflammable.

23   Because it does contain a large amount of water per

24   the MSDS sheet.

25        Q    I'm not sure if I understood you.  Can you

Page 66

1    up in the air.

2            Do you hold an opinion at all about how the

3    aromatic product and/or medium and heavy petroleum

4    distillates found their way up on top on the heaters

5    or in them?

6                  MR. ZOCCOLA:  Objection; form.

7                  You can answer.

8                  THE WITNESS:  No.  That's out of the

9    scope of what I was asked to do.

10   BY MR. GARDNER:

11       Q    Similarly, do you know when the aromatic

12   product was deposited on any of the three heaters?

13       A    No.

14       Q    Do you know when either the medium or heavy

15   petroleum distillates were deposited on any of the

16   three heaters?

17       A    No.

18       Q    Can you say one way or the other whether the

19   aromatic product that you found as a result of your

20   testing was deposited before the fire or during the

21   fire; one way or the other?

22       A    No opinion.

23       Q    Same question about timing; do you know

24   whether the medium petroleum or heavy petroleum

25   distillates were deposited on or in the tube heaters

Page 67

1     before or after the fire?

2          A     No.

3          Q     Or during the fire?

4          A     No.

5          Q     Okay.  Assume for a second that a fire

6     starts in this room from -- let's just say an unknown

7     cause and there's kerosene in the room and it ignites;

8     could that rise up and attach to these tube heaters

9     when they're 14 feet up in the air or do you know one

10    way or the other?

11                    MR. ZOCCOLA:  Objection to form.

12                    You can answer.

13                    THE WITNESS:  I don't have an opinion.

14                    MR. GARDNER:  Okay.

15    BY MR. GARDNER:

16          Q     If there were any machinery in the room that

17    had inside of it as a lubricant oil -- which we've

18    already established would be a petroleum

19    product -- and it was subjected to fire, do you know

20    if that could migrate upwards and deposit on the tube

21    heaters during the fire?

22                    MR. ZOCCOLA:  Objection to form.

23                    You can answer.

24                    THE WITNESS:  I don't have an opinion

25    on that.

Page 25

1          A     I believe that that matched my library of

2     information that I have.  I was not given any other

3     components other than the MSDS sheet.  And that

4     product was not listed on the MSDS sheet.

5               So I simply was able to classify it

6     according to our standard.  And that was the

7     classification that I was -- that I was given.

8          Q     And you included -- at least I received from

9     counsel in this case -- the product specs for the

10    Sheboygan paint, right?  You produced that.  Or did

11    they give that to you?

12         A     Okay.  So I didn't produce anything, but I

13    was given the MSDS sheet of the Sheboygan paint; the

14    blue enamel.  I did receive that as part of the

15    information in this case.

16         Q     Did that come from Mr. Foster?

17         A     Yes.  It did.

18         Q     And did it come that same date with the

19    items one through four evidence on March 11, 2020?

20         A     To be honest, I'm not sure if it did.  I

21    think he said he included it on his letter, but I

22    didn't specifically date it.  So it would've

23    come -- it would've come with one of the samples.

24         Q     Okay.  Can you go to the MDS sheet that

25    Mr. Foster gave you in connection with the Sheboygan

Page 27

1          A     Correct.

2          Q     And the third one says, "Percent solvent,

3     13.02 percent."  And do you know what that solvent is?

4          A     I do not.

5          Q     It mentions a flashpoint and then it says

6     "N/A."  Is it your understanding that means "not

7     applicable"?

8          A     Yes.

9          Q     And in terms of flashpoint, you're familiar

10    with that, correct?

11         A     Yes.

12         Q     And that would be the temperature at which

13    something burns, right?

14         A     Correct.

15         Q     Ignites, right?  Okay.  And you would agree

16    with that because you tried to burn the liquid version

17    of the Sheboygan paint and couldn't do it, right?

18         A     Correct.

19         Q     Okay.  And you never tried to burn it in its

20    dried state, correct?

21         A     No.

22         Q     Okay.  Is there anything on the front page

23    of Exhibit D, which is the product specifications

24    about the Sheboygan Paint Company, that you obtained

25    from Mr. Foster that mentions the existence of

Page 29

1    BY MR. GARDNER:

2         Q    Sharee, do you know whether this product

3    specification -- Sheboygan Paint Company refers to the

4    product in only its liquid form or in any other form,

5    such as when it's dry?

6         A    I do not know.

7         Q    Okay.  Section two says "hazardous

8    ingredients."  Do you see that?

9         A    I do.

10        Q    And then the print's a little small.  I

11   can't tell if that's a T or an I, but it looks like it

12   says, "NI ingredient"?  Maybe I'm wrong.

13        A    I believe it -- I believe it says "NT

14   ingredient."

15        Q    Okay.  And do you know what the NT stands

16   for, Sharee?

17        A    I do not.

18        Q    But in any event, section two is supposed to

19   list hazardous ingredients I suppose, right?

20        A    Section two is supposed to list hazardous

21   ingredients.  However, on MSDS sheets, many times it

22   does not list all the components of a particular

23   substance.  So in this particular case, it obviously

24   did not list the ignitable components that I

25   identified.  But it's not uncommon for the MSDS sheet

Page 122

1          CERTIFICATE OF TRANSCRIBER

2          I, KATLIN JENSEN, do hereby certify that

3     this transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

                                        KATLIN JENSEN

15

16

17

18

19

20

21

22

23

24

25



# FAST LABORATORY WORKSHEET

**Case Number:** 62249          **Date:** 3|11|20

**Date of Fire:** _____          **Date Collected:** _____

**Container(s):** (Quart Metal Can) 4   (Gallon Metal Can) 1-3   (Glass Jar)   (Plastic Vial)   (Nylon Bag)
With evidence tape applied _____

ODO1-3          **ANALYSIS**

**ODOR:** (Petroleum)   (Burned Wood)   (Putrid)   (Carpet)   (N/A)

**EXTRACTION:** 1|2|3|4|5 _____ Carbon Strip 60-80°C Overnight or 4 $^B$ Hours  -2hrs
_40_ Dilution in $CS_2$
_____ Vehicle Fluid Evaluation
_____ FAME, Pentane, transesterfied w/ 2N KOH in Methanol
_____ Natural Gas / Propane

*(circled note, right):* 1/2 An,MPD,HPP   3|4 An, MPD

**RESULTS:** _____ Gasoline _____ LPD _____ MPD _____ HPD

_____ Isoparaffinic _____ Naphthenic/paraffinic _____ Aromatic _____ Misc

5 (Negative) _____ Terpenes - Pine Wood _____ Normal Alkane

_____ PUFA'S /High/Moderate/Low/None _____ Natural Gas / Propane

*(circled note, left):* Flame Test NEG #4

**Visually Containing:**

1. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _gauze w/ blue residue_
2. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _gauze w/ blue residue_
3. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _gauze w/ blue residue_
4. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _blue enamel_
5. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _CVS comparison gauze_
___. (Gal) (Qt) (Can) (Plastic Cont) (Debris) (Gas) (Trans) _____

Notes:
(X) -) Overspray in paint booth on tubes/heater
-) repair
-) tube heaters propane          *(circled):* 1 = 2  3 = 4  NO HPP IN 3 & 4

*(margin, bottom right):* 1/10  9

This controlled document was approved and issued in accordance with the document managements provisions established by Forensic and Scientific Testing, INC. If printed, this is an uncontrolled copy that reflects the content of the controlled document on the date printed. The content is subject to change.
Revision: 2

5804 West 74th Street
Indianapolis, Indiana 46278
**(317) 510-6484** Telephone
**(317) 510-6488** Facsimile

*Return ↑*

March 6, 2020

Sharee Wells
Fast Labs
21 Industrial Drive
Thorsby, AL 35171

RE:  RCG File No. 058406186

Dear Ms. Wells:

Enclosed please find 3-1 gallon cans of samples collected from tube heaters.  Please analyze the debris for the presence of flammable, combustible or ignitable liquids.

Enclosed is a quart metal can with paint sample. Please test for contents that make up the product. This is the item I spoke to you in reference to when the paint dries it has properties similar to Class II and Class III liquids. I have enclosed a copy of the MSDS as well.

*480-384-5878*

The invoice can be sent to: Mr. Glenn Bell, CCMI, 17015 North Scottsdale Road, Ste 325, Scottsdale, AZ 85255. Claim # F923689  Republic Services, Fort Wayne, IN

Enclosed also find an Evidence Custody Form.  Please complete the section under Change of Evidence Custodian upon receipt of the evidence and again before returning it to us.

Feel free to call me at 317-447-2326 or email me at jfoster@rimkus.com if you have any questions.

Sincerely,

James P. Foster, IAAI-CFI, CVFI
Fire Consultant

*Kelly Williams*
*317-639-1210*

Enclosures



**Rimkus Consulting Group, Inc.**
**5804 West 74th Street**
**Indianapolis, Indiana 46278**
**(317) 510-6484 Telephone**
**(317) 510-6488 Facsimile**

April 4, 2020

Sharee Wells
Fast Labs
21 Industrial Drive
Thorsby, AL 35171

RE:  RCG File No. 58406186

Dear Ms. Wells:

Enclosed please find a cotton pad.  This is a control sample of the similar pad used for prior testing that was completed on the above matter. The test were positive and you requested a clean pad for comparison sample.

Enclosed also find an Evidence Custody Form.  Please complete the section under Change of Evidence Custodian (marked with arrows) upon receipt of the evidence and again before returning it to us.

Feel free to call me at 317-447-2326 or email me at jwgray@rimkus.com if you have any questions.

Sincerely,

James P. Foster
Fire Consultant

Enclosures

Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF INDIANA
2                   FORT WAYNE DIVISION

3

4

5

6    REPUBLIC SERVICES OF        )
     INDIANA, LIMITED            )
7    PARTNERSHIP,                )
                                 )
8         Plaintiff,             )
                                 )
9         v.                     ) Case No. 1:21-cv-108-HAB-SLC
                                 )
10   COE HEATING & AIR           )
     CONDITIONING, INC., and     )
11   GAS-FIRED PRODUCTS, INC. )
     d/b/a SPACE-RAY,            )
12                               )
          Defendants,            )
13   _____)

14

15

16

17              DEPOSITION OF LAUREL MASON
18        The deposition upon oral examination of
     LAUREL MASON, a witness produced and sworn
19   before me, Andrea Wray, Notary Public in and
     for the County of Hendricks, State of Indiana,
20   taken on behalf of the Plaintiff via
     VIDEOCONFERENCE, on the 9th day of February,
21   2023, commencing at 11:21 a.m., in accordance
     with F.R.C.P 30, with written notice as to time
22   and place thereof.

23

24

25

Page 56

1       Q    Okay.

2       A    No, I don't, but from time to time, I'm asked

3   to review reports and depositions and see if that

4   followed the scientific method as -- as an investigator

5   should.  Okay.

6            That is -- an investigator, to me, is also a

7   scientist in a way because that person is de- --

8   determining a hypothesis based upon their analysis of a

9   fire scene.  And that uses a scientific method.

10           But, most of the time, what I'm asked to do is

11  review how the investigator collected evidence:  Was the

12  evidence collected properly?  Was it packaged properly?

13           (Brief pause.)

14           I can't hear you.

15      Q    And this --

16      A    Oh, I'm sorry.  You --

17      Q    I didn't know if you were finished or not.

18  Sorry.

19           In this case, were you ever asked to evaluate

20  Mr. Foster's application of the scientific method?

21      A    Not specifically, but I reviewed his report.

22      Q    Are you offering any opinions in this case on

23  whether or not Mr. Foster properly followed the

24  scientific method?

25      A    As it -- as it relates to my report, yes.

Page 57

1      Q     What do you mean, as it relates to your

2   report?

3      A     Well, in my report, I talk about certain

4   things that Mr. Foster did or did not do in this case.

5      Q     And when you say, what he did or did not do,

6   you mean, in relation to the scientific method?

7      A     Into the investigation and the methodology

8   that he used to collect evidence.

9      Q     Okay.  Do you have any reason -- we'll get to

10  Mr. Foster's report, I think, later on, but you

11  understand that, in his 2018 -- or I'm sorry -- his

12  2000- -- his November 18th, 2022, report -- you've seen

13  that report, right?

14     A     Yes, sir.

15     Q     You reviewed it in detail, right?

16     A     Yes, sir.

17     Q     And you understand that he puts forth certain

18  opinions and conclusions in that report, right?

19     A     That's correct.

20     Q     Okay.  What I'm trying to narrow in on here,

21  Laurel, is whether or not you are offering opinions in

22  this case as to Mr. Foster's conclusions and opinions

23  contained in his November 18th, 2022, report; or are you

24  simply analyzing the methodologies he used throughout

25  the course of his investigation?

Page 58

1          MR. GARDNER:  Let me interpose an objection in

2     that we just got Mr. Foster's lengthy deposition

3     transcript to her.  There may be supplementation on

4     the --

5          MR. JONES:  I understand.

6          MR. GARDNER:  You know, but go ahead.

7          THE WITNESS:  You're gonna have to repeat the

8     question.

9          MR. JONES:  Could you read it back, Andrea?

.10          THE COURT REPORTER:  Yes -- sorry.  Let me

11     unmute.

12          (Question read back.)

13          THE WITNESS:  Well, his conclusions and

14     opinions are dependent upon his methodology.

15  BY MR. JONES:

16     Q    I understand that.

17          So -- I understand his -- his conclusions are

18  based on his methodologies, but when we -- when we go to

19  trial in this case, Laurel, what I'm trying to

20  understand is, are you going to offer opinions about

21  Mr. Foster's overall conclusions or are you only

22  offering opinions about his methodologies or are you

23  offering opinions on both?

24     A    About his --

25          MR. GARDNER:  Objection.

Page 59

1          Go ahead.

2      A    His conclusions based upon the methodologies.

3      Q    Okay.  So, you are offering opinions about the

4   overall conclusions of the certified fire investigator,

5   Mr. Foster, correct?

6      A    Correct.

7      Q    Okay.  Thank you.

8          On Page 1, Exhibit 5, you use the term --

9      A    Hold on.

10     Q    Okay.

11     A    Hold on just a second.  Let me get there.

12         Page 1, Exhibit 5 -- oh, okay.  All right.

13     Q    Exhibit 5, Page 1, the sentence I wrote --

14  read back to you, a moment ago, you used the term

15  "litigation support", and then you made reference to

16  what -- the support that you sometimes provide

17  attorneys.

18         Can you provide -- can you tell me more about

19  what you mean when you say "litigation support"; that

20  you routinely provide litigation support?

21     A    Sure.  Sometimes I'm requested to look at data

22  from other analysts as part of ongoing litigation to

23  determine whether or not that data is based upon good

24  science.  That's how I provide litigation support.

25         I also d- -- conduct analyses in cases for

1          Did I read that right?

2     A    Yes, sir.

3     Q    Okay.  My understanding of this is that you

4  are kind of pointing out some -- some -- would it be

5  fair to call it defic- -- in your opinion, deficiencies

6  of Mr. Foster's evidence collection?

7     A    Yes.

8     Q    Did any one of the -- of what you would call

9  omissions in that paragraph -- or in that sentence --

10  did any single one of those, to you, cause the evidence

11  he collected to be -- which was labeled at Exhibit A

12  that you described in that paragraph -- did any one of

13  those, what you would call, omissions cause the evidence

14  he collected to be not legitimate evidence, as you

15  described earlier?

16          MR. GARDNER:  Objection.  Form of the

17      question.  Argumentative.  Incomplete

18      hypothetical.

19          MR. JONES:  Marty, can you tell me how it's

20      argumentative?

21          MR. GARDNER:  Yeah, you're -- your use of the

22      word -- I need the question read back to me.

23          MR. JONES:  Andrea, if you could read it back.

24          (Discussion off the record.)

25          (Question read back.)

Page 107

1   BY MR. JONES:

2       Q   So, I'll -- I'll go ahead and say, that was a

3   terrible question, Laurel.  I don't think it was

4   argumentative, but I'll rephrase because that was a very

5   poor question.  Okay.

6           When we're looking at Page 8 of Exhibit 6, you

7   identify -- you say, "Republic 00603 does not identify",

8   I'm going to say, one, "the area swabbed with gauze".

9           Does the fact that the -- that that photograph

10  doesn't identify the area swabbed with gauze -- does

11  that, in your opinion, cause the evidence collected to

12  be illegitimate or unreliable?

13      MR. GARDNER:  Object to form regard- --

14      objection to the form, use of the word

15      "illegitimate."

16      MR. HEHNER:  Objection as to form.

17      A   It's improper evidence collection.  There's no

18  documentation to show -- all we have is Mr. Foster's

19  word of where he collected the evidence.  There's no

20  documentation to show what he did and whether, in fact,

21  it was removed from that location.

22          Yes, it -- it's -- it has a great deal to do

23  with the integrity of the evidence.

24      Q   Right.  You described earlier what you

25  described -- what you called a legitimate piece of

Page 132

1                   CERTIFICATE OF REPORTER

2

STATE OF INDIANA)

3

COUNTY OF HENDRICKS)

4

5            I, ANDREA KOMARIDIS WRAY, Court Reporter,

6    certify that the foregoing proceedings were taken before

7    me at the time and place therein designated; that my

8    shorthand notes were thereafter translated under my

9    supervision; and the foregoing pages, numbered 1 through

10   130, are a true and correct record of the aforesaid

11   proceedings.

12

13           I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

             DATED this 23rd day of February, 2023.

19

20

21

22              ANDREA KOMARIDIS WRAY
                NOTARY PUBLIC
23              COMMISSION NUMBER NP0743903
                COMMISSION EXPIRES 09/25/2030

24

25

# PRODUCT SPECIFICATIONS

---
SHEBOYGAN PAINT COMPANY                     DATE OF PREPARATION  10/30/14
1439 NORTH 25th STREET                      PRINTED DATE         12/01/14
P.O. BOX 417                                TRANSPORTATION EMERGENCY (800) 924-6804
SHEBOYGAN, WI  53082-0417
TELEPHONE  (920) 458-2157          CUSTOMER SERVICE  custserv@shebpaint.com
---

```
        TRADE NAME                          MFG. PRODUCT NO.
        MEDIUM BLUE WR PROTECTIVE           73-4383C
        ENAMEL

        CUSTOMER                    :
        PART NUMBER                 :
        WEIGHT PER GALLON           :     9.29 POUNDS
           (density)
                                    BY WEIGHT      BY VOLUME
        PERCENT SOLIDS              :    36.42          26.75

        PERCENT WATER               :    50.27          56.07

        PERCENT SOLVENT             :    13.02          16.82

        % EXEMPT SOLVENT            :      .29            .36

        VOC (WITH WATER AND EXEMPT SOLV):   1.21 LBS/GAL    145.01 GMS/LITER

        VOC (LESS WATER AND EXEMPT SOLV):   2.78 LBS/GAL    333.15 GMS/LITER

        PERCENT HAPS BY WEIGHT      :
        VOC LBS PER GALLON SOLIDS   :      4.52
        VOC KILOGRMS PER KILOGRMS SOLIDS:   .36
        VOC HAPS LBS PER GALLON SOLIDS  :
        VOC HAPS LBS PER LBS SOLIDS     :

        FLASHPOINT (FAHRENHEIT)     : N/A

        APPLICATION                 : SPRAY/ROLL/BRUSH

        REDUCTION                   : NONE-WATER IF NEEDED

        CURE                        : 8 MIN@175F

        SUBSTRATE                   : CRS

        COVERAGE                    : 429.07 SQUARE FEET @ 1 MIL NO LOSS

        VISC @ 80 F                 : 95-100  KU

        GLOSS                       : 85-100@1  MIL, HIGH*

        pH                          : 8.5-9
```

COMMENTS

73-4383C                    PAGE: 1

----------------------------------------------------------------------

## MATERIAL SAFETY DATA SHEET
### FOR COATINGS, RESINS AND RELATED MATERIALS

==================================================================

| HAZARD RATING | 0 – MINIMAL | 3 – SERIOUS |
|---|---|---|
| | 1 – SLIGHT | 4 – SEVERE |
| | 2 – MODERATE | * – CHRONIC |

HMIS RATING    HEALTH – * 2   FLAMMABILITY – 0  REACTIVITY – 0

## SECTION I
----------------------------------------------------------------------

SHEBOYGAN PAINT COMPANY                    DATE OF PREPARATION  10/30/14
1439 NORTH 25th STREET / P.O. BOX 417   TRANSPORTATION EMERGENCY (800) 924-6804
SHEBOYGAN, WI  53082-0417                   EMAIL: custserv@shebpaint.com
TELEPHONE: (920) 458-2157

| PRODUCT CLASS | TRADE NAME | MFG PRODUCT NO. |
|---|---|---|
| SURFACE COATING | MEDIUM BLUE WR PROTECTIVE | 73-4383C |
| | ENAMEL | |

----------------------------------------------------------------------

## SECTION II  – HAZARDOUS INGREDIENTS
----------------------------------------------------------------------

| NT | INGREDIENT | CAS# | ACGIH TLV PPM | mg/m3 | ACGIH STEL PPM | mg/m3 | OSHA PEL PPM | mg/m3 | OSHA CEILING PPM | mg/m3 | LEL % VOLUM | VAPOR PRESS mm/Hg DEG F | % BY Wght |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C | Glycol Ether Compd.(skin) | 111-76-2 | 20.00 | 100.0 | ----- | ----- | 50.00 | 240.0 | ----- | ----- | 1.100 | 0.600 @ 68. | 7.52 |
| A | Secondary Butyl Alcohol | 78-92-2 | 100.0 | 300.0 | ----- | ----- | 150.0 | 450.0 | ----- | ----- | 1.700 | 12.50 @ 68. | 4.83 |
| | NON-HAZARDOUS COMPONENT: Water | 7732-18-5 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | 17.50 @ 68. | 50.2 |
| C | Ammonia | 7664-41-7 | 25.00 | 17.00 | 35.00 | 24.00 | 50.00 | 35.00 | ----- | ----- | 16.00 | 6460. @ 68. | 0.29 |
| | Copper Compound | 147-14-8 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- @ --- | |
| | Titanium Dioxide (dust) | 13463-67-7 | ----- | 10.00 | ----- | ----- | ----- | 15.00 | ----- | ----- | ----- | ----- @ --- | |
| | Barium Sulfate (Barite) | 13462-86-7 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- @ --- | 9.10 |

----------------------------------------------------------------------

C –This toxic chemical is subject to the reporting requirements of both Section 313 of the Emergency Planning and Community
   Right-to-Know Act of 1986 (40CFR372) and the Wisconsin Dept. of Natural Resources Administrative Code Chapter NR445.
   VHAP = VOLATILE HAZARDOUS AIR POLLUTANT (VAPOR)          HAP  = HAZARDOUS AIR POLLUTANT (SOLID)
   (skin) = OSHA Skin Absorption Hazard                    VOC content determined by EPA method 24.

A –This toxic chemical is subject to the reporting requirements of Section 313 of the Emergency Planning and Community
   Right-to-Know Act of 1986 (40CFR372).                   VHAP = VOLATILE HAZARDOUS AIR POLLUTANT (VAPOR)
   HAP  = HAZARDOUS AIR POLLUTANT (SOLID)                  VOC content determined by EPA method 24.

## SECTION III – PHYSICAL DATA
----------------------------------------------------------------------

| BOILING RANGE  208-343 F | VOC KG/KG SOLIDS=.36 | VOC (WITH WATER AND EXEMPT SOLV) = 1.21 LBS/GAL | 145 GMS/LITER |
|---|---|---|---|
| | % HAPS BY WEIGHT= | VOC (LESS WATER AND EXEMPT SOLV) = 2.78 LBS/GAL | 333 GMS/LITER |

| VAPOR DENSITY | EVAPORATION RATE | %VOLATILE BY WEIGHT | %VOLATILE BY VOLUME | WEIGHT PER GALLON | SPECIFIC GRAVITY | AVG SOLV DENSITY |
|---|---|---|---|---|---|---|

VAPOR DENSITY HEAVIER THAN AIR          EVAPORATION RATE SLOWER THAN ETHER          63.58      73.25      9.291      1.115      8.06

---

# SECTION IV - FIRE & EXPLOSION HAZARDS

---

PROPER SHIPPING NAME - WATER BASED PRODUCT, DOES NOT SUSTAIN COMBUSTION          NONCOMBUSTIBLE (ASTM D4206)
    SHIPPING LABEL - KEEP FROM FREEZING LABEL                              FLASHPOINT N/A


EXTINGUISHING MEDIA: Water based product.  Flashpoint for this product is listed as N/A or Not Applicable due to the
presence of water. If water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid.  If
needed, extinguishing agents for Class B fires may be used.


# 73-4383C                            PAGE:  2

---

UNUSUAL FIRE & EXPLOSION HAZARDS:  Water based product. Sealed containers may explode if exposed to extreme heat.
Frozen containers may expand and leak contents when thawed. Water soluble liquids are non-accumulators of static charge.
Static protection precautions such as container bonding or grounding would not be necessary.  Flash point listed as N/A
or not applicable due to the presence of water.
SPECIAL FIRE FIGHTING PROCEDURES:  Water may be used to cool closed containers to prevent pressure buildup.  Keep people
away from any fire fighting operations involving chemicals. Wear a self-contained positive pressure breathing apparatus
in addition to full protective gear.

---

# SECTION V - HEALTH HAZARD

---

EFFECTS OF OVEREXPOSURE: Irritation of the respiratory tract or acute nervous system depression characterized by headache
dizziness, staggered gait, confusion, unconsciousness, coma. There is no applicable information available regarding the
carcinogen potential for this product as a whole, however any relevant information regarding any ingredient's status
as a potential, suspect, or confirmed carcinogen is listed in SECTION V of the MSDS.
Chronic overexposure may cause blood disorders or damage to the blood-forming system.
Chronic overexposure may damage the liver and/or kidneys, blood cells, cause cardiac sensations, hearing effects,
and/or cause birth or fertility defects in lab animals.
Repeated and prolonged exposure to some solvents has been associated with permanent brain and nervous system damage.
Intentional misuse by deliberately concentrating & inhaling vapors from this product may be harmful or fatal.
This product contains ethylene glycol monobutyl ether which is on the New Jersey and Pennsylvania Right-to-Know List.
CAS# 111-76-2
Chronic overexposure may cause damage to the liver, kidney, eyes, and/or respiratory system.
This product contains 2-butanol or secondary butyl alcohol which is on the Massachusetts, Pennsylvania and New Jersey
Right-to-Know Lists:  CAS# 78-92-2
MEDICAL CONDITIONS PRONE TO AGGRAVATION BY EXPOSURE: Preexisting eye, skin, central nervous system, digestive
tract, and respiratory tract.  May adversely affect persons with liver, kidney & blood forming organ disorders.
ROUTE(S) OF ENTRY: Inhalation, skin contact absorption, eye contact.  Products that are free-flowing liquids or pastes
are not expected to have routes of exposure for dust.  Dried product residue may exhibit dust inhalation hazards.
INHALATION: May cause moderate irritation to the respiratory tract.  Overexposure may have toxic and/or narcotic effects.
May cause congestion, headache, dizziness, weakness, nausea, and/or drowsiness. FIRST AID:  Remove to fresh air.  If
breathing is difficult, give oxygen.  If not breathing, give artificial respiration and get emergency medical assistance.
EYE CONTACT:  Liquids or vapors may cause severe irritation and/or chemical burns to the eyes.  Chronic overexposure may
cause eye damage, conjunctiva or corneal injury. FIRST AID: Immediately flush eyes and eyelids with large
amounts of water for 15 min.  Hold eyelids apart to ensure flushing of the entire area.  Get prompt medical attention.
SKIN CONTACT: May cause moderate to severe skin irritation. May cause burning sensations, defatting and/or dermatitis.
Chronic overexposure may cause skin cracking and/or eczema. FIRST AID: Remove contaminated clothing and shoes.  Wash
area with soap and water.  Get medical attention as needed.
SKIN ABSORPTION: May be absorbed through skin tissues. Chronic overexposure to the skin without using protective
barriers (gloves, aprons, etc.) may cause toxic effects.
INGESTION: Single dose oral toxicity is low.  May cause irritation to the gastrointestinal tract.  Ingestion may
cause nausea, discomfort, diarrhea, dizziness and vomiting. FIRST AID: DO NOT INDUCE VOMITING! Contents of this product
pose an inhalation hazard. If aspirated into the lungs, may cause chemical pneumonitis and/or pulmonary edema which can
be fatal.  Never leave individual unattended, keep head low to prevent aspiration.  SEEK IMMEDIATE MEDICAL ATTENTION!

---

# SECTION VI – REACTIVITY DATA

--------------------------------------------------------------------------------

STABILITY: _____UNSTABLE _XX_STABLE

INCOMPATABILITY (Materials to avoid): Keep away from all oxidizing materials, avoid strong acids & alkalis (caustics) and never distill solvents to dryness. Material can react violently under such conditions.

HAZARDOUS DECOMPOSITION PRODUCTS: Oxides of carbon, nitrogen and/or sulfur & other toxic gases and irritating vapors like aldehydes, amines, HCN,and incompletely burned hydrocarbons.

HAZARDOUS POLYMERIZATION: _____May Occur _XX_Will Not Occur

CONDITIONS TO AVOID: Container is not a pressure vessel. Never use pressure to empty. Use safe warehousing and handling procedures for drums, pails, containers, etc. Do not stack 5 gallon pails more than 5 high.

# SECTION VII – SPILL OR LEAK PROCEDURES

--------------------------------------------------------------------------------

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED: Dike spilled area and collect with inert absorbent material. If in a confined area, avoid breathing vapors and use a respiratory protection device (See Section VIII). Follow local, state and federal spill notification procedures.

## 73-4383C                         PAGE: 3

--------------------------------------------------------------------------------

WASTE DISPOSAL: Consult licensed waste handling and/or transportation facility. Follow local, state, provincial and federal waste regulations. Do not incorporate into municipal sewage treatment facilities. Empty containers retain product residue, follow label and MSDS warnings even after container is emptied.

# SECTION VIII – SAFE HANDLING & USE INFO

--------------------------------------------------------------------------------

RESPIRATORY PROTECTION: In outdoor or open areas with unrestricted ventilation, if needed, use NIOSH approved dust mask to protect from overspray airborne particulates. In restricted areas use NIOSH approved organic vapor respirator with dust particulate pre-filter. Supplied air systems or intrinsic safe PAPR systems with organic vapor protection may be used, consult OSHA respirator standard and check with a safety supplier for respirator system specifications.

VENTILATION: Provide sufficient ventilation to keep dust/ airborne particulate and organic vapor concentrations below OSHA personal exposure limits (PEL). Remove all smoke, dust, or fumes formed by welding, flame cutting, sanding or grinding surfaces coated with this material. Provide proper respiratory protection if ventilation or exhaust is inadequate.

SKIN PROTECTION REQUIREMENTS: Chemical resistant gloves are recommended, neoprene, nitrile, or butyl rubber. Cover as much of the exposed skin as possible with appropriate impervious clothing. If skin creams are used, keep the area protected by the cream to a minimum. Do not use skin creams to protect skin when working with acids or acid catalysts.

EYE PROTECTION: Eye protection should be worn in any type of industrial operation. The use of chemical goggles and a full face shield to prevent splash from liquids is recommended. Contact lenses should not be worn.

OTHER PROTECTIVE EQUIPMENT: The use of chemical resistant protective suit is suggested. Avoid any skin contact with vapors, mists, or spray. Prevent contact of materials with clothing if possible. Remove and wash contaminated clothing before re-use. Use an industrial type professional cleaning service, do not wash at home. Do not wear contaminated clothing or shoes away from the workplace. Leather products contaminated with this product should be discarded.

HYGIENIC PRACTICES: Emergency eye wash stations and safety showers are recommended. Wash hands prior to eating, using the washroom or smoking. Precautions must be taken so that persons handling this product do not breathe the vapors or have it contact the skin or eyes. In spray operations, protection must be afforded against exposure to both vapor and spray mist.

# SECTION IX – SPECIAL PRECAUTIONS

--------------------------------------------------------------------------------

PRECAUTIONS TO BE TAKEN IN HANDLING AND STORAGE: Follow safe warehousing procedures. Avoid puncturing the container. Keep containers away from excessive heat. KEEP FROM FREEZING!

OTHER PRECAUTIONS: Maintain a clean work area. Use only in a well ventilated area. VHAP=VOLATILE HAZARDOUS AIR POLLUTANT CAUTION! DO NOT TAKE INTERNALLY. Avoid breathing vapor/dust.

WARNING! This product contains chemicals known to the State of California to cause cancer or reproductive harm.

NOTICE: The HMIS rating for this material involves data and interpretations compiled from the various material suppliers of the component ingredients. This information will vary from supplier to supplier. The rating is intended for rapid and general identification of this product's hazards. To adequately deal with the safe handling of this material, all

information contained in the MSDS must be reviewed as part of an ongoing Hazard Communication Program.
This product complies with the Toxic Substances Control Act (TSCA) 40 CFR 700-799. The Material Safety Data Sheet (MSDS) complies with 29 CFR 1910.1200, Hazardous Communication Std. In the event of a TRANSPORTATION RELATED INCIDENT involving this product, CALL 1-800-688-4005. VOC content is determined by EPA method 24.



# EXPERT REPORT

*Republic Services of Indiana, L. P.*
*v.*
*Coe Heating and Air Conditioning, Inc. et al.*

United States District Court, Northern District of Indiana,
Fort Wayne Division

Case No.  1:21-cv-00108

Prepared for:

Gardner & Rans P.C.
117 Perspective Drive, Suite 2
Granger, IN  46530

Prepared by:

Laurel V. Mason, ABC-FD
Analytical Forensic Associates
3100 Five Forks Trickum Road, Suite 104
Lilburn, GA  30047

Report Date:  January 6, 2023
AFA Case #:  2211-1256

## TABLE OF CONTENTS

SECTION

I.    SUMMARY

Assignment
Scope

II.   SYNOPSIS OF ACTIVITIES
III.  ANALYSIS

Background
Summary of Reports by James Foster
Summary of Report and Deposition of Sharee Wells
Review of Safety and Technical Data Sheets

IV.   CONCLUSION AND OPINIONS
V.    DISCLOSURE
VI.   SIGNATURE
VII.  ATTACHMENTS
A.  Curriculum Vitae of Laurel V. Mason
B.  Fee Schedule of Analytical Forensic Associates
C.  Testimony List of Laurel V. Mason

# SUMMARY

## ASSIGNMENT

On November 29, 2022, I was requested by Martin Gardner of Gardner and Rans, P. C. to review information regarding a fire incident that occurred at the Republic Services facility located in Ft. Wayne, Indiana.   I was provided with a copy of a Certified Laboratory Report, dated April 14, 2020, generated by forensic scientist Sharee Wells with Forensic & Scientific Testing, Inc. (FAST) (Case #: FRM-3-62249) as a result of the analysis of evidence submitted by fire investigator James Foster with Rimkus Consulting Group, Inc. (Rimkus).  I was also asked to review the photographs, safety data sheets (SDS), and a rough draft deposition with exhibits of Sharee Wells taken on August 31, 2022, as well as her entire file containing the analytical test data, evidence forms, emails, and invoices.

## SCOPE

Specifically, Analytical Forensic Associates was requested to review provided documents to formulate an opinion as to the sampling and analysis of the evidence recovered from the fire scene to check for ignitable liquid residues and to determine the likelihood of the ignition of paint due to the use of the recently installed Space-Ray® heaters.

# SYNOPSIS OF ACTIVITIES

1.) On September 14, 2022, I was contacted by attorney Martin Gardner (M. Gardner) of Gardner and Rans P.C. and briefly discussed the loss and possible assignment.

2.) On November 29, 2022, various documents were received from M. Gardner with various documents which included the rough draft deposition of Sharee Wells with FAST, evidence custody forms, letters, analytical test data, invoices, safety data sheets email correspondence. I was also provided the Report of Findings dated December 3, 2019 generated by James P. Foster with Rimkus as well as seven unidentified photographs reportedly taken at the loss.

3.) On December 1, 2022, I was provided via email from attorney M. Gardner the Expert Report and associated exhibits generated on November 18, 2022, by James P. Foster CFI, CFEI, CVFI, Zionsville, IN.

4.) On December 30, 2022, I was provided via email from attorney M. Gardner a Rimkus evidence list, email communications, evidence custody form and six photographs of the areas where samples were recovered by Mr. Foster.

5.) On January 6, 2023, I was provided via email from attorney M. Gardner two additional photographs identified as Republic 00664 and 00672.

6.) In addition, the following documents have been reviewed:

   a. ASTM E1188-11 (2017) - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*
   b. NFPA 921 (2017 edition) – *Guide for Fire and Explosion Investigations*
   c. NFPA 1033 (2014 edition) – *Standard for Professional Qualifications for a Fire Investigator*
   d. Lentini, John J., *Scientific Protocols for Fire Investigations*, 2006, CRC Press, (pp 115-116)
   e. IAAI – Online Fire Scene Evidence Collection Guide (https://www.firearson.com)
   f. ASTM E1188-11 (Reapproved 2017) - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*
   g. ASTM E1412-19 - *Standard Practice for Separation of Ignitable Liquid Residues from Fire Debris Samples by Passive Headspace Concentration with Activated Charcoal*
   h. ASTM E1618-19 -

i.  *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris*

j.  NFPA 33 (2018 edition) - *Standard for Spray Application Using Flammable or Combustible Materials*

# ANALYSIS

## BACKGROUND

Information provided indicates that on March 3, 2019, a fire occurred at the Republic Services facility located at 6321 MacBeth Road, Ft. Wayne, Indiana which was reported at 11:15 pm.  Republic Services is a recycling and waste facility.  During the normal course of business, dumpster maintenance and repair are conducted which includes sanding, welding, patching, and repainting dumpsters.

## SUMMARY OF REPORTS BY JAMES FOSTER

Mr. James Foster with Rimkus was retained by CCMSI to determine the origin and cause of the fire. Mr. Foster visited the loss site on March 21, 2019.  A second visit on May 10, 2019, was conducted to uncover recently installed heaters, and finally, a joint examination with representatives from Coe Heating and Air Conditioning, Inc. was conducted on July 2, 2019.

In his report dated December 3, 2019, Mr. Foster indicated there had been sanding and painting during the day of the fire and that those operations were concluded around 3:00 pm after which time the employees cleaned where maintenance activities, which included welding, painting and sanding, had been conducted.  Additionally, Mr. Foster stated, welding operations that occurred earlier in the day had concluded at 11:00 am, no combustible materials were located in the area of the welding, and that there were no indications of any problems or issues from the time of welding until the reported time of the fire.  Mr. Foster reported that employees left the facility between 4 and 4:30 pm and a facility manager inspected the work area between 6 and 6:30 pm and did not observe any problems.

Mr. Foster indicated three Space-Ray® Ceiling tube infrared heaters, model PT125-30L5, supplied by electrical power and propane as the fuel had recently been installed in the welding and painting area and no problems had occurred prior to the event on March 3, 2019.

Mr. Foster concluded that there was a fire inside the maintenance structure of Republic Services that originated at the south end of the facility where the ceiling tube heaters had been installed and the cause of the fire was a direct result of the Space-Ray® infrared heaters in the painting area.  **Mr. Foster opined "the only ignition source identified was** the tube heaters that was (sic) thermostat controlled.  When the hearer (sic) activated, the spark to ignite the gas and heat ignited the combustibles that had accumulated on **the surface and burners of the tube heaters."  Mr. Foster goes on to say that after the heaters were uncovered for examination, "paint** and debris were observed on the tube

heaters, the deflectors, and inside of the ventilation tubes of the **heaters."**  He does not describe what methodology he used to exclude other sources of ignition when he readily identified cutting and welding operations were part of the use of this space.  Furthermore, he does not identify potential electrical sources of ignition or how they were excluded nor how potential gas leaks from the existing gas system were eliminated.  **His report states that "the facility did** not meet NFPA code or compliances of a spray booth**".**  A lay reading of NFPA 33, *Standard for Spray Application Using Flammable or Combustible Materials* (2018 edition) reveals specific requirements for fire sprinkler protection, separation of spray areas or room from other uses, explosion proof receptacles and light fixtures, spray filters and flammable liquid storage requirements.  None of these items are discussed in **Mr. Foster's report nor does he describe what he based his opinion that the space met the requirements of a "spray booth" as he claims.**

Photograph 2 of his December 3, 2019 report, labeled *Paint and other combustibles material inside ventilation pipe of the tube system* appears to be charred material with no blue paint visible.  Photograph 3 of the same report, labeled *Tube heater components and paint of reflector of unit (sic), In area (sic) of fire origin* reveals the tube of the heater on the left side of the photograph and the reflector in the center of the photograph.  No blue-colored paint is visible on the tube or reflector.  Blue material is easily identifiable on the right side of the photograph which appears to be the floor area upon which the tube heater is resting.  Photograph 4 is labeled *Tube heater and paint on reflector along with charring and more heat on this heater unit than others. Indication of area*, indicates no blue paint on the tube, however, heavy soot is observed on the tube as well as on the deflector.  No blue paint is observed in the photographs on the deflector but is visible on the floor area below the tube heater.

In **Mr. Foster's Expert Report dated November 18, 2022**, he indicated a joint examination was conducted on March 3, 2020, at which time the heaters were uncovered from the debris for examination, **and he observed "paint and other debris on the tube heaters, on** the reflector assembly around the tube heaters, and inside the ventilation tubes of the **heaters."  He additionally states, "a** build-up of paint was observed in the ventilation **pipe and reflector assembly of other tube heaters and in the tube heater of fire origin."** He does not describe how excluded the possibility of paint transfer from collapsed debris onto the tubes or reflectors after being covered for months under debris.

**Mr. Foster indicated that "paint samples and other debris samples from inside the tube heaters" were taken and submitted to Sharee** Wells of FAST **in Thorsby, Alabama "which** came back positive for (sic) **petroleum distillate, consistent with ignitable liquids."**  He does not exclude the possibility of paint and other debris being inside the otherwise sealed tube as being a result of the fire.  In addition, Mr. Foster does not explain how paint survived the effects of heat from the fire when on the object he cites as the cause while other painted surfaces were highly oxidized as shown in his photographs.  Photographs marked **"Exhibit F"** shows open or damaged paint cans in an unsecured locker.  The Rimkus *Evidence Custody Form*, RCG File No. 58406186, identifying samples

collected by James Foster on May 10, 2019, was received on March 11, 2020, by Sharee **Wells, along with three pieces of evidence labeled by Mr. Foster as "Exhibits A, B, and C".  The samples were further identified as swab**s, each contained in separate one gallon cans.

An additional Rimkus *Evidence Custody Form*, RCG File No. 58406186, identifying a one quart can, labeled **"Exhibit A"** identified as containing paint for testing collected by James Foster on March 6, 2020, was received by Ms. Wells on March 11, 2020.  Of note, in the *Change of Evidence Custodian* portion of the form, Ms. Wells identified the paint as **"Exhibit D".  An additional sample, "Exhibit E", identified as a comparison CVS gauze is** also identified on the *Change of Evidence Custodian* portion of the form and was identified as received by Ms. Wells on April 13, 2020, via USPS.  Furthermore, there is no explanation in the FAST report or on the *FAST Worksheet* as to how Ms. Wells **converted Mr. Foster's lettering system to her numbering system or the duplicate letter** usage.

Photographs provided by M. Gardner on December 20, 2022, have been identified as the location of samples recovered by Mr. Foster for submission to FAST for testing. Photograph *Republic 00603* depicts a one gallon metal can with a top on the container, an oxidized flue pipe immediately to the left of the evidence container, and a tent **evidence marker labeled "A"** on top of a flue pipe which is depicted at an angle from the bottom right to the top left of the photograph.  Photograph *Republic 00603* does not identify the area swabbed with gauze nor does it show the gauze prior to and after sampling or the one gallon sample container containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. Blue paint is not observed in the photograph.  The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in **"Exhibit A" was** collected from the south end heater and inside tubes.

Photograph *Republic 00632* depicts a one gallon metal can on the bottom right of the photograph.  No top is observed on the gallon can which contains a small amount of unidentifiable debris.  To the left of the evidence container, from the bottom left to the top right in the photograph is a tube heater and reflector.  A tent evidence marker also labeled **"A" is on the bottom area of the tube itself.  Soot marks are clearly visible on the** tube and the reflector **and there is an area below tent marker "A" where the soot on the** tube has been removed or disturbed.  Blue paint is not observed on the tube heater or reflector but is visible in the area beneath the tube heater.  Photograph *Republic 00632* as well as *Republic 00603* **are each identified with tent marker "A"** however the markers are clearly placed at different locations within the fire scene.  The area or areas swabbed are not identified in either of the photographs.  Neither photo depicts gauze pad(s) nor does it show gauze prior to and after sampling or the one gallon sample can containing the gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* indic**ates the swabbing in "Exhibit A" was collected from the south end heater and inside**

tubes, however, based on the photographs provided it is not clear where the evidence transferred to the swab(s) was collected.

Photographs *Republic 00626* and *Republic 00638* each depict a one gallon metal can with a top **next to a tent evidence marker labeled "B"**. The gallon can is sitting on debris and a flue pipe is disconnected at the top center of the photograph. The flue pipe exhibits significant oxidation. Photograph *Republic 00656* additionally has a tent marker **labeled "B". This** photograph has a one gallon evidence can with an intact lid as seen in the bottom left area of the photograph. To the immediate right of the gallon evidence can are two crossed pieces of tubing. To the right of the crossed tubing is a tent **evidence marker labeled "B". In between the crossed tubing is** a larger open tube. The **location of tent marker "B" is obviously different than the location as observed in** *Republic 00626* and *Republic 00638*. None of these photographs identify the area or areas swabbed with gauze nor does it show any gauze prior to and after sampling or the one gallon sample can containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* **indicates the swabbing in "Exhibit B" was collected from the** central tube heater however, based on the photographs provided it is not clear where the evidence transferred to the swab(s) was collected.

Photograph *Republic 00665* depicts a one gallon metal can with the lid in place on the container which is located in the center portion of the photograph. To the left of the evidence container, from the center to the bottom left of the can is a flue pipe. Between the flue pipe and the evidence container is a tent evidence marker **labeled "C"**. Photograph *Republic 00672* depicts a one gallon metal can, with no lid visible on the container or in the photograph, located in the approximate center of the photo. To the left of the evidence container is a flue pipe and unidentifiable metal debris. To the top and right of the evidence container is visible blue material. A tent evidence marker labeled "C" is to the bottom right of the container. This evidence container and tent marker "C" is in a completely different location than that observed in *Republic 00665*. Neither of these photographs depict gauze pad(s) nor do they show any gauze prior to and after sampling or the one gallon sample can(s) containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in **"Exhibit C" was collected from the** north end of tube heater, however, based on the photograph provided it is not clear where the evidence transferred to the swab(s) was collected.

Properly labeled evidence containers and proper photo documentation of the evidence prior to, during, and after collection is of utmost importance to protect the evidentiary value of any artifacts collected from the fire scene. As stated in *Scientific Protocols for Fire Investigators* by John J. Lentini (2006 edition pp 115-116):

"The labeled containers should be placed at the location where the sample will be collected and photographed in place before the sample is placed in the can. A second photograph should be taken showing the sample in the can next to the former location of the sample.  The location of the samples is the single most important attribute of the sample, so it is important that this information be thoroughly documented."

As found in ASTM E1188 - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator:*

> 3.3 *Photographic Documentation:*
> 3.3.1 Commence photographic documentation as soon as possible after the incident. Document the scene of the incident and the condition of items involved.
> 3.3.2 Potential evidence should be photographed in the position where it is first observed by the investigator. If items involved in the incident are disassembled or subjected to destructive testing, each step of the disassembly or testing shall be documented by contemporaneous photographs or videotaping.
> 3.3.3 The photographic technique utilized should be of sufficient resolution to preserve the essential aspects of the appearance of the evidence being photographed, and should also be capable of producing images that can be reproduced and enlarged. The date, time, and location of the photography or videotaping, and the identity of the photographer or videotaper shall be documented.

In this case, there are no photographs documenting the collection of the evidence, the evidence after collection, or the tape sealed labeled evidence containers.

The *Fire Scene Evidence Collection Guide* published on the International Association of Arson Investigators (IAAI) website **instructs the investigator to "s**eal the container(s) with evidence tape. Initial and date the tape. Label each container with identifying information, including case number, date, exhibit number, a brief description including recovery location, and your name."  **There is no indication in any of the photographs of** the evidence that the samples were labeled, or tape sealed.  Furthermore, there was no documentation on the Rimkus *Evidence Custody Form* (Wells Deposition BS pages 2 and 3), on the *FAST Laboratory Worksheet* (Wells Deposition BS page 19), or on the *FAST Certified Laboratory Report* dated April 14, 2020, shows that any of the evidence was tape sealed.

In addition, two samples collected from the fire scene collected at different times by Mr. Foster were both labeled **"Exhibit A"  (Wells Deposition BS page**s 2 and 3).  Any evidence collected from the fire scene should have unique identification so as not to confuse different pieces of evidence collected from the same fire scene.  ASTM E1188 *Standard*

*Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator* states:

> 3.2.3 Assign a unique identifier to each item collected and include this information in a label securely attached to the item or as documentation on **the item's container and enter the** identifying information on a log sheet together with a brief description of the item. The evidence documentation should also clearly include any specific details necessary for the preservation of the item, such as temperature control or special handling instructions.

NFPA 921

> 16.2.8.8 Evidence Photographs. Items of evidentiary value should be photographed at the scene and can be rephotographed at the investigator's office or laboratory if a more detailed view is needed. During the excavation of the debris strata, articles in the debris may or may not be recognized as evidence. If photographs are taken in an archaeological manner, the location and position of evidence that can be of vital importance will be documented permanently. Photographs orient the articles of evidence in their original location as well as show their condition when found. In an evidentiary photograph, a ruler can be used to identify relative size of the evidence. Other items can also be used to identify the size of evidence as long as the item is readily identifiable and of constant size (e.g., a penny). A photograph should be taken of the evidence without the ruler or marker prior to taking a photograph with the marker (see 17.5.2.1).

SUMMARY OF REPORT AND DEPOSITION BY SHAREE WELLS

Ms. Sharee Wells with FAST was retained by Mr. Foster to analyze three, one gallon cans, Exhibits "A", "B" and "C" (Wells Items 1, 2, and 3 on FAST Certified Laboratory Report) each containing samples collected from tube heaters for the presence of **"flammable, combustible or ignitable liquids"**. A one quart can identified as containing paint Exhibit "D" (Wells Item 4) was also submitted by Mr. Foster who requested in his **March 6, 2020 letter to Ms. Wells to "test for contents that make up the product. This** is the item I spoke to you in reference to when the paint dries it has properties similar to Class II and Class III liquids. I have enclose a **copy of the MSDS as well."**

The *FAST Laboratory Worksheet*, dated March 11, 2020, Case Number: 62249, indicated Items 1, 2 and 3 are one gallon cans and Items 4 and 5 are one quart cans. It is unclear, based on the Rimkus *Evidence Custody Form* and the *FAST Laboratory Worksheet* if the comparison sample, "Exhibit E" (Wells Item 5) was submitted in a one quart can or transferred into a new, unused can to recover any volatile components. Again, there is

no explanation in the FAST report or on the *FAST Worksheet* as to how Ms. Wells **converted Mr. Foster's lettering sys**tem to her numbering system or the duplicate letter usage.

Ms. Wells indicated the volatile components were recovered from the samples using ASTM E1412-19 *Standard Practice for Separation of Ignitable Liquid Residues from Fire Debris by Passive Headspace Concentration with Activated Charcoal* and analyzed using ASTM E1618-19 *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris*.  Both the recovery and analytical test methods are the generally accepted test methods in the forensic field of fire debris analysis to check for ignitable liquids.

Ms. Wells concluded the following in her April 14, 2020 report:

> Items 1 and 2 contained a similar mixture of an aromatic product, a medium petroleum distillate and a heavy petroleum product.

> Items 3 and 4 contained a similar mixture of an aromatic product and a medium petroleum distillate.  Items 3 and 4 did not contain a heavy petroleum product.

> Products in the range of a heavy petroleum product include, but are not limited to, some types of, (sic) some types of vehicles used in staining products, mineral sprits and other proprietary formulations.

> No ignitable liquid residues were identified in Item 5, the comparison gauze.

A**lthough there was no indication of a "flame test" being conducte**d on Item 4, in her test report, **Ms. Wells worksheet indicated "Flame Test Neg #4."**

In Ms. Wells deposition (no page or line number referenced on deposition) she was **asked to explain "in detail what a flame test is and how you do it in as much detail as** you can?**"**

> **A.**   So when I'm asked to perform a flame test, we're simply trying to determine whether or not the liquid that I have is ignitable.  And so one of the first things that we will do is just take, like, a Q-Tip - - a long Q-Tip and submerge it into the liquid just enough to wet the - - the applicator tip of the cotton.

> And we then just take a light and we light that off to see whether or not it will ignite; whether or not it will sustain a flame.  And we notate the color of the flame.  If I do not n**otate it, it would have been negative.  If it would've been positive, I would've notated a black or blue color on that.**

Q.  Right.  And I believe in connection with this flame test, you said it was from item number four, which is the medium blue WR protective enamel by Chaboygen (sic) Paint Company?

A.  Correct.

A thorough review of the chromatographic data, selected ion profiles, mass spectral data and library search report data (BS 20-90) generated as the result of the analysis of the four samples and the comparison sample reveals the analytical test results are consistent with the results reported in Ms. Wells report.


REVIEW OF SAFETY AND TECHNICAL DATA SHEETS

Several Safety Data Sheets (SDS) and formally known as Material Safety Data Sheets (MSDS) were provided to me to aid in interpreting the results of the analysis of the evidence and to form an opinion as to the source of the ignitable liquid residues detected in the samples.  I reviewed the SDS for the following products which were identified as used in the painting and maintenance area of the loss:

1. Medium Blue WR Protective Enamel – Sheboygan Paint Company, Sheboygan, WI.
2. Herculiner™ Protective Coating – Old Word Industries, LLC, Northbrook, IL.
3. J-B Weld Herculiner Roll-on Black – J-B Weld Company LLC, Sulphur Springs, TX.
4. PB Penetrating Catalyst, 16-PB, 8-PB, 8-PBS, PBTS, 20-PB, 26-PB, The Blaster Chemical Companies, Inc., Valley View, OH.
5. Brakleen® Brake Parts Cleaner – 29 oz, CRC Industries Warminster, PA.
6. Technical Data Sheet for Water-Reducible Protective Enamel – Water-Reducible Alkyd Top Coat – Sheboygan Paint Company, Sheboygan, WI.


Three of the products, Herculiner Protective Coating, J-B Weld Herculiner Roll-on Black and the PB Penetrating Catalyst, contained aromatic products as identified in the FAST report.  The Herculiner Protective Coating and the J-B Weld Herculiner Roll-on Black were both identified as flammable liquids.  These products may or may not be the source of the aromatic products detected in Items 1, 2, 3 and 4.

The Medium Blue WR Protective Enamel is composed primarily of water (~50 % by weight) and an unidentified solvent (~13 % by weight).  The SDS did not identify the solvent, however, based on the analysis of the paint sample by Ms. Wells, the solvent is most likely a combination of an aromatic product and a medium petroleum distillate. This product was also reported by Ms. Wells in her deposition and on her worksheet as

not supporting combustion. The SDS did not identify the composition of the solvent. Regarding flashpoint and flammability, the following was stated in the SDS:

> EXTINGUISHING MEDIA:  Water based product.  Flashpoint for this product is listed as N/A or Not Applicable due to the presence of water.  If water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid. If needed, extinguishing agents for Class B fires may be used.

The PB Penetrating Catalyst was identified as containing heavy aromatic naphtha, a heavy petroleum distillate, and a hydrotreated light distillate. Hydrotreated light distillates are chemically consistent with medium petroleum distillates.  This product may or may not be the source of the medium petroleum distillate detected in Items 1, 2 and 3 and the heavy petroleum products detected in Items 1 and 2.

## CONCLUSIONS AND OPINIONS

Based on my training, experience, and following scientific methodology for the preservation, collection, and analysis of evidence from fires, which includes the behavior of flammable and combustible liquids, and all the information gathered to date it is my opinion within a reasonable degree of scientific certainty in my field that the Medium Blue WR Protective Enamel manufactured by Sheboygan Paint Company, in either liquid or solid form, does not support combustion.  Based upon the photo documentation from Mr. Foster, as well as the evidence documents, the samples of residue were taken from inside flue ducting that existed for a prior heating system which explains the presence of aromatic and petroleum distillates detected by Ms. Wells of FAST.  Further, any build up of residue on the tube heaters would not support combustion given the fact that welding and grinding on painted dumpsters by maintenance workers is routine and there is no evidence supporting that the paint on these dumpsters or paint during the application process has previously ignited during these operations.

The analysis and opinions of Mr. Foster are rooted in speculation and data that are not applicable and incomplete.  While the presence of aromatic products and petroleum distillates is expected to be present in the Medium Blue WR Protective Enamel used, based on the analysis of the liquid conducted by Ms. Wells, and the review of the SDS, there is no indication that the levels in the product are sufficient to be ignitable or **communicate a fire.  In Mr. Foster's December 3, 2019** *Report of Findings*, and in his November 18, 2022, *Expert Report*, he **concludes "paint and other flammable products** used in the repair of trash dumpsters collected on the tube **heaters and ignited."**  He inappropriately determined that the building in which the fire occurred was a paint booth, and the use of the tube heaters were prohibited.  Mr. Foster does not acknowledge that the plain language definition of paint booths, paint areas, etc. as stated in NFPA 33 shows the building did not meet the requirements of this Code.  His report does not **reconcile how "paint and other flammable products" survived on the very object he** claims to have been the cause of the fire while other painted surfaces were consumed. **Moreover, he does not describe how "paint and other flammable products" were the** cause of the fire to the exclusion of other known sources of ignition in the building.  His opinion that the installation of the Space-Ray® tube heater was prohibited, and its subsequent use was the cause of the fire is speculative, has no scientific basis, and is unfounded.

# DISCLOSURE

This report discloses the expert opinion of Laurel V. Mason, ABC-FD, Forensic Scientist and Laboratory Director for Analytical Forensic Associates, as submitted to Martin J. Gardner, Gardner & Rans P.C., 117 Perspective Drive, Suite 2, Granger, Indiana. Mr. Gardner represents Coe Heating & Air Conditioning, Inc. regarding this loss. My role as an expert witness, in this case, is limited to the sampling and analysis of the samples recovered from the fire scene to check for ignitable liquid residues and to determine the likelihood of the ignition of paint due to the use of the recently installed Space-Ray® heaters.

Specifically, this report documents the entirety of the review documents provided regarding the collection of the evidence from the fire scene examination.  This report will consist of reports, a deposition, evidence custody forms, letters, analytical test data, safety data sheets, email correspondence and information obtained from outside sources.

The report may be amended at a later date if additional information becomes available through firsthand observation, further analysis, facts presented to experts prior to court through deposition or other disclosures, or facts supplied in court which have a direct bearing on this analysis.

# SIGNATURE

I hereby certify that the opinions and conclusions in this report have been formulated within a reasonable degree of scientific certainty in reference to the review and evaluation of the documents provided regarding the fire loss at the Republic Services facility located in Ft. Wayne, Indiana.

Sincerely,

Laurel V. Mason, ABC-FD
Analytical Forensic Associates
Phone:  770-982-0210
Email:  laurel@afalabs.com

3100 Five Forks Trickum Road • Suite 104
Lilburn, GA  30047
Phone:  770.982.0210 • 877.FIRELAB
Fax:  770.982.0206
www.afalabs.com

# Curriculum Vitae of Laurel V. Mason, ABC-FD
## Forensic Scientist

## Capabilities

She can chemically analyze physical evidence recovered from the fire scene to determine the presence of ignitable liquids, vegetable oils or explosive residues.  She can evaluate the validity of the analysis and analytical techniques of other scientists through review of data, reports and testimony.  She is capable of performing various types of instrumental and chemical analysis, reporting the results in a clear, concise format as well as providing expert testimony as to the results of her analyses.

## Analytical Forensic Associates Responsibilities

President / Laboratory Director / Senior Forensic Scientist:  1992 to present.

She developed and manages the operation of the analytical laboratory at Analytical Forensic Associates.  Her responsibilities include the direction of laboratory services pertaining to chemical analysis of ignitable liquids in fire debris, reporting of the results, protecting the evidence and testifying as to the results of those analyses.  She routinely conducts additional chemical analyses of fire evidence including the recovery and identification of vegetable oil residues and evaluates the validity of the work of other scientists through review of reports, testimony and other data as well as providing litigation support.  She is responsible for laboratory management, training and quality assurance.  She conducts preliminary evaluations of client problems, evaluates the chemical interactions and reactions of components specific to fire losses.  She is also capable of performing many types of chemical and instrumental analyses, including GC-MS, FTIR and light microscopy and giving expert testimony as to the results of those analyses.

She has analyzed or supervised the analysis of over one hundred fifty thousand fire debris samples since 1981 and has testified as an expert witness in Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Maine, Minnesota, Missouri, Michigan, New York, North Carolina, Oklahoma, Pennsylvania, Tennessee and West Virginia.

## Experience

Applied Technical Services, Inc.:  Forensic Chemist:  1981 to 1992.

She managed the day to day operation and maintenance of the fire and arson laboratory at Applied Technical Services.  She developed and implemented quality control and analytical procedures pertaining to the analysis of flammable and combustible liquid residues present in fire debris, reporting the results and protecting the evidence.  She analyzed physical evidence to substantiate the quality and/or legitimacy of the samples and conducted preliminary evaluations of customer problems.  Examined and identified microscopic fibers and particles and utilized

## Experience (continued)

working knowledge of gas chromatography, thin layer chromatography, infrared spectrophotometry, gas chromatography/mass spectrometry, and polarized light microscopy. **She developed the Company's capabilities in gas chromatography/mass spectrometry, asbestos** analysis, and radon testing.

## Education and Professional Training

Bachelor of Science in Biology, Mercer University, 1981.

**Workshop:  "What They Don't Know Can Kill You", AAFS, Virtual Meeting, February 2021.**

**Workshop: "A Decade later:  The State of Florida Vs. Casey Anthony Revisited –** Truth? Justice? **Both? Neither?", AAFS, Baltimore, MD, February 2017.**

**Workshop: "The Evolution of** Daubert and It**s Effects on the Forensic Sciences", AAFS, New** Orleans, LA, February 2017.

Workshop: **"Modern Challenges in Fire Debris Analysis", AAFS,** Orlando, FL, February 2015.

Workshop: **"Your Attention Please: A Public Speaking Workshop",** AAFS, Orlando, FL, February 2015.

Workshop: "Preparation and Strategic Planning for Accreditation of Forensic Laboratories Based on the ISO/IEC 17025 International Standard", AAFS, Atlanta, GA, February 2012.

Workshop: "Estimating the Uncertainty of Measurements in the Modern Forensic Laboratory: Compliance with ISO 17025", SAFS, Tunica, MS, September 2010.

Workshop: "Expert Witness Testimony Techniques for Forensic Scientists in a Post Daubert and NAS Report Environment", SAFS, Tunica, MS, September 2010.

Workshop: "Introduction to the Analysis of Explosives", SAFS, Tunica, MS, September 2010.

Workshop "Fires and Explosions:  A Multidisciplinary Overview of Investigative Methods, Mental States of Perpetrators, and Psychological Trauma to Victims", AAFS, Seattle, WA, February 2010.

Workshop: **"Don't Bomb in Court: How Arson and Bomb Scene Investigators and Laboratory** Personnel Can Survive in a Daubert or Frye Scientific Evidence Hearing in Court", AAFS Washington, DC, February 2008.

73rd, 71st, 69th, 68th, 67th, 66th, 64th, 62nd, 60th and 44th Annual Meeting of the American Academy of Forensic Sciences (AAFS), 2021, 2019, 2017, 2016, 2015, 2014, 2012, 2010, 2008 and 1992. Participant in the Fire Debris Discussion Group at each meeting.

Southern Association of Forensic Scientists Annual Training Meeting, 2010 and 1993.

Southeastern Annual Training Conference, 2009 – 2016.

64th, 63rd, 62nd, 61st, 59th, 57th, 56th, 54th, 53rd, 50th, 49th, 47th, 45th and 37th Annual Meeting of Meetings of the International Association of Arson Investigators (IAAI).

Southeastern Arson Seminar (GA-IAAI), 1997 – 2020.

**Georgia Fire Investigator's** Association Spring Seminar (GFIA), 1994 – 1995, 2003 – 2008, 2010 – 2013, 2015 - 2021.
Mass Spectral Interpretation of Arson Samples, Charleston, SC, September 1993.

## Education and Professional Training (continued)

38th, 39th and 40th Annual Fire and Arson **Investigator's Training Conference, Oklahoma Chapter** of the IAAI, 1992 - 1994.

3rd and 4th International Symposium on Recent Advances in Arson Analysis and Detection (AAFS), 1990 and 1992.

Bureau of Alcohol, Tobacco and Firearms Arson Accelerant Detection Course, Forsyth, GA, August 1989.

Seminar on Comprehensive Analytical Techniques, Perkin-Elmer Corporation, Norcross, GA, December 1988.

Short Course on Capillary Column Chromatography, Perkin-Elmer Corporation, Norcross, GA, July 1986.

Seminar on Modern Techniques of Fire and Arson Investigation, Marietta, GA, February 1985.

Short Course on Gas Chromatography, American Chemical Society (ACS), Atlanta, GA, 1982.

## Certifications

Fellow – American Board of Criminalistics, Fire Debris Specialist, Certificate #1736, Expiration July 2023.

A2LA Laboratory Accreditation in Forensic Testing, ISO/IEC 17025:2017 – Certificate #: 4964.01

## Professional Associations

Member and Fellow, American Board of Criminalistics, (ABC).

Member, American Academy of Forensic Sciences, (AAFS).

Member, Southern Association of Forensic Scientists, (SAFS).

Member, American Society of Testing and Materials, (ASTM)
E30 Committee Member-Forensic Science.

Member, National Fire Protection Association (NFPA).

Member, Atlanta Fire Evidence Discussion Group and Proficiency Testing in Fire Debris Participant.

Member, International Association of Arson Investigators (IAAI).
   Chair of Forensic Science Committee, 1999 to 2001.
   Co-Chair of Forensic Science Committee, 1994-1999.
   Member of Forensic Science Committee, 1994 to 2004, 2007 to 2012.
   Chapter Liaison, 1997 to 2000.
   Member of Nominating Committee, 1999 to 2001.
   Member of Training and Education Committee, 2002 to 2003.

**Member, Georgia Fire Investigator's Association (GFIA), Georgia Chapter 8 of the IAAI.**
   Parliamentarian, 2021 - current
   Treasurer, 2011 to 2021.
   Presidential Award of Recognition, 2021.

## Professional Associations (continued)

GFIA Life Member Award, August 2014.
Training and Education Committee, 2003 to 2016.
Board Member, 2000 to 2008 and 2011 to 2021.
Editor of the *Fire Trailer News*, 2004 to 2006.
Webmaster of the GFIA website, 2004 to 2006.
2nd Vice-President, 2002 to 2003.
1st Vice-President, 2003 to 2003.
President, 2003 to 2004.

**Member, Metro Fire Investigator's Association, Past President** – 1996.

Member of the Georgia, Florida, South Carolina, California, Iowa, Indiana, Illinois, Kansas, Louisiana, Ohio, Pennsylvania, Alberta, CN, and Taiwan Chapters of the IAAI.

Member, American Association for Laboratory Accreditation (A2LA), 2019 to present.

Member of the American Chemical Society (ACS).

## Publications and Presentations

"Isolation of Accelerant-Like Residues from Roof Shingles Using Headspace Concentration", (co-authored with J. J. Lentini), *Arson Analysis Newsletter*, Vol. 6, No. 3, May 1982.

"The Behavior of Flammable and Combustible Liquids" (co-authored with J. J. Lentini), *The Fire and Arson Investigator*, Vol. 42, No. 1, September 1991.

"Multiple Analysis of Fire Debris Samples Using Passive Headspace Concentration" (co-authored with L. A. Palmer), *Journal of Forensic Sciences*, Vol. 38, No. 1, Jan. 1993.

Presentation: "Evidence, Collection and Preservation", 39th IL-IAAI Annual Training Conference, Peoria, IL, 20 October 2022.

Presentation: "Evidence, Collection and Preservation", Arizona IAAI Annual Advanced Fire Investigators Seminar, Prescott, AZ, 28 July 2022.

Presentation: "Evidence, Collection and Preservation", Georgia Fire Investigators Association Spring Conference, Marietta, GA, 17 March 2022.

Presentation: "Fire Evidence: Collection, Preservation and Analysis", 24th Annual Fire Investigative Approaches Training Seminar – NC / SC Joint Conference, 22 October 2021, Myrtle Beach, SC.

Presentation: "Evidence, Collection and Preservation", Clermont County Fire Investigation Team Annual Winter Educational Seminar, Milford, OH, 18 February 2020.

Presentation: "Spontaneous Heating Fires with Vegetable Oils and Fats", IAAI – International Training Conference, Jacksonville, FL, April 2019.

Presentation: "Evidence Collection, Packaging, Preservation and Analysis of Fire Evidence", Florida Fire Investigator's Conference, Tampa, FL, 19 October 2017.

Presentation: "Evidence Collection, Preservation and Analysis of Fire Evidence", Indiana Chapter Annual Meeting, Plainfield, IN, 16 August 2017.

Laboratory Analysis Panel Round Table – IAAI ITC, 27 April 2016, Orlando, FL

## Publications and Presentations (continued)

Moderator, AAFS Criminalistics Scientific Session, 25 February 2016, Las Vegas, NV.

**Presentation: "Evidence Collection and** Preservation **– Forensic Laboratory Analysis", 7 July 2015,** Louisville, KY.

Presentation: **"Evidence Collection and Preservation – Forensic Laboratory Analysis", 21 July 2015,** Dallas, TX.

Presentation: **"Evidence Collection and Preservation – Forensic Laboratory Analysis", 23 July 2015,** Atlanta, GA.

Presentation: **"Evidence Collection and Preservation – Forensic Laboratory Analysis", 5 August** 2015, Baltimore, MD.

Moderator, AAFS Criminalistics Scientific Session, 28 February 2016, Las Vegas, NV.

Moderator, AAFS Criminalistics Scientific Session, 20 February 2015, Orlando, FL.

Presentation: **"What Happens at the Lab?"**, Tri-State Fire Investigators Meeting, 7 October 2014, Chattanooga, TN.

Co-Moderator, AAFS Criminalistics Scientific Session, 20 February 2014, Seattle, WA.

Presentation: "Laboratory Analysis of Evidence for Vegetable Oils / Analyst Certification and Accreditation", 34th Annual Training Conference, The Florida Advisory Committee on Arson Prevention, State Fire College, Ocala, FL, November 2011.

Presentation: "Laboratory Analysis of Evidence and Debris", 33rd Annual Training Conference, The Florida Advisory Committee on Arson Prevention, State Fire College, Ocala, FL, November 2010.

Presentation: **"Collection, Preservation, Packaging and Analysis of Fire Debris Evidence", 32**[nd] Annual Arson Seminar, PA, Association of Arson Investigators (PAAI), State College, PA, June 2009.

Presentation: **"Fire Debris Evidence:  Collection, Preservation, Packaging and Analysis",** Donan Engineering Company, Inc., Louisville, KY, January 2009.

Presentation: **"Laboratory Updates in Fire Debris Analysis",** Georgia Fire Investigator's Association Spring Seminar, March 2008.

Presentation: **"Evidence Collection", Southwest Georgia Fire Investigator's** Chapter Meeting, Cordele, GA, June 2007.

Presentation: **"Evidence Collection and the Ignitable Liquid Detection Canine",** Georgia Fire **Investigator's Association Spring Seminar, Athens, GA, March 2007.**

Presentation: **"Fire Evidence Collection", Columbus Fire Department, Columbus, GA, June 1998.**

Presentation: **"Fire Evidence Collection", Iowa Chapter of the International Association of Arson** Investigators Seminar, Ames, IA, September 1996.

Presentation: **"Fire Evidence Collection", 47th Annual International Association of Arson** Investigator's Seminar, St. Louis, MO, April 1996.

Presentation: **"Fire Evidence Collection", Alabama Association of Arson Investigator's** (AAAI) Seminar, Ft. Payne, AL, August 1995.

## Publications and Presentations (continued)

Presentation: **"Fire Scene Evidence Collection",** Georgia Fire Investigator's Association Conferences, Valdosta, GA, October 1993 - Dalton, GA, February 1995 and Albany, GA, March 1996.

**Presentation "**Multiple Analysis of Fire Debris Samples Using **Passive Headspace Concentration",** AAFS, New Orleans, LA, February 1992.

CURRICULUM VITAE

## *Michael A. Vergon; Certified Fire Investigator (IAAI-CFI #14-082131)*
### *Licensed in Indiana (PI21200027), Ohio (2012210012084), Michigan (3701206692), Kentucky (164751), and Illinois (115002639)*

Vergon and Associates Fire Investigation, LLC
14074 Trade Center Drive, Suite 250
Fishers, Indiana  46038
Telephone (317) 508-0527
Email: mike.vergon@vergonfireinvestigation.com
www.vergonfireinvestigation.com

---

## FORMAL EDUCATION

May, 1986; BA in Criminal Justice
Indiana University
Bloomington, Indiana

## EXPERIENCE / WORK HISTORY

2012 - Present   Owner of Vergon and Associates Fire Investigation, LLC

          Specializing in fire and explosion investigation and consulting for the insurance industry and law firms, and providing training and presentations as requested. Maintain IAAI- CFI certification and NFPA 1033 standards, and oversee the operations of the company and five IAAI-CFI investigators.

1997 – 2012   Special Agent/Certified Fire Investigator, ATF
          Indianapolis, Indiana (Retired October 31, 2012):

          Responsible for the investigation of violations of Federal and State arson statutes. Investigative functions included conducting origin and cause investigations and providing technical interpretation of fire-related information, including that related to complex, large loss and fatality fire scene investigation (whether incendiary or accidental); investigation of complex, multi-defendant arson-for-profit schemes; identification and collection of evidence; interview of witnesses; preparation of probable cause affidavits and the serving of arrest and/or search warrants; preparation and presentation of criminal case reports; court preparation and consultation with prosecuting attorneys; and providing testimony as warranted. I also maintained annual ATF CFI recertification standards by attending various in-bureau and out-bureau fire

Exhibit J

investigation related training programs and was responsible for conducting fire investigation related training.

Served as member of ATF National Response Team (2008 – 2012). Formed the Indianapolis Metropolitan Area Fire/Explosives Investigation Task Force (2010), serving in a supervisory capacity representing ATF.

| | |
|---|---|
| 1994 – 1997 | Special Agent/Project Officer<br>Intelligence Division, ATF Bureau Headquarters<br>Washington, D.C. |

Served as Program Manager for the Advanced Serial Case Management Program, at ATF Bureau Headquarters, in Washington, D.C., responding to high profile arson or bombing investigations throughout U.S., leading a team of analysts and data input personnel in lead control and analysis of critical and detailed lead information.

| | |
|---|---|
| 1989 - 1994 | Special Agent, ATF (High Intensity Drug Trafficking Area Task Force Group)<br>Miami, Florida |
| 1987 – 1989 | Deputy Sheriff, Collier County Sheriff's Office<br>Naples, Florida |

## EXPERT WITNESS TESTIMONY

Investigation of over 1000 fire scenes, including large, multi-million dollar loss and fire fatality scenes. Have testified as an expert witness in origin cause cases in State and Federal court.

2021 Gaylin Rose, Plaintiff, v Birch Tree Holdings, Llc, et al., Defendants; Case No. 2:18-cv-00197-JTM-JEM, United States District Court, Northern District of Indiana (Deposition)

2021 Indiana Farm Bureau Insurance as subrogee of Kenneth Beckley and Peggy Beckley v. Amazon.com, Inc., Guangdong Feilun Technology Industrial Co., LTD., SOWOFA US Store F/K/A SOWOFA CIUB; 1:19-cv-01568-JRS-TAB, United States District Court, Southern District of Indiana (Deposition)

2019 Nationwide General Insurance Company, as subrogee for Ryan Thomas, Plaintiff vs. Whirlpool Corporation, Defendant; 1:19-cv-000494-RLY-DLP, United States District Court, Southern District of Indiana (Deposition)

2019   Auto Owners Insurance Company vs James Dowdy and Mary Dowdy / James Dowdy, Mary Dowdy and American Bankers Insurance Company vs Brian Keilly and Karen Keilly; Cause #49D12-1702-CT-004990, State of Indiana, County of Marion (Deposition)

2018   Rama Arla and Mohana Arla vs. RTS Builders, Inc, Bittners, LLC, American Roofing & Metal Company, Inc., and Steinrock Roofing & Sheet Metal, Inc.; Commonwealth of Kentucky, Jefferson Circuit Court, Division XIII, Civil Action No. 15-CI-003260 (Deposition)

2017   Ball Corporation v. Air Tech of Michigan, Inc; 4:16-CV-00042-PPS-APR, United States District Court, Northern District of Indiana (Deposition)

2017   AMCO Insurance Company v. Lamont Fells and Christy Watts; Cause #32D024-1606-CT-94, State of Indiana; County of Hendricks (Deposition)

2017   Davion Allen v. Allstate Insurance Company; 2:16-cv-00310-PPS-APR, United States District Court, Northern District of Indiana (Trial)

2017   Ronald D. Liggett and Frances C. Liggett v. United Farm Family Mutual Insurance Company; Cause #38C01-1611-CT-15, State of Indiana; County of Jay (Deposition)

2017   State of Indiana (County of Warrick) vs. Dylan Wood; Cause #87D02-1507-F4-000283 (Trial)

2017   American Family Insurance Co. v. Ye Olde Chimney Sweep, LLC and Jim Voightschild; Cause No. 2-15-cv-00270-WTL-WGH, United States District Court, Southern District of Indiana (Deposition)

2016   Travelers Property Casualty Company of America vs Flaherty & Collins Construction, Development, LLC; Cause # 49D02-1011-CT-051350, State of Indiana; County of Marion (Deposition)

2016   State of Indiana (County of Marion) vs. Anthony Rothhaas; 49G04-1410-FS-048667 (Trial)

2015   State of Indiana (County of Starke) vs. James Campbell; 75C01-1403-PA-002 (Deposition and Trial)

2015   Travelers Property Casualty Company of America vs Flaherty & Collins Construction, Development, LLC; Cause # 49D02-1011-CT-051350, State of Indiana; County of Marion (Deposition)

32

2014  State of Indiana (County of Brown) v. James D. Bowyer; Cause #07C01-1203-FB-C000074 (Deposition and Trial)

2013  Ohrn v. JDPHD; Case No. 1:12-cv-0620 TWP-DML, United States District Court, Southern District of Indiana (Deposition)

2013  State of Indiana (County of Hamilton) v. Kaur; Cause #29D02-1012-FB-412 (Trial)

2013  Benjaman H. Durr and Wendy A. Durr v. USAA Casualty Insurance Company; 3:12-cv-00599-JTM-CAN, United States District Court, Northern District of Indiana (Deposition)

2010  State of Indiana (County of Marion) v. Brandon Burns; 49G06-0903-FB-035636 (Deposition)

2006  USA v. Romandine; 2:06-cr-0003-LJM-CMM, United States District Court, Southern District of Indiana (Trial)

2006  State of Indiana (County of Madison) vs. Darrin K. Dettra; Cause No. 48D03-0505-FA-207 (Deposition)

## PROFESSIONAL ORGANIZATIONS

1997 - Present: International Association of Arson Investigators (IAAI)

1997 - Present: National Society of Professional Insurance Investigators (NSPII, Indiana Chapter; State chapter president (2016).

2012 - Present: National Fire Protection Association (NFPA)

Past President of Indiana Chapter of IAAI; (2003 and 2008/2009)

Past President Indiana Arson and Crime Association (2003)

Founding member and past president: Indiana Fire Investigations Seminar

## AWARDS / COMMENDATIONS

2016  President's Award (National Society of Professional Insurance Investigators (NSPII)

2014  National Society of Professional Insurance Investigators (NSPII) Investigator of the Year Award (Indiana Chapter; Dennis Nebergall Award)

2012  State of Indiana, Office of State Fire Marshal's Meritorious Service Award

2011  Indianapolis Fire Department Public Service Commendation

2010  ATF Distinguished Service Medal

2009  International Association of Special Investigations Units (IASIU) National Public Service Award

2008  United States Attorney's Office Award regarding successful investigation of large scale arson-for-profit case (United States v. Kenneth Allen, et. al.) involving over seventy fires and fifty defendants

2006  National Society of Professional Insurance Investigators (NSPII) Investigator of the Year Award (Indiana Chapter; Dennis Nebergall Award)

2003  ATF Special Act Award and Exchange Club of Terre Haute Law Enforcement Agent of the Year for successful investigation of an arson fire that caused the death of a firefighter

2001  United States Department of Treasury Letter of Commendation, ATF Certificate of Award, and United States Attorney's Office (Southern District of Indiana) recognition for participation and arrest in a National Serial Church Arson investigation.

1998  ATF Special Act Award for participation as Lead Control Agent in a Birmingham, Alabama abortion clinic bombing (and for other investigative support-related activities)

1996  ATF Superior Accomplishment Award for role in the formation and implementation of the National Church Arson Task Force

**PROFESSIONAL TRAINING**

Annual International Association of Arson Investigators Conference (1999, 2000, 2002-2005, 2009, 2011, 2012, 2015, 2017):  Classes and topics varied and included: Interviewing, Fire Dynamics, Arc Mapping, Fire Death Investigation, Evidence Collection, Crime Scene Photography, Bomb Scene Investigation, Expert Witness Testimony, Legal Issues, Profiling of Serial Arsonists/Bombers, and Electrical Investigations.

Annual Indiana Fire Investigations Conference, Indianapolis, Indiana (1999-2009; 2011- 2014, 2018, 2021): Classes and topics varied.

Annual ATF Certified Fire Investigator Re-Certification Training (1999-2012): Training has involved a wide variety of topics/practical exercises, including Fire Scene Photography,

34

Live Burn Scenarios and the Use of Fire Dynamics Tools. Topics have also included Wildland and Marine Vessel Fire Investigation, Appliance Fire Investigation, and Dust and Chemical Explosion Investigation. I have also had extensive training in electrical systems, arc fault mapping, and electrical failure analysis with respect to fire scene investigation.

Annual ATF National Response Team Training (2008-2012) Training has involved a variety of topics and practical exercises, including eight hours of annual Hazardous Materials (HAZMAT) Training, Photography, Safety Operations and Use of Heavy Machinery/Equipment (with respect to fire scene examination).

Greater Cincinnati Regional Arson and Fire Investigations Seminar (2003, 2005, 2010)

2022   3 Hours - Photovoltaic Cells & Systems; IAAI CFITrainer.net (May)

2022   3 Hours - Emerging Technologies in Fire Investigation; IAAI CFITrainer.net (May)

2022   3 Hours - The Deposition Part 2: Questioning Tactics and Effective Responses; IAAI CFITrainer.net (May)

2022   3 Hours - The Deposition Part 1: Format, Content, and Preparation; IAAI CFITrainer.net (May)

2021   8 Hours HAZWOPER Refresher Training; Safety Unlimited, Inc. (June)

2020   Documenting the Event; IAAI CFITrainer.net (November)

2020   3 Hours - Ethics and the Fire Investigator; IAAI CFITrainer.net (October)

2020   4 Hours - Insurance and the Fire Investigation; IAAI CFITrainer.net (May)

2020   3 Hours - Fire Chemistry; IAAI CFITrainer.net (April)

2020   3 Hours - Effective Investigation and Testimony; IAAI CFITrainer.net (April)

2020   3 Hours - Critical Evaluation and Testing of Commonly Reported Accidental Causes; IAAI CFITrainer.net (March)

2019   8 Hours - HAZWOPER Refresher Training; Safety Unlimited, Inc.

2019   3 Hours - Fire Protection Systems; IAAI CFITrainer.Net

2019   3 Hours - Investigating Natural Gas Systems; IAAI CFITrainer.Net

2019   3 Hours - Process of Elimination; IAAI CFITrainer.Net

2019   2 Hours - The Practical Application of the Relationship Between NFPA 1033 and NFPA 921; IAAI CFITrainer.Net

2019   3 Hours - The Scientific Method for Fire and Explosion Investigation; IAAI CFITrainer.Net

2019   3 Hours - Writing the Initial Origin and Cause Report; IAAI CFITrainer.Net

2018   4 Hours - Managing Complex Fire Scene Investigations; IAAI CFITrainer.Net

2018   4 Hours - Evidence Examination: What Happens at the Lab; IAAI CFITrainer.Net

2018   8 Hours - HAZWOPER Refresher Training; Safety Unlimited, Inc.

2016   24 Hours - Advanced Principles of Fire Dynamics; Milwaukee, Wisconsin

2016   3 Hours - Residential Natural Gas Systems; IAAI CFITrainer.Net

2016   2 Hours - NFPA 1033 and Your Career; IAAI CFITrainer.Net

2015   40 Hours - OSHA HAZWOPER Training; Safety Unlimited, Inc.

2014   4 Hours - Basic Electricity; IAAI CFITrainer.Net

2014   4 Hours - Residential Electrical Systems; IAAI CFITrainer.Net

2013   4 Hours - Arc Mapping Basics; IAAI CFITrainer.Net

2013   8 Hours - Electrical Fire Investigation; Indianapolis, Indiana

2011   4 Hours - Explosion Dynamics; IAAI CFITrainer.Net

2011   3 Hours - Electrical Safety; IAAI CFITrainer.Net

2011   4 Hours - Understanding Fire Through the Candle Experiments; IAAI CFITrainer.Net

2011   4 Hours - Critical Thinking Solves Cases; IAAI CFITrainer.Net

2008   2 Hours - MagneTek: A Case Study in the Daubert Challenge; IAAI CFITrainer.Net
2000   16 Hours - Fire Findings Laboratories; Benton Harbor, Michigan
         (Gas and Electric Appliance Fires)

36

1999   3 credit hours in Fire Dynamics; University of Maryland

1998   3 credit hours in Incendiary Fire Analysis and Investigation; University of Maryland

1998   80 Hours - Fire Phenomena/Enclosure Fires; University of Maryland

1998   80 Hours - Advanced Cause and Origin and Court Techniques, ATF National Academy, Glynco, Georgia

1998   40 Hours - ATF Post-Blast Investigation Training; Ashland, Kentucky

1997   24 Hours - Small Appliance and Electrical Fire Seminar; Indianapolis, Indiana

1997   40 Hours - Ohio Arson Seminar; Columbus, Ohio (included presentation on evidence collection from Dr. Henry Lee)

1997   40 Hours - Hazardous Materials Incident Response Operations, U.S. Environmental Protection Agency, Cincinnati, Ohio

1997   80 Hours - Fire/Arson Investigation; National Fire Academy, Emmitsburg, Maryland

1996   80 Hours - Advanced Arson and Explosives Investigation Training, ATF National Academy, Glynco, Georgia

1995   40 Hours - Advanced Serial Case Management Training

1990   8 weeks - New Agent Training; ATF National Academy, Glynco, Georgia

1989   8 weeks - Criminal Investigator School, Federal Law Enforcement Training Center; Glynco, Georgia

1987   8 weeks - Southwest Florida Criminal Justice Academy

**INSTRUCTOR DUTIES / PRESENTATIONS**

2022   NC IAAI Presentation regarding Major Case Investigation, NFPA 921, and Cause v. Classification of Fires; Sanford, NC

2022   Dubai, UAE, World Police Expo presentation regarding Complex Case Investigation and the Scientific Method



REPORT OF FINDINGS re.

Fire at Republic Services of Indiana, Limited Partnerhip's Fort Wayne Facility, at
6231Macbeth Rd., Fort Wayne, Indiana 46809

Date of Loss: March 19, 2019

PREPARED FOR:

Mr. James W. Hehner
Clendening Johnson & Bohrer, P.C.
225 North Delaware St.,
Indianapolis, IN  46204-2127

PREPARED BY:

Michael A. Vergon, IAAI-CFI
Vergon and Associates Fire Investigation, LLC
14074 Trade Center Drive, Suite 250
Fishers, Indiana  46038
(317) 508-0527

December 29, 2022

**INTRODUCTION AND BACKGROUND**

On March 19, 2019, sometime around 11:00 p.m., Republic Services employees, at 6231 Macbeth Rd., Fort Wayne, Indiana, discovered a fire at one of the facility structures and called 911 to report the fire. Initially, only smoke was observed at or near the south end of what has been identified as Building 1. Building 1, hereafter referred to as 'the structure" was partially comprised of a storage bay, at its furthest south end, and two adjoining paint bays to the north. The below pre-fire photographs depict the structure as described:



Figure 1: Google Image aerial view, from Coe Exhibit, depicting overall building arrangement of Republic Facility. North is at top of photo.



Figure 2: Google Image aerial view, from Coe Exhibit, depicting east face view of Building 1, where smoke and flames were first observed by early witnesses. South end of building is at left in photo.

2

Samir Dizdarevic was one of the first known witnesses to the fire and was alerted to an odor of smoke, by a security guard. In his deposition testimony, he describes seeing only smoke at first and then flames, where the roof and rafters meet, and also at the overhead door closest to the south end of the structure. Soon after discovery, before seeing flames, he entered into the attached Operations Building, with the security guard, to "take a peek" and also observed smoke at the interior of the structure, describing the smoke as gray and/or white in color.

The first of the below photographs is one of the first known photos to be taken of the fire. It is not known who took the photo, nor at what time. A following side-by-side photographs depict what I believe to be the south end of Building 1, pre-fire and during-fire. The southernmost bay storage room appears to be the most heavily involved of the bays.



Figure 3: Early witness photograph of fire. Note furthest south bay Storage Room is most heavily involved of the bays, with fire also involving the south, exterior end of the structure.



Figure 4: Side-by-side photos, with vent fan window location being identified.

3

Allen County Southwest Fire Territory firefighters, dispatched at approximately 11:03 p.m., arriving on scene at approximately 11:14 p.m., observed flames venting from the roof of the structure. Firefighters fought the fire for several hours, finally extinguishing it, departing the scene at approximately 5:03 a.m., the following morning. The fire resulted in the destruction of the majority of the south end of the structure and its contents.

Rimkus Consulting Group, Inc. Preliminary Investigation and Initial Report

Rimkus Consulting Group was retained by CCMSI, on behalf of Republic Services, to conduct an investigation regarding the origin and cause of the fire. Investigator Jim Foster was the assigned investigator for Rimkus Consulting Group.

On March 20 or March 21, 2019, Investigator Foster conducted his initial scene examination. This date is unclear, as his report states he conducted his initial examination on March 21, 2019, but his photographs are dated March 20, 2019. Investigator Foster also states the date of the fire as March 3, 2019, while the fire department incident report lists the date of the fire as March 19, 2019. It is not known if Investigator Foster took field notes during his initial investigation, as none have been provided for review.

On May 10, 2019, more than seven weeks after his initial examination, Investigator Foster returned to the scene and collected swab and paint samples, which were submitted to Forensic and Scientific Testing (FAST) for analysis. It is not known from where these samples were collected, as there are no photographs, field notes, or narrative provided that document this information.

On July 2, 2019, a scheduled joint scene examination was commenced at the Republic Services facility with those parties which were initially placed on notice. Space Ray Gas Fired Products was not one of those parties initially placed on notice and no representative was present on their behalf on the date of this scene examination.

On December 3, 2019, Investigator Jim Foster authored a Report of Findings. Investigator Foster lists three Conclusions near the beginning of his report. They are:

1. "A fire occurred inside of the maintenance structure located along the west side of the property. The fire involved the south end of the structure where trash dumpsters are repaired and repainted."

2. "The fire involved the south end of the facility where ceiling tube heaters had recently been installed."

3. "The cause and origin of the fire is a direct result of open infrared tube heaters installed in an area where painting and other procedures are performed. The installation of this type of

4

heater is not recommended in this environment. Paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited."

Prior to stating these conclusions in his report, Investigator Foster states, "During our investigation, we applied the scientific methodology of fire investigation using the systematic approach as recommended in the current addition of National Fire Protection Association, N.F.P.A. 921 - "Guide for Fire and Explosion Investigations and N.F.P.A 1033 Standard for professional Qualifications for Fire Investigator"."

On February 21, 2020, I was retained to represent Space Ray, insured by FCCI, in the furtherance of this origin and cause investigation and in a joint scene examination scheduled for May 3, 2020. I was also provided a copy of Investigator Foster's Report of Findings, in which he reportedly had already determined origin and cause.

## REVIEW OF INVESTIGATOR FOSTER'S INITIAL REPORT OF FINDINGS

In preparation of the scheduled joint scene examination, I reviewed Investigator Foster's Report of Findings, dated December 3, 2019. Investigator Foster included a "DISCUSSION" section in his report, which is presumably the basis for his conclusions. His narrative includes the following statements:

Page 2 - Work in the area of the dumpster maintenance area involved the "use of flammable and other combustible material"

- Investigator Foster does not identify what flammable and/or combustible materials were present, how they were used, nor where they were located. He does also not document how he became aware of this information.

Page 2 - "Employees left the facility at 4-4:30 p.m."

- No employees are identified in his report. It is not documented which employee(s) was/were last working in Investigator Foster's determined area of origin. It is not documented what the employee's last actions or observations were prior to leaving that day, or if any of these employees smoked cigarettes.

Page 2 - "Three Space Ray ceiling tube infrared heaters, model PT125-30L5 had been installed in the paint and welding shop area within the past two months."; and "There had been no problems related to the heat prior to the fire event."

- These statements may infer that Investigator Foster is already laying the groundwork for a "cause" to the fire, before he has substantiated an origin of the fire.

5

Page 2 - Investigator Foster refers to the Space Ray heater instruction manual and cites, "this heater is not an explosion proof heater." And further cites, "Where the possibility of exposure to volatile and low flash point materials exist, it could result in property damage or death. This heater must not be installed in a spray booth where the heater can operate during the spraying process. The heater is a self-contained infrared radiant tube heater fore use in location where flammable gases or vapors are not generally present."

- The statements regarding the heater not being explosion proof, and statements regarding volatile and low flash point vapors pertain to an explosion hazard. There are no witness accounts, nor is there any other evidence presented by Investigator Foster by which to substantiate an explosion occurred prior to an ensuing fire.

Page 2 - "The facility did not meet NFPA code or compliances of a spray booth."

- It is not clear if Investigator Foster is actually implicating Republic Waste for being at fault for not operating to code. Further, a bay area of a structure is typically not a "spray booth".

Page 3 - "Other potential ignition sources were in the general area of fire origin however were not considered a potential due to their location and origin location."

- Investigator Foster states there were potential ignition sources present in the general area of fire origin, and then, in the same sentence says they were not considered due to their location. He does not identify other potential ignition sources, nor their specific locations. To not even consider other potential ignition sources in a general area of origin is not in line with adhering to the scientific method according to NFPA 921, as Investigator Foster states he does in his report.[1]

Page 3 - "The fire origin was reportedly high in the structure when first observed, which would place it at or near the ceiling."

- Investigator Foster provides no information regarding any specific witness observation regarding where fire/first flames were actually observed, nor does he identify any witness, what any witness may have specifically observed, nor where any witness was located when observations may have been made. Investigator Foster only seems to assume fire originated at or near ceiling level, but has no real basis for making that assumption. For example, was there any witness who saw fire conditions within the interior of the structure, or did the witness only make observations from the exterior of the structure? Further, Investigator Foster seems to discount the possibility the fire originated low in the structure, unseen, then progressed upward and outward, to the point that it was discovered. He also seems to dismiss the possibility, since he states the fire origin was "high in the structure", that the fire could have

---

[1] NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition; Figure 19.2

6

originated within the attic space. Investigator seems to be attempting to define origin only because he knows the tube heaters were located near ceiling level and were recently installed.

Page 3 - "When the hearer (sic) activated, the spark to ignite the gas and heat ignited the combustibles that had accumulated on the surface and burners of the tube heaters."

- It is unclear if Investigator Foster is stating that a spark will ignite heat, as heat does not ignite. He also does not clarify which tube heater or burner specifically was the source of the fire. Previously in his report, Investigator Foster also cites a portion of the heater manual regarding it being a self-contained system. If this is the case, then Investigator Foster fails to explain how any combustible material may have been ignited by a spark or burner, which was not exposed to the environment of the painting area.

Page 3 - "The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire was high in the building. Information from employees indicted (sic) the fire was high in the building upon discovery. This combined with the fire damage to the south heater that was at ceiling level indicated the possible location of the fire."

- Investigator Foster incorrectly states that fire patterns were discolored and charred. This is a technically incorrect statement as discoloration and charring *are* types of patterns, which are detailed in NFPA 921. Further, patterns such as these can also mean that metal and wood surfaces are simply exposed to either a higher degree of energy release and/or a longer duration to burning at these areas. Given the amount of destruction, building collapse and burning in this case, any fire patterns observed in a case such as this should not be given any weight regarding the fire's origin.

- Investigator Foster states the combined fire damage and the damage to the south heater indicated only a "possible" origin of the fire, yet he offers no further documentation anywhere in his report to support this hypothesis.

Investigator Foster photograph used in his report:

**Photograph 2**
Paint and other combustibles material inside ventilation pipe of tube system



Figure 5: Photo contained within Investigator Foster report.

7

- Investigator Foster does not identify anywhere in his report where this tube section was in the fire scene. He does not identify if this is from where he collected a swab sample sent to the laboratory for analysis. He does not explain how this material may have ended up in a self-contained, connected tube system. In fact, the tube systems of the three separate heaters had collapsed as a result of the fire and had come apart, coming to rest at various locations among the collapsed structure, contents, and debris, to include at concrete slab level. Further, Investigator Foster did not collect swab samples for more than seven weeks after the fire. It is most probable this material accumulated within the interior of the end of the tube during firefighting operations, or sometime post-fire.

## JOINT SCENE EXAMINATION (March 3, 2020)

On March 3, 2020, I participated in a joint scene examination at the Republic Waste facility, at 6231 Macbeth Rd., Fort Wayne, Indiana. Several other investigators were also present representing the various parties placed on notice. Prior to beginning any further scene examination, a briefing was held and the following additional information was related by Investigator Foster:

- The involved structure consisted of an area that was used a paint room, for the past 5-6 years.
- The only ventilation was natural, by cross ventilation.
- It is not known when any filters were last changed.
- It is not known if rags were used in the painting process.
- On November 20, 2018, work was conducted in the structure to upgrade due to prior water damage.
- On January 19, 2019, Coe Heating and Air installed three, LP, 125 BTU heaters.
- Three employees worked in the fire-damaged area.
- Welding and repair work was conducted at the north end of the area, the middle area consisted of a lounge, and painting and some welding work was performed at the south end.
- The last welding work ended at 10:00 a.m.
- It is typical for 3-4 dumpsters a day to be worked on/painted.
- All work was completed at 3:00 p.m., and it took an hour for clean-up.
- The paint room manager was the last person to leave the facility, at 6:30 p.m.
- The thermostat was set at 60 degrees Fahrenheit.
- At 10:50 p.m., a cleaning crew, in the center section, detected an odor of smoke.
- Flames were observed at the southernmost overhead door when the source of smoke odor was investigated.
- On March 20, 2019, Rimkus conducted an initial scene examination. Photographs were taken and the scene was left as it was.
- On May 10, 2019, a follow-up investigation was conducted by Rimkus. Additional photos were take and some excavation was conducted.
- On July 2, 2019, an initial joint scene examination was conducted. Participating parties conducted scene documentation only.
- There has been no scene security and the scene was left uncovered.

In addition to the briefing provided by Investigator Foster, Fred Jones made himself available for interview by participating on-site investigators. Mr. Jones was identified as the Container Shop Manager. He provided the following information:

- Electric service distribution was along south the wall w/ southeast corner below ground service entrance.
- Painting was done in two southernmost bays
- Contractor put lights in 3 years ago. Converted to LED. Korte Electrical performed this work.
- Filters switched on every 2-3 weeks. Regarding the main exhaust system, everything was on three switches. The exhaust system brought fresh air in and exhausted dust outside to south side.
- Did not pay attention to build up of paint residue on heaters, since only installed recently.
- Paint and bed-liner used on bins.
- 12-15 containers were painted per day, at times.
- Converted truck shop to paint bays 5-6 years ago.
- There were two thermostats, and always turned old heaters off, but left new ones on. The thermostats may have actually been set to 75 degrees Fahrenheit.
- The heaters were 9' - 10' above floor level.
- The furthest south bay was utilized for storage and contained a second story.
- When he walked through the area, everything was "off".
- The paint sprayer would shoot an approximate maximum distance of 24".
- Mist would still accumulate on surfaces at upper levels.

Subsequent to the briefing, it was determined that another identified party was not present and needed to also be attendance before any scene excavation was conducted and before any items of potential evidentiary value were collected.

Below are several photos, which generally depict the extent of fire damage to the structure:



Figure 6 (DSC_8755): View at Southeast corner of structure remains.



Figure 7 (DSC_8767): View from southwest corner of structure remains.



Figure 8 (DSC_8781): View within structure remains, east to west.



Figure 9 (DSC_8788): View within structure remains, east to west.

In a group setting, while still on scene, I engaged Investigator Foster and Rimkus Electrical Engineer Lou Inendino in conversation regarding the level of destruction at the scene and the likelihood of eliminating a possible electrical cause to the fire. I also specifically asked Investigator Foster how he came to his determination that the fire was caused by the infrared tube heaters.

EE Inendino advised that he could not eliminate a potential electrical cause to the fire. I also asked him about collecting electrical component remains and examining them in a laboratory setting to examine them more thoroughly. He replied this would not change his opinion.

When I asked Investigator Foster how he determined fire originated at the tube heaters, he replied that he came to this determination, because they were the only thing "on" at the time of the fire, and witnesses saw the fire "high". I asked him if those witnesses ever saw conditions within the interior of his determined bay area of origin and he replied that the witnesses only saw conditions from the exterior of the structure.

When I asked Investigator Foster where exactly he thought the fire originated within the structure, he pointed toward the destroyed structure and said, "in there somewhere."

During this examination, I documented the presence of an empty cigarette pack among the remains of debris, in a melted garbage container near one of the tube heaters that had collapsed to floor level.



Figure 10 (DSC_8805): Melted garbage container remains
among collapsed debris and section of collapsed tube.

I asked Investigator Foster how he could eliminate the possibility of a discarded cigarette as contributing to the cause of the fire and he replied that he was told nobody smoked in there.

Prior to departing the facility, I documented that the blue paint used to paint garbage bins was a Sheboygan Paint Company brand, water based paint. The following photos document the identification of the paint utilized at the Republic Services facility:



Figure 11 (DSC_8820): Barrel of "Republic Blue" paint.



Figure 12 (DSC_8822): Paint identified as Republic Blue Premium.

13



Figure 13 (DSC_8824): Paint identified as a water based product.



Figure 14 (DSC_8828): Paint identified as being a product of Sheboygan Paint Company.

I also documented that paint operations had been moved into another building at the facility, where tube heaters were still being utilized.



Figure 15 (DSC_8833: Area used as paint bay, since fire. Tube heaters still in use.

**JOINT SCENE EXAMINATION (May 11, 2020)**

On May 11, 2020, I participated in a subsequent joint scene examination at the Republic Waste facility, 6231 Macbeth Rd., Fort Wayne, Indiana. Examination on this date consisted of additional scene documentation and the collection of items, to include tube heater and component remains, and the remains of the aforementioned garbage container and its contents.

**LABORATORY EXAMINATION (August 23, 2022)**

On August 23, 2022, I participated in the examination of items collected by the Rimkus investigators during the May 11, 2020 scene examination. P.E. Scott Jones also participated in this examination, on behalf of Space Ray.

The examination consisted of detailed examination of the heater remains in which the housings were also opened and examined. Examination of these heaters resulted in the determination that they did not fail in any way. Further, it was determined that the Space Ray heaters created no conditions that were causal to the fire. P.E. Scott Jones has authored a more detailed report regarding his findings and his expert opinion in this matter.

Examination of the melted garbage container and its contents resulted in the discovery of smoking materials.

The below photographs depict this discovery:



Figure 16 (DSC_9868): Photo of melted garbage container prior to excavation.



Figure 17 (DSC_9875): Photo of melted garbage container content remains to include discarded cigarette pack.

16



Figure 18 (DSC_9879): Photo of discarded cigarette butt among
garbage container content remains.

## DEPOSITION TESTIMONY REVIEW

I have reviewed the transcribed testimony of individuals thus far deposed in this case.
Information (data) obtained from the these deposition transcripts includes the following:

**Fred Jones Deposition (Republic Services)**

Page 13 - Mr. Jones describes the storage room, which is the southernmost bay of Building 1. He
describes it as containing electrical panels, trash can liners, and foldable cardboard boxes.

Page 14 - Mr. Jones states the bay was split in half, having a downstairs and an upstairs, with no
heat.

Page 17 - Mr. Jones states that all cans in the two paint bays were painted that day (of the fire).
He advised that Dale Caley (deceased) was doing the painting.

Page 18 - Mr. Jones states that Dale Caley was a smoker.

Page 19 - Mr. Jones states that Dale Caley was the only person working in the paint bays that
day.

Pages 20-21 - Mr. Jones states that Dale Caley most likely did welding work on the day of the
fire, utilizing an acetylene torch, which is kept within the southwest corner of the storage room.

Page 22 - Mr. Jones describes access from the paint bays to the storage room, at the west side of the structure, where it was open from one area to the other. He also describes a vent fan being present between the storage room overhead door and the adjoining paint bay.

Pages 26-27 - Mr. Jones describes the old heaters as being open flames type heaters that were having a problem with gas accumulating when trying to ignite, resulting in a "boom" at times.

Page 27 - Per Mr. Jones, nobody ever complained about the new Space Ray heaters.

Page 28 - The old heaters were replaced, because they had so much buildup of paint and paint dust on the inside of them. In answer to a question regarding this, Mr. Jones indicated the open flame of the old heaters would ignite the blue spray paint.

Page 29 - Mr. Jones advises that he was gone most of the day of the fire and does not know if Dale Caley utilized a kerosene fueled salamander heater that day.

Page 35 - Mr. Jones stated that roll-on bedliner had not been used for the past five years.

Page 54 - Mr. Jones stated that Korte Electric comes out to do a lot of work on the outside on the plugs.

Page 68 - Mr. Jones states that he was regularly in the structure during the 60 days prior to the fire and never smelled paint dust burning on top of the Space Ray heaters.

**Terry Reader Deposition (Republic Services)**

Page 27 - Mr. Reader states he was probably in Building 1, at times, on the day of the fire, and states that Dale Caley was painting in Building 1 on the day of the fire.

Page 32 - Mr. Reader corroborates that Herculiner bedliner is no longer used.

Page 39 - Mr. Reader states that a blue dumpster never caught on fire while using a plasma torch or an acetylene torch.

Page 42 - Mr. Reader states that Brakleen, similar to break cleaner, was sometimes used to clean paint and parts. He also states that Herculiner was kept in a fire locker in Building 1.

Page 59 - Mr. Reader worked at Republic since 2012. He advised that the old, open flame heaters would get clogged up with paint and stop working.

Page 62 - Although Mr. Reader was concerned that the blue paint was going to get inside the old, open-flame heaters and catch fire, it never did.

Page 64 - During the time of his employment, there was never any discussion about being careful with the blue paint drying and catching fire.

Page 80 - Mr. Reader states there was a point in time that the older heaters were not working, so salamander heaters were utilized for at least a month straight at one point.

In reviewing the Rimkus file photographs, I located a photo which depicts one of these salamander heaters. Due to it being covered in blue paint dust/overspray, it had obviously been used in the area in which the blue spray paint was being utilized to paint dumpsters.

The below Rimkus photograph depicts the extent to which the salamander heater was covered in blue paint dust/overspray:



Figure 19: Rimkus photo P1010047 depicting a salamander heater, floor, and surrounding items covered in blue paint dust/overspray.

**Terry Reader Continued:**

Page 88 - Mr. Reader believes Dale Caley stopped painting and left, sometime from 3:30 p.m. to 4:30 p.m.

Page 98 - Nobody told Mr. Reader, after the fire, to be really careful about blue spray paint getting on the tube heaters where painting was now being conducted.

Page 115 - Mr. Reader has welded through the dried blue paint on previous occasions and it never caught fire.

Page 118 - The blue paint that accumulated on the salamander heater never caught fire.

Page 138 - At no time did the blue paint dust/overspray on the floor ever catch fire when Mr. Reader was using a plasma cutter, an acetylene torch, or a MIG welder.

Page 141 - Individuals smoking cigarettes would occasionally walk through buildings.

Page 143 - The smoking policy was not strictly enforced.

Page 156 - Mr. Reader recalls people smoking indoors on the day of the fire, but does not specifically recall who or where.

Page 166 - Mr. Reader recalls seeing cigarette butts on the floor of Building 1 and admits that cigarette butts were al over the facility.

**Samir Dizdarevic (Republic Services / Witness to fire)**

Page 21 - Mr. Dizdarevic was working at Republic Services the night of the fire. He States that, roughly, eight others were working with him during his shift.

Pages 28 - 29 - He was alerted to the fire by a security guard, while in his office. He saw the first evidence of smoke at the south side of Building 1. He initially saw no flames.

Page 30 - He entered into the operations building "to just take a peek" and saw a lot of smoke in there. There were still no flames observed.

Page 31 - He described the smoke in the operations building as "gray, white"

Page 36 - Mr. Dizdarevic first saw flames as he was pulling the supervisor trucks away from the south side of the building (Building 1). He states, "The very tip top of the building where the roof, and, you know, the rafters meet. You could see flames coming out there. And then from the overhead doors, the closest on the south side, that one had flames coming out of it as well."

Page 59 - When being questioned in trying to pinpoint which overhead door had flames coming out of it, Mr. Dizdarevic responds, "it was the furthest one away from the main entrance to the operations building." He reiterates on the following page, "The further south. Yes sir. That door."

## REVIEW OF INVESTIGATOR FOSTER'S EXPERT REPORT

I have reviewed Investigator Foster's Expert Report, dated November 18, 2022. Investigator Foster's conclusions remain the same as those documented in his initial report, dated December 3, 2019. Investigator Foster included a "Factual History" section in his report, which is presumably the basis for his conclusions. His narrative includes the following statements:

Page 3 - "A fire was reported to 911 after employees working outside the building observed fire and smoke coming from the building near the Middle East overhead door. They indicated flames appeared to be coming from the top of the building."

- I have not found anywhere in any of the data presented by which it has been stated smoke and fire were *first* observed coming from the middle overhead door. Furthermore, Investigator Foster does not identify what door this is, nor does he identify any employee. He simply refers to the witnesses as 'they", and does not state what each witness specifically observed.

Page 3 - During his site inspection on March 3, 2020, Investigator Foster states, "I observed paint and other debris on the tube heaters, on the reflector assembly around the tube heaters, *and inside the ventilation tubes of the heaters*." (Ital. mine)

- Investigator Foster offers no explanation why or how paint and other debris may have become present inside the ventilation tubes of the heaters.

Page 3 - He further states, "Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This indicates the fire origin occurred in the east heater near the control box with the ignition of the propane fuel."

- As the three heaters were aligned north-south, it is unclear what Investigator Foster means when he states fire origin occurred in the east heater. Further, based upon my examination of the scene and photographs, there was no greater area of charring and heat damage. The entirety of Building 1 and its contents were destroyed due to the fire and continued post-collapse burning.

- Further, Investigator Foster clearly states the fire originated at this location as a result of the ignition of propane fuel, when there is no data presented to indicate or substantiate the occurrence of a fuel-air explosion, which would have occurred, as he describes in this scenario.

21

Page 3 - "The fire patterns on the metal roof were discolored and charred more than the other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees was high in the building upon discovery. This combination with the fire damage to the south heater that was at ceiling level indicated the *possible* location of origin." (Ital. mine)

- See Page 7 comments, at the bottom of this page, regarding fire pattern analysis. The discoloration of the metal roof only indicates that the metal roof sections were exposed to a greater degree and/or a greater duration of exposure to the effects of fire. The overall scene and oxidation patterns had certainly changed in nearly a year's time due to exposure to the weather, and Investigator Foster has presented no photo documentation to support this "discoloration" statement.

- Further, it cannot be shown that fire did not originate low in the structure, progress upward to involve the roof structure, to the point at which it was first observed by employees at some unknown location at the exterior of the structure.

Page 4 - (…"I retrieved paint samples and other debris from inside the tube heaters…" "The samples came back positive for petroleum distillate, consistent with ignitable liquids."

- Investigator Foster still fails to explain how paint samples and other debris ended up in a closed system.

Page 7 - Regarding the laboratory examination, "I observed burn patterns on the testers, which showed fire damage more severe at the middle or center heater and fire damage on the north heater showed heat and fire spread from the south side or middle center heater. The fire and heat damage pattern on the south heater showed heat and fire spread from the north side heater and fire spread from the north side or center heater."

- This statement in support of Investigator Foster's origin determination is ambiguous and is not based on a sound interpretation of fire pattern analysis. The building suffered near total collapse, with no ceiling remaining, no roof remaining, and very little of the wall structure remaining. As the fire progressed to this point of destruction, all items within the structure, to include sections/components of the structure itself were exposed to varying degrees of heat and energy release, as well as to varying durations of burning. Patterns which may have been present in the early stage(s) of fire development would likely no longer be present. Likewise, items within, or portions of the structure which were nowhere near fire origin may have eventually been exposed to a significantly greater degree of burning, or a longer duration of burning, resulting in exhibited patterns which were created post-collapse.

22

**FORENSIC CHEMIST ANALYSIS**

On April 14, 2020, Forensic Chemist Sharee B. Wells, FAST, issued a Certified Laboratory Report regarding samples previously submitted to her by Investigator Jim Foster. The lab report documents that she received the swab and paint samples on March 11, 2020. The lab report also documents that these samples were collected by Investigator Jim Foster, on May 10. This is presumably May 10, 2019.

Laboratory analysis resulted in the finding that two of the samples contained "a similar mixture of an aromatic product, a medium petroleum distillate and a heavy petroleum distillate." Two other samples "contained a similar mixture of an aromatic product and a medium petroleum product." The report states, "Products in the range of a heavy petroleum distillate include, but are not limited to, some types of vehicles used in staining products, mineral spirits, and other proprietary formulations."

Forensic Chemist Dirk Hedglin, retained by Space Ray Gas-Fired Products, will address this matter in a separate report.

**CONCLUSION**

It is my opinion that Investigator Foster had predetermined the cause of the fire before fully conducting adequate investigation and research, and disregarded the opinion(s) of Rimkus EE Lou Inendino. It is my opinion that Investigator Foster has exhibited expectation bias in his investigation, which has also resulted in confirmation bias in exclusively relying on data that supports his hypothesis and fails to look for, ignores, or dismisses contradictory or nonsupporting data.[2]

**<u>Origin Determination:</u>**

NFPA 921, **Section 18.6.1** (Means of Hypothesis Testing), 2021 Edition reads, "During the investigation, the investigator may develop and test many hypotheses about the progress of the fire. For example, the investigator often has to determine whether a door or window was open or closed. Ultimately, the origin determination is arrived at through the testing of origin hypotheses. A technically valid origin determination is one that is uniquely consistent with the available data…"

NFPA 921, **Section 18.6.1.2** reads, "Can a fire starting at the hypothetical origin result in the observed damage? The investigator should be cautious about deciding on an origin just because a readily available fuel and potential ignition source are present."

---

[2] NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition; Sections 4.3.9 and 4.3.10

Investigator Foster fails to address the detailed deposition testimony of witness Samir Dizdarevic, who provides detailed testimony regarding exactly where he saw fire.

Investigator Foster also fails to address his analysis regarding the below photos, which support the testimony of Mr. Dizdarevic.



Figure 3, from Page of this report: Early witness photograph of fire.



Figure 4, from Page 3 of this report: Side-by-side photos, with vent fan window location being identified.

In addition to the testimony and analysis of the above photos, fire dynamics and building construction do not support fire origination in the paint bay area of the structure, and there is no valid origin determination that is uniquely consistent with the date..

The following photo array with notations was put together to assist in this analysis:



Figure 20: Clockwise, beginning from upper left; witness photo, pre-fire photo of the structure, Interior photo of paint bay, diagram of the structure, with locations of tube heaters (red rectangles).

Interior construction of the structure consisted of steel walls and ceiling, and a concrete slab. The lower right photo in the above array depicts this type of construction, with a steel wall separating the paint bay from the storage room. However, it is known, via deposition testimony, that there is a doorway or pathway at the west end of the structure, by which access could be made between the two rooms. Further, although not pictured, it is also known that the tube heaters hung below ceiling level, with no combustible building materials in contact with them. It also does not appear, in photos found in the Korte documents, that there is much in the way of exposed combustible materials kept within the paint bay area.

Investigator Foster fails to provide any explanation or support his hypothesis regarding fire progression within the paint bay area, at ceiling level. It is not probable fire progressed from his determined area to an adjoining room that is separated by a steel wall, fully involving the adjoining room, before fire progresses throughout the paint bay area.

It is my opinion the data more supports fire origination within the storage room. Fire originating within this bay would progress upward and outward, eventually involving the roof and interior walls of the bay. Fire would then subsequently progress into the adjoining paint bay, at the west side of the structure, via the passage way at this location. As heated smoke (unburned fuel) began to fill the paint bay. Fire would then eventually present itself at the vent fan window(s), where a fresh supply of oxygen (air) was present.

A fire originating in the paint bay is not what is evidenced above.

**<u>Cause Determination:</u>**

NFPA 921, **Section 4.5** (Level of Certainty) reads: "The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.

NFPA 921, **Section 4.5.1**, continues: "The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:

(1)  Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50%.
(2)  Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible"."

NFPA 921, Section **4.5.2**, reads: "If the level of an opinion is merely "suspected", the opinion does not qualify as an expert opinion. If the level of certainty is only "possible", the opinion

should be specifically expressed as "possible". Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty."

In both of his reports, Investigator Foster concludes, "The cause and origin of the fire is a direct result of open infrared tube heaters installed in an area where painting and other procedures are performed.". However, his supporting narrative states only that it is "possible" the fire originated near ceiling level, in the area of the tube heaters.

If Investigator Foster has only this level of certainty regarding origin, then he cannot have a higher level regarding cause.

Based upon available data and a lack of evidence by which any expert opinion can be supported, the correct level of certainty regarding any cause to this fire should only be "suspected", which does not qualify as an expert opinion.

NFPA 921, **Section 19.5** (Developing a Cause Hypothesis), 2021 Edition reads, "The investigator should use the scientific method as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences. This process of consideration actually involves the development and testing of alternative hypotheses. In this case, a separate hypothesis is developed considering each individual competent ignition source at the origin as a potential ignition source. Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (or refuted) by the facts discovered through further examination. The investigator is cautioned not to eliminate a potential ignition source merely because there is no obvious evidence for it...Potential ignition sources should only be eliminated from consideration only if there is reliable evidence that they could not be the ignition source for the fire..."

In addition, NFPA 921, **Section 19.6.4** (Means of Hypothesis Testing) reads, "When testing a hypothesis, the investigator should attempt to disprove, rather than confirm, the hypothesis. If the hypothesis cannot be disproved, then it may be accepted as either possible or probable..."

Regarding the above two sections of NFPA 921 (**Sections 19.5 and 19.6.4**):

It is my opinion that Investigator Foster cannot eliminate other potential ignition sources merely because there is no obvious evidence for them. Other potential ignition sources include discarded smoking material, failed or overheated electrical components, or not properly stored or discarded rags containing paint thinner or other liquids susceptible to spontaneous combustion. There is data presented in this matter in which all three of these potential ignition sources were or could have been present.

Investigator Foster does not document making any attempt to discount these possibilities, and ignored the opinion of his electrical engineer, who stated that the structure's electrical system could not be eliminated as a cause to the fire.

Investigator Foster fails to adequately explain how paint dust or other combustible materials could have ignited on or in a closed system. He offers no explanation how he has come to this determination, while discounting that the same paint dust and combustible materials have accumulated for years on the open flame heaters or the salamander heaters, which were previously utilized by the Republic Waste facility.

In addition, various types of welding were conducted on a regular basis, with no paint dust or other combustible materials ever having been witnessed igniting.

NFPA 921 also contains a section, **17.5.2** titled, Documenting the Collection of Physical Evidence. This sections consists of several sub-sections, which have to do with documenting evidence collection via, field notes, diagrams, photography, etc.., none of which has yet been presented by Investigator Foster or Rimkus Consulting Group.

There are also sub-sections that discuss the collection of comparison samples, which Investigator Foster did not do. Since at least one of his photographs depicts material present at the open end of a disassociated heater tube, with similar looking material covering the concrete slab around it, a comparison sample of this material should have also been collected and submitted for laboratory analysis, especially since this material in the tube tested positive for the presence of ignitable liquids.

Based upon the totality of the data reviewed and considered, and based upon the opinion of other experts retained in this matter, it is my opinion there is no data to support fire origination at the Space Ray heaters, or that the fire was caused in any way by the Space ray heaters. It is also my opinion there is insufficient data by which to substantiate any other potential cause to the fire.

My opinions in this matter is based upon all known facts gathered and analyzed in this investigation, the proper use of the process of elimination, evidence, observations, research, my experience, training, knowledge and expertise.

Should additional information become available at a later date, I reserve the right to evaluate that new information and amend my findings, as appropriate.

28

Attachment A

Items/Documents Reviewed:

1. Allen County Southwest Fire District Incident Report Number 190293
2. Diagram ("Defendant Coe's Exhibit C")
3. Deposition transcripts of:
   Sharee Wells, Chemist, Forensic and Scientific Testing
   Charles Golden, Coe Heating and Air Conditioning
   Ronald Dantzer, Coe Heating and Air Conditioning
   Daniel Kelly, Kelmar Corporation (Space Ray Dealer)
   Trevor Miller, Korte Does It All
   Fred Jones, Republic Services
   Gerald Depold, Republic Services
   Greg Tolley, Republic Services
   Jason Kelly, Republic Services
   John Shatto, Republic Services
   Kyle Orr, Republic Services
   Mike Sherfield, Republic Services
   Samir Dizdarevic, Republic Services
   Terry Reader, Republic Services
   Scott Kleinknight, Shawnee Construction
4. Forensic and Scientific Testing Laboratory Report regarding samples collected by Investigator James Foster
5. Investigative Notes
6. James P. Foster, Rimkus Consulting Group, Inc. Report of Findings, dated December 3, 2019
7. James P. Foster, Rimkus Consulting Group, Inc. Expert Report, dated November 18, 2022
8. Korte Does It All, Inc document
9. Material Safety Data Sheet; Herculiner
10. Material Safety Data Sheet; Sheboygan Paint Company
11. Photographs taken during March 3, 2020 scene examination
12. Photographs taken during May 11, 2020 scene examination
13. Photographs taken during August 23, 2022 artifact examination
14. NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition
15. Rimkus Consulting Group, Inc investigation file
16. Space Ray Installation and Operation Instructions

Page 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF INDIANA

3                     FORT WAYNE DIVISION

4     ─────────────────────────────────

5     REPUBLIC SERVICES OF INDIANA,

6     LIMITED PARTNERSHIP,

7              Plaintiff,

8         v.                          Case No.

9     COE HEATING & AIR CONDITIONING,    1:21-cv-108-HAB-SLC

10    INC. and GAS-FIRED-PRODUCTS,

11    INC. d/b/a SPACE-RAY,

12             Defendants.

13    ─────────────────────────────────

14              VIDEOCONFERENCE DEPOSITION OF

15                    MICHAEL AGOSTI

16    DATE:          Friday, February 3, 2023

17    TIME:          11:15 a.m.

18    LOCATION:      Remote Proceeding

19                   Gardner & Rans, PC

20                   117 Perspective Drive, Suite 2

21                   Granger, IN 46530

22    REPORTED BY:   Sarah Lakin, Notary Public

23    JOB NO.:       5676785

24

25                        Exhibit K

Page 206

1          A     What types of things -- paint --

2          Q     You've read this before; right?

3          A     Yes.  I'm just refreshing my memory.  Okay.

4     I see what you're referring to.

5          Q     Okay.  In reaching your conclusion that the

6     blue Sheboygan paint is non-combustible -- well,

7     really all of the opinions in your report, did Fred

8     Jones's testimony on page 11, line 18, play any role

9     in the generation of your reports?  Did you consider

10    it?

11         A     I considered it, but in relation to any

12    combustibility of the blue paint, I --

13         Q     He says -- he says paint would smolder;

14    right?

15         A     He actually mentions trash.

16         Q     He mentions trash, but he mentions -- he

17    says paint smoldering; right?

18         A     He does say that, yes.

19         Q     Okay.  Is your expert opinion in this case

20    that Fred Jones is mistaken or incorrect with his

21    testimony there?

22         A     Well, in my opinion, I don't think his

23    testimony is -- there's some unanswered questions

24    there.  He says, "When you're burning on the side of a

25    compacter."  What does he mean by that?  If he means

Page 207

1    welding, I don't think any material is going to --

2    almost -- I shouldn't say any.  Almost any material is

3    going to, to some effect, be -- have a reaction to a

4    welder being up against it.

5         Q    So just to be clear, you considered Fred

6    Jones's testimony that the paint is smoldering, and

7    that has no impact on your opinions in this case?

8         A    I do not know what he's specifically

9    referring to in that statement or question and answer

10   section there.

11        Q    Fred Jones also testified in his deposition

12   that he did walk through the paint bay during the

13   fire.  Do you remember seeing that in his deposition?

14        A    Yes.

15        Q    Okay.  What impact, if any, did that have on

16   your evaluation of cause and origin in this case?

17        A    Well, I utilized it to assist in my opinion

18   in that I see that a lot of times, and Mr. Foster

19   utilized it as a way to eliminate potential ignition

20   sources and causes of the fire, which I think, as I

21   outlined in my report, is inaccurate and flawed in

22   that just by virtue of someone walking through an area

23   30 minutes, an hour, 2 hours, 3 hours earlier, for

24   example, all that tells me is that nothing was going

25   on at that time.  It doesn't mean that there wasn't

Page 208

1  something smoldering or something -- something

2  occurred after that time.  So it's just a piece of

3  data.

4       Q    It's a piece of data, and you said that you

5  gave all deposition transcripts equal weight.  You

6  didn't give more weight to testimony that favors your

7  client.  He testified under oath that he checked for

8  smoldering, and he didn't see anything smoldering the

9  day of the fire.  Do you have any reason to doubt

10  that?

11            MR. GARDNER:  Hold on.  Objection.  Do

12  you mean doubt that he didn't see it or doubt that

13  there wasn't --

14  BY MR. JONES:

15       Q    Do you have any reason to doubt the veracity

16  of Mr. Jones's testimony as to what I just discussed?

17            MR. GARDNER:  Well, objection.  That's

18  an improper question in the Indiana --

19            MR. JONES:  Okay.

20            MR. GARDNER:  One witness as to the

21  veracity of another.  It's right in the Rules of

22  Evidence.

23            MR. JONES:  I understand.

24  BY MR. JONES:

25       Q    Mike?

Page 226

1   not do --

2        Q    You're making inferences based on what you

3   saw out there in your site inspections; correct?

4        A    That's based on my observations, yes.

5        Q    Okay.  I want to run -- I think this is the

6   last exhibit we're going to look at.  Well, it's one

7   we've already been looking at.  But Exhibit 1.  I want

8   to go to page 16.  On page 16 of your report -- and

9   this is on your opinion number 4, where you're talking

10  about cause being undetermined.  And actually, I'll go

11  to page 15.  It's the very last sentence of page 15,

12  going into 16.  It says -- you say:

13       "A thorough processing and examination of

14  the fire scene and area of interest was not conducted

15  or completed.  This left several identified, potential

16  ignition sources, to include branch circuit wiring,

17  junction boxes with conductors, circuit breaker

18  panels, lighting fixtures, electric fans and other

19  building electrical components not being examined,

20  evaluated or analyzed."

21       Do you have any evidence supporting a

22  hypothesis that any one of those potential ignition

23  sources caused the fire?

24       A    I would answer that by stating, as stated,

25  they're identified as potential ignition sources, and

Page 227

1    as it stands, they're all, until further examined,

2    they're all equally potential ignition sources as

3    potentially causing the fire until further examined

4    and eliminated.

5         Q    So I understand they're potential ignition

6    sources.  My question is have you seen any evidence in

7    this case that would take it from being a potential

8    to -- anything more than just a potential, any

9    supporting evidence that would -- have you seen any

10   supporting evidence that any one of those potential

11   ignition sources caused the fire?

12                  MR. GARDNER:  Objection to the form of

13   the question; asked and answered, assumes facts not in

14   evidence.

15        A    Specific -- something specific, no.  And

16   again, that's why, in my opinion, all of those items

17   needed to be further analyzed --

18        Q    Sorry.  I'm sorry.

19        A    In an attempt to identify a potential --

20   more specific or potential actual single cause for the

21   fire.

22        Q    And is the same true on page 17, second

23   paragraph, about halfway down?  You say:

24             "There are other potential ignition sources

25   which are potentially capable of igniting any

Page 245

1                CERTIFICATE OF TRANSCRIBER

2          I, DANIELLE S. VANRIPER, do hereby certify

3    that this transcript was prepared from the digital

4    audio recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                        DANIELLE S. VANRIPER

16

17

18

19

20

21

22

23

24

25



**Telephone: (812) 944-9988**
**scott@eiforensic.com**

# Scott A Jones, PE CFEI

Professional Engineer – Mechanical Engineering
Professional Engineer – Electrical Engineering
B.S. Degree – Mechanical Engineering, University of California, Berkeley
B.S. Degree – Nuclear Engineering, University of California, Berkeley
Masters Degree Business Administration
Certified Fire and Explosion Investigator
Certified Vehicle Fire Investigator
Private Pilot

## PROFESSIONAL SUMMARY

- Bachelor of Science Degrees: Mechanical Engineering and Nuclear Engineering; University of California, Berkeley, 1984
- Masters of Business Administration; Union College, Schenectady, New York, 1987

## PROFESSIONAL EXPERIENCE

2006 – Present      **ENGINEERING INVESTIGATION, LLC**
New Albany, Indiana
<u>Senior Mechanical & Electrical Engineer</u>
Investigate, analyze, and provide complete technical reporting on fire, failure, and defect causation. Specialties include: industrial and residential fires/explosions, heavy equipment and automotive systems, major appliances including gas and electric ranges, LP and natural gas systems, water heaters, HVAC systems, fireplaces, aircraft nacelle/EBU systems, sprinkler and fire detection systems, kitchen fire suppression systems, and industrial/OEM product failure.

2000 - 2006      **ENGINEERING AND FIRE INVESTIGATIONS, INC (EFI      GLOBAL)**
Lexington, Kentucky
<u>Senior Mechanical & Electrical Engineer</u>
Responsibilities the same as Engineering Investigation, LLC

Exhibit L

Curriculum Vitae Scott A. Jones, PE                                    Page 2

| 1996 - 2000 | **SERVEND INTERNATIONAL** |
|---|---|

**SERVEND INTERNATIONAL**
Sellersburg, Indiana
<u>Director of Engineering</u>
Served as Engineering Department Leader for Design
Engineering, R&D, Manufacturing Engineering, Tooling and
Consumer Service. Conducted design, safety and Underwriter's
Laboratories reviews to protect product integrity.

1994 - 1996        **GE APPLIANCES**
Louisville, Kentucky
<u>Design Manager - Ranges</u>
Provided engineering leadership to a group of 31 engineering
professionals in the Range product line.  Provided design
leadership for the GE, Profile, RCA, Hotpoint, and Kenmore
brands in electric and gas.  In addition, provided design
guidance for the Calrod heater line.

1987 - 1994        **GE AIRCRAFT ENGINES**
Cincinnati, Ohio
<u>Staff Engineer – New Engine Development</u>
Served as the staff engineer for the development, testing, and
manufacture of components for military (F-14, F16, B2, and TR-2)
and commercial (Boeing 777) aircraft engines.  Designed EBU
(fuel, hydraulic, pneumatic) systems within nacelle structures.
Tested design adequacy through flight test for turboprop and
turbofan engines.

1984 - 1987        **KNOLLS ATOMIC POWER LABORATORY**
Schenectady, New York
<u>Design Engineer – Power Plant Systems</u>
Developed nuclear and steam plant maintenance and operating
procedures for 3 land-based naval nuclear plants.  Wrote system
specifications and developed budgetary analyses for major
modification work.  Participated in design evaluation and system
performance testing for all contracted work.

1975 - 1981        **USS ALEXANDER HAMILTON (SSBN-617)**
New London, CT
<u>Electrician</u>
Served as an electrician and power plant operator aboard the
submarine.  Scheduled and performed preventive maintenance
for the ship's power generation, propulsion and crew support
equipment. Diagnosed and repaired ships' turbo-generators,
high kW AC/DC motor-generators, and ships' single and 3-phase

distribution switchgear and motor controllers.  Received 5 US Navy Letters of Commendation for "…attention to detail, expedient problem solving, and dedication to duty."

## *CERTIFICATIONS*

Registered Professional Engineer, License Numbers PE10200078 (IN); E67726 (OH); 062-056115 (IL); 22984 (KY); 16252 (MS); 6201053251 (MI); PE073499 (PA); 110614 (TN); 108063 (TX)
Certified Fire and Explosion Investigator - National Association of Fire Investigators
Certified Vehicle Fire Investigator - National Association of Fire Investigators
Private Pilot Certificate Number 3375280 – Single Engine Land


PROFESSIONAL ORGANIZATIONS

National Association of Fire Investigators (NAFI)
National Fire Protection Association (NFPA)

CONTINUING LEARNING

*Power Systems* – A calculus-based approach to resolving complex transmission line steady state and transient faulting conditions - *PDHOnline* - Shih-Min Hsu, PhD, PE – November 2021

*Indiana Laws & Rules for Professional Engineers* – PDHOnline - John Huang, PhD, PE – November 2021

*Diesel Engine Fundamentals* - EZ-pdh.com - Seth Grablow, PE – October 2021

*Aerial Photogrammetry, Electrical Reliability of North American Electric Power Systems, Indiana Statutes, Rules, and Ethics for Professional Engineers,* and *Emergency and Standby Power Systems* – EZ.pdh.com - Multiple lecturers – October 2020

*Engineering Law & Ethics* – Multiple lecturers - Halfmoon Education, Inc. – Indianapolis, IN – November 22, 2019

*Rotordynamics* – Albert Storace, PE - Halfmoon Education, Inc. – Cincinnati, OH – February 21, 2019

*NFPA 72 – 2019 Edition, National Fire Alarm and Signaling Code (2019)* – Indianapolis, IN - November 26-28, 2018

Curriculum Vitae Scott A. Jones, PE                                      Page 4

*Laws, Rules and Ethics for Indiana Professional Engineers*; R901; PDHOnline – October 4, 2018

*7 Habits of Highly Effective Engineers* plus *Oil & Gas Production and Process*; P245T and M535T; PDHOnline – December 24-26, 2017

*Fundamentals of Material Science & Electrical Design* plus *Lightning and Static Electricity Protection*; M152T and E112T – PDHOnline – May 17 & 18, 2016

*NFPA 70E – 2015 Edition, Electrical Safety in the Workplace* - National Fire Protection Association – Indianapolis, IN – September 25-25, 2015

*NFPA 921 Origin and Cause/Subrogation/Burn Cells* – Grinnell Mutual Reinsurance Investigations – Cincinnati, OH – June 17, 2015

*National Electrical Code 2014 Edition Seminar* – National Fire Protection Association – Indianapolis, IN – July 7-9, 2014

*Train-the-Trainer Review of Kirk's Fire Investigation – 7th Edition* – Dr. David Icove, PE and Gerald Haynes, PE – Miamisburg, OH - November 5-7, 2013

*National Electrical Code 2011 Edition Seminar* –National Fire Protection Association – Cincinnati, Ohio – October 24-26, 2012

*Advanced Deposition Skills for Experts* – SEAK, Inc. – Naples, Florida – April 13, 2011

*National Expert Witness Conference* – SEAK, Inc. – Naples, Florida – April 14-15, 2011

*Certified Fire Protection Specialist Primer* – National Fire Protection Association – Orlando, Florida – December 13-14, 2010

*National Electrical Code 2008 Edition Seminar* –National Fire Protection Association – Cincinnati, Ohio – October 19-21, 2009

*2008 International Symposium on Fire Investigation Science and Technology* – National Association of Fire Investigators – University of Cincinnati, Ohio – May 19-21, 2008

*Preview of the New (2008) Indiana Building Code* – American Institute of Architects/Lorman – Evansville, Indiana – February 19, 2008

*2007 Vehicle Burn Seminar* – International Association of Arson Investigators, Inc. – Georgetown College in Georgetown, Kentucky – March 29 & 30, 2007

Curriculum Vitae Scott A. Jones, PE                                    Page 5

*2006 International Symposium on Fire Investigation Science and Technology* – National Association of Fire Investigators – University of Cincinnati, Ohio - June 26-28, 2006

*2005 IASIU Insurance Fraud Seminar* – Kentucky Chapter IASIU – Louisville, Kentucky - May 12 & 13, 2005

*2004 National Seminar on Fire Analysis Litigation* – Sarasota, FL – National Association of Fire Investigators – August 12-13, 2004

*2003 IASIU Seminar* – Elizabeth, Indiana – May 19-20, 2003

*2003 World Tire Expo* – Seminar series presented by Tire Industry Association – Louisville, Kentucky – March 27 & 28, 2003

*2002 Vehicle Fire, Arson & Explosion Investigation Science & Technology Seminar* – Eastern Kentucky University, Richmond, Kentucky – September 30 – October 2, 2002

*Insurance Fraud Seminar* – Elizabeth, Indiana – May 13-14, 2002

*2001 Advanced Insurance Fraud Seminar* – Cincinnati, Ohio – November 14-15, 2001

*Overview of the 2000 International Residential Code* – Indianapolis, IN – October 30, 2001

*Indiana Fire and Arson Conference 2001* – Indianapolis, Indiana – August 20-22, 2001

*2000 Advanced Insurance Fraud Seminar* – National Society of Professional Insurance Investigators – Cincinnati, Ohio – November 14-16, 2000

*Arson Investigation for the Second Millennium* – National Association of Fire Investigators – Somerset, KY – May 2-6, 2000

# ENGINEERING REPORT

## DECEMBER 28, 2022

PREPARED FOR:      CLENDENING JOHNSON & BOHRER, PC
409 W PATTERSON DR; STE 205
BLOOMINGTON, INDIANA 47403

ATTENTION:         BENJAMIN KATCHUR, ESQ

---

INSURED:          GAS-FIRED PRODUCTS, INC

LOSS LOCATION:      6231 MACBETH ROAD
FORT WAYNE, INDIANA

DATE OF LOSS:       MARCH 19, 2019

FILE NUMBER:       N/A

CLAIM NUMBER:      C269498

EI FILE NUMBER:     EI-22-141

**THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE. RELEASE TO ANY COMPANY, CONCERN OR INDIVIDUAL IS SOLE RESPONSIBILITY OF ADDRESSEE.**

Gas-Fired Products, Inc.    2    December 28, 2022
Claim № C269498

# Introduction

During the late evening of March 19, 2019, a fire occurred at the Republic Services Waste Disposal, Recycling and Trash Pickup industrial site on Macbeth Road in Fort Wayne, Indiana. The fire originated at the southern extent of Building 1 that was utilized for dumpster repair/rework and storage as shown in the dotted red circle in *Figure 1*.



**Figure 1 - Republic Services Site**

Jim Foster, CFI and fire investigator working in the interests of Republic Services of Indiana, LP (Republic Services), opined that "Paint and other flammable products used in the repair of trash dumpsters collected on and inside the tube heaters and ignited."[1]

---

[1] *Expert Report*, by James P. Foster, CFI, CEFI, CVFI, dated November 18, 2022, p.1

Gas-Fired Products, Inc.                    3                    December 28, 2022
Claim № C269498

The LP gas-powered tube heaters were reportedly manufactured by the Insured, Gas-Fired Products, Inc. and were reportedly installed by Coe Heating & Air Conditioning, Inc. (Coe HVAC). Coe HVAC reportedly completed installation of the tube heaters on or before February 4, 2019.

Mike Vergon, CFI and Fire Investigator of Vergon & Associates Fire Investigation, LLC, was assigned by Clendening Johnson & Bohrer, PC to investigate the origin and cause of the fire. On or about May 16, 2022, Mr. Vergon contacted the author of this Engineering Report, Scott A Jones, PE of Engineering Investigation, LLC. Mr. Vergon requested the author's assistance in the inspection and evaluation of the tube heaters that had been previously removed from the loss site. The author did not visit the loss site. The scope of the author's duties did not include a complete fire origin and cause investigation.

In preparation for writing this Report, the author reviewed: National Oceanic & Atmospheric Administration (NOAA) regional weather; *Space-Ray Installation and Operating Instructions*, dated December 2017; *Expert Report*, by James P. Foster, CFI, CEFI, CVFI, dated November 18, 2022; Sheboygan Paint Company *Water Reducible Protective Enamel Technical Data Sheet*, undated; Report of Findings, by James P. Foster, CFI, CEFI [sic], CVFI, dated December 3, 2019; Sheboygan Paint Company, *Medium Blue WR Protective Enamel Product Specification* (MSDS), printed 12/01/14; white paper regarding code-compliance authored by Mr. Nicholas Ozog and dated November 18, 2022; deposition transcript of Mr. Fred Jones, Republic Services worker; deposition transcript of Mr. Terry Reader, Republic Services worker; loss site inspection photographs recorded by Mr. Vergon on March 3, 2020 and May 11, 2020; provisions of NFPA 54 – 2018 Edition, *National Fuel Gas Code*; provisions of NFPA 211 – 2019 Edition, *Standard for Chimneys, Fireplaces, Vents, and Solid Fuel Burning Appliances*; and Republic Job Material List (Front Sides and Back Sides) supplied by counsel on December 1, 2022.

Gas-Fired Products, Inc.                         4                    December 28, 2022
Claim № C269498

# Background

Mr. Foster provided a chronology of events in his *Expert Report* of November 18, 2022. In bulletized form, locations and events were as follows:

- o  The area where the fire originated was at the south end of the building where trash dumpsters were repaired and repainted.

- o  The dumpster maintenance included repairing, sanding, patching, and repainting the dumpsters.

- o  Work in this area included the use of flammable and other combustible materials.

- o  Welding was also done when needed to repair metal components. On the date of the fire, work had been completed in the area of origin. This work included welding to repair trash dumpsters.

- o  Sanding and painting operation had been done during the day.

- o  Work was completed around 3:00 p.m., and employees had cleaned up the area following the completed work day.

- o  There were no indications of any problems at the time the employees left the facility at 4-4:30 p.m.

- o  A facility manager had completed a walkaround that included the maintenance facility and the area where work had been done. There was no indication of any problems when that observation was completed at 6:00 to 6:30 p.m.

- o  Three Space Ray Ceiling tube infrared heaters, model PT125-30L5 had been installed in the paint and welding shop area within the past two months. The heaters were supplied by electrical power and propane fuel. There had been no reported problems related to the heat prior to the fire event.

Gas-Fired Products, Inc.                          5                December 28, 2022
Claim № C269498

## Regional Weather Conditions

The author downloaded historic regional weather conditions from the National Oceanic & Atmospheric Administration (NOAA). The weather conditions were reported from Fort Wayne International Airport (KFWA) via hourly METAR (aviation) weather observations. The data was compiled using the NOAA Local Climatological Data (LCD) service.

Fort Wayne International Airport was situated 3.8 miles to the south southeast of the loss site.

The overnight temperature in the days preceding the loss were near or below freezing as shown in the table:

| Date | Daily LOW Temperature | Precipitation |
|---|---|---|
| March 15 | 34°F | Rain & snow |
| March 16 | 29°F | None |
| March 17 | 25°F | Snow |
| March 18 | 27°F | None |
| March 19 | 28°F | None |

It is reasonable to believe that the subject tube heaters, if operational, would have been used to maintain temperature in the Painting Area.

# Observations

On August 23, 2022, the author inspected the remnants of the three PTS125-L5 single-pass, single-stage tube heaters that had been previously removed from the loss site. The heaters reportedly had been installed in an east-west arrangement. Accordingly, site inspection attendees marked the heater remnants as SOUTH, NORTH, and MIDDLE heaters.

## MIDDLE Heater Inspection

The MIDDLE heater head was presented as shown in *Figure 2*.

Gas-Fired Products, Inc.                           6                    December 28, 2022
Claim № C269498



**Figure 2 - MIDDLE Heater Remnants**

As shown in ***Figure 2***, the MIDDLE Heater head was presented with a LP gas supply piping segment, appliance connector, and a portion of the single-wall intake (combustion air supply) duct. All items were damaged from the heat of the fire and/or building collapse.

The brass LP gas jet was melted such that identification of orifice size could not be determined (***Figure 3***). The LP gas combination gas valve was a re-solidified pool of aluminum (***Figure 4***).



**Figure 3 - Melted Brass Jet**

Gas-Fired Products, Inc.                    7                    December 28, 2022
Claim № C269498



**Figure 4 - LP Gas Combination Valve**

Exhaust gases from the heater were routed outdoors via double-wall Type B vent. Transition through the roof sheathing was accomplished via roof flashing and storm collar (*Figure 5*).



**Figure 5 - Type B Vent with Roof Flashing and Storm Collar**

Gas-Fired Products, Inc.        8        December 28, 2022
Claim № C269498

Inspection of the inner surfaces of the aluminized steel heater tube revealed no blue paint deposits or foreign material(s) (*Figure 6*).



**Figure 6 - MIDDLE Heater Tube**

The aluminum *inner* tube in the Type B vent[2] had completely melted away as shown in *Figure 7*.



**Figure 7 - Type B Vent Inner Aluminum Tube Melted**

---

[2] All Type B vent inner aluminum tubes for all three heaters exhibited melting. The outer tubes were composed of galvanized steel.

Gas-Fired Products, Inc.                              9                    December 28, 2022
Claim № C269498

## SOUTH Heater Inspection

As shown in *Figure 8*, the SOUTH heater head was presented for inspection with the combustion air intake attached along with the appliance connector and lacquered steel LP gas supply drip leg.



**Figure 8 - South Heater Head with Combustion Air Intake**

The heater was equipped with a properly-sized[3] 30 LP gas orifice (*Figure 9*).



**Figure 9 - Drill Size 30 LP Gas Orifice**

---

[3] *Space-Ray Installation and Operating Instructions*, dated December 2017

Gas-Fired Products, Inc.                    10                    December 28, 2022
Claim № C269498

Inspection of the inner surfaces of the aluminized steel heater tube revealed re-solidified aluminum drop down from the associated exhaust vent with no blue paint deposits. (*Figure 10*).



**Figure 10 - View into SOUTH Heater Tube**

The SOUTH heater transition through roof sheathing was accomplished via roof flashing and storm collar around a Type B vent (*Figure 11*).



**Figure 11 - SOUTH Heater Type B Vent with Flashing and Storm Collar**

Gas-Fired Products, Inc.                     11                    December 28, 2022
Claim № C269498

## NORTH Heater Inspection

As shown in *Figure 12*, the NORTH Heater head was presented with a LP gas supply piping segment, appliance connector, and the starter collar/elbow segment for a single-wall intake (combustion air supply) duct.  All items were damaged from the heat of the fire and/or building collapse.  The LP gas combination valve body had melted (*Figure 13*).



**Figure 12 - NORTH Heater Head with LP Gas Supply Piping**



**Figure 13 - LP Gas Valve Melted**

Gas-Fired Products, Inc.                    12                    December 28, 2022
Claim № C269498

The brass LP gas orifice was recovered from the burner remnants.  The heater was
equipped with a proper drill size 30 LP gas orifice (**Figure 14**).



**Figure 14 - NORTH Heater Orifice**

The NORTH heater transition through the roof sheathing was accomplished via roof
flashing and storm collar around a Type B vent (**Figure 15**).



**Figure 15 - NORTH Heater Roof Transition and Firestop Spacer**

Gas-Fired Products, Inc.                    13                    December 28, 2022
Claim № C269498

A steel firestop spacer was recovered with the Type B vent section as shown in **Figure 15**. It appeared that firestop spacers were used in the ceiling exhaust transitions.

# Discussion

Direct inspection of the three heater heads revealed that all three heads were equipped with single wall tubes and flexible elbows to facilitate combustion air intake from an area other than the occupied space of the building of fire origin.

The front sheet of the Coe HVAC Bill of Materials (**APPENDIX**) for the Republic Services heater installation shows 10 feet of 30-gauge pipe was used during the installation of the heaters. 30-gauge pipe is often used for combustion air intake pipe as single wall vent (i.e., exhaust) pipe must be at least 26-gauge thickness.[4]

The Coe HVAC Bill of Materials also showed the use of 8 feet of 26-gauge pipe that may have been used as a connector to the Type B vents (i.e., double-wall vent pipe) that transitioned through the Attic.

From the author's artifact observations and Coe HVAC Bill of Materials, it is believed that the pre-fire heater configurations appeared in a manner similar to the unscaled layout created by the author (**Figure 16**).

As shown in **Figure 16**, fresh combustion air was drawn into each of the heaters from the Attic or through exterior wall(s) via 4-inch single wall piping attached to each of the heater heads. Exhaust air transitioned though the Attic using Type B vent.

The design is known as a direct-vent configuration whereby air moving through the heaters does not interact with the air in the heated volume. As such, aerosols, particulate, and vapors in the heated space are not drawn into the heaters' air stream. All piping downstream of the heater heads was at a positive (i.e., higher) pressure than the pressure in the room due to the action of the heater's blower.[5]

---

[4] 30-gauge pipe is thinner than 26-gauge pipe. Per NFPA 211-2019 Edition, ¶ 9.2, single-wall galvanized steel pipes used in gas appliance service as connectors must be constructed of 26-gauge or thicker material.
[5] The subject Space-Ray heaters are listed as NFPA 54-2018 Edition Category III appliances. A Category III appliance operates with a positive pressure (due to the combustion air blower) and has a high enough exhaust gas temperature to avoid excessive condensate production in the exhaust system.

Gas-Fired Products, Inc.                    14                    December 28, 2022
Claim № C269498



**Figure 16 - Radiant Heater Direct-Vent Air Flow Paths**

The *Space-Ray Installation and Operating Instructions*, offered direct-vent guidance to installers as a means to avoid interactions with detrimental environments:

### 17.1) DIRECT OUTSIDE AIR FOR COMBUSTION

*Outside combustion air should be supplied directly to the heater when the building is subject to negative pressure, or when contaminants or high humidity are present in the building air. These contaminants include paints, solvents, corrosive vapors or any other foreign particles that may cause damage to the heater or result in poor combustion.*

Gas-Fired Products, Inc.                    15                    December 28, 2022
Claim № C269498

# Conclusions

1. **Regional weather was not causal to the fire.**    Review of the regional weather conditions at the time of the loss revealed that it was a calm but cold evening.  There was no convective (i.e., thunderstorm) activity.

2. **The three Space-Ray tube heaters appeared to be installed and ready-to-run based upon heat demand.**  All three heaters appeared with intact appliance connectors for connection to the building's LP gas distribution system.  2 of 3 gas isolation valves for the heaters were verified in the OPEN position.  The third LP gas isolation valve was not destructively disassembled to facilitate direct inspection.  All heaters' radiant tubes were intact with no penetrations.

   2 of 3 LP gas orifices were verified to be drill size 30, which was the proper diameter for a 125,000 BTU/hour LP gas Space-Ray tube heater.  The third orifice had melted sufficiently to prevent orifice sizing.

   The vertical portions of the exhaust vents for all three heaters were proper double-wall Type B vent.  No outdoor vent caps appeared with the evidence, but Type B vents often use all-aluminum cap construction; whereby the vent caps would not be expected to survive a fire.

3. **The internal surfaces of the heaters were not contaminated by paint residue as the air flowing through the heaters was obtained from outside and exhausted outside**.  The heaters were installed in a direct-vent configuration whereby combustion air was obtained from uncontaminated air outside the heated space.  The configuration was a manufacturer's recommended configuration.

4. **The Space-Ray infrared LP-fueled heaters created no conditions that were causal to the fire**.  Although the heaters were extensively damaged by the action of the fire, there were no deleterious conditions discovered by careful inspection of the heater remnants.

Gas-Fired Products, Inc.                16              December 28, 2022
Claim № C269498

The opinions in this Report are given with a reasonable degree of engineering certainty.

This investigation was conducted in accordance with the Scientific Method as taught in National Fire Protection Association (NFPA) 921 – 2021 Edition, *Guide for Fire and Explosion Investigations*.  The analysis and conclusions are based upon information reviewed to date, plus general engineering knowledge and experience.  Information reviewed at a later date may warrant modifying or augmenting the conclusions, and the author reserves the right to supplement this Report.

Sincerely,



December 28, 2022

Scott A. Jones, PE CFEI CVFI
Registered Professional Engineer – Mechanical Engineering
Registered Professional Engineer – Electrical Engineering
Engineering Investigation, LLC

Gas-Fired Products, Inc.                    17                    December 28, 2022
Claim № C269498

# APPENDIX

Gas-Fired Products, Inc.                    18                    December 28, 2022
Claim № C269498

REPLACEMENT MATERAIL REQUISITION                    REV. 11-1-2018

JOB NAME _Republic Services_   JOB # _ZO4172 -D_ DATE _1-10-19_

ADDRESS _6231 Macbeth Rd._   PHONE_____   INSTALL_____

TOOLS NEEDED:RECLAIMER_____ LADDER FT._____ HAMMER DRILL_____ OTHER_____

| PULL | USED | DESCRIPTION | | COST |
|---|---|---|---|---|
| | | | THERMOSTATS | |
| | | TH3110D1008 | DIGITAL NON PROG.    PRO 3000 | |
| | | TH4110D1007 | DIGITAL PROG.   PRO 4000 | |
| | | TH6220U2000 | 2H/2C     CONVENTIONAL | |
| | | TH6210U2001 | T6 STAT     PROG 7 OR 5-2 DAYS 2H-1C | |
| | | | | |
| | | | | |
| | | **12 YEAR LABOR     NEEDS TO BE HIGHLIGHTED** | | |
| | | | | |
| 3 | 3 | Space heat PTS 125-30 S #13900 Tube heaters #192 | | |
| | | (LP GAS) | | |
| 3 | 4 ✓ | 4" flashings | | |
| 3 | 8 ✓ | 4" storm collars | | |
| 3 | 0 | wall thimbles   4" | | |
| 3 | 4 ✓ | 4" B-vent caps | | |
| 40 20' | 8' | 4" 26 g. pipe | | |
| 30' | 10' | 4" 30 g. pipe   5'ers | | |
| 10 | 13 | 4" Ell's | | |
| 3 | 4 | 5' x 4" B-vent pipe | | |
| 3 | 0 | 3'x4" B-vent pipe | | |
| 3 | 1 | 18" x 4" B-vent pipe | | |
| 80' | 40' | BX cable   B-2 | | |
| 6 | 2 | #14 2x4 Electrical boxes | | |
| 3 | 0 | switches | | |
| 2 | 0 | 2X4 switch covers | | |
| 60' | | 3/4 Black Iron | | |
| 10' | | 1/2" Black Iron | | |
| | 1 | 3/4 + 1/2" mega Kit | | |

Page 1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF INDIANA

3              FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7           Plaintiff,

8       v.                          Case No.

9    COE HEATING & AIR CONDITIONING,     1:21-cv-108-

10   INC. and GAS-FIRED PRODUCTS,        HAB-SLC

11   INC. d/b/a SPACE-RAY,

12          Defendants.

13   _____

14           VIDEOCONFERENCE DEPOSITION OF

15               SCOTT JONES

16   DATE:        Tuesday, February 21, 2023

17   TIME:        10:08 a.m.

18   LOCATION:    Remote Proceeding

19                New Albany, Indiana 47150

20   REPORTED BY: Sarah Lakin, Notary Public

21   JOB NO.:     5676789

22

23

24                    Exhibit M

25

Page 58

```
 1   Space-Ray infrared LP-fueled heaters created no
 2   conditions that were causal to the fire."  Do you see
 3   that?
 4        A    Yes, sir.
 5        Q    Is that a cause and origin opinion?
 6        A    No.  That is was this able to be operated,
 7   and did I see anything that would have caused the
 8   fire.  For example, had -- was one of the gas jets
 9   misdirected?  For example, was there a penetration in
10   one of the radiant tubes?
11             Those are the type of things that could
12   cause a fire, and I saw no conditions like that would
13   have been causal to a fire.
14        Q    In your opinion, did the Space-Ray infrared
15   heaters -- should those be eliminated in this case as
16   a potential ignition source?
17        A    Yes.
18        Q    And is it because you didn't see any
19   conditions that were -- let me back up.  Is it because
20   you believe the Space-Ray heaters didn't create any
21   conditions that were causal to the fire?
22        A    That is correct.
23        Q    Okay.  Is an opinion on the elimination of a
24   potential ignition source a cause and origin opinion?
25        A    It's -- it feeds into a larger -- when you
```

Page 101

1        Q     As a result of the falling down and collapse

2    in debris?

3                    MR. JONES:   Objection to form.

4    Foundation.

5        A     That is correct.

6        Q     Did you see any evidence that my client did

7    not properly utilize those connectors to create a seal

8    between the different pipe sections of the heaters?

9        A     This may be an FYI, but my understanding is

10   that Space-Ray ships these out complete already

11   connected.  I have not seen that, but that's my

12   historic understanding of these that your client may

13   not even have touched these.

14              But I saw no evidence responsive to your

15   question that there was anything.  But we did have a

16   building collapse and there were separated sections.

17       Q     And did you see any failure in connection

18   with either any part of the 26-gauge metal or the 30-

19   gauge metal that in your opinion played any role in

20   causing this fire?

21                   MR. JONES:   Objection to form.

22       A     I saw no condition that would have been

23   causal to the fire.

24       Q     Do you have the Space-Ray installation and

25   operation instructions manual with you?

Page 112

CERTIFICATE OF TRANSCRIBER

1

2          I, JENNA STERN, do hereby certify that this

3     transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

*Jenna Stern* (signature)

JENNA STERN

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF INDIANA

3                     FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7            Plaintiff,        Case Number 1:21-CV-00108

8    v.

9    COE HEATING & AIR CONDITIONING,

10   INC.; and GAS-FIRED PRODUCTS, INC.

11   d/b/a SPACE-RAY,

12           Defendants.

13   _____

14

15

16

17       REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18              JOHN H. DIGGLE, III, P.E.

19             Taken Friday, March 10, 2023

20             Scheduled for 1:00 p.m. EST

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

       Job No. CS5768515

25                       Exhibit N

Page 21

1    there's kind of a long rectangle that abuts the

2    southern wall.  Do you know what that is and

3    what you were intending to represent by that?

4    A.     Yeah, that's most likely the electrical

5    service panels, and it's their location, I

6    believe.

7    Q.     Okay.  So they were located in the

8    southeast corner of the building basically?

9    A.     That's correct, yeah.

10   Q.     Okay.  Let me just skip a page and go to

11   your last page.  It actually says page 1 of 1.

12   It looks like that, John.

13   A.     Yeah.  I got that.

14   Q.     Okay.  So it's dated May 11th of 2020,

15   so roughly two months later it appears to me

16   from the other notes we've been reading,

17   correct?

18   A.     Yes.

19   Q.     Were you back at the site on May 11th,

20   do you recall?

21   A.     Yes, I was.

22   Q.     Okay.  Let's see if I can read these

23   correctly, your notes from May 11th of 2020.

24   "Electric enters at south end of building.

25   Extensive thermal damage to breakers - all

Page 22

1    charred."  Then I think you wrote, "Switch

2    boxes in four-inch junction boxes - destroyed.

3    Conduit is destroyed and in pieces.  Fire melt

4    extensive to copper conductors."

5         Is that the reason why the electrical

6    systems were not gathered into evidence and

7    taken to the Rimkus lab, because of this

8    extensive damage?

9              MR. JONES:  Objection to the form

10   and foundation.

11             THE WITNESS:  That was a factor for

12   sure.  Yeah, the extensive damage, our

13   inability, in my opinion, to -- for there to be

14   any realistic likelihood that we were going to

15   be able to reconstruct the electrical system to

16   determine which came from -- you know, what

17   piece of wire came from where, that -- all of

18   that kind of came together in that decision.

19   BY MR. GARDNER:

20   Q.    Okay.  And was that a joint decision

21   involving you and Mr. Inendino and Mr. Foster?

22   A.    Well, regarding the electrical system,

23   that was probably solely my input to it.  They

24   were probably -- I mean, they were welcome to

25   voice their opinions about it, but they were

Page 23

1    probably just accepting my leadership on that

2    topic.

3    Q.    Would it be fair to say that due to the

4    extensive damage to the electrical systems, as

5    you have notated here on May 11th, 2020, in

6    your notes, along with the extensive damage to

7    the building and the total collapse, did you

8    conclude that it wouldn't make any difference

9    to gather it and take it down to the lab and

10   use scanning electron microscopes for the

11   reasons you just said, the damage is just too

12   extensive for that testing to be of any

13   meaning?

14   A.    I would characterize it as I -- it was

15   my opinion at the time and still is that due to

16   the extent of damage, doing that -- doing the

17   work of collecting it, going through a lab

18   exam, possibly doing metallurgy on it, like you

19   discussed, was very unlikely to be fruitful as

20   far as making any definitive conclusions about

21   the electrical system.

22   Q.    In other words, even if you took it to

23   Indianapolis and examined it and tried to do

24   arc mapping and tried to look at it with a

25   scanning electron microscope and other means

Page 24

1    and methods of your expertise, you wouldn't be

2    able to rule in or out electrical as a cause of

3    the fire?

4              MR. JONES:  Objection to form.

5              THE WITNESS:  I think that's a -- I

6    would agree with that, yes.

7    BY MR. GARDNER:

8    Q.    Okay.  Do you know a fellow named Mike

9    Vergon?

10   A.    Yes.

11   Q.    Have you worked other cases involving

12   Mike Vergon other than this one?

13   A.    Yes.

14   Q.    We took his deposition under oath on

15   January 19th, 2023, and I'm going to read you

16   just a little bit of his deposition.  And this

17   was a question by plaintiff's counsel,

18   Mr. Thomas Jones, page 42, line 18.

19         "Mike..." meaning Mike Vergon "Are you

20   aware of Mr. Inendino providing any cause and

21   origin opinions in this lawsuit?"

22         Answer, "Yes."

23         Question, "And what is the form of those

24   opinions?"

25         Answer, "At the scene when I asked him

Page 38

                    REPORTER'S CERTIFICATE

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF HENNEPIN    )

        I hereby certify that I reported the remote
deposition of JOHN H. DIGGLE, III, P.E. on Friday,
March 10, 2023, in Maple Grove, Minnesota, and
that the witness was by me first duly sworn to
tell the whole truth;
        That the testimony was transcribed by me
and is a true record of the testimony of the
witness;
        That the cost of the original has been
charged to the party who noticed the deposition,
and that all parties who ordered copies have been
charged at the same rate for such copies;

        That I am not a relative or employee or
attorney or counsel of any of the parties, or a
relative or employee of such attorney or counsel;

        That I am not financially interested in the
action and have no contract with the parties,
attorneys, or persons with an interest in the
action that affects or has a substantial tendency
to affect my impartiality;

        That the right to read and sign the
deposition transcript by the witness was waived.

        WITNESS MY HAND AND SEAL THIS 30th day of
March, 2023.

*Dana Anderson*

Dana S. Anderson-Linnell
Notary Public, Hennepin County, MN
My commission expires 1/31/2025

Page 1

1               IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF INDIANA

3                    FORT WAYNE DIVISION

4        _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7              Plaintiff,

8         v.                            Case No.:

9    COE HEATING & AIR CONDITIONING,     1:21-CV-00108

10   INC.; and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY,

12             Defendants.

13   _____

14              DEPOSITION OF TERRY READER

15   DATE:       Wednesday, October 26, 2022

16   TIME:       10:48 a.m.

17   LOCATION:   Whitley County Courthouse

18               101 West Van Buren Street

19               Columbia City, IN 46725

20   REPORTED BY: Andrew Pronschinske, Notary Public

21   JOB NO.:    5547497

22

23

24

25                    Exhibit O

Page 38

1      Q   Okay.  Did you occasionally, from time to

2  time when you were employed at Republic, repair blue

3  dumpsters?

4      A   Oh, yeah.

5      Q   Okay.  But you think you repaired more brown

6  ones than blue ones?

7      A   40/60, 50/50.

8      Q   Pretty close?

9      A   Yeah.  It was all over.

10     Q   But you think the brown ones have brown

11  paint on them?  Is that what you're saying?

12     A   They was blue when they left.  Everything

13  had to be converted to blue.

14     Q   Okay.  But you definitely used your plasma

15  torch and your acetylene torch on blue dumpsters?

16     A   Yes.

17     Q   And they had been painted previously and

18  been out in the field and came back in for repairs?

19     A   Yes.

20     Q   Okay.  And did you have a lot of dumpsters

21  catch on fire, the blue paint catch on fire when you

22  were using your plasma torch and your acetylene torch?

23  I'm talking about the dumpster itself, not the

24  contents.

25     A   The paint itself catch on fire?

Page 39

1    Q    Yeah.

2    A    No.

3    Q    Okay.  And you weren't -- while you were

4    using your plasma torch or your acetylene torch as

5    high as 3,000 degrees, you didn't have a fire

6    extinguisher sitting next to you so you -- make sure

7    the blue paint didn't catch up on fire and burn the

8    dumpster up; right?

9    A    Yes, we had fire extinguishers.

10   Q    Was it so you could spray blue paint?  Put a

11   fire out that's from blue paint?

12             MR. JONES:  Objection to form.

13   Q    Let me retract the question.

14             Did a dumpster ever catch on fire -- just

15   the blue dumpster itself.  I'm not talking about the

16   contents -- when you were using a plasma torch or an

17   acetylene torch?

18   A    No.

19   Q    Okay.  I'm going to show you what we've had

20   marked as Exhibit F.

21             (Exhibit F was previously marked for

22              identification.)

23             It's a lot of photos, but just the first

24   couple of pages.  I didn't bring an extra copy for

25   myself.

Page 63

BY MR. GARDNER:

Q    When you say "paint booth," what do you mean?

A    It has its own ventilation system and no heating system in it.

Q    All right.  You've seen that in other places?

A    Um-hum.

Q    Yes?

A    Yes.  But that's what --

Q    What place did you see that at?

A    I used to work at a place called MTI. We -- bucket trucks and I used to be a painter there, actual painter there.

Q    So you have painted inside of a defined spray booth?

A    Yes.

Q    And was the painting done at Republic's facility to Building Number 1 done in a defined paint booth?

A    No.

Q    Okay.  You never used a welder inside of the paint booth at MTI; did you?

A    No.

Q    And you never used a plasma or acetylene

Page 64

1    torch inside of the paint booth at MTI; did you?

2        A    No.

3        Q    Okay.  I might have asked this already, but

4    between 2012 when you started and 2019 when you left

5    after they fired you, did you ever see that blue paint

6    catch on fire either in a liquid state or a dry state?

7        A    No.

8        Q    Okay.  Was there ever any talk in the shop

9    about we got to be careful about this blue paint when

10   it dries because it's going to catch on fire?

11       A    No.

12       Q    Okay.  Do you remember, Terry, how many

13   square heaters were in Building Number 1 before the

14   fire?

15       A    I believe there was three in this one.  One

16   in this one.

17            MR. GARDNER:  And for the record, then,

18   when he said there's three in this one, he was

19   pointing at --

20            THE WITNESS:  In Building 1.

21   BY MR. GARDNER:

22       Q    And then in Building 2, there's a big white

23   garage door?

24       A    Right.  And that was part -- this was both

25   part of a --

Page 65

```
 1        Q     Upper --

 2        A     Yeah, like --

 3        Q     Container shop?

 4        A     Right.

 5        Q     Was there a dividing wall though, Terry,

 6   between Building 1 and Building 2?

 7        A     Yes.

 8        Q     And so, just to be clear, there were three

 9   overhead heaters in Building 1 where the painting

10   occurred, and one overhead heater in part of Building

11   2 where painting did not occur?

12        A     Right.

13        Q     Would that be accurate, what did occur in

14   Building Number 2 in the area that would be accessed

15   by the white garage door?

16        A     We repaired cans.

17        Q     Welding and cutting and such?

18        A     Yeah.  There too.

19        Q     Okay.  And in Exhibit D, do you see any blue

20   paint on the ceiling of Building Number 1?

21        A     No.

22        Q     Do you see any blue paint above the

23   horizontal blue line about halfway up the wall?

24        A     No.

25        Q     Did you ever see Dale get reprimanded for
```

Page 172

1          CERTIFICATE OF TRANSCRIBER

2              I, ANNE BROWN, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14                          *Anne Brown*

15                          ANNE BROWN

16

17

18

19

20

21

22

23

24

25

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF INDIANA

3                     FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7              Plaintiff,

8       v.                             Case No.

9    COE HEATING & AIR CONDITIONING,     1:21-CV-00108

10   INC.; and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY

12            Defendants.

13   _____

14            VIDEOCONFERENCE DEPOSITION OF

15                 SAMIR DIZDAREVIC

16   DATE:        Monday, October 31, 2022

17   TIME:        1:12 p.m.

18   LOCATION:    Remote Proceeding

19                Indianapolis, IN 46204

20   REPORTED BY: Andrew Pronschinske, Notary Public

21   JOB NO.:     5542223

22

23

24                      Exhibit P

25

Page 36

1    after seeing smoke?

2         A    Yes, sir.  He did.

3         Q    Did anyone else go in, to your knowledge?

4         A    Not that I can recall.  I don't think so.

5         Q    So after you exited, you were moving the

6    vehicles, what did you do next?

7         A    It's, pretty much, after you -- after we

8    moved the vehicles, I called 9-1-1.  The security

9    guard called 9-1-1.  I mean, I'm pretty sure a couple

10   other people called 9-1-1.

11        Q    So initially you said you didn't see any

12   flames.  Did you, at some point in time, see flames

13   comping from the operations building?

14        A    Yes.  You could see the flames.  As soon as

15   we got done pulling the supervisor trucks away from

16   the south side of that building, you could see flames.

17   The very tip top of the building where the roof and,

18   you know, obviously, the rafters meet, you could see

19   flames coming out there.  And then from the overhead

20   doors, the closest one to the exterior of that

21   building on the south side, that one had flames coming

22   out of it as well.

23        Q    Did you take any videos or pictures of the

24   fire as it was occurring?

25        A    Yes, I did.  But I've got a new phone.  At

```
 1              MR. ZOCCOLA:  I'm just going to object
 2    to form, real quick.  Real quick, Samir, let me --
 3              I think that misstates what he said
 4    earlier, Jim.  But I'll just -- I'll object to form.
 5              MR. HEHNER:  Sure.  Well, he said yes.
 6              Let me -- I'll just ask it a different
 7    way, Samir.  Us attorneys, we have all these rules we
 8    follow, so I'm going to ask it a slightly different
 9    way.  Can you hear me okay?  Is my audio fine?
10              THE WITNESS:  Yes, sir.  Yes.  Yes,
11    sir.  You're fine.
12    BY MR. HEHNER:
13         Q    Did you see flames coming out of either of
14    the garage doors on the southern side of that
15    building?
16         A    Yes, sir.
17         Q    And which -- was it both, one; can you
18    explain that for me?
19         A    It was the furthest one away from the main
20    entrance to the operations building.  So there was a
21    door to get into the operations building, and then to
22    the left of it, I believe, there was a ten-foot, you
23    know, overhead door.  And then there was an additional
24    10-foot overhead door that was right there, I believe,
25    so if I recall.  That building is pretty old, so.
```

Page 60

1      Q    I'm sorry.  So it would be the one to the

2   further south; is that correct?

3      A    Yes, sir.  The further south.  Yes, sir.

4   That door.

5      Q    Let's be clear on our orientation.  The

6   maintenance building that you worked in was a building

7   that sort of generally ran in a northerly and

8   southerly direction, but on the east side of the

9   parking lot; is that correct?

10      A    Yes, sir.  Yes.  Correct.

11      Q    And this building, where the fire occurred,

12   is a building that ran in a northerly-southerly

13   direction, but on the west side of the parking lot;

14   correct?

15      A    Yes, sir.  Correct.

16      Q    And the painting area that you've been

17   referring to was on the southern end of that building;

18   correct?

19      A    Yes, sir.  Correct.

20      Q    All right.  You mentioned that there

21   were -- that you had seen -- that there was a couple

22   of welding setups in that painting area; am I correct?

23      A    Yes, sir.

24      Q    Did you say there was oxygen as part of that

25   setup?

Page 69

1          CERTIFICATE OF TRANSCRIBER

2              I, JENNIFER MOSS, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                    JENNIFER MOSS

16

17

18

19

20

21

22

23

24

25