**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| REPUBLIC SERVICES OF INDIANA LIMITED PARTNERSHIP,<br><br>      Plaintiff,<br><br>vs.<br><br>COE HEATING & AIR CONDITIONING, INC.<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Case No. 1:21-cv-108-HAB-SLC** |

**DEFENDANT COE HEATING & AIR CONDITIONING, INC.'S DESIGNATION OF**
**EVIDENCE SUPPORTING COE HEATING  & AIR CONDITIONING, INC.'S MOTION**
**FOR SUMMARY JUDGMENT**

      COMES NOW Defendant, Coe Heating & Air Conditioning ("Coe"), by counsel,

Christopher J. Uyhelji and Martin J. Gardner of Gardner & Rans P.C., and in support of its

Motion for Summary Judgement submits the following Designation of Evidence:

1.      Deposition of Trevor Miller and Korte Proposal, attached in relevant part as

      Exhibit A;

2.      Deposition of Louis Inendino, attached in relevant part as Exhibit B;

3.      Deposition of Terry Reader, attached in relevant part as Exhibit C;

4.      Deposition of Samir Dizdarevic, attached in relevant part as Exhibit D;

5.      Deposition of Justin Davis, attached in relevant part as Exhibit E;

6.      Deposition of Ron Dantzer, attached in relevant part as Exhibit F;

7.      Deposition of Michael Agosti, attached in relevant part as Exhibit G;

8.      Deposition of Scott Jones, attached in relevant part as Exhibit H;

9.      Michael Agosti's Report, attached as Exhibit I;

1

10.     Michael Vergon's Report, attached as Exhibit J;

11.     Laurel Mason's Report, attached as Exhibit K;

12      Deposition of Michael Vergon, attached in relevant part as Exhibit L;

13.     Sharee Wells' Deposition and Technical Data Sheet, attached in relevant part as Exhibit M;

14.     Scott Jones' Expert Report, attached as Exhibit N;

15.     Deposition of Laurel Mason, attached in relevant part as Exhibit O;

16.     Deposition of James Foster, attached in relevant part as Exhibit P;

17.     Deposition of John Diggle, attached in relevant part as Exhibit Q;

18.     Deposition of Nicolaus Ozog, attached in relevant part as Exhibit R;

19.     Deposition of David Abraham, attached in relevant part as Exhibit S;

20.     David Abraham's CV and Report, attached as Exhibit T;

21.     Deposition of Kenneth Itles, attached in relevant part as Exhibit U;

22.     Plaintiff's Amended Complaint, previously submitted to the Court;

23.     Defendant's Answer to Plaintiff's Amended Complaint, previously submitted to the Court.

Respectfully submitted,

  /s/ Christopher J. Uyhelji
Christopher J. Uyhelji, Attorney No.: 28814-53
Martin J. Gardner, Attorney No.: 11557-49
Gardner & Rans P.C.
117 Perspective Drive Suite 2
Granger, Indiana 46530
Phone: (574) 233-6035
cuyhelji@gardnerandrans.com
mgardner@gardnerandrans.com
Attorneys for Defendant
Coe Heating & Air Conditioning, Inc.

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 28th day of April, 2023 a true and complete copy of the above and foregoing pleading or paper was made upon each party or attorney of record herein by depositing same in the United States Mail in envelopes properly addressed and with sufficient postage affixed, electronic mail or the CM/ECF system thereto:

Thomas Jones
James E. Zoccola
Lewis & Kappes
One American Square, Suite 2500
Indianapolis, Indiana 46282-0003
TJones@lewis-kappes.com
JZoccola@lewis-kappes.com

Date: April 28, 2023

*/s/ Christopher J. Uyhelji*
Christopher J. Uyhelji, #28814-53

Page 1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2                         FORT WAYNE DIVISION
3                    CIVIL ACTION NO. 1:21-cv-00108
4     REPUBLIC SERVICES OF INDIANA,   )
      LIMITED PARTNERSHIP,            )
5                                     )
                 Plaintiff,           )
6                                     )
                   -vs-               )
7                                     )
      COE HEATING & AIR CONDITIONING, )
8     INC.; and GAS-FIRED PRODUCTS,   )
      INC. d/b/a SPACE-RAY,           )
9                                     )
                 Defendants.          )
10
11
                REMOTE DEPOSITION OF TREVOR MILLER
12
13
14         The deposition upon oral examination of
      TREVOR MILLER, a witness remotely sworn before me,
15    Janine A. Ferren, RMR, CRR, CSR-IL No. 84-4852,
      Notary Public in and for the County of Hamilton,
16    State of Indiana, taken on behalf of the Defendant,
      at the offices of Korte Does It All, 10920
17    Stellhorn Road, New Haven, Allen County, Indiana,
      on the 21st day of October, 2022, scheduled to
18    commence at 10:30 a.m., pursuant to the Federal
      Rules of Civil Procedure with written notice as to
19    time and place thereof.
20
21
22                                        EXHIBIT
23                                          A
24
25         Job No. CS5542196

Page 47

1   on December 19, 2018, or before, had Kyle Orr or
2   anyone else associated with Republic told you
3   that the reason that their Modine room
4   combustion open flame heaters weren't working or
5   weren't working correctly?
6 A   No.
7 Q   Did they ever tell you they were clogging with
8   blue spray paint?
9 A   No.
10      MR. GARDNER:  That's all the questions I
11   have for you.  Other lawyers may have some.
12      Thank you.
13      THE WITNESS:  Okay.
14 CROSS-EXAMINATION,
15   QUESTIONS BY JAMES W. HEHNER:
16 Q   Trevor, my name is Jim Hehner.  As I told you at
17   the very beginning, I represent Gas-Fired
18   Products doing business as Space-Ray.
19 A   Uh-huh.
20 Q   One of the reasons you go out and look in the
21   room and look around for sizing, I assume, is to
22   make sure that there's sufficient size and
23   clearance for the products you want to install;
24   is that right?
25 A   That is correct.

Page 48

1   Q   Did you conclude that there was sufficient

2       clearance to properly and safely be able to

3       install closed infrared tube heaters in that

4       room, based on the size and the measurements you

5       observed?

6   A   Yes.

7   Q   If, in fact, Gas-Fired Products, doing business

8       as Space-Ray, closed infrared tube heaters had

9       been installed in there, would that have been an

10      appropriate application, installation, and safe,

11      in your opinion, for --

12  A   Yes, in my opinion, yes.

13          MR. JONES:  Objection to form.

14  Q   I'm not going to lead you.

15          If, in fact, the evidence shows that

16      gas-fired closed infrared tube heaters had been

17      installed, do you have an opinion as to whether

18      that would have been a safe application?

19          MR. JONES:  Jim, my objection is just that

20      I think it calls for an expert.

21          MR. HEHNER:  I'll let him answer it again.

22      He already said yes, didn't you?

23  BY MR. HEHNER:

24  Q   You shook your head.  When you shook your head,

25      does that mean yes?

Page 59

1   A    I do not recall if he chose -- I cannot put that
2        on someone else.  I do not remember.
3   Q    Oh.
4   A    Okay?
5   Q    But there was a discussion about it, about the
6        options?
7   A    Correct.
8   Q    And it sounds to me like, whenever these
9        gas-fired tube heaters, not only at Republic's
10       fleet maintenance buildings but at other places,
11       due to lack of propane or lack of pressure or no
12       propane that can build up the soot, there's a
13       safety system inside that makes them stop
14       working; right?
15  A    Correct.
16  Q    So the buildup of soot is going to make a
17       gas-fired closed infrared tube system stop
18       working instead of catching on fire; right?
19  A    Correct.
20  Q    You mentioned the installation of a double
21       split?  I think that's what you said.
22  A    Mini.
23  Q    Mini split.
24            Where was that installed at?
25  A    At the temporary locker room after the fire.

Page 60

1  Q   Your diagram where you have your measurements,

2      it's at KORTE 00009, did you write at the top 30

3      by 60 by 15 feet 4 inches tall?

4  A   Correct.

5  Q   So the ceiling was just over 15 feet high?

6  A   Correct.

7  Q   You felt that that ceiling height gave

8      sufficient space for these gas-fired infrared

9      tube heaters to be suspended from the ceiling

10     and meet required social distance to materials;

11     right?

12 A   Correct.

13 Q   As part of your training, experience, knowledge

14     base, et cetera, education in the realm of

15     heating and cooling systems, including infrared

16     gas tube heaters, have you heard the term "spray

17     booth"?

18         MR. JONES:  Objection to form.

19 A   Yes.

20 Q   You didn't recommend or estimate infrared gas

21     tube heaters for Republic's spray booth, did

22     you?  They didn't have a spray booth in that

23     room, did they?

24 A   No.  They had a room that they were painting in.

25         MR. JONES:  Marty, if I could -- I don't

Page 61

1      know if you're going to go on any more questions

2      about that, but I would just have a standing

3      objection on that, if it's easier.  I don't know

4      if you have any more questions on that.  I don't

5      want to keep interrupting.

6          MR. GARDNER:  I don't really have more

7      questions.

8          MR. HEHNER:  I would ask, Tom, what is your

9      objection?

10         MR. JONES:  I think it calls for expert

11     opinion.  I think it's also leading, lacks

12     foundation.

13         MR. HEHNER:  So part of it is form on

14     leading, okay.

15         MR. GARDNER:  So let me work with it a

16     little bit more.

17         MR. JONES:  I didn't mean to interrupt you,

18     Marty.  I'm just preserving it.

19         MR. GARDNER:  I understand.

20  BY MR. GARDNER:

21  Q   So how long have you been in the field of

22      heating and air conditioning, Trevor?

23  A   Nine years.

24  Q   And four of the years you were certified and

25      qualified to be a technician to work on closed

Page 63

1    years; right?

2  A   Correct.

3  Q   So you've been out in the field doing these

4    things; right?

5  A   Yes.

6  Q   Have you worked for any other companies besides

7    Korte doing this?

8  A   Yes.

9  Q   Who else?

10 A   A & A Mechanical.

11 Q   Do they do the same thing as Korte?

12 A   Yes.

13 Q   What years were you employed with A & A

14    Mechanical?

15 A   2011, 2012.

16 Q   Any other employers in the realm of heating and

17    cooling systems?

18 A   No.

19 Q   Have the opinions you've expressed today been

20    based on your knowledge, skill, experience,

21    training, and/or education in the field of

22    heating and cooling?

23 A   Yes.

24        MR. GARDNER:   That's all I have.

25

Page 64

1    RECROSS-EXAMINATION,

2        QUESTIONS BY JAMES W. HEHNER:

3    Q   Trevor, I had a couple just to circle back on

4        something Marty was asking you before.  I'm not

5        going to ask this question leading.

6            Was this area a spray booth, in your

7        opinion?

8    A   No.

9            MR. JONES:  Jim, I'm just objecting because

10       Marty's stated before that that's a term of art

11       that's subject to definition through different

12       associations.

13           MR. HEHNER:  I understand, but I'm working

14       around --

15           Trevor, ignore what I'm saying here because

16       I'm talking to Thomas.

17           I'm working around your form objection.

18       Okay?  So I'm asking if he believes it was a

19       spray booth.

20           MR. JONES:  Got it.

21   BY MR. HEHNER:

22   Q   You can answer the question, Trevor.

23   A   And I said no.

24   Q   Thank you very much.

25           You also said in some questioning that

Page 68

```
 1   STATE OF INDIANA              )
                                   )  SS:
 2   COUNTY OF HAMILTON            )
 3        I, Janine A. Ferren, a Notary Public in and
 4   for the County of Hamilton, State of Indiana at
 5   large, do hereby certify that TREVOR MILLER, the
 6   deponent herein, was by me first remotely sworn to
 7   tell the truth, the whole truth, and nothing but
 8   the truth in the aforementioned matter;
 9        That the foregoing deposition was remotely
10   taken on behalf of the Defendant, at the offices of
11   Korte Does It All, 10920 Stellhorn Road, New Haven,
12   Allen County, Indiana, on the 21st day of October
13   2022, commencing at the hour of 10:33 a.m.,
14   pursuant to the Federal Rules of Civil Procedure;
15        That said deposition was taken down
16   stenographically and transcribed under my direction
17   as accurately as possible, considering the quality
18   of the videoconference communication, and that the
19   typewritten transcript is a true record of the
20   testimony given by the said deponent; that the
21   signature of said deponent to his deposition was
22   waived by the deponent and all parties present, the
23   deposition to be read with the same force and
24   effect as if signed by him;
25        That the parties were represented by their
```

Page 69

1    counsel as aforementioned.

2         I do further certify that I am a disinterested

3    person in this cause of action; that I am not a

4    relative or attorney of any party, or otherwise

5    interested in the event of this action, and am not

6    in the employ of the attorneys for any party.

7         IN WITNESS WHEREOF, I have hereunto set my

8    hand and affixed my notarial seal on this 31st

9    day of October, 2022.

10

11

12

13   Janine A. Ferren

14   Seal, Notary Public            My Commission Expires:

     State of Indiana               April 22, 2024

15

     Janine A. Ferren               County of Residence:

16   Commission No. NP0681591       Hamilton

17

18

19

20

21

22

23

24

25

# Proposal



**KORTE INC.**
**Does it all**
Heating & Air • Electrical • Plumbing & Sewer

(260) 493-1604 Fax
(260) 493-2596 Phone
10920 Stellhorn Road
New Haven, IN 46774

• 24 Hour Service
• www.kortedoesitall.com
• Celebrating 50 Years Svc.
• Residential & Commercial
• Family Owned & Operated
• PC88600961

---

PROPOSAL SUBMITTED TO (INCLUDE ADDRESS & PHONE)
Republic Services 442-3-3243
6231 MacBeth Rd
Fort Wayne, IN 46809

JOB INFO/DATE
korr@republicservices.com

---

**We Propose** hereby to furnish material and labor - complete in accordance with below specifications:

Remove existing hanging unit heaters in the paint shop.

Install two  100k BTU LP gas infrared tube heater with 30 ft. tube, new thermostat for each and combustion air ducts. Reconnecting to existing gas line, electrical and flue piping
Install one 50k BTU LP gas infrared tube heater along the back side of the paint shop, new thermostat and combustion air duct. Connect for gas line

The total investment to perform the above work will be $ 

Three years parts warranty
One year labor warranty



All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs will be an extra charge over and above the estimate. Owner to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workman's Compensation Insurance.

Payment due as follows: _____Upon Completion_____
Authorized Signature:_____*Trevor Miller*_____
Valid for:____30____ days.

**Acceptance of Proposal & Work Authorization:** I, the undersigned, am owner/authorized representative/tenant of the premises at which the work above is being done. I hereby authorize you to perform the above work and to use such labor and materials as you deem advisable. Unless prior-authorization for billing, payment for all work done is due upon completion (C.O.D.). A $10.00 BILLING CHARGE is due thereafter. An office billing charge and/or finance charge of 1.76% per month (21% per annum) will be added after 10 days past due. I agree to pay reasonable attorney's fees, court costs and collection fees in the event of legal action. I have read this contract and agree to be bound by all the terms contained herein. In cases of repair work, all old parts will be removed from premises and discarded, unless otherwise specified herein.

Signature:_____    _____    Date:_____

TMS 09-14

KORTE 00007

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
2                      FORT WAYNE DIVISION

3

4      REPUBLIC SERVICES OF INDIANA,  )
       LIMITED PARTNERSHIP,           )
5                                     )
                  Plaintiff,          )
6                                     )
            v.                        )CASE NO. 1:21-CV-00108
7                                     )
       COE HEATING & AIR              )
8      CONDITIONING, INC.; and        )
       GAS-FIRED PRODUCTS, INC. d/b/a )
9      SPACE-RAY,                     )
                                      )
10                Defendants.         )
                                      )
11     ------------------------------

12          The Deposition of LOUIS V. INENDINO (via Zoom)

13          Date:  Thursday, March 9, 2023

14          Time:  11:07 AM

15          Place:  All the parties appeared remotely.

16

17

18             Called as a witness by the Defendants,
            in accordance with the Federal Rules of Civil
19          Procedure, Rules of the United States
            District Court, Northern District of Indiana,
20          pursuant to notice duly served.

21

22

23     Before Ann S. Hunsberger, Court Reporter

24     Notary Public, Elkhart County, Indiana

25     Job No. CS5768444

**EXHIBIT**

*B*

Page 89

```
 1          Tell me if I'm reading this right.  "Main circuit
 2          panel at southeast corner."  Did I read that right?
 3     A    Yes, sir.
 4     Q    Then you wrote, "Heaters were mounted approximately
 5          9 feet above the slab floor"; correct?
 6     A    Yes, sir.
 7     Q    Have you ever learned any information to the
 8          contrary that they're mounted higher than that?
 9     A    If I did, I cannot recall at this time.
10     Q    Okay.  The next thing you wrote on page 3 of 3 of
11          your notes dated March 3, 2020, was "Paint on,
12          quote, 'mist,' quote, would go up approximately
13          24 inches, then come back down."
14              Did I read that right, Lou?
15     A    Yes.  Would go up approximately 24, then come back
16          down.
17     Q    Down to the floor; right?
18              Well, you didn't write the word.  You meant
19          down like towards the floor?
20     A    Due to gravity, yes.
21     Q    Yes.  And then you wrote -- and, again, this seems
22          to be coming from Fred Jones "Sprayer not too old
23          from Sherwin Williams airless."  Do you see that?
24     A    Yes, I do.
25     Q    And then you wrote, "Could not spray up and hit
```

Page 111

1                          CERTIFICATE
2
3        I, Ann S. Hunsberger, a Notary Public, in and for
         the County of Elkhart and State of Indiana, hereby
4        certify:
5        That LOUIS V. INENDINO, appeared before me on
         Thursday, March 9, 2023, and was duly sworn or
6        affirmed to testify the truth, the whole truth, and
         nothing but the truth to questions propounded at
7        the taking of the foregoing deposition in a cause
         now pending and undetermined in said court;
8
         That I further certify I then and there reported
9        stenographically the proceedings at the said time
         and place; that the proceedings were then
10       transcribed from my original shorthand notes; and
         that the foregoing typewritten transcript is a true
11       and correct record thereof;
12       That I am not a relative, employee, attorney, or
         counsel; nor a relative or employee of such
13       attorney or counsel for any of the parties hereto,
         nor am I interested directly or indirectly in the
14       outcome of this action.
15       IN WITNESS WHEREOF, I have hereunto set
         my hand and affixed my Notarial seal this 22nd
16       day of March, 2023.
17
18
19
20
21
                    *Ann S. Hunsberger* (signature)
22                  Ann S. Hunsberger
                    Notary Public, State Of Indiana
23                  Residence:  Elkhart
                    My Commission Expires:  February 9, 2025
24
25

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF INDIANA

3                   FORT WAYNE DIVISION

4      _____

5   REPUBLIC SERVICES OF INDIANA,

6   LIMITED PARTNERSHIP,

7              Plaintiff,

8        v.                              Case No.:

9   COE HEATING & AIR CONDITIONING,      1:21-CV-00108

10  INC.; and GAS-FIRED PRODUCTS,

11  INC. d/b/a SPACE-RAY,

12             Defendants.

13  _____

14               DEPOSITION OF TERRY READER

15  DATE:        Wednesday, October 26, 2022

16  TIME:        10:48 a.m.

17  LOCATION:    Whitley County Courthouse

18               101 West Van Buren Street

19               Columbia City, IN 46725

20  REPORTED BY: Andrew Pronschinske, Notary Public

21  JOB NO.:     5547497

22

23                    **EXHIBIT**

24                       C

25

Page 38

1      Q     Okay.  Did you occasionally, from time to

2    time when you were employed at Republic, repair blue

3    dumpsters?

4      A     Oh, yeah.

5      Q     Okay.  But you think you repaired more brown

6    ones than blue ones?

7      A     40/60, 50/50.

8      Q     Pretty close?

9      A     Yeah.  It was all over.

10     Q     But you think the brown ones have brown

11   paint on them?  Is that what you're saying?

12     A     They was blue when they left.  Everything

13   had to be converted to blue.

14     Q     Okay.  But you definitely used your plasma

15   torch and your acetylene torch on blue dumpsters?

16     A     Yes.

17     Q     And they had been painted previously and

18   been out in the field and came back in for repairs?

19     A     Yes.

20     Q     Okay.  And did you have a lot of dumpsters

21   catch on fire, the blue paint catch on fire when you

22   were using your plasma torch and your acetylene torch?

23   I'm talking about the dumpster itself, not the

24   contents.

25     A     The paint itself catch on fire?

Page 39

1    Q    Yeah.

2    A    No.

3    Q    Okay.  And you weren't -- while you were

4    using your plasma torch or your acetylene torch as

5    high as 3,000 degrees, you didn't have a fire

6    extinguisher sitting next to you so you -- make sure

7    the blue paint didn't catch up on fire and burn the

8    dumpster up; right?

9    A    Yes, we had fire extinguishers.

10    Q    Was it so you could spray blue paint?  Put a

11    fire out that's from blue paint?

12              MR. JONES:  Objection to form.

13    Q    Let me retract the question.

14         Did a dumpster ever catch on fire -- just

15    the blue dumpster itself.  I'm not talking about the

16    contents -- when you were using a plasma torch or an

17    acetylene torch?

18    A    No.

19    Q    Okay.  I'm going to show you what we've had

20    marked as Exhibit F.

21              (Exhibit F was previously marked for

22              identification.)

23         It's a lot of photos, but just the first

24    couple of pages.  I didn't bring an extra copy for

25    myself.

Page 63

BY MR. GARDNER:

1

2      Q     When you say "paint booth," what do you

3  mean?

4      A     It has its own ventilation system and no

5  heating system in it.

6      Q     All right.  You've seen that in other

7  places?

8      A     Um-hum.

9      Q     Yes?

10      A     Yes.  But that's what --

11      Q     What place did you see that at?

12      A     I used to work at a place called MTI.

13  We -- bucket trucks and I used to be a painter there,

14  actual painter there.

15      Q     So you have painted inside of a defined

16  spray booth?

17      A     Yes.

18      Q     And was the painting done at Republic's

19  facility to Building Number 1 done in a defined paint

20  booth?

21      A     No.

22      Q     Okay.  You never used a welder inside of the

23  paint booth at MTI; did you?

24      A     No.

25      Q     And you never used a plasma or acetylene

Page 64

1   torch inside of the paint booth at MTI; did you?

2       A    No.

3       Q    Okay.  I might have asked this already, but

4   between 2012 when you started and 2019 when you left

5   after they fired you, did you ever see that blue paint

6   catch on fire either in a liquid state or a dry state?

7       A    No.

8       Q    Okay.  Was there ever any talk in the shop

9   about we got to be careful about this blue paint when

10  it dries because it's going to catch on fire?

11      A    No.

12      Q    Okay.  Do you remember, Terry, how many

13  square heaters were in Building Number 1 before the

14  fire?

15      A    I believe there was three in this one.  One

16  in this one.

17           MR. GARDNER:  And for the record, then,

18  when he said there's three in this one, he was

19  pointing at --

20           THE WITNESS:  In Building 1.

21  BY MR. GARDNER:

22      Q    And then in Building 2, there's a big white

23  garage door?

24      A    Right.  And that was part -- this was both

25  part of a --

Page 65

1       Q     Upper --

2       A     Yeah, like --

3       Q     Container shop?

4       A     Right.

5       Q     Was there a dividing wall though, Terry,

6    between Building 1 and Building 2?

7       A     Yes.

8       Q     And so, just to be clear, there were three

9    overhead heaters in Building 1 where the painting

10   occurred, and one overhead heater in part of Building

11   2 where painting did not occur?

12      A     Right.

13      Q     Would that be accurate, what did occur in

14   Building Number 2 in the area that would be accessed

15   by the white garage door?

16      A     We repaired cans.

17      Q     Welding and cutting and such?

18      A     Yeah.  There too.

19      Q     Okay.  And in Exhibit D, do you see any blue

20   paint on the ceiling of Building Number 1?

21      A     No.

22      Q     Do you see any blue paint above the

23   horizontal blue line about halfway up the wall?

24      A     No.

25      Q     Did you ever see Dale get reprimanded for

Page 114

```
 1    system utilized after the fire, across the parking
 2    lot, in what was the wash bay?
 3         A    Yes.
 4         Q    Okay.  So it's an airless system?
 5         A    Yes.
 6         Q    It's not spraying all over the place?
 7         A    Yeah.  Yes.
 8         Q    Have you ever purposely tried to burn the
 9    blue Sheboygan paint when it was dry, the paint was
10    dry?
11         A    Yes.
12         Q    Did it catch on fire?
13         A    Not -- combustible.  Well, I mean you can
14    burn it off, but --
15         Q    But it wouldn't make a fire?
16         A    No.  Not a combustible.
17         Q    Did you do that -- let me just try to make
18    you laugh here.  It just sounds like what I would do
19    when I was a kid.
20              Did you do that for fun or as an experiment,
21    like, when you're trying to see if it would burn?
22         A    Oh, no.  It was to clean the paint off
23    to -- so we could weld it.
24         Q    Okay.  Would you always need clean the blue
25    Sheboygan paint off the dumpsters before you weld?
```

Page 115

1    1    A    I did.  What everybody else would do was

2    2    just -- the wall through it.

3    3    Q    Just weld right through the blue paint?

4    4    A    Yeah.

5    5    Q    I want to make sure I got this clear.  To

6    6    weld right through the blue paint?

7    7    A    Tried to, yeah.

8    8    Q    And cut through the dried blue paint; right?

9    9    A    Yeah.

10   10   Q    And you never saw catch it on fire?

11   11   A    Yeah.

12   12   Q    No; right?

13   13   A    No, never caught on fire.

14   14   Q    I'm way closer to the end than the

15   15   beginning.

16   16        Within your employment records there is a,

17   17   I'll call it a write-up, dated February 6th of 2019.

18   18   I think it's by John Shatto and your signature's on it

19   19   too.  And there's a comment typed in that says

20   20   "Smoking must be kept in the smoking area only."

21   21        Do you remember that coming up in one of

22   22   your performance reviews?  This one was 2018, by the

23   23   way.

24

25   24   A    Probably.

Page 138

1       A    Yes.

2       Q    Okay.  And did at any time while you were

3   using your plasma cutter, your acetylene torch, or

4   your MIG welder, did any of the blue paint on the

5   floor catch on fire?

6       A    No.

7       Q    Could you sweep the floor and get some of

8   that blue dust off?  Was there, like, blue dust on the

9   floor?

10      A    Yes.

11      Q    And when you would weld or use your

12  acetylene or plasma torches near floor level, would

13  there be paint dust on the ground, blue paint dust?

14      A    Yes.

15      Q    And that never caught on fire?

16      A    No.

17              MR. GARDNER:  Terry, it's been

18  extremely nice to meet you.  I don't have any more

19  questions.

20              THE WITNESS:  Okay.

21              MR. GARDNER:  Thomas or Ben might have

22  questions for you.

23              MR. JONES:  Ben?

24              MR. KATCHUR:  Yeah.  I'm going to be

25  pretty quick.

Page 156

1          In 2018, was it your regular practice to

2     smoke indoors while at work?

3          A    Yeah, I smoked inside once in a while.

4          Q    Once in a while?  Would you say regularly?

5          A    No.

6          Q    Do you know or do you recall whether or not

7     anybody smoked indoors at Republic's facility on

8     March 19, 2018?

9          A    Yeah.  People did it.

10          Q    Do you know specifically on March 19th of

11     2018 if anybody specifically -- do you have any

12     recollection on that particular day whether or not you

13     remembered seeing anybody smoking inside?

14               MR. GARDNER:  Thomas, 2019.  You said

15     '18.

16     BY MR. JONES:

17          Q    I'm sorry.  2019.

18          A    No, I don't specifically remember who or

19     what --

20          Q    I'm just about done.

21               MR. JONES:  That's all I've got.

22     Marty, if you've got other questions?

23               MR. GARDNER:  I just have a couple.

24     //

25     //

Page 172

1                    CERTIFICATE OF TRANSCRIBER

2              I, ANNE BROWN, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14
                              *Anne Brown*

                                         ANNE BROWN
15

16

17

18

19

20

21

22

23

24

25

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF INDIANA

3                      FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7            Plaintiff,

8        v.                              Case No.

9    COE HEATING & AIR CONDITIONING,     1:21-CV-00108

10   INC.; and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY

12           Defendants.

13   _____

14              VIDEOCONFERENCE DEPOSITION OF

15                   SAMIR DIZDAREVIC

16   DATE:          Monday, October 31, 2022

17   TIME:          1:12 p.m.

18   LOCATION:      Remote Proceeding

19                  Indianapolis, IN 46204

20   REPORTED BY:   Andrew Pronschinske, Notary Public

21   JOB NO.:       5542223

22

23

24

25

Page 36

1    after seeing smoke?

2         A    Yes, sir.  He did.

3         Q    Did anyone else go in, to your knowledge?

4         A    Not that I can recall.  I don't think so.

5         Q    So after you exited, you were moving the

6    vehicles, what did you do next?

7         A    It's, pretty much, after you -- after we

8    moved the vehicles, I called 9-1-1.  The security

9    guard called 9-1-1.  I mean, I'm pretty sure a couple

10   other people called 9-1-1.

11        Q    So initially you said you didn't see any

12   flames.  Did you, at some point in time, see flames

13   comping from the operations building?

14        A    Yes.  You could see the flames.  As soon as

15   we got done pulling the supervisor trucks away from

16   the south side of that building, you could see flames.

17   The very tip top of the building where the roof and,

18   you know, obviously, the rafters meet, you could see

19   flames coming out there.  And then from the overhead

20   doors, the closest one to the exterior of that

21   building on the south side, that one had flames coming

22   out of it as well.

23        Q    Did you take any videos or pictures of the

24   fire as it was occurring?

25        A    Yes, I did.  But I've got a new phone.  At

```
                                              Page 50
 1   your maintenance --
 2        A    No, sir.
 3        Q    Okay.  Is that something that you're
 4   required to do as a supervisor there?
 5        A    Yes and no.  Because they didn't really have
 6   a designated, like, policy on smoking.  And they
 7   didn't have one where it was, you know, hey, you had a
 8   designated area to go to and smoke.  So no, like I
 9   said, it's, -- you know, they really didn't have a
10   policy for that.
11        Q    And by "they," you mean Republic?
12        A    Yes.  Republic Services did not have a
13   policy.
14        Q    And that's for the entire time you worked
15   there from 2016 to 2022?
16        A    Yes, sir.
17        Q    So the smoke outside, do you know where that
18   came from at Republic?
19        A    Which smoke are you referring to?
20        Q    No, you just said that people smoke outside
21   the buildings.  Do you know who gave that directive at
22   Republic during your time there?
23        A    No, sir.  I didn't --
24        Q    Okay.  And so you called the police, you
25   called Kyle, you called your maintenance manager.  Did
```

```
                                            Page 59
 1               MR. ZOCCOLA:  I'm just going to object
 2   to form, real quick.  Real quick, Samir, let me --
 3               I think that misstates what he said
 4   earlier, Jim.  But I'll just -- I'll object to form.
 5               MR. HEHNER:  Sure.  Well, he said yes.
 6               Let me -- I'll just ask it a different
 7   way, Samir.  Us attorneys, we have all these rules we
 8   follow, so I'm going to ask it a slightly different
 9   way.  Can you hear me okay?  Is my audio fine?
10               THE WITNESS:  Yes, sir.  Yes.  Yes,
11   sir.  You're fine.
12   BY MR. HEHNER:
13       Q    Did you see flames coming out of either of
14   the garage doors on the southern side of that
15   building?
16       A    Yes, sir.
17       Q    And which -- was it both, one; can you
18   explain that for me?
19       A    It was the furthest one away from the main
20   entrance to the operations building.  So there was a
21   door to get into the operations building, and then to
22   the left of it, I believe, there was a ten-foot, you
23   know, overhead door.  And then there was an additional
24   10-foot overhead door that was right there, I believe,
25   so if I recall.  That building is pretty old, so.
```

Page 60

1      Q    I'm sorry.  So it would be the one to the
2   further south; is that correct?
3      A    Yes, sir.  The further south.  Yes, sir.
4   That door.
5      Q    Let's be clear on our orientation.  The
6   maintenance building that you worked in was a building
7   that sort of generally ran in a northerly and
8   southerly direction, but on the east side of the
9   parking lot; is that correct?
10      A    Yes, sir.  Yes.  Correct.
11      Q    And this building, where the fire occurred,
12   is a building that ran in a northerly-southerly
13   direction, but on the west side of the parking lot;
14   correct?
15      A    Yes, sir.  Correct.
16      Q    And the painting area that you've been
17   referring to was on the southern end of that building;
18   correct?
19      A    Yes, sir.  Correct.
20      Q    All right.  You mentioned that there
21   were -- that you had seen -- that there was a couple
22   of welding setups in that painting area; am I correct?
23      A    Yes, sir.
24      Q    Did you say there was oxygen as part of that
25   setup?

Page 69

CERTIFICATE OF TRANSCRIBER

1

2          I, JENNIFER MOSS, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                   JENNIFER MOSS

16

17

18

19

20

21

22

23

24

25

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION
3             Case Number 1:21-cv-00108
4
    REPUBLIC SERVICES OF INDIANA,        )
5   LIMITED PARTNERSHIP,                 )
                                         )
6                         Plaintiff,     )
                                         )
7        -vs-                            )
                                         )
8   COE HEATING & AIR CONDITIONING,      )
    INC.; and GAS-FIRED PRODUCTS, INC.   )
9   d/b/a SPACE-RAY,                     )
                                         )
10                        Defendants.    )
11
12
13
14        30(b)(6) REMOTE DEPOSITION OF JUSTIN DAVIS

             on behalf of
15
           REPUBLIC SERVICES OF INDIANA, LP
16
17
18
          The 30(b)(6) remote deposition upon oral
19   examination of JUSTIN DAVIS, on behalf of Republic
     Services of Indiana, LP, a witness remotely sworn
20   by me, Tara Gandel Hudson, RPR, CRR, a Notary
     Public in and for the County of Hancock, State of
21   Indiana, taken on behalf of the Defendant Coe
     Heating and Air Conditioning, Inc. with the witness
22   located in Indianapolis, Marion County, Indiana, on
     the 16th day of December, 2022, scheduled to
23   commence at 11:45 a.m., pursuant to the Federal
     Rules of Civil Procedure with written notice as to
24   the time and place thereof.
25   Job No. CS5602008

EXHIBIT
E

tabbies®

Page 43

1      March 19, 2019 in the daytime?"

2           "Answer:  No."

3           In context for you, Justin, the storage

4      room he and I were discussing in that deposition

5      was in the far south side of Building Number 1.

6      There was a partition separating it from where

7      they actually did the painting.

8           Are you following me?

9   A  Yes.

10  Q  Okay.  Then I asked him on page 61, line 21 --

11     he was under oath:

12          "Question:  Were there any flammable

13     liquids or solvents of any kind in Building

14     Number 1 in the paint room section on the day of

15     the fire?"

16          He answered with a question:

17          "Answer:  Any flammable liquids?

18          On page 62 I followed up:

19          "Question:  Liquids or solvents."

20          "Answer:  No, I don't believe so."

21          You would defer to that answer as being

22     correct?

23  A  Yes, I would defer to his answer as being

24     correct.

25  Q  Okay.  When you say "I," you understand you're

Page 75

1    BY MR. GARDNER:

2    Q   Not a welding area; correct?

3    A   Correct.

4    Q   Does Republic agree that Building Number 1 did

5        not meet NFPA -- that's the National Fire

6        Protection Agency -- code or compliance of a

7        spray booth?

8            MR. ZOCCOLA:  Objection to form.  Lack of

9        foundation.

10   A   It was not designed nor built to be a spray room

11       as you're referring to.

12   BY MR. GARDNER:

13   Q   I specifically said spray booth.  Are you using

14       that interchangeably?

15           MR. ZOCCOLA:  Same objection.

16   A   In reference to your question, yes.  Spray booth

17       would not be what that room was built to be.

18   Q   Does Republic disagree with this statement:

19           "This work" --

20           Talking about the work done in Building

21       Number 1.

22           -- "included welding to repair trash

23       Dumpsters"?

24           MR. ZOCCOLA:  Objection to form.

25   A   I would have to have more context before I could

Page 78

1   A    I have not.

2   Q    Does Republic deny that it solicited a proposal

3        from Korte Does It All to remove existing

4        heaters in the paint shop and install new gas

5        infrared tube heaters?

6   A    No.

7   Q    Go to page 2 of Exhibit T.

8   A    Okay.

9   Q    It says "Korte Does It All," doesn't it?

10  A    Yes.

11  Q    Do you see Invoice Number H6231M10?

12  A    Yes.

13  Q    It's dated February 26, 2019?

14  A    Yes.

15  Q    It's prepared for Republic Services by a

16       salesman named T. Miller; right?

17  A    Yes.

18  Q    The description is to:

19            "Install a new 75,000 Btu, 50-foot tube

20       heater to replace existing unit.  Use existing

21       flue through the roof.  Replace flue to the

22       vertical.  Install new thermostat.  Verify

23       operation with propane."

24            Do you know which room this quote

25       references at Republic, or which building?

Page 79

1    MR. ZOCCOLA:  Objection.  It calls for

2    speculation.

3  BY MR. GARDNER:

4  Q   When I say "you," I mean, Republic.

5  A   Specifically which portion of the room, I

6    couldn't say.  These types of heaters are

7    installed in multiple locations in the

8    maintenance shop.  I would have to refer you to

9    either Greg Tolley or -- yeah, Greg Tolley would

10    have known which specific location this is

11    referring to.

12  BY MR. GARDNER:

13  Q   So you would accept his deposition testimony on

14    that exact point as accurate; correct?

15  A   Yes.

16  Q   Go to page 3 of this exhibit.  It's a rough

17    diagram.  Exhibit T.

18  A   Yes.

19  Q   We deposed Trevor Miller.  He was with Korte.

20    He was the salesman that came out at the request

21    of Republic to give a quote for installing

22    closed infrared tube heaters in Building

23    Number 1 before the fire.  These are some

24    measurements he took.

25    Do you see those measurements, 30 by 60 by

Page 96

1   BY MR. GARDNER:

2   Q   Justin, we just took at least a ten-minute

3       break.  You're still under oath.  Are you ready

4       to keep going?

5   A   Yes, and I am.

6   Q   In terms of painting Dumpsters, cans, et cetera,

7       with the blue enamel Sheboygan paint, that was

8       sprayed on.  Is that the only thing that would

9       be sprayed on a Dumpster or a can by Republic at

10      the Macbeth facility, or do they afterwards put

11      some sort of another coating on it?

12  A   No.  The only material that goes onto the

13      containers is the blue paint you're referring

14      to.

15  Q   Is that a one-part paint?  They don't add

16      anything to it before painting?

17  A   Correct.

18  Q   All right.  Republic isn't aware of the presence

19      of any flammable finishes in Building Number 1

20      in the 50 days prior to the March 19, 2019,

21      fire, including the date of the fire; correct?

22  A   Yes.  That's correct.  We are not aware of any

23      additional sealants or materials that would be

24      sprayed onto the containers that would be

25      flammable.

Page 97

1   Q   There wouldn't be any flammable finishes in

2       Building Number 1 on March 19, 2019?  Right?

3   A   No.

4   Q   I'm right, though?

5   A   Yes, yes.

6   Q   Sometimes that can get confusing.  Thank you.

7           Were there any volatile materials stored in

8       Building Number 1 between February 4th, 2019,

9       and March 19, 2019?

10          MR. JONES:  Objection to form.  Foundation.

11  A   Volatile as in -- we've been discussing

12      flammable materials and you're using a different

13      term now, so I'm not sure what you mean, other

14      than --

15          If you want to refer to the dictionary term

16      for "volatile"?

17  BY MR. GARDNER:

18  Q   Combustible.  Combustible, I would say.  Subject

19      to explosion.  Explodable.  How's that?

20  A   Subject to explosion, not that I'm aware of.

21  Q   Is Republic aware of the presence of any

22      low-flashpoint materials -- that means material

23      that will ignite at a temperature below 100

24      degrees -- inside of Building 1 between

25      February 4, 2019, and March 19, 2019?

1  STATE OF INDIANA            )
                               )  SS:
2  COUNTY OF HANCOCK           )

3      I, Tara Gandel Hudson, RPR, CRR, a Notary

4  Public in and for the County of Hancock, State of

5  Indiana at large, do hereby certify that the

6  deponent, JUSTIN DAVIS, was by me remotely sworn to

7  tell the truth, the whole truth, and nothing but

8  the truth in the aforementioned matter;

9      That the foregoing deposition was taken on

10  behalf of the Defendant Coe Heating and Air

11  Conditioning, Inc., with the witness located in

12  Indianapolis, Marion County, Indiana, on the 16th

13  day of December, 2022, scheduled to commence at

14  11:45 a.m., pursuant to the Federal Rules of Civil

15  Procedure;

16      That said deposition was reported

17  stenographically and transcribed to English under

18  my direction, and that the transcript is a true

19  record of the testimony received remotely of said

20  deponent; and that the signature of said deponent

21  to his deposition was waived by the deponent and

22  all parties present, the deposition to be read with

23  the same force and effect as if signed by the

24  deponent;

25      That the parties were represented by their

Page 165

1   counsel as aforementioned.

2       I do further certify that I am a disinterested

3   person in this cause of action; that I am not a

4   relative or attorney of either party, or otherwise

5   interested in the event of this action, and am not

6   in the employ of the attorneys for either party.

7       IN WITNESS WHEREOF, I have hereunto set my

8   hand and affixed my notarial seal this 3rd day of

9   January, 2023.

10

11          *Tara Gaudel Hudson*

12

                    Seal

13          Notary Public, State of Indiana
                Commission No. 682534

14      My Commission Expires March 27, 2024

15

16

17

18

19

20

21

22

23

24

25

Republic Services of Indiana v COE Heating Ronald Dantzer          05/06/2022

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
 2                     FORT WAYNE DIVISION

 3

 4    REPUBLIC SERVICES OF        )
      INDIANA, LIMITED            )
 5    PARTNERSHIP,                )
                                  )
 6              Plaintiff,        )   CASE NO.
                                  )   1:21-cv-108-HAB-SLC
 7         -v-                    )
                                  )
 8    COE HEATING & AIR           )
      CONDITIONING, INC. and      )
 9    GAS-FIRED PRODUCTS, INC.    )
      d/b/a SPACE-RAY,            )
10                                )
                Defendants.       )
11

12

13         The deposition upon oral examination of

14    RONALD EUGENE DANTZER, a witness produced and sworn

15    before me, Laura J. Bash, RMR, Notary Public in and

16    for the County of Allen, State of Indiana, taken on

17    behalf of the Plaintiff, at the offices of COE

18    Heating & Air Conditioning, Inc., 9410 Airport Drive,

19    Fort Wayne, Indiana, on May 6, 2022, at 12:58 p.m.,

20    pursuant to the Federal Rules of Civil Procedure.

21

22

23                          EXHIBIT

24                             F

25
```



```
 1   Q.   -- with respect to these heaters?

 2   A.   No.  I definitely would remember evaporation.  But

 3        no, that conversation never came up.

 4   Q.   And the conversation, the fact that the paint they

 5        were using was water-based paint, that never came

 6        up?

 7   A.   No.

 8   Q.   And whether it was water-based paint or some other

 9        kind of paint would not have impacted your

10        recommendation about using these types of infrared

11        tube heaters?

12   A.   No.

13   Q.   Based on seeing the paint dust that had built up

14        all around the room, that you described, did you

15        anticipate that similar paint dust -- strike that.

16            Would you have expected paint dust to build up

17        on these infrared tube heaters?

18   A.   Not like it would on the unit heaters.  The unit

19        heaters suck in oxygen to feed the burners.  The

20        fan on the back of it is pulling air into it, so

21        it's going to suck all that in.  Tube heaters

22        don't have any of that.  They are sealed

23        combustion, so there is nothing drawing paint dust

24        to it.  So no, I wouldn't have been concerned.

25   Q.   So even if there had been tons of buildup of dust
```

```
 1        nice.  Is it good practice for any other reason
 2        than appearance, to periodically clean?
 3   A.   Keeps everything functioning properly.  You know,
 4        tube heaters are a different animal, because they
 5        are sealed combustion, the flame is on the inside
 6        of the heat exchanger, there is nothing,
 7        mechanically, on the outside that can generate a
 8        spark or nothing rotating, like a fan prop or
 9        something like that, so it will continue to work
10        regardless of whether you're cleaning it or not.
11            The existing unit heaters hanging there
12        before, if they would have maintained them, they
13        would still use them today.  They just didn't
14        maintain nothing and it eventually snuffed it out.
15   Q.   You said it helps keep everything functioning
16        properly by cleaning.  What might happen if you --
17   A.   For instance -- I'm not trying to cut you off.
18        Let you finish you question.  Sorry.
19   Q.   What might happen if somebody failed to
20        periodically clean the surface?
21   A.   Nothing, with tube heaters.  What gets on
22        it -- it's like dumping oil -- I don't know if you
23        ever change your oil or anything in your car, but
24        if you dump a little excess oil down, it gets on
25        the exhaust manifold, it smokes a little bit.
```

Republic Services of Indiana v COE Heating Ronald Dantzer                05/06/2022

```
 1          other than that, it wouldn't have bothered me.
 2                    MR. GARDNER:  This objection is really
 3               late, but I believe you mean, would it
 4               concern him in connection with the heaters,
 5               not in connection with just general safety of
 6               the room absent heater use.  Is that how you
 7               mean it?
 8     A.   Are you asking whether or not those would have
 9          affected the installation of the heaters or
10          function of the heaters?
11     BY MR. JONES:
12     Q.   My question is, is if you were aware of acetylene
13          gas tanks in that room, would that have changed
14          your opinion that these infrared tube heaters were
15          appropriate to be placed in this room?
16     A.   Wouldn't have changed.
17                    MR. JONES:  That's all I've got.
18                    FURTHER EXAMINATION
19     BY MR. HEHNER:
20     Q.   Sir, you said you went out there in the middle of
21          the installation and the installer was on a
22          scissor left; is that right?
23     A.   Correct.
24     Q.   So you actually observed the installation of the
25          tubes as it was going on; is that right?
```

Republic Services of Indiana v COE Heating Ronald Dantzer                    05/06/2022

```
 1    A.    Correct.
 2    Q.    And 6 inches is pretty easy to determine.  You
 3          were able to determine, from looking, you said
 4          you're confident that he complied with the
 5          clearance requirements that were necessary for
 6          these tube heaters, correct?
 7    A.    Correct.
 8    Q.    But you could actually, physically, see it with
 9          your own eyes when you were in there; is that
10          correct?
11    A.    Correct.
12    Q.    And you're certain, although you didn't get a tape
13          measure out and go up on a lift, you could tell he
14          was adhering and complying with the clearance
15          requirements from your own visual observations,
16          correct?
17    A.    Yes.  We were well below 6 inches.
18    Q.    So 6 inches from the top, well below that.
19    A.    Correct.
20    Q.    Much greater clearance than 6 inches, right?
21    A.    We were almost a foot.
22    Q.    Much higher off the floor then 82 inches, correct?
23    A.    Correct.
24    Q.    And that certainly has sufficient clearance on the
25          sides; is that correct?
```



```
 1   A.    Correct.

 2   Q.    And you saw this with your own eyes, correct?

 3   A.    Correct.

 4              MR. HEHNER:  Thank you very much.

 5         That's all I have.

 6              MR. GARDNER:  Is it my turn?

 7                 FURTHER EXAMINATION

 8   BY MR. GARDNER:

 9   Q.    Could you go to this photo in Tab 8 of Plaintiff's

10         binder 1, it says "Northeast View."  I have it as

11         the fourth page.  Yeah.  So it shows kind of the

12         back --

13   A.    This?

14   Q.    Yeah, yeah, yeah.  You were mentioning something

15         about -- get the term right -- I'll just point.  I

16         am pointing to the back of the building.

17   A.    Okay.

18              MR. JONES:  When you say, "back," do

19         you mean south?  West?

20              MR. GARDNER:  I can't tell directions

21         from this.

22   A.    So that's going to be southwest.

23   BY MR. GARDNER:

24   Q.    And I'm -- so this would be south?

25   A.    Yeah.  South.
```



```
 1    STATE OF INDIANA       )
                             ) SS:
 2    COUNTY OF ALLEN        )

 3

 4            I, Laura J. Bash, RMR, a Notary Public in and

 5    for said county and state, do hereby certify that the

 6    deponent herein, was by me first duly sworn to tell

 7    the truth, the whole truth, and nothing but the truth

 8    in the aforementioned matter;

 9            That the foregoing deposition was taken on

10    behalf of the Defendant; that said deposition was

11    taken at the time and place heretofore mentioned

12    between 12:58 p.m. and 4:19 p.m.;

13            That said deposition was taken down in

14    stenograph notes and afterwards reduced to

15    typewriting under my direction; and that the

16    typewritten transcript is a true record of the

17    testimony given by said deponent;

18            And thereafter presented to said witness for

19    signature; that this certificate does not purport to

20    acknowledge or verify the signature hereto of the

21    deponent.

22            I do further certify that I am a disinterested

23    person in this cause of action; that I am not a

24    relative of the attorneys for any of the parties.

25
```

Republic Services of Indiana v COE Heating Ronald Dantzer                    05/06/2022

```
 1            IN WITNESS WHEREOF, I have hereunto set my

 2    hand and affixed my notarial seal this 17th day of

 3    May, 2022.

 4
                              Laura Bash
 5
                   _____
 6                 Laura J. Bash, RMR, Notary Public

 7

 8

 9

10    County of Allen
      My Commission Expires:
11    October 28, 2026

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF INDIANA

3                  FORT WAYNE DIVISION

4        _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7             Plaintiff,

8         v.                          Case No.

9    COE HEATING & AIR CONDITIONING,    1:21-cv-108-HAB-SLC

10   INC. and GAS-FIRED-PRODUCTS,

11   INC. d/b/a SPACE-RAY,

12            Defendants.

13       _____

14            VIDEOCONFERENCE DEPOSITION OF

15                  MICHAEL AGOSTI

16   DATE:        Friday, February 3, 2023

17   TIME:        11:15 a.m.

18   LOCATION:    Remote Proceeding

19                Gardner & Rans, PC

20                117 Perspective Drive, Suite 2

21                Granger, IN 46530

22   REPORTED BY: Sarah Lakin, Notary Public

23   JOB NO.:     5676785

24

25

**EXHIBIT**

6

Page 18

1       Q     Is Coe your client?

2       A     Is Coe my client?  No.  I've been retained

3   and hired by Attorney Gardner.

4       Q     All right.  You understand that Republic has

5   sued Coe and that's what this litigation is about;

6   right?

7       A     Yes.

8       Q     Okay.  And Coe is -- well, I guess it's not

9   Coe, but you are being paid to conduct -- you have

10  been paid to conduct a cause and origin investigation

11  in connection with this March 2019 fire; right?

12      A     Yes.

13      Q     Okay.  I want to turn your attention to -- I

14  think it's Exhibit 1.  There's a label at the bottom

15  right.  This is your report.  And I want to go towards

16  your CV.  So it's Agosti 36.

17                  (Exhibit 1 was marked for

18                  identification.)

19            Would you get that in front of you?

20      A     Okay.

21      Q     I want to talk through the different cases

22  that you've mentioned that you testified in before.

23  And I know my question earlier was about depositions.

24  Have you ever testified at trial?

25      A     I have, yes.

Page 170

1   utilized, essentially outlining, basically, some

2   factual information about the product itself, and that

3   my opinion is, is that I did not see any evidence of

4   blue paint buildup on the subject three heaters.

5       Q    And I can stop you, because Marty made a

6   great point.

7                MR. JONES:  Because that's a great

8   objection, Marty.  I like that one.

9                MR. GARDNER:  Because Thomas made ...

10  BY MR. JONES:

11      Q    All right.  On page 19, it's not the --

12  well, yeah, it's the first sentence.  Okay.  I'm going

13  to read that off, and I'm going to ask you a question

14  about it.

15               "Based on scientifically accepted and well-

16  documented indicators and the information provided to

17  me at this time, it's my opinion, within a reasonable

18  degree of fire science certainty, that the Sheboygan

19  Blue Aqua Enamel Paint, product number 73-4383C, is a

20  water-based, zero-flammability rating, non-combustible

21  product which does not sustain combustion."

22               Next sentence:

23               "This opinion is based on the manufacturer's

24  label and MSDS sheets for the subject product."

25               Did I read that right?

Page 178

1   quarter of the building were installed in a manner

2   adhering to and following the manufacturer's

3   installation and operations instructions."

4           Do you see that?

5       A   Yes.

6       Q   Okay.  What's the basis for your opinion?

7       A   The basis is based on after reviewing the

8   manufacturer's installation and operation manuals.

9   Additionally, it's also referring to -- continuing

10  onto the second sentence -- more so related to the

11  environment and application that they were installed

12  in.

13      Q   I understand.  I'm asking about the

14  installation manner.  Adhering to the manufacturer's

15  installation instructions.  And I'm trying to

16  understand the basis for your opinion.  Have you --

17  well, let me ask you this.  Do you know who installed

18  the three heaters?

19      A   Specifically?  Coe.

20      Q   Okay.  Do you know the names of the

21  individuals who installed those three heaters?

22      A   I have heard them previously.  I don't

23  recall them.

24      Q   I assume you've not talked to -- you haven't

25  talked to them; right?

Page 182

1          Q     You never saw those heaters installed.
2    Well, you never saw the heaters before the fire;
3    right?
4          A     Correct.
5          Q     You never went in to inspect to see whether
6    or not they actually had been correctly installed or
7    installed in a way that adhered to manufacturer's
8    warnings; right?
9          A     Correct.
10         Q     The next sentence, when you say that:
11               "At the time of the installation, they were
12   installed in such an application and environment that
13   did not expose the heaters to volatile and low
14   flashpoint materials."
15               What do you mean by it didn't expose them to
16   those materials?
17         A     That's based upon the -- what's the word --
18   the procedures that were taking place in this area
19   that I was informed of, mainly the application of this
20   Sheboygan blue paint as being the environment that
21   they were installed in.
22         Q     Do you know from the time the heaters were
23   installed to the day of the fire whether or not any
24   low flashpoint materials were stored in the same room
25   as the three heaters?  Do you know one way or another?

Page 202

1      A    Yes.

2      Q    Kyle Orr says on page 37, line 7, that he

3  had been "told by the heating and air people that

4  it" -- the old heaters -- "had sucked the paint up

5  into, you know, it sucks air in, heats it, blows it

6  out, and it sucked paint up into the unit and had

7  clogged the unit.  It wasn't repairable."

8           And then there's a question below:

9           "I believe that was Coe.

10           "Coe?  Do you know how long the heater that

11  you're telling us was getting clogged up with the

12  paint that got sucked in, do you know how long it had

13  been up there?"

14           He says:

15           "No, but I think it was there for a really

16  long time.  It looked really old."

17           To you, does the fact that overspray, when

18  paint had clogged up the old heaters, does that play

19  any role in your analysis and critique of Mr. Foster's

20  opinion?

21      A    I think we touched on that, but yes, again,

22  the -- these -- the old-type heaters were a totally

23  different type of heater.  Again, they're sucking in

24  air.  These infrared tube heaters are not sucking in

25  any air or potential overspray, so there -- it's two

Page 203

1    totally different things, in my opinion, you know, the

2    way the heaters operate.

3        Q    Okay.  I'm going to move to Exhibit 1, page

4    11.  I'm going to pull it up here, and we're going

5    to -- and move along here.  This is a section of your

6    report that says -- where you're talking about levels

7    of certainty.  Do you see that?

8        A    Yes.

9        Q    Okay.  And you reference Section 4.5.1 that

10   says:

11            "The investigator should know the level of

12   certainty that is required for providing expert

13   opinions.  Two levels of certainty commonly used are

14   probable and possible."

15            And it says:

16            "Probable.  At this level of certainty the

17   likelihood of the hypothesis being true is greater

18   than 50 percent.

19            "Possible.  At this level of certainty, the

20   hypothesis can be demonstrated to be feasible but

21   cannot be declared probable.  If two or more

22   hypotheses are equally likely, then the level of

23   certainty must be possible."

24            I want to understand your interpretation of

25   this section of NFPA 921.  Would it be the case that

Page 213

1   BY MR. JONES:

2       Q    Okay.  And did you give any weight to those

3   regarding the fire's origin or no?

4       A    Yes.  As outlined in my report, my opinion

5   is that the specific area of fire origin was not

6   determined, but in -- in refuting Mr. Foster's opinion

7   as to the south heater, it's just  my observation of

8   the analysis of the heaters themselves that the south

9   heater is actually in much better condition, and if

10  that was the origin, there should be an answer for the

11  reason that that's in better condition than the other

12  two heaters.

13      Q    Okay.  You say this in your report, speaking

14  of origin, I just want to make sure we're very clear.

15  You opine in your report that the area of origin was

16  the quarter south portion of the building; correct?

17      A    I'm just looking through my report to make

18  sure I don't --

19              MR. GARDNER:  Just for time's sake,

20  Thomas, is there a page that you're looking at?

21              MR. JONES:  Yeah, I had it --

22  BY MR. JONES:

23      Q    Well, I can just ask you, Mike.  Do you have

24  any opinion about the general area of origin as it

25  relates to Buildings 1 and 2?

Page 214

1      A      Yes.  And as you were referring to in my

2   report under Opinion 3, it is my opinion that the

3   general area of fire origin included the south quarter

4   of the building.  And I go on to say in my opinion

5   that this area of fire origin is very broad and was

6   not able to be brought down to a more specific area or

7   point of fire origin.

8      Q      Okay.  I want to go real quick to one of the

9   photographs you've got in your report.  It's on page

10   15 of your report.

11      A      Okay.

12      Q      There are two photographs there.  Do you see

13   that?

14      A      Yes.

15      Q      Okay.  And you mention in your report the

16   fact that there's more involvement of fire on the

17   southernmost portion of the building.  Do you see

18   where I'm circling?  Is that correct?

19      A      I would say based on that screen grab from

20   the video, it's depicting the very south end of the

21   building and south overhead door area all the way down

22   to ground level as being involved with fire, and it's

23   depicting the fire going upward and outward towards

24   the center overhead door, which is not displaying any

25   fire from the middle area of that overhead door north

Page 226

1    not do --

2         Q    You're making inferences based on what you

3    saw out there in your site inspections; correct?

4         A    That's based on my observations, yes.

5         Q    Okay.  I want to run -- I think this is the

6    last exhibit we're going to look at.  Well, it's one

7    we've already been looking at.  But Exhibit 1.  I want

8    to go to page 16.  On page 16 of your report -- and

9    this is on your opinion number 4, where you're talking

10   about cause being undetermined.  And actually, I'll go

11   to page 15.  It's the very last sentence of page 15,

12   going into 16.  It says -- you say:

13        "A thorough processing and examination of

14   the fire scene and area of interest was not conducted

15   or completed.  This left several identified, potential

16   ignition sources, to include branch circuit wiring,

17   junction boxes with conductors, circuit breaker

18   panels, lighting fixtures, electric fans and other

19   building electrical components not being examined,

20   evaluated or analyzed."

21        Do you have any evidence supporting a

22   hypothesis that any one of those potential ignition

23   sources caused the fire?

24        A    I would answer that by stating, as stated,

25   they're identified as potential ignition sources, and

Page 227

1   as it stands, they're all, until further examined,

2   they're all equally potential ignition sources as

3   potentially causing the fire until further examined

4   and eliminated.

5       Q    So I understand they're potential ignition

6   sources.  My question is have you seen any evidence in

7   this case that would take it from being a potential

8   to -- anything more than just a potential, any

9   supporting evidence that would -- have you seen any

10  supporting evidence that any one of those potential

11  ignition sources caused the fire?

12              MR. GARDNER:  Objection to the form of

13  the question; asked and answered, assumes facts not in

14  evidence.

15      A    Specific -- something specific, no.  And

16  again, that's why, in my opinion, all of those items

17  needed to be further analyzed --

18      Q    Sorry.  I'm sorry.

19      A    In an attempt to identify a potential --

20  more specific or potential actual single cause for the

21  fire.

22      Q    And is the same true on page 17, second

23  paragraph, about halfway down?  You say:

24              "There are other potential ignition sources

25  which are potentially capable of igniting any

Page 229

1    those potential ignition sources being the cause?

2              MR. GARDNER:  All the same objections

3    already listed.

4        A    No.  And that's the point of my answer is

5    that they were -- they all needed to be further

6    analyzed.

7        Q    Understood.  On page 16, you have four

8    paragraphs listed there.  The last sentence of that

9    paragraph on page 16 says:

10             "It is my opinion that smoking materials

11   improperly discarded or disposed of are unable to be

12   eliminated as being a potential cause for this fire

13   loss."

14             Why is it that the smoking materials

15   allegedly improperly discarded or disposed of can't be

16   eliminated as being a potential cause?

17       A    Again, the smoking materials are -- were

18   identified -- I identified those as a potential

19   competent ignition source within the area of higher

20   origin.  And those were unable to be eliminated based

21   on -- again, they're not -- the smoking materials are

22   not any more likely than any of the other potentially

23   identified ignition sources.

24       Q    And like the other potentially identified

25   ignition sources, you haven't seen any evidence

Page 230

1    supporting a hypothesis that the smoking materials

2    that you list were the cause of the fire; correct?

3                    MR. GARDNER:  Objection to the form of

4    the question.  All the rest of the other objections I

5    made last time, please.

6         A    Correct.  And at the end of the day, they

7    all remain uneliminated, unable to be eliminated.

8         Q    Understood.  I've got, like, two or three

9    more questions here, and then we'll -- I'll be done.

10   Page 17, bottom paragraph starts out with:

11                   "It is my opinion that the three infrared

12   heaters in place at the time of the fire and located

13   within the south quarter of the building were

14   installed in a manner adhering to and following the

15   manufactures installation and operations

16   instructions."

17                   The next sentence says:

18                   "Additionally, at the time of installation

19   the heaters were installed in such an application and

20   environment that did not expose the heaters to

21   volatile and low flashpoint materials."

22                   If we go to page 18, the top paragraph

23   describes your opinions related to the FAST Lab

24   report.  Do you see the paragraph I'm looking at?

25        A    Yes.

Page 245

CERTIFICATE OF TRANSCRIBER

1

2        I, DANIELLE S. VANRIPER, do hereby certify

3   that this transcript was prepared from the digital

4   audio recording of the foregoing proceeding, that said

5   transcript is a true and accurate record of the

6   proceedings to the best of my knowledge, skills, and

7   ability; that I am neither counsel for, related to,

8   nor employed by any of the parties to the action in

9   which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13

14

                              DANIELLE S. VANRIPER

15

16

17

18

19

20

21

22

23

24

25

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF INDIANA

3               FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7              Plaintiff,

8         v.                          Case No.

9    COE HEATING & AIR CONDITIONING,      1:21-cv-108-

10   INC. and GAS-FIRED PRODUCTS,         HAB-SLC

11   INC. d/b/a SPACE-RAY,

12             Defendants.

13   _____

14        VIDEOCONFERENCE DEPOSITION OF

15               SCOTT JONES

16   DATE:          Tuesday, February 21, 2023

17   TIME:          10:08 a.m.

18   LOCATION:      Remote Proceeding

19                  New Albany, Indiana 47150

20   REPORTED BY:   Sarah Lakin, Notary Public

21   JOB NO.:       5676789

22

23

24

25

**EXHIBIT**

H

Page 16

1      A      That is correct.  That has not happened.

2      Q      Okay.  I want to talk through kind of the

3   start of your involvement from when Mr. Vergon

4   contacted you in mid-May last year through the time

5   that you authored your December 22, 2022, report.

6           And when I talk about your report, I'll go

7   ahead and share my screen.  But immediately before we

8   got started, I circulated two exhibits.  One was

9   marked Exhibit A.  It's your engineering report dated

10  December 28, 2022.

11                    (Exhibit A was marked for

12                     identification.)

13              And Exhibit B was the Subpoena Duces

14  Tecum that our office sent to you care of James Hehner

15  dated January 20, 2023.

16                    (Exhibit B was marked for

17                     identification.)

18              So when I talk about your report today,

19  I'm talking about Exhibit A; okay?  Does that make

20  sense?

21     A      Yes.

22     Q      Okay.  And then Exhibit B is the Subpoena

23  Duces Tecum.  Do you have that available, by chance?

24  If not --

25     A      It's in my notes somewhere in here, yes.

Page 29

1   facts.  Does any of the information on page 4 of your
2   report -- is any of it relevant to your opinion?
3        A    Well, yeah because it's the environment that
4   they're installed in as far as, you know, what this
5   is, the factual basis.  I needed to understand that,
6   and that's why I summarized Mr. Foster's report and
7   his facts, if you will.
8        Q    Understood.  You just said you needed to
9   understand that and the environment they were in.
10  What do you mean by that?
11       A    Were they, you know -- was this in a circus
12  tent or was it in an industrial setting?  This is the
13  information I used to understand that.
14       Q    Was it important for you to -- are you
15  saying it was important for you to understand the
16  environment that these heaters were installed in?
17       A    It's very important.
18       Q    And I'm sorry to belabor the point, but why
19  is that?
20       A    These are not to be installed in a
21  residential application.
22       Q    But your opinion is not about whether or not
23  these were installed in accordance -- strike that.
24  You're not offering any opinions about whether or not
25  these were correctly installed; right?

1      A     That is correct.  I just wanted to see the

2    elements of a correct installation.  In other words,

3    what was the intake, what was the discharge, were they

4    set up for gas, et cetera.

5      Q    Understood.  I want to take you to the next

6    page.  You talk about the weather conditions.  What

7    impact, if any, did the regional weather conditions on

8    the day of the fire -- what relevance does that

9    information have, if any, on your opinion?

10     A    Just so you know, every engineering report I

11   do generally I put -- I want to examine the weather to

12   see if there was any influence such as storms, which

13   would have had convective activity, which is

14   lightning.  I get involved in a lot of lightning

15   situations.  So that's first and foremost.

16          But in this particular case, I want to make

17   sure that we had conditions -- atmospheric conditions

18   that would be conducive to these heaters operating.

19          And that's what I laid out in my table, that

20   it was the days leading up to the day of the event

21   were below freezing.  So it would be reasonable to

22   believe that the heater -- I'm sorry, the heaters

23   would be operating had they been enabled to operate

24   via the thermostat.

25     Q    Understood.  And I'm sorry to jump back.

Page 35

1    prepositional phrase "from outside the working area."

2        Q    Okay.  You then say "The heaters were

3    installed in a direct-vent configuration whereby

4    combustion air was obtained from uncontaminated air

5    outside the heated space."  Do you see that?

6        A    Yes.

7        Q    Okay.  What do you mean by "uncontaminated

8    air"?

9        A    Any particulate caused by the operation that

10   was happening in the working space would not be drawn

11   into the heater.

12       Q    Okay.  And I'll represent to you in this

13   case there had been some Republic employees who had

14   testified that there was what they've called "paint

15   dust," sort of dried out paint particles, that would

16   collect throughout the area where they were painting.

17   Does that sound familiar to you at all?

18       A    Yes, sir.

19       Q    Okay.  So you understand there was blue

20   paint dust all throughout this room; right?

21              MR. HEHNER:  I'm going to object to the

22   phrase "all throughout this room."  There's testimony

23   all over the place.  But as to where, how far, that

24   sort of thing, that's beyond the witness's knowledge,

25   so I object to the form of the question.

Page 36

1             MR. JONES:  It was a bad question.  I
2     apologize.
3             MR. GARDNER:  Go ahead, Thomas.
4             MR. JONES:  Sure.
5     BY MR. JONES:
6        Q    Scott, have you seen any pictures of what
7     the room looked like where these heaters were
8     installed before the fire?  Have you seen any pictures
9     of that?
10       A    Yes, sir.
11       Q    Okay.  Your observations of those
12    pictures -- have you seen anything that you understood
13    to be paint dust?
14       A    Yes.
15       Q    Okay.  When you talk about uncontaminated
16    air in opinion number 3 on page 15 of your report,
17    correct me if I'm wrong, but is what you're saying is
18    that the air being drawn in does not contain
19    particulates including paint dust or overspray from
20    the paint operations in the paint bay?  Is that fair?
21       A    That is correct.  I knew there were grinding
22    and other operations, welding, that were going on in
23    that space.  And that is correct the way you stated
24    it.
25       Q    Okay.  Do you know whether or not there was

1     Q    Okay.  And you didn't see any kind of

2   foreign materials inside the tubes.  That's what

3   you're saying; correct?

4     A    I -- I could see no paint inside any of the

5   tubes.

6     Q    All right.  I didn't ask about paint.  I'm

7   talking about what you say, foreign materials.

8     A    Yes, I -- I could not see any foreign

9   material in any of the tubes.

10    Q    Okay.  And how would you define foreign

11  materials?

12    A    In this case, paint.  Looking for paint

13  residue.  It would be blue.

14    Q    Any other kind of materials that would

15  constitute foreign materials other than blue paint?

16    A    Well, there was metallic content because

17  some of these tubes had aluminum in them, which was

18  melting out due to the temperature.  But I would look

19  for -- I'm always on the lookout for metal shavings or

20  a discoloration that doesn't belong.

21    Q    Discoloration that doesn't look -- what was

22  that?

23    A    That doesn't belong, which I would consider

24  a foreign material that needs more examination.

25    Q    Doesn't belong.  Understood.  I'm going to

Page 58

1   Space-Ray infrared LP-fueled heaters created no
2   conditions that were causal to the fire."  Do you see
3   that?
4        A    Yes, sir.
5        Q    Is that a cause and origin opinion?
6        A    No.  That is was this able to be operated,
7   and did I see anything that would have caused the
8   fire.  For example, had -- was one of the gas jets
9   misdirected?  For example, was there a penetration in
10  one of the radiant tubes?
11            Those are the type of things that could
12  cause a fire, and I saw no conditions like that would
13  have been causal to a fire.
14       Q    In your opinion, did the Space-Ray infrared
15  heaters -- should those be eliminated in this case as
16  a potential ignition source?
17       A    Yes.
18       Q    And is it because you didn't see any
19  conditions that were -- let me back up.  Is it because
20  you believe the Space-Ray heaters didn't create any
21  conditions that were causal to the fire?
22       A    That is correct.
23       Q    Okay.  Is an opinion on the elimination of a
24  potential ignition source a cause and origin opinion?
25       A    It's -- it feeds into a larger -- when you

Page 99

1   We don't have nearly as robust set in the United

2   States under UL, which is the primary standards

3   writing organization.

4           So pretty much you're going to find all gas

5   appliances head up to Canadian Standard Association

6   standards.  They may not be tested by them.  They can

7   be tested by a third-party laboratory.  But they're

8   the standards organization that most people use for

9   gas appliances.  That's historical.

10      Q     Thank you.  That's definitely something I

11  learned today.

12          That last sentence of 17.1 that's inside of

13  Space-Ray's installation and operation instructions

14  and I think you said is in there because they

15  subjected themselves and met compliance with the

16  Canadian Standards Association, does that mean to you

17  that in this particular case -- and you probably have

18  learned that there was some painting going on inside

19  of the room where the three heaters were installed of

20  that Sheboygan water-based paint -- that my client

21  would have met this 17.1. directive in as much as

22  because there's painting going on in the room, my

23  client used outside air for combustion?  So we

24  complied with this paragraph by doing that?

25              MR. JONES:  Objection to form.

Page 100

1    Foundation.

2       A    Yes, that is -- that is correct.

3            I -- you know, in prior testimony I've shown

4    in this paragraph to your point here, that's why I

5    looked at the MSDS sheet because I knew there had to

6    be solvents.  And it was responsive to this 17.1.,

7    which specifically said solvents.  And that's what

8    drove me over to the MSDS sheet in my investigation.

9       Q    So being that there were paints with

10   solvents being used by the plaintiff, Republic, in the

11   building where my client installed the three Space-Ray

12   closed infrared tube heaters, the remedy by my client

13   to put them in correctly is to use outside combustion

14   air; correct?

15            MY. JONES:  Objection to form.

16   Foundation.

17      A    That is correct, and that -- that is

18   correct, and that's per the manual.

19      Q    Thanks.  I'm just going through my notes.  I

20   might have a couple further.

21            Did you see evidence that in terms of the

22   30-foot-long heater pipes that there were connectors

23   between sections?

24      A    Yes, there were a number of connectors.

25   Some were disconnected, as you probably know.

Page 101

```
 1      Q    As a result of the falling down and collapse
 2   in debris?
 3                  MR. JONES:  Objection to form.
 4   Foundation.
 5      A    That is correct.
 6      Q    Did you see any evidence that my client did
 7   not properly utilize those connectors to create a seal
 8   between the different pipe sections of the heaters?
 9      A    This may be an FYI, but my understanding is
10   that Space-Ray ships these out complete already
11   connected.  I have not seen that, but that's my
12   historic understanding of these that your client may
13   not even have touched these.
14           But I saw no evidence responsive to your
15   question that there was anything.  But we did have a
16   building collapse and there were separated sections.
17      Q    And did you see any failure in connection
18   with either any part of the 26-gauge metal or the 30-
19   gauge metal that in your opinion played any role in
20   causing this fire?
21                  MR. JONES:  Objection to form.
22      A    I saw no condition that would have been
23   causal to the fire.
24      Q    Do you have the Space-Ray installation and
25   operation instructions manual with you?
```

Page 103

1    can't separate between a deflagration and a

2    detonation.

3            A concern when we talk, and I want to bring

4    this up for this record, is this thing in normal

5    operation?  Is it glowing red, which is well above the

6    auto-ignition temperature of a lot of different

7    things?  So that has to be part of it too in normal

8    operation.

9            So some of this becomes kind of academic of

10   that -- what you just read me.

11       Q    Got it.  This might be my last question.

12   Page 15 of your report, your section involving

13   conclusions --

14       A    Yes, sir.

15       Q    Do you hold the opinion to a reasonable

16   degree of scientific certainty that the Space-Ray

17   infrared gas-fired heaters did not cause this fire?

18               MR. JONES:  Objection to form.

19   Foundation.

20               MR. HEHNER:  What's wrong with the form

21   there?

22               MR. JONES:  Say again?

23               MR. HEHNER:  Thomas, what's wrong with

24   the form?

25               MR. JONES:  Sarah, can you read us the

Page 104

1    question back?

2                    THE REPORTER:  Yeah.  Just a moment

3    here.  Do you want me to read it or play back?

4                    MR. HEHNER:  Whatever's quicker for me.

5                    MR. JONES:  Yeah.  Whatever's faster.

6                    (The reporter read the record as

7                    requested.)

8                    MR. JONES:  So I'll take back my form

9    objection.  It's just a foundation objection.  He's

10   already testified that he's not offering cause and

11   origin opinions because he didn't conduct a cause or

12   origin investigation in this case.

13                   MR. HEHNER:  Thank you.

14   BY MR. GARDNER:

15       Q    You can answer now.

16       A    I believe the answer is yes.  There was --

17   they were not causal to the fire.

18       Q    Okay.  So Thomas's objection raises an

19   interesting point that I think needs clarified.

20            It's my understanding that in terms of

21   Space-Ray as a defendant in this case, they hired Mr.

22   Mike Vergon as their cause and origin expert, who

23   would have been looking for the origin and looking for

24   any and all causes or eliminating any and all causes.

25            Your role and your expertise, which you have

Page 112

1              CERTIFICATE OF TRANSCRIBER

2          I, JENNA STERN, do hereby certify that this

3     transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

                                      *Jenna Stern* [signature]

15                                    JENNA STERN

16

17

18

19

20

21

22

23

24

25



2481 Savanna Drive
Wauconda, Illinois 60084
O: 847.487.5776
F: 847.487.8142

# Investigation Report

**Republic Service of Indiana,**
**Limited Partnership**
**Plaintiff**
**v.**
**COE Heating & Air Conditioning, Inc.**
**&**
**Gas-Fired Products, Inc.**
**D/B/A Space-Ray**
**Defendants**





24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



December 28, 2022

Mr. Martin Gardner
Gardner & Rans
117 Perspective Drive-Suite 2
Granger, Indiana 46530

RE:  Republic Service of Indiana,
      Limited Partnership
      Plaintiff
       v.
      COE Heating & Air Conditioning, Inc.
      &
      Gas-Fired Products, Inc.
      D/B/A Space-Ray
      Defendants

Dear Mr. Gardner,

The following report summarizes my involvement in the March 19, 2019, fire incident which occurred at 6231 Macbeth Rd., Fort Wayne, Indiana.

## ASSIGNMENT

I was contacted by you on or about June 26, 2019 regarding the subject fire incident. I was requested to conduct an analysis of the origin and cause for the referenced fire incident. I agreed to the assignment and have been working on the matter as needed to date. Shortly after my engagement, a site inspection was coordinated with Plaintiffs expert Mr. Jim Foster who was employed with Rimkus Consulting Group Inc. at that time. I attended that site inspection which took place on July 2, 2019.

I am currently a fire analyst with Agosti Fire Investigations based out of Wauconda, Illinois. I have 25 years fire department experience and 20 years of forensic fire investigation experience. I have conducted over fifteen hundred fire investigations. I have been qualified as a fire expert in state courts for plaintiffs, as well as defendants. I am a Certified Fire Investigator with the International Association of Arson Investigators and a Certified Fire and Explosion Investigator with the National Association of Fire Investigators.




24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

## <u>INVESTIGATION/CASE ANALYSIS</u>

During my analysis of this fire incident I have reviewed the following documents, referenced the following materials and publications and performed the following tasks:

1. Southwest Fire District NFIRS fire report

2. "Report of Findings" authored by Jim Foster- Dated December 3, 2019

3. Expert Report authored by Jim Foster- Dated November 18, 2022

4. Rimkus Consulting Group Inc. file provided as discovery

5. Rimkus Consulting Group Inc. Evidence Custody Forms

6. Rimkus Consulting Group Inc. Evidence transmittal w/ cover letter

7. Rimkus Consulting Group Inc. Field Notes by electrical engineer John Diggle

8. Rimkus Consulting Group Inc. Field Notes by Louis V. Inendino

9. Forensic and Scientific Testing (FAST) Certified Laboratory Report- Dated April 14, 2020

10. Attendance at the following site inspections:

    a) July 2, 2019
    b) March 3, 2020
    c) May 11, 2020

11. Attendance at the following evidence examinations:

    a) February 24, 2022
    b) August 23, 2022

12. Review of provided witness video

13. Review of Depositions of:

    Dan Kelley, Gerald Depold, Greg Tolley, Jason Kelley, John Shatto, Kyle Orr, Mike Sherfield, Samir Dizdareic, Scott Kleinknight, Sharee Wells, Terry Reader, Trevor Miller, Fred Jones



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



14. Report authored by Nicholas Ozog with Wiss, Janney, Elstner Associates Inc.- Dated November 18, 2022

I reviewed the following literature, standards and reference manuals, etc.

a) National Fire Protection Association (NFPA) 921 Guide for Fire and Explosion Investigations- 2017 & 2021 editions.

b) National Fire protection Association (NFPA) 1033 Standard for Professional Qualifications for Fire Investigator- 2014 & 2022 editions.

c) ASTM E1188- Practice for the collection and preservation of information and physical items by a technical investigator.

d) ASTM E860- Standard practice for examining and testing items that are or may be involved in litigation.

## FIRE INCIDENT SUMMARY

The subject fire incident took place on March 19, 2019 at 6231 Macbeth Rd., Fort Wayne, Indiana. The subject property consisted of multiple buildings which were mostly shops for vehicle maintenance and dumpster repairs. The fire incident took place at or around 11:03 p.m. and was within a large industrial building which was located on the west side of the property. The subject building was quite large and had several additions. The subject building sustained severe heat and flame damage to the south half portion. The south, approximate 1/4 of the building sustained the most severe heat and flame damage. This included almost complete consumption of the roof structure and wall structures. The subject building was constructed of wood frame with metal corrugated exterior walls and metal corrugated interior ceiling and walls. There was an asphalt shingled roof. There were three large, overhead doors located on the east side of the subject building's south 1/4. The building had propane gas and electric service at the time of the fire.





24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



Overall view of property- Pre-fire (Google Earth Image)



Overall view of subject building- Pre-fire (Google Earth Image)



View of south end of subject building (Google Earth Image)



Overall view of subject building- post fire (Google Earth Image)

## SUMMARY OF MY OPINIONS

1) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **origin** of the fire incident. Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the incident fire **origin**, are flawed, inaccurate, unreliable and incomplete. Jim Foster's fire origin opinions are not based on the scientific method as required by NFPA 921, NFPA 1033 and accepted forensic fire investigation industry practices and standards.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



AGOSTI 00005

2) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **cause** of the fire incident.  Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the incident fire **cause**, are flawed, inaccurate, unreliable and incomplete. Jim Foster's fire cause opinions are not based on the scientific method as required by NFPA 921, NFPA 1033 and accepted forensic fire investigation practices and standards.

3) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **origin** related to the fire incident which occurred on March 19, 2019 at the property located at 6231 Macbeth Rd., Fort Wayne, Indiana was only able to be determined within a general area of fire origin. This included the south 1/4 of the subject building. This area of fire origin was very broad and was not able to be brought down to a more specific area and or point of fire origin. Though, based on witness video, the fire is clearly more advanced and well progressed in the southeast corner, at or near floor level and had not yet progressed to the middle or north portion of the south 1/4 of the building. Based on this, the area is to be considered a potential area of fire origin and warranted further examination and analysis.

4) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **cause** is undetermined. A specific area and/or point of fire origin were not able to be determined. Additionally, all potential, competent ignition sources were not eliminated.

5) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff expert Jim Foster's evidence collection from the subject fire scene, which took place on May 10, 2019, while no other parties were present, was conducted in a manner which does not follow recommended procedures in NFPA 921 or comply with accepted or recommend practices or procedures. Additionally, the aforementioned evidence collection was not properly documented.

6) Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the Sheboygan Blue Aqua Enamel Paint- Product number 73-4383C, is a water based, zero flammability rating, non-combustible product which does not sustain combustion.



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



## OPINION #1:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **origin** of the fire incident. Mr. Jim Foster's investigation did <u>not</u> follow a systematic approach based on the scientific method, as recommended in NFPA 921. It is my opinion that Mr. Jim Foster's investigation was incomplete and the fire scene and potential areas of interest related to fire origin were not properly or thoroughly processed. Given the scope and size of the subject fire scene and potential area of interest, a thorough, controlled demolition of the fire scene should have been conducted in attempt to determine an area of fire origin and possibly a point of fire origin. Mr. Jim Foster states on page 1 of his Expert Report that *"On December 3, 2019, after thorough analysis of the site and artifacts from the site, I provided my opinions to Republic Services about the cause and origin of the March19, 2019 fire which is the subject of this lawsuit."* It is my opinion that this statement is inaccurate and Mr. Jim Foster's investigation was not thorough or complete. Mr. Jim Foster failed to conduct any excavation or reconstruction of the fire scene. This would have included the examination, layering, and removal of debris.

NFPA 921- 2017 edition-18.3.2 states in part *"Fire scene excavation (the examination, layering, and removal of debris) and reconstruction allows for the investigator to observe patterns on exposed surfaces and to locate evidence that can assist in making an accurate origin analysis. The purpose of fire scene reconstruction is to recreate as nearly as practicable the pre-fire positions of contents and structural components."*

Mr. Jim Foster failed to secure the fire scene and overall site and or/area of interest. This failure to secure and limit access allowed for potential removal, destruction, or loss of items of evidentiary value and did not prevent undue change or additional damage to the scene. Mr. Jim Foster was initially out to conduct his initial, first inspection on March 20, 2019. He returned on May 10, 2019. This is approximately forty days. He made no attempt to secure and or preserve the site or subject fire scene. Furthermore, the next site inspection was not until July 2, 2019. The first joint scene inspection with multiple parties was next on March 3, 2020. At the time of the March 3, 2020 site inspection, I observed and documented that the subject fire scene was altered. The ground along the east wall of the subject building and within the area of interest had been cleared utilizing heavy equipment, with evidence of track marks on the ground. It was also observed and documented that some debris from the cleared area was placed into the fire scene. Additionally, several items to include an ice machine, garbage can and cigarette disposal container, all which were not fire damaged and clearly from another area, were placed into the fire scene on top of debris and within the area of interest. It is my opinion that the lack of fire scene security and preservation led to additional damage in the form of extensive corrosion, allowed for partial clean-up of the perimeter with debris thrown into the fire scene. This also



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

allowed for further cross contamination. It is my opinion that this could be considered spoliation as defined in NFPA 921.

NFPA 921- 2017 edition-12.3.5 states in part *"Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change, or destruction of evidence, or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did any prior investigator."*

 

View of southeast corner with evident track marks and cleared debris

View of east side of the south portion of the subject building Depicting items foreign to the area

NFPA 921- 2017 edition-29.5.2.1 states in part *"One of the first tasks to be completed is the establishment of investigation site security. Entrance should be limited to those individuals necessary to provide for safety, prevent the removal, destruction, or loss of items of evidentiary value; and prevent undue change or additional damage to the scene. It may be necessary to hire private security personnel or install barriers to obtain the level of security needed. Security should be maintained continuously until the investigation site activities are complete."*

NFPA 921- 2017 edition-18.1, states in part *"This chapter recommends a methodology to follow in determining the origin of a fire. The area of fire origin is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located. The point of origin is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be*



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.



*determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect."*

NFPA 921-2017 edition-Figure 18.2 outlines some examples when applying the scientific method to origin determination. These include but are not limited to; determine pre-fire conditions, excavation/examination/reconstruction of the scene, witness statement and observations, heat and flame vector analysis, electrical arc mapping, initial origin hypotheses, alternate hypotheses, origin insufficient to determine cause. See chart below.



Mr. Jim Foster states on page 1 in his "Report of Findings" that *"Rimkus Consulting Group, Inc. was retained by CCMSI to determine the origin and cause of the fire and to determine if the recently installed heaters contributed to the cause." and "A second site examination was completed on May 10, 2019, to uncover heaters recently installed from fire debris."* It is my opinion Mr. Jim Foster's investigation, from the onset was guided by and subject to expectation bias. In essence, the scene was not processed and Mr. Jim Foster only had concern with three infrared gas-fired tube heaters. Mr. Jim Foster's focus on the heaters was not based on first identifying an area of fire origin. Mr. Jim Foster did not utilize a systematic approach utilizing and considering the scientific method during his investigation related to fire origin.

   24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com   
Based in the Midwest • Serving clients across the U.S.

AGOSTI 00009

Mr. Jim Foster states on page 1 of his Expert Report that *"A representative from Republic retained Rimkus after the fire to evaluate the origin and cause and determine if the recently installed heaters may have contributed to the cause of the fire."* It is my opinion that this statement is reflective of Mr. Jim Foster's expectation bias from the onset of his investigation. His expectation bias led him to reach a premature conclusion without having examined or considered all relevant data.

NFPA 921- 2017 edition-4.3.9, states in part *"Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigators (s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator (s) uses the premature determination to dictate investigative processes, analyses, and ultimately, conclusions, in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports the previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method."*

Mr. Jim Foster does not state or identify a clear, concise and scientific based fire origin. Mr. Jim Foster states on page 1 of his Expert Report *"The area where the fire appeared to have originated was at the south end of the building where Republic's trash dumpsters were repaired and repainted."* This is a broad, general area of fire origin. Mr. Jim Foster states on page 3 of his Expert Report *"Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This indicates the fire origin occurred in the east heater near the control box associated with the ignition of the propane fuel."* This is an inaccurate and flawed statement. In fact there is no east heater. The three identified heaters are a north, middle and south heater. They run lengthwise east to west. Mr. Jim Foster states on page 3 of his Expert Report *"The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees was high in the building upon discovery. This combined with the fire damage to the south heater that was at ceiling level indicated the possible location of origin."* Mr. Jim Foster inaccurately and unreliably identifies metal portions of the building. The subject building was collapsed or consumed by the fire. Corrugated metal building components were down at or near floor level with no discernable way to differentiate where they were from or which metal panels they were (exterior wall, interior wall or interior ceiling). There were no fire patterns or indicators to indicate a fire originating up high in the building. A witness video depicts the fire well advanced in the southeast corner of the building, with only smoke showing and no fire involvement in the middle and north portion of the area. Mr. Jim Foster states a <u>possible</u> location of origin. This speaks to his level of certainty. A "possible" level of certainty is only feasible but cannot be declared probable. Mr. Jim Foster's level of certainty



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



related to the fire origin is not at a reasonable degree of scientific certainty. There are numerous possible areas of fire origin in the building.

NFPA 921-2017 edition-4.5.1- states in part *"The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible.*

> *1) Probable. This level of certainty corresponds to being more likely true then not. At this level of certainty the likelihood of the hypothesis being true is greater than 50 percent.*

> *2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."*

Mr. Jim Foster does <u>not</u> set forth a clear, concise, fire origin opinion based on the scientific method as required by NFPA 921 and the accepted forensic fire investigation practices and standards. Mr. Jim Foster did not utilize a systematic approach utilizing and considering the scientific method during his investigation related to fire origin.

## OPINION #2:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that plaintiff Republic Service of Indiana's expert Jim Foster, failed to set forth or provide a forensic, science based and NFPA 921 compliant opinion/opinions or report with opinions related to the fire **cause** of the fire incident. Mr. Jim Foster's opinions as outlined in his "Report of Findings" dated December 3, 2019 and Expert Report dated November 18, 2022, specifically related to the fire incident fire **cause**, are flawed, inaccurate, unreliable and incomplete. Mr. Jim Foster does not definitively state an opinion, scientifically based, as related to the fire cause. Mr. Jim Foster states on page 1 of his Expert Report *"The cause and origin of the fire is a direct result of the open infrared heaters installed in an area where painting and other procedures were performed."* This statement in and of itself is not a fire cause determination. Mr. Jim Foster states on page 4 of his Expert Report *"Information provided at the time of the fire site examination indicated temperatures prior to the fire were higher than what the settings were for the thermostat. Once the temperature dropped the ignition of the infrared heaters ignited. This occurred prior to the fire discovery. The heaters were the only source of ignition in the area of origin. In summary, other potential ignition sources were identified in the general area of fire origin. However, these other potential sources were ruled out due to their location and origin location."* This statement is speculative and not based on sufficient, reliable data. Mr. Jim Foster





24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.

simply states that paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited. Mr. Jim Foster opinion does not describe or articulate the exact cause hypothesis. The first fuel ignited, ignition source, ignition sequence are not described, explained or substantiated.  Mr. Jim Foster's photographs clearly identify and depict smoking materials in and around the subject area of interest. He does not clearly explain or articulate how, if at all he was able to eliminate them as a possible, competent ignition source. Mr. Jim Foster's photographs clearly identify and depict large quantities of electrical components, to include branch circuit wiring, junction boxes, light fixtures, circuit breaker panels. He does not clearly explain or articulate how, if at all he was able to eliminate them as a possible, competent ignition source. Additionally, Mr. Jim Foster does not accurately determine or define an area of fire origin to specifically identify and narrow down potential ignition sources within an area to rule in or rule out. Mr. Jim Foster failed to examine, analyze, document and collect for further examination, the gas system within the area of interest. This gas system fueled the subject three infrared gas-fired heaters. Mr. Jim Foster's Expert Report dated November 18, 2022, states on page 1, "The cause and origin of the fire is a direct result of the open infrared tube heaters installed in an area where painting and other procedures were performed." Mr. Jim Foster's opinions related to the fire cause are not based on the scientific method as recommended in NFPA 921.

NFPA 921-2017 edition-19.1, states in part *"Fire cause determination is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire. Fire cause determination generally follows origin determination. Generally, a fire cause determination can be considered reliable only if the origin has correctly been determined."*

NFPA 921-2017 edition-Figure 19.2 outlines some examples when applying the scientific method to cause determination. These include but are not limited to; origin has been determined, identify fuels in area of origin, identify potential ignition sources, analyze fuel(ignition temperature, quantity), analyze ignition source(temperature, energy, time), separate hypothesis for each ignition source, consider alternate hypothesis, can the hypothesized ignition source ignite the first fuel, insufficient information to determine cause. See chart below.





AGOSTI 00012



Mr. Jim Foster had present with him at the joint scene inspection which took place on march 3, 2020, electrical engineer John Diggle with Rimkus Consulting Group, Inc. Mr. Jim Foster's reports fail to describe or articulate how he utilized the assistance of an electrical engineer. He failed to state that he used the engineering analysis of his electrical engineer to assist him in eliminating other electrical fire causes in the area of fire origin.

Mr. Jim Foster does not set forth a clear, concise, fire cause opinion based on the scientific method as required by NFPA 921 and the accepted forensic fire investigation practices and standards.

## OPINION #3:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **origin** related to the fire incident which occurred on March 19, 2019 at the property located at 6231 Macbeth Rd., Fort Wayne, Indiana was only able to be determined to be within a general area of fire origin. This included the south 1/4 of the subject building. This area of fire origin was very broad and was not able to be brought down to a more specific area and or point of fire origin. Significant, severe heat and flame damage, to include the almost complete consumption and collapse of the roof structure and walls, resulted in a difficult fire scene to determine a more specific area or point of fire origin. My opinion and opinion expressed at the time of the scene



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

inspections, is that a controlled, demolition of the area of interest needed to be conducted in attempt to possibly determine a specific area or point of fire origin. The scene and area of interest was <u>not</u> thoroughly processed. In fact plaintiff expert Mr. Jim Foster who was coordinating and running the joint inspections made it clear he had no intention and was not processing the entire area of interest. In fact, Mr. Jim Foster's limited action during the course of the joint scene inspections was to enter his area of interest and collect three infrared gas-fired heaters. I objected and requested that the controlled demolition and processing be conducted. A fire scene reconstruction was <u>not</u> attempted to possibly determine a more specific area of fire origin. Given a broad area of fire origin, there were many possible areas of fire origin.

NFPA 921- 2017 edition-18.1, states in part *"This chapter recommends a methodology to follow in determining the origin of a fire. The area of fire origin is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located. The point of origin is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect."*

Based on my assessment and evaluation of a witness video, it is my opinion that the video depicts the fire involvement of the southeast corner, at or near floor level. The video also depicts only smoke showing from the middle and north portion of the south 1/4 of the building. The fire had not progressed to those areas yet. It is my opinion that the southeast corner is an area of interest and possible area of fire origin which needed to be processed and further analyzed in attempt to determine a specific area of fire origin. Mr. Jim Foster's investigation did not examine process or consider this area as a possible fire origin. Of note, the incoming electric service and circuit breaker panels for the subject building are in the area of the southeast corner along the south wall.

See the photographic comparison below depicting the east side of the south portion of the subject building. Three overhead doors can be seen for comparison.





24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.



Witness video screenshot (note arrow depicting curved downspout)



Google earth image (note arrow depicting curved downspout)

It is my opinion that the fire origin is within the south 1/4 of the subject building. A more specific area or point of fire origin was not determined.

## OPINION #4:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire **cause** is undetermined. Firstly, an area of fire origin was not able to be determined, thus a cause was not determined. Within the fire origin and area of interest, there were several potential ignition sources which were unable to be eliminated as causing this fire. A thorough processing and examination of the fire scene and area of interest was <u>not</u> conducted or completed. This left several identified, potential ignition sources, to include branch circuit wiring, junction boxes w/



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

conductors, circuit breaker panels, lighting fixtures, electric fans and other building electrical components not being examined, evaluated or analyzed. None of these aforementioned items were collected and removed from the fire scene as evidence for further analysis. It is my opinion that these items remain potential ignition sources which were <u>not</u> ruled out as being the cause of the fire. Other identified potential ignition sources include discarded and or improperly disposed of smoking materials. I observed and documented smoking materials in the form of cigarette packaging and cigarette butts within a melted down garbage can located at floor level on the interior of the south 1/4 of the building and immediately below the north infrared gas-fired heater. Additionally, discarded cigarette butts were observed and documented on the ground and in close proximity to the exterior of the southeast corner of the subject building. It is my opinion that smoking materials improperly discarded or disposed of are unable to be eliminated as being a potential cause for this fire loss.


View depicting electrical components within area of interest


View depicting electrical components within area of interest


View depicting electrical components within area of interest


View depicting electrical components within area of interest


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.


AGOSTI 00016

NFPA 921- 2017 edition- 18.8, states in part *"There are occasions when it is not possible to form a testable hypothesis defining an area that is useful for identifying potential causes. "*

It is my opinion that after my examination of the three infrared gas-fired heaters collected and removed from the fire scene, during evidence exams on February 24, 2022 & August 23, 2022, that there was no evidence of the presence of or the build-up of blue paint on any of the three heaters or their associated components.

It is my opinion that any theory related to the ignition of flammable and or combustible materials collecting on the infrared gas-fired heaters is flawed and incomplete, as there are other potential ignition sources which are potentially capable of igniting any identified materials suspected as being ignited. These other ignition sources include gas torches, grinders, welding, electric switches, electric fans, torpedo heaters and smoking. Additionally, based on information provided and photographic evidence, the previously installed suspended heaters, which were in place within the same space as the three infrared gas-fired heaters, since 2008 and were operating under the same conditions, with the application of Sheboygan blue paint, reportedly never caused any problems, to include fire or explosion. Furthermore, it was observed that in an adjacent building from the subject fire building, that painting operations were reportedly taking place, to include the application of Sheboygan blue paint. There were two infrared gas-fired heaters in place. There were no reported problems, to include fire or explosion.

It is my opinion that Mr. Jim Foster should have considered this data related to the previous heaters when developing, testing and selecting a final hypothesis, as recommended in NFPA 921.

Mr. Jim Foster states on page 2 of his Expert Report "The dumpster maintenance included operations such as repairing, sanding, patching and repainting dumpsters. Work in this included the use and storage of flammable combustibles materials."

It is my opinion that the three infrared heaters in place at the time of the fire and located within the south 1/4 of the building were installed in a manner adhering to and following the manufactures installation and operations instructions. Additionally, at the time of installation the heaters were installed in such an application and environment that did not expose the heaters to volatile and low flash point materials. At the time of installation, the subject building and area the heaters were installed was not an NFPA 33 compliant spray booth/spray area. At the time of installation, the subject building and area the heaters were installed was not an approved or certified spray booth/spray area as deemed by any local or state government agency or entity, such as the city, county or state.

NFPA 921- 2017 edition- 17.3.1.1, states in part *"Generally, the cause of a fire or explosion is not known until near the end of the investigation. Therefore, the evidentiary or interpretative value of various pieces of physical evidence observed at the scene may not be known until, at, or*



*near the end of the fire scene examination, or until the end of the complete investigation. As a result, the entire fire scene should be considered physical evidence and should be protected and preserved."*

It is my opinion that the Forensic and Scientific Testing (FAST) Certified Laboratory Report indicating the presence of medium and heavy petroleum distillates, can be explained as being expected to be present or common to the area in the subject work shop area and subject building. This is based on the documented presence of asphalt shingles and tar paper, lens wipe packets, other solvents and flammable liquids. There were several containers observed and documented which possibly contained flammable liquids. Additionally, it is my opinion that given the collapse of the roof, ceiling and all unburned components ultimately resting on or near floor level, with the tens of thousands of gallons of water utilized to extinguish the fire, any liquids within the area of fire damage would have become dispersed or floating to other areas than they were originally. This clearly caused cross-contamination.




View of containers in metal storage cabinet          View of containers in metal storage cabinet

It is my opinion that based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the fire <u>cause</u> is undetermined. A specific area and/or point of fire origin were not able to be determined. Additionally, all potential, competent ignition sources were not examined, analyzed or collected as evidence and were unable to be eliminated.

## OPINION #5:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.


AGOSTI 00018

plaintiff expert Jim Foster's evidence collection was not conducted following accepted guidelines and procedures as set forth in NFPA 921. Additionally, Mr. Jim Foster did not follow or comply with accepted practices or procedures. It is my opinion that Mr. Jim Foster failed to properly document his evidence collection from the subject fire scene. With no other parties present, it is of the utmost importance to properly document evidence collection.

NFPA 921- 2017 edition- 17.1, states in part that *"During the course of any fire investigation, the fire investigator is likely to be responsible for locating, collecting, identifying, storing, examining, and arranging for testing of physical evidence. The fire investigator should be thoroughly familiar with the recommended and accepted methods of processing such physical evidence."*

NFPA 921- 2017 edition- 17.5.2.1, states in part that *"Physical evidence should be thoroughly documented before it is moved. This documentation can be best accomplished through field notes, written reports, sketches, and diagrams, with accurate measurements and photography. The diagramming and photography should always be accomplished before the physical evidence is moved or disturbed. The investigator should strive to maintain a list of all evidence removed and who removed it."*

It is my opinion that Mr. Jim Foster failed to properly document his evidence collection through photography, diagramming or field notes. It is my opinion that Mr. Jim Foster failed to produce any sketches, measurements or field notes related to his evidence collection. Additionally, his photographs of his evidence collection are very minimal and incomplete. It is my opinion that Mr. Jim Foster's evidence collection fail to depict accurately his evidence collection. The photographs fail to depict all evidence collection performed and do not depict accurately the locations where evidence was collected. It is my opinion that Mr. Jim Foster's Evidence Custody Forms indicate two separate forms with date collected as being May 10, 2019. Each form indicates Exhibit A, B & C, with separate and different descriptions on each form. It is my opinion that this indicates two sets of evidence labeled A, B & C. This indicates a discrepancy in Mr. Jim Foster's evidence documentation. Additionally, it is unclear which evidence was submitted for laboratory analysis.

## OPINION # 6:

Based on scientifically accepted and well documented indicators and the information provided to me at this time, it is my opinion, within a reasonable degree of fire science certainty, that the Sheboygan Blue Aqua Enamel Paint- Product number 73-4383C, is a water based, zero flammability rating, non-combustible product which does not sustain combustion. This opinion is based on the manufactures label and MSDS sheets for the subject product. The paint is not a



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

flammable finish. Additionally, it was noted and observed that throughout the subject building and area of interest, that there was evidence of unburned, pristine blue paint remnants in the form of chunk pieces. These pieces and remnants were throughout and completely unburned or consumed by the fire. It is also my opinion that there was no build up or even slight presence of blue paint on any of the three infrared gas-fired heaters removed from the fire scene.


Drum of blue paint from subject site


Drum of blue paint from subject site


Drum of blue paint from subject site


Drum of blue paint from subject site

All of my opinions are based on my review of documents, photographs and videos. Additionally, my opinions are based on my examination of the subject fire scene and my education, training and experience as a fire and explosion investigator. All opinions are based on scientifically accepted and well documented indicators and are within a reasonable degree of fire science


24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com

Based in the Midwest • Serving clients across the U.S.

AGOSTI 00020

certainty. As addendums to this report and in separate documents are partial photograph documents with representative photographs from my complete set of photographs taken.

If and when more or additional information become available to me, I reserve the right to amend my opinions as stated above. If you have any questions or need further assistance please feel free to contact me.

Respectfully submitted,

Technical review by:

*Michael J Agosti*

*John Agosti*

Michael Agosti- IAAI CFI, NAFI CFEI & CVFI
Fire Analyst

John Agosti-IAAI CFI, NAFI CFEI
Fire Analyst



24/7 phone 847-682-6793 • John.Agosti@Agosti-Fire.com • www.arsonexpert.com
Based in the Midwest • Serving clients across the U.S.





REPORT OF FINDINGS re.

Fire at Republic Services of Indiana, Limited Partnerhip's Fort Wayne Facility, at
6231Macbeth Rd., Fort Wayne, Indiana 46809

Date of Loss: March 19, 2019

PREPARED FOR:

Mr. James W. Hehner
Clendening Johnson & Bohrer, P.C.
225 North Delaware St.,
Indianapolis, IN  46204-2127

PREPARED BY:

Michael A. Vergon, IAAI-CFI
Vergon and Associates Fire Investigation, LLC
14074 Trade Center Drive, Suite 250
Fishers, Indiana  46038
(317) 508-0527

December 29, 2022



**INTRODUCTION AND BACKGROUND**

On March 19, 2019, sometime around 11:00 p.m., Republic Services employees, at 6231 Macbeth Rd., Fort Wayne, Indiana, discovered a fire at one of the facility structures and called 911 to report the fire. Initially, only smoke was observed at or near the south end of what has been identified as Building 1. Building 1, hereafter referred to as 'the structure" was partially comprised of a storage bay, at its furthest south end, and two adjoining paint bays to the north. The below pre-fire photographs depict the structure as described:



Figure 1: Google Image aerial view, from Coe Exhibit, depicting overall building arrangement of Republic Facility. North is at top of photo.



Figure 2: Google Image aerial view, from Coe Exhibit, depicting east face view of Building 1, where smoke and flames were first observed by early witnesses. South end of building is at left in photo.

2

Samir Dizdarevic was one of the first known witnesses to the fire and was alerted to an odor of smoke, by a security guard. In his deposition testimony, he describes seeing only smoke at first and then flames, where the roof and rafters meet, and also at the overhead door closest to the south end of the structure. Soon after discovery, before seeing flames, he entered into the attached Operations Building, with the security guard, to "take a peek" and also observed smoke at the interior of the structure, describing the smoke as gray and/or white in color.

The first of the below photographs is one of the first known photos to be taken of the fire. It is not known who took the photo, nor at what time. A following side-by-side photographs depict what I believe to be the south end of Building 1, pre-fire and during-fire. The southernmost bay storage room appears to be the most heavily involved of the bays.



Figure 3: Early witness photograph of fire. Note furthest south bay Storage Room is most heavily involved of the bays, with fire also involving the south, exterior end of the structure.



Figure 4: Side-by-side photos, with vent fan window location being identified.

Allen County Southwest Fire Territory firefighters, dispatched at approximately 11:03 p.m., arriving on scene at approximately 11:14 p.m., observed flames venting from the roof of the structure. Firefighters fought the fire for several hours, finally extinguishing it, departing the scene at approximately 5:03 a.m., the following morning. The fire resulted in the destruction of the majority of the south end of the structure and its contents.

<u>Rimkus Consulting Group, Inc. Preliminary Investigation and Initial Report</u>

Rimkus Consulting Group was retained by CCMSI, on behalf of Republic Services, to conduct an investigation regarding the origin and cause of the fire. Investigator Jim Foster was the assigned investigator for Rimkus Consulting Group.

On March 20 or March 21, 2019, Investigator Foster conducted his initial scene examination. This date is unclear, as his report states he conducted his initial examination on March 21, 2019, but his photographs are dated March 20, 2019. Investigator Foster also states the date of the fire as March 3, 2019, while the fire department incident report lists the date of the fire as March 19, 2019. It is not known if Investigator Foster took field notes during his initial investigation, as none have been provided for review.

On May 10, 2019, more than seven weeks after his initial examination, Investigator Foster returned to the scene and collected swab and paint samples, which were submitted to Forensic and Scientific Testing (FAST) for analysis. It is not known from where these samples were collected, as there are no photographs, field notes, or narrative provided that document this information.

On July 2, 2019, a scheduled joint scene examination was commenced at the Republic Services facility with those parties which were initially placed on notice. Space Ray Gas Fired Products was not one of those parties initially placed on notice and no representative was present on their behalf on the date of this scene examination.

On December 3, 2019, Investigator Jim Foster authored a Report of Findings. Investigator Foster lists three Conclusions near the beginning of his report. They are:

1. "A fire occurred inside of the maintenance structure located along the west side of the property. The fire involved the south end of the structure where trash dumpsters are repaired and repainted."

2. "The fire involved the south end of the facility where ceiling tube heaters had recently been installed."

3. "The cause and origin of the fire is a direct result of open infrared tube heaters installed in an area where painting and other procedures are performed. The installation of this type of

heater is not recommended in this environment. Paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited."

Prior to stating these conclusions in his report, Investigator Foster states, "During our investigation, we applied the scientific methodology of fire investigation using the systematic approach as recommended in the current addition of National Fire Protection Association, N.F.P.A. 921 - "Guide for Fire and Explosion Investigations and N.F.P.A 1033 Standard for professional Qualifications for Fire Investigator"."

On February 21, 2020, I was retained to represent Space Ray, insured by FCCI, in the furtherance of this origin and cause investigation and in a joint scene examination scheduled for May 3, 2020. I was also provided a copy of Investigator Foster's Report of Findings, in which he reportedly had already determined origin and cause.

**REVIEW OF INVESTIGATOR FOSTER'S INITIAL REPORT OF FINDINGS**

In preparation of the scheduled joint scene examination, I reviewed Investigator Foster's Report of Findings, dated December 3, 2019. Investigator Foster included a "DISCUSSION" section in his report, which is presumably the basis for his conclusions. His narrative includes the following statements:

Page 2 - Work in the area of the dumpster maintenance area involved the "use of flammable and other combustible material"

- Investigator Foster does not identify what flammable and/or combustible materials were present, how they were used, nor where they were located. He does also not document how he became aware of this information.

Page 2 - "Employees left the facility at 4-4:30 p.m."

- No employees are identified in his report. It is not documented which employee(s) was/were last working in Investigator Foster's determined area of origin. It is not documented what the employee's last actions or observations were prior to leaving that day, or if any of these employees smoked cigarettes.

Page 2 - "Three Space Ray ceiling tube infrared heaters, model PT125-30L5 had been installed in the paint and welding shop area within the past two months."; and "There had been no problems related to the heat prior to the fire event."

- These statements may infer that Investigator Foster is already laying the groundwork for a "cause" to the fire, before he has substantiated an origin of the fire.

5

Page 2 - Investigator Foster refers to the Space Ray heater instruction manual and cites, "this heater is not an explosion proof heater." And further cites, "Where the possibility of exposure to volatile and low flash point materials exist, it could result in property damage or death. This heater must not be installed in a spray booth where the heater can operate during the spraying process. The heater is a self-contained infrared radiant tube heater fore use in location where flammable gases or vapors are not generally present."

- The statements regarding the heater not being explosion proof, and statements regarding volatile and low flash point vapors pertain to an explosion hazard. There are no witness accounts, nor is there any other evidence presented by Investigator Foster by which to substantiate an explosion occurred prior to an ensuing fire.

Page 2 - "The facility did not meet NFPA code or compliances of a spray booth."

- It is not clear if Investigator Foster is actually implicating Republic Waste for being at fault for not operating to code. Further, a bay area of a structure is typically not a "spray booth".

Page 3 - "Other potential ignition sources were in the general area of fire origin however were not considered a potential due to their location and origin location."

- Investigator Foster states there were potential ignition sources present in the general area of fire origin, and then, in the same sentence says they were not considered due to their location. He does not identify other potential ignition sources, nor their specific locations. To not even consider other potential ignition sources in a general area of origin is not in line with adhering to the scientific method according to NFPA 921, as Investigator Foster states he does in his report.[1]

Page 3 - "The fire origin was reportedly high in the structure when first observed, which would place it at or near the ceiling."

- Investigator Foster provides no information regarding any specific witness observation regarding where fire/first flames were actually observed, nor does he identify any witness, what any witness may have specifically observed, nor where any witness was located when observations may have been made. Investigator Foster only seems to assume fire originated at or near ceiling level, but has no real basis for making that assumption. For example, was there any witness who saw fire conditions within the interior of the structure, or did the witness only make observations from the exterior of the structure? Further, Investigator Foster seems to discount the possibility the fire originated low in the structure, unseen, then progressed upward and outward, to the point that it was discovered. He also seems to dismiss the possibility, since he states the fire origin was "high in the structure", that the fire could have

---

[1] NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition; Figure 19.2

originated within the attic space. Investigator seems to be attempting to define origin only because he knows the tube heaters were located near ceiling level and were recently installed.

Page 3 - "When the hearer (sic) activated, the spark to ignite the gas and heat ignited the combustibles that had accumulated on the surface and burners of the tube heaters."

- It is unclear if Investigator Foster is stating that a spark will ignite heat, as heat does not ignite. He also does not clarify which tube heater or burner specifically was the source of the fire. Previously in his report, Investigator Foster also cites a portion of the heater manual regarding it being a self-contained system. If this is the case, then Investigator Foster fails to explain how any combustible material may have been ignited by a spark or burner, which was not exposed to the environment of the painting area.

Page 3 - "The fire patterns on the metal roof were discolored and charred more than other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire was high in the building. Information from employees indicted (sic) the fire was high in the building upon discovery. This combined with the fire damage to the south heater that was at ceiling level indicated the possible location of the fire."

- Investigator Foster incorrectly states that fire patterns were discolored and charred. This is a technically incorrect statement as discoloration and charring *are* types of patterns, which are detailed in NFPA 921. Further, patterns such as these can also mean that metal and wood surfaces are simply exposed to either a higher degree of energy release and/or a longer duration to burning at these areas. Given the amount of destruction, building collapse and burning in this case, any fire patterns observed in a case such as this should not be given any weight regarding the fire's origin.

- Investigator Foster states the combined fire damage and the damage to the south heater indicated only a "possible" origin of the fire, yet he offers no further documentation anywhere in his report to support this hypothesis.

Investigator Foster photograph used in his report:

**Photograph 2**
Paint and other combustibles material inside ventilation pipe of tube system



Figure 5: Photo contained within Investigator Foster report.

- Investigator Foster does not identify anywhere in his report where this tube section was in the fire scene. He does not identify if this is from where he collected a swab sample sent to the laboratory for analysis. He does not explain how this material may have ended up in a self-contained, connected tube system. In fact, the tube systems of the three separate heaters had collapsed as a result of the fire and had come apart, coming to rest at various locations among the collapsed structure, contents, and debris, to include at concrete slab level. Further, Investigator Foster did not collect swab samples for more than seven weeks after the fire. It is most probable this material accumulated within the interior of the end of the tube during firefighting operations, or sometime post-fire.

## JOINT SCENE EXAMINATION (March 3, 2020)

On March 3, 2020, I participated in a joint scene examination at the Republic Waste facility, at 6231 Macbeth Rd., Fort Wayne, Indiana. Several other investigators were also present representing the various parties placed on notice. Prior to beginning any further scene examination, a briefing was held and the following additional information was related by Investigator Foster:

- The involved structure consisted of an area that was used a paint room, for the past 5-6 years.
- The only ventilation was natural, by cross ventilation.
- It is not known when any filters were last changed.
- It is not known if rags were used in the painting process.
- On November 20, 2018, work was conducted in the structure to upgrade due to prior water damage.
- On January 19, 2019, Coe Heating and Air installed three, LP, 125 BTU heaters.
- Three employees worked in the fire-damaged area.
- Welding and repair work was conducted at the north end of the area, the middle area consisted of a lounge, and painting and some welding work was performed at the south end.
- The last welding work ended at 10:00 a.m.
- It is typical for 3-4 dumpsters a day to be worked on/painted.
- All work was completed at 3:00 p.m., and it took an hour for clean-up.
- The paint room manager was the last person to leave the facility, at 6:30 p.m.
- The thermostat was set at 60 degrees Fahrenheit.
- At 10:50 p.m., a cleaning crew, in the center section, detected an odor of smoke.
- Flames were observed at the southernmost overhead door when the source of smoke odor was investigated.
- On March 20, 2019, Rimkus conducted an initial scene examination. Photographs were taken and the scene was left as it was.
- On May 10, 2019, a follow-up investigation was conducted by Rimkus. Additional photos were take and some excavation was conducted.
- On July 2, 2019, an initial joint scene examination was conducted. Participating parties conducted scene documentation only.
- There has been no scene security and the scene was left uncovered.

In addition to the briefing provided by Investigator Foster, Fred Jones made himself available for interview by participating on-site investigators. Mr. Jones was identified as the Container Shop Manager. He provided the following information:

- Electric service distribution was along south the wall w/ southeast corner below ground service entrance.
- Painting was done in two southernmost bays
- Contractor put lights in 3 years ago. Converted to LED. Korte Electrical performed this work.
- Filters switched on every 2-3 weeks. Regarding the main exhaust system, everything was on three switches. The exhaust system brought fresh air in and exhausted dust outside to south side.
- Did not pay attention to build up of paint residue on heaters, since only installed recently.
- Paint and bed-liner used on bins.
- 12-15 containers were painted per day, at times.
- Converted truck shop to paint bays 5-6 years ago.
- There were two thermostats, and always turned old heaters off, but left new ones on. The thermostats may have actually been set to 75 degrees Fahrenheit.
- The heaters were 9' - 10' above floor level.
- The furthest south bay was utilized for storage and contained a second story.
- When he walked through the area, everything was "off".
- The paint sprayer would shoot an approximate maximum distance of 24".
- Mist would still accumulate on surfaces at upper levels.

Subsequent to the briefing, it was determined that another identified party was not present and needed to also be attendance before any scene excavation was conducted and before any items of potential evidentiary value were collected.

Below are several photos, which generally depict the extent of fire damage to the structure:

9



Figure 6 (DSC_8755): View at Southeast corner of structure remains.



Figure 7 (DSC_8767): View from southwest corner of structure remains.



Figure 8 (DSC_8781): View within structure remains, east to west.



Figure 9 (DSC_8788): View within structure remains, east to west.

In a group setting, while still on scene, I engaged Investigator Foster and Rimkus Electrical Engineer Lou Inendino in conversation regarding the level of destruction at the scene and the likelihood of eliminating a possible electrical cause to the fire. I also specifically asked Investigator Foster how he came to his determination that the fire was caused by the infrared tube heaters.

EE Inendino advised that he could not eliminate a potential electrical cause to the fire. I also asked him about collecting electrical component remains and examining them in a laboratory setting to examine them more thoroughly. He replied this would not change his opinion.

When I asked Investigator Foster how he determined fire originated at the tube heaters, he replied that he came to this determination, because they were the only thing "on" at the time of the fire, and witnesses saw the fire "high". I asked him if those witnesses ever saw conditions within the interior of his determined bay area of origin and he replied that the witnesses only saw conditions from the exterior of the structure.

When I asked Investigator Foster where exactly he thought the fire originated within the structure, he pointed toward the destroyed structure and said, "in there somewhere."

During this examination, I documented the presence of an empty cigarette pack among the remains of debris, in a melted garbage container near one of the tube heaters that had collapsed to floor level.



Figure 10 (DSC_8805): Melted garbage container remains
among collapsed debris and section of collapsed tube.

I asked Investigator Foster how he could eliminate the possibility of a discarded cigarette as contributing to the cause of the fire and he replied that he was told nobody smoked in there.

Prior to departing the facility, I documented that the blue paint used to paint garbage bins was a Sheboygan Paint Company brand, water based paint. The following photos document the identification of the paint utilized at the Republic Services facility:



Figure 11 (DSC_8820): Barrel of "Republic Blue" paint.



Figure 12 (DSC_8822): Paint identified as Republic Blue Premium.



Figure 13 (DSC_8824): Paint identified as a water based product.



Figure 14 (DSC_8828): Paint identified as being a product of Sheboygan Paint Company.

I also documented that paint operations had been moved into another building at the facility, where tube heaters were still being utilized.



Figure 15 (DSC_8833: Area used as paint bay, since fire. Tube heaters still in use.

**JOINT SCENE EXAMINATION (May 11, 2020)**

On May 11, 2020, I participated in a subsequent joint scene examination at the Republic Waste facility, 6231 Macbeth Rd., Fort Wayne, Indiana. Examination on this date consisted of additional scene documentation and the collection of items, to include tube heater and component remains, and the remains of the aforementioned garbage container and its contents.

**LABORATORY EXAMINATION (August 23, 2022)**

On August 23, 2022, I participated in the examination of items collected by the Rimkus investigators during the May 11, 2020 scene examination. P.E. Scott Jones also participated in this examination, on behalf of Space Ray.

The examination consisted of detailed examination of the heater remains in which the housings were also opened and examined. Examination of these heaters resulted in the determination that they did not fail in any way. Further, it was determined that the Space Ray heaters created no conditions that were causal to the fire. P.E. Scott Jones has authored a more detailed report regarding his findings and his expert opinion in this matter.

Examination of the melted garbage container and its contents resulted in the discovery of smoking materials.

The below photographs depict this discovery:



Figure 16 (DSC_9868): Photo of melted garbage container prior to excavation.



Figure 17 (DSC_9875): Photo of melted garbage container content remains to include discarded cigarette pack.

16



Figure 18 (DSC_9879): Photo of discarded cigarette butt among
garbage container content remains.

## DEPOSITION TESTIMONY REVIEW

I have reviewed the transcribed testimony of individuals thus far deposed in this case.
Information (data) obtained from the these deposition transcripts includes the following:

**<u>Fred Jones Deposition (Republic Services)</u>**

Page 13 - Mr. Jones describes the storage room, which is the southernmost bay of Building 1. He
describes it as containing electrical panels, trash can liners, and foldable cardboard boxes.

Page 14 - Mr. Jones states the bay was split in half, having a downstairs and an upstairs, with no
heat.

Page 17 - Mr. Jones states that all cans in the two paint bays were painted that day (of the fire).
He advised that Dale Caley (deceased) was doing the painting.

Page 18 - Mr. Jones states that Dale Caley was a smoker.

Page 19 - Mr. Jones states that Dale Caley was the only person working in the paint bays that
day.

Pages 20-21 - Mr. Jones states that Dale Caley most likely did welding work on the day of the
fire, utilizing an acetylene torch, which is kept within the southwest corner of the storage room.

Page 22 - Mr. Jones describes access from the paint bays to the storage room, at the west side of the structure, where it was open from one area to the other. He also describes a vent fan being present between the storage room overhead door and the adjoining paint bay.

Pages 26-27 - Mr. Jones describes the old heaters as being open flames type heaters that were having a problem with gas accumulating when trying to ignite, resulting in a "boom" at times.

Page 27 - Per Mr. Jones, nobody ever complained about the new Space Ray heaters.

Page 28 - The old heaters were replaced, because they had so much buildup of paint and paint dust on the inside of them. In answer to a question regarding this, Mr. Jones indicated the open flame of the old heaters would ignite the blue spray paint.

Page 29 - Mr. Jones advises that he was gone most of the day of the fire and does not know if Dale Caley utilized a kerosene fueled salamander heater that day.

Page 35 - Mr. Jones stated that roll-on bedliner had not been used for the past five years.

Page 54 - Mr. Jones stated that Korte Electric comes out to do a lot of work on the outside on the plugs.

Page 68 - Mr. Jones states that he was regularly in the structure during the 60 days prior to the fire and never smelled paint dust burning on top of the Space Ray heaters.

**Terry Reader Deposition (Republic Services)**

Page 27 - Mr. Reader states he was probably in Building 1, at times, on the day of the fire, and states that Dale Caley was painting in Building 1 on the day of the fire.

Page 32 - Mr. Reader corroborates that Herculiner bedliner is no longer used.

Page 39 - Mr. Reader states that a blue dumpster never caught on fire while using a plasma torch or an acetylene torch.

Page 42 - Mr. Reader states that Brakleen, similar to break cleaner, was sometimes used to clean paint and parts. He also states that Herculiner was kept in a fire locker in Building 1.

Page 59 - Mr. Reader worked at Republic since 2012. He advised that the old, open flame heaters would get clogged up with paint and stop working.

Page 62 - Although Mr. Reader was concerned that the blue paint was going to get inside the old, open-flame heaters and catch fire, it never did.

Page 64 - During the time of his employment, there was never any discussion about being careful with the blue paint drying and catching fire.

Page 80 - Mr. Reader states there was a point in time that the older heaters were not working, so salamander heaters were utilized for at least a month straight at one point.

In reviewing the Rimkus file photographs, I located a photo which depicts one of these salamander heaters. Due to it being covered in blue paint dust/overspray, it had obviously been used in the area in which the blue spray paint was being utilized to paint dumpsters.

The below Rimkus photograph depicts the extent to which the salamander heater was covered in blue paint dust/overspray:



Figure 19: Rimkus photo P1010047 depicting a salamander heater, floor, and surrounding items covered in blue paint dust/overspray.

**Terry Reader Continued:**

Page 88 - Mr. Reader believes Dale Caley stopped painting and left, sometime from 3:30 p.m. to 4:30 p.m.

Page 98 - Nobody told Mr. Reader, after the fire, to be really careful about blue spray paint getting on the tube heaters where painting was now being conducted.

Page 115 - Mr. Reader has welded through the dried blue paint on previous occasions and it never caught fire.

Page 118 - The blue paint that accumulated on the salamander heater never caught fire.

Page 138 - At no time did the blue paint dust/overspray on the floor ever catch fire when Mr. Reader was using a plasma cutter, an acetylene torch, or a MIG welder.

Page 141 - Individuals smoking cigarettes would occasionally walk through buildings.

Page 143 - The smoking policy was not strictly enforced.

Page 156 - Mr. Reader recalls people smoking indoors on the day of the fire, but does not specifically recall who or where.

Page 166 - Mr. Reader recalls seeing cigarette butts on the floor of Building 1 and admits that cigarette butts were al over the facility.

**Samir Dizdarevic (Republic Services / Witness to fire)**

Page 21 - Mr. Dizdarevic was working at Republic Services the night of the fire. He States that, roughly, eight others were working with him during his shift.

Pages 28 - 29 - He was alerted to the fire by a security guard, while in his office. He saw the first evidence of smoke at the south side of Building 1. He initially saw no flames.

Page 30 - He entered into the operations building "to just take a peek" and saw a lot of smoke in there. There were still no flames observed.

Page 31 - He described the smoke in the operations building as "gray, white"

Page 36 - Mr. Dizdarevic first saw flames as he was pulling the supervisor trucks away from the south side of the building (Building 1). He states, "The very tip top of the building where the roof, and, you know, the rafters meet. You could see flames coming out there. And then from the overhead doors, the closest on the south side, that one had flames coming out of it as well."

Page 59 - When being questioned in trying to pinpoint which overhead door had flames coming out of it, Mr. Dizdarevic responds, "it was the furthest one away from the main entrance to the operations building." He reiterates on the following page, "The further south. Yes sir. That door."

**REVIEW OF INVESTIGATOR FOSTER'S EXPERT REPORT**

I have reviewed Investigator Foster's Expert Report, dated November 18, 2022. Investigator Foster's conclusions remain the same as those documented in his initial report, dated December 3, 2019. Investigator Foster included a "Factual History" section in his report, which is presumably the basis for his conclusions. His narrative includes the following statements:

Page 3 - "A fire was reported to 911 after employees working outside the building observed fire and smoke coming from the building near the Middle East overhead door. They indicated flames appeared to be coming from the top of the building."

- I have not found anywhere in any of the data presented by which it has been stated smoke and fire were *first* observed coming from the middle overhead door. Furthermore, Investigator Foster does not identify what door this is, nor does he identify any employee. He simply refers to the witnesses as 'they", and does not state what each witness specifically observed.

Page 3 - During his site inspection on March 3, 2020, Investigator Foster states, "I observed paint and other debris on the tube heaters, on the reflector assembly around the tube heaters, *and inside the ventilation tubes of the heaters*." (Ital. mine)

- Investigator Foster offers no explanation why or how paint and other debris may have become present inside the ventilation tubes of the heaters.

Page 3 - He further states, "Charring and heat damage to the east tube heater was greater than damage to the other tube heaters. This indicates the fire origin occurred in the east heater near the control box with the ignition of the propane fuel."

- As the three heaters were aligned north-south, it is unclear what Investigator Foster means when he states fire origin occurred in the east heater. Further, based upon my examination of the scene and photographs, there was no greater area of charring and heat damage. The entirety of Building 1 and its contents were destroyed due to the fire and continued post-collapse burning.

- Further, Investigator Foster clearly states the fire originated at this location as a result of the ignition of propane fuel, when there is no data presented to indicate or substantiate the occurrence of a fuel-air explosion, which would have occurred, as he describes in this scenario.

21

Page 3 - "The fire patterns on the metal roof were discolored and charred more than the other metal sheeting along the sides of the building. The discoloration of the metal indicated the fire started high in the building. Information from employees was high in the building upon discovery. This combination with the fire damage to the south heater that was at ceiling level indicated the *possible* location of origin." (Ital. mine)

- See Page 7 comments, at the bottom of this page, regarding fire pattern analysis. The discoloration of the metal roof only indicates that the metal roof sections were exposed to a greater degree and/or a greater duration of exposure to the effects of fire. The overall scene and oxidation patterns had certainly changed in nearly a year's time due to exposure to the weather, and Investigator Foster has presented no photo documentation to support this "discoloration" statement.

- Further, it cannot be shown that fire did not originate low in the structure, progress upward to involve the roof structure, to the point at which it was first observed by employees at some unknown location at the exterior of the structure.

Page 4 - (..."I retrieved paint samples and other debris from inside the tube heaters..." "The samples came back positive for petroleum distillate, consistent with ignitable liquids."

- Investigator Foster still fails to explain how paint samples and other debris ended up in a closed system.

Page 7 - Regarding the laboratory examination, "I observed burn patterns on the testers, which showed fire damage more severe at the middle or center heater and fire damage on the north heater showed heat and fire spread from the south side or middle center heater. The fire and heat damage pattern on the south heater showed heat and fire spread from the north side heater and fire spread from the north side or center heater."

- This statement in support of Investigator Foster's origin determination is ambiguous and is not based on a sound interpretation of fire pattern analysis. The building suffered near total collapse, with no ceiling remaining, no roof remaining, and very little of the wall structure remaining. As the fire progressed to this point of destruction, all items within the structure, to include sections/components of the structure itself were exposed to varying degrees of heat and energy release, as well as to varying durations of burning. Patterns which may have been present in the early stage(s) of fire development would likely no longer be present. Likewise, items within, or portions of the structure which were nowhere near fire origin may have eventually been exposed to a significantly greater degree of burning, or a longer duration of burning, resulting in exhibited patterns which were created post-collapse.

22

**FORENSIC CHEMIST ANALYSIS**

On April 14, 2020, Forensic Chemist Sharee B. Wells, FAST, issued a Certified Laboratory Report regarding samples previously submitted to her by Investigator Jim Foster. The lab report documents that she received the swab and paint samples on March 11, 2020. The lab report also documents that these samples were collected by Investigator Jim Foster, on May 10. This is presumably May 10, 2019.

Laboratory analysis resulted in the finding that two of the samples contained "a similar mixture of an aromatic product, a medium petroleum distillate and a heavy petroleum distillate." Two other samples "contained a similar mixture of an aromatic product and a medium petroleum product." The report states, "Products in the range of a heavy petroleum distillate include, but are not limited to, some types of vehicles used in staining products, mineral spirits, and other proprietary formulations."

Forensic Chemist Dirk Hedglin, retained by Space Ray Gas-Fired Products, will address this matter in a separate report.

**CONCLUSION**

It is my opinion that Investigator Foster had predetermined the cause of the fire before fully conducting adequate investigation and research, and disregarded the opinion(s) of Rimkus EE Lou Inendino. It is my opinion that Investigator Foster has exhibited expectation bias in his investigation, which has also resulted in confirmation bias in exclusively relying on data that supports his hypothesis and fails to look for, ignores, or dismisses contradictory or nonsupporting data.[2]

**Origin Determination:**

NFPA 921, **Section 18.6.1** (Means of Hypothesis Testing), 2021 Edition reads, "During the investigation, the investigator may develop and test many hypotheses about the progress of the fire. For example, the investigator often has to determine whether a door or window was open or closed. Ultimately, the origin determination is arrived at through the testing of origin hypotheses. A technically valid origin determination is one that is uniquely consistent with the available data…"

NFPA 921, **Section 18.6.1.2** reads, "Can a fire starting at the hypothetical origin result in the observed damage? The investigator should be cautious about deciding on an origin just because a readily available fuel and potential ignition source are present."

---

[2] NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition; Sections 4.3.9 and 4.3.10

Investigator Foster fails to address the detailed deposition testimony of witness Samir Dizdarevic, who provides detailed testimony regarding exactly where he saw fire.

Investigator Foster also fails to address his analysis regarding the below photos, which support the testimony of Mr. Dizdarevic.



Figure 3, from Page of this report: Early witness photograph of fire.



Figure 4, from Page 3 of this report: Side-by-side photos, with vent fan window location being identified.

In addition to the testimony and analysis of the above photos, fire dynamics and building construction do not support fire origination in the paint bay area of the structure, and there is no valid origin determination that is uniquely consistent with the date..

The following photo array with notations was put together to assist in this analysis:



Figure 20: Clockwise, beginning from upper left; witness photo, pre-fire photo of the structure, Interior photo of paint bay, diagram of the structure, with locations of tube heaters (red rectangles).

Interior construction of the structure consisted of steel walls and ceiling, and a concrete slab. The lower right photo in the above array depicts this type of construction, with a steel wall separating the paint bay from the storage room. However, it is known, via deposition testimony, that there is a doorway or pathway at the west end of the structure, by which access could be made between the two rooms. Further, although not pictured, it is also known that the tube heaters hung below ceiling level, with no combustible building materials in contact with them. It also does not appear, in photos found in the Korte documents, that there is much in the way of exposed combustible materials kept within the paint bay area.

Investigator Foster fails to provide any explanation or support his hypothesis regarding fire progression within the paint bay area, at ceiling level. It is not probable fire progressed from his determined area to an adjoining room that is separated by a steel wall, fully involving the adjoining room, before fire progresses throughout the paint bay area.

It is my opinion the data more supports fire origination within the storage room. Fire originating within this bay would progress upward and outward, eventually involving the roof and interior walls of the bay. Fire would then subsequently progress into the adjoining paint bay, at the west side of the structure, via the passage way at this location. As heated smoke (unburned fuel) began to fill the paint bay. Fire would then eventually present itself at the vent fan window(s), where a fresh supply of oxygen (air) was present.

A fire originating in the paint bay is not what is evidenced above.

**Cause Determination:**

NFPA 921, **Section 4.5** (Level of Certainty) reads: "The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.

NFPA 921, **Section 4.5.1**, continues: "The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:

(1) Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50%.
(2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible"."

NFPA 921, Section **4.5.2**, reads: "If the level of an opinion is merely "suspected", the opinion does not qualify as an expert opinion. If the level of certainty is only "possible", the opinion

26

should be specifically expressed as "possible". Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty."

In both of his reports, Investigator Foster concludes, "The cause and origin of the fire is a direct result of open infrared tube heaters installed in an area where painting and other procedures are performed.". However, his supporting narrative states only that it is "possible" the fire originated near ceiling level, in the area of the tube heaters.

If Investigator Foster has only this level of certainty regarding origin, then he cannot have a higher level regarding cause.

Based upon available data and a lack of evidence by which any expert opinion can be supported, the correct level of certainty regarding any cause to this fire should only be "suspected", which does not qualify as an expert opinion.

NFPA 921, **Section 19.5** (Developing a Cause Hypothesis), 2021Edition reads, "The investigator should use the scientific method as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences. This process of consideration actually involves the development and testing of alternative hypotheses. In this case, a separate hypothesis is developed considering each individual competent ignition source at the origin as a potential ignition source. Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (or refuted) by the facts discovered through further examination. The investigator is cautioned not to eliminate a potential ignition source merely because there is no obvious evidence for it…Potential ignition sources should only be eliminated from consideration only if there is reliable evidence that they could not be the ignition source for the fire…"

In addition, NFPA 921, **Section 19.6.4** (Means of Hypothesis Testing) reads, "When testing a hypothesis, the investigator should attempt to disprove, rather than confirm, the hypothesis. If the hypothesis cannot be disproved, then it may be accepted as either possible or probable…"

Regarding the above two sections of NFPA 921 (**Sections 19.5 and 19.6.4**):

It is my opinion that Investigator Foster cannot eliminate other potential ignition sources merely because there is no obvious evidence for them. Other potential ignition sources include discarded smoking material, failed or overheated electrical components, or not properly stored or discarded rags containing paint thinner or other liquids susceptible to spontaneous combustion. There is data presented in this matter in which all three of these potential ignition sources were or could have been present.

Investigator Foster does not document making any attempt to discount these possibilities, and ignored the opinion of his electrical engineer, who stated that the structure's electrical system could not be eliminated as a cause to the fire.

Investigator Foster fails to adequately explain how paint dust or other combustible materials could have ignited on or in a closed system. He offers no explanation how he has come to this determination, while discounting that the same paint dust and combustible materials have accumulated for years on the open flame heaters or the salamander heaters, which were previously utilized by the Republic Waste facility.

In addition, various types of welding were conducted on a regular basis, with no paint dust or other combustible materials ever having been witnessed igniting.

NFPA 921 also contains a section, **17.5.2** titled, Documenting the Collection of Physical Evidence. This sections consists of several sub-sections, which have to do with documenting evidence collection via, field notes, diagrams, photography, etc.., none of which has yet been presented by Investigator Foster or Rimkus Consulting Group.

There are also sub-sections that discuss the collection of comparison samples, which Investigator Foster did not do. Since at least one of his photographs depicts material present at the open end of a disassociated heater tube, with similar looking material covering the concrete slab around it, a comparison sample of this material should have also been collected and submitted for laboratory analysis, especially since this material in the tube tested positive for the presence of ignitable liquids.

Based upon the totality of the data reviewed and considered, and based upon the opinion of other experts retained in this matter, it is my opinion there is no data to support fire origination at the Space Ray heaters, or that the fire was caused in any way by the Space ray heaters. It is also my opinion there is insufficient data by which to substantiate any other potential cause to the fire.

My opinions in this matter is based upon all known facts gathered and analyzed in this investigation, the proper use of the process of elimination, evidence, observations, research, my experience, training, knowledge and expertise.

Should additional information become available at a later date, I reserve the right to evaluate that new information and amend my findings, as appropriate.

28

Attachment A

Items/Documents Reviewed:

1. Allen County Southwest Fire District Incident Report Number 190293
2. Diagram ("Defendant Coe's Exhibit C")
3. Deposition transcripts of:
   Sharee Wells, Chemist, Forensic and Scientific Testing
   Charles Golden, Coe Heating and Air Conditioning
   Ronald Dantzer, Coe Heating and Air Conditioning
   Daniel Kelly, Kelmar Corporation (Space Ray Dealer)
   Trevor Miller, Korte Does It All
   Fred Jones, Republic Services
   Gerald Depold, Republic Services
   Greg Tolley, Republic Services
   Jason Kelly, Republic Services
   John Shatto, Republic Services
   Kyle Orr, Republic Services
   Mike Sherfield, Republic Services
   Samir Dizdarevic, Republic Services
   Terry Reader, Republic Services
   Scott Kleinknight, Shawnee Construction
4. Forensic and Scientific Testing Laboratory Report regarding samples collected by Investigator James Foster
5. Investigative Notes
6. James P. Foster, Rimkus Consulting Group, Inc. Report of Findings, dated December 3, 2019
7. James P. Foster, Rimkus Consulting Group, Inc. Expert Report, dated November 18, 2022
8. Korte Does It All, Inc document
9. Material Safety Data Sheet; Herculiner
10. Material Safety Data Sheet; Sheboygan Paint Company
11. Photographs taken during March 3, 2020 scene examination
12. Photographs taken during May 11, 2020 scene examination
13. Photographs taken during August 23, 2022 artifact examination
14. NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition
15. Rimkus Consulting Group, Inc investigation file
16. Space Ray Installation and Operation Instructions




# EXPERT REPORT

### *Republic Services of Indiana, L. P.*
### *v.*
### *Coe Heating and Air Conditioning, Inc. et al.*

United States District Court, Northern District of Indiana,
Fort Wayne Division

Case No.  1:21-cv-00108

**Prepared for:**

Gardner & Rans P.C.
117 Perspective Drive, Suite 2
Granger, IN  46530

**Prepared by:**

Laurel V. Mason, ABC-FD
Analytical Forensic Associates
3100 Five Forks Trickum Road, Suite 104
Lilburn, GA  30047

Report Date:  January 6, 2023
AFA Case #:  2211-1256



# TABLE OF CONTENTS

**SECTION**

**I.   SUMMARY**

Assignment
Scope

**II.   SYNOPSIS OF ACTIVITIES**

**III.   ANALYSIS**

Background
Summary of Reports by James Foster
Summary of Report and Deposition of Sharee Wells
Review of Safety and Technical Data Sheets

**IV.   CONCLUSION AND OPINIONS**

**V.   DISCLOSURE**

**VI.   SIGNATURE**

**VII.   ATTACHMENTS**

A.  Curriculum Vitae of Laurel V. Mason
B.  Fee Schedule of Analytical Forensic Associates
C.  Testimony List of Laurel V. Mason

# SUMMARY

## ASSIGNMENT

On November 29, 2022, I was requested by Martin Gardner of Gardner and Rans, P. C. to review information regarding a fire incident that occurred at the Republic Services facility located in Ft. Wayne, Indiana.   I was provided with a copy of a Certified Laboratory Report, dated April 14, 2020, generated by forensic scientist Sharee Wells with Forensic & Scientific Testing, Inc. (FAST) (Case #: FRM-3-62249) as a result of the analysis of evidence submitted by fire investigator James Foster with Rimkus Consulting Group, Inc. (Rimkus).  I was also asked to review the photographs, safety data sheets (SDS), and a rough draft deposition with exhibits of Sharee Wells taken on August 31, 2022, as well as her entire file containing the analytical test data, evidence forms, emails, and invoices.

## SCOPE

Specifically, Analytical Forensic Associates was requested to review provided documents to formulate an opinion as to the sampling and analysis of the evidence recovered from the fire scene to check for ignitable liquid residues and to determine the likelihood of the ignition of paint due to the use of the recently installed Space-Ray® heaters.

## SYNOPSIS OF ACTIVITIES

1.) On September 14, 2022, I was contacted by attorney Martin Gardner (M. Gardner) of Gardner and Rans P.C. and briefly discussed the loss and possible assignment.

2.) On November 29, 2022, various documents were received from M. Gardner with various documents which included the rough draft deposition of Sharee Wells with FAST, evidence custody forms, letters, analytical test data, invoices, safety data sheets email correspondence. I was also provided the Report of Findings dated December 3, 2019 generated by James P. Foster with Rimkus as well as seven unidentified photographs reportedly taken at the loss.

3.) On December 1, 2022, I was provided via email from attorney M. Gardner the Expert Report and associated exhibits generated on November 18, 2022, by James P. Foster CFI, CFEI, CVFI, Zionsville, IN.

4.) On December 30, 2022, I was provided via email from attorney M. Gardner a Rimkus evidence list, email communications, evidence custody form and six photographs of the areas where samples were recovered by Mr. Foster.

5.) On January 6, 2023, I was provided via email from attorney M. Gardner two additional photographs identified as Republic 00664 and 00672.

6.) In addition, the following documents have been reviewed:

   a. ASTM E1188-11 (2017) - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*
   b. NFPA 921 (2017 edition) – *Guide for Fire and Explosion Investigations*
   c. NFPA 1033 (2014 edition) – *Standard for Professional Qualifications for a Fire Investigator*
   d. Lentini, John J., *Scientific Protocols for Fire Investigations*, 2006, CRC Press, (pp 115-116)
   e. IAAI – Online Fire Scene Evidence Collection Guide (https://www.firearson.com)
   f. ASTM E1188-11 (Reapproved 2017) - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*
   g. ASTM E1412-19 - *Standard Practice for Separation of Ignitable Liquid Residues from Fire Debris Samples by Passive Headspace Concentration with Activated Charcoal*
   h. ASTM E1618-19 -

   i. *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris*

   j. NFPA 33 (2018 edition) - *Standard for Spray Application Using Flammable or Combustible Materials*

# ANALYSIS

## BACKGROUND

Information provided indicates that on March 3, 2019, a fire occurred at the Republic Services facility located at 6321 MacBeth Road, Ft. Wayne, Indiana which was reported at 11:15 pm.  Republic Services is a recycling and waste facility.  During the normal course of business, dumpster maintenance and repair are conducted which includes sanding, welding, patching, and repainting dumpsters.

## SUMMARY OF REPORTS BY JAMES FOSTER

Mr. James Foster with Rimkus was retained by CCMSI to determine the origin and cause of the fire. Mr. Foster visited the loss site on March 21, 2019.  A second visit on May 10, 2019, was conducted to uncover recently installed heaters, and finally, a joint examination with representatives from Coe Heating and Air Conditioning, Inc. was conducted on July 2, 2019.

In his report dated December 3, 2019, Mr. Foster indicated there had been sanding and painting during the day of the fire and that those operations were concluded around 3:00 pm after which time the employees cleaned where maintenance activities, which included welding, painting and sanding, had been conducted.  Additionally, Mr. Foster stated, welding operations that occurred earlier in the day had concluded at 11:00 am, no combustible materials were located in the area of the welding, and that there were no indications of any problems or issues from the time of welding until the reported time of the fire.  Mr. Foster reported that employees left the facility between 4 and 4:30 pm and a facility manager inspected the work area between 6 and 6:30 pm and did not observe any problems.

Mr. Foster indicated three Space-Ray® Ceiling tube infrared heaters, model PT125-30L5, supplied by electrical power and propane as the fuel had recently been installed in the welding and painting area and no problems had occurred prior to the event on March 3, 2019.

Mr. Foster concluded that there was a fire inside the maintenance structure of Republic Services that originated at the south end of the facility where the ceiling tube heaters had been installed and the cause of the fire was a direct result of the Space-Ray® infrared heaters in the painting area.  Mr. Foster opined "the only ignition source identified was the tube heaters that was (sic) thermostat controlled.  When the hearer (sic) activated, the spark to ignite the gas and heat ignited the combustibles that had accumulated on the surface and burners of the tube heaters."  Mr. Foster goes on to say that after the heaters were uncovered for examination, "paint and debris were observed on the tube

heaters, the deflectors, and inside of the ventilation tubes of the heaters." He does not describe what methodology he used to exclude other sources of ignition when he readily identified cutting and welding operations were part of the use of this space. Furthermore, he does not identify potential electrical sources of ignition or how they were excluded nor how potential gas leaks from the existing gas system were eliminated. His report states that "the facility did not meet NFPA code or compliances of a spray booth". A lay reading of NFPA 33, *Standard for Spray Application Using Flammable or Combustible Materials* (2018 edition) reveals specific requirements for fire sprinkler protection, separation of spray areas or room from other uses, explosion proof receptacles and light fixtures, spray filters and flammable liquid storage requirements. None of these items are discussed in Mr. Foster's report nor does he describe what he based his opinion that the space met the requirements of a "spray booth" as he claims.

Photograph 2 of his December 3, 2019 report, labeled *Paint and other combustibles material inside ventilation pipe of the tube system* appears to be charred material with no blue paint visible. Photograph 3 of the same report, labeled *Tube heater components and paint of reflector of unit (sic), In area (sic) of fire origin* reveals the tube of the heater on the left side of the photograph and the reflector in the center of the photograph. No blue-colored paint is visible on the tube or reflector. Blue material is easily identifiable on the right side of the photograph which appears to be the floor area upon which the tube heater is resting. Photograph 4 is labeled *Tube heater and paint on reflector along with charring and more heat on this heater unit than others. Indication of area*, indicates no blue paint on the tube, however, heavy soot is observed on the tube as well as on the deflector. No blue paint is observed in the photographs on the deflector but is visible on the floor area below the tube heater.

In Mr. Foster's Expert Report dated November 18, 2022, he indicated a joint examination was conducted on March 3, 2020, at which time the heaters were uncovered from the debris for examination, and he observed "paint and other debris on the tube heaters, on the reflector assembly around the tube heaters, and inside the ventilation tubes of the heaters." He additionally states, "a build-up of paint was observed in the ventilation pipe and reflector assembly of other tube heaters and in the tube heater of fire origin." He does not describe how excluded the possibility of paint transfer from collapsed debris onto the tubes or reflectors after being covered for months under debris.

Mr. Foster indicated that "paint samples and other debris samples from inside the tube heaters" were taken and submitted to Sharee Wells of FAST in Thorsby, Alabama "which came back positive for (sic) petroleum distillate, consistent with ignitable liquids." He does not exclude the possibility of paint and other debris being inside the otherwise sealed tube as being a result of the fire. In addition, Mr. Foster does not explain how paint survived the effects of heat from the fire when on the object he cites as the cause while other painted surfaces were highly oxidized as shown in his photographs. Photographs marked "Exhibit F" shows open or damaged paint cans in an unsecured locker. The Rimkus *Evidence Custody Form*, RCG File No. 58406186, identifying samples

collected by James Foster on May 10, 2019, was received on March 11, 2020, by Sharee Wells, along with three pieces of evidence labeled by Mr. Foster as "Exhibits A, B, and C". The samples were further identified as swabs, each contained in separate one gallon cans.

An additional Rimkus *Evidence Custody Form*, RCG File No. 58406186, identifying a one quart can, labeled "Exhibit A" identified as containing paint for testing collected by James Foster on March 6, 2020, was received by Ms. Wells on March 11, 2020. Of note, in the *Change of Evidence Custodian* portion of the form, Ms. Wells identified the paint as "Exhibit D". An additional sample, "Exhibit E", identified as a comparison CVS gauze is also identified on the *Change of Evidence Custodian* portion of the form and was identified as received by Ms. Wells on April 13, 2020, via USPS. Furthermore, there is no explanation in the FAST report or on the *FAST Worksheet* as to how Ms. Wells converted Mr. Foster's lettering system to her numbering system or the duplicate letter usage.

Photographs provided by M. Gardner on December 20, 2022, have been identified as the location of samples recovered by Mr. Foster for submission to FAST for testing. Photograph *Republic 00603* depicts a one gallon metal can with a top on the container, an oxidized flue pipe immediately to the left of the evidence container, and a tent evidence marker labeled "A" on top of a flue pipe which is depicted at an angle from the bottom right to the top left of the photograph. Photograph *Republic 00603* does not identify the area swabbed with gauze nor does it show the gauze prior to and after sampling or the one gallon sample container containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. Blue paint is not observed in the photograph. The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in "Exhibit A" was collected from the south end heater and inside tubes.

Photograph *Republic 00632* depicts a one gallon metal can on the bottom right of the photograph. No top is observed on the gallon can which contains a small amount of unidentifiable debris. To the left of the evidence container, from the bottom left to the top right in the photograph is a tube heater and reflector. A tent evidence marker also labeled "A" is on the bottom area of the tube itself. Soot marks are clearly visible on the tube and the reflector and there is an area below tent marker "A" where the soot on the tube has been removed or disturbed. Blue paint is not observed on the tube heater or reflector but is visible in the area beneath the tube heater. Photograph *Republic 00632* as well as *Republic 00603* are each identified with tent marker "A" however the markers are clearly placed at different locations within the fire scene. The area or areas swabbed are not identified in either of the photographs. Neither photo depicts gauze pad(s) nor does it show gauze prior to and after sampling or the one gallon sample can containing the gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in "Exhibit A" was collected from the south end heater and inside

tubes, however, based on the photographs provided it is not clear where the evidence transferred to the swab(s) was collected.

Photographs *Republic 00626* and *Republic 00638* each depict a one gallon metal can with a top next to a tent evidence marker labeled "B". The gallon can is sitting on debris and a flue pipe is disconnected at the top center of the photograph. The flue pipe exhibits significant oxidation. Photograph *Republic 00656* additionally has a tent marker labeled "B". This photograph has a one gallon evidence can with an intact lid as seen in the bottom left area of the photograph. To the immediate right of the gallon evidence can are two crossed pieces of tubing. To the right of the crossed tubing is a tent evidence marker labeled "B". In between the crossed tubing is a larger open tube. The location of tent marker "B" is obviously different than the location as observed in *Republic 00626* and *Republic 00638*. None of these photographs identify the area or areas swabbed with gauze nor does it show any gauze prior to and after sampling or the one gallon sample can containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in "Exhibit B" was collected from the central tube heater however, based on the photographs provided it is not clear where the evidence transferred to the swab(s) was collected.

Photograph *Republic 00665* depicts a one gallon metal can with the lid in place on the container which is located in the center portion of the photograph. To the left of the evidence container, from the center to the bottom left of the can is a flue pipe. Between the flue pipe and the evidence container is a tent evidence marker labeled "C". Photograph *Republic 00672* depicts a one gallon metal can, with no lid visible on the container or in the photograph, located in the approximate center of the photo. To the left of the evidence container is a flue pipe and unidentifiable metal debris. To the top and right of the evidence container is visible blue material. A tent evidence marker labeled "C" is to the bottom right of the container. This evidence container and tent marker "C" is in a completely different location than that observed in *Republic 00665*. Neither of these photographs depict gauze pad(s) nor do they show any gauze prior to and after sampling or the one gallon sample can(s) containing gauze after sampling, a labeled evidence container, or the evidence container tape sealed with tamper evident tape. The May 10, 2019, Rimkus *Evidence Custody Form* indicates the swabbing in "Exhibit C" was collected from the north end of tube heater, however, based on the photograph provided it is not clear where the evidence transferred to the swab(s) was collected.

Properly labeled evidence containers and proper photo documentation of the evidence prior to, during, and after collection is of utmost importance to protect the evidentiary value of any artifacts collected from the fire scene. As stated in *Scientific Protocols for Fire Investigators* by John J. Lentini (2006 edition pp 115-116):

"The labeled containers should be placed at the location where the sample will be collected and photographed in place before the sample is placed in the can. A second photograph should be taken showing the sample in the can next to the former location of the sample.  The location of the samples is the single most important attribute of the sample, so it is important that this information be thoroughly documented."

As found in ASTM E1188 - *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator:*

3.3 *Photographic Documentation:*
3.3.1 Commence photographic documentation as soon as possible after the incident. Document the scene of the incident and the condition of items involved.
3.3.2 Potential evidence should be photographed in the position where .it is first observed by the investigator. If items involved in the incident are disassembled or subjected to destructive testing, each step of the disassembly or testing shall be documented by contemporaneous photographs or videotaping.
3.3.3 The photographic technique utilized should be of sufficient resolution to preserve the essential aspects of the appearance of the evidence being photographed, and should also be capable of producing images that can be reproduced and enlarged. The date, time, and location of the photography or videotaping, and the identity of the photographer or videotaper shall be documented.

In this case, there are no photographs documenting the collection of the evidence, the evidence after collection, or the tape sealed labeled evidence containers.

The *Fire Scene Evidence Collection Guide* published on the International Association of Arson Investigators (IAAI) website instructs the investigator to "seal the container(s) with evidence tape. Initial and date the tape. Label each container with identifying information, including case number, date, exhibit number, a brief description including recovery location, and your name."  There is no indication in any of the photographs of the evidence that the samples were labeled, or tape sealed.  Furthermore, there was no documentation on the Rimkus *Evidence Custody Form* (Wells Deposition BS pages 2 and 3), on the *FAST Laboratory Worksheet* (Wells Deposition BS page 19), or on the *FAST Certified Laboratory Report* dated April 14, 2020, shows that any of the evidence was tape sealed.

In addition, two samples collected from the fire scene collected at different times by Mr. Foster were both labeled "Exhibit A" (Wells Deposition BS pages 2 and 3).  Any evidence collected from the fire scene should have unique identification so as not to confuse different pieces of evidence collected from the same fire scene.  ASTM E1188 *Standard*

*Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator* states:

> 3.2.3 Assign a unique identifier to each item collected and include this information in a label securely attached to the item or as documentation on the item's container and enter the identifying information on a log sheet together with a brief description of the item. The evidence documentation should also clearly include any specific details necessary for the preservation of the item, such as temperature control or special handling instructions.

NFPA 921

> 16.2.8.8 Evidence Photographs. Items of evidentiary value should be photographed at the scene and can be rephotographed at the investigator's office or laboratory if a more detailed view is needed. During the excavation of the debris strata, articles in the debris may or may not be recognized as evidence. If photographs are taken in an archaeological manner, the location and position of evidence that can be of vital importance will be documented permanently. Photographs orient the articles of evidence in their original location as well as show their condition when found. In an evidentiary photograph, a ruler can be used to identify relative size of the evidence. Other items can also be used to identify the size of evidence as long as the item is readily identifiable and of constant size (e.g., a penny). A photograph should be taken of the evidence without the ruler or marker prior to taking a photograph with the marker (see 17.5.2.1).

**SUMMARY OF REPORT AND DEPOSITION BY SHAREE WELLS**

Ms. Sharee Wells with FAST was retained by Mr. Foster to analyze three, one gallon cans, Exhibits "A", "B" and "C" (Wells Items 1, 2, and 3 on FAST Certified Laboratory Report) each containing samples collected from tube heaters for the presence of "flammable, combustible or ignitable liquids". A one quart can identified as containing paint Exhibit "D" (Wells Item 4) was also submitted by Mr. Foster who requested in his March 6, 2020 letter to Ms. Wells to "test for contents that make up the product. This is the item I spoke to you in reference to when the paint dries it has properties similar to Class II and Class III liquids. I have enclose a copy of the MSDS as well."

The *FAST Laboratory Worksheet*, dated March 11, 2020, Case Number: 62249, indicated Items 1, 2 and 3 are one gallon cans and Items 4 and 5 are one quart cans. It is unclear, based on the Rimkus *Evidence Custody Form* and the *FAST Laboratory Worksheet* if the comparison sample, "Exhibit E" (Wells Item 5) was submitted in a one quart can or transferred into a new, unused can to recover any volatile components. Again, there is

no explanation in the FAST report or on the *FAST Worksheet* as to how Ms. Wells converted Mr. Foster's lettering system to her numbering system or the duplicate letter usage.

Ms. Wells indicated the volatile components were recovered from the samples using ASTM E1412-19 *Standard Practice for Separation of Ignitable Liquid Residues from Fire Debris by Passive Headspace Concentration with Activated Charcoal* and analyzed using ASTM E1618-19 *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris*.  Both the recovery and analytical test methods are the generally accepted test methods in the forensic field of fire debris analysis to check for ignitable liquids.

Ms. Wells concluded the following in her April 14, 2020 report:

> Items 1 and 2 contained a similar mixture of an aromatic product, a medium petroleum distillate and a heavy petroleum product.

> Items 3 and 4 contained a similar mixture of an aromatic product and a medium petroleum distillate.   Items 3 and 4 did not contain a heavy petroleum product.

> Products in the range of a heavy petroleum product include, but are not limited to, some types of, (sic) some types of vehicles used in staining products, mineral sprits and other proprietary formulations.

> No ignitable liquid residues were identified in Item 5, the comparison gauze.

Although there was no indication of a "flame test" being conducted on Item 4, in her test report, Ms. Wells worksheet indicated "Flame Test Neg #4."

In Ms. Wells deposition (no page or line number referenced on deposition) she was asked to explain "in detail what a flame test is and how you do it in as much detail as you can?"

> A.   So when I'm asked to perform a flame test, we're simply trying to determine whether or not the liquid that I have is ignitable.  And so one of the first things that we will do is just take, like, a Q-Tip - - a long Q-Tip and submerge it into the liquid just enough to wet the - - the applicator tip of the cotton.

> And we then just take a light and we light that off to see whether or not it will ignite; whether or not it will sustain a flame.  And we notate the color of the flame.  If I do not notate it, it would have been negative.  If it would've been positive, I would've notated a black or blue color on that.

Q.  Right.  And I believe in connection with this flame test, you said it was from item number four, which is the medium blue WR protective enamel by Chaboygen (sic) Paint Company?

A.  Correct.

A thorough review of the chromatographic data, selected ion profiles, mass spectral data and library search report data (BS 20-90) generated as the result of the analysis of the four samples and the comparison sample reveals the analytical test results are consistent with the results reported in Ms. Wells report.

**REVIEW OF SAFETY AND TECHNICAL DATA SHEETS**

Several Safety Data Sheets (SDS) and formally known as Material Safety Data Sheets (MSDS) were provided to me to aid in interpreting the results of the analysis of the evidence and to form an opinion as to the source of the ignitable liquid residues detected in the samples.  I reviewed the SDS for the following products which were identified as used in the painting and maintenance area of the loss:

1.  Medium Blue WR Protective Enamel – Sheboygan Paint Company, Sheboygan, WI.
2.  Herculiner™ Protective Coating – Old Word Industries, LLC, Northbrook, IL.
3.  J-B Weld Herculiner Roll-on Black – J-B Weld Company LLC, Sulphur Springs, TX.
4.  PB Penetrating Catalyst, 16-PB, 8-PB, 8-PBS, PBTS, 20-PB, 26-PB, The Blaster Chemical Companies, Inc., Valley View, OH.
5.  Brakleen® Brake Parts Cleaner – 29 oz, CRC Industries Warminster, PA.
6.  Technical Data Sheet for Water-Reducible Protective Enamel – Water-Reducible Alkyd Top Coat – Sheboygan Paint Company, Sheboygan, WI.

Three of the products, Herculiner Protective Coating, J-B Weld Herculiner Roll-on Black and the PB Penetrating Catalyst, contained aromatic products as identified in the FAST report.  The Herculiner Protective Coating and the J-B Weld Herculiner Roll-on Black were both identified as flammable liquids.  These products may or may not be the source of the aromatic products detected in Items 1, 2, 3 and 4.

The Medium Blue WR Protective Enamel is composed primarily of water (~50 % by weight) and an unidentified solvent (~13 % by weight).  The SDS did not identify the solvent, however, based on the analysis of the paint sample by Ms. Wells, the solvent is most likely a combination of an aromatic product and a medium petroleum distillate. This product was also reported by Ms. Wells in her deposition and on her worksheet as

not supporting combustion. The SDS did not identify the composition of the solvent. Regarding flashpoint and flammability, the following was stated in the SDS:

> EXTINGUISHING MEDIA:  Water based product.  Flashpoint for this product is listed as N/A or Not Applicable due to the presence of water.  If water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid. If needed, extinguishing agents for Class B fires may be used.

The PB Penetrating Catalyst was identified as containing heavy aromatic naphtha, a heavy petroleum distillate, and a hydrotreated light distillate. Hydrotreated light distillates are chemically consistent with medium petroleum distillates.  This product may or may not be the source of the medium petroleum distillate detected in Items 1, 2 and 3 and the heavy petroleum products detected in Items 1 and 2.

## CONCLUSIONS AND OPINIONS

Based on my training, experience, and following scientific methodology for the preservation, collection, and analysis of evidence from fires, which includes the behavior of flammable and combustible liquids, and all the information gathered to date it is my opinion within a reasonable degree of scientific certainty in my field that the Medium Blue WR Protective Enamel manufactured by Sheboygan Paint Company, in either liquid or solid form, does not support combustion.  Based upon the photo documentation from Mr. Foster, as well as the evidence documents, the samples of residue were taken from inside flue ducting that existed for a prior heating system which explains the presence of aromatic and petroleum distillates detected by Ms. Wells of FAST.  Further, any build up of residue on the tube heaters would not support combustion given the fact that welding and grinding on painted dumpsters by maintenance workers is routine and there is no evidence supporting that the paint on these dumpsters or paint during the application process has previously ignited during these operations.

The analysis and opinions of Mr. Foster are rooted in speculation and data that are not applicable and incomplete.  While the presence of aromatic products and petroleum distillates is expected to be present in the Medium Blue WR Protective Enamel used, based on the analysis of the liquid conducted by Ms. Wells, and the review of the SDS, there is no indication that the levels in the product are sufficient to be ignitable or communicate a fire.  In Mr. Foster's December 3, 2019 *Report of Findings*, and in his November 18, 2022, *Expert Report*, he concludes "paint and other flammable products used in the repair of trash dumpsters collected on the tube heaters and ignited."  He inappropriately determined that the building in which the fire occurred was a paint booth, and the use of the tube heaters were prohibited.  Mr. Foster does not acknowledge that the plain language definition of paint booths, paint areas, etc. as stated in NFPA 33 shows the building did not meet the requirements of this Code.  His report does not reconcile how "paint and other flammable products" survived on the very object he claims to have been the cause of the fire while other painted surfaces were consumed.  Moreover, he does not describe how "paint and other flammable products" were the cause of the fire to the exclusion of other known sources of ignition in the building.  His opinion that the installation of the Space-Ray® tube heater was prohibited, and its subsequent use was the cause of the fire is speculative, has no scientific basis, and is unfounded.

# DISCLOSURE

This report discloses the expert opinion of Laurel V. Mason, ABC-FD, Forensic Scientist and Laboratory Director for Analytical Forensic Associates, as submitted to Martin J. Gardner, Gardner & Rans P.C., 117 Perspective Drive, Suite 2, Granger, Indiana. Mr. Gardner represents Coe Heating & Air Conditioning, Inc. regarding this loss. My role as an expert witness, in this case, is limited to the sampling and analysis of the samples recovered from the fire scene to check for ignitable liquid residues and to determine the likelihood of the ignition of paint due to the use of the recently installed Space-Ray® heaters.

Specifically, this report documents the entirety of the review documents provided regarding the collection of the evidence from the fire scene examination.  This report will consist of reports, a deposition, evidence custody forms, letters, analytical test data, safety data sheets, email correspondence and information obtained from outside sources.

The report may be amended at a later date if additional information becomes available through firsthand observation, further analysis, facts presented to experts prior to court through deposition or other disclosures, or facts supplied in court which have a direct bearing on this analysis.

# SIGNATURE

I hereby certify that the opinions and conclusions in this report have been formulated within a reasonable degree of scientific certainty in reference to the review and evaluation of the documents provided regarding the fire loss at the Republic Services facility located in Ft. Wayne, Indiana.

Sincerely,

Laurel V. Mason, ABC-FD
Analytical Forensic Associates
Phone:  770-982-0210
Email:  laurel@afalabs.com

Page 1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF INDIANA

3                FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7            Plaintiff,

8        v.                           Case No.

9    COE HEATING & AIR CONDITIONING,    1:21-cv-108-HAB-SLC

10   INC. and GAS-FIRED PRODUCTS, INC.

11   d/b/a SPACE-RAY,

12          Defendants.

13   _____

14           VIDEOCONFERENCE DEPOSITION OF

15                MICHAEL VERGON

16   DATE:        Thursday, January 19, 2023

17   TIME:        3:05 p.m.

18   LOCATION:    Remote Proceeding

19                Indianapolis, IN 46204

20   REPORTED BY:  Andrew Pronschinske, Notary Public

21   JOB NO.:     5673406

22

23

24

25

EXHIBIT

L

Page 9

1    missing anything.

2         Q     Okay.  I'm going to pull up in a moment your

3    expert report.  And it's going to be probably the main

4    subject of our discussion today, your expert report in

5    this matter that's dated December 29, 2022.  Does that

6    sound familiar?  We've marked it as Exhibit A for this

7    deposition.

8                    (Exhibit A was marked for

9                    identification.)

10        A     Yes, I have it right here.

11        Q     Okay.  Is this report dated December 29,

12   2022; is that accurate?

13        A     Yes.

14        Q     If you scroll down to page 34 of your

15   report -- and you know what, I'm going to go ahead and

16   pull this up to just make it easier and share my

17   screen.

18                    MR. JONES:  Andrew, it says that

19   screensharing is not allowed.

20                    THE REPORTER:  I think that should have

21   enabled it.

22                    MR. JONES:  There we go.

23                    THE REPORTER:  There we go.

24   BY MR. JONES:

25        Q     Okay.  Can you see that?

1      A     Yes, I do.

2      Q     It's that second-to-last paragraph, and it

3  says, "It is my opinion that Investigator Foster

4  cannot eliminate other potential ignition sources

5  merely because there is no obvious evidence for them."

6  Did you in the course of your investigation find any

7  evidence suggesting that, for example, failed

8  electrical components caused the fire?

9      A     No, but that's the point; right?  I mean,

10  there -- you couldn't eliminate electrical.  I mean,

11  there's -- there's actually data and witness testimony

12  in the depositions that they were -- the public was

13  having problems with outlets, I think they're referred

14  to, at the south side of the building where the

15  vehicles were plugged in.  And they kept having them

16  repaired, so -- but there was nothing left to look at

17  of the electrical system.

18          There -- the circuits couldn't be traced,

19  they couldn't be examined, you know, if there were

20  any -- if there was any evidence of electrical arc

21  activity, it was probably destroyed by melting of the

22  copper wires or conductors that point by the time the

23  fire progressed to the point that it progressed.  So

24  you -- electrical couldn't be eliminated.  There was

25  no way at that point.  In fact, at the scene, I asked

Page 37

1    their own, Rimkus' electrical engineer, about it.   And

2    he said that he couldn't eliminate electrical.

3        Q     So I want to talk about that conversation in

4    a minute.   But was there any evidence that you found

5    suggesting that discarded smoking materials caused the

6    fire in this case?

7        A     Did it cause the fire?   No.   But it did not

8    cause the fire?   Same thing.

9        Q     Have you found any evidence in this case

10   showing that improperly stored rags containing paint

11   thinner caused the fire?

12       A     No, but same answer.

13       Q     Okay.   Is it your position that it's

14   impossible to eliminate discarded smoking materials as

15   being the cause of the fire?

16       A     Impossible?   Yes.

17       Q     And are there cases where --

18            MR. HEHNER:   I just want to make sure I

19   understand.   Is the answer impossible, or it's

20   impossible to eliminate smoking?   Is that what you

21   understood the answer to be, Thomas?

22            MR. JONES:   Yeah.

23            MR. HEHNER:   Okay.   That's all.   Thank

24   you.

25   BY MR. JONES:

Page 68

1      Q    I'm going to jump back.  Well, hang on, I

2  forgot to ask you.  Scott Jones, how did your

3  communications with Scott Jones take place in this

4  case when you guys were discussing this case?

5      A    Both at the laboratory examination and also

6  over the telephone.

7      Q    Did you ever exchange any emails with Scott

8  Jones regarding this case?

9      A    I don't recall, other than I sent him a copy

10 of my opinion report.  He sent me a copy of his

11 opinion report.  And then I let him know that I was

12 being deposed.  And other than that, we didn't

13 exchange or trade opinions via email, no.

14     Q    I think I'm getting close to done.  So I'm

15 still going to jump around a little bit here.  I want

16 to go to page 8 of your report.

17     A    Okay.

18     Q    And on the top paragraph, it starts with

19 "Investigator Foster does not identify."  And towards

20 the bottom, it says, "Further, Investigator Foster did

21 not collect swab samples for more than seven weeks

22 after the fire.  It is most probable this material

23 accumulated within the interior of the end of the tube

24 during firefighting operations, or sometime

25 post-fire."  My question is, why is that most

Page 69

1    probable?

2        A    Again, speaking with Scott Jones that

3    the -- there's no explanation how this material would

4    have ended up in a closed system as it's been

5    explained to me and Scott Jones understands it.  And

6    so the tube heaters became -- I call it

7    disassociated -- they came apart, basically, during

8    the fire and during the collapse of the building.

9    They fell down in different sections with the open

10   ends exposed to the environment of the fire and all

11   the fire debris and -- and fire suppression of water

12   on a concrete slab with -- with who knows what flowing

13   on the slab and on the surfaces of materials.  And

14   these were open and exposed tubes.

15       Q    So just so I'm clear.  It's your opinion

16   that's stated there, is that based on what Scott Jones

17   has told you?

18       A    Well, based on my own observations as well.

19   I mean, I've looked at the photographs.  And

20   these -- there were tube -- and I don't know where

21   this -- there's no way to identify where this

22   particular section of tube was located in the fire

23   scene.  I think I recall, based on looking at some

24   photographs, it may have been one that was found at

25   slab level with who knows what flowing around the

Page 70

1    opening of the tube.  So I -- I don't know.  So it is

2    based on my own observations.  But it's also based on,

3    you know, conversation with Scott Jones that

4    the -- it's not possible this material, the way it's

5    designed, would have ended up in this tube just by

6    general day-to-day operation.

7        Q    And going back to the question I asked you

8    earlier about the Space-Ray video that I know you

9    haven't watched yet.  But is your answer still the

10   same, that even if -- well, strike that.  That's a bad

11   question, Mike.

12            You're saying in this paragraph basically

13   that it's a closed system, you understand from Scott

14   Jones and your own observations that it's a closed

15   system.  Therefore, it's unlikely that paint or any

16   other debris would get in there.  It's more likely,

17   and what you would say is it's most probable that

18   those materials accumulated within the interior of the

19   end tube during firefighting operations or sometime

20   post-fire.  You're basing that opinion on the

21   assumption that debris, paint, other things can't

22   enter in the box or the tube on their own without it

23   breaking open.  Is that fair?

24       A    Well, the burn box and the tubes are

25   separate.  I mean, completely separate.  I mean, yeah,

Page 71

1    the heat flows through the tube from the burner box.

2    But if dust -- I mean, we're talking about dust maybe

3    getting into the burner box if you're talking about

4    the video.  But how does the -- how -- how the dust

5    particles -- the size of particles of dust doesn't

6    equate or translate to what's shown in the photograph

7    on page 7 of my report.  I mean, it just can't -- it

8    can't happen.

9        Q    Sorry.  Could you explain that a little bit

10   more?

11       A    Well, yeah.  We talked about the

12   construction and operation of the tube heaters.  And

13   now, again, I'm relying on a large part what Scott

14   Jones explained to me about the system and how it's a

15   closed system.  So -- and you were talking about the

16   video and the repair guy talking about dust getting in

17   the burner box; right?  And that's just very small

18   particulate matter.  It's dust.  We all know what dust

19   is.  But these are large -- this is debris in the end

20   of the tube.  This isn't dust.  Not dust particles.

21   It's not the accumulation of dust particles.  This

22   is -- this is debris that came from somewhere other

23   than inside the tube.

24            And again, I'm basing that on my own

25   observations because in the photographs that I have on

1    the fire scene and -- and where Jim Foster took some

2    photographs of the tubes at concrete level, this exact

3    same type of material is in the photographs on the

4    concrete slab right next to the tube.

5         Q    Let me go down to page -- back on page 8,

6    under "Joint Scene Examination (March 3, 2020)."  You

7    say, "Prior to beginning any further scene

8    examination."  You talk about how Mr. Foster called a

9    brief and some additional information was relayed.

10   And we got this list of different things that you

11   outlined.  On the very bottom, it says, "There has

12   been no scene security and the scene was left

13   uncovered."  Is that information that you got from Mr.

14   Foster?

15        A    No.  I mean, it was obvious the scene was

16   left uncovered.  I mean, there was nothing covering

17   the scene.  It's a -- it's a large scene exposed to

18   the weather, the elements.  And I pulled some random

19   weather data from the seven-week period it was left

20   since the time of the fire to the time that

21   Investigator Foster collected samples.  You had a

22   couple days in there of half-inch rain, an inch of

23   rain.  So you've had some inclement weather in that

24   seven-week period.  So that would only add to pooling

25   and puddling of water and debris floating around.  So,

Page 78

1    particular fire scene.

2        Q    And in Jim Foster's report, he talks about

3    fire patterns.  In your report, you critique that and

4    you make the statement on page 7, if you turn back to

5    that.  You say, "Given the amount of destruction,

6    building collapse and burning in this case, any fire

7    patterns observed in a case such as this should not be

8    given any weight regarding the fire's origin."  Do you

9    stand by that statement?

10       A    Absolutely.

11       Q    And tell me why.

12       A    Because when you have full collapse, burning

13   of a building, patterns really don't mean anything.

14   There's no localized pattern.  The whole building is a

15   burn pattern.  The whole building is gone.  Everything

16   in it is burned.  So how can you look at one -- it's

17   not, I'll say, it's not possible to look at one little

18   area of a pattern on a piece of metal and say, this is

19   more discolored than another piece because fire

20   dynamics is such that if the fire had been contained

21   into a certain area and -- and patterns had developed,

22   oxidation patterns on metal or charring on wood were

23   preserved and localized, absolutely you can say that

24   those patterns matter and you could tell where the

25   fire originated.  Then likely maybe get to determine a

Page 79

1    cause of the fire eventually down the road.  But in a

2    case like this, you might have a fire develop in,

3    let's just say the west side of the building.  And

4    then as the fire progresses and the building collapses

5    and the fire department's arriving, they're trying to

6    extinguish the fire wherever they best can.

7            The east side of the building at that point

8    may have been collapsed and stuff is continuing to

9    burn there that the fire department can get to, maybe

10   buried under a roof or debris.  And that's continuing

11   to burn and create patterns that's far, far removed

12   from the area of origin of the fire.  And so you could

13   have actually worse and more severe burning and -- and

14   more, I'd say, greater, you know, greater fire extent

15   damage at the side of the building that's complete

16   opposite side of the building from your area of origin

17   by that point -- by that point in the fire.

18           So -- so for anyone to say that they

19   can -- they could have gone to this fire scene and

20   looked at patterns and I don't want -- I'm trying not

21   to be too critical of Investigator Foster's

22   investigation or him personally.  But it's -- it's

23   kind of ludicrous.

24      Q    I think we're just about wrapping up.  I

25   know I said that a minute ago.  But if you could turn

Page 80

1    to page 27.  I've got a couple more questions on that

2    page.

3          A     Okay.

4          Q     On the bottom of the page, you say that

5    "Investigator Foster does not document making any

6    attempt to discount these possibilities, and ignored

7    the opinion of his electrical engineer, who stated

8    that the structure's electrical system could not be

9    eliminated as a cause to the fire."  When you say he

10   ignored the opinion of his electrical engineer, are

11   you talking about the statements that you say that Lou

12   made during the site inspection on scene?

13         A     Yeah.  That -- in part, that.  But as part

14   of -- if -- if Investigator Foster says he follows

15   NFPA 921 as he does in his report, as -- as he -- he

16   does state he follows 921.  And a large part of 921 in

17   origin determination and cause determination has to do

18   with process of elimination, the proper process of

19   elimination and considering alternate sources of

20   causes -- causes of the fire.  So he doesn't even

21   address these other issues.

22               We, you know, there is electrical in the

23   building.  He can't just say, well, they told me the

24   lights were off and eliminate electrical.  He -- he

25   makes no effort in his report to give an explanation

Page 81

1    according to 921 why -- that he considered these other

2    potential causes, how he eliminated them, and -- and

3    then the final basis for his final hypothesis.

4         Q    If you turn to the next page, third

5    paragraph.

6              MR. HEHNER:  Page 28; is that right?

7    BY MR. JONES:

8         Q    Yeah, page 28 which is I think the last page

9    of the report before the attachment of CV.  On page

10   28, third paragraph, it says, "NFPA 921 also contains

11   a section, 17.5.2 titled, Documenting the Collection

12   of Physical Evidence.  This sections consists of

13   several sub-sections, which have to do with

14   documenting evidence collection via, field notes,

15   diagrams, photography, etc.., none of which has yet

16   been presented by Investigator Foster or Rimkus

17   Consulting Group."  Did I read that right?

18        A    Yes.

19        Q    And do you stand by that statement?

20        A    A hundred percent.

21        Q    I want to show you what's been marked as

22   Exhibit B.  I'm going to share my screen.  Do you see

23   my screen okay?

24              (Exhibit B was marked for

25              identification.)

Page 87

1   said no.

2        Q    So you're assuming he said no because of the

3   extent of the damage; is that?

4        A    Right.  I asked a specific question, and he

5   pretty much answered my question.

6        Q    Okay.  If we can jump real quick to page 6

7   of your report.  I'm at the middle of the page

8   underneath "Page 3," the section that says "Page 3."

9   And again, this is page 6 of Exhibit A which is your

10  report.  It says "Page 3 - The fire origin was

11  reportedly high in the structure when first observed,

12  which would place it at or near the ceiling."  And

13  then -- oh, I'm sorry.  The one right before that.

14  "Page 3 - Other potential ignition sources were in the

15  general area of fire origin however were not

16  considered a potential due to their location and

17  origin location."  Can you explain to me your

18  understanding of what Mr. Foster means by that?

19       A    I have no idea what he's talking about.  It

20  doesn't make sense.  I mean, he's putting potential

21  ignition sources in the origin, and then he's saying

22  they were not considered because of their origin -- or

23  their location.  So I -- I have no idea what he means.

24       Q    This sentence just doesn't make sense to

25  you.  Is that what you're saying?

Page 88

1      A    It sounds like on one hand, he's

2   acknowledging there's other potential ignition sources

3   in the general area of fire origin.  But then he says

4   they were not considered a potential due to their

5   location and origin location.  So I -- I'm not

6   following what he's saying.  He -- if there's

7   potential ignition sources there, then how is he

8   eliminating them?  He doesn't explain what those

9   potential ignition sources are, he doesn't say how

10   he's eliminating them, and he gives no explanation

11   about anything else regarding them.

12      Q    And this is all page 6 and, you know, half

13   of page 5 of your report is under the heading of

14   "REVIEW OF INVESTIGATOR FOSTER'S INITIAL REPORT OF

15   FINDINGS."  You've reviewed his initial report from

16   December of 2019 as well as his expert report drafted

17   in November of 2022; correct?

18      A    That's correct.

19      Q    Is it your opinion that throughout the

20   course of this investigation as reflected in both of

21   those reports, that he has not considered other

22   potential ignition sources other than the infrared gas

23   tube heaters?

24      A    I don't know.  I think someone's going to

25   have to ask him.  I mean, he -- he acknowledges there

Page 89

1    are other ignition sources.  But then he says he

2    ignored the other potential ignition sources.

3        Q    You're saying based on his reports, you

4    don't know one way or another whether or not he

5    considered potential ignition sources?  And the reason

6    I'm asking is, under that section we were just talking

7    about, you state in response that "He does not

8    identify other potential ignition sources, nor their

9    specific locations. To not even consider other

10   potential ignition sources in a general area of origin

11   is not in line with adhering to the scientific method

12   according to NFPA 921, as Investigator Foster states

13   he does in his report."

14            My question is, is your opinion in this case

15   that Mr. Foster did not consider other potential

16   ignition sources, or is it based on his reports, it's

17   unclear to you whether or not he did?

18       A    It's based on his report that it's unclear,

19   and he doesn't articulate anything about that as he

20   should in his report.  I mean, he should articulate

21   what those ignition sources were, where they were in

22   relation to where he thought the fire started, how he

23   eliminated them, did he -- there's no documentation,

24   there's no photographs of these other alleged

25   potential ignition sources.  It just appears that he's

Page 101

1   Foundation.

2        A    I do.

3        Q    Do you remember -- have you ever had a

4   chance to look at the safety data sheet for the

5   Sheboygan blue paint?

6        A    I have looked at that, yes.

7        Q    And I'm on page -- I don't know, it says 93,

8   but it's the second page of the document, under the

9   fire and explosion hazard.  Or after it says, "does

10  not sustain combustion and noncombustible according to

11  ASTMD 4206."  It says this in part, "flashpoint for

12  this product is listed as nonapplicable due to the

13  presence of water."  Do you remember reading that?

14       A    I do.

15       Q    And did you get a chance to read Sharee

16  Wells' deposition?  She's a lab expert down in, I

17  think, Birmingham.

18       A    I did read it, yes.

19       Q    And she told us under oath that she tried to

20  burn this blue paint in its liquid form and it

21  couldn't burn; right?  Do you remember that?

22                 MR. JONES:  Objection to form.

23       A    I do.  And we actually tried to burn it at

24  the -- at the scene, at one of the scene exams as

25  well.  And it didn't burn.

Page 102

1      Q     The part that you were trying to burn at the
2   scene exam, was it a dry part?
3      A     It was kind of gooey, blue, you know, like
4   bubblegum-type texture.
5      Q     Taken from in the fire scene, perhaps off
6   the floor?
7      A     Somewhere.  I think in where they were
8   currently doing the painting.  So in the newer -- in
9   the newer paint area, yes.
10     Q     And did it catch on fire?
11     A     Did not.
12     Q     Okay.  Have you read anything in this case
13  that would indicate that this blue Sheboygan paint in
14  question in this case is combustible in any form?
15                 MR. JONES:  Objection to foundation.
16     A     The paint in and of itself, no.  No.
17     Q     Mr. Jones asked you about the property the
18  paint may take on if water is boiled off.  You
19  remember him asking you that?
20     A     I do.
21     Q     And I think you deferred that point to the
22  opinion of a chemist.  And in this case, I think
23  Space-Ray's hired a fellow named Dirk Hedglin.  Aside
24  that point, do you know of any evidence in this case
25  that this blue Sheboygan paint got up on top of these

Page 103

1   or on these Space-Ray heater tubes in 43 days and
2   boiled on the date of the fire?
3        A    No, not at all.  That doesn't seem likely.
4   And again, we're talking about dust particles.  That,
5   I mean, we can all picture a layer of dust on a
6   surface and however possibly that dust may ignite, you
7   can imagine what dust particles the flame height could
8   even be.  Would be miniscule.
9        Q    And there's no reference in the facts of
10  this case, I think you've already testified, nor in
11  Mr. Foster's two reports of the next
12  flammable/combustible material, is there?
13       A    No, and that's something he should have
14  explained and laid out in his origin and in -- with
15  respect to fire progression, what's the next ignited
16  material, then how did fire progress throughout the
17  rest of the structure.
18       Q    And there's nothing like that in either of
19  his reports, is there?
20       A    No, there's not.
21       Q    Okay.  And in connection with Mr.
22  Jones -- I'm so used to calling him Thomas -- Thomas
23  questions to you about dust inside of the heater box
24  assembly which we know is sealed.  I think you told us
25  that.  And you made some reference to a different

1    expert in the case.  Nonetheless, is it your

2    fundamental understanding, that inside of the

3    Space-Ray boxes which are sealed, there's an igniter

4    in there; correct?

5         A    That's correct.

6         Q    And what it ignites is propane gas; correct?

7         A    That's correct.

8         Q    So in a sense, or at least in layman terms,

9    that box is designed for combustion; correct?

10        A    It is designed for combustion, yes.

11        Q    Does it make any sense to you that some dust

12   or blue paint dust could get inside that box and cause

13   a fire in that room?

14             MR. JONES:  Objection to foundation.

15        A    No, but that's something I thought of as

16   well.  Even if dust did or something did ignite in

17   that combustion box, then it's going to burn up.  Then

18   so how would that material flow downstream to

19   accumulate as -- as in the big particle form we're

20   seeing in the photographs taken by Jim Foster?

21        Q    Right.  Near the end of your deposition, you

22   indicated that in the realm of this particular fire

23   scene, you stated something like whether we were there

24   for a day or there for a week, it would end up the

25   same.  I think you said something like that.  Can you

Page 106

1    deposition that he entered into building number 2,

2    smelled and saw some smoke -- building 2's the

3    rectangular, operational building -- ended up making a

4    call, I think, and grabbed some truck keys.  And I

5    think him and maybe the security guard moved some

6    trucks away from building number 2.  And it was only

7    after he talked to John Shatto that he first observed

8    flames.  Do you remember reading --

9                MR. JONES:  Objection to form.

10       A    That witness was Sameer or Sameer.  I won't

11   pronounce his last name.

12       Q    He testified on pages 36, 59, and 60, that

13   when he first saw flames -- I'm referencing page 3 of

14   your report -- they were only coming out of the most

15   southern bay garage door.  Do you remember reading

16   that?

17       A    I do, and that's something that I double and

18   triple checked in the deposition to make sure

19   that -- and married up with the photographs that I've

20   had and that he -- yes, he did say that.

21       Q    And that would support your opinion in this

22   case that the origin of the fire was somewhere in the

23   most southern bay, not in the paint room?

24       A    Yes.  If it was just his opinion or

25   his -- his data was, like, standalone data and I

Page 107

1   didn't have the photograph to go with and, you know,

2   someone could say, well, it was south.  Generally

3   speaking, somewhere south, what does that really mean?

4   But he was very specific in his identifying where the

5   fire came from.

6          And in the questioning, I think someone

7   pinned him down on that exactly what bay he was

8   talking about.  And -- and then again,

9   taking -- taking that with the photograph that I have

10  in my report, I think that kind of corroborates and

11  they kind of back each other up.

12     Q    Mr. Foster made some mention in at least one

13  of his reports about he was able to determine some

14  sort of fire pattern, and you spoke about that today.

15  And you remember from your site visit and from your

16  photos the interior walls and the ceiling, all except

17  one, inside of so-called paint room, building number

18  1, was corrugated metal; correct?

19     A    Correct.

20     Q    And that was also on the outside of building

21  number 1; correct?

22     A    Yes.

23     Q    And you said this was a to-the-ground fire.

24  And so by the time Mr. Foster shows up, there's

25  already been a fire for as many as five hours.  And

Page 112

CERTIFICATE OF TRANSCRIBER

1
2        I, PROMY ISLAM, do hereby certify that this
3    transcript was prepared from the digital audio
4    recording of the foregoing proceeding, that said
5    transcript is a true and accurate record of the
6    proceedings to the best of my knowledge, skills, and
7    ability; that I am neither counsel for, related to,
8    nor employed by any of the parties to the action in
9    which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14
15                                    PROMY ISLAM
16
17
18
19
20
21
22
23
24
25

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF INDIANA

3                     FORT WAYNE DIVISION

4        _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7             Plaintiff,

8        v.                              Case No.

9    COE HEATING & AIR CONDITIONING,     1:21-CV-00108

10   INC.; and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY,

12           Defendants.

13   _____

14             VIDEOCONFERENCE DEPOSITION OF

15               SHAREE WELLS, MS, F-ABC

16   DATE:        Wednesday, August 31, 2022

17   TIME:        1:34 p.m.

18   LOCATION:    Remote Proceeding

19                Indianapolis, IN 46204

20   REPORTED BY: Suzannah Clemons, Notary Public

21   JOB NO.:     5384665

22

23

24

25

EXHIBIT

M

Page 21

1    case of anything after April 14, 2020?

2         A    After April 14?

3         Q    That's the date of your report.

4         A    No.  No.

5         Q    Have you been asked to perform any more

6    tests in the last two years?

7         A    No.

8         Q    In preparing for the deposition, did you

9    reach any opinions not already expressed on the second

10   page of Exhibit B, which is your report?

11        A    No.  I did not.  But I did notice that on my

12   laboratory worksheet I did not include the flame test

13   for item number four.  Sometimes we report it;

14   sometimes we don't.  In this case, it looks like I did

15   not report that.  But if you look on my worksheet, the

16   flame test for item number four was negative.

17        Q    And can you explain in detail to four

18   lawyers that aren't laboratory experts like you what a

19   flame test is and how you did it in as much detail as

20   you can?

21        A    Okay.  So when I'm asked to perform a flame

22   test, we're simply trying to determine whether or not

23   the liquid that I have is ignitable.  And so one of

24   the first things that we will do is just take, like, a

25   Q-Tip -- a long Q-Tip and submerge it into the liquid

Page 22

1    just enough to wet the -- the applicator tip of the

2    cotton.

3              And then we just take a lighter and we light

4    that off to see whether or not it will ignite; whether

5    or not it will sustain a flame.  And then we notate

6    the color of the flame.  If I do not notate it, it

7    would have been negative.

8              If it would've been positive, I would've

9    notated a black or a blue color on that.

10        Q    Right.  And I believe in connection with

11   this flame test, you said it was from item number

12   four, which is the medium blue WR protective enamel by

13   Sheboygan Paint Company?

14        A    Correct.

15        Q    All right.  When that was delivered to you,

16   was that delivered with the first -- you got

17   everything other than the swab all at once, correct?

18   The test swab came second on April 13 of '20?

19        A    Let me check and make sure that is correct.

20        Q    I think if you look on the first page it

21   says evidence delivered on March 11; I assume that's

22   2020, correct?

23        A    Yes.  And --

24        Q    And on 13th of 2020 you received item 5?

25        A    Yes.  It appears that's the way that worked.

Page 23

1  Yes.

2       Q   Okay.  Back to the flame test, did you

3  perform any other flame tests in this case to anything

4  other than as you've just described?

5       A   No.

6       Q   All right.  Did you ever attempt to conduct

7  the flame test with that same paint -- that same

8  medium blue WR protective enamel; item number four in

9  your report -- when it was dry; in a dry form?

10      A   No.  I did not.

11      Q   Do you mind me asking why not?

12      A   I was never asked to do any further testing.

13 And at the time, we were just trying to determine the

14 makeup of the paint.

15      Q   Did you conclude that the paint, as we're

16 describing here -- I'm just going to say the Sheboygan

17 paint to make the deposition a little easier.  Did you

18 determine that -- it does not have a component

19 petroleum or petroleum distillate?

20      A   No.  I did not conclude that.  My

21 conclusions -- is it does actually have ignitable

22 liquid residues, but the paint itself is nonflammable.

23 Because it does contain a large amount of water per

24 the MSDS sheet.

25      Q   I'm not sure if I understood you.  Can you

Page 25

1        A    I believe that that matched my library of

2    information that I have.  I was not given any other

3    components other than the MSDS sheet.  And that

4    product was not listed on the MSDS sheet.

5             So I simply was able to classify it

6    according to our standard.  And that was the

7    classification that I was -- that I was given.

8        Q    And you included -- at least I received from

9    counsel in this case -- the product specs for the

10   Sheboygan paint, right?  You produced that.  Or did

11   they give that to you?

12       A    Okay.  So I didn't produce anything, but I

13   was given the MSDS sheet of the Sheboygan paint; the

14   blue enamel.  I did receive that as part of the

15   information in this case.

16       Q    Did that come from Mr. Foster?

17       A    Yes.  It did.

18       Q    And did it come that same date with the

19   items one through four evidence on March 11, 2020?

20       A    To be honest, I'm not sure if it did.  I

21   think he said he included it on his letter, but I

22   didn't specifically date it.  So it would've

23   come -- it would've come with one of the samples.

24       Q    Okay.  Can you go to the MDS sheet that

25   Mr. Foster gave you in connection with the Sheboygan

Page 27

1      A    Correct.

2      Q    And the third one says, "Percent solvent,

3    13.02 percent."  And do you know what that solvent is?

4      A    I do not.

5      Q    It mentions a flashpoint and then it says

6    "N/A."  Is it your understanding that means "not

7    applicable"?

8      A    Yes.

9      Q    And in terms of flashpoint, you're familiar

10   with that, correct?

11     A    Yes.

12     Q    And that would be the temperature at which

13   something burns, right?

14     A    Correct.

15     Q    Ignites, right?  Okay.  And you would agree

16   with that because you tried to burn the liquid version

17   of the Sheboygan paint and couldn't do it, right?

18     A    Correct.

19     Q    Okay.  And you never tried to burn it in its

20   dried state, correct?

21     A    No.

22     Q    Okay.  Is there anything on the front page

23   of Exhibit D, which is the product specifications

24   about the Sheboygan Paint Company, that you obtained

25   from Mr. Foster that mentions the existence of

Page 29

1    BY MR. GARDNER:

2        Q    Sharee, do you know whether this product

3    specification -- Sheboygan Paint Company refers to the

4    product in only its liquid form or in any other form,

5    such as when it's dry?

6        A    I do not know.

7        Q    Okay.  Section two says "hazardous

8    ingredients."  Do you see that?

9        A    I do.

10       Q    And then the print's a little small.  I

11   can't tell if that's a T or an I, but it looks like it

12   says, "NI ingredient"?  Maybe I'm wrong.

13       A    I believe it -- I believe it says "NT

14   ingredient."

15       Q    Okay.  And do you know what the NT stands

16   for, Sharee?

17       A    I do not.

18       Q    But in any event, section two is supposed to

19   list hazardous ingredients I suppose, right?

20       A    Section two is supposed to list hazardous

21   ingredients.  However, on MSDS sheets, many times it

22   does not list all the components of a particular

23   substance.  So in this particular case, it obviously

24   did not list the ignitable components that I

25   identified.  But it's not uncommon for the MSDS sheet

Page 66

1    up in the air.

2            Do you hold an opinion at all about how the

3    aromatic product and/or medium and heavy petroleum

4    distillates found their way up on top on the heaters

5    or in them?

6                    MR. ZOCCOLA:  Objection; form.

7                    You can answer.

8                    THE WITNESS:  No.  That's out of the

9    scope of what I was asked to do.

10   BY MR. GARDNER:

11        Q    Similarly, do you know when the aromatic

12   product was deposited on any of the three heaters?

13        A    No.

14        Q    Do you know when either the medium or heavy

15   petroleum distillates were deposited on any of the

16   three heaters?

17        A    No.

18        Q    Can you say one way or the other whether the

19   aromatic product that you found as a result of your

20   testing was deposited before the fire or during the

21   fire; one way or the other?

22        A    No opinion.

23        Q    Same question about timing; do you know

24   whether the medium petroleum or heavy petroleum

25   distillates were deposited on or in the tube heaters

Page 67

1    before or after the fire?

2         A    No.

3         Q    Or during the fire?

4         A    No.

5         Q    Okay.  Assume for a second that a fire

6    starts in this room from -- let's just say an unknown

7    cause and there's kerosene in the room and it ignites;

8    could that rise up and attach to these tube heaters

9    when they're 14 feet up in the air or do you know one

10   way or the other?

11                    MR. ZOCCOLA:  Objection to form.

12                    You can answer.

13                    THE WITNESS:  I don't have an opinion.

14                    MR. GARDNER:  Okay.

15   BY MR. GARDNER:

16        Q    If there were any machinery in the room that

17   had inside of it as a lubricant oil -- which we've

18   already established would be a petroleum

19   product -- and it was subjected to fire, do you know

20   if that could migrate upwards and deposit on the tube

21   heaters during the fire?

22                    MR. ZOCCOLA:  Objection to form.

23                    You can answer.

24                    THE WITNESS:  I don't have an opinion

25   on that.

# PRODUCT SPECIFICATIONS

---

| | |
|---|---|
| SHEBOYGAN PAINT COMPANY | DATE OF PREPARATION  10/30/14 |
| 1439 NORTH 25th STREET | PRINTED DATE        12/01/14 |
| P.O. BOX 417 | TRANSPORTATION EMERGENCY (800) 924-6804 |
| SHEBOYGAN, WI  53082-0417 | |
| TELEPHONE  (920) 458-2157 | CUSTOMER SERVICE  custserv@shebpaint.com |

---

| | | |
|---|---|---|
| TRADE NAME | MFG. PRODUCT NO. | |
| MEDIUM BLUE WR PROTECTIVE | 73-4383C | |
| ENAMEL | | |

| | | | |
|---|---|---|---|
| CUSTOMER | : | | |
| PART NUMBER | : | | |
| WEIGHT PER GALLON | : | 9.29 POUNDS | |
|   (density) | | | |
| | | BY WEIGHT | BY VOLUME |
| PERCENT SOLIDS | : | 36.42 | 26.75 |
| PERCENT WATER | : | 50.27 | 56.07 |
| PERCENT SOLVENT | : | 13.02 | 16.82 |
| % EXEMPT SOLVENT | : | .29 | .36 |
| VOC (WITH WATER AND EXEMPT SOLV) | : | 1.21 LBS/GAL | 145.01 GMS/LITER |
| VOC (LESS WATER AND EXEMPT SOLV) | : | 2.78 LBS/GAL | 333.15 GMS/LITER |

| | | |
|---|---|---|
| PERCENT HAPS BY WEIGHT | : | |
| VOC LBS PER GALLON SOLIDS | : | 4.52 |
| VOC KILOGRMS PER KILOGRMS SOLIDS | : | .36 |
| VOC HAPS LBS PER GALLON SOLIDS | : | |
| VOC HAPS LBS PER LBS SOLIDS | : | |

| | |
|---|---|
| FLASHPOINT (FAHRENHEIT) | : N/A |
| APPLICATION | : SPRAY/ROLL/BRUSH |
| REDUCTION | : NONE-WATER IF NEEDED |
| CURE | : 8 MIN@175F |
| SUBSTRATE | : CRS |
| COVERAGE | : 429.07 SQUARE FEET @ 1 MIL NO LOSS |
| VISC @ 80 F | : 95-100  KU |
| GLOSS | : 85-100@1  MIL, HIGH* |
| pH | : 8.5-9 |

COMMENTS

73-4383C                          PAGE: 1
------------------------------------------------------------------

# MATERIAL SAFETY DATA SHEET
### FOR COATINGS, RESINS AND RELATED MATERIALS
==================================================================

HAZARD RATING    0 - MINIMAL     3 - SERIOUS
                 1 - SLIGHT      4 - SEVERE
                 2 - MODERATE    * - CHRONIC

  HMIS RATING    HEALTH - * 2   FLAMMABILITY - 0   REACTIVITY - 0
------------------------------------------------------------------

# SECTION I
------------------------------------------------------------------

SHEBOYGAN PAINT COMPANY                 DATE OF PREPARATION  10/30/14
1439 NORTH 25th STREET / P.O. BOX 417   TRANSPORTATION EMERGENCY (800) 924-6804
SHEBOYGAN, WI  53082-0417                  EMAIL: custserv@shebpaint.com
TELEPHONE: (920) 458-2157

| PRODUCT CLASS | TRADE NAME | MFG PRODUCT NO. |
|---|---|---|
| SURFACE COATING | MEDIUM BLUE WR PROTECTIVE | 73-4383C |
| | ENAMEL | |

# SECTION II  - HAZARDOUS INGREDIENTS
------------------------------------------------------------------

| | | | ACGIH TLV | | ACGIH STEL | | OSHA PEL | | OSHA CEILING | | LEL % | VAPOR PRESS | % BY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NT | INGREDIENT | CAS# | PPM | mg/m3 | PPM | mg/m3 | PPM | mg/m3 | PPM | mg/m3 | VOLUM | mm/Hg DEG F | Wght |
| C | Glycol Ether Compd.(skin) | 111-76-2 | 20.00 | 100.0 | ----- | ----- | 50.00 | 240.0 | ----- | ----- | 1.100 | 0.600 @ 68. | 7.52 |
| A | Secondary Butyl Alcohol | 78-92-2 | 100.00 | 300.0 | ----- | ----- | 150.00 | 450.0 | ----- | ----- | 1.700 | 12.50 @ 68. | 4.83 |
| | NON-HAZARDOUS COMPONENT: Water | 7732-18-5 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | 17.50 @ 68. | 50.2 |
| C | Ammonia | 7664-41-7 | 25.00 | 17.00 | 35.00 | 24.00 | 50.00 | 35.00 | ----- | ----- | 16.00 | 6460. @ 68. | 0.29 |
| | Copper Compound | 147-14-8 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- @ --- | |
| | Titanium Dioxide (dust) | 13463-67-7 | ----- | 10.00 | ----- | ----- | ----- | 15.00 | ----- | ----- | ----- | ----- @ --- | |
| | Barium Sulfate (Barite) | 13462-86-7 | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- @ --- | 9.10 |

C -This toxic chemical is subject to the reporting requirements of both Section 313 of the Emergency Planning and Community
   Right-to-Know Act of 1986 (40CFR372) and the Wisconsin Dept. of Natural Resources Administrative Code Chapter NR445.
   VHAP = VOLATILE HAZARDOUS AIR POLLUTANT (VAPOR)      HAP = HAZARDOUS AIR POLLUTANT (SOLID)
   (skin) = OSHA Skin Absorption Hazard                 VOC content determined by EPA method 24.

A -This toxic chemical is subject to the reporting requirements of Section 313 of the Emergency Planning and Community
   Right-to-Know Act of 1986 (40CFR372).                VHAP = VOLATILE HAZARDOUS AIR POLLUTANT (VAPOR)
   HAP = HAZARDOUS AIR POLLUTANT (SOLID)                VOC content determined by EPA method 24.

==================================================================

# SECTION III - PHYSICAL DATA
------------------------------------------------------------------

| BOILING RANGE  208-343 F | VOC KG/KG SOLIDS=.36 | VOC (WITH WATER AND EXEMPT SOLV) = 1.21 LBS/GAL | 145 GMS/LITER |
|---|---|---|---|
| | % HAPS BY WEIGHT= | VOC (LESS WATER AND EXEMPT SOLV) = 2.78 LBS/GAL | 333 GMS/LITER |

| VAPOR DENSITY | EVAPORATION RATE | %VOLATILE | %VOLATILE | WEIGHT | SPECIFIC | AVG SOLV |
|---|---|---|---|---|---|---|
| | | BY WEIGHT | BY VOLUME | PER GALLON | GRAVITY | DENSITY |

VAPOR DENSITY HEAVIER THAN AIR        EVAPORATION RATE SLOWER THAN ETHER      63.58    73.25    9.291    1.115    8.06
--------------------------------------------------------------------------------

# SECTION IV - FIRE & EXPLOSION HAZARDS
--------------------------------------------------------------------------------

PROPER SHIPPING NAME - WATER BASED PRODUCT, DOES NOT SUSTAIN COMBUSTION        NONCOMBUSTIBLE (ASTM D4206)
    SHIPPING LABEL - KEEP FROM FREEZING LABEL                                  FLASHPOINT N/A


EXTINGUISHING MEDIA: Water based product.  Flashpoint for this product is listed as N/A or Not Applicable due to the
presence of water. If water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid.  If
needed, extinguishing agents for Class B fires may be used.


## 73-4383C                          PAGE:  2
--------------------------------------------------------------------------------

UNUSUAL FIRE & EXPLOSION HAZARDS:  Water based product. Sealed containers may explode if exposed to extreme heat.
Frozen containers may expand and leak contents when thawed. Water soluble liquids are non-accumulators of static charge.
Static protection precautions such as container bonding or grounding would not be necessary.  Flash point listed as N/A
or not applicable due to the presence of water.
SPECIAL FIRE FIGHTING PROCEDURES:  Water may be used to cool closed containers to prevent pressure buildup.  Keep people
away from any fire fighting operations involving chemicals. Wear a self-contained positive pressure breathing apparatus
in addition to full protective gear.

# SECTION V - HEALTH HAZARD
--------------------------------------------------------------------------------

EFFECTS OF OVEREXPOSURE: Irritation of the respiratory tract or acute nervous system depression characterized by headache
dizziness, staggered gait, confusion, unconsciousness, coma. There is no applicable information available regarding the
carcinogen potential for this product as a whole, however any relevant information regarding any ingredient's status
as a potential, suspect, or confirmed carcinogen is listed in SECTION V of the MSDS.
Chronic overexposure may cause blood disorders or damage to the blood-forming system.
Chronic overexposure may damage the liver and/or kidneys, blood cells, cause cardiac sensations, hearing effects,
and/or cause birth or fertility defects in lab animals.
Repeated and prolonged exposure to some solvents has been associated with permanent brain and nervous system damage.
Intentional misuse by deliberately concentrating & inhaling vapors from this product may be harmful or fatal.
This product contains ethylene glycol monobutyl ether which is on the New Jersey and Pennsylvania Right-to-Know List.
CAS# 111-76-2
Chronic overexposure may cause damage to the liver, kidney, eyes, and/or respiratory system.
This product contains 2-butanol or secondary butyl alcohol which is on the Massachusetts, Pennsylvania and New Jersey
Right-to-Know Lists:  CAS# 78-92-2
MEDICAL CONDITIONS PRONE TO AGGRAVATION BY EXPOSURE: Preexisting eye, skin, central nervous system, digestive
tract, and respiratory tract.  May adversely affect persons with liver, kidney & blood forming organ disorders.
ROUTE(S) OF ENTRY: Inhalation, skin contact absorption, eye contact.  Products that are free-flowing liquids or pastes
are not expected to have routes of exposure for dust.  Dried product residue may exhibit dust inhalation hazards.
INHALATION: May cause moderate irritation to the respiratory tract.  Overexposure may have toxic and/or narcotic effects.
May cause congestion, headache, dizziness, weakness, nausea, and/or drowsiness. FIRST AID:  Remove to fresh air.  If
breathing is difficult, give oxygen.  If not breathing, give artificial respiration and get emergency medical assistance.
EYE CONTACT:  Liquids or vapors may cause severe irritation and/or chemical burns to the eyes.  Chronic overexposure may
cause eye damage, conjunctiva or corneal injury. FIRST AID: Immediately flush eyes and eyelids with large
amounts of water for 15 min.  Hold eyelids apart to ensure flushing of the entire area.  Get prompt medical attention.
SKIN CONTACT: May cause moderate to severe skin irritation. May cause burning sensations, defatting and/or dermatitis.
Chronic overexposure may cause skin cracking and/or eczema. FIRST AID: Remove contaminated clothing and shoes.  Wash
area with soap and water.  Get medical attention as needed.
SKIN ABSORPTION: May be absorbed through skin tissues. Chronic overexposure to the skin without using protective
barriers (gloves, aprons, etc.) may cause toxic effects.
INGESTION: Single dose oral toxicity is low.  May cause irritation to the gastrointestinal tract.  Ingestion may
cause nausea, discomfort, diarrhea, dizziness and vomiting. FIRST AID: DO NOT INDUCE VOMITING! Contents of this product
pose an inhalation hazard. If aspirated into the lungs, may cause chemical pneumonitis and/or pulmonary edema which can
be fatal.  Never leave individual unattended, keep head low to prevent aspiration.  SEEK IMMEDIATE MEDICAL ATTENTION!
--------------------------------------------------------------------------------

# SECTION VI - REACTIVITY DATA
------------------------------------------------------------------------
STABILITY:    ____UNSTABLE  _XX_STABLE
INCOMPATABILITY (Materials to avoid): Keep away from all oxidizing materials, avoid strong acids & alkalis (caustics)
and never distill solvents to dryness.  Material can react violently under such conditions.
HAZARDOUS DECOMPOSITION PRODUCTS: Oxides of carbon, nitrogen and/or sulfur & other toxic gases and irritating vapors like
aldehydes, amines, HCN, and incompletely burned hydrocarbons.
HAZARDOUS POLYMERIZATION: ____May Occur  _XX_Will Not Occur
CONDITIONS TO AVOID:  Container is not a pressure vessel. Never use pressure to empty.  Use safe warehousing and
handling procedures for drums, pails, containers, etc. Do not stack 5 gallon pails more than 5 high.
------------------------------------------------------------------------

# SECTION VII - SPILL OR LEAK PROCEDURES
------------------------------------------------------------------------
STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED: Dike spilled area and collect with inert absorbent material.
If in a confined area, avoid breathing vapors and use a respiratory protection device (See Section VIII).  Follow
local, state and federal spill notification procedures.


## 73-4383C                          PAGE:  3
------------------------------------------------------------------------
WASTE DISPOSAL:  Consult licensed waste handling and/or transportation facility.  Follow local, state, provincial
and federal waste regulations. Do not incorporate into municipal sewage treatment facilities.  Empty containers
retain product residue, follow label and MSDS warnings even after container is emptied.
------------------------------------------------------------------------

# SECTION VIII - SAFE HANDLING & USE INFO
------------------------------------------------------------------------
RESPIRATORY PROTECTION:  In outdoor or open areas with unrestricted ventilation, if needed, use NIOSH approved dust
mask to protect from overspray airborne particulates.  In restricted areas use NIOSH approved organic vapor respirator
with dust particulate pre-filter. Supplied air systems or intrinsic safe PAPR systems with organic vapor protection
may be used, consult OSHA respirator standard and check with a safety supplier for respirator system specifications.
VENTILATION:  Provide sufficient ventilation to keep dust/ airborne particulate and organic vapor concentrations below
OSHA personal exposure limits (PEL). Remove all smoke, dust, or fumes formed by welding, flame cutting, sanding or
grinding surfaces coated with this material.  Provide proper respiratory protection if ventilation or exhaust
is inadequate.
SKIN PROTECTION REQUIREMENTS:  Chemical resistant gloves are recommended, neoprene, nitrile, or butyl rubber.  Cover
as much of the exposed skin as possible with appropriate impervious clothing.  If skin creams are used, keep the area
protected by the cream to a minimum.  Do not use skin creams to protect skin when working with acids or acid catalysts.
EYE PROTECTION: Eye protection should be worn in any type of industrial operation. The use of chemical goggles and a full
face shield to prevent splash from liquids is recommended. Contact lenses should not be worn.
OTHER PROTECTIVE EQUIPMENT:  The use of chemical resistant protective suit is suggested. Avoid any skin contact with
vapors, mists, or spray.  Prevent contact of materials with clothing if possible.  Remove and wash contaminated clothing
before re-use.  Use an industrial type professional cleaning service, do not wash at home.  Do not wear contaminated
clothing or shoes away from the workplace.  Leather products contaminated with this product should be discarded.
HYGIENIC PRACTICES: Emergency eye wash stations and safety showers are recommended.  Wash hands prior to eating, using
the washroom or smoking.  Precautions must be taken so that persons handling this product do not breathe the vapors or
have it contact the skin or eyes.  In spray operations, protection must be afforded against exposure to both vapor
and spray mist.
------------------------------------------------------------------------

# SECTION IX - SPECIAL PRECAUTIONS
------------------------------------------------------------------------
PRECAUTIONS TO BE TAKEN IN HANDLING AND STORAGE: Follow safe warehousing procedures. Avoid puncturing the container. Keep
containers away from excessive heat. KEEP FROM FREEZING!
OTHER PRECAUTIONS: Maintain a clean work area. Use only in a well ventilated area. VHAP=VOLATILE HAZARDOUS AIR POLLUTANT
CAUTION! DO NOT TAKE INTERNALLY. Avoid breathing vapor/dust.
WARNING! This product contains chemicals known to the State of California to cause cancer or reproductive harm.
NOTICE: The HMIS rating for this material involves data and interpretations compiled from the various material suppliers
of the component ingredients.  This information will vary from supplier to supplier.  The rating is intended for rapid
and general identification of this product's hazards.  To adequately deal with the safe handling of this material, all

information contained in the MSDS must be reviewed as part of an ongoing Hazard Communication Program.

This product complies with the Toxic Substances Control Act (TSCA) 40 CFR 700-799. The Material Safety Data Sheet (MSDS) complies with 29 CFR 1910.1200, Hazardous Communication Std. In the event of a TRANSPORTATION RELATED INCIDENT involving this product, CALL 1-800-688-4005. VOC content is determined by EPA method 24.

# ENGINEERING REPORT

### DECEMBER 28, 2022

| | |
|---|---|
| **PREPARED FOR:** | **CLENDENING JOHNSON & BOHRER, PC**<br>**409 W PATTERSON DR; STE 205**<br>**BLOOMINGTON, INDIANA 47403** |
| **ATTENTION:** | **BENJAMIN KATCHUR, ESQ** |

| | |
|---|---|
| **INSURED:** | **GAS-FIRED PRODUCTS, INC** |
| **LOSS LOCATION:** | **6231 MACBETH ROAD**<br>**FORT WAYNE, INDIANA** |
| **DATE OF LOSS:** | **MARCH 19, 2019** |
| **FILE NUMBER:** | **N/A** |
| **CLAIM NUMBER:** | **C269498** |
| **EI FILE NUMBER:** | **EI-22-141** |

## THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE.  RELEASE TO ANY COMPANY, CONCERN OR INDIVIDUAL IS SOLE RESPONSIBILITY OF ADDRESSEE.



EXHIBIT

Gas-Fired Products, Inc.                    2                    December 28, 2022
Claim № C269498

# Introduction

During the late evening of March 19, 2019, a fire occurred at the Republic Services Waste Disposal, Recycling and Trash Pickup industrial site on Macbeth Road in Fort Wayne, Indiana.  The fire originated at the southern extent of Building 1 that was utilized for dumpster repair/rework and storage as shown in the dotted red circle in *Figure 1*.



**Figure 1 - Republic Services Site**

Jim Foster, CFI and fire investigator working in the interests of Republic Services of Indiana, LP (Republic Services), opined that "Paint and other flammable products used in the repair of trash dumpsters collected on and inside the tube heaters and ignited."[1]

---

[1] *Expert Report*, by James P. Foster, CFI, CEFI, CVFI, dated November 18, 2022, p.1

Gas-Fired Products, Inc.                      3                    December 28, 2022
Claim № C269498

The LP gas-powered tube heaters were reportedly manufactured by the Insured, Gas-Fired Products, Inc. and were reportedly installed by Coe Heating & Air Conditioning, Inc. (Coe HVAC). Coe HVAC reportedly completed installation of the tube heaters on or before February 4, 2019.

Mike Vergon, CFI and Fire Investigator of Vergon & Associates Fire Investigation, LLC, was assigned by Clendening Johnson & Bohrer, PC to investigate the origin and cause of the fire. On or about May 16, 2022, Mr. Vergon contacted the author of this Engineering Report, Scott A Jones, PE of Engineering Investigation, LLC. Mr. Vergon requested the author's assistance in the inspection and evaluation of the tube heaters that had been previously removed from the loss site. The author did not visit the loss site. The scope of the author's duties did not include a complete fire origin and cause investigation.

In preparation for writing this Report, the author reviewed: National Oceanic & Atmospheric Administration (NOAA) regional weather; *Space-Ray Installation and Operating Instructions*, dated December 2017; *Expert Report*, by James P. Foster, CFI, CEFI, CVFI, dated November 18, 2022; Sheboygan Paint Company *Water Reducible Protective Enamel Technical Data Sheet*, undated; Report of Findings, by James P. Foster, CFI, CEFI [sic], CVFI, dated December 3, 2019; Sheboygan Paint Company, *Medium Blue WR Protective Enamel Product Specification* (MSDS), printed 12/01/14; white paper regarding code-compliance authored by Mr. Nicholas Ozog and dated November 18, 2022; deposition transcript of Mr. Fred Jones, Republic Services worker; deposition transcript of Mr. Terry Reader, Republic Services worker; loss site inspection photographs recorded by Mr. Vergon on March 3, 2020 and May 11, 2020; provisions of NFPA 54 – 2018 Edition, *National Fuel Gas Code*; provisions of NFPA 211 – 2019 Edition, *Standard for Chimneys, Fireplaces, Vents, and Solid Fuel Burning Appliances*; and Republic Job Material List (Front Sides and Back Sides) supplied by counsel on December 1, 2022.

Gas-Fired Products, Inc.        4        December 28, 2022
Claim № C269498

# Background

Mr. Foster provided a chronology of events in his *Expert Report* of November 18, 2022. In bulletized form, locations and events were as follows:

- The area where the fire originated was at the south end of the building where trash dumpsters were repaired and repainted.

- The dumpster maintenance included repairing, sanding, patching, and repainting the dumpsters.

- Work in this area included the use of flammable and other combustible materials.

- Welding was also done when needed to repair metal components. On the date of the fire, work had been completed in the area of origin. This work included welding to repair trash dumpsters.

- Sanding and painting operation had been done during the day.

- Work was completed around 3:00 p.m., and employees had cleaned up the area following the completed work day.

- There were no indications of any problems at the time the employees left the facility at 4-4:30 p.m.

- A facility manager had completed a walkaround that included the maintenance facility and the area where work had been done. There was no indication of any problems when that observation was completed at 6:00 to 6:30 p.m.

- Three Space Ray Ceiling tube infrared heaters, model PT125-30L5 had been installed in the paint and welding shop area within the past two months. The heaters were supplied by electrical power and propane fuel. There had been no reported problems related to the heat prior to the fire event.

Gas-Fired Products, Inc.                          5                    December 28, 2022
Claim № C269498

## Regional Weather Conditions

The author downloaded historic regional weather conditions from the National Oceanic & Atmospheric Administration (NOAA). The weather conditions were reported from Fort Wayne International Airport (KFWA) via hourly METAR (aviation) weather observations. The data was compiled using the NOAA Local Climatological Data (LCD) service.

Fort Wayne International Airport was situated 3.8 miles to the south southeast of the loss site.

The overnight temperature in the days preceding the loss were near or below freezing as shown in the table:

| Date | Daily LOW Temperature | Precipitation |
|---|---|---|
| March 15 | 34°F | Rain & snow |
| March 16 | 29°F | None |
| March 17 | 25°F | Snow |
| March 18 | 27°F | None |
| March 19 | 28°F | None |

It is reasonable to believe that the subject tube heaters, if operational, would have been used to maintain temperature in the Painting Area.

# Observations

On August 23, 2022, the author inspected the remnants of the three PTS125-L5 single-pass, single-stage tube heaters that had been previously removed from the loss site. The heaters reportedly had been installed in an east-west arrangement. Accordingly, site inspection attendees marked the heater remnants as SOUTH, NORTH, and MIDDLE heaters.

## MIDDLE Heater Inspection

The MIDDLE heater head was presented as shown in *Figure 2*.

Gas-Fired Products, Inc.                    6                    December 28, 2022
Claim № C269498



**Figure 2 - MIDDLE Heater Remnants**

As shown in ***Figure 2***, the MIDDLE Heater head was presented with a LP gas supply piping segment, appliance connector, and a portion of the single-wall intake (combustion air supply) duct. All items were damaged from the heat of the fire and/or building collapse.

The brass LP gas jet was melted such that identification of orifice size could not be determined (***Figure 3***). The LP gas combination gas valve was a re-solidified pool of aluminum (***Figure 4***).



**Figure 3 - Melted Brass Jet**

Gas-Fired Products, Inc.
Claim № C269498

7

December 28, 2022



**Figure 4 - LP Gas Combination Valve**

Exhaust gases from the heater were routed outdoors via double-wall Type B vent. Transition through the roof sheathing was accomplished via roof flashing and storm collar (*Figure 5*).



**Figure 5 - Type B Vent with Roof Flashing and Storm Collar**

Gas-Fired Products, Inc.                    8                    December 28, 2022
Claim № C269498

Inspection of the inner surfaces of the aluminized steel heater tube revealed no blue paint deposits or foreign material(s) (*Figure 6*).



**Figure 6 - MIDDLE Heater Tube**

The aluminum *inner* tube in the Type B vent[2] had completely melted away as shown in *Figure 7*.



**Figure 7 - Type B Vent Inner Aluminum Tube Melted**

---

[2] All Type B vent inner aluminum tubes for all three heaters exhibited melting. The outer tubes were composed of galvanized steel.

Gas-Fired Products, Inc.                           9                           December 28, 2022
Claim № C269498

## SOUTH Heater Inspection

As shown in *Figure 8*, the SOUTH heater head was presented for inspection with the combustion air intake attached along with the appliance connector and lacquered steel LP gas supply drip leg.



**Figure 8 - South Heater Head with Combustion Air Intake**

The heater was equipped with a properly-sized[3] 30 LP gas orifice (*Figure 9*).



**Figure 9 - Drill Size 30 LP Gas Orifice**

---

[3] *Space-Ray Installation and Operating Instructions*, dated December 2017

Gas-Fired Products, Inc.                    10                    December 28, 2022
Claim № C269498

Inspection of the inner surfaces of the aluminized steel heater tube revealed re-solidified aluminum drop down from the associated exhaust vent with no blue paint deposits. (*Figure 10*).



**Figure 10 - View into SOUTH Heater Tube**

The SOUTH heater transition through roof sheathing was accomplished via roof flashing and storm collar around a Type B vent (*Figure 11*).



**Figure 11 - SOUTH Heater Type B Vent with Flashing and Storm Collar**

Gas-Fired Products, Inc.                  11                December 28, 2022
Claim № C269498

## NORTH Heater Inspection

As shown in *Figure 12*, the NORTH Heater head was presented with a LP gas supply piping segment, appliance connector, and the starter collar/elbow segment for a single-wall intake (combustion air supply) duct.  All items were damaged from the heat of the fire and/or building collapse.  The LP gas combination valve body had melted (*Figure 13*).



**Figure 12 - NORTH Heater Head with LP Gas Supply Piping**



**Figure 13 - LP Gas Valve Melted**

Gas-Fired Products, Inc.                      12                      December 28, 2022
Claim № C269498

The brass LP gas orifice was recovered from the burner remnants.  The heater was
equipped with a proper drill size 30 LP gas orifice (*Figure 14).*



**Figure 14 - NORTH Heater Orifice**

The NORTH heater transition through the roof sheathing was accomplished via roof
flashing and storm collar around a Type B vent (*Figure 15*).



**Figure 15 - NORTH Heater Roof Transition and Firestop Spacer**

Gas-Fired Products, Inc.                         13                         December 28, 2022
Claim № C269498

A steel firestop spacer was recovered with the Type B vent section as shown in **Figure 15**. It appeared that firestop spacers were used in the ceiling exhaust transitions.

# Discussion

Direct inspection of the three heater heads revealed that all three heads were equipped with single wall tubes and flexible elbows to facilitate combustion air intake from an area other than the occupied space of the building of fire origin.

The front sheet of the Coe HVAC Bill of Materials (**APPENDIX**) for the Republic Services heater installation shows 10 feet of 30-gauge pipe was used during the installation of the heaters. 30-gauge pipe is often used for combustion air intake pipe as single wall vent (i.e., exhaust) pipe must be at least 26-gauge thickness.[4]

The Coe HVAC Bill of Materials also showed the use of 8 feet of 26-gauge pipe that may have been used as a connector to the Type B vents (i.e., double-wall vent pipe) that transitioned through the Attic.

From the author's artifact observations and Coe HVAC Bill of Materials, it is believed that the pre-fire heater configurations appeared in a manner similar to the unscaled layout created by the author (**Figure 16**).

As shown in **Figure 16**, fresh combustion air was drawn into each of the heaters from the Attic or through exterior wall(s) via 4-inch single wall piping attached to each of the heater heads. Exhaust air transitioned though the Attic using Type B vent.

The design is known as a direct-vent configuration whereby air moving through the heaters does not interact with the air in the heated volume. As such, aerosols, particulate, and vapors in the heated space are not drawn into the heaters' air stream. All piping downstream of the heater heads was at a positive (i.e., higher) pressure than the pressure in the room due to the action of the heater's blower.[5]

---

[4] 30-gauge pipe is thinner than 26-gauge pipe. Per NFPA 211-2019 Edition, ¶ 9.2, single-wall galvanized steel pipes used in gas appliance service as connectors must be constructed of 26-gauge or thicker material.
[5] The subject Space-Ray heaters are listed as NFPA 54-2018 Edition Category III appliances. A Category III appliance operates with a positive pressure (due to the combustion air blower) and has a high enough exhaust gas temperature to avoid excessive condensate production in the exhaust system.

Gas-Fired Products, Inc.                14                December 28, 2022
Claim № C269498



**Figure 16 - Radiant Heater Direct-Vent Air Flow Paths**

The *Space-Ray Installation and Operating Instructions*, offered direct-vent guidance to installers as a means to avoid interactions with detrimental environments:

**17.1) DIRECT OUTSIDE AIR FOR COMBUSTION**

*Outside combustion air should be supplied directly to the heater when the building is subject to negative pressure, or when contaminants or high humidity are present in the building air. These contaminants include paints, solvents, corrosive vapors or any other foreign particles that may cause damage to the heater or result in poor combustion.*

Gas-Fired Products, Inc.                 15                 December 28, 2022
Claim № C269498

# Conclusions

1. **Regional weather was not causal to the fire.** Review of the regional weather conditions at the time of the loss revealed that it was a calm but cold evening. There was no convective (i.e., thunderstorm) activity.

2. **The three Space-Ray tube heaters appeared to be installed and ready-to-run based upon heat demand.** All three heaters appeared with intact appliance connectors for connection to the building's LP gas distribution system. 2 of 3 gas isolation valves for the heaters were verified in the OPEN position. The third LP gas isolation valve was not destructively disassembled to facilitate direct inspection. All heaters' radiant tubes were intact with no penetrations.

   2 of 3 LP gas orifices were verified to be drill size 30, which was the proper diameter for a 125,000 BTU/hour LP gas Space-Ray tube heater. The third orifice had melted sufficiently to prevent orifice sizing.

   The vertical portions of the exhaust vents for all three heaters were proper double-wall Type B vent. No outdoor vent caps appeared with the evidence, but Type B vents often use all-aluminum cap construction; whereby the vent caps would not be expected to survive a fire.

3. **The internal surfaces of the heaters were not contaminated by paint residue as the air flowing through the heaters was obtained from outside and exhausted outside.** The heaters were installed in a direct-vent configuration whereby combustion air was obtained from uncontaminated air outside the heated space. The configuration was a manufacturer's recommended configuration.

4. **The Space-Ray infrared LP-fueled heaters created no conditions that were causal to the fire**. Although the heaters were extensively damaged by the action of the fire, there were no deleterious conditions discovered by careful inspection of the heater remnants.

Gas-Fired Products, Inc.                    16                    December 28, 2022
Claim № C269498

The opinions in this Report are given with a reasonable degree of engineering certainty.

This investigation was conducted in accordance with the Scientific Method as taught in National Fire Protection Association (NFPA) 921 – 2021 Edition, *Guide for Fire and Explosion Investigations*.  The analysis and conclusions are based upon information reviewed to date, plus general engineering knowledge and experience.  Information reviewed at a later date may warrant modifying or augmenting the conclusions, and the author reserves the right to supplement this Report.

Sincerely,



*December 28, 2022*

Scott A. Jones, PE CFEI CVFI
Registered Professional Engineer – Mechanical Engineering
Registered Professional Engineer – Electrical Engineering
Engineering Investigation, LLC

Gas-Fired Products, Inc.                    17                    December 28, 2022
Claim № C269498

# APPENDIX

Gas-Fired Products, Inc.                    18                    December 28, 2022
Claim № C269498

REPLACEMENT  MATERIAL  REQUISITION                REV. 11-1-2018

JOB NAME _Republic Services_    JOB # _ZOX/7Z -D_ DATE _1-10-19_

ADDRESS _6031 Macbeth Rd._  PHONE_____ INSTALL_____

TOOLS NEEDED: RECLAIMER_____ LADDER FT._____ HAMMER DRILL_____ OTHER_____

| PULL | USED | DESCRIPTION | | COST |
|------|------|-------------|--|------|
| | | | THERMOSTATS | |
| | | TH3110D1008 | DIGITAL NON PROG.    PRO 3000 | |
| | | TH4110D1007 | DIGITAL PROG.   PRO 4000 | |
| | | TH6220U2000 | 2H/2C      CONVENTIONAL | |
| | | TH6210U2001 | T6 STAT     PROG 7 OR 5-2 DAYS 2H-1C | |
| | | | | |
| | | **12 YEAR LABOR**     **NEEDS TO BE HIGHLIGHTED** | | |
| | | | | |
| 3 | 3 | Space heey PTS 125-30 LS #139400 Tube heaters 4192 | | |
| | | (LP GAS) | | |
| 3 | 4 ✓ | 4" flashings | | |
| 3 | 8 ✓ | 4" storm collars | | |
| 3 | 0 | wall thimbles   4" | | |
| 3 | 4 ✓ | 4" B-vent caps | | |
| 20' | 8' | 4" 26 g. pipe | | |
| 30' | 10' | 4" 30 g. pipe   5'ers | | |
| 10 | 13 | 4" Ell 's | | |
| 3 | 4 | 5' x 4" B-vent pipe | | |
| 3 | 0 | 3' x 4" B-vent pipe | | |
| 3 | 1 | 18" x 4" B-vent pipe | | |
| 80' | 40' | BX Cable   B-2 | | |
| 6 | 2 | 2x4 Electrical boxes | | |
| 3 | 0 | switches | | |
| 3 | 0 | 2x4 switch covers | | |
| 60' | | 3/4 Black Iron | | |
| 10' | | 1/2" Black Iron | | |
| 1 | | 3/4 + 1/2" mega Kit | | |

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2                  FORT WAYNE DIVISION

 3

 4

 5

 6  REPUBLIC SERVICES OF     )
    INDIANA, LIMITED         )
 7  PARTNERSHIP,             )
                             )
 8       Plaintiff,          )
                             )
 9       v.                  ) Case No. 1:21-cv-108-HAB-SLC
                             )
10  COE HEATING & AIR        )
    CONDITIONING, INC., and  )
11  GAS-FIRED PRODUCTS, INC. )
    d/b/a SPACE-RAY,         )
12                           )
         Defendants,         )
13  _____  )

14

15

16

17           DEPOSITION OF LAUREL MASON
18       The deposition upon oral examination of
    LAUREL MASON, a witness produced and sworn
19  before me, Andrea Wray, Notary Public in and
    for the County of Hendricks, State of Indiana,
20  taken on behalf of the Plaintiff via
    VIDEOCONFERENCE, on the 9th day of February,
21  2023, commencing at 11:21 a.m., in accordance
    with F.R.C.P 30, with written notice as to time
22  and place thereof.

23

24

25
```

EXHIBIT

Page 71

1     Q    I understand.

2          Did you rely on this portion of the MSDS

3     sheet -- and I'm talk- -- when I say "this", I'm talking

4     Exhibit 25, Page 3, where it says "non-combustible".

5          Did you rely on that portion of the MSDS sheet

6     in any way in generating your opinions in this case?

7     A    I relied more upon the information that's in

8     the physical data as well as the hazardous ingredients

9     and as well as extinguishing medians in fire and

10    explosion hazards.

11    Q    Okay.  Where it says "extinguishing media" and

12    then it says "water-based product" -- do you see that?

13    A    Yes, sir.

14    Q    That portion of the MES -- MSDS sheet -- does

15    that representation, where it says "water-based

16    product" -- did that have any bearing in any way on your

17    opinions -- in generating your opinions in this case?

18    A    Yes.

19    Q    Tell me more about that.

20    A    It's a water-based product.  It doesn't have a

21    flash point because it's a water-based product.  It's

22    primarily water; however, if you boil the product --

23    let's say, you have a fire where this paint is, and you

24    boil it, the water will boil off and then, because based

25    upon the solvents that are present, it could become a

Page 80

1    independently check for ignitable-liquid residues from

2    anything from the scene, correct?

3        A    Correct.

4        Q    Okay.  When you say, part two, that you've

5    been asked to formulate an opinion to determine the

6    likelihood of the ignition of paint due to the use of

7    the recently-installed Space-Ray heaters -- in your

8    opinion, does that get into the arena of cause and

9    origin, in any way?

10       A    No.

11       Q    And why not?

12       A    What I was asked to -- to do was to look at

13   the paint to see whether or not it could have been

14   ignited -- based upon its physical properties, could

15   have been ignited by the Space-Ray heaters -- or to look

16   at the -- the -- the blue paint, the characteristics of

17   the blue paint, to see if it was ignited by the heaters,

18   if it was possible.

19       Q    So, for that portion of your -- of the opinion

20   that you've been asked to formulate, what information

21   did you think you needed before opining on that?

22       A    The material safety data sheet, the

23   information about the product, the information that

24   Ms. Wells found in the paint, itself.

25       Q    Does the -- does the temperature of the Space-

1  going to get particulates from the paint up on the

2  heaters unless somebody is spraying it up there.  So,

3  how else do you explain that?

4        MR. GARDNER:  Objection.  Argumentative.  Form

5     of the question.  Incomplete hypothetical.  Assumes

6     facts not in evidence.

7     A    My understanding of this liquid, based upon

8  the density and the physical characteristics -- yes,

9  when they sprayed, it's atomized, but it's going to be

10  heavier than air.

11        So, the paint, itself, and the vapors, which

12  are heavier than the air, are not going to be all over

13  the spray area unless there's some type of mechanical

14  way to get it up there, by either spraying it up there

15  or by sucking the air or some type of ventilation system

16  that re- -- that pulls the spray-booth air up.

17     Q    Do you know anything about the ventilation

18  system that existed in the area where Republic Services

19  employees were spraying this paint?

20     A    No, sir.

21     Q    Okay.  I want to go back to your report --

22  give me one moment.  I need to pull it back up -- which

23  is Exhibit 6.  So, if you could, go there.

24        If you go Page 6 of Exhibit 6, it starts with

25  "analysis".  Do you see that?

Page 94

1   work area between 6:00 and 6:30 p.m. and did not observe

2   any problems."

3           Do you see that?

4       A   Yes.

5       Q   In generating your report, do you think that

6   information that a facility manager inspected the work

7   area and did not observe any problems -- does that

8   affect your opinion in any way?

9       A   Not really, no.

10      Q   Okay.  Why not?

11      A   There weren't any problems at that time.

12  My -- I was asked to determine whether or not the paint

13  could ignite on the heaters after the temperature or the

14  thermostat kicked on, on the Space-Ray heaters and

15  ignited the heaters -- whether or not the paint could

16  ignite.

17      Q   I want to go to Page 7.  There's a portion of

18  a sentence and it then it goes -- sorry.  One moment.

19          He -- do you see where I'm at, Page 7 of

20  Exhibit 6?

21      A   Yes, what -- what -- where are we?

22      Q   Very top of the page.  It says, "He does not

23  describe what methodology he used to exclude other

24  sources of ignition when he readily identified cutting

25  and welding operations were part of the use of this

Page 107

1   BY MR. JONES:

2       Q    So, I'll -- I'll go ahead and say, that was a

3   terrible question, Laurel.  I don't think it was

4   argumentative, but I'll rephrase because that was a very

5   poor question.  Okay.

6           When we're looking at Page 8 of Exhibit 6, you

7   identify -- you say, "Republic 00603 does not identify",

8   I'm going to say, one, "the area swabbed with gauze".

9           Does the fact that the -- that that photograph

10  doesn't identify the area swabbed with gauze -- does

11  that, in your opinion, cause the evidence collected to

12  be illegitimate or unreliable?

13          MR. GARDNER:  Object to form regard- --

14      objection to the form, use of the word

15      "illegitimate."

16          MR. HEHNER:  Objection as to form.

17      A    It's improper evidence collection.  There's no

18  documentation to show -- all we have is Mr. Foster's

19  word of where he collected the evidence.  There's no

20  documentation to show what he did and whether, in fact,

21  it was removed from that location.

22          Yes, it -- it's -- it has a great deal to do

23  with the integrity of the evidence.

24      Q    Right.  You described earlier what you

25  described -- what you called a legitimate piece of

Page 132

1                    CERTIFICATE OF REPORTER

2

    STATE OF INDIANA)

3

    COUNTY OF HENDRICKS)

4

5          I, ANDREA KOMARIDIS WRAY, Court Reporter,

6    certify that the foregoing proceedings were taken before

7    me at the time and place therein designated; that my

8    shorthand notes were thereafter translated under my

9    supervision; and the foregoing pages, numbered 1 through

10   130, are a true and correct record of the aforesaid

11   proceedings.

12

13         I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

           DATED this 23rd day of February, 2023.

19

20

21

22         ANDREA KOMARIDIS WRAY
           NOTARY PUBLIC

23         COMMISSION NUMBER NP0743903
           COMMISSION EXPIRES 09/25/2030

24

25

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
2                       FORT WAYNE DIVISION
3                    CASE NO. 1:21-CV-00108
4    REPUBLIC SERVICES OF INDIANA,      )
     LIMITED PARTNERSHIP,               )
5                                       )
              Plaintiff,                )
6                                       )
     vs.                                )
7                                       )
     COE HEATING & AIR CONDITIONING,    )
8    INC.; and GAS-FIRED PRODUCTS,      )
     INC. d/b/a SPACE-RAY,              )
9                                       )
              Defendants.               )
10   _____
11
12        The video deposition upon oral examination of
13   JAMES P. FOSTER, CFI, CFEI, CVFI, a witness
14   produced and sworn before me, Lisa C. Pierce, a
15   Notary Public in and for the County of Hamilton,
16   State of Indiana, taken on behalf of the Defendants
17   at Lewis Kappes, One American Square, Suite 2500,
18   Indianapolis, Marion County, Indiana, on
19   January 24, 2023, commencing at the hour of
20   11:16 a.m., pursuant to Applicable Rules of
21   Procedure, with written notice as to time and place
22   thereof.
23
24
25   Job No. CS5675427

**EXHIBIT**

Page 125

1          water from it, which is what happened in this case.
2          The heaters basically dried off or boiled off
3          the -- the water which became adhered to the
4          surfaces and basically dried on those surfaces.
5          It's not a liquid product anymore; it's dried.
6     QUESTIONS BY MR. GARDNER:
7     Q.   Okay.  So your opinion in this case as to the
8          ignitability or combustibility of Blue Sheboygan is
9          regarding its dry form, right, instead of its wet
10         form?
11    A.   I would say yes.
12    Q.   Tell me about all the tests you've done to confirm
13         that dry Blue Sheboygan paint can ignite or combust
14         or sustain combustion.
15            MR. JONES:  Objection to form.
16            THE WITNESS:  I've not done any tests.  I've
17         only went by what the company's -- the
18         manufacturers of paints stated.  And --
19            MR. GARDNER:  (Unintelligible.)
20            THE WITNESS:  -- their MSDS sheets.
21            MR. JONES:  Let him finish.
22            MR. GARDNER:  Go ahead.  Done?
23            THE WITNESS:  Yep.
24    QUESTIONS BY MR. GARDNER:
25    Q.   Okay.  So you have not tested the hypothesis that

Page 126

1        you have that dry Blue Sheboygan paint is
2        ignitable, combustible, or sustains combustion.
3                MR. JONES:  Objection to form.
4                THE WITNESS:  I have not tested that
5        hypothesis.  The only thing I have is the MSDS
6        sheets and also lab report that says there was
7        medium and heavy -- and I think aromatic or aromic
8        (phonetic) material that was found in those con --
9        in the samples that was sent in.
10               MR. GARDNER:  The word's aromatic.
11               THE WITNESS:  Aromatic, yeah.
12    QUESTIONS BY MR. GARDNER:
13    Q.   So in connection with your conclusion, a/k/a
14         opinion, stated in your December 3rd, 2019,
15         Paragraph 3, Page 2 report, you -- you indicate at
16         the end, the last sentence -- you can read it if
17         you want -- Paint and other flammable products used
18         in the repair of trash dumpsters collected on the
19         tube heaters and ignited, right?
20    A.   Right.
21    Q.   You didn't use the word "in" there, did you?
22    A.   I didn't use the word "in," no.  I --
23    Q.   I thought in your -- your last report, which is
24         Exhibit G, dated November 18th, 2022, you indicated
25         that none of your opinions had changed from your

Page 163

1            THE WITNESS:  No --

2            MR. JONES:  -- speculation.

3            THE WITNESS:  -- I do not.

4   QUESTIONS BY MR. GARDNER:

5   Q.    The next says, A number of electrical panels for

6         building.  Do you see that?

7   A.    Yes.

8   Q.    You agree with that, don't you?

9   A.    Yes.

10           MR. JONES:  Objection to foundation.

11  QUESTIONS BY MR. GARDNER:

12  Q.    You observed numerous electrical panels inside of

13        building number 1 in your site inspections.

14  A.    Yes.

15  Q.    And you photographed them.

16  A.    I photographed some that -- in the -- the exterior

17        of the building and also photographed some

18        throughout the building.

19  Q.    Yeah.  I'm just referring to building number --

20  A.    Building 1 as well, yes.

21  Q.    Right.  But you didn't collect any of that, did

22        you?

23  A.    No, we did not.

24  Q.    It was never tested, was it?

25           MR. JONES:  Objection to foundation.

1            THE WITNESS:  There was no testing done.

2     QUESTIONS BY MR. GARDNER:

3     Q.    Of the electrical components including these

4           electrical panels, right?

5     A.    Correct.

6            MR. JONES:  Same objections.

7     QUESTIONS BY MR. GARDNER:

8     Q.    It next says, Three overhead doors and one on the

9           other side.  Far door had electric.  All others

10          were manual.  Do you see that?

11    A.    Yes.

12    Q.    Would that be your understanding that the white

13          door on the far south side of the building number 1

14          in Exhibit Z is -- was electrically operated, but

15          the two blue ones were not?

16            MR. JONES:  Objection to form, foundation.

17            MR. GARDNER:  He --

18            MR. JONES:  Misstates the document.  It

19          doesn't say --

20            THE WITNESS:  I don't know anything about this

21          pape -- paper.  But I -- I assume that there --

22          they would have to be correct, yes.  If it came

23          from Fred Jones; he knows about the facility.

24    QUESTIONS BY MR. GARDNER:

25    Q.    So these seven pages of Exhibit D, you never looked

Page 408

STATE OF INDIANA      )
                      ) SS:
COUNTY OF HAMILTON    )


        I, Lisa C. Pierce, a Notary Public in and for

the County of Hamilton, State of Indiana at large,

do hereby certify that JAMES P. FOSTER, CFI, CFEI,

CVFI, the deponent herein, was by me first duly

sworn to tell the truth, the whole truth, and

nothing but the truth in the aforementioned matter;

        That the foregoing video deposition was taken

on behalf of the Defendants at Lewis Kappes, One

American Square, Suite 2500, Indianapolis, Marion

County, Indiana, on January 24, 2023, commencing at

the hour of 11:16 a.m., pursuant to Rules of

Applicable Procedure;

        That said video deposition was taken down in

stenographic notes and afterwards reduced to

typewriting under my direction, and that the

typewritten transcript is a true record of the

testimony given by said deponent; and thereafter

presented to said deponent for his signature;

        That the parties were represented by their

aforementioned counsel.

        I do further certify that I am a disinterested

Page 409

1   person in this cause of action; that I am not a

2   relative or attorney of any party, or otherwise

3   interested in the event of this action, and am not

4   in the employ of the attorneys for any party.

5        IN WITNESS WHEREOF, I have hereunto set my

6   hand and affixed my notarial seal this 1st day of

7   February, 2023.

8

9

10

11

12

13                    N O T A R Y   P U B L I C

14

15

16   My Commission Expires:

     March 14, 2029

17

18   County of Residence:

     Hamilton

19

20

21

22

23

24

25

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF INDIANA

3                   FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7            Plaintiff,        Case Number 1:21-CV-00108

8    v.

9    COE HEATING & AIR CONDITIONING,

10   INC.; and GAS-FIRED PRODUCTS, INC.

11   d/b/a SPACE-RAY,

12           Defendants.

13   _____

14

15

16

17         REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                JOHN H. DIGGLE, III, P.E.

19               Taken Friday, March 10, 2023

20               Scheduled for 1:00 p.m. EST

21

22                                            EXHIBIT

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

     Job No. CS5768515

25

1    there's kind of a long rectangle that abuts the

2    southern wall.  Do you know what that is and

3    what you were intending to represent by that?

4    A.    Yeah, that's most likely the electrical

5    service panels, and it's their location, I

6    believe.

7    Q.    Okay.  So they were located in the

8    southeast corner of the building basically?

9    A.    That's correct, yeah.

10   Q.    Okay.  Let me just skip a page and go to

11   your last page.  It actually says page 1 of 1.

12   It looks like that, John.

13   A.    Yeah.  I got that.

14   Q.    Okay.  So it's dated May 11th of 2020,

15   so roughly two months later it appears to me

16   from the other notes we've been reading,

17   correct?

18   A.    Yes.

19   Q.    Were you back at the site on May 11th,

20   do you recall?

21   A.    Yes, I was.

22   Q.    Okay.  Let's see if I can read these

23   correctly, your notes from May 11th of 2020.

24   "Electric enters at south end of building.

25   Extensive thermal damage to breakers - all

1    charred."  Then I think you wrote, "Switch

2    boxes in four-inch junction boxes - destroyed.

3    Conduit is destroyed and in pieces.  Fire melt

4    extensive to copper conductors."

5            Is that the reason why the electrical

6    systems were not gathered into evidence and

7    taken to the Rimkus lab, because of this

8    extensive damage?

9               MR. JONES:  Objection to the form

10   and foundation.

11              THE WITNESS:  That was a factor for

12   sure.  Yeah, the extensive damage, our

13   inability, in my opinion, to -- for there to be

14   any realistic likelihood that we were going to

15   be able to reconstruct the electrical system to

16   determine which came from -- you know, what

17   piece of wire came from where, that -- all of

18   that kind of came together in that decision.

19   BY MR. GARDNER:

20   Q.    Okay.  And was that a joint decision

21   involving you and Mr. Inendino and Mr. Foster?

22   A.    Well, regarding the electrical system,

23   that was probably solely my input to it.  They

24   were probably -- I mean, they were welcome to

25   voice their opinions about it, but they were

1    probably just accepting my leadership on that

2    topic.

3    Q.    Would it be fair to say that due to the

4    extensive damage to the electrical systems, as

5    you have notated here on May 11th, 2020, in

6    your notes, along with the extensive damage to

7    the building and the total collapse, did you

8    conclude that it wouldn't make any difference

9    to gather it and take it down to the lab and

10   use scanning electron microscopes for the

11   reasons you just said, the damage is just too

12   extensive for that testing to be of any

13   meaning?

14   A.    I would characterize it as I -- it was

15   my opinion at the time and still is that due to

16   the extent of damage, doing that -- doing the

17   work of collecting it, going through a lab

18   exam, possibly doing metallurgy on it, like you

19   discussed, was very unlikely to be fruitful as

20   far as making any definitive conclusions about

21   the electrical system.

22   Q.    In other words, even if you took it to

23   Indianapolis and examined it and tried to do

24   arc mapping and tried to look at it with a

25   scanning electron microscope and other means

Page 24

1    and methods of your expertise, you wouldn't be

2    able to rule in or out electrical as a cause of

3    the fire?

4              MR. JONES:  Objection to form.

5              THE WITNESS:  I think that's a -- I

6    would agree with that, yes.

7    BY MR. GARDNER:

8    Q.     Okay.  Do you know a fellow named Mike

9    Vergon?

10   A.     Yes.

11   Q.     Have you worked other cases involving

12   Mike Vergon other than this one?

13   A.     Yes.

14   Q.     We took his deposition under oath on

15   January 19th, 2023, and I'm going to read you

16   just a little bit of his deposition.  And this

17   was a question by plaintiff's counsel,

18   Mr. Thomas Jones, page 42, line 18.

19              "Mike..." meaning Mike Vergon "Are you

20   aware of Mr. Inendino providing any cause and

21   origin opinions in this lawsuit?"

22              Answer, "Yes."

23              Question, "And what is the form of those

24   opinions?"

25              Answer, "At the scene when I asked him

Page 38

REPORTER'S CERTIFICATE

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF HENNEPIN    )

I hereby certify that I reported the remote deposition of JOHN H. DIGGLE, III, P.E. on Friday, March 10, 2023, in Maple Grove, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition transcript by the witness was waived.

WITNESS MY HAND AND SEAL THIS 30th day of March, 2023.

*Dana Anderson*

Dana S. Anderson-Linnell
Notary Public, Hennepin County, MN
My commission expires 1/31/2025

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF INDIANA
3                      FORT WAYNE DIVISION
4

5

REPUBLIC SERVICES OF              )
6   INDIANA, LIMITED                  )
PARTNERSHIP,                      )
7                                     )
                   Plaintiff,      )   Case No. 1:21-CV-00108
8                                     )
vs.                               )
9                                     )
COE HEATING & AIR                 )
10   CONDITIONING, INC.; and          )
GAS-FIRED PRODUCTS, INC.          )
11   D/b/a SPACE-RAY,                  )
                                  )
12                   Defendants.      )
                                  )
13

14

15

16

17

18          REMOTE DEPOSITION OF NICHOLAS OZOG, P.E.
19                     February 2, 2023
20

21

22

23

24   Job No. CS5682475
     Reported by:
25   Vanessa S. Gosney, CSR #752, RPR

Page 19

1          MR. JONES:  Objection to form.

2          THE WITNESS:  In prior work experience I've

3   written reports addressing fire losses.  As

4   specific to cause and origin, I can't recall.

5          Q.   BY MR. GARDNER:  And you'll concede that

6   in this case your report does not contain any

7   opinions of yours in the realm of the origin of

8   this fire, correct?

9          MR. JONES:  Objection to form.

10          THE WITNESS:  Our report was -- my report

11   was limited to evaluating the installation and area

12   of the heater.

13          Q.   BY MR. GARDNER:  Right.  So you'll

14   agree, your report does not contain any opinion

15   from you as to the origin or the cause of this

16   fire, correct?

17          A.   Correct.

18          Q.   Okay.  Did you personally conduct any

19   flame tests to the Sheboygan blue enamel paint that

20   is alledgedly involved in this case?

21          MR. JONES:  Objection to form.

22          THE WITNESS:  I did not conduct any testing.

23          Q.   BY MR. GARDNER:  And in fact, you didn't

24   conduct any testing of any kind of anything in this

25   case, did you?

Page 20

```
 1          A.    I did not conduct any testing.
 2          Q.    And have you seen the results of any
 3    testing of the blue Sheboygan paint as to its
 4    flammability?
 5          MR. JONES:  Objection to form.
 6          THE WITNESS:  I have the SDS sheet from
 7    Sheboygan Paint.
 8          Q.    BY MR. GARDNER:  Other than that, have
 9    you seen the results of any testing conducted
10    involving this case of the flammability or
11    combustibility of the blue enamel Sheboygan paint?
12          A.    Not that I can recall.
13          Q.    All right.  Have you ever spoken to
14    Ms. Sherry Wells?  She's one of plaintiff's
15    nonretained experts.
16          A.    No.
17          Q.    Have you read the deposition of
18    Ms. Sherry Wells?
19          A.    No.
20          Q.    Have you read the report of Ms. Sherry
21    Wells?
22          A.    I don't believe so.
23          Q.    I think your report mentions that -- and
24    your materials list is --  materials -- I'm sorry,
25    some information supplied to you is the deposition
```

Page 56

1   to give an explanation every time I find a question

2   objectionable, I can do that, but I think it's

3   going to drag the depositions out, it's going to

4   interfere with your flow of questioning, and I'm

5   trying to reduce interference with your question.

6           So when you ask him, does he think

7   something, I think you're asking him to speculate.

8   And I'm just trying --

9       MR. GARDNER:  Do you want me to change it to

10  opinion?  I can do that.

11      MR. JONES:  I am just trying to reserve my

12  objection.

13      Q.   BY MR. GARDNER:  In your opinion, Nick,

14  is blue enamel Sheboygan paint a flammable finish

15  when it is wet and has not dried?

16      MR. JONES:  Same objection.

17      THE WITNESS:  We would need to do additional

18  testing to evaluate once it's been applied to a

19  substrate to identify if it is combustible or not.

20      Q.   BY MR. GARDNER:  Same question, do you

21  hold an opinion whether the blue enamel Sheboygan

22  paint is a flammable finish after it's dried on

23  metal?

24      A.   We would need to evaluate if that finish

25  is combustible on metal.

1      Q.    Which you haven't done?

2      A.    No.

3      Q.    You used the term "flammable finish"

4   several times throughout your report having counted

5   them all, but in terms of your phraseology in your

6   report of a flammable finish, what flammable finish

7   inside of Building number 1 are you talking about?

8      A.    The application of flammable finishes as

9   defined and referenced in national recognized

10  standards as well as NFPA 33.

11     Q.    I'm asking you inside of Building number

12  1 on March 19th, 2019, can you identify a flammable

13  finish that was in there?

14     A.    May you rephrase the question?

15     Q.    You have utilized throughout your report

16  reference to terminology "flammable finish" and

17  "flammable finishes."  I'm asking you, what in your

18  opinion were the flammable finishes located or

19  utilized inside of Building number 1 on March 19th,

20  2019?

21     A.    And so with that it's the application of

22  flammable finishes.  And as defined by NFPA 33,

23  that includes water-based paints.

24     Q.    In their liquid form or their dry form?

25     A.    It is the application.  So it would be

Page 59

1    Sheboygan paint to see whether it's flammable while

2    it's being applied, while it's being sprayed.  You

3    haven't done that?

4         A.   We have not conducted testing on the

5    blue Sheboygan paint.

6         Q.   So in your opinion, if I held up a flame

7    and a sprayer, the kind of airless sprayer that

8    Republic used inside of that room, Building number

9    1, on March 19th and I sprayed it at the flame,

10   you're telling me you think it would combust or

11   ignite or not?

12        MR. JONES:  Objection to form.

13        THE WITNESS:  I'm not going to speculate in

14   terms of that.

15        Q.   BY MR. GARDNER:  Because you don't know.

16   You don't know what would happen, do you?

17        MR. JONES:  Objection to form.

18        THE WITNESS:  Is that a question?

19        Q.   BY MR. GARDNER:  Yes.

20        A.   I don't know.

21        Q.   Setting aside the blue Sheboygan paint,

22   are you aware of the presence of any other

23   flammable finishes utilized inside of Building

24   number 1 on March 19th, 2019?

25        A.   There was an index provided from

Page 228

1    REPORTER'S CERTIFICATE
     STATE OF IDAHO   )
2                     )  ss.
     COUNTY OF ADA    )

3

4        I, MISTI L. LATHAM, Certified Shorthand
5    Reporter and Notary Public in and for the State of
6    Idaho, do hereby certify:
7        That prior to being examined, the witness
8    named in the foregoing deposition was by me duly sworn
9    remotely to testify to the truth, the whole truth,
10   and nothing but the truth;.
11       That said deposition was taken down by me in
12   shorthand at the time and place therein named and
13   thereafter reduced to typewriting under my
14   direction, and that the foregoing transcript
15   contains a full, true and verbatim record of said
16   deposition.
17       I further certify that I have no interest in
18   the event of the action.
19       WITNESS my hand and seal this 17th day of
20   February, 2023.

21

22                    MISTI L. LATHAM
                      RPR and Notary
23                    Public in and for the
                      State of Idaho.

24

25   My Commission Expires:  7-7-27

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF INDIANA

3                  FORT WAYNE DIVISION

4    _____

5    REPUBLIC SERVICES OF INDIANA,

6    LIMITED PARTNERSHIP,

7           Plaintiff,

8        v.                          Case No.

9    COE HEATING & AIR CONDITIONING,    1:21-cv-108-HAB-SLC

10   INC. and GAS-FIRED PRODUCTS,

11   INC. d/b/a SPACE-RAY,

12          Defendants.

13   _____

14            VIDEOCONFERENCE DEPOSITION OF

15                  DAVID ABRAHAM

16   DATE:          Wednesday, March 29, 2023

17   TIME:          1:01 p.m.

18   LOCATION:      Remote Proceeding

19                  Sylvania, OH 43560

20   REPORTED BY:   Suzannah Clemons, Notary Public

21   JOB NO.:       5777920

22

23                                    EXHIBIT

24                                       S

25

Page 22

1      A     Correct.

2      Q     Okay.  A property's value is also impacted

3   by the buildings and businesses that surround it.

4   Would you agree with that statement?

5      A     Correct, yes.

6      Q     Okay.  I'm going to open what we marked as

7   Exhibit A -- or I'm sorry, Exhibit 1 for your

8   deposition.  It's just a copy of your report, so if

9   you have that up, that'll be fine for you to use.  I'm

10  going to share my screen, Suzannah, if that's okay.

11  It looks --

12               (Exhibit 1 was marked for

13               identification.)

14               THE REPORTER:  Yup.  It should be

15  enabled.

16               MR. JONES:  Perfect.

17  BY MR. JONES:

18      Q     Just one second.

19      A     And when you reference page numbers, will

20  you be referencing the report page numbers or PDF page

21  numbers?

22      Q     I'm glad you asked.  I think the PDF page is

23  five pages ahead of what the page numbers are, so I'm

24  going to plan to just reference the page number

25  indicated on the actual page, as opposed to the PDF

Page 56

1   process.

2          Q     So you had started that months before you

3   were issued a MAI license in September?

4          A     Yeah, I think we first talked about it;

5   right?

6          Q     Understood.  So you said earlier you worked,

7   you guessed, 70 to 80 -- you testified you spent 70 to

8   80 hours of work on this project, so would that have

9   probably been 70 to 80 hours between December 14th

10  until the time you issued the report at the end of

11  December?

12         A     Yes.

13         Q     Okay.  I'm going to go up here.  On page 1

14  of this is Exhibit 10, there's a list of -- it's kind

15  of a table of different items -- under Intended Use,

16  it says that "The report to be performed under this

17  agreement appraisal is intended only for use at legal

18  proceedings in the named case, which is above.  The

19  report is not intended for any other use."  Below

20  that, it says Purpose, and it says "Depreciated

21  insurable market value," and then in parentheses, it

22  says "Fair market value."  Are depreciated insurable

23  market value and fair market value synonymous?

24         A     In this case, we're using it synonymously.

25         Q     Under Scope of Work on page 2, do you see

Page 64

1      Q    It's --

2      A    I'm not sure.  I -- I mean, I used a report

3   that had the square footage because the square footage

4   was different in different -- depending on what you

5   looked at, so I wanted to use the same square footage

6   that the other expert was using, and I remember

7   reviewing that report and using that square footage.

8      Q    Does this table here -- I don't know exactly

9   what exhibits means, but we did receive response to

10  our subpoena on what was in your file.  Is there

11  anything missing on this table about items of data

12  that you reviewed or relied on or considered?  Is

13  there anything missing or is this a complete list?

14     A    It's a complete list.  There could be

15  information that was in the file that I didn't use or

16  didn't see if that's the question.

17     Q    Okay.  I want to take you to -- on my notes,

18  it's page 7 and I think what I mean is PDF page 7

19  here, so that would probably be page 2.

20     A    Okay.

21     Q    Okay.  So this is executive summary on the

22  work you did; right?

23     A    Yes.

24     Q    And there's two approaches, a sales

25  comparison approach, which you valued at 570,000 or

Page 121

CERTIFICATE OF TRANSCRIBER

I, FELICIA HALL, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

FELICIA HALL



# David J. Abraham, MAI, SRA

MANAGING DIRECTOR | DETROIT Valuation & Advisory Services



david.abraham@colliers.com

## EDUCATION AND QUALIFICATIONS

Bachelor of Science in Business Administration, Siena Heights University, Adrian, MI

## STATE CERTIFICATION

Michigan

New York

Ohio

## CONTACT DETAILS

MOB +1 734 674 9505

DIR +1 248 226 1872

FAX +1 248 226 1873

Colliers International
2 Corporate Dr., Suite 300
Southfield, MI 48076

www.colliers.com

## BUSINESS EXPERIENCE

David Abraham serves as the Associate Managing Director of Colliers International's Southfield (Detroit), Michigan office, which provides valuation and advisory services throughout the state of Michigan. He represents clients on a national basis and has provided real estate appraisal and consulting services since 1983. Recently, Mr. Abraham has focused on both apartment and hospitality valuation and has completed the valuation of over 30 hotel properties as well as over 5,000 multi-family housing units in the past 18 months.

Mr. Abraham is a Designated member of the Appraisal Institute, holding the MAI and SRA designations. He is experienced in the valuation easements, takings and partial interests, and has served as an expert witness in a variety of valuation cases involving commercial, industrial and residential properties. Mr. Abraham is regularly retained for his expertise in performing hotel valuations, market studies, and feasibility analyses, or to serve in an expert witness capacity for hotel and multi-family properties as well as matters regarding litigation, condemnation or tax appeals.

## PROFESSIONAL MEMBERSHIPS AND ACCREDITATIONS

Designated Member of the Appraisal Institute, MAI and SRA designation

Certified General Appraiser – Michigan #1201000512

Certified General Appraiser – Ohio #ACGO.2014001729

## APPRAISAL INSTITUTE COURSES

Appraisal Principals, Appraisal Institute Course 110

Appraisal Procedures, Appraisal Institute Course 120

Basic & Advanced Income Capitalization, Appraisal Institute Courses 310 & 510

Highest & Best Use & Market Analysis, Appraisal Institute Course 520

Advanced Sales Comparison & Cost Approaches, Appraisal Institute Course 530

Report Writing and Valuation Analysis, Appraisal Institute Course 540

Subdivision Valuation, Appraisal Institute

Advanced Spreadsheet Modeling for Valuation Applications, Appraisal Institute

Practical Regression Using Microsoft Excel, Appraisal Institute

The Appraiser as an Expert Witness: Preparation & Testimony, Appraisal Institute

## OTHER RELATED COURSES

Trends in the Lodging Industry, Oct. 2012

7-Hr National USPAP (Uniform Standards of Professional Appraisal Practice), May 2013

Business Practices & Ethics, June 2013

Farm & Ranch Valuation, American Soc. of Farm Managers & Rural Appraisers

Appraising Troubled Properties, AI





Accelerating success.



# David J. Abraham, MAI, SRA

Managing Director
Valuation & Advisory Services

David.abraham@colliers.com

**CONTACT DETAILS**

MOB +1 734 674 9505
OFF +1 248 540 1000

Colliers International
2 Corporate Drive, St. 300
Southfield, MI 43560

www.colliers.com

## REPRESENTATIVE CLIENTS AND PROJECTS

12/2006 – Peter N. Heydon to Washtenaw Land Trust – Stein Road, Scio Twp., MI

Donation of Development Rights for IRS Use – Value Accepted by IRS – No Challenge

07/2007 – City of Dearborn CSO-9 – 23830 Michigan Avenue, Dearborn, MI

Loss of Dev. Rights for Subsurface Easement – Accepted by Courts – No Challenge

06 to 10/2008 – City of Troy – 1250 Wattles Road and 13 other parcels, Troy, MI

Temporary & Permanent Easement for Road & Drainage Development – No Challenge

08/2010 – Willy's Overland Lofts to Detroit Historic Preservation   Willis St., Detroit, MI

Donation of Development Rights for IRS Use – No Challenge

11/2010 – Confidential Owner to Michigan DNR – Former Nike Missile Silo Site

Loss of Value due to Proposed Development Rights Agreement – No Challenge

12/2011 – Eagle Development to Portage County Road Commission (Abeska Law)

Eagle Pointe, Eagle Lake Road, Edwardsburg, MI

Value Diminution based on Loss of Riparian Rights – No Challenge

**EXPERT WITNESS TESTIMONY**

Washtenaw County Circuit Court

Lenawee County Circuit Court

Michigan Tax Tribunal

Lenawee County Probate Court

Speaker – 1994 - Lenawee County Board of Realtors – Easements & Takings

Consulting Appraiser – Penobscot Building in Detroit CBD

**Recent Testimony**

United States Bankruptcy Court – Eastern District of Michigan, Southern Division

Case No. 17-52483 – Chapter 11

September 13, 2017

In re: Packard Square, LLC

Multifamily


**Recent Expert Witness Case**

State of Michigan Kalamazoo County Circuit Court

DBD Kazoo, LLC vs. Western Michigan, LLC et al.

Student Housing


**Retained as Expert Witness in the following courts since 1985**

Lenawee County Circuit Court - Michigan

Jackson County Circuit Court – Michigan

Washtenaw County Circuit Court – Michigan

Kalamazoo County Circuit Court – Michigan


**Publications**

5/30/2015 - LinkedIn & CIVAS Quarterly Magazine – The Case of the Overvalued Hotel

5/31/2015 - LinkedIn – Appraisal Expert Witnesses & Airline Pilots

9/21/2015 - LinkedIn - Maximizing Hotel Revenue – And Appraised Value

12/8/2016 – LinkedIn – State of the U.S. Market and 2017 Outlook



# INDUSTRIAL BUILDING

6231 MacBeth Road
Fort Wayne, Indiana 46809

**APPRAISAL REPORT**

Date of Report: December 30, 2022

Colliers File #: DTW221032



PREPARED FOR
Martin Gardner
Gardner & Rans, P.C.
117 Perspective Drive
Suite 2
Granger, IN 46530

PREPARED BY
COLLIERS INTERNATIONAL
VALUATION & ADVISORY SERVICES

# LETTER OF TRANSMITTAL

**COLLIERS INTERNATIONAL**
**VALUATION & ADVISORY SERVICES**

2 Corporate Drive, Suite 300
Southfield, MI 48076 USA
MAIN +1 248 540 1000
FAX  +1 248 226 1835
WEB  www.colliers.com/valuationadvisory



December 30, 2022

Martin Gardner
**Gardner & Rans, P.C.**
117 Perspective Drive
Suite 2
Granger, IN 46530

**RE: Industrial Building**
6231 MacBeth Road
Fort Wayne, Indiana 46809

Colliers File #: DTW221032

Mr. Gardner:

Pursuant with our engagement, the above captioned property was appraised utilizing best practice appraisal principles for this property type. This appraisal report satisfies the scope of work and requirements agreed upon by Gardner & Rans, P.C. and Colliers International Valuation & Advisory Services.

At the request of the client, this appraisal is presented in an Appraisal Report format as defined by *USPAP* Standards Rule 2-2(a). My appraisal format provides a detailed description of the appraisal process, subject and market data and valuation analyses.

The purpose of this appraisal is to develop an opinion of the Depreciated Insurable Value of the subject property's fee simple interest. The following table conveys the final opinion of the retrospective value of the subject property that is developed within this appraisal report:

| VALUE TYPE | INTEREST APPRAISED | DATE OF VALUE | VALUE |
|---|---|---|---|
| Retrospective Value | Fee Simple | March 20, 2019 | $550,000 |

The subject was an Industrial (Flex Space) property totaling 14,275 SF of NRA located on a 143.78-acre site at 6231 MacBeth Road in Fort Wayne, Indiana. The improvements were built between 1965 to 1975, and were considered to be in average condition and have a remaining economic life of 20 years based on my estimate, as of the retrospective date. In March 2019, the subject building was partially destroyed by a fire. The part of the building that was not destroyed was rendered unusable. The subject parcel has several other buildings, but we are only appraising the one building described herein.

Colliers International Valuation & Advisory Services, and certain of its subsidiaries, is an independently owned and operated business and a member firm of Colliers International Property Consultants, an affiliation of independent companies with over 500+ offices throughout more than 68 countries worldwide.

The analyses, opinions and conclusions communicated within this appraisal report were developed based upon the requirements and guidelines of the current Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. The report is intended to conform to the scope of work agreed upon between the client and Colliers Valuation.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter. *USPAP* defines an Extraordinary Assumption as, "an assignment specific-assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions". *USPAP* defines a Hypothetical Condition as, "that which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis".

The Extraordinary Assumptions and/or Hypothetical Conditions that were made during the appraisal process to arrive at my opinion of value are fully discussed below. I advise the client to consider these issues carefully given the intended use of this appraisal, as their use might have affected the assignment results.

## EXTRAORDINARY ASSUMPTIONS
We apply the extraordinary assumption that the subject was in the condition as stated as of the retrospective date.

## HYPOTHETICAL CONDITIONS
No Hypothetical Conditions were applied.

## RELIANCE LANGUAGE
The Appraisal is for the sole use of the Client; however, Client may provide only complete, final copies of the Appraisal report in its entirety (but not component parts) to third parties who shall review such reports in connection with the scope of work. Colliers International Valuation & Advisory Services is not required to explain or testify as to appraisal results other than to respond to the Client for routine and customary questions. Please note that our consent to allow the Appraisal prepared by Colliers International Valuation & Advisory Services or portions of such Appraisal, to become part of or be referenced in any public offering, the granting of such consent will be at our sole and absolute discretion and, if given, will be on condition that Colliers International Valuation & Advisory Services will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to Colliers International Valuation & Advisory Services, by a party satisfactory to Colliers International Valuation & Advisory Services.

Colliers International Valuation & Advisory Services hereby expressly grants to Client the right to copy the Appraisal and distribute it to other parties in the case for which the Appraisal has been prepared, including employees of Client, other attorneys in the case, and the court for entry as evidence.

My opinion of value reflects current conditions and the likely actions of market participants as of the date of value. It is based on the available information gathered and provided to us, as presented in this report, and does not predict future performance. Changing market or property conditions can and likely will have an effect on the subject's value.

© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

The signature below indicates my assurance to the client that the development process and extent of analysis for this assignment adhere to the scope requirements and intended use of the appraisal. If you have any specific questions or concerns regarding the attached appraisal report, or if Colliers International Valuation & Advisory Services can be of additional assistance, please contact the individuals listed below.

Sincerely,

**COLLIERS INTERNATIONAL**
**VALUATION & ADVISORY SERVICES**

David Abraham, MAI, SRA
Managing Director | Michigan
Certified General Real Estate Appraiser
State of Indiana License #TP22200820
+1 248 226 1872
david.abraham@colliers.com

© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

DTW221032

**LETTER OF TRANSMITTAL**

**INTRODUCTION**

Executive Summary _____ 1
Aerial Photograph _____ 3
Subject Property Photographs_____ 4
Identification of Appraisal Assignment _____ 10
Scope of Work _____ 13

**DESCRIPTIONS & EXHIBITS**

Regional Map _____ 15
Regional Analysis _____ 16
Local Area Map _____ 21
Local Area Analysis _____ 22
Site Description _____ 31
    Plat Map _____ 33
    Zoning Map _____ 34
    Flood Map _____ 35
    Aerial Photographs _____ 37
Improvement Description _____ 40
Assessment & Taxation _____ 42
Zoning Analysis_____ 43
Market Analysis_____ 44
Highest & Best Use _____ 53

**VALUATION**

Valuation Methods_____ 55
Sales Comparison Approach _____ 57
    Sales Summation Table _____ 58
    Sales Location Map _____ 59
    Sales Data Sheets_____ 60
    Sales Comparison Approach Conclusion _____ 68
Land Valuation _____ 69
    Land Sale Summation Table _____ 70
    Land Sales Location Map _____ 71
    Land Sales Data Sheets _____ 72
    Land Sales Valuation Conclusion _____ 78
Cost Approach _____ 80
    Replacement Cost by MVS _____ 81
    Cost Comparables_____ 82
    Age / Life Depreciation _____ 83
    Cost Approach Conclusion _____ 84
Reconciliation of Value Conclusions _____ 85

**CERTIFICATION**

**ASSUMPTIONS & LIMITING CONDITIONS**

**ADDENDA**

Professional Service Agreement
Subject Data
Valuation Glossary
Qualifications of Appraiser
Qualifications of Colliers International Valuation & Advisory Services

## GENERAL INFORMATION

| | |
|---|---|
| Property Name | Industrial Building |
| Property Type | Industrial - Flex Space |
| Address | 6231 MacBeth Road |
| City | Fort Wayne |
| State | Indiana |
| Zip Code | 46809 |
| County | Allen |
| Core Based Statistical Area (CBSA) | Fort Wayne, IN |
| Market | Fort Wayne |
| Submarket | Outlying Allen County |
| Latitude | 41.029866 |
| Longitude | -85.220463 |
| Census Tract Number | 0115.02 |

## SITE INFORMATION

| Land Area | Acres | Square Feet |
|---|---|---|
| Usable | 143.78 | 6,263,057 |
| Unusable | 0.00 | 0 |
| Excess | 0.00 | 0 |
| Surplus | 0.00 | 0 |
| **Total** | **143.78** | **6,263,057** |
| Current Zoning | General Industrial (I-2) | |
| Flood Zone | Zone A & Zone X (Unshaded) | |
| Seismic Zone | Low Risk | |

## IMPROVEMENT INFORMATION (PRIOR TO LOSS)

| | |
|---|---|
| Net Rentable Area (NRA) | 14,275 SF |
| Gross Building Area SF (GBA) | 14,275 SF |
| Warehouse SF | 10,375 SF |
| Office SF | 3,900 SF |
| Total Number Of Buildings | 4 |
| Total Number Of Stories | 1 |
| Year Built | 1965 to 1975 |
| Quality | Average |
| Condition | Average |
| Type Of Construction | Steel and masonry with some wood components |
| Land To Building Ratio | 438.7 : 1 |
| Site Coverage Ratio | 0.2% |
| Parking Type | Surface |
| Office Build Out % | 27% |
| Clear Height (Feet) | 16 Feet |
| Grade Doors | 9 |

## HIGHEST & BEST USE (PRIOR TO LOSS)

| | |
|---|---|
| As Vacant | Development Of An Industrial Property As Market Conditions Warrant |
| As Improved | Continued Use As An Industrial Property |

## EXPOSURE TIME & MARKETING PERIOD

| | |
|---|---|
| Exposure Time | 12 Months or Less |
| Marketing Period | 12 Months or Less |

| VALUATION SUMMARY | |
|---|---|
| **VALUATION INDICES** | **RETROSPECTIVE VALUE** |
| **INTEREST APPRAISED** | **FEE SIMPLE** |
| **DATE OF VALUE** | **MARCH 20, 2019** |
| **SALES COMPARISON APPROACH** | |
| **SALES CONCLUSION** | **$570,000** |
| Sales Conclusion $/SF | $40/SF |
| **COST APPROACH** | |
| **COST CONCLUSION** | **$530,000** |
| Cost Conclusion $/SF | $37/SF |
| **FINAL VALUE CONCLUSION** | |
| **FINAL VALUE** | **$550,000** |
| $/SF | $39/SF |





**1 – BUILDING 3 EXTERIOR**



**2 – BUILDING 4 EXTERIOR**



**3 – BUILDING 2 EXTERIOR**



**4 – CONCRETE FOUNDATION (FORMERLY BUILDING 1)**



**5 – VIEW OF SUBJECT SITE/EAST BUILDING**



**6 – BUILDING 4 EXTERIOR**

© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES



**7 – SUBJECT INTERIOR**



**8 - SUBJECT INTERIOR**



**9 - SUBJECT INTERIOR**



**10 - SUBJECT INTERIOR**



**11 – BUILDING 3 EXTERIOR**



**12 - BUILDING 4 EXTERIOR**

CONTINUED

DTW221032



**13 – OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**14 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**15 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**16 – SUBJECT PARCEL PARKING**



**17 – PARCEL EAST OF SUBJECT**



**18 - PARCEL EAST OF SUBJECT**

© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

Case 1:21-cv-10815-NRB   Document 57-1   filed 04/28/23   page 248 of 378



**19 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**20 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**21 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**22 - OTHER BUILDINGS ON SITE (NOT SUBJECT)**



**23 – SUBJECT PARCEL**

PHOTOGRAPH INDEX



DTW221032

DTW221032

# SUBJECT OVERVIEW AND NOTES

CONTINUED

This area remains and is seen in the photographs. The interior of this space was accessed and photographed. It was clearly damaged by the fire, but even before the fire, was believed to be in, at best, average condition, and the finishes were clearly dated to the late 1960's or early 1970's. It is not typical for overhead doors to be damaged indirectly by fire, and the doors and structure were in below average condition, showing that condition was likely subpar prior to the loss.

This area remains and is seen in the photographs. The interior of this space was not accessed and is not accessible. It is believed that this is where the condemned photo was taken

This area is completely scraped to the foundation. The concrete pad (former foundation slab) is now being used for bin storage.



© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## PROPERTY IDENTIFICATION
The subject is an Industrial (Flex Space) property totaling 14,275 SF NRA located on a 143.78-acre site at 6231 MacBeth Road in Fort Wayne, Allen County, Indiana. The subject's depreciated insurable value is based on the subject improvements without land, so the site area and legal description are presented for reference only.

The assessor's parcel number is: 02-12-30-100-001.000-067.

The legal description of the subject property is as follows:

**Parcel 02-12-30-100-001.000-067:**

NW 1/4 EX PT N OF RAILROAD & EX E 214.9 FT FRL SEC 30

## CLIENT IDENTIFICATION
The client of this specific assignment is Gardner & Rans, P.C.

## PURPOSE
The purpose of this appraisal is to develop an opinion of the Depreciated Insurable Value of the subject property's fee simple interest.

## INTENDED USE
The intended use of this appraisal is intended only for use in legal proceedings in named case. The report is not intended for any other use.

## INTENDED USERS
Gardner & Rans, P.C., and the attorneys and courts in the case of Case of REPUBLIC SERVICES OF INDIANA, LP. V. COE HEATING & AIR CONDITIONING, INC. and GAS-FIRED PRODUCTS, INC. d/b/a SPACE-RAY are the intended users of this report. Use of this report by third parties and other unintended users is not permitted. This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the authors no portion of the report stands alone.

## ASSIGNMENT DATES
| | |
|---|---|
| Date of Report | December 30, 2022 |
| Date of Inspection | December 29, 2022 |
| Valuation Date - Retrospective | March 20, 2019 |

## PERSONAL INTANGIBLE PROPERTY
No personal property or intangible items are included in this valuation.

## PROPERTY AND SALES HISTORY

### Current Owner
The subject title is currently recorded in the name of National Serv-All Inc as recorded in the Allen County Deed Records.

## Three-Year Sales History

Research of the applicable public records, private data services and an interview of the current owner and/or broker revealed that the subject property has not transferred during the past three years of the effective date of value stated in this report.

## Subject Sale Status

Research of the applicable public records, private data services and an interview of the current owner and/or broker revealed that the subject property is not under a current agreement of sale or option and is not currently offered for sale on the open market.

## DEFINITIONS

This section summarizes the definitions of value, property rights appraised, and value scenarios that are applicable for this appraisal assignment. All other applicable definitions for this assignment are located in the Valuation Glossary section of the Addenda.

Given the scope and intended use of this assignment, the following definition of value is applicable:

## Depreciated Insurable Value

Depreciated Insurable Value is a depreciated insurable replacement cost estimate of the subject improvements, which represents the depreciated replacement cost new of the subject improvements, exclusive of land value, and the costs associated with excavation, site work, and architects fees. Insurance coverage is usually specific to a given project. I have not been provided with the specific policy requirements. The insurable estimate is made using base costs and multiplier adjustments for market conditions and location from *Marshall Valuation Service* and supported by actual construction costs.  The sales comparison approach uses sales of similar buildings, with the land value extracted to arrive at a market value of the improvements.

In the case of the appraisal, the Depreciated Insurable Value is the Market Value (defined below) of the improvements that were destroyed or rendered valueless by the firer as of the date of loss. Note that only the depreciated value of the improvements are being concluded.

## Market Value

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

## PROPERTY RIGHTS APPRAISED

The property rights appraised constitute the fee simple interest as of the retrospective date.

---

[1] Interagency Appraisal and Evaluation Guidelines, December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat.[2]

**VALUE SCENARIOS**

**Retrospective Value**

A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion."[3]

---

[2] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022
[3] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

## INTRODUCTION

The appraisal development and reporting processes requires gathering and analyzing information about those assignment elements necessary to properly identify the appraisal problem to be solved. The scope of work decision must include the research and analyses that are necessary to develop credible assignment results given the intended use of the appraisal. Sufficient information includes disclosure of research and analyses performed and might also include disclosure of research and analyses not performed. The scope of work for this appraisal assignment is outlined below:

› The appraiser analyzed the regional and local area economic profiles including employment, population, household income, and real estate trends. The local area was further studied to assess the general quality and condition, and emerging development trends for the real estate market. The immediate market area was inspected and examined to consider external influences on the subject.

› The appraiser confirmed and analyzed legal and physical features of the subject property including sizes of the improvements, zoning, and the construction materials and likely condition of the improvements on the date of the loss prior to the fire. This process also included estimating the remaining economic life of the improvements.

› The appraiser completed an industrial market analysis that included market and sub-market overviews. The Fort Wayne market and Outlying Allen County sub-market overviews analyzed supply/demand conditions using vacancy, absorption, supply change and rent change statistics. Conclusions were drawn regarding the subject property's competitive position given its physical and locational characteristics, the prevailing economic conditions and external influences.

› The appraiser conducted a Highest and Best Use analysis, determining the highest and best use of the subject property As-Vacant and As-Improved. The analysis considered legal, locational, physical and financial feasibility characteristics of the subject property. Development of the Highest and Best Use As-Improved explored potential alternative treatments of the property including demolition, expansion, renovation, conversion, and continued use "as-is."

› The appraiser confirmed and analyzed the subject property including tax and assessment records. This information as well as trends established by confirmed market indicators was used to forecast performance of the subject property.

› Selection of the valuation methods was based on the identifications required in USPAP relating to the intended use, intended users, definition and date of value, relevant property characteristics and assignment conditions. As a result, this appraisal developed the Sales Comparison and Cost approaches to value. The resulting value indicators were reconciled within the Analysis of Value Conclusions section. The appraisal develops an opinion of the Depreciated Insurable Value of the subject property's fee simple interest. The reasoning for including or excluding traditional approaches to value is developed within the Valuation Methodology section.

› Reporting of this appraisal is in an Appraisal Report format as required in USPAP Standard 2. The appraiser's analysis and conclusions are fully described within this document.

› I understand the Competency Rule of USPAP and the author of this report meets the standards.

› No one provided significant real property appraisal assistance to appraiser signing this certification.

## SOURCES OF INFORMATION

The following sources were contacted to obtain relevant information:

| SOURCES OF INFORMATION | |
|---|---|
| ITEM | SOURCE |
| Tax Information | Allen County Tax Assessor |
| Zoning Information | City of Fort Wayne Zoning Code |
| Site Size Information | Allen County Tax Assessor |
| Building Size Information | Kenneth Itle Report dated 11/17/2022 WJE No. 2019.8247 |
| New Construction | Costar |
| Flood Map | InterFlood |
| Demographics | Pitney Bowes/Gadberry Group - GroundView® |
| Comparable Information | See Comparable Datasheets for details |
| Legal Description | Allen County Property Records |
| Other Property Data | Exhibits, Itle Report, Appraiser's Site Visit & Public Records |

## SUBJECT PROPERTY INSPECTION

The following table illustrates the Colliers International professionals involved with this appraisal report and their status related to the property inspection.

| SUBJECT PROPERTY INSPECTION | | | |
|---|---|---|---|
| APPRAISER | INSPECTED | EXTENT | DATE OF INSPECTION |
| David Abraham, MAI, SRA | Yes | Interior/Exterior | December 29, 2022 |

The appraiser only inspected those interior and exterior improvements that remained on the site, and the foundation pad where the destroyed improvements were located.



## INTRODUCTION

The Fort Wayne, IN Metropolitan Statistical Area is comprised of two counties in northeastern Indiana: Allen and Whitley. The MSA is anchored by the city of Fort Wayne. The Fort Wayne metropolitan area is part of the northern Indiana region, with a population of 419,601 at the 2020 census, and is considered part of the Great Lakes Megalopolis.



The MSA's economy is focused on seven core industries, including advanced manufacturing, defense contracting, financial services, and transportation/distribution. Approximately 100 trucking corporations and over 30 companies provide support through two interstates, four U.S. highways, and seven state roads that cross the county. The transportation industry benefits from easy access to Interstates 75, 80, and 90. Fort Wayne International Airport is currently home to four notable carriers: United, Delta, American, and Allegiant Air. The Port of Indiana-Burns Harbor on Lake Michigan and the Port of Toledo on Lake Erie provide access to the Saint Lawrence Seaway. Both ports have an experienced workforce and the facilities needed to deal with bulk, break bulk, project cargo, and containers.

## DEMOGRAPHIC ANALYSIS

The following is a demographic study of the region sourced by Pitney Bowes/Gadberry Group - GroundView®, an on-line resource center that provides information used to analyze and compare the past, present, and future trends of geographical areas. Demographic changes are often highly correlated to changes in the underlying economic climate. Periods of economic uncertainty necessarily make demographic projections somewhat less reliable than projections in more stable periods. These projections are used as a starting point, but we also consider current and localized market knowledge in interpreting them within this analysis. Please note that our demographics provider sets forth income projections in constant dollars which, by definition, reflect projections after adjustment for inflation. We are aware of other prominent demographic data providers that project income in current dollars, which do not account for inflation. A simple comparison of projections for a similar market area made under the constant and current dollar methodologies can and likely will produce data points that vary, in some cases, widely. Further, all forecasts, regardless of demographer methodology(ies), are subjective in the sense that the reliability of the forecast is subject to modeling and definitional assumptions and procedures.

### Population

According to Pitney Bowes/Gadberry Group - GroundView®, a Geographic Information System (GIS) Company, the Fort Wayne metropolitan area had a 2021 total population of 419,155 and experienced an annual growth rate of 0.7%, which was higher than the Indiana annual growth rate of 0.4%. The metropolitan area accounted for 6.2% of the total Indiana population (6,781,380). Within the metropolitan area the population density was 421 people per square mile compared to the lower Indiana population density of 188 people per square mile and the lower United States population density of 92 people per square mile.

| POPULATION | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2010 Total Population | 308,745,538 | 6,483,802 | 388,621 |
| 2021 Total Population | 331,582,303 | 6,781,380 | 419,155 |
| 2026 Total Population | 342,006,764 | 6,912,197 | 432,091 |
| 2010 - 2021 CAGR | 0.65% | 0.4% | 0.7% |
| 2021 - 2026 CAGR | 0.62% | 0.38% | 0.6% |

Source: Pitney Bowes/Gadberry Group - GroundView®

| POPULATION DENSITY | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2021 Per Square Mile | 92 | 188 | 421 |
| 2026 Per Square Mile | 95 | 191 | 434 |

Source: Pitney Bowes/Gadberry Group - GroundView®

The 2021 median age for the metropolitan area was 36.47, which was 5.86% younger than the United States median age of 38.61 for 2021. The median age in the metropolitan area is anticipated to grow by 0.49% annually, increasing the median age to 37.38 by 2026.

| MEDIAN AGE | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2021 | 38.61 | 38.01 | 36.47 |
| 2026 | 39.39 | 38.81 | 37.38 |
| CAGR | 0.40% | 0.42% | 0.49% |

Source. Pitney Bowes/Gadberry Group - GroundView®

## Education

The Fort Wayne, IN MSA is home to Indiana's fifth-largest public university, Indiana University-Purdue University Fort Wayne (IPFW), with an annual enrollment of approximately 12,000 students. IPFW is a coeducational public university cooperatively managed by two state university systems: Indiana University and Purdue University. The university offers approximately 200 graduate and undergraduate degree programs within nine colleges and schools, including a branch of the Indiana University School of Medicine. IPFW has an endowment of approximately $48.6 million. Ivy Tech Community College of Indiana serves the region with the northeast campus in Fort Wayne. The college enrolls approximately 10,000 students annually.

## Household Trends

The 2021 number of households in the metropolitan area was 162,210. The number of households in the metropolitan area is projected to grow by 0.7% annually, increasing the number of households to 167,744 by 2026. The 2021 average household size for the metropolitan area was 2.54, which was 1.01% smaller than the United States average household size of 2.57 for 2021. The average household size in the metropolitan area is anticipated to decrease by 0.05% annually, reducing the average household size by 2026.

| NUMBER OF HOUSEHOLDS | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2021 | 125,920,087 | 2,655,592 | 162,210 |
| 2026 | 130,248,641 | 2,729,019 | 167,744 |
| CAGR | 0.7% | 0.5% | 0.7% |

Source: Pitney Bowes/Gadberry Group - GroundView®

| AVERAGE HOUSEHOLD SIZE | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2021 | 2.57 | 2.48 | 2.54 |
| 2026 | 2.56 | 2.46 | 2.54 |
| CAGR | (0.04%) | (0.16%) | (0.05%) |

Source: Pitney Bowes/Gadberry Group - GroundView®

The Fort Wayne metropolitan area had 29.19% renter occupied units, compared to the higher 30.15% in Indiana and the higher 35.17% in the United States.

USDC IND/NB case 1:21-cv-00108-HAB   document 57-1   filed 04/28/23   page 259 of 378

| HOUSING UNITS | | | |
|---|---|---|---|
| | US | IN | CBSA |
| Owner Occupied | 64.83% | 69.85% | 70.81% |
| Renter Occupied | 35.17% | 30.15% | 29.19% |

Source: Pitney Bowes/Gadberry Group - GroundView®

The 2021 median household income for the metropolitan area was $58,541, which was 11.8% lower than the United States median household income of $66,358. The median household income for the metropolitan area is projected to grow by 3.7% annually, increasing the median household income to $70,351 by 2026.

As is often the case when the median household income levels are lower than the national average, the cost of living index is also lower. According to the American Chamber of Commerce Researchers Association (ACCRA) Cost of Living Index, the Fort Wayne, IN MSA's cost of living is 87.5 compared to the national average score of 100. The ACCRA Cost of Living Index compares groceries, housing, utilities, transportation, health care and miscellaneous goods and services for over 300 urban areas.

| MEDIAN HOUSEHOLD INCOME | | | |
|---|---|---|---|
| YEAR | US | IN | CBSA |
| 2021 | $66,358 | $59,041 | $58,541 |
| 2026 | $80,318 | $71,145 | $70,351 |
| CAGR | 3.9% | 3.8% | 3.7% |

Source: Pitney Bowes/Gadberry Group - GroundView®



**Consumer Spending Fort Wayne**

Health Care, 23.43%
Hsld Furnishings, 9.27%
Auto Maint., 0.42%
Apparel, 8.60%
Computers, 2.47%
Education, 6.08%
Entertainment, 13.78%
Food at Home, 20.54%
Eating Out, 15.42%



**Consumer Spending Comparison Average Household**

■ United States   ▫ Indiana   ■ Fort Wayne

## EMPLOYMENT

Total employment has increased annually over the past decade in the state of Indiana by 1.06% and increased annually by 1.1% in the area. From 2020 to 2021 unemployment decreased in Indiana by 3.6% and decreased by 4.0% in the area. In the state of Indiana and in the area unemployment has increased over the previous month by 0.7%.

| EMPLOYMENT & UNEMPLOYMENT STATISTICS 2012 - 2021 |||||||||
|---|---|---|---|---|---|---|---|
| | TOTAL EMPLOYMENT |||| UNEMPLOYMENT RATE ||||
| | Indiana || Fort Wayne, IN Metropolitan Statistical Area || United States* | Indiana | Fort Wayne, IN Metropolitan Statistical Area |
| Year | Total | % Δ Yr Ago | Total | % Δ Yr Ago | | | |
| 2012 | 2,911,925 | 0.3% | 187,941 | (0.7%) | 8.1% | 8.2% | 8.2% |
| 2013 | 2,953,672 | 1.4% | 190,025 | 1.1% | 7.4% | 7.5% | 7.3% |
| 2014 | 3,036,685 | 2.8% | 194,804 | 2.5% | 6.2% | 5.9% | 5.6% |
| 2015 | 3,109,791 | 2.4% | 199,672 | 2.5% | 5.3% | 4.8% | 4.5% |
| 2016 | 3,186,420 | 2.5% | 203,699 | 2.0% | 4.9% | 4.4% | 4.1% |
| 2017 | 3,217,049 | 1.0% | 205,689 | 1.0% | 4.4% | 3.5% | 3.2% |
| 2018 | 3,270,727 | 1.7% | 210,287 | 2.2% | 3.9% | 3.4% | 3.1% |
| 2019 | 3,282,443 | 0.4% | 213,199 | 1.4% | 3.7% | 3.3% | 3.1% |
| 2020 | 3,083,159 | (6.1%) | 200,273 | (6.1%) | 8.1% | 7.2% | 7.5% |
| 2021 | 3,203,166 | 3.9% | 207,616 | 3.7% | 5.3% | 3.6% | 3.5% |
| CAGR | 1.06% | - | 1.1% | - | - | - | - |

Source: U.S. Bureau of Labor Statistics    *Unadjusted Non-Seasonal Rate



| UNEMPLOYMENT RATES ||||||||||||
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov 2021 | Dec 2021 | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 | Jun 2022 | Jul 2022 | Aug 2022 | Sep 2022 | Oct 2022 |
| USA | 3.9% | 3.7% | 4.4% | 4.1% | 3.8% | 3.3% | 3.4% | 3.8% | 3.8% | 3.8% | 3.3% | 3.4% |
| Indiana | 2.2% | 1.5% | 2.4% | 2.7% | 2.7% | 2.2% | 2.5% | 3.2% | 3.5% | 3.1% | 2.2% | 2.9% |
| Area | 2.1% | 1.4% | 2.2% | 2.4% | 2.6% | 2.2% | 2.3% | 3.0% | 3.2% | 2.8% | 2.1% | 2.7% |

The preceding chart depicts unemployment trends in the region, Indiana, and the U.S. Overall levels of unemployment in the region experienced major fluctuations throughout the past three months. By the end of October 2022, unemployment in the region was 0.2% lower than Indiana's and 0.7% lower than the national average.

**REGIONAL ANALYSIS**
CONTINUED

DTW221032

| TOP EMPLOYERS | |
|---|---|
| EMPLOYER NAME | INDUSTRY |
| Parkview Birthing Center | Healthcare/Social Assistance |
| Parkview Health | Healthcare/Social Assistance |
| Lutheran Hospital | Healthcare/Social Assistance |
| Sweetwater Sound Inc. | Wholesale/Retail Trade |
| L3harris | Wholesale/Retail Trade |
| GE Power Conversion | Professional/Scientific/Technical Services |
| BF Goodrich Tire Manufacturing | Manufacturing |
| Post Masters | Professional/Scientific/Technical Services |
| Lincoln National Life Insurance Company | Finance/Insurance |
| Raytheon Company | Manufacturing |

Source: http://www.hoosierdata.in.gov/

The preceding chart depicts the top employers in Allen County. Principal employers in the region are spread throughout the healthcare/social assistance sector. Parkview Birthing Center is one of the largest employers in the area. The center is at Parkview Women's & Children Hospital on the campus of Parkview Regional Medical Center. Parkview Health, and Lutheran Hospital are among the county's largest employers. The health system serves Northeast Indiana and comprises seven hospitals. Lutheran Hospital is a 396-bed medical facility in Fort Wayne that serves residents in northeastern Indiana, northwestern Ohio, and southern Michigan.

## AIRPORT STATISTICS
The following chart summarizes the local airport statistics.

| FORT WAYNE INTERNATIONAL AIRPORT (FWA) | | |
|---|---|---|
| YEAR | ENPLANED PASSENGERS | % CHG |
| 2011 | 272,796 | - |
| 2012 | 280,732 | 2.9% |
| 2013 | 294,968 | 5.1% |
| 2014 | 323,252 | 9.6% |
| 2015 | 353,872 | 9.5% |
| 2016 | 360,369 | 1.8% |
| 2017 | 359,658 | (0.2%) |
| 2018 | 372,030 | 3.4% |
| 2019 | 402,400 | 8.2% |
| 2020 | 213,125 | (47.0%) |
| 2021 | 335,804 | 57.6% |

Source: U.S. Department of Transportation

## SUMMARY
The Fort Wayne, IN MSA continues to be the economic center of Northeast Indiana. The regional economy has achieved significant diversification with industries including manufacturing, aerospace, defense, distribution, and logistics. Real estate in the Fort Wayne market should ultimately enjoy relative strength in terms of value stability and appreciation for the foreseeable future.

DTW221032



Casa Ristorante

Engle Rd

Smith Rd

*Eagle Marsh Nature Preserve*

S

Smith Rd

Fox Island County Park
Temporarily closed

Yohne Rd

Yohne Rd

Smith Rd

Orchard Ridge Country Club

Lower Huntington Rd

Google

© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

21

## INTRODUCTION

In this section of the report, I provide details about the local area and describe the influences that bear on the real estate market as well as the subject property. A map of the local area is presented on the prior page. Below are insights into the local area based on fieldwork, interviews, demographic data and experience working in this market.

## LOCAL AREA PROFILE

The subject property is in Fort Wayne, Indiana, the seat of Allen County. According to the 2020 census, the population was 263,886. The city is approximately 140 miles northeast of Indianapolis, 18 miles west of the Ohio border, and 50 miles south of the Michigan border. The city is served by Interstates 69 and 469, U.S. Routes 27 and 30, and State Routes 3, 14 and 930. Air transportation is provided by Fort Wayne International Airport, a commercial service airport approximately eight miles southwest of the city's downtown area.

### Transportation Routes

Major traffic arteries are shown in the chart below:

| MAJOR ROADWAYS & THOROUGHFARES | | | |
| --- | --- | --- | --- |
| HIGHWAY | DIRECTION | FUNCTION | DISTANCE FROM SUBJECT |
| Interstate 469 | north-south | Interstate Highway | This is within eight miles of the subject property. |
| State Route 14 | east-west | Local Highway | This is within five miles of the subject property. |
| U.S. Route 24 | east-west | Local Highway | This is within four miles of the subject property. |
| Interstate 69 | north-south | Interstate Highway | This is within five miles of the subject property. |
| SURFACE STREETS | DIRECTION | FUNCTION | DISTANCE FROM SUBJECT |
| Engle Road | east-west | Secondary Arterial | The subject property fronts this street. |

Public transportation is not available near the subject property.

### Economic Factors

Fort Wayne has a diversified economy supported by a group of industries, including manufacturing, education, tourism, logistics, and financial services. Manufacturing companies based in Fort Wayne includes the General Motors Fort Wayne assembly plant, which is one of the top employers in the city with approximately 3,000 employees. The headquarters of several insurance companies are in Fort Wayne, such as Lincoln Financial Group, which is one of the largest insurance companies in the country. Steel Dynamics is the only Fortune 500 Company headquartered in the city. The area is a center for the defense industry with companies such as BAE Systems, Harris Corporation, Raytheon Systems, and the Fort Wayne Air National Guard Station. The tourism industry in Fort Wayne benefits from the presence of several museums, hotels, festival parks, and meeting facilities. Parkview Health System and Lutheran Health Network are among the city's five top employers.

### Community Services

Community services and facilities are readily available in the surrounding area. These include public services such as fire stations, hospitals, police stations, and schools (all ages).

## DEMOGRAPHIC PROFILE

Below is a demographic study of the area, sourced by Pitney Bowes/Gadberry Group - GroundView®, an on-line resource center that provides information used to analyze and compare the past, present, and future trends of properties and geographical areas. Please note that our demographics provider sets forth income projections in constant dollars which, by definition, reflect projections after adjustment for inflation. We are aware of other prominent demographic data providers that project income in current dollars, which do not account for inflation. A simple comparison of projections for a similar market area made under the constant and current dollar methodologies can and likely will produce data points that vary, in some cases, widely. Further, all forecasts, regardless of demographer methodology(ies), are subjective in the sense that the reliability of the forecast is subject to modeling and definitional assumptions and procedures.

### LOCAL AREA DEMOGRAPHICS

| DESCRIPTION | 1 MILE | 3 MILES | 5 MILES | DESCRIPTION | 1 MILE | 3 MILES | 5 MILES |
|---|---|---|---|---|---|---|---|
| **POPULATION** | | | | **AVERAGE HOUSEHOLD INCOME** | | | |
| 2000 Population | 48 | 23,924 | 92,840 | 2021 | $90,519 | $74,905 | $77,560 |
| 2010 Population | 48 | 24,603 | 93,025 | 2026 | $103,414 | $88,698 | $92,186 |
| 2021 Population | 49 | 25,043 | 97,121 | Change 2021-2026 | 14.25% | 18.41% | 18.86% |
| 2026 Population | 49 | 25,108 | 98,791 | **MEDIAN HOUSEHOLD INCOME** | | | |
| Change 2000-2010 | 0.00% | 2.84% | 0.20% | 2021 | $78,124 | $53,639 | $54,178 |
| Change 2010-2021 | 2.08% | 1.79% | 4.40% | 2026 | $93,749 | $64,656 | $65,295 |
| Change 2021-2026 | 0.00% | 0.26% | 1.72% | Change 2021-2026 | 20.00% | 20.54% | 20.52% |
| **POPULATION 65+** | | | | **PER CAPITA INCOME** | | | |
| 2010 Population | 8 | 3,927 | 10,865 | 2021 | $38,296 | $34,162 | $31,708 |
| 2021 Population | 10 | 4,879 | 14,589 | 2026 | $43,752 | $40,727 | $37,882 |
| 2026 Population | 11 | 5,465 | 16,825 | Change 2021-2026 | 14.25% | 19.22% | 19.47% |
| Change 2010-2021 | 25.00% | 24.24% | 34.28% | **2021 HOUSEHOLDS BY INCOME** | | | |
| Change 2021-2026 | 10.00% | 12.01% | 15.33% | <$15,000 | 0.0% | 8.4% | 9.6% |
| **NUMBER OF HOUSEHOLDS** | | | | $15,000-$24,999 | 13.6% | 9.0% | 9.3% |
| 2000 Households | 21 | 10,342 | 36,943 | $25,000-$34,999 | 0.0% | 13.0% | 11.8% |
| 2010 Households | 21 | 11,084 | 37,440 | $35,000-$49,999 | 18.2% | 16.6% | 15.7% |
| 2021 Households | 22 | 11,285 | 39,363 | $50,000-$74,999 | 13.6% | 18.1% | 18.7% |
| 2026 Households | 22 | 11,391 | 40,260 | $75,000-$99,999 | 18.2% | 13.8% | 12.8% |
| Change 2000-2010 | 0.00% | 7.17% | 1.35% | $100,000-$149,999 | 22.7% | 13.0% | 12.0% |
| Change 2010-2021 | 4.76% | 1.81% | 5.14% | $150,000-$199,999 | 4.5% | 3.5% | 4.4% |
| Change 2021-2026 | 0.00% | 0.94% | 2.28% | $200,000 or greater | 4.5% | 4.6% | 5.5% |
| **HOUSING UNITS (2021)** | | | | **MEDIAN HOME VALUE** | $112,500 | $130,592 | $127,652 |
| Owner Occupied | 20 | 6,851 | 25,987 | **AVERAGE HOME VALUE** | $130,372 | $147,456 | $159,920 |
| Renter Occupied | 1 | 4,427 | 13,354 | **HOUSING UNITS BY UNITS IN STRUCTURE** | | | |
| **HOUSING UNITS BY YEAR BUILT** | | | | 1, detached | 21 | 7,019 | 29,318 |
| Built 2010 or later | 0 | 143 | 1,059 | 1, attached | 0 | 543 | 1,133 |
| Built 2000 to 2009 | 2 | 810 | 3,318 | 2 | 0 | 256 | 1,369 |
| Built 1990 to 1999 | 3 | 1,628 | 5,945 | 3 or 4 | 0 | 527 | 1,468 |
| Built 1980 to 1989 | 0 | 1,654 | 4,074 | 5 to 9 | 0 | 1,235 | 2,287 |
| Built 1970 to 1979 | 2 | 2,495 | 5,193 | 10 to 19 | 0 | 805 | 1,394 |
| Built 1960 to 1969 | 3 | 1,506 | 4,220 | 20 to 49 | 0 | 311 | 782 |
| Built 1950 to 1959 | 9 | 1,935 | 5,241 | 50 or more | 0 | 513 | 1,178 |
| Built 1940 to 1949 | 1 | 512 | 2,925 | Mobile home | 0 | 68 | 392 |
| Built 1939 or earlier | 3 | 602 | 7,387 | Boat, RV, van, etc. | 0 | 0 | 19 |

Source. Pitney Bowes/Gadberry Group - GroundView®



POPULATION GROWTH BY AGE - 5 MILES
0-17, 18-29, 30-39, 40-49, 50-64, 65+
■2010 □2021 ■2026



POPULATION BY AGE
0-17, 18-29, 30-39, 40-49, 50-64, 65+
■1 MILE □3 MILES ■5 MILES

## IMMEDIATE AREA PROFILE

This section discusses uses and development trends in the immediate area that directly impact the performance and appeal of the subject property.

### Predominant Land Uses

Significant development in the immediate area consists of office and industrial uses along major arterials that are interspersed with multi-family complexes and single-family residential development removed from arterials. The local area has a mix of commercial uses nearby and the composition is shown in the following graph.



**COMMERCIAL AREA COMPOSITION**

■ RETAIL

■ OFFICE

▫ INDUSTRIAL

■ MULTI-FAMILY

©CoStar

## Multi-Family Development

The following chart shows a summary of multi-family data by type in the immediate area from CoStar.

| MULTI-FAMILY SUMMARY | | | |
|---|---|---|---|
| CLASS | PROPERTIES | NRA (SF) | AVG YR BLT |
| B | 20 | 2,340,244 | 1982 |
| C | 21 | 871,533 | 1956 |
| TOTAL | 41 | 3,211,777 | 1969 |

Source: CoStar

The largest three multi-family properties are at 6530 Covington Road, 6101 Cornwallis Drive and 4499 Coventry Parkway with an NRA of 419,435 SF, 378,063 SF and 350,276 SF that were built in 1968, 2002 and 1987, respectively. The closest large multi-family property in proximity to the subject is at 8045 Oriole Avenue with an NRA of 204,000 SF that was built in 2016. The majority of properties were constructed before 2000. The following chart and map show the subject property and its location relative to the 10 largest multi-family properties in the immediate area from CoStar.

| LARGEST MULTI-FAMILY PROPERTIES | | | | | | |
|---|---|---|---|---|---|---|
| NAME | DISTANCE | MAP PIN | CLASS | NRA (SF) | STORIES | YEAR BUILT |
| Colony Bay Apartments | 2.3 Miles | A | B | 419,435 | 4 | 1968 |
| Liberty Mills Apartments | 2.0 Miles | B | B | 378,063 | 3 | 2002 |
| Willows of Coventry Apartments | 2.0 Miles | C | B | 350,276 | 2 | 1987 |
| Coventry Court West Apartments | 2.5 Miles | D | C | 231,384 | 2 | 1982 |
| Bridgedale Terrace Apartments | 2.7 Miles | E | B | 228,659 | 1 | 1970 |
| Canal Flats | 1.5 Miles | F | B | 204,000 | 3 | 2016 |
| Multi-family Building | 1.9 Miles | G | B | 180,000 | 3 | 2020 |
| Multi-family Building | 2.0 Miles | H | C | 139,745 | 2 | 1965 |
| Poplar Ridge Apartments | 2.6 Miles | I | C | 123,135 | 1 | 1987 |
| Southwest Seniors Community Apartments | 1.7 Miles | J | B | 116,841 | 1 | 2005 |

Source: CoStar



## Retail Development

The following chart shows a summary of retail data by type in the immediate area from CoStar.

| RETAIL SUMMARY | | | | | |
|---|---|---|---|---|---|
| TYPE | PROPERTIES | NRA (SF) | AVG YR BLT | OCCUPANCY | AVG RENT |
| General Retail | 120 | 732,771 | 1976 | 98.3 | $9.47 |
| TOTAL | 120 | 732,771 | 1976 | 98.3 | $9.47 |

Source: CoStar

The largest three retail properties are at 6306-6410 West Jefferson Boulevard, 5725 Coventry Lane and 6325-6447 Jefferson Boulevard with an NRA of 189,070 SF, 118,954 SF and 111,072 SF that were built in 1978, 2012 and 1989, respectively. The closest large retail property in proximity to the subject is the third property which is detailed above. The majority of properties were constructed before 2000. The following chart and map show the subject property and its location relative to the nine largest retail properties in the immediate area from CoStar.

| LARGEST SHOPPING CENTERS | | | | | | | |
|---|---|---|---|---|---|---|---|
| NAME | DISTANCE | MAP PIN | TYPE | NRA (SF) | % LEASED | YEAR BUILT | AVG RENT |
| Covington Plaza | 1.9 Miles | A | General Retail | 189,070 | 96.1 | 1978 | N/Av |
| Village at Coventry | 2.1 Miles | B | General Retail | 118,954 | 100.0 | 2012 | N/Av |
| Village At Time Corners | 1.7 Miles | C | General Retail | 111,072 | 65.2 | 1989 | N/Av |
| Time Corners | 2.1 Miles | D | General Retail | 79,761 | 85.7 | 1980 | $10.20 |
| Village at Coventry | 2.0 Miles | E | General Retail | 76,081 | 88.5 | 1985 | $15.57 |
| Jefferson Crossing | 1.9 Miles | F | General Retail | 59,979 | 98.5 | 1977 | $14.00 |
| Village at Coventry | 1.9 Miles | G | General Retail | 42,277 | 100.0 | 1990 | N/Av |
| Kroger | 2.7 Miles | H | General Retail | 38,818 | 100.0 | - | N/Av |
| Canopy Corners | 2.2 Miles | I | General Retail | 38,700 | 96.1 | 1989 | $14.00 |

Source: CoStar



## Office Development

The following chart shows a summary of office data by class in the immediate area from CoStar.

| OFFICE SUMMARY | | | | | |
|---|---|---|---|---|---|
| CLASS | PROPERTIES | NRA (SF) | AVG YR BLT | OCCUPANCY | AVG RENT |
| A | 4 | 149,324 | 1998 | 98.6 | $16.75 |
| B | 100 | 3,431,900 | 1991 | 95.7 | $16.07 |
| C | 75 | 538,929 | 1977 | 98.9 | $15.90 |
| TOTAL | 179 | 4,120,153 | 1985 | 97.1 | $16.01 |

Source: CoStar

The largest three office properties are at 7900 West Jefferson Boulevard, 1700 Magnavox Way and 8001 West Jefferson Boulevard with an NRA of 1,279,568 SF, 355,012 SF and 240,652 SF that were built in 1991, 1969 and 1974, respectively. The closest large office property in proximity to the subject is at 7575 West Jefferson Boulevard with an NRA of 122,543 SF that was built in 1963. The majority of properties were constructed before 2000. The following chart and map show the subject property and its location relative to the 10 largest office properties in the immediate area from CoStar.

| LARGEST OFFICE BUILDINGS | | | | | | |
|---|---|---|---|---|---|---|
| NAME | DISTANCE | MAP PIN | CLASS | NRA (SF) | % LEASED | YEAR BUILT | AVG RENT |
| Luthern Hospital | 1.6 Miles | A | B | 1,279,568 | 99.6 | 1991 | $16.63 |
| Office Building | 2.7 Miles | B | B | 355,012 | 77.4 | 1969 | $16.50 |
| Verizon North State Headquarters | 1.4 Miles | C | B | 240,652 | 100.0 | 1974 | $16.50 |
| Office Building | 1.2 Miles | D | B | 122,543 | 100.0 | 1963 | N/Av |
| K&K Insurance | 2.8 Miles | E | B | 90,000 | 86.8 | 1986 | $16.50 |
| Lutheran Medical Group | 1.7 Miles | F | B | 78,745 | 100.0 | 2004 | N/Av |
| Office Building | 2.1 Miles | G | B | 76,081 | 100.0 | 1988 | N/Av |
| Fort Wayne Orthopedics | 1.2 Miles | H | B | 64,038 | 100.0 | 1994 | N/Av |
| Office Building | 1.7 Miles | I | B | 59,192 | 100.0 | 1993 | N/Av |
| Jefferson Center | 1.4 Miles | J | A | 58,558 | 98.5 | 1996 | $17.00 |

Source: CoStar



## Industrial Development

The following chart shows a summary of industrial data by type in the immediate area from CoStar.

| TYPE | PROPERTIES | NRA (SF) | AVG YR BLT | OCCUPANCY | AVG RENT |
|---|---|---|---|---|---|
| **INDUSTRIAL SUMMARY** | | | | | |
| Industrial | 89 | 4,251,378 | 1985 | 98.0 | $6.15 |
| Flex | 19 | 406,422 | 1981 | 100.0 | – |
| **TOTAL** | **108** | **4,657,800** | **1985** | **98.3** | **$6.15** |

Source: CoStar

The largest three industrial properties are at 3511 Engle Road, 4250-4300 Airport Expressway and 3005 Commercial Road with an NRA of 414,038 SF, 333,750 SF and 271,380 SF that were built in 1977, 2015 and 1974, respectively. The closest large industrial property in proximity to the subject is at 4404 Engle Ridge Drive with an NRA of 129,500 SF that was built in 1977. The majority of properties were constructed before 2000. The following chart and map show the subject property and its location relative to the 10 largest industrial properties in the immediate area from CoStar.

| NAME | DISTANCE | MAP PIN | TYPE | NRA (SF) | % LEASED | YEAR BUILT | AVG RENT |
|---|---|---|---|---|---|---|---|
| **LARGEST INDUSTRIAL PROPERTIES** | | | | | | | |
| Industrial Building | 2.0 Miles | A | Industrial | 414,038 | 100.0 | 1977 | N/Av |
| BAE Facility | 2.2 Miles | B | Industrial | 333,750 | 100.0 | 2015 | N/Av |
| Industrial Building | 2.7 Miles | C | Industrial | 271,380 | 100.0 | 1974 | N/Av |
| Industrial Building | 2.5 Miles | D | Industrial | 155,384 | 100.0 | 1980 | N/Av |
| Airport Business Center | 3.1 Miles | E | Industrial | 153,944 | 100.0 | 1980 | N/Av |
| Industrial Spec Building | 2.0 Miles | F | Industrial | 150,000 | 100.0 | 2020 | N/Av |
| Industrial Building | 2.0 Miles | G | Industrial | 146,607 | 100.0 | 1988 | N/Av |
| Industrial Building | 2.3 Miles | H | Industrial | 137,500 | 100.0 | 2017 | N/Av |
| Industrial Building | 2.2 Miles | I | Industrial | 130,000 | 100.0 | 1991 | N/Av |
| Industrial Building | 1.6 Miles | J | Industrial | 129,500 | 100.0 | 1977 | N/Av |

Source: CoStar



LOCAL AREA ANALYSIS
CONTINUED                                                                 DTW221032

The following map shows the subject property and the five largest retail, office, and industrial properties in the immediate area from CoStar.



## SUBJECT PROPERTY ANALYSIS

The following discussion draws context and analysis on how the subject property is influenced by the local and immediate areas.

### Subject Property Analysis

The uses adjacent to the property are noted below:

- › **North -** Railroad, Vacant land, Parking lot
- › **South -** Vacant land, Landfill
- › **East -** Landfill
- › **West -** Fox Island County Park

### Access

The subject site has frontage on two arterials. Based on my field work, the subject's access is rated average/good compared to other properties with which it competes.

### Visibility

The subject is clearly visible in both directions along the street. The visibility of the property is not hampered by adjacent properties, trees or other obstructions. In comparison to competitive properties, the subject property has good visibility.

### Subject Conclusion

Trends in the local and immediate areas, adjacent uses and the property's specific location features indicate an overall typical external influence for the subject, which is concluded to have a good position in context of competing properties.

### SUMMARY

Fort Wayne is home to nationally renowned corporations serving as the backbone for the city's economy and its continued growth. The presence of industries contributes to the city's economic stability. It is anticipated that the area will continue to be a part of a growing regional economy, thus resulting in stable to moderately increasing property values and rental rates.

| General Description | The subject site consists of 1 parcel. As noted below, the subject site has 6,263,057 SF (143.78 AC) of land area. The area is estimated based on the assessor's parcel map, and may change if a professional survey determines more precise measurements. Going forward, our valuation analyses will utilize the usable site area. The following discussion summarizes the subject site size and characteristics. |
|---|---|

**Assessor Parcel**     02-12-30-100-001.000-067

**Number Of Parcels**     1

| Land Area | Acres | Square Feet |
|---|---|---|
| Primary Parcel | 143.78 | 6,263,057 |
| Unusable Land | 0.00 | 0 |
| Excess Land | 0.00 | 0 |
| Surplus Land | 0.00 | 0 |
| **Total Land Area** | **143.78** | **6,263,057** |

**Shape**     Rectangular - See Plat Map For Exact Shape

**Topography**     Level at street grade

**Drainage**     Assumed Adequate

**Utilities**     All available to the site

| Street Improvements | Street | Direction | No. Lanes | Street Type | Curbs | Sidewalks | Streetlights | Center Lane | Gutters |
|---|---|---|---|---|---|---|---|---|---|
| Engle Road | Primary Street | two-way | four-lane | minor arterial | | | | | |
| MacBeth Road | Secondary Street | two-way | two-lane | minor arterial | | | | | |

**Frontage**     The subject has approximately 920 feet of frontage on MacBeth Road.

**Accessibility**     **Average/Good -** The subject is located within four miles of U.S. Route 24. Access to the subject is offered through an easement from an adjacent property.

**Exposure**     **Average/Good -** The subject has average exposure on a minor arterial.

**Seismic**     The subject is in a low risk zone.

**Flood Zone**     Zone A. This is referenced by Community Number 180302, Panel Number 18003C0290G, dated August 03, 2009. Zone A is a High Risk Special Flood Hazard Area (SFHA). Special Flood Hazard Areas represent the area subject to inundation by 1-percent-annual chance flood. Structures located within the SFHA have a 26-percent chance of flooding during the life of a standard 30-year mortgage. Federal floodplain management regulations and mandatory flood insurance purchase requirements apply in these zones. Areas subject to inundation by the 1-percent-annual-chance flood event. Because detailed hydraulic analyses have not been performed, no Base Flood Elevations (BFEs) or flood depths are shown. Zone X (Unshaded). This is referenced by Community Number 180302, Panel Number 18003C0290G, dated August 03, 2009. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal

hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local stormwater drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25-percent of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1-percent and .2-percent-annual-chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.)

**Site Rating**

Overall, the subject site is considered a good industrial site in terms of its location, exposure, and access to employment, education and shopping centers, recognizing its location along a minor arterial.

**Easements**

A preliminary title report was not available for review. During the on-site inspection, no adverse easements or encumbrances were noted. This appraisal assumes that there is no negative value impact on the subject improvements. If questions arise regarding easements, encroachments, or other encumbrances, further research is advised.

**Soils**

A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements.

**Hazardous Waste**

We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer.

DTW221032

PARCEL MAP



## ZONING MAP



**I2 - General Industrial**
**R1 - Single Family Residential**

Please note that we have only analyzed the I-2 Zoning District as the subject building is not in the R-1 Zoning District portion of the parcel. The land included in the subject parcel that is zoned R-1 is being used as vacant land.

CONTINUED                                                                                    DTW221032

## FLOOD MAP



CONTINUED                                                                      DTW221032



# InterFlood by a la mode

Prepared for: Colliers International

**MAP DATA**

FEMA Special Flood Hazard Area: **No**
Map Number: 18003C0290G
Zone: **X**
Map Date: August 03, 2009
FIPS: **18003**

**MAP LEGEND**

Powered by CoreLogic®

☐ Areas inundated by 500-year flooding    ⊠ Protected Areas
▦ Areas inundated by 100-year flooding    ▧ Floodway
☐ Velocity Hazard                         ◯ Subject Area

CONTINUED                                                                    DTW221032

## AERIAL PHOTOGRAPHS

**Subject Building Before the Fire**



## Subject Building After The Fire



EXHIBITS

DTW221032

39

This area remains and is seen in the photographs. The interior of this space was accessed and photographed. It was clearly damaged by the fire, but even before the fire, was believed to be in, at best, average condition, and the finishes were clearly dated to the late 1960's or early 1970's. It is not typical for overhead doors to be damaged indirectly by fire, and the doors and structure were in below average condition, showing that condition was likely subpar prior to the loss.

This area remains and is seen in the photographs. The interior of this space was not accessed and is not accessible. It is believed that this is where the condemned photo was taken

This area is completely scraped to the foundation. The concrete pad (former foundation slab) is now being used for bin storage.



© 2022 COLLIERS INTERNATIONAL VALUATION & ADVISORY SERVICES

## INTRODUCTION

The information presented below is a basic description of the improvements before the loss, based on the available data and our inspection of the building that remained. This information is used in the valuation of the property. Reliance has been placed upon information provided by sources deemed dependable for this analysis. It is assumed that there were no hidden defects, and that all structural components were functional and operational, unless otherwise noted.

| | |
|---|---|
| **Property Type** | Industrial - Flex Space |
| **Design** | Single-Tenant Owner-Occupied - 1 Tenant Space |
| **Number of Buildings** | 4 |
| **Number of Stories** | 1 |
| **Net Rentable Area (NRA)** | 14,275 SF |
| **Gross Building Area (GBA)** | 14,275 SF |
| **Warehouse SF** | 10,375 SF |
| **Office SF** | 3,900 SF |
| **Office Build Out** | 27% |
| **Clear Height** | 16 Feet |
| **Dock High Doors** | - |
| **Grade Level Doors** | 9 |
| **Parking** | Stone and asphalt |
| **Year Built** | 1965 to 1975 |
| **Age/Life Analysis** | |
| Actual Age | 52 Years |
| Effective Age | 30 Years |
| Economic Life | 50 Years |
| Remaining Life | 20 Years |
| **Quality** | Average |
| **Condition** | Average |
| **Functional Design** | Overall, the subject has a functional design. |
| **Basic Construction** | Steel and masonry with some wood components |
| **Foundation** | Poured concrete slab |
| **Framing** | Steel and masonry with some wood components |
| **Exterior Walls** | Wood and Steel |
| **Roof** | Asphalt or fiberglass shingles on a gabled roof |
| **Insulation** | Assumed to be standard and to code for both walls and ceilings |
| **Heating** | Forced air for the offices with suspended heaters for the shop areas |
| **Air Conditioning** | Plenum mounted AC for the office areas is assumed |
| **Lighting** | Fluorescent and Incandescent |

| | |
|---|---|
| **Interior Walls** | Drywall in the offices with exposed finishes in the shop |
| **Electrical** | Assumed adequate and to-code. |
| **Ceilings** | Suspended and drywall in the offices with exposed finishes in the shop areas |
| **Windows** | Standard windows; glass in wood, vinyl or aluminum frames |
| **Doors** | Steel pedestrian doors |
| **Flooring** | Concrete in the shop and commercial grade carpeting and solid surface flooring ion the office areas. |
| **Plumbing** | Standard plumbing with at least one set of men's and women's restrooms and a plumbed break area (assumed based on use) |
| **Fire Protection** | None noted or assumed |
| **Security** | None |
| **Elevators** | None |
| **Landscaping** | Not applicable to the scope of work. |
| **Build-out/TIs** | The improvements have or will have typical industrial/office finishes that vary based on each tenant concept. |
| **Signage** | There is a monument style sign visible along MacBeth Road at the entrance to the subject. |
| **Parking** | The subject property has an asphalt paved parking lot that provides X surface level parking spaces. |
| **Deferred Maintenance** | Based on my interview with the property owner / manager / contact and the onsite inspection by the field appraiser, no observable deferred maintenance exists. |
| **Hazardous Materials** | This appraisal assumes that the improvements are constructed free of all hazardous waste and toxic materials, including (but not limited to) asbestos. Please refer to the Assumptions and Limiting Conditions section regarding this issue. |
| ***ADA* Compliance** | This analysis assumes that the subject complies with all ADA requirements. Please refer to the Assumptions and Limiting Conditions section regarding this issue. |

Case 1:21-cv-00108-HAB document 57-1 filed 04/28/23 page 283 of 378

DTW221032

## INTRODUCTION

Assessment of real property is established by an assessor that is an appointed or elected official charged with determining the value of each property. The assessment is used to determine the necessary rate of taxation required to support the municipal budget. A property tax is a levy on the value of property that the owner is required to pay to the municipality in which it is situated. Multiple jurisdictions may tax the same property.

The subject property is located within Allen County. The assessed value and property tax for the current year are summarized in the following table.

| ASSESSMENT & TAXES | | | | | | |
|---|---|---|---|---|---|---|
| Tax Year | Projected 2022 payable 2023 | | | | Tax Rate | 1.8765% |
| District | 067 | | | | Taxes Current | Yes |
| Taxes SF Basis | Net Rentable Area | | | | | |
| APN | LAND | IMPV | TOTAL | EXEMPTIONS | TAXABLE | BASE TAX |
| 02-12-30-100-001.000-067 | $424,300 | $441,100 | $865,400 | $0 | $865,400 | $16,239 |
| Totals | $424,300 | $441,100 | $865,400 | $0 | $865,400 | $16,239 |
| Total/SF | $29.72 | $30.90 | $60.62 | $0.00 | $60.62 | $1.14 |
| Tax Credits | | | | | | |
| Local Property Tax Credits | | | | | | ($835) |
| Total Tax Credits | | | | | | ($835 ) |
| Additional Tax Charges | | | | | | |
| Junk Unit Drain | | | | | | $67.0 |
| Total Additional Tax Charges | | | | | | $67 |
| Total Additional Tax Charges Per SF | | | | | | $0.00 |
| Total Base Tax, Tax Credits & Additional Tax Charges | | | | | | $15,472 |
| Total Base Tax, Tax Credits & Additional Tax Charges Per SF | | | | | | $1.08 |

Source: Allen County Assessment & Taxation

## SUBJECT PROPERTY ANALYSIS

The total taxable value for the subject property is $865,400 or $60.62/SF. There are no exemptions in place. Total projected taxes for the property are $15,472 or $1.08/SF.

As part of the scope of work, we researched assessment and tax information related to the subject property. The following are key factors related to local assessment and taxation policy. Real property in Allen County is assessed at 100% of market value. Real property is reassessed every four years. The next scheduled reassessment date is January 1, 2025. In addition to scheduled reassessments, properties in Allen County are reassessed upon conversion, renovation or demolition. Please note that the current taxes due on the property are zero, and we have included the tax bill in the addendum. Property taxes do not affect the subject's insurable value.

According to the staff representative at the Allen County treasurer's office, real estate taxes for the subject property are current as of the date of this report.

## INTRODUCTION

Zoning requirements typically establish permitted and prohibited uses, building height, lot coverage, setbacks, parking and other factors that control the size and location of improvements on a site. The zoning characteristics for the subject property are summarized below:

**General Industrial (I-2)**

| ZONING SUMMARY | |
|---|---|
| Municipality Governing Zoning | Allen County Planning & Zoning Department |
| Current Zoning | General Industrial (I-2) |
| Permitted Uses | A wide variety of industrial uses |
| Current Use | Industrial Use |
| Is Current Use Legally Permitted? | Yes |
| Zoning Change | Not Likely |
| ZONING REQUIREMENTS | |
| Conforming Use | The existing improvements appear to represent a conforming use within this zone |
| Minimum Yard Setbacks | |
| Front (Feet) | 25 |
| Rear (Feet) | 25 |
| Side (Feet) | 25 |

Source: Allen County Planning & Zoning Department

## ZONING CONCLUSIONS

Based on the appraiser's interpretation of the zoning ordinance, the subject property is an outright permitted use that could be rebuilt if unintentionally destroyed.

Detailed zoning studies are typically performed by a zoning or land use expert, including attorneys, land use planners, or architects. The depth of my analysis correlates directly with the scope of this assignment, and it considers all pertinent issues that have been discovered through my due diligence. Please note that this appraisal is not intended to be a detailed determination of compliance, as that determination is beyond the scope of this real estate appraisal assignment.

## INTRODUCTION

The market analysis section provides a comprehensive study of supply/demand conditions, examines transaction trends, and interprets ground level information conveyed by market participants. Based on these findings and an analysis of the subject property, conclusions are drawn with regard to the subject's competitive position within the marketplace. Below is a list of the various sections covered in the following Industrial market analysis:

> Fort Wayne Industrial Market
> Outlying Allen County Industrial Submarket
> Broker / Market Participant Interviews
> Transaction Trends
> Subject Property Analysis

## FORT WAYNE INDUSTRIAL MARKET

The following is an analysis of supply/demand trends in the Fort Wayne Industrial market using information provided by CoStar, widely recognized as a credible source for tracking market statistics. The table below presents historical data for key market indicators.

| FORT WAYNE HISTORICAL STATISTICS  (LAST TEN YEARS) | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2012 | 64,462,681 SF | 2,084,477 SF | 1,506,577 SF | 5.2% | $3.82/SF |
| 2013 | 64,475,681 SF | 13,000 SF | (334,695) SF | 7.9% | $3.44/SF |
| 2014 | 65,015,237 SF | 539,556 SF | (228,633) SF | 6.9% | $3.61/SF |
| 2015 | 65,850,787 SF | 835,550 SF | 2,038,353 SF | 6.9% | $3.79/SF |
| 2016 | 67,254,329 SF | 1,403,542 SF | 1,091,912 SF | 6.0% | $3.67/SF |
| 2017 | 68,526,810 SF | 1,272,481 SF | 1,149,669 SF | 5.6% | $3.38/SF |
| 2018 | 68,702,835 SF | 176,025 SF | 1,788,591 SF | 4.5% | $3.57/SF |
| 2019 | 68,702,835 SF | 0 SF | (328,384) SF | 3.4% | $4.15/SF |
| 2020 | 69,355,974 SF | 653,139 SF | 310,281 SF | 4.8% | $4.25/SF |
| 2021 | 69,800,974 SF | 445,000 SF | 503,068 SF | 5.0% | $4.25/SF |
| CAGR | 0.8% | - | - | | 1.1% |

*Supply numbers based on information which is amended/updated on an on-going basis by Costar.
Source: Costar®

Over the past ten years the Fort Wayne industrial market was stable where there was balance in prevailing industrial supply/demand conditions. Over this time period the market inventory significantly increased by 11.5%. Further there was significant positive absorption (11.6% change), moderate decrease in the vacancy rate (0.2% change) and considerable increase of the asking average rent (11.3% change).

Analysis of the data indicates the Fort Wayne industrial market has gone through three distinctive trends over the past ten years.

| TEN YEAR HISTORICAL TREND ANALYSIS | | | | |
|---|---|---|---|---|
| PERIOD | ADDED SUPPLY | NET ABSORPTION | VACANCY | ASKING RENT |
| 2012-2021 | 7,422,770 SF | 7,496,739 SF | 5.2%→5.0% | $3.82→$4.25 |
| 10 Yrs | 11.5% | 11.6% | -0.2% | 11.3% |
| 2012-2014 | 2,637,033 SF | 943,249 SF | 5.2%→6.9% | $3.82→$3.61 |
| 3 Yrs | 4.1% | 1.5% | 1.8% | -5.5% |
| 2015-2017 | 3,511,573 SF | 4,279,934 SF | 6.9%→5.6% | $3.79→$3.38 |
| 3 Yrs | 5.3% | 6.5% | -1.3% | -10.8% |
| 2018-2021 | 1,274,164 SF | 2,273,556 SF | 4.5%→5.0% | $3.57→$4.25 |
| 4 Yrs | 1.9% | 3.3% | 0.4% | 19.0% |

The three year period from 2012 to 2014 was highlighted with significantly increased supply, slight positive absorption, increase of vacancy rates and considerable decrease of asking rent in the market. The next three year period from 2015 to 2017 featured significantly increased supply, significant positive absorption, moderate decrease of vacancy rates and considerable decrease of asking rent levels. The most recent four year period from 2018 to 2021 featured slightly increased supply, positive absorption, moderate increase of vacancy rates and considerable increase of asking rent levels.

Over the past ten years the market had a compound annual growth rate (CAGR) of 0.8% per year. Vacancy has ranged from 3.4% to 7.9% with an average of 5.6%. Vacancy increased from 5.2% in 2012 to 6.9% in 2014, decreased from 6.9% in 2015 to 5.6% in 2017 and increased from 4.5% in 2018 to 5.0% in 2021.



Over the past ten years asking rent has experienced a CAGR of 1.1%. Asking rent hit a low of $3.38/SF in 2017 and a high in 2020 at $4.25/SF.



In the past ten years a total of 7,422,770 SF were added to the supply with 7,496,739 SF of net absorption achieved during the same period.



| FORT WAYNE TRAILING FOUR QUARTER PERFORMANCE | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2021 Q4 | 69,800,974 SF | 165,000 SF | 653,870 SF | 4.4% | $4.45/SF |
| 2022 Q1 | 70,036,974 SF | 236,000 SF | (32,770) SF | 4.8% | $4.65/SF |
| 2022 Q2 | 70,054,974 SF | 18,000 SF | 580,067 SF | 4.0% | $4.69/SF |
| 2022 Q3 | 70,054,974 SF | 0 SF | 303,115 SF | 3.5% | $5.03/SF |

Source: Costar®

As of Q3 2022 the Fort Wayne market has a total industrial inventory of 70,054,974 SF with 2,478,182 SF vacant indicating a current vacancy rate of 3.5%. There was no additional inventory delivered last quarter, whereas there was 419,000 SF added in the last year.

Over the past four quarters the Fort Wayne industrial market has experienced a moderate increase of supply. These key factors have resulted in positive net absorption, decrease of vacancy rates and increase of asking rent in the marketplace.



Key supply/demand statistics for the most recent quarter, last year and historical averages are summarized below.

| FORT WAYNE MARKET TREND ANALYSIS | | | |
|---|---|---|---|
| | Q3 2022 | 2021 | Last 10 |
| Total SF | 70,054,974 | 69,800,974 | 67,214,814 |
| Vacant SF | 2,478,182 | 3,455,148 | 3,763,357 |
| Market Vacancy | 3.5% | 5.0% | 5.6% |
| Construction Growth Rate | 0.0% | 0.6% | 0.8% |
| Absorption Rate | 0.4% | 0.7% | 1.1% |
| Average Asking Rent/SF | $5.03 | $4.25 | $3.79 |

Source: Costar®

## Vacancy
The Q3 2022 vacancy rate (3.5%) is slightly lower than last year (5.0%) and lower than the average vacancy over the past ten years (5.6%). The historic vacancy trend indicates stable long-term demand for industrial space in the Fort Wayne market. The most recent vacancy trends demonstrate slightly superior market conditions in comparison to the historic trend and suggest continued stability moving forward.

## Supply
There was no new inventory added during Q3 2022, whereas the growth rate was 0.6% last year. Over the past ten years the Fort Wayne industrial market grew at a CAGR of 0.8%. The historic trend demonstrates a nominal growth rate that was generally supported. The most recent trends show slightly reduced growth in comparison to the historic trend in reaction to the current economic conditions. As summarized in the table below, there are six industrial projects under construction in the Fort Wayne industrial market totaling 923,000 SF that represent

1.3% of supply that will be added in the near term. The construction activity in the market appears to be at a level that will reasonably be supported by the market. Based on this evidence it appears that supply side issues do not represent a threat to the stability of supply/demand conditions in the market.

| FORT WAYNE INDUSTRIAL CONSTRUCTION ACTIVITY SUMMARY | | | |
|---|---|---|---|
| STATUS | NO. OF PROJECTS | SIZE (SF) | % OF SUPPLY |
| Under Construction | 6 | 923,000 | 1.3% |

Source: Costar®

## Absorption

During Q3 2022 net absorption was 0.4% and net absorption was 0.7% over the last year. The Fort Wayne industrial market has established an overall trend of stable absorption (1.1%) over the past ten years. The historic absorption trend indicates stable long-term demand for industrial space in the Fort Wayne market. The most recent absorption trends demonstrate similar market conditions in comparison to the historic trend and suggest continued stability moving forward.

## Fort Wayne Market Conclusion

Based on the preceding analysis, the Fort Wayne industrial market demonstrates sound fundamentals. Analysis of supply and demand factors indicate the market is currently stable with no evidence to prove this will change any time soon. The greatest strength of the market appears to be its low vacancy rates. There are no observed weaknesses of the market that stand out.

## OUTLYING ALLEN COUNTY INDUSTRIAL SUBMARKET OVERVIEW

The following is an analysis of supply/demand trends in the Outlying Allen County Industrial submarket using information provided by CoStar. The table below presents historical data for key market indicators.

| OUTLYING ALLEN COUNTY HISTORICAL STATISTICS  (LAST TEN YEARS) | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2012 | 12,334,148 SF | 1,738,077 SF | 1,783,308 SF | 3.6% | $7.98/SF |
| 2013 | 12,347,148 SF | 13,000 SF | (173,050) SF | 9.4% | $5.23/SF |
| 2014 | 12,589,548 SF | 242,400 SF | (607,066) SF | 6.9% | $4.89/SF |
| 2015 | 12,589,548 SF | 0 SF | 1,227,862 SF | 7.4% | $5.59/SF |
| 2016 | 13,831,394 SF | 1,241,846 SF | 993,000 SF | 3.2% | $4.63/SF |
| 2017 | 14,773,240 SF | 941,846 SF | (108,790) SF | 7.8% | $3.46/SF |
| 2018 | 14,884,240 SF | 111,000 SF | 1,504,212 SF | 3.9% | $3.50/SF |
| 2019 | 14,884,240 SF | 0 SF | 33,827 SF | 0.3% | $4.09/SF |
| 2020 | 15,062,979 SF | 178,739 SF | (7,577) SF | 2.2% | $3.91/SF |
| 2021 | 15,227,979 SF | 165,000 SF | 121,595 SF | 2.3% | $4.16/SF |
| CAGR | 2.1% | - | - | - | (6.3%) |

*Supply numbers based on information which is amended/updated on an on-going basis by Costar
Source: Costar®

Over the past ten years the Outlying Allen County industrial submarket was stable where there was balance in prevailing industrial supply/demand conditions. Over this time period the submarket inventory significantly increased by 37.6%. Further there was significant positive absorption (38.7% change), moderate decrease in the vacancy rate (1.3% change) and considerable decrease of the asking average rent (47.9% change).

Analysis of the data indicates the Outlying Allen County industrial submarket has gone through three distinctive trends over the past ten years.

| TEN YEAR HISTORICAL TREND ANALYSIS | | | | |
|---|---|---|---|---|
| PERIOD | ADDED SUPPLY | NET ABSORPTION | VACANCY | ASKING RENT |
| 2012-2021 | 4,631,908 SF | 4,767,321 SF | 3.6%→2.3% | $7.98→$4.16 |
| 10 Yrs | 37.6% | 38.7% | -1.3% | -47.9% |
| 2012-2014 | 1,993,477 SF | 1,003,192 SF | 3.6%→6.9% | $7.98→$4.89 |
| 3 Yrs | 16.2% | 8.1% | 3.4% | -38.7% |
| 2015-2017 | 2,183,692 SF | 2,112,072 SF | 7.4%→7.8% | $5.59→$3.46 |
| 3 Yrs | 17.3% | 16.8% | 0.4% | -38.1% |
| 2018-2021 | 454,739 SF | 1,652,057 SF | 3.9%→2.3% | $3.50→$4.16 |
| 4 Yrs | 3.1% | 11.1% | -1.6% | 18.9% |

The three year period from 2012 to 2014 was highlighted with significantly increased supply, significant positive absorption, substantial increase of vacancy rates and considerable decrease of asking rent in the submarket. The next three year period from 2015 to 2017 featured significantly increased supply, significant positive absorption, moderate increase of vacancy rates and considerable decrease of asking rent levels. The most recent four year period from 2018 to 2021 featured increased supply, significant positive absorption, moderate decrease of vacancy rates and considerable increase of asking rent levels.

Over the past ten years the submarket had a compound annual growth rate (CAGR) of 2.1% per year. Vacancy has ranged from 0.3% to 9.4% with an average of 4.7%. Vacancy increased from 3.6% in 2012 to 6.9% in 2014, increased from 7.4% in 2015 to 7.8% in 2017 and decreased from 3.9% in 2018 to 2.3% in 2021.



Over the past ten years asking rent has experienced a CAGR decrease of 6.3%. Asking rent hit a low of $3.46/SF in 2017 and a high in 2012 at $7.98/SF.



In the past ten years a total of 4,631,908 SF were added to the supply with 4,767,321 SF of net absorption achieved during the same period.



The following table summarizes the trailing four quarter performance of the Outlying Allen County submarket.

| OUTLYING ALLEN COUNTY TRAILING FOUR QUARTER PERFORMANCE | | | | | |
|---|---|---|---|---|---|
| PERIOD | SUPPLY | NEW CONSTRUCTION | NET ABSORPTION | VACANCY | ASKING RENT |
| 2021 Q4 | 15,227,979 SF | 165,000 SF | 188,000 SF | 2.2% | $4.73/SF |
| 2022 Q1 | 15,227,979 SF | 0 SF | 127,549 SF | 1.4% | $5.11/SF |
| 2022 Q2 | 15,227,979 SF | 0 SF | (23,076) SF | 1.5% | $5.21/SF |
| 2022 Q3 | 15,227,979 SF | 0 SF | 103,326 SF | 0.8% | $5.43/SF |

Source: Costar®

As of Q3 2022 the Outlying Allen County submarket has a total industrial inventory of 15,227,979 SF with 129,169 SF vacant indicating a current vacancy rate of 0.8%. There was no additional inventory delivered last quarter, whereas there was 165,000 SF added in the last year.

Over the past four quarters the Outlying Allen County industrial submarket has experienced an increase of supply. There was also positive net absorption, decrease in vacancy rates and increase of asking rent in the marketplace.



Key supply/demand statistics for the most recent quarter, last year and historical averages are summarized below.

| OUTLYING ALLEN COUNTY MARKET TREND ANALYSIS | | | |
|---|---|---|---|
| | Q3 2022 | 2021 | Last 10 |
| Total SF | 15,227,979 | 15,227,979 | 13,852,446 |
| Vacant SF | 129,169 | 350,244 | 649,957 |
| Market Vacancy | 0.8% | 2.3% | 4.7% |
| Construction Growth Rate | 0.0% | 1.1% | 2.1% |
| Absorption Rate | 0.7% | 0.8% | 3.1% |
| Average Asking Rent/SF | $5.43 | $4.16 | $4.74 |

Source Costar®

## Vacancy

The Q3 2022 vacancy rate (0.8%) is lower than last year (2.3%) and substantially lower than the average vacancy over the past ten years (4.7%). The historic vacancy trend indicates stable long-term demand for industrial space in the Outlying Allen County submarket. The most recent vacancy trends demonstrate slightly superior market conditions in comparison to the historic trend and suggest continued stability moving forward.

## Supply

There was no new inventory added during Q3 2022, whereas the growth rate was 1.1% last year. Over the past ten years the Outlying Allen County industrial submarket grew at a CAGR of 2.1%. The historic trend demonstrates a nominal growth rate that was generally supported. The most recent trends show slightly reduced growth in comparison to the historic trend in reaction to the current economic conditions. As summarized in the table below, there is one industrial project under construction in the Outlying Allen County industrial submarket totaling 637,500 SF that represent 4.0% of supply that will be added in the near term. The construction activity in the submarket appears to be at a level that will reasonably be supported by the market. Based on this evidence it appears that supply side issues do not represent a threat to the stability of supply/demand conditions in the market.

| OUTLYING ALLEN COUNTY INDUSTRIAL CONSTRUCTION ACTIVITY SUMMARY | | | |
|---|---|---|---|
| STATUS | NO. OF PROJECTS | SIZE (SF) | % OF SUPPLY |
| Under Construction | 1 | 637,500 | 4.0% |

Source: Costar®

## Absorption

During Q3 2022 net absorption was 0.7% and net absorption was 0.8% over the last year. The Outlying Allen County industrial market has established an overall trend of stable absorption (3.1%) over the past ten years. The historic absorption trend indicates stable long-term demand for industrial space in the Outlying Allen County submarket. The most recent absorption trends demonstrate similar market conditions in comparison to the historic trend and suggest continued stability moving forward.

## Outlying Allen County Submarket Conclusion

Based on the preceding analysis, the Outlying Allen County industrial submarket demonstrates sound fundamentals. Analysis of supply and demand factors indicate the market is currently stable with no evidence to prove this will change any time soon. The greatest strength of the submarket appears to be its low vacancy rates. There are no observed weaknesses of the submarket that stand out.

## TRANSACTION TRENDS

### Sales Volume & Seller Activity

The volume of sale transactions for similar assets has been steady over the past six months within the local area, and was similar as of the date of the loss.

Based on research completed on various listing sources including CoStar and LoopNet, properties similar to the subject in terms of pricing and overall investment appeal have general availability, with numerous listings offered within the marketplace. This trend was confirmed with agents and other market participants throughout the region.

**Most Probable Buyer Profile/Activity**
In the open market, the subject property type would have commanded the most interest from regional and local buyers that are actively pursuing similar small owner-user properties. As of the retrospective date, there was steady buyer demand for substitute properties of the subject. The most probable buyer was an owner user.

**Transaction Trends Conclusion**
Based on the preceding analysis, there is an established sales market for the subject property. As previously discussed, the velocity of sale transactions has been steady since 2019. Currently there is steady buyer demand, while there is general availability for this property type on the supply side. Based on these factors, conditions are in equilibrium in regard to negotiating sale terms. One of the greatest observed strengths of this asset type is the particularly sound fundamentals compared to other commercial real estate sectors.

**SUBJECT PROPERTY ANALYSIS**
This market analysis has examined historical and current supply/demand trends for the subject property type on market and submarket levels. Further, the subject's competitive dataset was profiled and analyzed to gain perspective of supply/demand conditions for properties in direct competition with the subject. Market participant interviews were conducted to provide ground level support of what is really occurring in the marketplace. Next, transaction trends were researched and analyzed. The final step will be to draw conclusions from the market data and analyses based on their perceived influence on the subject property.

The subject is an Industrial (Flex Space) asset with a total net rentable area of 14,275 SF. The market generally classifies the subject as a small owner-user property.

**Tenant Appeal Conclusion**
Based on our analysis of the subject property and investigation of comparable properties in the marketplace, the subject would have been likely to have had average overall tenant appeal with a typical competitive position for attracting and retaining tenants.

**Buyer Appeal Conclusion**
Based on our analysis of the subject property and investigation of substitute properties in the marketplace, the subject was likely to have had average overall buyer appeal with an average competitive position if the asset was exposed to the open market.

## EXPOSURE TIME & MARKETING PERIOD

Exposure time is defined as "An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal." (The Dictionary of Real Estate Appraisal, Appraisal Institute, 2022). Reasonable exposure time is impacted by the aggressiveness and effectiveness of a property's exposure to market participants, availability and cost of financing, and demand for similar investments. Exposure time is best established based the recent history of marketing periods for comparable sales, discussions with market participants and information from published surveys.

The availability of acquisition financing factors into exposure time. In 2019, financing was available for well-positioned commercial real estate, particularly for stabilized assets within core MSAs and owner/user deals. For second tier or marginal properties, financing has been available but subject to more stringent requirements. Based on review of the local capital market, we conclude that adequate financing options would have been available to consummate a sale of the property on the date of value.

### Exposure Time Conclusion

The preceding information generally supports an exposure time range 6 to 14 months for Industrial (Flex Space) properties. The subject property is of average quality and is in average condition. Based on its overall physical and locational characteristics, the subject has average overall appeal to owner/users. Considering these factors, a reasonable estimate of exposure time for the subject property is 12 months or less.

### Marketing Period Conclusion

Marketing period is very similar to exposure time, but reflects a projected time period to sell the property, rather than a retrospective estimate. We have reviewed open listings and discussed the market with local participants, and given the nature of the subject property, we feel that a time period of 12 months or less is supported for the subject's marketing period.

## INTRODUCTION

The highest and best use of an improved property is defined as that reasonable and most probable use that will support its highest present value. The highest and best use, or most probable use, must be legally permissible, physically possible, financially feasible, and maximally productive. This section develops the highest and best use of the subject property As-Vacant and As-Improved.

## AS-VACANT ANALYSIS

### Legal Factors

The legal factors that possibly influence the highest and best use of the subject site are discussed in this section. Private restrictions, zoning, building codes, historic district controls, and environmental regulations are considered, if applicable to the subject site. Permitted uses of the subject's General Industrial (I-2) zoning were listed in the Zoning Analysis section. Overall, legal factors support a broad range of industrial uses for the subject site if the land were vacant.

### Physical & Locational Factors

Regarding physical characteristics, the subject site is rectangular in shape and has level topography with average/good access and average/good exposure. The subject site has frontage on a secondary street. The immediate area is developed with industrial and public development along major arterials that is interspersed with multi-family complexes and single-family residential development removed from arterials. Of the outright permitted uses, physical and locational features best support development of an industrial property as market conditions warrant for the site's highest and best use as-vacant.

### Feasibility Factors

Regarding financial feasibility of an industrial property in the region, construction delivery trends were previously discussed in the Market Analysis section. In general, the Fort Wayne Market and Outlying Allen County Submarket are experiencing a typical level of construction activity compared to historical norms. Select owner/users are known to be expanding regionally on similar sites. The relative stability of the owner/user sector could drive near term development of the subject site under this scenario. Financial feasibility factors generally support near-term development of the subject site if it were vacant.

### As-Vacant Conclusion

Based on the previous discussion, the subject's highest and best use as-vacant is concluded to be development of an industrial property as market conditions warrant.

## RETROSPECTIVE AS-IMPROVED ANALYSIS

### Legal Factors

The subject's Industrial (Flex Space) use (as-improved) was permitted outright by the I-2 zoning. The legal factors influencing the highest and best use of the property supported the subject's use as-improved.

### Physical & Locational Factors

The physical and location characteristics of the subject improvements have been previously discussed in this report. In summary, the subject's improvements were constructed in 1965 to 1975 and had a remaining economic life of 20 years based on my estimate. The project was of average quality construction and in average condition, with adequate service amenities. The subject improvements as-improved were sufficiently supported by site features including its rectangular shape, level topography, average/good access and average/good exposure. Further, the subject's location supported the subject improvements as-improved with similar and homogeneous

developments present in the subject's immediate market area. Physical and location factors influencing the highest and best use of the property supported the subject's use as-improved.

## Alternative Uses & Feasibility Factors

In addition to legal and physical considerations, analysis of the subject property as-improved requires the treatment of two important issues: 1) consideration of alternative uses for the property; and 2) the marketability of the most probable use. The five possible alternative treatments of the property are demolition, expansion, renovation, conversion, and the subject's use as-improved.

› **Demolition** As of the date of loss, the subject contributed significant value to the subject parcel and demolition wouldn't have been relevant.

› **Expansion** Expansion is not relevant to the scope of work.

› **Renovation** The subject property was approximately 57 years old and was in average condition. Renovation, in the form of capital expenditures, would not have increased the rent levels or value appreciably. For this reason, renovation was not appropriate.

› **Conversion** Conversion was neither appropriate nor applicable to this property.

› **Continued Use "As-Is"** The final option was the continued use of the property "As-Is." This was legal, physically possible, and financially feasible. Therefore, as of the date of loss, continued use as an Industrial property would have been most appropriate.

Among the five alternative uses, the subject's industrial and office (flex) use as-improved – as of the retrospective date - is supported to be its Highest and Best Use.

## Marketability Factors

In general an industrial supply/demand conditions and immediate market area trends support viable short and long-term operations of the subject's use as-improved. Based on our analysis of the subject property and investigation of comparable properties in the marketplace, the subject would have been likely to have had average overall tenant appeal with a typical competitive position for attracting and retaining tenants. Based on our analysis of the subject property and investigation of substitute properties in the marketplace, the subject was likely to have had average overall buyer appeal with an average competitive position if the asset was exposed to the open market.

## Retrospective As-Improved Conclusion

Based on the previous discussion, the highest and best use of the subject property as-improved, as of the retrospective date, is concluded to be continued use as an industrial property.

## INTRODUCTION

The following presentation of the appraisal process deals directly with the valuation of the subject property. The following paragraphs describe the standard approaches to value that were considered for this analysis.

## INCOME APPROACH

The Income Approach is based on the premise that properties are purchased for their income producing potential. It considers both the annual return on the invested principal and the return of the invested principal. This valuation technique entails careful consideration of contract rents currently in place, projected market rents, other income sources, vacancy allowances, and projected expenses associated with the efficient operation and management of the property. The relationship of these income estimates to property value, either as a single stream or a series of projected streams, is the essence of the income approach. The two fundamental methods of this valuation technique include Discounted Cash Flow and Direct Capitalization.

Characteristics specific to the subject property do not warrant that this valuation technique is developed. Development of the Income Approach is not a specific scope requirement of this assignment. The subject is an owner/user facility, and typically buyers and sellers of this property type place secondary weight on the Income Approach. Based on the preceding information, the Income Approach will not be presented.

## SALES COMPARISON APPROACH

The Sales Comparison Approach is based on the principle of substitution, which asserts that no one would pay more for a property than the value of similar properties in the market. This approach analyzes comparable sales by applying transactional and property adjustments in order to bracket the subject property on an appropriate unit value comparison.

Characteristics specific to the subject property and the scope of work warrant that this valuation technique to be developed. Development of the Sales Comparison Approach is a specific scope requirement of this assignment. Sufficient sales data is available to provide a credible value estimate by the Sales Comparison Approach. Based on this reasoning, the Sales Comparison Approach is presented within this appraisal.

## LAND VALUATION

Development land in the subject marketplace is most often valued utilizing the Sales Comparison Approach. Characteristics specific to the subject property warrant that a site value is developed. Development of the subject site value is a specific scope requirement of this assignment. The site value is required to be developed for use within the Sales Comparison Approach, in order to deduct the site values of the comparables. Within the Site Valuation section, a pro-forma site is valued on a per square-foot basis and this value is applied to the site size of each comparable in the sales comparison approach, in order to derive the value of the improvements only.

## COST APPROACH

The Cost Approach is a set of procedures through which a value indication is derived for the fee simple estate by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit; deducting depreciation from the total cost; and adding the estimated land value.

Characteristics specific to the subject property warrant that this valuation technique is developed. Development of the Cost Approach is a method to determine the reasonableness of the depreciation and original cost of the subject. Based on the scope of work, the Cost Approach will be presented.

**RECONCILIATION OF VALUE CONCLUSIONS**

The Sales Comparison and Cost approaches are used to value the subject property, which will be reconciled into the final opinion of depreciated insurable value in the Analysis of Value Conclusions section.

Case 1:21-cv-00108-HAB   document 57-1   filed 04/28/23   page 298 of 378

DTW221032

## INTRODUCTION

The Sales Comparison Approach is based on the principle of substitution, which asserts that a buyer would not pay more for a property than the value of similar properties in the market. This approach analyzes comparable sales by applying transactional and property adjustments to bracket the subject property within an appropriate unit value comparison.

## UNIT OF COMPARISON

The most relevant unit of comparison is the price per square foot of NRA. This indicator best reflects the analysis used by buyers and sellers in this market for improved properties with similar design and utility.

## COMPARABLE SELECTION

I completed a thorough search for similar improved sales in terms of property type, location, physical characteristics, and date of sale. In selecting comparables, emphasis was placed on confirming recent improved sales of properties that match the highest and best use, and buyer/seller profile of the subject property. Overall, the sales selected represent the best comparables available for this analysis.

## ADJUSTMENT PROCESS

Quantitative adjustments are made to the comparable sales. The following adjustments or general market trends were considered for the basis of valuation.

### Land Value Adjustment

Land value has been deducted from each sale based on the per-square foot value of industrial land multiplied by the lot size of each indicator.

### Transactional Adjustments

Dollar adjustments to the comparable sales were considered and made when warranted for transactional adjustments in the sequence shown below:

| | |
|---|---|
| Property Rights Transferred | The valuation of the subject site was completed on a fee simple basis. If warranted, leased fee, leasehold and/or partial interest sales were adjusted accordingly. |
| Financing Terms | The subject property was valued on a cash equivalent basis. Adjustments were made to the comparables involving financing terms atypical of the marketplace. |
| Conditions of Sale | This adjustment accounts for extraordinary motivation on the part of the buyer or seller often associated with distressed sales. |
| Expenditures After Purchase | Adjustments were applied if physical conditions warranted expenditures on the part of the buyer to bring the comparable up to functional standards. Most often this adjustment accounts for costs associated with deferred maintenance. |
| Market Conditions | Market conditions adjustments were based on a review of historical sale data, market participant interviews and review of current versus historical pricing. Based on my research, the following table summarizes the market conditions adjustment applied in this analysis. |

| MARKET CONDITIONS ADJUSTMENT | | |
|---|---|---|
| Per Year As Of   December 2022 | (As-Is) | 1% |

The analysis applies an upward market conditions adjustment of 1% annually reflecting the conditions between the oldest comparable sale date up through the effective valuation date. An adjustment for the retrospective date of value will be made subsequent to the analysis.

**Property Adjustments**

Quantitative percentage adjustments are also made for location and physical characteristics such as size, age, site and parking ratios, access, exposure, quality and condition, as well as other applicable elements of comparison. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate my logic in deriving a value opinion for the subject property.

**PRESENTATION**

The following Sales Summation Table, Location Map and datasheets summarize the improved sales data. Following these items, the comparable sales are adjusted for applicable elements of comparison and the opinion of value by the Sales Comparison Approach is concluded.

## IMPROVED SALES SUMMATION TABLE

| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 | COMPARABLE 6 |
|---|---|---|---|---|---|---|---|
| Name | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Warehouse |
| Address | 6231 MacBeth Road | 3108 Lower Huntington Road | 4717 Clubview Dr | 534 Southview Ave | 3807 Transportation Dr | 4822 Projects Dr | 6821 Metro Park Dr |
| City | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne |
| State | IN | IN | IN | IN | IN | IN | IN |
| Zip | 46809 | 46809 | 46804 | 46806 | 46818 | 46825 | 46818 |
| County | Allen | Allen | Allen | Allen | Allen | Allen | Allen |
| **PHYSICAL INFORMATION** | | | | | | | |
| Property Type | Industrial | Industrial | Industrial | Industrial | Industrial | Industrial | Industrial |
| NRA (SF) | 14,275 | 6,000 | 24,000 | 4,881 | 17,256 | 11,300 | 12,000 |
| Land Area (SF) | | 95,832 | 101,495 | 21,344 | 60,984 | 42,253 | 87,120 |
| Location | Average/Good | Average/Good | Average/Good | Average/Good | Good | Good | Good |
| Quality | Average | Average | Average | Good | Average | Average | Average |
| Condition | Average | Fair | Average | Average | Average | Good | Average/Good |
| Exposure | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Access | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Year Built | 1965 to 1975 | 1999 | 1980 | 1976 | 1993 | 1985 | 2004 |
| Year Renovated | - | - | - | 1983 | - | - | - |
| **SALE INFORMATION** | | | | | | | |
| Date | | 5/8/2020 | 7/31/2021 | 6/8/2022 | 1/31/2022 | 12/28/2021 | 3/5/2020 |
| Status | | Recorded | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Fee Simple | Leased Fee | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Price | | $300,000 | $1,170,000 | $335,000 | $970,000 | $700,000 | $820,000 |
| Analysis Price | | $300,000 | $1,170,000 | $335,000 | $970,000 | $700,000 | $820,000 |
| Comp Land Area (SF) | | 95,832 | 101,495 | 21,344 | 60,984 | 42,253 | 87,120 |
| Comp Land Value ($/SF) | | $2.00 | $2.00 | $2.00 | $2.00 | $2.00 | $2.00 |
| Total Comp Land Value | | -$191,664 | -$202,990 | -$42,688 | -$121,968 | -$84,506 | -$174,240 |
| Adjusted Comp Price | | $108,336 | $967,010 | $292,312 | $848,032 | $615,494 | $645,760 |
| Adjusted $/SF NRA | | $18 | $40 | $60 | $49 | $54 | $54 |

**SALES APPROACH**

CONTINUED

DTW221032

## SALES LOCATION MAP



### COMPARABLE KEY

| COMP | DISTANCE | NAME | ADDRESS | OCC. | SALE DATE | OAR | $/SF |
|------|----------|------|---------|------|-----------|-----|------|
| SUBJECT | - | Industrial Building | 6231 MacBeth Road, Fort Wayne, IN | 100.0% | - | - | $44 |
| No. 1 | 2.3 Miles | Industrial Building | 3108 Lower Huntington Road, Fort Wayne, IN | 100.0% | 5/8/2020 | | $18 |
| No. 2 | 1.4 Miles | Industrial Building | 4717 Clubview Dr, Fort Wayne, IN | 100.0% | 7/31/2021 | | $40 |
| No. 3 | 4.8 Miles | Industrial Building | 534 Southview Ave, Fort Wayne, IN | 100.0% | 6/8/2022 | | $60 |
| No. 4 | 7.4 Miles | Industrial Building | 3807 Transportation Dr, Fort Wayne, IN | 100.0% | 1/31/2022 | | $49 |
| No. 5 | 7.7 Miles | Industrial Building | 4822 Projects Dr, Fort Wayne, IN | | 12/28/2021 | | $54 |
| No. 6 | 7.9 Miles | Industrial Warehouse | 6821 Metro Park Dr, Fort Wayne, IN | 100.0% | 3/5/2020 | | $54 |

## COMPARABLE 1

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Building |
| Address | 3108 Lower Huntington Road |
| City, State, Zip Code | Fort Wayne, IN, 46809 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-12-28-380-001.000-074 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Property X LLC |
| Seller | Rider Rodney & Denise |
| Transaction Date | 05/8/2020 |
| Transaction Status | Recorded |
| Transaction Price | $300,000 |
| Analysis Price | $300,000 |
| Recording Number | 26055 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 6,000 |
| Leasable Area (NRA) | 6,000 |
| Number of Buildings | 1 |
| Year Built | 1999 |
| No. of Floors | 1 |
| % of Office Build-out | 21% |
| Clear Height | 16 Feet |
| Quality | Average |
| Condition | Fair |
| Appeal | Average |
| Building Structure | Steel / Masonry |
| Exterior | Mixed |
| Site Size | 2.2 Acres (95,832 SF) |
| Zoning | IN1 |
| Shape | Generally Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 6.3% |



### INDUSTRIAL BUILDING



### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $18 |
| Adjusted Price per SF | $20 |
| Capitalization Rate | |

### CONFIRMATION

| | |
|---|---|
| Name | CoStar/Public Records |
| Company | Confidential |
| Source | Agent (CoStar) / Assessor's Records |
| Date / Phone Number | 02/15/2021       Confidential |

### REMARKS

This is a small industrial / commercial building that was purchased by an owner/user. It was not leased at the time of the sale.

## COMPARABLE 2

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Building |
| Address | 4717 Clubview Dr |
| City, State, Zip Code | Fort Wayne, IN, 46804 |
| County | Allen |
| MSA | Chicago-Naperville-Elgin, IL-IN-WI |
| APN | 02-12-20-252-002.000-074 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Covington Properties LLC |
| Seller | Robert Loubier |
| Transaction Date | 07/31/2021 |
| Transaction Status | Recorded |
| Transaction Price | $1,170,000 |
| Analysis Price | $1,170,000 |
| Rights Transferred | Leased Fee |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |
| Marketing Time | 4 Months |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 24,000 |
| Leasable Area (NRA) | 24,000 |
| Number of Buildings | 1 |
| Year Built | 1980 |
| No. of Floors | 1 |
| % of Office Build-out | 10% |
| Clear Height | 21 Feet |
| Front Footage | Average |
| Class | C |
| Quality | Average |
| Condition | Average |
| Appeal | Average |
| Building Structure | Steel / Masonry |
| Exterior | Mixed |
| Site Size | 2.3 Acres (101,495 SF) |
| Zoning | I2 |
| Shape | Generally Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 23.6% |



### INDUSTRIAL BUILDING



### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $40 |
| Adjusted Price per SF | $43 |
| Capitalization Rate | |

### CONFIRMATION

| | | |
|---|---|---|
| Name | CoStar/Public Records | |
| Company | Confidential | |
| Source | Agent (CoStar) / Assessor's Records | |
| Date / Phone Number | 10/24/2022 | Confidential |

### REMARKS

The property at 4717 Clubview Drive in fort Wayne sold for $1,170,000. The subject property spans 24,000 square-feet, comprised of 9.3% office and 90.7% industrial space serving as Phoenix America's headquarters for eighteen years.The property sits on 2.33 acres. The building w as an investment sale, but w as leased at market rates.

## COMPARABLE 3

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Building |
| Address | 534 Southview Ave |
| City, State, Zip Code | Fort Wayne, IN, 46806 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-12-24-357-008.000-074, 02-12-24-357-0 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | A S W E Investments |
| Seller | KJK LLC |
| Transaction Date | 06/8/2022 |
| Transaction Status | Recorded |
| Transaction Price | $335,000 |
| Analysis Price | $335,000 |
| Recording Number | 2022031016 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |
| Marketing Time | 1 Months |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 4,881 |
| Leasable Area (NRA) | 4,881 |
| Number of Buildings | 1 |
| Year Built | 1976 |
| Year Renovated | 1983 |
| No. of Floors | 1 |
| % of Office Build-out | 18% |
| Clear Height | 13-14 Feet |
| Class | C |
| Grade Doors | 4 |
| Quality | Good |
| Condition | Average |
| Appeal | Average/Good |
| Building Structure | Wood |
| Exterior | Mixed |
| Site Size | 0.5 Acres (21,344 SF) |
| Zoning | I1 |
| Shape | Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 22.9% |



**INDUSTRIAL BUILDING**



### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $60 |
| Adjusted Price per SF | $49 |
| Capitalization Rate | |

### CONFIRMATION

| | |
|---|---|
| Name | Evan Rubin |
| Company | The Zacher Company |
| Source | Agent (CoStar) / Assessor's Records |
| Date / Phone Number | 12/28/2022    +1 260 422 8474 |

### REMARKS

The original structure was constructed in 1976 before an addition was completed in 1983. The property is approximately 18% office space. The building is located just east of US-27. There are 5 overhead doors. There is also fencing for yard storage. The original asking price for this property was $390,000 before it ultimately closed for a sale price of $335,000.

## COMPARABLE 4

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Building |
| Address | 3807 Transportation Dr |
| City, State, Zip Code | Fort Wayne, IN, 46818 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-17-477-003.000-073 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Veritas Equity Partners Llc |
| Seller | Terrapin Llc |
| Transaction Date | 01/31/2022 |
| Transaction Status | Recorded |
| Transaction Price | $970,000 |
| Analysis Price | $970,000 |
| Recording Number | 2022006198 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 17,256 |
| Leasable Area (NRA) | 17,256 |
| Number of Buildings | 1 |
| Year Built | 1993 |
| No. of Floors | 2 |
| Parking Spaces / Ratio | 40 (2.3/1,000 SF NRA) |
| % of Office Build-out | 41% |
| Clear Height | 20 Feet |
| Class | C |
| Quality | Average |
| Condition | Average |
| Appeal | Average/Good |
| Building Structure | Steel / Masonry |
| Exterior | Mixed |
| Site Size | 1.4 Acres (60,984 SF) |
| Zoning | I2 |
| Shape | Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 24.5% |



**INDUSTRIAL BUILDING**

### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $49 |
| Adjusted Price per SF | $41 |
| Capitalization Rate | |

### CONFIRMATION

| | |
|---|---|
| Name | Confirmed |
| Company | CoStar/Public Records |
| Source | Agent (CoStar) / Assessor's Records |
| Date / Phone Number | 12/28/2022        Confidential |

### REMARKS

This property is comprised of warehouse space (10,212 SF) and office space (7,044 SF). The office space is two stories while the warehouse space is only one story. The property is located north of the I-69 and US-30 junction. The sale and property details were verified with the assessor's records.

## COMPARABLE 5

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Building |
| Address | 4822 Projects Dr |
| City, State, Zip Code | Fort Wayne, IN, 46825 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-23-426-010.000-073 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Trustline Properties Llc |
| Seller | Lnee Properties Llc |
| Transaction Date | 12/28/2021 |
| Transaction Status | Recorded |
| Transaction Price | $700,000 |
| Analysis Price | $700,000 |
| Recording Number | 2022000871 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 11,300 |
| Leasable Area (NRA) | 11,300 |
| Number of Buildings | 1 |
| Year Built | 1985 |
| No. of Floors | 1 |
| Parking Spaces / Ratio | 20 (1.8/1,000 SF NRA) |
| % of Office Build-out | 44% |
| Clear Height | 16 Feet |
| Class | C |
| Grade Doors | 1 |
| Dock Doors | 1 |
| Quality | Average |
| Condition | Good |
| Appeal | Average/Good |
| Building Structure | Steel / Masonry |
| Exterior | Mixed |
| Site Size | 1.0 Acres (42,253 SF) |
| Zoning | I1 |
| Shape | Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 26.7% |





**INDUSTRIAL BUILDING**

### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $54 |
| Adjusted Price per SF | $41 |
| Capitalization Rate | |

### CONFIRMATION

| | |
|---|---|
| Name | Confirmed |
| Company | CoStar/Public Records |
| Source | Agent (CoStar) / Assessor's Records |
| Date / Phone Number | Confidential      Confidential |

### REMARKS

This property is a mixed-use building with 6,300 SF of industrial/flex space and 5,000 SF of office space. The property has one loading dock and one grade level drive-in door. The entire building is air conditioned.  The sale price was confirmed by Costar.

## COMPARABLE 6

### LOCATION INFORMATION

| | |
|---|---|
| Name | Industrial Warehouse |
| Address | 6821 Metro Park Dr |
| City, State, Zip Code | Fort Wayne, IN, 46818 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-16-176-001.007-073 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Peakway Investment Group Llc |
| Seller | Duncan Supply Co Inc |
| Transaction Date | 03/5/2020 |
| Transaction Status | Recorded |
| Transaction Price | $820,000 |
| Analysis Price | $820,000 |
| Recording Number | 2020012799 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | |
|---|---|
| Gross Building Area (GBA) | 12,000 |
| Leasable Area (NRA) | 12,000 |
| Number of Buildings | 1 |
| Year Built | 2004 |
| No. of Floors | 1 |
| Parking Spaces / Ratio | 26 (2.2/1,000 SF NRA) |
| % of Office Build-out | 27% |
| Clear Height | 18 Feet |
| Front Footage | Typical |
| Class | C |
| Grade Doors | 1 |
| Dock Doors | 1 |
| Quality | Average |
| Condition | Average/Good |
| Appeal | Average/Good |
| Building Structure | Metal |
| Exterior | Mixed |
| Site Size | 2.0 Acres (87,120 SF) |
| Zoning | I2 |
| Shape | Rectangular |
| Topography | Level |
| Access | Average/Good |
| Exposure | Average/Good |
| Site Coverage (SF)/Ratio | 13.8% |



**INDUSTRIAL WAREHOUSE**



### ANALYSIS INFORMATION

| | |
|---|---|
| Price per SF | $54 |
| Adjusted Price per SF | $46 |
| Capitalization Rate | |

### CONFIRMATION

| | |
|---|---|
| Name | John Caffray |
| Company | Sturges Property Group |
| Source | CoStar |
| Date / Phone Number | 12/30/2022    +1 260 425 2065 |

### REMARKS

This property is an industrial warehouse on the north side of Fort Wayne. The building is comprised of warehouse space (8,800 SF) and office space (3,200 SF). The ceilings are 18 feet high, and the building has 1 drive-in door and 1 loading dock. The sale price and building details were confirmed with the assessor's records.

# IMPROVED SALES ADJUSTMENT TABLE

| COMPARABLE | SUBJECT | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 | COMPARABLE 6 |
|---|---|---|---|---|---|---|---|
| Name | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Building | Industrial Warehouse |
| Address | 6231 MacBeth Road | 3108 Lower Huntington Road | 4717 Clubview Dr | 534 Southview Ave | 3807 Transportation Dr | 4822 Projects Dr | 6821 Metro Park Dr |
| City, State | Fort Wayne, IN | Fort Wayne, IN | Fort Wayne, IN | Fort Wayne, IN | Fort Wayne, IN | Fort Wayne, IN | Fort Wayne, IN |
| Zip | 46809 | 46809 | 46804 | 46806 | 46818 | 46825 | 46818 |
| NRA (SF) | 14,275 | 6,000 | 24,000 | 4,881 | 17,256 | 11,300 | 12,000 |
| Year Built | 1965 to 1975 | 1999 | 1980 | 1976 | 1993 | 1985 | 2004 |
| **SALE INFORMATION** | | | | | | | |
| Date | | 5/8/2020 | 7/31/2021 | 6/8/2022 | 1/31/2022 | 12/28/2021 | 3/5/2020 |
| Status | | Recorded | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Fee Simple | Leased Fee | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Adjusted Comp Price | | $108,336 | $967,010 | $292,312 | $848,032 | $615,494 | $820,000 |
| Adjusted $/SF NRA | | $18 | $40 | $49 | $54 | $54 |
| **TRANSACTIONAL ADJUSTMENTS** | | | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | 0% | 0% |
| Expenditures After the Sale | | 0% | 0% | 0% | 0% | 0% | 0% |
| Market Conditions[1] | | 3% | 1% | 1% | 1% | 1% | 3% |
| Subtotal Transactional Adj Price | | $19 | $41 | $60 | $50 | $55 | $55 |
| **PROPERTY ADJUSTMENTS** | | | | | | | |
| Location | Average/Good | Average/Good | Average/Good | Average/Good | Good | Good | Good |
| Adjustment | | 0% | 0% | 0% | -10% | -10% | -10% |
| Size | 14,275 | 6,000 | 24,000 | 4,881 | 17,256 | 11,300 | 12,000 |
| Adjustment | | -5% | 5% | -10% | 0% | 0% | 0% |
| Quality | Average | Average | Average | Good | Average | Average | Average |
| Adjustment | | 0% | 0% | -10% | 0% | 0% | 0% |
| Condition | Average | Fair | Average | Average | Average | Good | Average/Good |
| Adjustment | | 10% | 0% | 0% | 0% | -10% | -5% |
| Exposure | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| Access | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| % Office | 27% | 21% | 10% | 18% | 41% | 44% | 27% |
| Adjustment | | 0% | 5% | 0% | -4% | -5% | 0% |
| Clear Height | 16 Feet | 16 Feet | 21 Feet | 13-14 Feet | 20 Feet | 16 Feet | 18 Feet |
| Adjustment | | 0% | -5% | 2% | -4% | 0% | -2% |
| Subtotal Property Adjustment | | 5% | 5% | -18% | -18% | -25% | -17% |
| **TOTAL ADJUSTED PRICE** | | $20 | $43 | $49 | $41 | $41 | $46 |

| STATISTICS | UNADJUSTED | ADJUSTED |
|---|---|---|
| LOW | $18 | $20 |
| HIGH | $60 | $49 |
| MEDIAN | $51 | $42 |
| AVERAGE | $46 | $40 |

[1] Market Conditions Adjustment  1%
Date of Value (for adjustment calculations)  12/29/22

## SALES COMPARABLE ANALYSIS

### Introduction

The comparable sales indicate an adjusted value range from $20 to $49/SF, with a median of $42/SF and an average of $40/SF. The range of total gross adjustment applied to the comparables was from 16% to 26%, with an average gross adjustment across all comparables of 20%. The level of total adjustment applied to the comparables is considered minimal, an indication that the dataset is applicable to the subject and increases the credibility of the analysis. The adjustment process for each comparable sale is discussed in the following paragraphs.

### Discussion of Adjustments

Comparable 1 ($20/SF as adjusted) required a total upward transaction adjustment of 3%. This comparable required a total upward adjustment of 5% for property characteristics. Smaller properties tend to sell for more on a per-square foot basis, and a downward adjustment weas applied to this indicator. The total gross adjustment applied to this comparable was 18%. The moderate level of gross adjustments required for this comparable indicates that it can be adequately relied upon for valuation of the subject. This comparable is given primary consideration as a value indicator for the subject.

Comparable 2 ($43/SF as adjusted) required a total upward transaction adjustment of 1%. Although this property was leased, based on our understanding of the transaction, there was no premium for the lease because it was at market rates, and no property rights adjustment was applied. This comparable required a total upward adjustment of 5% for property characteristics. This property is about 10,000 SF larger than the subject and an upward adjustment is applied on a per square-foot basis. The total gross adjustment applied to this comparable was 16%. The moderate level of gross adjustments required for this comparable indicates that it can be adequately relied upon for valuation of the subject. This comparable is given primary consideration as a value indicator for the subject.

Comparable 3 ($49/SF as adjusted) required a total upward transaction adjustment of 1%. This comparable required a total downward adjustment of -18% for property characteristics. Smaller properties tend to sell for more on a per-square foot basis, and a downward adjustment weas applied to this indicator. The total gross adjustment applied to this comparable was 23%. The substantial level of gross adjustments required for this comparable was justified due to the comparable's varying attributes. Considering these factors, this comparable is given secondary consideration as a value indicator for the subject.

Comparable 4 ($41/SF as adjusted) required a total upward transaction adjustment of 1%. This comparable required a total downward adjustment of -18% for property characteristics. This indicator is in an area where industrial rents are higher than the subject's location (based on CoStar data), and a downward location adjustment was applied. The total gross adjustment applied to this comparable was 19%. The moderate level of gross adjustments required for this comparable indicates that it can be adequately relied upon for valuation of the subject. This comparable is given primary consideration as a value indicator for the subject.

Comparable 5 ($41/SF as adjusted) required a total upward transaction adjustment of 1%. This comparable required a total downward adjustment of -25% for property characteristics. This indicator is in an area where industrial rents are higher than the subject's location (based on CoStar data), and a downward location adjustment was applied. The total gross adjustment applied to this comparable was 26%. The substantial level of gross adjustments required for this comparable was justified due to the comparable's varying attributes. Considering these factors, this comparable is given secondary consideration as a value indicator for the subject.

Comparable 6 ($46/SF as adjusted) required a total upward transaction adjustment of 3%. This comparable required a total downward adjustment of -17% for property characteristics. This indicator is in an area where industrial rents are higher than the subject's location (based on CoStar data), and a downward location adjustment was applied. The total gross adjustment applied to this comparable was 20%. The substantial level of gross adjustments required for this comparable was justified due to the comparable's varying attributes. Considering these factors, this comparable is given primary consideration as a value indicator for the subject.

## SALES COMPARISON APPROACH CONCLUSION

The comparable sales indicate an adjusted value range from $20 to $49/SF, with a median of $42/SF and an average of $40/SF. Based on the results of the preceding analysis, Comparable 1 ($20/SF adjusted), Comparable 2 ($43/SF adjusted), Comparable 4 ($41/SF adjusted) and Comparable 6 ($46/SF adjusted) are given primary consideration for the subject's opinion of value.

The following table summarizes the analysis of the comparables, reports the reconciled price per NRA value conclusion, and presents the concluded value of the subject property.

| SALES COMPARISON APPROACH CONCLUSION (NRA) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ANALYSIS | ADJUSTMENT | | | | NET | GROSS | OVERALL |
| COMP | PRICE | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | ADJ % | ADJ % | COMPARISON |
| 1 | $18 | 3% | $19 | 5% | $20 | 11% | 18% | PRIMARY |
| 2 | $40 | 1% | $41 | 5% | $43 | 7% | 16% | PRIMARY |
| 3 | $60 | 1% | $60 | -18% | $49 | -18% | 23% | SECONDARY |
| 4 | $49 | 1% | $50 | -18% | $41 | -17% | 19% | PRIMARY |
| 5 | $54 | 1% | $55 | -25% | $41 | -25% | 26% | SECONDARY |
| 6 | $54 | 3% | $55 | -17% | $46 | -15% | 20% | PRIMARY |
| LOW | $20 | | | | | AVERAGE | | $40 |
| HIGH | $49 | | | | | MEDIAN | | $42 |
| | | | SUBJECT SF | $/SF CONCLUSION | | | | VALUE |
| AS-IS INSURABLE VALUE | | | 14,275 | x | $44/SF | = | | $630,000 |
| (3% Inflation From 3/19 to 2/22) | | | Multiplier | | | | | 0.91 |
| RETROSPECTIVE INSURABLE VALUE | | | | $40/SF | | | | $570,000 |

[1]Cumulative ²Additive                                                                                 Rounded to nearest $10,000

DTW221032

## INTRODUCTION

As previously discussed within the Valuation Methods section, the subject is valued as one marketable economic site in this appraisal. Land value is influenced by a number of factors; most prominent of which is development and use potential. These factors, as well as others, are considered in the following analysis.

## UNIT OF COMPARISON

The most relevant unit of comparison is the price per square foot. This indicator best reflects the analysis used by buyers and sellers in this market for land with similar utility and zoning in this marketplace.

## COMPARABLE SELECTION

A thorough search was made for similar land sales in terms of proximity to the subject, size, location, development potential, and date of sale. In selecting comparables, emphasis was placed on confirming recent sales of commercial sites that are similar to the subject property in terms of location and physical characteristics. Overall, the sales selected represent the best comparables available for this analysis.

## ADJUSTMENT PROCESS

Quantitative adjustments are made to the comparable sales. The following adjustments or general market trends were considered for the basis of valuation.

### Transactional Adjustments

Dollar adjustments to the comparable sales were considered and made when warranted for transactional adjustments in the sequence shown below:

Property Rights Transferred — The valuation of the subject site was completed on a fee simple basis. If warranted, leased fee, leasehold and/or partial interest land sales were adjusted accordingly.

Financing Terms — The subject site was valued on a cash equivalent basis. Adjustments were made to the comparables involving financing terms atypical of the marketplace.

Conditions of Sale — This adjustment accounts for extraordinary motivation on the part of the buyer or seller often associated with distressed sales and/or assemblages.

Expenditures After Purchase — Adjustments were applied if site conditions warranted expenditures on the part of the buyer to create a buildable site. Examples include costs for razing pre-existing structures, general site clearing and/or mitigation of environmental issues.

Market Conditions — Market conditions adjustments were based on a review of historical sale data, market participant interviews and review of current versus historical pricing. Based on my research, the following table summarizes the market conditions adjustment applied in this analysis.

| MARKET CONDITIONS ADJUSTMENT | | |
|---|---|---|
| Per Year As Of   December 2022 | (As-Is) | 2% |

The analysis applies an upward market conditions adjustment of 2% annually reflecting the conditions between the oldest comparable sale date up through the current date because the adjustment to the retrospective date is made at the end of the sales comparison approach analysis.

CONTINUED

DTW221032

## Property Adjustments
Quantitative percentage adjustments are also made for location and physical characteristics such as size, shape, access, exposure, topography, zoning and overall utility. Where possible the adjustments applied are based on paired data or other statistical analysis. For example, location adjustments are based primarily on review of land values in the market areas for the comparables relative to the subject. It should be stressed that the adjustments are subjective in nature and are meant to illustrate my logic in deriving a value opinion for the subject site.

## PRESENTATION
The following Land Sales Summation Table, Location Map and datasheets summarize the sales data used in this analysis. Following these items, the comparable land sales are adjusted for applicable elements of comparison and the opinion of site value is concluded.

### LAND SALES SUMMATION TABLE

| COMPARABLE | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 |
|---|---|---|---|---|---|
| Name | Vacant Land | Vacant Land | Vacant Land | Vacant Land | Vacant Land |
| Address | 4130 Fourier Dr | 3600 Block Metro Dr | 3500 N Metro Dr | 2100 Blk Wayne Haven St | 4733 Arden Dr |
| City | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne |
| State | IN | IN | IN | IN | IN |
| Zip | 46818 | 46818 | 46818 | 46803 | 46804 |
| County | Allen | Allen | Allen | Allen | Allen |
| APN | 02-07-17-277-001.000-073, 02-07-17-279-001.000-07 | 02-07-16-151-002.011-073 | 02-07-16-151-002.003-073 | 02-13-10-451-002.000-041 | 02-12-20-177-002.000-074 |
| **PHYSICAL INFORMATION** | | | | | |
| SF | 199,069 | 43,996 | 89,734 | 77,972 | 91,040 |
| Location | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Exposure | Average/Good | Average/Good | Average/Good | Average | Average |
| Access | Average/Good | Average/Good | Average/Good | Average | Average |
| Shape | Irregular | Rectangular | Rectangular | Rectangular | Irregular |
| Site Utility Rating | Good | Average/Good | Average/Good | Average | Average |
| Zoning | I2 | I2 | I-2 | I-2P | I2 |
| Corner | No | No | No | No | No |
| Topography | Level | Level | Level | Level | Level |
| **SALE INFORMATION** | | | | | |
| Date | 8/25/2021 | 2/12/2021 | 2/23/2022 | 6/11/2020 | 1/28/2020 |
| Status | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Price | $448,500 | $89,500 | $162,500 | $90,000 | $78,000 |
| Analysis Price | $448,500 | $89,500 | $162,500 | $90,000 | $78,000 |
| $/SF Land | $2.25 | $2.03 | $1.81 | $1.15 | $0.86 |

## LAND SALES LOCATION MAP



**COMPARABLE KEY**

| COMP | DISTANCE | ADDRESS | SALE DATE | ACRES | SF | $/SF |
|------|----------|---------|-----------|-------|------|------|
| SUBJECT | - | 6231 MacBeth Road, Fort Wayne, IN | - | 143.8 | 6,263,057 | $2.00 |
| No. 1 | 7.7 Miles | 4130 Fourier Dr, Fort Wayne, IN | 8/25/2021 | 4.6 | 199,069 | $2.25 |
| No. 2 | 7.9 Miles | 3600 Block Metro Dr, Fort Wayne, IN | 2/12/2021 | 1.0 | 43,996 | $2.03 |
| No. 3 | 7.9 Miles | 3500 N Metro Dr, Fort Wayne, IN | 2/23/2022 | 2.1 | 89,734 | $1.81 |
| No. 4 | 9.2 Miles | 2100 Blk Wayne Haven St, Fort Wayne, IN | 6/11/2020 | 1.8 | 77,972 | $1.15 |
| No. 5 | 1.2 Miles | 4733 Arden Dr, Fort Wayne, IN | 1/28/2020 | 2.1 | 91,040 | $0.86 |

## COMPARABLE 1

### LOCATION INFORMATION

| | |
|---|---|
| Name | Vacant Land |
| Address | 4130 Fourier Dr |
| City, State, Zip Code | Fort Wayne, IN, 46818 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-17-277-001.000-073, 02-07-17-279-0 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Appollo Plaza Ltd |
| Seller | Apollo Design Techonology Inc |
| Transaction Date | 08/25/2021 |
| Transaction Status | Recorded |
| Transaction Price | $448,500 |
| Analysis Price | $448,500 |
| Recording Number | 57227 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | | |
|---|---|---|
| Intended Use | Vacant Land | |
| Location | Average/Good | |
| Frontage | Typical | |
| Site Size | Acres | SF |
| Net | 4.57 | 199,069 |
| Gross | 4.57 | 199,069 |
| Zoning | I2 | |
| Shape | Irregular | |
| Topography | Level | |
| Access | Average/Good | |
| Exposure | Average/Good | |



## VACANT LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF |
|---|---|---|
| Gross | $98,140 | $2.25 |
| Net | $98,140 | $2.25 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | Costar/Assessor's Records | |
| Company | Costar/Assessor's Records | |
| Source | CoStar | |
| Date / Phone Number | 12/28/2022 | Confidential |

### REMARKS

According to Costar, this was a distressed sale. Additionally, Costar reported that the improvements were demolished prior to the sale of the underlying land. This site is comprised of 2 contiguous parcels. The site is zoned I2 (General Industrial). This property was previously improved with an industrial building. The property was severely damaged by a fire in December 2020 and was subsequently demolished before being sold.

## COMPARABLE 2

### LOCATION INFORMATION

| | |
|---|---|
| Name | Vacant Land |
| Address | 3600 Block Metro Dr |
| City, State, Zip Code | Fort Wayne, IN, 46818 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-16-151-002.011-073 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Northeast Property Group LLC |
| Seller | Buchanan Real Estate |
| Transaction Date | 02/12/2021 |
| Transaction Status | Recorded |
| Transaction Price | $89,500 |
| Analysis Price | $89,500 |
| Recording Number | 2021010270 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | | |
|---|---|---|
| Intended Use | Vacant Land | |
| Location | Average/Good | |
| Frontage | Typical | |
| Site Size | Acres | SF |
| Net | 1.01 | 43,996 |
| Gross | 1.01 | 43,996 |
| Zoning | I2 | |
| Shape | Rectangular | |
| Topography | Level | |
| Access | Average/Good | |
| Exposure | Average/Good | |



### VACANT LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF |
|---|---|---|
| Gross | $88,614 | $2.03 |
| Net | $88,614 | $2.03 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | David Nugent | |
| Company | BND Commercial Real Estate | |
| Source | Assessor | |
| Date / Phone Number | 12/28/2022 | +1 260 407 7113 |

### REMARKS

The asking price for the property was originally $89,000 and sold for $89,500. This property is zoned I-2 (General Industrial). The site is located on the north side of Fort Wayne. The property has access to full utilities.

## COMPARABLE 3

### LOCATION INFORMATION

| | |
|---|---|
| Name | Vacant Land |
| Address | 3500 N Metro Dr |
| City, State, Zip Code | Fort Wayne, IN, 46818 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-07-16-151-002.003-073 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Orion Real Estate Dev |
| Seller | Djankovic Nikola |
| Transaction Date | 02/23/2022 |
| Transaction Status | Recorded |
| Transaction Price | $162,500 |
| Analysis Price | $162,500 |
| Recording Number | 2022010590 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | | |
|---|---|---|
| Intended Use | Vacant Land | |
| Location | Average/Good | |
| Frontage | Typical | |
| Site Size | Acres | SF |
| Net | 2.06 | 89,734 |
| Gross | 2.06 | 89,734 |
| Zoning | I-2 | |
| Shape | Rectangular | |
| Topography | Level | |
| Access | Average/Good | |
| Exposure | Average/Good | |



## VACANT LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF |
|---|---|---|
| Gross | $78,883 | $1.81 |
| Net | $78,883 | $1.81 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | Costar/Assessor's Records | |
| Company | Costar/Assessor's Records | |
| Source | Assessor | |
| Date / Phone Number | 12/28/2022 | Confidential |

### REMARKS

This property is zoned I-2 (General Industrial). The site is located on the north side of Fort Wayne. The property has access to full utilities.

## COMPARABLE 4

### LOCATION INFORMATION

| | |
|---|---|
| Name | Vacant Land |
| Address | 2100 Blk Wayne Haven St |
| City, State, Zip Code | Fort Wayne, IN, 46803 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-13-10-451-002.000-041 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Don R Fruchey Inc |
| Seller | BZW MASTER PAINT |
| Transaction Date | 06/11/2020 |
| Transaction Status | Recorded |
| Transaction Price | $90,000 |
| Analysis Price | $90,000 |
| Recording Number | 2020032801 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | | |
|---|---|---|
| Intended Use | Vacant Land | |
| Location | Average/Good | |
| Frontage | Typical | |
| Site Size | Acres | SF |
| Net | 1.79 | 77,972 |
| Gross | 1.79 | 77,972 |
| Zoning | I-2P | |
| Shape | Rectangular | |
| Topography | Level | |
| Access | Average | |
| Exposure | Average | |

### VACANT LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF |
|---|---|---|
| Gross | $50,279 | $1.15 |
| Net | $50,279 | $1.15 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | Roger Koehlinger | |
| Company | BND Commercial Real Estate | |
| Source | CoStar | |
| Date / Phone Number | 12/28/2022 | +1 260 421 1904 |

### REMARKS

This property is zoned I-2P (Planned General Industrial). The property is approximately 4 miles from I-469 and Hwy 30.

## COMPARABLE 5

### LOCATION INFORMATION

| | |
|---|---|
| Name | Vacant Land |
| Address | 4733 Arden Dr |
| City, State, Zip Code | Fort Wayne, IN, 46804 |
| County | Allen |
| MSA | Fort Wayne, IN |
| APN | 02-12-20-177-002.000-074 |

### SALE INFORMATION

| | |
|---|---|
| Buyer | Arroyo Daniel |
| Seller | Jra Realty Llc |
| Transaction Date | 01/28/2020 |
| Transaction Status | Recorded |
| Transaction Price | $78,000 |
| Analysis Price | $78,000 |
| Recording Number | 2020005590 |
| Rights Transferred | Fee Simple |
| Financing | Cash at Settlement |
| Conditions of Sale | Arms-Length |

### PHYSICAL INFORMATION

| | | |
|---|---|---|
| Intended Use | Vacant Land | |
| Location | Average/Good | |
| Frontage | Typical | |
| Site Size | Acres | SF |
| Net | 2.09 | 91,040 |
| Gross | 2.09 | 91,040 |
| Zoning | I2 | |
| Shape | Irregular | |
| Topography | Level | |
| Access | Average | |
| Exposure | Average | |



### VACANT LAND

### ANALYSIS INFORMATION

| Price | $/Acre | $/SF |
|---|---|---|
| Gross | $37,321 | $0.86 |
| Net | $37,321 | $0.86 |

### CONFIRMATION

| | | |
|---|---|---|
| Name | Fletcher Moppert | |
| Company | The Zacher Company | |
| Source | CoStar | |
| Date / Phone Number | 12/28/2022 | +1 260 422 8474 |

### REMARKS

This site is part of a larger industrial park that is being developed. All utilities are available on site.

CONTINUED

DTW221032

# LAND SALES ADJUSTMENT TABLE

| COMPARABLE | | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 | COMPARABLE 4 | COMPARABLE 5 |
|---|---|---|---|---|---|---|
| Name | | Vacant Land | Vacant Land | Vacant Land | Vacant Land | Vacant Land |
| Address | | 4130 Fourier Dr | 3600 Block Metro Dr | 3500 N Metro Dr | 2100 Blk Wayne Haven St | 4733 Arden Dr |
| City | | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne | Fort Wayne |
| SF | | 199,069 | 43,996 | 89,734 | 77,972 | 91,040 |
| **SALE INFORMATION** | | | | | | |
| Date | | 8/25/2021 | 2/12/2021 | 2/23/2022 | 6/11/2020 | 1/28/2020 |
| Status | | Recorded | Recorded | Recorded | Recorded | Recorded |
| Rights Transferred | | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Analysis Price | | $448,500 | $89,500 | $162,500 | $90,000 | $78,000 |
| Price/SF | | $2.25 | $2.03 | $1.81 | $1.15 | $0.86 |
| **TRANSACTIONAL ADJUSTMENTS** | | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% | 0% |
| Expenditures After the Sale | | 0% | 0% | 0% | 0% | 0% |
| Market Conditions[1] | | 3% | 4% | 2% | 5% | 6% |
| Subtotal Transactional Adj Price | | $2.32 | $2.11 | $1.85 | $1.21 | $0.91 |
| **PROPERTY ADJUSTMENTS** | | | | | | |
| Location | | Average/Good | Average/Good | Average/Good | Average/Good | Average/Good |
| Adjustment | | 0% | 0% | 0% | 0% | 0% |
| Size | | 199,069 | 43,996 | 89,734 | 77,972 | 91,040 |
| Adjustment | | 0% | 0% | 0% | 0% | 0% |
| Exposure | | Average/Good | Average/Good | Average/Good | Average | Average |
| Adjustment | | 0% | 0% | 0% | 5% | 5% |
| Access | | Average/Good | Average/Good | Average/Good | Average | Average |
| Adjustment | | 0% | 0% | 0% | 5% | 5% |
| Shape | | Irregular | Rectangular | Rectangular | Rectangular | Irregular |
| Adjustment | | 0% | 0% | 0% | 0% | 0% |
| Site Utility Rating | | Good | Average/Good | Average/Good | Average | Average |
| Adjustment | | -10% | 0% | 0% | 10% | 10% |
| Subtotal Property Adjustment | | -10% | 0% | 0% | 20% | 20% |
| **TOTAL ADJUSTED PRICE** | | $2.09 | $2.11 | $1.85 | $1.45 | $1.09 |

| STATISTICS | UNADJUSTED | ADJUSTED |
|---|---|---|
| LOW | $0.86 | $1.09 |
| HIGH | $2.25 | $2.11 |
| MEDIAN | $1.81 | $1.85 |
| AVERAGE | $1.62 | $1.72 |

[1] Market Conditions Adjustment: 2%

Date of Value (for adjustment calculations): 12/30/22

## LAND SALES ANALYSIS

### Introduction

The comparable land sales indicate an adjusted value range from $1.09 to $2.11/SF, with a median of $1.85/SF and an average of $1.72/SF. The range of total gross adjustment applied to the comparables was from 2% to 26%, with an average gross adjustment across all comparables of 14%. The level of total adjustment applied to the comparables is considered minimal, an indication that the dataset is applicable to the subject and increases the credibility of the analysis. The adjustment process for each comparable land sale is discussed in the following paragraphs.

### Discussion of Adjustments

Comparable 1 ($2.09/SF as adjusted) required a total upward transaction adjustment of 3%. This comparable required a total downward adjustment of -10% for property characteristics. The total gross adjustment applied to this comparable was 13%. The moderate level of gross adjustments required for this comparable indicates that it can be adequately relied upon for valuation of the subject. This comparable is given primary consideration as a value indicator for the subject.

Comparable 2 ($2.11/SF as adjusted) required a total upward transaction adjustment of 4%. This comparable did not require any property characteristic adjustments. The total gross adjustment applied to this comparable was 4%. The minimal amount of gross adjustments required for this comparable suggests it is similar to the subject, increasing its applicability for this analysis. Overall this comparable warrants primary consideration as a value indicator for the subject.

Comparable 3 ($1.85/SF as adjusted) required a total upward transaction adjustment of 2%. This comparable did not require any property characteristic adjustments. The total gross adjustment applied to this comparable was 2%. The minimal amount of gross adjustments required for this comparable suggests it is similar to the subject, increasing its applicability for this analysis. Overall this comparable warrants primary consideration as a value indicator for the subject.

Comparable 4 ($1.45/SF as adjusted) required a total upward transaction adjustment of 5%. This comparable required a total upward adjustment of 20% for property characteristics. The total gross adjustment applied to this comparable was 25%. The substantial level of gross adjustments required for this comparable reduces its reliability for valuation of the subject. Therefore, this comparable is given minimal consideration as a value indicator for the subject.

Comparable 5 ($1.09/SF as adjusted) required a total upward transaction adjustment of 6%. This comparable required a total upward adjustment of 20% for property characteristics. The total gross adjustment applied to this comparable was 26%. The substantial level of gross adjustments required for this comparable reduces its reliability for valuation of the subject. Therefore, this comparable is given minimal consideration as a value indicator for the subject.

## LAND VALUE CONCLUSION

The comparable land sales indicate an adjusted value range from $1.09 to $2.11/SF, with a median of $1.85/SF and an average of $1.72/SF. Based on the results of the preceding analysis, Comparable 1 ($2.09/SF adjusted), Comparable 2 ($2.11/SF adjusted), and Comparable 3 ($1.85/SF adjusted) are given primary consideration for the subject's opinion of land value.

The following table summarizes the analysis of the comparables, reports the reconciled price per square foot value conclusion, and presents the concluded value of the subject site.

| | | CALCULATION OF LAND VALUE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| COMP | ANALYSIS PRICE | ADJUSTMENT | | | | NET ADJ % | GROSS ADJ % | OVERALL COMPARISON |
| | | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | | | |
| 1 | $2.25 | 3% | $2.32 | -10% | $2.09 | -7% | 13% | PRIMARY |
| 2 | $2.03 | 4% | $2.11 | 0% | $2.11 | 4% | 4% | PRIMARY |
| 3 | $1.81 | 2% | $1.85 | 0% | $1.85 | 2% | 2% | PRIMARY |
| 4 | $1.15 | 5% | $1.21 | 20% | $1.45 | 26% | 25% | MINIMAL |
| 5 | $0.86 | 6% | $0.91 | 20% | $1.09 | 27% | 26% | MINIMAL |
| LOW | $1.09 | | | | AVERAGE | | | $1.72 |
| HIGH | $2.11 | | | | MEDIAN | | | $1.85 |
| COMPONENT | | | | | | | | $/SF CONCLUSION |
| | | | | | | | | $2.00 |

[1]Cumulative [2]Additive

Rounded to nearest $10,000

## INTRODUCTION

The Cost Approach is a set of procedures through which a value indication is derived for the fee simple estate by estimating the cost new as of the effective date of the appraisal to construct a reproduction of (or replacement for) the existing structures,, including an entrepreneurial incentive; deducting depreciation from the total cost; and adding the estimated land value. The contributory value of any site improvements that have not already been considered in the total cost can be added on a depreciated-cost basis. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property rights being appraised.[4]

## REPLACEMENT COST ANALYSIS

The following cost approach to value was developed based on replacement cost analysis. Replacement Cost is defined as: The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout.[5]

Replacement cost includes both direct and indirect costs. Direct costs are expenditures for labor and materials used in the construction of improvements (also known as hard costs). Indirect costs are expenditures for items other than labor and materials that are necessary for construction, but are not typically part of the construction contract (also known as soft costs). Indirect costs often include real property taxes during construction, professional fees, permanent financing fees, leasing commissions, marketing costs and contingency.

### Replacement Cost New (Buildings)

This section calculates the replacement cost new of the subject building improvements by estimating total direct and indirect costs to which an entrepreneurial profit incentive is applied. Three sources were selected to support direct and indirect costs: Marshall Valuation Service, the developer's cost schedule and cost comparables. This selection is appropriate considering the scope and intended use of the appraisal, and given that the subject improvements are dated construction.

### Marshall Valuation Service

Marshall Valuation Service is a comprehensive appraisal guide widely used throughout the United States for developing replacement costs and depreciated values of buildings and other improvements, and is largely considered the authority on building costs.

The table on the following page outlines the process I applied for developing replacement cost new of the subject building improvements with Marshall Valuation Service. First, the subject components were researched to identify the applicable base building costs per square foot. Next, the base building costs were adjusted for square foot refinements, height and size refinements, and current and local cost multipliers to determine an estimate of direct costs. After determining direct costs using Marshall Valuation Service, I then analyzed market evidence to estimate indirect costs. Finally, an appropriate developer's profit was applied to provide an indication of the replacement cost new.

[4] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022
[5] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

## REPLACEMENT COST NEW (BUILDINGS)
### MARSHALL VALUATION SERVICE DIRECT COST

| | | 1 | 2 |
|---|---|---|---|
| Number of Buildings | 4 | | |
| Gross Building Area | 14,275 SF | 1 | 2 |
| MVS Building Type | | Industrial Shell | Office |
| Number of Stories | | | |
| Height per Story | | | |
| Component Description | | Industrial Shell | Interior Finishes |
| MVS Section/Page/Class | | 14/35/S | |
| MVS Publication Date | | Feb-2022 | Feb-2022 |
| Quality Rating | | Good | Average |
| Component SF (Gross) | | 14,275 | 3,900 |
| **Base Cost (Per SF)** | | **$59.00** | **$68.50** |
| **SQUARE FOOT REFINEMENTS** | | | |
| Heating and Cooling | | $1.79 | $2.94 |
| **Subtotal** | | **$60.79** | **$71.44** |
| **HEIGHT & SIZE REFINEMENTS** | | | |
| Height Per Story Multiplier | | 1.000 | 1.000 |
| Area/Perimeter Multiplier | | 1.000 | 1.000 |
| **Subtotal** | | **$60.79** | **$71.44** |
| **COST MULTIPLIERS** | | | |
| Current Cost Multiplier   (3% Inflation From 3/19 to 2/22) | | 0.91 | 0.91 |
| Local Multiplier | | 1.00 | 1.00 |
| **DIRECT COSTS PER SF** | | **$55.32** | **$65.01** |
| Indirect Cost (% of Direct)[1] | 8% | 8% | 8% |
| INDIRECT COST PER SF | | $4.43 | $5.20 |
| **DIRECT & INDIRECT TOTAL PER SF** | | **$59.74** | **$70.21** |
| **CALCULATION OF REPLACEMENT COST NEW WITH PROFIT** | | | |
| Component SF (Gross) | | 14,275 | 3,900 |
| Direct & Indirect Total | | $852,851 | $273,824 |
| ENTREPRENEURIAL PROFIT %[1] | 10% | 10% | 10% |
| Entrepreneurial Profit $ | | $85,285 | $27,382 |
| **TOTAL REPLACEMENT COST NEW** | | **$938,137** | **$301,206** |
| **FINAL TOTAL REPLACEMENT COST NEW** | | **$938,137** | **$301,206** |

[1]Colliers International Estimate

Based on my research, indirect costs are typically 10% to 20% of direct cost for this type of development in the marketplace. Considering the size and project characteristics, I have estimated indirect costs at 8% of direct costs.

Entrepreneurial profit and overhead compensates the developer for project risk and management. It is unlikely that a developer would proceed with a development unless adequate profit is available to justify the effort. Based on anecdotal evidence provided by developers of similar Flex Space projects, profit is typically based on a percentage of replacement cost, generally 5% to 15%, depending upon project size, location, marketability and risk. An entrepreneurial profit and overhead allocation of 10% was used in this analysis.

The replacement cost new as developed with Marshall Valuation Service is summarized in the following table.

| REPLACEMENT COST NEW SUMMARY (BUILDINGS) | | | |
|---|---|---|---|
| MARSHALL VALUATION SERVICE | | | |
| Direct & Indirect Costs | | $1,126,675 | $78.93/SF |
| Entrepreneurial Profit | @10% | $112,668 | $7.89/SF |
| **TOTAL REPLACEMENT COST NEW (RCN)** | | **$1,239,343** | **$86.82/SF** |

## Cost Comparables

The cost comparables selected for this analysis are summarized in the following table.

| | | | | | COMPARABLE COST TABLE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| NO. | REF NO. | DATE | COST | CONTINGENCY | CONTINGENCY | SOFT COSTS | SIZE (SF) | OFFICE (SF) | % OFFICE | COST/SF | COMMENTS |
| 1 | GRR220114 | November-2022 | $2,000,000 | $86,978 | 4% | 0% | 28,000 | 2,261 | 8% | $71.43 | Standard industrial with standard office |
| 2 | DTW220999 | December-2022 | $668,930 | $0 | 0% | 6% | 8,960 | 1,500 | 17% | $74.66 | Standard industrial with standard office |
| 3 | DTW221020 | October-2022 | $2,034,587 | $0 | 0% | 9% | 17,800 | 300 | 2% | $114.30 | 300 SF office - raised dock, specialized concrete apron for spill retention, step-up foundation. Specialty construction for chemical handling. |
| | | | AVERAGE | | | 5% | 18,253 | 1,354 | 9% | $86.80 | |

| COST COMPARABLES | | | |
|---|---|---|---|
| COMPARABLE | 1 | 2 | 3 |
| Cost Year Built | 2022 | 2022 | 2022 |
| Property Type | Industrial | Industrial | Industrial |
| Gross Building Area | 28,000 SF | 8,960 SF | 17,800 SF |
| Cost | $2,000,000 | $668,930 | $2,034,587 |
| Total Costs | $2,000,000 | $668,930 | $2,034,587 |
| Per Square Foot | $71.43 | $74.66 | $114.30 |
| LOW | $71.43/SF | | |
| HIGH | $114.30/SF | | |
| AVERAGE | $86.80/SF | | |

The cost comparables ranged in size from 8,960 to 28,000 SF, with an average of 18,253 SF. The comparable buildings were built between 2022 and 2022. Included in the cost breakdown for each comparable are direct costs, indirect costs and profit. The replacement cost new (excluding site improvements) of the cost comparables ranged from $71.43/SF to $114.30/SF, and averaged $86.80/SF.

## Building Replacement Cost New Conclusion (Buildings)

The following table summarizes the indicators that were used to estimate the replace cost new of the subject building improvements and the reconciled conclusion.

| REPLACEMENT COST NEW ESTIMATES CONCLUSION (BUILDINGS) | | |
|---|---|---|
| APPROACH | TOTAL | $/SF |
| Marshall Valuation Service Cost Estimate | $1,239,343 | $86.82 |
| Cost Comparables | $1,239,016 | $86.80 |
| **CONCLUDED REPLACEMENT COST NEW (BUILDINGS)** | **$1,239,343** | **$86.82** |

The analysis supports a range for replacement cost new of the building improvements from $86.80 to $86.82/SF. Primary weight was placed on the Marshall Valuation Services cost estimate in the reconciled conclusion of $86.82.

## Depreciation Analysis (Buildings)

The following table details the depreciation estimate developed for the subject building improvements.

| DEPRECIATION ANALYSIS (BUILDINGS) | | |
|---|---|---|
| | 1 | 2 |
| Component Description | Industrial Shell | Interior Finishes |
| **TOTAL REPLACEMENT COST NEW** | $938,137 | $301,206 |
| LESS: Physical Curable | $0 | $0 |
| LESS: Functional Curable | $0 | $0 |
| LESS: Functional Incurable | $0 | $0 |
| Subtotal Adjusted Replacement Cost New | $938,137 | $301,206 |
| **Age/Life Analysis** | | |
| Economic Life | 50 | 20 |
| Effective Age | 30 | 10 |
| Remaining Economic Life | 20 | 10 |
| Percent Depreciated | 60.0% | 50.0% |
| LESS: Age/Life Depreciation | ($562,882) | ($150,603) |
| Adjusted Replacement Cost New | $375,255 | $150,603 |
| LESS: Economic Obsolescence (External) 0% | $0 | $0 |
| Depreciated Replacement Cost New (Buildings) | $375,255 | $150,603 |

My analysis of depreciation reflects physical and functional curable prior to consideration of physical and functional incurable items, which are treated as components of the age-life analysis. The subject is about 52 years old in actual age, but was reportedly updated several times over the years, lowering the effective age to around 58% of the actual age of the improvements.   The office was improved at a later date, but office improvements have a shorter life than structural components.  A total life to the office improvements of 20-years was applied, with a 10-year effective age as of the date of loss.

The depreciation analysis for the subject building improvements is summarized in the following table.

| DEPRECIATION ANALYSIS SUMMARY (BUILDINGS) | | |
|---|---|---|
| APPROACH | TOTAL | $/SF |
| **TOTAL REPLACEMENT COST NEW** | $1,239,343 | $87 |
| LESS: Physical Curable | $0 | $0 |
| LESS: Functional Curable | $0 | $0 |
| LESS: Functional Incurable | $0 | $0 |
| LESS: Age/Life Depreciation | ($713,485) | -$50 |
| LESS: Economic Obsolescence (External) | $0 | $0 |
| **Depreciated Replacement Cost New (Buildings)** | $525,858 | $37 |

## COST APPROACH CONCLUSION

The Cost Approach analysis and conclusion are presented in the following table.

| COST APPROACH VALUE CONCLUSION | | |
|---|---|---|
| **IMPROVEMENTS (BUILDINGS)** | | |
| Direct & Indirect Costs | | $1,126,675 |
| PLUS: Entrepreneurial Profit | | $112,668 |
| LESS: Total Depreciation | | ($713,485) |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS (BUILDINGS)** | | $525,858 |
| | | |
| **IMPROVEMENTS (SITE)** | | |
| Direct & Indirect Costs | | $0 |
| PLUS: Entrepreneurial Profit | | $0 |
| LESS: Total Depreciation | | $0 |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS (SITE)** | | $0 |
| | | |
| **SUMMARY (ALL IMPROVEMENTS)** | | |
| Adjusted Costs/Cost New | | $1,126,675 |
| PLUS: Total Entrepreneurial Profit | | $112,668 |
| **TOTAL REPLACEMENT COST NEW** | | $1,239,343 |
| LESS: Total Depreciation | | ($713,485) |
| **TOTAL DEPRECIATED VALUE OF IMPROVEMENTS** | | $525,858 |
| **RETROSPECTIVE VALUE** | $37/SF | **$530,000** |

Rounded to nearest $10,000

## INTRODUCTION

The Reconciliation of Value Conclusions is the final step in the appraisal process and involves the weighing of the individual valuation techniques in relationship to their substantiation by market data, and the reliability and applicability of each valuation technique to the subject property. Understanding the profiles of potential buyers and their typical reliance on each approach to value strongly influences the weighting process.

In the open market, the subject property type would command most interest from regional and local buyers that are actively pursuing similar small owner-user properties. There is currently steady buyer demand for substitute properties of the subject based on the volume of sale transactions and reports by buyers, sellers and other market participants during confirmation of market transactions. The most probable buyer is an owner user.

Based on the overall quality of the data and analyses, and considering the decision-making process of the typical buyer profile of the subject asset, both approaches were given equal weight in concluding the depreciated insurable value of the subject as of the retrospective date.

## PRESENTATION OF VALUE CONCLUSIONS

My opinion of value reflects the available information gathered and provided to us, as presented in this report, and does not predict future performance.

The following table summarizes my final opinion of the Depreciated Insurable Value of the subject property's fee simple interest.

| ANALYSIS OF VALUE CONCLUSIONS | |
| --- | --- |
| **VALUATION INDICES** | **RETROSPECTIVE VALUE** |
| **INTEREST APPRAISED** | **FEE SIMPLE** |
| **DATE OF VALUE** | **MARCH 20, 2019** |
| Cost Approach | $530,000 |
| Sales Comparison Approach | $570,000 |
| **FINAL VALUE CONCLUSION (INSURABLE VALUE)** | **$550,000** |
| $/SF | $39/SF |

DTW221032

I certify that, to the best of my knowledge and belief:

› The statements of fact contained in this report are true and correct.

› The reported analyses, opinions, and conclusions of the signer are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

› The signer of this report has no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

› David Abraham, MAI, SRA has performed no services, as an appraiser or in any other capacity regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

› The signer is not biased with respect to the property that is the subject of this report or to the parties involved with this assignment.

› The engagement in this assignment was not contingent upon developing or reporting predetermined results.

› The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

› The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice* and the *Code of Professional Ethics and Standards of Professional Appraisal* Practice of the Appraisal Institute.

› David Abraham, MAI, SRA inspected the property that is the subject of this report.

› No one provided significant real property appraisal assistance to appraiser signing this certification.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

As of the date of this report David Abraham, MAI, SRA completed the continuing education program for Designated Members of the Appraisal Institute.

_David Abraham_ _____                    December 30, 2022
David Abraham, MAI, SRA                                                Date
Managing Director | Michigan
Certified General Real Estate Appraiser
State of Indiana License #TP22200820
+1 248 226 1872
david.abraham@colliers.com

This appraisal is subject to the following assumptions and limiting conditions:

› The appraiser may or may not have been provided with a survey of the subject property. If further verification is required, a survey by a registered surveyor is advised.

› I assume no responsibility for matters legal in character, nor do we render any opinion as to title, which is assumed to be marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, under responsible ownership, and competent management.

› The exhibits in this report are included to assist the reader in visualizing the property. I have made no survey of the property and assume no responsibility in connection with such matters.

› Unless otherwise noted herein, it is assumed that there are no encroachments, zoning, or restrictive violations existing in the subject property.

› The appraiser assumes no responsibility for determining if the property requires environmental approval by the appropriate governing agencies, nor if it is in violation thereof, unless otherwise noted herein.

› Information presented in this report has been obtained from reliable sources, and it is assumed that the information is accurate.

› This report shall be used for its intended purpose only, and by the party to whom it is addressed. Possession of this report does not include the right of publication.

› The appraiser may not be required to give testimony or to appear in court by reason of this appraisal, with reference to the property in question, unless prior arrangements have been made therefore.

› The statements of value and all conclusions shall apply as of the dates shown herein.

› There is no present or contemplated future interest in the property by the appraiser which is not specifically disclosed in this report.

› Without the written consent or approval of the author neither all, nor any part of, the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media. This applies particularly to value conclusions and to the identity of the appraiser and the firm with which the appraiser is connected.

› This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the author no portion of the report stands alone.

› The valuation stated herein assumes professional management and operation of the buildings throughout the lifetime of the improvements, with an adequate maintenance and repair program.

› The liability of Colliers International Valuation & Advisory Services, its principals, agents, and employees is limited to the client. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraiser is in no way responsible for any costs incurred to discover or correct any deficiency in the property.

› The appraiser is not qualified to detect the presence of toxic or hazardous substances or materials which may influence or be associated with the property or any adjacent properties, has made no investigation or analysis as to the presence of such materials, and expressly disclaims any duty to note the degree of fault. Colliers International Valuation & Advisory Services and its principals, agents, employees, shall not be liable for any costs, expenses, assessments, or penalties, or diminution in value, property damage, or personal

injury (including death) resulting from or otherwise attributable to toxic or hazardous substances or materials, including without limitation hazardous waste, asbestos material, formaldehyde, or any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, solids or gasses, waste materials or other irritants, contaminants or pollutants.

›  The appraiser assumes no responsibility for determining if the subject property complies with the *Americans with Disabilities Act* (*ADA*). Colliers International Valuation & Advisory Services, its principals, agents, and employees, shall not be liable for any costs, expenses, assessments, penalties or diminution in value resulting from non-compliance. This appraisal assumes that the subject meets an acceptable level of compliance with *ADA* standards; if the subject is not in compliance, the eventual renovation costs and/or penalties would negatively impact the present value of the subject. If the magnitude and time of the cost were known today, they would be reduced from the reported value conclusion.

›  An on-site inspection of the subject property was conducted. No evidence of asbestos materials on-site was noted. A Phase 1 Environmental Assessment was not provided for this analysis. This analysis assumes that no asbestos or other hazardous materials are stored or found in or on the subject property. If evidence of hazardous materials of any kind occurs, the reader should seek qualified professional assistance. If hazardous materials are discovered and if future market conditions indicate an impact on value and increased perceived risk, a revision of the concluded values may be necessary.

›  A detailed soils study was not provided for this analysis. The subject's soils and sub-soil conditions are assumed to be suitable based upon a visual inspection, which did not indicate evidence of excessive settling or unstable soils. No certification is made regarding the stability or suitability of the soil or sub-soil conditions.

›  This analysis assumes that the financial information provided for this appraisal, including rent rolls and historical income and expense statements; accurately reflect the current and historical operations of the subject property.

DTW221032

Professional Service Agreement
Subject Data
Valuation Glossary
Qualifications of Appraiser
Qualifications of Colliers International Valuation & Advisory Services

Colliers Valuation & Advisory Services

# Professional Service Agreement



2 Corporate Drive, Suite 300
Southfield, MI 48076
DIR +1 248.540.1000
WEB www.colliers.com/valuationadvisory

December 14, 2022

David Abraham, MAI, SRA
Managing Director | Detroit
2 Corporate Drive, Suite 300
Southfield, MI 48076
O: 248.540.1000
david.abraham@colliers.com

Martin Gardner
**Gardner & Rans, P.C. |** Attorneys at Law
117 Perspective Drive, Suite 2
Granger, IN 46530
croe@gardnerandrans.com
Tel 574 233 6035 | Fax 574 233 6046

**RE: Appraisal of 6231 MacBeth Road, Fort Wayne, IN**

Dear Mr. Gardner:

Thank you for considering Colliers International Valuation & Advisory Services, LLC for the assignment identified in the below stated Professional Service Agreement. Please sign one copy of the agreement and return it to me, thereby indicating your authorization for us to proceed with this assignment and your acceptance of the attached Terms and Conditions.

### PROFESSIONAL SERVICE AGREEMENT
#### ("Agreement")

| | |
|---|---|
| Project / Location | 6231 MacBeth Road, Fort Wayne, IN 46809 ("Property") |
| Project Description | Case of REPUBLIC SERVICES OF INDIANA, LP. V. COE HEATING & AIR CONDITIONING, INC. and GAS-FIRED PRODUCTS, INC. d/b/a SPACE-RAY. |
| | Provide a market value of the fire-damaged or destroyed building (improvements only) as of the retrospective date of loss, or a current date as needed. |
| Parties | Colliers International Valuation & Advisory Services, LLC ("CIVAS") and Gardner & Rans, P.C. (herein at times referred to as "Client") |
| Intended User | The appraisal will be prepared for Gardner & Rans, P.C. Intended users include the Client. No other users are intended. |
| | **It should be noted that if this engagement is directly with the owner of the Property, the Appraisal will not be accepted by federally insured lenders due to FIRREA Compliance, limiting the use of this report. Should this potentially impact your source of lenders, we recommend engagement be directed by a Federally Insured Lender.** |
| Intended Use | The report to be performed under this Agreement ("Appraisal") is intended only for use in Legal Proceedings in Named Case. The report is not intended for any other use. |
| Purpose | Depreciated Insurable Market Value (Fair Market Value) |
| Type of Appraisal | CIVAS will produce an Appraisal Report in which the appraiser's analysis and conclusions will be fully described within this document. |

Accelerating success.

# Professional Service Agreement
Continued

| | |
|---|---|
| Rights Appraised | Fee Simple |
| Date of Value | Date of inspection (or other date defined by appraiser) |
| Scope of Work | CIVAS and/or its designated affiliate will provide the Appraisal in accordance with USPAP, Indiana Court Rules, and the Code of Ethics and Certifications Standards of the Appraisal Institute and State Licensing Laws. CIVAS will research relevant market data and perform analysis to the extent necessary to produce credible appraisal results. |

Based on our discussions with the Client, the Client has requested the following valuation scenarios:

> Retrospective As Of: Day Prior to the Date of Loss

CIVAS anticipates developing the following valuation approaches:

> Land Value (If Applicable)
> Cost Approach (If Applicable)
> Sales Comparison Approach (If Applicable)
> Income Capitalization Approach (including Direct Capitalization) (If Applicable)
> Approaches applicable to the Scope of Work

A site and exterior only observation of the subject property will be performed.

**Please note if it's a requirement per the client's underwriting guidelines to analyze and report all approaches to value, this will be performed although some approaches may be limited in application.**

The scope of work will be included in the Appraisal. A copy of the Assumptions and Limiting Conditions, which appear in the Appraisal, is available upon request.

| | |
|---|---|
| Delivery | Draft Appraisal: Delivered on 12/28/2022 pending receipt of retainer received on or before 12/19/2022, with authorization and receipt of property specific information. |

Final Appraisal: Delivered three (3) days after completion of client review and authorization to deliver final report(s).

| | |
|---|---|
| Professional Fee | $6,450 |

The fee here is for report delivery only. There will be an additional $6,000 retainer paid 5 business days prior to any testimony, with time to be billed as stated in Paragraph 16 of the Terms & Conditions Attached.

| | |
|---|---|
| Expenses | Fee includes all associated expenses. |
| No. of Reports | One (1) Electronic Draft Appraisal and One (1) Electronic Final Appraisal. |

No printed copies will be delivered to the client.

| | |
|---|---|
| Retainer | The entire fee is required prior to our proceeding. |

To Pay By Check:
Please remit all payments to
Colliers International Valuation & Advisory Services
26791 Network Place
Chicago, IL 60673-1267
**Please include the property name or address on the memo line**

Wire Instructions:
JP Morgan Chase Bank, NA
Chicago, IL
70-2322/719
Account Name: Colliers International Valuation & Advisory Services, LLC
Account No. 899559074
ABA No. 021000021
ACH Payment Transit Routing Number: 071000013
Swift code for International Wires ONLY: CHASUS33
**Please include the property name or address in addenda/memo payment information**

Please send notification to CIVASAccounting@colliers.com when payment has been sent.

| | |
|---|---|
| Acceptance Date | These specifications are subject to modification if this Agreement is not accepted within three (3) business days from the date of this letter. |

**Terms and Conditions**

The attached Terms and Conditions and Specific Property Data Request are deemed a part of this Agreement as though set forth in full herein. The following is a list of information needed to begin and complete our analysis. The Client signing this Agreement or the party sending the specific property data certifies that all the information provided is accurate and complete as of the date of this request, and that any updates, revisions or additional relevant information that comes into control or possession of the Client prior to the date on which the Appraisal is delivered shall be provided to CIVAS immediately. Please forward with the Agreement or as soon as possible.

> Survey with Legal Description & Site Size
> Title Report
> Wetland Delineation Map (if applicable)
> Engineering studies, soil tests or environmental assessments
> Ground lease (if applicable)
> Existing Building or Improvement Plans
> Individual Floor or Unit Plans
> Current County Property Tax Bill
> Details on any Sale, Contract, or listing of the property in the past 3 years
> Construction Cost/Budget (within past 3 years)
> Detailed list of personal property items
> Property Condition Report
> Details regarding the historical and future replacement schedule (i.e., carpets, appliances, cabinetry, laundry facilities, HVAC, etc.)
> Capital improvements history (2 years) & budget

> Three year & YTD Income & Expenses
> Current Budget
> Detailed occupancy report for the past 3 years and YTD
> Detailed current certified rent roll indicating any vacant units and in-place rents
> Details regarding any pending changes to the rent roll including any negotiated side deals to delay or forgive rent payments
> Aged Accounts/Delinquency Report
> Details regarding any concessions currently being offered for new and existing tenants
> Marketing plan and/or local competitive study, if available
> Copy of recent Appraisals or Market Studies
> Name and telephone number of property contact for physical inspection and additional information needed during the appraisal process
> Property Contact _____

**In addition to the items requested above, please forward any additional materials you would consider relevant in the analysis of the subject property.**

**Reliance Language**

The Appraisal is for the sole use of the Client; however, Client may provide only complete, final copies of the Appraisal report in its entirety (but not component parts) to third parties who shall review such reports in connection with the stated Intended Use. CIVAS is not required to explain or testify as to appraisal results other than to respond to the Client for routine and customary questions. Please note that our consent to allow the Appraisal prepared by CIVAS or portions of such Appraisal, to become part of or be referenced in any public offering, the granting of such consent will be at our sole and absolute discretion and, if given, will be on condition that CIVAS will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to CIVAS, by a party satisfactory to CIVAS. CIVAS hereby expressly grants to client the right to copy the Appraisal and distribute it to employees of client and to your accountants/auditors in its entirety (but not component parts) without the need to provide CIVAS with an Indemnification Agreement and/or Non-Reliance letter.

If you have questions regarding the enclosed, please feel free to contact me. CIVAS appreciates this opportunity to be of service to you on this assignment and looks forward to serving you. If you have additional questions, please contact us.

I, **Martin Gardner**, agree to the above stated terms and authorize Colliers International Valuation & Advisory Services, LLC to prepare the above referenced appraisal.

*Martin J. Gardner* _____   Date: 12-14-2022 _____

**Martin Gardner**
**Gardner & Rans, P.C. | Attorneys at Law**

Respectfully,

**Colliers International Valuation & Advisory Services, LLC**

David Abraham, MAI, SRA
Managing Director | Detroit
O: 248.540.1000
david.abraham@colliers.com

# Professional Service Agreement
Continued

## Terms and Conditions

## "T&C"

1) The Appraisal will be subject to Colliers International Valuation & Advisory Services, LLC's ("CIVAS") Assumptions and Limiting Conditions that are incorporated into each appraisal, and any Extraordinary Assumptions and Hypothetical Conditions that may be incorporated into each appraisal.

2) Any capitalized, non-defined words shall have the same meaning as defined in the Agreement to which these T&Cs are attached.

3) Client is defined as the party signing the Agreement and shall be responsible for payment of the fees stipulated in the Agreement. Payment of the fee for the Appraisal is not contingent on the appraised value(s) or the outcome of the report(s). Additional fees will be charged on an hourly basis for any work that may exceed the scope of this proposal, including performing additional valuation scenarios, additional research, and conference calls, meetings, deposition preparation, deposition, trial testimony or travel that may exceed the time allotted by CIVAS for an assignment of this nature. If CIVAS is requested to cease working on the Appraisal for any reason prior to the completion of the appraisal(s), CIVAS will be entitled to bill the Client for the time spent to date at CIVAS' hourly rates for the personnel involved. The Client will be billed a minimum $500 or at a rate of $250 per hour for associate time, $300 per hour for valuation services director, $400 per hour for managing director, and $450 per hour for executive managing director. If the Client delays completion of the assignment beyond ninety (90) days, the fee may be renegotiated. This may result in the total fee exceeding the original agreed fee agreed upon cost.

4) Client agrees to pay all fees and expenses, including attorney's fees, incurred by CIVAS in connection with the collection or attempted collection of the fees and expenses. In the event Client fails to make payments when due and payable, the amount due shall bear interest at 1.5% per month or the maximum rate permitted in the state in which the CIVAS office executing the Agreement is located, whichever is lesser.

5) The fee is due upon delivery of the final report or within thirty (30) days of your receipt of the draft report, whichever is sooner. If a draft is requested, the fee is considered earned upon delivery of our draft report.

6) In the event that either party commences any legal action relating to the provisions of the Agreement, including collection, the prevailing party shall be entitled to its actual attorneys' fees and costs. The Agreement shall be governed by and construed in accordance with the laws of the state where the CIVAS office executing the Agreement is located. The venue of any action arising out of the Agreement shall be the county where the CIVAS office executing the Agreement is located. Client will have up to thirty (30) days from receipt of the Draft Appraisal to review and communicate its review to CIVAS. CIVAS reserves the right to bill Client for additional appraisal efforts that may arise from the Client not responding within with this time period.

7) CIVAS does not make any representation or warranty, express or implied, as to the accuracy or completeness of the information or the state of affairs of the Property furnished to CIVAS by Client. In the event that any such information is inaccurate, misleading or incomplete, CIVAS shall have no responsibility or liability for any matters relating thereto (whether to the Client or to any third party).

8) CIVAS shall have no responsibility for legal matters, questions of survey or title, soil or subsoil conditions, engineering, or other similar technical matters. The Appraisal will not constitute a survey of the Property analyzed.

9) Client shall provide CIVAS with such materials with respect to the Appraisal as requested by CIVAS and which are in the possession or under the control of Client. Client shall provide CIVAS with sufficient access to the Property to be analyzed and hereby grants permission for entry, unless discussed in advance to the contrary.

10) The data gathered in the course of the Appraisal (except data furnished by Client) and the Appraisal prepared pursuant to the Agreement are, and will remain, the property of CIVAS. With respect to data provided by Client, such data shall be confidential, and CIVAS shall not disclose any information identified as confidential furnished to CIVAS. Notwithstanding the foregoing, CIVAS is authorized by Client to disclose all or any portion of the Appraisal and the related data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable CIVAS to comply with the Bylaws and Regulations of such Institute as now or hereafter in effect.

11) Unless specifically noted, CIVAS does not assume any duty to analyze or examine the Property or adjacent property for the possible presence of toxic and/or hazardous substances or materials (including but not exclusive to asbestos, PCB transformers, or other toxic, hazardous, or contaminated substances and/or underground storage tanks (hazardous material), or the cost of encapsulation or removal thereof) and accepts no liability regarding the issue. If such materials exist, CIVAS defers to the expertise of professionals specifically trained in analyzing the cost to remediate, which will not be a part of the appraisal fee proposal. The Appraisal will contain a comprehensive disclaimer to this effect.

12) CIVAS understands that there is no major or significant deferred maintenance in the Property which would require the expertise of a professional cost estimator or contractor. If such repairs are needed, the estimates are to be prepared by others, and are not a part of the fee contemplated in the Agreement.

13) Client acknowledges that CIVAS is being retained hereunder as an independent contractor to perform the services described herein and nothing in the Agreement shall be deemed to create any other relationship between Client and CIVAS. The Agreement shall be deemed concluded and the services hereunder completed upon delivery to Client of the Appraisal discussed herein.

14) Client agrees that its only remedy for losses or damages relating to the Agreement shall be limited to the amount of the appraisal fee paid by the Client and in no circumstances shall CIVAS be liable for any losses or damages in excess of this amount. Should the Client, or any other entitled party, make a claim against CIVAS, its directors, officers, employees and other affiliates and shareholders, relating to this engagement or the appraisal(s), the maximum damages recoverable from CIVAS, its

# Professional Service Agreement
Continued

directors, officers, employees and other affiliates and shareholders, shall be the amount of funds actually collected by CIVAS under the Agreement, and no claim shall be made for any consequential or punitive damages.

15) If CIVAS or any of its employees receives a subpoena or other judicial notification to produce documents or provide testimony involving the Appraisal in connection with a lawsuit or related proceeding, CIVAS will notify the Client of receipt of the subpoena or notification. However, if CIVAS is not part of the lawsuit or proceedings, Client agrees to compensate CIVAS for the professional time required and to reimburse CIVAS for the expenses incurred in responding to any such subpoena or judicial notification, including any attorneys' fees, as they are incurred. CIVAS is to be compensated at the prevailing hourly rates of the personnel responding to the subpoena or command for testimony.

16) If expert witness testimony is required in connection with the Appraisal, the following hourly rates will apply.  The Client will be billed at the rate of $250 per hour for associate time, $350 per hour for valuation services director, $400 per hour for managing director, and $450 per hour for executive managing director.  The hourly billings pertain to court preparation, waiting and travel time, document review and preparation (excludes appraisal report) and all meetings related to court testimony.

17) Client shall indemnify and hold CIVAS, its parent, subsidiaries, affiliates, its officers, directors, employees and agents ("CIVAS Indemnities"), fully harmless against all losses, damages, claims, and expenses of any kind whatsoever (including costs and reasonable attorneys' fees), sustained or incurred by a third party as a result of the negligence or intentional acts or omissions of Client (including any failure to perform any duty imposed by law), any misrepresentation, distortion or if Client fails to provide complete and accurate information to CIVAS, for which recovery is sought against the CIVAS Indemnities; however, such obligation to defend and indemnify shall not apply to the extent caused by the negligent act or willful misconduct of CIVAS. Client shall indemnify and hold CIVAS Indemnities harmless from any claims, expenses, judgments or other items or costs arising as a result of the Client's failure or the failure of any of the Client's agents to provide a complete copy of the Appraisal to any third party. LIMITATION OF LIABILITY.  EXCEPT FOR THE INDEMNIFICATION PROVISION ABOVE, ANYTHING IN THE AGREEMENT TO THE CONTRARY NOTWITHSTANDING, UNDER NO CIRCUMSTANCES WHATSOEVER SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER.

18) CIVAS agrees to maintain Professional Liability Insurance in the amount of $1,000,000 and General Liability insurance in the amount of $2,000,000, as well as Workers Compensation per local regulatory requirements.  CIVAS will endeavor to provide Client with written notice regarding any cancellation of any such insurance. CIVAS will provide Client with certificates of insurance naming Client as an additional insured on the General Liability policy upon request.

19) The Appraisal and the name Colliers International Valuation & Advisory Services may not be used in any marketing or investment material or offering memoranda without CIVAS' prior written consent. CIVAS, its employees and appraisers have no liability to any recipients of any prepared material and disclaim all liability to any party other than the Client.

20) Unless CIVAS consents in writing, the Appraisal cannot be used by any party or for any purpose other than the Client for the purposes specified in the Agreement. Should the Client provide a copy of this Appraisal to any person or entity not authorized by CIVAS in writing, Client hereby agrees to hold CIVAS, its directors, officers, employees and other affiliates and shareholders, harmless from all damages, expenses, claims and costs, including any attorney's fees. The Client acknowledges that any opinions and conclusions expressed by the professionals of CIVAS pursuant to the Agreement are made as employees and not as individuals. CIVAS' responsibility is limited to the Client, and the use of the Appraisal or related product by third parties shall be solely at the risk of the Client and/or third parties.

21) The use of this appraisal shall be used only for the purpose as set forth in the Intended Use section of the Agreement. In the event that the client wishes to use this report or portions of this report for any other purpose such as, to become part of or be referenced in, any offering or other material intended for the review of others, or to be submitted to others, will be at the Client's sole and absolute discretion and, if given, will be on condition that CIVAS will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to CIVAS and the Client, by a party satisfactory to CIVAS and the Client.  CIVAS does consent to Client submission of the complete Appraisal to rating agencies, loan participants or your accountants/auditors without the need to provide us with an Indemnification Agreement and/or Non-Reliance letter.

# CLASS S BUILDINGS

Class S buildings are characterized by incombustible construction and prefabricated structural members. The exterior walls may be steel studs or an open-steel-skeleton frame with exterior single or sandwich wall coverings consisting of prefabricated panels or sheet siding. Floors and roofs are supported on steel joists or beams, or the floor may be concrete slab on grade. Upper floors or roofs may consist of metal deck, prefabricated panels or sheathing.

Class S slant-wall buildings (a subset of Class S) are characterized by incombustible construction

and light, prefabricated structural members. They are not fire-resistant buildings. The exterior walls and roof coverings are prefabricated metal panels or sheet siding supported by an open-steel skeleton slant (modified A) frame. Ground floors are typically concrete slabs.

Included in this classification are Uniform and Standard Building Code construction, Type IV (non-combustible), Basic Code Type V and ISO Class 3 buildings. This class is also referred to as Noncombustible and can be One-hour Type II construction.



# CALCULATOR METHOD

## ALTERNATE METHOD

This method is presented as an alternative to the normal calculator method, which includes average office/shop space commensurate with the occupancy type and quality level. Listed below are typical office-finish costs based on actual office space, which can be added to a basic shell cost for a complete building cost. For two-story offices, add mezzanine structure cost, which includes a weighting for additional fenestration and exterior trim.

## LIGHT INDUSTRIAL/WAREHOUSE SHELL BUILDINGS (454)

| CLASS | TYPE | EXTERIOR WALLS | INTERIOR FINISH | LIGHTING AND PLUMBING | HEAT | Sq. M. | COST Cu. Ft. | Sq. Ft. |
|-------|------|----------------|-----------------|----------------------|------|--------|--------------|---------|
| C | Good | Good frame and wall panels, elastomeric roof, good fenestration | 6" – 7" hardened slab, painted walls | Good fluorescent or high bay factory lighting and utilities | None | 699.65 | 4.64 | 65.00 |
| | Average | Light frame or bearing walls, block or tilt-up, some trim, storefront, windows | 5" – 6" slab, sealer, exposed insulation | Adequate general warehouse lighting and utilities | None | 505.90 | 3.36 | 47.00 |
| | Low cost | Light block or tilt-up, built-up cover, panelized roof, small storefront entry | Light concrete slab, no interior paint | Minimum single-tube fluorescent or high bay (18 f.c.), sewer and water service | None | 365.97 | 2.43 | 34.00 |
| | Cheap | Light tilt-up, panelized roof, small entry | Unfinished, adequate slab | Minimum lighting and rough plumbing | None | 293.32 | 1.95 | 27.25 |
| D | Good | Good frame with stucco or siding, some ornamentation | 6" – 7" hardened slab, painted walls | Good fluorescent or high bay factory lighting and utilities | None | 651.22 | 4.32 | 60.50 |
| | Average | Wood studs, stucco, wood rafters and sheathing, some trim | 5" – 6" slab, sealer, exposed insulation | Adequate general warehouse lighting and utilities | None | 465.54 | 3.09 | 43.25 |
| D POLE | Average | Pole frame, metal siding, lined and insulated, some trim, storefront, windows | 5" – 6" slab, sealer, exposed insulation | Adequate general warehouse lighting and utilities | None | 379.43 | 2.52 | 35.25 |
| | Low cost | Pole frame, metal siding, little fenestration, exposed insulation | Light concrete slab | Minimum single-tube fluorescent or high bay (18 f.c.), sewer and water service | None | 271.79 | 1.80 | 25.25 |
| | Cheap | Pole frame, light metal utility siding, minimal openings, no storefront | Unfinished, adequate slab, exposed frame | Minimum utility lighting and rough plumbing | None | 210.97 | 1.40 | 19.60 |
| S | Good | Good steel frame, heavy metal siding, sandwich panels, good fenestration, trim | 6" – 7" hardened slab, some finished wainscot or liner | Good fluorescent or high bay factory lighting and utilities | None | 635.07 | 4.21 | 59.00 |
| | Average | Steel frame, siding or sandwich panels, some trim, storefront entry, windows | 5" – 6" slab, sealer, exposed insulation | Adequate general warehouse lighting and utilities | None | 452.08 | 3.00 | 42.00 |
| | Low cost | Light steel frame, metal siding, little fenestration, exposed insulation | Light concrete slab, no interior liner | Minimum single-tube fluorescent or high bay (18 f.c.), sewer and water service | None | 320.23 | 2.12 | 29.75 |
| | Cheap | Light pre-eng. frame, light metal utility siding, minimal openings, no storefront | Unfinished, adequate slab, exposed frame | Minimum utility or high bay lighting and rough plumbing | None | 243.26 | 1.61 | 22.60 |

NOTE: The base wall height is 14 feet (4.27 meters). Add or deduct 2% per foot. For draft curtains, add 2.01 to 2.63 per square foot (21.64 to 28.31 per square meter) of curtain. Add for heat from Page 36. The cheap industrial utility shell is comparable to the shed structures found in Section 17, except for slightly heavier commercial frame, fenestration and trim. For greater detail, see Section 64. Cold storage insulation can be added from Section 44 or 58. To convert illumination in foot candles (f.c.) to lumens per square meter, multiply by 10.764.

## INDUSTRIAL, INTERIOR OFFICE SPACE (994)
### (SQUARE FOOT OF OFFICE FINISH)

| TYPE | INTERIOR FINISH | LIGHTING AND PLUMBING | HEAT | Sq. M. | COST Cu. Ft. | Sq. Ft. |
|------|-----------------|----------------------|------|--------|--------------|---------|
| Excellent | Good executive suites, cafeteria, glazed finishes, hardwoods | Good fixtures, kitchen, some extras | Heat pump | 1905.21 | 12.64 | 177.00 |
| Good | Good plaster, partitions, paneling, suspended acoustic, carpet, tile or vinyl, good meeting or showroom space | Good fluorescent lighting, good restrooms and fixtures, some tile | Package A.C. | 1216.32 | 8.07 | 113.00 |
| Average | Average drywall or plaster, acoustic tile, vinyl composition or carpet, adequate shelving and counters | Adequate lighting and outlets, average restrooms and fixtures | Forced Air | 737.33 | 4.89 | 68.50 |
| Low cost | Low-cost partitions, paint, suspended ceiling, vinyl composition, minimal counters and shelving | Minimum lighting and plumbing, few extras, small restroom | Electric wall heaters | 444.01 | 2.95 | 41.25 |
| Good office mezzanine structure | Metal structure and concrete deck over offices, stairs and railings | Included in office cost | Included in office cost | 417.10 | ––––– | 38.75 |
| Average office mezzanine structure | Wood structure and deck over offices, stairs and railings | Included in office cost | Included in office cost | 330.99 | ––––– | 30.75 |

NOTE: The base office wall height is 8' (2.44 meter). Add or deduct 2% for each foot (.305 meter) of deviation. Partition density can cause the costs to vary as much as plus or minus 30%. For shop plumbing, including enclosure, add 5450.00 plus 4250.00 per fixture. For bay height partition walls, per square foot of wall: frame, one-hour construction at 8.65 to 17.75 for three-hour (93.11 to 191.06 per square meter); masonry costs 12.60 to 14.50 per square foot (135.63 to 156.08 per square meter) of wall area. For prefabricated modular offices and mezzanines, see Section 64.

MARSHALL VALUATION SERVICE                    The data included on this page becomes obsolete after update delivery, scheduled for February 2024.
© 2023 CoreLogic®, Inc. and its licensors, all rights reserved. Any reprinting, distribution, creation of derivative works, and/or public display is strictly prohibited.                    2/2023

# CALCULATOR METHOD

## GARAGES, INDUSTRIALS, LOFTS AND WAREHOUSES
## REFINEMENTS

On this page and the next are means of making adjustments to the base costs given in this section. The component parts which are not defined, such as the roof or foundation, are considered to be commensurate with the general quality of the building. If further refinements are required or the construction is unusual, either price entirely or adjust the base costs by the Segregated Cost System, Section 44. Special items which should be added to the total cost may be added from the Unit-in-Place cost sections.

### HEATING AND COOLING

These costs are averages of the total cost of the entire heating or cooling installation, including its prorated share of the contractor's overhead and profit and the architect's fees. If the heating found in the building being appraised is different from that indicated for the base being used, take the difference between the costs of the two and add to or subtract from the base square foot cost. If a cubic foot cost is used, use one-fourteenth (1/14) the difference shown to adjust the base cubic foot cost. All of the heating costs included in the base costs are those listed under "Moderate Climate." For specific system costs not found below, see Section 44 or 53. For laminar flow clean rooms, see Section 44.

### COOLING ONLY

Cooling costs in industrial buildings are dependent on the summer heat load, types of walls and roof, type of manufacturing, number of partitions, and traffic in and out. In general, the following figures will serve as a guide for picking the proper cost of separate cooling. For cold-storage refrigeration, see Page 24 or Section 58 for greater detail.

| TYPE | SQUARE METER COSTS | | | SQUARE FOOT COSTS | | |
|---|---|---|---|---|---|---|
| | Mild Climate | Moderate Climate | Extreme Climate | Mild Climate | Moderate Climate | Extreme Climate |
| Central refrigeration with ducts and zone controls | 76.10 | 111.41 | 163.07 | 7.07 | 10.35 | 15.15 |
| Package refrig. (short ductwork) | 53.93 | 76.42 | 107.64 | 5.01 | 7.10 | 10.00 |
| Central evaporative (with ducts) | 39.40 | 51.67 | 67.38 | 3.66 | 4.80 | 6.26 |
| Package refrigeration | 252.00 | to 1790.00 per ton of rated capacity. | | | | |
| Evaporative coolers | 414.00 | to 2360.00 per thousand CFM of rated capacity. | | | | |

### ELEVATORS

Lump sum cost per elevator plus the cost per stop or landing, including the ground level. Use the cost per stop for basement and mezzanine stops. See Section 58 for more detailed costs, for glass observation elevators and for personnel lift costs.

| TYPE | Low | Average | Good | Excellent |
|---|---|---|---|---|
| Passenger, 2- to 3-story | 58500.00 | 68750.00 | 81000.00 | 95500.00 |
| 4-story and over | 102000.00 | 117000.00 | 134000.00 | 154000.00 |
| add cost per stop | 8500.00 | 9800.00 | 11200.00 | 12900.00 |
| Freight, base cost, 2- to 3-story | 45200.00 | 59750.00 | 79000.00 | 104000.00 |
| 4-story and over | 88750.00 | 112000.00 | 142000.00 | 179000.00 |
| add, cost per stop, manual doors | 11500.00 | 12500.00 | 13500.00 | 14700.00 |
| power doors | 19900.00 | 21700.00 | 23700.00 | 25600.00 |
| Escalators, each stairway | 238000.00 | 255000.00 | 272000.00 | 291000.00 |
| Vertical wheelchair lifts, each | 15400.00 | 19600.00 | 25000.00 | 31600.00 |

### HEATING ONLY

| TYPE | SQUARE METER COSTS | | | SQUARE FOOT COSTS | | |
|---|---|---|---|---|---|---|
| | Mild Climate | Moderate Climate | Extreme Climate | Mild Climate | Moderate Climate | Extreme Climate |
| Electric, baseboard or cable | 40.15 | 59.20 | 87.62 | 3.73 | 5.50 | 8.14 |
| radiant panel | 38.10 | 49.51 | 64.48 | 3.54 | 4.60 | 5.99 |
| Electric wall heaters (incl FWA) | 20.99 | 27.45 | 35.74 | 1.95 | 2.55 | 3.32 |
| Forced-air furnace | 45.85 | 67.27 | 98.92 | 4.26 | 6.25 | 9.19 |
| Hot water, baseboard/convector | 74.16 | 114.10 | 175.45 | 6.89 | 10.60 | 16.30 |
| radiant floor or ceiling | 71.80 | 116.25 | 187.83 | 6.67 | 10.80 | 17.45 |
| Space heaters, with fan | 18.51 | 30.68 | 49.94 | 1.72 | 2.85 | 4.64 |
| radiant | 22.17 | 34.98 | 55.86 | 2.06 | 3.25 | 5.19 |
| Steam (incl. boiler) | 70.83 | 103.87 | 152.65 | 6.58 | 9.65 | 14.20 |
| (without boiler) | 56.94 | 87.19 | 132.93 | 5.29 | 8.10 | 12.35 |
| Wall or floor furnaces | 22.17 | 29.60 | 40.15 | 2.06 | 2.75 | 3.73 |

### HEATING AND COOLING – EXCEPT LABORATORY BUILDINGS

| | | | | | | |
|---|---|---|---|---|---|---|
| Package A.C. (short ductwork) | 84.39 | 127.55 | 193.21 | 7.84 | 11.85 | 17.95 |
| Warm and cool air (zoned) | 110.87 | 171.15 | 264.25 | 10.30 | 15.90 | 24.55 |
| Hot and chilled water (zoned) | 192.14 | 293.32 | 444.01 | 17.85 | 27.25 | 41.25 |
| Heat-pump system | 90.74 | 148.00 | 242.19 | 8.43 | 13.75 | 22.50 |
| add for grnd. loop heat source | 23.47 | 40.90 | 71.80 | 2.18 | 3.80 | 6.67 |
| Individual thru-wall heat pumps | 39.40 | 62.97 | 101.40 | 3.66 | 5.85 | 9.42 |
| Small individual heat pumps cost | 2120.00 | to 2875.00 per ton of rated capacity. | | | | |

### VENTILATION ONLY

| | | | | | | |
|---|---|---|---|---|---|---|
| Ventilation (blowers and ducts) or smoke removal system | 13.76 | 19.91 | 28.95 | 1.28 | 1.85 | 2.69 |

The data included on this page becomes obsolete after update delivery, scheduled for February 2024.

# CALCULATOR METHOD

## GARAGES, INDUSTRIALS, LOFTS AND WAREHOUSES
### FLOOR AREA – PERIMETER MULTIPLIERS

| AVERAGE FLOOR AREA Sq. M. | Sq. Ft. | M. FT. | 30 100 | 38 125 | 46 150 | 53 175 | 61 200 | 76 250 | 91 300 | 107 350 | 122 400 | 137 450 | 152 500 | 183 600 | 213 700 | 244 800 | 274 900 | 305 1000 | M. FT. | AVERAGE FLOOR AREA Sq. Ft. | Sq. M. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 93 | 1,000 | | 1.252 | 1.360 | 1.468 | 1.576 | — | — | — | — | — | — | — | — | — | — | — | — | | 1,000 | 93 |
| 139 | 1,500 | | 1.112 | 1.182 | 1.252 | 1.323 | 1.395 | — | — | — | — | — | — | — | — | — | — | — | | 1,500 | 139 |
| 186 | 2,000 | | — | 1.095 | 1.147 | 1.199 | 1.252 | 1.360 | — | — | — | — | — | — | — | — | — | — | | 2,000 | 186 |
| 232 | 2,500 | | — | — | 1.083 | 1.125 | 1.168 | 1.252 | 1.340 | 1.430 | — | — | — | — | — | — | — | — | | 2,500 | 232 |
| 279 | 3,000 | | — | — | — | 1.077 | 1.112 | 1.182 | 1.252 | 1.323 | 1.395 | — | — | — | — | — | — | — | | 3,000 | 279 |
| 372 | 4,000 | | — | — | — | 1.013 | 1.040 | 1.094 | 1.147 | 1.199 | 1.252 | 1.306 | — | — | — | — | — | — | | 4,000 | 372 |
| 465 | 5,000 | | — | — | — | — | .996 | 1.040 | 1.083 | 1.125 | 1.168 | 1.210 | 1.252 | — | — | — | — | — | | 5,000 | 465 |
| 557 | 6,000 | | — | — | — | — | — | 1.004 | 1.040 | 1.077 | 1.112 | 1.147 | 1.182 | 1.252 | — | — | — | — | | 6,000 | 557 |
| 650 | 7,000 | | — | — | — | — | — | 1.008 | 1.040 | 1.071 | 1.102 | 1.132 | 1.192 | 1.252 | — | — | — | | | 7,000 | 650 |
| 743 | 8,000 | | — | — | — | — | — | .984 | 1.013 | 1.040 | 1.068 | 1.094 | 1.147 | 1.199 | 1.252 | — | — | | | 8,000 | 743 |
| 929 | 10,000 | | — | — | — | — | — | — | .972 | .996 | 1.019 | 1.040 | 1.083 | 1.125 | 1.168 | 1.210 | — | | | 10,000 | 929 |
| 1,115 | 12,000 | | — | — | — | — | — | — | .985 | .984 | 1.003 | 1.040 | 1.077 | 1.112 | 1.147 | 1.182 | | | | 12,000 | 1,115 |
| 1,301 | 14,000 | | — | — | — | — | — | — | .945 | .961 | .977 | 1.008 | 1.040 | 1.071 | 1.102 | 1.132 | | | | 14,000 | 1,301 |
| 1,486 | 16,000 | | — | — | — | — | — | — | — | .943 | .957 | .984 | 1.013 | 1.040 | 1.068 | 1.094 | | | | 16,000 | 1,486 |
| 1,672 | 18,000 | | — | — | — | — | — | — | — | .929 | .942 | .967 | .991 | 1.016 | 1.040 | 1.065 | | | | 18,000 | 1,672 |
| 1,858 | 20,000 | | — | — | — | — | — | — | — | — | .926 | .949 | .972 | .996 | 1.019 | 1.040 | | | | 20,000 | 1,858 |
| 2,323 | 25,000 | | — | — | — | — | — | — | — | .907 | .924 | .942 | .957 | .977 | .996 | | | | | 25,000 | 2,323 |
| 2,787 | 30,000 | | — | — | — | — | — | — | — | — | .907 | .921 | .935 | .949 | .965 | | | | | 30,000 | 2,787 |
| 3,252 | 35,000 | | — | — | — | — | — | — | — | — | .896 | .907 | .919 | .932 | .945 | | | | | 35,000 | 3,252 |
| 3,716 | 40,000 | | — | — | — | — | — | — | — | — | — | .899 | .907 | .916 | .926 | | | | | 40,000 | 3,716 |
| 4,181 | 45,000 | | — | — | — | — | — | — | — | — | — | — | .898 | .907 | .916 | | | | | 45,000 | 4,181 |
| 4,645 | 50,000 | | — | — | — | — | — | — | — | — | — | — | .891 | .898 | .907 | | | | | 50,000 | 4,645 |

| AVERAGE FLOOR AREA Sq. M. | Sq. Ft. | M. FT. | 274 900 | 305 1000 | 335 1100 | 366 1200 | 396 1300 | 427 1400 | 457 1500 | 488 1600 | 518 1700 | 549 1800 | 579 1900 | 610 2000 | 671 2200 | 731 2400 | 792 2600 | 914 3000 | M. FT. | AVERAGE FLOOR AREA Sq. Ft. | Sq. M. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,858 | 20,000 | | 1.019 | 1.040 | 1.052 | 1.083 | — | — | — | — | — | — | — | — | — | — | — | — | | 20,000 | 1,858 |
| 2,323 | 25,000 | | .977 | .996 | 1.015 | 1.032 | 1.049 | 1.066 | — | — | — | — | — | — | — | — | — | — | | 25,000 | 2,323 |
| 2,787 | 30,000 | | .949 | .965 | .980 | .995 | 1.010 | 1.025 | 1.040 | — | — | — | — | — | — | — | — | — | | 30,000 | 2,787 |
| 3,252 | 35,000 | | .932 | .945 | .957 | .969 | .982 | .995 | 1.008 | 1.021 | — | — | — | — | — | — | — | — | | 35,000 | 3,252 |
| 3,716 | 40,000 | | .916 | .926 | .937 | .949 | .961 | .972 | .984 | .995 | 1.007 | 1.019 | — | — | — | — | — | — | | 40,000 | 3,716 |
| 4,181 | 45,000 | | .907 | .916 | .926 | .935 | .945 | .955 | .965 | .975 | .985 | .995 | 1.005 | 1.015 | — | — | — | — | | 45,000 | 4,181 |
| 4,645 | 50,000 | | .900 | .898 | .907 | .918 | .924 | .933 | .942 | .950 | .959 | .968 | .977 | .986 | .996 | 1.015 | — | — | | 50,000 | 4,645 |
| 5,574 | 60,000 | | .889 | .895 | .901 | .907 | .914 | .921 | .928 | .935 | .942 | .949 | .957 | .965 | .980 | .995 | — | — | | 60,000 | 5,574 |
| 6,503 | 70,000 | | — | .877 | .884 | .890 | .896 | .902 | .907 | .913 | .919 | .925 | .932 | .939 | .945 | .957 | .969 | .982 | | 70,000 | 6,503 |
| 7,432 | 80,000 | | — | .869 | .875 | .881 | .887 | .893 | .898 | .903 | .907 | .911 | .916 | .921 | .926 | .937 | .949 | .961 | .984 | 80,000 | 7,432 |
| 9,290 | 100,000 | | — | — | .863 | .868 | .872 | .877 | .882 | .887 | .891 | .895 | .899 | .903 | .907 | .916 | .924 | .933 | .950 | 100,000 | 9,290 |
| 11,148 | 120,000 | | — | — | .856 | .859 | .863 | .867 | .871 | .875 | .879 | .883 | .887 | .891 | .895 | .901 | .907 | .914 | .928 | 120,000 | 11,148 |
| 13,006 | 140,000 | | — | — | .851 | .854 | .857 | .860 | .863 | .867 | .871 | .874 | .877 | .880 | .884 | .890 | .896 | .902 | .913 | 140,000 | 13,006 |
| 14,864 | 160,000 | | — | — | — | .850 | .853 | .855 | .858 | .861 | .863 | .866 | .869 | .872 | .875 | .881 | .887 | .893 | .903 | 160,000 | 14,864 |
| 16,722 | 180,000 | | — | — | — | .846 | .849 | .851 | .854 | .856 | .858 | .680 | .863 | .866 | .869 | .874 | .879 | .884 | .895 | 180,000 | 16,722 |
| 18,580 | 200,000 | | — | — | — | .846 | .848 | .850 | .853 | .855 | .657 | .859 | .861 | .663 | .866 | .873 | .877 | .887 | | 200,000 | 18,580 |
| 20,903 | 225,000 | | — | — | — | — | .845 | .847 | .849 | .851 | .853 | .855 | .858 | .858 | .862 | .867 | .871 | .879 | | 225,000 | 20,903 |
| 23,226 | 250,000 | | — | — | — | — | — | .842 | .844 | .846 | .848 | .849 | .851 | .853 | .858 | .862 | .866 | .873 | | 250,000 | 23,226 |
| 25,548 | 275,000 | | — | — | — | — | — | .839 | .841 | .843 | .845 | .847 | .848 | .850 | .852 | .855 | .858 | .862 | .868 | 275,000 | 25,548 |
| 27,871 | 300,000 | | — | — | — | — | — | — | .839 | .841 | .842 | .844 | .846 | .847 | .849 | .852 | .855 | .857 | .863 | 300,000 | 27,871 |
| 32,516 | 350,000 | | — | — | — | — | — | — | .835 | .636 | .639 | .840 | .841 | .843 | .845 | .847 | .850 | .853 | .857 | 350,000 | 32,516 |
| 37,161 | 400,000 | | — | — | — | — | — | — | — | .835 | .836 | .838 | .840 | .841 | .843 | .845 | .848 | .853 | | 400,000 | 37,161 |
| 46,451 | 500,000 | | — | — | — | — | — | — | — | .831 | .832 | .833 | .834 | .835 | .838 | .840 | .842 | .846 | | 500,000 | 46,451 |

MARSHALL VALUATION SERVICE          The data included on this page becomes obsolete after update delivery, scheduled for February 2024.
© 2022 CoreLogic®, Inc. and its licensors, all rights reserved. Any reprinting, distribution, creation of derivative works, and/or public display is strictly prohibited.          2/2022

# CALCULATOR METHOD

## GARAGES, INDUSTRIALS, LOFTS AND WAREHOUSES
### FLOOR AREA – PERIMETER MULTIPLIERS

| AVERAGE FLOOR AREA Sq.M. | Sq.Ft. | M. 610 FT. 2000 | 671 2200 | 731 2400 | 792 2600 | 914 3000 | 1067 3500 | 1219 4000 | 1372 4500 | 1524 5000 | 1676 5500 | 1829 6000 | 1981 6500 | 2133 7000 | 2286 7500 | 2438 M. 8000 FT. | Sq.Ft. | Sq.M. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27,871 | 300,000 | .849 | .852 | .855 | .857 | .863 | .872 | .880 | | | | | | | | | 300,000 | 27,871 |
| 32,516 | 350,000 | .845 | .847 | .850 | .853 | .857 | .863 | .871 | | | | | | | | | 350,000 | 32,516 |
| 37,161 | 400,000 | .841 | .843 | .846 | .848 | .853 | .858 | .863 | .870 | .875 | | | | | | | 400,000 | 37,161 |
| 46,451 | 500,000 | .835 | .838 | .840 | .842 | .846 | .850 | .855 | .859 | .863 | .868 | .873 | | | | | 500,000 | 46,451 |
| 55,741 | 600,000 | | | | .837 | .841 | .845 | .849 | .853 | .856 | .859 | .863 | .867 | | | | 600,000 | 55,741 |
| 65,032 | 700,000 | | | | .836 | .841 | .845 | .848 | .851 | .854 | .857 | .860 | .863 | .867 | | | 700,000 | 65,032 |
| 74,322 | 800,000 | | | | .834 | .837 | .841 | .844 | .847 | .850 | .853 | .856 | .858 | .860 | .863 | | 800,000 | 74,322 |
| 83,612 | 900,000 | | | | .832 | .835 | .838 | .841 | .843 | .847 | .849 | .851 | .854 | .856 | .858 | | 900,000 | 83,612 |
| 92,902 | 1,000,000 | | | | | .832 | .835 | .838 | .841 | .843 | .846 | .848 | .850 | .850 | .852 | | 1,000,000 | 92,902 |
| 102,192 | 1,100,000 | | | | | .831 | .833 | .835 | .836 | .839 | .841 | .843 | .846 | .848 | .850 | .852 | 1,100,000 | 102,192 |
| 111,483 | 1,200,000 | | | | | | | | .834 | .836 | .839 | .841 | .843 | .845 | .847 | .849 | 1,200,000 | 111,483 |
| 120,773 | 1,300,000 | | | | | | | | .832 | .834 | .836 | .839 | .841 | .843 | .845 | .847 | 1,300,000 | 120,773 |
| 130,063 | 1,400,000 | | | | | | | | .831 | .833 | .835 | .836 | .839 | .841 | .843 | .845 | 1,400,000 | 130,063 |
| 139,353 | 1,500,000 | | | | | | | | .830 | .832 | .833 | .835 | .837 | .839 | .841 | .843 | 1,500,000 | 139,353 |

NOTE: For larger buildings, enter the table by taking half the area and half the perimeter.

## STORY HEIGHT MULTIPLIERS

Multiply the base cost by the following multipliers for any variation in average story height from the base of 14 feet (4.27 meters). For extremely high-pitched roofs (see Section 10), use the height of the eaves plus one-half the height from the eaves to the ridge as the effective height.

In some buildings it is better to compute the total volume and divide by the total square feet of floor area to get an effective height to use.

| AVERAGE WALL HEIGHT (M.) | (FT.) | SQUARE FOOT OR SQUARE METER MULTIPLIER | CUBIC FOOT MULT. | AVERAGE WALL HEIGHT (M.) | (FT.) | SQUARE FOOT OR SQUARE METER MULTIPLIER | CUBIC FOOT MULT. | AVERAGE WALL HEIGHT (M.) | (FT.) | SQUARE FOOT OR SQUARE METER MULTIPLIER | CUBIC FOOT MULT. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2.44 | 8 | .885 | 1.567 | 7.31 | 24 | 1.231 | .718 | 16.76 | 55 | 2.075 | .528 |
| 3.05 | 10 | .921 | 1.289 | 7.92 | 26 | 1.281 | .690 | 18.29 | 60 | 2.225 | .519 |
| 3.66 | 12 | .960 | 1.120 | 8.53 | 28 | 1.331 | .666 | 21.33 | 70 | 2.530 | .506 |
| 4.27 | 14 | 1.000 (base) | 1.000 | 9.14 | 30 | 1.382 | .645 | 24.38 | 80 | 2.845 | .498 |
| 4.88 | 16 | 1.041 | .911 | 10.67 | 35 | 1.515 | .606 | 27.43 | 90 | 3.161 | .492 |
| 5.49 | 18 | 1.086 | .844 | 12.19 | 40 | 1.650 | .577 | 30.48 | 100 | 3.461 | .485 |
| 6.10 | 20 | 1.133 | .794 | 13.72 | 45 | 1.788 | .556 | 33.52 | 110 | 3.738 | .476 |
| 6.71 | 22 | 1.181 | .752 | 15.24 | 50 | 1.930 | .540 | 36.57 | 120 | 3.977 | .464 |

*The data included on this page becomes obsolete after update delivery, scheduled for February 2024.*
© 2022 CoreLogic®, Inc. and its licensors, all rights reserved. Any reprinting, distribution, creation of derivative works, and/or public display is strictly prohibited.

## LOCAL MULTIPLIERS

Apply to costs brought up-to-date from preceding pages. Do not apply to Section 98 or any other indexes.

### UNITED STATES

| CLASS | A | B | C | D | S |
|---|---|---|---|---|---|
| **COLORADO** | | | | | |
| Aspen | 0.99 | 1.02 | 1.02 | 1.02 | 1.02 |
| Boulder | 1.09 | 1.12 | 1.11 | 1.10 | 1.10 |
| Colorado Springs | 0.96 | 0.99 | 0.98 | 0.98 | 0.99 |
| Costilla County | 0.96 | 1.00 | 0.97 | 0.99 | 1.00 |
| Denver | 0.86 | 0.88 | 0.88 | 0.88 | 0.89 |
| Durango | 0.99 | 1.01 | 1.00 | 1.00 | 1.02 |
| Eagle Co. (x/resort areas) | 0.91 | 0.91 | 0.92 | 0.90 | 0.93 |
| Fort Collins | 0.93 | 0.95 | 0.95 | 0.95 | 0.95 |
| Grand Junction | 0.95 | 1.00 | 1.02 | 1.00 | 1.00 |
| Greeley | 1.00 | 1.00 | 1.00 | 1.00 | 1.02 |
| Gunnison County | 0.96 | 1.00 | 1.01 | 1.01 | 0.99 |
| Kit Carson County | 0.94 | 0.98 | 0.97 | 0.97 | 0.97 |
| Logan County | 0.87 | 0.90 | 0.91 | 0.91 | 0.90 |
| Longmont | 0.88 | 0.92 | 0.91 | 0.91 | 0.91 |
| Loveland | 0.95 | 0.98 | 1.00 | 0.99 | 1.00 |
| Moffat County | 0.94 | 0.98 | 1.02 | 1.00 | 0.98 |
| Montrose County | 0.92 | 0.94 | 0.92 | 0.93 | 0.94 |
| Prowers County | 0.91 | 0.92 | 0.93 | 0.89 | 0.92 |
| Pueblo | 0.91 | 0.92 | 0.92 | 0.92 | 0.92 |
| Steamboat Springs | 0.94 | 0.96 | 0.95 | 0.95 | 0.95 |
| Vail | 1.14 | 1.17 | 1.16 | 1.15 | 1.14 |
| | 1.12 | 1.16 | 1.14 | 1.13 | 1.13 |
| **CONNECTICUT** | | | | | |
| Bridgeport | 1.12 | 1.13 | 1.11 | 1.11 | 1.11 |
| Bristol | 1.13 | 1.15 | 1.14 | 1.14 | 1.14 |
| Danbury | 1.11 | 1.12 | 1.11 | 1.08 | 1.10 |
| Fairfield | 1.12 | 1.14 | 1.14 | 1.15 | 1.14 |
| Greenwich | 1.11 | 1.12 | 1.13 | 1.13 | 1.12 |
| Hartford | 1.25 | 1.23 | 1.19 | 1.21 | 1.27 |
| Meriden | 1.15 | 1.15 | 1.15 | 1.14 | 1.13 |
| Middletown | 1.10 | 1.11 | 1.10 | 1.09 | 1.08 |
| Milford | 1.07 | 1.07 | 1.05 | 1.05 | 1.07 |
| New Britain | 1.13 | 1.12 | 1.11 | 1.10 | 1.08 |
| New Haven | 1.12 | 1.11 | 1.11 | 1.07 | 1.10 |
| New London | 1.06 | 1.08 | 1.06 | 1.08 | 1.05 |
| Norwich | 1.06 | 1.07 | 1.08 | 1.05 | 1.05 |
| Stamford | 1.23 | 1.24 | 1.19 | 1.21 | 1.25 |
| Waterbury | 1.11 | 1.10 | 1.06 | 1.05 | 1.06 |
| Windsor Locks | 1.13 | 1.13 | 1.11 | 1.10 | 1.11 |
| **DELAWARE** | | | | | |
| Dover | 1.09 | 1.07 | 1.08 | 1.07 | 1.07 |
| Wilmington | 1.07 | 1.06 | 1.05 | 1.05 | 1.05 |
| | 1.10 | 1.08 | 1.08 | 1.10 | 1.09 |
| **DIST. OF COLUMBIA** | 1.03 | 1.08 | 1.04 | 1.04 | 1.04 |
| **FLORIDA** | | | | | |
| Bradenton | 0.97 | 0.97 | 0.96 | 0.97 | 0.97 |
| Brevard County | 0.99 | 0.98 | 0.97 | 0.98 | 0.98 |
| Broward County | 0.98 | 0.97 | 0.94 | 0.98 | 0.98 |
| Dade County | 0.98 | 0.97 | 0.97 | 0.97 | 0.98 |
| Daytona Beach | 0.96 | 0.95 | 0.97 | 0.97 | 0.98 |
| Fort Myers | 0.95 | 0.95 | 0.94 | 0.94 | 0.95 |
| Fort Pierce | 0.95 | 0.94 | 0.94 | 0.95 | 0.96 |
| Gainesville | 0.98 | 0.94 | 0.94 | 0.94 | 0.97 |
| Jacksonville | 0.96 | 0.98 | 0.97 | 0.98 | 0.97 |
| Key West | 0.98 | 0.98 | 0.97 | 0.98 | 0.97 |
| Lakeland | 1.14 | 1.13 | 1.15 | 1.13 | 1.12 |
| Marathon | 0.97 | 0.97 | 0.97 | 0.96 | 0.97 |
| | 0.99 | 1.07 | 1.09 | 1.06 | 1.09 |

| CLASS | A | B | C | D | S |
|---|---|---|---|---|---|
| **FLORIDA (Continued)** | | | | | |
| Miami | 0.96 | 0.95 | 0.97 | 0.97 | 0.98 |
| Naples | 0.95 | 0.96 | 0.95 | 0.96 | 0.96 |
| Ocala | 0.95 | 0.95 | 0.96 | 0.94 | 0.95 |
| Orlando | 1.00 | 1.00 | 0.98 | 0.98 | 0.96 |
| Palm Beach | 1.01 | 0.98 | 0.97 | 0.98 | 1.00 |
| Panama City | 0.81 | 0.84 | 0.82 | 0.84 | 0.82 |
| Pensacola | 0.87 | 0.86 | 0.85 | 0.88 | 0.87 |
| Pinellas County | 1.00 | 1.00 | 0.99 | 1.00 | 0.99 |
| Sarasota | 0.99 | 0.99 | 0.97 | 1.00 | 0.98 |
| Tallahassee | 0.95 | 0.95 | 0.95 | 0.95 | 0.97 |
| Tampa | 0.99 | 0.99 | 0.99 | 1.00 | 0.98 |
| Vero Beach | 0.99 | 0.96 | 0.94 | 0.92 | 0.96 |
| **GEORGIA** | | | | | |
| Albany | 0.92 | 0.92 | 0.89 | 0.88 | 0.89 |
| Athens | 0.89 | 0.91 | 0.85 | 0.85 | 0.85 |
| Atlanta | 0.96 | 0.96 | 0.91 | 0.92 | 0.92 |
| Augusta | 1.01 | 0.99 | 0.96 | 0.97 | 0.96 |
| Columbus | 0.92 | 0.92 | 0.86 | 0.84 | 0.87 |
| Macon | 0.91 | 0.92 | 0.86 | 0.85 | 0.86 |
| Rome | 0.93 | 0.93 | 0.90 | 0.89 | 0.90 |
| Savannah | 0.94 | 0.94 | 0.91 | 0.89 | 0.90 |
| Valdosta | 0.88 | 0.90 | 0.90 | 0.89 | 0.89 |
| | 0.85 | 0.85 | 0.83 | 0.85 | 0.84 |
| **HAWAII** | | | | | |
| Hilo | 1.51 | 1.58 | 1.56 | 1.57 | 1.55 |
| Kauai | 1.55 | 1.62 | 1.60 | 1.62 | 1.60 |
| Maui | 1.66 | 1.73 | 1.71 | 1.73 | 1.70 |
| Oahu | 1.44 | 1.49 | 1.49 | 1.49 | 1.46 |
| | 1.40 | 1.47 | 1.44 | 1.44 | 1.42 |
| **IDAHO** | | | | | |
| Boise | 1.03 | 1.04 | 1.04 | 1.03 | 1.05 |
| Caldwell | 1.06 | 1.04 | 1.07 | 1.07 | 1.06 |
| Coeur d' Alene | 1.04 | 1.02 | 1.06 | 1.06 | 1.04 |
| Idaho Falls | 1.02 | 1.06 | 1.05 | 1.03 | 1.07 |
| Lewiston | 1.04 | 1.05 | 1.06 | 1.04 | 1.07 |
| Moscow | 1.01 | 1.04 | 1.00 | 0.98 | 1.04 |
| Pocatello | 1.02 | 1.05 | 1.00 | 0.99 | 1.05 |
| Twin Falls | 1.00 | 1.02 | 1.00 | 1.00 | 1.04 |
| | 1.02 | 1.04 | 1.05 | 1.04 | 1.05 |
| **ILLINOIS** | | | | | |
| Alton | 1.10 | 1.12 | 1.12 | 1.11 | 1.10 |
| Aurora | 0.99 | 1.02 | 1.01 | 1.01 | 1.09 |
| Belleville | 1.19 | 1.20 | 1.21 | 1.19 | 1.18 |
| Bloomington | 1.04 | 1.07 | 1.09 | 1.06 | 1.03 |
| Carbondale | 1.03 | 1.12 | 1.09 | 1.10 | 1.09 |
| Centralia | 1.06 | 1.08 | 1.07 | 1.06 | 1.05 |
| Champaign | 1.01 | 1.04 | 1.05 | 1.04 | 1.04 |
| Chicago | 1.06 | 1.07 | 1.08 | 1.08 | 1.08 |
| Danville | 1.23 | 1.22 | 1.22 | 1.21 | 1.20 |
| De Kalb | 1.08 | 1.09 | 1.08 | 1.09 | 1.09 |
| Decatur | 1.18 | 1.19 | 1.19 | 1.17 | 1.17 |
| East St. Louis | 1.03 | 1.04 | 1.05 | 1.07 | 1.04 |
| Elgin | 1.05 | 1.06 | 1.08 | 1.08 | 1.06 |
| Evanston | 1.19 | 1.20 | 1.20 | 1.19 | 1.19 |
| Galesburg | 1.21 | 1.21 | 1.21 | 1.19 | 1.19 |
| Joliet | 1.07 | 1.08 | 1.06 | 1.06 | 1.07 |
| Kankakee | 1.19 | 1.20 | 1.20 | 1.19 | 1.17 |
| Marion | 1.20 | 1.22 | 1.21 | 1.23 | 1.22 |
| Moline | 1.08 | 1.08 | 1.07 | 1.06 | 1.06 |
| | 1.05 | 1.05 | 1.04 | 1.04 | 1.04 |

| CLASS | A | B | C | D | S |
|---|---|---|---|---|---|
| **ILLINOIS (Continued)** | | | | | |
| Normal | 1.04 | 1.12 | 1.10 | 1.11 | 1.10 |
| Peoria | 1.04 | 1.07 | 1.07 | 1.06 | 1.05 |
| Quincy | 1.06 | 1.10 | 1.11 | 1.10 | 1.08 |
| Rock Island | 1.06 | 1.06 | 1.06 | 1.07 | 1.06 |
| Rockford | 1.10 | 1.13 | 1.12 | 1.12 | 1.10 |
| Skokie | 1.22 | 1.21 | 1.23 | 1.23 | 1.21 |
| Springfield | 1.03 | 1.05 | 1.03 | 1.03 | 1.03 |
| Urbana | 1.06 | 1.07 | 1.08 | 1.08 | 1.08 |
| Waukegan | 1.20 | 1.21 | 1.22 | 1.19 | 1.21 |
| **INDIANA** | | | | | |
| Anderson | 1.02 | 1.01 | 1.01 | 1.01 | 1.02 |
| Bloomington | 0.97 | 0.94 | 0.94 | 0.95 | 0.96 |
| Columbus | 0.99 | 0.98 | 0.98 | 0.98 | 1.01 |
| Elkhart | 1.04 | 1.03 | 1.01 | 1.01 | 1.04 |
| Evansville | 0.94 | 0.99 | 0.99 | 0.99 | 1.00 |
| Fort Wayne | 1.00 | 1.01 | 1.00 | 0.99 | 1.00 |
| Gary | 1.20 | 1.19 | 1.20 | 1.19 | 1.19 |
| Hammond | 1.20 | 1.19 | 1.19 | 1.19 | 1.19 |
| Indianapolis | 1.01 | 0.99 | 1.00 | 1.00 | 1.00 |
| Kokomo | 0.99 | 0.98 | 0.96 | 0.97 | 0.98 |
| Lafayette | 0.96 | 0.99 | 0.97 | 0.97 | 1.00 |
| Logansport | 0.94 | 0.94 | 0.91 | 0.92 | 0.95 |
| Marion | 0.95 | 0.95 | 0.93 | 0.92 | 0.96 |
| Michigan City | 1.20 | 1.19 | 1.19 | 1.18 | 1.16 |
| Muncie | 0.95 | 0.94 | 0.95 | 0.96 | 0.95 |
| Richmond | 0.95 | 0.95 | 0.94 | 0.94 | 0.96 |
| South Bend | 1.02 | 1.01 | 1.00 | 1.00 | 1.02 |
| Terre Haute | 1.02 | 1.00 | 0.99 | 0.99 | 1.00 |
| **IOWA** | | | | | |
| Burlington | 0.98 | 1.00 | 0.99 | 0.99 | 1.00 |
| Cedar Rapids | 0.98 | 0.98 | 0.96 | 0.96 | 0.98 |
| Council Bluffs | 0.98 | 0.99 | 0.98 | 0.99 | 0.99 |
| Davenport | 0.92 | 0.97 | 0.94 | 0.92 | 0.94 |
| Des Moines | 1.06 | 1.05 | 1.06 | 1.06 | 1.06 |
| Dubuque | 0.99 | 0.98 | 0.97 | 0.96 | 0.99 |
| Fort Dodge | 1.02 | 1.03 | 1.01 | 1.03 | 1.01 |
| Iowa City | 0.99 | 1.00 | 0.99 | 1.01 | 1.01 |
| Mason City | 0.99 | 1.03 | 1.02 | 1.04 | 1.02 |
| Sioux City | 0.92 | 0.96 | 0.95 | 0.94 | 0.95 |
| Waterloo | 0.99 | 1.00 | 1.02 | 1.00 | 1.00 |
| **KANSAS** | | | | | |
| Dodge City | 0.95 | 0.96 | 0.96 | 0.95 | 0.96 |
| Fort Scott | 0.93 | 0.93 | 0.95 | 0.93 | 0.93 |
| Garden City | 0.91 | 0.93 | 0.92 | 0.94 | 0.92 |
| Goodland | 0.88 | 0.89 | 0.88 | 0.88 | 0.88 |
| Hays | 0.87 | 0.88 | 0.87 | 0.85 | 0.88 |
| Kansas City | 1.06 | 1.06 | 1.05 | 1.06 | 1.05 |
| Lawrence | 1.03 | 1.04 | 1.05 | 1.06 | 1.04 |
| Liberal | 0.87 | 0.87 | 0.88 | 0.86 | 0.87 |
| Manhattan | 0.93 | 0.96 | 0.97 | 0.96 | 0.95 |
| Olathe | 1.06 | 1.06 | 1.07 | 1.06 | 1.05 |
| Overland Park | 1.06 | 1.06 | 1.06 | 1.05 | 1.05 |
| Pittsburg | 0.89 | 0.90 | 0.89 | 0.89 | 0.89 |
| Salina | 0.92 | 0.93 | 0.93 | 0.92 | 0.94 |
| Topeka | 1.01 | 1.03 | 1.02 | 1.02 | 1.01 |
| Wichita | 0.94 | 0.94 | 0.92 | 0.91 | 0.96 |

MARSHALL VALUATION SERVICE
© 2022 CoreLogic, Inc. and its licensors, all rights reserved. Any reprinting, distribution, creation of derivative works, or public display is strictly prohibited.

The data included on this page becomes obsolete after update delivery, scheduled for October 2022.

7/2022

*MONTHLY GREEN SUPPLEMENT*

# CURRENT COST MULTIPLIERS

*SECTION 99 PAGE 3*
*September 2022*

These multipliers bring costs from preceding pages up to date. Also apply Local Multipliers, Section 99, Pages 5 through 10.

*This page supersedes the August 2022 Green Supplement.*

## CALCULATOR COST SECTIONS

| (Effective Date of Cost Pages) | | 11 (11/20) | 12 (8/22) | 13 (5/22) | 14 (2/22) | 15 (11/21) | 16 (8/21) | 17 (5/21) | 18 (2/21) |
|---|---|---|---|---|---|---|---|---|---|
| EASTERN | A | 1.40 | 1.04 | 1.08 | 1.11 | 1.20 | 1.28 | 1.35 | 1.39 |
| | B | 1.33 | 1.05 | 1.07 | 1.13 | 1.11 | 1.19 | 1.26 | 1.30 |
| | C | 1.34 | 1.01 | 1.10 | 1.12 | 1.12 | 1.21 | 1.29 | 1.27 |
| | D | 1.35 | 1.01 | 1.10 | 1.11 | 1.08 | 1.20 | 1.27 | 1.29 |
| | S | 1.43 | 1.06 | 1.12 | 1.14 | 1.17 | 1.24 | 1.30 | 1.37 |
| CENTRAL | A | 1.35 | 0.98 | 1.03 | 1.09 | 1.15 | 1.25 | 1.30 | 1.32 |
| | B | 1.26 | 0.99 | 1.03 | 1.07 | 1.11 | 1.16 | 1.20 | 1.22 |
| | C | 1.30 | 0.98 | 1.06 | 1.08 | 1.07 | 1.14 | 1.22 | 1.24 |
| | D | 1.31 | 0.98 | 1.07 | 1.10 | 1.09 | 1.19 | 1.23 | 1.27 |
| | S | 1.32 | 0.98 | 1.03 | 1.10 | 1.11 | 1.19 | 1.29 | 1.29 |
| WESTERN | A | 1.34 | 1.03 | 1.09 | 1.16 | 1.21 | 1.27 | 1.32 | 1.31 |
| | B | 1.28 | 1.00 | 1.11 | 1.12 | 1.15 | 1.22 | 1.27 | 1.25 |
| | C | 1.32 | 1.03 | 1.09 | 1.15 | 1.11 | 1.21 | 1.26 | 1.30 |
| | D | 1.37 | 1.02 | 1.11 | 1.16 | 1.09 | 1.19 | 1.32 | 1.32 |
| | S | 1.36 | 1.00 | 1.12 | 1.15 | 1.15 | 1.29 | 1.34 | 1.31 |

## SEGREGATED COST SECTIONS

| (Effective Date of Cost Pages) | | 41 (12/20) | 42 (9/22) | 43 (6/22) | 44 (3/22) | 45 (12/21) | 46 (9/21) | 47 (6/21) | 48 (3/21) |
|---|---|---|---|---|---|---|---|---|---|
| EASTERN | A | 1.40 | 1.04 | 1.08 | 1.11 | 1.20 | 1.28 | 1.35 | 1.39 |
| | B | 1.33 | 1.05 | 1.07 | 1.13 | 1.11 | 1.19 | 1.26 | 1.30 |
| | C | 1.34 | 1.01 | 1.10 | 1.12 | 1.12 | 1.21 | 1.29 | 1.27 |
| | D | 1.35 | 1.01 | 1.10 | 1.11 | 1.08 | 1.20 | 1.27 | 1.29 |
| | S | 1.43 | 1.06 | 1.12 | 1.14 | 1.17 | 1.24 | 1.30 | 1.37 |
| CENTRAL | A | 1.35 | 0.98 | 1.03 | 1.09 | 1.15 | 1.25 | 1.30 | 1.32 |
| | B | 1.26 | 0.99 | 1.03 | 1.07 | 1.11 | 1.16 | 1.20 | 1.22 |
| | C | 1.30 | 0.98 | 1.06 | 1.08 | 1.07 | 1.14 | 1.22 | 1.24 |
| | D | 1.31 | 0.98 | 1.07 | 1.10 | 1.09 | 1.19 | 1.23 | 1.27 |
| | S | 1.32 | 0.98 | 1.03 | 1.10 | 1.11 | 1.19 | 1.29 | 1.29 |
| WESTERN | A | 1.34 | 1.03 | 1.09 | 1.16 | 1.21 | 1.27 | 1.32 | 1.31 |
| | B | 1.28 | 1.00 | 1.11 | 1.12 | 1.15 | 1.22 | 1.27 | 1.25 |
| | C | 1.32 | 1.03 | 1.09 | 1.15 | 1.11 | 1.21 | 1.26 | 1.30 |
| | D | 1.37 | 1.02 | 1.11 | 1.16 | 1.09 | 1.19 | 1.32 | 1.32 |
| | S | 1.36 | 1.00 | 1.12 | 1.15 | 1.15 | 1.29 | 1.34 | 1.31 |

## UNIT-IN-PLACE COST SECTIONS (51 – 70)

| Sec. Page | Date | | Eastern | Central | Western |
|---|---|---|---|---|---|
| 51 - 2-3 | (3/21) | Concrete Foundations | 1.26 | 1.23 | 1.27 |
| 51 - 4 | (3/21) | Pilings | 1.30 | 1.25 | 1.31 |
| 51 - 7-8 | (3/21) | Steel and Concrete Frame | 1.26 | 1.22 | 1.28 |
| 51 - 3,7 | (3/21) | Wood Foundations, Frame | 1.26 | 1.26 | 1.32 |
| 52 - 1-4, 6 | (3/21) | Interior Construction | 1.28 | 1.27 | 1.30 |
| 52 - 5 | (3/21) | Bank Vaults and Equipment | 1.34 | 1.28 | 1.32 |
| 53 - 1-8 | (6/21) | Heating, Cooling & Ventilating | 1.27 | 1.25 | 1.30 |
| 53 - 9-12 | (6/21) | Plumbing, Fire Protection, etc. | 1.30 | 1.25 | 1.33 |
| 54 - 1-6 | (6/21) | Electrical, Security | 1.31 | 1.34 | 1.30 |
| 55 - 3-7 | (8/21) | Wall Costs | 1.21 | 1.19 | 1.26 |
| 56 - 1-2 | (8/21) | Stained Glass | 1.21 | 1.19 | 1.25 |
| 56 - 3-6 | (8/21) | Storefronts | 1.21 | 1.19 | 1.25 |
| 56 - 7 | (8/21) | Stonework | 1.17 | 1.17 | 1.23 |
| 56 - 8 | (8/21) | Columns, Stone & Concrete | 1.17 | 1.17 | 1.23 |
| 56 - 8 | (8/21) | Columns, Wood & Aluminum | 1.20 | 1.20 | 1.25 |
| 57 - 1-6 | (9/21) | Roofs | 1.16 | 1.16 | 1.19 |
| 58 - 1 | (9/21) | Cold Storage | 1.16 | 1.14 | 1.21 |
| 58 - 2-8 | (9/21) | Elevators, Conveying Systems | 1.24 | 1.21 | 1.25 |
| 61 - 1-8 | (12/20) | Tanks | 1.36 | 1.35 | 1.39 |
| 62 - 1 | (6/22) | Industrial Pumps & Boilers | 1.08 | 1.00 | 1.14 |
| 62 - 2-3, 6 | (6/22) | Piping | 1.08 | 1.00 | 1.14 |
| 62 - 4 | (6/22) | Electrical Motors | 1.08 | 1.00 | 1.14 |
| 62 - 5 | (6/22) | Steel Stacks, Chutes | 1.08 | 1.00 | 1.14 |
| 62 - 6 | (6/22) | Masonry & Concrete Chimneys | 1.05 | 1.01 | 1.11 |
| 62 - 6 | (6/22) | Compactors, Incinerators | 1.08 | 1.00 | 1.14 |
| 63 - 1-4 | (9/22) | Trailer and Mfg. Housing Parks | 0.98 | 0.98 | 1.05 |
| 63 - 5-10 | (9/22) | Manufactured Housing | 0.98 | 0.99 | 1.03 |
| 64 - 1-6 | (3/22) | Service Stations, Car Washes | 1.13 | 1.10 | 1.12 |
| 64 - 7-9 | (3/22) | Prefabricated Metal Structures | 1.13 | 1.08 | 1.16 |
| 64 - 7-8 | (3/22) | Prefab. Wood & Air Structures | 1.12 | 1.10 | 1.14 |
| 65 - 1-12 | (3/22) | Equipment Costs | 1.11 | 1.11 | 1.11 |
| 66 - 1 | (12/21) | Subdivision Costs | 1.12 | 1.09 | 1.15 |
| 66 - 2-9 | (12/21) | Yard Improvements | 1.11 | 1.08 | 1.17 |
| 66 - 10-11 | (12/21) | Demolition & Remediation | 1.11 | 1.10 | 1.15 |
| 67 - 1-2 | (12/21) | Golf Courses | 1.11 | 1.12 | 1.14 |
| 67 - 3-7 | (12/21) | Recreational Facilities | 1.11 | 1.10 | 1.15 |
| 70 - 1-32 | (1/22) | Green Section | 1.09 | 1.11 | 1.16 |

*MARSHALL VALUATION SERVICE*
© 2022 CoreLogic, Inc. and its licensors, all rights reserved. Any reprinting, distribution, creation of derivative works, and/or public displays is strictly prohibited.

*The data included on this page becomes obsolete after update delivery, scheduled for October 2022.*

9/2022

### DISTRICT MAP



WESTERN        CENTRAL        EASTERN

This area remains and is seen in the photographs. The interior of this space was accessed and photographed. It was clearly damaged by the fire, but even before the fire, was believed to be in, at best, average condition, and the finishes were clearly dated to the late 1960's or early 1970's. It is not typical for overhead doors to be damaged inderectly by fire, and the doors and structure were in below average condition, showing that condition was likely subpar prior to the loss.

This area remains and is seen in the photographs. The interior of this space was not accessed and is not accessible. It is believed that this is where the condemned photo was taken

This area is completely scraped to the foundation. The concrete pad (former foundation slab) is now being used for bin storage.

Google



1/4

**02-12-30-100-001.000-067**

| General Information | |
|---|---|
| **Parcel Number** | 02-12-30-100-001.000-067 |
| **Local Parcel Number** | 31-0071-0002 |
| **Tax ID:** | |
| **Routing Number** | - - - |
| **Property Class 455** | Commercial Garage |

**NATIONAL SERV-ALL INC**

| Ownership | |
|---|---|
| National Serv-All Inc | |
| C/O Republic Svcs Property Tax | |
| PO Box 29246 | |
| Phoenix, AZ 85038 | |

**Legal**
NW 1/4 EX PT N OF RAILROAD & EX E 214.9 FT
FRL SEC 30

**6231 MACBETH RD**

| Transfer of Ownership | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Owner | Doc ID | Code | Book/Page | Adj | Sale Price | VII |
| 01/01/1900 | National Serv-All Inc | | WD | / | | $0 | I |

**455, Commercial Garage**

**QUARRIES / LWR HUNTIN**

| Notes |
|---|
| 3/23/2020 DBA: Republic Services |

**Commercial**

**Valuation Records (Work In Progress values are not certified values and are subject to change)**

| Year: 2022 | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|
| Assessment Year | 2022 | 2021 | 2020 | 2019 | 2018 |
| Reason For Change | WIP | AA | AA | AA | AA |
| As Of Date | 03/21/2022 | 03/10/2021 | 03/13/2020 | 03/15/2019 | 03/20/2018 |
| Valuation Method | Indiana Cost Mod | Indiana Cost Mod | Indiana Cost Mod | Indiana Cost Mod | Indiana Cost Mod |
| Equalization Factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Notice Required | ☑ | ☑ | ☑ | ☑ | ☑ |
| Land | $424,300 | $424,300 | $424,300 | $424,300 | $424,300 |
| Land Res (1) | $0 | $0 | $0 | $0 | $0 |
| Land Non Res (2) | $0 | $0 | $0 | $0 | $0 |
| Land Non Res (3) | $424,300 | $424,300 | $424,300 | $424,300 | $424,300 |
| Improvement | $441,100 | $403,800 | $509,100 | $509,100 | $509,100 |
| Imp Res (1) | $0 | $0 | $0 | $0 | $0 |
| Imp Non Res (2) | $0 | $0 | $0 | $0 | $0 |
| Imp Non Res (3) | $441,100 | $403,800 | $509,100 | $509,100 | $509,100 |
| Total | $865,400 | $828,100 | $933,400 | $933,400 | $933,400 |
| Total Res (1) | $0 | $0 | $0 | $0 | $0 |
| Total Non Res (2) | $0 | $0 | $0 | $0 | $0 |
| Total Non Res (3) | $865,400 | $828,100 | $933,400 | $933,400 | $933,400 |

**Land Data (Standard Depth: Res 120', CI 120'   Base Lot: Res 0' X 0', CI 0' X 0')**

| Land Type | Pricing Method | Soil ID | Act Front. | Size | Factor | Rate | Adj. Rate | Ext. Value | Infl. % | Res Elig % | Market Factor | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | OA | | 0 | 20.7800 | 1.00 | $10,000 | $10,000 | $207,800 | 0% | 0% | 1.0000 | $207,800 |
| 14 | OA | | 0 | 123.0000 | 1.00 | $1,760 | $1,760 | $216,480 | 0% | 0% | 1.0000 | $216,480 |

| Land Computations | |
|---|---|
| Calculated Acreage | 143.78 |
| Actual Frontage | |
| Developer Discount | ☐ |
| Parcel Acreage | 143.78 |
| 81 Legal Drain NV | 0.00 |
| 82 Public Roads NV | 0.00 |
| 83 UT Towers NV | 0.00 |
| 9 Homesite | 0.00 |
| 91/92 Acres | 0.00 |
| Total Acres Farmland | 143.78 |
| Farmland Value | 0.00 |
| Measured Acreage | 0.00 |
| Avg Farmland Value/Acre | 0.00 |
| Value of Farmland | $0 |
| Classified Total | $0 |
| Farm / Classified Value | $0 |
| Homesite(s) Value | $0 |
| 91/92 Value | $0 |
| Supp. Page Land Value | $0 |
| CAP 1 Value | $0 |
| CAP 2 Value | $0 |
| CAP 3 Value | $424,300 |
| **Total Value** | **$424,300** |

| Location Information | |
|---|---|
| **County** | Allen |
| **Township** | WAYNE TOWNSHIP |
| **District 067 (Local 031)** | 067 WAYNE (31) |
| **School Corp 0235** | FORT WAYNE COMMUNITY |
| **Neighborhood 91216-067** | QUARRIES / LWR HUNTINGTON 0 |
| **Section/Plat** | 0030 |
| **Location Address (1)** | 6231 MACBETH RD |
| | FORT WAYNE, IN 46809 |
| **Zoning** | |
| **Subdivision** | |
| **Lot** | |

**Market Model**
C&I | Mines, Quarries & Landfills

| Characteristics | |
|---|---|
| **Topography** | Flood Hazard |
| Rolling | ERA |
| **Public Utilities** | |
| All | TIF |
| **Streets or Roads** | |
| Paved | |

**Neighborhood Life Cycle Stage**
Other
Printed Monday, April 11, 2022
**Review Group** 2020

| | | | | | |
|---|---|---|---|---|---|
| Data Source Aerial | Collector 03/23/2020 | cmstaa | Appraiser 10/22/2020 | cagjab |

**02-12-30-100-001,000-067    NATIONAL SERV-ALL INC    6231 MACBETH RD    455, Commercial Garage    QUARRIES / LWR HUNTIN**

## General Information

| | |
|---|---|
| Occupancy | C/I Building |
| Description | main office bldg |
| Story Height | 2 |
| Type | N/A |

| | Pro. Use | Industrial Office |
|---|---|---|
| | Pre. Framing | Wood Joist |
| | Pre. Finish | Finished Divided |
| | # of Units | |

| | SB | B | 1 | U |
|---|---|---|---|---|
| | | | Industrial Office | |
| Wall Type | B: 2(170) | 1: 2(282) | U: 2(296') | |
| Heating | | 1066 sqft | 2568 sqft | 2589 sqft |
| A/C | | 1066 sqft | 2568 sqft | 2589 sqft |
| Sprinkler | | | | |

## Plumbing RES/CI

| | # | TF | TF |
|---|---|---|---|
| Full Bath | 0 | 0 | 0 |
| Half Bath | 0 | 0 | 0 |
| Kitchen Sinks | 0 | 0 | 0 |
| Water Heaters | 0 | 0 | 9 |
| Add Fixtures | 0 | 9 | 9 |
| Total | 0 | 9 | 9 |

### Roofing
Built Up | Tile | Metal
Wood | Asphalt | Slate
Other

### GCK Adjustments
Low Prof | Ext Sheat | Insulatio
Steel/GP | AluSR | Int Liner
HGSR | PPS | Sand Pnl

## Exterior Features

| Description | Value |
|---|---|
| Wood Deck | $2,200 |
| Porch, Enclosed Frame | $4,900 |
| Wood Deck | $1,000 |

| Description | Area | Value |
|---|---|---|
| Wood Deck | 96 | |
| Porch, Enclosed Frame | 56 | |
| Wood Deck | 16 | |

## Special Features

| Description | Value | Description | Value |
|---|---|---|---|

### Other Plumbing
| Description | Value |
|---|---|

## Floor/Use Computations

| Pricing Key | GCI LUTLSTOR | GCM GENOFF | GCI INDOFF | GCI INDOFF |
|---|---|---|---|---|
| Use | | | | |
| Use Area | 718 sqft | 1066 sqft | 2568 sqft | 2589 sqft |
| Area Not in Use | 0 sqft | 0 sqft | 0 sqft | 0 sqft |
| Use % | 40.2% | 59.8% | 100.0% | 100.0% |
| Eff Perimeter | 170' | 170' | 292' | 296' |
| PAR | 10 | 10 | 11 | 11 |
| # of Units / AC | 0 / N | 0 | 0 / N | 0 / N |
| Avg Unit sz/pdth | | | | |
| Floor | B | B | 1 | 2 |
| Wall Height | 9' | 9' | 9' | 9' |
| Base Rate | $53.03 | $108.04 | $155.32 | $137.19 |
| Frame Adj | ($7.76) | ($11.26) | ($11.86) | ($8.81) |
| Wall Height Adj | $0.00 | ($3.94) | ($12.18) | ($12.18) |
| Dock Floor | $0.00 | $0.00 | $0.00 | $0.00 |
| Roof Deck | $0.00 | $0.00 | $0.00 | $0.00 |
| Adj Base Rate | $45.27 | $92.84 | $131.28 | $116.20 |
| BPA Factor | 1.00 | 1.00 | 1.00 | 1.00 |
| Sub Total (rate) | $45.27 | $92.84 | $131.28 | $116.20 |
| Interior Finish | $0.00 | $0.00 | $0.00 | $0.00 |
| Partitions | $0.00 | $0.00 | $0.00 | $0.00 |
| Heating | ($1.60) | ($11.25) | ($3.94) | $0.00 |
| A/C | $0.00 | $0.00 | $0.00 | $0.00 |
| Sprinkler | $0.00 | $0.00 | $0.00 | $0.00 |
| Lighting | $0.00 | $0.00 | $0.00 | $0.00 |
| Unit Finish/ISR | $43.67 | $92.84 | $131.28 | $116.20 |
| GCK Adj. | $0.00 | $0.00 | $0.00 | $0.00 |
| S.F. Price | $43.67 | $92.84 | $131.28 | $116.20 |
| Total (Use) | $31,355 | $98,967 | $337,127 | $300,842 |

Pricing Key: Use, Use Area 2589 sqft / 0 sqft, Use % 100.0%, Eff Perimeter 296', PAR 11, # Units 0/N

## Building Computations

| | |
|---|---|
| Garages | $768,291 |
| Fireplaces | $0 |
| Sub-Total (building) | $790,791 |
| Quality (Grade) | $14,400 |
| Location Multiplier | $0 |
| Repl. Cost New | $8,100 |

| | | | |
|---|---|---|---|
| Sub-Total (all floors) | $768,291 | S.F. Price | $790,791 |
| | | Sub-Total | $790,792 |
| | | Unit Cost | 0.95 |
| | | Total (Use) | $751,252 |

| | Size | RCN | Norm Dep | Remain. Value |
|---|---|---|---|---|
| Garages | 6,941 sqft | $751,252 | 80% | $150,250 |
| Racquetball/Squash | 20'x50' | $9,115 | 65% | $3,190 |
| Theater Balcony | 20'X68' | $13,049 | 65% | $4,570 |
| Plumbing | 3000' x 6' | $5,751. | 65% | $13,049 |
| Other Plumbing | 2,000 sqft | $128,028 | 80% | $25,610 |
| Special Features | 575' x 6' | $5,339 | 80% | $1,070 |
| Exterior Features | | $9,122 | 80% | $1,820 |

## Summary of Improvements

| Description | Year Built | Eff Year | Eff Age | Co nd | Grade | Construction | Base Rate | LCM | Adj Rate | Size | ... | Improv. Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: main office bldg | C 1900 | 1971 | 51 | A | | Wood Frame | | 0.95 | | 6,941 sqft | | $142,700 |
| 2: Car Shed (20x50) | C-1 | 1971 | 51 | A | | | $10.10 | 0.95 | $9.12 | 20'x50' | | $3,200 |
| 3: Car Shed (20x68) | C | 1971 | 51 | A | | | $10.10 | 0.95 | $9.60 | 20'X68' | | $4,600 |
| 4: Fencing 3000 lf | C | 1971 | 51 | A | | Aluminum | $43.38 | 0.95 | $5,751. | 3000' x 6' | | $25,600 |
| 5: Paving asph | C | 1971 | 51 | A | | Asphalt | $2.81 | 0.95 | $15.00 | 2,000 sqft | | $1,100 |
| 6: wd fence | C | 1971 | 51 | A | | Plank | $16.70 | 0.95 | $152.3 | 575' x 6' | | $1,800 |

| Description | Res Eligibl | Story Height |
|---|---|---|
| 1: main office bldg | 0% | 2 |
| 2: Car Shed (20x50) | 0% | 1 |
| 3: Car Shed (20x68) | 0% | 1 |
| 4: Fencing 3000 lf | 0% | 1 |
| 5: Paving asph | 0% | 1 |
| 6: wd fence | 0% | 1 |

| | PC | Nbhd | Mrkt |
|---|---|---|---|
| | 100% | 1.000 | 1.0000 |
| | 100% | 1.000 | 1.0000 |
| | 100% | 1.000 | 1.0000 |
| | 100% | 1.000 | 1.0000 |
| | 100% | 1.000 | 1.0000 |
| | 100% | 1.000 | 1.0000 |

| | Abn Obs |
|---|---|
| | 5% |
| | 0% |
| | 0% |
| | 0% |
| | 0% |
| | 0% |

Sketch annotations: fv conf room, 18', 36', (718), B, 41', Bsmt level, 14' 15', 4', 27', 26', (1066), 2s Fr(1988) B, 31', Blt 1999 11', 9', (1463), 5', 1s EFP, 31', 8', 2s Fr, 8', 1s WDDK, 41', 12', 96', 8', WDDK, 5, 4, 6

Total this page   $179,000

Total all pages   $441,100

$337,127

3/4

**02-12-30-100-001.000-067**   NATIONAL SERV-ALL INC          6231 MACBETH RD          455, Commercial Garage          QUARRIES / LWR HUNTIN

### General Information

| | | | |
|---|---|---|---|
| Occupancy | C/I Building | Pre. Use | Commercial Garage |
| Description | truck garage & m | Pre. Framing | Fire Resistant |
| Story Height | 1 | Pre. Finish | Unfinished |
| Type | N/A | # of Units | |

| | SB | B | 1 | U |
|---|---|---|---|---|
| Wall Type | | | 1: 1(320') | |
| Heating | | | 5200 sqft | |
| A/C | | | | |
| Sprinkler | | | | |

### Plumbing RES/CI

| | # | TF | # | TF |
|---|---|---|---|---|
| Full Bath | 0 | 0 | 0 | 0 |
| Half Bath | 0 | 0 | 0 | 0 |
| Kitchen Sinks | 0 | 0 | 0 | 0 |
| Water Heaters | 0 | 0 | 0 | 0 |
| Add Fixtures | 0 | 0 | 4 | 4 |
| Total | 0 | 0 | 4 | 4 |

### Roofing

Built Up ☐ Tile ☐ Metal ☐
Wood ☐ Asphalt ☐ Slate ☐
Other ☐

### GCK Adjustments

Low Prof ☐ Ext Sheat ☐ Insulatio ☐
SteelCP ☐ AluSR ☐ Int Liner ☐
HGSR ☐ PPS ☐ Sand Pnl ☐

### Exterior Features

| Description | Area | Value |
|---|---|---|

### Special Features

| Description | Value | | | |
|---|---|---|---|---|
| Can, IT 805sqft | $5,760 | | | |

### Other Plumbing

| Description | Value |
|---|---|
| 1 x Emerg Eye | $700 |



### Building Computations

| | | |
|---|---|---|
| Sub-Total (all floors) | $363,012 | Garages |
| Racquetball/Squash | $0 | Fireplaces |
| Theater Balcony | $0 | Sub-Total (building) |
| Plumbing | $6,400 | Quality (Grade) |
| Other Plumbing | $700 | Location Multiplier |
| Special Features | $5,760 | Repl. Cost New |
| Exterior Features | $0 | |

### Floor/Use Computations

| | |
|---|---|
| Pricing Key | GCI |
| Use | COMGAR |
| Use Area | 5200 sqft |
| Area Not in Use | 0 sqft |
| Use % | 100.0% |
| Eff Perimeter | 320' |
| PAR | 6 |
| # of Units / AC | 0 / N |
| Avg Unit sz/pdth | |
| Floor | 1 |
| Wall Height | 20' |
| Base Rate | $64.89 |
| Frame Adj | $0.00 |
| Wall Height Adj | $4.92 |
| Dock Floor | $0.00 |
| Roof Deck | $0.00 |
| Adj Base Rate | $69.81 |
| BPA Factor | 1.00 |
| Sub Total (rate) | $69.81 |
| Interior Finish | $0.00 |
| Partitions | $0.00 |
| Heating | $0.00 |
| A/C | $0.00 |
| Sprinkler | $0.00 |
| Lighting | $0.00 |
| Unit Finish/SR | $0.00 |
| GCK Adj. | $0.00 |
| S.F. Price | $69.81 |
| Sub-Total | |
| Unit Cost | 0.95 |
| Elevated Floor | $0.00 |
| Total (Use) | $363,012 |

|  |  |  |
|---|---|---|
| | $375,872 | |
| | $300,698 | |
| | $285,663 | |

### Summary of Improvements

| Description | Year Built | Eff Year | Eff Age | Cond | Grade | Story Height | Construction | Res Eligibl | | Base Rate | LCM | Adj Rate | Size | RCN | Norm Dep | Remain. Value | Abn Obs | PC | Nbhd | Mrkt | Improv. Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1 | Metal | 0% | | $3.80 | 0.95 | $308,6 | 5,200 sqft | $285,663 | 80% | $57,130 | 5% | 100% | 1.000 | 1.0000 | $54,300 |
| | | | | | | 1 | Concrete | 0% | | | 0.95 | $308,6 | 22,500 sqft | $81,225 | 80% | $16,250 | 0% | 100% | 1.000 | 1.0000 | $16,300 |

### Summary of Improvements (lower)

| Description | Res Eligibl | Story Height | Year Built | Eff Year | Eff Age | Cond | Base Rate | LCM | Adj Rate | Size |
|---|---|---|---|---|---|---|---|---|---|---|
| 1: truck garage & maint bl | 0% | 1 | D 1960 | 1967 | 55 | A | $3.80 | 0.95 | $308,6 | 5,200 sqft |
| 2: Paving Conc | 0% | 1 | C 1967 | 1967 | 55 | A | | 0.95 | $308,6 | 22,500 sqft |

**Total this page**          $70,600

**Total all pages**          $441,100

$70,600

4/4

**02-12-30-100-001.000-067**   **NATIONAL SERV-ALL INC**   **6231 MACBETH RD**   **455, Commercial Garage**   **QUARRIES / LWR HUNTIN**

## General Information

| | | |
|---|---|---|
| Occupancy | C/I Building | Pre. Use | GCK |
| Description | steel framed Kit b | Pre. Framing | Steel Post and Bea |
| Story Height | 1 | Pre. Finish | Unfinished |
| Type | N/A | # of Units | 1 |

|  | SB | B | 1 | U |
|---|---|---|---|---|

Wall Type: 1: 1(838')
Heating: 16608 sqft
A/C
Sprinkler

### Plumbing RES/CI

| | # | TF | # | TF |
|---|---|---|---|---|
| Full Bath | 0 | 0 | 0 | 0 |
| Half Bath | 0 | 0 | 0 | 0 |
| Kitchen Sinks | 0 | 0 | 0 | 0 |
| Water Heaters | 0 | 0 | 6 | 6 |
| Add Fixtures | 0 | 0 | 6 | 6 |
| Total | 0 | 0 | 6 | 6 |

### Roofing
Built Up | Tile | Metal
Wood | Asphalt | Slate
Other

### GCK Adjustments
Low Prof | Ext Sheat ☑ | Insulatio
SteelGP | AluSR | Int Liner
HGSR | PPS | Sand Pnl

### Exterior Features
| Description | Area | Value |
|---|---|---|

### Special Features
| Description | Value |
|---|---|
| Mezz 1152sqft | $14,400 |

### Other Plumbing
| Description | Value |
|---|---|

## Building Computations

| | |
|---|---|
| Sub-Total (all floors) | $582,417 |
| Garages | $0 |
| Racquetball/Squash | $0 |
| Fireplaces | $0 |
| Theater Balcony | | 
| Sub-Total (building) | $606,417 |
| Plumbing | $9,600 | S.F. Price | $28.52 |
| Quality (Grade) | Sub-Total | $606,418 |
| Other Plumbing | $0 | Location Multiplier | 0.95 |
| Special Features | $14,400 | Unit Cost | |
| Exterior Features | $0 | Repl. Cost New | $576,096 |
| | Elevated Floor | $0.00 |

## Floor/Use Computations

| | | | |
|---|---|---|---|
| Pricing Key | GCK | GCK | GCK |
| Use | GCK | GCK | GCK |
| Use Area | 17376 sqft | 0 sqft | 1152 sqft |
| Area Not in Use | 0 sqft | | |
| Use % | 93.8% | | 6.2% |
| Eff Perimeter | 838' | | 838' |
| PAR | 5 | | 5 |
| # of Units / AC | 0 / N | | 0 / N |
| Avg Unit sz/pth | | | |
| Floor | 1 | | 1 |
| Wall Height | 20' | | 20' |
| Base Rate | $17.09 | | $17.09 |
| Frame Adj | $0.35 | | $0.35 |
| Wall Height Adj | $3.93 | | $10.41 |
| Dock Floor | $0.00 | | $0.00 |
| Roof Deck | $0.00 | | $0.00 |
| Adj Base Rate | $17.44 | | $17.44 |
| BPA Factor | 1.00 | | 1.00 |
| Sub Total (rate) | $17.44 | | $17.44 |
| Interior Finish | $4.45 | | $44.73 |
| Partitions | ($0.18) | | $0.00 |
| Heating | $2.87 | | $0.00 |
| A/C | $0.00 | | $0.00 |
| Sprinkler | $0.00 | | $0.00 |
| Lighting | $0.00 | | $0.00 |
| Unit Finish/SR | $0.00 | | $0.00 |
| GCK Adj. | $2.87 | | $0.00 |
| S.F. Price | $28.52 | | $76.45 |
| Sub-Total | | | |
| Unit Cost | $0.00 | | $0.00 |
| Elevated Floor | $0.00 | | $0.00 |
| Total (Use) | $495,503 | | $86,914 |

## Summary of Improvements

| Description | Res Eligibl | Year Built | Eff Year | Eff Age | Co Grd | Construction | Grade | Size | Base Rate | LCM | Adj Rate | RCN | Norm Dep | Remain. Value | Abn Obs | PC | Nbhd | Mrkt | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: steel framed Kit bldg | 0% | 1995 | 1999 | 23 | A | Metal | C | 18,528 sqft | | 0.95 | | $576,096 | 65% | $201,630 | 5% | 100% | 1.000 | 1.0000 | $191,500 |

Total this page   $191,500

Total all pages   $441,100

STATE FORM 53569 (R22/12-21)
APPROVED BY STATE BOARD OF ACCOUNTS, 2021

PRESCRIBED BY THE DEPARTMENT OF LOCAL GOVERNMENT FINANCE IC 6-1.1-22-8.1

TREASURER FORM TS-1A

## COUNTY: 2-Allen

## SPRING INSTALLMENT REMITTANCE COUPON

| PARCEL NUMBER | DUPLICATE NUMBER | TAX YEAR | Late Payment Penalty: 5% penalty after May 10, 2023, if there is no delinquent amount: 10% penalty for previous delinquency or if payment is made after June 09, 2023 |
|---|---|---|---|
| 02-12-30-100-001.000-067 | 1934055 | 2022 Payable 2023 | |
| TAXING UNIT NAME | | LEGAL DESCRIPTION | |
| Wayne | | Nw 1/4 Ex Pt N Of Railroad & Ex E 214.9 Ft Frl Sec 30 | |

| TOTAL AMOUNT DUE by May 10, 2023 | $0.00 |
|---|---|

(260)449-7693
Pay Online at: AllenCountyTreasurer.us/(844)576-2177

Remit Payment and Make Check Payable to:
Allen County Treasurer
PO Box 2540
Fort Wayne IN 46801-2540

National Serv-All Inc
c/o Republic Svcs Property Tax
PO Box 29246
Phoenix AZ 85038

0001934055 00000000000

Reprinted: 12/20/2022 04:31 PM    LowTaxInfo.com

## COUNTY: 2-Allen

## FALL INSTALLMENT REMITTANCE COUPON

| PARCEL NUMBER | DUPLICATE NUMBER | TAX YEAR | Late Payment Penalty: 5% penalty after November 10, 2023, if there is no delinquent amount: 10% penalty for previous delinquency or if payment is made after December 11, 2023 |
|---|---|---|---|
| 02-12-30-100-001.000-067 | 1934055 | 2022 Payable 2023 | |
| TAXING UNIT NAME | | LEGAL DESCRIPTION | |
| Wayne | | Nw 1/4 Ex Pt N Of Railroad & Ex E 214.9 Ft Frl Sec 30 | |

| TOTAL AMOUNT DUE by November 10, 2023 | $0.00 |
|---|---|

(260)449-7693
Pay Online at: AllenCountyTreasurer.us/(844)576-2177

Remit Payment and Make Check Payable to:
Allen County Treasurer
PO Box 2540
Fort Wayne IN 46801-2540

National Serv-All Inc
c/o Republic Svcs Property Tax
PO Box 29246
Phoenix AZ 85038

0001934055 00000000000

Reprinted: 12/20/2022 04:31 PM    LowTaxInfo.com

## COUNTY: 2-Allen

## TAXPAYER'S COPY - KEEP FOR YOUR RECORDS

| PARCEL NUMBER | DUPLICATE NUMBER | TAX YEAR | DUE DATES |
|---|---|---|---|
| 02-12-30-100-001.000-067 | 1934055 | 2022 Payable 2023 | SPRING - May 10, 2023 |
| TAXING UNIT NAME | | LEGAL DESCRIPTION | FALL - November 10, 2023 |
| Wayne | | Nw 1/4 Ex Pt N Of Railroad & Ex E 214.9 Ft Frl Sec 30 | |

### DATE OF STATEMENT: 12/20/2022

### TOTAL DUE FOR 2022 PAY 2023: $0.00

| PROPERTY ADDRESS |
|---|
| 6231 Macbeth Rd, Fort Wayne IN 46809 |

| PROPERTY TYPE | TOWNSHIP: |
|---|---|
| Real | Wayne |

| ACRES | Total AV PTRC Rate | LIT 1% Rate |
|---|---|---|
| 143.7800 | n/a | n/a |

National Serv-All Inc
c/o Republic Svcs Property Tax
PO Box 29246
Phoenix AZ 85038

| ITEMIZED CHARGES | SPRING TOTAL | FALL TOTAL |
|---|---|---|
| Tax | $0.00 | $0.00 |
| Delinquent Tax | $0.00 | $0.00 |
| Delinquent Penalty | $0.00 | $0.00 |
| Other Assessment (OA) | $0.00 | $0.00 |
| Delinquent OA Tax | $0.00 | $0.00 |
| Delinquent OA Penalty | $0.00 | $0.00 |
| Fees | $0.00 | $0.00 |
| Adjustments | $0.00 | $0.00 |
| Amount Due | $0.00 | $0.00 |
| Payment Received | | |
| Balance Due | $0.00 | $0.00 |

Reprinted: 12/20/2022 04:31 PM    LowTaxInfo.com

STATE FORM 53569 (R21/12-21)
APPROVED BY STATE BOARD OF ACCOUNTS, 2021

PRESCRIBED BY THE DEPARTMENT OF LOCAL GOVERNMENT FINANCE IC 6-1.1-22-8.1
COUNTY FORM TS-1A

# SPECIAL MESSAGE TO PROPERTY OWNER

Property taxes are constitutionally capped at 1% of property values for homesteads (owner-occupied), 2% for other residential property and farmland, and 3% for all other property. Please note that local government unit annual budget notices are now available online at: **https://budgetnotices.in.gov**. Additional information for how to read your current tax bill can be located online at: **www.in.gov/dlgf/ understanding-your-tax-bill/tax-bill-101**.

## TAXPAYER AND PROPERTY INFORMATION

| Taxpayer Name | Address | Date of Notice | Parcel Number | Taxing District |
|---|---|---|---|---|
| National Serv-All Inc c/o Republic Svcs Property Tax PO Box 29246 Phoenix AZ 85038 | 6231 Macbeth Rd Fort Wayne IN 46809 | December 20, 2022 | 02-12-30-100-001.000-067 | 067 Wayne |
| | | Duplicate Number | Tax ID Number | |
| | | 1934055 | 02-12-30-100-001.000-067 | |
| Legal Description | Billed Mortgage Company | | | Property Type |
| Nw 1/4 Ex Pt N Of Railroad & Ex E 214.9 Ft Frl Sec 30 | | | | Real |

### Spring installment due on or before May 10, 2023 and Fall installment due on or before November 10, 2023.

## TABLE 1: SUMMARY OF YOUR TAXES

| ASSESSED VALUE AND TAX SUMMARY | 2021 Pay 2022 | 2022 Pay 2023 |
|---|---|---|
| 1a. Gross assessed value of homestead property | $0 | $0 |
| 1b. Gross assessed value of other residential property and farmland | $0 | $0 |
| 1c. Gross assessed value of all other property, including personal property | $828,100 | $865,400 |
| **2. Equals total gross assessed value of property** | **$828,100** | **$865,400** |
| 2a. Minus deductions (see Table 5 below) | $0 | $0 |
| **3. Equals subtotal of net assessed value of property** | **$828,100** | **$865,400** |
| 3a. Multiplied by your local tax rate | 1.8765 | n/a |
| **4. Equals gross tax liability (see Table 3 below)** | **$15,539.30** | **n/a** |
| 4a. Minus local property tax credits | ($834.54) | n/a |
| 4b. Minus savings due to property tax cap (see Table 2 and footnotes below) | $0.00 | n/a |
| 4c. Minus savings due to over 65 circuit breaker credit | $0.00 | n/a |
| **5. Total property tax liability (see remittance coupon for total amount due)** | **$14,704.76** | **n/a** |

Please see Table 4 for a summary of other charges to this property.

## TABLE 2: PROPERTY TAX CAP INFORMATION

| | | |
|---|---|---|
| Property tax cap (1%, 2%, or 3%, depending upon combination of property types) [1] | $24,843.00 | n/a |
| Upward adjustment due to voter-approved projects and charges (e.g., referendum) [2] | $1,984.96 | n/a |
| **Maximum tax that may be imposed under cap** | **$26,827.96** | **n/a** |

## TABLE 3: GROSS PROPERTY TAX DISTRIBUTION AMOUNTS APPLICABLE TO THIS PROPERTY

| TAXING AUTHORITY | TAX RATE 2022 | TAX RATE 2023 | TAX AMOUNT 2022 | TAX AMOUNT 2023 | TAX DIFFERENCE 2022-2023 | PERCENT DIFFERENCE |
|---|---|---|---|---|---|---|
| AIRPORT | 0.0334 | n/a | $276.59 | n/a | n/a | n/a |
| COUNTY | 0.4680 | n/a | $3,875.51 | n/a | n/a | n/a |
| LIBRARY | 0.1418 | n/a | $1,174.25 | n/a | n/a | n/a |
| SCHOOL | 0.9278 | n/a | $7,683.10 | n/a | n/a | n/a |
| SW FIRE DIST | 0.1990 | n/a | $1,647.92 | n/a | n/a | n/a |
| TOWNSHIP | 0.1065 | n/a | $881.93 | n/a | n/a | n/a |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **TOTAL** | **1.8765** | **n/a** | **$15,539.30** | **n/a** | **n/a** | **n/a** |

| TABLE 4: OTHER CHARGES / ADJUSTMENTS TO THIS PROPERTY | | | | TABLE 5: DEDUCTIONS APPLICABLE TO THIS PROPERTY [3] | | |
|---|---|---|---|---|---|---|
| LEVYING AUTHORITY | 2022 | 2023 | % Change | TYPE OF DEDUCTION | 2022 | 2023 |
| 1203200 - Junk Unit Drain | $67.04 | $0.00 | (100.0%) | | | |
| 1606660 - Little River Drain | $0.00 | $0.00 | 0.0% | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **TOTAL ADJUSTMENTS** | **$67.04** | **$0.00** | **(100.0%)** | **TOTAL DEDUCTIONS** | **$0** | **$0** |

1. The property tax cap is calculated separately for each class of property owned by the taxpayer.

2. Changes not subject to the property tax caps include property tax levies approved by voters through a referendum. When added to the base property tax cap amount for your property, this creates the effective tax cap. For more information, see the back of this document. Information regarding the referendums proposed during the most recent elections can be located online at: **www.in.gov/dlgf/referendum-information**.

3. If any circumstances have changed that would make you ineligible for a deduction that you have been granted per Table 5 of this tax bill, you must notify the county auditor. If such a change in circumstances has occurred and you have not notified the county auditor, the deduction will be disallowed and you will be liable for taxes and penalties on the amount deducted.

STATE FORM 53569 (R21 / 12-21)
APPROVED BY STATE BOARD OF ACCOUNTS, 2021

TREASURER FORM TS-1A
PRESCRIBED BY THE DEPARTMENT OF LOCAL GOVERNMENT FINANCE IC 6-1.1-22-8.1

## NOTICE OF PROPERTY TAX ASSESSMENTS

**Name and Address of Taxpayer** – The owner and mailing address of the owner of record as of the date of this notice.
**Date of Notice/Due Date** – Date that the property tax bill was mailed and the date by which payment must be made in order to avoid late charges.
**Property Number (State/Local)** – State mandated property number of the taxable real estate and the local parcel number, if applicable.
**Taxing District** – The number assigned by the Department of Local Government Finance to the taxing district in which this property is located.

## TABLE 1: SUMMARY OF YOUR TAXES

**Tax Summary** – The amounts involved with calculating your real estate property taxes.
**Taxes 2020 Pay 2021** – The summary of calculations based on tax rates for taxes payable last year.
**Taxes 2021 Pay 2022** – The summary of calculations based on this year's tax rates.
**Tax Relief Credits** – Credits are determined annually and are used to reduce property tax liabilities applicable to properties in this table.
- **Local Property Tax Credits** – Relief credit generated by the local income tax, which can be used to reduce property tax bills.
- **Over 65 Circuit Breaker Credit** – Credit for a calendar year if homestead qualifies and age, adjusted gross income, homestead assessed value, and other eligibility requirements are met. The credit caps the increase of the homestead property tax liability of credit recipient at two percent (2%).

## TABLE 2: PROPERTY TAX CAP INFORMATION

**Property Tax Cap** – Property may not be taxed above caps prescribed by law, unless voters approve additional taxes. Those caps are 1% for homesteads, 2% for other residential property and farm land, and 3% for all other classes of property. When voters approve additional spending in a referendum, an adjustment to the cap is made to reflect the additional expense. This excess revenue is calculated as a separate value and added to the cap figure.
This new value is considered your effective property tax cap or the maximum that may be imposed under the cap. Taxpayers should note that the circuit breaker cap amount is the combined cap amount for all classes of property applicable to a parcel.

## TABLE 3: GROSS PROPERTY TAX DISTRIBUTION AMOUNTS APPLICABLE TO THIS PROPERTY

**Taxing Authority** – The name of the unit levying the taxes.
**Tax Rate 2021** – The tax rate per $100 of assessed value for this property allocated to each taxing authority for 2021.
**Tax Rate 2022** – The tax rate per $100 of assessed value for this property allocated to each taxing authority for the current year.
**Tax Amount 2021** – The amount of taxes for this property allocated to each taxing authority for 2021.
**Tax Amount 2022** – The amount of taxes for this property allocated to each taxing authority for the current year.
**Tax Difference 2021-2022** – The difference in dollars between current taxes and prior year taxes for each taxing authority.
**Percent Difference** – The percent change between last year's tax amount and this year's tax amount for each taxing authority.

## TABLE 4: OTHER CHARGES / ADJUSTMENTS TO THIS PROPERTY

**Levying Authority** – The type of additional charge added to your property tax bill such as sewer, ditch, or other special assessment.
**Amount 2021** – The total amount of other charges added to your tax bill in 2021.
**Amount 2022** – The total amount of other charges added to your tax bill for the current year.

## TABLE 5: DEDUCTIONS APPLICABLE TO THIS PROPERTY

**Type of Deduction** – No deduction is automatic. All must be applied for with the appropriate office by the applicable due date.
Various restrictions apply. For more information, call the county auditor at (260) 449-7241 or www.allencountyauditor.us.
Deductions documented in this bill can include, but are not limited to, the following:
- **Abatement** – Deduction for eligible properties where taxes have been lowered or eliminated, generally through the action of the city council or county council. (IC 6-1.1-12.1)
- **Blind/Disabled** – Deduction for the blind or disabled. Must supply proof from a doctor or Social Security awards letter. (IC 6-1.1-12, 12)
- **Enterprise Zone** – Deduction for eligible properties located within a designated enterprise zone. (IC 6-1.1-12-40)
- **Geothermal** – Deduction for eligible properties using geothermal devices. (IC 6-1.1-12-34, 35.5)
- **Homestead Standard Deduction** – Deduction for owner-occupied primary residence. (IC 6-1.1-12-37)
- **Supplemental Standard Deduction** – Additional deduction for homesteads after the application of the Homestead Standard Deduction. (IC 6-1.1-12-37.5)
- **Mortgage** – Deduction for mortgaged property for eligible persons. (IC 6-1.1-12-1, 2)
- **Nonprofit** – Exemption for eligible properties. (IC 6-1.1-10)
- **Over 65** – Deduction for individuals over 65 years of age; subject to income, residency, and assessed value limits. (IC 6-1.1-12-9, 10.1)
- **Veterans** – Deduction for disabled veterans. Must supply proof of service, honorable discharge, and disability. (IC 6-1.1-12-13, 14, 15)
**Amount 2021** – The amount deducted from your bill in 2021 for each benefit.
**Amount 2022** – The amount deducted from your bill this year for each benefit.

**Homestead Credits**
Allen County provides local property tax credits for certain taxpayers pursuant to IC 6-3.6-5 and/or IC 6-1.1-20.4. Taxpayers receiving a local property tax credit will see the credit amount in Box 4A on the Form TS-1A.

Information on the valuation of your property and a copy of the property record card can be obtained from your assessorat (260) 449-7123 or www.allencounty.us/assessors-office.
To obtain a review of an assessment, the taxpayer must file an appeal via a Form 130. If the Form 11 is mailed before May 1 of the assessment year, the filing deadline for real property is June 15 of that year. If the Form 11 is mailed after April 30 of the assessment year, the filing deadline for real property is June 15 in the year that the tax statements are mailed. For personal property assessments, the filing deadline is not later than forty-five (45) days after the date of the required notice (Form 11).
NOTE: Failure to file a timely Form 130 can be grounds for dismissal of this appeal. The assessing official who receives an appeal filed by a taxpayer must: (1) immediately forward the notice to the county board; and (2) schedule a preliminary informal meeting with the taxpayer in order to resolve the appeal.

For further instructions on filing an appeal or correction of error, contact your assessor at (260) 449-7123.

Please note that the appeal requires relevant evidence of the true tax value of the property as of the assessment date (January 1, 2022, for mobile homes assessed under IC 6-1.1-7 and January 1, 2021, for real property).



# Property Detail Report

**For Property Located At :**
**6231 MACBETH RD, FORT WAYNE, IN 46809-9719**



Bldg Card: 000 of 003

**Owner Information**
| | |
|---|---|
| Owner Name: | NATIONAL SERV-ALL INC |
| Mailing Address: | PO BOX 29246, PHOENIX AZ 85038-9246 B901 |
| Vesting Codes: | / / |

**Location Information**
| | | | |
|---|---|---|---|
| Legal Description: | NW 1/4 EX PT N OF RAILROAD & EX E 214.9 FT FRL SEC 30 | | |
| County: | ALLEN, IN | APN: | 02-12-30-100-001.000-067 |
| Census Tract / Block: | 115.02 / 2 | Alternate APN: | 3100710002 |
| Township-Range-Sect: | | Subdivision: | |
| Legal Book/Page: | | Map Reference: | 6474-B1 / |
| Legal Lot: | | Tract #: | |
| Legal Block: | | School District: | |
| Market Area: | | School District Name: | |
| Neighbor Code: | 91216-0 | Munic/Township: | WAYNE TWP |

**Owner Transfer Information**
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

**Last Market Sale Information**
| | | | |
|---|---|---|---|
| Recording/Sale Date: | / | 1st Mtg Amount/Type: | / |
| Sale Price: | | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | | 1st Mtg Document #: | |
| Document #: | | 2nd Mtg Amount/Type: | / |
| Deed Type: | | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | |
| New Construction: | | Multi/Split Sale: | |
| Title Company: | | | |
| Lender: | | | |
| Seller Name: | | | |

**Prior Sale Information**
| | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | / | Prior Lender: | |
| Prior Sale Price: | | Prior 1st Mtg Amt/Type: | / |
| Prior Doc Number: | | Prior 1st Mtg Rate/Type: | / |
| Prior Deed Type: | | | |

**Property Characteristics**
| | | | | | |
|---|---|---|---|---|---|
| Year Built / Eff: | 1900 / 1971 | Total Rooms/Offices | | Garage Area: | |
| Gross Area: | 30,669 | Total Restrooms: | | Garage Capacity: | |
| Building Area: | 30,669 | Roof Type: | | Parking Spaces: | |
| Tot Adj Area: | 30,669 | Roof Material: | | Heat Type: | |
| Above Grade: | | Construction: | WOOD | Air Cond: | |
| # of Stories: | 3 | Foundation: | | Pool: | |
| Other Improvements: | Building Permit | Exterior wall: | | Quality: | |
| | | Basement Area: | | Condition: | AVERAGE |

**Site Information**
| | | | | | |
|---|---|---|---|---|---|
| Zoning: | | Acres: | 143.78 | County Use: | COMMERCIAL GARAGE (455) |
| Lot Area: | 6,263,057 | Lot Width/Depth: | x | State Use: | |
| Land Use: | GARAGE | Res/Comm Units: | / | Water Type: | PUBLIC |
| Site Influence: | | | | Sewer Type: | PUBLIC SERVICE |

**Tax Information**

| | | | | | |
|---|---|---|---|---|---|
| Total Value: | $828,100 | Assessed Year: | 2021 | Property Tax: | $14,704.76 |
| Land Value: | $424,300 | Improved %: | 49% | Tax Area: | 067 |
| Improvement Value: | $403,800 | Tax Year: | 2021 | Tax Exemption: | |
| Total Taxable Value: | $828,100 | | | | |



**Valuation & Advisory Services**

Direct: +1 206 695 4200
Fax: +1 206 682 7938
colliers.com

601 Union Street
Suite 4800
Seattle, WA 98101
United States

## Valuation Glossary 2022

Unless specified otherwise, these definitions were extracted from the following sources or publications:

The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022 (Dictionary).

Uniform Standards of Professional Appraisal Practice, 2020-2022 Edition (USPAP).

The Appraisal of Real Estate, Fifteenth Edition, Appraisal Institute, Chicago, Illinois, 2020 (15th Edition).

**Absolute Net Lease**

A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. *(Dictionary)*

**Ad Valorem Tax**

A real estate tax based on the assessed value of the property, which is not necessarily equivalent to its market value. *(15th Edition)*

**Arm's-length Transaction**

A transaction between unrelated parties who are each acting in his or her own best interest. *(Dictionary)*

**As-Is Market Value**

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. *(Dictionary)*

**Assessed Value**

The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value. *(Dictionary)*

**Average Daily Room Rate (ADR)**

In the lodging industry, the net rooms revenue derived from the sale of guest rooms divided by the number of paid occupied rooms. *(Dictionary)*

**Band of Investment**

A technique in which the capitalization rates attributable to components of an investment are weighted and combined to derive a weighted-average rate attributable to the total investment. *(Dictionary)*

**Cash-Equivalent Price**

The sale price of a property that is equivalent to what a cash buyer would pay. *(Dictionary)*

**Common Area**

The total area within a property that is not designed for sale or rental but is available for common use by all owners, tenants, or their invitees, e.g., parking and its appurtenances, malls, sidewalks, landscaped areas, recreation areas, public toilets, truck and service facilities. *(Dictionary)*

**Contract Rent**

The actual rental income specified in a lease. *(15th Edition)*

**Cost Approach**

A set of procedures through which a value indication is derived for the fee simple estate by estimating the cost new as of the effective date of the appraisal to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive; deducting depreciation from the total cost; and adding the estimated land value. The contributory value of any site improvements that have not already been considered in the total cost can be added on a depreciated-cost basis. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property rights being appraised. *(Dictionary)*

**Curable Functional Obsolescence**

An element of depreciation; a curable defect caused by a flaw involving the structure, materials, or design, which can be practically and economically corrected. *(Dictionary)*

**Debt Coverage Ratio (DCR)**

The ratio of net operating income to annual debt service, which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR)*. *(Dictionary)*

**Deferred Maintenance**

Items of wear and tear on a property that should be fixed now to protect the value or income-producing ability of a property. *(Dictionary)*

**Depreciation**

In appraisal, a loss in the value of improvements from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date. *(Dictionary)*

**Direct Costs**

Expenditures for the labor and materials used in the construction of improvements; also called *hard costs*. *(Dictionary)*



### Discounted Cash Flow (DCF) Analysis

The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analyst specifies the quantity, variability, timing, and duration of the income streams and the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate. *(Dictionary)*

### Discount Rate

A rate of return on capital used to convert future payments or receipts into present value. *(Dictionary)*

### Disposition Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider their best interests.
7. An adequate marketing effort will be made during the exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. *(Dictionary)*

### Easement

The right to use another's land for a stated purpose. Access or right-of-way easements may be acquired by private parties or public utilities. Governments may be the beneficiaries of easements placed on privately owned land that is dedicated to conservation, open space, or preservation. *(15th Edition)*

### Economic Life

The period over which improvements to real estate contribute to property value. *(Dictionary)*

### Effective Age

The age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. *(Dictionary)*

### Effective Date

The date on which the appraisal or review opinion applies (SVP) *(Dictionary)*

### Effective Gross Income (EGI)

The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. *(Dictionary)*

### Effective Gross Income Multiplier (EGIM)

The ratio between the sale price (or value) of a property and its effective gross income. *(Dictionary)*

### Effective Rent

The total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions - e.g. free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other lease incentives. *(15th Edition)*

### Eminent Domain

The right of government to take private property for public use upon the payment of just compensation. The Fifth Amendment of the U.S. Constitution, also known as the *takings clause*, guarantees payment of just compensation upon appropriation of private property. *(Dictionary)*

### Entrepreneurial Incentive

The amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial incentive is the expectation of future reward as opposed to the profit actually earned on the project. *(Dictionary)*

### Entrepreneurial Profit

A market-derived figure that represents the amount an entrepreneur received for his or her contribution to a past project to compensate for his or her time, effort, knowledge, and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses. *(Dictionary)*

### Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. *(Dictionary)*



**Excess Rent**

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the lessor and may reflect superior management, a lease execution in an earlier, stronger rental market, or an agreement of the parties. Due to the higher risk inherent in the receipt of excess rent, it may be calculated separately and capitalized or discounted at a higher rate in the income capitalization approach. *(15th Edition)*

**Expense Stop**

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying any operating expenses above a stated level or amount. *(Dictionary)*

**Exposure Time**

An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. *(USPAP)*

**Extraordinary Assumption**

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. An extraordinary assumption may be used in an assignment only if:

- It is required to properly develop credible opinions and conclusions;
- The appraiser has a reasonable basis for the extraordinary assumption;
- Use of the extraordinary assumption results in a credible analysis; and
- The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions. *(USPAP)*

**External Obsolescence**

A type of depreciation; a diminution in value caused by negative external influences and generally incurable on the part of the owner, landlord, or tenant. The external influence may be either temporary or permanent. There are two forms of external obsolescence: economic and locational. *(Dictionary)*

**Fair Market Value**

In nontechnical usage, a term that is equivalent to the contemporary usage of *market value.*

As used in condemnation, litigation, income tax, and property tax situations, a term that is similar in concept to market value but may be defined explicitly by the relevant agency or interpreted differently by court precedent. *(Dictionary)*

**Feasibility Analysis**

A study of the cost-benefit relationship of an economic endeavor. *(USPAP)*

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. *(Dictionary)*

**Floor Area Ratio (FAR)**

The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area. *(Dictionary)*

**Functional Obsolescence**

The impairment of functional capacity of improvements according to market tastes and standards. *(Dictionary)*

**Functional Utility**

The ability of a property or building to be useful and to perform the function for which it is intended according to current market tastes and standards; the efficiency of a building's use in terms of architectural style, design and layout, traffic patterns, and the size and type of rooms. *(Dictionary)*

**Furniture, Fixtures, and Equipment (FF&E)**

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

**Going-concern**

An established and operating business having an indefinite future life. *(Dictionary)*

**Going-concern Value**

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern or market value of the total assets of the business. (Dictionary)*

**Gross Building Area (GBA)**

Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. *(Dictionary)*



**Gross Leasable Area (GLA)**

Total floor area designed for the occupancy and exclusive use of tenants, including basements and mezzanines; measured from the center of joint partitioning to the outside wall surfaces. *(Dictionary)*

**Gross Living Area (GLA)**

Total area of finished, above-grade residential space area; calculated by measuring the outside perimeter of the structure and includes only finished, habitable, above-grade living space. (Finished basements and attic areas are not generally included in total gross living area. Local practices, however, may differ.) *(Dictionary)*

**Highest & Best Use**

The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid (IVS). *(Dictionary)*

**Hypothetical Condition**

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. *(USPAP)*

**Income Capitalization Approach**

In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to this approach. Techniques and procedures from this approach are used to analyze comparable sales data and to measure obsolescence in the cost approach. *(15th Edition)*

**Incurable Functional Obsolescence**

An element of depreciation; a defect caused by a deficiency or superadequacy involving the structure, materials, or design that cannot be practically or economically corrected as of the effective date of the appraisal. *(Dictionary)*

**Indirect Costs**

Expenditures or allowances for items other than labor and materials that are necessary for construction, but are not typically part of the construction contract. Indirect costs may include administrative costs, professional fees, financing costs and the interest paid on construction loans, taxes and the builder's or developer's all-risk insurance during construction, and marketing, sales, and lease-up costs incurred to achieve occupancy or sale. Also called *soft costs*. *(Dictionary)*

**Interim Use**

The use contemplated by the market participants that the subject real estate can be put to while waiting for certain subsequent factors to occur. *(Dictionary)*

**Investment Value**

The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. *(Dictionary)*

**Leased Fee Interest**

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversion right when the lease expires. *(Dictionary)*

**Leasehold Estate**

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. *(Dictionary)*

**Legal Nonconforming Use**

A use that was lawfully established and maintained, but no longer conforms to the use regulations of its current zoning; sometimes known as a legally nonconforming use. *(Dictionary)*

**Liquidation Value**

The most probable price that a specified interest in property should bring under the following conditions:

1.  Consummation of a sale within a short time period.
2.  The property is subjected to market conditions prevailing as of the date of valuation.
3.  Both the buyer and seller are acting prudently and knowledgeably.
4.  The seller is under extreme compulsion to sell.
5.  The buyer is typically motivated.
6.  Both parties are acting in what they consider to be their best interests.
7.  A normal marketing effort is not possible due to the brief exposure time.
8.  Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9.  The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. *(Dictionary)*



## Market Area

The geographic region from which a majority of demand comes and in which the majority of competition is located. Depending on the market, a market area may be further subdivided into components such as primary, secondary, and tertiary market areas, or the competitive market area may be distinguished from the general market area. *(Dictionary)*

## Market Rent

The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. *(Dictionary)*

## Market Study

An analysis of the market conditions of supply, demand, and pricing for a specific property type in a specific area. *(Dictionary)*

## Market Value (Most Common Non-FRT)

The most probable price, as of a specific date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue distress. *(Dictionary)*

## Market Value (Interagency Guidelines)

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Interagency Appraisal and Evaluation Guidelines, December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472)

## Marketability Analysis

The study of how a specific property is expected to perform in a specific market. A marketability analysis expands on a market analysis by addressing a specific property. *(Dictionary)*

## Neighborhood Analysis

The objective analysis of observable or quantifiable data indicating discernible patterns of urban growth, structure, and change that may detract from or enhance property values; focuses on four sets of considerations that influence value: social, economic, governmental, and environmental factors. *(Dictionary)*

## Net Net Net Lease

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management. Also called *NNN lease, triple net lease,* or *fully net lease. (Dictionary)*

## Net Operating Income (NOI)

The actual or anticipated net income that remains after all operating expenses are deducted from effective gross income but before mortgage debt service and book depreciation are deducted. Note: This definition mirrors the convention used in corporate finance and business valuation for EBITDA (earnings before interest, taxes, depreciation, and amortization). *(15th Edition)*

## Obsolescence

One cause of depreciation; an impairment of desirability and usefulness caused by new inventions, changes in design, improved processes for production, or external factors that make a property less desirable and valuable for a continued use; may be either functional or external. *(Dictionary)*

## Off-site Costs

Costs incurred in the development of a project excluding on-site costs such as grading and construction of the building and other improvements; also called *common costs* or *off-site improvement costs. (Dictionary)*

## On-site Costs

Costs incurred for the actual construction of buildings and improvements on a particular site. *(Dictionary)*

## Overage Rent

The percentage rent paid over and above the guaranteed minimum rent or base rent; calculated as a percentage of sales in excess of a specified breakeven sales volume. *(15th Edition)*



## Overall Capitalization Rate (OAR)

The relationship between a single year's net operating income expectancy and the total property price or value. *(Dictionary)*

## Parking Ratio

The ratio of parking area or parking spaces to an economic or physical unit of comparison. Minimum required parking ratios for various land uses are often stated in zoning ordinances. *(Dictionary)*

## Potential Gross Income (PGI)

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. *(Dictionary)*

## Potential Gross Income Multiplier (PGIM)

The ratio between the sale price (or value) of a property and its annual potential gross income. *(Dictionary)*

## Present Value (PV)

The value of a future payment or series of future payments discounted to the current date or to time period zero. *(Dictionary)*

## Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not achieved sellout or a stabilized level of long-term occupancy. *(Dictionary)*

## Qualitative Adjustment

An indication that one property is superior, inferior, or similar to another property. Note that the common usage of the term is a misnomer in that an adjustment to the sale price of a comparable property is not made. Rather, the indication of a property's superiority or inferiority to another is used in relative comparison analysis, bracketing, and other forms of qualitative analysis. *(Dictionary)*

## Quantitative Adjustment

In the application of the sales comparison and income capitalization approaches, a numerical (dollar or percentage) adjustment to the sale price, rent, or expense amount of a comparable property to account for the effect on value of a difference between each comparable property and the subject property. *(Dictionary)*

## Rentable Area

The amount of space on which the rent is based; calculated according to local practice. *(Dictionary)*

## Replacement Cost

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. *(Dictionary)*

## Replacement Cost for Insurance Purposes

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design and layout for insurance coverage purposes guaranteeing that damaged property is replaced with a new property (i.e., depreciation is not deducted). *(Dictionary)*

## Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same or similar materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building. *(Dictionary)*

## Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." *(Dictionary)*

## Sales Comparison Approach

The process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered vacant when an adequate supply of comparable sales is available. *(Dictionary)*

## Scope of Work

The type and extent of research and analysis in an appraisal or appraisal review assignment. Scope of work includes, but is not limited to:

The extent to which the property is identified;

The extent to which tangible property is inspected;

The type and extent of data researched; and

The type and extent of analysis applied to arrive at opinions or conclusions. *(USPAP)*



## Shopping Center Types

Neighborhood Shopping Center: The smallest type of shopping center, generally with a gross leasable area of between 30,000 and 100,000 square feet. Typical anchors include supermarkets. Neighborhood shopping centers offer convenience goods and personal services and usually depend on a market population support of 3,000 to 40,000 people.

Community Shopping Center: A shopping center of 100,000 to 400,000 square feet that usually contains one junior department store, a variety store, discount or department store. A community shopping center generally has between 20 and 70 retail tenants and a market population support of 40,000 to 150,000 people.

Regional Shopping Center: A shopping center of 300,000 to 900,000 square feet that is built around one or two full-line department stores of approximately 200,000 square feet each plus small tenant spaces. This type of center is typically supported by a minimum population of 150,000 people.

Super-Regional Center: A large center of 600,000 to 2.0 million square feet anchored by three or more full-line department stores. This type of center is typically supported by a population area of 300,000 people. *(15th Edition)*

## Sum of the Retail Values

The sum of the separate and distinct market value opinions for each of the units in a condominium; subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sales prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values* or *aggregate retail selling price. (Dictionary)*

## Superadequacy

An excess in the capacity or quality of a structure or structural component; determined by market standards. *(Dictionary)*

## Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. *(Dictionary)*

## Tenant Improvements (TIs)

1. Fixed improvements to the land or structures installed for use by a lessee.

2. The original installation of finished tenant space in a construction project; subject to periodic change for succeeding tenants. *(Dictionary)*

## Usable Area

The area that is actually used by the tenants measured from the inside of the exterior walls to the inside of walls separating the space from hallways and common areas. *(Dictionary)*

## Useful Life

The period of time over which a structure or a component of a property may reasonably be expected to perform the function for which it was designed. *(Dictionary)*

## Vacancy and Collection Loss

A deduction from potential gross income *(PGI)* made to reflect income deductions due to vacancies, tenant turnover, and nonpayment of rent; also called *vacancy and credit loss* or *vacancy and contingency loss. (Dictionary)*

## Yield Capitalization

A method used to convert future benefits into present value by (1) discounting each future benefit at an appropriate yield rate, or (2) developing an overall rate that explicitly reflects the investment's income pattern, holding period, value change, and yield rate. *(Dictionary)*





**Managing Director | Detroit**
**Valuation & Advisory Services**

david.abraham@colliers.com
Direct: +1 248 226 1872
Mobile: +1 734 674 9505
Fax: +1 248 226 1873
colliers.com

2 Corporate Drive, Suite 300
Southfield, MI 48076
United States

### Education or Qualifications

Bachelor of Science in Business
Administration, Siena Heights
University, Adrian, MI

### State Certifications

Michigan

New York

Ohio

## David J. Abraham, MAI, SRA

### Area of Expertise

David Abraham serves as the Managing Director of Colliers International's Southfield (Detroit), Michigan office, which provides valuation and advisory services throughout the state of Michigan. He represents clients on a national basis and has provided real estate appraisal and consulting services since 1983. Recently, Mr. Abraham has focused on both apartment and hospitality valuation and has completed the valuation of over 30 hotel properties as well as over 5,000 multi-family housing units in the past 18 months.

Mr. Abraham is a Designated member of the Appraisal Institute, holding the MAI and SRA designations. He is experienced in the valuation easements, takings and partial interests, and has served as an expert witness in a variety of valuation cases involving commercial, industrial and residential properties. Mr. Abraham is regularly retained for his expertise in performing hotel valuations, market studies, and feasibility analyses, or to serve in an expert witness capacity for hotel and multi-family properties as well as matters regarding litigation, condemnation or tax appeals.

### Affiliations or Memberships

Designated Member of the Appraisal Institute, MAI and SRA designation

Certified General Appraiser – Michigan #1201000512

Certified General Appraiser – Ohio #ACGO.2014001729

*Accelerating success.*



# David J. Abraham, MAI, SRA

Managing Director
Valuation & Advisory Services

David.abraham@colliers.com

## CONTACT DETAILS

MOB +1 734 674 9505
OFF +1 248 540 1000

Colliers International
2 Corporate Drive, St. 300
Southfield, MI 43560

www.colliers.com

## REPRESENTATIVE CLIENTS AND PROJECTS

01/2020 – Great Lakes railway Line & Yards - Michigan

City of Dearborn CSO-9 – 23830 Michigan Avenue, Dearborn, MI
Loss of Dev. Rights for Subsurface Easement – Accepted by Courts – No Challenge

City of Troy – 1250 Wattles Road and 13 other parcels, Troy, MI Temporary &
Permanent Easement for Road & Drainage Development – No Challenge

Willy's Overland Lofts to Detroit Historic Preservation   Willis St., Detroit, MI Donation
of Development Rights for IRS Use – No Challenge

Michigan DNR – Former Nike Missile Silo Site  Loss of Value due to Proposed
Development Rights Agreement – No Challenge

Eagle Development to Portage County Road Commission (Abeska Law) Eagle
Point, Eagle Lake Road, Edwardsburg, MI
Value Diminution based on Loss of Riparian Rights – No Challenge

**EXPERT WITNESS TESTIMONY**

Washtenaw County Circuit Court

Lenawee County Circuit Court

Michigan Tax Tribunal

Lenawee County Probate Court

Speaker – 1994 - Lenawee County Board of Realtors – Easements & Takings

Consulting Appraiser – Penobscot Building in Detroit CBD

**Recent Testimony**

United States Bankruptcy Court – Eastern District of Michigan, Southern Division

Case No. 17-52483 – Chapter 11

September 13, 2017

In re: Packard Square, LLC

Multifamily


**Recent Expert Witness Case**

State of Michigan Kalamazoo County Circuit Court

DBD Kazoo, LLC vs. Western Michigan, LLC et al.

Student Housing


**Retained as Expert Witness in the following courts since 1985**

Lenawee County Circuit Court - Michigan

Jackson County Circuit Court – Michigan

Washtenaw County Circuit Court – Michigan

Kalamazoo County Circuit Court – Michigan


**Publications**

5/30/2015 - LinkedIn & CIVAS Quarterly Magazine – The Case of the Overvalued Hotel

5/31/2015 - LinkedIn – Appraisal Expert Witnesses & Airline Pilots

9/21/2015 – LinkedIn - Maximizing Hotel Revenue – And Appraised Value

12/8/2016 – LinkedIn – State of the U.S. Market and 2017 Outlook



Indiana Professional Licensing Agency
Real Estate Appraiser Licensure Board
402 W. Washington Street, W072
Indianapolis, IN 46204

## Appraiser Temporary Permit

| License Number | Expire Date |
|---|---|
| TP22200820 | 09/16/2023 |

### David John Abraham

| Eric J. Holcomb | Lindsay M. Hyer |
|---|---|
| Governor | Executive Director |
| State of Indiana | Indiana Professional Licensing Agency |



Indiana Professional Licensing Agency
402 W. Washington Street, W072
Indianapolis, IN 46204

**Appraiser Temporary Permit**

| License Number | Expire Date |
|---|---|
| TP22200820 | 09/16/2023 |

**David John Abraham**

Signature _____



COLLIERS INTERNATIONAL

# Litigation Support Services
## Colliers International Valuation & Advisory Services

**Litigation Valuation and Support Services can be performed for:**

- Eminent Domain
- Right-of-Way
- Estates
- Arbitration
- Encroachments
- Easements
- Conservation Easements
- Tax Donations
- Divorce
- Partnership Dissolution
- Tax Assessment Appeals
- Rebuttal
- Appraiser Standard-of-Care (USPAP)
- Forensic Appraisal Review

Colliers has assembled a team of professionals to provide expert valuation for the litigation involving real estate and business valuation. Our professionals have extensive experience in Local, State and Federal jurisdictions. Knowing that knowledgeable valuation professionals with litigation-specific experience can prove invaluable to presenting a successful case, the core Colliers litigation team for your case will be able to marshal the resources of our 15,000 person strong organization to assist you in meeting your case objectives. In addition to the litigation team, we have local offices with MAI Designated appraisers, Certified General appraisers and full support staff with local boots-on-the-ground knowledge of the local market.

The team's commitment to you is to provide responsive service, well documented work, and all the necessary follow-up required upon completion of an assignment, including depositions, testimony, courtroom and review support. This is the Colliers Litigation Support Team's promise.

# Portfolio of Assignments



Mangrove Property, Regional Transit Connector Project
Subsurface, Roadway, Utility, and Temporary Construction Easements

Port of Long Beach
Container Facility
Rent Arbitration



Barren Ridge Renewable Transportation Project Los Angeles Department of Water and Power

Pebble Beach Single Family Residence
Overholtzer v. No. Counties Title Ins. Co.
Diminution-in-value Analysis



Santa Monica Bergamot Arts Center
Expo Line Phase 2
Partial Taking of Building & Easement

Valencia Avenue
Street Widening

## Litigation Support

**Project Lead**



**David Abraham, MAI, SRA**
Associate Managing Director
+1 248 226 1872 Phone
David.Abraham@colliers.com





**CIVAS Global Stats**

| | CIVAS Staff | | Certified / Licensed Staff | | Property Valued | | Value of the Property valued (USD) |
|---|---|---|---|---|---|---|---|
| | **1,238** | | **726** | | **207,728** | | **928.4 Billion** |
| ANZ | 136 | ANZ | 100 | ANZ | 13,096 | ANZ | 94 bn |
| Asia | 249 | Asia | 63 | Asia | 62,183 | Asia | 368 bn |
| Canada | 100 | Canada | 50 | Canada | 3,978 | Canada | 58 bn |
| USA | 306 | USA | 206 | USA | 17,452 | USA | 169 bn |
| Latam | 47 | Latam | 32 | Latam | 3,485 | Latam | 14.4 bn |
| EMEA | 400 | EMEA | 275 | EMEA | 107,534 | EMEA | 225 bn |





**Real estate advisors in more than 507 offices in 67 countries.**



Founding member of the World Green Building Council



Member of World Economic Forum



Named Top 100 service provider more times than any other real estate firm



The second-most-recognized commercial real estate brand



# Valuation & Advisory Services

**Services Offered**

Single Asset Valuation
Portfolio Valuation
Institutional Asset Valuation
Loan Pool Valuation
Appraisal Review
Appraisal Management
Lease and Cost Analysis
Insurance Valuation
Arbitration & Consulting
Feasibility Studies
Investment Analysis
Highest and Best Use Studies
Tax Appeals
Litigation Support
Segregated-Cost Analysis

**Experience That Counts**

Office
Industrial
Retail
Multifamily
Mixed-Use Properties
Senior Housing
Land
Self-Storage
Manufactured Housing
Agriculture
Net Lease
Hospitality
Health Care
Subdivisions
Embassies & Consulates
GSA Properties
Special Use Properties
Telecommunications
Easements
Life Science

Real estate valuations play a pivotal role in today's business climate. An accurate and well supported opinion of property value can mean the difference between reaching a critical goal— securing a loan, closing a sale, reporting to investors, choosing the best asset—or failing to achieve it altogether.

Colliers Valuation & Advisory Services' reports are designed to deliver insight into a property's fundamentals, its competition and the overall market dynamics affecting value. A solid valuation report can be a strategic asset for investors, lenders and owners, provided that it addresses both a property's unique characteristics and the most current market conditions.

Commitment to high-end client service, coupled with Colliers' unparalleled market intelligence and resources, differentiates us as the firm of choice in the real estate industry.



**Professionals**
Our professionals share a commitment to deliver the highest level of service and consistent results. We go the extra mile for our clients, whether this means meeting a tight deadline or working with a complex and challenging property.

**Technology**
Our unmatched report creation technology speeds appraisals through the pipeline. This secure, centralized production system generates a wide range of reports and high volume portfolio orders without delays.

**Information**
Today's business climate places valuation in a more pivotal position than ever before. All our appraisals are evaluated and approved by an experienced review team to ensure our clients receive concise and timely appraisals. With clear, prompt reporting and a comprehensive, big picture approach, Colliers International's Valuation and Advisory reports give our clients the information they need to make better business decisions.

This document has been prepared by Colliers for advertising and general information only. Colliers makes no guarantees, representations or warranties of any kind, expressed or implied, regarding the information including, but not limited to, warranties of content, accuracy and reliability. Any interested party should undertake their own inquiries as to the accuracy of the information. Colliers excludes unequivocally, all inferred or implied terms, conditions and warranties arising out of this document and excludes all liability for loss and damages arising there from. This publication is the copyrighted property of Colliers and/or its licensor(s). © 2020. All rights reserved. This communication is not intended to cause or induce breach of an existing listing agreement. U.S. Valuation & Advisory Services.

Accelerating success.

# Valuation & Advisory Services National Leadership



**US Leadership**
Jeremy Walling, MAI, MRICS
President | US
Jeremy.Walling@colliers.com
+1 312 371 4920

**Client Relations & Service**
Jerry Gisclair MAI, MRICS
Executive Vice President
Jerry.Gisclair@colliers.com
+1 813 871 8531

**Eastern US**
PJ Cusmano, MAI, MRICS
Executive Vice President
PJ.Cusmano@colliers.com
+1 813 229 1599

**Western US**
Jeff Shouse, MAI, CRE
Executive Vice President
Jeff.Shouse@colliers.com
+1 916 724 5531

**Quality Enhancement**
Jim Murrett, MAI, SRA
Executive Managing Director
Jim.Murrett@colliers.com
+1 716 312 7790

**Advisory Services**
Bruce Nell, MAI, AI-GRS, MRICS
Executive Managing Director
Bruce.Nell@colliers.com
+1 614 437 4687

**Portfolio Management**
AJ Hutson, MAI, AI-GRS
Executive Managing Director
AJ.Hutson@colliers.com
+1 704 973 7202

---

# Region & Market Leaders

**Albuquerque**
Conner Marshall, MAI
Sr. Valuation Services Director
Conner.Marshall@colliers.com
+1 505 880 7053

**Austin**
Jay Lefevers, MAI
Managing Director
Jay.Lefevers@colliers.com
+1 602 770 4530

**Atlanta**
Leamon Holliday, MAI
Managing Director
Leamon.Holliday@colliers.com
+1 404 892 3526

**Baltimore**
Zachary Smith, MAI
Associate Managing Director
Zachary.Smith@colliers.com
+1 443 602 8985

**Birmingham**
Tim Rau, MAI, ASA
Managing Director
Tim.Rau@colliers.com
+1 205 970 6160

**Boise**
John Campbell, MAI
Sr. Valuation Services Director
John.Campbell@colliers.com
+1 206 965 1129

**Boston**
Chris Stickney, MAI
Associate Managing Director
Chris.Stickney@colliers.com
+1 617 330 8171

**Buffalo**
James Murrett, MAI, SRA
Executive Managing Director
Jim.Murrett@colliers.com
+1 716 312 7790

**Charleston (SC)**
Curt McCall, Jr., CRE, MAI
Executive Managing Director
Curt.McCall@colliers.com
+1 843 442 1915

**Charleston (WV)**
Douglas S. Butcher
Sr. Valuation Services Director
Doug.Butcher@colliers.com
+1 304 712 8289

**Charlotte**
Alan McNulty, MAI
Managing Director
Alan.McNulty@colliers.com
+1 704 409 2374

**Chicago**
Tony Guth, MAI
Managing Director
Tony.Guth@colliers.com
+1 312 602 6159

**Cincinnati**
Brian Graham, MAI, CCIM
Sr. Valuation Services Director
Brian.Graham@colliers.com
+1 513 200 9735

**Cleveland**
Jacob Roehl
Senior Valuation Specialist
Jacob.Roehl@colliers.com
+1 303 915 5165

**Columbus**
Christian Smith, MAI
Managing Director
Christian.Smith@colliers.com
+1 614 437 4684

**Dallas**
Kyle Knox, MAI
Managing Director
Kyle.Knox@colliers.com
+1 214 217 9335

**Denver**
Jonathan Fletcher, MAI
Managing Director
Jon.Fletcher@colliers.com
+1 303 779 5500

**Destin**
Kevin Branton
Senior Valuation Specialist
Kevin.Branton@colliers.com
+1 850 460 1202

**Detroit**
David Abraham, MAI, SRA
Managing Director
David.Abraham@colliers.com
+1 248 226 1872

**Fayetteville**
Curt Smith, MAI
Valuation Services Director
Curt.Smith@colliers.com
+1 479 202 5932

**Fort Lauderdale**
Denise Morales, MAI
Valuation Services Director
Denise.Morales@colliers.com
+1 954 652 4627

**Fort Myers**
Jacob Hutchings, MAI
Valuation Services Director
Jacob.Hutchings@colliers.com
+1 239 985 8088

**Fresno**
John Larson, MAI
Sr. Valuation Services Director
John.Larson@colliers.com
+1 559 221 1271

**Grand Rapids**
Will Fowler, MAI
Valuation Services Director
Will.Fowler@colliers.com
+1 616 988 5843

**Hawaiian Islands**
Bobby Hastings, MAI, MRICS
Managing Director
Bobby.Hastings@colliers.com
+1 808 200 5603

**Huntsville**
Wesley Pinyan, MAI, CCIM
Valuation Services Director
Huntsville@colliers.com
+1 256 603 7099

**Houston**
Jay Lefevers, MAI
Managing Director
Jay.Lefevers@colliers.com
+1 602 770 4530

**Indianapolis**
Tony Guth, MAI
Managing Director
Tony.Guth@colliers.com
+1 312 602 6159

**Irvine**
John Park, MAI
Sr. Valuation Services Director
John.Park@colliers.com
+1 949 724 1152

**Jacksonville**
Patrick Phipps, MAI
Managing Director
Patrick.Phipps@colliers.com
+1 904 861 1114

**Kansas City**
Alex Hoenig, MAI
Associate Managing Director
Alex.Hoenig@colliers.com
+1 816 419 3561

**Knoxville**
Nelson Pratt, MAI
Managing Director
Nelson.Pratt@colliers.com
+1 865 673 4840 ext. 1

**Las Vegas**
Evan Ranes, MAI, ASA, R/W-AC
Managing Director
Evan.Ranes@colliers.com
+1 702 836 3749

**Lexington**
Robert Lancaster, Ph.D.
Sr. Valuation Services Director
robert.lancaster@colliers.com
+1 859 221 7802

**Lincoln**
Alex Hoenig, MAI
Associate Managing Director
Alex.Hoenig@colliers.com
+1 816 419 3561

**Little Rock**
Joshua Smith, MAI, MRICS
Managing Director
Joshua.Smith@colliers.com
+1 501 219 8546

**Los Angeles**
Jeff Shouse, MAI, CRE
Executive Vice President
Jeff.Shouse@colliers.com
+1 916 724 5531

**Miami**
Ralph Peña, III, MAI
Managing Director
Ralph.Pena@colliers.com
+1 786 517 4855

**Milwaukee**
Tony Guth, MAI
Managing Director
Tony.Guth@colliers.com
+1 312 602 6159

**Minneapolis**
Jeff Shouse, MAI, CRE
Executive Vice President
Jeff.Shouse@colliers.com
+1 916 724 5531

**Nashville**
Patrick Gibson, MAI, CCIM
Executive Managing Director
Patrick.Gibson@colliers.com
+1 615 610 4728

**New Orleans**
Jason Lindsey, MAI
Valuation Services Director
Jason.Lindsey@colliers.com
+1 504 717 1926

**New York**
Tony O'Sullivan, MAI, MRICS
Executive Managing Director
Tony.OSullivan@colliers.com
+1 212 207 8057

**New York (upstate)**
Anthony Palma, MAI, MRICS
Valuation Services Director
Anthony.Palma@colliers.com
+1 518 788 8108

**Orlando**
Chuck Buhler, MAI, CCIM
Managing Director
Chuck.Buhler@colliers.com
+1 407 362 6155

**Philadelphia**
Albert Crosby, MAI
Associate Managing Director
Albert.Crosby@colliers.com
+1 215 928 7526

**Phoenix**
Michael Brown
Associate Managing Director
Michael.Brown@colliers.com
+1 602 222 5166

**Pittsburgh**
Bruce Nell, MAI, AI-GRS, MRICS
Executive Managing Director
Bruce.Nell@colliers.com
+1 614 437 4687

**Portland/Vancouver**
Jeremy Snow, MAI
Managing Director
Jeremy.Snow@colliers.com
+1 503 542 5409

**Raleigh**
Alan McNulty, MAI
Managing Director
Alan.McNulty@colliers.com
+1 704 409 2374

**Reno**
Rebekah Dunn, MAI
Sr. Valuation Services Director
Rebekah.Dunn@colliers.com
+1 916 724 5508

**Richmond**
Bruce Nell, MAI, AI-GRS, MRICS
Executive Managing Director
Bruce.Nell@colliers.com
+1 614 437 4687

**Sacramento**
Scott Shouse, MAI
Managing Director
Scott.Shouse@colliers.com
+1 916 724 5532

**Salt Lake City**
Kelly Tate, MAI
Sr. Valuation Services Director
Kelly.Tate@colliers.com
+1 385 249 5444

**San Diego**
Rob Detling, MAI
Managing Director
Rob.Detling@colliers.com
+1 858 860 3852

**San Francisco**
Vathana Duong, MAI
Managing Director
Vathana.Duong@colliers.com
+1 415 288 7854

**San Jose**
Jeff Shouse, MAI, CRE
Executive Vice President
Jeff.Shouse@colliers.com
+1 916 724 5531

**Sarasota**
Justin Butler, MAI
Managing Director
Justin.Butler@colliers.com
+1 941 210 5004

**Seattle**
Reid Erickson, MAI
Executive Managing Director
Reid.Erickson@colliers.com
+1 206 965 1106

**St. Louis**
Kate Spencer, MAI
Managing Director
Kate.Spencer@colliers.com
+1 214 558 9953

**Tampa**
Ryan Toile, MAI, MRICS
Vice President
Ryan.Toile@colliers.com
+1 813 871 8510

**Washington DC**
John Farrell, MAI, AI-GRS
Managing Director
John.Farrell@colliers.com
+1 212 242 5487

---

# Practice Group Leaders

**Agriculture**
Ben Slaughter, ARA
Managing Director
Benjamin.Slaughter@colliers.com
+1 559 256 0156

**Healthcare**
Justin Butler, MAI
Managing Director
Justin.Butler@colliers.com
+1 941 210 5004

**Manufactured Housing**
Bruce Nell, MAI, AI-GRS, MRICS
Executive Managing Director
Bruce.Nell@colliers.com
+1 614 437 4687

**Self-Storage**
Jeff Shouse, MAI, CRE
Executive Vice President
Jeff.Shouse@colliers.com
+1 916 724 5531

Kate Spencer, MAI
Managing Director
Kate.Spencer@colliers.com
+1 214 558 9953

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF INDIANA
2                  FORT WAYNE DIVISION

3

REPUBLIC SERVICES OF            )
4    INDIANA, LIMITED             )
PARTNERSHIP,                    )
5                                 )
          Plaintiff,            )
6                                 )
-vs-                           )   Case
7                                 )   No. 1:21-CV-00108
COE HEATING & AIR              )
8    CONDITIONING, INC., and      )
GAS-FIRED PRODUCTS, INC.,      )
9    d/b/a SPACE-RAY,              )
                                  )
10          Defendants.            )

11

12          The remote Zoom deposition of KENNETH

13   M. ITLE, M.A., called for examination, taken pursuant

14   to the Federal Rules of Civil Procedure of the United

15   States District Courts pertaining to the taking of

16   depositions, taken before CAROLYN J. HAWKES, C.S.R.,

17   within and for the County of Boone and State of

18   Illinois, on the 16th day of February, 2023, at 10:00

19   a.m. CST.

20

21

22

23

24   Job No. CS5695674

EXHIBIT

Page 22

1    day on site.

2       Q.  Okay.  When were you first contacted in

3    connection -- sorry, about this case?

4       A.  It would have been prior to that May site

5    visit, so I'd have to go back and check, but around

6    April, I guess, April of 2020.

7       Q.  And do you remember who first contacted you

8    about the case?

9       A.  I believe it was Kevin Morrissey of Lewis &

10   Kappes.

11      Q.  That was an attorney that was working on the

12   case early in the case, right?

13      A.  Correct.  They passed it off to Jim Zoccola.

14      Q.  I do not have the emails in front of me.

15   You're more than welcome to look at your emails about

16   this case if it helps you answer some of these

17   questions.  What specifically were you asked to do in

18   connection with this case?

19      A.  So my role was to develop a cost estimate for

20   what it would take to build essentially a new version

21   of the building that had the fire, matching its basic

22   layout and function and quality of materials.

23      Q.  And is that what you did?

24      A.  Yes.

Page 23

1    Q.   You were not asked to calculate a fair market

2    value of the structure, say the value of it the day

3    before the fire?

4    A.   No.

5    Q.   You were not asked to perform a cost analysis?

6    A.   No.

7         MR. ZOCCOLA:   Objection to form.  You can

8      answer.  Ken, you can answer.

9    BY THE WITNESS:

10   A.   No, that's not -- it's not exactly -- no.  I

11   was doing a cost estimate for a new building.

12   BY MR. GARDNER:

13   Q.   Yeah, so because this is your first

14   deposition, I'll tell you that from time to time

15   attorneys make objections.  They're not ruled on

16   today.  We don't -- I've only done it I think twice

17   in 36 years.  We don't call the judge up and ask for

18   rulings.  They're preserved for another day.  So

19   don't let it throw you off course.

20        But if an attorney is making an objection,

21   if Jim Zoccola is making an objection, you'll want to

22   stop talking until he finishes the objection.  It

23   makes it -- that's another thing, it makes the court

24   reporter's job easier.

Page 37

BY MR. GARDNER:

1      Q.   In other words, you'll concede that's outside

2   of your area of expertise to do that?

3      A.   Yes.   I would not -- I would not know how to

4   approach that.

5      Q.   Okay.   And to be clear, in this case you have

6   not calculated any fair market value of the structure

7   prior?

8         MR. ZOCCOLA:   Asked and answered.

9   BY THE WITNESS:

10     A.   Yeah, to reiterate, I have developed a cost

11  estimate for constructing a replica of the building.

12  BY MR. GARDNER:

13     Q.   Right.   A brand new building, correct?

14        MR. ZOCCOLA:   Objection to form.

15  BY THE WITNESS:

16     A.   Correct.

17  BY MR. GARDNER:

18     Q.   And you did not --

19     A.   Correct.

20     Q.   -- do any depreciation off of your brand new

21  building construction estimate, did you?

22        MR. ZOCCOLA:   Objection to form.

23  BY THE WITNESS:

Page 80

1   including the staff break room and the locker room;

2   right?

3      A.   Correct.

4      Q.   Okay.   In your first report, which I've marked

5   as Exhibit RRR today -- and we're not going to really

6   go through it because you prepared a supplemental

7   report, and your first report was dated July 29,

8   2020 -- your total cost, including permits and

9   professional fees, et cetera, was $2,255,000;

10  correct?

11     A.   Correct.

12     Q.   On page 3 of your final report, dated

13  November 17, 2022, Exhibit MMM, you have an opinion

14  of cost.   Just tell me when you're there, Ken.

15     A.   Okay.   Got it.

16     Q.   You wrote:   Based on the above assumptions, we

17  estimate the net construction cost of the replacement

18  building to be $2,629,713.   This total equates to a

19  construction cost of approximately $184 per square

20  foot.   Inclusive of permits and professional fees,

21  estimated at 5 percent construction cost, the total

22  project cost of $2,761,899; right?

23     A.   Correct.

24     Q.   So roughly it went up by just over half a

Page 81

1    million dollars compared to the report from two years

2    previous?

3        A.   Correct.

4        Q.   And I think you explained that -- I'm trying

5    to see where you explain that at.   Wait a second.

6             I think you explained the roughly half a

7    million dollar increase, in your opinion, as to the

8    cost of new construction on the bottom of the first

9    paragraph of page 1 of Exhibit MMM.   Just let me know

10   when you're there.

11       A.   Yes.

12       Q.   You wrote here on November 17, 2022:   An

13   initial cost estimate was prepared by Wiss, Janney in

14   July 2020.   The attached revised cost estimate

15   includes updated assumptions related to the building

16   finishes, equipment, and furnishings, as well as

17   updated unit cost to reflect changes in the

18   construction industry since 2020.

19            Those are the reasons why your ultimate

20   opinion as to the total cost to rebuild a brand new

21   structure that for all intents and purposes

22   replicated the old structure, that's why the cost

23   went up.   Those are the reasons, right?

24            MR. ZOCCOLA:   Objection to form.

Page 156

1      STATE OF ILLINOIS          )

                                  )   SS:

2      COUNTY OF B O O N E        )

3                    I, Carolyn J. Hawkes, Certified

4      Shorthand Reporter within and for the County of Boone

5      and State of Illinois, do hereby certify that,

6      to-wit, on the 16th day of February, 2023, appeared

7      remotely before me KENNETH M. ITLE, M.A., witness

8      produced on behalf of the plaintiff in a certain

9      cause now pending and undetermined in the United

10     States District Court, Northern District of Indiana,

11     Fort Wayne Division.

12                    I further certify that the said KENNETH

13     M. ITLE, M.A., was by me first remotely duly sworn to

14     testify the truth, the whole truth, and nothing but

15     the truth in the cause aforesaid; that the testimony

16     then given by said witness was reported

17     stenographically by me, in the presence of the said

18     witness, and afterwards reduced to typewriting; and

19     the foregoing is a true and correct transcript of the

20     testimony so given by said witness as aforesaid.

21                    I further certify that signature to the

22     deposition was reserved by agreement of counsel for

23     the respective parties.

24                    I further certify that MR. JAMES E.

Page 157

1    ZOCCOLA and MR. THOMAS JONES appeared on behalf of

2    the plaintiff and MR. MARTIN J. GARDNER and MR. BEN

3    KATCHUR appeared on behalf of the defendants.

4                 I further certify that I am not counsel

5    for nor in any way related to any of the parties to

6    this cause, nor am I in any way interested in the

7    outcome thereof.

8                 In testimony whereof I have hereunto

9    set my hand this 2nd day of March, 2023, A. D.

10

11

12

13

                  Carolyn J. Hawkes
                  Certified Shorthand Reporter
14
                  Boone County, Illinois

15

     CSR No. 084-003296.

16

17

18

19

20

21

22

23

24