**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| REPUBLIC SERVICES OF INDIANA, LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | **Case No. 1:21-cv-108-HAB** |
| v. | ) ) | |
| COE HEATING & AIR CONDITIONING, INC. | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION TO EXCLUDE OPINIONS OF MR. JAMES P. FOSTER, CFI, CEFI, CVFI**

TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ..................................................................................2

        A.  January 2019 – March 2019 ..........................................................................2

            i.    Coe offers to install gas tube heaters in Republic's Paint Bay .........3

            ii.   Coe ignores the installation manual warnings. ..............................4

            iii.  The Paint Bay catches fire ..............................................................6

        B.  Mr. Foster's Investigation .............................................................................6

            i.    Initial site inspection .......................................................................6

            ii.   Samples collected from the Heaters .................................................8

            iii.  Lab testing shows "significant" levels of flammable materials inside
                  the Heaters. ......................................................................................9

            iv.   Joint Scene Examinations and Joint Lab Examination ...................10

            v.    Mr. Ozog's Expert Report ..............................................................11

        C.  Mr. Foster's Final Report and Conclusions ...............................................11

III.    LEGAL STANDARD ............................................................................................13

IV.     ARGUMENT ........................................................................................................13

        A.  Mr. Foster is Qualified to Offer Cause and Origin Opinions .....................13

            vi.   Mr. Foster has the "relevant expertise" necessary to offer his
                  opinions. ........................................................................................14

            vii.  Rule 702 does not require that Foster be an electrical engineer to
                  offer cause and origin opinions. ....................................................14

        B.  Mr. Foster Applied a Reliable Methodology in Compliance with Rule 702(b)-(d). ....16

            i.    Mr. Foster's investigation was guided by NFPA 921 and the
                  scientific method. ...........................................................................16

            ii.   Under NFPA 921, "probable" cause does not mean irrefutable or
                  certain cause. .................................................................................18

        C.  Coe Invites the Court to Embrace Credibility Challenges Created By Experts It
            Never Disclosed. ......................................................................................22

            i.    Coe did not disclose the experts it now relies on. ...........................22

            ii.   Cross-examination and contrary evidence is the appropriate means
                  of rebutting Mr. Foster's expert testimony. ..................................23

V.      CONCLUSION .....................................................................................................25

**INDEX OF EXHIBITS**

| EX. | | DESCRIPTION |
|---|---|---|
| A | | Fred Jones Deposition Transcript |
| B | | James Foster Expert Report |
| C | | Nicholas Ozog Expert Report |
| D | | James Foster Deposition Transcript |
| E | | Michael Agosti Deposition Transcript |
| F | | Excerpt of Space-Ray Installation and Owner's Manual |
| G | | Charles Golden Deposition Transcript |
| H | | Ronald Dantzer Deposition Transcript |
| I | | Kyle Orr Deposition Transcript |
| J | | Daniel Kelly Deposition Transcript |
| K | | Sharee Wells Deposition Transcript |
| L | | MSDS Sheet for Blue Sheboygan Paint |
| M | | John Diggle Deposition Transcript |
| N | | NFPA 30 FAQ |
| O | | Michael Vergon Deposition Transcript |

## I.  INTRODUCTION

Coe's Motion to Exclude [Dkts. 54, 55] ("Mot.") should be denied. As explained below, Mr. Foster is qualified to opine on the probable cause of the fire in this case. The methodologies he used during his investigation are well-recognized in his field of expertise and scientifically reliable. Coe's challenges to his investigation largely amount to credibility challenges.

*First*, Mr. Foster is well-qualified to render his opinions. He has performed over 2,000 fire investigations over his career. He holds certifications from multiple national and international fire investigation organizations. And like many licensed fire investigators, Mr. Foster has been specifically trained on how to analyze and determine whether electrical components were causal to a structural fire. Ignoring all of this, Defendant insists that because Mr. Foster is not an electrical engineer, he is unqualified to opine on the cause of the fire in this case. The Court should reject Defendant's novel standard. Mr. Foster is imminently qualified for the purposes of Rule 702 to rule out electrical issues as a likely cause of the fire.

*Second*, Mr. Foster's methodology is reliable under Rule 702. Defendant's argument to the contrary boils down to: (a) the facts underlying his conclusions are disputed, and (b) there is "no 'rational connection' between the [sic] Foster's data and his causation opinion[,]" therefore, his methodology is unreliable. (Mot. p. 24). The former is inapposite, and the latter is simply not true. As he explained during his deposition, Mr. Foster routinely relies on NFPA 921 as a guide in all of his investigations. In this case, and in conformity with NFPA 921, he collected and evaluated an enormity of data. He systematically studied the scene, multiple times. He then methodically evaluated and ultimately eliminated other potential ignition sources in accordance with his training and experience, and in accordance with NFPA 921. And Mr. Foster's ultimate conclusions have more than a "rational connection" to the facts and data he considered.

1

*Third*, Coe's Motion should be denied because rather than relying on its own experts, Coe hinges its arguments on the opinions of experts Coe never disclosed. This presents unfair prejudice to Plaintiff, who has developed and executed its litigation strategy around a reasonable expectation that Coe would follow the Court's case management deadlines and F.R.C.P. 26. Even if the Court allowed Coe to benefit from its undisclosed expert witnesses, their opinions only seek to challenge Mr. Foster's credibility, not the scientific reliability of his methodology. The Court should decline Defendant's invitation to weigh the credibility of the parties' competing experts, and the jury should have the opportunity to consider Mr. Foster's thoroughly developed opinions on cause and origin.

Coe's Motion to Exclude should be denied.

## II.   FACTUAL BACKGROUND

Republic notes from the outset that it regrets having to expend a large portion of its response outlining basic facts. However, many of the facts Coe relies on its Motion are not only contested, they are contradicted by contrary evidence. Accordingly, Republic provides the following factual background.

### A.  January 2019 – March 2019

Republic owns and operates a large waste management facility located at 6231 MacBeth Rd., Ft. Wayne, IN (the "Facility"). In early 2019, Republic owned an Operations Building at the Facility. The Operations Building was divided into four (4) sections: one section was used for office space, and three sections were used for maintenance operations. (Orr Dep. 13:22 – 14:20).[1]

In Buildings 3 and 4 (the northern sections), Republic performed heavy container repair, such as cutting and welding of heavy containers (dumpsters). (Orr Dep. 46:5-18). Once the containers were repaired, Republic employees would transport them to a large enclosed area inside Building 1 for

---

[1] For the purposes of this litigation, the parties have referred to the sections as Buildings 1, 2, 3, and 4.

painting and additional repairs. (Orr Dep. 46:13-14). Republic's employees referred to the spray painting area the "Paint Bay" or "Paint Room." (Orr Dep. 71:21).

Republic employees routinely painted 17-19 containers each day in the Paint Bay. (Foster Dep. 190:17-20). They used airless paint sprayers connected to 5-gallon buckets of Blue Enamel Sheboygan Paint. (Foster Dep. 43:19-22). Some minor welding occurred in the Paint Bay from time-to-time, but the room was primarily used to spray paint containers. Employees noted that the Paint Bay was covered from floor to ceiling in paint overspray. Over time, dried paint would evolve into a dry dust-like powder, which covered almost all of the Paint Shop. (Jones Dep. 28:12-19)

Through the course of Republic's operations in the Paint Bay, over time, the dried out dust-like substance ("paint dust") from spraying operations collected inside the Paint Bay's heaters, causing the heaters to clog up and malfunction. (Jones Dep. 28:12-19). According to interviews with Republic interviews, blue paint was "everywhere in the facility." (Foster Dep. 129:2-4). Republic sought to fix the heater problem in early 20219 by contacting multiple HVAC companies to obtain quotes for a new type of heater that would be compatible with the harsh spraying conditions inside the Paint Bay.

    i.    <u>Coe offers to install gas tube heaters in Republic's Paint Bay</u>

One of the HVAC companies Republic consulted with was Defendant, Coe Heating & Air Conditioning, Inc. (Dantzer Dep. 27:22 – 28:5). Ron Dantzer, Coe's salesman, met with Republic personnel in early 2019. *Id.* Mr. Dantzer inspected the Paint Bay and took measurements of the enclosed space. (*Id.* at 47:15). Republic's employees informed Mr. Dantzer about the commercial spray painting activities which regularly took place inside the Paint Bay. (*Id.* at 55:25). After his inspection and meeting with Mr. Orr and Mr. Shatto, Mr. Dantzer ultimately recommended that Republic purchase 3 Space-Ray, Inc. infrared gas tube heaters (collectively, the "Heaters") for the Paint Bay. On January 10, 2019, Coe provided a quote to Mr. Orr for the purchase and installation of the Heaters. (*Id.* at 66:20 – 67:10) Mr. Orr, on behalf of Republic, accepted Coe's proposal. (*Id.* at 67:1-5).

3

    ii.    <u>Coe ignores the installation manual warnings.</u>

Unbeknownst to Republic, the Heaters Mr. Dantzer recommended included an explicit warning, which cautioned installers and owners that the Heaters should not to be installed in areas where painting operations occurred. A high-lighted excerpt of the installation warning ("Warning") is provided below:



(Ex. F). Mr. Dantzer admitted at his deposition that he was completely unaware of the Warning before offering Republic the quote. (Dantzer Dep. at 83:10). He also claimed that he did not think he had any obligation to be familiar with the Warning before encouraging Republic to purchase the Heaters for the Paint Bay. (*Id.* at 43:10-12).

On January 31, 2019, Coe sent two (2) of its employees to Republic's Paint Bay to remove the old malfunctioning heaters and to install the new Space-Ray Heaters. (Dantzer Dep. 88:1-12). These employees were Charles Golden and Jason Stuckey.[2] (Golden Dep. 14:13-17).  Mr. Golden worked as an assistant under the direction of Mr. Stuckey (lead installer). *Id.*  The January 2019

---

[2] Mr. Stuckey is now deceased. (Golden Dep. at 14:19).

installation at Republic was the first time Mr. Golden could recall being involved with installing gas tube heaters. (Golden Dep. at 52:1-4). It was also the first time Mr. Golden had "ever installed heaters, in any commercial facilities, in a room where any kind of spraying or painting took place[.]" (*Id.* at 43:1-4). Mr. Golden indicated that nobody had informed him that spraying activities regularly took place in the Paint Room. (*Id.*. at 34:3-8). Golden testified that Coe's installation team typically would not review installation manuals before performing installations. (*Id.*. at 25:8-11). Mr. Golden was shown a copy of the Warning during his deposition. (*Id.* at 57:11 – 58:12; Golden Dep. Ex. 1, Tab 5, p. 3). After reviewing the Warning, Republic's counsel asked Mr. Golden what impact, if any, the Warning would have had on his decision to move forward with installing the Heaters. (Golden Dep. at 60:19-21). Mr. Golden responded that "common sense" would inform a Coe's salesmen to not ask Coe's installation team to install a heater in a room where spraying or painting operations took place. (*Id.* at 43:25 – 45:21). When asked to clarify, he testified to the following:

> A: **Common sense. Is something going to burn, is it going to catch fire?** You know, simple things.
>
> Q: What are - -
>
> A: **Common sense tells you certain things that you don't do. And - - just leave it at that.**

(*Id.* at 45:22 – 46:2) (emphasis added).

Unaware of the Warning, Mr. Golden and Mr. Stuckey proceeded to install the new Heaters in the Paint Bay. According to Mr. Jones, the new Heaters' "heat shields" hung around twelve (12) inches below the ceiling in the Paint Bay. (Jones Dep. 31:21 – 32:1). The new heaters were fully installed and operational by February 4, 2019 (Dantzer Dep. 88:12). Shortly after Coe installed the new Heaters, spray painting operations resumed in the Paint Bay. Republic employees working in the Paint Bay alerted their supervisor (Fred Jones) that there was paint dust "getting on top of the shields" of the new Heaters and that the Heaters "were starting to turn blue like everything else". (Jones Dep.

61:11 – 62:7; 64:6-17)). During his deposition, Mr. Jones testified that "[t]here probably wasn't anything in that paint room that didn't have some blue spray on it." (Jones Dep. 61:22-25).

    iii.    <u>The Paint Bay catches fire</u>

On March 19, 2019, just six (6) weeks after the new Heaters were installed, Republic employees observed flames break out from the room of the Paint Bay. The fire was first reported at 11:03 p.m. by nearby witnesses. first responders received a call regarding the fire. (foster Dep. 44:13-23). Witnesses, who were later interviewed by Mr. Foster, observed that it appeared the flames started "high" in the Paint Bay before spreading throughout the rest of the Paint Bay and later the rest of the Operations Building. Firefighters eventually extinguished the fire at approximately 5:00 a.m. on March 20, 2023. (Foster Dep. 44:18-21). The Operations Building was a total loss.

**B. Mr. Foster's Investigation**

    i.    <u>Initial site inspection</u>

Mr. Foster was engaged on March 20, 2019 to investigate the fire. He arrived on scene at approximately 3:00 p.m. (Foster Dep. 45:23), less than 12 hours after the fire was extinguished. Upon arrival, Mr. Foster began interviewing witnesses on scene. Witnesses he spoke with included Samir Dizdarevic, a Republic employee who first observed the fire and captured video footage of the fire. Mr. Foster also interviewed Fred Jones. Mr. Jones was the last person to walk through the Paint Bay the night of the fire, and it was his job to verify that Republic's end-of-day protocols had been followed. (Foster Dep. 393:2-9). Mr. Foster also interviewed Kyle Orr, the Operations Manager who arrived on scene shortly after the fire was reported and who closely was familiar with the activities which had recently been conducted in Buildings 1, 2, 3, and 4. (Foster Dep. 44:24 – 45:6; 51:15-19).

These witnesses informed Mr. Foster that all work had concluded in Building 1 by 4:00 p.m. the prior day. (Foster Rep. at p. 4). Mr. Jones noted that Republic's policies at the time required employees during the last hour of the day "to clean everything up, sweep the floor, check and make

sure everything's turned off." (Foster Dep. at 392:20-25; Orr Dep. at 99:5-22). Mr. Jones told Foster that everything inside the operations facility was turned off, except for the heaters. (Foster Dep. 393:10-21). Mr. Jones explained to Mr. Foster that "basically all of the electrical components and systems inside of building number 1 were turned off, other than the heaters . . . at the time of the fire[.]" (Foster Dep. at 112:13 – 113:6).

The witnesses told Mr. Foster that the new Heaters had most likely been set at around 70 degrees (F), and that they were set to run throughout the night. (Foster Report at p. 4; Orr Dep. at 73:18; Jones Dep. at 26:2-7). Mr. Foster reviewed weather records which indicated an overnight low of 28 degrees (F) the night of the Fire. (Foster Dep. at 194:3-7). The Republic employees on scene also told Mr. Foster that Republic had been painting 17-19 containers per day in the Paint Bay. (Foster Dep. at 190:17-20).

The employee who first saw the flames emanating from the rafters of Building 1, informed Mr. Foster that he saw flames that appeared to be coming from the roof at ceiling level. (Foster Dep. 262:25 – 263:5). Mr. Orr witnessed flames coming up from the southwest end of Building 1. (Orr Dep. 90:11-15). Mr. Foster spoke with other witnesses who observed fire and smoke coming up from the middle east overhead door on Building 1 (Foster Rep. at p. 3; Foster Dep. 262:25 – 263:14).

In addition to conducting witness interviews, Mr. Foster began an initial assessment of the fire scene. He analyzed burn patterns on the metal roofing and siding from the Operations Building. He also evaluated burn patterns on the new Heaters. (Foster Dep. at 109:2-5; Foster Rep. at p. 3). Mr. Foster observed that the electrical wiring throughout the building was all in-conduit, which makes a significant difference decreasing the likelihood of wiring issues causing ignitions. (Foster Dep. at 112:19-22). Mr. Foster determined during the initial site investigation the that a full investigation of the scene would require additional time, heavy equipment (to evaluate the damage and secure evidence from the scene), and notice to all potentially interested parties. (Foster Report at p. 3). He also

7

determined from reports to 911 that employees observed fire and smoke emanating from the building near the overhead doors along the Paint Bay. (*Id.*) . The fire was extinguished and the south end of the Operations Building (including "Buildings 1 and 2" had collapsed. (*Id.*). He determined after his initial investigation that a joint examination with interested parties would be required, including Coe Heating and Air Conditioning, Inc. (*Id.*).

      ii.   <u>Samples collected from the Heaters</u>

In May 10, 2019, Mr. Foster received word from a Republic employee that weeks before the fire, one of the HVAC companies Republic had consulted (other than Coe) had actually warned Republic against using infrared gas tube heater to heat the Paint Bay. (Foster Dep. 77:24 – 78:13).[3] Out of an abundance of caution, Mr. Foster returned to the scene to retrieve samples of debris found inside the Heaters. (Foster Report, p. 4). Relying on his training on forensic evidence collection, he carefully reached into the 3 Heaters to collect gauze samples of materials inside the Heaters. (Foster Dep. at 295:19-24). In conformance with NFPA 921 evidence protocols, he photographed the locations where he retrieved scraping and gauze samples from inside the gas tube heaters (Foster Dep. 78:13:-16; 295:11 – 296:17; 386:23 – 387:3) (NFPA § 16.2.1: "Photographs are the most efficient and effective reminders of what the investigator saw while at the scene.) He secured the gauze samples into separate clean metal gallon-size cans and then sealed the containers. (Foster Dep. 323:2-3; see NFPA 17.6.2.1: "The recommended container for the collection of liquid and solid accelerant

---

[3] Coe's Motion spotlights purported inconsistencies between the information Mr. Foster learned from witness interviews he conducted and certain deposition testimony of fact witnesses, such as John Diggle and the Korte Does it All, Inc. representative (Mot. pp. 5, 13) These are red herring. John Diggle is not "Republic's retained electrical engineer" (Mot. pp. 1, 23) and Coe knows that. (*See* Diggle Dep. 6:10-14) (Coe's counsel telling Mr. Diggle that "[a]lthough you had some early involvement . . . you have not been designated as a testifying expert with any opinions"). Republic has never designated Mr. Diggle as an expert witness in this case and he has not offered any expert opinions relevant to this case. In any event, Mr. Diggle disputes key facts Coe urges the Court to embrace. (Diggle Dep. 26:18-21) ("I don't think I would have said with certainty that I could not rule [electrical causes] out or - - I don't think I would have given definitive conclusions."). The Court should not credit Mr. Diggle's testimony in its reliability analysis. Even if inconsistencies exist between deposition testimony and witness statements, they would go to the "soundness of the factual underpinnings of [Mr. Foster]'s analysis[,]" not the reliability of his methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

evidence is an unused, clean metal can[.]"). Foster sent the samples them to Forensic & Scientific Testing, Inc. ("FAST Lab") for laboratory analysis by forensic scientists (Foster Report at p. 4). To safeguard against false positives, Mr. Foster also sent the laboratory a sterile gauze sample for the laboratory to use as a control sample. Mr. Foster requested that the scientists run laboratory tests on each of the gauze samples to test for the presence of any flammable, combustible, or ignitable liquids. (SW Dep. 13:20-14:6).[4] Mr. Foster also sent FAST Lab a sample of the Sheboygan Paint in liquid form for analysis.

     iii.   <u>Lab testing shows "significant" levels of flammable materials inside the Heaters.</u>

Ms. Sharee B. Wells, MS ABC-FD is a forensic scientist who determined through laboratory testing that the gauze samples retrieved from inside the Heaters were positive for petroleum distillate, consistent with ignitable materials. (Rep. 4, Appx. 2, p. 2; Wells Dep. 13 – 43:3). She also confirmed that the same material was found in the sample of Sheboygan Paint Mr. Foster sent her. The control sample was negative. Ms. Well explained during her deposition the various scientific testing methods she used. (Wells Dep. 20:20-24; 38:2-14) (e.g., charcoal vapor concentration technique and gas chromatographic mass spectrometric analysis). Ms. Wells also performed a "flame test" on a wet, <u>liquid sample</u> of the Sheboygan Paint. (Wells Dep. 21:11-16). The flame test was negative in the paint's <u>liquid form</u>. (Coe's Mot. pp. 4, 9, 22, 23). But Ms. Wells never attempted to conduct a flame test with the paint in its <u>dry form.</u> (Wells Dep. at 23:10).[5]

Notably Ms. Wells' testing indicated that both the Sheboygan Paint and the sample scrapings from inside the Heaters contained xylol, a "highly flammable" material. (Wells Dep. 42:10). Ms. Wells also referred to this as an "aromatic product" throughout her deposition. (Wells Dep. 43:15). Ms.

---

[4] Ms. Wells explained during her deposition that in her field, the term "ignitable liquids" is a misnomer—it encompasses substances both in solid and liquid states. (Wells Dep. 117:14-18; 119:2-14).

[5] None of the experts referenced in Coe's Motion performed a flame test with the paint in its <u>dry form</u>.

Wells noted that the Sheboygan Paint's MSDS sheet does not publish what percentage of the paint in its liquid form contains xylol and she could not precisely determine what percentage of the paint is xylol. (Wells Dep. 43:23 – 44:10). When asked "how much of the [xylol] was detected by you in connection with the swabs" she responded, "I can tell you from the total ion chromatogram that was produced in this case, **it was a very significant amount**. And the total abundance in this case was about **eight million, which is pretty significant**." (Wells Dep. 45:15-19) (emphasis added). The test results lined up with the warnings on the MSDS sheet for the paint, which note that the paint is approximately 36% solids, 50% water, and 13% solvents. (Ex. L, MSDS Sheet) (Ozog Report at p. 4). It also corresponds with the MSDS sheet's warning, which explains that "if water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid." (Ex. L, MSDS Sheet) (Ozog Report at p. 4). NFPA 30 provides that Class II, IIIA, and IIIB liquid are flammable materials which support combustion. (Ex. N, p. 1). In short, Ms. Wells' testing confirmed that (1) the same type of "highly flammable" petroleum distillate (xylol) in the Sheboygan Blue Enamel Paint was also inside the Heaters, and (2) the samples Mr. Foster collected from deep inside the heaters contained "significant amounts" of that flammable material (xylol).

iv.   Joint Scene Examinations and Joint Lab Examination

Mr. Foster facilitated multiple joint scene examination at Republic's Facility and two (2) joint lab examinations at Rimkus' Indianapolis laboratory. Details of these examinations are outlined in the parties' expert reports. During the joint scene examinations, Mr. Foster asked all attendees—including Coe's fire investigator—if there was any evidence they deemed important that they wished be collected. (Foster Dep. at 187:3-20). The three (3) Heaters were collected, along with various other debris. At deposition, Mr. Agosti admitted that although he was interested in further evaluating certain electrical components at the scene, he chose not to pursue collection of the components and was not

10

prohibited by Mr. Foster or anyone else from collecting the components. (Agosti Dep. at 156:11-23; Foster Dep. 390:20 – 391:8).

The parties' counsel and experts later attended two (2) joint inspections at Rimkus' secure facility in Indianapolis to perform destructive testing of the artifacts retrieved from the scene. Mr. Foster closely analyzed the artifacts from the Site and took additional photos. From Mr. Foster's perspective, these examinations did not reveal anything new. (Foster Rep. at p. 1)

   v. <u>Mr. Ozog's Expert Report</u>

Mr. Foster's final report notes that he considered and relied on the expert report and opinions of Republic's expert witness, Nicholas Ozog. (Foster Report at pp. 1, 8). Mr. Ozog is a mechanical engineer who holds a Master of Science degree in Fire Protection Engineering from the University of Maryland. (Ozog Rep. at Appx. 1, p. 1). Mr. Ozog noted that "[t]he paint used in [Republic's] paint spray operations, though not a flammable or combustible liquid *as packaged by the manufacturer* . . . contained solvents at approximately 13% by weight. The paint manufacturer also included a warning indicating that, 'if water has boiled off, this product may exhibit properties of a Class II, IIIA, or IIIB liquid.'" (Ozog Report at p.6). Mr. Ozog noted that "[t]he operations in the paint room . . . **are similar to those operations that would be conducted in a paint booth**. As such the specific requirements and definitions of a paint booth should have been evaluated." (*Id.*) (emphasis added).

   **C.** **Mr. Foster's Final Report and Conclusions**

After collecting and analyzing the vast amount of evidence and after ruling out other potential ignition sources, Mr. Foster rendered his final report and conclusions on November 18, 2022.[6] Throughout the entirety of his investigation, he "applied the methodology of fire investigation using a systematic approach as recommended by the National Fire Protection Association, NFPA 921 –

---

[6] The Dec. 2019 report was a preliminary report to Republic's insurer, not a report prepared for the purposes of F.R.C.P. 26 disclosure in litigation. Any similarities or discrepancies between Mr. Foster's Final Report and Conclusions and his initial findings in Dec. 2019 are areas of inquiry for cross-examination and potential impeachment.

"Guide for Fire and Explosion Investigations" and NFPA 1033 "Standard for professional Qualifications for Fire Investigator." (Foster Rep. at p. 3).

Mr. Foster noted that during the site inspections, the heaters were identified as a potential ignition source and were uncovered from the fire debris for examination. (Foster Rep. at p. 3). He observed paint and other debris on the tube heaters, on the reflector assembly around the tube heaters, "and inside the ventilation tubes of the heaters." (*Id.*). He observed that charring and burn patterns near the "control box" of one of the heaters suggested ignition with the propane fuel that would have fed into the control box. *Id.* Mr. Foster also observed "[a] buildup of paint" in the ventilation pipe and reflector assembly of all three tube heaters. (*Id.*) Mr. Foster analyzed and interpreted burn patterns on the metal roof, noting that the burn patterns and discoloration of the metal roof (in contrast to the metal sheeting along the side of the building), in concert with witnesses testimony that the fire was "high in the building upon discovery" suggested a probably origin of the fire.

Mr. Foster considered the information he collected during multiple witness interviews, who advised Mr. Foster that other potential ignition sources from other electrical components were all turned off at the time of the fire. (Foster Rep. at p.4). After analyzing other potential ignition sources, he determined they could be adequately ruled out due to their relative location to the origin of fire. For example, he acknowledged of potential evidence that some individuals may have smoked inside or near the Paint Bay on occasion. (*Id.*). But he ruled out improperly discarded smoking materials as a potential cause because Fred Jones was specifically looking for (and smelling for) anything burning in the Paint Bay at the end-of-the-day walk through. (*Id.*) Mr. Foster also acknowledged that minor welding operations may have taken place earlier in the day in the Paint Bay, but because those operations had ceased more than 12 hours before the fire, he could sufficiently rule that out as a potential ignition source. (*Id.*). The area had been both cleaned and inspected by management. (*Id.*) No electrical appliances were energized in the room. During his deposition, Mr. Foster said he

12

considered all of the facts and evidence he collected and then began systematically hypothesizing as to potential causes. (Foster Dep. at 91:19-24).  He then looked at all the evidence he collected and then determined his conclusions.[7]

In summary, Mr. Foster determined that the probable cause of the fire was the gas tube heaters igniting overspray paint dust which then spread throughout the Paint Bay and onto the building's wooden frame. Mr. Foster noted that the middle heater in the Paint Bay was most badly damaged and exhibited signs of heavy charring near the propane attachment, consistent with being a probable ignition source. Mr. Foster considered and appropriately ruled out other alternative ignition sources as likely causes of the fire.

### III.   LEGAL STANDARD

The admissibility of opinion expert testimony is governed by F.R.C.P. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). Using a 3-step analysis, the Court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).[8] If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert,* 509 U.S. at 596).

### IV.   ARGUMENT

#### A.   Mr. Foster is Qualified to Offer Cause and Origin Opinions.

---

[7] (NFPA 921 §19.6.5: *Appropriate Use* provides: "Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence) must be based on the analysis of facts and logical inferences that flow from those facts. Those facts and logical inferences are derived from data, observations, calculations, experiments, and the laws of science.

[8] The third prong is not at issue here, as Coe's Motion does not dispute that Mr. Foster's opinions will assist the trier of fact to understand the evidence or to determine a fact in issue.

Defendant incorrectly argues that Mr. Foster is unqualified to opine on cause and origin in this case because he is not an electrical engineer and, therefore, could not "rule out an electrical cause of the fire[.]" (Mot. pp. 1, 11-12). According to Defendant, "[a]n electrical engineer is necessary to collect and test the electrical components to determine if they played a role in the fire." (Mot. 12).

vi.   Mr. Foster has the "relevant expertise" necessary to offer his opinions.

Mr. Foster is a Certified Fire Investigator (CFI), Certified Fire and Explosion Investigator (CFEI), and a Certified Vehicle Fire Investigator (CVFI). (CV, p. 1-3). He has been a fire investigator for 44 years. (Foster Rep. App. 1, CV; Foster Dep. 12:14). He holds certifications in fire investigation from the National Fire Protection Association (NFPA), the International Association of Arson Investigators (IAAI), and the National Association of Fire Investigators (NAFI). He has been involved in more than 2,000 fire investigations and he has authored more than 1,400 cause and origin reports. (Foster Dep. 37:8-9; 389:14-18). For decades, Mr. Foster has been a certified instructor teaching courses on fire investigation methodologies to fire and police departments throughout the State of Indiana. (CV p. 1-2; Foster Dep. 81:13-16). Mr. Foster previously served as a Fire/Arson Investigator at the Carmel Fire Department (Foster Rep., App. 1, CV p. 3) and as the Chief Fire Investigator for Madison County Emergency Management. (*Id*). In recent years, Mr. Foster has worked as a fire investigation consultant for international fire investigation consulting firms, such as Rimkus Consulting Group, Inc. and EFI Global. (CV, p. 2-3). He has attended "several joint scene examinations" including situations similar to the fire investigation here, "where multiple parties are involved." (Foster Dep. 390:7-11). Mr. Foster has completed hundreds of hours of classroom training, which includes specific courses on arc-mapping and evaluating structural electrical systems to assist in determining areas of origin (CV p. 5).

vii.   Rule 702 does not require that Foster be an electrical engineer to offer cause and origin opinions.

14

Coe urges the Court to adopt a novel standard: that for a certified fire investigator to analyze electrical components in a structural fire and reach a cause and origin opinion, they must either be an electrical engineer or consult with one before rendering their opinion. Tellingly, Coe cites no authority for its position. But as the Seventh Circuit has explained, "[t]he notion that [*Daubert*] requires particular credentials for an expert witness is **<u>radically unsound</u>**." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); see also *Blue Book Services, Inc. v. Amerihua Produce, Inc.*, 337 F.Supp.3d 802, 816 (N.D. Ill. 2018) ("Experts can take many forms, and [Defendant]'s definition would essentially foreclose a wide swath of experts qualified by 'skill, experience, [and] training.'") (citing F.R.C.P. 702).[9]

Coe now asks this Court to depart from Seventh Circuit precedent and adopt a rigid admissibility standard for certified fire investigators. The Court should decline Coe's invitation. Mr. Foster has been trained on how to evaluate electrical debris on fire scenes. Fire departments and police departments around the state seek out Mr. Foster's expertise when training their personnel on how to properly perform fire investigations in accordance with national fire investigation standards. Mr. Foster is well-versed in the collection and forensic analysis of evidence at fire scenes, and has conducted more than 2,000 investigations. His extensive experience and training more than qualify him to rule out electrical appliances and electrical issues in the building as potential causes to the Fire. Mr. Foster explained both in his report and during his deposition in specific details how he methodically eliminated electrical components as the likely cause of the fire, using his training and

---

[9] Chief Judge DeGuilio recently addressed this question on a *Daubert* challenge to a fire expert in a criminal case. *U.S. v. Thomas*, No. 3:18-CR-45 JD, 2022 WL 36098, at *7 (N.D. Ind. Jan. 3, 2022). Finding the fire expert adequately qualified, Judge DeGuilio explained that "Rule 702 and the Federal Rules of Evidence does not require an expert to possess any particular credential." *Id.* (citing *Tuf Racing Prod., Inc.*, 223 F.3d at 591); see also *Castagna v. Newmar Corp.*, No. 3:15-CV-249 JD, 2020 WL 13659743, at *9 (N.D. Ind. Mar. 4, 2020) ([Defendants] argue that because he is not an electrical engineer, Mr. Powell is not qualified to offer opinions relating to an inverter. Again, however, the defendants have failed to establish why such a narrow specialization is required for these opinions. Mr. Powell is a qualified fire investigator with extensive experience and training, including thousands of fire investigations over his decades of work. His investigation led him to conclude that the fire began inside the inverter, but that was the product of his expertise as a fire investigator, and Mr. Powell is suitably qualified in that respect.").

experience. (Foster Dep. 111:6 – 113:6) (Foster Rep. at p. 4). The Court should reject Defendant's unsupported, novel standard and find that Mr. Foster is sufficiently qualified under F.R.C.P. 702 to evaluate whether electrical components were likely causes of the March 2019 fire.

**B. Mr. Foster Applied a Reliable Methodology in Compliance with Rule 702(b)-(d).**

    i.    Mr. Foster's investigation was guided by NFPA 921 and the scientific method.

Mr. Foster fully engaged the scientific method and NFPA 921 in forming his opinions. Mr. Foster testified that his investigations are always guided by NFPA 921: *Guide for Fire and Explosion Investigations*. NFPA 921 is "a comprehensive, peer-reviewed, and detailed guide for fire investigation, and [courts] have held that its methodology is reliable for purposes of Rule 702." *Ball Corp. v. Air Tech of Michigan, Inc.*, No. 4:16-CV-42-TLS, 2022 WL 1801120, at *5 (N.D. Ind. June 2, 2022) (quoting *Thomas*, 2022 WL 36098, at *9); see also *Abu-Hashish v. Scottsdale Ins. Co.*, 88 F.Supp.2d 906, 908 (N.D. Ill. 2000) (stating that NFPA 921 is "a recognized guide for use by fire investigators in the fire investigation process."). "NFPA 921 recommends that fire investigators use a 'systematic approach' that is based on the scientific method used in the physical sciences." *Ball Corp.*, 2022 WL 1801120, at *5 (citing NFPA 921 § 4.2). Mr. Foster collected an immense amount of data and evidence.[10]

He conducted multiple inspections of the fire scene, both individually and as a facilitator for other parties. He took more than one thousand photographs of the scene and potential evidence at the scene. He conducted multiple interviews of witnesses, including eye-witnesses who personally observed the fire early on and other witnesses with personal knowledge of the operations and

---

[10] "For an expert opinion to have a proper foundation, there must be a 'link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.'" *Bezingue v. Steuben Lakes Reg. Waste Dist.*, 507 F.Supp.3d 1021, 1030 (N.D. Ind. 2020) (quoting *U.S. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003)). The question of reliability under Rule 702 "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). To pass Rule 702 scrutiny, there need only be a "rational connection between the data and the opinions." *Id.* at 809.

conditions of the Paint Bay immediately before the fire.[11] Mr. Foster carefully collected forensic samples from deep inside the gas tube heaters, the only electrical appliance drawing electricity at the time of the fire. Mr. Foster secured the samples and shipped them to a certified fire debris analysist to have them tested in a laboratory. Mr. Foster consulted with the fire debris scientist, and also considered the opinions of Mr. Nicholas Ozog, an engineer with expertise in ignitable liquids. Using his decades of training and experience, he analyzed electrical components on scene and burn patterns on the fire scene to determine a point of origin. After gathering the relevant data, Mr. Foster utilized the scientific method and deductive reasoning to hypothesize and ultimately reach conclusions as to the cause and origin of the Fire. He considered, for example, potential electrical issues as having caused the fire. However, he noted that there was zero evidence on-scene suggesting that any electrical components had malfunctioned or caused an ignition. Mr. Foster also explained in great detail during his deposition that all of the electrical wiring in the building was still in conduit, which significantly reduces the likelihood of loose wires acting as ignition sources. (Foster Dep. 111:12 – 113:17).[12] Mr. Foster also considered Fred Jones' undisputed testimony that all electrical appliances and devices were shut down at the time of the fire, except for the Heaters, and that he inspected the Paint Bay at the end of the day and saw nothing smoldering. (Foster Dep. 113:15-17). Mr. Foster considered the fact that the Heaters routinely ran overnight. He considered the fact that the thermostat for the Heaters was set to 70 degrees (F) and the weather the night of the fire involved a low of 28 degree (F).

---

[11] See NFPA 921 § 14.1.1: *Purpose of Obtaining Information*. ("The scientific method requires the collection and analysis of data. … Examining the fire scene or evaluating prior documentation of the fire scene, interviewing witnesses, and conducting research and analysis of information from other sources all provide the fire investigator with additional data to establish origin and cause of a particular fire.").

[12] Coe faults Foster for not performing "tests" of "electrical components" on scene. But Coe does not explain what "tests" should have been performed, the feasibility of such "tests", or what information might have been gained from the "tests." Like many of the points raised in Coe's Motion, this is simply a potential arrow in Coe's cross-examination quiver. Rule 702 does not require fire experts to perform tests on all electrical components for their opinions to be admissible. See *Nationwide Agribusiness Ins. Co. v. David Martin Constr. Co.*, No 3:18-CV-166, 2020 WL 6280917, at *6 (S.D. Ohio Oct. 26, 2020) ("[The] argument that [a fire investigator's] testimony is unreliable due to lack of testing goes to the weight of the testimony and not its admissibility.")

Mr. Foster also considered potential evidence that certain employees allegedly smoked inside the Paint Bay on occasion. He ruled out improperly discarded smoking materials (i.e., hot cigarette butts) as being likely ignition sources because none of the employees had been in the Paint Bay for several hours before the time of the fire. He correctly reasoned that Fred Jones would have spotted or smelled odors of burning substances when he performed his 6:00 p.m. walk-through of Building 1. (Foster Rep. at p. 4). This too, complied with NFPA 921 recommendations. (NFPA 921 § 19.6.4.5: *Time Lines* states: "In the context of testing a cause hypothesis, the time frame may be a discriminator for determining an ignition scenario is consistent with the available data as it related to time frames."). In other words, the time frame in the data Foster collected and considered (i.e., Mr. Jones' walk-through inspection, all operations had ceased, nobody had entered the building) were a proper consideration for Mr. Foster to make.

In short, Mr. Foster methodically evaluated various hypotheses. He employed his training and experience, engaged the scientific method, and adequately followed the guidelines under NFPA 921. *See Russell v. Whirlpool Corp.*, 702 F.3d 450, 457 (8th Cir. 2012) (explaining there is "nothing reliable" about a fire expert's methodology when they "considered burn patterns, identified a point of origin, and eliminated as many alternative causes of the fire as possible."; "In the context of fire investigations, we have held expert opinions formed on the basis of observations and experience may meet this reliability threshold.").

    ii.   <u>Under NFPA 921, "probable" cause does not mean irrefutable or certain cause.</u>

Coe's Motion suggest that all potential ignition sources must be definitely ruled out with certainty before a fire investigator can reliably establish a cause and origin opinion. This is not the standard required by NFPA 921 or by the Seventh Circuit. If it were, it would be nearly impossible for a fire investigator to *ever* make cause and origin determinations. NFPA 921 § 4.5.1 describes "probable" as a "level of certainty [that] corresponds to being more likely true then not. At this level

18

of certainty, the likelihood of the hypothesis being true is greater than 50 percent." In other words, it is akin to the preponderance of the evidence standard used in civil cases (i.e., more like than not). NFPA 921 also recognizes that not all data will necessarily support a given hypothesis. (See NFPA 921 § 19.7.2, stating "[i]t is unusual for all data items to be totally consistent with the selected hypothesis."). That is because fire investigators don't deal in certainties—they work with probabilities. As Judge Springmann recently noted, the fact that "viable" alternative theories may exist does not render a fire expert's opinion *per se* unreliable. The key is whether the fire investigator followed a systematic methodlogy which accounted and excluded viable alternative theories. Here, Foster did just that. *Ball Corp. v. Air Tech of Mi., Inc.*, 4:16-CV-42-TLS, at *1 (N.D. Ind. June 2, 2022).

*Ball Corp.* is on point, with similar facts and arguments as this case. *Ball Corp.* involved a structural fire at a manufacturing plant in Monticello, Indiana. *Id.* The plant manufactured aluminum cans which, as part of the manufacturing process, were sprayed with an 'IC spray" and then sent through an industrial oven to cure. *Id.* The cans produced combustible vapors during the curing process. *Id.* The vapors would condense and form combustible deposits inside the oven and connected ductwork. *Id.* at *2. Some of the condensate was "flaky[.]" *Id.* Due to the buildup that would sometimes accumulate in oven and ductwork, the oven's manual recommended to have the oven regularly cleaned. *Id.* Ball Corp. hired Air Tech to clean the ovens and ductwork, who would go inside the ovens and ductwork and vacuum "as much dust and debris as they could[.]" *Id.* Shortly after Air Tech completed a cleaning, plant employees noticed light smoke coming from one of the oven's blowers. *Id.* When an employee looked inside one of the ovens, "he saw sparks and embers flowing through the ductwork" and "noticed that paint on the outside had started to bubble." *Id.* at *3. Fire fighters eventually responded to the scene and noticed fire above the oven in a vent "as well as the insulation that covered the ductwork." *Id.* As firefighters tried to put the fire out, "there was an explosion at the facility and the firefighters had to evacuate and regroup." *Id.*

19

The fire explosion caused significant damaged, and Ball Corp. filed suit against Air Tech. *Id.* Both parties engaged fire investigators. *Id.* Defendant filed a *Daubert* motion against Ball Corp.'s fire expert, Scott Howell (of Rimkus Consulting Group, Inc.) on the basis that his methodology was unreliable. *Id.* at \*4. More specifically, Air Tech claimed that Mr. Howell failed to adequately rule out other potential causes of the fire by ignoring certain facts and potential hypotheses, that he engaged in "negative corpus" by reaching his conclusion without evidence. *Id.* at \*6.

Denying the Defendant's motion to exclude, Judge Springmann stated that while some of the alternative theories of origin "may be . . . viable" Mr. Howell "did not ignore" them but instead "dismissed it" for a number of specific reasons. *Id.* The court recognized that Mr. Howell's "use of the process of elimination is sufficiently reliable and comports with NFPA 921." *Id.* The court also noted that the "purported lack of 'physical evidence' [supporting Mr. Howell's opinion] is not problematic given this case involved a fire, where evidence is often destroyed." *Id.* Finally, the Court addressed what Air Tech argued amount to "'speculative' reasoning, ignoring or misconstruing evidence, and failing to adequately consider alternative hypotheses." In response, Judge Springmann explained, "[a]gain, the Court has difficulty understanding how these arguments are anything other than questioning the underlying facts or the correctness of Mr. Howell's opinion. That is not the Court's role under Rule 702 and *Daubert*. Like many of the Defendant's arguments, these are potential lines for cross-examination." *Id.* at \*7.

Coe's Motion highlights *Gopalratnam v. Hewlett Packard*, a case that is easily distinguishable from the facts in this case. 877 F.3d 771, (7th Cir. 2017). There, the expert's scientific theory crucial to his methodology "was not only unsupported, but in fact contrary to generally accepted battery science[,]" including his own prior publications. *Id.* at 784. He failed to cite any study or publication supporting this key assumption in his opinion. Mr. Doughty also reached his conclusion because the warped cell was retrieved from a pile of debris outside the home after the fire, leading Doughty to believe it must

have projectiled into the pile of debris as a result of the internal fault he claimed took place. *Id.* at 787. Doughty had no evidence for why his "projectile" theory was more likely a result of an internal fault, as opposed to fire suppression efforts.

Here, Coe urges the Court to find that Mr. Foster made an impermissible inferential leap by determining that the paint samples he scraped from inside the Heaters more likely than not accumulated inside the Heaters before the Fire. But **it is undisputed that the Heaters "were starting to turn blue like everything else" shortly after they were installed**. (FJ Dep. 61:11 – 62:7; 64:6-17). Mr. Foster explained that each Heater is "not a tightly sealed unit[,]" which suggested the paint dust which had accumulated on and around the Heaters pre-fire also accumulated inside the Heaters. Space-Ray's YouTube channel posted a video last year titled "How to Clean Your Space-Ray Tube Heater" where a Space-Ray representative explains, while cleaning the inside of the gas tube heater box, "undoubtedly, any kind of enclosure is subject to get dust inside of it[.]" (Vergon Dep. 64:14-21).[13] It is not an inferential leap to conclude that the paint particles detected "deep" inside of the tube heaters were more likely than not a result overspray from Republic's spraying operations.[14]

Coe also directs the Court to *Comer v. American Electric*, 63 F.Supp.2d 929 (N.D. Ind. 1999). *Comer* involved a textbook "jukebox witness" who materially changed his testimony—without explanation—multiple times throughout the case. *Id.* at 931, 35 ("his testimony frequently vacillated in material and unexpected ways, all in an obvious effort to pin some sort of liability on the Defendant"; Dr. Nine's abrupt shift in testimony . . . was [not] based on . . . any particularized fact or

---

[13] See https://www.youtube.com/watch?v=YS3IkFAb_qg, *How to Clean Your Space-Ray Tube Heater*, at 2:24, October 5, 2022 (last accessed March 12, 2023).

[14] The fact that paint dust had already accumulated on and around the Heaters before the Fire suggests it is more likely than not the paint detected inside the Heater tubes were starting to accumulate dust before the fire, just like the old heaters which had also been mounted to the ceiling in the Paint Bay and routinely clogged up with blue paint dust. (Jones Dep. 28:12-19). The Heaters' installation manual specifically warns against installing it in areas where spraying operations occur. Moreover, Mr. Foster testified at this deposition that when he collected the paint samples, he observed no blue paint in the immediate area of the Heaters. (Foster Dep. 238:3-18).

observation"; Dr. Nine's "apparent ability to change [his opinions] based on nothing more than the mere suggestion of counsel."). Dr. Nine "admitted under oath that he lacked any reliable factual basis for concluding in his supplemental report that the voltage surge was caused by an equipment problem[.]" *Id.* at 937.

The expert's testimony in *Comer* stands in stark contrast to the opinions and testimony by Mr. Foster. Mr. Foster's opinions and conclusions are derived from specific facts, many of which happen to be undisputed. Mr. Foster's investigation and analysis was also guided by NFPA 921 each step of the way. (The *Comer* opinion makes no mention of NFPA 921, presumably because Dr. Nine never claimed to follow it.)

## C. Coe Invites the Court to Embrace Credibility Challenges Created By Experts It Never Disclosed.

Coe's Motion relies less on the applicable case law and more on conclusory statements by their purported experts, some of whom they failed to disclose in their Rule 26 Expert Disclosures. Even if the Court permits Coe to now amend its disclosures to add the new experts, the experts' opinions and other factual issues raised by Coe only serve as credibility challenges to Mr. Foster.

      i.    Coe did not disclose the experts it now relies on.

Coe seeks to be bolster its own experts' opinions with Space-Ray's expert reports. But Space-Ray is no longer a party to this lawsuit,[15] and Coe should not be allowed to now benefit from a settling defendant's experts, particularly when Coe never indicated it planned on retaining or otherwise relying on the experts. To allow Coe to do so presents significant prejudice to Republic. Republic's litigation strategy has stemmed from its assumption that Coe has fully disclosed its expert witnesses in

---

[15] At the time of the disclosures, Gas-Fired Products, Inc. d/b/a Space-Ray (the manufacturer of the Heaters) was a defendant in this lawsuit. Republic initially sued Space-Ray under products liability and negligence theories. [Dkt. 1, paragraphs 31-35, 51-60]. On February 27, 2023, Republic formally settled its claims against Space-Ray and later dismissed Space-Ray from this lawsuit. [Dkts. 49, 51, 52].

compliance with Rule 26 and this Court's order. Without disclosing the terms of the confidential settlement Republic reached with Space-Ray, Republic notes that one of the factors influencing its settlement evaluation and decision to settle with Space-Ray was to prevent Coe from "free-riding" on Space-Ray's expert witnesses, some of whom are duplicative of Coe's own expert witnesses. "The law encourages voluntary settlement of lawsuits" and "plaintiffs may settle for less from one defendant, if they believe other defendants will be placed at a disadvantage by virtue of the settlement and will, consequently, pay more in settlement in the future." *Wolt v. Sherwood*, 828 F.Supp. 1562, 1568 (D. Utah 1993). Coe never provided a joint-disclosure with Space-Ray, and Coe never entered any "shared-use" agreement with Space-Ray to use Space-Ray's experts. Coe certainly could have done so, but, presumably for strategic litigation purposes, chose not to.[16] It is unfairly prejudicial for Coe to now couch its *Daubert* arguments on experts who are no longer going to be testifying at trial, and who Coe never previously identified. In sum, Republic respectfully requests the Court disregard the portions of Coe's Motion which refer to and rely upon a Space-Ray expert witnesses.

    ii.    <u>Cross-examination and contrary evidence is the appropriate means of rebutting Mr. Foster's expert testimony.</u>

Even if the Court allows Coe to rely on its former co-defendant's experts in its pretrial motions (like the present Motion to Exclude), the expert opinions simply create factual disputes and are fodder for cross-examination of Mr. Foster. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

---

[16] See *FMC Corp. v. Vendo Corp.*, 196 F.Supp.2d 1023, 1047-48 (E.D. Cal. 2002) ("[Non-settling defendant] could have sought an agreement with [settling defendant] to share [settling defendant]'s experts, but did not. ... [Non-settling defendant] could have sought such an agreement and should have known . . . that settlement was a likely possibility which would leave [non-settling defendant] with only two designated experts."); *State ex rel. Ward v. Hill*, 489 S.E.2d 24, 32 (W. Va 1997) ("[W]e hold that, absent a formal agreement among defendants in a litigation proceeding involving multiple defendants, the circuit court should not generally permit a settling defendant's expert witnesses to testify for the remaining defendants.").

As one example, Coe's Motion relies on Space-Ray's expert (Michael Vergon) who opined that given the extensive damage to the Operations Building, in his opinion, fire burn patterns "really don't mean anything" with respect to determining origin of the fire. (Mot. p. 17). Mr. Vergon testified that Mr. Foster's use of burn patterns in his opinions was "kind of ludicrous[.]" (See Mot. p. 17). **Coe's own fire expert disagrees.** He not only analyzed fire patterns at the scene, he found them "to be helpful" and he used the fire patterns when determining the origin of the fire. (Agosti Dep. 210:10-15; 211:5-19; 212:23-25; 213:2-12) ("[T]here was a discernible fire patterns [sic] of significant more damage to the middle and north heater as opposed to the south heater."). Beyond Coe's proffered expert witnesses, to the extent there are any perceived weaknesses or inconsistencies in Mr. Foster's expert opinions, Coe will have the opportunity to explore them through cross-examination and the presentation of contrary evidence.

Much of Coe's Motion to Exclude is also premised on its accusation that Mr. Foster exhibited expectation bias and confirmation bias. (See e.g., Mot. p. 18). But even if that were true (it is not), potential bias during his investigation is just ammunition for cross-examination, not a basis for exclusion.  The same is true with the purported differences between Mr. Foster's expert report and deposition testimony of fact witnesses. There have been no less than 29 depositions taken in this case. Some of those were Republic employees who Mr. Foster previously interviewed during his initial fire investigation hours after the Fire. To the extent there are inconsistencies between the employees' deposition testimony and statements they made when interviewed by Mr. Foster, those too would be factual disputes ripe for cross-examination.[17]

---

[17] Coe also spotlights alleged statements allegedly made by John Diggle, an electrical engineer Rimkus asked to attend a site inspection in 2020. This is a red herring. John Diggle is not "Republic's retained electrical engineer" (Mot. pp. 1, 23) and Coe knows that. (See Diggle Dep. 6:10-14) (Coe's counsel telling Mr. Diggle that "[a]lthough you had some early involvement . . . you have not been designated as a testifying expert with any opinions"). Republic has never designated Mr. Diggle as an expert witness in this case and he has not offered any expert opinions relevant to this case. Moreover, Mr. Diggle disputes key facts Coe urges the Court to embrace. (Diggle Dep. 26:18-21) ("I don't think I would have said with certainty that I could not rule [electrical causes] out or - - I don't think I would have given definitive conclusions."). The Court should not credit Mr. Diggle's testimony in its reliability analysis.

Similarly, Coe claims that a typo in Mr. Foster's written report—although corrected during his deposition—supports exclusion under Rule 702. (Mot. p.5) ("Foster testified during his deposition that his Reports should have stated probable instead of possible."); (Foster Dep. 202:22-24) (Foster explaining "I put [the word probable] by error. I did that apparently. I did not catch that at the time, just like I didn't catch the March the 3rd [separate typo]."). Republic respectfully submits that a typographical error in Mr. Foster's report—which he corrected at deposition—has no meaningful impact on his testimony.  To the extent a now-corrected typo *might* impact Foster's testimony, that only goes to the weight and credibility of his opinions, not admissibility. See *Computer Associates Intern v. Quest Software, Inc.*, 333 F.Supp.2d 688, 695 (N.D. Ill 2004) (holding that expert's material typos in his expert report, which he acknowledged and corrected at his deposition, went "to the weight that we give his [opinions] rather than to the admissibility."). If Coe wants to attack Foster's opinions due to typos in his report, the time for Coe to do that will be cross-examination.

## V.   <u>CONCLUSION</u>

Mr. Foster's testimony should be admitted under Rule 702, and Coe's motion should be denied.

Dated: May 12, 2023

Respectfully submitted,

/s/ *Thomas R. Jones*

Thomas R. Jones (36860-49)
James E. Zoccola (15885-29)
**LEWIS & KAPPES, P.C.**
One American Square, Suite 2500
Indianapolis, Indiana 46282
Telephone: (317) 639-1210
Facsimile: (317) 639-4882
Email: TJones@Lewis-Kappes.com
Email:  JZoccola@Lewis-Kappes.com
*Attorneys for Plaintiff, Republic Services of  Indiana,*
*Limited Partnership*

26

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 12, 2023, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which sent notification of such filing to all counsel of record.


*/s/ Thomas R. Jones*
Thomas R. Jones, Atty. No. 36860-49