Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF INDIANA
 2                    FORT WAYNE DIVISION
 3                  CASE NO. 1:21-CV-00108
 4    REPUBLIC SERVICES OF INDIANA,    )
      LIMITED PARTNERSHIP,             )
 5                                     )
             Plaintiff,                )
 6                                     )
      vs.                              )
 7                                     )
      COE HEATING & AIR CONDITIONING,  )
 8    INC.; and GAS-FIRED PRODUCTS,    )
      INC. d/b/a SPACE-RAY,            )
 9                                     )
             Defendants.               )
10    _____
11
12          The video deposition upon oral examination of
13       JAMES P. FOSTER, CFI, CFEI, CVFI, a witness
14       produced and sworn before me, Lisa C. Pierce, a
15       Notary Public in and for the County of Hamilton,
16       State of Indiana, taken on behalf of the Defendants
17       at Lewis Kappes, One American Square, Suite 2500,
18       Indianapolis, Marion County, Indiana, on
19       January 24, 2023, commencing at the hour of
20       11:16 a.m., pursuant to Applicable Rules of
21       Procedure, with written notice as to time and place
22       thereof.
23
24
25    Job No. CS5675427
```

Page 2

```
1        A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3       Thomas Jones
        James E. Zoccola
4   LEWIS KAPPES
        One American Square
5       Suite 2500
        Indianapolis, IN 46282
6       P: 317.639.1210
        F: 317.639.4882
7       E: tjones@lewiskappes.com
          jzoccola@lewiskappes.com
8
9   FOR THE DEFENDANTS:
10      Martin J. Gardner
        GARDNER & RANS, P.C.
11      117 Perspective Drive
        Suite 2
12      Granger, IN 46530
        P: 574.233.6035
13      E: mgardner@gardnerandrans.com
14      James W. Hehner
        Ben Katchur
15  CLENDENING JOHNSON & BOHRER, P.C.
        225 North Delaware Street
16      Indianapolis, IN 46204-2137
        P: 812.382.8559
17      E: jhehner@lawcjb.com
18
19  THE VIDEOGRAPHER:
20      Greg Dupuis
21
22
23
24
25
```

Page 3

```
1             INDEX OF EXAM
2                 Page
3   DIRECT EXAMINATION................
        Questions by Martin J. Gardner      6
4       Questions by James W. Hehner      384
5   CROSS-EXAMINATION...................
        Questions by Thomas Jones         389
6
    REDIRECT EXAMINATION...............
7       Questions by Martin J. Gardner    399
        Questions by James W. Hehner      404
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              INDEX OF EXHIBITS
2                                        Page
3   Deposition Exhibits:
4   Exhibit G - Two Color Photos.........    72
    Exhibit Z, Page 3 - Color Aerial Photo   47
5   Exhibit Z, Page 2 - Color Aerial Photo   54
    Exhibit DD - Twelve Color Photos......  137
6   Exhibit SS - Second Amended Notice of
            Video Deposition.........   20
7   Exhibit TT - Second Amended Subpoena
            Duces Tecum.............   20
8
9
    Deposition Exhibits Retained by Counsel:
10
    Exhibit C - Invoice 6624965 CCMSI....    87
11  Exhibit D - Handwritten Notes, 7 Pages   34
    Exhibit E - Fred Jones Document.......  188
12  Exhibit F - Letter Dated December 3, 2019  67
    Exhibit P - Product Specification.....  351
13  Exhibit R - Modine Installation and
            Service Manual Sheet......  270
14  Exhibit S - Modine 6-189.9 November 2014  271
    Exhibit V - Korte Does It All Proposal  271
15  Exhibit W - 6231 MacBeth Diagram.....  276
    Exhibit Y - December 15, 2022 Email...  281
16  Exhibit AA - Color Photographs........  211
    Exhibit CC - Color Photographs........  235
17  Exhibit FF - Color Photographs........  248
    Exhibit GG - Letter Dated November, 2022  311
18  Exhibit HH - Evidence Custody Form....  315
    Exhibit KK - Color Photographs........  317
19  Exhibit LL - Color Photographs........  321
    Exhibit MM - Color Photographs........  324
20  Exhibit NN - Color Photographs........  325
    Exhibit PP - Color Photographs........  341
21
22
23
24
25
```

Page 5

```
1                   11:16 a.m.
2                 January 24, 2023
3       THE VIDEOGRAPHER:  Good morning.  We are going
4   on the record at 11:16 a.m. on January 24th, 2023.
5   Please note that the microphones are sensitive and
6   may pick up whispering and private conversation.
7   Please mute your phones at this time.  Audio and
8   video recording will continue to take place unless
9   all parties agree to go off the record.
10      This is media unit one of the video-recorded
11  deposition of James P. Foster taken by counsel for
12  the defendant in the matter of Republic Services of
13  Indiana, Limited Partnership, versus COE Heating &
14  Air Conditioning, Inc., et al., filed in the
15  US District Court, Northern District of Indiana,
16  Fort Wayne Division, Case Number 1:21-CV-00108.
17  The location of this deposition is Lewis & Kappes
18  law firm, Indianapolis, Indiana 46282.
19      My name is Greg Dupuis representing Veritext,
20  and I'm the videographer.  The court reporter is
21  Lisa Pierce from the firm Veritext.  I'm not
22  related to any party in this action nor am I
23  financially interested in the outcome.  If there
24  are any objections to proceeding, please state them
25  at the time of your appearance.  Counsel and all
```

Page 6

1  present will now state their appearances and
2  affiliations for the record beginning with the
3  noticing attorney.
4      MR. GARDNER:  Martin Gardner for Defendant
5  COE Heating & Air Conditioning, Inc.
6      MR. JONES:  Thomas Jones and Jim Zoccola for
7  the plaintiff.
8      MR. HEHNER:  James Hehner and Ben Zoccola
9  [sic] for Gas-Fired Products, Inc. doing business
10  as Space-Ray.
11      THE VIDEOGRAPHER:  Will the court reporter now
12  swear in the witness, and then we may proceed.
13      THE STENOGRAPHIC REPORTER:  Would you raise
14  your right hand, please.
15      JAMES P. FOSTER, CFI, CFEI, CVFI,
16  having been first duly sworn to tell the truth, the
17  whole truth, and nothing but the truth relating to
18  said matter, was examined and testified as follows:
19      THE WITNESS:  Yes, I do.
20  DIRECT EXAMINATION,
21  QUESTIONS BY MR. GARDNER:
22  Q.  Can you please state your full name on the record.
23  A.  James P. Foster.
24  Q.  You and I have met a couple of times in this case
25      and maybe even earlier in our careers.  Can I call

Page 7

1  you Jim today?
2  A.  Yes, you can, sir.
3  Q.  You can call me Marty; just makes the dep go
4      faster.  How old are you, Jim?
5  A.  I am 67.
6  Q.  Your date of birth?
7  A.  7-3 of 1955.
8  Q.  And what's your current address, home address?
9  A.  7850 Parkdale Drive, Zionsville, Indiana 46077.
10  Q.  Who's your current employer?
11  A.  My current employer I -- that I work for on a
12      regular basis right now is Northside Trailer.  And
13      I work there as a mechanic.
14  Q.  How long have you worked at Northside Trailer, Jim?
15  A.  Two -- almost year-and-a-half, since June of 2021,
16      I guess is it.
17  Q.  What is the business address of Northside Trailer?
18  A.  Ooh, I don't know offhand.  It's on State Road 32.
19      It's about 14,000 block.  But I don't know --
20      it's -- it's next to the Indianapolis Executive
21      Airport, if you know where that's at, Hamilton
22      County.
23  Q.  Unfortunately I don't.
24  A.  Okay.
25  Q.  All right.  And are you -- did you say full-time or

Page 8

1      part-time?
2  A.  I'm full-time there.
3  Q.  And what days and hours do you work?
4  A.  Monday through Friday.
5  Q.  Your shift?
6  A.  Just eight to five.
7  Q.  Hourly?
8  A.  Yes.
9  Q.  You -- oh, here come some papers.  You said you
10      were a mechanic.  Can you give us your job duties
11      at Northside Trailer.
12  A.  Basically we do all types of mechanical work on
13      trailers for -- at this point in time.
14  Q.  Do you have any certification as a mechanic?
15  A.  No, I do not.
16  Q.  And in the last year-and-a-half, have you had --
17      I'm not gonna ask your income here.  But have you
18      had any other sources of income other than working
19      with Northside Trailer?
20  A.  Yes.  I have Social Security and a pension from the
21      City of Carmel Fire Department.
22  Q.  Your curriculum vitae and your information on your
23      LinkedIn indicates reference to doing some private
24      work as a fire investigator after leaving Rimkus?
25  A.  Yes.

Page 9

1  Q.  Can you tell us about that.
2  A.  I still do that kind of on a very part-time basis
3      when asked.  I have a -- there's a company out of
4      Florida that has a -- an insurance company here in
5      Indiana that they occasionally need someone to do
6      fire investigations for.  And that's called Fire
7      Forensics.  So I'm still involved in the
8      investigation aspect of things.
9  Q.  When were you last employed with Rimkus?
10  A.  Ooh.  June --
11  Q.  Just a month and year.
12  A.  In June of 2021, I believe it was.
13  Q.  The curriculum vitae that you provided indicates
14      your dates of employment with Rimkus Consulting
15      Group, Inc. was 2018 to 2020.
16  A.  So be over a year-and-a-half, whatever that would
17      be.  I can't -- it's 2020 then.  So I'm sorry.
18  Q.  Okay.  That's all right.
19  A.  Yeah.
20  Q.  You think it was June of 2020?
21  A.  2020, yes.
22  Q.  All right.  And when did you start working
23      part-time doing fire investigation work independent
24      of Rimkus?  And after your employment with Rimkus,
25      when did you --

3 (Pages 6 - 9)

Page 10

1   A.   Well, after my employment with Rimkus, I still
2        followed up on a lot of cases that were still --
3        that would occasionally come about --
4   Q.   You mean, that you started with --
5   A.   -- from -- from past --
6   Q.   -- Rimkus?
7   A.   Yeah.
8   Q.   I'm sorry.
9   A.   After I left Rimkus.
10  Q.   How many?
11  A.   I've had five or six cases come up that I've had to
12       do followup work with as well as two depositions.
13  Q.   In the five or six cases that you continued to work
14       on after leaving Rimkus in June of 2020, is this
15       case one of the five or six?
16  A.   Yes.
17  Q.   All right. Have you, since leaving Rimkus in June
18       of 2020, prepared any expert reports in connection
19       with those five or six cases, outside of the one
20       you produced in December of 2022 in this case?
21  A.   I -- I don't think I've prepared any expert reports
22       that I haven't already completed prior to leaving
23       Rimkus.
24  Q.   So the only new expert report -- report you've
25       prepared since leaving Rimkus was the one in this

Page 11

1        case --
2   A.   Yes.
3   Q.   -- dated December 2022, right?
4   A.   Yes.
5   Q.   I think you mentioned giving a couple of
6        depositions. When were those?
7   A.   One was three weeks ago in a case in Chicago. I --
8        I don't have the date in front of me. But ...
9   Q.   You could find that on --
10  A.   And I don't --I don't --
11  Q.   -- look at your calendar?
12  A.   I -- I can if you --
13  Q.   Yeah. Hold on. When's the last time you had your
14       deposition taken? Three weeks ago.
15  A.   Three weeks ago.
16  Q.   Okay. Let's go over a couple of ground rules.
17       You've been giving depositions for how many years?
18  A.   Well, I've been a fire investigator for 44 years.
19  Q.   How long ago was your first deposition?
20  A.   And my first deposition was actually when I began
21       at Rimkus, which would have been in -- my beginning
22       date there would have been 2000 --
23  Q.   Fourteen?
24  A.   No, it was -- '16, I think, it was when I was --
25  Q.   Oh. So your first deposition was while you were

Page 12

1        with Rimkus?
2   A.   Yes.
3   Q.   Your curriculum vitae says that started in 2018.
4   A.   That -- yeah, okay. That was '18. I'm sorry.
5   Q.   So you never gave a deposition prior to calendar
6        year 2018.
7   A.   No, for Rimkus, that was when I first give one for
8        them. I give one for EFI when I worked for them
9        in -- about 2016 was my first deposition.
10  Q.   How many depositions total do you think you've
11       given --
12  A.   In the --
13  Q.   -- in your career?
14  A.   -- 44 years I've been in the fire investigator,
15       it's -- I've given, like, six depositions total.
16  Q.   And in those six depositions total, were you
17       involved in the case in terms of determining cause
18       and origin?
19  A.   Yes, sir.
20  Q.   Okay. So just a couple of ground rules. If you
21       and I were having coffee together, we would talk at
22       the same time, and we would talk over top of each
23       other, and neither of us would care or notice. But
24       our court reporter has to finish typing up a
25       question before she can start typing up an answer?

Page 13

1   A.   Okay.
2   Q.   So try your best, Jim, to slow down a little bit
3        and wait until the question's finished. And we'll
4        try our best to make sure your answer's finished
5        before we start the next question. Okay?
6   A.   Okay.
7   Q.   All right. If there's a question you don't
8        understand, please let us know so that we can
9        rephrase it and get on the same page.
10  A.   Okay.
11  Q.   Otherwise I'll presume you understood the question.
12       All right?
13  A.   Okay.
14  Q.   We're going to take some breaks throughout today.
15       We might go as long as 5:00 today. If you need to
16       take a break for an important phone call or
17       something, just let us know. And we can
18       accommodate that so long as you answer the pending
19       question. All right?
20  A.   Yes.
21  Q.   Are you on any medications today that could in any
22       way affect your ability to give a deposition that
23       might go through 5:00 today?
24  A.   No, sir.
25  Q.   The deposition you gave in Chicago approximately

4 (Pages 10 - 13)

Page 14

1       three weeks ago, how long did the deposition last?
2   A.  Four-and-a-half hours.
3   Q.  Is that case pending in Illinois or Indiana or
4       somewhere else?
5   A.  In Michigan.
6   Q.  I threw a dart and missed everything.  All right.
7       How long have you been involved in that case?
8   A.  Since 2020.
9   Q.  But you have not issued a cause-and-origin report
10      in that case?
11  A.  Yes.  I've issued a cause-and-origin report --
12  Q.  But you issued it --
13  A.  -- personally.
14  Q.  -- before leaving Rimkus.
15  A.  Yes.
16  Q.  I got it.  In the case where you were deposed three
17      weeks ago, were you retained by the plaintiff or
18      one of the -- a, sorry, a defendant?
19  A.  By the plaintiff.
20  Q.  Just in broad, general terms, what kind of fire
21      case are we talking about there?  You can make it
22      quick.
23  A.  This is a restaurant fire that involved spontaneous
24      ignition of rags.
25  Q.  And you rendered an opinion on cause and origin?

Page 15

1   A.  Yes.
2   Q.  Okay.  And did you use the word "probable" in your
3       report?
4   A.  Yes, sir.
5   Q.  And did you state your opinion in that report to
6       any degree of scientific or fire investigation
7       certainty?
8   A.  Yes, sir.
9   Q.  Okay.  And then you mentioned a -- that you took
10      two -- you sat for two depositions since leaving
11      Rimkus.  What was the other one?
12  A.  I had one for -- in Indianapolis, on the south side
13      of Indianapolis, at -- in Decatur area, for a
14      Newegg facility that caught fire.
15  Q.  The company called Newegg?
16  A.  Yes.
17  Q.  And you ren -- had you rendered, prior to your
18      deposition, a re -- final report rendering your
19      opinion as to origin and cause?
20  A.  Yes.
21  Q.  And did you utilize the word "probable" in that
22      report?
23  A.  Yes, sir.
24  Q.  And did you make reference to your degree of
25      scientific certainty or fire investigation

Page 16

1       certainty in that report?
2   A.  Yes, sir.
3   Q.  What -- what is the name of the law firm or lawyer
4       that re -- you worked with in connection with the
5       Michigan fire case for which you gave a deposition
6       about three weeks ago?
7   A.  Corsin -- I can't remember the name of the --
8       Corsin was the lawyer -- law firm.
9   Q.  Are they out of Chicago?
10  A.  Yeah.  123 Wacker Drive is their address I know.
11  Q.  Before we move away from that, do you remember the
12      name of the attorney who took your deposition three
13      weeks ago?
14  A.  No, I do not.
15  Q.  Okay.  Going back to the other deposition you
16      mentioned that involved a -- a fire pertaining to
17      the new -- a Newegg facility --
18  A.  Yes.
19  Q.  -- were you retained by the plaintiff or a
20      defendant?
21  A.  A defendant.
22  Q.  Was it an insurance company paying your bill?
23  A.  Yes, sir.
24  Q.  Which insurance company?
25  A.  Actually, it wasn't.  I guess it was not insurance

Page 17

1       company.  It was an attorney's office that --
2   Q.  Okay.
3   A.  -- they were working for an insurance company.
4       But --
5   Q.  And -- and I don't want to dwell on it much.  Just
6       can you summarize quickly what your determination
7       of the fire at the Newegg facility was.
8   A.  It was a -- a projector that caught fire due to
9       lack of maintenance.
10  Q.  Thanks.  How long did that deposition last?
11  A.  I believe it was approximately four hours.
12  Q.  And about what month and year did that deposition
13      take place?
14  A.  I don't know exactly the month.  But it was in 2000
15      and -- or 2020.  Off the top of my head, I believe
16      it was in, like, March.  But ...
17  Q.  Okay.  Do you remember the name of the lawyer --
18      the lawyer who took your deposition in connection
19      with the Newegg case?
20  A.  His -- his name was Jim -- James Johnson out of
21      Chicago.
22  Q.  That's the one who took the deposition?
23  A.  Yes.  Or that -- no.  That was our attorney.  That
24      was our --
25  Q.  The one that you were working for?

Page 18

1  A.  -- we were working for, yes.
2  Q.  Do you remember --
3  A.  I don't know the attorney for -- that did the
4      deposition.
5  Q.  And what county and state is that litigation
6      pending, that Newegg case?
7  A.  In Indianapolis, Marion County.
8          Got -- I've got to make one statement for
9      that.  That case has already been settled.  So it
10     is not --
11 Q.  Is not what?
12 A.  Is not going -- going any farther at this point.
13 Q.  All right.  Did you -- were you ever presented with
14     a transcription of your deposition given in perhaps
15     March of 2020?
16 A.  No, sir.
17 Q.  Do you keep anywhere, including not -- but not
18     limited to your home, copies of any depositions
19     you've given in your career?
20 A.  No.  I do not have any copies.
21 Q.  Has the deposition that was taken in Chicago been
22     transcribed and given to you yet?
23 A.  No, sir.
24 Q.  So you've told us in your career, prior to today,
25     you've given about five or six depositions.  This

Page 19

1      might make number seven, right?
2  A.  No.  This would be inclusive of --
3  Q.  Oh, that's right.
4  A.  -- of those.
5  Q.  How many times have you testified in court?
6  A.  Multiple times.  I -- is -- in reference to court
7      proceedings --
8  Q.  Let me refine the question.  How many times have
9      you testified in court as an origin-and-cause
10     expert?
11 A.  I've never had to go to trial.
12 Q.  And so the depositions you've given have involved
13     other matters outside of you giving expert opinion
14     on cause and origin, correct?
15 A.  Yes.
16 Q.  Okay.  And were some of those depositions because
17     you -- you were a fireman?
18 A.  In one particular case, yes, as a firefighter I was
19     deposed involving an arson fire that I responded
20     to.  I was a lieutenant on engine company.  The
21     other cases would involve when I was a Hamilton
22     County Sheriff Officer.  Been numerous court
23     appearances in reference to multiple types of court
24     cases.
25 Q.  Were you a reserve officer?

Page 20

1  A.  Yes.
2  Q.  What's the difference between a reserve officer and
3      a non-reserve officer?
4  A.  The title.
5  Q.  That's all?
6  A.  Yes.
7  Q.  Okay.  So we've issued a couple of deposition
8      notices for you -- for your deposition, including,
9      most recently, a Second Amended Deposition Notice
10     by video.  I jumped to exhibit marking SS.  I don't
11     have -- have copies with me.  Have you seen this
12     before, Jim?
13 A.  Yes, I have seen this.
14 Q.  Okay.  I appreciate you coming today.
15         MR. GARDNER:  We'll just move this over for
16     her.  Okay?
17 QUESTIONS BY MR. GARDNER:
18 Q.  Attached to that is -- was a Subpoena Duces Tecum
19     requesting certain documents.  I've marked this as
20     Exhibit TT dated today.  Take a look at that; let
21     me know if you've seen that before.  Oops.
22 A.  Yes, I have.
23 Q.  Okay.  Is there anything listed in the subpoena,
24     any documents or records or property as enumerated
25     and listed in Exhibit TT, that you haven't already

Page 21

1      produced to either Jim Zoccola or Thomas Jones?
2  A.  No.  I have -- I have no records of anything that
3      hasn't already been produced.
4  Q.  Okay.  And so some of these things can be -- could
5      be in the custody of Rimkus, like, on their
6      computer files, correct?
7  A.  Possibly.  I -- I have no knowledge of that at --
8      at the present time.
9  Q.  Codefendant in this case, I'll call them Space-Ray
10     for today, some time ago issued a subpoena duces
11     tecum for production to Rimkus and they responded.
12     Did you -- have you ever seen the so-called Rimkus
13     file that was produced in response to Space-Ray's
14     subpoena?
15 A.  No, I have not.
16         MR. GARDNER:  I'll tell you what, let's leave
17     that one right here.
18 QUESTIONS BY MR. GARDNER:
19 Q.  Have you ever been excluded as being an expert
20     witness in any case?
21 A.  No, I have not.
22 Q.  What, if anything, did you review in preparation
23     for today's deposition?
24 A.  I reviewed my reports.  I've reviewed reports of --
25     of Mike Vergon, Vergon and Associates.  And I

6 (Pages 18 - 21)

Page 22

1    reviewed report of, is it, Agotti?  How do you --
2    how do you pronounce his name?
3    Q.   Mike -- Mike Agosti.
4    A.   Mike Agosti.
5    Q.   This case is loaded with Mikes and Jims.  So --
6    A.   Yes, it is.
7    Q.   -- you examined your December 2019 -- sorry, I
8    think it's November 2019 and December 2022 reports?
9    A.   Yes.
10   Q.   And Mr. Mike Vergon's expert report and Mr. Michael
11   Agosti's expert report.  Anything else?
12   A.   And I've had meetings with my --
13   Q.   I'm just asking --
14   A.   -- counsel.
15   Q.   -- things you looked at, not about meetings.
16   A.   Oh, okay.  No, I have not.
17   Q.   You did not examine any photographs in preparation
18   for --
19   A.   Oh, yes.  That would be part of our file, our
20   reports.
21   Q.   When you say "our," who are you referring to?
22   A.   The file, the case file of the -- reference to this
23   case that I have access to.
24   Q.   Okay.  And when did you read your two expert
25   reports --

Page 23

1    A.   It's been --
2    Q.   -- sorry, in preparation for the deposition?
3    A.   Over the last week.
4    Q.   And when did you read Mr. Mike Vergon's report in
5    preparation for the deposition?
6    A.   Same -- same time --
7    Q.   Same holds --
8    A.   -- same -- same --
9    Q.   -- true for Mr. Agosti's?
10   A.   I received them both at the same time and reviewed
11   them.
12   Q.   And that was during this past week?
13   A.   Yes.
14   Q.   Okay.  And you said photographs.  Were some of the
15   those Bates stamped?  You know what a Bates stamp
16   looks like?  Like, marked for reference, page
17   numbers?
18   A.   They're all -- all the photographs I reviewed are
19   the photographs I have on the file that has
20   been submitted to you, counsel, and have been
21   submitted to your off -- to you as well.
22   Q.   Okay.
23   A.   I don't think any of them are date stamped that I
24   know of --
25   Q.   Are these --

Page 24

1    A.   -- other than --
2    Q.   I apologize.  Do you remember looking at any
3    photographs that had Bates stamps that began with
4    the word "Republic"?
5    A.   Not to my knowledge, no.
6    Q.   Did you look at any photographs that were Bates
7    stamped beginning with the word "Rimkus"?
8    A.   Just a Rimkus file of photos that I have.  I'm not
9    sure there -- there's nothing on the photograph
10   that would indicate Rimkus.  But -- to my
11   knowledge.
12   Q.   And when did you look -- look at those in
13   preparation for the deposition, the photographs,
14   Mike?  I'm -- Jim?
15   A.   I've had those -- those in my possession for
16   probably a couple months.  And off and on I would
17   review some photographs and so forth when things
18   would come up.
19   Q.   When -- these photographs that you reviewed that
20   we're talking about, were you looking at them in a
21   digital format, like on a computer, or printed?
22   A.   Digital format.
23   Q.   Okay.  And did you bring those today?
24   A.   No, I did not.
25   Q.   Why not?

Page 25

1    A.   I didn't have any records to -- to bring.  I don't
2    have a computer to do something.  And so I --
3    they're all -- they're all been given to counsel.
4    Q.   Okay.
5        MR. JONES:  Yeah, Marty, everything has been
6    produced that he's got --
7        MR. GARDNER:  Right.
8        MR. JONES:  -- to our knowledge.  So
9    everything responsive to the subpoena that you
10   referenced earlier I think has already been
11   produced.
12       MR. GARDNER:  Thanks.
13   QUESTIONS BY MR. GARDNER:
14   Q.   Any other photographs you looked at besides the
15   ones that you've had for months?
16   A.   The only other photographs is the photographs that
17   were with -- that were attached to the reports of
18   Vergon and Agosti.
19   Q.   Right.  And the photographs -- setting those two
20   aside, or setting the photographs in those other
21   two reports aside, the photographs that you
22   reviewed, so far as you know, were those all taken
23   by you and/or some other Rimkus employee in the
24   investigation of this case?
25   A.   Yeah.  All of -- all photos that were taken by me

7 (Pages 22 - 25)

Page 26

1   or by, I think, Lou -- I'm not sure how to
2   pronounce his last name, but he's a mechanical
3   engineer with Rimkus that was at the joint scene
4   exam.
5   Q.   Inendino?
6   A.   Inendino, yes.
7   Q.   Anybody else?
8   A.   And also I had a video and photographs that were
9       from the --
10  Q.   -- night of the fire?
11  A.   Yeah.  The -- a pers -- one of the employees of
12      the -- Republic Services.
13  Q.   And those videos and photos from an employee of
14      Republic Services were taken the night of the fire,
15      March 19th --
16  A.   Yes.
17  Q.   -- 2019?
18  A.   Yes, at the time of the fire.
19  Q.   Okay.  Did any -- the photos that you reviewed in
20      preparation for the deposition, you said you took
21      some of them.  Mr. Inendino, Lou Inendino, took
22      some.  Were any taken by a fella named John Diggle?
23  A.   I don't have his photos that -- to my knowledge.
24      They may have come from Rimkus, if they were
25      presented to you.  But I don't have a copy of his

Page 27

1   photos.
2   Q.   And do those photos include those taken at -- at
3       the scene up -- up in -- on the facil -- the
4       Republic facility on MacBeth Road in Fort Wayne?
5   A.   Yeah.  There were multiple photographs taken at
6       different times at that facility.
7   Q.   Over a thousand, right?
8   A.   I don't know the -- know the total count but
9       probably close to that.
10  Q.   And other photos that you looked at were taken
11      during a couple of examinations conducted -- I'll
12      use the word "lab" -- at the Rimkus facility in
13      Indianapolis?
14  A.   Yes.
15  Q.   Okay.  Have we covered all the things that you
16      reviewed in preparation for the deposition?
17  A.   Yes.  To my knowledge, yes.
18  Q.   Okay.  So you didn't read any depositions in
19      preparation for the dep -- this deposition.
20  A.   No.  I have no acc -- I did not have any access to
21      depositions.
22  Q.   Have you read any of the depositions taken by the
23      attorneys in this case of any witnesses?
24  A.   I have not.
25  Q.   Let's circle back to your private work as a fire

Page 28

1   investigator subsequent to ending employment with
2   Rimkus.  How many total cases do you have currently
3   pending, in -- including this one?
4   A.   The -- to my knowledge there's three cases that are
5       still outstanding, I guess you could say.
6   Q.   And in that reference, Jim, are you talking about
7       outstanding from -- from when you were with Rimkus?
8   A.   Yes.
9   Q.   And how many are you currently working on now that
10      are different than the three that were outstanding
11      from Rimkus?
12  A.   I'm not currently working on any other cases at
13      this point on my own.
14  Q.   When's the last -- would be the last time you
15      worked on an independent case that didn't flow over
16      from your time with Rimkus?
17  A.   Again, it would be three weeks ago on Saturday.
18      I -- I did a fire investigation in Evansville for
19      Fire Forensics.
20  Q.   So that's a new case?
21  A.   Yes.
22  Q.   Okay.
23  A.   That's a closed case now, however, so --
24  Q.   Okay.  How long was it open for you?
25  A.   They just needed a second opinion, so I was asked

Page 29

1   to go to the location for a second opinion.  And
2   then once we were there, and I give a report to the
3   insurance adjuster, then they ended up closing the
4   file.
5   Q.   So your involvement for most recent case,
6       independent of any case you ever had from Rimkus,
7       was short lived.
8   A.   Yes.
9   Q.   Lasted less than a week --
10  A.   Yes.
11  Q.   -- your involvement?  All right.  Did you prepare a
12      written report in that case where --
13  A.   That was not with Rimkus.
14  Q.   I understand.
15  A.   Okay.
16  Q.   Yeah.  That -- that is the subject now, cases that
17      you have worked on --
18  A.   Since --
19  Q.   -- since ending employment with Rimkus.
20  A.   Yes.
21  Q.   That's our subject.
22  A.   Right.
23  Q.   Did you issue a written report in that case?
24  A.   Yes, I did.
25  Q.   Was it a preliminary report, so to say?

8 (Pages 26 - 29)

Page 30

1   A.  Yes.  It was just a short report and the findings.
2   Q.  Of cause and origin?
3   A.  Yes.
4   Q.  Were you able to determine the origin?
5   A.  Yes.
6   Q.  And the cause?
7   A.  Yes.
8   Q.  Were you working -- were you hired by the
9       defendant?
10  A.  We were hired by the insurance company representing
11      the homeowner.  Or the insurance on the property, I
12      guess you could say.
13  Q.  In other words, the insurance company might be
14      making or was making a claim.
15  A.  Yes.
16  Q.  Okay.  Did you use the terminology or the word
17      "probable" in that report?
18  A.  I don't think so with that.  Didn't use any
19      terminology in regards to --
20  Q.  Level of certainty?
21  A.  -- probable or -- or level of certainty.  Just let
22      them know what was found.
23  Q.  What?
24  A.  I just let them know what we found.
25  Q.  So you didn't state your opinion in the short

Page 31

1       report prepared within the last three weeks for
2       that insurance company for the homeowner to any
3       degree of scientific certainty or fire investigator
4       certainty, right?
5   A.  I give them opinion of the -- what I determined at
6       the time I had looked at the fire scene and also
7       spoke with the fire investigator.  And there was --
8       the scene had been disturbed.  So it made it
9       difficult to determine exactly what transpired and
10      only what witnesses said.
11          So I give them a -- and what the fire
12      department investigators told me.  So I just
13      relayed information of what I had -- I had to
14      determine by witness statements.  And I gave no
15      official opinion on which one of those three
16      determinations that they had or that three
17      potential issues that were given.  And left it at
18      that.
19  Q.  The scene in this case was a home -- a home?
20  A.  Yes.
21  Q.  And residential --
22  A.  Yes.
23  Q.  -- dwelling?  Okay.  In what way was it disturbed?
24  A.  There had been prior investigations done at the
25      site.  And the area of origin had already been

Page 32

1       swept, I guess you could say, and cleaned up.  And
2       some of the information that was given that certain
3       items in that area had -- were not able to be
4       evaluated, had already been destroyed.
5   Q.  Okay.  So what would you -- be your best estimate
6       of the total number of cases you've taken since
7       ending employment with Rimkus as an independent
8       investigator?
9   A.  I've only had two cases with this company in
10      Indianapolis -- or in Florida, rather.  I'm sorry.
11  Q.  So the answer to the question is two cases.
12  A.  Two, yes.
13  Q.  Your only source of cases since leaving Rimkus was
14      that of the Florida insurance company?
15  A.  Yes.  Other than the -- following up cases with --
16      that I've had with Rimkus.
17  Q.  Right, okay.  So I had earlier asked you what
18      depositions you read in preparation for today's
19      deposition.  Have you ever read any depositions in
20      this case?
21  A.  Not in this case I have not.
22  Q.  Okay.  So I'm going to give a list.  And you just
23      let me know if I say a name, and you think you did
24      read the dep.  All right?  You haven't read Terry
25      Reader's deposition?

Page 33

1   A.  Not to my knowledge.  I don't recognize the name.
2   Q.  You don't know who Terry Reader is?
3   A.  No, I do not.
4   Q.  And you'll concede his name does not appear in any
5       of your reports?
6   A.  Yes.
7   Q.  You'll concede his name does not appear in any
8       field notes in this case?
9   A.  Yes.
10  Q.  And you have no idea what his role was as a
11      Republic employee?
12  A.  No, I do not know.
13  Q.  And you don't know anything he said in his
14      deposition?
15  A.  No.
16  Q.  Mr. John Shadow.  You've met with him, right?  That
17      name sound familiar?
18  A.  The name sounds familiar.  But I don't -- I did not
19      read anything as for as his deposition is
20      concerned.
21  Q.  All right.  So you don't know the contents of his
22      deposition at all, right?
23  A.  No.
24  Q.  Is it true that neither you nor any employee of
25      Rimkus ever obtained a video or electronically --

9 (Pages 30 - 33)

Page 34

1    electronically recorded statement of Terry Reader?
2  A.   That would be true, to my knowledge.
3  Q.   Is it true that neither you nor any employee of
4       Rimkus, or anyone else that you're aware of, not
5       including depositions, ever took a video or
6       electronically recorded statement of Terry Reader
7       or John Shadow or Fred Jones or Greg Toling or
8       Trevor Miller or Dan Kelly or Charles Golden or Ron
9       Danzer or Michael Sharefield or Scott Kleinight?
10      Is that all true?
11          MR. JONES:  Objection to form --
12          THE WITNESS:  Yes.
13          MR. JONES:  -- compound.
14  QUESTIONS BY MR. GARDNER:
15  Q.   There's been some discussions in this case amongst
16       the lawyers concerning the topic of field notes.
17       And we have been given, I don't know, seven or nine
18       pages of field notes in this case.  Have you seen
19       those?
20  A.   I saw field notes, I think, of -- that was of --
21       Lou, I believe, had some field notes.  And John
22       Diggle had some field notes, I believe.  I did see
23       those.
24  Q.   All right.  Those are Exhibit D, 1 through 7.  None
25       of those are in your handwriting?

Page 35

1  A.   No.
2  Q.   Did you ever create field notes or handwritten
3       notes of any kind during your -- during your
4       investigation of this case, you?
5  A.   There are -- at the time I was at the site, I know
6       I -- there was handwritten information that -- that
7       I was taking at the time.  Those are all have --
8       all were -- would have been part of the Rimkus
9       file.  And once they complete a report, most of
10      the -- those notes are not part of the record
11      anymore.  And they're -- they're thrown -- they
12      discard them or shred them.
13          That is not from -- from me; that is from
14      Rimkus' standpoint.
15  Q.   And why weren't the handwritten notes of Lou
16      Inendino and John Diggle destroyed?
17  A.   I don't know for sure about that.  Because I -- I'm
18      sure that they probably put those into -- to the
19      file themselves.  I don't have any information
20      about that on why they were maintained.  Other than
21      the fact I -- I did the written report.  And
22      they -- their reports, they didn't make any written
23      reports.  So they could have kept those on so they
24      would have some record of their involvement.
25  Q.   During your investigation of this case, did you

Page 36

1       make any electronic recordings of any kind?
2  A.   No, I did not.
3  Q.   And I'm setting aside photos, right?
4  A.   Well, other than, yeah, the digital photos, yes.
5  Q.   Okay.  You made no video ever, did you?
6  A.   No.
7  Q.   In the two cases that you've worked on since
8       leaving Rimkus, have you also destroyed your field
9       notes?
10  A.   I -- no, I have not.
11  Q.   Has it been your custom and practice in the
12       preparation of over 1400 cause-and-origin reports
13       to discard your field notes before your
14       deposition's taken?
15          MR. JONES:  Objection to form, foundation.
16          MR. GARDNER:  I'll change the question.
17  QUESTIONS BY MR. GARDNER:
18  Q.   Has it been your custom and practice, Jim, during
19       your career as a cause-and-origin investigator,
20       which started about 2000, what, 14?
21  A.   No.  It started in 19 --
22  Q.   Eight --
23  A.   -- in --
24  Q.   -- '18?
25  A.   -- 1979.

Page 37

1  Q.   Oh.  Okay.
2  A.   As for as cause and origin --
3  Q.   Right.
4  A.   -- investigations.
5  Q.   Are you saying that since 1979 you have been
6       preparing cause-and-origin reports?
7  A.   Yes.
8  Q.   And that's why you've prepared over 1400, right?
9  A.   Yes.  It's -- it's actually more than that now.
10      But that's just at the -- hasn't been updated in
11      the --
12  Q.   Right.
13  A.   -- the CV yet.  So --
14  Q.   We have your CV --
15          MR. HEHNER:  Are you gonna finish that other
16      question?
17          MR. GARDNER:  I've got thousands of other
18      questions.
19          MR. HEHNER:  Well, the one -- the one about
20      whether it's his practice to destroy.
21          MR. GARDNER:  Yeah.  I'm on -- I'm still on
22      that, right.
23          MR. HEHNER:  Okay.  I'm sorry.
24          MR. GARDNER:  Okay.
25  QUESTIONS BY MR. GARDNER:

10 (Pages 34 - 37)

Page 38

1  Q.  So in what percentage of cases you've been involved
2       in as a cause and in -- origin investigator have
3       you destroyed your field notes before the case
4       closed?
5       MR. JONES:  Objection to form.  I think that
6  misstates his prior testimony.
7       MR. GARDNER:  I'll ask it a different way.
8  QUESTIONS BY MR. GARDNER:
9  Q.  Has it always been the case that you've preserved
10      your field notes in cases, except for when Rimkus
11      destroys them?
12      MR. JONES:  Objection to the form.
13      THE WITNESS:  If it was my case in, like, the
14  fire department or through my personal -- like, the
15  last couple cases I've had, I would -- I would keep
16  field notes personally.
17      But Rimkus had a policy that I was not
18  allowed, as an investigator, to keep personal
19  information and personal files, things of that
20  nature.  So they -- they would all have been turned
21  over to Rimkus at the time.
22  QUESTIONS BY MR. GARDNER:
23  Q.  When did you first learn, during your employment
24      with Rimkus that started in 2018, that your field
25      notes would be destroyed if you gave them to

Page 39

1       Rimkus?
2  A.  Initially they -- they did not.  But there -- I
3       guess, apparently, at some port -- some -- at some
4       point during the process, they elected not to keep
5       all the information on file.  I -- I was instructed
6       at the time that they would be des -- destroying
7       any handwritten files, and they would keep
8       electronic files in place.
9  Q.  Except for those by Lou Inendino and Fred -- I'm
10      sorry -- Mr. Diggle, John Diggle?
11  A.  I -- I have no clue of why those are still there,
12      for -- for example.  Unless they requested them
13      personally to be kept so that they would have some
14      information and knowledge that they were there,
15      since they were, you know, compensated by the
16      insurance company to be there.
17  Q.  Your first report is dated December 3rd, 2019,
18      correct?
19  A.  Yes.
20  Q.  And your second report is dated November 18th,
21      2022, correct?
22  A.  Yes.
23  Q.  Were your field notes destroyed by Rimkus before
24      December 3rd, 2019 or after?
25  A.  I am not sure of the exact date where they would

Page 40

1       have been destroyed.  I -- I think once I -- once I
2       produced a written report, I was informed that they
3       would -- there would be no -- those were all turned
4       in to Rimkus.  And then once I do a written report,
5       then they would have destroyed any type of --
6  Q.  What --
7  A.  -- handwritten notes.
8  Q.  Did Rimkus destroy any other evidence in this case
9       besides your handwritten notes?
10      MR. JONES:  Objection to form, foundation.
11      THE WITNESS:  Not to my knowledge.  I don't --
12  I don't think so.
13  QUESTIONS BY MR. GARDNER:
14  Q.  So it's your understanding Rimkus has preserved all
15      evidence in this case in connection with the
16      investigation of this fire with the exception of
17      your field notes.
18      MR. JONES:  Objection to form, foundation.
19      THE WITNESS:  I don't know that for a fact.
20  But I would assume they would have the file.  And
21  whatever they've kept in the file is their -- what
22  they've decided to keep in the file.  I have not
23  been there for several years.  So ...
24  QUESTIONS BY MR. GARDNER:
25  Q.  What dates did you prepare field notes in

Page 41

1       connection with your investigation of this case?
2  A.  From the very first day I was there.
3  Q.  And do you keep them in a -- some sort of a binder?
4       How do you do it?
5  A.  I have a file folder that the front of the file
6       gives the information about the -- my -- my case.
7       And I put the requested information in there.
8       And I also then make notes on that, time stamped when I
9       was at the site and when I was -- and who I spoke
10      to, who to contact, things of that nature.  So I
11      have all that information readily available.
12  Q.  I'm really not tracking with you here.  I'm not
13      asking if you had a file folder, but I am asking
14      you about field notes.  I mean, did you take them
15      on a legal pad?  How did you -- how did you take
16      your field notes in this case?
17  A.  No.  There's a file folder that I have that has --
18      basically the front of it has information -- had
19      information about the -- the case.
20  Q.  Like the basic --
21  A.  -- location, all the basic information.  And then
22      it had sections lined off that had, like, the dates
23      and times.  And I would write the date, time, and I
24      could note out to the side any -- those are just
25      general notes.

11 (Pages 38 - 41)

Page 42

1   And then on the back side of that I would
2   draw, like, a diagram, maybe, of the facility,
3   things of that nature, and then transfer those over
4   to another diagram at a later date and -- on a
5   computer system. And then I would obviously use
6   those notes to -- to make my report.
7   And then it would be a folder. So if there
8   was any other information I obtained, like a copy
9   of the fire report, things of that nature, other
10  information, I would go into that folder, file
11  folder. If I did a re -- speak to someone, I would
12  make notes on usually a notepad of some kind,
13  usually a legal pad.
14  Q.  You're talking, like, if you were to speak with a
15      -- an eyewitness, witness, or an employee of
16      Rimkus [sic], you would put notes on a notepad.
17      Would you --
18  A.  Well, the employee of Republic, you mean? Is that
19      who you're --
20  Q.  Did I say --
21  A.  -- referring to?
22  Q.  -- Rimkus? I meant Republic; I apologize.
23  A.  Yeah, I -- yes. I would have made notes on there
24      who I -- who I spoke to, if they would give me that
25      information. A couple people in this particular

Page 43

1   case would not -- did not want their name to be
2   available because they were -- they were not
3   employees that were probably able to give that
4   information out for --
5   Q.  I am not tracking that at all. Are you telling me
6      that you spoke with some Rimkus, sorry, Re --
7      Republic employees who told you they didn't want
8      their names in the file?
9   A.  Yes.
10  Q.  How many?
11  A.  Two.
12  Q.  Do you remember who they are today?
13  A.  I don't recall their names. And I wasn't given
14      their name. 'Cause they -- at the time I was
15      there, the day of the -- of the fire, they -- they
16      did give me the information that they were there at
17      the night of the fire. Actually, one of them even
18      give me a video of the -- prior to the fire
19      department arrival. But I don't know the -- know
20      the name of the person.
21  Q.  Can you describe -- I'm sorry.
22  A.  Kind of a -- short guy with glasses. I'm not
23      sure what his --
24      MR. JONES: I think you're talking about
25      Samir.

Page 44

1   THE WITNESS: Samir?
2   MR. GARDNER: And you --
3   MR. JONES: Or --
4   QUESTIONS BY MR. GARDNER:
5   Q.  You weren't at the facility the day of the fire
6      March 19th, 20 -- you were there March 20th.
7   A.  Well, yes, the 20th, yes. The day of the fire
8      was -- it was 11:00 at night. So it actually
9      continued -- initially I was told by the fire
10     department it was the 20th because of the fact that
11     the initial -- it carried over way into the -- to
12     that morning. So ...
13  Q.  Would you -- would this comport with your memory,
14     that the fire was reported to the local fire
15     department somewhere between 11:00 p.m. and
16     midnight on March 19th, 2019?
17  A.  It was 11:01 -- or 3, I believe, is the --
18  Q.  Good job. And then they were there suppressing the
19     fire for about six hours until about five in the
20     morning --
21  A.  Yes.
22  Q.  -- on the 20th of March, right?
23  A.  Yes.
24  Q.  Okay. And Thomas has helped us in connection with
25     a -- witness who you spoke with the day after the

Page 45

1   fire at the scene up there in Fort Wayne as being
2   Samir -- I'm gonna probably mispronounce his last
3   name -- Dizdarevic, D-i-z-d-a-r-e-v-i-c.
4   You believe you spoke to him the day after the
5   fire.
6   A.  Yes.
7   Q.  Okay. I think his deposition is the only one I did
8      not attend in this case, so I -- I don't know what
9      he looks like. Could you -- I -- I know you
10     started to give a physical description and I turned
11     my back. What was your physical description?
12     MR. HEHNER: Swallow it.
13     THE WITNESS: I knew he was a really short guy
14     with glasses, probably in his 50s. I don't know --
15     I knew he was not of US heritage, I guess you could
16     say. He looked like an --
17  QUESTIONS BY MR. GARDNER:
18  Q.  He looked something like me?
19  A.  -- Indian -- Indian heritage, in that nature, is
20     all I know of.
21  Q.  What time did you meet with him on March 20th,
22     2019?
23  A.  I was actually there about 3:00 in the afternoon.
24     We were contacted around 1:00 in -- in reference to
25     the fire loss. And they said they wanted somebody

12 (Pages 42 - 45)

Page 46

1   there as soon as possible.  So I left as soon as I
2   got the fire call or the fire information and a
3   location and went to the site.  It's about an hour
4   and a half away from our office.
5   Q.  And you were let through a guard -- like a guard
6      gate of some sort?
7   A.  Yeah.  There was no one at the guard gate, but
8      there -- there is a guard gate there.
9   Q.  So my question is:  What time did you speak with
10     Samir?
11  A.  I -- I initially went to the office.  I'm not sure
12     exact time I spoke with him.  But it was roughly
13     around 4:00 in the afternoon.
14  Q.  And where did you speak with Samir?
15  A.  Right outside of the building where the loss
16     occurred, near the gas pumps.
17  Q.  What gas pumps?
18  A.  Right -- right in by the building itself there's
19     gas pumps where they fill the -- the garbage
20     trucks.
21  Q.  There's a lot of buildings at the -- at the site in
22     this case.  Can you be more specific, which
23     building?
24  A.  The fire building --
25  Q.  The building --

Page 47

1   A.  -- that the fire was -- was that the fire occurred
2      in.
3   Q.  Okay.
4   A.  The pumps are directly across the -- the aisle from
5      that.  And then he -- we were standing on the --
6      would have -- would have been the east side of the
7      pumps.
8        MR. GARDNER:  Pull up Exhibit Z.  Thanks, Ben.
9      Jim, up on the screen, one of the attorneys in
10     this case for Space-Ray has displayed a -- an
11     image.  I'm gonna hand it to you unless, I think,
12     Thomas might be --
13       MR. JONES:  Page 3?
14       MR. GARDNER:  He can mark on this one.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Before you mark on it, Jim, does that photograph --
17     would that photograph help you tell us where you
18     were standing, talking to Samir --
19  A.  Yes.
20  Q.  -- the day after the fire?
21  A.  Uh-huh.
22  Q.  And can you point -- for right now just point for
23     me.
24  A.  About right in this area right here.
25  Q.  Okay.

Page 48

1   A.  There's the gas pumps right here.
2   Q.  All right.  And is that the only area you ever were
3      with Samir, speaking with Samir about this fire?
4   A.  Yes.
5   Q.  Okay.  Can you put a circle around that area and
6      put the initial S in it.  And then we'll show it up
7      to the camera.
8   A.  Okay.
9   Q.  I need you to hold it up to the camera.
10  A.  Oh.
11  Q.  So on -- on Ex -- on Exhibit Z, Page 3, you have
12     made a circle with an S in it as to where you and
13     Samir were standing at approximately 4:00 p.m. on
14     March 20th, 2019, right?
15  A.  Yes.
16  Q.  Anybody else around?
17  A.  Not to my knowledge, there wasn't anyone else
18     standing there at the time.
19  Q.  Is that my pen?  Yeah, thanks.  And how long did
20     you speak with Samir?
21  A.  Maybe five to ten minutes.
22  Q.  And did you take notes of what he told you?
23  A.  No, I did not.  I had just gotten out of my
24     vehicle.  And he was standing there, and I spoke to
25     him.  And my comment to him was -- I asked him if

Page 49

1   he was -- he -- he made a comment about the -- the
2   fire and asked me if I was there for that.  And I
3   said yes.  And I said, Were you here the day of the
4   fire?  Just to start up conversation.  And he said,
5   Yes, I was.  He said, I actually took pictures.
6   Q.  And he gave you the pictures?
7   A.  Yes.  And a vid --
8   Q.  You've --
9   A.  -- and a video of the --
10  Q.  Okay.  You've seen reference to the -- his photo in
11     both Mr. Agosti's and Mr. Vergon's reports, haven't
12     you?
13  A.  Yes.
14  Q.  That's the last time you ever talked to Samir in
15     connection with this case, right?
16  A.  Yes.
17  Q.  And you didn't audio record that conversation?
18  A.  No, I did not.
19  Q.  You didn't videotape it?
20  A.  No.
21  Q.  You took no notes.
22  A.  No.
23  Q.  You obtained no handwritten statement from him.
24  A.  No, he -- his comment to me at the time is he
25     didn't know for sure if he should be saying

Page 50

1    anything because he was not really officially able
2    to say anything.  So I -- he asked me not to --
3    that he -- he actually didn't give me his name.  I
4    just -- he didn't want to --
5    Q.  You --
6    A.  -- he didn't want to --
7    Q.  -- coincidentally ran into guy who took a photo and
8        video of the fire when you first arrived at the
9        scene?
10   A.  Right.  Correct.
11   Q.  Was he the first person you spoke to when you
12       arrived at the MacBeth facility that day around --
13   A.  No, I --
14   Q.  -- 4:00, 3:00?
15   A.  No, I did not.  I spoke to Kyle Orr, I think's his
16       last name, I believe.
17   Q.  And where -- where did you speak to Kyle Orr at?
18   A.  In the office.  I went to the office.
19   Q.  Is the office you're referring to shown on the
20       Exhibit Z, Page 3?  Probably isn't.
21   A.  It doesn't appear to be on here.  But I -- I know
22       as you come in, you -- I think it's on -- the
23       other side of this, right side of the screen over
24       in here somewhere.
25   Q.  Okay.  That's where you went first when you --

Page 51

1    A.  Yes.
2    Q.  -- arrived?  All right.  And so about what time did
3        you talk to -- meet Kyle?
4    A.  Kyle was the name of the person I was given as a
5        contact.  So that -- I went to the office; I asked
6        for Kyle.
7    Q.  I said -- my question is:  What time?
8    A.  That would have been at around 3:00 in the
9        afternoon.
10   Q.  How long did you speak with Kyle Orr on March 20th,
11       2019 at the MacBeth facility?
12   A.  Probably no more than ten minutes.
13   Q.  Had you ever spoken to him before?
14   A.  On the phone I had, yes.
15   Q.  Okay.  Did you speak with anyone else that day
16       besides Kyle Orr and Samir at the scene?
17   A.  I spoke to -- I believe it would have been Fred
18       Jones, is it?  I think that's his -- the manager of
19       the -- of the facility.
20   Q.  Did you speak with him in the same office you spoke
21       with Kyle Orr?
22   A.  No.  I actually spoke to him at a later time that
23       day, right out in front of the building itself.
24   Q.  That's a little vague.  You mean the building that
25       burned?

Page 52

1    A.  The burn -- the -- the burned building, yes.
2    Q.  Right.  Which is shown on the left side of
3        Exhibit Z, Page 3, correct?
4    A.  Yes.
5    Q.  You guys get up pretty close to it?
6    A.  We were fairly close.
7    Q.  Did you speak with anybody else that day at the
8        Republic facility besides Samir, Kyle Orr, and Fred
9        Jones?
10   A.  I can't recall anyone at the present time.
11   Q.  Okay.  And I think you said you arrived about
12       three -- 3:00 p.m. on March 20th, 2019?  What
13       time --
14   A.  Yes.
15   Q.  -- did you leave?
16   A.  Yes, I -- I probably --
17   Q.  What time did you leave?
18   A.  -- leave -- I -- I would say probably around 5:00
19       in the evening.  Was there for --
20   Q.  Drove back to --
21   A.  -- a couple hours.
22   Q.  Okay.  Did you audio or video record your
23       statements of either Kyle Orr or Fred Jones?
24   A.  No.
25   Q.  Did you obtain handwritten statements from either

Page 53

1        Kyle Orr or Fred Jones --
2    A.  No, I did not.
3    Q.  -- that day or any other day?
4    A.  No.
5    Q.  And did anyone from Rimkus, besides you, do such a
6        thing?
7    A.  No.
8    Q.  How long did you talk to Kyle Orr on March 20,
9        2019?
10   A.  I told you I was with him for about ten minutes.
11   Q.  Thank you.  Did you take field notes of what he
12       told you?
13   A.  I wrote down informa -- general information, like
14       the address and just -- and time of fire, who
15       responded, things like that, and when he was
16       notified about the fire, for example --
17   Q.  Had you obtained --
18   A.  -- and what he knew --
19   Q.  Go ahead.
20   A.  -- and what information he knew about the fire.
21   Q.  Okay.  So what do you remember him telling you,
22       March 20th, 2019?
23   A.  He was not physically present at the site at the
24       time, but he was notified of the fire.  I think
25       there -- I -- he give me a -- a person's name that

14 (Pages 50 - 53)

Page 54

1    called him and informed him of the fire.  I think
2    it was one of the managers there at the facility.
3        And I don't recall too much more of a
4    conversation with him, other than the fact that he
5    was the manager of the facility and that -- and
6    told me basically what they did in that particular
7    building that the fire originated in.
8  Q.  And what did he tell you about that?  What they did
9    in that particular building where the --
10 A.  Well, the building is a long building that has
11   several -- they do several things within that
12   building.  The one --
13 Q.  Like what?
14 A.  -- the north end of the building is -- is -- was
15   basically used as a large dumpster repair.  The
16   center part of the --
17 Q.  I'm gonna pause you for just a second.  I
18   apologize.  This will help us.
19      MR. GARDNER:  Ben, can you pull up Z, Page 2.
20      Okay.  I'm gonna hand you what we have
21   previously identified, I think yesterday and during
22   a lot of other depositions.
23      THE WITNESS:  Uh-huh.
24      MR. GARDNER:  But today it's marked Exhibit Z,
25   Page 2.  And as we -- you do your deposition today,

Page 55

1    we'll be referencing that -- those structures.
2  QUESTIONS BY MR. GARDNER:
3  Q.  And you recognize the -- so that's a Googler [sic]
4    photo taken prior to the fire, correct?
5  A.  Yes --
6  Q.  All right.
7  A.  -- uh-huh.
8  Q.  And so you see the numbers starting from left to
9    right, 1, 2, 3 and 4?
10 A.  Yes.
11 Q.  Okay.  So you -- we were talking about what Kyle
12   Orr told you that you remember from your
13   conversation with him --
14 A.  Right.
15 Q.  -- December 20th, 2019.  So continue with your
16   answer about what activities they were doing in
17   these buildings, and make reference to the
18   buildings as you do so, numbers.
19 A.  He was -- he told me that -- I didn't have the
20   separation of the building.  He just told me that
21   the north end, they did heavy work on large
22   dumpsters, things of that nature, repair work.  And
23   then -- and on trucks and stuff like that.
24 Q.  So then the --
25 A.  Mechanical facility basically.

Page 56

1  Q.  Right.  So in terms of the orientation of the
2    photograph, two orange clad buildings, 3 and 4,
3    those are -- that's the north end --
4  A.  Yes --
5  Q.  -- you understand?
6  A.  -- right, number 3 and number 4.
7  Q.  And the far left building, number 1, has a -- a
8    white door on the most extreme south side and then
9    two sort of bluish doors.  See those?
10 A.  Yes.
11 Q.  Okay.  So Kyle Orr told you about op -- operations
12   again in 3 and 4 unit --
13 A.  Right.
14 Q.  -- buildings 3 and 4.  And you've answered
15   question, right?
16 A.  Right.
17 Q.  Okay.
18 A.  And then -- and Section 2 was a -- kind of an
19   employee area where they had, like, employee --
20 Q.  Offices?
21 A.  -- offices and lockers, things of that nature.  And
22   also they -- there was a section in there where
23   drivers kept their laptops and things like that
24   they had for their computers in their trucks.
25      And --

Page 57

1  Q.  What did he tell you --
2  A.  -- that's where they would clock in and out and
3    things of that nature.
4  Q.  And skip building 2 --
5      MR. JONES:  If you could let him finish his
6    answer.
7      THE WITNESS:  Okay.
8      MR. GARDNER:  Yeah.  So -- yeah, if I ask you
9    about one of the moons of Pluto, I -- we don't need
10   to talk about all the moons of Pluto.  And then we
11   have a lot to get through today.  So I'm going
12   to --
13      THE WITNESS:  Okay.
14      MR. GARDNER:  -- take you off of what he told
15   you about building 2 and just ask you specifically,
16   and I apologize I didn't previously.
17 QUESTIONS BY MR. GARDNER:
18 Q.  What did Kyle Orr tell you in the about ten minutes
19   you spoke with him at the premises on December --
20   I'm sorry -- November 20th, 2019 about the
21   operations in building number 1?
22 A.  He told me that building number 1 was a -- a repair
23   shop for dumpsters; that they would bring dumpsters
24   in, sand them down, repaint them or re -- do minor
25   repairs.  Like, if a panel would be off, they would

15 (Pages 54 - 57)

Page 58

1    repair that panel and then repaint them, things of
2    that nature.
3        And they had been doing that in this facility,
4    I believe, for approximately five to six years.
5    And that's where the fire -- in that section of the
6    building, the Section 1, was where the fire
7    originated at.
8  Q.  Kyle Orr told you that?
9  A.  That's -- well, he told me that's where the biggest
10       part of the damage was at, yes.
11 Q.  All right.  So in terms of the minor repairs, can
12       you give me any details of what Mr. Orr was telling
13       you about?
14 A.  What they usually did in that building, as I
15       already offered.  And that was where they did minor
16       repairs on dumpsters.  And then they also did
17       painting in that -- that area --
18 Q.  Did he --
19 A.  -- for --
20 Q.  -- did he tell you that they had used or sometimes
21       used welding machines inside of building number 1?
22 A.  Yes.  He said occasionally -- that's where they
23       repair the panels.  They sometimes would have to
24       weld a new panel onto a -- a dumpster.
25 Q.  A panel made of steel.

Page 59

1  A.  Yes.
2  Q.  And so before re -- welding it on -- by the way,
3       did he tell you it was a MIG welding or TIG welding
4       or what kind of --
5  A.  No, he didn't say what type.
6  Q.  Did you ever figure it out during your
7       investigation?
8  A.  No.  I did not know.
9  Q.  Did you photograph any MIG or TIG welding units in
10       the fire debris rubble of building number 1 on any
11       occasion?
12 A.  I believe I have photographs of a welding unit
13       that's in -- in my photographs.
14 Q.  Inside the fire debris.
15 A.  Right.
16 Q.  Okay.  And did Kyle Orr tell you December -- I'm
17       sorry -- November 20th of 2019 that they also used
18       acetylene torches inside of building number 1 in
19       terms of repairing dumpsters?
20 A.  Occasionally they would have to.  They -- they said
21       that the acetylene, the torches, they had not used
22       them that particular day, however, is what he told
23       me.
24 Q.  Have you ever read any -- heard or read or learned
25       anything in the case to the contrary of that?

Page 60

1  A.  No, I have not.
2  Q.  So so far as you know, when you made your two
3       reports in this case, you moved from the
4       presumption that acetylene torches had not been
5       used inside of building number 1 at any time on
6       March 19th, 2019, correct?
7  A.  Yes, sir.
8  Q.  What about plasma cutters?  Did Kyle Orr mention to
9       you the use of plasma cutters?
10 A.  No, sir.
11 Q.  So as far as you know, no one had operated a plasma
12       cutter inside of building number 1 on March 19th,
13       2019, before the fire.
14 A.  No, sir.
15 Q.  And do you know con -- who conducted any -- sorry.
16       Do you know if any welding was conducted on
17       March 9 -- 19th, 2019?
18 A.  Yes.  I was told that there was some welding that
19       occurred early in the morning of the 19th and that
20       they -- and he thought that the welding was all --
21       was pretty much completed by the early morning.
22       Like, between eight and 10:00 is what I was told.
23 Q.  And who was doing the welding?
24 A.  The -- one of the workers in the --
25 Q.  I'm asking for the name.

Page 61

1  A.  -- shop.  I don't know.
2  Q.  Did he identify this person when you met with him
3       the day after the fire?
4  A.  No, he did not.
5  Q.  Did you ask who it was?
6  A.  At the time I did not ask, only because of the fact
7       that by looking at the -- or realizing what was
8       occurring here, I -- we were going to have to come
9       back to this fire scene and --
10 Q.  You'd have to --
11 A.  -- do the investigation.  Because I --
12 Q.  Go ahead.
13 A.  -- it was too large of a scene to -- to do an
14       investigation like they -- they wanted me to come
15       up there, do an investigation that evening.  And so
16       it's too late at this point in time to really --
17       due to the large scene that --
18 Q.  And that's what stopped you -- that's what stopped
19       you from getting the name of the fellow that did
20       the welding on the day of the fire?
21 A.  Well, I -- I would've assumed that I would be able
22       to get that information later on down the line,
23       yes.
24 Q.  You didn't though, did you?
25 A.  I did not get it, no.

16 (Pages 58 - 61)

Page 62

1  Q.  Ever.
2  A.  No.
3  Q.  Wouldn't it have been important to obtain
4     information from the fellow working and doing
5     welding inside of building number 1 on March 19th,
6     2019 before the fire started?
7        MR. JONES:  Objection to form.
8        THE WITNESS:  There -- there's a lot of
9     information that would have been nice to have
10    obtained at that point.  However, due to the -- to
11    the time nature and due to the aspect of we're
12    gonna come back to this scene, then I was going to
13    try to catch up -- to have these people available
14    to talk to.
15       But -- and then -- so I decided that I needed
16    to go ahead and get some pictures while the
17    daylight was still available and go ahead and start
18    looking at the scene to see what all we needed to
19    have done at that point in time.  So I went to the
20    site to look at it.
21 QUESTIONS BY MR. GARDNER:
22 Q.  Yeah.  According to Rimkus's billing records, the
23    second time you went to the Rimkus [sic] facility
24    was roughly two months later on May 10th, 2019.
25    That sound about right?

Page 63

1  A.  Yes.
2  Q.  Between March 20th, 2019 and May 10th, 2019, tell
3     us all the attempts you made to determine the name
4     of the fella that was working inside of building 1,
5     including performing welding operations.
6  A.  I did not make any attempts to get any information
7     at that point in time.  Because initially I was --
8     they were -- I was under the impression by -- that
9     they weren't sure they were gonna go ahead and go
10    through -- through with anything at this point in
11    time until they had some additional information.
12    And that -- I told them that I would not be able to
13    do this scene investigation at this particular
14    point in time; I'd have to come back.
15       And I was told that they would -- that we
16    would also have to get people placed on notice to
17    come back.  And that's the first time that I spoke
18    to them about that.  And due to the time nature of
19    them delaying some -- some of that contact, they --
20    I was not back at the site until the second -- that
21    second day.
22 Q.  You had access to a phone though in those two
23    months, didn't you?
24 A.  Yes, sir.
25 Q.  Would it be fair to say that you made no attempt to

Page 64

1     contact any witnesses or Rimkus [sic] employees who
2     might have worked inside of building number 1 on
3     March 19th, 2019 --
4        MR. JONES:  Did you say Rimkus employees?
5        MR. GARDNER:  I'm sorry.  Republic employees.
6        THE WITNESS:  I did not contact anyone at that
7     point in time.  Other than speak to Kyle, by phone,
8     to -- I actually called and double-checked a few
9     times if -- how the case -- you know, if we needed
10    to get moving on this, or whatever, to try to push
11    it along.  But a lot of the information and contact
12    of people were up in the air, so to speak, of who
13    to get in contact with.
14 QUESTIONS BY MR. GARDNER:
15 Q.  But to be clear, when you were at the scene the day
16    after the fire, you failed to ask Kyle Orr the name
17    of the fella that was doing welding inside of
18    building number 1 the day of the fire.
19       MR. JONES:  Objection to form.
20       MR. HEHNER:  What's wrong -- can you tell me
21    what's wrong --
22       MR. GARDNER:  I'm -- I'm comfortable with my
23    question.
24       MR. HEHNER:  Okay.  That's fine.
25       THE WITNESS:  I did not obtain the name or the

Page 65

1     information of the person who did the welding at
2     that time.
3  QUESTIONS BY MR. GARDNER:
4  Q.  Do you know a time that fella -- strike the
5     question.
6        Have you ever heard of a fella named Terry
7     Reader?
8  A.  I've heard that name before, yes.
9  Q.  But you haven't read his deposition at all, have
10    you?
11 A.  No, I have not.
12 Q.  And you've never spoke with him, have you?
13 A.  No.  I have not spoken to him.
14 Q.  You did not obtain either a video or audio-recorded
15    statement of Terry Reader ever, correct?
16 A.  No, sir.
17 Q.  Do you know when -- did you ever find out the name
18    of the guy that was welding that day?
19 A.  I don't personally know who it was.  I -- I think I
20    might have read something somewhere in somebody's
21    report that --
22 Q.  Dale Calle sound familiar?
23 A.  -- that --
24 Q.  Does Dale Calle sound familiar to you?
25 A.  The name sounds familiar, yes.

17 (Pages 62 - 65)

1  Q.  Do you know when Dale Calle was first employed --
2  A.  No, I don't.
3  Q.  -- at Republic?  No idea.
4  A.  No.
5  Q.  And do you know when he was last employed by
6     Republic?
7        MR. JONES:  Objection to foundation.
8        THE WITNESS:  No, I do not.
9  QUESTIONS BY MR. GARDNER:
10  Q.  Because you never talked to him.
11  A.  I've never spoken to him.
12  Q.  And nobody with Rimkus ever gave you that data.
13  A.  No.
14  Q.  According to his file he left employment with
15     Republic approximately two months after the fire,
16     by my memory.  I could be off.  But there -- his
17     records say May of 2019.  Did you ever contact him
18     after he left Rimkus?
19  A.  I didn't --
20  Q.  I'm sorry, Republic?
21  A.  I did not have any contact information related to
22     him.
23  Q.  Isn't it important, according to NFP 921, to obtain
24     statements of witnesses who had been conducting
25     activities in a room where you might -- you think

1     might be the origin of the fire?
2  A.  It's always important to try to obtain information.
3     And also witnesses.  But a lot of time it's also
4     equally important to do an investigation before you
5     speak to too many witnesses.  Because you want to
6     try to develop your own opinions of the fire and
7     what caused the fire as well.
8  Q.  It's important --
9  A.  Witnesses are --
10  Q.  -- to talk to them before they die, isn't it?
11  A.  That's true.
12  Q.  Do you know when he died?
13  A.  No.
14  Q.  Your report mentions reference to NFP 921, correct?
15  A.  Yes.
16  Q.  Both your reports say that, don't they?
17  A.  Yes, they do.
18  Q.  Exhibit F is a report dated December 3rd, 2019.
19     That's your report of findings.  You've seen that,
20     right?
21  A.  Yes, I have.
22        MR. HEHNER:  Which one?  Which one, Marty?
23     The first one?
24        MR. GARDNER:  Yeah.
25        MR. HEHNER:  Okay.  Thank you.

1  QUESTIONS BY MR. GARDNER:
2  Q.  Do you have it in front of you?
3  A.  Yes.
4  Q.  Okay.  You're more than free to look at it as we go
5     through.
6        You address this December 3rd, 2019 report to
7     Mr. Glenn Bell, correct?
8  A.  Yes.
9  Q.  Is he the gentlemen that first contacted you about
10     this case?
11  A.  Yes, sir.
12  Q.  What?
13  A.  Yes, sir.
14  Q.  He's out in Scottsdale, Arizona?
15  A.  That's his address, yes.  I don't know whether
16     that's his office address or whether it's his
17     personal address.
18  Q.  Got it.  You've never met with Mr. Bell?
19  A.  No.
20  Q.  Approximately how many times have you spoke to him?
21  A.  I spoke to him the day of the assignment to let him
22     know I would go ahead and -- 'cause they wanted
23     someone there.  And also then after I was there, I
24     con -- recontacted him that same day on the
25     night -- or on the 20th and let him know what --

1     that there was no way I was going to be able to do
2     a fire investigation in the short amount of time
3     that they wanted this done to -- without having
4     other people notified.
5  Q.  What was the short amount of time that they wanted
6     it done?
7  A.  That day.
8  Q.  Oh, okay.  So you've only talked to Glenn twice,
9     both on March 20th, 2019?
10  A.  Yes, on --
11  Q.  Never again --
12  A.  -- by phone.
13  Q.  -- never again, right?
14  A.  No.
15  Q.  You've not read his deposition?
16  A.  No, I have not.
17  Q.  Okay.
18        MR. JONES:  Are you saying Glenn Bell has been
19     deposed in this case?  Is that what --
20        MR. GARDNER:  I apologize.  Again, getting
21     things mixed up.  Withdraw that question.
22  QUESTIONS BY MR. GARDNER:
23  Q.  Tell me if you agree with this statement, Jim:
24     NFPA 1933 lays out the minimum qualifications for a
25     fire investigator while NFPA 921 contains the basic

18 (Pages 66 - 69)

Page 70

1    knowledge base and methodology required to comply
2    with NFPA 1033 requirements, correct?  Is that
3    accurate?
4  A.  Well, with -- there's -- there's a -- one's a
5    standard and one's a guideline, yes.
6  Q.  All right.
7  A.  And I didn't hear the term "guideline."  So 21 --
8    921 is a guide; 9 -- 1033 is a standard for
9    qualification.
10  Q.  For your -- for your qualifications.
11  A.  Yes.
12  Q.  All right.  By the way, when -- when were you first
13    qualified it as a cause -- cause-and-origin
14    investigator?
15  A.  I was first certified in 1979 through the State of
16    Indiana.  And then after -- following that I worked
17    for various volunteer departments as I was --
18    and -- and also did fire investigations for them,
19    so to speak --
20  Q.  I only asked you the year you were first certified.
21  A.  1979.
22  Q.  Thanks.  How did you --
23  A.  But there are several certification processes
24    through this.  So --
25  Q.  So the one in 1979, did you take a test?

Page 71

1  A.  Yes, I did.
2  Q.  Did you pass the first --
3  A.  A course and a test, yes.
4    MR. HEHNER:  You said something standard test?
5    MR. GARDNER:  He said a course and a test.
6    MR. HEHNER:  Thank -- oh, thank you.
7    THE WITNESS:  Through the State of Indiana.
8    MR. GARDNER:  Got it.
9    MR. HEHNER:  Thank you.
10  QUESTIONS BY MR. GARDNER:
11  Q.  So what's the date of this fire?
12  A.  Date of the fire is actually March the 19th of
13    2019.
14  Q.  Why did you record that it was March 3rd?
15  A.  I don't know how that is listed there as March the
16    3rd.  I -- I think on this particular thing was
17    just a mis -- misprint or -- 'cause this is all --
18    when I do a report, what happens is I do -- it gets
19    sent in to someone to eval -- to read the report
20    and so forth and evaluate it.  And I don't know how
21    that date got overlooked.  But --
22  Q.  Could it be because --
23  A.  -- I typed the report --
24  Q.  Okay.
25  A.  -- and the date's wrong.

Page 72

1  Q.  Yeah.
2  A.  And also the -- it didn't get -- there's two
3    processes of review.  And it never got caught.  And
4    usually anything like that would normally get
5    caught.  So --
6  Q.  Might have been helpful if you had your field notes
7    to look at.
8    MR. JONES:  Objection to form.
9  QUESTIONS BY MR. GARDNER:
10  Q.  Might have got the date right.
11    MR. JONES:  Objection to form.
12    THE WITNESS:  Well, I knew what the date was.
13    It's just an -- an error on my part --
14  QUESTIONS BY MR. GARDNER:
15  Q.  Are there any other --
16  A.  -- typing error.
17  Q.  -- errors in this report?
18  A.  There's a couple of errors that I --
19    that I know of that I -- one of them is -- okay.
20    I'll -- I'll wait till we get to that point.
21  Q.  I'm sure we will.
22    I'm gonna skip ahead just a hair.  Your most
23    recent and last report, so far as I understand, is
24    marked as Exhibit G, Pages 1 through 9, dated
25    November 18th, 2022, right?

Page 73

1  A.  Yes.
2  Q.  And on Page 2 of that report you again put the date
3    of the fire -- wait.  See if you did.  No, you got
4    the date right.  Okay.
5    Have you, since preparing your November 18th,
6    '22 report, prepared any supplemental or additional
7    reports in this case?
8  A.  This report was initiated following the -- the lab
9    report of the space heaters.
10  Q.  Yeah, I know that.  My question is:  Have you
11    prepared any supplemental or --
12  A.  No.
13  Q.  -- additional reports --
14  A.  No, I have not.
15  Q.  -- since this one?
16  A.  No, I have not.
17  Q.  Have you reached any additional opinions not
18    already expressed in either of your two reports
19    produced in this case?
20  A.  No, I have not.
21  Q.  Did you express all of the opinions that you had in
22    this case connection -- in connection with the
23    origin cause of this fire in your November 18th,
24    '22 report, or did you hold some back?
25  A.  I don't think I held back any opinions.  I think

19 (Pages 70 - 73)

Page 74

1    I -- there's probably not everything that I did in
2    that fire investigation is in the report
3    necessarily.  But -- 'cause there would be multiple
4    things involved --
5  Q.  I -- I only asked you opinions.
6  A.  No.
7  Q.  This report, your last report, November 18th, 2022,
8    contains all of your opinions about the cause and
9    origin of this fire.
10 A.  Yes, sir.
11 Q.  And you've not developed any different or
12    additional opinions since then, right?
13 A.  No, sir.
14 Q.  Okay.  Referencing again, Jim, your first report,
15    marked as Defendant's Exhibit F, dated
16    December 3rd, 2019.  In the second paragraph you
17    talk about Rimkus -- I'll use that just as a --
18    keep the deposition shorter -- was retained by
19    CCMSI, right?
20 A.  Yes.
21 Q.  Is that -- do you know what those initials stand
22    for?
23 A.  No, I do not.
24 Q.  Do you know if that's some division or alternative
25    name of Republic?

Page 75

1  A.  I know Republic -- I was told that Republic
2    Services was -- self-insures.  So I -- I'm not
3    sure -- I assumed it was somebody associated with
4    the company by those initials.
5  Q.  Your second paragraph of Exhibit F, the information
6    in it, you can just read it to yourself right now.
7    And -- and setting aside Mr. Otto Soyk --
8  A.  Uh-huh.
9  Q.  -- did that information come from Glenn Bell?
10 A.  Yes, sir.
11 Q.  Okay.  So you and Glenn Bell first spoke the day
12    after this fire.
13 A.  Yes.  It was on the 20th.
14 Q.  Okay.  And he asked you to determine the origin and
15    cause of the fire and to determine if recently
16    installed heaters contributed to the cause,
17    correct?
18 A.  Yes.
19 Q.  And did you ask him why he thought -- or he -- he
20    or his company thought that the recently installed
21    heaters might have something to do with the fire?
22 A.  They -- he was given information, I think, by the
23    people on -- at the site that stated that that was
24    one of the things that had recently been done at
25    the facility, within the last couple months.  And

Page 76

1    they were wondering if that would have anything to
2    do with the cause of the fire.  And that
3    information was given to check into that
4    possibility along with, obviously, determine a
5    cause and origin of the fire.
6  Q.  Didn't Glenn Bell also tell you, the day after the
7    fire, when he first contacted you, that an
8    unidentified heating and air company had been
9    consulted to install the style of heat in the
10    building and advised against this type of heater
11    used in the area due to welding and paint
12    operations?
13 A.  I never got that information from Glenn --
14 Q.  Where did you --
15 A.  -- no.
16 Q.  -- get it from?
17 A.  I got that from Kyle Orr.
18 Q.  When?
19 A.  The day I was there.
20 Q.  The first day.
21 A.  The first day.  The 19th, or the 20th, rather.
22 Q.  And you wrote -- skipping to Page 2 of your report.
23    We'll skip back to 1 here in a minute.  It's the
24    last big paragraph near the bottom, the sentence I
25    just wrote to you -- read to you.

Page 77

1    You don't have any field notes left from your
2    conversation with Kyle Orr about this unidentified
3    company that advised against this type of heater,
4    do you?
5  A.  No.  I didn't know the name of the company.  I
6    presently know the name of the company.  But I did
7    not know the name of the company at the time.
8    Because --
9  Q.  When did you first learn it?
10 A.  -- 'cause Kyle didn't have that information readily
11    available to give to me --
12 Q.  Okay.
13 A.  -- at that time.
14 Q.  When did you first learn it?
15 A.  On the day of the joint scene exam.
16 Q.  What day is that?
17 A.  Like, March the 3rd of 2020, I believe it was.
18 Q.  Who told you?
19 A.  Not March -- or not 2020.  It would have been
20    March -- the day I was there for collecting from
21    the heater.  The -- I collected the samples from
22    the heaters.  That date would have been --
23 Q.  May 10th?
24 A.  -- May the 10th, 2019.  Sorry.  'Cause that's when
25    I was informed that those heaters -- about the

Page 78

1    heaters.
2  Q.  That some other company had recommended against the
3       installation of that style heater.
4  A.  Yes.
5  Q.  Who told you that on May 10th, 2019?
6  A.  That would have been also Kyle at that time.
7  Q.  Has anybody else besides Kyle Orr ever given you
8       that information?
9  A.  Fred Jones is also another manager there that give
10      me that information on the day I was there for
11      the --
12 Q.  May 10th, 2019?
13 A.  May the 10th, yes.
14 Q.  That's the day you collected your gauze swabs and
15      scrapings and --
16 A.  Yes.
17 Q.  -- such, right?  So you don't have any field notes
18      left from talking to Kyle Orr or Fred Jones on
19      May 10th, 2019 about this company that recommended
20      against the installation of these heaters, do you?
21 A.  No, I do not.
22 Q.  What name did they give you that day?
23 A.  Korte, I believe, is the -- starts with a K,
24      o-r-t-i, I believe.
25 Q.  Korte Does It All?

Page 79

1  A.  Yeah.
2  Q.  So I imagine this sounded important to you, that
3       another company had looked at this facility, with
4       expertise, and had recommended against using closed
5       infrared Space-Ray heaters?  Sorry, closed infrared
6       tube heaters?
7  A.  Well, all the information I received was -- I
8       consider important, yes.  And that would have been
9       an important --
10 Q.  Right.
11 A.  -- also.
12 Q.  So you probably followed up on that pretty quickly.
13 A.  No, I did not.  I -- I treated it like I would any
14      other information, which would have been just
15      taking that information in.  And also, you know,
16      put on a shelf, so to speak, as part of the
17      investigation.
18 Q.  Did you ever take it off the shelf and talk to
19      Korte about this?
20 A.  I did not talk to Korte about that except for in
21      a -- a phone conversation I had.  I can't recall
22      the guy's name, that stated that they had also
23      installed, I believe, some lighting equipment in
24      the facility, and things of that nature.  But had
25      advised against putting those type of space heaters

Page 80

1    in.
2  Q.  What -- what day was that, this phone call with
3       Korte?
4  A.  I'm not sure what date that would be.  That would
5       have been prior to my --
6  Q.  First report?
7  A.  -- first report -- or, yeah, first report.
8  Q.  You can't even say the month?
9       MR. JONES:  Objection to form.
10      THE WITNESS:  That would have been December.
11 QUESTIONS BY MR. GARDNER:
12 Q.  Of what year?
13 A.  Of 2019, I believe.
14 Q.  All right.  How long did that phone call last?
15 A.  Just a very few minutes.
16 Q.  Who did you talk to?  What was the name?
17 A.  I don't recall the name offhand.
18 Q.  So surely you put that information in -- in some
19      sort of notes, didn't you?
20 A.  Yes, I did.
21 Q.  Those are the notes that are destroyed.
22 A.  I assume so, yes.  I personally did not destroy any
23      notes.  But --
24 Q.  Yeah.  Do you think when Rimkus adopted the new
25      policy of destroying field notes after a

Page 81

1    preliminary report is prepared that that was
2    incongruent with the guide -- NFP 921 guidelines?
3  A.  I, you know, obviously, working for a company, I
4       don't control what they do or what they don't do.
5       But I -- yes, I think it would probably be helpful
6       to keep any type of information and notes available
7       to -- to have to refer back to.
8       I can see some of their understanding in
9       regards to keeping information when they have
10      thousands and thousands of pieces of information
11      that they'd have to keep on file.  That if the
12      information is -- is -- for them is too much.
13 Q.  Your resumé speaks to you teaching courses, for
14      decades I think, in fire scene investigation
15      techniques and methodology, doesn't it?
16 A.  Yes, sir.
17 Q.  Have you ever taught anyone in any of your classes
18      that they should destroy their field notes?
19 A.  I have never --
20 Q.  You've --
21 A.  -- stated that fact, no.
22 Q.  You've done just the opposite, haven't you, that
23      all field notes should be maintained throughout the
24      course of the investigation.
25 A.  Right.  All field notes should be -- in my opinion,

21 (Pages 78 - 81)

Page 82

1    yes, all field notes should be kept --
2  Q.  'Cause NFP 921 --
3        MR. JONES:  He can answer.  He's -- he's
4    answering.  If you could let him finish --
5        MR. GARDNER:  His answers are going on
6    forever.  We're gonna be here till midnight.
7        MR. JONES:  But you're -- you're asking these
8    questions.  He has the right to answer them.
9    So ...
10       THE WITNESS:  Yes.  I would've -- I would
11   expect to -- anyone to keep any information that
12   they've obtained --
13       MR. GARDNER:  I'm sorry.  I'm stepping on the
14   court reporter.
15       THE WITNESS:  -- as for as their information
16   that they -- they written down in any capacity,
17   whether it's typed or written --
18  QUESTIONS BY MR. GARDNER:
19  Q.  There are multiple --
20  A.  -- handwritten.
21  Q.  -- several sections of NFP 921 that indicate that
22   those field notes should be maintained throughout
23   the course of the investigation, aren't there?
24  A.  Yes.  I -- I think there -- the feeling that I had
25   whenever we discussed that with our general office

Page 83

1    was that once the report's written, that they feel
2    like that that was completion of the investigation
3    and therefore if it was -- those written things,
4    all those written stuff didn't need to be kept
5    anymore.
6        Now, unless, I guess you could -- I --
7    hindsight would have been -- would have been I
8    could have asked and requested that they been kept.
9    But at the time it -- I did not do that.
10  Q.  Didn't John Shadow or Kyle Orr ever tell you that
11   the reason they selected my client, COE Heating &
12   Air Conditioning, to install the three closed
13   infrared tube heaters, rather than Korte Does It
14   All, was for price reasons alone?
15  A.  No, I did not -- they did not say anything to me --
16  Q.  That's news --
17  A.  -- about that.
18  Q.  -- to you today, isn't it?
19  A.  Yes.
20  Q.  'Cause you didn't read the deposition of Ron
21   Danzer, did you?
22  A.  No, I have not.
23  Q.  Where that's talked about.
24  A.  No.
25  Q.  And you didn't read the deposition of John Shadow

Page 84

1    or Kyle Orr, where both -- that's talked about, did
2    you?
3  A.  No, I did not.
4  Q.  So if in the depositions of -- of --
5        (A discussion was held off the record.)
6        MR. GARDNER:  I'm gonna take Jim Z's so --
7    recommendation of regular breaks about now.  Is
8    that okay?
9        MR. JONES:  Perfect -- that's great.
10       THE VIDEOGRAPHER:  The local time is 12:41.
11   This ends media one.  We are off the record.
12       (A brief recess was taken.)
13       THE VIDEOGRAPHER:  This begins media two.  The
14   local time is 12:52.  We are on the record.
15       MR. GARDNER:  Thanks.  Can you read back the
16   last question.
17       (The requested text was read by the court
18   reporter.)
19       MR. GARDNER:  I meant John Shadow.
20  QUESTIONS BY MR. GARDNER:
21  Q.  Correct?
22  A.  Yes.
23  Q.  Okay.  Prior to your employment with Rimkus, you
24   were employed by a company called EFI Global.  And
25   from looking at, I believe, your LinkedIn profile,

Page 85

1    you left EFI Global in June of 2018, and that same
2    month started with Rimkus in June of 2018.  That
3    sound right?
4  A.  Yes, sir.
5  Q.  Why did you leave EFI Global to go to Rimkus?
6  A.  EFI Global had purchased Unified and Fire
7    Investigations.  They -- they basically became one
8    entity.  They had five other investigators that
9    came on board.  And at the time they were
10   considering going to part-time status with
11   everybody so no longer would have a contract,
12   written contract.
13       So -- and at the same time I received an email
14   from Rimkus who said that -- or offered me
15   additional income, $25,000 actually more per year
16   than what I was making under -- under contract.
17   And so I elected to leave from there and go to
18   Rimkus.  They did not have an investigator in
19   Indiana at the time.
20  Q.  Thank you.  Why did you leave employment in 2020
21   with Rimkus?
22  A.  From Rimkus, after the -- during period of COVID
23   and things of that nature, they started having
24   some -- receiving -- lack of receiving fire
25   investigations.  And so they decided to put

22 (Pages 82 - 85)

Page 86

1    everybody -- all their fire investigators on
2    part-time status, and actually hired two additional
3    part-time people. So that way we -- they would
4    have sufficient number of people to cover the state
5    in different areas, one up in Fort Wayne and one
6    south.
7        So I at that point in time, due to the fact I
8    had -- no longer had a contract with them and --
9    and a guaranteed income, I decided to leave their
10   employment there.
11 Q.  But your income since leaving has been far less
12   than while with them, hasn't it?
13       MR. JONES: Objection. I don't think he's
14   testified to that yet.
15       THE WITNESS: No, it has -- had not been.
16   Because at the time, whenever I went part-time with
17   them initially, and basically my income from them
18   was in -- a lot less than what it was originally.
19   And also the fact that I could not live on that
20   type of an income, other than my retirement and
21   Social Security. But I did not want to continue
22   to -- so I -- I left them.
23       And actually at the time my father-in-law
24   owned a company for -- a construction company. And
25   I went and worked for him for a while until I

Page 87

1    decided to go off on my own and get this other job
2    actually.
3  QUESTIONS BY MR. GARDNER:
4  Q.  Exhibit C are various invoices from Rimkus --
5  A.  C.
6  Q.  -- from this case?
7  A.  Is that here?
8  Q.  You're not really gonna need to look at it.
9  A.  Okay.
10 Q.  Just, for instance, the first day you were on site,
11   March 20th, 2019, Rimkus billed its client in this
12   case for you at the rate of $195 an hour, correct?
13 A.  Yes, sir.
14 Q.  All right. And since leaving Rimkus, what is your
15   billable rate in this case?
16 A.  One-fifty an hour.
17 Q.  And what are you charging me an hour -- my client
18   today for this deposition an hour?
19 A.  One-fifty an hour.
20 Q.  So is your rate 150 an hour whether you're on site,
21   talking to witnesses, giving depositions,
22   testifying in trial?
23 A.  Yes. They -- I know Rimkus has a -- like a $225
24   for any type of legal, so they jump it up even
25   higher than that. And I thought it would be fair

Page 88

1    to keep it at 150 for any type of work that was
2    being done, personally, as well -- except for
3    travel time I only -- is -- I reduce that to $50 an
4    hour travel time.
5  Q.  And since ending that -- those couple of recent
6    cases that we talked about near the beginning of
7    this deposition, you're down to just this one case,
8    aren't you?
9  A.  Yes.
10 Q.  Okay. And what do you earn hourly as a mechanic at
11   that Northside Trailer place?
12       MR. JONES: Objection to form. I don't know
13   that he testified earlier that he's an hourly
14   worker there.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Are you an --
17 A.  Yes, I am an hourly worker there. But I make
18   approximately $1,000 a week.
19 Q.  I'm just asking hourly.
20       MR. JONES: What -- what -- Marty, what --
21   what's the relevance of his earnings in his job?
22       MR. GARDNER: Comparison to what he earns
23   during this case --
24       MR. JONES: Okay. Well --
25       MR. GARDNER: -- when he's not working on this

Page 89

1    case.
2        MR. JONES: Okay. Well, we object to form.
3    You can answer.
4  QUESTIONS BY MR. GARDNER:
5  Q.  My only question right now is, Jim, what are you
6    paid hourly, by the hour, at Northside Trailer?
7  A.  Well, they --
8        MR. JONES: Objection.
9        THE WITNESS: -- it's a variation of -- of --
10   of things. I get paid a hourly, which is $25 an
11   hour. And I also get paid a bonus, depending on
12   how much work is being done and so forth. So
13   roughly my paychecks run in -- or the gross amount
14   is around $1,000 a month -- or a week.
15 QUESTIONS BY MR. GARDNER:
16 Q.  So today you're making 150 an hour. And setting
17   aside bonuses, when you work at the Northside
18   Trailer, you make 25 an hour.
19       MR. JONES: Same objections.
20 QUESTIONS BY MR. GARDNER:
21 Q.  Right?
22 A.  Well, I don't -- I don't work as a fire
23   investigation on a regular basis. So I'll have to
24   have income coming in. This is just following up
25   with old cases and things of that nature, yes. And

23 (Pages 86 - 89)

Page 90

1   trying to be fair to every -- everything involved
2   here.
3   Q.  Referring, Jim, to Exhibit F, which is your first
4       report, dated December 3rd, 2019.  Second paragraph
5       states, last sentence, as follows:  This report was
6       reviewed by Otto Soyk --
7   A.  Uh-huh.
8   Q.  -- Junior, IAAI, hyphen, CFI, common -- comma, V in
9       parentheses, Fire Division Manager.  Do you see
10      that?
11  A.  Yes.
12  Q.  Why was that done?
13  A.  Every fire report that we did with Rimkus that I
14      had to -- I had to send to a division manager for
15      review.  It was just a peer review.
16  Q.  He didn't catch the date of the fire wrong, did he?
17  A.  No, he did not.
18  Q.  He didn't catch any errors, did he?
19  A.  Not to my knowledge.
20  Q.  There's a billing in the Rimkus file which we have
21      at Exhibit C, Page 7, dated -- you don't have to
22      look at it, Jim, really -- dated November 19th,
23      2019 by Otto Soyk.  It says, Review report for
24      technical content, eight-tenths of an hour at 195
25      an hour.  Does that sound about right?  It's

Page 91

1       page --
2   A.  I would assume so, yes.  It sounds right.
3   Q.  You've not had your December '22 report technically
4       reviewed, have you?
5       MR. JONES:  Did you say December '22?
6       MR. GARDNER:  Yeah.
7       MR. ZOCCOLA:  It's November.
8       MR. JONES:  I don't -- I don't think he did
9   one --
10      MR. GARDNER:  I apologize; it's November '22.
11      THE WITNESS:  No, I did not.
12  QUESTIONS BY MR. GARDNER:
13  Q.  Why?
14  A.  I no longer worked for Rimkus.
15  Q.  You had nobody to --
16  A.  That was a requirement from Rimkus.  And, also, I
17      don't have anyone to review that re -- that as a
18      peer.
19  Q.  Okay.  You'll concede that in your investigation of
20      this -- the fire in this case, you used the
21      systematic approach as recommended in the current
22      edition of the National Fire Protection
23      Association, NFPA 921?
24  A.  Yes, sir.
25  Q.  Guide for Fire and Explosion Investigations,

Page 92

1       correct?
2   A.  Yes, sir.
3   Q.  And in compliance with NFPA 1033 Standard for
4       Professional Qualifications of a Fire Investigator?
5   A.  Yes.
6       MR. JONES:  Are you -- you asked current.
7       What -- are you talking about this year or current
8       as of the date of fire?
9       MR. GARDNER:  The date of this report.  He put
10      it right in his report.
11      MR. JONES:  Are -- you're asking him -- okay.
12      Never mind.
13  QUESTIONS BY MR. GARDNER:
14  Q.  Did you reference NFPA 921 in connection with
15      preparing either of your reports?  In other words,
16      did you open it up and look at it?
17  A.  I open it up and look at it all the time.  I don't
18      know -- I'm -- almost on every time I do a report,
19      I -- and also even when I'm not doing reports, I
20      observe and read the manual.
21  Q.  It must be really important then for a fire --
22  A.  It is important.  Yes, I --
23      MR. JONES:  Objection.
24      THE WITNESS:  It is a -- a matter of -- a
25      guideline that we -- we use.  And it changes.  It's

Page 93

1       an ongoing and changing guideline.
2   QUESTIONS BY MR. GARDNER:
3   Q.  Right.  And so when you wrote your December 3rd,
4       2019 report, it was the 2017 edition in -- in
5       place, wasn't it?
6   A.  Yes, sir.
7   Q.  And when you wrote your next report, which I'll get
8       the date right, November 18th, 2022, the 2021
9       NFPA 921 edition was out, wasn't it?
10  A.  Yes, it was out.
11  Q.  Were there any significant changes made in the 2021
12      edition of NFPA 921 that you used as compared to
13      the 2017 edition?
14      MR. JONES:  Objection to form, foundation.
15      THE WITNESS:  There are several changes that
16      were made in that -- in the differences.  And just
17      a couple of the major changes, one was that they
18      took away all of the categories of --
19      MR. GARDNER:  My only question is:  Did you --
20      MR. JONES:  He -- he -- he's answering your
21      question.
22      THE WITNESS:  Prior investigation --
23      MR. GARDNER:  He -- he's not.  My question is:
24      Did you utilize the change in your --
25      MR. JONES:  And he's telling you what he

Page 94

1    utilized and what changes.  So I think it's fair
2    for him to get to actually tell you --
3         MR. GARDNER:  I'll withdraw the question.
4         MR. JONES:  -- what changes he utilized.
5         MR. ZOCCOLA:  Well, let him finish his
6    quest -- let him finish his answer.
7    QUESTIONS BY MR. GARDNER:
8    Q.  What were you trying to say?
9    A.  I was just letting you know what changes that I
10   recognized as some major changes in the -- from the
11   '17 to the -- the '22.
12   Q.  Okay.  And did you make reference to any of those
13   changes in either of your reports?
14   A.  No, I did not.
15   Q.  And other than indicating that you applied the
16   method -- methodology for fire investigations as
17   recommended by the National Fire Protection
18   Association 9F -- NFP 9 -- A 921, you made no
19   further reference to any section in either reports,
20   did you?
21   A.  No, I did not.
22   Q.  Is that how you usually make your reports without
23   reference to any NFPA 921 sections?
24   A.  We make a reference to the -- we use in those as a
25   guidelines and -- and initially so there --

Page 95

1    therefore -- this was -- this report from Rimkus
2    was generated from an automatic -- basically a
3    standard format that they use for reports.  And we
4    just fill in the sections as -- as we do that.
5        We don't utilize every single -- we utilize
6    the -- the re -- NFP 921.  However, we don't
7    particularly utilize it in word form on every
8    situation as we go through.  It's always utilized,
9    put it that way, some form or another.
10   Q.  How does NFPA 921 define area of origin?
11        MR. JONES:  Objection to form.
12        THE WITNESS:  They refer to it as a general
13   area where the fire originated from.
14   QUESTIONS BY MR. GARDNER:
15   Q.  How does NFPA 921 identify -- or I'm sorry --
16   define the word "char"?
17        MR. JONES:  Objection to form.  I don't think
18   he -- you're looking at something right now.
19   You're asking -- are you quizzing him on it?  Or
20   are you asking him to say verbatim?  Or you asking
21   him to give a summary?  Or what are you asking?
22        MR. GARDNER:  I stand with my question.  I
23   like it.
24        MR. JONES:  You can answer.
25        THE WITNESS:  Well --

Page 96

1         MR. JONES:  Same objection.
2         THE WITNESS:  I -- again, I don't know exactly
3    word for word for what it says.  But it -- char is
4    basically the remains of combustible products that
5    have been involved in a -- in the fire scene.  And
6    it's usually identified as the -- the charred
7    remains of the combustible material that's burnt.
8    QUESTIONS BY MR. GARDNER:
9    Q.  Would you agree that the definition per NFPA 921 of
10   "char" is a carbonaceous material that has been
11   burned or pyrolyzed and has blackened appearances.
12        MR. JONES:  Same objections.
13        THE WITNESS:  Yeah.
14   QUESTIONS BY MR. GARDNER:
15   Q.  What does the word "pyrolyzed" mean?
16        MR. JONES:  Same objection.
17        THE WITNESS:  Are you talking about
18   pulmerization (phonetic) or pulmerized (phonetic)?
19   QUESTIONS BY MR. GARDNER:
20   Q.  I'll spell if for you, p-y-r-o-l-y-z-e-d.
21   A.  Pulmerized (phonetic)?  That is where a -- a
22   chemical or a -- or a -- or a product, basically
23   when exposed to air, can suddenly explode or
24   rupture, a container or whatever.  I don't know of
25   their --

Page 97

1    Q.  Do you --
2    A.  Excuse me.  I don't know their exact wording that
3    they use, but that's what it does.
4    Q.  All right.  Would you agree that the definition per
5    NFPA 921 of the word "combustible" is something
6    capable of undergoing combustion?
7    A.  That is part of it, yes.
8    Q.  Would you agree that per NFPA 921 the defini --
9    definition of competent ignition source is, quote,
10   an ignition source that has sufficient energy and
11   is capable of transferring that energy to the fuel
12   long enough to raise the fuel to its ignition
13   temperature?
14        MR. JONES:  Same objections.
15        THE WITNESS:  Yes.  That would be the
16   definition of -- as you're reading it.
17        MR. GARDNER:  What?
18        THE WITNESS:  Yes.  That would be the
19   definition --
20        MR. GARDNER:  Okay.
21        THE WITNESS:  -- that you're reading.
22   QUESTIONS BY MR. GARDNER:
23   Q.  NFPA 921, Section 3.3.42 is -- we're in the
24   definitional section, which I'm sure you've looked
25   at, haven't you?

25 (Pages 94 - 97)

Page 98

1  A.  I've -- yeah, looked at --
2  Q.  Okay.
3  A.  I don't know all the definitions by their def -- I
4      guess that's why we have the book to refer to --
5  Q.  That's right.
6  A.  -- if we need to.
7  Q.  It defines data analysis as the process of
8      systematically utilizing logical techniques to
9      dissect, reorder, evaluate, and interpret data?
10     Would you agree with that?
11         MR. JONES:  Same objections.
12         THE WITNESS:  Yes, sir.
13         MR. GARDNER:  Okay.
14  QUESTIONS BY MR. GARDNER:
15  Q.  Do you know what deductive reasoning is?
16  A.  Deductive reasoning is using information that
17      you're given to form hypothesis in different areas
18      that we -- that is utilized to -- there's in --
19      there's inductive reasoning and there's deductive
20      reasoning.  And the -- in the -- the pattern of
21      fire investigation or methodology.
22          And you use those to determine, like, witness
23      statements, data that you receive, everything that
24      you utilize, wit -- in the process to make -- to
25      form an opinion and to form a hypothesis.

Page 99

1  Q.  And did you do that in this case?
2  A.  Yes, sir.
3  Q.  Tell me if you agree with this as the definition of
4      explosion per NFPA 921.
5         MR. ZOCCOLA:  Where are you reading from?
6      Is --
7         MR. GARDNER:  I don't have to tell you that.
8      Work product.
9         MR. ZOCCOLA:  So you're gonna -- you're gonna
10     ask questions about --
11        MR. GARDNER:  I've got a lot of questions
12     about this.
13        MR. ZOCCOLA:  -- about written product, and
14     you're not gonna identify what you're --
15        MR. GARDNER:  I just did.
16        MR. ZOCCOLA:  -- what you're reading?
17        MR. GARDNER:  I just did.
18        MR. ZOCCOLA:  Okay.
19        MR. JONES:  Same objections as before.
20  QUESTIONS BY MR. GARDNER:
21  Q.  Will you agree that NFPA 921, Section 3.3.58
22     defines an explosion as, quote, the sudden
23     conversion of potential energy, paren, chemical or
24     mechanical, closed paren, into kinetic energy with
25     the production and release of gasses under

Page 100

1      pressure, further release of gas under pressure?
2         MR. JONES:  Just to clarify, are you asking if
3      he agrees with the definition?  Or are you asking
4      whether or not --
5         MR. GARDNER:  Asking if he agrees -- that is
6      the definition.
7         MR. ZOCCOLA:  And -- and there's no foundation
8      of what he's reading.
9         MR. JONES:  I don't know that you've laid any
10     foundation for what you're reading from.  You've
11     not identified what you're reading from.  And I
12     don't know if you're asking -- if -- you know, if
13     he agrees with NFPA's definitions as you're reading
14     them?
15        MR. GARDNER:  I'm holding NFPA --
16        MR. JONES:  Right.  And if -- if --
17        MR. GARDNER:  -- 921, Thomas.  What do you
18     think I'm doing?
19        MR. JONES:  My point is, if we're gonna sit
20     here and read through whether or not you're reading
21     all these correctly, we're gonna be here a while.
22     And if you want to --
23        MR. GARDNER:  Just asking if he agrees or not.
24        MR. JONES:  -- if you want to ask all those
25     questions, you know, have at it.  But we -- keeping

Page 101

1      all those objections.
2         THE WITNESS:  I will agree that those -- the
3      definition as you read it in their -- in that book
4      is true -- is true definition that the ...
5  QUESTIONS BY MR. GARDNER:
6  Q.  Do you agree that the definition of "fuel" per
7      NFPA 921, Section 3.3.95 is, quote, a material that
8      will maintain combustion under specified
9      environmental conditions?
10        MR. JONES:  Same objections.
11        THE WITNESS:  Yes, sir.
12  QUESTIONS BY MR. GARDNER:
13  Q.  Does NFPA 21 [sic], in the definitional section,
14     give a definition for a fire scene reconstruction?
15        MR. JONES:  Objection to foundation.
16        THE WITNESS:  Yes, they do.
17  QUESTIONS BY MR. GARDNER:
18  Q.  Okay.  Do you agree that NFPA Section 921 --
19     Section 3.3.80 defines "fire scene reconstruction"
20     as the process of recreating the physical scene
21     during fire scene analysis investigation or through
22     the removal of debris in the placement of contents
23     for structural elements in their prefire positions?
24        MR. JONES:  Same objections.
25        THE WITNESS:  I agree that's the definition --

26 (Pages 98 - 101)

Page 102

1     MR. GARDNER: Okay.
2     THE WITNESS: -- that's in that book, yes.
3  QUESTIONS BY MR. GARDNER:
4  Q.  Did you do that in this case?
5  A.  The -- in this particular case -- obviously, every
6     fire scene's different.  And we treat every --
7     every fire scene that's there.  We can't -- we
8     don't utilize every single thing in that book on
9     every single fire.
10 Q.  I know that.
11 A.  We try to do it -- the -- the best job we can to
12    facilitate the fire investigation based on all
13    facts and all information that's given.  And we
14    utilize reconstruction as one of those, if we're
15    able to do that.
16 Q.  I'll move to strike that as nonresponsive.  And if
17    you don't listen to my questions, I'll have to move
18    the Court for more time over seven hours here.
19    MR. JONES:  I think he's answer -- he's
20 answering your questions.
21    MR. GARDNER:  No, he hasn't.
22    MR. JONES:  You've gone --
23    MR. GARDNER:  -- yes or no questions.
24    MR. JONES:  -- you've gone through definitions
25 in a book that we --

Page 103

1     MR. GARDNER:  Thomas, that was a yes-or-no
2  question.
3     MR. JONES:  -- that we all agree on.  You're
4  asking whether or not -- I mean, if you're
5  concerned about conserving time, I -- I don't know
6  why we're going through all these definitions and
7  asking whether or not you read them correctly out
8  of a book you're not gonna show him.
9     MR. GARDNER:  That's not what I did.  I asked
10 him if he -- he -- I read it to him and asked him
11 if he did it.  He hasn't said yes --
12    MR. ZOCCOLA:  That's not what you did.  You --
13 you -- you're quizzing him on --
14    MR. GARDNER:  Hold on.  Only one lawyer.
15    MR. ZOCCOLA:  Yeah.  I got it.
16    MR. JONES:  Our -- our point's just that --
17    MR. GARDNER:  -- object.
18    MR. JONES:  -- our point's just that if you're
19 gonna spend a significant portion of this depo --
20 deposition quizzing him on --
21    MR. GARDNER:  Thomas, my use of time --
22    MR. JONES:  -- definitions --
23    MR. GARDNER:  -- is up to me.
24    MR. JONES:  Okay.  Well, then, by all means.
25 But if you're gonna ask --

Page 104

1     MR. GARDNER:  -- answer yes or no not.
2     THE WITNESS:  I agree with the definition,
3     yes, that's in the book.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Did you do that?
6  A.  Yes.
7  Q.  Did you reconstruct the scene?
8  A.  We -- I -- I can't say yes or no.  Because we -- in
9     my opinion, we try to do everything that we can do
10    to -- to reconstruct the scene if it's feasibly
11    possible.
12 Q.  Did you do that in this case, reconstruct the scene
13    to its prefire --
14 A.  To a certain degree, yes.  But in -- for the most
15    part no.
16 Q.  You'll concede that the word "reconstructed" or
17    words "reconstructed" or "reconstruct" are in
18    neither of your reports.
19    MR. JONES:  Objection.  They speak for
20 themselves.
21    THE WITNESS:  No.  That is not in my report.
22    MR. GARDNER:  'Cause you didn't do it.
23    MR. JONES:  Same -- same objections.
24    THE WITNESS:  Not physically, no.
25 QUESTIONS BY MR. GARDNER:

Page 105

1  Q.  NFPA 921, Section 3.3.131 defines material first
2     ignited as, quote, the fuel that is first set on
3     fire by the heat ignition, semicolon, to be
4     meaningful, comma, both a type of material and a
5     form of material should be identified.  You'd agree
6     with that, wouldn't you?
7     MR. JONES:  Objection to form, foundation.
8     THE WITNESS:  Yes.
9     MR. GARDNER:  Okay.
10 QUESTIONS BY MR. GARDNER:
11 Q.  In this case did you determine the material first
12    ignited?
13 A.  In my opinion the first material that was ignited
14    would -- would have been the heater which would
15    have been fueled by propane.
16 Q.  Material was the heater?  Is that what you're
17    saying?
18    MR. JONES:  Objection.
19    THE WITNESS:  No, I didn't say that.  I said
20    the first fuel that was ignited was propane.
21 QUESTIONS BY MR. GARDNER:
22 Q.  And what ignited second?
23 A.  Would have been the product that was on the heater
24    and in the heater and in the tubes that was
25    combustible materials, then suppically (phonetic)

27 (Pages 102 - 105)

1    it ignited and -- which was -- which -- which
2    basically ended up, my opinion, as the cause of
3    this fire as for as ignition of the fire.
4    Q.   And what was the product on and in the heaters that
5         you're talking about?
6    A.   The residue from paint and other material that's
7         used in the -- in the -- in their process of
8         repairing dumpsters.
9    Q.   And what are the other materials identified as?
10   A.   Well, they told me occasionally they use paint
11        thinners there.  They also utilized -- primarily
12        the paint that's a blue-color paint.  I don't have
13        the name offhand.  But I have that information, the
14        MSDS sheet on that particular product.
15   Q.   You're talking about the Blue Sheboygan paint,
16        aren't you?
17   A.   Yes.
18   Q.   Okay.  And what -- what size are those --
19   A.   In the past, which is not effect -- not related to
20        this particular fire.  But in the past they've also
21        used the Hercul -- Hercules bed liner that they use
22        on some of the dumpsters.  Certain -- certain
23        customers request that to happen --
24   Q.   Had they used Herculiners in -- on March 19th, 2019
25        in that room -- building?

1    A.   To my knowledge they have not used that for a
2         couple of years at least.  And I was told at one
3         point it was five years that they hadn't used it.
4         So --
5    Q.   Who told you that?
6    A.   -- there were some discrepancies in that aspect.
7    Q.   Who told you that?
8    A.   That was -- Fred Jones was one.
9    Q.   Okay.  Do you know if any Herculiner product was
10        stored inside of building number 1 on the day of
11        the fire?
12   A.   I did not see any Herculine material.
13   Q.   Okay.  Were you aware that Terry Reader testified
14        that there was -- there were can -- one-gallon cans
15        of Herculiner inside of building number 1 on the
16        day of the fire?
17        MR. JONES:  Objection to form.  Misstates
18        prior testimony.
19        THE WITNESS:  No.  I was told that they had
20        not used Herculine material for several years.
21        MR. GARDNER:  I'm not talking about using it;
22        I'm talking about storing it in respect to --
23        THE WITNESS:  No.  I don't know that it was
24        present.
25        MR. GARDNER:  Okay.

1    QUESTIONS BY MR. GARDNER:
2    Q.   So it might have been.  You just didn't read Terry
3         Reader's deposition.
4    A.   I did not read his deposition.
5    Q.   Did you utilize the scientific -- any scientific
6         method in this case?
7    A.   We always use a scientific method on every fire
8         that we go to, the extent of what we can utilize of
9         the -- that method based on what we're presented
10        with.
11   Q.   Can you explain for us the scientific method that
12        you utilized in this case?
13   A.   Obviously the first --
14        MR. JONES:  Objection, foundation.  You can
15        answer.
16        MR. HEHNER:  I didn't understand what you
17        said.
18        MR. JONES:  Form and foundation objections.
19        MR. HEHNER:  Thank you.
20        THE WITNESS:  Obviously the first thing of any
21        scientific method is, as they -- as they say,
22        determine the need, which is obviously -- those two
23        are -- the first two are already -- steps are
24        already pretty much given -- a given.
25        The need of it, 'cause there's a fire.  And

1    two is determine the -- the cause and origin of the
2    fire.  And then, obviously, to collect data.  And
3    that could be any type of data that would be
4    presented:  Witness statements, physical data, fire
5    patterns, things of that nature.  And then any type
6    of other data that you receive from laboratories,
7    things that -- all those are applied.  And you
8    develop initial hypothesis.  Develop initial
9    hypothesis, then you try to utilize that and see if
10   the data that you received fits that hypothesis.
11       And then you go -- if that, for some reason,
12   is not possible or unreliable, then you try to
13   determine if there's any other hypothesis and
14   rule -- try to rule those out.  And then you come
15   up with a most common or a cause -- a cause of the
16   fire based on a percent of accuracy or percent of
17   trying to use -- I can't remember the -- what my
18   term was.  But --
19   QUESTIONS BY MR. GARDNER:
20   Q.   How about scientific certainty?
21   A.   Right, scientific certainty.
22   Q.   Have you fully explained for us your understanding
23        of the scientific method as you utilized it in
24        investigation of this fire?
25   A.   In this particular fire, yes.

28 (Pages 106 - 109)

Page 110

1  Q.  You're familiar with the idea of expectation bias
2      and confirmation bias?
3  A.  Yes, I am.
4  Q.  And you kept those in mind and avoided those during
5      your investigation in reaching your conclusions in
6      this case?
7  A.  Yeah.  I all -- every fire I do, I don't go into it
8      with any type of expectations, or even if someone
9      has said something to me about it.  That's not why
10     we investigate fires.  We want to know what we feel
11     is, in our expert opinion, the true cause of the
12     fire.
13 Q.  So to avoid presumption, would you agree that until
14     data has been collected, no specific hypothesis can
15     be reasonably formed or tested?
16 A.  To avoid presumption, yes.
17 Q.  Would you agree that to avoid confirmation bias
18     that the failure to consider alternate or opposing
19     hypotheses or prematurely discounting seemingly
20     contradictory data without appropriate analysis and
21     casting can result in incorrect conclusions?
22        MR. JONES:  Objection to foundation, form.
23        THE WITNESS:  Yes.  I agree that any other
24     possible hypothesis should be looked at and
25     discarded or become part of your overall

Page 111

1      investigation --
2         MR. GARDNER:  Were you --
3         THE WITNESS:  -- with that statement.  I'm
4      sorry.
5  QUESTIONS BY MR. GARDNER:
6  Q.  Were you able to eliminate an electrical --
7      electrical system or component as the cause of this
8      fire?
9  A.  To answer, yes, based on several aspects of this
10     particular fire.
11 Q.  Explain.
12 A.  Number one is the -- there was information that was
13     given to me by Kyle, as well as too by Fred Jones,
14     that the last person in the area was at 4:00 in the
15     evening, and any work would have been done.
16     Everything gets shut off on a routine basis.  And
17     all the electricity to the facility was shut off,
18     with exception of the fact of the power going to
19     the heaters.
20        Second of all, it was rechecked again at
21     approximately two-and-a-half hours later by
22     Mr. Jones.  And he confirmed that the -- all the
23     power to -- to lights and to other things and
24     equipment had been stored properly and everything
25     had been shut off.

Page 112

1  Q.  Did you just now testify that you determined that
2      all electrical supply going into the facility had
3      been shut off?
4  A.  Not all electrical going into the facility.  I said
5      the only thing in -- in that particular area of the
6      building that I was informed by Mr. Jones was
7      that -- the -- was the power going to the heaters.
8  Q.  You're not suggesting that the power into the
9      facility was off, are you?
10 A.  No.  I'm talking -- not to the box itself, no.  I'm
11     not saying that.
12 Q.  Okay.
13 A.  I'm saying to the -- any components in the
14     building.  I'm sure the receptacles, things like
15     that, still had power.  But there was nothing
16     operating in the building that -- that had power.
17     Lights were off, no equipment was running, things
18     of that nature.
19        And all the electrical wiring was in -- in
20     conduit as well.  And that makes a pretty big
21     difference when it comes to electrical causes of
22     fires, for the most part, due to wiring issues.
23 Q.  And when did you reach that conclusion?
24 A.  That's just general knowledge of -- of fire --
25 Q.  I'm sorry.  Let me retract the question.

Page 113

1         About when did you learn from Kyle Orr, and I
2      think you said Fred Jones, that basically all the
3      electrical components and systems inside of
4      building number 1 were turned off, other than the
5      heaters, on the day -- at the time of the fire?
6  A.  That was when I talked to Mr. Jones at the site.
7  Q.  The day after the fire.
8  A.  The day -- no.  That was -- Mr. Jones wasn't
9      contacted until or talked to until the --
10 Q.  May 10th of --
11 A.  May the -- yeah, when I went there the second time.
12 Q.  Okay.  So by May 10th, 2019, when you went there
13     the -- for the second time, you had been informed
14     by Kyle Orr and Fred Jones that nothing
15     electrical -- no electrical products or components
16     were on other than the heaters inside of building
17     number 1 at the time of the fire?
18 A.  Yes.
19 Q.  Then why did you bring John Diggle or Mr. Inendino
20     to the fire scene?
21 A.  Well, there's -- first of all talk about John
22     Diggle.  June Diggle is electrical engineer with
23     Rimkus based out of Chicago.  And the fire
24     examination site, there were several other
25     electrical engineers that were going to be there

29 (Pages 110 - 113)

1    with other representations.  So I felt that it
2    should be possible that we have representation for
3    -- for electrical engineer in case there was some
4    electrical issue that came up that we could discuss
5    it with him, and also he could guide us on certain
6    issues regarding electricity of the building.
7        So I asked him to attend the -- first of all
8    asked our client, then I asked him to attend the --
9    that examination.
10   Q.   And did Mr. John Diggle, electrical engineer,
11   examine the electrical components in and around the
12   fire scene of building number 1?
13       MR. JONES:  Objection, foundation.
14       THE WITNESS:  What I had him do is I had him
15   in contact with the other electrical engineers that
16   was there and had them to discuss any electrical
17   issues that they wanted to discuss.  And if there
18   was anything that they needed from me, then let me
19   know.  And we could've try to obtain anything that
20   we -- they wanted to obtain.
21   QUESTIONS BY MR. GARDNER:
22   Q.   Were you present when Lou Inendino informed a group
23   inclu -- that would have included Mike Vergon that
24   he could not exclude an electrical cause of this
25   fire?

1        MR. JONES:  Objection to form, foundation.
2        THE WITNESS:  Lou Argino (phonetic) is a
3    mechanical engineer, number one.  He's not an
4    electrical engineer.  So I'm not sure he would
5    have -- in my knowledge I don't know why he would
6    have ever made that statement.  I don't recall.
7    There was -- I was not present when that statement
8    was made by any -- to anybody.  And I'm surprised
9    that statement would be something he -- knowing
10   Lou, that that would ever be said.
11       MR. GARDNER:  You haven't read Mike Vergon's
12   deposition.  I think we just took it.
13       THE WITNESS:  No, I have not.
14       MR. JONES:  There's no transcript.
15   QUESTIONS BY MR. GARDNER:
16   Q.   Did you -- were you in the presence of -- of John
17   Diggle when he informed other experts at the scene,
18   including Mike Vergon, that he could exclude -- I'm
19   sorry -- he could not exclude an electrical cause
20   of this fire?
21       MR. JONES:  Objection to form, foundation.
22       THE WITNESS:  No.  I was not in the presence
23   of him.  And I'm surprised, again, that anybody on
24   our team would have even made that suggestion to
25   anyone else at the site.

1    QUESTIONS BY MR. GARDNER:
2    Q.   Can you reference Exhibit F, which is your first
3        report.  Your --
4    A.   I'm on F right now.
5    Q.   Yea.  Do you see conclusions there at the top?  I'm
6        sorry.  At the bottom?
7    A.   Yeah.
8    Q.   Yeah.  In this report is the word "conclusion"
9        synonymous with the word "opinions"?  Is that what
10       you mean?
11   A.   Yes.
12   Q.   And basically you listed three opinions, bottom of
13       Page 1, top of Page 2, correct?
14   A.   Uh-huh.
15   Q.   Your first conclusion, number one, you can read it
16       to yourself.  But, as I understand it, you're sort
17       of giving a general origin of the fire in
18       conclusion number one, right?
19   A.   That's just a general conclusion that a fire
20       occurred, yes, and where it occurred.
21   Q.   Yeah.  And number two you're talking about it
22       involved the south end of the facility.  So that's
23       more of a general area of origin instead of a
24       specific area of origin, right?
25   A.   Yes.

1    Q.   Okay.  So your -- your true cause-and-origin
2        opinions are contained in Paragraph 3, correct?
3        MR. JONES:  Objection to form.
4        THE WITNESS:  Yes.
5        MR. JONES:  Yeah.
6        THE WITNESS:  Yes, sir.
7        MR. GARDNER:  Did you say yes?  All right.
8    QUESTIONS BY MR. GARDNER:
9    Q.   And did you state that the cause and origin of the
10       fire is a direct -- direct result of open infrared
11       tube heaters installed in an area where painting
12       and other procedures are performed?  That's part of
13       the paragraph, right.
14   A.   Yes.
15   Q.   Why did you use the word "open"?
16   A.   'Cause it's not a tightly sealed unit.
17   Q.   For writing this report, particularly opinion
18       number three we're talking about here, had you
19       consulted with any experts regarding closed
20       infrared tube heaters?
21   A.   No, I have not.
22   Q.   Have you ever --
23   A.   Consulted --
24   Q.   -- in this case?
25   A.   No.  I'm just familiar with those type of heaters,

Page 118

1    how it --
2  Q.  And you think they're open.
3  A.  They're not -- they're not -- I would say they're
4      not open to things.  But you can actually -- when
5      you view -- view one of those heaters, you can
6      actually see the flame through some of the openings
7      and stuff that's in the heaters themselves,
8      particularly from the bell and things of that
9      nature.
10 Q.  From the what?
11 A.  There's a bell that comes out.  I refer to it as a
12     bell.  It's a cone-shaped device where the -- the
13     flame comes out of the heater.
14 Q.  So you've seen these three heaters that you saw at
15     the fire scene and then you gathered up and trucked
16     down to Rimkus, right?
17 A.  Yes.
18 Q.  And you've seen the three heater box -- heater
19     boxes, haven't you?
20 A.  Yes.
21 Q.  What nomenclature or terminology are you
22     comfortable with using in referencing the boxes,
23     the square boxes of the heaters?
24 A.  My definition --
25        MR. JONES:  Objection, foundation.

Page 119

1        THE WITNESS:  Okay.  My definition would be
2     that they were -- it's a closed system; however,
3     it's not tightly sealed system.
4  QUESTIONS BY MR. GARDNER:
5  Q.  No, no.  I'm just talking about how to -- how
6     what's -- you and I to come to an agreement on the
7     word we use for the -- the box where the ignition
8     occurs.
9  A.  The heater unit.
10 Q.  Heater unit.
11 A.  Yeah.
12 Q.  Okay.  It's kind of rectangular in shape, isn't it?
13 A.  Yes.
14 Q.  And is it sealed with silicone?
15        MR. JONES:  Objection to foundation.
16        MR. GARDNER:  I'm -- I'm talking before a fire
17     starts.  Are they still --
18        THE WITNESS:  Not to my knowledge.
19        MR. JONES:  Same objection.
20        THE WITNESS:  I don't know that.  I didn't --
21     I was not present at the time they were installed,
22     so I have no knowledge of that.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Do you have any expertise in the field of HVAC?
25 A.  No, just general knowledge.

Page 120

1  Q.  Have you ever installed a closed infrared tube
2      heater?
3  A.  No, I have not.
4  Q.  Have you ever maintained or worked on a closed
5      infrared tube heater?
6  A.  No.
7  Q.  Have you ever installed a regular household
8      furnace?
9  A.  Yes, sir.
10 Q.  Okay.  Did you consult with any kind of an expert
11     as to the operation of the closed infrared
12     Space-Ray tube heaters that were used in -- I'm
13     sorry -- that my client installed at Republic?
14 A.  No.  The only thing that I referred to and assisted
15     me was their offer -- installation manual of a --
16     of a particular heater that they had installed
17     there.
18 Q.  And in terms of the word -- your use of the word
19     "open," if I'm following you right, you mean open
20     to the -- the air in the room where they're
21     mounted.  Is that what you mean?
22 A.  I'm just talking about them being ope -- they're --
23     yeah, they're -- the whole thing is open.  It's not
24     en -- enclosed, except for the burner units
25     themselves are in a -- in an enclosed container.

Page 121

1     However, that enclosed container is not totally
2     a -- a sealed container.
3  Q.  And you -- are you saying that -- let's say you and
4     I are together at Republic's facility on MacBeth
5     Road the -- the day before the fire, that would be
6     March 18th, 2019, climbed up a ladder and looked at
7     these burner unit boxes of the Space-Ray heaters.
8     We could physically see a flame without opening it
9     anywhere?  Is that when you think?
10        MR. JONES:  Objection to foundation.
11        THE WITNESS:  I -- I cannot attest to these
12     particular heaters because I don't know how they
13     were installed.  I can only attest to -- 'cause
14     our -- our fire station, for example, has this type
15     of heaters installed in them, as well as other
16     shops and other areas that I've been involved with.
17     And you can actually physically see the burner
18     units burning even though they're technically in a
19     closed box.
20        And another thing that I saw in this
21     particular situation was remnants of paint that was
22     inside of the tubes and inside of the heater units
23     themselves that indicated that the paint got in
24     there some way or another.  So obviously they were
25     not sealed totally to prevent fumes, vapors, paint,

31 (Pages 118 - 121)

Page 122

1      small products from getting in too.
2   Q.   Do you know when this paint got inside of the
3      heaters and the tubes?
4   A.   Some -- sometime within the two months they been --
5      they were there.
6   Q.   How did you exclude this paint that you claim you
7      see and debris getting inside of them during the
8      fire or during fire suppression or in the months
9      they were laying out there?
10  A.   Because I wit -- physically witnessed the paint
11     being basically baked onto the product or to the --
12     refer to it as a product, I -- to the heater units
13     and to the -- all -- all of it, all around the
14     place.  And as well as the employees that were
15     there basically was said that there was -- told me
16     that the place was covered in blue.
17  Q.   You switched to the word "on."  I'm dwelling in --
18     in reference to "in."  What goes on -- what was
19     found in the firebox of the heaters in the -- in
20     the tubes.  And you said there was --
21  A.   There was some --
22  Q.   -- in.
23  A.   -- some blue -- yeah, blue -- remnants of blue --
24     blue paint dried and also had been adhered to the
25     surfaces in -- inside the tubes.

Page 123

1   Q.   And it was still blue?
2   A.   As well as everywhere else, yes.
3   Q.   Despite being in a fire for six hours.
4   A.   Well, not all of it had been involved in the fire
5      for six hours.  That's the whole fire.  That --
6      that particular unit itself or, you know, those
7      units themselves may -- may or may not have been.
8   Q.   Had you --
9         MR. HEHNER:  When you use "unit" -- I need to
10     be -- understand.  When you use "unit," are you
11     talking about the heaters?
12        THE WITNESS:  The heaters, yes.
13        MR. HEHNER:  Okay.  I'm sorry.  Thank you.
14  QUESTIONS BY MR. GARDNER:
15  Q.   Have you ever attempted to ignite or combust the
16     Blue Sheboygan paint in a liquid form?
17  A.   No, I have not.
18  Q.   Has anyone done that to your knowledge in this
19     case?
20  A.   No.  I'm not saying in liquid form, but it would
21     have ignited.
22  Q.   Sharee Wells didn't tell you that she tried to
23     ignite this Blue Sheboygan paint in its liquid
24     form?
25        MR. JONES:  Objection to form, foundation.

Page 124

1         THE WITNESS:  No, she did not tell me that.
2      The only thing as I referred to in the aspect of
3      the MSDS sheets, other than the paint itself, is
4      once the paint dries, the products that remain on
5      surfaces and things like that, which would be the
6      surface of the heaters, the -- wherever this paint
7      is at, would -- it becomes a similar to properties
8      of a Class II and Class III liquid.
9   Q.   Doesn't the MDS data sheet for Blue Sheboygan paint
10     say once the paint -- sorry -- water boils off, it
11     doesn't use the word dry, does it?
12        MR. JONES:  Objection to foundation.
13        THE WITNESS:  Well, that's technically dried
14     is what that -- is what it boils off to be is the
15     dry surface.
16  QUESTIONS BY MR. GARDNER:
17  Q.   So your opinion in this case rests to some degree
18     on your belief that the drying of the Blue
19     Sheboygan paint is the same things as boiling Blue
20     Sheboygan paint.
21        MR. JONES:  Objection to form.  Misstates his
22     testimony.
23        THE WITNESS:  No.  I don't think -- I think
24     there's two -- it's two different things.  But in
25     technicality, when you dry something, you expel the

Page 125

1      water from it, which is what happened in this case.
2      The heaters basically dried off or boiled off
3      the -- the water which became adhered to the
4      surfaces and basically dried on those surfaces.
5      It's not a liquid product anymore; it's dried.
6   QUESTIONS BY MR. GARDNER:
7   Q.   Okay.  So your opinion in this case as to the
8      ignitability or combustibility of Blue Sheboygan is
9      regarding its dry form, right, instead of its wet
10     form?
11  A.   I would say yes.
12  Q.   Tell me about all the tests you've done to confirm
13     that dry Blue Sheboygan paint can ignite or combust
14     or sustain combustion.
15        MR. JONES:  Objection to form.
16        THE WITNESS:  I've not done any tests.  I've
17     only went by what the company's -- the
18     manufacturers of paints stated.  And --
19        MR. GARDNER:  (Unintelligible.)
20        THE WITNESS:  -- their MSDS sheets.
21        MR. JONES:  Let him finish.
22        MR. GARDNER:  Go ahead.  Done?
23        THE WITNESS:  Yep.
24  QUESTIONS BY MR. GARDNER:
25  Q.   Okay.  So you have not tested the hypothesis that

32 (Pages 122 - 125)

Page 126

1  you have that dry Blue Sheboygan paint is
2  ignitable, combustible, or sustains combustion.
3      MR. JONES:  Objection to form.
4      THE WITNESS:  I have not tested that
5  hypothesis.  The only thing I have is the MSDS
6  sheets and also lab report that says there was
7  medium and heavy -- and I think aromatic or aromic
8  (phonetic) material that was found in those con --
9  in the samples that was sent in.
10     MR. GARDNER:  The word's aromatic.
11     THE WITNESS:  Aromatic, yeah.
12 QUESTIONS BY MR. GARDNER:
13 Q.  So in connection with your conclusion, a/k/a
14     opinion, stated in your December 3rd, 2019,
15     Paragraph 3, Page 2 report, you -- you indicate at
16     the end, the last sentence -- you can read it if
17     you want -- Paint and other flammable products used
18     in the repair of trash dumpsters collected on the
19     tube heaters and ignited, right?
20 A.  Right.
21 Q.  You didn't use the word "in" there, did you?
22 A.  I didn't use the word "in," no.  I --
23 Q.  I thought in your -- your last report, which is
24     Exhibit G, dated November 18th, 2022, you indicated
25     that none of your opinions had changed from your

Page 127

1  first report.
2      MR. JONES:  Objection to form.
3      THE WITNESS:  No.  I indicated that the
4  examination of the tube heaters did not change my
5  opinion of what I originally -- or a conclusion
6  that I came to.
7  QUESTIONS BY MR. GARDNER:
8  Q.  Could you please, Jim, go to Exhibit G, Page 2, top
9      overview of opinions.
10 A.  Okay.
11 Q.  Last sentence.  Tell me if I read this verbatim
12     correctly.  However, comma, my initial conclusions
13     from the December 3rd, 2019 report remain
14     unchanged, period.
15 A.  I'm trying to see where you were at here so I --
16 Q.  It's the last sentence -- close to the last
17     sentence of overview of opinions.
18 A.  Overview of opinions.
19     MR. HEHNER:  At -- at the main paragraph.  Not
20  the one, two, three.
21     THE WITNESS:  Oh, up here.  I'm sorry.
22     MR. JONES:  However --
23     THE WITNESS:  Additional examination has been
24  conducted and -- and information has been analyzed.
25  My initial conclusions from the December the 3rd

Page 128

1  report remains unchanged.  Yes.  I agree with that.
2  QUESTIONS BY MR. GARDNER:
3  Q.  Which is that the paint and other flammable
4      products used in the repair of trash dumpers
5      coll -- dumpsters collected on the tube heaters and
6      ignited, right?
7  A.  Yes.
8  Q.  Okay.  How did the paint collect on the tube
9      heaters?  How did it rise up from, say, floor level
10     or the level of a human spray painting,
11     14-and-a-half feet up in the air and get on these
12     heaters in 43 days?
13     MR. JONES:  Objection to form --
14     THE WITNESS:  The best --
15     MR. JONES:  -- foundation.
16     THE WITNESS:  -- the best way for me to state
17  that would be how it accumulated on everything else
18  inside the building.  There was all -- there was
19  paint there.  And if you went to where the -- there
20  actually was -- had moved that paint -- paint
21  facility to, the same thing is occurring there.
22 QUESTIONS BY MR. GARDNER:
23 Q.  Paint all over the place.
24 A.  Yeah.  It's a -- it's a blue paint everywhere.
25 Q.  All up and down the walls?

Page 129

1  A.  Not -- not as bad as it probably would be over a
2      period of time.  But it -- since -- but it -- it's
3      everywhere in the facility.  And I was told by
4      employee that it was everywhere in the facility.
5  Q.  I'm talking about this -- referencing now this --
6      the new place where they --
7  A.  Right.  I have pictures -- I have pictures
8      associated with that.
9  Q.  Right.
10 A.  So ...
11 Q.  And how is that room heated?
12 A.  By the tube heaters as well.  And I suggested that
13     to them.
14 Q.  Suggested what?
15 A.  That they should not be moving that over there
16     if -- because of the fact that the same thing can
17     occur to that building as occurred to the other
18     building.
19 Q.  Do you know when Republic, after the fire that
20     we're talking about, started painting their
21     dumpsters across the parking lot over in what used
22     to be the old wash bay in the big maintenance
23     building?
24     MR. JONES:  Objection to form.
25     THE WITNESS:  I don't know exactly the date

33 (Pages 126 - 129)

Page 130

1   that they moved. But I think they did some work
2   there at the same time they did work at the other
3   facility as well.
4       MR. GARDNER: Checking my memory here.
5       THE WITNESS: They didn't say any dates-wise
6   to me.
7   QUESTIONS BY MR. GARDNER:
8   Q. Correct me if I'm wrong, but I believe Greg Tolle
9       testified in his deposition that Republic started
10      painting, using the same Blue Sheboygan paint about
11      two to three weeks after the fire across the
12      parking lot --
13  A. Right.
14      MR. JONES: Objection, misstates --
15      MR. GARDNER: -- in what used to be -- hold
16   on, Thomas -- in what used to be the old wash --
17   truck wash bay, right?
18      MR. JONES: Objection, misstates prior
19   testimony.
20      THE WITNESS: Yes, sir.
21      MR. GARDNER: Okay.
22   QUESTIONS BY MR. GARDNER:
23   Q. You were there and you took photos inside of that
24      new paint bay, didn't you?
25   A. Yes.

Page 131

1   Q. Including of -- of the heaters used in there,
2       didn't you?
3   A. Yes. A couple months later, yes, when I --
4   Q. How many heaters were in there?
5   A. I noticed -- I believe as there's one long heater
6       along the away wall. And I -- if memory -- I have
7       pictures. But if there -- the -- I believe there's
8       another heat -- I believe there's two heaters in
9       that particular area of the wash bay.
10  Q. Did you take pictures of them?
11  A. Yes, sir.
12      MR. JONES: Objection, form.
13   QUESTIONS BY MR. GARDNER:
14  Q. Do you know the manufacturer of those two heaters
15      in the new wash -- paint facility?
16      MR. JONES: Objection to foundation.
17      THE WITNESS: No, I do not.
18   QUESTIONS BY MR. GARDNER:
19  Q. Did you climb up and look at them?
20  A. No.
21  Q. Did you see any blue paint on them?
22  A. Yes, sir.
23      MR. JONES: Marty, I'm -- I'm objecting to
24   your whole line of questioning on --
25      MR. GARDNER: I'll give you --

Page 132

1       MR. JONES: -- relevance. It's --
2       MR. GARDNER: -- a continuing objection
3   relevance --
4       MR. JONES: Thank you.
5       MR. GARDNER: -- if that's what you're talking
6   about.
7       MR. JONES: Thank you.
8   QUESTIONS BY MR. GARDNER:
9   Q. You saw blue paint on the two heaters that you saw
10      on the --
11  A. From the -- from the -- on the deflectors. Not
12      inside it. I didn't get in -- climb up and look
13      inside the tubes or anything of that nature, no.
14  Q. Isn't the date you took those photographs
15      March 3rd, 2020, inside the new paint --
16  A. The date I took that photograph is when I was asked
17      by the lab to get a sample of the -- if I could get
18      a sample of the paint.
19  Q. Uh-huh.
20  A. And also they wanted me to send them a sample of my
21      swab. So I went back up there and got a sample of
22      the paint itself. And the -- the only location
23      they had the paint was in that particular room. So
24      they directed me there, and that's when I noticed
25      all the material. I wasn't there to investigate

Page 133

1   any fire in that situation. But I was there to get
2   a sample of the paint. So I was there a very short
3   amount of time.
4       And at the same time I actually told -- I
5   think -- I believe it was Kyle at the time. I
6   mentioned to him, I said, you know, obviously this
7   was moved over here, and most of your paint's over
8   here now, and so it has the same type of heaters.
9   I don't know who the -- he said they'd been in
10  there -- that area for a lot much longer than the
11  other area. But I said they're becoming -- the
12  room is becoming like the other room was described
13  to me, blue.
14  Q. A lot of blue.
15  A. Yes.
16  Q. All over the place.
17  A. Not necessarily all over the place at -- at present
18      time I was there. But obviously it -- it could
19      be -- end up being that way if they use that room
20      for any length of time.
21  Q. There are two evidence custody forms in this case
22      referencing your collection of blue paint. One's
23      dated March 4th, 2020; and the other's dated
24      March 6th, 2020. Does that sound familiar to you?
25  A. I don't know where -- does he have a copy of those?

34 (Pages 130 - 133)

Page 134

1  Q.  Yeah.  But for the time being take me -- we'll --
2      we're gonna get to those.
3  A.  Okay.
4  Q.  There's billing in the Rimkus invoices in Exhibit C
5      that indicates that Mr. John Diggle and that you,
6      James Foster, and Lou Inendino went to the Republic
7      MacBeth facility on March 3rd, 2020?
8          MR. JONES:  Do you have a page number?
9          MR. GARDNER:  Yeah.  It's Page 10, Thomas.
10         MR. JONES:  Okay.  Thanks.
11         THE WITNESS:  Yeah.  We -- I think at that
12     particular timeframe we had a -- we had initially
13     set a joint examination up for -- for that date,
14     and everybody showed up.  And then there was
15     information given to us that the other parties
16     wanted additional things.  So there -- there was
17     not a whole lot of time involved in --
18 QUESTIONS BY MR. GARDNER:
19 Q.  I'm just trying to establish the day you took these
20     photographs --
21 A.  Yes.
22 Q.  -- inside the new -- the new paint room.
23 A.  Okay.
24 Q.  Got it?
25 A.  Yes.

Page 135

1  Q.  All right.  And if you'll look on that same page,
2      Jim, Exhibit C, Page 10.  The next entry is
3      March 6th, 2020.
4  A.  Right.
5  Q.  Evidence prepared for shipping to F.A.S.T. Labs for
6      testing, right?
7  A.  Yes, right.
8  Q.  And that was the Blue Sheboygan paint you collected
9      at the facility on March 3rd, 2020, right?
10 A.  And the -- a swab that --
11 Q.  Okay.
12 A.  -- was used too --
13 Q.  Okay.
14 A.  -- so they could have a comparison sample.
15 Q.  So that's almost a year after the fire when you're
16     gathering this blue paint across the parking lot
17     over in where they resumed painting operations,
18     right?
19 A.  Yes.
20 Q.  Okay.
21 A.  Also might add that that particular building was a
22     little taller than the other building was, as well,
23     the ceiling level was.
24 Q.  Did you -- you personally have any diagrams or
25     schematics available that you prepared in

Page 136

1      connection with your investigation of this case?
2  A.  The only thing I did was I -- on my file report I
3      did a -- a drawling [sic] of the site itself.
4  Q.  Do you have it today?
5  A.  No, I do not.  I don't have any information with me
6      today.
7  Q.  Right.  Despite the subpoena asking you to bring
8      it.
9          MR. JONES:  Objection to form.  We produced
10     everything that he's got.
11         THE WITNESS:  I -- I was told everything was
12     being --
13         MR. GARDNER:  Hold on.  There's no diag --
14     diagram or schematic attributable to him --
15         MR. JONES:  I'm not sure if he understands the
16     question.  If you're asking did he ever prepare one
17     or does he still have one in his physical
18     possession?
19         MR. GARDNER:  I'll break it down.
20 QUESTIONS BY MR. GARDNER:
21 Q.  Did you ever prepare a diagram or schematic in
22     connection with investigating this case?
23 A.  I had -- yes, I did.  On the -- on the back of my
24     file folder, I had the diagram of the building
25     itself.  It was a rough-sketch diagram; it was not

Page 137

1      a computer diagram or anything of that nature but
2      yes.
3  Q.  Did --
4  A.  And the measurements of the building, the external
5      measurements.
6  Q.  When's the last time you've seen this?
7  A.  Since I left Rimkus or -- yeah.
8  Q.  Did you contact Rimkus in preparation for this
9      deposition and ask that you be allowed to look at
10     the -- their file that they maintain in this case?
11 A.  I contacted Rimkus to have the file sent to -- or
12     sent to me.  And I received cert -- I received
13     limited information, and that was my report and
14     my -- and a copy of the lab report that I
15     'pecifically requested and also a copy of the
16     photo -- photos that weres -- were taken.
17 Q.  Can you pull up Exhibit DD.
18 A.  Which one?
19 Q.  DD.
20         MR. JONES:  Oh, it's the other one.  I'm
21     sorry.  You're right.
22         THE WITNESS:  Oh, sorry.
23         MR. JONES:  You can close that one.
24     I'll trade you binders.
25         THE WITNESS:  Okay.  Okay.

35 (Pages 134 - 137)

Page 138

1  QUESTIONS BY MR. GARDNER:
2  Q.  The exhibit -- Defendants' Exhibit DD has twelve
3     pages numbered 1 through 12.  These are the photos
4     that you took at the Rimkus facility, and the --
5     the new, it's called paint room, on March 3rd,
6     2020?
7  A.  They appear to be, yes.
8  Q.  You can look at the screen if that's -- I can't
9     tell how good -- sometimes --
10 A.  Okay.
11 Q.  -- these don't copy so well.  Depends on the
12    printer.
13 A.  Okay.
14 Q.  And does this first page accurately depict the
15    condition of the old wash bay, then current paint
16    bay, on March 3rd, 2020?
17 A.  Yeah.  There was nothing in the -- inside the bay
18    at the time that they were painting.
19 Q.  Do you see any blue paint anywhere in this picture
20    other than the bottom half of that garage door?
21 A.  As for as a large amount of it, no, I haven't.  I
22    don't.
23 Q.  Can you circle any small amounts other than what I
24    just said?
25 A.  Not by this photograph, I can't.

Page 139

1  Q.  Okay.  How about Page 2?  Can you circle on Page 2
2     of Exhibit DD any blue paint anywhere?  The walls,
3     the ceiling, or the heater?
4        MR. JONES:  Objection to form, relevance.
5        THE WITNESS:  I -- I don't see anything on
6     these -- on this photograph.  But it look -- it
7     appears on the photograph right below the heater
8     tube that there might be some blue there.  But I
9     can't tell for sure by these photographs.  On the
10    bottom side of that tube.
11 QUESTIONS BY MR. GARDNER:
12 Q.  I'm gonna hand you my Exhibit DD so you can draw on
13    it and give it to the court reporter.  On Page 2
14    would you -- we'll just give you a blue pen.  Got a
15    blue pen there?  Circle the alleged blue paint you
16    see in that --
17       MR. JONES:  Same -- same objections.
18       THE WITNESS:  Right in that area.  I don't
19    know if I can -- right in that area there.
20       MR. GARDNER:  I can tell --
21       THE WITNESS:  It might be lightly -- I can't
22    quite tell for sure though.
23 QUESTIONS BY MR. GARDNER:
24 Q.  You're uncertain.  You're uncertain.
25 A.  As for as the looks on these pic -- on these

Page 140

1     pictures, yes.
2        MR. JONES:  Same objections.
3        MR. GARDNER:  Same question --
4        THE WITNESS:  As you can see on the ceiling
5     there, there's blue paint on the ceiling.  So ...
6        MR. HEHNER:  Which -- which one are you
7     looking at on -- it's DD but --
8        THE WITNESS:  Number 2.
9        MR. HEHNER:  Number 2.  Thank you.
10       MR. GARDNER:  Would you circle the blue paint
11    on the ceiling that you're talking about.
12       MR. JONES:  Same objections.
13       THE WITNESS:  Here's B up here.
14       MR. JONES:  Okay.
15       MR. GARDNER:  You guys can watch -- oh, I see
16    here.  Thomas, I'm gonna -- that didn't come out
17    very good.
18       MR. JONES:  What part are you circling?
19       MR. GARDNER:  The same part he circled.  I'm
20    gonna write the initial B in here --
21       THE WITNESS:  Okay.
22       MR. GARDNER:  -- for your claim that you see
23    blue paint in that area.  Not coming out real --
24       MR. JONES:  He take a look at it real quick.
25    Make sure it looks the same.

Page 141

1        THE WITNESS:  I mean, in this photograph it
2     appears to be blue paint there.  And there appears
3     to be even some light dusting of paint on --
4  QUESTIONS BY MR. GARDNER:
5  Q.  And you --
6  A.  -- the ceiling.
7  Q.  -- you told -- you told Republic employees that you
8     had concern, grave concern probably, that here they
9     are still painting almost a year later with this
10    same Blue Sheboygan paint with an air sprayer in a
11    room with the same style heater, that it might
12    catch on fire?
13       MR. JONES:  Objection to form, foundation
14    and --
15       MR. GARDNER:  Fire.
16       MR. JONES:  -- relevance.
17       THE WITNESS:  I made a comment to them, yes,
18    that there -- there -- they could potentially have
19    some of the same issues in this particular building
20    by what they were doing in there.  And also the
21    fact that -- the reason why I would -- this is
22    not -- it's not the same conditions obviously.  But
23    it is similar to the conditions that existed in the
24    other building.  'Cause this didn't -- this was not
25    described as blue all over the walls, blue all over

Page 142

1    everything like the other place was.
2         But I saw remnants of blue paint pretty much
3    everywhere in the facility, not necessarily stand
4    out.  It was light, dusting-type paint in the
5    ceil -- in there.
6    QUESTIONS BY MR. GARDNER:
7    Q.  Are you aware that Rim -- Republic continued to use
8        their blue -- use Blue Sheboygan paint, the same
9        kind that they had used previously across the
10       parking lot, for at least three-and-a-half years
11       without any fire or explosion?
12       MR. JONES:  Objection to foundation,
13   relevance.
14       THE WITNESS:  I don't know.  I don't have any
15   information related to that.  The only thing I was
16   based on was what I found and what was presented to
17   us at the site and the statements that were made
18   there and the lab results that were obtained by the
19   samples that I took.
20   QUESTIONS BY MR. GARDNER:
21   Q.  I'm gonna hand you Exhibit DD.  And just go through
22       each page here, and put a circle around any blue
23       paint you see.
24       MR. JONES:  Same objections.
25       THE WITNESS:  Well, obviously it is showing

Page 143

1    there.
2         MR. GARDNER:  Probably on Page 3 by now.
3         THE WITNESS:  I already did that.  And there's
4    actually some light stuff in here, looks like.
5    This is all over the place in that particular -- on
6    the top.  I mean, the room where the paint was at,
7    it was -- there's a lot of blue there.  I can't --
8         MR. GARDNER:  Apparently -- yeah, I know.  I
9    apologize.  I only meant --
10        THE WITNESS:  Entire --
11        MR. GARDNER:  Hold on.
12        THE WITNESS:  -- entirely covered.
13        MR. GARDNER:  Jim, I only meant the walls,
14   ceiling, and heaters.
15        THE WITNESS:  Oh, okay.
16        MR. GARDNER:  I apologize.  I know there's
17   blue paint -- I think you've already done it with
18   your giant circles.
19        THE WITNESS:  And the one -- one thing about
20   these particular pictures is the -- this position
21   of this heater is not in the same position as were
22   the other heaters were while they were doing the
23   painting in the other thing.  This is off to the
24   side, against the wall.  And this is actual --
25   the -- where they did most of their painting would

Page 144

1    have been out in the center of this.  Not -- it's
2    not the same position nor is it in the same manner
3    as the other one was.
4    QUESTIONS BY MR. GARDNER:
5    Q.  What's the difference to you in terms -- as you're
6        referencing not in the same position, how does that
7        play in --
8    A.  I don't know how the ventilation --
9        MR. JONES:  Same -- same objection and
10   relevance.
11       THE WITNESS:  I don't know how the ventila --
12       MR. GARDNER:  Hold on a second.  The case law
13   clearly states you -- all relevancy objections are
14   preserved without any requirement to make it.
15   We're not in trial today.
16       MR. JONES:  All right.  Well --
17       MR. GARDNER:  So I --
18       MR. JONES:  -- form and relevance.
19       THE WITNESS:  First of all, the deflector is
20   not the same as it was in -- in the other one.
21   'Cause they were directly on top.  They were not
22   turned.  And this is almost to a 90-degree turn.
23   And it's forcing the air out this way from that.
24   So that would obviously keep some -- any paint from
25   accumulating to a certain degree.

Page 145

1         And, also, I don't know the ventilation system
2    of this building or if there's any other
3    ventilation [sic] systems at all.
4    QUESTIONS BY MR. GARDNER:
5    Q.  You didn't check for that when you were in there
6        taking --
7    A.  No, I didn't.
8    Q.  -- these pictures --
9    A.  I didn't -- I --
10       MR. JONES:  Objection to form.
11       THE WITNESS:  -- I just took pictures of what
12   was there.  This building had no bearing on what my
13   investigation was.  It basically did show me
14   that -- and I took pictures only to show them that
15   this -- similar things could happen in here if it
16   wasn't resolved and taken care of, or -- or
17   properly cleaned, one way or the other.
18   QUESTIONS BY MR. GARDNER:
19   Q.  You had some concerns that another fire could
20       occur --
21   A.  Yes.
22   Q.  -- in that --
23       MR. JONES:  Objection to form.
24   QUESTIONS BY MR. GARDNER:
25   Q.  'Cause you think this dry blue paint can ignite and

37 (Pages 142 - 145)

Page 146

1    combust when it gets on these heaters.
2  A.   Once -- yeah, once it -- the -- the liquid or the
3    water base boils off, yes.  And that's by the --
4    the company's own information that they provided.
5  Q.   Did -- do you know from the photos or from being in
6    the room, roughly a year after the fire, whether
7    the Vantage combustion boxes were open or closed?
8        MR. JONES:  Same objections, foundation.
9        THE WITNESS:  I don't know.  They were not
10   operating at the time I was there, so I could not
11   see whether or not they were.
12 QUESTIONS BY MR. GARDNER:
13 Q.   Page 9 of Exhibit DD.  That's a salamander heater,
14   isn't it?
15 A.   Yes.
16       MR. JONES:  Objection to foundation.
17 QUESTIONS BY MR. GARDNER:
18 Q.   And it has blue paint on it, doesn't it?
19 A.   Yes.
20 Q.   And do you know what the fuel is that -- that
21   salamander heater in this photograph runs from?
22       MR. JONES:  Same objection.
23       THE WITNESS:  I don't personally know but
24   likely kerosene.
25       MR. GARDNER:  Right.

Page 147

1  QUESTIONS BY MR. GARDNER:
2  Q.   And do you know if a -- if Republic had been
3    utilizing a salamander heater to heat any space
4    inside of building number 1 prior to March 20th,
5    2019?
6  A.   You're talking about the building that the fire
7    originated --
8  Q.   Yeah.  And --
9  A.   -- correct?  Okay.
10 Q.   -- building number 1, Jim.
11 A.   Okay.  I do know that they had a salamander heater
12   in there.  But I was told that that hadn't been
13   used for quite some time since they had the
14   overhead heaters.  And they had three of those
15   in --
16 Q.   Who told you that?
17 A.   I think that was Mr. Jones.
18 Q.   When?
19 A.   When I spoke to him on the -- was it the 20th?  I
20   can't remember exact dates.  But --
21 Q.   What year?
22 A.   When I spoke to him when we were standing out there
23   in front of the -- in May when I -- when I was
24   there doing the --
25 Q.   Okay.

Page 148

1  A.   -- thing.  So that would have been --
2  Q.   May 10th, 2020?
3  A.   -- 2019.
4  Q.   I'm sorry.  May 10th, 2019.
5  A.   2019.
6  Q.   And we do have some notes from Fred Jones in the
7    file, don't we?  You've seen those, right?  Written
8    by Lou Inendino?
9  A.   I --
10       MR. JONES:  Objection to form, foundation.
11       THE WITNESS:  -- I don't know that I've seen
12   those, no.
13 QUESTIONS BY MR. GARDNER:
14 Q.   Have you seen any field notes of witnesses'
15   statements in -- in this file taken by John Diggle?
16 A.   I've seen them, yes.  I have not --
17 Q.   Did you refer to those and utilize any of the field
18   notes prepared by John -- either John Diggle or Lou
19   Inendino in reaching any of your conclusions?
20       MR. JONES:  Objection to form.
21       THE WITNESS:  I did -- I personally based my
22   opinion on my investigation and my opinions of what
23   I saw while I was -- information I was given.  And
24   they did not offer any opinion to me, either one,
25   as for as a cause or origin of the fire.

Page 149

1  QUESTIONS BY MR. GARDNER:
2  Q.   I'm not talking about --
3  A.   That's my opinion.
4  Q.   -- their opinions.  They're lay witnesses.  I'm
5    talking about the facts from them.
6        MR. JONES:  Same objections.
7        THE WITNESS:  I'm not for sure exactly what
8    you're referring to.  But the --
9  QUESTIONS BY MR. GARDNER:
10 Q.   Wait a second.  You think Lou Inendino and John
11   Diggle wrote down opinions from Fred Jones --
12       MR. JONES:  Objection to form.
13       MR. GARDNER:  -- and -- I apologize -- any
14   other witness in their --
15       THE WITNESS:  I don't -- I don't think --
16       MR. JONES:  Same objections.
17       THE WITNESS:  I think they would just write
18   down facts as they would see them.
19       MR. GARDNER:  Right.
20       THE WITNESS:  I don't think they would write
21   down facts just because somebody gave them
22   information.  They might say a certain person told
23   them this or something.  But --
24       MR. GARDNER:  Okay.
25       THE WITNESS:  -- I don't think they would

38 (Pages 146 - 149)

Page 150

1  utilize that as factual information that they
2  would -- they would give a conclusion to, I guess,
3  I would speak about --
4      MR. GARDNER: You and I are not --
5      THE WITNESS: -- offer an an --
6      MR. GARDNER: -- on the same page.
7      THE WITNESS: -- investigation.
8  QUESTIONS BY MR. GARDNER:
9  Q. Did you, as the cause-and-origin expert, the only
10     one involved in this case for the plaintiff, rely
11     on any, way, shape or form, on any of the
12     information obtained by either Lou Inen -- Inendino
13     or John Diggle when they talked to Fred Jones or
14     any other witness?
15     MR. JONES: Objection to form.
16     THE WITNESS: No, I did not.
17     MR. GARDNER: Okay.
18  QUESTIONS BY MR. GARDNER:
19  Q. Do you know if kerosene has as a -- is produced by
20     the distillation of petroleum?
21     MR. JONES: Objection to foundation.
22     THE WITNESS: Yes, as similar diesel fuel.
23     MR. GARNER: Right.
24     THE WITNESS: It's a combustible material that
25     has a higher flash point, so to speak, than

Page 151

1  gasoline, for example.
2  QUESTIONS BY MR. GARDNER:
3  Q. And its residue could include and be interpreted as
4     a heavy petroleum distillate?
5     MR. JONES: Objection to foundation.
6     THE WITNESS: Yes. It would -- that's similar
7     to the -- the -- to any other products as well, as
8     for as --
9  QUESTIONS BY MR. GARDNER:
10  Q. -- any product can -- can leave the residue of a
11     heavy petroleum distillate?
12  A. No --
13     MR. JONES: Objection to form --
14     THE WITNESS: -- I'm not saying that --
15     MR. JONES: -- foundation.
16     THE WITNESS: -- at all.
17     MR. GARDNER: Okay.
18     THE WITNESS: The -- like paint thinners, for
19     example, gives off the same type class --
20     Class II-type vein, which was evident. And also
21     the -- if it's burning efficiently, it's -- they
22     typically would not do that. It would have to be
23     some contact. This is at floor level.
24  QUESTIONS BY MR. GARDNER:
25  Q. What is?

Page 152

1  A. This heater would be at floor level, number one.
2     And, number two, the fire originated at ceiling
3     level, according to the witnesses.
4  Q. You mean Shamir -- Samir?
5  A. Yes.
6  Q. You didn't read in his deposition -- well, you
7     didn't read his deposition at all, did you?
8  A. I don't recall that, no.
9  Q. Okay. Do you know if he -- when you looked and
10     went outside, he was located acloss -- across in
11     the fleet maintenance office at the time he was
12     alerted to something going on, do you know if he
13     saw fire first or if he saw smoke first or if he
14     saw both at the same time?
15     MR. JONES: Objection to foundation, form.
16     THE WITNESS: I don't know. He saw smoke, I
17     think initially, obviously. And then it -- 'cause
18     it was pretty heavy smoke involvement. And then he
19     saw flames.
20  QUESTIONS BY MR. GARDNER:
21  Q. Okay. Do you know if he went inside in either
22     building, 1 or 2 or 3 or 4, as we've got in this
23     Exhibit Z?
24     MR. JONES: Same objections.
25     THE WITNESS: To my knowledge, I think they

Page 153

1  attempted to. But I think they decided not to and
2  contacted 9-1-1 to --
3  QUESTIONS BY MR. GARDNER:
4  Q. So you're not aware he went inside with the
5     security guard and got keys to vehicles and went
6     outside and moved vehicles?
7  A. I'm -- I'm aware of that fact. But I --
8  Q. Well, how could he get the keys if he didn't go
9     inside --
10     MR. JONES: If you will let him finish his
11     answer.
12     THE WITNESS: But I'm -- I'm not aware that --
13     where those were located at as for as in the
14     building themselves.
15     MR. GARNER: Oh.
16     THE WITNESS: So ...
17  QUESTIONS BY MR. GARDNER:
18  Q. Go on my memory from his deposition is he only
19     entered building number 2. Were you aware of that,
20     Shamir [sic]?
21     MR. JONES: Objection to form.
22     THE WITNESS: I was not aware of that, no.
23     MR. GARDNER: Okay.
24  QUESTIONS BY MR. GARDNER:
25  Q. And were you aware that after he came outside,

39 (Pages 150 - 153)

Page 154

1    he -- I think he called John Shadow and 9-1-1?
2  A.  He said --
3        MR. JONES:  Objection, foundation.
4        THE WITNESS:  -- he made several phone calls.
5    So he didn't tell me who he called.
6  QUESTIONS BY MR. GARDNER:
7  Q.  All right.  And you didn't read his deposition that
8    when he first saw fire, it was predominantly coming
9    out of this white door, the most southern garage
10    door on building number 1, rather than out of the
11    two doors that are blue in Exhibit C?
12        MR. JONES:  Objection, form; asked and
13    answered.
14        THE WITNESS:  Well, the -- yeah, the -- I'm
15    assume -- I'm assuming -- saying that he -- they
16    saw fire coming out of the vent here on the front
17    of the building and around the doors.  But on the
18    south door particularly.
19        MR. GARDNER:  The white door.
20        THE WITNESS:  The only -- the only thing that
21    that could -- that tells me is not that the fire
22    originated there necessarily.  All it tells me is
23    fire seeks oxygen.  And those doors are -- there's
24    cracks in garage doors everywhere, that that door
25    could have possibly been a lot more open than the

Page 155

1    other doors were.
2        MR. GARDNER:  Sounds like you're speculating.
3        THE WITNESS:  I don't know.
4        MR. GARDNER:  You're speculating --
5        THE WITNESS:  That's speculation, yes.
6        MR. JONES:  Objection to form.
7        THE WITNESS:  But that's one of the -- the
8    known facts that fire seeks oxygen, and they're
9    going seek an open spot.
10  QUESTIONS BY MR. GARDNER:
11  Q.  What is the -- I'm on exhibit, I think it's DD,
12    Page 9.  There's a little red can here at the
13    bottom.  Do you see that?
14  A.  Yes.
15        MR. JONES:  Same objection.
16  QUESTIONS BY MR. GARDNER:
17  Q.  Is that full of kerosene?
18        MR. JONES:  Objection, foundation.
19        THE WITNESS:  I don't know what's in it.
20  QUESTIONS BY MR. GARDNER:
21  Q.  'Cause you didn't look.
22  A.  No, I did not look in there.
23        MR. JONES:  Same objection.
24  QUESTIONS BY MR. GARDNER:
25  Q.  Do your photographs taken at some point of the

Page 156

1    debris field in building number 1 show a -- a --
2    the remains of a salamander unit?
3        MR. JONES:  Objection --
4        THE WITNESS:  Yes, it does.
5        MR. JONES:  -- foundation.
6  QUESTIONS BY MR. GARDNER:
7  Q.  And do you know if that salamander heater was used
8    on the day of the fire or not?
9  A.  I was told --
10        MR. JONES:  Same objection.
11        THE WITNESS:  -- it had not been used for
12    quite some time.
13  QUESTIONS BY MR. GARDNER:
14  Q.  By Fred Jones?
15  A.  Yes.
16  Q.  But you didn't talk to the fella that was actually
17    working in the room, Dale Calle, about that, did
18    you?
19  A.  No, I did not.
20        MR. JONES:  Same objections.
21  QUESTIONS BY MR. GARDNER:
22  Q.  If you would have talked to Dale Calle or had
23    someone talk to him and get any kind of a
24    statement, then you could, one, rule out or rule in
25    the use of a kerosene salamander heater on the day

Page 157

1    of the fire --
2        MR. JONES:  Objection to form.
3  QUESTIONS BY MR. GARDNER:
4  Q.  -- couldn't you?
5  A.  I -- if I did not believe his statement to me that
6    it had not been used, him being the manager, I
7    probably would have followed through with that a
8    little bit more.  But given the fact that he told
9    me that since the other heaters have not been --
10    had only been installed for two months, they have
11    not had to utilize those -- the salamander heaters
12    because of sufficient heat in the building.
13  Q.  So you thought Fred Jones -- statements of Fred
14    Jones were reliable and dependable, correct?
15        MR. JONES:  Objection to form.
16        THE WITNESS:  Yes.  I would say so, yes.
17  QUESTIONS BY MR. GARDNER:
18  Q.  Can you go to Exhibit D?  It's a seven-page
19    exhibit.
20  A.  D itself?
21  Q.  Yes, sir.
22        MR. GARDNER:  It might be in the other binder.
23        THE WITNESS:  The other book.
24        MR. JONES:  Yep.  Trade you again.
25        THE WITNESS:  Okay.

40 (Pages 154 - 157)

Page 158

1  QUESTIONS BY MR. GARDNER:
2  Q.  Apologize.  I do have to wrap up some more
3     questions or at least one question on Exhibit DD,
4     Page 10.  I'm just gonna hand it to you.  You don't
5     have to find it.
6  A.  Okay.
7  Q.  There is a machine in the -- sort of the right side
8     of the photograph with some large yellow, I don't
9     know, yellow and red swirly paints.  Do you know
10    what kind of that machine is?
11       MR. JONES:  Objection to foundation,
12    relevance.
13       THE WITNESS:  I'm not for sure, but I believe
14    it's a pressure washer.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Okay.  On Page 11 of Exhibit DD -- here you go --
17    on the far left top side of the photograph, Jim,
18    there's another type of device.  Do you know what
19    that -- you can hold it.
20  A.  That's a spray paint --
21       MR. JONES:  Same objections.
22       THE WITNESS:  -- machine.
23  QUESTIONS BY MR. GARDNER:
24  Q.  Okay.  Do you know what type of spray paint machine
25    had been used in building number 1 prior to the

Page 159

1     fire on March 19th, 2019?
2        MR. JONES:  Objection, foundation.
3        THE WITNESS:  I have photographs of it.  It
4     was inside of a metal container.
5  QUESTIONS BY MR. GARDNER:
6  Q.  It was an airless sprayer, wasn't it?
7  A.  Yes.
8        MR. JONES:  Objection, foundation.
9  QUESTIONS BY MR. GARDNER:
10  Q.  What does that mean, an airless sprayer?
11       MR. JONES:  Objection, foundation.
12       THE WITNESS:  It was under pressure and didn't
13    require air to operate.
14  QUESTIONS BY MR. GARDNER:
15  Q.  So it didn't require a compressor, right?
16  A.  Right, right.
17       MR. JONES:  Same objection.
18  QUESTIONS BY MR. GARDNER:
19  Q.  Are you on Exhibit D?
20  A.  Yes.
21  Q.  All right.  It's on Rimkus letterhead, Page 1.
22  A.  Yes.
23  Q.  And it's sheet 1 of 3?
24  A.  Yes.
25  Q.  You just look at the first page for now.  Do you

Page 160

1     see the initials LVI at the top?
2  A.  Yes.
3  Q.  Okay.  And says Republic Waste Service, fire site
4     inspection, right?
5  A.  Yes.
6  Q.  Dated March 3rd, 2020, right?
7  A.  Yes.
8  Q.  Just two week -- couple weeks short of a year after
9     the fire.
10  A.  Yes, sir.
11  Q.  Are you aware of any field notes created by either
12    you or Lou Inendino or John Diggle --
13       MR. HEHNER:  Diggle.
14  QUESTIONS BY MR. GARDNER:
15  Q.  -- created at any date prior to March 3rd, 2020
16    that are still in existence?
17  A.  No, I do not.
18  Q.  All right.  So at the top left, Fred Jones' name is
19    underlined, isn't it?
20  A.  Yes.
21  Q.  To tell you that the information Mr. Inendino's
22    recording on Page 1 comes from Fred Jones?
23       MR. JONES:  Objection to foundation.  He
24    didn't write this.
25       THE WITNESS:  I don't know anything about this

Page 161

1     particular note.  And -- and there might -- he --
2     it appears that Fred Jones is underlined.  That's
3     all I can say to this.  So -- but I don't know why.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Were you present when Mr. Jones spoke -- sorry --
6     when Mr. Inendino spoke to Fred Jones on March 3rd,
7     2020?
8  A.  I don't recall any conversation.  I mean, that must
9     have been something he did on his own.
10  Q.  Did Mr. Inendino record, on Page 1 of the
11    Exhibit D, that the main electrical power came in
12    at the southeast corner of the building?
13       MR. JONES:  Objection to foundation.
14       THE WITNESS:  I don't see where it's at here
15    real quick.
16       MR. GARDNER:  Near the top.
17       THE WITNESS:  Okay.  Yeah, third line down
18    you're talking about.
19       MR. GARDNER:  Yeah.
20  QUESTIONS BY MR. GARDNER:
21  Q.  Does that comport with your exam -- site
22    examinations?
23  A.  Yes.
24  Q.  All right.
25  A.  Main --

41 (Pages 158 - 161)

1  Q.  The next line beneath it, Jim, says, Generator used
2      to run on methanol from the landfill.  I think it
3      says terminated.  You see that?
4  A.  Yes.
5  Q.  Did you ever observe a generator in building
6      number 1 that ran on methanol?
7      MR. JONES:  Objection to foundation.
8      THE WITNESS:  No, I did not observe the
9      generator.
10 QUESTIONS BY MR. GARDNER:
11 Q.  Can you comment or elaborate any further on that
12     sentence?
13     MR. JONES:  Same objection.
14     THE WITNESS:  I was -- I was just told they
15     transferred everything over to electric power, and
16     they just no longer used that system in the
17     building --
18     MR. GARDNER:  Okay, thanks.
19     THE WITNESS:  -- for several reasons.
20 QUESTIONS BY MR. GARDNER:
21 Q.  Next sentence, Jim, says, New -- I think it says
22     corners or covers done a while back.  Do you know
23     what that's in reference to?
24     MR. JONES:  Objection to foundation.  Calls
25     for --

1      THE WITNESS:  No --
2      MR. JONES:  -- speculation.
3      THE WITNESS:  -- I do not.
4  QUESTIONS BY MR. GARDNER:
5  Q.  The next says, A number of electrical panels for
6      building.  Do you see that?
7  A.  Yes.
8  Q.  You agree with that, don't you?
9  A.  Yes.
10     MR. JONES:  Objection to foundation.
11 QUESTIONS BY MR. GARDNER:
12 Q.  You observed numerous electrical panels inside of
13     building number 1 in your site inspections.
14 A.  Yes.
15 Q.  And you photographed them.
16 A.  I photographed some that -- in the -- exterior
17     of the building and also photographed some
18     throughout the building.
19 Q.  Yeah.  I'm just referring to building number --
20 A.  Building 1 as well, yes.
21 Q.  Right.  But you didn't collect any of that, did
22     you?
23 A.  No, we did not.
24 Q.  It was never tested, was it?
25     MR. JONES:  Objection to foundation.

1      THE WITNESS:  There was no testing done.
2  QUESTIONS BY MR. GARDNER:
3  Q.  Of the electrical components including these
4      electrical panels, right?
5  A.  Correct.
6      MR. JONES:  Same objections.
7  QUESTIONS BY MR. GARDNER:
8  Q.  It next says, Three overhead doors and one on the
9      other side.  Far door had electric.  All others
10     were manual.  Do you see that?
11 A.  Yes.
12 Q.  Would that be your understanding that the white
13     door on the far south side of the building number 1
14     in Exhibit Z is -- was electrically operated, but
15     the two blue ones were not?
16     MR. JONES:  Objection to form, foundation.
17     MR. GARDNER:  He --
18     MR. JONES:  Misstates the document.  It
19 doesn't say --
20     THE WITNESS:  I don't know anything about this
21     pape -- paper.  But I -- I assume that there --
22     they would have to be correct, yes.  If it came
23     from Fred Jones; he knows about the facility.
24 QUESTIONS BY MR. GARDNER:
25 Q.  So these seven pages of Exhibit D, you never looked

1      at and never read, never considered nor took into
2      consideration, when reaching your cause-and-origin
3      opinions expressed, I think it was December of
4      2022.  Right?
5  A.  No.  I've never seen these -- this information.
6  Q.  So you couldn't have utilized it or considered it
7      when you reached your cause-and-origin opinions,
8      could you?
9  A.  No, I could not.
10 Q.  Okay.  Just barely past the halfway down Page 1,
11     Exhibit D, Jim, Lou Inendino recorded, Korte Does
12     It All --
13 A.  Uh-huh.
14 Q.  -- did lighting upgrade just in the two paint bays.
15     Do you see that?
16 A.  Yes.
17 Q.  Were you aware of that before today?
18 A.  Yes, I was.
19 Q.  Okay.  It's recorded that the structure had a
20     shingle roof, right?  You see that?
21 A.  That's what's recorded, yes.
22 Q.  Did you know that --
23 A.  Corrugated metal underneath of it.
24 Q.  Yeah.  What kind of shingles, asphalt?
25 A.  Yes.

Page 166

1  Q.  Do you know the components of asphalt, the asphalt
2      shingles that were on top of building 1 at the time
3      of the fire?
4          MR. JONES:  Objection to foundation.
5          THE WITNESS:  I did not see any remains of any
6      asphalt shingles.
7  QUESTIONS BY MR. GARDNER:
8  Q.  They were consumed by the fire?
9  A.  Yes.
10 Q.  Because it was made out of tar and var -- tar
11     components combust?
12         MR. JONES:  Objection foundation, form.
13         THE WITNESS:  Yeah.  They're made out of
14     petroleum products, yes.
15         MR. GARDNER:  Yeah.
16         THE WITNESS:  They don't --
17 QUESTIONS BY MR. GARDNER:
18 Q.  How did you exclude the tar shingles as being the
19     source of either the medium or heavy petroleum
20     distillates found as a result of Sharee Wells'
21     testing of the items you sent down to her?
22         MR. JONES:  Objection to foundation.
23         MR. GARDNER:  Dur -- as a result of cross
24     contamination during fire -- during the fire.
25         MR. JONES:  Objection to form, foundation.

Page 167

1          THE WITNESS:  Well, I -- obviously the
2      shingles were com -- completely destroyed 'cause
3      there wasn't any shingles remaining, number one.
4      Number two, all the elect -- the electrical or the
5      metal panels were -- that made up the roof were
6      laying on top of everything.  So there -- there
7      would not have been any residue likely to -- to get
8      down inside of the -- of the heaters or inside of
9      the tubes of -- that circumstance.
10         And number -- I guess the third thing is, when
11     I sent the lab report in to confirm everything for
12     the paint sample, the paint sample came back as
13     positive as well.  The liquid version of it.
14 QUESTIONS BY MR. GARDNER:
15 Q.  The room, building number 1, had some ventilation
16     systems, didn't it?  You can look at Exhibit Z for
17     the question.
18 A.  Okay.  Yes.
19 Q.  You're aware of that, right?
20 A.  Yes.
21 Q.  How many exhaust fans or intake fans were there on
22     the day of the fire in building 1 in Exhibit Z?
23         MR. JONES:  Objection to foundation.
24         THE WITNESS:  I was told there was one at the
25     rear and one at the front.  It was kind of a cross

Page 168

1      ventilation --
2  QUESTIONS BY MR. GARDNER:
3  Q.  Which one brought air in -- oh, sorry, strike that.
4      Did they both bring air into this building 1, or
5      did they both exhaust air out of building 1, or --
6  A.  No.
7  Q.  -- some other combination?
8          MR. JONES:  Objection to foundation.
9          THE WITNESS:  They -- the rear one brought air
10     in, and the front one brought air out, is the way I
11     always understand it.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Okay.  And that's recorded by Lou Inendino on
14     Page 1 of Exhibit D, isn't it?  Fan on the back
15     brought fresh air in.
16 A.  I don't --
17         MR. JONES:  Objection to foundation.
18         THE WITNESS:  Yes.
19         MR. GARDNER:  Okay.
20 QUESTIONS BY MR. GARDNER:
21 Q.  At the bottom it's recorded, New heaters.  Didn't
22     pay attention to overspray --
23 A.  Yes.
24 Q.  -- because they weren't there long.  Paint came
25     out, 55-gallon drum, all blue.  You see that?

Page 169

1  A.  Yes.
2  Q.  Okay.  So as far as you know, any paint inside of
3      building number 1 at the day of the fire was in
4      55-gallon drums.
5  A.  Yes.
6          MR. JONES:  Objection to foundation.
7  QUESTIONS BY MR. GARDNER:
8  Q.  None -- none of it was in gallon cans, was it?
9          MR. JONES:  Same objection.
10         THE WITNESS:  To my knowledge, no.  They had
11     it in 55-gallon drums.
12         MR. GARDNER:  Okay.
13 QUESTIONS BY MR. GARDNER:
14 Q.  Page 2 of Exhibit D, Jim.
15 A.  Yes.
16 Q.  Again, this -- these notes are handwritten by Lou
17     Inendino on March 3rd, 2020.
18 A.  Yes.
19 Q.  All right.  Near the top it says, Tool room doorway
20     still there.  Do you know what he's talking about?
21         MR. JONES:  Objection to foundation; calls for
22     speculation.
23         THE WITNESS:  Well, they -- yeah, I know what
24     room he's talking about.  They had a -- a room, a
25     storage room and a thing to the south, very south

43 (Pages 166 - 169)

Page 170

1    end with a dividing wall, separated that room from
2    the other bay areas.  And they stored tools in
3    'cause they could lock the doors.
4    QUESTIONS BY MR. GARDNER:
5    Q.  Okay.  And so for reference, looking at Exhibit Z,
6        Page 2, the tool room, as you understand it to be,
7        was located -- would have been located in the space
8        behind the most southern white door, correct?
9    A.  Correct.
10   Q.  And that was an unheated space, wasn't it?
11       MR. JONES:  Objection to foundation.
12       THE WITNESS:  As for as I know, yes, it was
13   unheated.  There was no tube heaters in that -- in
14   the space.
15   QUESTIONS BY MR. GARDNER:
16   Q.  Maybe a salamander heater?
17       MR. JONES:  Objection to foundation; calls
18   for --
19       THE WITNESS:  There was no --
20       MR. JONES:  -- speculation.
21       THE WITNESS:  -- salamander heaters located in
22   that space either.
23   QUESTIONS BY MR. GARDNER:
24   Q.  Where was the salamander heater located?
25   A.  It was --

Page 171

1        MR. JONES:  Same objections.
2        THE WITNESS:  -- it was back towards the back
3    about probably 25 feet.
4    QUESTIONS BY MR. GARDNER:
5    Q.  In the room where they spray painted?
6    A.  Yes.
7    Q.  Further down Page 2, Exhibit D, notes by Lou
8        Inendino from talking to Fred Jones.  It says,
9        Always -- always turned off -- wait a minute.  Old
10       heaters always turned off for painting.  Do you see
11       that?
12       MR. JONES:  Objection to form.
13       THE WITNESS:  Yes.
14   QUESTIONS BY MR. GARDNER:
15   Q.  Near it says, Used salamanders for paint cans.
16       Do you see that?
17   A.  I don't know where that's at for sure.  Okay.
18       Always heaters turned off for painting.  Used
19       salamanders.
20   Q.  For paint cans.
21   A.  For paint cans.
22   Q.  Right.
23       MR. JONES:  Objection to foundation --
24       THE WITNESS:  I don't know when --
25       MR. JONES:  -- form.

Page 172

1        THE WITNESS:  -- if and when they used them.
2    Because --
3    QUESTIONS BY MR. GARDNER:
4    Q.  This notation makes no reference to when, does it?
5    A.  No.
6    Q.  Because you didn't talk to Dale Calle or Terry
7        Reader, right?
8        MR. JONES:  Objection to form --
9        THE WITNESS:  I talked to the manager --
10       MR. JONES:  -- foundation.
11       THE WITNESS:  -- of the facility.  He said
12   they hadn't been used.
13   QUESTIONS BY MR. GARDNER:
14   Q.  Okay.  Then it says the heaters were -- I think it
15       says at 70 or 75 degrees per Fred?
16   A.  Yes.
17   Q.  And then Jim Foster and Kyle said the heaters were
18       at 60 -- set at 60 degrees Fahrenheit?
19   A.  That's what Kyle told me, yes.
20   Q.  All right.
21   A.  They turn them down of an -- of an evening.
22   Q.  Right.  And then beneath that it says, Fred thinks
23       thermostat higher than that, right?  Higher than
24       60.
25   A.  Right.

Page 173

1    Q.  Okay.  And then it says, MIG welder kept in the
2        tool room, right?
3    A.  Yes.
4    Q.  Did you find the remains of a MIG welder in the
5        tool room that we've already talked about?
6    A.  There was remains in there.  I don't know what type
7        of welder it was.  But there was remains in that
8        tool room.
9    Q.  And you didn't collect it, did you?
10   A.  No, I did not.
11   Q.  And you didn't collect the salamander, did you?
12   A.  No.
13   Q.  And then it says, Minor welding done near southeast
14       corner.  You see that?
15   A.  Yes.
16   Q.  You have any reason to dispute that?
17   A.  No.
18   Q.  Okay.  Next, Page 3 of Exhibit D, about halfway --
19       roughly halfway down, Jim.  It says, Main circuit
20       panel located southeast corner?
21   A.  Yes.  It would be --
22   Q.  You agree with that --
23       MR. JONES:  Objection to form, foundation.
24   QUESTIONS BY MR. GARDNER:
25   Q.  -- based on your investigation?

Page 174

1  A.  Yes.
2  Q.  Okay.  It says heaters mounted nine feet above
3     slab.  Do you see that?
4        MR. JONES:  Objection to form.
5        THE WITNESS:  I'm assuming that's -- I don't
6     see that on here.  But --
7        MR. GARDNER:  It's right next to the main
8     circuit southeast corner.
9        MR. JONES:  It's right here.
10       THE WITNESS:  Okay.  Heater mounted nine feet
11    above -- yes.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Do you have any reason to dispute it?
14       MR. JONES:  Objection --
15       THE WITNESS:  No.
16       MR. JONES:  -- to foundation.
17 QUESTIONS BY MR. GARDNER:
18 Q.  You've seen no evidentiary basis or deposition
19    testimony that indicates otherwise?
20 A.  No.
21 Q.  Is the fact that they were located nine feet off
22    the floor important or relative at all to your
23    cause-and-origin opinions?
24       MR. JONES:  Objection to form.
25       THE WITNESS:  I -- I think nine feet off the

Page 175

1     floor is -- you know, it's only basically three to
2     four feet above an awe -- a human being basically,
3     five feet above your head.  Or four foot above your
4     head; depends on how tall somebody is.  And this is
5     why I was mentioning the fact that in the other
6     building I referred to earlier with the heater,
7     it's, like, 14 feet up.
8  QUESTIONS BY MR. GARDNER:
9  Q.  So it's --
10 A.  So it's much higher.
11 Q.  -- way harder to stand on heaters, like, 14,
12    15 feet up than nine feet, right?
13       MR. JONES:  Objection to form and foundation.
14       THE WITNESS:  Right.  It would probably come
15    down before it continued up.
16 QUESTIONS BY MR. GARDNER:
17 Q.  Yeah.  And if they're 15-feet high, 14-feet high,
18    paint's gonna hit the floor rather than drift all
19    the way up, right?
20       MR. JONES:  Same objections.
21       THE WITNESS:  I -- I'm -- I'm not privy to how
22    much weight the -- the paint weighs, or whatever,
23    and the particles weigh.  But it would --
24    obviously, the weight of the particles would affect
25    how high it would go, number one.  And ventilation

Page 176

1     in this -- the room would also affect how -- where
2     it goes and where it lands.
3  QUESTIONS BY MR. GARDNER:
4  Q.  Was the ventilation in building number 1 on
5     March 19th, 2019 operating the fans?
6        MR. JONES:  Objection to --
7        THE WITNESS:  I have no knowledge --
8        MR. JONES:  -- foundation.
9        THE WITNESS:  -- of that, if it was functional
10    or not.  I was -- I was told that they -- the --
11    sometimes they're used and sometimes not.  Depends
12    on how much --
13 QUESTIONS BY MR. GARDNER:
14 Q.  So when they're --
15 A.  -- water they use.
16 Q.  -- draw air in from the back through a fan and
17    expel it through the front --
18 A.  Right.
19 Q.  -- which would be the east side, that would stir up
20    the paint in the room and allow it to maybe get up
21    higher.  Is that what you're saying?
22       MR. JONES:  Objection to --
23       THE WITNESS:  I'm not saying --
24       MR. JONES:  -- foundation.
25       THE WITNESS:  -- that at all.  I'm just saying

Page 177

1     I don't know the circulation is in the room and how
2     it affects that.  I wasn't there when the building
3     was obviously operational so -- to know.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Next line, it says, Paint on mist, in quotes, would
6     go up 24 inches.  You see that?
7  A.  Yes.
8  Q.  Then tell the -- tell the jury what the next words
9     are after that.  Just read that out loud.
10 A.  And then come back down?
11       MR. JONES:  Objection.
12       MR. GARDNER:  Come back down to the floor.
13       MR. JONES:  Same objections.
14 QUESTIONS BY MR. GARDNER:
15 Q.  Right?
16 A.  That's what statement is on here, yes.
17 Q.  Right.
18 A.  That doesn't explain though the fact that there was
19    heat -- or paint on the deflectors and on the --
20    the heater tubes themselves --
21 Q.  It's incongruent with that.
22 A.  -- and how that --
23 Q.  It's incongruent information, isn't it?
24 A.  Right.  It's not information that I would deem
25    liable [sic] based on what I saw.

45 (Pages 174 - 177)

Page 178

1   Q.   After the fire.
2   A.   After the fire.
3   Q.   'Cause you're never in the room before the fire.
4   A.   No.
5   Q.   And at no time did you ever obtain -- did you ever
6        obtain any photos taken inside building -- building
7        number 1 taken before the fire showing the
8        conditions, did you?
9   A.   I did not.
10  Q.   Have you ever seen any?
11  A.   I -- I don't think I have.  Except for I think one
12       of the -- I thought I saw something about inside
13       of -- online or something or --
14  Q.   Yeah, okay.
15  A.   -- on the -- one of the report.
16  Q.   Continuing after the phrase, written by Lou
17       Inendino, after talking to Fred Jones, that starts
18       out with, Paint on mist would go up 24 inches then
19       come back down.  Sprayer not too old from
20       Sherwin -- Sherwin Williams, airless.  And could
21       you read the rest of the sentence.
22  A.   It says here, It could not spray up and hit
23       heaters.
24  Q.   And that came from Fred Jones, didn't it?
25           MR. JONES:  Same objections, form, foundation.

Page 179

1           THE WITNESS:  Yeah.  He's talking 'pecifically
2        about the sprayer.  Depend on how they have it
3        ang -- there's a lot of issues involved in that and
4        explanations that does not cover.  Number one
5        is, where does the vapors go?  How would the
6        ventilation affect where the -- everything goes?
7        And why did everybody say that they had blue paint
8        everywhere in the facility, all over the place?
9           So if that would have been the case, then
10       obviously it would not have been just -- it only
11       been 24 inches away from where they were painting.
12       And that's not what the --
13  QUESTIONS BY MR. GARDNER:
14  Q.   So you understand --
15  A.   -- information was.
16  Q.   -- say you and I had been in there a month before
17       the fire taking pictures inside of building
18       number 1, as low -- as shown on Exhibit Z, we would
19       have seen blue paint floor to ceiling, up on the
20       ceiling, on the heaters.  That's what you're
21       saying.
22  A.   That's the --
23           MR. JONES:  Objection to foundation, form.
24           THE WITNESS:  -- that's the description I was
25       given by the employees working --

Page 180

1   QUESTIONS BY MR. GARDNER:
2   Q.   And you've never --
3   A.   -- there.
4   Q.   -- seen any photographs contradicting that
5        information --
6   A.   No --
7   Q.   -- have you?
8   A.   -- I have not.
9   Q.   Okay.  Continuing with that sentence and finishing.
10       Lou Inendino recorded March 3rd, 2020, in talking
11       to Fred Jones, who you said you relied on,
12       Overspray would be --
13           MR. JONES:  Object --
14           MR. GARDNER:  -- drawn into the filters.
15           MR. JONES:  Objection to -- objection to form,
16       foundation.
17           THE WITNESS:  Well, the filters were at --
18       were at the -- the fans that -- particularly the
19       front fan that blows the -- to circulate out.  And
20       the filter was there, and it filtered the air going
21       to the outside.  And that's an environmental
22       requirement, so to speak, for any type of a paint
23       booth or paint area.
24  QUESTIONS BY MR. GARDNER:
25  Q.   Do you have some idea there was a paint booth in

Page 181

1        building number 1?
2           MR. JONES:  Objection to foundation.
3           THE WITNESS:  I don't think it's a paint
4        booth, obviously.  It doesn't meet any requirements
5        for a paint booth.  It does meet requirement for a
6        painting area or a spray area.
7   QUESTIONS BY MR. GARDNER:
8   Q.   And then Fred Jones' phone number's recorded?
9   A.   Yes.
10          MR. JONES:  Objection to foundation.
11  QUESTIONS BY MR. GARDNER:
12  Q.   Why didn't you include in either of your reports
13       the information obtained from Lou Inendino on
14       March 3rd, 2020 from the manager of the facility in
15       question, Fred Jones, about the blue paint could
16       not spray up and hit the heaters?  Why didn't you
17       put that in your report?
18          MR. JONES:  Objection to form.
19          THE WITNESS:  Because it -- they -- I'm not
20       saying that they took the spray gun and -- and
21       sprayed the heaters with it.  I'm saying that the
22       overspray and the air ventilation systems and the
23       -- the overs -- the -- was sprayed in a manner to
24       which the circulation of those products landed on
25       everything in the building, according to

46 (Pages 178 - 181)

Page 182

1    information that I was given.
2        MR. GARDNER:  When you say --
3        THE WITNESS:  And I think in this thing
4    they're talking about 24 inches is how far the --
5    the sprayer will actually spray as for as to paint.
6    They're not talking about spraying -- whether the
7    mist that's generated would go.
8    QUESTIONS BY MR. GARDNER:
9    Q.  Did you go over these notes before this deposition
10       started?
11   A.  No, I did not.  I haven't seen these notes before.
12   Q.  Can you go to the next page, Page 4 of Exhibit D.
13       Now, these notes are also dated March 3rd, 2020.
14       You were -- you were at the site that day, right?
15   A.  Yes.
16   Q.  And these are by JDHD, right?
17   A.  Yes.
18   Q.  You and I (unintelligible) John Diggle?
19   A.  Yes.
20   Q.  The EE you brought with you.
21   A.  Uh-huh.
22   Q.  Yes?
23   A.  Yes.
24   Q.  All right.  And couple lines down, doesn't --
25       didn't he record, that is John Diggle, Republic

Page 183

1    bought the building in 1965?
2        MR. JONES:  Objection to foundation.  Document
3    speaks for itself.
4        THE WITNESS:  Yes.
5    QUESTIONS BY MR. GARDNER:
6    Q.  Down at the bottom it says -- you see the reference
7       to time, 10:50?
8    A.  Yes.
9    Q.  Bottom left, Jim.
10   A.  Uh-huh.
11   Q.  And Mr. Diggle recorded, SERVPRO at north end of
12      building, smelled smoke, found fire, took cell
13      phone videos?  You see all that?
14   A.  Yes.
15   Q.  All right.  Tell us about your efforts or anybody
16      from Rimkus efforts to speak with these SERVPRO
17      people.
18       MR. JONES:  Objection to form.
19       THE WITNESS:  I made contact with SERVPRO on
20   the -- the day of the fire, first inspection.  But
21   they would not give me any information about who
22   the employees were, any information at all.  They
23   -- they said that they could not release any
24   information in that regard.
25   QUESTIONS BY MR. GARDNER:

Page 184

1    Q.  Can you go to the next Page 5, Exhibit D.
2    A.  Uh-huh.
3    Q.  Still these are the handwritten notes of John
4       Diggle taken March 3rd, '20 and talking to Fred
5       Jones, right?
6    A.  Yes.
7    Q.  Fred Jones referred to as the container shop lead,
8       right?
9    A.  Uh-huh.
10   Q.  He'd worked there for 11 years, right?
11   A.  Yeah, he -- they -- he referred to me as he was a
12      manager.  But I'm sure that's --
13   Q.  Right.  And did Mr. Diggle make this diagram on
14      Page 5 of Exhibit D?
15       MR. JONES:  Objection to form, foundation.
16       THE WITNESS:  I would assume so since this is
17   his documentation.
18   QUESTIONS BY MR. GARDNER:
19   Q.  All right.  Go to the last page of Exhibit D,
20      Page 7.  Why is it that John Diggle and Lou
21      Inendino were the ones taking notes from Fred Jones
22      instead of you?
23       MR. JONES:  Objection to form, foundation;
24   calls for speculation.
25       THE WITNESS:  Well, I had already spoken to

Page 185

1    him, but I think -- he was there the day of the
2    examination.  And obviously I did not -- I was
3    involved in the aspect of collecting evidence and
4    things of that nature.  And John Diggle obviously
5    was not involved in the -- doing that.  So I'm
6    assuming, by this notation, he was talking to
7    people and utilizing his time to get information
8    from them or whatever.  I don't know.
9    QUESTIONS BY MR. GARDNER:
10   Q.  You don't let people employed with Rimkus take
11      notes that aren't accurate note takers, do you?
12       MR. JONES:  Objection to form.
13       THE WITNESS:  No, I don't.
14   QUESTIONS BY MR. GARDNER:
15   Q.  See, this is the first time I've seen John Diggle's
16      writing in my whole life.  You've seen it prior in
17      other cases, haven't you?
18   A.  Yes.
19   Q.  Okay.  See if I read it right.  Page 7, Electric
20      enters at south end of building.  Extensive thermal
21      dam -- damage to the breakers.  All charred.
22      Switch boxes in four-inch junction box destroyed.
23      Have I read that right?
24   A.  Yes.
25       MR. JONES:  Objection to form, foundation.

47 (Pages 182 - 185)

Page 186

1 QUESTIONS BY MR. GARDNER:
2 Q. Conduit is destroyed and in pieces. Fire melt
3   extensive to copper conductors? Conductor?
4      MR. JONES: Objection, foundation --
5      THE WITNESS: Yeah. I --
6      MR. JONES: -- document speaks for itself.
7      THE WITNESS: That -- that could be the,
8   obviously, what his -- what there was visual at the
9   time of the examination. That doesn't mean that
10   was the cause of the fire or anything.
11      MR. GARDNER: Nobody asked you about cause of
12   the fire at this point.
13      THE WITNESS: Okay.
14 QUESTIONS BY MR. GARDNER:
15 Q. To your understanding that -- wait a minute. Is it
16   the case that none of the electrical systems,
17   including those mentioned on Page 7 of Exhibit D,
18   were collected due to the amount of extensive
19   damage to them? That play a role in not collecting
20   it?
21 A. It did not play a role in not collecting it. The
22   information that was obtainable to us was where the
23   fire originated from and was stated to us it was
24   high in the building. And it was, at the time,
25   based on the electrical components being in --

Page 187

1   with -- in conduit, and things of that nature, that
2   the likelihood of this would be very minimal.
3      All this here was a hypothesis that we looked
4   at, same -- using the scientific method. And that
5   hypothesis was ruled out basically on the aspect of
6   there was nothing that would indicate that the fire
7   started in the electrical by those that are in
8   attendance. And, second of all, is everybody in
9   attendance had an opportunity, if they wanted
10   something collected, no matter whether it was me or
11   anybody, we -- we always do that.
12 Q. Now, wait a minute. Are you denying that you were
13   asked by the electrical engineers, by -- by the
14   defendants and the cause and origin -- my
15   cause-and-origin expert asked you for, and Rimkus,
16   to collect the electrical systems? Are you
17   denying --
18 A. No. I did not deny anything, and I would never
19   deny anything like that. They have an opportunity
20   to request it.
21 Q. And they did.
22 A. And nobody did.
23 Q. Are you sure?
24 A. I'm positive.
25 Q. Okay.

Page 188

1 A. Or it would have been collected.
2 Q. Can you go to the Exhibit E. It's just a one-page
3   exhibit.
4 A. (Witness complies.)
5 Q. This is a typed-up page rather than handwritten
6   notes. It looks like it's attributed to Fred
7   Jones, container shop manager. Have you seen this
8   before?
9 A. No, I have not.
10 Q. Who -- who prepared this? Who typed this up?
11      MR. JONES: Objection to foundation.
12      THE WITNESS: I have no knowledge --
13      MR. JONES: He just said he's never seen it.
14      THE WITNESS: -- of that.
15 QUESTIONS BY MR. GARDNER:
16 Q. What?
17 A. I have no knowledge of who typed this up.
18 Q. You've never seen it before today?
19 A. No, I have not.
20      MR. JONES: Asked and answered.
21      MR. GARDNER: Would this be a good time to
22   take a --
23      THE STENOGRAPHIC REPORTER: Yes.
24      MR. JONES: Yeah. Now's great time to take
25   a break.

Page 189

1      THE VIDEOGRAPHER: This ends media two. The
2   local time's 2:33. We are off the record.
3      (A brief recess was taken.)
4      THE VIDEOGRAPHER: This begins media three.
5   The local time is 2:45, and we are on the record.
6 QUESTIONS BY MR. GARDNER:
7 Q. Jim, on Page 2 of your first report, marked as
8   Exhibit F, roughly two-thirds of the way down --
9   tell me when you're there, Page 2.
10 A. Okay. Uh-huh.
11 Q. It says there had been no problems related to the
12   heat prior to the fire event. You see that?
13      MR. ZOCCOLA: What paragraph are you reading
14   from?
15      MR. GARDNER: Fifth.
16      THE WITNESS: The third paragraph?
17      MR. GARDNER: Fifth.
18      THE WITNESS: The fifth one? Oh, that would
19   be the fourth one you're talking about. Three
20   space heaters?
21      MR. GARDNER: Yeah, that's the one.
22      THE WITNESS: Okay. All right.
23 QUESTIONS BY MR. GARDNER:
24 Q. You wrote at the end, There had been no problems
25   related to the heat prior to the fire event.

48 (Pages 186 - 189)

Page 190

1  A.  Yes.
2  Q.  Do you mean the heaters or you mean the heat --
3      heat system?  What are you talking about?
4  A.  The heat -- the units themselves I'm talking about
5      there.
6  Q.  According to the information from my client, they
7      be -- these Space-Ray closed infrared tube heaters
8      first became operational on February 4th, 2019.
9      And this fire was 43 days later on March 19th,
10     2019.  Can you explain why there had not been a
11     fire in the previous 43 days?
12        MR. JONES:  Objection to foundation.
13        THE WITNESS:  I cannot explain that type of
14     sit -- I don't know how they were installed.  I
15     don't know if they were installed properly.  I'm
16     assuming they were, but I don't know that for a
17     fact.  And also the fact that I don't know how -- I
18     was told that they spray paint seventeen to
19     nineteen containers in there a day.  So that's a
20     lot of -- a lot of painting going on.
21        So I don't know.  There's certainly
22     circumstances involved in that that I don't know.
23     You know, it's just given the right conditions and
24     the right time, that's when things happen.
25  QUESTIONS BY MR. GARDNER:

Page 191

1  Q.  Tell us what conditions existed on March 19th, 2019
2      that had not existed or were different from the
3      previous 43 days.
4         MR. JONES:  Objection to foundation; misstates
5      prior testimony.
6         MR. GARDNER:  Hold on a second.  I'm gonna
7      move for additional time for this deposition, if
8      you don't knock it off with objections that aren't
9      legally recognized, Thomas.  You're taking up the
10     whole deposition.  Her fingers are --
11        MR. JONES:  They've been concise the whole
12     deposition.  I -- yours in other depos have been
13     the opposite.  I -- I'm keeping it to, like, two
14     words.
15        MR. GARDNER:  I'm just warning you.
16        MR. ZOCCOLA:  You read from notes for --
17        MR. GARDNER:  I'm allowed to read from notes.
18        MR. ZOCCOLA:  -- like, three hours.
19        MR. JONES:  No.  The notes relying on --
20     you're asking his opinion about what other people
21     said in their notes.  I'm going to object on that
22     every day.  Because he can't speculate as to what
23     John Diggle may or may not have thought when he
24     wrote his notes.  And if your questions are
25     gonna -- I -- I'm going to object.  But they're

Page 192

1      concise and --
2         MR. GARDNER:  I just made my record --
3         MR. JONES:  -- proper objections.
4         MR. GARDNER:  -- that's all.
5         MR. JONES:  That's fine.
6         MR. GARDNER:  We'll be moving for more time,
7      if this doesn't --
8         Can you read the last question.
9         (The requested text was read by the court
10     reporter.)
11        MR. JONES:  And if you'd like --
12        MR. GARDNER:  Recognize his --
13        MR. JONES:  -- same objection.
14        MR. GARDNER:  She just read it, Tom.  You
15     don't have to do it.
16        MR. JONES:  Well, I -- you're complaining --
17        MR. GARDNER:  Your objections were recorded.
18        MR. JONES:  If you can let met state my
19     objection.
20        MR. GARDNER:  You already did.
21        MR. JONES:  You're -- you're asking a question
22     about what conditions have changed.  And I don't
23     think he testified that any conditions had changed
24     on the day of the fire.  That's my objection.
25        THE WITNESS:  I don't know that any conditions

Page 193

1      have changed.  I just know that they're -- under
2      certain conditions things happen.  Other conditions
3      they don't happen.
4  QUESTIONS BY MR. GARDNER:
5  Q.  You're -- but you're not aware --
6  A.  It --
7  Q.  -- of any changes?
8  A.  I'm not a -- aware of any changes that -- that
9      occurred in this particular situation.  But
10     everything occurs given under certain conditions.
11     And in these particular situation, I feel the
12     conditions were right for this to -- to have
13     happened.
14  Q.  But they weren't the right conditions for it to
15     happen in the previous 43 days.
16  A.  Given the circumstances, obviously it didn't
17     happen.  So I'm assuming that the conditions
18     weren't right at those -- at that time.
19  Q.  So far as you know, the heaters had been
20     operational during the prior -- the 43 days after
21     installation until the time of the fire?
22  A.  Yes, I would --
23  Q.  What I mean by that, Jim, is the temperatures were
24     low enough in the room to call for heat.
25  A.  Yeah.  It was in the winter time, actually.

49 (Pages 190 - 193)

Page 194

1  Q.  Right.  You -- you didn't obtain any weather
2      records, did you, in this case?
3  A.  I checked with weather.  There -- the temp at the
4      time of day on this particular day was that --
5      during the daytime was 47 degrees.
6  Q.  What about the overnight low?
7  A.  Overnight low went down to, like, 28, I believe it
8      was, on that particular day.  Don't quote me.
9  Q.  Did you look at the -- did you look at the weather
10     records all the way back to the date of first
11     operation of February 4th, 2019?
12 A.  No.  It's -- I'm -- that's during the wintertime,
13     so, I mean, it would be likely that those would be
14     operational almost 24 hours a day at certain times.
15 Q.  Right.  And so explain the ignition sequence of
16     these Space-Ray heaters that my client installed.
17     So the temperature drops and the thermostat calls
18     for the -- the room to be heated.
19 A.  Right.
20 Q.  Explain how that operates.  What happens inside the
21     heater box?
22 A.  Well, I'm not a mechanical engineer.  But
23     generally -- the general knowledge that I know
24     about is there's electronic ignition that occurs.
25     Once the temperature drops, the thermostat calls

Page 195

1      for more heat and sends it to the -- a heater unit.
2      And basically it causes electronic ignition to
3      occur.  There's a -- I believe a thermal resistor
4      in there that heats up and causes ignition to -- to
5      occur in the heater.
6  Q.  Of propane gas?
7  A.  Yes, of pro -- calls for pro -- a valve that opens
8      up and allows propane to come through and the
9      ignition occurs.
10 Q.  Ignition of the propane gas.
11 A.  Yes.
12 Q.  Inside the box.
13 A.  Inside the box.  The -- that's the heater box, yes.
14 Q.  Right.  And then so this heat blows down through
15     the -- the tube.  I think they're, like, 30 feet
16     long, right?
17 A.  Yes.
18 Q.  How -- do you know how it is propelled down inside
19     the tube?  Is there a force of air or something?
20 A.  I -- there's a fan --
21 Q.  Blowing --
22 A.  -- that blows it --
23 Q.  And --
24 A.  -- down through there.
25 Q.  -- in this case -- in building number 1, in the

Page 196

1      43 days before the fire, the source of the
2      combustible air was from outside of the room,
3      wasn't it --
4  A.  Yes.
5  Q.  -- rather than inside air.
6  A.  As for as the air that's supplied down through the
7      tube, yes.
8  Q.  Yeah, okay.  So have you done any research into the
9      preexisting Modine heaters that my client replaced.
10     There were three of them in the room.
11 A.  I have not done any research on them as I was told
12     those were not -- no longer in operation or used
13     under normal circumstances unless it gets really
14     cold.  And in this situation that they relied on
15     the three heaters that were installed.
16 Q.  The new ones.
17 A.  Yes.
18 Q.  Do you know why, from any witness testimony or
19     deposition testimony, the three preexisting Modine
20     heaters were not functioning and needed replaced?
21     MR. JONES:  Objection --
22     THE WITNESS:  No, I do not know why.
23 QUESTIONS BY MR. GARDNER:
24 Q.  You hadn't been told they had clogged up with blue
25     paint mist and no longer could ignite?

Page 197

1  A.  It would not surprise me that that would be the
2      case.
3  Q.  And what was the source of combustible air inside
4      of the preexisting three Modine heaters that had
5      been in there for over a decade?
6      MR. JONES:  Objection to foundation.
7      THE WITNESS:  Well, they were standalone
8      heaters.  So there was vents inside -- or in those
9      heaters that would've probably pulled just room air
10     in --
11     MR. GARDNER:  Including the paint.
12     THE WITNESS:  -- as opposed to outside air --
13     MR. GARDNER:  Right.
14     THE WITNESS:  -- yes.
15 QUESTIONS BY MR. GARDNER:
16 Q.  So the old ones pulled in room air --
17 A.  Yes.
18 Q.  -- correct?  And the new ones did not.
19 A.  Yes.
20 Q.  Right.  And do you know if in any of the buildings
21     currently -- strike that.  Any of the buildings at
22     the Republic MacBeth facility still have those
23     different mode -- I'm sorry -- Modine heaters?
24 A.  I did -- I did not go in any other of the buildings
25     other than the -- the -- that fire building and

50 (Pages 194 - 197)

Page 198

1     the -- the --
2  Q.  Office?
3  A.  -- office.
4  Q.  So you didn't go --
5  A.  I think --
6  Q.  -- inside -- I'm sorry.  I'm following you.
7  A.  Go ahead.
8  Q.  You didn't go inside building 3 or 4, did you?
9  A.  Yeah, I did.
10 Q.  Oh, you did?  Did --
11 A.  They have some -- they have some heaters in there
12    from -- similar to that.  I didn't know what the
13    brand were.  But that was --
14 Q.  But they were --
15 A.  -- one of them --
16 Q.  -- the kind that combust from room air.
17 A.  Yes.
18 Q.  And let's say you and I had been in -- met together
19    on March 18th, 2019 inside of building number 1 at
20    the MacBeth facility where they were sometimes
21    spray painting dumpsters, climbed up a ladder and
22    examined these Modine heaters, I would've be able to
23    look without opening anything and see the open
24    flames?
25        MR. JONES:  Objection to form, foundation.

Page 199

1        THE WITNESS:  I don't -- can't account for
2     these particular heaters.  I don't know how they
3     were installed or how -- if there was any openings
4     of -- in that -- that system or not.  As for as
5     what I'm basing some of my opinion on, obviously,
6     is that type of heater being installed is not a
7     completely closed system.
8  QUESTIONS BY MR. GARDNER:
9  Q.  The Modines.
10 A.  No, the -- the Space-Ray heaters, if --
11 Q.  You think --
12 A.  -- that's what you're referring to.
13 Q.  -- Space-Ray heaters are -- are less closed than
14    the old Modines?
15 A.  Oh, no.  I think they're probably more closed.  But
16    there are still openings that aren't sealed tight,
17    and you get air -- you get products of combus --
18    not products of combustion.  But you get products
19    of -- of paint fumes, paint vapors, paint mist and
20    spray inside of those particular units, which was
21    evidenced by the pictures and by what I saw.
22 Q.  So one of your hypothesis or theories -- strike
23    that.  One of your opinions is that Blue Sheboygan
24    water-based paint got inside of tube heaters and
25    the heat -- the burner box and caught on fire?

Page 200

1  A.  It didn't just -- it didn't catch on fire,
2     basically.  It -- it ignited by the fact that it --
3     it boiled off, the water boiled off of the paint.
4     Which is, by their own statement, it becomes a
5     Class II to Class, I think, IIIA and IIIB flammable
6     material or combustible material.
7  Q.  Did you ever have a chemist check that, the
8     difference between paint drying and boiling?
9  A.  Basically the -- I'm refer -- basically drying is
10    going to take over a period of time and dry off.
11    Boiling is actually boiling it off, so to speak.
12    But essentially what you're doing is -- I -- better
13    choice of words might be to just -- it basically
14    would be dried on the -- on the system.
15 Q.  I'm talking about in the system.  So you understand
16    that in the burner boxes of the three Space-Ray
17    units that my client installed, there was a fire
18    when they were operating correctly.
19 A.  Right.
20 Q.  And you're saying that blue paint got in there and
21    cause -- caused a different kind of fire?
22 A.  I don't --
23        MR. JONES:  Objection to form.
24        THE WITNESS:  -- that it caught fire inside
25    the box itself.  But it was close to the box within

Page 201

1     the -- the tubes.  I -- there was evidence of blue
2     paint in the tube that had basically dried onto
3     the -- or had -- was on the system.  And -- and it,
4     by its own definition, it had boiled off and -- and
5     stayed -- and had dried on the system, and it
6     becomes a combustible material.
7  QUESTIONS BY MR. GARDNER:
8  Q.  And just -- and combusted, in your opinion.
9  A.  Yes.
10 Q.  And still stayed bright blue.
11 A.  It wasn't bright blue in the -- in the area where
12    it would think.  But it was in other areas of the
13    -- the -- not all the paint had boiled off or had
14    burnt off.
15 Q.  You'll concede that you --
16 A.  That's what I'm basing my opinion on.
17 Q.  You'll concede you didn't identify a single witness
18    in your report of December 3rd, 2019 by name,
19    correct?
20        MR. JONES:  Objection --
21        THE WITNESS:  I don't have --
22        MR. JONES:  -- to the form.  Document
23    speaks --
24        THE WITNESS:  -- those names --
25        MR. JONES:  -- for itself.

51 (Pages 198 - 201)

Page 202

1    THE WITNESS: -- available to me, no.
2    QUESTIONS BY MR. GARDNER:
3    Q.  You didn't name anybody in this report by name.
4    A.  No, I did not name anybody in the report.
5    Q.  And so on Page 3 of your first report, be the third
6        paragraph from the bottom, you wrote, This combined
7        with the fire damage to the south heater that was
8        at ceiling level indicated the possible location of
9        fire origin, right?
10   A.  Yeah.  That -- there's a couple things about this.
11       I -- you mentioned earlier, I had a couple of
12       issues with things that were -- comments that were
13       on that I made that this should have been stated as
14       a -- instead of possible a probable location of
15       origin, not --
16   Q.  You've been a fire investigator for forty -- how
17       many years?
18   A.  Forty-four.
19   Q.  And you accidentally wrote the word "possible"
20       instead of "probable"?
21       MR. JONES:  Objection to form.
22       THE WITNESS:  Yeah.  I -- I put it by error.
23   I did that apparently.  I did not catch that at the
24   time, just like I didn't catch the March the 3rd.
25   But that was one of those things that were -- was

Page 203

1        not --
2    QUESTIONS BY MR. GARDNER:
3    Q.  So roughly --
4    A.  It should have been "probable."
5    Q.  So roughly three years later you wrote another
6        report.
7    A.  It was a continuation of the report --
8    Q.  Yeah.  Dated November --
9    A.  -- original.
10   Q.  -- 2022.
11   A.  Yes.
12   Q.  Show me in that report where you corrected the
13       records to "possible" to the word "probable."
14       MR. JONES:  Objection to form.  He didn't say
15   that he made that correction in that report.
16       MR. GARDNER:  Well, he had --
17       THE WITNESS:  Yeah.
18       MR. GARDNER:  -- three years to do it.
19       MR. JONES:  Well ...
20       THE WITNESS:  I -- I --
21       MR. JONES:  What's -- what's your -- what's
22   your question?
23       THE WITNESS:  -- I did not make the
24   correction, that particular correction.  I didn't
25   catch it.  So ...

Page 204

1    QUESTIONS BY MR. GARDNER:
2    Q.  So you didn't say anything about a probable origin
3        of the fire in any -- either of these.  In both
4        reports you used possible point of origin, didn't
5        you?
6    A.  I used that term.  And that term was wrongly used,
7        in my opinion.  Because NFPA also states that
8        the -- there's a distinguishing between probable
9        and possible.  And if you feel like something is
10       more than 51 percent, it could become possible --
11       or not possible but probable.  And that's -- in
12       this case I feel this was more than that 51 percent
13       actually.  So it -- I should have used the word
14       "probable."
15   Q.  But you didn't --
16   A.  And having read this report, I never even noticed
17       that as an issue.
18   Q.  And you've written 1400 reports.
19       MR. JONES:  Objection.
20       MR. GARDNER:  I'm sorry.  You've written over
21   1400 reports.
22       MR. JONES:  Objection to form.
23       THE WITNESS:  Well, I've never -- most of the
24   time the reports are based on the -- on what you
25   see and what you -- and I don't know that that term

Page 205

1        is always used on every single report.
2    QUESTIONS BY MR. GARDNER:
3    Q.  Would you agree and concede that the vast majority
4        of your expert cause-and-origin reports that you've
5        prepared, your final report, you've expressed your
6        opinions regarding the origin of the fire to a
7        degree of probability?
8    A.  Degree of certain bit --
9    Q.  Yes.
10   A.  -- cert -- certainty, yes.
11   Q.  And you didn't do that in this case.
12   A.  Not necess -- no, I -- I did -- I didn't say those
13       in those exact words.  But I did reference to the
14       fact of what I felt the origin of the fire occurred
15       and how it occurred.
16   Q.  Would you agree with this statement:  The retention
17       of original notes, diagrams, photographs, and
18       measurements is the best practice --
19       MR. JONES:  Objection, form, foundation.
20   QUESTIONS BY MR. GARDNER:
21   Q.  -- fire -- cause-and-origin fire investigation?
22   A.  I would agree that that would be the best practice,
23       yes.
24   Q.  Would you agree that this data constitute a body of
25       factual information that should be retained until

52 (Pages 202 - 205)

Page 206

1    all reasonable -- sorry -- reasonably perceived
2    litigation processes are resolved?
3         MR. JONES: Same objections.
4         THE WITNESS: That's what that guideline says,
5    yes.
6    QUESTIONS BY MR. GARDNER:
7    Q.  Would you read -- agree with this statement:  The
8    entire fire scene should be considered physical
9    evidence and should be protected and preserved?
10        MR. JONES: Same objections.
11        MR. GARDNER: Section 17.3.1.1.
12        THE WITNESS: In an ideal world, yes, that
13   would be the case.
14   QUESTIONS BY MR. GARDNER:
15   Q.  Did you obtain any architectural drawings in your
16   investigation of this case?
17   A.  No, I did not.
18   Q.  Did you obtain any engineering drawings in your
19   investigation of this case?
20   A.  No.
21   Q.  Did you obtain any wiring schematics in your
22   investigation of this case?
23   A.  No.
24   Q.  Would you agree with this statement:  Most
25   contamination of physical evidence occurs during

Page 207

1    its collection?
2    A.  Yeah.  I would agree that that's possibly the case,
3    yes.  That doesn't always -- that is a guideline
4    that they use, and those are statements that are
5    general.  But given certain circumstances and
6    certain conditions, in this case a large fire that
7    was -- basically occurred a fourth of the building,
8    so to speak, or maybe even more affected, is --
9    there's so much area to cover that there's not any
10   way you can protect everything 100 percent.
11   Q.  And this doesn't refer to everything.  I just
12   read -- I'm talking about physical evidence during
13   its collection.  That's all.
14   A.  There's like --
15   Q.  Like your swabs.
16   A.  -- we did; is that right?  Not -- I didn't -- I --
17   there was no damage of anything that I saw in
18   collection of evidence in that particular
19   situation.
20   Q.  And you documented that thoroughly --
21   A.  I doc --
22   Q.  -- with photography.
23   A.  Yes.  I have it on -- it was in the photos that was
24   taken at the time I collected it.
25   Q.  And so as a general rule in your collection, when

Page 208

1    you're collecting evidence, sometimes you'll put it
2    in gallon cans, right?
3    A.  Most always, yes.
4    Q.  Sometimes --
5    A.  It depends on the evidence, obviously, you're
6    collecting.  If it's a liquid or if it's a small
7    item that could fit in there.
8    Q.  My --
9    A.  Obviously tube heaters couldn't go in there.
10   Q.  I understand.  So things smaller than a gallon --
11   A.  Yes.
12   Q.  -- can, right?
13   A.  (Nods head.)
14   Q.  And in this case you obtained some swabs that you
15   say were on -- from on and in the heaters, right?
16   A.  Yes.  The -- inside the tubes primarily.
17   Q.  They primarily came from inside the tubes.
18   A.  Right.
19   Q.  And was there any one of the three tubes that had
20   more material to collect than the other three?
21   A.  I would say the middle heater probably had more
22   that I noticed.  And also the south heater had more
23   damage done to the deflectors than the -- any of
24   the other heaters did.  So there are several --
25   several variations to why that could be the case.

Page 209

1    But ...
2    Q.  Which of the three heaters, in your opinion, first
3    ignited in this fire?  The north heater, center
4    heater, the south heater, or the east heater?
5    A.  Well, I think -- I think the most likely source of
6    ignition was in the south heater.  However, the
7    middle heater received the most damage.  And I --
8    that is due to the fact that that heater is in the
9    center of the room.  And obviously the heat goes
10   up, and that was -- the heat affected that worse.
11   'Cause there doesn't necessarily mean that's where
12   the area of origin occurred.
13   Q.  Have you ever looked at the Herculiner safety data
14   sheet?
15   A.  Yes, I have.
16   Q.  Why?
17   A.  I was told that they used that occasionally.
18   And -- but they hadn't used it for over five years.
19   So I did go ahead and pull that online just to
20   check it to see, and it is petroleum-based product.
21   Q.  Did it also have xylene in it as its main
22   ingredient?
23   A.  So there's a lot of ingredients in that.  And I
24   did -- I searched a lot of those products that
25   was -- that had listed in those type of things as

53 (Pages 206 - 209)

Page 210

1    well.  Just read online anyway.
2  Q.  Had a little trouble following you.  But the only
3    questions right now is:  Will you concede that
4    product Herculiner has an ingredient -- has as an
5    ingredient xylene?
6  A.  Yes, sir.
7  Q.  And that's one of the things Sharee Wells
8    determined as a result of her testing.
9      MR. JONES:  Objection to form.
10     THE WITNESS:  I don't recall anything on the
11   report that says xylene.  But I do recall there's a
12   heavier or light --
13     MR. GARDNER:  Petroleum.
14     THE WITNESS:  -- medium, heavy distillates.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Okay.  What other things did you research and pull
17   up the data sheets or safety sheets besides
18   Herculiner?
19 A.  That was primarily that because of the fact that
20   that's what was mentioned to me that was used in
21   the facility.  And then I found out, obviously the
22   second time that I went, that the -- that sys --
23   that had not been used.  Because there was -- there
24   was only one, maybe a couple customers that they
25   had that liked to have that or requested that be

Page 211

1    put on the containers.  So it hadn't been utilized
2    for five years.  So I never ...
3  Q.  Can you go to Exhibit AA.
4      MR. GARDNER:  Thomas, AA.
5      MR. HEHNER:  AA?
6      MR. JONES:  Oops.
7      THE WITNESS:  AA you said?
8      MR. GARDNER:  Yes, sir.  Six pages.
9  QUESTIONS BY MR. GARDNER:
10 Q.  Have you -- have you seen this first page of AA
11   before today?
12 A.  No, I have not.
13     MR. ZOCCOLA:  Hold on a second.
14     MR. JONES:  Just pull it up real quick.  Oh,
15   he's got it up there.
16     MR. GARDNER:  Well, he's got it upside-down.
17     MR. ZOCCOLA:  Let us -- let us get it up for a
18   second.
19     MR. GARDNER:  Here you go.
20     MR. JONES:  Okay.
21 QUESTIONS BY MR. GARDNER:
22 Q.  Can you see that, Jim?
23 A.  Apparently it's upside-down in this picture here
24   so --
25 Q.  Yeah.

Page 212

1  A.  Yeah.
2  Q.  All right.  Have you seen this before today?
3  A.  No, I have not.
4  Q.  Do you know who took these pictures --
5  A.  No.
6  Q.  -- in Exhibit AA?
7  A.  No.
8  Q.  Tell us all the efforts you made to obtain
9    photographs taken inside of building number 1 prior
10   to the fire.
11 A.  I asked if there was any photos available, and I
12   was told no at the time.
13 Q.  I thought you talked to Korte.  You said you talked
14   to people at Korte.
15 A.  Briefly about -- I didn't ask them about pictures
16   or anything.  I didn't -- but I asked Kyle and
17   Mr. Jones about pictures.
18 Q.  But you contacted them to see if they were the
19   other competitor company of my client that -- that
20   allegedly told Republic not to go with closed
21   infrared tube heaters.
22 A.  Right.
23 Q.  And you didn't ask them if they took pictures.
24 A.  I didn't ask them if they took pictures, no.
25 Q.  All right.  You haven't read the deposition of

Page 213

1    Trevor Miller who's the one that sent me these
2    pictures.
3      MR. JONES:  Objection, asked and answered.
4      THE WITNESS:  No, I have not.
5  QUESTIONS BY MR. GARDNER:
6  Q.  Okay.  Do you see a lot of paint on the ceiling in
7    photograph one of Exhibit AA?
8      MR. JONES:  Objection to form.
9      THE WITNESS:  Not in this photograph I don't
10   see it.
11 QUESTIONS BY MR. GARDNER:
12 Q.  Do you see a rather clear demarcation roughly
13   halfway up the wall in the -- would be the most
14   northern east garage door separating white from
15   blue?
16     MR. JONES:  Objection to form.
17     THE WITNESS:  I see that line of -- line
18   across there, yes.
19 QUESTIONS BY MR. GARDNER:
20 Q.  Did you know Terry Reader testified that blue paint
21   in this photograph on the bottom half of the wall
22   was painted intentionally --
23     MR. JONES:  Objection to form; asked and
24   answered.
25 QUESTIONS BY MR. GARDNER:

54 (Pages 210 - 213)

Page 214

1  Q.  -- as opposed to spray mist?
2  A.  I -- I am sure.  It looks like it's sprayed
3      intentionally.  Looks like it's -- it's like a --
4      dividing the wall.
5  Q.  I didn't sprayed, painted.  If I said sprayed I
6      meant to say painted.
7  A.  Okay.
8  Q.  Right.
9  A.  Painted.
10 Q.  Not gonna get a clear line like that just spraying
11     it, are you?  Unless you use a guard --
12 A.  -- some type of protection.
13 Q.  Right.  So go to Page 2 of Exhibit AA.  I'll
14     represent to you my understanding of the photo is
15     that photographer's aiming his lens to the east.
16     You see that exhaust fan?
17 A.  Uh-huh, yes.
18 Q.  And this is in a room where they sometimes painted
19     Blue Sheboygan paint, right?  Do you know?
20 A.  I'm assuming that but I don't know.
21 Q.  I'll hold it out to you --
22 A.  I don't know where this room was at for sure.
23     So ...
24 Q.  I'll hold out that Trevor Miller testified he took
25     these photos roughly two months before the fire

Page 215

1      when he visited the site to give Republic a quote
2      for the -- for --
3          MR. JONES:  Objection, lack -- sorry.
4          MR. GARDNER:  Hold on.  For closed infrared
5      heaters.
6          MR. JONES:  Objection, lack of foundation.
7          THE WITNESS:  I don't know anything about
8      these photos so I couldn't tell you.
9  QUESTIONS BY MR. GARDNER:
10 Q.  Does that look like a blue dumpster --
11 A.  Yes, sir.
12 Q.  -- in the photo near the bottom?
13     But you'll concede, looking at this photo,
14     Page 2 of Exhibit AA, it's hard to discern the
15     existence of any blue paint on the ceiling or
16     higher than, say, halfway or two-thirds up the
17     wall, right?
18         MR. JONES:  Objection, form.
19         MR. GARDNER:  It's essentially white.
20         THE WITNESS:  It's essentially white.  But
21     there is dust, appears to be, on the door, for
22     example, the front -- above the front door or on
23     the door.
24         MR. GARDNER:  And on --
25         THE WITNESS:  And it comes down.

Page 216

1  QUESTIONS BY MR. GARDNER:
2  Q.  Yeah.  And on the blue -- you can see that fan's
3      blue.
4  A.  On the fan, yes.
5  Q.  Correct.  So the ceiling of building number 1 was
6      corrugated metal, right?
7  A.  Yes.
8  Q.  Was it white metal or was it painted white?
9  A.  I don't know.
10 Q.  In the outside of the building, building number 1,
11     it's also con -- constructed out of corrugated
12     metal?
13 A.  Yes.
14 Q.  And this is just my failure to understand the
15     construction of this building.  Is it just one
16     layer of metal, Jim, so far as you understand, from
17     being out at the fire scene multiple times, it
18     constituted both the inside and outside wall?  Or
19     was it the case that there was sheets of corrugated
20     metal on the outside that are different than the
21     ones that are on the inside of building 1?
22         MR. JONES:  Objection, form --
23         MR. GARDNER:  Follow me?
24         MR. JONES:  -- foundation.
25         THE WITNESS:  Yeah.  A void space between the

Page 217

1      two you're talking about --
2  QUESTIONS BY MR. GARDNER:
3  Q.  Was there -- do you know if there was or wasn't?
4  A.  No, I do not.  It appears to be only on the outside
5      of the building.
6  Q.  So, in other words --
7  A.  And then there was some -- there was -- in some
8      areas of the building it was a wood-frame structure
9      that actually supported the metal.
10 Q.  So are you saying that in some areas of building
11     number 1 there was corrugated steel on the outside
12     and then -- and then a different piece of
13     corrugated steel on the inside separated by some
14     wood framing members?
15 A.  I did not see any -- any indication of whether
16     there was one on the in -- I know there was on
17     outside.  I did not see indication of one on the
18     inside.  There was an inside wall that was a -- a
19     wood -- made out of wood and wood frame.
20 Q.  Inside where?  What do you mean inside wall?  Which
21     one?
22 A.  That separated the -- the storage unit from the
23     rest of the facility.
24 Q.  Okay.  Now, how about the far south side, the most
25     extreme south wall of the storage building?  I'm

55 (Pages 214 - 217)

Page 218

1    looking at Exhibit Z, Page 2. Was the outside of
2    that -- that would be the south end of the
3    building. Was that made out of corrugated metal?
4    A. Yes, sir.
5    Q. And was it just one sheet, or was there another
6       sheet inside?
7    A. I believe on the outside wall there was a sheet on
8       the inside. But I -- I'd have to look at my
9       photographs to find that -- to determine that for
10      sure.
11   Q. You don't know one way or the other. Right?
12   A. No, I don't know at the present time, no.
13   Q. Could you go to page. Well --
14      It's Exhibit AA, Page 4. It looks like this,
15      Jim.
16   A. Let me see here. Next one coming up here. Okay.
17   Q. Have you seen that before today?
18   A. No, I have not.
19   Q. Trevor Miller from Korte Does It All provided this
20      to me in response to a subpoena that I sent him.
21      And he testified about it during his deposition.
22      Do you know what these materials are that are
23      stacked up on the left side of the photo that have
24      some blue paint on them here and there?
25   A. These are --

Page 219

1       MR. JONES: Objection, foundation.
2       THE WITNESS: -- on the left-hand side
3    you're --
4       MR. GARDNER: Yes, sir.
5       THE WITNESS: -- talking about?
6       MR. GARDNER: Yes, sir.
7       THE WITNESS: I think it's just wood material,
8    I believe, like at -- in that -- or I -- I don't
9    know what they are for sure.
10   QUESTIONS BY MR. GARDNER:
11   Q. Just to be clear, I'm talking about the stuff
12      that -- it's white on the edges.
13   A. Box -- looks like boxes.
14   Q. Okay. To the right of that looks like some
15      cardboard, doesn't it, piece of --
16   A. Yes.
17   Q. -- cardboard?
18   A. Uh-huh.
19   Q. And then there's -- looks like a -- a crate or
20      pallet full of boxes with blue spray paint on top
21      of them?
22   A. Uh-huh.
23   Q. Do you know what's in the boxes?
24   A. No, I do not.
25   Q. And then I'll represent to you that the right side

Page 220

1    of this photograph would constitute the inside
2    south wall of the storage room.
3    A. Okay.
4    Q. Okay. Can you go to the same exhibit, Page 6. It
5       looks like this.
6       MR. JONES: Keep the binder off your
7    microphone.
8       THE WITNESS: Oh, sorry. This one?
9       MR. GARDNER: Yes. Yeah, you got it.
10      MR. ZOCCOLA: What page?
11      MR. HEHNER: Six.
12      MR. ZOCCOLA: Thanks.
13   QUESTIONS BY MR. GARDNER:
14   Q. Do you know who the gentleman is in the yellow
15      jacket?
16   A. No, I don't.
17   Q. And Trevor Miller took this photograph and -- and
18      supplied it to us in response to a subpoena to
19      Korte and he testified about it.
20      So it's inside of the so-called container --
21      southern container shop where they spray painted
22      the dumpsters sometimes, right?
23   A. Okay.
24   Q. You understand that?
25      MR. JONES: Objection to form.

Page 221

1    QUESTIONS BY MR. GARDNER:
2    Q. Do you see the dumpsters?
3    A. Yes.
4    Q. Do you see blue paint on the floor?
5    A. Yes, sir.
6    Q. Do you know if at the time of this fire there was
7       blue paint on the floor accumulated as is -- as is
8       shown in this photograph?
9    A. I don't know that for a fact, no. I'm just going
10      by what people said, yes.
11   Q. This -- and did people tell you there was blue
12      paint on the floor at the time of this fire?
13   A. I was just informed that it was everywhere in the
14      building is what I was told.
15   Q. We talked to a fella named Justin Davis, who was
16      the plaintiff's -- one of the plaintiff's two FRCP
17      30(b)(6) representatives. He testified that they
18      cleaned up -- when they would clean up this bay,
19      they wouldn't require that this blue paint be
20      removed. Have you read that deposition?
21   A. No.
22      MR. JONES: Objection to form.
23      THE WITNESS: No, I have not.
24   QUESTIONS BY MR. GARDNER:
25   Q. Okay. And so this fire was a total collapse,

56 (Pages 218 - 221)

Page 222

1    wasn't it?  This building number 1, the roof
2    completely collapsed, the walls collapsed down,
3    correct?
4    A.  Yes, sir.
5    Q.  And so sometime during the fire, the three
6        Space-Ray heater assemblies collapsed and fell to
7        the floor?
8    A.  Yes.  They were all under the debris, yes.
9    Q.  Right.  The middle one actually landed on top of a
10       fire locker, didn't it?
11   A.  Yes.
12   Q.  What were the contents of the first locker?
13       MR. JONES:  Objection to foundation.
14       THE WITNESS:  Well, one of the lockers that
15   was there was the contents of the -- the spray
16   machine that they had.
17       MR. GARDNER:  Yeah.
18       THE WITNESS:  And there was also a -- I think
19   there was a --
20       MR. GARDNER:  Paint thinner?
21       THE WITNESS:  Yeah.  There was -- there was
22   other containers inside of there.  I don't know --
23   QUESTIONS BY MR. GARDNER:
24   Q.  You didn't collect any of those, did you?
25   A.  No, we did not.

Page 223

1    Q.  And so you didn't test any of them, did you?
2    A.  No.
3    Q.  And I'm talking about the gallon cans that were
4        inside the -- center metal so-called fire safe
5        upon which the center heater fell onto, right?
6    A.  Correct.
7    Q.  So you do not know what was in those cans, do you?
8        Except for the one you took back.
9    A.  On the one I took back.  What --
10   Q.  You collected one of them.  You guys collected the
11       -- the rectangular one.
12   A.  Over at -- on the opposite end of those.  That's
13       only because it was requested that it be retained.
14   Q.  You're saying it wasn't in the locker?
15   A.  No, it was not.
16   Q.  Where was it?  I'm mixed up on the opposite end.
17   A.  On the -- were -- it was over by the wall on the
18       C -- under the C -- what I classify as the -- the
19       north end of that room.
20   Q.  Okay.
21   A.  Not in the area of origin.
22   Q.  So this blue paint, according to Sharee Wells, when
23       she tested it, showed the presence of an aromatic
24       product and medium and -- I'm sorry -- medium
25       petroleum distilling, but not heavy, right?

Page 224

1    A.  Correct.
2    Q.  Okay.
3    A.  Well, they showed heavy in the --
4    Q.  I'm talking about --
5    A.  -- heaters.
6    Q.  -- no, blue paint.
7    A.  Not -- in the blue paint, yes.
8    Q.  Right.  So what was the source of the heavy
9        petroleum distillate she found on a couple of the
10       heaters --
11       MR. JONES:  Objection to foundation.
12   QUESTIONS BY MR. GARDNER:
13   Q.  -- if it wasn't the blue paint?
14   A.  I don't know for sure what the -- what it was.
15       Whether it was something else that they had used
16       some point in time or what.  But the -- the sample
17       came from the heaters.  And that's what was tested.
18   Q.  But you don't know the source of it, do you?
19   A.  I don't know what all was being used in that
20       facility.  And -- and I was told it was -- there
21       was paint thinner occasionally.  And there was also
22       other, like, welding going on in the facility.  And
23       that -- there's also welding situation that -- and
24       components from welding that could accumulate in
25       the building, dust and so forth.

Page 225

1    Q.  Welding dust?
2    A.  So there -- yes.
3    Q.  Do you know if anybody ever welded through a -- a
4        blue painted Republic dumpster prior to the fire,
5        cut right through the -- the blue paint?
6    A.  No, I do not.
7    Q.  Do you know if anybody ever used an acetylene torch
8        or a plasma cutter to cut through the -- any parts
9        of the dumpsters right through the blue paint?
10       MR. JONES:  Objection to form.
11       THE WITNESS:  I'm sure it -- it probably could
12   have happened if they uti -- utilized that -- other
13   than welding.  Welding typically you have clean off
14   anything before you would weld.  So --
15   QUESTIONS BY MR. GARDNER:
16   Q.  Okay.  Well, restricted to using acetylene torches
17       and plasma cutters.
18       Can you explain to us why, when employees of
19   Republic, prior to the fire, would cut through with
20   torches, parts of the dumpsters that were painted
21   blue, why didn't the blue paint catch on fire in
22   its dry form?
23       MR. JONES:  Objection, foundation.
24       THE WITNESS:  Well, that -- that would be in a
25   dry form.  But it -- actually it -- given the

57 (Pages 222 - 225)

Page 226

1    situation here, you're -- you're talking about
2    between dry and -- and boiled off.  Obviously it
3    was not boiled off.  It didn't get hot enough to
4    dry it out completely.  It probably takes a -- most
5    likely would take a long time for that to happen.
6    QUESTIONS BY MR. GARDNER:
7    Q.   For what to happen?
8    A.   But once it's boiled off in a fire or in a heated
9    area, then obviously it becomes a whole different
10   situation at that point versus just sprayed on it.
11   Q.   You mean just recently sprayed on.
12   A.   Right.
13   Q.   I'm not talking about that.
14   A.   Not recently sprayed on it, just on the components
15   themselves.
16   Q.   I'm only talking about the dumpsters.  Is that what
17   you mean when you say "component"?
18   A.   On -- on --
19   Q.   You haven't read Terry Reader's deposition, so
20   you're at a disadvantage.
21   A.   Right.
22   Q.   He testified that he and other employees, including
23   Dale Calle, on occasions prior to the fire, used
24   acetylene torches and plasma cutters to cut
25   through, to make repairs, dumpsters that had been

Page 227

1    out in the field for I don't know how long, longer
2    than a day, and at no time did the dry blue paint
3    on the dumpster ever catch on fire.  How -- how do
4    you explain that?
5        MR. JONES:  Objection to form, foundation.
6        THE WITNESS:  I can't explain any -- there's
7    always circumstances that can -- can happen that
8    can -- I'm going based on what the -- the company
9    that supplies the paint even says on the container,
10   that the paint can boil off.  And once the water's
11   boiled off, it becomes a Class II liquid or similar
12   prop -- properties of a Class II, IIIA and IIIB
13   liquid.  And what could be --
14   QUESTIONS BY MR. GARDNER:
15   Q.   And you're using that synonymous with --
16       MR. JONES:  If he could finish his answer.
17   Go --
18       MR. GARDNER:  I'm sorry.  Go ahead, Jim.
19       THE WITNESS:  I guess I'm -- I mean, I'm using
20   the same word.  This would be dry paint, yes.
21       MR. GARDNER:  Uh-huh.
22       THE WITNESS:  But not necessarily boiled off.
23   Using a torch possibly could do that.  But I think
24   over a long period of time that there has to be --
25   in this particular situation that that occurred

Page 228

1    frequently, every day possibly.
2    QUESTIONS BY MR. GARDNER:
3    Q.   Cutting.
4    A.   So --
5    Q.   You mean cutting through the --
6    A.   Right.  I don't know if it occurred every day.
7    They -- they were saying that that -- the only
8    thing they did that day, other -- other than
9    painting, was they did some welding earlier on in
10   the -- the morning, but -- on that particular day
11   of the fire.
12   Q.   Do you know the temperature of -- of an acetylene
13   torch when it's cutting through steel?
14       MR. JONES:  Objection to foundation.
15       THE WITNESS:  Very hot.
16   QUESTIONS BY MR. GARDNER:
17   Q.   Over 3,000 --
18   A.   I mean, it's probably -- yeah.  Probably likely
19   twenty-five to 3,000, yes.
20   Q.   Right.  And how about a plasma torch?  What is the
21   contact temperature of cutting with a plasma torch
22   through steel?
23   A.   I'm not sure what the temperature would be.  But
24   I -- I personally use one on a regular basis, so I
25   understand it's hot.

Page 229

1    Q.   What was the temperature -- I'm sorry.  What
2    temperature does it require for Blue Sheboygan
3    paint to ignite or combust?
4    A.   Well, it -- it -- the paint itself doesn't combust.
5    I'm talking about the properties in the paint that
6    they say becomes a Class II or Class IIIA and IIIB
7    liquid, similar properties.  Those properties being
8    like diesel fuel, kerosene, and paint thinner.
9    Those particular properties are combustible
10   materials.
11   Q.   You think paint thinner was in the blue paint?
12   A.   I don't know what was in the blue paint, whether
13   they thinned it with paint thinners or not.  I
14   don't know that for a fact.  But I'm not saying
15   it -- over a period of time they said they used
16   paint thinners occasionally.  That's what I was
17   told.  So that could have been possibly there at
18   some point in time.
19   Q.   So the --
20   A.   How --
21   Q.   -- so the source of combustibility in the blue
22   paint could be these additives you're talking
23   about, right?
24   A.   No.  It becomes -- it becomes similar to those
25   properties that I just described.

58 (Pages 226 - 229)

Page 230

1  Q.  These type two and type three --
2  A.  Right.
3  Q.  -- liquids?
4  A.  The dried or the boiled off paint becomes a
5      combustible material.  And those -- like kerosene,
6      diesel fuel, things like that, can ignite at a
7      hundred degrees temperature or more -- or higher.
8      Or be -- below 140 degrees temperature, put it that
9      way.
10 Q.  Do you think the temperatures in and on the three
11     Space-Ray heaters exceeded 140 -- 140 degrees in
12     the 43 days prior to the fire?
13     MR. JONES:  Objection to foundation; calls for
14     speculation.
15     THE WITNESS:  Well, there's -- yeah, I -- I do
16     believe that they -- obviously propane burns at a
17     higher -- high rate, high temperature.
18 QUESTIONS BY MR. GARDNER:
19 Q.  So it would be over 140?
20 A.  Right --
21     MR. JONES:  Same objections.
22     THE WITNESS:  But the only thing is about that
23     is, there's conditions.  I could have a match here,
24     and if those conditions are right, it's not gonna
25     catch anything on fire.  But given the certain

Page 231

1      circumstances, particularly the oxygen
2      concentration in the air, the ventilation that's in
3      the syst -- that's in the room, everything can --
4      can change those conditions.
5  QUESTIONS BY MR. GARDNER:
6  Q.  None of which you're aware of in this case as they
7      existed on March 19th, 2019.
8  A.  I'm -- I'm never aware of any condition changes on
9      any fire 'cause I don't know the circumstances.  I
10     don't know the conditions at the time of the fire.
11     Only thing I have to go on is based on what I see.
12 Q.  What direction was the wind blowing at the time of
13     the fire?
14     MR. JONES:  Objection to foundation.
15     THE WITNESS:  So -- I don't know that for
16     sure.
17 QUESTIONS BY MR. GARDNER:
18 Q.  You didn't check it, did you?
19     MR. JONES:  Same objections.
20     THE WITNESS:  I -- I did check that.  But I --
21     I don't have that information in front of me --
22 QUESTIONS BY MR. GARDNER:
23 Q.  And you didn't put it in --
24 A.  -- at the time.
25 Q.  -- either of your reports, did you?

Page 232

1      MR. JONES:  Objection --
2      THE WITNESS:  I did not put that in --
3      MR. JONES:  -- asked and answered.
4      THE WITNESS:  -- a report.
5  QUESTIONS BY MR. GARDNER:
6  Q.  And you didn't record any of the temperature
7      conditions in your -- either of your reports, did
8      you?
9      MR. JONES:  Same objections.
10     THE WITNESS:  I did not stipulate any type of
11     temperatures in a report.  The only thing that I
12     did stipulate is the fact that I believe I -- I'd
13     have to look.  But the -- when the heaters kicked
14     on, that's what ignited the -- under -- under that
15     condition.
16 QUESTIONS BY MR. GARDNER:
17 Q.  Your second report suggests, correct me if I'm
18     wrong, that you think that during the day, while
19     the employees were working inside of building
20     number 1, on March 19th, 2019, the heaters were
21     not -- work -- were not activated.
22     MR. JONES:  Objection to form.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Am I reading your report wrong?
25 A.  I don't know that they were not.  I'm just saying

Page 233

1      that due -- the temperatures during the day, I was
2      told, was 47 degrees.  And also confirmed that with
3      the -- the weather in Fort Wayne, Indiana, which is
4      not too far from that airport, I guess you could
5      say, where I think where that came from.
6  Q.  I did too.  So weren't these thermostats --
7      MR. JONES:  I don't think he's finished with
8      his answer.
9      MR. GARDNER:  -- 60 or 75 degrees?
10     MR. JONES:  Were you finished with your answer
11     on your last question?
12     THE WITNESS:  Yes.
13     MR. JONES:  Okay.
14 QUESTIONS BY MR. GARDNER:
15 Q.  Weren't these thermostats set, according to Fred
16     Jones, at 75 degrees?
17 A.  I had different -- conflicting different
18     information on that actually.
19 Q.  You didn't talk about that though in your report,
20     did you?  This --
21 A.  No.  'Cause I was told it was turned down to
22     50 degrees of a night, is what I was told.
23 Q.  By who?
24 A.  Mr. Jones, when I talked to him.
25 Q.  Okay.

59 (Pages 230 - 233)

Page 234

1  A.  So my opinion would have been based on that.  And
2      based on that -- that information being told,
3      during the daytime, the temperatures inside would
4      have been high enough to possibly -- the -- the
5      system may not even function because of the
6      temperatures being -- 'cause the inside of my
7      garage is not heated at home, and it runs usually
8      about 20 degrees warmer in my garage than it does
9      outside.  So, I mean, that's just an example.
10         So I would -- they -- in this situation, it's
11     47 outside, if the temperatures were set at 50,
12     like I was told, then obviously -- and even made a
13     comment to me that he -- they even check that when
14     they do their routine --
15  Q.  They check to see if they're on 50 at night.  Is
16     that what you're saying?
17  A.  The -- the temper -- thermostat's turned down, yes.
18  Q.  Okay.  So referring you back to Exhibit AA, 6, you
19     see this blue paint on the floor, right?
20  A.  Uh-huh.  Yes, sir.
21  Q.  There's testimony in the case that Dale Calle and
22     Terry Reader sometimes would use their acetylene
23     torches and welders at floor level or near -- I'm
24     sorry, near floor level.  And at no time did any of
25     the blue paint on the floor or paint dust on the

Page 235

1      floor ignite.  Can you account for that?
2      MR. JONES:  Objection to form and foundation.
3      THE WITNESS:  Again I go all back to the -- to
4      the situation where the -- all the conditions
5      coming together at the right time, at the right
6      place, there could be vary -- varying reasons why
7      that would not happen.  Or -- or possibly could
8      happen as well.
9  QUESTIONS BY MR. GARDNER:
10  Q.  Can you go to Exhibit CCC?
11  A.  Yes, sir.
12  Q.  Page 10.
13  A.  (Witness complies.)
14  Q.  Looks like this, Jim.
15     MR. ZOCCOLA:  It's CCC?
16     MR. JONES:  CCC?
17     MR. HEHNER:  CC.
18     MR. GARDNER:  I'm sorry.  It is CC, Page 10.
19     MR. HEHNER:  Thank you very much.
20     MR. JONES:  What page are you on again?
21     MR. GARDNER:  Ten.
22     MR. JONES:  Okay.
23  QUESTIONS BY MR. GARDNER:
24  Q.  Did you take that picture?
25  A.  I -- I recall this picture, yes.  This is the -- of

Page 236

1      the trash can?
2  Q.  Yeah.
3  A.  Yes.
4  Q.  And this was collected into evidence, taken down to
5      Rimkus' facility, right?
6  A.  Yes, it was.
7  Q.  All right.  Was the trash can plastic?
8  A.  Yes.
9  Q.  It was --
10  A.  I -- I don't know about what we refer to as
11     plastic.  It was a comb --
12  Q.  Some sort of --
13  A.  -- poly, yeah.
14  Q.  Yeah.  You see pack of -- packet, a package with --
15     might have been an empty pack of cigarettes in that
16     photo?
17  A.  Yes.
18  Q.  Okay.  You see this blue all over the place in the
19     picture?
20  A.  Yes.
21  Q.  And did you see blue like that spread out
22     throughout the floor of this facility during your
23     inspections?
24  A.  In different areas.  It seemed to be in piles.
25  Q.  Yeah.  How do you exclude the transfer of the blue

Page 237

1      paint onto the components of the heaters, as a
2      result of this room heating up during the fire,
3      with this blue paint on the floor, and they've --
4      these heaters falling to the floor, and are there
5      for a year?  How do you know the blue paint that
6      you found wasn't from cross contamination?
7      MR. JONES:  Objection to form.
8      THE WITNESS:  By what I saw in the -- the
9      paint that I saw on the -- these components I felt
10     like was not -- particularly in those ones that
11     were not involved directly in a -- the -- the major
12     heat or major fire, 'cause there was some areas
13     that the metal was perfectly good, that had the
14     product on it and it was baked on.  So that -- that
15     give me the -- the feeling that or the thought,
16     well, maybe there is.  I -- I didn't -- I didn't
17     think it was possible either.
18  QUESTIONS BY MR. GARDNER:
19  Q.  Maybe there is what?
20  A.  Product in there -- in there that would be
21     flammable or be combustible.  That's why I decided
22     at the time I was there, and given that situation,
23     was that I needed to go ahead and probably swab
24     these in order to get those -- that sample so
25     that -- 'cause it's gonna -- I didn't know when we

Page 238

1   would be able to be back, based on everything that
2   was going on.
3   Q.   And that's your answer to how you excluded cross
4       contamination from heaters falling into blue --
5       blue paint during a fire?
6   A.   I didn't see any heaters --
7           MR. JONES:  Objection.
8           THE WITNESS:  -- in blue paint.
9   QUESTIONS BY MR. GARDNER:
10  Q.   You didn't?
11  A.   No.
12  Q.   You don't -- haven't seen photos showing heaters
13      laying in the blue paint.
14  A.   Well, they're near -- it's nearby.  But it's not
15      laying in the paint --
16  Q.   So --
17  A.   -- in the areas where I collected the samples, put
18      it that way.
19  Q.   By your -- by yourself, right?
20  A.   Yes.
21  Q.   It's the only time -- well, strike that.  It's the
22      only time you collected evidence from the scene
23      when you were alone, May 10th, 2019?
24  A.   Yes.
25  Q.   You didn't have John Diggle with you, did you?

Page 239

1   A.   No, I did not.
2   Q.   And you didn't have Lou Inen -- Inendino with you,
3       did you?
4   A.   No, I did not.
5   Q.   And you didn't video it, did you?
6   A.   I photographed it.
7   Q.   But you didn't --
8   A.   Several photographs.
9   Q.   -- video it, did you?
10  A.   No.
11  Q.   So this blue paint on the floor here in this trash
12      barrel that's burned to the floor on Page 10 of
13      Exhibit CC, how do you account for that still being
14      bright blue paint if it's been subjected to
15      combustion.
16  A.   'Cause it was in an area totally away from the area
17      of origin.  It was not in the area of origin.
18  Q.   Despite the fact that the container melted and is
19      gone.
20  A.   It burnt down from the top down, and this was
21      inside the container.
22  Q.   Okay.  On this same exhibit, Jim, can you go to
23      Page 16.  It's this one.
24  A.   Okay.
25  Q.   What is that --

Page 240

1           MR. JONES:  Objection to foundation.
2   QUESTIONS BY MR. GARDNER:
3   Q.   -- in the photo?
4   A.   It's a -- I don't know.  This is inside of a
5       dumpster, looks like.
6   Q.   You sure it's not inside of that fire locker in the
7       middle of the room that the center heater --
8   A.   Yeah that --
9   Q.   -- fell on?
10  A.   -- that could be possible as well.  'Cause it's --
11      I don't --
12  Q.   Did you collect it as evidence?
13  A.   No, we did not.
14  Q.   Doesn't that look like a 55-gallon drum of some
15      sort?
16  A.   Yes.
17  Q.   Do you know if that's plastic or metal?
18  A.   It's metal.
19  Q.   Okay.  You see, like, a -- a hose kind of attached
20      to it?  But ...
21  A.   Yes.
22  Q.   And do you know what the purpose of that hose was?
23  A.   I'm assuming to get material out of the container.
24  Q.   The paint you mean.
25  A.   I don't know what was in that container, no.

Page 241

1   Q.   'Cause you never swabbed it, did you?
2   A.   No, I did not.
3   Q.   What about this silvery-looking stuff on top of the
4       container, Exhibit CC, 16?  Do you know what that
5       stuff is?
6   A.   No, I don't.
7   Q.   Do you know if it's a byproduct of Herculiner --
8   A.   No.
9   Q.   -- that's been burned?
10  A.   I don't --
11          MR. JONES:  Objection, foundation.
12  QUESTIONS BY MR. GARDNER:
13  Q.   You didn't collect it or test it, did you?
14  A.   No, I did not.  It was not in the area of where I
15      believe the fire origin occurred.  So that's why
16      I -- I didn't collect it at the time.
17  Q.   Go to the next page, CC, Page 18.  Do you see these
18      containers?
19  A.   Yes, sir.
20  Q.   The one on the far right is sort of rectangular as
21      opposed to the cylinder shape on the left?
22  A.   Yes.
23  Q.   Did -- this container on the far right, was that
24      collected into evidence?
25  A.   No.

61 (Pages 238 - 241)

Page 242

1  Q.  You sure?
2  A.  No, it was not -- I -- well, yeah, it was
3     collected.  I'm sorry.
4  Q.  Yeah.
5  A.  Yes.
6  Q.  We just paid a fellow to take pictures of it.
7  A.  Yeah.
8  Q.  And so what kind of can is that?  What was in there
9     at the time of the fire?
10     MR. JONES:  Objection to foundation.
11     THE WITNESS:  I don't know what was in that
12     container.
13  QUESTIONS BY MR. GARDNER:
14  Q.  But it was collected and taken to Indianapolis,
15     wasn't it?
16  A.  Yes.
17  Q.  And it was recently photographed by one of the
18     Rimkus employees, right?
19  A.  I -- I don't know.  I don't know.
20  Q.  So you can't exclude that can as -- as being --
21     having paint thinner in it at the time of the fire,
22     can you?
23  A.  The only thing I can exclude is -- is that that did
24     not have -- was not in the area of fire origin.
25     So ...

Page 243

1  Q.  Well, what is the area of fire origin then?
2  A.  The south section of the building.
3  Q.  The south heater?
4  A.  Yeah, correct.
5  Q.  Okay.  Not the east heater.
6  A.  No.  It was the south heater.
7  Q.  Why did you say in your -- your reports that it was
8     in the east heater?
9  A.  At the time when I was doing my report, I was -- I
10     did not have -- I looked at some of the directions,
11     and I -- I misdocumented the fact that it was east
12     instead of south.  I was thinking east side -- east
13     of the -- east side of the building where the --
14     where the -- the heaters were at.  And my
15     terminology was not used properly to describe the
16     location of the -- of the heater itself.
17  Q.  On Page 3 of Exhibit F -- you don't have to go to
18     it -- your first report, December 3rd, 2019, you
19     reference the poi -- the pornt of origin -- point
20     of origin as the east two heater twice in one
21     paragraph, didn't you?
22  A.  Right.  It should have been south heater.
23  Q.  Yeah.  And in the very next paragraph you use the
24     word south heater.
25  A.  Yes.

Page 244

1  Q.  So which one's wrong?  East or south?
2  A.  The east is wrong.
3     MR. JONES:  Objection, asked and answered.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Okay.  So you meant south the whole time.
6     MR. JONES:  Asked and answered.
7  QUESTIONS BY MR. GARDNER:
8  Q.  Correct?
9  A.  Yes.
10  Q.  Did you correct that in your next report?
11  A.  I don't believe I did because I didn't catch it at
12     the time for the difference.
13     My second report was based on the -- after the
14     tube heaters were evaluated, that it didn't change
15     -- that particularly documented that that didn't
16     change the -- my opinion.  And most of the other
17     documentation I'd already given a report to, I
18     didn't change.  And at the time I didn't catch it.
19  Q.  Still back on Exhibit CC, Page 19.  You see the
20     couple, they look to me like gallon can cylin --
21     cylinders.  You see them?
22  A.  Yes, sir.
23  Q.  Do you know what was in those at the time of the
24     fire?
25  A.  No, I don't.

Page 245

1  Q.  Did you collect those?
2  A.  No.
3  Q.  Never tested them?
4  A.  Again, I didn't -- there wasn't there any reason
5     for me to collect them based on the fact that I did
6     not believe they were in an area of fire origin.
7     And all evidence that -- or anything that would be
8     in this -- the whole facility, and particularly in
9     the area of origin, or anything anybody thought was
10     area of origin, I would have collected had anybody
11     wanted it collected as well.
12  Q.  So your -- your -- because of the size of this
13     fire, you were collecting things in the area of
14     origin.  Has that got it?  That's why --
15  A.  That's usually why -- you want to try to collect
16     things in the area of origin because of the fact
17     that there's potential for those things to be
18     evaluated.  If it's outside the area of origin,
19     then it could be collected.  But it doesn't
20     necessarily have anything to do with determining
21     fire cause.
22  Q.  Then why did you collect the rectangular can shown
23     on Page 19 of Exhib CC -- Exhibit CC?
24  A.  I -- someone brought it to me and wanted to
25     collected it --

62 (Pages 242 - 245)

Page 246

1  Q.  Okay.
2  A.  -- wanted it collected.
3  Q.  Okay.  But you had determined the south heater was
4      the area of origin.
5  A.  The south end of the building, yes, in -- up in
6      the -- the heater.
7  Q.  Which explains why you went to the trouble and
8      expense of collecting the north and central
9      heaters.
10 A.  No.  I was asked by our client to collect all the
11     heaters.  So that's why I collected all of them.  I
12     just felt, because of the damage that was done, and
13     also to that south end of the building, that the
14     south heater was the -- the area of or -- fire
15     origin.
16 Q.  Could you go to Page 20 of Exhibit CC, Jim.
17 A.  Okay.
18 Q.  There's a couple of cans.  One's tipped over.  Do
19     you see that?
20 A.  Yes.
21 Q.  There's some silver-ish-looking, dried-up gook?
22 A.  Yes.
23     MR. JONES:  Objection to form.
24     MR. GARDNER:  I apologize for my terminology.
25     You can use whatever term you want.  What is

Page 247

1      that --
2      MR. JONES:  Objection --
3      MR. GARDNER:  -- silver stuff?
4      MR. JONES:  Objection to foundation.
5      THE WITNESS:  Well, looks like similar to the
6      type of material that was on top of the other
7      container of --
8  QUESTIONS BY MR. GARDNER:
9  Q.  So you didn't collect that?
10 A.  No.
11 Q.  Didn't test it?
12 A.  In this particular picture it also -- it looks like
13     that the -- that heat was applied to that
14     container.  And it also -- all -- caused it to
15     explode out.  So it was probably --
16 Q.  What explode -- what explode out?
17 A.  The top of the -- the lid.
18 Q.  No, by what element?  What --
19 A.  These -- the product that was inside of that.
20 Q.  But you don't know what it is.
21 A.  No.
22 Q.  And so you -- it could have been Herculiner.
23     MR. JONES:  Objection to form, foundation.
24 QUESTIONS BY MR. GARDNER:
25 Q.  You can't rule out --

Page 248

1  A.  I don't -- I don't know what it could have been.
2      Put it that way.
3  Q.  You can't rule out that it was Herculiner, can you?
4      MR. JONES:  Same objections.
5      THE WITNESS:  No, I cannot.
6      MR. GARDNER:  Did you get his answer?
7  QUESTIONS BY MR. GARDNER:
8  Q.  Can you go to Exhibit FF.  Do you know what the
9      product PB B'laster is?
10 A.  Yes.
11 Q.  What is it?
12 A.  It's a spray can usually to spray bolts and nuts to
13     loosen them up and things of that nature to --
14 Q.  Right.
15 A.  -- to --
16 Q.  Do you know the comp -- do you know the ingredients
17     of it?
18 A.  No, I don't.
19 Q.  You haven't ever looked at the technical sheets for
20     that?
21 A.  No.
22 Q.  Or the data sheets?
23 A.  No, I have not.
24 Q.  Do you know if it has either xylene or petroleum
25     distillates as an ingredient?

Page 249

1      MR. JONES:  Objection to form.
2      THE WITNESS:  I know it would have petroleum
3      distillants [sic], possibly, as an ingredient based
4      on the fact that, you know, if you measured the
5      actual liquid in it because it's got hexane or
6      propane in it.
7  QUESTIONS BY MR. GARDNER:
8  Q.  Have you read the report of -- of Space-Ray's
9      expert per hexalent (phonetic)?
10 A.  I don't recall that report, no.
11 Q.  He's a chemist in the case.
12 A.  Okay.
13 Q.  And you didn't hire a chemist, did you?
14 A.  No, I did not.
15 Q.  All right.  So did you collect any cans of
16     PB B'laster from the fire scene debris?
17 A.  No.
18 Q.  Are you sure?
19 A.  Yes, sir.
20 Q.  Did you see any?
21 A.  I did not see any.
22 Q.  Do you know if any cans of PB B'laster were in the
23     room at the time of the fire?
24 A.  No.
25     MR. JONES:  Objection to form and foundation.

63 (Pages 246 - 249)

Page 250

1     THE WITNESS: I don't know. That's at ground
2     level. And I -- the fire, by all definition and
3     all that -- by all opinions of everybody that I
4     spoke to, occurred high in the ceiling. So it was
5     not in the area of fire origin. So I didn't
6     collect it. And no one at the site requested any
7     of this information to be collected as well.
8     QUESTIONS BY MR. GARDNER:
9     Q. How did you rule out this fire happening somewhere
10    other than at ceiling height, like ground level or
11    somewhere higher, but below the ceiling? How did
12    you rule that out? And how did you rule out that
13    moving upwards to the ceiling --
14        MR. JONES: Objection.
15        MR. GARDNER: -- like a lot of fires do?
16        MR. JONES: Objection to form.
17        THE WITNESS: The -- the fact that I was told
18    that the fire -- they saw the fire at ceiling --
19    high level in the building, near the ceiling.
20    Combine that with the fact that a lot of times when
21    we go to visit -- of the multiple fires that I've
22    investigated, we -- one of the first thing we try
23    to do is determine what's new to the building,
24    what's been introduced to it. A lot of times
25    something new has occurred which changes the

Page 251

1     dynamics of the building. And I was told that
2     these space heaters were recently installed within
3     a couple months. And that by -- and I started
4     researching the heaters just to -- to add to that
5     the, you know, the bookshelf, so to speak, as I
6     referred to.
7        And when I did that, I noticed that it was
8     talking about the -- these heaters should not be
9     installed in paint areas or paint booths, so to
10    speak. Even though this does not def -- meet the
11    definition of paint booth, that's what was
12    occurring there.
13       Second thing was the fact that when I did the
14    lab test of the products that were inside the
15    tubes, they came up with combustible materials.
16    And then the same thing on the side of the
17    container of the paint. Once it boils off it
18    becomes combustible. Given all those types of
19    things, that's a part of the big puzzle. And it
20    fit the -- the occasion that, you know, in my
21    opinion, more than 51 percent likely to have
22    happened or probable to have happened.
23    QUESTIONS BY MR. GARNER:
24    Q. NFPA 921, Section 4.5, speaks to a fire
25    investigator's level certainty, doesn't it?

Page 252

1     A. Yes, it does.
2     Q. And it states, The level of certainty describes how
3     strongly someone holds an opinion or conclusion.
4     Correct?
5     A. Yes.
6     Q. Further it states, Someone may hold an opinion to a
7     higher or lower level of certainty, period.
8     Correct?
9     A. Yes.
10    Q. That level is determined by assessing the
11    investigator's confidence in the data, in the
12    analysis of that data, and testing of hypothesis
13    formed. That level of certainty may be determined,
14    sorry, may determine the practical application of
15    the opinion, comma, especially in legal
16    proceedings. Do you agree with that?
17    A. Yes.
18    Q. And then it says, The investigator should know the
19    level of certainty that is required for providing
20    expert opinions, period. Two levels of certainty
21    commonly used are probable and possible. Correct?
22    A. Yes.
23    Q. Then it -- it says, Possible. At that level of
24    certainty, the hypothesis can be demonstrated to be
25    feasible but cannot be declared probable. Do you

Page 253

1     agree with that --
2     A. That's what it says --
3     Q. -- in general? Correct.
4     A. -- general.
5     Q. If two or more hypotheses are equally likely, then
6     the level of certainty must be possible. Correct?
7     A. Yes.
8     Q. And then in terms of definition of probable,
9     according to this book you relied on, NFPA 921,
10    probable is defined as, quote, this level of
11    certainty corresponds to being more likely true
12    than not, period. This level of certainty, the
13    likelihood of hypothesis being true, is greater
14    than 50 percent. Right?
15        MR. JONES: Objection to form and --
16        THE WITNESS: 51 percent, I think.
17        MR. GARDNER: Right.
18        MR. JONES: Objection to form and foundation.
19    QUESTIONS BY MR. GARDNER:
20    Q. Neither the words "probable" or "likely" are
21    anywhere in either of your two reports, are they?
22    A. No. The word "likely" is not used in any official
23    report.
24    Q. And your -- your --
25    A. Any -- should not be used anywhere according to --

64 (Pages 250 - 253)

Page 254

1 Q. But the word "probable" should be.
2 A. "Probable" or "possible" is two -- two words that
3    could be used.
4 Q. Yeah.
5 A. Of course, I already addressed at that earlier in
6    the aspect of it was misused in this situation. At
7    the time I typed it, I -- there was -- I just made
8    an error in that aspect.
9 Q. You -- you said probable -- sorry. You said
10   possible when you meant probable.
11 A. Yes.
12 Q. And you had two reports, and three years between,
13   you never fixed.
14 A. I did not.
15   MR. JONES: Objection, asked and answered.
16   MR. GARDNER: Okay.
17   MR. HEHNER: I did not hear his answer.
18   MR. GARDNER: He said, "I did not."
19   MR. HEHNER: Okay. Thank you.
20 QUESTIONS BY MR. GARDNER:
21 Q. Same manual, in NFPA 921, Section 4.5.2. Quote, if
22   the level of certainty of an opinion is merely
23   suspected, the opinion does not qualify as an
24   expert opinion. You agree with that?
25 A. I agree with that statement, yes.

Page 255

1 Q. Okay. Continuing: If the level of certainty is
2    only possible, then the opinion should be
3    specifically expressed as possible. Do you agree
4    with that?
5 A. Yes.
6 Q. Continuing and ending: Only when the level of
7    certainty is considered probable should an opinion
8    be expressed with reasonable certainty, correct?
9 A. Yes.
10 Q. Section 4.5.3 is referring to expert opinions,
11   which you've given in this case, correct?
12 A. Yes.
13 Q. Right. And you'll agree that your opinions are
14   based on facts.
15 A. Based on everything: Facts, statements that are
16   given to me, the whole scene, what I saw -- what I
17   see.
18 Q. Right.
19 A. Things likes that.
20 Q. You haven't expressed any opinions in your 1400
21   reports that weren't based on facts, have you?
22 A. No, I have not.
23 Q. And you'll agree that the strength of the opinion
24   is no better than the strength of the facts.
25   MR. JONES: Objection to form.

Page 256

1    THE WITNESS: I would have to agree with that
2    statement, yes.
3 QUESTIONS BY MR. GARDNER:
4 Q. In other words, if the facts are wrong, the opinion
5    could be wrong.
6    MR. JONES: Objection to form.
7    THE WITNESS: I would say that if you had the
8    wrong facts, yes, that would probably be the case.
9 QUESTIONS BY MR. GARDNER:
10 Q. Yeah. And -- and the strength of the facts or the
11   quality of the facts will affect the quality of the
12   opinion, correct?
13   MR. JONES: Same objections.
14   THE WITNESS: Oh, I personally think that you
15   have to take everything in consideration. You
16   don't just take one fact. There has to be multiple
17   facts that you put together versus --
18 QUESTIONS BY MR. GARDNER:
19 Q. You shouldn't exclude any facts either --
20   MR. JONES: If he could --
21 QUESTIONS BY MR. GARDNER:
22 Q. -- should you? Okay.
23 A. You know what I'm saying? I mean, you could -- you
24   could -- obviously, you have ten facts, nine of
25   those facts prove to be true and one is

Page 257

1    questionable, then you -- you'd have to cons --
2    make -- my opinion would be it's more likely true
3    than not, so to speak, or level of certainty
4    becomes true.
5 Q. Do you judge the veracity of the witness
6    statements?
7    MR. JONES: Objection --
8    THE WITNESS: If they have -- if they have --
9    if I have a reason -- no reason to believe that
10   they would not be lying to me, yes. And I don't
11   have any reason to believe that or any evidence to
12   support that. Sometimes I don't believe clients'
13   statements or -- or a -- people's statements --
14 QUESTIONS BY MR. GARDNER:
15 Q. Witness statements you mean?
16 A. -- by witness statements --
17 Q. Okay.
18 A. -- based on why they're wanting to make the
19   statement.
20 Q. Did you believe Shamir -- Samir?
21 A. I -- I believed his comments and his statements to
22   be what he -- what he felt was true. I -- that
23   was, again, one of those other things I put in the
24   book on the shelf. And then as I see the situation
25   and see the sites and see the -- the scene itself,

65 (Pages 254 - 257)

Page 258

1  then I add to that or subtract from that, one way
2  or the other.
3  Q. And the thing you subtracted in this case is the
4  statement taken from Fred Jones that said the spray
5  paint wouldn't go up and get on heaters.
6     MR. JONES: Objection to form.
7     THE WITNESS: First of all, he didn't tell me
8  that, number one. And, number two, is the --
9  there's no -- there is no specul -- I say
10  speculating the fact that based on the 24-inch
11  spray pattern. And that's not totally entirely
12  true in this situation.
13     MR. GARDNER: So you determined --
14     THE WITNESS: The overspray is --
15     MR. GARDNER: So --
16     THE WITNESS: -- what we're talking about.
17 QUESTIONS BY MR. GARDNER:
18 Q. -- you determined that some of the witness
19  statements in this case were speculative.
20     MR. JONES: Objection to form. Misstates
21  testimony.
22     THE WITNESS: I did not see his witness
23  statement, so I can't attest to his witness
24  statement as for as what he's re -- he's referring
25  to the spray, not the overspray --

Page 259

1     MR. GARDNER: Did you have --
2     THE WITNESS: -- or the mist.
3     MR. GARDNER: I apologize.
4  QUESTIONS BY MR. GARDNER:
5  Q. Did you have any witness statements or statements
6   from witnesses at all before you preempted and
7   discarded your field notes when you prepared your
8   first report?
9      MR. JONES: Objection to form; asked and
10  answered.
11     THE WITNESS: The -- the only thing I had was
12  statements that were made to me at the scene
13  initially when I was there.
14 QUESTIONS BY MR. GARDNER:
15 Q. The day after the fire?
16 A. Which no one wanted to get involved, so to speak.
17  And then I had a -- statements made to me by Fred
18  Jones while I was at the site doing some collection
19  of the evidence.
20 Q. So Fred Jones didn't directly tell you this thing
21  that I think was Mr. Inendino and Mr. Diggle
22  recorded about the paint, that sprayer wouldn't
23  allow the paint to go -- defy the law of gravity
24  and get up 14 feet in the air on these heaters.
25     MR. JONES: Objection to form.

Page 260

1     THE WITNESS: I did not see their reports. I
2  did not see them talking. I did not get that
3  information from them at that point in time because
4  the -- I didn't realize that they had even had that
5  communication with them.
6  QUESTIONS BY MR. GARDNER:
7  Q. Did you drive up to Indianapolis that day with
8   Mr. Inendino, or did you guys drive separate?
9  A. No. We drove separately.
10 Q. And -- and Mr. Diggle came in from Chicago.
11 A. Yes.
12     MR. HEHNER: And you said Indianapolis. You
13  meant Fort Wayne, didn't you? You said --
14     MR. GARDNER: No, they drove up from
15  Indianapolis.
16     MR. HEHNER: Oh, from. I'm sorry; pardon me.
17 QUESTIONS BY MR. GARDNER:
18 Q. So NFPA 921 has a Section 4.5.3 entitled Expert
19  Opinions. And it states as follows: Many courts
20  have a threshold of certainty for the investigator
21  to be able to render opinions in court such as,
22  quote, proven to an acceptable level of certainty,
23  quote, or, quote, a reasonable degree of scientific
24  and engineering certainty, quote, or, quote,
25  reasonable degree of certainty within my

Page 261

1  profession, quote. You're familiar with that,
2  aren't you?
3  A. Yes.
4  Q. But you failed to state your opinions with any
5   degree -- stating any degree of certainty in any
6   field, didn't you?
7      MR. JONES: Objection to form.
8      THE WITNESS: Those words were not used. But
9   that's my opinion. And I -- I feel I have the
10  level of degree of certainty by giving those
11  opinions.
12 QUESTIONS BY MR. GARDNER:
13 Q. But the phrase "degree of certainty" is nowhere in
14  either of your reports, correct?
15 A. It is not in the report, no, that -- those
16  particular words are not.
17 Q. I'm gonna read -- so you're -- you're -- NFPA 921
18  guideline that you refer to in both your reports,
19  it suggests keeping an open mind, doesn't it,
20  throughout --
21 A. Yeah.
22 Q. -- the investigation?
23 A. Right. Throughout the investigation, yes.
24 Q. Okay. I'm gonna read to you just a little bit out
25  of Samir's deposition taken October --

66 (Pages 258 - 261)

Page 262

1    October 31st, 2022, which you've never read.
2        MR. JONES:  Which page are you on --
3        MR. GARDNER:  36 --
4        MR. JONES:  -- of the depo?
5        MR. GARDNER:  -- 36.
6    QUESTIONS BY MR. GARDNER:
7    Q.  The question is:
8        "So initially you said you didn't see any
9        flames.  Did you, at some point in time, see flames
10       coming from the operations building?
11       "A.  Yes.  You could see the flames.  As soon
12       as we got done pulling the supervisor trucks away
13       from the south side of the building, you could see
14       flames.  The very tip-top of the building where the
15       roof and, you know, obviously the rafters met, you
16       could see flames coming out of there.  And then
17       from the overhead doors, the closest one to the
18       exterior of that building on the south side.  That
19       one had flames coming out of it as well."
20       Have you ever heard that before today?
21   A.  No.
22   Q.  So you didn't have that information when you
23       prepared your opinions, did you?
24       MR. JONES:  Objection, asked and answered.
25       THE WITNESS:  Well, I didn't have the

Page 263

1    paperwork.  I had the verbal information that there
2    was flames coming from the roof and that the --
3    they observed -- well, put it this -- no, flames
4    coming -- it appeared to be coming from the roof of
5    the -- or the ceiling level.
6    QUESTIONS BY MR. GARDNER:
7    Q.  So you had different information than the entirety
8        of Samir's answer to that question.
9        MR. ZOCCOLA:  Objection --
10       MR. JONES:  Objection to form.  You can
11   answer.
12       THE WITNESS:  Yes.  I had different
13   information given to me even by him, yes, from
14   that -- at that point.
15   QUESTIONS BY MR. GARDNER:
16   Q.  Same deposition, Samir Dizdarevic, taken
17       October 31st, '22.  Page 59, questions by counsel
18       for Space-Ray, Line 13.
19       "Did you see flames coming out of either of
20       the garage doors on the southern side of that
21       building?
22       "A.  Yes, sir.
23       "Q.  In which?  Was it both?  One, can you
24       explain that for me?
25       "A.  It was the furthest one away from the

Page 264

1    main entrance to the operations building."
2        You've never heard that before today, have
3    you?
4    A.  No.  Other than the fact that you said before on
5        the first one that he saw flames coming from the
6        roof first.
7    Q.  That's -- I disagree --
8    A.  Fires were coming from the -- that opening from the
9        south side.
10       MR. GARDNER:  I'll move to strike the answer
11   as not being what I said, let alone what Samir
12   said.
13       Page 60, Line 1.
14       "Q.  I'm sorry.  So it would be the one to the
15       furthest south; is that correct?
16       "A.  Yes, sir.  The furthest south, yes, sir.
17   That door."
18   QUESTIONS BY MR. GARDNER:
19   Q.  Have you ever heard that before today?
20   A.  No.
21   Q.  Did you ask Republic to provide you with
22       depositions?
23   A.  I did not, no.
24   Q.  Did you ask Republic's attorneys to provide you
25       with any depositions?

Page 265

1    A.  No.  I based my opinion on what facts I gather and
2        what facts I collected and on -- and I did not --
3        first of all, I didn't even know some of these
4        dep -- these people were de -- deposed until, you
5        know, I was getting prepared for this.  And then
6        I -- I was -- it -- my understanding that some of
7        them were -- had been dis -- deposed already.
8        So --
9    Q.  So Exhibit FF, there's some writing on that can.
10       Do you see that?  Look at the writing there.
11   A.  Yes.
12   Q.  I've never -- I have not seen an evidence
13       collection form from Rimkus referencing this can,
14       have you?
15   A.  I don't know what it says.  So I can't tell you.
16   Q.  Isn't that your handwriting?
17   A.  Yeah.  But I can't tell what it says on there.
18   Q.  I believe the Rimkus file number's at the top.  And
19       then it says, Wipes on small desk north something.
20       Isn't that your handwriting?
21       MR. JONES:  Objection to form.
22       MR. HEHNER:  On Page 1 --
23       MR. GARDNER:  Yes, sir.
24       MR. HEHNER:  -- of 3?  Thank you.
25       MR. GARDNER:  Date May 11 --

Page 266

1    THE WITNESS: Yeah. On the C section or
2  whatever --
3    MR. GARDNER: Yeah.
4    THE WITNESS: -- it says on there.
5    MR. GARDNER: May --
6    THE WITNESS: I see C section but -- Section C
7  of the building that I -- that I referred to, the
8  north --
9    MR. GARDNER: What --
10   THE WITNESS: -- north end of the structure.
11   MR. GARDNER: Okay.
12 QUESTIONS BY MR. GARDNER:
13 Q.  And it says May 11, 2020?
14 A.  On this -- yeah. It says that on the -- on the
15   can, yes.
16 Q.  And then your name, Jim, looks like --
17 A.  Yeah.
18 Q.  -- F-O-S-T, right?
19 A.  Right.
20 Q.  So it's your handwriting.
21 A.  Yes.
22 Q.  Where's this can today?
23   MR. JONES: Objection to foundation.
24   THE WITNESS: Should be in -- at Rimkus
25   Consulting Group. Ever -- all our information

Page 267

1  goes -- or all our --
2    MR. GARDNER: Can you go to the next page.
3    THE WITNESS: -- evidence goes there.
4  QUESTIONS BY MR. GARDNER:
5  Q.  Exhibit FF, Page 2. Another can. You see it?
6  A.  Yes.
7  Q.  Is that your handwriting?
8  A.  Yes.
9  Q.  Can you read it to us?
10 A.  No.
11 Q.  Was this taken into evidence? And is there a
12   custody form for it?
13 A.  There was a custody for everything that is taken
14   into evidence.
15 Q.  What is inside the cans shown in Exhibit FF,
16   Pages 1 and 2?
17   MR. JONES: Objection to foundation.
18   THE WITNESS: I cannot read what's on the top
19   of this thing. But it would tell you on there what
20   it would -- what it would -- where it came from.
21 QUESTIONS BY MR. GARDNER:
22 Q.  So you don't know what's in the cans.
23 A.  Not by -- unless I'd be able to read it, yes, I
24   cannot -- don't know what's in that.
25 Q.  If you go to the third page of this exhibit.

Page 268

1    Exhibit FF, Page 3. You see --
2  A.  Uh-huh.
3  Q.  -- looks like part of a tape measure?
4  A.  Yes.
5  Q.  A gallon can with no writing on it?
6  A.  Uh-huh.
7  Q.  Yes?
8  A.  Yes.
9  Q.  And do you see, it looks like a can that's exploded
10   or rusted through --
11 A.  Spray can?
12   MR. JONES: Objection to form.
13 QUESTIONS BY MR. GARDNER:
14 Q.  Do you know what that spray can is?
15 A.  No, I do not.
16 Q.  Why is it photographed?
17   MR. JONES: Objection to form.
18 QUESTIONS BY MR. GARDNER:
19 Q.  Why was it photographed?
20 A.  I think I was coming out -- at that point in time
21   out to where the -- showing where the -- I
22   collected the evidence and in this -- in this
23   container. But it -- I'm just measuring it out
24   from the wall. 'Cause you're not -- overall did
25   not show the picture; it just shows the first two

Page 269

1  feet of where the -- the --
2  Q.  So you didn't take this picture because of this
3  partially exploded -- or whatever --
4  A.  No, I didn't take it because of the can.
5    MR. JONES: Objection to form.
6  QUESTIONS BY MR. GARDNER:
7  Q.  Well, what were you trying to document if not this
8  weird can that looks like it's burned and rusted?
9    MR. JONES: Same objection.
10   THE WITNESS: Wherever we take evidence at,
11   typically what we do is we measure from two points
12   of location. Like, either from the front of the
13   building to the evidence or from the, you know,
14   either east or west side -- however you want to
15   refer to it as -- or from a point of origin. And
16   we measure out. Sometimes we cannot get the whole
17   thing in a -- the photograph and so we measure out.
18   In this particular picture I was just -- I was
19   just doing measurements of this pile of stuff that
20   was here and how far away it was from the wall.
21 Q.  Did you collect that?
22 A.  So I did not collect that, no.
23 Q.  On --
24 A.  I -- I was going to. But I -- at the time I was
25   there, I decided to just limit my -- limit to the

68 (Pages 266 - 269)

Page 270

1    Space-Ray heaters.  Because I didn't want to
2    disturb any evidence more than what was --
3  Q.  Was this May 10th, 2019?
4  A.  Yes.  I believe so.  I can't -- I don't know for
5    sure in this particular photograph.  It could have
6    been on the day of the examination.  I'm not sure.
7        MR. GARDNER:  Time for a five-minute break?
8        MR. JONES:  That's great.
9        MR. ZOCCOLA:  Yeah.
10       THE VIDEOGRAPHER:  This ends media three.  The
11   time is 3:59, and we are off the record.
12       (A brief recess was taken.)
13       THE VIDEOGRAPHER:  This begins media four.
14   The time is 4:13.  We are on the record.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Jim, we're just back from a break.  And I'm
17   directing your attention quickly to Exhibit R,
18   32 pages.  It's the Modine -- one of the Modine
19   installation and service manuals?
20  A.  Uh-huh.
21  Q.  Do you see it?
22  A.  Yes.
23  Q.  Did you ever -- have you ever, during your course
24   of the investigation, preparing your reports, refer
25   to this manual?

Page 271

1  A.  No, I have not.
2  Q.  Okay.  You're never read any of it, correct?
3  A.  No.
4  Q.  And the contents of it then were not in any way,
5    shape, or form considered by you in preparing your
6    opinions in this case?
7  A.  No, it was not.
8  Q.  Okay.  Same question for the next Exhibit S.  It's
9    a different Mo -- Modine style manual for gas-fired
10   power vented unit heaters, propeller, and blower
11   models.  Do you see that?
12  A.  Yes.
13  Q.  It's 28 pages.  Have you ever seen this before
14   today?
15  A.  No, I have not.
16  Q.  Never read it before today?
17  A.  No.
18  Q.  So you couldn't have considered any of the contents
19   of this manual when you prepared your opinions in
20   this case, correct?
21  A.  I did not.
22  Q.  Can you go to Exhibit V?
23  A.  D?
24  Q.  V --
25  A.  V.

Page 272

1  Q.  -- as in victory.  It should be next or close.
2    It's two pages.  Do you see this?
3  A.  Yes.
4  Q.  This one's undated.  I questioned Mr. Trevor Miller
5    of Korte Does It All about it during his
6    deposition.  And he indicated he prepared this
7    quote -- the record can correct me if I'm wrong --
8    a couple of months before this fire and in
9    connection with removing the old Modine units from
10   building 1 and installing gas infrared tube
11   heaters.  That's what he told us anyway.  Have you
12   seen this before?
13  A.  No.
14  Q.  All right.  Did you ask Korte, when you called them
15   up, to produce a copy of their bid for installing
16   gas infrared tube heaters inside of building
17   number 1?
18  A.  No, I did not.  I did ask Kyle if they had a copy
19   of the bid, since that's what they referred to.
20   And they were not able to produce that at the time.
21  Q.  You mean at any time.
22  A.  At any time, they didn't produce it.
23  Q.  Okay.  Can you think of any reason for Trevor
24   Miller, whose name's identified at the bottom of
25   Exhibit V, to quote Republic for the cost of Korte

Page 273

1    Does It All for removing the existing hanging unit
2    heaters in the paint shop and installing gas
3    infrared tube heaters if they recommended against
4    it?
5        MR. JONES:  Objection to form.
6        THE WITNESS:  I don't have any information
7    about what the discussions were between Korte and
8    between Republic.  The only thing that I was given
9    information by was the fact that Korte was doing
10   other things there, and they were in the process of
11   kind of remodeling those -- that whole building
12   technically.  And Korte had given them -- and they
13   want these new heaters put in.  And I was told
14   that, according to Korte, that the type of heaters
15   that were installed was not appropriate for that
16   type of facility due to the painting that was
17   involved in the facility.
18       MR. GARDNER:  I'm --
19       THE WITNESS:  That's all I was told.
20       MR. GARDNER:  -- I'm lost in your answer.
21  QUESTIONS BY MR. GARDNER:
22  Q.  At the end of it you said that type of heater was
23   not the right type of heater.  Are you talking
24   about the Modines or the Space-Rays?
25  A.  No, not the Modine.  The Space-Ray tile -- style --

Page 274

1  Q.  So my question to you is --
2  A.    -- style heaters.
3  Q.    -- and I don't -- listen carefully.  Why -- do you
4       know why Korte would bid to remove the Modine
5       heaters from building -- inside building number 1,
6       there were three of them, and install gas-fired
7       tube heaters if they were recommending against the
8       installation of that style heater?
9          MR. JONES:  Objection to form; asked and
10      answered.
11         MR. GARDNER:  It's a yes-or-no question.
12  QUESTIONS BY MR. GARDNER:
13  Q.  Do you know?
14  A.  I -- no, I don't know.  I have no reason to know
15      what they discussed or what they decided to do.
16  Q.  But you were told that they recommended against it,
17      and here you're looking at a bid for it.  Correct?
18      Exhibit V?
19  A.  Yeah.  I was -- I -- I have not -- I didn't know
20      anything about a bid was -- other than I was told
21      that they had bid earlier on -- or they had
22      contacted them to see if they would be able to do
23      that.  And they were told -- I was told that they
24      had told Republic Services that they could not --
25      that they would -- would not want to install that

Page 275

1       type of heater in that type of environment.
2  Q.  And in -- and indeed --
3  A.  I don't --
4  Q.    -- you included that commentary in your reports,
5       didn't you?
6  A.  So -- the only commentary I had in my report was
7       the fact the type of heaters were not suitable for
8       that, and it was a prior company.  I didn't mention
9       Korte by name, but a prior company was contacted --
10  Q.  Told them not --
11  A.    -- and told them not -- that those type of heaters
12      were not utilized in that type of environment.
13  Q.  I think your word in your report was "not
14      recommended."
15  A.  Yes.
16  Q.  So you didn't have access to this report when you
17      prepared your two expert opinions, did you?
18  A.  I did not have access to this, no.
19  Q.  If I called it a report I meant it -- this bid,
20      Exhibit V.  You didn't have access to Exhibit V,
21      did you?
22  A.  Right.  And I have no reason -- no knowledge of why
23      it exists.
24  Q.  You can't explain it, can you?
25  A.  I cannot.

Page 276

1  Q.  Exhibit W is a diagram.
2  A.  Okay.
3  Q.  Have you seen that before today?
4  A.  No, I have not.
5  Q.  You didn't prepare it, did you, Jim?
6  A.  No.
7  Q.  So far as you know, no one from Rimkus prepared it,
8       right?
9  A.  To my knowledge, no.
10  Q.  Do you know when it was prepared?
11         MR. JONES:  Objection to form, foundation.
12         THE WITNESS:  No, I don't.
13  QUESTIONS BY MR. GARDNER:
14  Q.  All right.  This exhibit sticker is covering up the
15      -- the word Korte.  And I know that -- and I
16      apologize for that.  There is another copy that's
17      been circulated.  'Cause we got this, I think, from
18      Korte.
19         Anyway, Korte -- it's my understanding, Jim,
20      and the record will correct me if I'm wrong, that
21      this diagram in Exhibit W and these words were
22      written by someone from Korte Does It All.  You --
23      but you've -- you didn't rely on it, did you?
24  A.  I did not.  Not --
25         MR. JONES:  Objection, foundation.

Page 277

1          THE WITNESS:  The first time I've seen this
2       document was today.
3  QUESTIONS BY MR. GARDNER:
4  Q.  All right.  So if you look at the top of the page,
5       which would be that -- that square that says 48 by
6       48 by 48; do you see that?
7  A.  Yes, sir.
8  Q.  And the word "paint" is inside of there?
9  A.  Yes.
10  Q.  Skipping over the rectangular building number 2,
11      and skipping to building number 3, on the more
12      northern end, do you see the words "paint" inside
13      there?
14  A.  Yes.
15  Q.  Does that conflict with what you had been told by
16      Republic employees that painting was only conducted
17      in building number 1 and not buildings 3 and 4?
18         MR. JONES:  Objection to form, foundation.
19      Document speaks for itself.
20         THE WITNESS:  The way I understand it, they
21      did paint in the south end of the building.  And
22      then they would move the containers from there into
23      the next section over, just to get them out of the
24      way to paint other containers.  Because they were
25      painting multiple containers a day --

70 (Pages 274 - 277)

Page 278

1    MR. GARDNER: Right. So you don't know --
2    THE WITNESS: -- to try to --
3  QUESTIONS BY MR. GARDNER:
4  Q.  -- if they ever painted inside of building number 3
5     shown in Exhibit Z, Page 2, do you?
6  A.  No, I do not.
7    MR. JONES: Same objections.
8  QUESTIONS BY MR. GARDNER:
9  Q.  So the Page 2 of Exhibit W is a -- kind of a
10    rough -- you can turn that page, I think. Should
11    be a Page 2.
12  A.  Uh-huh.
13  Q.  Yeah. Have you seen this diagram today that's
14    labeled on the top left Korte Does It All, Inc.?
15    Do you see that?
16  A.  Yes.
17  Q.  Have you seen it before today?
18  A.  No.
19  Q.  It shows some very rough dimensions. Do you see
20    the 30 on the top of the drawing and 60 along this
21    right side?
22  A.  Yes.
23  Q.  And there's a kind of a square sticking out of the
24    top left. Looks like it's 17 foot 3 inches by
25    17 feet 5 inches; do you see that?

Page 279

1  A.  Yes.
2  Q.  Do you have any notion of what -- I'll just point
3     to it for you. Do you have any notion what was in
4     this place?
5    MR. JONES: Objection to form, foundation.
6    THE WITNESS: I don't know what this --
7    MR. GARDNER: Thomas is right.
8    THE WITNESS: I don't know what these are --
9    are these reference to --
10    MR. GARDNER: Hold on, Jim. I'm gonna --
11    Thomas's objection's right. He laid an objection
12    on foundation, so let me give it to you.
13  QUESTIONS BY MR. GARDNER:
14  Q.  We obtained or I obtained Exhibit W, Page 2
15    responsive to a subpoena to Korte Does It All, and
16    then I asked Trevor Miller what this was. And he
17    told me when he went out to Republic space to bid
18    the installa -- removal and installation of new
19    heaters inside of building number 1 couple months
20    before the fire, he prepared this diagram. So
21    that's the foundation.
22  A.  Okay.
23  Q.  Okay. So do you see at the top where he writes 30
24    by 60?
25  A.  Yes.

Page 280

1  Q.  And then 15 feet 4 inches tall?
2  A.  Yes.
3  Q.  All right. And he told us that that was his
4     measurement inside of building number 1 where they
5     did welding and cutting and spraying operations
6     from floor to ceiling. That's what he said in his
7     dep.
8  A.  Okay.
9  Q.  Did you know that before today?
10  A.  I -- roughly I knew the height of the building.
11    But the -- I was also told that the heaters were
12    only about nine to ten feet above the ground.
13  Q.  Right.
14  A.  So --
15  Q.  And that -- that comported with kind of what you
16    conclude here in your -- you all right?
17  A.  Yes.
18  Q.  -- your origin and cause report that these heaters
19    were nine feet off the floor.
20    MR. JONES: Objection to form.
21    THE WITNESS: I didn't say that in my report.
22    All I knew is that they were not at -- touching the
23    ceiling. They were hanging from the ceiling.
24  QUESTIONS BY MR. GARDNER:
25  Q.  Do you know if prior to the fire Republic was

Page 281

1    soliciting bids from different contractors to move
2    the paint operations over into the fleet
3    maintenance building?
4    MR. JONES: Objection to form.
5    THE WITNESS: I have no knowledge of that.
6  QUESTIONS BY MR. GARDNER:
7  Q.  No -- nobody from Republic ever told you that?
8  A.  No, sir.
9  Q.  Can you go to Exhibit X.
10  A.  (Witness complies.)
11  Q.  I may not have it here.
12    Skip that exhibit. I'm not going to have any
13    questions on it. Go to Exhibit Y, please, Jim.
14  A.  All right.
15  Q.  This is -- some of this, the beginning of it or
16    couple of emails between counsel in the case, more
17    particularly me and Thomas Jones, who's sitting to
18    your right, regarding my questions about where you
19    obtained your samples. And he referred us to some
20    photos.
21  A.  Yes.
22  Q.  Okay. Did you assist Thomas in doing that?
23  A.  He already had -- I already had the photos. Well,
24    I -- I don't think the photos had been produced yet
25    as for as that part's concerned. And I -- and I

71 (Pages 278 - 281)

Page 282

1    produced those photos from that -- from my file,
2    yes.
3  Q.  Okay.  Can you go to Page 4 of Exhibit Y.  At the
4    top --
5  A.  Four?
6  Q.  Yeah, you're --
7  A.  Okay.
8  Q.  -- on the right page.  At the top left it says
9    F.A.S.T.  And then the top heading is
10    F.A.S.T. Laboratory Worksheet.  Do you see that?
11  A.  Yes.
12  Q.  Case 6224 --
13  A.  Nine?
14  Q.  It could be a 9.  Have you worked with Miss Sharee
15    Wells in prior cases -- in cases prior to this?
16  A.  Yes, I have.
17  Q.  All right.  Do you recognize this as being her
18    handwriting?
19  A.  We don't -- I don't get this paperwork from her,
20    this particular sheet.
21  Q.  You just got her page-and-a-half --
22  A.  Just the --
23  Q.  Final report --
24  A.  -- final report, yes.
25  Q.  Right.  Yeah.

Page 283

1  A.  And it's a typed report.  So I don't have any idea
2    about her --
3  Q.  Right.
4  A.  -- handwriting.
5  Q.  And you relied on her report as part of your -- the
6    foundation for your opinions in this case?
7  A.  Yes.  A typical lab report, yes.
8  Q.  You'll concede that neither of your reports, one of
9    which you pared -- prepared in 2019, and one which
10    you prepared in 2022, don't make any reference to a
11    flame test being negative.
12    MR. JONES:  Objection to form.
13    THE WITNESS:  I have no information regarding
14    that.
15  QUESTIONS BY MR. GARDNER:
16  Q.  You can just look at the first page there.  If you
17    page --
18  A.  Number.
19  Q.  I'm sorry, Page 4.  See on the left where she
20    wrote, on her F.A.S.T. Laboratory Worksheet, flame
21    test negative, number four?
22  A.  Yes.
23  Q.  Do you know what that means?
24  A.  They've used some sort of a flame to ignite
25    something that the -- the evidence, I guess.  I

Page 284

1    don't know.
2  Q.  Did you ask Sharee Wells, as part of your request,
3    that she perform testing in this case to perform a
4    flame test of the Blue Sheboygan paint?
5  A.  No, I did not.
6  Q.  You sure?
7  A.  I did not ask her.
8  Q.  Okay.  You didn't ask her to perform a -- a flame
9    test of the Blue Sheboygan paint in a wet stage?
10  A.  Yes, I -- there -- she act -- she actually
11    contacted me because she wanted to continue on
12    with -- to just try to determine if there was
13    anything particularly with the swab -- the swab.
14    Because typically they could control samples,
15    anytime there's a question that comes up about
16    something.
17        And so I sent her a control sample of the
18    swab.  It's actually sterile.  And then also sent
19    her a control sample of the paint.  And those are
20    what I sent to have tested just to -- is what she
21    requested.
22  Q.  Try to listen a little carefully.  I didn't ask you
23    any of that.  I'm just asking you about flame
24    tests.  Did you ask her to perform a flame test to
25    the paint in a wet state?

Page 285

1  A.  I'm just -- I don't -- I don't ask for what test
2    they do.  All I do is send the -- send the -- the
3    test to them to have it -- to have it tested.  As
4    for as my samples, I have -- I send it to them to
5    have it tested for any type of residue for ignition
6    source.  Or ignition -- or not ignition.  But --
7  Q.  How about flamm --
8  A.  -- ignitable liquids, I guess you could say.
9  Q.  Okay.
10  A.  But in this particular case where I sent -- where I
11    sent the samples separate to her, she performs
12    whatever tests she wants to perform on those for a
13    control sample --
14  Q.  You -- you --
15  A.  -- based on what was sent before.
16  Q.  Okay.  And you did not request Sharee Wells, nor
17    anyone else, to ever try to burn, ignite, or
18    combust the Blue Sheboygan paint in either -- in
19    either a wet stage or a dry stage or any stage,
20    correct?
21  A.  No, I did not --
22  Q.  Okay.
23  A.  -- 'pecifically request that.
24  Q.  Why had you never or had anyone on your behalf or
25    behalf of Republic attempt to burn this Blue

72 (Pages 282 - 285)

Page 286

1  Sheboygan paint in any state, whether it be wet,
2  dry, or boiled?
3      MR. JONES:  Objection to form.
4      THE WITNESS:  My personal opinion, based on my
5  years of -- of being a fire investigator, and also
6  with the scene that presented itself, that the
7  tests that were done and the samples that were
8  taken, give me credibility to what occur -- what
9  would have occurred in that situation.  And that's
10 basically what I -- with -- we're supposed to do
11 with a degree of certainty.  And that's what I try
12 to always do in any fire scene that I investigate.
13     And the degree of certainty in this case
14 surpassed what I would have rec -- what I -- if I
15 decided that this wasn't a poten -- a -- a possible
16 cause of the fire, then I would have changed it
17 to -- you know, went maybe a little bit farther.
18     But the aspect of this was that everything led
19 to -- to this being the potential, or not the
20 potential, but the probable cause of the fire.  And
21 when I got the information from the lab that
22 these -- all these swabs -- you know, if there was
23 only one of them that contained it, I probably
24 wouldn't have went as -- as strong as I would
25 have --

Page 287

1  QUESTIONS BY MR. GARDNER:
2  Q.  Do you remember the question?
3  A.  No.  But I was -- I was trying to answer --
4      MR. GARDNER:  Strike the rest of this answer
5  here.  I'm asking you about flame tests --
6      THE WITNESS:  I --
7      MR. GARDNER:  -- and I think you've answered.
8      THE WITNESS:  -- and I told you I didn't
9  request a flame test.
10     MR. GARDNER:  Okay.  And then the question
11 was:  Why?  And I think you've answered.  Okay.  I
12 could save Space-Ray some time tonight and ask --
13 or some other day.
14 QUESTIONS BY MR. GARDNER:
15 Q.  Would you be willing to reconsider your hypothesis
16 that Blue -- Blue Sheboygan paint ignited or
17 combusted after it became dry if a chemist or some
18 expert can show you that it is not combustible or
19 ignitable or -- nor will sustain combustion in a
20 dry form or after it's boiled?
21     MR. JONES:  Objection to form, foundation.
22     THE WITNESS:  I can only base my opinion on
23 the facts that were presented to me.  And the facts
24 that were presented to me was the -- even by the
25 company's paint and by the comp -- by -- on the

Page 288

1  label of the container, it says if it's boiled off,
2  it presents a -- the properties of a flammable, or
3  not flammable, but combustible liquid.  Which
4  basically, when you look those up, that's
5  equivalent to, like, diesel fuel, other -- other
6  flammable products, or combustible products, that
7  would have been easily ignited.
8      And given the situation that this occurred and
9  by what I saw at the site, then I -- that's what I
10 made -- based my decision on.
11 QUESTIONS BY MR. GARDNER:
12 Q.  I got a little mixed up on whether Sharee Wells
13 ever told you verbally that she performed a flame
14 test on the Blue Sheboygan paint, and the result
15 was negative.  Did she ever tell you that?
16 A.  No.
17 Q.  That's why it's not included in your report --
18 A.  Information.
19 Q.  -- right?
20 A.  Yes.  But it was on the -- I'm assuming it was on
21 the liquid part of the paint that would've she
22 tested it; is that correct?  Or was it dry tested?
23 I don't know.
24 Q.  That's my main point.
25 A.  Or boiled off.

Page 289

1  Q.  You don't know, do you?
2  A.  No, I don't.
3  Q.  And you've never had the paint boiled off to see
4  what happens, have you?
5  A.  I've never done that.  But in this particular case
6  it obviously was on the products that I saw and --
7  or on the heater units that I saw.  And also it was
8  dried on there.  So there's no reason for me not to
9  believe that this paint accumulated prior to the
10 fire and was a source of combustible material to --
11 once the heaters kicked on to -- that ignited the
12 fire.
13     That was my opinion.  And that's based on the
14 scientific method of trying to eliminate everything
15 else involved to a certain degree, or degree of
16 certainty, I should say, as well as the fact that
17 that certain degree or degree of certainty was
18 overwhelmingly -- everything I looked at was
19 pointing more towards these heaters than anything
20 else.
21 Q.  Right.  The degree of certainty about which you
22 failed to put in your reports.
23 A.  I did not fail to put --
24     MR. JONES:  Objection to form; asked and
25 answered.

73 (Pages 286 - 289)

Page 290

1  QUESTIONS BY MR. GARDNER:
2  Q.  You failed to put the words in there.
3  A.  Those particular words.  But those particular words
4     does not mean that I didn't use that degree of
5     certainty to form my opinions.
6  Q.  Can you go to Page 5 of Exhibit Y.  This is a --
7  A.  Okay.
8  Q.  -- Rimkus evidence custody form.  Your handwriting,
9     isn't it?
10 A.  Yes.
11 Q.  Dated date of collection May 10, 2019?
12 A.  Yes.
13 Q.  Exhibits A, B, C?
14 A.  Yes.
15 Q.  Did you label multiple samples using the same
16     letters as A, B, C, as you did this page?
17 A.  The only thing I did was if it was a different
18     date, then they might have been labeled the same.
19 Q.  Turn the page over, Page 6 of the same exhibit,
20     top, same date, isn't it, May 10, 2019?
21 A.  Right.
22 Q.  And these are referencing the swabs --
23     MR. JONES:  It's a different date.  Are you on
24  Page 7.
25     MR. GARDNER:  No.  Page 6, Thomas.

Page 291

1     THE WITNESS:  Page 6?
2     MR. GARDNER:  I think it's Page 6.  Yeah.
3     MR. JONES:  Okay.  Got you.  Thanks.
4  QUESTIONS BY MR. GARDNER:
5  Q.  So at the top -- yeah.  So at the top it says,
6     May 10th, 2019, right?
7  A.  Dated collected?
8  Q.  Yes, sir.
9     MR. HEHNER:  Oh, date collected, 5-10.  Yeah.
10     THE WITNESS:  5-10?
11     MR. GARDNER:  They're both May 10th, 2019.
12     THE WITNESS:  Right.
13 QUESTIONS BY MR. GARDNER:
14 Q.  The date you collected the samples.
15 A.  Yes.
16 Q.  The only date you went up there and collected any
17     samples from the heaters.
18 A.  Yes.
19 Q.  Okay.  And isn't it a fact that you labeled
20     multiple cans as A, B, C on May 10th, 2019?
21     MR. JONES:  Objection to form.
22     THE WITNESS:  It appears to me that the lay --
23     the A, B, C on Page 2 was marked out.
24 QUESTIONS BY MR. GARDNER:
25 Q.  And who did that?

Page 292

1  A.  I don't know.
2  Q.  Well, when you -- when you wrote --
3  A.  It was possibly done by the laboratory, based on
4     the fact that it was -- I think they used the
5     same -- used the --
6  Q.  You just guessing?
7  A.  I don't know who -- who marked those out for sure.
8  Q.  I'm not asking you that at this point.  I'm asking
9     you:  Did you write down A, B, C on Page 6 of
10     Exhibit Y?
11 A.  Exhibit Y.  Is this Exhibit Y here?
12 Q.  Yeah.
13 A.  Okay.  Oh, okay.  I would -- I would have written
14     down -- yes.  It was --
15 Q.  So you marked two cans as Exhibit A on May 10th,
16     2019, two separate cans.
17     MR. JONES:  Objection to form, foundation.
18     THE WITNESS:  This one here was the -- the
19     first page here was done initially when I collected
20     the samples.
21     And the second page is the one -- what I sent
22     to the lab.  But that was done at a -- a later time
23     in -- in the --
24     MR. GARDNER:  Oh, okay.
25     THE WITNESS:  -- the time frame.

Page 293

1  QUESTIONS BY MR. GARDNER:
2  Q.  So you just used three -- you used one can A, one
3     can B --
4  A.  Right.  Yeah, right.  There's no -- there's no
5     other cans of -- of --
6  Q.  No -- no dupli --
7  A.  No -- no duplicates; put it that way.
8  Q.  'Cause that would violate NFP standards in -- 921
9     standards.
10 A.  Well, if it occurred --
11     MR. JONES:  Objection to form and foundation.
12 QUESTIONS BY MR. GARDNER:
13 Q.  Doesn't NFPA Sec -- 921 indicate that you should,
14     as a fire investigator collecting evidence, should
15     separately mark every piece of evidence differently
16     with a different label --
17     MR. JONES:  Same objection.
18 QUESTIONS BY MR. GARDNER:
19 Q.  -- so as -- so as to avoid confusion later?
20 A.  That's just normal practice that we would normally
21     do to -- to every -- every piece of evidence --
22 Q.  It's important, isn't it?
23 A.  -- unless it ties together into one unit where they
24     put it all in a box and label it as --
25 Q.  Yes.

74 (Pages 290 - 293)

Page 294

1  A.  -- this is -- this is an -- an alternator, for
2      example.
3  Q.  Okay.
4  A.  But --
5  Q.  So --
6  A.  -- yes.
7  Q.  -- Pages 5 and 6 of Exhibit Y are referring to the
8      same three cans.
9  A.  Yes.
10 Q.  Okay.  So would you look at Page 5 of Exhibit Y?
11 A.  Okay.
12 Q.  All right.  It's dated May 10th, 2019?
13 A.  Yes.
14 Q.  All right.  You labeled Exhibit A.  You put
15     quantity, one, right?
16 A.  Yes.
17 Q.  And didn't you write metal can of sample of
18     interior flue south?
19 A.  Yes.
20 Q.  Next line, Exhibit B-1, interior -- sorry -- metal
21     can with sample inside flue center?
22 A.  Yes.
23 Q.  I -- from my question is, what do you mean with
24     this little swiggle?  You're using swiggles here.
25     Is that of or and --

Page 295

1  A.  Of.  Metal can of sample.
2  Q.  Oh.  Oh, sorry.
3  A.  No, that's --
4  Q.  That's the word "of."
5  A.  Yes.
6  Q.  Thank you.  And then the third line where you
7      reference Exhibit C, you wrote, didn't you, Jim,
8      quantity, one, metal can of sample of interior flue
9      sou -- north.
10 A.  Yes.
11 Q.  All samples were collected from scraping inside the
12     pipe.  Well, you can read the rest to me.
13 A.  From -- let's see here.  Heaters in the south
14     garage area of the painting room.
15 Q.  What's the word between from and heaters?
16 A.  Propane heaters.
17 Q.  Okay.  All right.  So these are scrapings, these
18     are -- these aren't gauze samples.
19 A.  It was everything from inside, yes.  I -- I did --
20     whatever was inside of that container, I reached up
21     inside.  It wasn't at the -- near the opening
22     necessarily.  But the -- whatever I would see
23     inside of there, as I would get out with a -- the
24     gauze pad.
25 Q.  You -- the word "gauze" isn't in this page -- isn't

Page 296

1      on this page at all.  Page 5, Exhibit Y.  You don't
2      write the word gauze at all.
3  A.  There's no -- there was no --
4  Q.  No need for it?
5      MR. JONES:  If you could let him finish his
6  answer.
7      THE WITNESS:  First of all, is it -- at --
8  there's no -- no indication of how the samples were
9  collected on here.
10 QUESTIONS BY MR. GARDNER:
11 Q.  Yes, there is.  It says --
12 A.  Scraping --
13 Q.  -- scraping inside the pipe.
14 A.  Well, using the -- gauze pad --
15 Q.  Okay.
16 A.  -- scraping -- I did not --
17 Q.  You think this was the gauze.
18 A.  -- yes.
19 Q.  Okay.
20 A.  I did not use anything else to scrape --
21 Q.  And you think --
22 A.  -- inside --
23 Q.  -- was sent --
24 A.  -- this container.
25 Q.  -- to Sharee Wells?

Page 297

1  A.  Yes.
2  Q.  And why isn't there a change of evidence custody --
3      custodian change after May 10th, 2019 at the
4      bottom?
5      MR. JONES:  Objection to form, foundation.
6      THE WITNESS:  The only thing that I can --
7  that I can recall is that this form was -- I -- the
8  only reason why this would've happened would be
9  that this form could not be located or found when I
10 sent the -- the year -- it was almost like a few
11 months later.  I can't remember exact timeframe
12 when this was all sent in to the lab.  And they
13 kept a copy of this form once it was located 'cause
14 I'd already read -- read in another form.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Let's go to the next page of Exhibit Y, Page 6.
17 A.  Okay.
18 Q.  Are you there, Jim?
19 A.  Yes.
20 Q.  That's another evidence custody form from Rimkus
21     dated the same date as Page 5, as May 10th, 2019?
22 A.  Yes.
23 Q.  And in your handwriting you wrote Exhibits A, B, C,
24     correct?
25 A.  Yes.

Veritext Legal Solutions
800-567-8658                                                              973-410-4098

Page 298

1  Q.  And each one you wrote quantity, one, right?
2  A.  Yes.
3  Q.  And in first line in Exhibit A, you wrote, One
4      gallon metal can, slash, swabs up south end heater
5      tube, right?
6  A.  Yes.
7  Q.  There's some more handwriting that says "and
8      inside." Is that yours, the word "inside"? Is
9      that your handwriting?
10 A.  That's not my handwriting.
11 Q.  Whose is it?
12 A.  I don't know.
13 Q.  And just like you don't know who crossed out your
14     A, B, C and put in P, Q, R.
15 A.  I don't know who did that either.
16 Q.  And you don't know when it happened, do you?
17 A.  No.
18 Q.  All right. The next item on the list, Exhibit B,
19     Page 6 of Y, you wrote, One gallon metal can,
20     slash, swabs off tube heater, middle unit, correct?
21 A.  Of tube heater, middle unit, yes.
22 Q.  Thanks. And then thirdly, Exhibit C, one metal
23     container can? What is that? What -- what did you
24     write there? I can't read it.
25 A.  One metal gallon can, slash, swabs of tube heater

Page 299

1      north end. And then somebody wrote "heater" on
2      there. I didn't -- that's not my writing.
3  Q.  And then in paren you wrote, Hold for testing
4      possibly or something?
5  A.  Yes.
6  Q.  March 6th, 2020, test for flammable -- what's the
7      rest of it say?
8  A.  For flammable or liquid for -- or ignitable
9      liquid --
10 Q.  Approve --
11 A.  -- abbreviation for --
12 Q.  Approval?
13 A.  -- ignitable. Approval.
14 Q.  All right. And you think that Exhibit --
15 A.  It's -- it's been approved; put it that way.
16     That's where it was --
17 Q.  Right.
18 A.  -- approved.
19 Q.  And this Page 5 of Exhibit Y, has a chain -- chain
20     of evidence, custody, showing that it was sent down
21     to Miss Sharee Wells?
22 A.  Yes.
23 Q.  And then returned to Rimkus by Sharee?
24 A.  Yes.
25     MR. HEHNER: It's actually 6 of Exhibit Y that

Page 300

1      we're on that shows that.
2      MR. GARDNER: Okay, sorry.
3      THE WITNESS: Thank you.
4      MR. HEHNER: That's okay.
5      MR. GARDNER: I'm missing a page.
6      MR. HEHNER: Isn't it?
7  QUESTIONS BY MR. GARDNER:
8  Q.  So you're convinced, Jim, that the -- the cans you
9      sent to Sharee Wells, the gallon-size cans --
10 A.  Yes.
11 Q.  -- were the materials you collected, indicated on
12     Page 6 of Exhibit Y and Page 5 of Exhibit Y.
13 A.  Yes.
14 Q.  It was all in the same can.
15 A.  Yes. It was the same can.
16 Q.  Page 7 of Exhibit Y. Can you go to that, Jim.
17     Collected a different date, March 6th, 2020. Do
18     you see that?
19 A.  Yes.
20 Q.  Is that your handwriting?
21 A.  Yes.
22 Q.  And, again, you wrote Exhibit A in your
23     handwriting, didn't you?
24 A.  Yes.
25 Q.  And somebody, who you don't know and you don't know

Page 301

1      when, crossed it out and put an S --
2      MR. JONES: Objection to form --
3      MR. GARDNER: -- right?
4      MR. JONES: -- foundation.
5      THE WITNESS: I don't know who would have
6      crossed it out.
7  QUESTIONS BY MR. GARDNER:
8  Q.  How often are your evidence custody forms norm --
9      labeling changed --
10 A.  Well, I know --
11 Q.  -- in your career?
12     MR. JONES: Objection to form.
13     THE WITNESS: -- I -- I've not really had any
14     changes that I know of 'pecifically. The only --
15     without me knowing about it; put it that way. The
16     second part of that would be that sometimes the --
17     there is -- they did have a -- a person that was in
18     charge of the evidence.
19 QUESTIONS BY MR. GARDNER:
20 Q.  Like who?
21 A.  Maria, I think. Forget her last name now. But I
22     think her initials was actually on this one.
23     Stoner, Maria Stoner re -- received --
24 Q.  You -- you think she might be the one crossing out
25     your A, B, Cs and putting in --

Page 302

1   A.   She is the --
2        MR. JONES:  Object -- objection to form.
3        THE WITNESS:  She is the person that's in
4   charge of the evidence room.
5        MR. GARDNER:  Yeah.
6        THE WITNESS:  So there might have been
7   something that -- in there -- in the aspect of that
8   where she would have changed it.
9   QUESTIONS BY MR. GARDNER:
10  Q.   So you can see how this would create confusion for
11  the lawyers and experts in this case when your
12  references to Exhibits As and Bs and Cs are -- are
13  ten -- are turned into different letters, can't
14  you?
15  A.   And I have no --
16       MR. JONES:  Objection to form and foundation.
17       THE WITNESS:  Okay.  I don't -- I don't know
18  why they were changed.  And this is the first time
19  I've seen them in that -- where they've --
20  QUESTIONS BY MR. GARDNER:
21  Q.   It isn't recommended pursuant to NFPA 921, is it?
22  A.   I would say --
23       MR. JONES:  Objection -- objection to
24  foundation.
25       THE WITNESS:  Okay.  I would say that it's not

Page 303

1   recommended.  But I would say, on -- on top of
2   that, would it -- likely should have a -- if there
3   is something that's changed or -- there should be
4   a -- a reason as to why it was.
5   QUESTIONS BY MR. GARDNER:
6   Q.   Can you go to Page 9 of Exhibit Y.  This was an
7   exhibit produced some time ago, along with multiple
8   other photographs, by the plaintiff, Republic,
9   to -- to counsel in this record.  It also has a
10  Bates stamp, I'll just use -- say 603.  Do you see
11  that?
12  A.   Oh, okay.  Yes, uh-huh.
13  Q.   Right.  Do you see an empty can there?
14  A.   Yes, uh-huh.
15  Q.   You took this picture?
16  A.   Yes.
17  Q.   You -- you put that evidence Temp A on top -- top
18  of this?
19  A.   On that pipe, yes.
20  Q.   What was the evidence you collected -- you're
21  trying to document that you collected in this
22  photograph?
23  A.   This is the A can where it's positioned at, and
24  that's the area where the -- the sample was
25  collected.

Page 304

1   Q.   From the two pages we were looking at that you
2   collected on May 10th, 2019?
3   A.   Yes.
4   Q.   Okay.  Well, which pipe is this in Republic 603
5   also marked Defendants' Exhibit Y, Page 9?
6        MR. JONES:  Objection to form.
7   QUESTIONS BY MR. GARDNER:
8   Q.   Center heater? middle heater? south heater?
9   A.   A is -- refers to the south heater.
10  Q.   Okay.  What part of the south heater assembly?
11  A.   Yes.  B would be referred to the middle heater.
12  Q.   No.  My question is:  What part of the heater
13  assembly piping is Exhibit A?
14  A.   Where A -- where the A is -- actually sit on is
15  part of the tube heater.  This would be the, I
16  believe, the third section, which would be the east
17  side of that.
18  Q.   All right.  You said it's not -- neither the in --
19  no component of either the intake or the exhaust
20  piping?
21  A.   No.
22       MR. JONES:  Objection to form and foundation.
23  QUESTIONS BY MR. GARDNER:
24  Q.   So did you collect all the evidence from one
25  location that you marked as Exhibit A in your forms

Page 305

1   dated May 10th, 2019?
2   A.   Yes.  There's multiple pictures other than just one
3   picture related to these.
4   Q.   But it's all the same spot.
5   A.   Yes.  A would be the same spot.  B would be the
6   same spot.
7   Q.   Okay.  Can you flip to page -- the next page?
8   A.   Yes.
9   Q.   Twelve, Exhibit Y, Republic 632.
10  A.   Yes.
11  Q.   You're telling us that this photograph of this can
12  that's open in Republic 632 is the same location as
13  Republic 603?
14  A.   Well, I -- actually the area is the -- the same.
15  It's just that the tube was -- it was a lower
16  section of the -- of the same tube.
17  Q.   Yeah.  You'll -- you'll concede that Republic 603
18  with Exhibit 10-A shows no shield, does it?
19       MR. JONES:  Objection --
20       MR. GARDNER:  Deflector shield.
21       MR. JONES:  -- objection to form.
22       THE WITNESS:  There is a shield there.  It's
23  just underneath of it.
24  QUESTIONS BY MR. GARDNER:
25  Q.   Oh, Okay.  Do you see the blue paint on the ground

77 (Pages 302 - 305)

Page 306

1    in Republic 60 -- 632?
2  A.  Yeah, I do see some blue paint there.
3  Q.  And was there -- do you know if there was blue
4       paint underneath the tube heater assembly,
5       particularly the top -- would be the top of the
6       reflector, after it landed onto the floor into this
7       area that has blue paint that's depicted by you in
8       photograph 632?
9       MR. JONES:  Objection to form.
10      THE WITNESS:  This is -- obviously the blue
11      paint there has not been a -- not been contaminated
12      by fire and so forth.  So I'm not sure there's a --
13      I did not collect any -- that type of paint as for
14      as what was on the floor.
15  QUESTIONS BY MR. GARDNER:
16  Q.  Why not?
17  A.  I was collecting it off of the heaters that was
18      there to see if that's hypothesis was credible.
19  Q.  But this tube heater assembly that's laying on the
20      floor -- ground I mean -- in Republic 00632,
21      Defendants' Exhibit Y-12 today, is laying on the
22      ground on -- on top of blue paint, isn't it?
23  A.  But the -- the paint was collected from inside the
24      tube, not from the reflector on the --
25  Q.  Okay.  You didn't collect any paint from the

Page 307

1       reflectors.
2  A.  No.
3  Q.  Ever.
4  A.  I -- I don't recall collecting anything from those,
5       no.
6  Q.  Okay.  Neither on the tops nor bottoms of them?
7  A.  No.
8  Q.  So in either Page 9 -- I apologize.  I'm just gonna
9       use Republic for reference.  Neither photograph
10      marked Republic 603 nor Republic 632 do you show
11      any swabs before or after collection.
12  A.  I don't -- I don't know that I show in the swabs in
13      my photos, no.
14  Q.  You'll concede that there's not a single photograph
15      that you took or was taken by any employee of
16      Republic of -- I'll rephrase the question.
17      You were alone on May 10th, 2019 when you
18      gathered these swabs and scrapings, weren't you?
19  A.  Yes, I was.
20  Q.  And you understand collection of evidence is
21      critical in a case like this, that you were relying
22      the results of these samplings and testings by
23      Sharee Wells.
24      MR. JONES:  Objection to form.
25      THE WITNESS:  Yeah.  Collection of any

Page 308

1       evidence is important.  And I try to re -- maintain
2       that throughout this whole category by not moving
3       as -- as least as possible and by not uncovering
4       everything as -- as least as possible --
5  QUESTIONS BY MR. GARDNER:
6  Q.  Why didn't you take a picture of the swabs or the
7       scrapings inside of cans A, B, or C in any -- any
8       photo you ever took?
9  A.  I was just trying to dict -- predict, or not
10      predict, indicate where those -- where those
11      samples were taken from.
12  Q.  Right.  And you'll --
13  A.  That's my only re --
14  Q.  Go ahead.
15  A.  -- only reason for marking them and letting them
16      know where the -- the swab was taken from.
17      At the time I -- due to the environmental
18      conditions and so forth, I was -- I was not -- you
19      know, it was extremely cold outside that day, for
20      example.  So I did not -- I just wanted to collect
21      enough to where I could run a sample of the inside
22      of the tubes just to confirm any hypothesis that
23      was there.  Because I didn't want to disturb any
24      more evidence.
25      And I was already there.  'Cause I was -- I

Page 309

1       was contacted by Republic to see if I could recover
2       the heaters.  That was the main reason why I was --
3  Q.  It was extremely cold on May 10th, 2019?
4  A.  Well, it was cold.  It was -- I don't know that it
5       was extremely cold.  I don't know what you would
6       refer --
7  Q.  Too cold for you --
8  A.  -- to as extremely cold.
9  Q.  -- to take photos of either the scrapings or the
10      samp -- or the gauze pads.
11      MR. JONES:  Objection to form; misstates his
12      testimony.
13      THE WITNESS:  I -- I did not take photographs
14      of what I put in the can.  Would it have been ideal
15      situation?  Yeah.  But it -- it -- I don't know
16      that that would have affect -- I'm not -- I just
17      took -- took the samples out of those areas and
18      samp -- and kept them for quite some time before
19      they even agreed to go ahead and send them in to
20      the lab.
21  QUESTIONS BY MR. GARDNER:
22  Q.  On Republic Bates stamp 00632, where precisely did
23      you take your sample from, this part of the --
24  A.  I'm just mark -- on this particular thing, I was
25      just marking the heater.

78 (Pages 306 - 309)

Page 310

1   Q.  I know that.  I'm asking you where you took the
2      sample from.
3   A.  I did not take any samples from that particular
4      area.  It was all from inside the heater, as
5      indicated on my report.  I'm just showing where the
6      heater -- the same heater as -- as it goes -- as it
7      goes down.
8   Q.  All right.  So the --
9   A.  'Cause I identify the heater that I took the sample
10     from.
11  Q.  Okay.  So none of your sample came from anything
12     shown in 632, rather somewhere inside of some pipe?
13  A.  Yes.
14  Q.  And same answer for looking at Republic 603?  You
15     didn't take the sample from the outside of that
16     tube, rather somewhere from the inside?
17  A.  602 you said?
18  Q.  603.
19     MR. HEHNER:  603.
20     THE WITNESS:  All my samples were taken from
21     inside the heaters tube or tubes, one of the two.
22     Or heater tubes, sorry.
23  QUESTIONS BY MR. GARDNER:
24  Q.  And you'll concede you -- you did not take a
25     photograph of any of the swabs in their clean state

Page 311

1      prior to swabbing.
2      MR. JONES:  Objection to form.
3      THE WITNESS:  I did not take a photograph of
4      the -- any of the swabs.  They were in sterile
5      packaging so I did not.
6   QUESTIONS BY MR. GARDNER:
7   Q.  And you didn't photograph any of the gauze swabs
8      inside of the cans with the lid open prior to you
9      sealing the cans, did you?
10     MR. JONES:  Objection to form.
11     THE WITNESS:  Not -- no, I did not.
12  QUESTIONS BY MR. GARDNER:
13  Q.  And before putting them in the cans, you didn't
14     take any pictures of them on May 10th, 2019, or you
15     personally at any time, showing what you -- what
16     was on the swabs after you took your samples.
17  A.  No, I did not.
18  Q.  Can you go to Exhibit GG.  It might be in a
19     different binder.
20  A.  GG?
21  Q.  Yeah.  You might have it --
22     MR. JONES:  I'll trade you.
23     THE WITNESS:  GG right here.
24  QUESTIONS BY MR. GARDNER:
25  Q.  This is a three-page exhibit, Jim.  If you skip to

Page 312

1      the third page, you'll see it was digitally signed
2      by Lou Inendino --
3   A.  Uh-huh.
4   Q.  -- right?
5   A.  Yes.
6   Q.  And did you -- have you ever seen this before
7      today?
8   A.  I've seen this at the -- I think he had this
9      available at the --
10  Q.  Sinus --
11  A.  -- heater examination that we did.
12  Q.  In the time that you collected them and took them
13     in Indy, right?
14  A.  Yes.
15  Q.  He has been identified by Plaintiffs as a
16     non-retained expert.  Other than his methodology or
17     a recording of the manner in which the -- I'll say
18     the heater assembly units were tagged as evidence,
19     did you rely on any opinions of him in reaching
20     your opinions?
21     MR. JONES:  Objection to foundation.
22     THE WITNESS:  No.  He is a mechanical engineer
23     that was sent with me to also -- to help.  'Cause
24     we -- I anticipated collecting a lot of evidence.
25     And we tried to utilize people in the office to

Page 313

1      help out doing that, if necessary.  And he was one
2      of the persons that said that he would go help --
3   QUESTIONS BY MR. GARDNER:
4   Q.  I didn't ask you if Mr. Inendino went and helped
5      you.  I asked you if you relied on any of his
6      opinions.
7   A.  No, I did not.
8   Q.  Would you agree, Jim, that Exhibit GG, Pages 1
9      through 3, is a recording by Mr. Inendino of the
10     labeling he utilized during the collection of the
11     various items gathered at Republic facility
12     during -- I can't find the date.  During some --
13     during the time you guys were there to collect the
14     evidence?
15  A.  Yes.  This would have been done on May -- collected
16     on May 11th.
17  Q.  What year?
18  A.  2020.
19  Q.  I see it.  Thanks.  You were there that day, right?
20  A.  Yes.  Everybody was there that day, I think.
21  Q.  Did Mr. Inendino -- I apologize if I say his name
22     wrong -- give you any opinions that you did not
23     rely on in this case?
24  A.  No.  He was -- he did not give me any opinions.
25  Q.  Okay.  You said he was a mechanical engineer,

79 (Pages 310 - 313)

Page 314

1  right?
2  A.  Yes.
3  Q.  Do you have an opinion as to whether my client --
4     setting aside from this question whether the nature
5     of the activities in the room was such that the
6     heaters were appropriate or not in the room; I'm
7     not asking you that.  Setting that aside, do you
8     have any evidence that would suggest the heaters,
9     in and of themselves, were installed incorrectly?
10 A.  I have no evidence of that.  I wasn't there --
11 Q.  Okay.
12 A.  -- when they were installed.
13 Q.  Have you read Space-Ray's expert report by
14    Mr. Davis?
15    MR. HEHNER: Jones.
16    MR. GARDNER: Mr. Jones?
17    MR. HEHNER: Jones.
18    MR. GARDNER: David Jones?
19    THE WITNESS: No, I have not.
20    MR. JONES: Jones, Scott Jones.
21    MR. GARDNER: Scott Jones.  Thanks.
22    THE WITNESS: No, I have not.
23    MR. GARDNER: Okay.
24    THE WITNESS: I do know Scott Jones, however.
25 QUESTIONS BY MR. GARDNER:

Page 315

1  Q.  You've encountered him in other cases?
2  A.  Yes.
3  Q.  And the record will correct my if I'm wrong, but my
4     memory of the summarization of his conclusion,
5     Mr. Scott Jones, was that the Space-Ray heaters, in
6     and of themselves, were installed correctly by my
7     client.  And I'm not talking about whether they
8     should or should not have been in the room.  Do you
9     have any reason to doubt that?
10 A.  I have no reason to -- I have no evidence to prove
11    they weren't installed correctly --
12 Q.  Okay.
13 A.  -- as for as the installation is concerned.
14 Q.  Did you only collect blue paint, Blue Sheboygan
15    paint, from Republic's facility once or twice?
16 A.  Just once.
17 Q.  Okay.  I think that was March -- March 4th, 2020 or
18    March 3rd?
19 A.  I believe so.  Whenever they requested it from the
20    lab.
21 Q.  Can you go to Page 5 of -- of HH.
22 A.  HH?
23 Q.  Yes, sir.
24 A.  Page 5?
25 Q.  Yeah.  That's not your handwriting, is it?

Page 316

1  A.  No, sir.
2  Q.  Wait a second.  It says, Collected by Jim Foster.
3     But whose handwriting is this?
4  A.  This is Lou.
5  Q.  Okay.  Again, this looks to me like his attempt to
6     record the exhibit labels to certain parts of the
7     Space-Ray heaters that he collected -- you guys
8     collected.  Do you see Exhibit C-4, C-5, D-1, D-2,
9     et cetera, down?
10 A.  Yes.
11 Q.  And then it says RL.  And then there's different
12    lettering down the left side.  Who's RL?
13 A.  I don't know who that is.
14 Q.  Do you know why Page 6 of Defendants' Exhibit HH
15    has two sets of labels as exhibit identifiers?
16 A.  No, I do not.
17 Q.  Does that fit with the guidelines of NFPA 921 --
18    MR. JONES: Objection to form.
19    MR. GARDNER: -- you have these exhibits
20 different --
21    THE WITNESS: It could be --
22    MR. GARDNER: -- label --
23    THE WITNESS: -- there could --
24    MR. JONES: Objection to form, foundation.
25    THE WITNESS: Okay.

Page 317

1     MR. JONES: You can answer.
2     THE WITNESS: There could be reasons why
3  it's -- why it's been changed to that.  But I have
4  no knowledge of why.
5     MR. GARDNER: Okay.
6  QUESTIONS BY MR. GARDNER:
7  Q.  Can you go to Exhibit KK.
8  A.  KK? Okay.
9  Q.  At defendants' request, recently some folks at --
10    at Rimkus, I think it was Lou Inendino and
11    Mr. Jacobs, opened up some of the evidence and took
12    photographs for us in stages.  Are you aware of
13    that?
14 A.  Yes.  Their new evidence collection -- a room,
15    technician or whatever they call them, I think --
16 Q.  Yeah.
17 A.  -- is that person.
18 Q.  Right.  All right.  Are you aware that happened?
19 A.  Yes, I am.
20 Q.  Have you looked at the photos?
21 A.  I saw two or three photos --
22 Q.  We're gonna go --
23 A.  -- earlier today.
24 Q.  -- through them really fast so -- so, Jim, we're on
25    Exhibit KK.

80 (Pages 314 - 317)

Page 318

1  A.  Okay.
2  Q.  Page 4 shows an object, it's like saran wrap or
3     something.
4  A.  Is that it right here?
5  Q.  Yes, sir.
6  A.  Yes.
7  Q.  Do you know what that is?
8  A.  It appears to be one of the tube heaters wrapped in
9     plastic that we examined.  I'm not sure.
10  Q.  Go to Page 6 of the same exhibit, and tell me if
11     you still think that's a tube heater.
12  A.  Looks like some sort of a can.
13  Q.  Yeah.  Go to the next Page 7.  It's a rectangular
14     can, isn't it?
15  A.  Yes, it is.
16  Q.  This one, Jim.
17  A.  J?
18  Q.  Yeah.
19  A.  Yes.
20  Q.  All right.  And the next Page 8 of Exhibit KK.
21  A.  Uh-huh.
22  Q.  Is this not a picture of the can collected from
23     inside that fire locker underneath the center tube
24     heater?
25     MR. JONES:  Objection to foundation.

Page 319

1     THE WITNESS:  It -- it appears to be, yes.
2  QUESTIONS BY MR. GARDNER:
3  Q.  And can you look at the top of the photo?  I mean,
4     this looks like it's been subjected to rain and has
5     rusted the can, right?
6  A.  Uh-huh.
7     MR. JONES:  Objection to foundation.
8  QUESTIONS BY MR. GARDNER:
9  Q.  Trying to direct your attention to Page 8 of KK,
10     Jim.  Are you there?
11  A.  This one here?
12  Q.  Yes, sir.  No, no.  The prior --
13  A.  So the prior page?
14  Q.  Yeah.
15     MR. JONES:  The numbers are on --
16     THE WITNESS:  Oh, okay.
17     MR. JONES:  -- right here.
18     MR. GARDNER:  Look to the right-hand side
19     where your right thumb is.  You're holding your
20     right thumb --
21     THE WITNESS:  I see --
22  QUESTIONS BY MR. GARDNER:
23  Q.  You see that?
24  A.  Yeah, 116?
25  Q.  What is the darker gray material that's inside of

Page 320

1     the rusted-out rectangular can on Page 8 of
2     Exhibit KK?
3     MR. JONES:  Objection to foundation.
4     THE WITNESS:  I have no knowledge of what that
5     product is.
6  QUESTIONS BY MR. GARDNER:
7  Q.  Okay.  Can you go to the next Page 9 of Exhibit KK.
8     You see a hole in the can?
9  A.  Yes.
10  Q.  An opening in the can.
11  A.  Yes.
12  Q.  Do you know what caused that?
13  A.  That's a rusted area.
14  Q.  Do you think that's just from rust?
15  A.  I'm sure it prob -- possibly was from rust.
16  Q.  So Page 12 of the same Exhibit KK.  Tell me when
17     you're there, Jim.
18  A.  KK?
19  Q.  Yes, sir.
20     MR. JONES:  You're there.
21     THE WITNESS:  Twelve?  Yeah.
22  QUESTIONS BY MR. GARDNER:
23  Q.  You can see that's different angle, the same rusty
24     rectangular-shaped can?
25  A.  Yeah, it's some type of product that's in the can

Page 321

1     that would -- that has solidified, basically --
2  Q.  And you don't know what it is?
3  A.  -- become hard.  No, I don't.
4  Q.  And the next page shows the opening.  Page 13, KK.
5     Does this look like this -- that can we looked at
6     earlier from photos you took at the scene inside of
7     the fire locker beneath the center tube heater?
8  A.  Yes, it appears to be.
9  Q.  Okay.  You believe it was turpentine or paint
10     thinner?
11  A.  I don't know what it was.  I don't have any idea.
12  Q.  Have you ever seen a can that looks like this
13     before though --
14  A.  Yes.
15  Q.  -- that had paint thinner in it?
16  A.  A lot of cans similar to that have this shape of a
17     can.
18  Q.  That have paint thinner in them.
19  A.  Yes.
20  Q.  So moving forward, Exhibit LL, Jim.
21  A.  Okay.
22  Q.  Page 2 references an evidence custody form dated
23     March 6th, 2020 about a metal can of -- quart metal
24     can of paint, doesn't it?
25  A.  Yes.

81 (Pages 318 - 321)

Page 322

1  Q.  Then the next Page 3 shows the F.A.S.T. Lab red
2      sticker?
3  A.  Yes.
4  Q.  You expect Sharee Wells, or someone on her behalf,
5      put her label on this can prior to shipping it back
6      up to Rimkus, right?
7      MR. JONES:  Objection to form.
8      THE WITNESS:  I don't have any knowledge.  But
9      that would be a possibility, yeah.  That -- that's
10     where this would've came from, I would assume.
11 QUESTIONS BY MR. GARDNER:
12 Q.  I didn't see any picture you ever took that had any
13     evidence sealing tape on the cans.  Is that because
14     you didn't take the pictures or because you didn't
15     use the evidence sealing tape?
16     MR. JONES:  Objection to form.
17     THE WITNESS:  The day that I was there and I
18     decided to go ahead and collect -- they wanted the
19     heater collected.  The day I was there, while I was
20     already there, so that the evidence would not be
21     destroyed in any additional environmental issues
22     and things like that, I decided to go ahead and
23     collect them.
24     I probably could have been more prudent about
25     what I've done.  But I went ahead and collected the

Page 323

1      evidence.  And, no, I did not use any evidence tape
2      to go across the thing similar to this.  I put them
3      in the container, sealed the container.  And I was
4      not involved with any contact with the container --
5  QUESTIONS BY MR. GARDNER:
6  Q.  Just so we're clear, you're talking about your
7      swabs and scrapings --
8  A.  Yes.
9  Q.  -- on May 10, 2019.
10 A.  Yes.
11 Q.  All right.  So if we continue with these recent
12     photos kindly taken by Rimkus at the co --
13     codefendants' request.  Go to Page 6 of KK.
14     There's a gauze pad in there, isn't there?
15 A.  Yes.
16 Q.  It's not paint, is it?
17 A.  No.
18 Q.  Can you explain why the evidence custody form talks
19     about paint but the evidence in the can is a swab?
20     MR. JONES:  Objection to form.
21     THE WITNESS:  They're referring to it as a --
22     as a paint can, I believe.  But I don't know that
23     for a fact.  What -- what -- I didn't -- this is
24     not what I -- I didn't anything -- this is not my
25     photograph.  So --

Page 324

1  QUESTIONS BY MR. GARDNER:
2  Q.  Okay.  Can you go to Page 9 of Exhibit KK?
3  A.  Yeah.  Page 7 does show the swab and how it was
4      packaged.
5  Q.  Shows the package, doesn't it?  We're going to
6      Page 9 to show all of it.
7  A.  Okay.
8  Q.  So what is this?  What does Page 9 represent here,
9      Jim, on Exhibit --
10 A.  This is what was sent to the lab to have tested for
11     a controlled sample for the swab that was used.
12 Q.  Okay.  Thanks.
13 A.  It was in a sterile package.
14 Q.  Can you go to Exhibit MM?
15 A.  Okay.
16 Q.  Page 2 is an evidence custody form dated March 4th,
17     2020.
18 A.  Uh-huh.
19 Q.  Your handwriting?
20 A.  Yes.
21 Q.  One metal can containing paint sample collected at
22     joint examination, right?
23 A.  I -- I can't read what it says but yes.
24 Q.  I've read it so much -- I'm bad at reading your
25     writing as you are.

Page 325

1      And if you go -- skip to Page 9 of Exhibit MM.
2      Tell me when you're there, Jim.
3  A.  Okay.  Page 9?  Yes.
4  Q.  What is that?
5      MR. JONES:  Objection --
6      THE WITNESS:  That's --
7      MR. JONES:  -- foundation.
8  QUESTIONS BY MR. GARDNER:
9  Q.  I'll ask it another way.  Do you know what it is?
10 A.  It appears to be the blue paint that was collected
11     to send in to the lab for testing at their request.
12 Q.  At F.A.S.T. Lab?
13 A.  Yes.
14 Q.  Can you go to Exhibit NN, and skip all the way to
15     Page 94.
16 A.  (Witness complies.)  Right here?
17 Q.  Looks like you're there.  Again, this is a -- a
18     photograph recently provided through Plaintiffs'
19     counsel.  And these were taken out at the Rimkus
20     lab.  Do you see five gauze swabs in this photo?
21 A.  Yeah.  There's -- there's --
22 Q.  I'm sorry, seven.  There's seven, isn't there?
23 A.  One, two, three, four, five, six, seven.  Yeah,
24     some -- or --
25 Q.  I'm just asking --

Page 326

1   A. -- together --
2   Q. -- there are seven --
3   A. Yes.
4   Q. -- right?  And you took these samples?
5   A. Yes.
6   Q. From -- from where?
7   A. These are the samples that are taken from the north
8       heater.
9   Q. And that's because -- you can tell that 'cause --
10  A. Yeah.  It's stamped that, yes.
11  Q. What part of the north heater was the top right
12      swab taken from?
13      MR. JONES:  Objection to foundation.  There's
14  no markings of what this gauze --
15      THE WITNESS:  Yeah.  I -- the heat -- the
16      heater was -- there was multiple --
17      MR. GARDNER:  Thomas --
18      THE WITNESS:  -- locations --
19      MR. GARDNER:  -- Thomas made -- hold on.
20  Thomas made a good objection.  Not that the others
21  weren't good either.
22  QUESTIONS BY MR. GARDNER:
23  Q. So I was oriented to the photo different than you.
24      So orienting the photo, Jim, such that the
25      legal pad, it says Exhibit C, is at the bottom.

Page 327

1       Are you doing that?
2   A. Yes.
3   Q. Okay.  So the very top gauze pad, can you
4       specifically tell us where that came from inside of
5       the tube heater?
6       MR. JONES:  Same objections.
7       THE WITNESS:  The picture of where these areas
8       were collected, there was just more than one swab
9       used in -- in that particular area.  I only
10      collected from one area.  I didn't collect from the
11      whole tube itself in different areas.  I just
12      collected from the one area.
13  QUESTIONS BY MR. GARDNER:
14  Q. That's shown in your picture?
15  A. Yes.
16  Q. All right.  And you took -- you took seven swabs?
17  A. Took multi -- multiple swabs from --
18  Q. More than seven?
19  A. Yeah.  From -- from inside the tube.  I just
20      reached as for as I could go to get multiple swabs
21      out of it.
22  Q. Well, where are the others in addition to -- other
23      than these seven shown on Page 94?
24  A. But I don't -- I don't know where the other --
25      other --

Page 328

1       MR. GARDNER:  Jim, we have to -- we have to go
2   off the record for some technical issues.
3       THE WITNESS:  Okay.
4       THE VIDEOGRAPHER:  The time is 5:10.  We are
5   off the record.
6       (A brief recess was taken.)
7       THE VIDEOGRAPHER:  This begins media five.
8   The time is 5:14.  We are on the record.
9   QUESTIONS BY MR. GARDNER:
10  Q. Jim, referring again to Page 94 of Exhibit MM, can
11      you show us precisely where you obtained these
12      seven swabs, other than where you've already showed
13      us where those exhibit tabs were in the photos we
14      looked at the other film.
15  A. First of all, I want to clarify one thing, is that
16      I -- this is not my photograph.  I don't know where
17      these swabs technically came from.  I'm assuming
18      that they came from the north can or basically from
19      the C heater.  But unless there's other diagrams
20      somewhere else or whether somebody took these and
21      put all the swabs together in the same picture, I
22      can't attest to these pictures, only because of the
23      fact I didn't take them.  And I didn't --
24  Q. Did you say I can't or I can?
25  A. I can't.

Page 329

1   Q. Okay.
2   A. I -- I can te -- attest to the fact that I did use
3       swabs to collect the samples.  I just don't know
4       where -- I don't know that I would have used seven
5       swabs in one --
6   Q. -- one-gallon can?
7   A. In -- yeah, at -- at one time.  But I don't know.
8       Some case -- cases I would have.  I didn't count
9       the number of swabs.  I just used the swabs as I
10      was getting material out.  I just went ahead and
11      continued to use them.  It could have been possible
12      that I could have used seven.
13  Q. Okay.  Well --
14  A. I don't know that.  I don't know --
15  Q. I think 93 will help you out.  No, the other way.
16  A. 93?
17  Q. It's my understanding that a couple of employees,
18      that I believe included Lou Inendino, took this
19      photograph marked 99 of Exhibit NN of the swabs in
20      the can prior to dumping them out and taking the
21      next picture.  Sound reasonable to you?
22  A. I guess it sounds reasonable.  I -- but I wasn't
23      there, physically present to know.
24  Q. We'd have to depose Mr. Inendino to figure that
25      out.

83 (Pages 326 - 329)

Page 330

1  A.  I would assume so, yes.
2  Q.  'Cause you don't know.
3  A.  'Cause I don't know.
4  Q.  All right.
5  A.  I've not seen them in this --
6  Q.  Last time you saw --
7  A.  -- picture before.
8  Q.  -- when you sealed the can --
9  A.  Yes.
10  Q.  -- and that was it, right?
11  A.  Yes.
12  Q.  Okay.  So the next, Page 94 of Exhibit NN, can you
13     tell us where each of these seven swabs were taken
14     from inside of the north two heater?
15     MR. JONES:  Objection to foundation; asked and
16     answered.
17     THE WITNESS:  There is a picture of where the
18     C swabs were taken from.
19  QUESTIONS BY MR. GARDNER:
20  Q.  The ten photos we already looked at?
21  A.  Yes.
22  Q.  Okay.  Other than that --
23  A.  In that area.  That's -- that's the only area that
24     the swabs would have been coming from, for me,
25     where the -- where the tube was apart.  And it came

Page 331

1     from both sides -- both sides of that tube, as for
2     as I could reach back into the tube with the swab.
3  Q.  So you're referring to, for example, pictures we
4     already looked at, Exhibit Y, Page 16, where you
5     have this Exhibit C, tent, right?
6  A.  Yes.
7     MR. JONES:  Can you pull those up real quick.
8     Okay.  Ben's got it up there, if you can see
9     it.
10     THE WITNESS:  Yes.
11  QUESTIONS BY MR. GARDNER:
12  Q.  So all the swabs that you put in the container next
13     to tent Exhibit marker C came from the pipe that's
14     shown on Page 16 of Exhibit Y.
15  A.  Yes.
16  Q.  That's -- that's about right there.
17  A.  There and from the other end -- other end of the
18     pipe, both sections.
19  Q.  Okay.
20  A.  Where the pipe was split.
21  Q.  Continuing in the same exhibit, Jim, MM.  Going
22     past 94, it shows the seven swabs.  You go
23     Page 97 --
24  A.  Uh-huh.
25  Q.  -- it still references Exhibit C, sample north

Page 332

1     flue.  Page 97.
2  A.  97?
3  Q.  That's --
4  A.  Yes.  North unit.
5  Q.  -- it here.  Page 97.
6  A.  Oh, that's 96.
7  Q.  They're red, Jim.
8     MR. JONES:  On the bottom left from where
9     you're sitting.  There you go.
10     THE WITNESS:  97.
11  QUESTIONS BY MR. GARDNER:
12  Q.  Yeah, okay.  So this is a different --
13  A.  Yeah, in that --
14  Q.  -- Exhibit C photograph.  And then the next Page 98
15     of Exhibit NN --
16  A.  Uh-huh.
17  Q.  -- is a yellow label on the can?
18  A.  Yes.
19  Q.  Is that in your handwriting?
20  A.  Yes.
21  Q.  Okay.  And the next Page 99 is the top of the can?
22  A.  Yes.  That is not my handwriting on the top of the
23     can.  Oh, yes, it is.  I'm sorry.  That's the C I
24     put under there --
25  Q.  Okay.

Page 333

1  A.  -- U 1, I couldn't -- I would've not put that.  But
2     it's actually a C with a -- with a line under to
3     show how it coordinates with the --
4  Q.  Go to Page 101 and tell me what that depicts, the
5     bottom of that can.
6  A.  What -- the products that came out of the tube
7     itself.
8     MR. HEHNER:  Oh, yeah.  We're looking at the
9     same thing.
10     MR. GARDNER:  NN, Page 101.
11  QUESTIONS BY MR. GARDNER:
12  Q.  And that came from inside of the tube shown --
13  A.  Yes.
14  Q.  -- on Defendants' Exhibit Y, Page 16?
15  A.  Yes.
16  Q.  How do you know that the material you claim to have
17     collected from the inside of the pipe shown on
18     Page 16 of Exhibit Y isn't just debris from the
19     fire that got into the pipe after the pipes fell to
20     the ground into the debris that's shown on this
21     photograph Y-16?
22     MR. JONES:  Objection to form.
23     THE WITNESS:  I had no reason to believe that
24     this -- the products inside the tube were not
25     consistent with what was in the lining of the tube.

84 (Pages 330 - 333)

Page 334

1    And when I did the swab, I reached in to do the
2    swab, these came out. So I didn't -- I wasn't
3    aware really what all was in that -- inside the
4    heater. They were out -- actually covered over at
5    the time with the metal.
6  QUESTIONS BY MR. GARDNER:
7  Q. Sorry. For clarity, you mean the heater tube.
8  A. The heater tube, yes.
9  Q. You didn't collect anything to send to Sharee Wells
10    from inside the heater -- heating assembly box, did
11    you?
12  A. No, I did not.
13  Q. Okay.
14  A. Other than I have the photographs of some of
15    that --
16  Q. So is it your understanding then that when Sharee
17    Wells tested samples that you sent to her, it
18    included the debris shown in the bottom of the can
19    on Page 101 of Defendants' Exhibit NN?
20  A. Yes. 'Cause the way they test this is they don't
21    take anything out of the can necessarily --
22  Q. So the swabs --
23  A. -- test it.
24  Q. -- were in the same cans --
25  A. Yes.

Page 335

1  Q. -- as the -- the debris.
2  A. Right.
3  Q. You sure?
4  A. Yes.
5  Q. You remember seeing any reference to debris, other
6    than swabs, in F.A.S.T. Lab's worksheet?
7  A. I -- I swabbed -- used the swabs to --
8  Q. I know you did. I'm asking: Did she reference any
9    other material other than swabs in the F.A.S.T. Lab
10    worksheet?
11  A. I don't re --
12    MR. JONES: Objection to form.
13    THE WITNESS: -- I don't recall that offhand.
14    I don't think so. But everything was in one can
15    that I used the swab to get out. And everything
16    was in -- brought down into that can.
17  QUESTIONS BY MR. GARDNER:
18  Q. From that one heater's part --
19  A. From --
20  Q. -- the north heater?
21  A. Right. If it's -- if it's like the C heater, it
22    would be the -- from that particular area.
23  Q. So you believe you -- you shipped three gallon cans
24    to Sharee Wells, labeled A, B, C, that included
25    both debris scraped from inside these sections of

Page 336

1    the tube heaters and also swabs taken from inside.
2  A. Yes. I know --
3  Q. So each of the --
4  A. -- I did.
5  Q. -- three would have had swabs and debris.
6  A. Yes.
7  Q. You sure?
8  A. I'm pretty sure about that, yes. I -- I don't have
9    any reason not to know that that wasn't the case.
10  Q. Can you explain then why in Exhibit NN the swabs
11    were in the one gallon container alone and this
12    debris's in a completely different gallon container
13    alone?
14    MR. JONES: Objection to form and foundation.
15    He's already said he wasn't there when the photos
16    were taken --
17    MR. GARDNER: Well, he was there when the
18    evidence --
19    MR. JONES: You can answer.
20    THE WITNESS: Well, the only thing I can -- it
21    doesn't show the side of the can here on this,
22    necessarily. Unless this is it right here that
23    shows the Rimkus can.
24    MR. HEHNER: When you say "this right here,"
25    what -- look at the yellow -- I mean, the red

Page 337

1    numbers. What page --
2    MR. GARDNER: He's pointing to 100.
3    THE WITNESS: Yeah, 100.
4    MR. HEHNER: Okay. Thank you.
5    THE WITNESS: North flue. Where is the --
6  QUESTIONS BY MR. GARDNER:
7  Q. Let me help you. Go to Page 88 and compare that to
8    Page 100. And you tell me --
9  A. 88?
10  Q. -- do you still think the debris shown in the can
11    in Page 101 was sent to Sharee Wells along with the
12    swabs, the blue swabs that we were looking at
13    earlier?
14  A. 88, swabs, north heater.
15    MR. JONES: Same objections to foundation and
16    form.
17    THE WITNESS: Swabs. C.
18    MR. JONES: To clarify --
19    THE WITNESS: I don't see the inside of this
20    container so --
21    MR. JONES: Which -- which page numbers are
22    you asking him to compare? It is 88 --
23    MR. GARDNER: 88.
24    MR. JONES: -- and 100?
25    MR. GARDNER: Yes.

85 (Pages 334 - 337)

Page 338

1    MR. JONES:  Okay.
2    THE WITNESS:  88 and 100?
3    MR. HEHNER:  88 for me is a label.
4    MR. GARDNER:  Page 88 says swab north.
5    MR. HEHNER:  Right.
6    MR. GARDNER:  Page 100 says sample flue north.
7    So they're different.
8    MR. JONES:  Go to Page 88.
9    THE WITNESS:  86.
10   MR. JONES:  These are the two.
11   THE WITNESS:  88, basically it says custody
12   form, swabs and north.
13   QUESTIONS BY MR. GARDNER:
14   Q.  Right.  And then they opened -- the folks,
15   including Lou Inendino, and I think his last name
16   was Jacobs, opened these cans sequentially for
17   us -- at about 2,000-dollar charge -- to show us
18   what's inside these cans.  And one can had, as I'm
19   interpreting these, only swabs.  And another can
20   had only debris.  But you think you shipped --
21   shipped them to Sharee Wells together?
22   MR. JONES:  Objection to form, foundation.
23   THE WITNESS:  I know the -- the three I sent
24   from the day I collected it was all -- only from
25   one can A, B, and C.

Page 339

1    QUESTIONS BY MR. GARDNER:
2    Q.  And it contain -- you think you sent her -- can A
3    had swabs and debris; can B had swabs and debris;
4    can C had --
5    A.  Right.
6    Q.  -- swabs and debris.
7    A.  That was correct.
8    Q.  And she converted --
9    A.  From what I collected.
10   Q.  And she converted those to items one, two, three.
11   MR. JONES:  Objection to foundation.
12   THE WITNESS:  I don't know how she converted
13   them.  But I'm assuming that's how it was on the --
14   she listed --
15   MR. GARDNER:  That's the point.
16   THE WITNESS:  -- she listed them on her file
17   of what -- on her lab report of what she received.
18   QUESTIONS BY MR. GARDNER:
19   Q.  You have some idea that Sharee Wells separated the
20   debris from the swabs when she returned them to
21   Rimkus, so she shipped back six cans instead of
22   three gallon cans?
23   A.  I -- I don't --
24   MR. JONES:  Objection to foundation; calls for
25   speculation.

Page 340

1    THE WITNESS:  I don't know anything about
2    that.  But I know I was not there when the cans
3    came back, so I couldn't attest to that.
4    QUESTIONS BY MR. GARDNER:
5    Q.  When did the cans come back?
6    A.  I don't know.
7    MR. JONES:  Objection to foundation.
8    QUESTIONS BY MR. GARDNER:
9    Q.  Didn't they come back right after they were sent?
10   Sorry.  Soon after they were sent?
11   A.  We have to request them -- okay.
12   MR. JONES:  Objection to form.  You can
13   answer.
14   THE WITNESS:  We have -- if -- once they're --
15   the lab's been tested, then they have to be --
16   they -- we have to request them back.  She asked
17   for more information and more -- more testing to be
18   done.  So that put the timeframe well past the time
19   that I was there to -- to have -- to request them
20   back or whatever.
21   Like, we don't typically request them back
22   right away.  They do send them back, but they
23   don't -- sometimes that takes a while for that to
24   come back.
25   QUESTIONS BY MR. GARDNER:

Page 341

1    Q.  So your belief is that when Sharee Wells shipped
2    the three gallon cans that had you shipped to her
3    labeled A, B, C, you were no longer employed with
4    Rimkus.
5    A.  I don't know when these came back; I could not tell
6    you.
7    Q.  You haven't looked at the evidence custody forms to
8    see the answer to that.
9    MR. JONES:  Objection to form.
10   THE WITNESS:  No.  I don't have the evidence
11   custody sheets.
12   QUESTIONS BY MR. GARDNER:
13   Q.  So you've prepared your two -- your second report
14   in 2022 without knowing whether Sharee Wells
15   shipped back to Rimkus after her -- she was
16   finished with the samples, six gallon cans or three
17   gallon cans?
18   MR. JONES:  Objection to form.
19   THE WITNESS:  I don't know that.  Only thing
20   I'm going by is a report that I received from the
21   lab regarding the samples that were sent.  That's
22   only -- that's information I have to rely on.
23   QUESTIONS BY MR. GARDNER:
24   Q.  Jim, can you -- same exhibit -- sorry.  New
25   Exhibit PP, Page 112.

86 (Pages 338 - 341)

Page 342

1   A.   112?
2   Q.   Yes, sir.
3   A.   Exhibit A, swabs from --
4   Q.   South number 16.
5   A.   South, yes.
6   Q.   Okay.  Exhibit A crossed out letter P, right?
7   A.   Yes.
8   Q.   And you don't know who did that?
9   A.   No, I do not.
10  Q.   Page 114, the same exhibit.  Is that your
11       handwriting?
12  A.   Yes.
13  Q.   And you put this yellow label on before shipping
14       this can to Sharee Wells?
15  A.   No.  This -- the label is on there.  The -- the red
16       label wasn't on there.
17       MR. JONES:  We're on the next page --
18       THE WITNESS:  Oh.
19       MR. JONES:  -- 114.
20       THE WITNESS:  This one, yes.
21  QUESTIONS BY MR. GARDNER:
22  Q.   Was that yellow label on that can when you shipped
23       it to Sharee Wells?
24  A.   Yes.
25  Q.   Can you go to Page 115?  Is that your handwriting

Page 343

1        on top of that can?
2   A.   Yes.
3   Q.   And at this point the can has a F.A.S.T. Lab --
4   A.   Yes.
5   Q.   -- sticker on it, right?
6   A.   Yes.
7   Q.   What's the purpose of that?
8        MR. JONES:  Objection to foundation.
9        THE WITNESS:  What they do is -- it's
10       basically an evidence tape that's put on to assure
11       that the -- that no one has tampered with it, I
12       guess.  Anti-tamper tape, I guess you could say.
13       MR. GARDNER:  Right.
14       THE WITNESS:  So this tape is real, real
15       thin --
16       MR. GARDNER:  Yeah.
17       THE WITNESS:  -- and the -- if someone would
18       open the can, they would obviously rupture the
19       tape.
20  QUESTIONS BY MR. GARDNER:
21  Q.   But you didn't put any such tape like that on these
22       three -- three gallon cans before you shipped them
23       to Sharee Wells, did you?
24  A.   No, I did not.
25  Q.   And it's recommended that you do such according to

Page 344

1        NFPA 921, isn't it?
2        MR. JONES:  Objection to form and foundation.
3        THE WITNESS:  I don't think there's anything
4        that in -- in their NFP 921 that mentions the fact
5        that we have to have -- use red tape.  It has to be
6        secured.
7        MR. GARDNER:  I didn't say anything about red
8        tape.  I meant to say just taped to prevent
9        tampering.
10       MR. JONES:  Same objections.
11       THE WITNESS:  NFP guidelines, yes, that would
12       be the -- the best way to do it.
13  QUESTIONS BY MR. GARDNER:
14  Q.   Best practice then?
15  A.   If you -- particularly in a criminal case
16       necessarily.  But in this particular situation, I
17       did not have the tape available at the time I was
18       at the site.  And so I went ahead and secured
19       the -- the evidence and took it to Rimkus to have
20       it secured in our evidence locker.
21  Q.   Did you have the time between returning to Rimkus
22       with the gallon cans that you marked Exhibits A, B,
23       C, to put any tape on them before you shipped them
24       to Sharee Wells?
25  A.   I could have, yes.

Page 345

1   Q.   But you didn't.
2   A.   I did not do that.
3   Q.   Okay.  Could you go to Page 117, Exhibit PP?
4   A.   Yes.
5   Q.   Looks like about eight swabs in this photograph?
6   A.   Yes.
7   Q.   And if you skip back one page to 116, it's a
8        picture taken by an employee of Rimkus -- Rimkus
9        showing the swabs before they took -- took them out
10       of the can, right?
11  A.   Uh-huh.
12       MR. JONES:  Objection to foundation.
13  QUESTIONS BY MR. GARDNER:
14  Q.   And where did you take these swabs shown in -- hold
15       on, Jim -- shown on Page 117 of Exhibit PP?  Where
16       did you take them from?
17  A.   According to this they came from the south heater.
18  Q.   Where on the south heater?
19  A.   There's a photograph, again, that shows where
20       that -- those were taken from in the photographs.
21  Q.   We already looked at those, didn't we?
22  A.   Yes.
23  Q.   So that would include Defendants' Exhibit Y, Bates
24       stamped Republic 603?  Right?
25  A.   Yes.  That would be it.

87 (Pages 342 - 345)

Page 346

1  Q.  And the Defendants' Exhibit Y, Page 12, Bates
2      stamped Republic 632?
3  A.  That shows the -- the pipe that I took that sample
4      from.
5  Q.  The swab shown on Page 117 of Exhibit PP.
6      MR. JONES:  Objection --
7      THE WITNESS:  That's --
8      MR. JONES:  -- foundation.
9      THE WITNESS:  The swabs that are shown here is
10     from the south heater.  And they're -- they were
11     used to swab the inside of the pipe -- the -- that
12     pipe --
13     MR. GARDNER:  I'm talking about where you got
14     them from.  I know what they are.
15     THE WITNESS:  From the first picture you had,
16     where it shows the pipe separation.  Right there.
17 QUESTIONS BY MR. GARDNER:
18 Q.  Talking about Republic 603?
19 A.  Yes.
20 Q.  And also part of this pipe that you put a --
21 A.  I did not take any swabs from there.
22 Q.  You took no --
23 A.  I --
24 Q.  Hold on, Jim.  It's going to be too confusing.
25     You took no swabs from the area located in the

Page 347

1      part of the Space-Ray heater on the ground located
2      in Republic 632?
3      MR. JONES:  Let me get that photo in front of
4      him before he answers.
5      THE WITNESS:  No.  And I've -- I've mentioned
6      this earlier that this is only to label the pipe,
7      showing the pipe.  And I wanted to take a picture
8      of some of the -- the paint that was in that area.
9      MR. GARDNER:  On the ground, Jim.
10     THE WITNESS:  Trying -- no.  Well, on the
11     ground as well as relationship to where the pipe
12     was in the -- I took the reflectors, any reflector
13     that was available.  Because the reflectors would
14     show -- and -- and also show the tape.  And also
15     this is a piping where A was collected from.
16     Not -- I did not collect anything from outside of
17     the pipe.
18 QUESTIONS BY MR. GARDNER:
19 Q.  But inside the pipe with evidence tent label A,
20     Republic 632 is where you took some of those swabs.
21 A.  Yes.
22     MR. JONES:  Asked and answered.
23 QUESTIONS BY MR. GARDNER:
24 Q.  Can you go to Page 124, Exhibit PP.
25     MR. JONES:  Let's switch these binders out

Page 348

1      again.
2      MR. ZOCCOLA:  What exhibit?
3      MR. GARDNER:  PP.
4      MR. HEHNER:  PP.
5      MR. JONES:  Which page number did you say?
6      MR. GARDNER:  124.
7      THE WITNESS:  Okay.
8  QUESTIONS BY MR. GARDNER:
9  Q.  For fear of cutting off Space-Ray from a question,
10     I'm going to ask you a couple questions off the
11     topic we're on now.
12 A.  Okay.
13 Q.  Do you hold any opinion as to whether the Space-Ray
14     heaters were defective in any way in relation to
15     design or manufacture?
16 A.  I don't have anything to -- evidence to show that
17     they were not working properly or installed
18     properly at the time as for as the installation of
19     the heaters.
20 Q.  I understand.  I think we were miscommunicating.
21     So Space-Ray -- I mean, Gas-Fired Products
22     d/b/a Space-Ray is sued in this case under products
23     liability theory, under Indiana's products
24     liability statute.  Are you an expert in products
25     liability cases?

Page 349

1      MR. JONES:  Objection to form.
2      MR. GARDNER:  Outside of the realm of fire
3  investigation.
4      MR. JONES:  Objection to form.
5      THE WITNESS:  No.  And I -- the -- and my --
6  well, no.  I don't -- I don't have anything to
7  dispute that their -- that they were -- they were
8  installed properly or they weren't functioning
9  properly.
10     MR. GARDNER:  I understand.
11 QUESTIONS BY MR. GARDNER:
12 Q.  Do you or any other expert that you've consulted
13     with or that's been used in this case on behalf of
14     the plaintiff have any opinion as to whether or not
15     these Space-Ray heaters in question were defective
16     in their manufacture?
17 A.  I don't -- I do not have anything to support that
18     opinion.
19 Q.  Okay.  And do either you or any other experts you
20     consulted with or that have been retained by
21     Republic hold the opinion that there was anything
22     wrong with the design of the Space-Ray heaters?
23     MR. JONES:  Objection to foundation.
24     THE WITNESS:  I don't have any information
25     from anyone that would say that they were not

88 (Pages 346 - 349)

Page 350

1   designed properly or weren't installed properly or
2   used properly as for as they worked op -- they
3   worked.
4       MR. GARDNER:  Yeah, okay.
5   QUESTIONS BY MR. GARDNER:
6   Q.  And, lastly, you have consulted the installation
7       manual for the Space-Ray heaters, haven't you?
8   A.  Yes.
9   Q.  And there's reference in your report to some
10      language on Page 3 from that binder, I'm sorry,
11      that manual?
12  A.  Yes.  I'm assuming it's from Page 3.
13  Q.  Other than that language, are -- is there any other
14      parts of that manual that you relied on to form
15      your opinions of cause and origin in this case?
16  A.  No.  I did not rely on anything as for as -- other
17      than the -- I did look at the manual.  And the
18      manual stated that it should not be installed in --
19      that's what prompted me to go ahead and do a sample
20      testing, and things of that nature, to see if there
21      was any product on this that would potentially
22      cause a fire.
23      MR. JONES:  And, Marty, I know this is a late
24      objection.  But I'm not sure that we're all on the
25      same page of what page from the manual you're

Page 351

1   talking about.  So I'm just preserving that
2   objection.
3   QUESTIONS BY MR. GARDNER:
4   Q.  You've referred -- I'm skipping.  I'll come back to
5       where we were in a minute.
6       You've recurred [sic] repeatedly during this
7       deposition to some language that comes from the
8       product specifications we've marked as Exhibit P
9       today regarding the Blue Sheboygan paint in
10      terms -- in terms of it boiling, right?
11  A.  Yes.
12  Q.  But when you wrote your letter to Sharee Wells
13      asking her what to do, you didn't use the word
14      "boiling," did you --
15      MR. JONES:  Objection to form.
16  QUESTIONS BY MR. GARDNER:
17  Q.  -- or "boiled off," did you?  You said "dry," when
18      the paint dries.
19  A.  I might have said -- I might have used the word
20      "dry."  Essentially the -- what I was --
21  Q.  I'm just asking --
22  A.  Yes, okay.
23  Q.  Yes.
24  A.  I might have used that -- that terminology, yes.
25  Q.  You didn't say "boiled off," you said "dry" in your

Page 352

1   letter to Sharee Wells about what --
2   A.  Right.
3   Q.  -- how this paint can change through some -- you
4       said the drying process, but you meant the boiling
5       process.
6   A.  Well, I meant the boiling off.
7       MR. JONES:  Objection to form.
8       MR. GARDNER:  Jim, referring back to
9   Exhibit PP, Page 124.  Let me know when you're
10      there.
11      MR. ZOCCOLA:  What exhibit?
12      MR. GARDNER:  PP --
13      MR. ZOCCOLA:  PP.
14      MR. GARDNER:  -- Page 124.
15      THE WITNESS:  Okay.
16  QUESTIONS BY MR. GARDNER:
17  Q.  That's a legal pad that says, Exhibit A, number 13,
18      sample flue south, right?
19  A.  Yes.
20  Q.  The next Page 125 shows the can with your permanent
21      black marker A with a line under it, correct?
22  A.  Uh-huh.
23  Q.  And your handwriting --
24  A.  Yes.
25  Q.  -- on the yellow label?  And so then one

Page 353

1   Page 26 [sic], that's your handwriting on this
2   yellow label?
3   A.  Yes.
4   Q.  Sample taken from flue pipe propane tube heater
5       south end, right?
6   A.  Yes.
7   Q.  Inside two Peter flue pipe, right?
8   A.  Yes.
9   Q.  May 10th, 2019?
10  A.  Yes.
11  Q.  If you go to the -- the next Page 127 of
12      Exhibit PP.
13  A.  Yes.
14  Q.  There aren't any blue swabs in there, are there?
15  A.  Not in this photograph there's not.
16  Q.  And the next page shows the debris spilled out on
17      the top of a table with a measuring device?
18      Page 128?
19  A.  Yes, yeah.
20      MR. JONES:  Objection to foundation.
21  QUESTIONS BY MR. GARDNER:
22  Q.  No blue swabs in this photo either, right?
23  A.  Not in this photo.
24  Q.  So isn't it the case that this can that you labeled
25      on May 10th, 2019 had no blue swabs in it but only

89 (Pages 350 - 353)

Page 354

1 some -- some kind of debris?
2     MR. JONES: Objection to foundation.
3     THE WITNESS: I don't -- I can't attest to the
4 fact of where the swabs are. Everything I did was
5 by swabs and sweeping them out. So I don't know
6 anything about these photos or about where the
7 swabs might be. Obviously there were swabs in all
8 the other exhibits that they had here. And I don't
9 know what -- what would have happened to those or
10 where they would have been.
11 QUESTIONS BY MR. GARDNER:
12 Q. But you're -- you're gonna stick with the three --
13 you only mailed -- sorry. You only shipped three
14 one-gallon cans, plus two quart cans, to Sharee
15 Wells for testing at F.A.S.T. Lab. And each of the
16 cans contained both fire debris that you claim you
17 got out of these two heaters and swabs, right?
18 A. Yes. I -- I only sent three containers to them
19 myself. I don't know anything about any other --
20 Q. You're confusing the question --
21 A. -- containers.
22 Q. -- with the way you're answering it. Am I right?
23 The three cans you --
24 A. Yes.
25 Q. -- the only cans you sent had -- each one had

Page 355

1 swabs, samples, and scrapings, and debris --
2 A. Yes.
3 Q. -- correct?
4 A. Yes.
5     MR. JONES: Objection, asked and answered.
6     MR. GARDNER: Correct?
7     THE WITNESS: Okay. Yes.
8     MR. HEHNER: I am confused. Because there was
9 another can that had paint in it, right?
10     MR. GARDNER: That's a quart can.
11     MR. HEHNER: Okay. So -- okay.
12     MR. GARDNER: He mentioned those --
13     MR. HEHNER: Yeah.
14     MR. GARDNER: -- before that. So --
15     MR. HEHNER: Thank you. I'm just not the
16 brightest.
17     THE WITNESS: I wouldn't say that.
18 QUESTIONS BY MR. GARDNER:
19 Q. So could you go to your expert report, Exhibit G.
20 It's your second one. It's dated November 18th,
21 2022, Page 4.
22 A. Wrong way here. P is upside-down.
23     (Mr. Zoccola left the conference room.)
24     THE WITNESS: G?
25     MR. GARDNER: Yes, sir.

Page 356

1     THE WITNESS: Okay.
2 QUESTIONS BY MR. GARDNER:
3 Q. Near the top there's a quote where it says, This
4 heater is not an explosion-proof heater.
5 A. Which one are you talking about?
6 Q. Page 4.
7 A. Page 4? Okay.
8 Q. Do you see it?
9 A. Yes.
10 Q. You typed this report up, didn't you?
11 A. Yes.
12 Q. And you -- this language that you have quoted, it's
13 more bold, it's centered, starts off with, This
14 heater. That came from the installation manual for
15 the Space-Ray heaters, didn't it?
16 A. Yes.
17 Q. But you don't remember what page.
18 A. I don't -- at this -- at this point I don't. I --
19 I --
20 Q. That's all right.
21 A. -- came -- would have come from the manual.
22 Q. Okay. And you typed this up verbatim, didn't you,
23 from the manual?
24 A. Yes, I believe so.
25 Q. And the first two words is "this heater." And the

Page 357

1 last two words is "insurance company"?
2 A. Yes.
3 Q. Okay. Would you read the first sentence out loud
4 to the first period.
5 A. This heater is not an explosion-proof heater.
6 Q. And read the rest of this quote here to yourself.
7 Let me know when you're done.
8 A. Okay.
9 Q. Do you see the word "fire" anywhere in this
10 particular language that you quoted on Page 4 out
11 of the Space-Ray installation and product manual?
12     MR. JONES: Objection. Document speaks for
13 itself.
14     MR. GARDNER: There's no such objection as the
15 document speaks --
16     MR. JONES: Okay. Doc -- objection, form.
17     THE WITNESS: There is reference to potential
18 fire by definition of low flash point. Flash point
19 would be --
20     MR. GARDNER: That's not what I asked you.
21 QUESTIONS BY MR. GARDNER:
22 Q. I said: Do you see the word "fire" in this --
23 A. I don't see the word "fire," no.
24 Q. Okay. Do you see the word "flammable"?
25     MR. JONES: Same objections.

Page 358

1     THE WITNESS:  No.
2   QUESTIONS BY MR. GARDNER:
3   Q.  Do you see the word "combust"?
4   A.  No.
5   Q.  Do you think this language is referencing fires and
6       explosions?
7   A.  Potentially both.  The language says --
8   Q.  But the only word it uses is "explosion," isn't it?
9   A.  The data says it's not explosion proof, which means
10      there's openings that vapors and things like that
11      can get into the system.  It's not a sealed up
12      container or a sealed unit.  That's what basically
13      explosion proof would be.  It would have to be
14      totally sealed with no availability of any vapor or
15      anything to be entered in the computer -- or into
16      the heater.
17  Q.  Other than your reference to the word "heater,"
18      which you took out of Page 3 of the Space-Ray
19      manual, the word "explosion" doesn't exist in
20      either of your reports, does it?
21      MR. JONES:  Objection to foundation.
22      THE WITNESS:  No.  I don't -- I don't have any
23      reason to suspect that an explosion necessarily
24      occurred.
25      MR. GARDNER:  Right.

Page 359

1     THE WITNESS:  It's totally different.
2     MR. GARDNER:  I couldn't agree more.
3   QUESTIONS BY MR. GARDNER:
4   Q.  So you did not determine, as a result of your
5       investigation, that there was an explosion
6       involving these Space-Ray heaters, did you?
7   A.  There was -- not to my knowledge, there was no
8       explosion.
9   Q.  Other than damage --
10  A.  I don't know what occurred.
11  Q.  Other than damage from falling on the ground and
12      some collapse damage, the three heater boxes or the
13      propane gas ignites inside the Space-Ray heaters,
14      they were fairly intact, weren't they?
15      MR. JONES:  Objection to form.
16      MR. GARDNER:  They weren't exploded.
17      MR. JONES:  Same objection.
18      THE WITNESS:  Yeah, there was -- they were
19      fairly intact, I would say.  They were damage --
20      damaged by heat and --
21  QUESTIONS BY MR. GARDNER:
22  Q.  But they were -- they weren't damaged by an
23      explosion, were they?
24      MR. JONES:  Objection to form and foundation.
25      THE WITNESS:  Not that I could tell.

Page 360

1   QUESTIONS BY MR. GARDNER:
2   Q.  Isn't it your opinion that there was no explosion
3       of these -- any part of these three Space-Ray
4       heaters that my client installed during this fire?
5   A.  That there was no explosion, you said?
6   Q.  Yeah.
7   A.  I -- I don't have any reason or evidence to support
8       an explosion occurred, no.
9   Q.  Okay.  In fact, you concluded that there was no
10      explosion as to any component of the three
11      Space-Ray heaters that my client installed,
12      correct?
13  A.  There did not appear to be any explosion.
14  Q.  Okay.  Have you ever consulted with a fire marshal
15      about this case?
16  A.  No, I have not.
17  Q.  Have you spoken with or communicated in any way
18      with any fire marshal about this case prior to
19      issuing either of your two reports?
20  A.  No.
21  Q.  Have you consulted with any personnel from any
22      insurance company about this case during your
23      investigation and prior to preparing your two
24      reports?
25  A.  No, I have not.

Page 361

1   Q.  Can you go to -- go to Page 7 of your second
2       report, Defendants' Exhibit G.
3   A.  Page 7 of the report?
4   Q.  Yeah.
5   Q.  Okay.
6   Q.  The top photograph you wrote, reference photo --
7       photograph three, Two heater components and paint
8       on reflector unit in area of fire origin.  Is that
9       what you wrote?
10  A.  Yes.
11  Q.  There's a lot of blue paint in this photograph,
12      isn't there?
13  A.  Yes.
14  Q.  It's bright blue, isn't it?
15  A.  Yes.
16  Q.  Is all of it on the tube heater components and
17      reflector, or is some of it on the ground?
18  A.  Some of it's on the ground.
19  Q.  Most of it's on the ground.
20  A.  Yeah.  Some of it, yeah.
21  Q.  I --
22  A.  That's just a general picture of a thousand
23      pictures that I took.
24  Q.  I'm just talking about this one.  You -- you
25      thought it was important enough to put in your

91 (Pages 358 - 361)

Page 362

1    report, didn't you?
2        MR. JONES:  Objection to form.
3        MR. GARDNER:  Of the thousands of pictures.
4        MR. JONES:  Same objection.
5        THE WITNESS:  Yeah.  It was an -- it was a
6    photograph just to show that the paint was present
7    throughout the facility, for the most part, and
8    at -- in the area of origin as well.
9    QUESTIONS BY MR. GARDNER:
10   Q.  Your second report and final report has exactly
11       five photographs in it, correct?
12   A.  Yes.
13   Q.  Take my word for it.
14   A.  Okay.
15   Q.  All right.  Well, you can see it and look at it on
16       Page 7, Exhibit G, your second report, that this
17       blue paint in the photo on the floor looks exactly
18       like, at least in color and contrast, to the blue
19       paint that you're claiming is on the reflector
20       unit.
21       MR. JONES:  Objection to form.
22       THE WITNESS:  I -- on this -- yeah.  The
23   paint -- the -- the bright blue paint on the right
24   side of the picture is on the floor.  But there is
25   paint -- this photograph here is not -- doesn't

Page 363

1    demonstrate adequately to that photograph, I guess.
2    But there is paint on the interior of the units
3    themselves.
4    QUESTIONS BY MR. GARDNER:
5    Q.  In this photograph --
6    A.  Not --
7    Q.  -- or just others?
8    A.  No, in others as well.  These are just general
9        photographs of the -- of the fire origin.
10   Q.  Jim, I'm gonna hand you what I've marked Exhibit G,
11       Page 7.
12   A.  Yes.
13   Q.  Same photo you're looking at.  And take your time.
14       Please circle on that photograph what part of the
15       blue paint is on any part of the heater or the
16       heater shield.  And then hold it up to the camera
17       so he can zoom in.
18   A.  I can't quite tell with this photograph here.
19       But --
20       Probably could have used a more demonstrative
21       picture, I guess, a more reflective.  But I
22       don't -- I can't quite tell what's re -- what
23       the -- I mean, obviously, the blue --
24   Q.  (Unintelligible.)
25   A.  I -- I can't see anything on there --

Page 364

1    Q.  Okay.
2    A.  -- right offhand.
3    Q.  You can't see anything.  So you'll concede,
4        however, on Page 7 of your ex -- your second and
5        final expert report, so far in this case, that you
6        created in, I think, November 2022, all the blue
7        paint in this photograph, is it the same
8        brightness, consistency, saturation --
9    A.  In --
10   Q.  -- it's all bright blue, isn't it?
11   A.  In these photographs, yes.  They -- these were
12       taken much soon -- much sooner in the process
13       though than what obviously the -- we saw at the
14       examination of the heaters.
15   Q.  The bottom --
16   A.  This is -- this is at the time I was there
17       collecting the evidence and things like that.
18   Q.  May 10th, 2019.
19   A.  Yes.
20   Q.  Bottom photograph 4 --
21   A.  Uh-huh.
22   Q.  -- Exhibit G, Page 7.  You wrote, Two heater and
23       the paint on reflector along with charring, and
24       more heat on this heater unit than others,
25       indication -- I'm sorry, yeah -- indication origin

Page 365

1    area.
2        You think this photograph shows blue paint on
3    any part of the heaters rather than just showing
4    blue paint on the floor?
5    A.  I think --
6        MR. JONES:  Objection to form.  You can
7    answer.
8        THE WITNESS:  I think on the heater unit
9    itself, right there at the -- where it comes out of
10   the -- the heater burner unit itself, there is --
11   you can kind of almost see it right in that picture
12   right here.
13   QUESTIONS BY MR. GARDNER:
14   Q.  I can't see it at all.  You go ahead and circle it
15       and show the camera.  We've got to move on.
16   A.  Okay.
17   Q.  Take your time.  Is that visible, Jim?  I can't
18       tell.
19   A.  It doesn't show up very well on there but there --
20   Q.  Try red.
21   A.  -- right in that area.  It doesn't show up either.
22       MR. HEHNER:  Try that.
23       THE WITNESS:  Nope.
24       MR. HEHNER:  Show up?  Try that.
25       MR. JONES:  Do you have a paint brush in

92 (Pages 362 - 365)

Page 366

1    there?
2         THE WITNESS:  I don't -- there's about four
3    our five circles there.  Can you see that?
4         MR. GARDNER:  I'll take it back.  We're gonna
5    give it to the court reporter.
6         THE WITNESS:  Okay.
7         MR. GARDNER:  Thanks, Jim Hehner.  And thanks,
8    Jim Foster.
9    QUESTIONS BY MR. GARDNER:
10   Q.  So this bottom photo, Jim, Defendants' Exhibit G,
11      your report, Page -- I'm sorry.
12   A.  Seven.
13   Q.  It's Page 6 of your report.  It's Page 7 of the
14      exhibit.  That is the south heater?
15   A.  Yes.
16   Q.  Okay.  And this heater --
17   A.  I believe so, yes.
18   Q.  -- was examined in the laboratory at Rimkus twice?
19   A.  Yes.
20   Q.  In February and August of 2022?
21   A.  I don't know about twice.  I don't -- somebody
22      looked at it.  I wasn't present at that.  I was
23      only present at one.
24   Q.  You were there at the August --
25   A.  Yes.

Page 367

1    Q.  -- 2022 --
2    A.  Right.
3    Q.  -- when I was there.
4    A.  Yes.
5    Q.  And I asked you in the presence of all the experts
6       and the attorneys in assembly if you could show us
7       on any of the heaters, any component of the
8       Space-Ray heaters that my client installed, any
9       blue paint, and you told us no.
10        MR. JONES:  Objection.
11   QUESTIONS BY MR. GARDNER:
12   Q.  What did you mean by that answer?
13        MR. JONES:  Objection to form, foundation.
14        THE WITNESS:  I did not say no as for that --
15      you asked me where I took samples from.
16        MR. GARDNER:  I asked you that too.  But I
17      also asked you where --
18        MR. JONES:  If you could let him finish.
19        MR. GARDNER:  He's answering a different
20      question.  He's answering the next question.
21        THE WITNESS:  The only -- only answer that I
22      give to where I -- I didn't know was the -- where
23      the sample were collected.  Samples were collected
24      because of -- of the --
25        MR. GARDNER:  I'm not on the samples.

Page 368

1         THE WITNESS:  -- positioning of the heaters.
2         MR. GARDNER:  Just asking for:  Could you show
3    us blue paint?  That was my question.
4         THE WITNESS:  Yes.  I could show you blue
5    paint on those heaters.
6         MR. GARDNER:  You said no in that room.
7         THE WITNESS:  I did not say no.
8    QUESTIONS BY MR. GARDNER:
9    Q.  You sure?
10   A.  Yes.
11   Q.  Okay.
12   A.  I have pictures to prove otherwise.
13   Q.  To prove that you said yes?
14   A.  No.  That there's paint on the units themselves.
15   Q.  Okay.  Pictures taken in the lab that day?
16   A.  Yes.
17   Q.  You believe would show paint on the south heater?
18   A.  Yes, I do.  I don't know about the south heater,
19      which one offhand it was.  But there's -- it shows
20      paint on the heater.
21   Q.  Are you telling me that in the August '22 lab exam
22      at Rimkus, when we were all looking at the south
23      heater that you depicted at the bottom of your
24      report, Page 6 of your report of 2022, that
25      there's -- the blue paint isn't there anymore?

Page 369

1         MR. JONES:  Objection to form.
2         THE WITNESS:  I have no idea which -- in what
3    area and what photographs I have as for as at the
4    examination.  But I do know that there were several
5    areas where I took pictures of that had blue paint
6    on the heaters and the heater exam, when we did the
7    examination of the heaters.
8    QUESTIONS BY MR. GARDNER:
9    Q.  Was it as bright blue as depicted on the top of --
10      on photograph three of your second report?
11   A.  No.  It was not bright blue.  It was baked-on
12      blue -- baked-on blue.  Kind of a light blue.
13   Q.  It was light blue.
14   A.  Yes.
15   Q.  Can you show us any pictures -- can you show us any
16      pictures today of this bright blue, sorry,
17      light-blue paint on --
18   A.  I -- I don't have any --
19   Q.  Hold on -- on any components of the Space-Ray
20      heaters?
21   A.  If -- if there's pictures available that I -- from
22      the examination, yes.  I --
23        MR. GARDNER:  Yeah, okay.  We can just go off
24      now.
25        THE VIDEOGRAPHER:  This ends media five.  The

93 (Pages 366 - 369)

Page 370

1    local time is 5:55.  We are off the record.
2        (A brief recess was taken.)
3        THE VIDEOGRAPHER:  This begins media six.  It
4    is 6:05 p.m., and we are on the record.
5    QUESTIONS BY MR. GARDNER:
6    Q.  So before we broke, I believe the subject was --
7        you were telling me about photographs you took in
8        August of 2022 at the Rimkus examination of the
9        heaters?
10   A.  Yes.
11   Q.  That you believe show light-blue paint?
12   A.  Yes.
13   Q.  How many photos do you think you took that showed
14       light-blue paint on any of the three heaters on --
15       in August of 2022 at Rimkus?
16   A.  Probably overall at least three photos that I can
17       recall.
18   Q.  So that would be easy for you to find and give to
19       Thomas, wouldn't it?
20   A.  Yes, sir.
21   Q.  And, do you remember, were they all from the north
22       heater, all from the center heater, all from the
23       south, or some combination?
24   A.  I don't know exactly which one they're from at this
25       point.  I could look it up -- I mean, I have them

Page 371

1    sequential as for as, you know, the north heater.
2    What -- the way we examine them at the lab exam.
3    But I don't know exactly which one showed residue
4    of paint.
5    Q.  But it was just one?
6    A.  I think it was two of them that I noticed the paint
7        was on, yes.
8    Q.  And what components of the two of them was it on?
9    A.  On the tube itself.
10   Q.  Not the -- not the heater box?
11   A.  Not that I could recall on the heater box.
12   Q.  And not the deflectors?
13   A.  Not the deflectors.  Well, there -- there was one
14       deflector, I think, that had some residue on it.
15       But I -- I can't recall which --
16   Q.  I'm not asking about residue.  I'm asking about
17       visible, light-blue paint.
18   A.  Yeah, that's what I'm referring to is paint
19       residue.
20   Q.  And do you think that the three pictures you took
21       at the Rimkus facility in August of last year,
22       2022, you're telling us now show light-blue paint
23       on these heater tubes.
24   A.  Yes.
25   Q.  Was combusted blue paint?

Page 372

1    A.  I don't know what it -- what -- if it's combusted.
2        It's similar to the paint that was on there
3        whenever I made -- got the collections off and what
4        I saw on the --
5    Q.  Regardless of --
6    A.  -- reflectors --
7    Q.  -- of some prior sequence, I'm asking you:  This
8        light-blue paint that you took photographs, that
9        you claim in August of last year at Rimkus --
10   A.  Yes.
11   Q.  -- there's still light blue after combustion?  Or
12       is it your opinion that blue paint was not
13       combusted?
14   A.  I don't think it was combusted, no.
15   Q.  Okay.  So the rest of the blue paint other -- that
16       wasn't -- that you couldn't find on the heaters, it
17       was 'cause it had been combusted and was gone?  Is
18       that what you're saying?
19   A.  I'm -- I'm saying the environment probably had a
20       lot to do with some of the res -- but there was
21       several -- initial -- the initial exam showed a lot
22       of paint on the reflectors and on the tubes
23       initially.
24   Q.  What -- what initial one?
25   A.  The first one, the examination that I -- when I was

Page 373

1    there the first time and -- and also the second
2    time.
3    Q.  So -- hold on.  We get our dates right here.  So
4        you're talking March 20th, 2019 to May 10th, 2019?
5    A.  Yes.
6    Q.  And you took pictures of all that.
7    A.  Yes.
8    Q.  All this blue paint on these heaters.
9    A.  Not on -- not on the first day I was there, on the
10       19th, but on the --
11   Q.  The 10th?
12   A.  -- the heat -- the day -- the heat, yeah.  The day
13       I did the examination of the heaters.
14   Q.  You mean you took the samples.
15   A.  Yes.
16   Q.  You had --
17   A.  I also took several pictures that day as well.
18   Q.  I know.  And you had to remove debris off the top
19       of heaters to get it them, didn't you?
20   A.  Yes.
21   Q.  All right.
22   A.  The metal components of the roof.
23   Q.  I'm -- I'm in -- wait a minute.  You referenced
24       NFPA 921 in both of your reports.
25   A.  Uh-huh.

94 (Pages 370 - 373)

Veritext Legal Solutions
800-567-8658                                    973-410-4098

Page 374

1  Q.  At the time you wrote your first report, the only
2     one in existence was the 2017 edition, correct?
3  A.  Yeah, other than prior editions.  But that --
4  Q.  Yeah.
5  A.  -- was the one that was effective, yeah, or active
6     in that --
7  Q.  And when you wrote your second report, it was the
8     2021 edition, right?
9  A.  Yes.
10 Q.  But wouldn't it be fair to say that since the
11    time -- time of the fire was 2019.
12 A.  Yes.
13 Q.  And the bulk of your investigation was prior to you
14    issuing your 2022 report, the edition that you were
15    referring to was the 2017 edition.
16 A.  Yes.
17 Q.  Okay.  Good thing I brought it.
18       So in that edition, in Chapter 18,
19    Section 18.4.6, it says, Analysis of sequential
20    events.  You're familiar with that term, phrase?
21 A.  Yes.
22 Q.  All right.  The analysis of the timing or sequence
23    of events during a fire can be useful in
24    determining the origin, period.  Much of the data
25    for this analysis will come from witnesses, period.

Page 375

1     You agree with all that?
2  A.  Yes.
3  Q.  In some instances, comma, a witness may be found
4     who saw the fire in its inception stage and can
5     provide the investigator with an area of fire
6     origin.  Do you agree with that?
7  A.  Yes.
8  Q.  Okay.  Such circumstances create a burden on the
9     fire investigator to conduct a thorough and
10    investigation as possible to find facts that can
11    support or refute the witnesses' statements.  Do
12    you agree with that?
13 A.  Yeah, I -- yeah, I think you have an obligation to
14    see if that's the potential hypothesis or not, yes.
15 Q.  Continuing:  Quote, Means to verify such statements
16    could include pattern analysis, arc mapping -- you
17    didn't do you any arc mapping, did you?
18 A.  I did not.
19 Q.  Matching smoke detectors.  There weren't any smoke
20    detectors, were there?
21 A.  Not to my knowledge, no.
22 Q.  A heat detector?  You didn't use any heat -- there
23    weren't any heat detectors --
24 A.  No.
25 Q.  -- were there?

Page 376

1     So tell me your opinion, in terms of the
2     sequence of combustion, assuming your hypothesis is
3     correct, that this blue paint and other products
4     were caused to ignite when the heater activated, as
5     you say in your second report, once that this first
6     fuel burns.  You say the first fuel's propane,
7     don't you?
8  A.  That would be the first thing that ignited, yes.
9  Q.  And the second -- second thing to ignite is this
10    blue paint?
11 A.  Would be the remnants of blue paint that was
12    combustible, according to the company --
13 Q.  Okay.  Then --
14 A.  -- off.
15 Q.  -- what's next?  What's the next fuel?
16 A.  Well, we had a lot of that blue paint, number one,
17    throughout the process.  And then you had other
18    combustibles.  Once that caught fire, it just
19    spread throughout the --
20 Q.  I'm asking you --
21 A.  -- building.
22 Q.  -- what the -- I want exactly your sequence of
23    events of combustibles.  You said number one was
24    propane, and number two was blue paint.  What --
25 A.  Right.

Page 377

1  Q.  After those burned, what is there left up there,
2     anywhere near any of these heaters, to -- to
3     sustain combustion to burn this building?
4        MR. JONES:  Objection to form; asked and
5     answered.
6        THE WITNESS:  Because of the blue paint and
7     the res -- there was -- residue was everywhere in
8     this facility, according to the witnesses, that I
9     base my opinions on, which is the first number one
10    thing as for as in the -- a cause and origin
11    decisionmaking process is obviously witness
12    statements --
13 Q.  So it's the blue --
14 A.  -- and that --
15 Q.  -- paint all the rest of the room is what you're --
16 A.  Well, it's -- it's partly that as well as the fact
17    that once you -- it -- that heater was over near
18    the south wall.  And that south wall is actually
19    combustible.  That -- it's got -- it's a wooden --
20    wooden wall to the storage unit.
21 Q.  So that's, you think, was the second fuel -- sorry,
22    the third fuel was the --
23 A.  I -- I don't know the -- total sequence of how
24    that all occurred.  But I'm just saying that the --
25    the ignition source is all compatible with the --

95 (Pages 374 - 377)

Page 378

1  Q.  You're on a different question.  I'm asking you the
2     sequence of events of -- of combustion in this
3     room, not for your entire opinion here again.  I've
4     got to leave Space-Ray some time.
5  A.  I don't know what the sequence of events amounted
6     to.  I do know --
7  Q.  No, wait.  Sequence of events of combustion is what
8     I'm talking about.  Combustible --
9  A.  Right.
10 Q.  -- materials.  You've told me number one is
11    propane.
12 A.  Right.
13 Q.  Number two is blue paint inside --
14 A.  Right.
15 Q.  -- the tube heaters.
16 A.  Correct.
17 Q.  Okay.  Not inside the heater.
18 A.  Well, inside the tube heater --
19        MR. JONES:  Objection to form.
20        MR. GARDNER:  Right.
21        MR. JONES:  You can answer.
22        MR. GARDNER:  Inside the tube heater -- go
23    ahead.
24        THE WITNESS:  Inside the tube heaters.  And
25    then obviously there's the same type of material

Page 379

1     outside the tube heaters which would --
2  QUESTIONS BY MR. GARDNER:
3  Q.  You mean on the tube heaters?
4  A.  On the tube heaters and --
5  Q.  Okay.
6  A.  -- on the reflectors and everywhere around that
7     area.
8  Q.  Okay.  Then what?
9  A.  And those would ignite and basically cause and
10    produce other things nearby to continue to express.
11 Q.  What are the other things precisely?
12 A.  Primarily the paint, the -- and the -- as well as
13    the -- being that it's -- it's close to other areas
14    involvement.
15 Q.  What other areas?
16 A.  And it's a wood frame --
17        MR. JONES:  If he could finish his answer.
18        MR. GARDNER:  He's giving vague answers.  He
19    said --
20        THE WITNESS:  It's a wood -- it's a wood-frame
21    construction.
22 QUESTIONS BY MR. GARDNER:
23 Q.  The third thing that combusted was the wood wall
24    that separated the paint bay from the storage room?
25        MR. JONES:  Objection, asked and answered.

Page 380

1     He's already answered that question.
2        THE WITNESS:  I'm saying is --
3        MR. GARDNER:  You're right, Thomas.  He said
4     he doesn't know the sequence of events, of -- other
5     than number one was propane and number two was blue
6     paint in the heater tubes, and number three was
7     blue paint on the tubes and the reflectors.
8        THE WITNESS:  The residue of the paint, the
9     combustible --
10 QUESTIONS BY MR. GARDNER:
11 Q.  Beyond that you don't know.
12 A.  -- of the paint and of the construction of the
13    building was primarily -- a lot of wood
14    construction as well of the -- the structure --
15 Q.  So the wood building --
16 A.  -- itself.
17 Q.  -- just caught on fire after the blue paint
18    ignited.  Is that it?
19 A.  No, that's not -- I'm not -- well, it did catch on
20    fire eventually.  But --
21 Q.  Yeah.  But you don't the sequence --
22 A.  I don't know the sequence past the fact that I
23    think ignition source was the heaters kicking on at
24    the certain time.
25 Q.  Okay.  The sequence that you don't -- you said I

Page 381

1     don't know the sequence past the fact, you're
2     talking about the sequence of combustion,
3     combustible materials igniting, correct?
4  A.  There -- yeah.  There was other combustible
5     materials that would have potentially ignited.
6     There's also a drop-down from the -- from the
7     ceiling area.  That could have potentially ignited
8     other combustibles that -- down on the ground as
9     well.
10 Q.  You think during this fire --
11 A.  -- all --
12 Q.  This is just a different question.  You're
13    conceding that during this fire materials on the
14    ground combusted, like the paint thinner?
15        MR. JONES:  Objection to --
16        THE WITNESS:  I'm just --
17        MR. JONES:  -- objection to form.
18        THE WITNESS:  -- I'm just saying there's a
19    possibility of that, yes.  I don't know.  I wasn't
20    inside the facility when it caught fire, number
21    one.  I'm only --
22 QUESTIONS BY MR. GARDNER:
23 Q.  But you're the fire investigator.
24 A.  I'm -- I'm basing my opinion on --
25        MR. JONES:  Let him -- let him finish his

Page 382

1    answer.
2        THE WITNESS:  -- on what witnesses stated and
3    basically what the lab results stated --
4        MR. GARDNER:  Okay.
5        THE WITNESS:  -- and what I saw and the facts
6    that were presented to me at the scene.
7    QUESTIONS BY MR. GARDNER:
8    Q.  The lab results helped you figure out the sequence
9    of fire events subsequent to ignitial -- ignition
10   of propane, blue paint inside the heater tubes, and
11   blue paint on the heater tubes and reflectors.
12   A.  No.
13   Q.  You think -- and past that you -- you'll concede
14   that any combustion past that would be in no way,
15   shape, or form affected by Sharee Wells' opinions,
16   correct?
17       MR. JONES:  Objection to form.  It's a
18   compound question.
19       THE WITNESS:  The only thing that would affect
20   Sharee Wells' opinion was the presence of
21   combustible materials on the heaters and in the
22   heaters.  That's my opinion.
23   QUESTIONS BY MR. GARDNER:
24   Q.  On them?  I thought you only sent her materials --
25   A.  I -- I mean, yeah.  I -- she confirmed that that

Page 383

1    was -- the material that I sent to her inside was
2    -- was combustible.
3    Q.  Wait.  The only material you sent to her was from
4    inside --
5    A.  That I can confirm, yes, as a lab result.
6    Q.  You're -- you're -- isn't it true, the only thing
7    you ever sent to Sharee Wells was materials
8    collected from inside the tube heaters?
9    A.  Yes, sir.
10   Q.  Pipes.
11   A.  Yes.
12   Q.  Not the box.
13   A.  Not the box.
14   Q.  And did you inspect the inside of the three burner
15   boxes at the Rimkus facility in August of 2022?
16   A.  Yes, I did.
17   Q.  And did you see -- did you see blue paint inside
18   any of those?
19   A.  No.  And I wouldn't've expected to see blue paint
20   inside of it.
21   Q.  Why not?
22   A.  Not inside of the burner box 'cause it's gonna burn
23   all -- if there was anything in there, it was gonna
24   burn off, number one, because of the heat.  And --
25   Q.  I'll accept that.

Page 384

1    A.  -- because of the combustible materials.
2    Q.  Thank you.
3        MR. GARDNER:  I'll pass the witness.
4        MR. HEHNER:  Mr. Foster, my name is Jim
5    Hehner.  I represent Gas-Fired Products doing
6    business as Space-Ray.
7    QUESTIONS BY MR. HEHNER:
8    Q.  I think I understand your answers to Mr. Gardner's
9    questions.  But I'm going to ask them a little
10   different way.  I want to ask you about my client's
11   product.
12   A.  Uh-huh.
13   Q.  Do you have -- from your investigation, do you have
14   any information or evidence that would cause you to
15   believe that the tube heaters failed to perform or
16   operate properly?
17   A.  I have no information that would lead me to suspect
18   that the heaters didn't perform properly.
19   Q.  Okay.  That's what I thought your answer would be
20   based on your other answers.  Let me ask it a
21   slightly different way.  Do you have any evidence
22   or information that -- that there was any failure
23   to operate properly by the tube heaters that caused
24   the fire?
25   A.  No.  I do not have any reason to suspect there's a

Page 385

1    failure --
2    Q.  Okay.
3    A.  -- of the heaters.
4    Q.  You talked about photos with -- you remember where
5    the A cards were and the B cards and the C cards?
6    A.  Yes.
7    Q.  And you said those helped indicate where the
8    samples were taken from.  Do you have any
9    photographs, diagrams, videos, anything that shows
10   you actually in the process of retrieving the
11   materials that came from those sites and ended up
12   in the cans?
13   A.  No, I do not.
14   Q.  Okay.
15   A.  And the reason I do -- did not have any photo or
16   any --
17       MR. GARDNER:  He didn't -- hold on.  I object.
18   He didn't ask -- object to the answer.  He didn't
19   ask you the reason.
20       MR. JONES:  You're object --
21       MR. GARDNER:  -- again.
22       MR. JONES:  To be clear --
23       MR. HEHNER:  I'll ask him.  I'll just ask him.
24       MR. JONES:  Right.  But to be clear --
25   QUESTIONS BY MR. HEHNER:

97 (Pages 382 - 385)

Page 386

1 Q.  You have no photos; is that right?  No videos, no
2     diagrams, no photos.
3 A.  Not from inside of the -- when I was collecting --
4 Q.  The process of retrieval.
5 A.  Right.
6 Q.  And the -- and the -- and you wanted to tell me
7     why.  Why is it?
8 A.  The -- the reason why is because it was a -- it was
9     a kind of an afterthought, the day that I was
10    there.  They asked me to come up to retrieve the
11    heaters, is what they wanted me to do.
12 Q.  Okay.
13 A.  To preserve them.  And when I got there, I -- I
14    told them that I did not feel that the heaters
15    should be disturbed be -- until we have proper
16    examination of the heaters.
17 Q.  Okay.
18 A.  And then before I left, I thought, well, I maybe
19    should go ahead and collect the sample real quick,
20    so just to have that available.  Because I wasn't
21    sure when I could get back in order to preserve the
22    evidence that -- that was in the heaters.
23 Q.  I've heard -- I've heard reference to the words
24    sampling, gauze, swab, swabbing gauze, scraping.
25    Are the -- are you using all those terms

Page 387

1     interchangeably?
2 A.  Yeah.  I'm scraping it out with the gauze pad
3     basically is what I'm --
4 Q.  So you're not using a -- a device other than your
5     hand or a gauze pad.
6 A.  Correct.  Other than my fingers.
7 Q.  Okay.  You mentioned heaters in the fire stations.
8     You said that the fire -- some of the fire stations
9     you've worked it have very similar gas tube heaters
10    mounted up on the ceilings; is that right?
11 A.  I don't believe they're Space-Ray.  But I do
12    believe they have -- they're the similar-type
13    heaters that you can actually see the burners --
14 Q.  And that's --
15 A.  -- when they're burning, you can actually see the
16    flame inside of them.
17 Q.  That's my question.  Where do you see that flame?
18    Did you see it in the con -- what I -- my client
19    calls the control box, which you guys have called
20    the fire box or the heat box or something like
21    that.  It's the area where the -- where the fuel is
22    supplied.  Do you see that flame in that area?
23 A.  At the front of the control box is -- is your
24    terminology.
25 Q.  Is there an opening or a hole or a gap or a --

Page 388

1 A.  It's just --
2 Q.  -- space?
3 A.  -- you can see the flame, kind of like you would a
4     furnace.  It's closed up but you can look inside --
5 Q.  Okay.
6 A.  -- and see it burning.  So --
7 Q.  But you can't see any flame along the tube itself.
8     All you can see is an indication of heat like
9     blowing or something; is that right?
10 A.  Not in the reference to what I was referring to,
11    the fire --
12        MR. GARDNER:  Jim, you're talking about the
13    ones at his fire station.
14        MR. HEHNER:  Right.
15        MR. GARDNER:  Not the ones in the building.
16        MR. HEHNER:  That's correct.
17 QUESTIONS BY MR. HEHNER:
18 Q.  Yeah.  And what I'm saying is, you don't see open
19    flames in those tubes because they're solid metal.
20    You just see heat.
21 A.  Correct.
22 Q.  Okay.  You can't see heat.  You see indications of
23    heat 'cause they're glowing.
24 A.  Right.
25 Q.  Okay.

Page 389

1        MR. HEHNER:  That's all I have.  Thank you
2     very much.
3        MR. JONES:  Just a few.  I think you --
4        MR. HEHNER:  How much time do we have?  Can we
5     go off the -- I don't want to eat up time finding
6     out how much time we have.  So how much time do we
7     have?
8        THE VIDEOGRAPHER:  In a half hour we will be
9     at seven hours.
10        MR. HEHNER:  Okay.  Thank you.
11        MR. JONES:  Okay.
12 CROSS-EXAMINATION,
13 QUESTIONS BY MR. JONES:
14 Q.  Just to be clear on the numbers, how many fire
15    scenes have you been -- fire investigations have
16    you been involved in in your career?
17 A.  As -- as a fire investigator, I would say probably
18    around 2,000 to 2500.  I don't have an exact count
19    because it was -- been several -- over 44 years.
20    And we didn't really keep track of things years
21    ago.
22 Q.  And -- and in those investigations, what has your
23    role been?
24 A.  As a fire investigation -- investigator with the
25    fire departments, either volunteer-wise initially.

98 (Pages 386 - 389)

Page 390

1     And then I was also the shift investigator with the
2     City of Carmel Fire Department for ten years.
3  Q.  Have you been involved as a -- both as a -- like, a
4     facilitator at investigations, like you were in
5     this case, for all the other experts who showed up,
6     and as a participant?
7  A.  Yeah.  I've attended several joint scene
8     examinations and participated in them and also ran
9     a few of those in similar situations as this one
10    here where these -- where multiple parties are
11    involved.
12 Q.  Okay.  There was discussion earlier about another
13    expert in the case who says that he requested that
14    additional, I think it was demolition to be done.
15    And you can find it in his report, if I'm
16    misstating it at all.
17       But it's your testimony that -- that the
18    statement in Mr. Agosti's report about that is
19    false; is that correct?
20 A.  My statement of that is everybody has a chance to
21    request anything at the site to be collected
22    before -- as a site wraps up, everybody's back
23    together.  And my question to everyone is:  Is
24    there anything here that anybody wants us to
25    uncover or they want to evaluate or they want us

Page 391

1     to take as samples or evidence, whatever, speak now
2     or -- 'cause the scene's gonna be turned back over
3     to the owner.
4        And if there's something we need to do, if
5     it's -- if it's within reason.  You know, we can't
6     collect the whole building.  But if it's in reason,
7     we would -- we would obviously collect that item
8     for that person.
9  Q.  You -- you --
10       MR. HEHNER:  His answer was -- I'm going to
11    move to strike his answer as unresponsive to your
12    question.  You asked him if it was false and he
13    never answered.
14       MR. GARDNER:  I'll object.  It's also --
15       MR. JONES:  Okay.
16       MR. GARDNER:  -- inappropriate in Indiana or
17    federal court to ask another witness whether
18    somebody else said something false.
19       MR. JONES:  Okay.
20       MR. GARDNER:  You can use the word "incorrect"
21    if you want to.
22 QUESTIONS BY MR. JONES:
23 Q.  You don't agree with that statement that we were
24    just talking about --
25 A.  No --

Page 392

1  Q.  -- is that fair?
2  A.  -- I do not.
3  Q.  Okay.
4        MR. HEHNER:  Thank you.
5  QUESTIONS BY MR. JONES:
6  Q.  At some point in your investigation you spoke with
7     Fred Jones, right?
8  A.  Yes.
9  Q.  Can you tell us what Mr. Jones told you about his
10    walkthrough at the end of the day and -- and
11    whether or not -- what way -- well, let me back up.
12    Strike that question.
13       Tell me about your conversation with Fred
14    Jones and what you learned from him.
15 A.  What he told me was that on the day of the fire --
16    and he went through basically the timeframe of the
17    situation, like, whenever they were in there
18    working, when they did some welding earlier that
19    morning, and things of that nature.
20       And then at the end of the day they're
21    required, the last hour of the day, to clean
22    everything up, sweep the floor, check and be sure
23    everything's turned off.  And also the fact that
24    they -- to be sure that the facility is locked up,
25    turn the lights off, things of that nature.

Page 393

1        And then before he goes home, his job
2     basically, he walks around the facility to be sure
3     that that -- and he went into this, the paint area,
4     to double check to be sure all that stuff was done.
5  Q.  Is it your understanding Fred Jones was the last
6     person to walk through the paint -- what we've been
7     calling the paint bay?
8  A.  Yes.  That's the last person that I have known
9     to -- prior to the fire.
10 Q.  Okay.  Based on what you learned -- well, how did
11    the information you learned from Fred Jones about
12    his walkthrough impact your investigation and
13    conclusions, if at all?
14 A.  Well, one thing that it did help was the fact that
15    there was nothing running or nothing in operation
16    inside the facility, other than obviously the
17    electricity going to the heaters for the fan blower
18    motors and things of that nature.  The lights were
19    turned off.  And as for as any electric --
20    electrical motors, things like that, or fans, they
21    were all in the off position.
22 Q.  Did you follow the scientific method throughout the
23    course of your investigation?
24 A.  In every investigation I do, and including this
25    investigation, the scientific method is always

99 (Pages 390 - 393)

Page 394

1  followed. And sometimes those -- as for as the
2  steps are concerned, it may not always be step two
3  versus step three and three versus four. Sometimes
4  we get information initially.
5      And in this particular case I was given
6  information prior to the fire that we just tuck
7  away and put on a shelf, so to speak, until we can
8  use that as a potential hypothesis. And if all the
9  evidence points to where that could be a -- the
10  potential ignition source or cause of the fire,
11  then as long as it's a -- comes underneath that
12  probable cause to suspect that, then we would
13  select that as a potential or as the probable cause
14  of the fire, based on all the evidence put together
15  and facts.
16 Q.  Sure. And you mentioned earlier that you often,
17     throughout your work, reference NFPA 921; is that
18     right?
19 A.  Yes, I do.
20 Q.  Did you reference NFPA 921 throughout the course of
21     this investigation at effort?
22 A.  I didn't obviously have the book available 'cause
23     I'm knowledgeable with the book. I've had several
24     classes. And training obviously shows that you
25     have -- and questions in regard to NFP 921. But I

Page 395

1  do read it periodically just to keep up on the --
2  some of the information as well as -- because it is
3  a unit that we need -- or a book that we use to
4  guide us in our investigations. And every
5  investigation is from day one that I've ever
6  done -- I guess not from day one because it
7  actually in '79 there was no NFPA 921 --
8 Q.  Sure.
9 A.  -- but since it came out and was involved in the
10     fire investigation world, since that day one we
11     have used that as a guide.
12 Q.  Do -- do you have any recollection whether or not
13     in this particular case, and in this particular
14     investigation, if at any point you would have
15     referenced NFPA 921?
16 A.  I've all -- obviously referenced the -- I've read
17     the certain sections of the book and so forth and
18     things of that nature. And in -- in one capacity I
19     noticed that they -- the -- Mr. Agosti, whatever,
20     referenced art mapping and other things that may be
21     used. And in 2017 that was still in the -- the
22     book. But actually in 2021 edition, they took that
23     out of the fire origin category and put it under
24     fire --
25     MR. GARDNER: Cause.

Page 396

1      THE WITNESS: Well, not fire cause. Fire
2  spread or fire -- I can't think of the name of it.
3      MR. JONES: That's -- that's okay. That's
4  okay.
5 QUESTIONS BY MR. JONES:
6 Q.  Quick question --
7 A.  Patterns.
8 Q.  -- on the MSDS sheets for this -- that we were
9     looking at earlier. We've -- we've looked at a
10     number of MSDS sheets in this case. One of them --
11     and I don't know what exhibit number it was, but it
12     was for the Blue Sheboygan paint. Do you remember
13     looking at that?
14 A.  Yes.
15 Q.  Okay. Do you have any reason to doubt the
16     representations the manufacturer made in that MSDS
17     sheet?
18 A.  No, I do not. The same information was actually on
19     the container itself that contained the paint.
20 Q.  And -- and just to clarify. There was some
21     discussion about the level of certainty that you
22     have on your conclusions in this case. Is it your
23     testimony that you -- you hold the opinions -- or
24     strike that.
25      The opinions you hold in this case are held to

Page 397

1  a degree of fire science certainty; is that
2  correct?
3 A.  Yes.
4      MR. GARDNER: Objection, asked and answered.
5  Furthermore, Plaintiff's counsel have the option to
6  contact him after seeing his report to get
7  clarification, yet they released it without any
8  statement like that initially.
9      MR. JONES: What -- what exactly is your
10  objection? Asked and answered?
11      MR. GARDNER: That's part of it, yeah.
12      MR. JONES: Okay. What was the -- all of the
13  other commentary? Is that ...
14      MR. GARDNER: Form of the -- form of the
15  question.
16      MR. JONES: Okay.
17 QUESTIONS BY MR. JONES:
18 Q.  You were shown on exhibit -- Defendants' Exhibit G,
19     Page 7 -- I'm gonna put that in front of you.
20     You've got it still in front of you?
21 A.  Yeah.
22 Q.  It's part of your initial report. And we were
23     looking at photograph three. And you were asked to
24     identify in both photograph three and photograph
25     four where you see the paint residue that you

Page 398

1    observed the date that you took those photographs.
2    Do you remember that?
3  A.  Yes.
4  Q.  During a break I showed you these photos on a
5    digital format with increased brightness.  And when
6    you observed that, were you able to more clearly
7    see the paint residue that you were referencing
8    earlier on both photograph three and photograph
9    four?
10  A.  Yes, sir.
11  Q.  So it's -- is it your testimony that photograph
12    three and photograph four, as represented in
13    Exhibit G, Page 7 -- it -- are you saying that it
14    doesn't allow you to -- the way these are printed
15    don't allow you to as clearly see the -- the paint
16    residue that you observed the day that you took the
17    photographs?
18  A.  Yes.
19  Q.  Okay.  The last thing.  We were looking through
20    several pictures under Defendants' Exhibit NN.  And
21    these were several photos that Mr. Gardner told you
22    Rimkus took in the -- I think it was in the last
23    couple of weeks.  Do you remember that?
24  A.  Yes.
25  Q.  Okay.  And all of those photographs that you were

Page 399

1    asked about, those were all taken outside of your
2    presence, correct?
3  A.  Yes.
4  Q.  You were not involved in any subsequent lab exam in
5    the last couple of weeks, right?
6  A.  No, I was not.
7       MR. JONES:  Okay.  Those are all the questions
8    I have.
9       MR. GARDNER:  I just have couple really quick.
10  REDIRECT EXAMINATION,
11  QUESTIONS BY MR. GARDNER:
12  Q.  Chapter 18 in NFPA 921, either Edition 17 or 21, is
13    entitled Origin Determination, isn't it?
14  A.  Uh-huh.  Yes, sir.
15  Q.  And there's an introductory Paragraph 818.1.  I'm
16    sure you've read it many times, haven't you?
17  A.  I haven't totally read the '21 book at this point.
18    But --
19  Q.  I'm --
20  A.  -- '17 I have.
21  Q.  Seventeen, okay.
22       I'm gonna read this, and tell me if you agree
23    with it.  Quote, The point of origin is defined as
24    the exact physical location within the area of
25    origin where a heat source and the fuel interact,

Page 400

1    comma, resulting in a fire or explosion.  Do you
2    agree with that?
3  A.  I agree with the point of origin definition, yes.
4  Q.  Continuing:  Quote, The origin of a fire is one of
5    the most important hypotheses that an investigator
6    develops and tests during the investigation.  Do
7    you agree with that?
8  A.  Yes.
9  Q.  Quote, Generally, comma, if the origin cannot be
10    determined, comma, the cause cannot be determined,
11    comma, and generally, comma, if the correct origin
12    is not identified, comma, the subsequent cause
13    determination will also be incorrect.  Do you agree
14    with that?
15  A.  Yes.
16  Q.  Did you prepare an origin matric [sic] analy --
17    analysis in this case?
18  A.  No.
19  Q.  Did -- did you measure char depth of anything in
20    this case?
21  A.  No.
22  Q.  So you did not prepare a depth-of-char diagram,
23    right?
24  A.  In this particular fire there's no indication of a
25    char depth would be something you could use.

Page 401

1    Because most of it was noncombustible material.
2    Wasn't wood, which usually chars.  You cannot
3    measure char on metal.
4  Q.  Did you measure any of the char on the wood that
5    you have told us you think might have been one of
6    the things that combusted during this --
7  A.  No, I did not measure any char.
8  Q.  So did you not do a depth-of-char analysis,
9    correct?
10  A.  No, I did not.
11  Q.  Mr. Jones asked you some questions about how many
12    fire scene investigations you've done.  I think you
13    said roughly 2,500?
14  A.  Yes, close.
15  Q.  And you've written in excess of four -- 1,400
16    cause-and-origin reports, right?
17  A.  Yes.
18  Q.  Okay.  How many of those investigations or reports
19    involved as -- as a cause or origin of the fire a
20    closed infrared tube heater, besides this case?
21  A.  I've only had one other fire that involved the
22    infrared.  I don't know whether -- it was not
23    really totally closed, but it was a heater that
24    caused the fire in a -- a garage --
25  Q.  What year?

Page 402

1  A.  -- workshop garage, so to speak.  I don't know when
2     that was.  It has been a -- long time ago.
3  Q.  So it wasn't at -- wasn't it -- if it was a long
4     time ago, are we talking about one of those styled
5     like the Mo -- preexisting Modine heaters as
6     opposed to a closed infrared --
7  A.  When they -- when it first came out, the tube
8     heater, this particular tube heater was actually
9     installed too close to combustibles, which was what
10    the -- the findings of the -- of the fire was.
11 Q.  That's not your opinion in this case.
12 A.  No, it's not.
13 Q.  Okay.  There -- you probably remember seeing in the
14    Space-Ray installation manual a couple of pages
15    about distance requirements?  In other words, where
16    my -- my client's installer should locate the three
17    Space-Ray heaters in -- inside of building number 1
18    relative to the height from the floor, the space
19    between the top of the heater deflector shields in
20    the ceiling and the side walls.
21 A.  Yes --
22 Q.  You remember reading that?
23 A.  -- there is.
24 Q.  You have no basis to contradict that my client
25    followed those distance spacings as recommended by

Page 403

1     the manufacturer to combustibles, do you?
2  A.  I don't have any reason to --
3  Q.  Okay.
4  A.  -- dispute that, no.
5  Q.  How many of your in excess of 1400 cause-and-origin
6     expert reports involved noncombustible water-based
7     paint --
8        MR. JONES:  Objection to foundation.
9  QUESTIONS BY MR. GARDNER:
10 Q.  -- as a -- as a fuel source?
11 A.  I've had several -- not -- as for as the paint?
12    I -- I don't know that it actual being water based
13    necessarily.  I can't -- I can't generally say that
14    anything water based has been related to a fire
15    cause and a fire spread.
16 Q.  So, in other words, in the 2500 investigations
17    and -- and in the in excess of 1400
18    cause-and-origin reports, you've never determined,
19    other than in this case, that one of the
20    combustible fuels was dry water-based paint, have
21    you?
22 A.  I have not.  And that's based on the -- on the
23    facts that I came -- came on as for as the
24    paperwork and the manufacturer's statements.
25 Q.  If I asked you this earlier, I apologize.  Thomas

Page 404

1     made me think of it.
2        But you did not, and neither did Rimkus,
3     process the store -- the area of the storage room
4     in the most extreme south end of the building
5     number 1 shown on Defendants' Exhibit Z-2 -- Z-2,
6     correct?
7  A.  We didn't --
8        MR. JONES:  Objection to form.
9        MR. GARDNER:  You didn't process that --
10       MR. JONES:  You can answer.
11       MR. GARDNER:  -- as part of the space.
12       THE WITNESS:  We did not process that --
13    process that area.  And no one present at the scene
14    requested that area be processed.
15 QUESTIONS BY MR. GARDNER:
16 Q.  Based on your memory, huh?
17 A.  No.  I mean, that's -- that was for facts.  That's
18    not just my memory.
19       MR. GARDNER:  That's all I've got.
20 QUESTIONS BY MR. HEHNER:
21 Q.  Have there -- sir, have there been investigations
22    where you could not determine the origin of the
23    fire?
24 A.  Yes.  There has been information --
25 Q.  Have -- have there been investigations where you

Page 405

1     could not determine the cause of the fire?
2  A.  Yes.
3  Q.  Is it common?
4  A.  Fairly common --
5  Q.  Okay.
6  A.  -- yes.  It's not always common.  But it's -- it's
7     something that, obviously, if you come up with a
8     couple of -- of hypotheses that you can't really
9     rule out either one without a certain -- certain
10    degree of certainty, I guess you could say, then
11    you would have to list it as an undetermined fire,
12    which is no longer obviously being utilized by
13    NFPA.  But --
14 Q.  This may not be possible.  But is there -- can you
15    give me a percentage?  Is it half the time?  Is
16    it -- is it 25 percent of the time?  Is it -- do
17    you have an opinion?
18 A.  I think in -- in the past it probably was about
19    half the time.
20 Q.  All right.
21 A.  But now it's becoming more -- less than that
22    because of the fact -- because of videos and things
23    like that.  And a lot of -- a lot of fires anymore
24    are basically -- almost video is a good thing.  So
25    it's be -- we get surveillance videos, security

Page 406

1    videos, and things like that.
2        MR. HEHNER:  That's all I have.  Thank you
3    very much.
4        MR. JONES:  Good?
5        MR. HEHNER:  Anybody else?
6        MR. JONES:  I'm good.
7        MR. HEHNER:  Off the record.  We done?
8        MR. GARDNER:  Yeah.
9        MR. JONES:  Good.
10       THE VIDEOGRAPHER:  This ends media six and
11   concludes the deposition.  The local time is
12   6:39 p.m.  We are off the record.
13       (A discussion was held off the record.)
14       THE STENOGRAPHIC REPORTER:  Do you want
15   signature?
16       MR. JONES:  We do, yes.
17       THE STENOGRAPHIC REPORTER:  And your orders.
18       MR. HEHNER:  Electronic for me with -- with
19   exhibits.
20       THE STENOGRAPHIC REPORTER:  Same?
21       THE VIDEOGRAPHER:  Similarly I need to know
22   wants videos.
23       MR. HEHNER:  I'm sor -- I do not want a video.
24   I don't know who does.
25       MR. JONES:  I'll get back to you.

Page 407

1        THE VIDEOGRAPHER:  You have a card.
2        MR. JONES:  Yeah.  So no for now.
3        MR. GARDNER:  I have to get back to you too.
4        THE VIDEOGRAPHER:  You've got my card, and it
5    has the case number when you call to order.
6        THE STENOGRAPHIC REPORTER:  And you want
7    electronic, Marty?
8        MR. GARDNER:  Yes.
9        MR. JONES:  Same.
10
11       AND FURTHER DEPONENT SAITH NOT.
12            (6:42 p.m.)
13
14   _____
15       JAMES P. FOSTER, CFI, CFEI, CVFI
16
17
18
19
20
21
22
23
24
25

Page 408

1    STATE OF INDIANA    )
2                 ) SS:
3    COUNTY OF HAMILTON  )
4
5        I, Lisa C. Pierce, a Notary Public in and for
6    the County of Hamilton, State of Indiana at large,
7    do hereby certify that JAMES P. FOSTER, CFI, CFEI,
8    CVFI, the deponent herein, was by me first duly
9    sworn to tell the truth, the whole truth, and
10   nothing but the truth in the aforementioned matter;
11       That the foregoing video deposition was taken
12   on behalf of the Defendants at Lewis Kappes, One
13   American Square, Suite 2500, Indianapolis, Marion
14   County, Indiana, on January 24, 2023, commencing at
15   the hour of 11:16 a.m., pursuant to Rules of
16   Applicable Procedure;
17       That said video deposition was taken down in
18   stenographic notes and afterwards reduced to
19   typewriting under my direction, and that the
20   typewritten transcript is a true record of the
21   testimony given by said deponent; and thereafter
22   presented to said deponent for his signature;
23       That the parties were represented by their
24   aforementioned counsel.
25       I do further certify that I am a disinterested

Page 409

1    person in this cause of action; that I am not a
2    relative or attorney of any party, or otherwise
3    interested in the event of this action, and am not
4    in the employ of the attorneys for any party.
5        IN WITNESS WHEREOF, I have hereunto set my
6    hand and affixed my notarial seal this 1st day of
7    February, 2023.
8
9
10
11
12
13        N O T A R Y   P U B L I C
14
15
16   My Commission Expires:
     March 14, 2029
17
18   County of Residence:
     Hamilton
19
20
21
22
23
24
25

103 (Pages 406 - 409)

Page 410

1  Thomas Jones, Esq.
2  tjones@lewiskappes.com
3          February 1, 2023
4  RE: Republic Services Of Indiana Limited Partnership v. Coe
5    1/24/2023, James P. Foster , CFI, CFEI, CVFI (#5675427)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 411

1  Republic Services Of Indiana Limited Partnership v. Coe Heating
2  James P. Foster , CFI, CFEI, CVFI (#5675427)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 James P. Foster , CFI, CFEI, CVFI            Date
25

Page 412

1  Republic Services Of Indiana Limited Partnership v. Coe Heating
2  James P. Foster , CFI, CFEI, CVFI (#5675427)
3       ACKNOWLEDGEMENT OF DEPONENT
4    I, James P. Foster , CFI, CFEI, CVFI, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 James P. Foster , CFI, CFEI, CVFI            Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15     _____ DAY OF _____, 20___.
16
17
18     _____
19     NOTARY PUBLIC
20
21
22
23
24
25

104 (Pages 410 - 412)

**&**

**&**   1:7 2:10,15
5:13,17 6:5
83:11

**0**

**00108**   1:3 5:16
**00632**   306:20
309:22

**1**

**1**   34:24 55:9
56:7 57:21,22
58:6,21 59:10
59:18 60:5,12
62:5 63:4 64:2
64:18 72:24
76:23 107:10
107:15 113:4
113:17 114:12
116:13 138:3
147:4,10
152:22 154:10
156:1 158:25
159:21,23
160:22 161:10
162:6 163:13
163:20 164:13
165:10 166:2
167:15,22
168:4,5,14
169:3 176:4
178:7 179:18
181:1 195:25
198:19 212:9
216:5,10,21

217:11 222:1
232:20 264:13
265:22 267:16
272:10,17
274:5 277:17
279:19 280:4
294:20 313:8
316:8 333:1
402:17 404:5
410:3
**1,000**   88:18
89:14
**1,400**   401:15
**1/24/2023**
410:5
**10**   134:9 135:2
158:4 235:12
235:18 239:12
290:11,20
305:18 323:9
**100**   207:10
337:2,3,8,24
338:2,6
**101**   333:4,10
334:19 337:11
**1033**   70:2,8
92:3
**10:00**   60:22
**10:50**   183:7
**10th**   62:24 63:2
77:23,24 78:5
78:12,13,19
113:10,12
148:2,4 238:23
270:3 291:6,11

291:20 292:15
294:12 297:3
297:21 304:2
305:1 307:17
309:3 311:14
353:9,25
364:18 373:4
373:11
**11**   158:16
184:10 265:25
266:13
**112**   341:25
342:1
**114**   342:10,19
**115**   342:25
**116**   319:24
345:7
**117**   2:11 345:3
345:15 346:5
**11:00**   44:8,15
**11:01**   44:17
**11:16**   1:20 5:1
5:4 408:15
**11th**   313:16
**12**   138:3
306:21 320:16
346:1
**123**   16:10
**124**   347:24
348:6 352:9,14
**125**   352:20
**127**   353:11
**128**   353:18
**12:41**   84:10

**12:52**   84:14
**13**   263:18
321:4 352:17
**137**   4:5
**14**   36:20
128:11 175:7
175:11,17
259:24 409:16
**14,000**   7:19
**140**   230:8,11,11
230:19
**1400**   36:12
37:8 204:18,21
255:20 403:5
403:17
**15**   4:15 175:12
175:17 280:1
**150**   87:20 88:1
89:16
**16**   11:24
239:23 241:4
331:4,14
333:14,18,21
342:4
**17**   94:11
278:24,25
399:12,20
**17.3.1.1.**   206:11
**18**   12:4 36:24
241:17 374:18
399:12
**18.4.6**   374:19
**188**   4:11
**18th**   39:20
72:25 73:5,23

74:7 93:8
121:6 126:24
198:19 355:20
**19**   36:21
244:19 245:23
**1933**   69:24
**195**   87:12
90:24
**1955**   7:7
**1965**   183:1
**1979**   36:25
37:5 70:15,21
70:25
**19th**   26:15 44:6
44:16 60:6,12
60:17,19 62:5
64:3 71:12
76:21 90:22
106:24 159:1
176:5 190:9
191:1 231:7
232:20 373:10
**1:00**   45:24
**1:21**   1:3 5:16
**1st**   409:6

**2**

**2**   2:11 4:5
54:19,25 55:9
56:18 57:4,15
73:2 76:22
116:13 126:15
127:8 139:1,1
139:13 140:8,9
152:22 153:19
169:14 170:6

171:7 189:7,9
214:13 215:14
218:1 267:5,16
277:10 278:5,9
278:11 279:14
291:23 316:8
321:22 324:16
404:5,5
**2,000**   338:17
389:18
**2,500**   401:13
**20**   4:6,7 44:6
53:8 184:4
234:8 246:16
412:15
**2000**   11:22
17:14 36:20
**2014**   4:14
**2016**   12:9
**2017**   93:4,13
374:2,15
395:21
**2018**   9:15 12:3
12:6 38:24
85:1,2
**2019**   4:12 22:7
22:8 26:17
39:17,24 44:16
45:22 48:14
51:11 52:12
53:9,22 55:15
57:20 59:17
60:6,13,17
62:6,24 63:2,2
64:3 66:17

67:18 68:6
69:9 71:13
74:16 77:24
78:5,12,19
80:13 87:11
90:4,23 93:4
106:24 113:12
121:6 126:14
127:13 147:5
148:3,4,5
159:1 176:5
190:8,10 191:1
194:11 198:19
201:18 231:7
232:20 238:23
243:18 270:3
283:9 290:11
290:20 291:6
291:11,20
292:16 294:12
297:3,21 304:2
305:1 307:17
309:3 311:14
323:9 353:9,25
364:18 373:4,4
374:11
**2020**   9:15,17,20
9:21 10:14,18
14:8 17:15
18:15 77:17,19
85:20 132:15
133:23,24
134:7 135:3,9
138:6,16 148:2
160:6,15 161:7

169:17 180:10
181:14 182:13
266:13 299:6
300:17 313:18
315:17 321:23
324:17
**2021**   7:15 9:12
93:8,11 374:8
395:22
**2022**   4:15,17
10:20 11:3
22:8 39:21
72:25 74:7
93:8 126:24
165:4 203:10
262:1 283:10
341:14 355:21
364:6 366:20
367:1 368:24
370:8,15
371:22 374:14
383:15
**2023**   1:19 5:2,4
408:14 409:7
410:3
**2029**   409:16
**20th**   44:6,7,10
44:22 45:21
48:14 51:10
52:12 53:22
55:15 57:20
59:17 63:2
68:25 69:9
75:13 76:21
87:11 147:4,19

373:4
**21**  70:7 101:13
399:12,17
**211**  4:16
**21173**  409:12
**22**  73:6,24 91:3
91:5,10 94:11
263:17 368:21
**225**  2:15 87:23
**235**  4:16
**24**  1:19 5:2
177:6 178:18
179:11 182:4
194:14 258:10
408:14
**248**  4:17
**24th**  5:4
**25**  89:10,18
171:3 405:16
**25,000**  85:15
**2500**  1:17 2:5
389:18 403:16
408:13
**26**  353:1
**270**  4:13
**271**  4:14,14
**276**  4:15
**28**  194:7
271:13
**281**  4:15
**2:33**  189:2
**2:45**  189:5

**3**

**3**  4:4,12 44:17
47:13 48:11
50:20 52:3
55:9 56:2,6,12
56:14 117:2
126:15 143:2
152:22 159:23
173:18 198:8
202:5 243:17
265:24 268:1
277:11,17
278:4,24 313:9
322:1 350:10
350:12 358:18
**3,000**  228:17,19
**3.3.131**  105:1
**3.3.42**  97:23
**3.3.58**  99:21
**3.3.80**  101:19
**3.3.95**  101:7
**30**  195:15
221:17 278:20
279:23 410:17
**311**  4:17
**315**  4:18
**317**  4:18
**317.639.1210**
2:6
**317.639.4882**
2:6
**31st**  262:1
263:17
**32**  7:18 270:18

**321**  4:19
**324**  4:19
**325**  4:20
**34**  4:11
**341**  4:20
**351**  4:12
**36**  262:3,5
**384**  3:4
**389**  3:5
**399**  3:7
**3:00**  45:23
50:14 51:8
52:12
**3:59**  270:11
**3rd**  39:17,24
67:18 68:6
71:14,16 74:16
77:17 90:4
93:3 126:14
127:13,25
132:15 134:7
135:9 138:5,16
160:6,15 161:6
169:17 180:10
181:14 182:13
184:4 201:18
202:24 243:18
315:18

**4**

**4**  55:9 56:2,6
56:12,14
152:22 182:12
198:8 218:14
277:17 280:1
282:3 283:19

316:8 318:2
355:21 356:6,7
357:10 364:20
**4.5**  251:24
**4.5.2.**  254:21
**4.5.3**  255:10
260:18
**404**  3:7
**43**  128:12
190:9,11 191:3
193:15,20
196:1 230:12
**44**  11:18 12:14
389:19
**46077**  7:9
**46204-2137**
2:16
**46282**  2:5 5:18
**46530**  2:12
**47**  4:4 194:5
233:2 234:11
**48**  277:5,6,6
**4:00**  46:13
48:13 50:14
111:14
**4:13**  270:14
**4th**  133:23
190:8 194:11
315:17 324:16

**5**

**5**  184:1,14
278:25 290:6
294:7,10 296:1
297:21 299:19
300:12 315:21

**[5 - able]**                                                                          Page 4

315:24 316:8
**5-10**  291:9,10
**50**  88:3 233:22
　234:11,15
　253:14
**50s**  45:14
**51**  204:10,12
　251:21 253:16
**54**  4:5
**55**  168:25
　169:4,11
　240:14
**5675427**  410:5
　411:2 412:2
**574.233.6035**
　2:12
**59**  263:17
**5:10**  328:4
**5:14**  328:8
**5:55**  370:1

### 6

**6**  3:3 220:4
　221:17 234:18
　290:19,25
　291:1,2 292:9
　294:7 297:16
　298:19 299:25
　300:12 316:14
　318:10 323:13
　366:13 368:24
**6-189.9**  4:14
**60**  172:18,18,24
　233:9 264:13
　278:20 279:24
　306:1

**602**  310:17
**603**  303:10
　304:4 305:13
　305:17 307:10
　310:14,18,19
　345:24 346:18
**6224**  282:12
**6231**  4:15
**632**  305:9,12
　306:1,8 307:10
　310:12 346:2
　347:2,20
**6624965**  4:10
**67**  4:12 7:5
**6:05**  370:4
**6:39**  406:12
**6:42**  407:12
**6th**  133:24
　135:3 299:6
　300:17 321:23

### 7

**7**  4:11 34:24
　90:21 184:20
　185:19 186:17
　290:24 300:16
　318:13 324:3
　361:1,3 362:16
　363:11 364:4
　364:22 366:13
　397:19 398:13
**7-3**  7:7
**70**  172:15
**72**  4:4
**75**  172:15
　233:9,16

**7850**  7:9
**79**  395:7

### 8

**8**  318:20 319:9
　320:1
**812.382.8559**
　2:16
**818.1.**  399:15
**86**  338:9
**87**  4:10
**88**  337:7,9,14
　337:22,23
　338:2,3,4,8,11

### 9

**9**  60:17 70:8
　72:24 94:18
　146:13 155:12
　282:14 303:6
　304:5 307:8
　320:7 324:2,6
　324:8 325:1,3
**9-1-1**  153:2
　154:1
**90**  144:22
**921**  66:23
　67:14 69:25
　70:8 81:2 82:2
　82:21 91:23
　92:14 93:9,12
　94:18,23 95:6
　95:10,15 96:9
　97:5,8,23 99:4
　99:21 100:17
　101:7,18 105:1

251:24 253:9
254:21 260:18
261:17 293:8
293:13 302:21
316:17 344:1,4
373:24 394:17
394:20,25
395:7,15
399:12
**93**  329:15,16
**94**  325:15
　327:23 328:10
　330:12 331:22
**96**  332:6
**97**  331:23
　332:1,2,5,10
**98**  332:14
**99**  329:19
　332:21
**9f**  94:18

### a

**a.m.**  1:20 5:1,4
　408:15
**aa**  4:16 211:3,4
　211:5,7,10
　212:6 213:7
　214:13 215:14
　218:14 234:18
**abbreviation**
　299:11
**ability**  13:22
**able**  30:4 32:3
　43:3 50:1
　61:21 63:12
　69:1 102:15

111:6 198:22
238:1 260:21
267:23 272:20
274:22 398:6
**above** 174:2,11
175:2,3,3
215:22 280:12
410:6 412:7
**acc** 27:20
**accept** 383:25
**acceptable**
260:22
**access** 22:23
27:20 63:22
275:16,18,20
**accidentally**
202:19
**accommodate**
13:18
**account** 199:1
235:1 239:13
**accumulate**
224:24
**accumulated**
128:17 221:7
289:9
**accumulating**
144:25
**accuracy**
109:16 410:9
**accurate** 70:3
185:11
**accurately**
138:14

**acetylene** 59:18
59:21 60:4
225:7,16
226:24 228:12
234:22
**acknowledge...**
412:3
**acknowledg...**
410:12
**acloss** 152:10
**act** 284:10
**action** 5:22
409:1,3
**activated**
232:21 376:4
**active** 374:5
**activities** 55:16
66:25 314:5
**actual** 143:24
249:5 403:12
**actually** 11:20
16:25 37:9
43:17 44:8
45:23 49:5
50:3 51:22
64:8 71:12
85:15 86:2,23
87:2 94:2
118:4,6 121:17
128:20 133:4
143:4 156:16
182:5 193:25
200:11 204:13
217:9 222:9
225:25 233:18

284:10,18
299:25 301:22
304:14 305:14
333:2 334:4
377:18 385:10
387:13,15
395:7,22
396:18 402:8
**add** 135:21
251:4 258:1
**addition**
327:22
**additional**
63:11 73:6,13
73:17 74:12
85:15 86:2
127:23 134:16
191:7 322:21
390:14
**additions** 412:6
**additives**
229:22
**address** 7:8,8
7:17 16:10
53:14 68:6,15
68:16,17
**addressed**
254:5
**adequately**
363:1
**adhered** 122:24
125:3
**adjuster** 29:3
**adopted** 80:24

**advised** 76:10
77:3 79:25
**aerial** 4:4,5
**affect** 13:22
175:24 176:1
179:6 256:11
309:16 382:19
**affected** 207:8
209:10 382:15
**affects** 177:2
**affiliations** 6:2
**affixed** 409:6
**aforemention...**
408:10,24
**afternoon**
45:23 46:13
51:9
**afterthought**
386:9
**ago** 11:7,14,15
11:19 14:1,17
16:6,13 21:10
28:17 303:7
389:21 402:2,4
**agosti** 22:3,4
25:18 395:19
**agosti's** 22:11
23:9 49:11
390:18
**agotti** 22:1
**agree** 5:9 69:23
96:9 97:4,8
98:10 99:3,21
101:2,6,18,25
103:3 104:2

105:5 110:13
110:17,23
128:1 163:8
173:22 205:3
205:16,22,24
206:7,24 207:2
252:16 253:1
254:24,25
255:3,13,23
256:1 313:8
359:2 375:1,6
375:12 391:23
399:22 400:2,3
400:7,13
**agreed** 309:19
**agreement**
119:6
**agrees** 100:3,5
100:13,23
**ahead** 53:19
61:12 62:16,17
63:9 68:22
72:22 125:22
198:7 209:19
227:18 237:23
308:14 309:19
322:18,22,25
329:10 344:18
350:19 365:14
378:23 386:19
**aiming** 214:15
**air** 1:7 5:14 6:5
64:12 76:8
83:12 96:23
120:20 128:11

141:10 144:23
159:13 168:3,4
168:5,9,10,15
176:16 180:20
181:22 195:19
196:2,5,6
197:3,9,12,16
198:16 199:17
231:2 259:24
**airless** 159:6,10
178:20
**airport** 7:21
233:4
**aisle** 47:4
**al** 5:14
**alerted** 152:12
**alleged** 139:15
**allegedly**
212:20
**allotted** 410:20
**allow** 176:20
259:23 398:14
398:15
**allowed** 38:18
137:9 191:17
**allows** 195:8
**alternate**
110:18
**alternative**
74:24
**alternator**
294:1
**amended** 4:6,7
20:9

**american** 1:17
2:4 408:13
**amount** 69:2,5
89:13 133:3
138:21 186:18
**amounted**
378:5
**amounts**
138:23
**analy** 400:16
**analysis** 98:7
101:21 110:20
252:12 374:19
374:22,25
375:16 400:17
401:8
**analyzed**
127:24
**ang** 179:3
**angle** 320:23
**answer** 12:25
13:18 32:11
55:16 57:6
82:3,8 89:3
94:6 95:24
102:19 104:1
108:15 111:9
153:11 227:16
233:8,10 238:3
248:6 254:17
263:8,11
264:10 273:20
287:3,4 296:6
310:14 317:1
336:19 340:13

341:8 365:7
367:12,21
378:21 379:17
382:1 384:19
385:18 391:10
391:11 404:10
**answer's** 13:4
**answered**
56:14 154:13
188:20 213:3
213:24 232:3
244:3,6 254:15
259:10 262:24
274:10 287:7
287:11 289:25
330:16 347:22
355:5 377:5
379:25 380:1
391:13 397:4
397:10
**answering** 82:4
93:20 102:20
354:22 367:19
367:20
**answers** 82:5
347:4 379:18
384:8,20
**anti** 343:12
**anticipated**
312:24
**anybody** 26:7
48:16 52:7
78:7 115:8,23
183:15 187:11
202:3,4 225:3

225:7 245:9,10
390:24 406:5
**anymore**  35:11
83:5 125:5
368:25 405:23
**anytime**  284:15
**anyway**  210:1
272:11 276:19
**apart**  330:25
**apologize**  24:2
42:22 54:18
57:16 69:20
91:10 143:9,16
149:13 158:2
246:24 259:3
276:16 307:8
313:21 403:25
**apparently**
39:3 143:8
202:23 211:23
**appear**  33:4,7
50:21 138:7
360:13
**appearance**
5:25
**appearances**
6:1 19:23
96:11
**appeared**  263:4
**appears**  139:7
141:2,2 161:2
215:21 217:4
291:22 318:8
319:1 321:8
325:10

**appended**
412:7
**applicable**  1:20
408:16 410:8
**application**
252:14
**applied**  94:15
109:7 247:13
**appreciate**
20:14
**approach**
91:21
**appropriate**
110:20 273:15
314:6
**approval**
299:12,13
**approve**  299:10
**approved**
299:15,18
**approximately**
13:25 17:11
48:13 58:4
66:15 68:20
88:18 111:21
**arc**  375:16,17
**architectural**
206:15
**area**  15:13
31:25 32:3
47:24 48:2,5
56:19 58:17
76:11 95:10,13
111:14 112:5
116:23,24

117:11 131:9
133:10,11
139:18,19
140:23 180:23
181:6,6 201:11
207:9 209:12
223:21 226:9
239:16,16,17
241:14 242:24
243:1 245:6,9
245:10,13,16
245:18 246:4
246:14 250:5
295:14 303:24
305:14 306:7
310:4 320:13
327:9,10,12
330:23,23
335:22 346:25
347:8 361:8
362:8 365:1,21
369:3 375:5
379:7 381:7
387:21,22
393:3 399:24
404:3,13,14
**areas**  86:5
98:17 121:16
170:2 201:12
217:8,10
236:24 237:12
238:17 251:9
309:17 327:7
327:11 369:5
379:13,15

**argino**  115:2
**arizona**  68:14
**aromatic**  126:7
126:10,11
223:23
**aromic**  126:7
**arrival**  43:19
**arrived**  50:8,12
51:2 52:11
**arson**  19:19
**art**  395:20
**aside**  25:20,21
36:3 75:7
89:17 314:4,7
**asked**  9:3 28:25
32:17 48:25
49:2 50:2 51:5
70:20 74:5
75:14 83:8
92:6 103:9,10
114:7,8,8
132:16 154:12
186:11 187:13
187:15 188:20
212:11,16
213:3,23 232:3
244:3,6 246:10
254:15 259:9
262:24 274:9
279:16 289:24
313:5 330:15
340:16 347:22
355:5 357:20
367:5,15,16,17
377:4 379:25

386:10 391:12
397:4,10,23
399:1 401:11
403:25
**asking**   22:13
41:13,13 60:25
82:7 88:19
92:11 95:19,20
95:20,21 100:2
100:3,5,12,23
103:4,7 136:7
136:16 191:20
192:21 284:23
287:5 292:8,8
310:1 314:7
325:25 335:8
337:22 351:13
351:21 368:2
371:16,16
372:7 376:20
378:1
**aspect**   9:8
62:11 107:6
124:2 185:3
187:5 254:6,8
286:18 302:7
**aspects**   111:9
**asphalt**   165:24
166:1,1,6
**assemblies**
222:6
**assembly**
304:10,13
306:4,19
312:18 334:10

367:6
**assessing**
252:10
**assignment**
68:21
**assist**   281:22
**assisted**   120:14
**associated**   75:3
129:8
**associates**
21:25
**association**
91:23 94:18
**assume**   40:20
80:22 91:2
154:15 164:21
184:16 322:10
330:1
**assumed**   61:21
75:3
**assuming**
154:15 174:5
185:6 190:16
193:17 214:20
240:23 288:20
328:17 339:13
350:12 376:2
**assure**   343:10
**attached**   20:18
25:17 240:19
410:11
**attempt**   63:25
285:25 316:5
**attempted**
123:15 153:1

**attempts**   63:3,6
**attend**   45:8
114:7,8
**attendance**
187:8,9
**attended**   390:7
**attention**
168:22 270:17
319:9
**attest**   121:11
121:13 258:23
328:22 329:2
340:3 354:3
**attorney**   6:3
16:12 17:23
18:3 409:2
410:13
**attorney's**   17:1
**attorneys**   27:23
47:9 264:24
367:6 409:4
**attributable**
136:14
**attributed**
188:6
**audio**   5:7 49:17
52:22 65:14
**august**   366:20
366:24 368:21
370:8,15
371:21 372:9
383:15
**automatic**   95:2
**availability**
358:14

**available**   41:11
43:2 62:13,17
77:11 81:6
135:25 202:1
212:11 312:9
344:17 347:13
369:21 386:20
394:22 410:6
**avoid**   110:13
110:16,17
293:19
**avoided**   110:4
**aware**   34:4
107:13 142:7
153:4,7,12,19
153:22,25
160:11 165:17
167:19 193:5,8
231:6,8 317:12
317:18 334:3
**awe**   175:2

**b**

**b**   1:8 140:13,20
221:17 290:13
290:16 291:20
291:23 292:9
293:3 294:20
297:23 298:14
298:18 301:25
304:11 305:5
308:7 335:24
338:25 339:3
341:3 344:22
348:22 385:5
409:13

**b'laster** 248:9
249:16,22
**back** 16:15
27:25 42:1
45:11 52:20
61:9 62:12
63:14,17,20
73:24,25 76:23
81:7 84:15
132:21 136:23
162:22 167:12
168:14 171:2,2
176:16 177:10
177:12 178:19
194:10 223:8,9
234:18 235:3
238:1 244:19
270:16 322:5
331:2 339:21
340:3,5,9,16,20
340:21,22,24
341:5,15 345:7
351:4 352:8
366:4 386:21
390:22 391:2
392:11 406:25
407:3
**bad** 129:1
324:24
**baked** 122:11
237:14 369:11
369:12
**barely** 165:10
**barrel** 239:12

**base** 70:1 146:3
287:22 377:9
**based** 102:12
108:9 109:16
111:9 113:23
142:16 148:21
173:25 177:25
186:25 199:24
204:24 209:20
227:8 231:11
234:1,2 238:1
244:13 245:5
249:3 255:14
255:15,21
257:18 258:10
265:1 285:15
286:4 288:10
289:13 292:3
384:20 393:10
394:14 403:6
403:12,14,20
403:22 404:16
**basic** 41:20,21
69:25
**basically** 8:12
41:18 54:6,15
55:25 85:7
86:17 95:2
96:4,22 106:2
113:2 116:12
122:11,15
125:2,4 145:13
175:1,2 187:5
195:2 200:2,9
200:9,13 201:2

207:7 286:10
288:4 321:1
328:18 338:11
343:10 358:12
379:9 382:3
387:3 392:16
393:2 405:24
**basing** 199:5
201:16 381:24
**basis** 7:12 9:2
89:23 111:16
174:18 228:24
402:24
**bates** 23:15,15
24:3,6 303:10
309:22 345:23
346:1
**bay** 129:22
130:17,24
131:9 138:15
138:16,17
170:2 221:18
379:24 393:7
**bays** 165:14
**bearing** 145:12
**becoming**
133:11,12
405:21
**bed** 106:21
**began** 11:20
24:3
**beginning** 6:2
11:21 24:7
88:6 281:15

**begins** 84:13
189:4 270:13
328:7 370:3
**behalf** 1:16
285:24,25
322:4 349:13
408:12
**belief** 124:18
341:1
**believe** 9:12
17:11,15 34:21
34:22 44:17
45:4 50:16
51:17 58:4
59:12 77:17
78:23,24 79:23
80:13 84:25
130:8 131:5,7
131:8 133:5
157:5 158:13
194:7 195:3
218:7 219:8
230:16 232:12
241:15 244:11
245:6 257:9,11
257:12,20
265:18 270:4
289:9 304:16
315:19 321:9
323:22 329:18
333:23 335:23
356:24 366:17
368:17 370:6
370:11 384:15
387:11,12

**believed** 257:21
**bell** 68:7,18
  69:18 75:9,11
  76:6 118:8,11
  118:12
**ben** 2:14 6:8
  47:8 54:19
**ben's** 331:8
**beneath** 162:1
  172:22 321:7
**best** 13:2,4 32:5
  102:11 128:14
  128:16 205:18
  205:22 344:12
  344:14
**better** 200:12
  255:24
**beyond** 380:11
**bias** 110:1,2,17
**bid** 272:15,19
  274:4,17,20,21
  275:19 279:17
**bids** 281:1
**big** 76:24
  112:20 129:22
  251:19
**biggest** 58:9
**bill** 16:22
**billable** 87:15
**billed** 87:11
**billing** 62:22
  90:20 134:4
**binder** 41:3
  157:22 220:6
  311:19 350:10

**binders** 137:24
  347:25
**birth** 7:6
**bit** 13:2 157:8
  205:8 261:24
  286:17
**black** 352:21
**blackened**
  96:11
**block** 7:19
**blower** 271:10
  393:17
**blowing** 195:21
  231:12 388:9
**blows** 180:19
  195:14,22
**blue** 106:12,15
  122:16,23,23
  122:23,24
  123:1,16,23
  124:9,18,19
  125:8,13 126:1
  128:24 130:10
  131:21 132:9
  133:13,14,22
  135:8,16
  138:19 139:2,8
  139:14,15,15
  140:5,10,23
  141:2,10,25,25
  142:2,8,8,22
  143:7,17
  145:25 146:18
  154:11 164:15
  168:25 179:7

179:19 181:15
196:24 199:23
200:20 201:1
201:10,11
213:15,20
214:19 215:10
215:15 216:2,3
218:24 219:20
221:4,7,11,19
223:22 224:6,7
224:13 225:4,5
225:9,21,21
227:2 229:2,11
229:12,21
234:19,25
236:18,21,25
237:3,5 238:4
238:5,8,13
239:11,14
284:4,9 285:18
285:25 287:16
287:16 288:14
305:25 306:2,3
306:7,10,22
315:14,14
325:10 337:12
351:9 353:14
353:22,25
361:11,14
362:17,18,23
363:15,23
364:6,10 365:2
365:4 367:9
368:3,4,25
369:5,9,11,12

369:12,12,13
369:16,17
370:11,14
371:17,22,25
372:8,11,12,15
373:8 376:3,10
376:11,16,24
377:6,13
378:13 380:5,7
380:17 382:10
382:11 383:17
383:19 396:12
**bluish** 56:9
**board** 85:9
**body** 205:24
**bohrer** 2:15
**boil** 227:10
**boiled** 125:2
  200:3,3 201:4
  201:13 226:2,3
  226:8 227:11
  227:22 230:4
  286:2 287:20
  288:1,25 289:3
  351:17,25
**boiling** 124:19
  200:8,11,11
  351:10,14
  352:4,6
**boils** 124:10,14
  146:3 251:17
**bold** 356:13
**bolts** 248:12
**bonus** 89:11

bonuses   89:17
book   98:4
    101:3 102:2,8
    102:25 103:8
    104:3 157:23
    253:9 257:24
    394:22,23
    395:3,17,22
    399:17
bookshelf
    251:5
booth   180:23
    180:25 181:4,5
    251:11
booths   251:9
bottom   76:24
    116:6,12
    138:20 139:10
    155:13 168:21
    183:6,9 202:6
    213:21 215:12
    272:24 297:4
    326:25 332:8
    333:5 334:18
    364:15,20
    366:10 368:23
bottoms   307:6
bought   183:1
box   112:10
    118:18 119:7
    121:19 185:22
    194:21 195:12
    195:13,13
    199:25 200:25
    200:25 219:13

293:24 334:10
371:10,11
383:12,13,22
387:19,20,20
387:23
boxes   118:19
    118:22,23
    121:7 146:7
    185:22 200:16
    219:13,20,23
    359:12 383:15
brand   198:13
break   13:16
    136:19 188:25
    270:7,16 398:4
breakers
    185:21
breaks   13:14
    84:7
brief   84:12
    189:3 270:12
    328:6 370:2
briefly   212:15
bright   201:10
    201:11 239:14
    361:14 362:23
    364:10 369:9
    369:11,16
brightest
    355:16
brightness
    364:8 398:5
bring   24:23
    25:1 57:23
    113:19 136:7

168:4
broad   14:20
broke   370:6
brought   168:3
    168:9,10,15
    182:20 245:24
    335:16 374:17
brush   365:25
bs   302:12
building   46:15
    46:18,23,24,25
    51:23,24 52:1
    54:7,9,10,10,12
    54:14 55:20
    56:7 57:4,15
    57:21,22 58:6
    58:14,21 59:10
    59:18 60:5,12
    62:5 63:4 64:2
    64:18 76:10
    106:25 107:10
    107:15 112:6
    112:14,16
    113:4,16 114:6
    114:12 128:18
    129:17,18,23
    135:21,22
    136:24 137:4
    141:19,24
    145:2,12 147:4
    147:6,10
    152:22 153:14
    153:19 154:10
    154:17 156:1
    157:12 158:25

161:12 162:5
162:17 163:6
163:13,17,18
163:19,20
164:13 166:2
167:15,22
168:4,5 169:3
175:6 176:4
177:2 178:6,6
179:17 181:1
181:25 183:1
183:12 185:20
186:24 195:25
197:25 198:8
198:19 207:7
212:9 216:5,10
216:10,15,21
217:5,8,10,25
218:3 221:14
222:1 224:25
232:19 243:2
243:13 246:5
246:13 250:19
250:23 251:1
262:10,13,14
262:18 263:21
264:1 266:7
269:13 272:10
272:16 273:11
274:5,5 277:10
277:11,17,21
278:4 279:19
280:4,10 281:3
376:21 377:3
380:13,15

388:15 391:6
402:17 404:4
**buildings** 46:21
55:17,18 56:2
56:14 197:20
197:21,24
277:17
**bulk** 374:13
**burden** 375:8
**burn** 52:1
285:17,25
377:3 383:22
383:24
**burned** 51:25
52:1 96:11
239:12 241:9
269:8 377:1
**burner** 120:24
121:7,17
199:25 200:16
365:10 383:14
383:22
**burners** 387:13
**burning** 121:18
151:21 387:15
388:6
**burns** 230:16
376:6
**burnt** 96:7
201:14 239:20
**business** 6:9
7:17 384:6
**byproduct**
241:7

**c**

**c** 1:14 2:1 4:10
45:3 87:4,5
90:21 134:4
135:2 154:11
223:18,18
266:1,6,6
290:13,16
291:20,23
292:9 295:7
297:23 298:14
298:22 308:7
316:8,8 326:25
328:19 330:18
331:5,13,25
332:14,23
333:2 335:21
335:24 337:17
338:25 339:4
341:3 344:23
385:5 408:5
409:13
**calendar** 11:11
12:5
**call** 6:25 7:3
13:16 21:9
46:2 80:2,14
193:24 317:15
407:5
**calle** 65:22,24
66:1 156:17,22
172:6 226:23
234:21
**called** 9:6 15:15
21:12 54:1

64:8 84:24
138:5 154:1,5
220:20 223:4
272:14 275:19
387:19
**calling** 393:7
**calls** 154:4
162:24 169:21
170:17 184:24
194:17,25
195:7 230:13
339:24 387:19
**camera** 48:7,9
363:16 365:15
**cans** 107:14
169:8 171:15
171:20,21
208:2 223:3,7
246:18 249:15
249:22 267:15
267:22 291:20
292:15,16
293:5 294:8
300:8,9 308:7
311:8,9,13
321:16 322:13
334:24 335:23
338:16,18
339:21,22
340:2,5 341:2
341:16,17
343:22 344:22
354:14,14,16
354:23,25
385:12

**capable** 97:6,11
**capacity** 82:16
395:18
**carbonaceous**
96:10
**card** 407:1,4
**cardboard**
219:15,17
**cards** 385:5,5,5
**care** 12:23
145:16
**career** 12:13
18:19,24 36:19
301:11 389:16
**careers** 6:25
**carefully** 274:3
284:22
**carmel** 8:21
390:2
**carried** 44:11
**case** 1:3 5:16
6:24 10:15,20
11:1,7 12:17
14:3,7,10,16,21
16:5 17:19
18:6,9 19:18
21:9,20 22:5
22:22,23 25:24
27:23 28:15,20
28:23 29:5,6
29:12,23 31:19
32:20,21 33:8
34:15,18 35:4
35:25 38:3,9
38:13 40:8,15

41:1,6,16,19
43:1 45:8
46:22 47:10
49:15 59:25
60:3 64:9
68:10 69:19
73:7,19,22
87:6,12,15
88:7,23 89:1
91:20 99:1
102:4,5 104:12
105:11 108:6
108:12 110:6
114:3 117:24
123:19 124:17
125:1,7 133:21
136:1,22
137:10 144:12
150:10 179:9
186:16 194:2
195:25 197:2
204:12 205:11
206:13,16,19
206:22 207:2,6
208:14,25
216:19 231:6
234:21 249:11
255:11 256:8
258:3,19 271:6
271:20 281:16
282:12 283:6
284:3 285:10
286:13 289:5
302:11 307:21
313:23 329:8

336:9 344:15
348:22 349:13
350:15 353:24
360:15,18,22
364:5 390:5,13
394:5 395:13
396:10,22,25
400:17,20
401:20 402:11
403:19 407:5
**cases**   10:2,11
10:13,19 19:21
19:24 28:2,4
28:12 29:16
32:6,9,11,13,15
36:7 38:1,10
38:15 88:6
89:25 185:17
282:15,15
315:1 329:8
348:25
**casting**   110:21
**catch**   62:13
90:16,18
141:12 200:1
202:23,24
203:25 225:21
227:3 230:25
244:11,18
380:19
**categories**
93:18
**category**   308:2
395:23

**caught**   15:14
17:8 72:3,5
199:25 200:24
376:18 380:17
381:20
**cause**   12:17
14:9,11,25
15:19 19:9,14
30:2,6 36:12
36:19 37:2,6
38:2 43:14
68:22 70:13,13
71:17 73:23
74:3,8 75:15
75:16 76:2,5
77:10,24 82:2
83:20 104:22
106:2 108:25
109:1,15,15
110:11 111:7
114:24 115:19
117:1,9,16
121:13 141:24
144:21 145:25
148:25 150:9
152:17 155:21
165:2,7 167:2
170:3 174:23
178:3 186:10
186:11 187:14
187:15 200:21
205:4,21
209:11 231:9
233:21 234:6
237:12,25

239:16 240:10
241:1 245:21
268:24 276:17
280:18 286:16
286:20 293:8
297:13 308:25
310:9 312:23
326:9 330:2,3
334:20 350:15
350:22 372:17
377:10 379:9
383:22 384:14
388:23 391:2
394:10,12,13
394:22 395:25
396:1 400:10
400:12 401:16
401:19 403:5
403:15,18
405:1 409:1
**caused**   67:7
200:21 247:14
320:12 376:4
384:23 401:24
**causes**   112:21
195:2,4
**cc**   4:16 235:17
235:18 239:13
241:4,17
244:19 245:23
245:23 246:16
**ccc**   235:10,15
235:16
**ccmsi**   4:10
74:19

[ceil - circles]                                                                        Page 14

ceil   142:5
ceiling   135:23
    139:3 140:4,5
    140:11 141:6
    143:14 152:2
    179:19,20
    202:8 213:6
    215:15 216:5
    250:4,10,11,13
    250:18,19
    263:5 280:6,23
    280:23 381:7
    402:20
ceilings   387:10
cell   183:12
center   54:16
    144:1 209:3,9
    223:4,5 240:7
    294:21 304:8
    318:23 321:7
    370:22
centered
    356:13
central   246:8
cert   137:12
    205:10
certain   20:19
    32:2 104:14
    106:22,22
    114:5 144:25
    149:22 193:2
    193:10 194:14
    205:8 207:5,6
    230:25 289:15
    289:17 316:6

380:24 395:17
405:9,9
certainly
    190:21
certainty   15:7
    15:25 16:1
    30:20,21 31:3
    31:4 109:20,21
    205:10 251:25
    252:2,7,13,19
    252:20,24
    253:6,11,12
    254:22 255:1,7
    255:8 257:3
    260:20,22,24
    260:25 261:5
    261:10,13
    286:11,13
    289:16,17,21
    290:5 396:21
    397:1 405:10
certification
    8:14 70:23
certified   70:15
    70:20
certify   408:7,25
cetera   316:9
cfei   1:13 6:15
    407:15 408:7
    410:5 411:2,24
    412:2,4,12
cfi   1:13 6:15
    90:8 407:15
    408:7 410:5
    411:2,24 412:2

412:4,12
chain   299:19
    299:19
chance   390:20
change   36:16
    93:24 127:4
    231:4 244:14
    244:16,18
    297:2,3 352:3
    411:4,7,10,13
    411:16,19
changed
    126:25 192:22
    192:23 193:1
    286:16 301:9
    302:8,18 303:3
    317:3
changes   92:25
    93:11,15,17
    94:1,4,9,10,13
    193:7,8 231:8
    250:25 301:14
    410:10 412:6
changing   93:1
chapter   374:18
    399:12
char   95:16 96:3
    96:10 400:19
    400:22,25
    401:3,4,7,8
charge   301:18
    302:4 338:17
charging   87:17
charles   34:8

charred   96:6
    185:21
charring
    364:23
chars   401:2
check   76:3
    145:5 200:7
    209:20 231:18
    231:20 234:13
    234:15 392:22
    393:4
checked   64:8
    194:3
checking   130:4
chemical   96:22
    99:23
chemist   200:7
    249:11,13
    287:17
chicago   11:7
    13:25 16:9
    17:21 18:21
    113:23 260:10
choice   200:13
cigarettes
    236:15
circle   27:25
    48:5,12 138:23
    139:1,15
    140:10 142:22
    363:14 365:14
circled   140:19
circles   143:18
    366:3

circling  140:18
circuit  173:19
  174:8
circulate
  180:19
circulated
  276:17
circulation
  177:1 181:24
circumstance
  167:9
circumstances
  190:22 193:16
  196:13 207:5
  227:7 231:1,9
  375:8
city  8:21 390:2
clad  56:2
claim  30:14
  122:6 140:22
  333:16 354:16
  372:9
claiming
  362:19
clarification
  397:7
clarify  100:2
  328:15 337:18
  396:20
clarity  334:7
class  124:8,8
  151:19,20
  200:5,5 227:11
  227:12 229:6,6

classes  81:17
  394:24
classify  223:18
clean  221:18
  225:13 310:25
  392:21
cleaned  32:1
  145:17 221:18
clear  64:15
  213:12 214:10
  219:11 323:6
  385:22,24
  389:14
clearly  144:13
  398:6,15
clendening
  2:15
client  83:11
  87:11,17 114:8
  120:13 190:6
  194:16 196:9
  200:17 212:19
  246:10 314:3
  315:7 360:4,11
  367:8 387:18
  402:24
client's  384:10
  402:16
clients  257:12
climb  131:19
  132:12
climbed  121:6
  198:21
clock  57:2

clogged  196:24
close  27:9 52:5
  52:6 127:16
  137:23 200:25
  272:1 379:13
  401:14 402:9
closed  28:23
  38:4 79:4,5
  83:12 99:24
  117:19 119:2
  120:1,4,11
  121:19 146:7
  190:7 199:7,13
  199:15 212:20
  215:4 388:4
  401:20,23
  402:6
closest  262:17
closing  29:3
clue  39:11
codefendant
  21:9
codefendants
  323:13
coe  1:7 5:13 6:5
  83:11 410:4
  411:1 412:1
coffee  12:21
coincidentally
  50:7
cold  196:14
  308:19 309:3,4
  309:5,7,8
coll  128:5

collapse  221:25
  359:12
collapsed  222:2
  222:2,6
collect  109:2
  128:8 163:21
  173:9,11
  187:16 208:20
  222:24 240:12
  241:13,16
  245:1,5,15,22
  246:10 247:9
  249:15 250:6
  269:21,22
  304:24 306:13
  306:25 308:20
  313:13 315:14
  322:18,23
  327:10 329:3
  334:9 347:16
  386:19 391:6,7
collected  77:21
  78:14 110:14
  126:18 128:5
  135:8 186:18
  187:10 188:1
  207:24 223:10
  223:10 236:4
  238:17,22
  241:24 242:3
  242:14 245:10
  245:11,19,25
  246:2,11 250:7
  265:2 268:22
  291:7,9,14,16

292:19 295:11
296:9 300:11
300:17 303:20
303:21,25
304:2 306:23
312:12 313:15
316:2,7,8
318:22 322:19
322:25 324:21
325:10 327:8
327:10,12
333:17 338:24
339:9 347:15
367:23,23
383:8 390:21
**collecting**
77:20 185:3
186:19,21
208:1,6 245:13
246:8 293:14
306:17 307:4
312:24 364:17
386:3
**collection**
133:22 207:1
207:13,18,25
259:18 265:13
290:11 307:11
307:20,25
313:10 317:14
**collections**
372:3
**color**  4:4,4,5,5
4:16,16,17,18
4:19,19,20,20

106:12 362:18
**com**  167:2
**comb**  236:11
**combination**
168:7 370:23
**combine**
250:20
**combined**
202:6
**combus**  199:17
**combust**
123:15 125:13
146:1 166:11
198:16 229:3,4
285:18 358:3
**combusted**
201:8 287:17
371:25 372:1
372:13,14,17
379:23 381:14
401:6
**combustibility**
125:8 229:21
**combustible**
96:4,7 97:5
105:25 126:2
150:24 196:2
197:3 200:6
201:6 229:9
230:5 237:21
251:15,18
287:18 288:3,6
289:10 376:12
377:19 378:8
380:9 381:3,4

382:21 383:2
384:1 403:20
**combustibles**
376:18,23
381:8 402:9
403:1
**combustion**
97:6 101:8
125:14 126:2
146:7 199:18
239:15 287:19
372:11 376:2
377:3 378:2,7
381:2 382:14
**come**  8:9 10:3
10:11 24:18
26:24 50:22
61:8,14 62:12
63:14,17 75:9
109:14 119:6
140:16 175:14
177:10,12
178:19 195:8
340:5,9,24
351:4 356:21
374:25 386:10
405:7
**comes**  112:21
118:11,13
160:22 215:25
284:15 351:7
365:9 394:11
**comfortable**
64:22 118:22

**coming**  20:14
89:24 140:23
154:8,16
218:16 235:5
262:10,16,19
263:2,4,4,19
264:5,8 268:20
330:24
**comma**  90:8
105:4 127:12
252:15 375:3
400:1,9,10,11
400:11,12
**commencing**
1:19 408:14
**comment**  48:25
49:1,24 141:17
162:11 234:13
**commentary**
275:4,6 397:13
**comments**
202:12 257:21
**commission**
409:16
**common**  90:8
109:15 405:3,4
405:6
**commonly**
252:21
**communicated**
360:17
**communication**
260:5
**comp**  248:16
287:25

**company** 9:3,4
  15:15 16:22,24
  17:1,3 19:20
  30:10,13 31:2
  32:9,14 39:16
  75:4,20 76:8
  77:3,5,6,7 78:2
  78:19 79:3
  81:3 84:24
  86:24,24
  212:19 227:8
  275:8,9 357:1
  360:22 376:12
**company's**
  125:17 146:4
  287:25
**compare** 337:7
  337:22
**compared**
  93:12
**comparison**
  88:22 135:14
**compatible**
  377:25
**compensated**
  39:15
**competent** 97:9
**competitor**
  212:19
**complaining**
  192:16
**complete** 35:9
  412:8
**completed**
  10:22 60:21

410:17
**completely**
  167:2 199:7
  222:2 226:4
  336:12
**completion**
  83:2
**compliance**
  92:3
**complies** 188:4
  235:13 281:10
  325:16
**comply** 70:1
**component**
  111:7 226:17
  304:19 360:10
  367:7
**components**
  112:13 113:3
  113:15 114:11
  164:3 166:1,11
  186:25 224:24
  226:14 237:1,9
  361:7,16
  369:19 371:8
  373:22
**comport** 44:13
  161:21
**comported**
  280:15
**compound**
  34:13 382:18
**compressor**
  159:15

**computer** 21:6
  24:21 25:2
  42:5 137:1
  358:15
**computers**
  56:24
**con** 60:15
  68:24 126:8
  216:11 387:18
**concede** 33:4,7
  91:19 104:16
  201:15,17
  205:3 210:3
  215:13 283:8
  305:17 307:14
  310:24 364:3
  382:13
**conceding**
  381:13
**concentration**
  231:2
**concern** 141:8
  141:8
**concerned**
  33:20 103:5
  281:25 315:13
  394:2
**concerning**
  34:16
**concerns**
  145:19
**concise** 191:11
  192:1
**conclude**
  280:16

**concluded**
  360:9
**concludes**
  406:11
**conclusion**
  112:23 116:8
  116:15,18,19
  126:13 127:5
  150:2 252:3
  315:4
**conclusions**
  110:5,21 116:5
  127:12,25
  148:19 393:13
  396:22
**condition**
  138:15 231:8
  232:15
**conditioning**
  1:7 5:14 6:5
  83:12
**conditions**
  101:9 141:22
  141:23 178:8
  190:23 191:1
  192:22,23,25
  193:2,2,10,12
  193:14,17
  207:6 230:23
  230:24 231:4
  231:10 232:7
  235:4 308:18
**conduct** 375:9
**conducted**
  27:11 60:15,16

**[conducted - continued]**

127:24 277:16
**conducting**
66:24
**conductor**
186:3
**conductors**
186:3
**conduit** 112:20
186:2 187:1
**cone** 118:12
**conference**
355:23
**confidence**
252:11
**confirm** 125:12
167:11 308:22
383:5
**confirmation**
110:2,17
**confirmed**
111:22 233:2
382:25
**conflict** 277:15
**conflicting**
233:17
**confused** 355:8
**confusing**
346:24 354:20
**confusion**
293:19 302:10
**connection**
10:18 16:4
17:18 40:15
41:1 44:24
49:15 73:22,22

92:14 126:13
136:1,22 272:9
**cons** 257:1
**conserving**
103:5
**consider** 79:8
110:18
**consideration**
165:2 256:15
**considered**
165:1,6 206:8
255:7 271:5,18
**considering**
85:10
**consistency**
364:8
**consistent**
333:25
**constitute**
205:24 220:1
**constituted**
216:18
**constructed**
216:11
**construction**
86:24 216:15
379:21 380:12
380:14
**consult** 120:10
**consulted** 76:9
117:19,23
349:12,20
350:6 360:14
360:21

**consulting** 9:14
266:25
**consumed**
166:8
**contact** 41:10
51:5 63:19
64:1,6,11,13
66:17,21
114:15 137:8
151:23 183:19
228:21 323:4
397:6
**contacted**
45:24 68:9
76:7 113:9
137:11 153:2
212:18 274:22
275:9 284:11
309:1
**contain** 339:2
**contained**
117:2 286:23
354:16 396:19
**container**
96:24 120:25
121:1,2 159:4
184:7 188:7
220:20,21
227:9 239:18
239:21 240:23
240:25 241:4
241:23 242:12
247:7,14
251:17 268:23
288:1 295:20

296:24 298:23
323:3,3,4
331:12 336:11
336:12 337:20
358:12 396:19
**containers**
190:19 211:1
222:22 241:18
277:22,24,25
354:18,21
**containing**
324:21
**contains** 69:25
74:8
**contaminated**
306:11
**contamination**
166:24 206:25
237:6 238:4
**content** 90:24
**contents** 33:21
101:22 222:12
222:15 271:4
271:18
**continuation**
203:7
**continue** 5:8
55:15 86:21
284:11 323:11
379:10
**continued**
10:13 44:9
142:7 175:15
329:11

continuing
132:2 178:16
180:9 255:1,6
331:21 375:15
400:4
contract 85:11
85:12,16 86:8
contractors
281:1
contradict
402:24
contradicting
180:4
contradictory
110:20
contrary 59:25
contrast 362:18
contributed
75:16
control 81:4
284:14,17,19
285:13 387:19
387:23
controlled
324:11
conversation
5:6 49:4,17
54:4 55:13
77:2 79:21
161:8 392:13
conversion
99:23
converted
339:8,10,12

convinced
300:8
coordinates
333:3
copies 18:18,20
20:11 410:14
copper 186:3
copy 26:25
42:8 133:25
137:14,15
138:11 272:15
272:18 276:16
297:13
corner 161:12
173:14,20
174:8
corners 162:22
correct 19:14
21:6 39:18,21
50:10 52:3
55:4 60:6
65:15 67:14
68:7 70:2
75:17 84:21
87:12 92:1
116:13 117:2
130:8 147:9
157:14 164:5
164:22 170:8,9
197:18 201:19
216:5 222:3
223:6 224:1
232:17 243:4
244:8,10 252:4
252:8,21 253:3

253:6 255:8,11
256:12 261:14
264:15 271:2
271:20 272:7
274:17 276:20
285:20 288:22
297:24 298:20
315:3 339:7
352:21 355:3,6
360:12 362:11
374:2 376:3
378:16 381:3
382:16 387:6
388:16,21
390:19 397:2
399:2 400:11
401:9 404:6
412:8
corrected
203:12
correction
203:15,24,24
corrections
412:6
correctly
100:21 103:7
127:12 200:18
315:6,11
corresponds
253:11
corrugated
165:23 216:6
216:11,19
217:11,13
218:3

corsin 16:7,8
cost 272:25
could've
114:19
counsel 4:9
5:11,25 22:14
23:20 25:3
263:17 281:16
303:9 325:19
397:5 408:24
410:14
count 27:8
329:8 389:18
county 1:15,18
7:22 18:5,7
19:22 408:3,6
408:14 409:18
couple 6:24
11:5,16 12:20
20:7 24:16
27:11 38:15
42:25 52:21
72:18 75:25
88:5 93:17
107:2 131:3
160:8 182:24
202:10,11
210:24 224:9
244:20 246:18
251:3 272:8
279:19 281:16
329:17 348:10
398:23 399:5,9
402:14 405:8

**course** 71:3,5
81:24 82:23
254:5 270:23
393:23 394:20
**courses** 81:13
**court** 1:1 5:15
5:20 6:11
12:24 19:5,6,9
19:22,23 82:14
84:17 102:18
139:13 192:9
260:21 366:5
391:17
**courts** 260:19
**cover** 86:4
179:4 207:9
**covered** 27:15
122:16 143:12
334:4
**covering**
276:14
**covers** 162:22
**covid** 85:22
**cracks** 154:24
**crate** 219:19
**create** 35:2
302:10 375:8
**created** 160:11
160:15 364:6
**credibility**
286:8
**credible** 306:18
**criminal**
344:15

**critical** 307:21
**cross** 3:5
166:23 167:25
237:6 238:3
389:12
**crossed** 298:13
301:1,6 342:6
**crossing** 301:24
**cs** 301:25
302:12 410:15
**cs5675427** 1:25
**current** 7:8,10
7:11 91:21
92:6,7 138:15
**currently** 28:2
28:9,12 197:21
**curriculum**
8:22 9:13 12:3
**custodian**
297:3
**custody** 4:18
21:5 133:21
267:12,13
290:8 297:2,20
299:20 301:8
321:22 323:18
324:16 338:11
341:7,11
**custom** 36:11
36:18
**customers**
106:23 210:24
**cut** 225:5,8,19
226:24

**cutter** 60:12
225:8
**cutters** 60:8,9
225:17 226:24
**cutting** 228:3,5
228:13,21
280:5 348:9
**cv** 1:3 5:16
37:13,14
**cvfi** 1:13 6:15
407:15 408:8
410:5 411:2,24
412:2,4,12
**cylin** 244:20
**cylinder** 241:21
**cylinders**
244:21

**d**

**d** 1:8 4:11
34:24 45:3,3
96:20 157:18
157:20 159:19
161:11 164:25
165:11 168:14
169:14 171:7
173:18 182:12
184:1,14,19
186:17 271:23
316:8,8 348:22
**dale** 65:22,24
66:1 156:17,22
172:6 226:23
234:21
**dam** 185:21

**damage** 58:10
185:21 186:19
202:7 207:17
208:23 209:7
246:12 359:9
359:11,12,19
**damaged**
359:20,22
**dan** 34:8
**danzer** 34:9
83:21
**darker** 319:25
**dart** 14:6
**data** 66:12 98:7
98:9,23 109:2
109:3,4,6,10
110:14,20
124:9 205:24
209:13 210:17
248:22 252:11
252:12 358:9
374:24
**date** 7:6 11:8
11:22 23:23
39:25 41:23
42:4 71:11,12
71:21 72:10,12
73:2,4 77:22
80:4 90:16
92:8,9 93:8
129:25 132:14
132:16 134:13
160:15 194:10
265:25 290:11
290:18,20,23

291:9,14,16
297:21 300:17
313:12 398:1
411:24 412:12
**date's** 71:25
**dated** 4:12,17
11:3 20:20
39:17,20 67:18
72:24 74:15
90:4,21,22
126:24 133:23
133:23 160:6
182:13 203:8
290:11 291:7
294:12 297:21
305:1 321:22
324:16 355:20
**dates** 9:14
40:25 41:22
130:5 147:20
373:3
**david** 314:18
**davis** 221:15
314:14
**day** 41:2 43:15
44:5,7,25 45:4
47:20 49:3
50:12 51:15,23
52:7 53:3,3
59:22 61:3,20
63:21 64:15,18
65:18 68:21,24
69:7 75:11
76:6,19,20,21
77:15,16,20

78:10,14,22
80:2 87:10
107:10,16
113:5,7,8
121:5 134:19
156:8,25
167:22 169:3
182:14 183:20
185:1 190:19
191:22 192:24
194:4,4,8,14
227:2 228:1,6
228:8,10
232:18 233:1
259:15 260:7
270:6 277:25
287:13 308:19
313:19,20
322:17,19
338:24 368:15
373:9,12,12,17
386:9 392:10
392:15,20,21
395:5,6,10
398:16 409:6
412:15
**daylight** 62:17
**days** 8:3 128:12
190:9,11 191:3
193:15,20
196:1 230:12
410:17
**daytime** 194:5
234:3

**dd** 4:5 137:17
137:19 138:2
139:2,12 140:7
142:21 146:13
155:11 158:3
158:16
**de** 265:4
**debris** 59:10,14
101:22 122:7
156:1 222:8
249:16 333:18
333:20 334:18
335:1,5,25
336:5 337:10
338:20 339:3,3
339:6,20
353:16 354:1
354:16 355:1
373:18
**debris's** 336:12
**decade** 197:5
**decades** 81:14
**decatur** 15:13
**december** 4:12
4:15 10:20
11:3 22:7,8
39:17,24 55:15
57:19 59:16
67:18 68:6
74:16 80:10
90:4 91:3,5
93:3 126:14
127:13,25
165:3 201:18
243:18

**decided** 40:22
62:15 85:25
86:9 87:1
153:1 237:21
269:25 274:15
286:15 322:18
322:22
**decision** 288:10
**decisionmaki...**
377:11
**declare** 412:4
**declared**
252:25
**deductive**
98:15,16,19
**deem** 177:24
**deemed** 412:6
**def** 98:3 251:10
**defective**
348:14 349:15
**defendant** 5:12
6:4 14:18
16:20,21 30:9
**defendant's**
74:15
**defendants** 1:9
1:16 2:9 138:2
187:14 304:5
306:21 316:14
317:9 333:14
334:19 345:23
346:1 361:2
366:10 397:18
398:20 404:5
408:12

define  95:10,16
defined  253:10
  399:23
defines  98:7
  99:22 101:19
  105:1
defini  97:8
definition  96:9
  97:4,9,16,19
  99:3 100:3,6
  101:3,4,6,14,25
  104:2 118:24
  119:1 201:4
  250:2 251:11
  253:8 357:18
  400:3
definitional
  97:24 101:13
definitions  98:3
  100:13 102:24
  103:6,22
deflector
  144:19 305:20
  371:14 402:19
deflectors
  132:11 177:19
  208:23 371:12
  371:13
defy  259:23
degree  15:6,24
  31:3 104:14
  124:17 144:22
  144:25 205:7,8
  260:23,25
  261:5,5,10,13

286:11,13
289:15,15,17
289:17,21
290:4 397:1
405:10
degrees  172:15
  172:18 194:5
  230:7,8,11
  233:2,9,16,22
  234:8
delaware  2:15
delaying  63:19
demarcation
  213:12
demolition
  390:14
demonstrate
  363:1
demonstrated
  252:24
demonstrative
  363:20
deny  187:18,19
denying  187:12
  187:17
dep  7:3 27:19
  32:24 265:4
  280:7
department
  8:21 31:12
  38:14 43:19
  44:10,15 390:2
departments
  70:17 389:25

depend  179:2
dependable
  157:14
depending
  89:11
depends  138:11
  175:4 176:11
  208:5
depict  138:14
depicted  306:7
  368:23 369:9
depicts  333:4
depo  103:19
  262:4
deponent
  407:11 408:8
  408:21,22
  410:13 412:3
depos  191:12
depose  329:24
deposed  14:16
  19:19 69:19
  265:4,7
deposing
  410:13
deposition  1:12
  4:3,6,9 5:11,17
  11:14,19,20,25
  12:5,9 13:22
  13:25 14:1
  15:18 16:5,12
  16:15 17:10,12
  17:18,22 18:4
  18:14,21 20:7
  20:8,9 21:23

23:2,5 24:13
26:20 27:16,19
32:19,25 33:14
33:19,22 45:7
54:25 65:9
69:15 74:18
83:20,25 87:18
88:7 103:20
108:3,4 115:12
130:9 137:9
152:6,7 153:18
154:7 174:18
182:9 191:7,10
191:12 196:19
212:25 218:21
221:20 226:19
261:25 263:16
272:6 351:7
406:11 408:11
408:17
deposition's
  36:14
depositions
  10:12 11:6,17
  12:10,15,16
  15:10 18:18,25
  19:12,16 27:18
  27:21,22 32:18
  32:19 34:5
  54:22 84:4
  87:21 264:22
  264:25
depth  400:19
  400:22,25
  401:8

des 39:6
describe 43:21
  243:15
described
  133:12 141:25
  229:25
describes 252:2
description
  45:10,11
  179:24
design 348:15
  349:22
designed 350:1
desk 265:19
despite 123:3
  136:7 239:18
destroy 37:20
  40:8 80:22
  81:18
destroyed 32:4
  35:16 36:8
  38:3,25 39:23
  40:1,5 80:21
  167:2 185:22
  186:2 322:21
destroying 39:6
  80:25
destroys 38:11
details 58:12
detector 375:22
detectors
  375:19,20,23
determination
  17:6 399:13
  400:13

determinations
  31:16
determine 30:4
  31:9,14 63:3
  75:14,15 76:4
  98:22 105:11
  108:22 109:1
  109:13 218:9
  250:23 252:14
  284:12 359:4
  404:22 405:1
determined
  31:5 112:1
  210:8 246:3
  252:10,13
  258:13,18
  400:10,10
  403:18
determining
  12:17 245:20
  374:24
develop 67:6
  109:8,8
developed
  74:11
develops 400:6
device 118:12
  158:18 353:17
  387:4
diag 136:13
diagram 4:15
  42:2,4 136:14
  136:21,24,25
  137:1 184:13
  276:1,21

278:13 279:20
  400:22
diagrams
  135:24 205:17
  328:19 385:9
  386:2
dict 308:9
die 67:10
died 67:12
diesel 150:22
  229:8 230:6
  288:5
difference 20:2
  112:21 144:5
  200:8 244:12
differences
  93:16
different 27:6
  28:10 38:7
  74:11 86:5
  98:17 102:6
  124:24 191:2
  197:23 200:21
  216:20 217:12
  226:9 233:17
  233:17 236:24
  263:7,12 271:9
  281:1 290:17
  290:23 293:16
  300:17 302:13
  311:19 316:11
  316:20 320:23
  326:23 327:11
  332:12 336:12
  338:7 359:1

367:19 378:1
  381:12 384:10
  384:21
differently
  293:15
difficult 31:9
diggle 26:22
  34:22 35:16
  39:10,10
  113:19,22,22
  114:10 115:17
  134:5 148:15
  148:18 149:11
  150:13 160:12
  160:13 182:18
  182:25 183:11
  184:4,13,20
  185:4 191:23
  238:25 259:21
  260:10
diggle's 185:15
digital 24:21,22
  36:4 398:5
digitally 312:1
dimensions
  278:19
direct 3:3 6:20
  117:10,10
  319:9
directed 132:24
directing
  270:17
direction
  231:12 408:19

directions
243:10
directly  47:4
144:21 237:11
259:20
dis  265:7
disadvantage
226:20
disagree  264:7
discard  35:12
36:13
discarded
110:25 259:7
discern  215:14
discounting
110:19
discrepancies
107:6
discuss  114:4
114:16,17
discussed  82:25
274:15
discussion  84:5
390:12 396:21
406:13
discussions
34:15 273:7
disinterested
408:25
displayed
47:10
dispute  173:16
174:13 349:7
403:4

dissect  98:9
distance  402:15
402:25
distillants
249:3
distillate  151:4
151:11 224:9
distillates
166:20 210:14
248:25
distillation
150:20
distilling
223:25
distinguishing
204:8
district  1:1,1
5:15,15
disturb  270:2
308:23
disturbed  31:8
31:23 386:15
dividing  170:1
214:4
division  1:2
5:16 74:24
90:9,14
dizdarevic  45:3
263:16
doc  207:21
357:16
document  4:11
164:18 183:2
186:6 201:22
269:7 277:2,19

303:21 357:12
357:15
documentation
184:17 244:17
documented
207:20 244:15
documents
20:19,24
doing  6:9 8:23
9:23 55:16
58:3 60:23
62:4 64:17
92:19 100:18
141:20 143:22
147:24 185:5
200:12 243:9
259:18 269:19
273:9 281:22
313:1 327:1
384:5
dollar  338:17
door  56:8
138:20 154:9
154:10,18,19
154:24 164:9
164:13 170:8
213:14 215:21
215:22,23
264:17
doors  56:9
154:11,17,23
154:24 155:1
164:8 170:3
262:17 263:20

doorway
169:19
double  64:8
393:4
doubt  315:9
396:15
draw  42:2
139:12 176:16
drawing
278:20
drawings
206:15,18
drawling  136:3
drawn  180:14
dried  122:24
124:13 125:2,4
125:5 200:14
201:2,5 230:4
246:21 289:8
dries  124:4
351:18
drift  175:18
drive  2:11 7:9
16:10 260:7,8
drivers  56:23
drop  381:6
drops  194:17
194:25
drove  52:20
260:9,14
drum  168:25
240:14
drums  169:4,11
dry  124:11,15
124:25 125:9

**[dry - electrical]**                                        Page 25

125:13 126:1
145:25 200:10
225:22,25
226:2,4 227:2
227:20 285:19
286:2 287:17
287:20 288:22
351:17,20,25
403:20
**drying** 124:18
200:8,9 352:4
**duces** 4:7 20:18
21:10
**due** 17:8 61:17
62:10,11 63:18
76:11 86:7
112:22 186:18
209:8 233:1
273:16 308:17
**duly** 6:16 408:8
**dumpers** 128:4
**dumping**
329:20
**dumpster**
54:15 58:24
215:10 225:4
227:3 240:5
**dumpsters**
55:22 57:23,23
58:16 59:19
106:8,22
126:18 128:5
129:21 198:21
220:22 221:2
225:9,20

226:16,25
**dupli** 293:6
**duplicates**
293:7
**dupuis** 2:20
5:19
**dur** 166:23
**dust** 215:21
224:25 225:1
234:25
**dusting** 141:3
142:4
**duties** 8:10
**dwell** 17:5
**dwelling** 31:23
122:17
**dynamics**
251:1

**e**

**e** 2:1,1,3,7,13
2:17 4:11 45:3
96:20 188:2
411:3,3,3
**earlier** 6:25
25:10 32:17
88:13 175:6
202:11 228:9
254:5 274:21
317:23 321:6
337:13 347:6
390:12 392:18
394:16 396:9
398:8 403:25
**early** 60:19,21

**earn** 88:10
**earnings** 88:21
**earns** 88:22
**easily** 288:7
**east** 47:6
176:19 209:4
213:14 214:15
243:5,8,11,12
243:12,13,20
244:1,2 269:14
304:16
**easy** 370:18
**eat** 389:5
**edges** 219:12
**edition** 91:22
93:4,9,12,13
374:2,8,14,15
374:18 395:22
399:12
**editions** 374:3
**ee** 182:20
**effect** 106:19
**effective** 374:5
**efficiently**
151:21
**effort** 394:21
**efforts** 183:15
183:16 212:8
**efi** 12:8 84:24
85:1,5,6
**eight** 8:6 36:22
60:22 90:24
345:5
**either** 21:1
52:23,25 65:14

73:18 92:15
94:13,19
148:18,24
150:12 152:21
160:11 166:19
170:22 181:12
204:3 231:25
232:7 237:17
248:24 253:21
256:19 261:14
263:19 269:12
269:14 285:18
285:19 298:15
304:19 307:8
309:9 326:21
349:19 353:22
358:20 360:19
365:21 389:25
399:12 405:9
**elaborate**
162:11
**elect** 167:4
**elected** 39:4
85:17
**electric** 162:15
164:9 185:19
393:19
**electrical** 111:6
111:7 112:2,4
112:19,21
113:3,15,15,22
113:25 114:3,4
114:10,11,15
114:16,24
115:4,19

161:11 163:5
163:12 164:3,4
167:4 186:16
186:25 187:7
187:13,16
393:20
**electrically**
164:14
**electricity**
111:17 114:6
393:17
**electronic** 36:1
39:8 194:24
195:2 406:18
407:7
**electronically**
33:25 34:1,6
**element** 247:18
**elements**
101:23
**eliminate** 111:6
289:14
**email** 4:15
85:13
**emails** 281:16
**employ** 409:4
**employed** 9:9
66:1,5 84:24
185:10 341:3
**employee** 25:23
26:13 33:11,24
34:3 42:15,18
56:19,19 129:4
307:15 345:8

**employees**
26:11 43:3,7
64:1,4,5
122:14 141:7
179:25 183:22
225:18 226:22
232:19 242:18
277:16 329:17
**employer** 7:10
7:11
**employment**
9:14,24 10:1
28:1 29:19
32:7 38:23
66:14 84:23
85:20 86:10
**empty** 236:15
303:13
**en** 120:24
**enclosed**
120:24,25
121:1
**encountered**
315:1
**ended** 29:3
106:2 385:11
**ends** 84:11
189:1 270:10
369:25 406:10
**energy** 97:10
97:11 99:23,24
**engine** 19:20
**engineer** 26:3
113:22 114:3
114:10 115:3,4

194:22 312:22
313:25
**engineering**
206:18 260:24
**engineers**
113:25 114:15
187:13
**entered** 153:19
358:15
**enters** 185:20
**entire** 143:10
206:8 378:3
**entirely** 143:12
258:11
**entirety** 263:7
**entitled** 260:18
399:13
**entity** 85:8
**entrance** 264:1
**entry** 135:2
**enumerated**
20:24
**environment**
275:1,12
372:19
**environmental**
101:9 180:21
308:17 322:21
**equally** 67:4
253:5
**equipment**
79:23 111:24
112:17
**equivalent**
288:5

**errata** 410:11
410:13,17
**erratas** 410:15
**error** 72:13,16
202:22 254:8
**errors** 72:17,18
90:18
**especially**
252:15
**esq** 410:1
**essentially**
200:12 215:19
215:20 351:20
**establish**
134:19
**estimate** 32:5
**et** 5:14 316:9
**eval** 71:19
**evaluate** 71:20
98:9 390:25
**evaluated** 32:4
244:14 245:18
**evansville**
28:18
**evening** 52:19
61:15 111:15
172:21
**event** 189:12,25
409:3
**events** 374:20
374:23 376:23
378:2,5,7
380:4 382:9
**eventually**
380:20

everybody
85:11 86:1
134:14 179:7
187:8 250:3
313:20 390:20
everybody's
390:22
everything's
392:23
evidence  4:18
40:8,15 133:21
135:5 185:3
201:1 206:9,25
207:12,18
208:1,5 236:4
238:22 240:12
241:24 245:7
257:11 259:19
265:12 267:3
267:11,14
268:22 269:10
269:13 270:2
283:25 290:8
293:14,15,21
297:2,20
299:20 301:8
301:18 302:4
303:17,20
304:24 307:20
308:1,24
312:18,24
313:14 314:8
314:10 315:10
317:11,14
321:22 322:13

322:15,20
323:1,1,18,19
324:16 336:18
341:7,10
343:10 344:19
344:20 347:19
348:16 360:7
364:17 384:14
384:21 386:22
391:1 394:9,14
evidenced
199:21
evident  151:20
evidentiary
174:18
ex  48:11 364:4
exact  39:25
46:12 97:2
147:20 205:13
297:11 389:18
399:24
exactly  17:14
31:9 96:2
129:25 149:7
362:10,17
370:24 371:3
376:22 397:9
exam  3:1 26:4
77:15 161:21
368:21 369:6
371:2 372:21
399:4
examination
1:12 3:3,5,6
6:20 113:24

114:9 127:4,23
134:13 185:2
186:9 270:6
312:11 324:22
364:14 369:4,7
369:22 370:8
372:25 373:13
386:16 389:12
399:10
examinations
27:11 161:22
390:8
examine  22:17
114:11 371:2
examined  6:18
22:7 198:22
318:9 366:18
example  39:12
53:16 121:14
151:1,19
215:22 234:9
294:2 308:20
331:3
exceeded
230:11
except  38:10
39:9 79:20
88:2 120:24
178:11 223:8
exception
40:16 111:18
excess  401:15
403:5,17
exclude  114:24
115:18,19

122:6 166:18
236:25 242:20
242:23 256:19
excluded  21:19
238:3
excuse  97:2
executive  7:20
exhaust  167:21
168:5 214:16
304:19
exhib  245:23
exhibit  4:4,4,5
4:5,6,7,10,11
4:11,12,12,13
4:14,14,15,15
4:16,16,17,17
4:18,18,19,19
4:20,20 20:10
20:20,25 34:24
47:8 48:11
50:20 52:3
54:24 67:18
72:24 74:15
75:5 87:4 90:3
90:21 116:2
126:24 127:8
134:4 135:2
137:17 138:2,2
139:2,12
142:21 146:13
152:23 154:11
155:11 157:18
157:19 158:3
158:16 159:19
161:11 164:14

164:25 165:11
167:16,22
168:14 169:14
170:5 171:7
173:18 179:18
182:12 184:1
184:14,19
186:17 188:2,3
189:8 211:3
212:6 213:7
214:13 215:14
218:1,14 220:4
234:18 235:10
239:13,22
241:4 243:17
244:19 245:23
246:16 248:8
265:9 267:5,15
267:25 268:1
270:17 271:8
271:22 272:25
274:18 275:20
275:20 276:1
276:14,21
278:5,9 279:14
281:9,12,13
282:3 290:6,19
292:10,11,11
292:15 294:7
294:10,14,20
295:7 296:1
297:16 298:3
298:18,22
299:14,19,25
300:12,12,16

300:22 303:6,7
304:5,13,25
305:9,18
306:21 311:18
311:25 313:8
316:6,8,14,15
317:7,25
318:10,20
320:2,7,16
321:20 324:2,9
324:14 325:1
325:14 326:25
328:10,13
329:19 330:12
331:4,5,13,14
331:21,25
332:14,15
333:14,18
334:19 336:10
341:24,25
342:3,6,10
345:3,15,23
346:1,5 347:24
348:2 351:8
352:9,11,17
353:12 355:19
361:2 362:16
363:10 364:22
366:10,14
396:11 397:18
397:18 398:13
398:20 404:5
**exhibits**   4:1,3,9
290:13 297:23
302:12 316:19

344:22 354:8
406:19
**exist**   358:19
**existed**   141:23
191:1,2 231:7
**existence**
160:16 215:15
374:2
**existing**   273:1
**exists**   275:23
**expect**   82:11
322:4
**expectation**
110:1
**expectations**
110:8
**expected**
383:19
**expel**   124:25
176:17
**expense**   246:8
**expert**   10:18,21
10:24 19:10,13
21:19 22:10,11
22:24 110:11
120:10 150:9
187:15 205:4
249:9 252:20
254:24 255:10
260:18 275:17
287:18 312:16
314:13 348:24
349:12 355:19
364:5 390:13
403:6

**expertise**   79:4
119:24
**experts**   115:17
117:19 302:11
349:19 367:5
390:5
**expires**   409:16
**explain**   108:11
111:11 177:18
190:10,13
194:15,20
225:18 227:4,6
263:24 275:24
323:18 336:10
**explained**
109:22
**explains**   246:7
**explanations**
179:4
**explode**   96:23
247:15,16,16
**exploded**   268:9
269:3 359:16
**explosion**   91:25
99:4,22 142:11
356:4 357:5
358:8,9,13,19
358:23 359:5,8
359:23 360:2,5
360:8,10,13
400:1
**explosions**
358:6
**exposed**   96:23

**express** 73:21
  379:10
**expressed**
  73:18 165:3
  205:5 255:3,8
  255:20
**extensive**
  185:20 186:3
  186:18
**extent** 108:8
**exterior** 163:16
  262:18
**external** 137:4
**extreme** 56:8
  217:25 404:4
**extremely**
  308:19 309:3,5
  309:8
**eyewitness**
  42:15

**f**

**f** 2:6 4:12 67:18
  74:15 75:5
  90:3 116:2,4
  189:8 243:17
  266:18
**f.a.s.t.** 135:5
  282:9,10
  283:20 322:1
  325:12 335:6,9
  343:3 354:15
**facil** 27:3
**facilitate**
  102:12

**facilitator**
  390:4
**facility** 15:14
  16:17 17:7
  27:4,6,12 42:2
  44:5 50:12
  51:11,19 52:8
  54:2,5 55:25
  58:3 62:23
  75:25 79:3,24
  111:17 112:2,4
  112:9 116:22
  121:4 128:21
  129:3,4 130:3
  131:15 134:7
  135:9 138:4
  142:3 164:23
  172:11 179:8
  181:14 197:22
  198:20 210:21
  217:23 224:20
  224:22 236:5
  236:22 245:8
  273:16,17
  313:11 315:15
  362:7 371:21
  377:8 381:20
  383:15 392:24
  393:2,16
**fact** 35:21
  40:19 44:10
  54:4 61:6
  81:21 86:7,19
  111:18 129:16
  141:21 153:7

  157:8 174:21
  175:5 177:18
  190:17,17
  200:2 205:14
  209:8 210:19
  221:9 229:14
  232:12 239:18
  243:11 245:5
  245:16 249:4
  250:17,20
  251:13 256:16
  258:10 264:4
  273:9 275:7
  289:16 291:19
  292:4 323:23
  328:23 329:2
  344:4 354:4
  360:9 377:16
  380:22 381:1
  392:23 393:14
  405:22
**facts** 102:13
  149:5,18,21
  155:8 255:14
  255:15,21,24
  256:4,8,10,11
  256:17,19,24
  256:25 265:1,2
  287:23,23
  375:10 382:5
  394:15 403:23
  404:17
**factual** 150:1
  205:25

**fahrenheit**
  172:18
**fail** 289:23
**failed** 64:16
  261:4 289:22
  290:2 384:15
**fails** 410:19
**failure** 110:18
  216:14 384:22
  385:1
**fair** 63:25
  87:25 90:1
  94:1 374:10
  392:1
**fairly** 52:6
  359:14,19
  405:4
**falling** 237:4
  238:4 359:11
**false** 390:19
  391:12,18
**familiar** 33:17
  33:18 65:22,24
  65:25 110:1
  117:25 133:24
  261:1 374:20
**fan** 168:14
  176:16 180:19
  195:20 214:16
  216:4 393:17
**fan's** 216:2
**fans** 167:21,21
  176:5 180:18
  393:20

**far**  25:22 56:7
60:2,11 72:23
86:11 158:17
164:9,13 169:2
182:4 193:19
216:16 217:24
233:4 241:20
241:23 269:20
276:7 364:5
**farther**  18:12
286:17
**fast**  317:24
**faster**  7:4
**father**  86:23
**fear**  348:9
**feasible**  252:25
**feasibly**  104:10
**february**  190:8
194:11 366:20
409:7 410:3
**federal**  391:17
**feel**  83:1 110:10
193:11 204:9
204:12 261:9
386:14
**feeling**  82:24
237:15
**feet**  128:11
171:3 174:2,10
174:21,25
175:2,3,7,12,12
175:17,17
195:15 259:24
269:1 278:25
280:1,12,19

**fell**  222:6 223:5
240:9 333:19
**fella**  26:22 63:4
64:17 65:4,6
156:16 221:15
**fellow**  61:19
62:4 242:6
**felt**  114:1
205:14 237:9
246:12 257:22
**ff**  4:17 248:8
265:9 267:5,15
268:1
**field**  33:8 34:16
34:18,20,21,22
35:2 36:8,13
38:3,10,16,24
39:23 40:17,25
41:14,16 53:11
72:6 77:1
78:17 80:25
81:18,23,25
82:1,22 119:24
148:14,17
156:1 160:11
227:1 259:7
261:6
**fifth**  189:15,17
189:18
**fifty**  87:16,19
**figure**  59:6
329:24 382:8
**file**  21:13 22:19
22:22,22 23:19
24:8 29:4 35:9

35:19 39:5
40:20,21,22
41:5,5,13,17
42:10 43:8
66:14 81:11
90:20 136:2,24
137:10,11
148:7,15
265:18 282:1
339:16
**filed**  5:14
**files**  21:6 38:19
39:7,8
**fill**  46:19 95:4
**film**  328:14
**filter**  180:20
**filtered**  180:20
**filters**  180:14
180:17
**final**  15:18
205:5 282:23
282:24 362:10
364:5
**financially**  5:23
**find**  11:9 65:17
158:5 173:4
218:9 313:12
370:18 372:16
375:10 390:15
**finding**  389:5
**findings**  30:1
67:19 402:10
**fine**  64:24
192:5

**fingers**  191:10
387:6
**finish**  12:24
37:15 57:5
82:4 94:5,6
125:21 153:10
227:16 296:5
367:18 379:17
381:25
**finished**  13:3,4
233:7,10
341:16
**finishing**  180:9
**fire**  8:21,24 9:6
9:6,23 11:18
12:14 14:20,23
15:6,14,25
16:5,16 17:7,8
19:19 26:10,14
26:18 27:25
28:18,19 31:3
31:6,7,11
38:14 40:16
42:9 43:15,17
43:18 44:5,7,9
44:14,14,19
45:1,5,25 46:2
46:2,24 47:1,1
47:20 48:3
49:2,4 50:8
53:14,16,20,24
54:1,7 55:4
58:5,6 59:10
59:14 60:13
61:3,9,20 62:6

| | | | |
|---|---|---|---|
| 64:16,18 66:15 | 146:6 147:6 | 243:1 244:24 | 402:10 403:14 |
| 67:1,6,7 69:2 | 148:25 152:2 | 245:6,13,21 | 403:15 404:23 |
| 69:25 70:18 | 152:13 154:8 | 246:14 249:16 | 405:1,11 |
| 71:11,12 73:3 | 154:16,21,23 | 249:23 250:2,5 | **firebox** 122:19 |
| 73:23 74:2,9 | 155:8 156:8 | 250:9,18,18 | **fired** 1:8 6:9 |
| 75:12,15,21 | 157:1 159:1 | 251:24 259:15 | 271:9 274:6 |
| 76:2,5,7 81:14 | 160:3,9 166:3 | 272:8 279:20 | 348:21 384:5 |
| 85:6,24 86:1 | 166:8,24,24 | 280:25 286:5 | **firefighter** |
| 89:22 90:9,13 | 167:22 169:3 | 286:12,16,20 | 19:18 |
| 90:16 91:20,22 | 178:1,2,3,7 | 289:10,12 | **fireman** 19:17 |
| 91:25 92:4,8 | 179:17 183:12 | 293:14 306:12 | **fires** 110:10 |
| 92:21 94:16,17 | 183:20 186:2 | 318:23 321:7 | 112:22 250:15 |
| 95:13 96:5 | 186:10,12,23 | 333:19 349:2 | 250:21 264:8 |
| 98:21 101:14 | 187:6 189:12 | 350:22 354:16 | 358:5 405:23 |
| 101:19,21 | 189:25 190:9 | 357:9,18,22,23 | **firm** 5:18,21 |
| 102:6,7,9,12 | 190:11 192:24 | 360:4,14,18 | 16:3,8 |
| 105:3 106:3,3 | 193:21 196:1 | 361:8 363:9 | **first** 6:16 11:19 |
| 106:20 107:11 | 197:25 199:25 | 374:11,23 | 11:20,25 12:7 |
| 107:16 108:7 | 200:1,17,21,24 | 375:4,5,9 | 12:9 38:23 |
| 108:25 109:2,4 | 202:7,9,16 | 376:18 380:17 | 39:17 41:2 |
| 109:16,24,25 | 204:3 205:6,14 | 380:20 381:10 | 50:8,11,25 |
| 110:7,12 111:8 | 205:21,21 | 381:13,20,23 | 63:17 66:1 |
| 111:10 112:24 | 206:8 207:6 | 382:9 384:24 | 67:23 68:9 |
| 113:5,7,17,20 | 209:3 212:10 | 387:7,8,8,20 | 70:12,15,20 |
| 113:23 114:12 | 214:25 216:17 | 388:11,13 | 71:2 74:14 |
| 114:25 115:20 | 221:6,12,25 | 389:14,15,17 | 75:11 76:7,20 |
| 116:17,19 | 222:5,10 223:4 | 389:24,25 | 76:21 77:9,14 |
| 117:10 118:15 | 225:4,19,21 | 390:2 392:15 | 80:6,7,7 87:10 |
| 119:16 121:5 | 226:8,23 227:3 | 393:9 394:6,10 | 90:3 105:1,2 |
| 121:14 122:8,8 | 228:11 230:12 | 394:14 395:10 | 105:11,13,20 |
| 123:3,4,5 | 230:25 231:9 | 395:23,24 | 108:13,20,23 |
| 129:19 130:11 | 231:10,13 | 396:1,1,2 | 113:21 114:7 |
| 133:1 135:15 | 237:2,12 238:5 | 397:1 400:1,4 | 116:2,15 127:1 |
| 141:12,15 | 240:6 241:15 | 400:24 401:12 | 138:14 144:19 |
| 142:11 145:19 | 242:9,21,24 | 401:19,21,24 | 152:13,13 |

154:8 159:25
183:20 185:15
189:7 190:8
194:10 202:5
209:2 211:10
222:12 243:18
250:22 258:7
259:8 264:5,6
265:3 268:25
277:1 283:16
292:19 296:7
298:3 302:18
328:15 346:15
356:25 357:3,4
372:25 373:1,9
374:1 376:5,6
376:8 377:9
402:7 408:8
**fit** 208:7 251:20
316:17
**fits** 109:10
**five** 8:6 10:11
10:13,15,19
18:25 44:19
48:21 58:4
85:8 107:3
175:3 209:18
211:2 228:19
270:7 325:20
325:23 328:7
362:11 366:3
369:25
**fixed** 254:13
**flame** 118:6,13
121:8 283:11

283:20,24
284:4,8,23,24
287:5,9 288:13
387:16,17,22
388:3,7
**flames** 152:19
198:24 262:9,9
262:11,14,16
262:19 263:2,3
263:19 264:5
388:19
**flamm** 285:7
**flammable**
126:17 128:3
200:5 237:21
288:2,3,6
299:6,8 357:24
**flash** 150:25
357:18,18
**fleet** 152:11
281:2
**flip** 305:7
**floor** 128:9
151:23 152:1
174:22 175:1
175:18 177:12
179:19 221:4,7
221:12 222:7
234:19,23,24
234:25 235:1
236:22 237:3,4
239:11,12
280:6,19 306:6
306:14,20
362:17,24

365:4 392:22
402:18
**florida** 9:4
32:10,14
**flow** 28:15
**flue** 294:18,21
295:8 332:1
337:5 338:6
352:18 353:4,7
**folder** 41:5,13
41:17 42:7,10
42:11 136:24
**folks** 317:9
338:14
**follow** 216:23
393:22
**followed** 10:2
79:12 157:7
394:1 402:25
**following** 32:15
70:16 73:8
89:24 120:19
198:6 210:2
**follows** 6:18
90:5 260:19
**followup** 10:12
**foot** 175:3
278:24
**force** 195:19
**forcing** 144:23
**foregoing**
408:11 412:5
**forensics** 9:7
28:19

**forever** 82:6
**forget** 301:21
**form** 4:18
34:11 36:15
38:5,12 40:10
40:18 62:7
64:19 72:8,11
80:9 88:12
89:2 93:14
95:7,9,11,17
98:17,25,25
105:5,7 107:17
108:18 110:22
115:1,21 117:3
123:16,20,24
123:25 124:21
125:9,10,15
126:3 127:2
128:13 129:24
131:12 136:9
139:4 141:13
144:18 145:10
145:23 148:10
148:20 149:12
150:11,15
151:13 152:15
153:21 154:12
155:6 157:2,15
164:16 166:12
166:25 171:12
171:25 172:8
173:23 174:4
174:24 175:13
178:25 179:23
180:15 181:18

| | | | |
|---|---|---|---|
| 183:18 184:15 | 304:22 305:21 | 224:25 306:12 | 159:2,8,11 |
| 184:23 185:12 | 306:9 307:24 | 308:18 395:17 | 160:23 161:13 |
| 185:25 198:25 | 309:11 311:2 | **forty** 202:16,18 | 162:7,24 |
| 200:23 201:22 | 311:10 316:18 | **forward** 321:20 | 163:10,25 |
| 202:21 203:14 | 316:24 321:22 | **foster** 1:13 5:11 | 164:16 166:4 |
| 204:22 205:19 | 322:7,16 | 6:15,23 134:6 | 166:12,22,25 |
| 210:9 213:8,16 | 323:18,20 | 172:17 316:2 | 167:23 168:8 |
| 213:23 215:18 | 324:16 333:22 | 366:8 384:4 | 168:17 169:6 |
| 216:22 220:25 | 335:12 336:14 | 407:15 408:7 | 169:21 170:11 |
| 221:22 225:10 | 337:16 338:12 | 410:5 411:2,24 | 170:17 171:23 |
| 225:22,25 | 338:22 340:12 | 412:2,4,12 | 172:10 173:23 |
| 227:5 232:22 | 341:9,18 344:2 | **found** 30:22,24 | 174:16 175:13 |
| 235:2 237:7 | 349:1,4 350:14 | 122:19 126:8 | 176:8,24 |
| 246:23 247:23 | 351:15 352:7 | 142:16 166:20 | 178:25 179:23 |
| 249:1,25 | 357:16 359:15 | 183:12 210:21 | 180:16 181:2 |
| 250:16 253:15 | 359:24 362:2 | 224:9 237:6 | 181:10 183:2 |
| 253:18 255:25 | 362:21 365:6 | 297:9 375:3 | 184:15,23 |
| 256:6 258:6,20 | 367:13 369:1 | **foundation** | 185:25 186:4 |
| 259:9,25 261:7 | 377:4 378:19 | 36:15 40:10,18 | 188:11 190:12 |
| 263:10 265:13 | 381:17 382:15 | 66:7 93:14 | 191:4 197:6 |
| 265:21 267:12 | 382:17 397:14 | 100:7,10 | 198:25 205:19 |
| 268:12,17 | 397:14 404:8 | 101:15 105:7 | 215:6 216:24 |
| 269:5 271:5 | **format** 24:21 | 108:14,18 | 219:1 222:13 |
| 273:5 274:9 | 24:22 95:3 | 110:22 114:13 | 224:11 225:23 |
| 276:11 277:18 | 398:5 | 115:1,21 | 227:5 228:14 |
| 279:5 280:20 | **formed** 110:15 | 118:25 119:15 | 230:13 231:14 |
| 281:4 283:12 | 252:13 | 121:10 123:25 | 235:2 240:1 |
| 286:3 287:20 | **forms** 133:21 | 124:12 128:15 | 241:11 242:10 |
| 287:21 289:24 | 301:8 304:25 | 131:16 141:13 | 247:4,23 |
| 290:5,8 291:21 | 341:7 | 142:12 146:8 | 249:25 253:18 |
| 292:17 293:11 | **fort** 1:2 5:16 | 146:16 148:10 | 266:23 267:17 |
| 297:5,7,9,13,14 | 27:4 45:1 86:5 | 150:21 151:5 | 276:11,25 |
| 297:20 301:2 | 233:3 260:13 | 151:15 152:15 | 277:18 279:5 |
| 301:12 302:2 | **forth** 24:17 | 154:3 155:18 | 279:12,21 |
| 302:16 304:6 | 71:20 89:12 | 156:5 158:11 | 283:6 287:21 |

292:17 293:11
297:5 301:4
302:16,24
304:22 312:21
316:24 318:25
319:7 320:3
325:7 326:13
330:15 336:14
337:15 338:22
339:11,24
340:7 343:8
344:2 345:12
346:8 349:23
353:20 354:2
358:21 359:24
367:13 403:8
**four** 14:2 17:11
175:2,3 185:22
202:18 270:13
282:5 283:21
325:23 366:2
394:3 397:25
398:9,12
401:15
**fourteen** 11:23
**fourth** 189:19
207:7
**frame** 217:8,19
292:25 379:16
379:20
**framing** 217:14
**frcp** 221:16
**fred** 4:11 34:7
39:9 51:17
52:8,23 53:1

78:9,18 107:8
111:13 113:2
113:14 148:6
149:11 150:13
156:14 157:13
157:13 160:18
160:22 161:2,6
164:23 171:8
172:15,22
178:17,24
180:11 181:8
181:15 184:4,7
184:21 188:6
233:15 258:4
259:17,20
392:7,13 393:5
393:11
**free** 68:4
**frequently**
228:1
**fresh** 168:15
**friday** 8:4
**front** 11:8 41:5
41:18 51:23
68:2 147:23
154:16 167:25
168:10 176:17
180:19 215:22
215:22 231:21
269:12 347:3
387:23 397:19
397:20
**fuel** 97:11,12
101:6 105:2,20
146:20 150:22

229:8 230:6
288:5 376:6,15
377:21,22
387:21 399:25
403:10
**fuel's** 376:6
**fueled** 105:15
**fuels** 403:20
**full** 6:22 7:25
8:2 155:17
219:20
**fully** 109:22
**fumes** 121:25
199:19
**function** 234:5
**functional**
176:9
**functioning**
196:20 349:8
**furnace** 120:8
388:4
**further** 94:19
100:1 162:11
171:7 252:6
407:11 408:25
**furthermore**
397:5
**furthest** 263:25
264:15,16

**g**

**g** 4:4 72:24
126:24 127:8
355:19,24
361:2 362:16
363:10 364:22

366:10 397:18
398:13
**gallon** 107:14
168:25 169:4,8
169:11 208:2
208:10 223:3
240:14 244:20
268:5 298:4,19
298:25 300:9
329:6 335:23
336:11,12
339:22 341:2
341:16,17
343:22 344:22
354:14
**gap** 387:25
**garage** 138:20
154:9,24
213:14 234:7,8
263:20 295:14
401:24 402:1
**garbage** 46:19
**gardner** 2:10
2:10 3:3,7 6:4
6:4,21 20:15
20:17 21:16,18
25:7,12,13
34:14 36:16,17
37:17,21,24,25
38:7,8,22
40:13,24 44:2
44:4 45:17
47:8,14,15
54:19,24 55:2
57:8,14,17

| | | | |
|---|---|---|---|
| 62:21 64:5,14 | 127:7 128:2,22 | 164:7,17,24 | 211:21 213:5 |
| 64:22 65:3 | 130:4,7,15,21 | 166:7,15,17,23 | 213:11,19,25 |
| 66:9 67:24 | 130:22 131:13 | 167:14 168:2 | 215:4,9,19,24 |
| 68:1 69:20,22 | 131:18,25 | 168:12,19,20 | 216:1,23 217:2 |
| 71:5,8,10 72:9 | 132:2,5,8 | 169:7,12,13 | 219:4,6,10 |
| 72:14 80:11 | 134:9,18 | 170:4,15,23 | 220:9,13 221:1 |
| 82:5,13,18 | 136:13,19,20 | 171:4,14 172:3 | 221:24 222:17 |
| 84:6,15,19,20 | 138:1 139:11 | 172:13 173:24 | 222:20,23 |
| 87:3 88:15,22 | 139:20,23 | 174:7,12,17 | 224:12 225:15 |
| 88:25 89:4,15 | 140:3,10,15,19 | 175:8,16 176:3 | 226:6 227:14 |
| 89:20 91:6,10 | 140:22 141:4 | 176:13 177:4 | 227:18,21 |
| 91:12 92:9,13 | 141:15 142:6 | 177:12,14 | 228:2,16 |
| 93:2,19,23 | 142:20 143:2,8 | 179:13 180:1 | 230:18 231:5 |
| 94:3,7 95:14 | 143:11,13,16 | 180:14,24 | 231:17,22 |
| 95:22 96:8,14 | 144:4,12,17 | 181:7,11 182:2 | 232:5,16,23 |
| 96:19 97:17,20 | 145:4,18,24 | 182:8 183:5,25 | 233:9,14 235:9 |
| 97:22 98:13,14 | 146:12,17,25 | 184:18 185:9 | 235:18,21,23 |
| 99:7,11,15,17 | 147:1 148:13 | 185:14 186:1 | 237:18 238:9 |
| 99:20 100:5,15 | 149:1,9,13,19 | 186:11,14 | 240:2 241:12 |
| 100:17,23 | 149:24 150:4,6 | 188:15,21 | 242:13 244:4,7 |
| 101:5,12,17 | 150:8,17,18 | 189:6,15,17,21 | 246:24 247:3,8 |
| 102:1,3,21,23 | 151:2,9,17,24 | 189:23 190:25 | 247:24 248:6,7 |
| 103:1,9,14,17 | 152:20 153:3 | 191:6,15,17 | 249:7 250:8,15 |
| 103:21,23 | 153:17,23,24 | 192:2,4,6,12,14 | 253:17,19 |
| 104:1,4,22,25 | 154:6,19 155:2 | 192:17,20 | 254:16,18,20 |
| 105:9,10,21 | 155:4,10,16,20 | 193:4 196:23 | 256:3,9,18,21 |
| 107:21,25 | 155:24 156:6 | 197:11,13,15 | 257:14 258:13 |
| 108:1 109:19 | 156:13,21 | 199:8 201:7 | 258:15,17 |
| 111:2,5 114:21 | 157:3,17,22 | 202:2 203:2,16 | 259:1,3,4,14 |
| 115:11,15 | 158:1,15,23 | 203:18 204:1 | 260:6,14,17 |
| 116:1 117:7,8 | 159:5,9,14,18 | 204:20 205:2 | 261:12 262:3,5 |
| 119:4,16,23 | 160:14 161:4 | 205:20 206:6 | 262:6 263:6,15 |
| 123:14 124:16 | 161:16,19,20 | 206:11,14 | 264:10,18 |
| 125:6,19,22,24 | 162:10,18,20 | 210:13,15 | 265:23,25 |
| 126:10,12 | 163:4,11 164:2 | 211:4,8,9,16,19 | 266:3,5,9,11,12 |

267:2,4,21
268:13,18
269:6 270:7,15
273:18,20,21
274:11,12
276:13 277:3
278:1,3,8
279:7,10,13
280:24 281:6
283:15 287:1,4
287:7,10,14
288:11 290:1
290:25 291:2,4
291:11,13,24
292:24 293:1
293:12,18
296:10 297:15
300:2,5,7
301:3,7,19
302:5,9,20
303:5 304:7,23
305:20,24
306:15 308:5
309:21 310:23
311:6,12,24
313:3 314:16
314:18,21,23
314:25 316:19
316:22 317:5,6
319:2,8,18,22
320:6,22
322:11 323:5
324:1 325:8
326:17,19,22
327:13 328:1,9

330:19 331:11
332:11 333:10
333:11 334:6
335:17 336:17
337:2,6,23,25
338:4,6,13
339:1,15,18
340:4,8,25
341:12,23
342:21 343:13
343:16,20
344:7,13
345:13 346:13
346:17 347:9
347:18,23
348:3,6,8
349:2,10,11
350:4,5 351:3
351:16 352:8
352:12,14,16
353:21 354:11
355:6,10,12,14
355:18,25
356:2 357:14
357:20,21
358:2,25 359:2
359:3,16,21
360:1 362:3,9
363:4 365:13
366:4,7,9
367:11,16,19
367:25 368:2,6
368:8 369:8,23
370:5 378:20
378:22 379:2

379:18,22
380:3,10
381:22 382:4,7
382:23 384:3
385:17,21
388:12,15
391:14,16,20
395:25 397:4
397:11,14
398:21 399:9
399:11 403:9
404:9,11,15,19
406:8 407:3,8
**gardner's**
384:8
**gardnerandra...**
2:13
**garner**  150:23
153:15 251:23
**gas**  1:8 6:9
46:16,17,19
48:1 100:1
195:6,10 271:9
272:10,16
273:2 274:6
348:21 359:13
384:5 387:9
**gasoline**  151:1
**gasses**  99:25
**gate**  46:6,7,8
**gather**  265:1
**gathered**
118:15 307:18
313:11

**gathering**
135:16
**gauze**  78:14
295:18,24,25
296:2,14,17
309:10 311:7
323:14 325:20
326:14 327:3
386:24,24
387:2,5
**general**  14:20
41:25 53:13
82:25 95:12
112:24 116:17
116:19,23
119:25 194:23
207:5,25 253:3
253:4 361:22
363:8
**generally**
194:23 400:9
400:11 403:13
**generated**  95:2
182:7
**generator**
162:1,5,9
**gentleman**
220:14
**gentlemen**  68:9
**getting**  61:19
69:20 122:1,7
265:5 329:10
**gg**  4:17 311:18
311:20,23
313:8

| | | | |
|---|---|---|---|
| **giant** 143:18 | 255:16 263:13 | 197:24 198:4,7 | **goes** 122:18 |
| **give** 8:10 12:7,8 | 273:8,12 288:8 | 198:8 208:9 | 176:2 179:6 |
| 13:22 29:2 | 394:5 408:21 | 209:19 211:3 | 209:9 267:1,3 |
| 31:5,11 32:22 | 412:9 | 211:19 212:20 | 310:6,7 393:1 |
| 42:24 43:3,16 | **gives** 41:6 | 214:13 218:13 | **going** 5:3 13:14 |
| 43:18 45:10 | 151:19 | 220:4 227:17 | 16:15 18:12,12 |
| 50:3 53:25 | **giving** 11:5,17 | 227:18 231:11 | 32:22 57:11 |
| 58:12 77:11 | 19:13 87:21 | 235:3,10 | 61:8 62:12 |
| 78:9,22 95:21 | 116:17 261:10 | 237:23 239:22 | 69:1 82:5 |
| 101:14 131:25 | 379:18 | 241:17 243:17 | 85:10 103:6 |
| 139:13,14 | **glasses** 43:22 | 246:16 248:8 | 111:18 112:2,4 |
| 149:21 150:2 | 45:14 | 250:21 258:5 | 112:7 113:25 |
| 183:21 215:1 | **glenn** 68:7 69:8 | 259:23 267:2 | 152:12 155:9 |
| 237:15 279:12 | 69:18 75:9,11 | 267:25 271:22 | 180:20 190:20 |
| 286:8 313:22 | 76:6,13 | 281:9,13 282:3 | 191:21,25 |
| 313:24 366:5 | **global** 84:24 | 290:6 297:16 | 200:10 221:9 |
| 367:22 370:18 | 85:1,5,6 | 300:16 303:6 | 224:22 227:8 |
| 405:15 | **glowing** 388:23 | 308:14 309:19 | 238:2 269:24 |
| **given** 12:11,15 | **go** 5:9 7:3 | 311:18 313:2 | 281:12 324:5 |
| 18:14,19,22,25 | 11:16 13:15,23 | 315:21 317:7 | 331:21 341:20 |
| 19:12 25:3 | 19:11 29:1 | 317:22 318:10 | 346:24 348:10 |
| 31:17 32:2 | 42:10 53:19 | 318:13 320:7 | 384:9 391:10 |
| 34:17 43:13 | 61:12 62:16,17 | 322:18,22 | 393:17 |
| 51:4 75:22 | 63:9,9 68:4,22 | 323:2,13 324:2 | **golden** 34:8 |
| 76:3 78:7 | 85:5,17 87:1 | 324:14 325:1 | **gonna** 8:17 |
| 98:17 102:13 | 95:8 108:8 | 325:14 327:20 | 37:15 45:2 |
| 108:24,24 | 109:11 110:7 | 328:1 331:22 | 47:11 54:17,20 |
| 111:13 134:15 | 125:22 127:8 | 332:9 333:4 | 62:12 63:9 |
| 148:23 157:8 | 142:21 153:8 | 337:7 338:8 | 72:22 82:6 |
| 179:25 182:1 | 153:18 157:18 | 342:25 345:3 | 84:6 87:8 99:9 |
| 190:23 193:10 | 158:16 175:25 | 347:24 350:19 | 99:9,14 100:19 |
| 193:16 207:5 | 177:6 178:18 | 353:11 355:19 | 100:21 103:8 |
| 225:25 230:25 | 179:5 182:7,9 | 361:1,1 365:14 | 103:19,25 |
| 237:22 244:17 | 182:12 184:1 | 369:23 378:22 | 134:2 139:12 |
| 251:18 255:11 | 184:19 188:2 | 386:19 389:5 | 140:16,20 |

**[gonna - head]**                                                    Page 38

142:21 158:4
175:18 191:6
191:25 214:10
230:24 237:25
261:17,24
279:10 307:8
317:22 354:12
363:10 366:4
383:22,23
391:2 397:19
399:22
**good**   5:3 44:18
138:9 140:17
188:21 237:13
326:20,21
374:17 405:24
406:4,6,9
**googler**   55:3
**gook**   246:21
**gotten**   48:23
**granger**   2:12
**grave**   141:8
**gravity**   259:23
**gray**   319:25
**great**   84:9
188:24 270:8
**greater**   253:13
**greg**   2:20 5:19
34:7 130:8
**gross**   89:13
**ground**   11:16
12:20 250:1,10
280:12 305:25
306:20,22
333:20 347:1,9

347:11 359:11
361:17,18,19
381:8,14
**group**   9:15
114:22 266:25
**guaranteed**
86:9
**guard**   46:5,5,7
46:8 153:5
214:11
**guess**   7:16
16:25 28:5
30:12 32:1
39:3 45:15
83:6 98:4
150:2 167:10
227:19 233:4
283:25 285:8
329:22 343:12
343:12 363:1
363:21 395:6
405:10
**guessing**   292:6
**guide**   70:8 81:2
91:25 114:5
395:4,11
**guideline**   70:5
70:7 92:25
93:1 206:4
207:3 261:18
**guidelines**   81:2
94:25 316:17
344:11
**gun**   181:20

**guy**   43:22
45:13 50:7
65:18
**guy's**   79:22
**guys**   52:5
140:15 223:10
260:8 313:13
316:7 387:19

**h**

**h**   411:3
**hair**   72:22
**half**   7:15 8:16
9:16 14:2 46:4
111:21 128:11
138:20 142:10
213:21 282:21
389:8 405:15
405:19
**halfway**   165:10
173:18,19
213:13 215:16
**hamilton**   1:15
7:21 19:21
408:3,6 409:18
**hand**   6:14
47:11 54:20
139:12 142:21
158:4 219:2
319:18 363:10
387:5 409:6
**handwriting**
34:25 265:16
265:20 266:20
267:7 282:18
283:4 290:8

297:23 298:7,9
298:10 300:20
300:23 315:25
316:3 324:19
332:19,22
342:11,25
352:23 353:1
**handwritten**
4:11 35:2,6,15
39:7 40:7,9
49:23 52:25
82:20 169:16
184:3 188:5
**hanging**   273:1
280:23
**happen**   106:23
145:15 190:24
193:2,3,15,17
226:5,7 227:7
235:7,8
**happened**
125:1 193:13
225:12 251:22
251:22 297:8
298:16 317:18
354:9
**happening**
250:9
**happens**   71:18
194:20 289:4
**hard**   215:14
321:3
**harder**   175:11
**head**   17:15
175:3,4 208:13

heading   282:9
hear   70:7
   254:17
heard   59:24
   65:6,8 262:20
   264:2,19
   386:23,23
heat   76:9 105:3
   131:8 147:3
   157:12 177:19
   189:12,25
   190:2,3,4
   193:24 195:1
   195:14 199:25
   209:9,10
   237:12 247:13
   326:15 359:20
   364:24 373:12
   373:12 375:22
   375:22,23
   383:24 387:20
   388:8,20,22,23
   399:25
heated   129:11
   194:18 226:8
   234:7
heater   76:10
   77:3,21 78:3
   105:14,16,23
   105:24 118:13
   118:18,18
   119:9,10 120:2
   120:5,16
   121:22 122:12
   131:5 139:3,7

141:11 143:21
146:13,21
147:3,11 152:1
156:7,25
170:16,24
174:10 175:6
177:20 194:21
195:1,5,13
199:6 202:7
208:21,22
209:3,4,4,4,6,7
209:8 222:6
223:5 240:7
243:3,5,6,8,16
243:20,22,24
246:3,6,14
273:22,23
274:8 275:1
289:7 298:4,20
298:21,25
299:1 304:8,8
304:8,9,10,11
304:12,15
306:4,19
309:25 310:4,6
310:6,9,22
312:11,18
318:11,24
321:7 322:19
326:8,11,16
327:5 328:19
330:14 334:4,7
334:8,10
335:20,21
337:14 345:17

345:18 346:10
347:1 353:4
356:4,4,14,25
357:5,5 358:16
358:17 359:12
361:7,16
363:15,16
364:22,24
365:8,10
366:14,16
368:17,18,20
368:23 369:6
370:22,22
371:1,10,11,23
376:4 377:17
378:17,18,22
380:6 382:10
382:11 401:20
401:23 402:8,8
402:19
heater's   335:18
heaters   73:9
   75:16,21 77:22
   77:25 78:1,20
   79:5,6,25
   83:13 106:4
   111:19 112:7
   113:5,16
   117:11,20,25
   118:5,7,14,23
   120:12 121:7
   121:12,15
   122:3,19
   123:11,12
   124:6 125:2

126:19 127:4
128:5,9,12
129:12 131:1,4
131:8,14 132:9
133:8 143:14
143:22 146:1
147:14 157:9
157:11 167:8
168:21 170:13
170:21 171:10
171:18 172:14
172:17 174:2
175:11 178:23
179:20 181:16
181:21 189:20
190:2,7 193:19
194:16 196:9
196:15,20
197:4,8,9,23
198:11,22
199:2,10,13,24
208:9,15,24
209:2 212:21
215:5 224:5,10
224:17 230:11
232:13,20
237:1,4 238:4
238:6,12
243:14 244:14
246:9,11 251:2
251:4,8 258:5
259:24 270:1
271:10 272:11
272:16 273:2,3
273:13,14

274:2,5,7
275:7,11
279:19 280:11
280:18 289:11
289:19 291:17
295:13,15,16
306:17 309:2
310:21 314:6,8
315:5 316:7
318:8 336:1
348:14,19
349:15,22
350:7 354:17
356:15 359:6
359:13 360:4
360:11 364:14
365:3 367:7,8
368:1,5 369:6
369:7,20 370:9
370:14 372:16
373:8,13,19
377:2 378:15
378:24 379:1,3
379:4 380:23
382:21,22
383:8 384:15
384:18,23
385:3 386:11
386:14,16,22
387:7,9,13
393:17 402:5
402:17
**heating**  1:7
5:13 6:5 76:8
83:11 237:2

334:10 411:1
412:1
**heats**  195:4
**heavier**  210:12
**heavy**  55:21
126:7 151:4,11
152:18 166:19
210:14 223:25
224:3,8
**hehner**  2:14 3:4
3:7 6:8,8 37:15
37:19,23 45:12
64:20,24 67:22
67:25 71:4,6,9
108:16,19
123:9,13
127:19 140:6,9
160:13 211:5
220:11 235:17
235:19 254:17
254:19 260:12
260:16 265:22
265:24 291:9
299:25 300:4,6
310:19 314:15
314:17 333:8
336:24 337:4
338:3,5 348:4
355:8,11,13,15
365:22,24
366:7 384:4,5
384:7 385:23
385:25 388:14
388:16,17
389:1,4,10

391:10 392:4
404:20 406:2,5
406:7,18,23
**height**  250:10
280:10 402:18
**held**  73:25 84:5
396:25 406:13
**help**  47:17
54:18 312:23
313:1,2 329:15
337:7 393:14
**helped**  44:24
313:4 382:8
385:7
**helpful**  72:6
81:5
**hercul**  106:21
**hercules**
106:21
**herculine**
107:12,20
**herculiner**
107:9,15
209:13 210:4
210:18 241:7
247:22 248:3
**herculiners**
106:24
**hereto**  412:7
**hereunto**  409:5
**heritage**  45:15
45:19
**hexalent**  249:9
**hexane**  249:5

**hh**  4:18 315:21
315:22 316:14
**high**  175:17,17
175:25 186:24
230:17,17
234:4 250:4,19
**higher**  87:25
150:25 172:23
172:23 175:10
176:21 215:16
230:7,17
250:11 252:7
**hindsight**  83:7
**hire**  249:13
**hired**  30:8,10
86:2
**hit**  175:18
178:22 181:16
**hold**  11:13 48:9
73:24 103:14
130:15 136:13
143:11 144:12
158:19 191:6
211:13 214:21
214:24 215:4
252:6 279:10
299:3 326:19
345:14 346:24
348:13 349:21
363:16 369:19
373:3 385:17
396:23,25
**holding**  100:15
319:19

**holds**  23:7
  252:3
**hole**  320:8
  387:25
**home**  7:8 18:18
  31:19,19 234:7
  393:1
**homeowner**
  30:11 31:2
**hose**  240:19,22
**hot**  226:3
  228:15,25
**hour**  1:19 46:3
  87:12,16,17,18
  87:19,20 88:4
  89:6,11,16,18
  90:24,25 389:8
  392:21 408:15
**hourly**  8:7
  88:10,13,17,19
  89:6,10
**hours**  8:3 14:2
  17:11 44:19
  52:21 102:18
  111:21 123:3,5
  191:18 194:14
  389:9
**household**
  120:7
**huh**  47:21
  54:23 55:7
  75:8 90:7
  116:14 132:19
  165:13 182:21
  183:10 184:2,9

  189:10 214:17
  219:18,22
  227:21 234:20
  268:2,6 270:20
  278:12 303:12
  303:14 312:3
  318:21 319:6
  324:18 331:24
  332:16 345:11
  352:22 364:21
  373:25 384:12
  399:14 404:16
**human**  128:10
  175:2
**hundred**  230:7
**hvac**  119:24
**hyphen**  90:8
**hypotheses**
  110:19 253:5
  400:5 405:8
**hypothesis**
  98:17,25 109:8
  109:9,10,13
  110:14,24
  125:25 126:5
  187:3,5 199:22
  252:12,24
  253:13 287:15
  306:18 308:22
  375:14 376:2
  394:8

**i**

**iaai**  90:8
**idea**  33:10 66:3
  110:1 180:25

  283:1 321:11
  339:19 369:2
**ideal**  206:12
  309:14
**identified**
  54:21 96:6
  100:11 105:5
  106:9 272:24
  312:15 400:12
**identifiers**
  316:15
**identify**  61:2
  95:15 99:14
  201:17 310:9
  397:24
**ignitability**
  125:8
**ignitable**  126:2
  285:8 287:19
  299:8,13
**ignite**  123:15
  123:23 125:13
  145:25 196:25
  229:3 230:6
  235:1 283:24
  285:17 376:4,9
  379:9
**ignited**  105:2
  105:12,13,20
  105:22 106:1
  123:21 126:19
  128:6 200:2
  209:3 232:14
  287:16 288:7
  289:11 376:8

  380:18 381:5,7
**ignites**  359:13
**ignitial**  382:9
**igniting**  381:3
**ignition**  14:24
  97:9,10,12
  105:3 106:3
  119:7 194:15
  194:24 195:2,4
  195:9,10 209:6
  285:5,6,6
  377:25 380:23
  382:9 394:10
**ii**  124:8 151:20
  200:5 227:11
  227:12 229:6
**iii**  124:8
**iiia**  200:5
  227:12 229:6
**iiib**  200:5
  227:12 229:6
**illinois**  14:3
**image**  47:11
**imagine**  79:2
**impact**  393:12
**important**
  13:16 62:3
  66:23 67:2,4,8
  79:2,8,9 92:21
  92:22 174:22
  293:22 308:1
  361:25 400:5
**impression**
  63:8

**inappropriate**
391:16
**inception** 375:4
**inch** 185:22
258:10
**inches** 177:6
178:18 179:11
182:4 278:24
278:25 280:1
**inclu** 114:23
**include** 27:2
151:3 181:12
345:23 375:16
**included**
114:23 275:4
288:17 329:18
334:18 335:24
**including** 18:17
20:8 28:3 34:5
63:5 115:18
131:1 164:3
186:17 197:11
226:22 338:15
393:24
**inclusive** 19:2
**income** 8:17,18
85:15 86:9,11
86:17,20 89:24
**incongruent**
81:2 177:21,23
**incorrect**
110:21 391:20
400:13
**incorrectly**
314:9

**increased**
398:5
**independent**
9:23 28:15
29:6 32:7
**index** 3:1 4:1
**indian** 45:19,19
**indiana** 1:1,4
1:16,18 5:13
5:15,18 7:9 9:5
14:3 70:16
71:7 85:19
233:3 391:16
408:1,6,14
410:4 411:1
412:1
**indiana's**
348:23
**indianapolis**
1:18 2:5,16
5:18 7:20
15:12,13 18:7
27:13 32:10
242:14 260:7
260:12,15
408:13
**indicate** 24:10
82:21 126:15
187:6 293:13
308:10 385:7
**indicated**
121:23 126:24
127:3 202:8
272:6 300:11
310:5

**indicates** 8:23
9:13 134:5
174:19
**indicating**
94:15
**indication**
217:15,17
296:8 364:25
364:25 388:8
400:24
**indications**
388:22
**inductive** 98:19
**indy** 312:13
**inen** 150:12
239:2
**inendino** 26:5,6
26:21,21 35:16
39:9 113:19
114:22 134:6
148:8,19
149:10 150:12
160:12 161:6
161:10 165:11
168:13 169:17
171:8 178:17
180:10 181:13
184:21 239:2
259:21 260:8
312:2 313:4,9
313:21 317:10
329:18,24
338:15
**inendino's**
160:21

**informa** 53:13
**information**
8:22 31:13
32:2 35:6,19
38:19 39:5,14
41:6,7,11,18,19
41:21 42:8,10
42:25 43:4,16
46:2 53:13,20
61:22 62:4,9
63:6,11 64:11
65:1 66:21
67:2 75:5,9,22
76:3,13 77:10
78:8,10 79:7
79:14,15 80:18
81:6,9,10,12
82:11,15 98:16
102:13 106:13
111:12 127:24
134:15 136:5
137:13 142:15
146:4 148:23
149:22 150:1
150:12 160:21
165:5 177:23
177:24 179:15
180:5 181:13
182:1 183:21
183:22,24
185:7 186:22
190:6 205:25
231:21 233:18
234:2 250:7
260:3 262:22

263:1,7,13
266:25 273:6,9
283:13 286:21
288:18 340:17
341:22 349:24
384:14,17,22
393:11 394:4,6
395:2 396:18
404:24
**informed** 40:2
54:1 77:25
112:6 113:13
114:22 115:17
221:13
**infrared** 79:5,5
83:13 117:10
117:20 120:1,5
120:11 190:7
212:21 215:4
272:10,16
273:3 401:20
401:22 402:6
**ingredient**
209:22 210:4,5
248:25 249:3
**ingredients**
209:23 248:16
**initial** 44:11
48:6 109:8,8
127:12,25
140:20 372:21
372:21,24
397:22
**initially** 39:2
44:9 46:11

63:7 86:17
94:25 134:12
152:17 259:13
262:8 292:19
372:23 389:25
394:4 397:8
**initials** 74:21
75:4 160:1
301:22
**initiated** 73:8
**inside** 58:21
59:14,18 60:5
60:12 62:5
63:4 64:2,17
107:10,15
113:3,16
121:22,22
122:2,7,25
128:18 130:23
132:12,13,15
134:22 138:17
147:4 152:21
153:4,9 159:4
163:12 167:8,8
169:2 178:6,12
179:17 194:20
195:12,13,18
196:5 197:3,8
198:6,8,19
199:20,24
200:24 208:16
208:17 212:9
216:18,21
217:13,18,18
217:20,20

218:6,8 220:1
220:20 222:22
223:4 232:19
234:3,6 239:21
240:4,6 247:19
251:14 267:15
272:16 274:5
277:8,12 278:4
279:19 280:4
294:21 295:11
295:19,20,21
295:23 296:13
296:22 298:8,8
306:23 308:7
308:21 310:4
310:12,16,21
311:8 318:23
319:25 321:6
327:4,19
330:14 333:12
333:17,24
334:3,10
335:25 336:1
337:19 338:18
346:11 347:19
353:7 359:13
378:13,17,18
378:22,24
381:20 382:10
383:1,4,8,14,17
383:20,22
386:3 387:16
388:4 393:16
402:17

**inspect** 383:14
**inspection**
160:4 183:20
**inspections**
163:13 236:23
**install** 76:9
83:12 274:6,25
**installa** 279:18
**installation**
4:13 78:3,20
120:15 193:21
270:19 274:8
279:18 315:13
348:18 350:6
356:14 357:11
402:14
**installed** 75:16
75:20 79:23
117:11 119:21
120:1,7,13,16
121:13,15
157:10 190:14
190:15 194:16
196:15 199:3,6
200:17 251:2,9
273:15 314:9
314:12 315:6
315:11 348:17
349:8 350:1,18
360:4,11 367:8
402:9
**installer** 402:16
**installing**
272:10,15
273:2

| | | | |
|---|---|---|---|
| **instance** 87:10 | **investigate** | 400:6 | 38:1 74:4 90:1 |
| **instances** 375:3 | 110:10 132:25 | **investigations** | 96:5 116:22 |
| **instructed** 39:5 | 286:12 | 9:6 31:24 37:4 | 121:16 123:4 |
| **insurance** 9:4 | **investigated** | 70:18 85:7,25 | 134:17 150:10 |
| 16:22,24,25 | 250:22 | 91:25 94:16 | 179:3 185:3,5 |
| 17:3 29:3 | **investigating** | 389:15,22 | 190:22 237:11 |
| 30:10,11,13 | 136:22 | 390:4 395:4 | 259:16 273:17 |
| 31:2 32:14 | **investigation** | 401:12,18 | 289:15 323:4 |
| 39:16 357:1 | 9:8,23 15:6,25 | 403:16 404:21 | 389:16 390:3 |
| 360:22 | 25:24 28:18 | 404:25 | 390:11 395:9 |
| **insures** 75:2 | 35:4,25 40:16 | **investigator** | 399:4 401:19 |
| **intact** 359:14 | 41:1 59:7 | 8:24 11:18 | 401:21 403:6 |
| 359:19 | 61:11,14,15 | 12:14 28:1 | **involvement** |
| **intake** 167:21 | 63:13 67:4 | 31:3,7 32:8 | 29:5,11 35:24 |
| 304:19 | 69:2 74:2 | 36:19 38:2,18 | 152:18 379:14 |
| **intentionally** | 79:17 81:14,24 | 69:25 70:14 | **involving** 19:19 |
| 213:22 214:3 | 82:23 83:2 | 85:18 92:4 | 359:6 |
| **interact** 399:25 | 89:23 91:19 | 202:16 252:18 | **ish** 246:21 |
| **interchangea...** | 93:22 98:21 | 260:20 286:5 | **issue** 29:23 |
| 387:1 | 101:21 102:12 | 293:14 375:5,9 | 114:4 204:17 |
| **interested** 5:23 | 109:24 110:5 | 381:23 389:17 | **issued** 14:9,11 |
| 409:3 | 111:1 136:1 | 389:24 390:1 | 14:12 20:7 |
| **interior** 294:18 | 145:13 148:22 | 400:5 | 21:10 |
| 294:20 295:8 | 150:7 173:25 | **investigator's** | **issues** 31:17 |
| 363:2 | 205:21 206:16 | 251:25 252:11 | 112:22 114:6 |
| **interpret** 98:9 | 206:19,22 | **investigators** | 114:17 141:19 |
| **interpreted** | 261:22,23 | 31:12 85:8 | 179:3 202:12 |
| 151:3 | 270:24 349:3 | 86:1 | 322:21 328:2 |
| **interpreting** | 359:5 360:23 | **invoice** 4:10 | **issuing** 360:19 |
| 338:19 | 374:13 375:10 | **invoices** 87:4 | 374:14 |
| **introduced** | 384:13 389:24 | 134:4 | **item** 208:7 |
| 250:24 | 392:6 393:12 | **involve** 19:21 | 298:18 391:7 |
| **introductory** | 393:23,24,25 | **involved** 9:7 | **items** 32:3 |
| 399:15 | 394:21 395:5 | 12:17 14:7,23 | 166:21 313:11 |
| | 395:10,14 | 16:16 19:12 | 339:10 |

[j - jones]                                                              Page 45

| j | | | |
| --- | --- | --- | --- |
| **j**  2:10 3:3,7 | 266:16 270:16 | 185:15 191:23 | 104:23 105:7 |
| 318:17 | 276:5,19 | 238:25 | 105:18 107:8 |
| **jacket**  220:15 | 279:10 281:13 | **johnson**  2:15 | 107:17 108:14 |
| **jacobs**  317:11 | 295:7 297:18 | 17:20 | 108:18 110:22 |
| 338:16 | 300:8,16 | **joint**  26:3 | 111:13,22 |
| **james**  1:13 2:3 | 311:25 313:8 | 77:15 134:13 | 112:6 113:2,6 |
| 2:14 3:4,7 5:11 | 316:2 317:24 | 324:22 390:7 | 113:8,14 |
| 6:8,15,23 | 318:16 319:10 | **jones**  2:3 3:5 | 114:13 115:1 |
| 17:20 134:6 | 320:17 321:20 | 4:11 6:6,6 21:1 | 115:14,21 |
| 407:15 408:7 | 324:9 325:2 | 25:5,8 34:7,11 | 117:3,5 118:25 |
| 410:5 411:2,24 | 326:24 328:1 | 34:13 36:15 | 119:15,19 |
| 412:2,4,12 | 328:10 331:21 | 38:5,12 40:10 | 121:10 123:25 |
| **january**  1:19 | 332:7 341:24 | 40:18 43:24 | 124:12,21 |
| 5:2,4 408:14 | 345:15 346:24 | 44:3 47:13 | 125:15,21 |
| **jdhd**  182:16 | 347:9 352:8 | 51:18 52:9,23 | 126:3 127:2,22 |
| **jhehner**  2:17 | 363:10 365:17 | 53:1 57:5 62:7 | 128:13,15 |
| **jim**  6:6 7:1,4,14 | 366:7,8,10 | 64:4,19 66:7 | 129:24 130:14 |
| 13:2 17:20 | 384:4 388:12 | 69:18 72:8,11 | 130:18 131:12 |
| 20:12 21:1 | **jims**  22:5 | 78:9,18 80:9 | 131:16,23 |
| 24:14 28:6 | **job**  1:25 8:10 | 82:3,7 84:9 | 132:1,4,7 |
| 36:18 47:9,16 | 44:18 87:1 | 86:13 88:12,20 | 134:8,10 136:9 |
| 69:23 74:14 | 88:21 102:11 | 88:24 89:2,8 | 136:15 137:20 |
| 84:6 89:5 90:3 | 393:1 | 89:19 91:5,8 | 137:23 139:4 |
| 90:22 127:8 | **john**  26:22 | 92:6,11,23 | 139:17 140:2 |
| 135:2 143:13 | 33:16 34:7,21 | 93:14,20,25 | 140:12,14,18 |
| 147:10 158:17 | 35:16 39:10 | 94:4 95:11,17 | 140:24 141:13 |
| 162:1,21 | 83:10,25 84:19 | 95:24 96:1,12 | 141:16 142:12 |
| 165:11 169:14 | 113:19,21 | 96:16 97:14 | 142:24 144:9 |
| 172:17 173:19 | 114:10 115:16 | 98:11 99:19 | 144:16,18 |
| 183:9 189:7 | 134:5 148:15 | 100:2,9,16,19 | 145:10,23 |
| 193:23 211:22 | 148:18,18 | 100:24 101:10 | 146:8,16,22 |
| 216:16 218:15 | 149:10 150:13 | 101:15,24 | 147:17 148:6 |
| 227:18 235:14 | 154:1 160:12 | 102:19,22,24 | 148:10,20 |
| 239:22 246:16 | 182:18,25 | 103:3,16,18,22 | 149:6,11,12,16 |
| | 184:3,20 185:4 | 103:24 104:19 | 150:13,15,21 |

| | | | |
|---|---|---|---|
| 151:5,13,15 | 184:15,21,23 | 246:23 247:2,4 | 314:16,17,18 |
| 152:15,24 | 185:12,25 | 247:23 248:4 | 314:20,20,20 |
| 153:10,21 | 186:4,6 188:7 | 249:1,25 | 314:21,24 |
| 154:3,12 155:6 | 188:11,13,20 | 250:14,16 | 315:5 316:18 |
| 155:15,18,23 | 188:24 190:12 | 253:15,18 | 316:24 317:1 |
| 156:3,5,10,14 | 191:4,11,19 | 254:15 255:25 | 318:25 319:7 |
| 156:20 157:2 | 192:3,5,11,13 | 256:6,13,20 | 319:15,17 |
| 157:13,14,15 | 192:16,18,21 | 257:7 258:4,6 | 320:3,20 322:7 |
| 157:24 158:11 | 196:21 197:6 | 258:20 259:9 | 322:16 323:20 |
| 158:21 159:2,8 | 198:25 200:23 | 259:18,20,25 | 325:5,7 326:13 |
| 159:11,17 | 201:20,22,25 | 261:7 262:2,4 | 327:6 330:15 |
| 160:18,22,23 | 202:21 203:14 | 262:24 263:10 | 331:7 332:8 |
| 161:2,5,6,13 | 203:19,21 | 265:21 266:23 | 333:22 335:12 |
| 162:7,13,24 | 204:19,22 | 267:17 268:12 | 336:14,19 |
| 163:2,10,25 | 205:19 206:3 | 268:17 269:5,9 | 337:15,18,21 |
| 164:6,16,18,23 | 206:10 210:9 | 270:8 273:5 | 337:24 338:1,8 |
| 166:4,12,22,25 | 211:6,14,20 | 274:9 276:11 | 338:10,22 |
| 167:23 168:8 | 212:17 213:3,8 | 276:25 277:18 | 339:11,24 |
| 168:17 169:6,9 | 213:16,23 | 278:7 279:5 | 340:7,12 341:9 |
| 169:21 170:11 | 215:3,6,18 | 280:20 281:4 | 341:18 342:17 |
| 170:17,20 | 216:22,24 | 281:17 283:12 | 342:19 343:8 |
| 171:1,8,12,23 | 219:1 220:6,25 | 286:3 287:21 | 344:2,10 |
| 171:25 172:8 | 221:22 222:13 | 289:24 290:23 | 345:12 346:6,8 |
| 172:10 173:23 | 224:11 225:10 | 291:3,21 | 347:3,22,25 |
| 174:4,9,14,16 | 225:23 227:5 | 292:17 293:11 | 348:5 349:1,4 |
| 174:24 175:13 | 227:16 228:14 | 293:17 296:5 | 349:23 350:23 |
| 175:20 176:6,8 | 230:13,21 | 297:5 301:2,4 | 351:15 352:7 |
| 176:22,24 | 231:14,19 | 301:12 302:2 | 353:20 354:2 |
| 177:11,13 | 232:1,3,9,22 | 302:16,23 | 355:5 357:12 |
| 178:17,24,25 | 233:7,10,13,16 | 304:6,22 | 357:16,25 |
| 179:23 180:11 | 233:24 235:2 | 305:19,21 | 358:21 359:15 |
| 180:13,15 | 235:16,20,22 | 306:9 307:24 | 359:17,24 |
| 181:2,8,10,15 | 237:7 238:7 | 309:11 311:2 | 362:2,4,21 |
| 181:18 183:2 | 240:1 241:11 | 311:10,22 | 365:6,25 |
| 183:18 184:5,7 | 242:10 244:3,6 | 312:21 314:15 | 367:10,13,18 |

| | | | |
|---|---|---|---|
| 369:1 377:4 | **keep** 18:17 | 242:8 273:11 | 67:12 68:15,22 |
| 378:19,21 | 38:15,18 39:4 | 278:9,23 | 68:25 71:15,20 |
| 379:17,25 | 39:7 40:22 | 280:15 354:1 | 72:19 73:10 |
| 381:15,17,25 | 41:3 74:18 | 365:11 369:12 | 74:21,24 75:1 |
| 382:17 385:20 | 81:6,11 82:11 | 386:9 388:3 | 77:5,6,7 79:15 |
| 385:22,24 | 88:1 144:24 | **kindly** 323:12 | 81:3 87:23 |
| 389:3,11,13 | 220:6 389:20 | **kinetic** 99:24 | 88:12 92:18 |
| 391:15,19,22 | 395:1 | **kk** 4:18 317:7,8 | 94:9 96:2,24 |
| 392:5,7,9,14 | **keeping** 81:9 | 317:25 318:20 | 97:2 98:3,15 |
| 393:5,11 396:3 | 100:25 191:13 | 319:9 320:2,7 | 100:9,12,12,25 |
| 396:5 397:9,12 | 261:19 | 320:16,18 | 102:10 103:5 |
| 397:16,17 | **kelly** 34:8 | 321:4 323:13 | 107:9,23 |
| 399:7 401:11 | **kept** 35:23 | 324:2 | 110:10 114:19 |
| 403:8 404:8,10 | 39:13 40:21 | **kleinight** 34:9 | 115:5 119:20 |
| 406:4,6,9,16,25 | 56:23 82:1 | **knew** 45:13,15 | 121:12 122:2 |
| 407:2,9 410:1 | 83:4,8 110:4 | 53:18,20 72:12 | 123:6 129:19 |
| **judge** 257:5 | 173:1 297:13 | 280:10,22 | 129:25 131:14 |
| **jump** 87:24 | 309:18 | **knock** 191:8 | 133:6,9,25 |
| **jumped** 20:10 | **kerosene** | **know** 7:18,19 | 139:19 142:14 |
| **junction** | 146:24 150:19 | 7:21 13:8,17 | 143:8,16 144:8 |
| 185:22 | 155:17 156:25 | 16:10 17:14 | 144:11 145:1 |
| **june** 7:15 9:10 | 229:8 230:5 | 18:3 20:21 | 146:5,9,20,23 |
| 9:12,20 10:14 | **keys** 153:5,8 | 23:15,24 25:22 | 147:2,11 |
| 10:17 85:1,2 | **kicked** 232:13 | 27:8,8 30:22 | 148:11 150:19 |
| 113:22 | 289:11 | 30:24 32:23 | 152:9,12,16,21 |
| **junior** 90:8 | **kicking** 380:23 | 33:2,12,13,21 | 155:3,19 156:7 |
| **jury** 177:8 | **kind** 9:2 14:20 | 34:17 35:5,17 | 158:9,9,18,24 |
| **justin** 221:15 | 35:3 36:1 | 39:15 40:19 | 160:25 161:3 |
| **jzoccola** 2:7 | 42:12 43:22 | 43:19,19 45:8 | 162:22 164:20 |
| **k** | 56:18 59:4 | 45:9,14,20 | 165:22 166:1 |
| | 119:12 120:10 | 49:25 50:21 | 169:2,20,23 |
| **k** 78:23 126:13 | 142:9 156:23 | 59:8 60:2,11 | 170:12 171:17 |
| **kappes** 1:17 2:4 | 158:10 165:24 | 60:15,16 61:1 | 171:24 173:6 |
| 5:17 408:12 | 167:25 198:16 | 64:9 65:4,17 | 175:1 177:1,3 |
| **katchur** 2:14 | 200:21 240:19 | 65:19 66:1,5 | 185:8 190:14 |

190:15,16,17
190:21,22,23
192:25 193:1
193:19 194:23
195:18 196:18
196:22 197:20
198:12 199:2
204:25 212:4
213:20 214:19
214:20,22
215:7 216:9
217:3,16
218:11,12,22
219:9,23
220:14 221:6,9
222:22 223:7
224:14,18,19
225:3,7 227:1
228:6,12
229:12,14
231:9,10,15
232:25 236:10
237:5,25 240:4
240:17,22,25
241:4,7 242:11
242:19,19
244:23 247:20
248:1,8,16,16
248:24 249:2,4
249:22 250:1
251:5,20
252:18 256:23
262:15 265:3,5
265:15 267:22
267:24 268:14

269:13 270:4
274:4,13,14,14
274:19 276:7
276:10,15
278:1 279:6,8
280:9,25
283:23 284:1
286:17,22
288:23 289:1
292:1,7 298:12
298:13,15,16
300:25,25
301:5,10,14
302:17 306:3
307:12 308:16
308:19 309:4,5
309:15 310:1
314:24 316:13
316:14 318:7
320:12 321:2
321:11 323:22
325:9 327:24
328:16 329:3,4
329:7,14,14,23
330:2,3 333:16
335:8 336:2,9
338:23 339:12
340:1,2,6
341:5,19 342:8
346:14 350:23
352:9 354:5,9
354:19 357:7
359:10 366:21
367:22 368:18
369:4 370:24

371:1,3 372:1
373:18 377:23
378:5,6 380:4
380:11,22
381:1,19 391:5
396:11 401:22
402:1 403:12
406:21,24
**knowing**  115:9
301:15 341:14
**knowledge**
21:7 24:5,11
25:8 26:23
27:17 28:4
33:1 34:2
39:14 40:11
48:17 70:1
90:19 107:1
112:24 115:5
119:18,22,25
123:18 152:25
169:10 176:7
188:12,17
194:23 275:22
276:9 281:5
317:4 320:4
322:8 359:7
375:21
**knowledgeable**
394:23
**known**  155:8
393:8
**knows**  164:23
**korte**  4:14
78:23,25 79:19

79:20 80:3
83:13 165:11
212:13,14
218:19 220:19
272:5,14,25
273:7,9,12,14
274:4 275:9
276:15,18,19
276:22 278:14
279:15
**kyle**  50:15,17
51:3,4,6,10,16
51:21 52:8,23
53:1,8 55:11
56:11 57:18
58:8 59:16
60:8 64:7,16
76:17 77:2,10
78:6,7,18
83:10 84:1
111:13 113:1
113:14 133:5
172:17,19
212:16 272:18

**l**

**l**  96:20 409:13
**lab**  27:12 73:8
126:6 132:17
137:14 142:18
167:11 251:14
283:7 286:21
292:22 297:12
309:20 315:20
322:1 324:10
325:11,12,20

335:9 339:17
341:21 343:3
354:15 368:15
368:21 371:2
382:3,8 383:5
399:4
**lab's** 335:6
340:15
**label** 288:1
290:15 293:16
293:24 316:22
322:5 332:17
338:3 342:13
342:15,16,22
347:6,19
352:25 353:2
**labeled** 278:14
290:18 291:19
294:14 335:24
341:3 353:24
**labeling** 301:9
313:10
**labels** 316:6,15
**laboratories**
109:6
**laboratory**
282:10 283:20
292:3 366:18
**labs** 135:5
**lack** 17:9 85:24
215:3,6
**ladder** 121:6
198:21
**laid** 100:9
279:11

**landed** 181:24
222:9 306:6
**landfill** 162:2
**lands** 176:2
**language**
350:10,13
351:7 356:12
357:10 358:5,7
**laptops** 56:23
**large** 54:15
55:21 61:13,17
138:21 158:8
207:6 408:6
**lasted** 29:9
**lastly** 350:6
**late** 61:16
350:23
**law** 5:18 16:3,8
86:23 144:12
259:23
**lawcjb.com**
2:17
**lawyer** 16:3,8
17:17,18
103:14
**lawyers** 34:16
302:11
**lay** 149:4
291:22
**layer** 216:16
**laying** 122:9
167:6 238:13
238:15 306:19
306:21

**lays** 69:24
**lead** 184:7
384:17
**learn** 38:23
77:9,14 113:1
**learned** 59:24
392:14 393:10
393:11
**leave** 21:16
52:15,17,18
85:5,17,20
86:9 151:10
378:4
**leaving** 8:24
10:14,17,22,25
14:14 15:10
32:13 36:8
86:11 87:14
**led** 286:18
**left** 10:9 31:17
46:1 52:2 55:8
56:7 66:14,18
77:1 78:18
85:1 86:22
137:7 158:17
160:18 183:9
218:23 219:2
241:21 278:14
278:24 282:8
283:19 316:12
332:8 355:23
377:1 386:18
**legal** 41:15
42:13 87:24
252:15 326:25

352:17 410:23
**legally** 191:9
**length** 133:20
**lens** 214:15
**letter** 4:12,17
342:6 351:12
352:1
**letterhead**
159:21
**lettering**
316:12
**letters** 290:16
302:13
**letting** 94:9
308:15
**level** 30:20,21
128:9,10
135:23 151:23
152:1,3 202:8
234:23,24
250:2,10,19
251:25 252:2,7
252:10,13,19
252:23 253:6
253:10,12
254:22 255:1,6
257:3 260:22
261:10 263:5
396:21
**levels** 252:20
**lewis** 1:17 2:4
5:17 408:12
**lewiskappes....**
2:7,7 410:2

liability  348:23
  348:24,25
liable  177:25
lid  247:17
  311:8
lieutenant
  19:20
life  185:16
light  141:3
  142:4 143:4
  210:12 369:12
  369:13,17
  370:11,14
  371:17,22
  372:8,11
lighting  79:23
  165:14
lightly  139:21
lights  111:23
  112:17 392:25
  393:18
liked  210:25
likelihood
  187:2 253:13
likely  146:24
  167:7 194:13
  209:5 226:5
  228:18 251:21
  253:5,11,20,22
  257:2 303:2
likes  255:19
limit  269:25,25
limited  1:4 5:13
  18:18 137:13
  410:4 411:1

412:1
line  61:22
  131:24 161:17
  162:1 177:5
  213:17,17
  214:10 263:18
  264:13 294:20
  295:6 298:3
  333:2 352:21
  411:4,7,10,13
  411:16,19
lined  41:22
liner  106:21
lines  182:24
lining  333:25
linkedin  8:23
  84:25
liquid  123:16
  123:20,23
  124:8 125:5
  146:2 167:13
  208:6 227:11
  227:13 229:7
  249:5 288:3,21
  299:8,9
liquids  230:3
  285:8
lisa  1:14 5:21
  408:5
list  32:22
  298:18 405:11
listed  20:23,25
  71:15 116:12
  209:25 339:14
  339:16

listen  102:17
  274:3 284:22
litigation  18:5
  206:2
little  13:2 51:24
  135:22 155:12
  157:8 210:2
  261:24 284:22
  286:17 288:12
  294:24 384:9
live  86:19
lived  29:7
loaded  22:5
local  44:14
  84:10,14 189:2
  189:5 370:1
  406:11
locate  402:16
located  152:10
  153:13 170:7,7
  170:21,24
  173:20 174:21
  297:9,13
  346:25 347:1
location  5:17
  29:1 41:21
  46:3 132:22
  202:8,14
  243:16 269:12
  304:25 305:12
  399:24
locations
  326:18
lock  170:3

locked  392:24
locker  222:10
  222:12 223:14
  240:6 318:23
  321:7 344:20
lockers  56:21
  222:14
logical  98:8
long  7:14 11:19
  13:15,18 14:1
  14:7 17:10
  28:24 48:19
  51:10 53:8
  54:10 80:14
  97:12 131:5
  168:24 195:16
  226:5 227:1,24
  394:11 402:2,3
longer  85:11
  86:8 91:14
  133:10 162:16
  196:12,25
  227:1 341:3
  405:12
look  11:11
  20:20 24:6,12
  24:12 62:20
  68:4 72:7 87:8
  90:22 92:16,17
  131:19 132:12
  135:1 137:9
  138:8 139:6
  140:24 155:21
  155:22 159:25
  167:16 194:9,9

198:23 215:10
218:8 232:13
240:14 244:20
265:10 277:4
283:16 288:4
294:10 319:3
319:18 321:5
336:25 350:17
362:15 370:25
388:4
**looked**  22:15
25:14 27:10
31:6 45:16,18
79:3 97:24
98:1 110:24
121:6 152:9
164:25 187:3
209:13 243:10
248:19 289:18
317:20 321:5
328:14 330:20
331:4 341:7
345:21 366:22
396:9
**looking**  24:2,20
61:7 62:18
84:25 95:18
140:7 170:5
215:13 218:1
241:3 246:21
274:17 304:1
310:14 333:8
337:12 363:13
368:22 396:9
396:13 397:23

398:19
**looks**  23:16
45:9 139:25
140:25 143:4
188:6 214:2,3
218:14 219:13
219:14,19
220:5 235:14
240:5 247:5,12
266:16 268:3,9
269:8 278:24
316:5 318:12
319:4 321:12
325:17 345:5
362:17
**loosen**  248:13
**loss**  45:25
46:15
**lost**  273:20
**lot**  10:2 46:21
54:22 57:11
62:8 64:11
67:3 86:18
99:11 129:21
130:12 133:10
133:14 134:17
135:16 142:10
143:7 154:25
179:3 190:20
190:20 209:23
209:24 213:6
250:15,20,24
312:24 321:16
361:11 372:20
372:21 376:16

380:13 405:23
405:23
**lou**  26:1,21
34:21 35:15
39:9 114:22
115:2,10 134:6
148:8,18
149:10 150:12
160:12 165:11
168:13 169:16
171:7 178:16
180:10 181:13
184:20 239:2
312:2 316:4
317:10 329:18
338:15
**loud**  177:9
357:3
**low**  179:18
193:24 194:6,7
357:18
**lower**  252:7
305:15
**lvi**  160:1
**lying**  257:10

**m**

**macbeth**  4:15
27:4 50:12
51:11 121:4
134:7 197:22
198:20
**machine**  158:7
158:10,22,24
222:16

**machines**  58:21
**made**  31:8 36:5
42:23 48:12
49:1 58:25
60:2 63:3,25
93:11,16 94:18
115:6,8,24
141:17 142:17
154:4 166:10
166:13 167:5
183:19 192:2
202:13 203:15
212:8 217:19
218:3 234:12
254:7 259:12
259:17 288:10
326:19,20
372:3 396:16
404:1 412:5
**mailed**  354:13
**main**  127:19
161:11,25
173:19 174:7
209:21 264:1
288:24 309:2
**maintain**  101:8
137:10 308:1
**maintained**
35:20 81:23
82:22 120:4
**maintenance**
17:9 129:22
152:11 281:3
**major**  93:17
94:10 237:11

237:12
**majority**  205:3
**make**  13:4
14:21 15:24
18:8 19:1
35:22 36:1
41:8 42:6,12
55:17 63:6
88:17 89:18
94:12,22,24
98:24 140:25
144:14 184:13
203:23 226:25
257:2,18
283:10
**makes**  7:3
112:20 172:4
**making**  30:14
30:14 85:16
89:16
**manager**  51:18
54:5 78:9 90:9
90:14 157:6
172:9 181:14
184:12 188:7
**managers**  54:2
**manner**  144:2
181:23 312:17
**manual**  4:13
92:20 120:15
164:10 254:21
270:25 271:9
271:19 350:7
350:11,14,17
350:18,25

356:14,21,23
357:11 358:19
402:14
**manuals**
270:19
**manufacture**
348:15 349:16
**manufacturer**
131:14 396:16
403:1
**manufacturer's**
403:24
**manufacturers**
125:18
**mapping**
375:16,17
395:20
**march**  17:16
18:15 26:15
44:6,6,16,22
45:21 48:14
51:10 52:12
53:8,22 60:6
60:12,17 62:5
63:2 64:3 69:9
71:12,14,15
77:17,19,20
87:11 106:24
121:6 132:15
133:23,24
134:7 135:3,9
138:5,16 147:4
159:1 160:6,15
161:6 169:17
176:5 180:10

181:14 182:13
184:4 190:9
191:1 198:19
202:24 231:7
232:20 299:6
300:17 315:17
315:17,18
321:23 324:16
373:4 409:16
**maria**  301:21
301:23
**marion**  1:18
18:7 408:13
**mark**  47:14,16
293:15 309:24
**marked**  20:19
23:16 54:24
72:24 74:15
189:7 291:23
292:7,15 304:5
304:25 307:10
329:19 344:22
351:8 363:10
**marker**  331:13
352:21
**marking**  20:10
308:15 309:25
**markings**
326:14
**marshal**  360:14
360:18
**martin**  2:10 3:3
3:7 6:4
**marty**  7:3 25:5
67:22 88:20

131:23 350:23
407:7
**match**  230:23
**matching**
375:19
**material**  96:7
96:10 101:7
105:1,4,5,11,13
105:16 106:6
107:12,20
126:8 132:25
150:24 200:6,6
201:6 208:20
219:7 230:5
240:23 247:6
289:10 319:25
329:10 333:16
335:9 378:25
383:1,3 401:1
**materials**
105:25 106:9
218:22 229:10
251:15 300:11
378:10 381:3,5
381:13 382:21
382:24 383:7
384:1 385:11
**matric**  400:16
**matter**  5:12
6:18 92:24
187:10 408:10
**matters**  19:13
**mds**  124:9
**mean**  10:4
41:14 42:18

USDC IN/ND case 1:21-cv-00108-HAB   document 58-2   filed 05/12/23   page 157 of 207

[mean - mike]                                                   Page 53

51:24 96:15
103:4 116:10
120:19,21
141:1 143:6
152:4 159:10
161:8 186:9
190:2,2 193:23
194:13 209:11
217:20 226:11
226:17 227:19
228:5,18 234:9
240:24 256:23
257:15 272:21
290:4 294:23
306:20 319:3
334:7 336:25
348:21 363:23
367:12 370:25
373:14 379:3
382:25 404:17
**meaningful**
105:4
**means** 103:24
283:23 358:9
375:15
**meant** 42:22
84:19 143:9,13
214:6 244:5
254:10 260:13
275:19 344:8
352:4,6
**measure** 268:3
269:11,16,17
400:19 401:3,4
401:7

**measured**
249:4
**measurement**
280:4
**measurements**
137:4,5 205:18
269:19
**measuring**
268:23 353:17
**mechanic** 7:13
8:10,14 88:10
**mechanical**
8:12 26:2
55:25 99:24
115:3 194:22
312:22 313:25
**media** 5:10
84:11,13 189:1
189:4 270:10
270:13 328:7
369:25 370:3
406:10
**medications**
13:21
**medium** 126:7
166:19 210:14
223:24,24
**meet** 45:21
51:3 181:4,5
251:10
**meetings** 22:12
22:15
**melt** 186:2
**melted** 239:18

**members**
217:14
**memory** 44:13
66:16 130:4
131:6 153:18
315:4 404:16
404:18
**mention** 60:8
275:8
**mentioned** 11:5
15:9 16:16
133:6 186:17
202:11 210:20
347:5 355:12
387:7 394:16
**mentioning**
175:5
**mentions** 67:14
344:4
**merely** 254:22
**met** 6:24 33:16
61:2 68:18
192:18 198:18
262:15
**metal** 159:4
165:23 167:5
216:6,8,12,16
216:20 217:9
218:3 223:4
237:13 240:17
240:18 294:17
294:20 295:1,8
298:4,19,22,25
321:23,23
324:21 334:5

373:22 388:19
401:3
**methanol** 162:2
162:6
**method** 94:16
108:6,7,9,11,21
109:23 187:4
289:14 393:22
393:25
**methodology**
70:1 81:15
94:16 98:21
312:16
**mgardner** 2:13
**michael** 22:10
34:9
**michigan** 14:5
16:5
**microphone**
220:7
**microphones**
5:5
**middle** 208:21
209:7 222:9
240:7 298:20
298:21 304:8
304:11
**midnight** 44:16
82:6
**mig** 59:3,9
173:1,4
**mike** 21:25
22:3,3,4,10
23:4 24:14
114:23 115:11

Veritext Legal Solutions
800-567-8658                                            973-410-4098

**[mike - names]**                                                                Page 54

115:18
**mikes** 22:5
**miller** 34:8
213:1 214:24
218:19 220:17
272:4,24
279:16
**mind** 92:12
110:4 261:19
**minimal** 187:2
**minimum**
69:24
**minor** 57:24
58:11,15
173:13
**minute** 76:23
171:9 186:15
187:12 270:7
351:5 373:23
**minutes** 48:21
51:12 53:10
57:18 80:15
**mis** 71:17
**miscommuni...**
348:20
**misdocument...**
243:11
**misprint** 71:17
**mispronounce**
45:2
**missed** 14:6
**missing** 300:5
**misstates** 38:6
107:17 124:21
130:14,18

164:18 191:4
258:20 309:11
**misstating**
390:16
**mist** 177:5
178:18 182:7
196:25 199:19
214:1 259:2
**misused** 254:6
**mixed** 69:21
223:16 288:12
**mm** 4:19
324:14 325:1
328:10 331:21
**mo** 271:9 402:5
**mode** 197:23
**models** 271:11
**modine** 4:13,14
196:9,19 197:4
197:23 198:22
270:18,18
271:9 272:9
273:25 274:4
402:5
**modines** 199:9
199:14 273:24
**monday** 8:4
**month** 9:11
17:12,14 80:8
85:2 89:14
179:16
**months** 24:16
25:15 62:24
63:23 66:15
75:25 122:4,8

131:3 157:10
214:25 251:3
272:8 279:19
297:11
**moons** 57:9,10
**morning** 5:3
44:12,20 60:19
60:21 228:10
392:19
**motors** 393:18
393:20
**mounted**
120:21 174:2
174:10 387:10
**move** 16:11
20:15 102:16
102:17 191:7
264:10 277:22
281:1 365:15
391:11
**moved** 60:3
128:20 130:1
133:7 153:6
**moving** 64:10
129:15 192:6
250:13 308:2
321:20
**msds** 106:14
124:3 125:20
126:5 396:8,10
396:16
**multi** 327:17
**multiple** 19:6
19:23 27:5
74:3 82:19

216:17 250:21
256:16 277:25
290:15 291:20
303:7 305:2
326:16 327:17
327:20 390:10
**mute** 5:7

**n**

**n** 2:1 409:13
**name** 5:19 6:22
16:3,7,12
17:17,20 22:2
26:2 32:23
33:1,4,7,17,18
43:1,14,20
45:3 50:3,16
51:4 53:25
60:25 61:19
63:3 64:16,25
65:8,17,25
74:25 77:5,6,7
78:22 79:22
80:16,17
106:13 160:18
201:18 202:3,3
202:4 266:16
275:9 301:21
313:21 338:15
384:4 396:2
**name's** 272:24
**named** 26:22
65:6 221:15
**names** 43:8,13
201:24

**national** 91:22
94:17
**nature** 38:20
41:10 42:3,9
45:19 55:22
56:21 57:3
58:2 62:11
63:18 79:24
85:23 89:25
109:5 112:18
118:9 132:13
137:1 185:4
187:1 248:13
314:4 350:20
392:19,25
393:18 395:18
**near** 46:16
76:24 88:6
161:16 169:19
171:15 173:13
215:12 234:23
234:24 238:14
250:19 295:21
356:3 377:2,17
**nearby** 238:14
379:10
**necess** 205:12
**necessarily**
74:3 133:17
142:3 154:22
209:11 227:22
245:20 295:22
334:21 336:22
344:16 358:23
403:13

**necessary**
313:1 412:6
**need** 9:5 13:15
48:9 57:9 83:4
87:8 98:6
108:22,25
123:9 296:4
391:4 395:3
406:21
**needed** 28:25
62:15,18 64:9
114:18 196:20
237:23
**negative**
283:11,21
288:15
**neither** 12:23
33:24 34:3
104:18 253:20
283:8 304:18
307:6,9 404:2
**never** 12:5
19:11 65:12
66:10,11 68:18
69:11,13 72:3
76:13 81:19
92:12 163:24
164:25 165:1,1
165:5 178:3
180:2 187:18
188:13,18
204:16,23
211:2 231:8
241:1 245:3
254:13 262:1

264:2 265:12
271:2,16
285:24 289:3,5
391:13 403:18
**new** 10:24
16:17 28:20
58:24 80:24
129:6 130:24
131:15 132:15
134:22,22
138:5 162:21
168:21 196:16
197:18 250:23
250:25 273:13
279:18 317:14
341:24
**newegg** 15:14
15:15 16:17
17:7,19 18:6
**news** 83:16
**nfp** 66:23 67:14
81:2 82:2,21
94:18 95:6
293:8 344:4,11
394:25
**nfpa** 69:24,25
70:2 91:23
92:3,14 93:9
93:12 94:23
95:10,15 96:9
97:5,8,23 99:4
99:21 100:15
101:7,13,18
105:1 204:7
251:24 253:9

254:21 260:18
261:17 293:13
302:21 316:17
344:1 373:24
394:17,20
395:7,15
399:12 405:13
**nfpa's** 100:13
**nice** 62:9
**night** 26:10,14
43:17 44:8
68:25 233:22
234:15
**nine** 34:17
174:2,10,21,25
175:12 256:24
280:12,19
282:13
**nineteen**
190:19
**nn** 4:20 325:14
329:19 330:12
332:15 333:10
334:19 336:10
398:20
**nods** 208:13
**nomenclature**
118:21
**non** 20:3
312:16
**noncombusti...**
401:1 403:6
**nonresponsive**
102:16

**nope**  365:23
**norm**  301:8
**normal**  196:13
  293:20
**normally**  72:4
  293:20
**north**  2:15
  54:14 55:21
  56:3 183:11
  209:3 223:19
  246:8 265:19
  266:8,10 295:9
  299:1 326:7,11
  328:18 330:14
  331:25 332:4
  335:20 337:5
  337:14 338:4,6
  338:12 370:21
  371:1
**northern**  1:1
  5:15 213:14
  277:12
**northside**  7:12
  7:14,17 8:11
  8:19 88:11
  89:6,17
**notarial**  409:6
**notary**  1:15
  408:5 412:13
  412:19
**notation**  172:4
  185:6
**note**  5:5 41:24
  161:1 185:11
  410:10

**noted**  412:7
**notepad**  42:12
  42:16
**notes**  4:11 33:8
  34:16,18,20,21
  34:22 35:2,3
  35:10,15 36:9
  36:13 38:3,10
  38:16,25 39:23
  40:7,9,17,25
  41:8,14,16,25
  42:6,12,16,23
  48:22 49:21
  53:11 72:6
  77:1 78:17
  80:19,21,23,25
  81:6,18,23,25
  82:1,22 148:6
  148:14,18
  160:11 169:16
  171:7 182:9,11
  182:13 184:3
  184:21 185:11
  188:6 191:16
  191:17,19,21
  191:24 205:17
  259:7 408:18
**notice**  1:21 4:6
  12:23 20:9
  63:16
**noticed**  131:5
  132:24 204:16
  208:22 251:7
  371:6 395:19

**notices**  20:8
**noticing**  6:3
**notified**  53:16
  53:24 69:4
**notion**  279:2,3
**november**  4:14
  4:17 22:8
  39:20 57:20
  59:17 72:25
  73:5,23 74:7
  90:22 91:7,10
  93:8 126:24
  203:8 355:20
  364:6
**now's**  188:24
**number**  5:16
  19:1 32:6 56:6
  56:6,7 57:21
  57:22 58:21
  59:10,18 60:5
  60:12 62:5
  64:2,18 86:4
  107:10,15
  111:12 113:4
  113:17 114:12
  115:3 116:15
  116:18,21
  117:18 134:8
  140:8,9 147:4
  147:10 152:1,2
  153:19 154:10
  156:1 158:25
  162:6 163:5,13
  163:19 164:13
  167:3,4,10,15

  169:3 175:25
  176:4 178:7
  179:4,18 181:1
  195:25 198:19
  212:9 216:5,10
  217:11 222:1
  232:20 258:8,8
  272:17 274:5
  277:10,11,17
  278:4 279:19
  280:4 283:18
  283:21 329:9
  342:4 348:5
  352:17 376:16
  376:23,24
  377:9 378:10
  378:13 380:5,5
  380:6 381:20
  383:24 396:10
  396:11 402:17
  404:5 407:5
**number's**
  181:8 265:18
**numbered**
  138:3
**numbers**  23:17
  55:8,18 319:15
  337:1,21
  389:14
**numerous**
  19:22 163:12
**nuts**  248:12

| o | | | |
|---|---|---|---|
| **o**  78:24 96:20 | 142:12 144:9 | 192:13,19,24 | 280:20 281:4 |
| 266:18 409:13 | 145:10,23 | 196:21 197:6 | 283:12 286:3 |
| **object**  89:2 | 146:16,22 | 198:25 200:23 | 287:21 289:24 |
| 103:17 180:13 | 148:10,20 | 201:20 202:21 | 291:21 292:17 |
| 191:21,25 | 149:12 150:15 | 203:14 204:19 | 293:11,17 |
| 302:2 318:2 | 150:21 151:5 | 204:22 205:19 | 297:5 301:2,12 |
| 385:17,18,20 | 151:13 152:15 | 210:9 213:3,8 | 302:2,16,23,23 |
| 391:14 | 153:21 154:3 | 213:16,23 | 304:6,22 |
| **objecting** | 154:12 155:6 | 215:3,6,18 | 305:19,21 |
| 131:23 | 155:15,18,23 | 216:22 219:1 | 306:9 307:24 |
| **objection**  34:11 | 156:3,10 157:2 | 220:25 221:22 | 309:11 311:2 |
| 36:15 38:5,12 | 157:15 158:11 | 222:13 224:11 | 311:10 312:21 |
| 40:10,18 62:7 | 159:2,8,11,17 | 225:10,23 | 316:18,24 |
| 64:19 66:7 | 160:23 161:13 | 227:5 228:14 | 318:25 319:7 |
| 72:8,11 80:9 | 162:7,13,24 | 230:13 231:14 | 320:3 322:7,16 |
| 86:13 88:12 | 163:10,25 | 232:1,22 235:2 | 323:20 325:5 |
| 89:8 92:23 | 164:16 166:4 | 237:7 238:7 | 326:13,20 |
| 93:14 95:11,17 | 166:12,22,25 | 240:1 241:11 | 330:15 333:22 |
| 96:1,16 101:15 | 167:23 168:8 | 242:10 244:3 | 335:12 336:14 |
| 104:19 105:7 | 168:17 169:6,9 | 246:23 247:2,4 | 338:22 339:11 |
| 105:18 107:17 | 169:21 170:11 | 247:23 249:1 | 339:24 340:7 |
| 108:14 110:22 | 170:17 171:12 | 249:25 250:14 | 340:12 341:9 |
| 114:13 115:1 | 171:23 172:8 | 250:16 253:15 | 341:18 343:8 |
| 115:21 117:3 | 173:23 174:4 | 253:18 254:15 | 344:2 345:12 |
| 118:25 119:15 | 174:14,24 | 255:25 256:6 | 346:6 349:1,4 |
| 119:19 121:10 | 175:13 176:6 | 257:7 258:6,20 | 349:23 350:24 |
| 123:25 124:12 | 176:22 177:11 | 259:9,25 261:7 | 351:2,15 352:7 |
| 124:21 125:15 | 179:23 180:15 | 262:24 263:9 | 353:20 354:2 |
| 126:3 127:2 | 180:15 181:2 | 263:10 265:21 | 355:5 357:12 |
| 128:13 129:24 | 181:10,18 | 266:23 267:17 | 357:14,16 |
| 130:14,18 | 183:2,18 | 268:12,17 | 358:21 359:15 |
| 131:12,16 | 184:15,23 | 269:5,9 273:5 | 359:17,24 |
| 132:2 136:9 | 185:12,25 | 274:9 276:11 | 362:2,4,21 |
| 139:4 141:13 | 186:4 188:11 | 276:25 277:18 | 365:6 367:10 |
|  | 190:12 191:4 | 279:5,11 | 367:13 369:1 |

**[objection - oh]**                                            Page 58

377:4 378:19
379:25 381:15
381:17 382:17
397:4,10 403:8
404:8
**objection's**
279:11
**objections** 5:24
89:19 96:12
97:14 98:11
99:19 101:1,10
101:24 104:23
108:18 139:17
140:2,12
142:24 144:13
146:8 149:6,16
152:24 156:20
158:21 164:6
171:1 175:20
177:13 178:25
191:8 192:3,17
206:3,10
230:21 231:19
232:9 248:4
256:13 278:7
327:6 337:15
344:10 357:25
**obligation**
375:13
**observe** 92:20
162:5,8
**observed**
163:12 263:3
398:1,6,16

**obtain** 52:25
62:3 64:25
65:14 66:23
67:2 114:19,20
178:5,6 194:1
206:15,18,21
212:8
**obtainable**
186:22
**obtained** 33:25
42:8 49:23
53:17 62:10
82:12 142:18
150:12 181:13
208:14 279:14
279:14 281:19
328:11
**obviously** 42:5
76:4 81:3
102:5 108:13
108:20,22
109:2 121:24
133:6,18
141:22 142:25
144:24 152:17
167:1 175:24
177:3 179:10
181:4 185:2,4
186:8 193:16
199:5 208:5,9
209:9 210:21
226:2,9 230:16
234:12 256:24
262:15 289:6
306:10 343:18

354:7 363:23
364:13 377:11
378:25 391:7
393:16 394:22
394:24 395:16
405:7,12
**occasion** 59:11
251:20
**occasionally**
9:5 10:3 58:22
59:20 106:10
209:17 224:21
229:16
**occasions**
226:23
**occur** 129:17
145:20 195:3,5
286:8
**occurred** 46:16
47:1 60:19
116:20,20
129:17 193:9
205:14,15
207:7 209:12
227:25 228:6
241:15 250:4
250:25 286:9
288:8 293:10
358:24 359:10
360:8 377:24
**occurring** 61:8
128:21 251:12
**occurs** 119:8
193:10 194:24
195:9 206:25

**october** 261:25
262:1 263:17
**offer** 120:15
148:24 150:5
**offered** 58:15
85:14
**offhand** 7:18
80:17 106:13
335:13 364:2
368:19
**office** 17:1 46:4
46:11 50:18,18
50:19 51:5,20
68:16 82:25
152:11 198:2,3
312:25
**officer** 19:22,25
20:2,3
**offices** 56:20,21
**official** 31:15
253:22
**officially** 50:1
**oh** 8:9 11:25
19:3 22:16,19
37:1 48:10
69:8 71:6
127:21 137:20
137:22 140:15
143:15 153:15
168:3 189:18
198:10 199:15
211:14 220:8
256:14 260:16
291:9 292:13
292:24 295:2,2

| | | | |
|---|---|---|---|
| 303:12 305:25 | 98:2,13 99:18 | 211:20 213:6 | 315:17 316:5 |
| 319:16 332:6 | 101:18 102:1 | 214:7 217:24 | 316:25 317:5,8 |
| 332:23 333:8 | 103:24 105:9 | 218:16 219:14 | 318:1 319:16 |
| 342:18 | 106:18 107:9 | 220:3,4,23 | 320:7 321:9,21 |
| **okay**   7:24 9:18 | 107:13,25 | 221:25 223:20 | 324:2,7,12,15 |
| 11:16 12:4,20 | 112:12 113:12 | 224:2 225:16 | 325:3 327:3 |
| 13:1,5,6,10,13 | 117:1 119:1,12 | 233:13,25 | 328:3 329:1,13 |
| 15:2,9 16:15 | 120:10 123:13 | 234:18 235:22 | 330:12,22 |
| 17:2,17 19:16 | 125:7,25 | 236:18 239:22 | 331:8,19 |
| 20:7,14,16,23 | 127:10 128:8 | 239:24 240:19 | 332:12,21,25 |
| 21:4 22:16,24 | 130:21 134:3 | 243:5 244:5 | 334:13 337:4 |
| 23:14,22 24:23 | 134:10,23 | 246:1,3,17 | 338:1 340:11 |
| 25:4 26:19 | 135:11,13,20 | 249:12 254:16 | 342:6 345:3 |
| 27:15,18 28:22 | 137:25,25 | 254:19 255:1 | 348:7,12 |
| 28:24 29:15 | 138:10,13 | 256:22 257:17 | 349:19 350:4 |
| 30:16 31:23 | 139:1 140:14 | 261:24 266:11 | 351:22 352:15 |
| 32:5,17,22 | 140:21 143:15 | 271:2,8 272:23 | 355:7,11,11 |
| 36:5 37:1,23 | 147:9,11,25 | 276:2 279:22 | 356:1,7,22 |
| 37:24 44:24 | 149:24 150:17 | 279:23 280:8 | 357:3,8,16,24 |
| 45:7 47:3,25 | 151:17 152:9 | 281:22 282:3,7 | 360:9,14 361:5 |
| 48:5,8 49:10 | 152:21 153:23 | 284:8 285:9,16 | 362:14 364:1 |
| 50:25 51:15 | 157:25 158:6 | 285:22 287:10 | 365:16 366:6 |
| 52:11,22 53:21 | 158:16,24 | 287:11 290:7 | 366:16 368:11 |
| 54:20 55:11 | 160:3 161:17 | 291:3,19 | 368:15 369:23 |
| 56:11,17 57:7 | 162:18 165:10 | 292:13,13,24 | 372:15 374:17 |
| 57:13 59:16 | 165:19 167:18 | 294:3,10,11 | 375:8 376:13 |
| 64:24 67:25 | 168:13,19 | 295:17 296:15 | 378:17 379:5,8 |
| 68:4 69:8,17 | 169:2,12 170:5 | 296:19 297:17 | 380:25 382:4 |
| 71:24 72:19 | 171:17 172:14 | 300:2,4 302:17 | 384:19 385:2 |
| 73:4 74:14 | 173:1,18 174:2 | 302:25 303:12 | 385:14 386:12 |
| 75:11,14 77:12 | 174:10 178:14 | 304:4,10 305:7 | 386:17 387:7 |
| 84:8,23 87:9 | 180:9 185:19 | 305:25 306:25 | 388:5,22,25 |
| 88:10,24 89:2 | 186:13 187:25 | 307:6 310:11 | 389:10,11 |
| 91:19 92:11 | 189:10,22 | 313:25 314:11 | 390:12 391:15 |
| 94:12 97:20 | 196:8 210:16 | 314:23 315:12 | 391:19 392:3 |

**[okay - opposing]**

393:10 396:3,4
396:15 397:12
397:16 398:19
398:25 399:7
399:21 401:18
402:13 403:3
405:5
**old** 7:4 89:25
129:22 130:16
138:15 171:9
178:19 197:16
199:14 272:9
**once** 29:2 35:9
40:1,1,4 83:1
124:4,10 146:2
146:2 194:25
226:8 227:10
251:17 289:11
297:13 315:15
315:16 340:14
376:5,18
377:17
**one's** 70:4,5
133:22 244:1
246:18 272:4
**ones** 25:15
164:15 184:21
196:16 197:16
197:18 216:21
237:10 388:13
388:15
**ongoing** 93:1
**online** 178:13
209:19 210:1

**ooh** 7:18 9:10
**oops** 20:21
211:6
**op** 56:11 350:2
**ope** 120:22
**open** 28:24
92:16,17
117:10,15
118:2,4 120:19
120:19,23
146:7 154:25
155:9 198:23
261:19 305:12
311:8 343:18
388:18
**opened** 317:11
338:14,16
**opening** 121:8
198:23 264:8
295:21 320:10
321:4 387:25
**openings** 118:6
199:3,16
358:10
**opens** 195:7
**operate** 159:13
384:16,23
**operated** 60:11
164:14
**operates**
194:20
**operating**
112:16 146:10
176:5 200:18

**operation**
120:11 194:11
196:12 393:15
**operational**
177:3 190:8
193:20 194:14
**operations**
56:11 57:21
63:5 76:12
135:17 262:10
264:1 280:5
281:2
**opinion** 14:25
15:5,19 19:13
28:25 29:1
30:25 31:5,15
81:25 98:25
104:9 105:13
106:2 110:11
117:17 124:17
125:7 126:14
127:5 148:22
148:24 149:3
191:20 199:5
201:8,16 204:7
209:2 234:1
244:16 251:21
252:3,6,15
254:22,23,24
255:2,7,23
256:4,12 257:2
261:9 265:1
286:4 287:22
289:13 314:3
348:13 349:14

349:18,21
360:2 372:12
376:1 378:3
381:24 382:20
382:22 402:11
405:17
**opinions** 67:6
73:17,21,25
74:5,8,12
116:9,12 117:2
126:25 127:9
127:17,18
148:22 149:4
149:11 165:3,7
174:23 199:23
205:6 250:3
252:20 255:10
255:13,20
260:19,21
261:4,11
262:23 271:6
271:19 275:17
283:6 290:5
312:19,20
313:6,22,24
350:15 377:9
382:15 396:23
396:25
**opportunity**
187:9,19
**opposed** 197:12
214:1 241:21
402:6
**opposing**
110:18

**opposite** 81:22
  191:13 223:12
  223:16
**option** 397:5
**oral** 1:12
**orange** 56:2
**order** 237:24
  386:21 407:5
**orders** 406:17
**orientation**
  56:1
**oriented**
  326:23
**orienting**
  326:24
**origin** 12:18
  14:9,11,25
  15:19 19:9,14
  30:2,4 31:25
  36:12,19 37:2
  37:6 38:2 67:1
  70:13 73:23
  74:9 75:14
  76:5 95:10
  109:1 116:17
  116:23,24
  117:1,9 148:25
  150:9 165:2,7
  174:23 187:14
  187:15 202:9
  202:15 204:2,4
  205:4,6,14,21
  209:12 223:21
  239:17,17
  241:15 242:24

243:1,19,20
245:6,9,10,14
245:16,18
246:4,15 250:5
269:15 280:18
350:15 361:8
362:8 363:9
364:25 374:24
375:6 377:10
395:23 399:13
399:23,25
400:3,4,9,11,16
401:16,19
403:5,18
404:22
**original** 203:9
  205:17
**originally**
  86:18 127:5
**originated** 54:7
  58:7 95:13
  147:7 152:2
  154:22 186:23
**orr** 50:15,17
  51:10,16,21
  52:8,23 53:1,8
  55:12 56:11
  57:18 58:8,12
  59:16 60:8
  64:16 76:17
  77:2 78:7,18
  83:10 84:1
  113:1,14
**otto** 75:7 90:6
  90:23

**outcome** 5:23
**outside** 10:19
  19:13 46:15
  152:10 153:6
  153:25 180:21
  196:2 197:12
  216:10,18,20
  217:4,11,17
  218:1,7 234:9
  234:11 245:18
  308:19 310:15
  347:16 349:2
  379:1 399:1
**outstanding**
  28:5,7,10
**overall** 110:25
  268:24 370:16
**overhead**
  147:14 164:8
  262:17
**overlooked**
  71:21
**overnight**
  194:6,7
**overs** 181:23
**overspray**
  168:22 180:12
  181:22 258:14
  258:25
**overview** 127:9
  127:17,18
**overwhelmin...**
  289:18
**own** 28:13 67:6
  87:1 146:4

161:9 200:4
201:4
**owned** 86:24
**owner** 391:3
**oxygen** 154:23
  155:8 231:1

**p**

**p** 1:13 2:1,1,6
  2:12,16 4:12
  5:11 6:15,23
  96:20 298:14
  342:6 351:8
  355:22 407:15
  408:7 409:13
  410:5 411:2,24
  412:2,4,12
**p.c.** 2:10,15
**p.m.** 44:15
  48:13 52:12
  370:4 406:12
  407:12
**pack** 236:14,15
**package** 236:14
  324:5,13
**packaged**
  324:4
**packaging**
  311:5
**packet** 236:14
**pad** 41:15
  42:13 295:24
  296:14 323:14
  326:25 327:3
  352:17 387:2,5

**pads**   309:10

**page**   3:2 4:2,4,5
  13:9 23:16
  47:13 48:11
  50:20 52:3
  54:19,25 73:2
  76:22 90:21
  91:1 116:13,13
  126:15 127:8
  134:8,9 135:1
  135:2 138:14
  139:1,1,13
  142:22 143:2
  146:13 150:6
  155:12 157:18
  158:4,16
  159:21,25
  160:22 161:10
  165:10 168:14
  169:14 170:6
  171:7 173:18
  182:12,12
  184:1,14,19,20
  185:19 186:17
  188:2,5 189:7
  189:9 202:5
  211:10 214:13
  215:14 218:1
  218:13,14
  220:4,10
  235:12,18,20
  239:12,23
  241:17,17
  243:17 244:19
  245:23 246:16

  262:2 263:17
  264:13 265:22
  267:2,5,25
  268:1 277:4
  278:5,9,10,11
  279:14 282:3,8
  282:21 283:16
  283:17,19
  290:6,16,19,19
  290:24,25
  291:1,2,23
  292:9,19,21
  294:10 295:25
  296:1,1 297:16
  297:16,21
  298:19 299:19
  300:5,12,12,16
  303:6 304:5
  305:7,7 307:8
  311:25 312:1
  315:21,24
  316:14 318:2
  318:10,13,20
  319:9,13 320:1
  320:7,16 321:4
  321:4,22 322:1
  323:13 324:2,3
  324:6,8,16
  325:1,3,15
  327:23 328:10
  330:12 331:4
  331:14,23
  332:1,5,14,21
  333:4,10,14,18
  334:19 337:1,7

  337:8,11,21
  338:4,6,8
  341:25 342:10
  342:17,25
  345:3,7,15
  346:1,5 347:24
  348:5 350:10
  350:12,25,25
  352:9,14,20
  353:1,11,16,18
  355:21 356:6,7
  356:17 357:10
  358:18 361:1,3
  362:16 363:11
  364:4,22
  366:11,13,13
  368:24 397:19
  398:13 411:4,7
  411:10,13,16
  411:19

**pages**   4:11
  34:18 72:24
  138:3 164:25
  211:8 267:16
  270:18 271:13
  272:2 294:7
  304:1 313:8
  402:14

**paid**   89:6,10,11
  242:6

**paint**   76:11
  106:6,10,12,12
  106:15 121:21
  121:23,25
  122:2,6,10,24

  123:16,23
  124:3,4,6,9,10
  124:19,20
  125:13 126:1
  126:17 128:3,8
  128:19,20,20
  128:23,24
  130:10,24
  131:15,21
  132:9,15,18,22
  132:23 133:2
  133:22 134:22
  135:8,16 138:5
  138:15,19
  139:2,15 140:5
  140:10,23
  141:2,3,10
  142:2,4,8,23
  143:6,17
  144:24 145:25
  146:18 151:18
  158:20,24
  165:14 167:12
  167:12 168:24
  169:2 171:15
  171:20,21
  175:22 176:20
  177:5,19
  178:18 179:7
  179:19 180:22
  180:23,25
  181:3,5,15
  182:5 190:18
  196:25 197:11
  199:19,19,19

199:24 200:3,8
200:20 201:2
201:13 213:6
213:20 214:19
215:15 218:24
219:20 221:4,7
221:12,19
222:20 223:22
224:6,7,13,21
225:5,9,21
227:2,9,10,20
229:3,4,5,8,11
229:11,12,13
229:16,22
230:4 234:19
234:25,25
237:1,3,5,9
238:5,8,13,15
239:11,14
240:24 242:21
251:9,9,11,17
258:5 259:22
259:23 273:2
277:8,12,21,24
281:2 284:4,9
284:19,25
285:18 286:1
287:16,25
288:14,21
289:3,9 305:25
306:2,4,7,11,13
306:22,23,25
315:14,15
321:9,15,18,24
323:16,19,22

324:21 325:10
347:8 351:9,18
352:3 355:9
361:7,11 362:6
362:17,19,23
362:23,25
363:2,15 364:7
364:23 365:2,4
365:25 367:9
368:3,5,14,17
368:20,25
369:5,17
370:11,14
371:4,6,17,18
371:22,25
372:2,8,12,15
372:22 373:8
376:3,10,11,16
376:24 377:6
377:15 378:13
379:12,24
380:6,7,8,12,17
381:14 382:10
382:11 383:17
383:19 393:3,6
393:7 396:12
396:19 397:25
398:7,15 403:7
403:11,20
**paint's** 133:7
175:18
**painted** 171:5
213:22 214:5,6
214:9,18 216:8
220:21 225:4

225:20 278:4
**painting** 58:17
117:11 128:10
129:20 130:10
135:17 138:18
141:9 143:23
143:25 171:10
171:18 179:11
181:6 190:20
198:21 228:9
273:16 277:16
277:25 295:14
**paints** 125:18
158:9
**pallet** 219:20
**panel** 57:25
58:1,24,25
173:20
**panels** 58:23
163:5,12 164:4
167:5
**pape** 164:21
**paper** 164:21
**papers** 8:9
**paperwork**
263:1 282:19
403:24
**paragraph**
74:16 75:5
76:24 90:4
117:2,13
126:15 127:19
189:13,16
202:6 243:21
243:23 399:15

**pardon** 260:16
**pared** 283:9
**paren** 99:23,24
299:3
**parentheses**
90:9
**parkdale** 7:9
**parking** 129:21
130:12 135:16
142:10
**part** 8:1 9:2,23
22:19 35:8,10
54:16 58:10
72:13 79:16
85:10 86:2,3
86:16 97:7
104:15 110:25
112:22 117:12
140:18,19
251:19 268:3
283:5 284:2
288:21 301:16
304:10,12,15
309:23 326:11
335:18 346:20
347:1 360:3
362:7 363:14
363:15 365:3
397:11,22
404:11
**part's** 281:25
**partially** 269:3
**participant**
390:6

**participated**
  390:8
**particles**
  175:23,24
**particular**
  19:18 42:25
  54:6,9 59:22
  63:13 71:16
  102:5 106:14
  106:20 109:25
  111:10 112:5
  120:16 121:12
  121:21 123:6
  131:9 132:23
  134:12 135:21
  141:19 143:5
  143:20 161:1
  193:9,11 194:4
  194:8 199:2,20
  203:24 207:18
  227:25 228:10
  229:9 247:12
  261:16 269:18
  270:5 282:20
  285:10 289:5
  290:3,3 309:24
  310:3 327:9
  335:22 344:16
  357:10 394:5
  395:13,13
  400:24 402:8
**particularly**
  95:7 117:17
  118:8 154:18
  180:18 231:1

237:10 244:15
  245:8 281:17
  284:13 306:5
  344:15
**parties**  5:9
  134:15 390:10
  408:23
**partly**  377:16
**partnership**
  1:4 5:13 410:4
  411:1 412:1
**parts**  225:8,20
  316:6 350:14
**party**  5:22
  409:2,4
**pass**  71:2 384:3
**past**  10:5 23:12
  106:19,20
  165:10 331:22
  340:18 380:22
  381:1 382:13
  382:14 405:18
**pattern**  98:20
  258:11 375:16
**patterns**  109:5
  396:7
**pause**  54:17
**pay**  168:22
**paychecks**
  89:13
**paying**  16:22
**pb**  248:9
  249:16,22
**pecifically**
  137:15 179:1

285:23 301:14
**peer**  90:15
  91:18
**pen**  48:19
  139:14,15
**pending**  13:18
  14:3 18:6 28:3
**pension**  8:20
**people**  42:25
  62:13 63:16
  64:12 69:4
  75:23 86:3,4
  183:17 185:7
  185:10 191:20
  212:14 221:10
  221:11 265:4
  312:25
**people's**  257:13
**perceived**
  206:1
**percent**  109:16
  109:16 204:10
  204:12 207:10
  251:21 253:14
  253:16 405:16
**percentage**
  38:1 405:15
**perfect**  84:9
**perfectly**
  237:13
**perform**  284:3
  284:3,8,24
  285:12 384:15
  384:18

**performed**
  117:12 288:13
**performing**
  63:5
**performs**
  285:11
**period**  85:22
  127:14 129:2
  200:10 227:24
  229:15 252:7
  252:20 253:12
  357:4 374:24
  374:25
**periodically**
  395:1
**permanent**
  352:20
**pers**  26:11
**person**  43:20
  50:11 51:4
  61:2 65:1
  111:14 149:22
  301:17 302:3
  317:17 391:8
  393:6,8 409:1
**person's**  53:25
**personal**  38:14
  38:18,19 68:17
  286:4
**personally**
  14:13 38:16
  39:13 65:19
  80:22 88:2
  135:24 146:23
  148:21 228:24

[personally - picture]                                    Page 65

256:14 311:15
**personnel**
  360:21
**persons**   313:2
**perspective**
  2:11
**pertaining**
  16:16
**peter**   353:7
**petroleum**
  150:20 151:4
  151:11 166:14
  166:19 209:20
  210:13 223:25
  224:9 248:24
  249:2
**phone**   13:16
  51:14 63:22
  64:7 69:12
  79:21 80:2,14
  154:4 181:8
  183:13
**phones**   5:7
**phonetic**   96:18
  96:18,21
  105:25 115:2
  126:8 249:9
**photo**   4:4,5
  49:10 50:7
  55:4 137:16
  214:14 215:12
  215:13 218:23
  236:16 240:3
  308:8 319:3
  325:20 326:23

326:24 347:3
353:22,23
361:6 362:17
363:13 366:10
385:15
**photograph**
  24:9 47:16,17
  56:2 59:9
  132:16 138:25
  139:6,7 141:1
  146:21 158:8
  158:17 213:7,9
  213:21 220:1
  220:17 221:8
  269:17 270:5
  303:22 305:11
  306:8 307:9,14
  310:25 311:3,7
  323:25 325:18
  328:16 329:19
  332:14 333:21
  345:5,19
  353:15 361:6,7
  361:11 362:6
  362:25 363:1,5
  363:14,18
  364:7,20 365:2
  369:10 397:23
  397:24,24
  398:8,8,11,12
**photographed**
  163:15,16,17
  239:6 242:17
  268:16,19

**photographer's**
  214:15
**photographs**
  4:16,16,17,18
  4:19,19,20,20
  22:17 23:14,18
  23:19 24:3,6
  24:13,17,19
  25:14,16,16,19
  25:20,21 26:8
  27:5 59:12,13
  132:14 134:20
  139:9 155:25
  159:3 180:4
  205:17 212:9
  218:9 239:8
  303:8 309:13
  317:12 334:14
  345:20 362:11
  363:9 364:11
  369:3 370:7
  372:8 385:9
  398:1,17,25
**photography**
  207:22
**photos**   4:4,5
  24:8 25:25
  26:13,19,23
  27:1,2,10 36:3
  36:4 130:23
  137:16 138:3
  146:5 178:6
  207:23 212:11
  214:25 215:8
  238:12 281:20

281:23,24
282:1 307:13
309:9 317:20
317:21 321:6
323:12 328:13
330:20 336:15
354:6 370:13
370:16 385:4
386:1,2 398:4
398:21
**phrase**   178:16
  261:13 374:20
**physical**   45:10
  45:11 101:20
  109:4 136:17
  206:8,25
  207:12 399:24
**physically**
  53:23 104:24
  121:8,17
  122:10 329:23
**pic**   139:25
**pick**   5:6
**picture**   138:19
  211:23 235:24
  235:25 236:19
  247:12 268:25
  269:2,18
  303:15 305:3
  308:6 318:22
  322:12 327:7
  327:14 328:21
  329:21 330:7
  330:17 345:8
  346:15 347:7

361:22 362:24
363:21 365:11
**pictures**  49:5,6
62:16 129:7,7
131:7,10 140:1
143:20 145:8
145:11,14
179:17 199:21
212:4,15,17,23
212:24 213:2
242:6 305:2
311:14 322:14
328:22 331:3
361:23 362:3
368:12,15
369:5,15,16,21
371:20 373:6
373:17 398:20
**piece**  217:12
219:15 293:15
293:21
**pieces**  81:10
186:2
**pierce**  1:14
5:21 408:5
**pile**  269:19
**piles**  236:24
**pipe**  295:12
296:13 303:19
304:4 310:12
331:13,18,20
333:17,19
346:3,11,12,16
346:20 347:6,7
347:11,17,19

353:4,7
**pipes**  333:19
383:10
**piping**  304:13
304:20 347:15
**place**  1:21 5:8
17:13 39:8
88:11 93:5
122:14,16
128:23 129:6
133:16,17
142:1 143:5
179:8 235:6
236:18
**placed**  63:16
**placement**
101:22
**plaintiff**  1:5 2:2
6:7 14:17,19
16:19 150:10
303:8 349:14
**plaintiff's**
221:16,16
397:5
**plaintiffs**
312:15 325:18
**plasma**  60:8,9
60:11 225:8,17
226:24 228:20
228:21
**plastic**  236:7
236:11 240:17
318:9
**play**  144:7
186:19,21

**please**  5:5,7,24
6:14,22 13:8
127:8 281:13
363:14
**plus**  354:14
**pluto**  57:9,10
**poi**  243:19
**point**  8:13
18:12 28:13
39:4 47:22,22
61:16 62:10,19
63:7,10,14
64:7 72:20
86:7 100:19
107:3 150:25
155:25 186:12
204:4 224:16
226:10 229:18
243:19 260:3
262:9 263:14
268:20 269:15
279:2 288:24
292:8 339:15
343:3 356:18
357:18,18
370:25 392:6
395:14 399:17
399:23 400:3
**point's**  103:16
103:18
**pointing**
289:19 337:2
**points**  269:11
394:9

**policy**  38:17
80:25
**poly**  236:13
**pornt**  243:19
**port**  39:3
**portion**  103:19
**position**  143:20
143:21 144:2,6
393:21
**positioned**
303:23
**positioning**
368:1
**positions**
101:23
**positive**  167:13
187:24
**possession**
24:15 136:18
**possibility**  76:4
322:9 381:19
**possible**  46:1
104:11 109:12
110:24 114:2
202:8,14,19
203:13 204:4,9
204:10,11
237:17 240:10
252:21,23
253:6 254:2,10
255:2,3 286:15
308:3,4 329:11
375:10 405:14
**possibly**  21:7
154:25 207:2

227:23 228:1
229:17 234:4
235:7 249:3
292:3 299:4
320:15
**poten**  286:15
**potential**  31:17
99:23 245:17
286:19,20
357:17 375:14
394:8,10,13
**potentially**
141:18 350:21
358:7 381:5,7
**power**  111:18
111:23 112:7,8
112:15,16
161:11 162:15
271:10
**pp**  4:20 341:25
345:3,15 346:5
347:24 348:3,4
352:9,12,13
353:12
**practical**
252:14
**practice**  36:11
36:18 37:20
205:18,22
293:20 344:14
**precisely**
309:22 328:11
379:11
**predict**  308:9
308:10

**predominantly**
154:8
**preempted**
259:6
**preexisting**
196:9,19 197:4
402:5
**prefire**  101:23
104:13
**preliminary**
29:25 81:1
**prematurely**
110:19
**premises**  57:19
**preparation**
21:22 22:17
23:2,5 24:13
26:20 27:16,19
32:18 36:12
137:8
**prepare**  29:11
40:25 136:16
136:21 276:5
400:16,22
**prepared**  10:18
10:21,25 31:1
37:8 73:6,11
81:1 135:5,25
148:18 188:10
205:5 259:7
262:23 265:5
271:19 272:6
275:17 276:7
276:10 279:20
283:9,10

341:13
**preparing**  37:6
73:5 92:15
270:24 271:5
360:23
**presence**
115:16,22
223:23 367:5
382:20 399:2
**present**  6:1
21:8 52:10
53:23 107:24
114:22 115:7
119:21 133:17
161:5 218:12
329:23 362:6
366:22,23
404:13
**presented**
18:13 26:25
108:9 109:4
142:16 286:6
287:23,24
382:6 408:22
**presently**  77:6
**presents**  288:2
**preserve**
386:13,21
**preserved**  38:9
40:14 144:14
206:9
**preserving**
351:1
**pressure**  100:1
100:1 158:14

159:12
**presume**  13:11
**presumption**
60:4 110:13,16
**pretty**  52:5
60:21 79:12
108:24 112:20
142:2 152:18
336:8
**prevent**  121:25
344:8
**previous**
190:11 191:3
193:15
**previously**
54:21 57:16
142:9
**price**  83:14
**primarily**
106:11 208:16
208:17 210:19
379:12 380:13
**printed**  24:21
398:14
**printer**  138:12
**prior**  10:22
12:5 15:17
18:24 31:24
38:6 43:18
55:4 80:5
84:23 93:22
107:18 130:18
147:4 158:25
160:15 185:16
189:12,25

191:5 193:20
212:9 225:4,19
226:23 230:12
275:8,9 280:25
282:15,15
289:9 311:1,8
319:12,13
322:5 329:20
360:18,23
372:7 374:3,13
393:9 394:6
**private**  5:6
8:23 27:25
**privy**  175:21
**pro**  195:7,7
**prob**  320:15
**probability**
205:7
**probable**  15:2
15:21 30:17,21
202:14,20
203:4,13 204:2
204:8,11,14
251:22 252:21
252:25 253:8
253:10,20
254:1,2,9,10
255:7 286:20
394:12,13
**probably**  24:16
27:9 35:18
43:3 45:2,14
50:20 51:12
52:16,18 74:1
79:12 81:5

129:1 141:8
143:2 157:7
171:3 175:14
197:9 199:15
208:21 225:11
226:4 228:18
228:18 237:23
247:15 256:8
286:23 322:24
363:20 370:16
372:19 389:17
402:13 405:18
**problems**
189:11,24
**procedure**  1:21
408:16
**procedures**
117:12
**proceed**  6:12
**proceeding**
5:24
**proceedings**
19:7 252:16
**process**  39:4
98:7,24 101:20
106:7 273:10
352:4,5 364:12
376:17 377:11
385:10 386:4
404:3,9,12,13
**processed**
404:14
**processes**  70:23
72:3 206:2

**produce**  272:15
272:20,22
379:10
**produced**  1:14
10:20 21:1,3
21:13 25:6,11
40:2 73:19
136:9 150:19
281:24 282:1
303:7
**product**  4:12
96:22 99:8,13
105:23 106:4
106:14 107:9
122:11,12
125:5 151:10
209:20 210:4
223:24 237:14
237:20 247:19
248:9 320:5,25
350:21 351:8
357:11 384:11
**production**
21:11 99:25
**products**  1:8
6:9 96:4
113:15 122:1
124:4 126:17
128:4 151:7
166:14 181:24
199:17,18,18
209:24 251:14
288:6,6 289:6
333:6,24
348:21,22,23

348:24 376:3
384:5
**profession**
261:1
**professional**
92:4
**profile**  84:25
**projector**  17:8
**prompted**
350:19
**pronounce**
22:2 26:2
**proof**  356:4
357:5 358:9,13
**prop**  227:12
**propane**
105:15,20
195:6,8,10
230:16 249:6
295:16 353:4
359:13 376:6
376:24 378:11
380:5 382:10
**propelled**
195:18
**propeller**
271:10
**proper**  192:3
386:15
**properly**
111:24 145:17
190:15 243:15
348:17,18
349:8,9 350:1
350:1,2 384:16

384:18,23
**properties**
124:7 227:12
229:5,7,7,9,25
288:2
**property** 20:24
30:11
**proposal** 4:14
**protect** 207:10
**protected**
206:9
**protection**
91:22 94:17
214:12
**prove** 256:25
315:10 368:12
368:13
**proven** 260:22
**provide** 264:21
264:24 375:5
**provided** 9:13
146:4 218:19
325:18
**providing**
252:19
**prudent** 322:24
**public** 1:15
408:5 412:19
**pull** 47:8 54:19
137:17 209:19
210:16 211:14
331:7
**pulled** 197:9,16
**pulling** 262:12

**pulmerization**
96:18
**pulmerized**
96:18,21
**pumps** 46:16
46:17,19 47:4
47:7 48:1
**purchased** 85:6
**purpose** 240:22
343:7
**pursuant** 1:20
302:21 408:15
**push** 64:10
**put** 35:18 41:7
42:16 48:5,6
73:2 79:16
80:18 85:25
92:9 95:9
142:22 181:17
202:22 208:1
211:1 230:8
231:23 232:2
238:17 248:2
256:17 257:23
263:3 273:13
289:22,23
290:2 293:7,24
294:14 298:14
299:15 301:1
301:15 303:17
309:14 322:5
323:2 328:21
331:12 332:24
333:1 340:18
342:13 343:10

343:21 344:23
346:20 361:25
394:7,14
395:23 397:19
**putting** 79:25
301:25 311:13
**puzzle** 251:19
**pyrolyzed**
96:11,15

**q**

**qualification**
70:9
**qualifications**
69:24 70:10
92:4
**qualified** 70:13
**qualify** 254:23
**quality** 256:11
256:11
**quantity**
294:15 295:8
298:1
**quart** 321:23
354:14 355:10
**quest** 94:6
**question** 12:25
13:5,7,11,19
19:8 32:11
36:16 37:16
46:9 51:7
56:15 64:23
65:5 69:21
73:10 84:16
89:5 93:19,21
93:23 94:3

95:22 103:2
112:25 136:16
140:3 158:3
167:17 181:15
192:8,21
203:22 233:11
262:7 263:8
271:8 274:1,11
284:15 287:2
287:10 294:23
304:12 307:16
314:4 348:9
349:15 354:20
367:20,20
368:3 378:1
380:1 381:12
382:18 387:17
390:23 391:12
392:12 396:6
397:15
**question's** 13:3
**questionable**
257:1
**questioned**
272:4
**questioning**
131:24
**questions** 3:3,4
3:5,7,7 6:21
20:17 21:18
25:13 34:14
36:17 37:18,25
38:8,22 40:13
40:24 44:4
45:17 47:15

**[questions - questions]**

| | | | |
|---|---|---|---|
| 55:2 57:17 | 149:1,9 150:8 | 201:7 202:2 | 270:15 273:21 |
| 62:21 64:14 | 150:18 151:2,9 | 203:2 204:1 | 274:12 276:13 |
| 65:3 66:9 68:1 | 151:24 152:20 | 205:2,20 206:6 | 277:3 278:3,8 |
| 69:22 71:10 | 153:3,17,24 | 206:14 210:3 | 279:13 280:24 |
| 72:9,14 80:11 | 154:6 155:10 | 210:15 211:9 | 281:6,13,18 |
| 82:8,18 84:20 | 155:16,20,24 | 211:21 213:5 | 283:15 287:1 |
| 87:3 88:15 | 156:6,13,21 | 213:11,19,25 | 287:14 288:11 |
| 89:4,15,20 | 157:3,17 158:1 | 215:9 216:1 | 290:1 291:4,13 |
| 91:12 92:13 | 158:3,15,23 | 217:2 219:10 | 291:24 293:1 |
| 93:2 94:7 | 159:5,9,14,18 | 220:13 221:1 | 293:12,18 |
| 95:14 96:8,14 | 160:14 161:4 | 221:24 222:23 | 296:10 297:15 |
| 96:19 97:22 | 161:20 162:10 | 224:12 225:15 | 300:7 301:7,19 |
| 98:14 99:10,11 | 162:20 163:4 | 226:6 227:14 | 302:9,20 303:5 |
| 99:20 100:25 | 163:11 164:2,7 | 228:2,16 | 304:7,23 |
| 101:5,12,17 | 164:24 166:7 | 230:18 231:5 | 305:24 306:15 |
| 102:3,17,20,23 | 166:17 167:14 | 231:17,22 | 308:5 309:21 |
| 104:4,25 | 168:2,12,20 | 232:5,16,23 | 310:23 311:6 |
| 105:10,21 | 169:7,13 170:4 | 233:14 235:9 | 311:12,24 |
| 108:1 109:19 | 170:15,23 | 235:23 237:18 | 313:3 314:25 |
| 111:5 114:21 | 171:4,14 172:3 | 238:9 240:2 | 317:6 319:2,8 |
| 115:15 116:1 | 172:13 173:24 | 241:12 242:13 | 319:22 320:6 |
| 117:8 119:4,23 | 174:12,17 | 244:4,7 247:8 | 320:22 322:11 |
| 123:14 124:16 | 175:8,16 176:3 | 247:24 248:7 | 323:5 324:1 |
| 125:6,24 | 176:13 177:4 | 249:7 250:8 | 325:8 326:22 |
| 126:12 127:7 | 177:14 179:13 | 251:23 253:19 | 327:13 328:9 |
| 128:2,22 130:7 | 180:1,24 181:7 | 254:20 256:3,9 | 330:19 331:11 |
| 130:22 131:13 | 181:11 182:8 | 256:18,21 | 332:11 333:11 |
| 131:18 132:8 | 183:5,25 | 257:14 258:17 | 334:6 335:17 |
| 134:18 136:20 | 184:18 185:9 | 259:4,14 260:6 | 337:6 338:13 |
| 138:1 139:11 | 185:14 186:1 | 260:17 261:12 | 339:1,18 340:4 |
| 139:23 141:4 | 186:14 188:15 | 262:6 263:6,15 | 340:8,25 |
| 142:6,20 144:4 | 189:6,23 | 263:17 264:18 | 341:12,23 |
| 145:4,18,24 | 190:25 191:24 | 266:12 267:4 | 342:21 343:20 |
| 146:12,17 | 193:4 196:23 | 267:21 268:13 | 344:13 345:13 |
| 147:1 148:13 | 197:15 199:8 | 268:18 269:6 | 346:17 347:18 |

[questions - reader's]                                                    Page 71

347:23 348:8
348:10 349:11
350:5 351:3,16
352:16 353:21
354:11 355:18
356:2 357:21
358:2 359:3,21
360:1 362:9
363:4 365:13
366:9 367:11
368:8 369:8
370:5 379:2,22
380:10 381:22
382:7,23 384:7
384:9 385:25
388:17 389:13
391:22 392:5
394:25 396:5
397:17 399:7
399:11 401:11
403:9 404:15
404:20
**quick**  14:22
140:24 161:15
211:14 331:7
386:19 396:6
399:9
**quickly**  17:6
79:12 270:17
**quite**  139:22
147:13 156:12
309:18 363:18
363:22
**quizzing**  95:19
103:13,20

**quote**  97:9
99:22 101:7
105:2 194:8
215:1 253:10
254:21 260:22
260:23,23,24
260:24 261:1
272:7,25 356:3
357:6 375:15
399:23 400:4,9
**quoted**  356:12
357:10
**quotes**  177:5

**r**

**r**  2:1 4:13 45:3
78:24 96:20
270:17 298:14
409:13 411:3,3
**rafters**  262:15
**rags**  14:24
**rain**  319:4
**raise**  6:13
97:12
**ran**  50:7 162:6
390:8
**rans**  2:10
**rate**  87:12,15
87:20 230:17
**rather**  32:10
76:21 83:13
154:10 175:18
188:5 196:5
213:12 310:12
310:16 365:3

**ray**  1:8 6:10
21:9 47:10
79:5 120:12
121:7 190:7
194:16 199:10
199:13 200:16
222:6 230:11
263:18 270:1
273:25 287:12
315:5 316:7
347:1 348:9,13
348:21,22
349:15,22
350:7 356:15
357:11 358:18
359:6,13 360:3
360:11 367:8
369:19 378:4
384:6 387:11
402:14,17
**ray's**  21:13
249:8 314:13
**rays**  273:24
**reach**  112:23
331:2
**reached**  73:17
165:7 295:20
327:20 334:1
**reaching**  110:5
148:19 165:2
312:19
**read**  22:24 23:4
27:18,22 32:18
32:19,24,24
33:19 59:24,24

65:9,20 69:15
71:19 75:6
76:25 83:20,25
84:15,17 92:20
100:20 101:3
103:7,10 108:2
108:4 115:11
116:15 126:16
127:11 152:6,7
154:7 165:1
177:9 178:21
185:19,23
191:16,17
192:8,9,14
204:16 206:7
207:12 210:1
212:25 221:20
226:19 249:8
261:17,24
262:1 267:9,18
267:23 271:2
271:16 295:12
297:14,14
298:24 314:13
324:23,24
357:3,6 395:1
395:16 399:16
399:17,22
410:9 412:5
**reader**  33:2
34:1,6 65:7,15
107:13 172:7
213:20 234:22
**reader's**  32:25
108:3 226:19

**[readily - recorded]**                                                   Page 72

**readily** 41:11
77:10
**reading** 97:16
97:21 99:5,16
100:8,10,11,13
100:20 189:13
232:24 324:24
402:22
**real** 140:23,24
161:15 211:14
331:7 343:14
343:14 386:19
**realize** 260:4
**realizing** 61:7
**really** 41:12
45:13 50:1
61:16 87:8
90:22 92:21
196:13 301:13
317:24 334:3
389:20 399:9
401:23 405:8
**realm** 349:2
**rear** 167:25
168:9
**reason** 83:11
109:11 141:21
173:16 174:13
245:4 257:9,9
257:11 272:23
274:14 275:22
289:8 297:8
303:4 308:15
309:2 315:9,10
333:23 336:9

358:23 360:7
384:25 385:15
385:19 386:8
391:5,6 396:15
403:2 410:11
411:6,9,12,15
411:18,21
**reasonable**
206:1 255:8
260:23,25
329:21,22
**reasonably**
110:15 206:1
**reasoning**
98:15,16,19,20
**reasons** 83:14
162:19 235:6
317:2
**rec** 286:14
**recall** 43:13
52:10 54:3
79:21 80:17
115:6 152:8
161:8 210:10
210:11 235:25
249:10 297:7
307:4 335:13
370:17 371:11
371:15
**receipt** 410:18
**receive** 98:23
109:6
**received** 23:10
79:7 85:13
109:10 137:12

137:12 209:7
301:23 339:17
341:20
**receiving** 85:24
85:24
**recent** 29:5
72:23 88:5
323:11
**recently** 20:9
75:15,20,24
226:11,14
242:17 251:2
317:9 325:18
**receptacles**
112:14
**recess** 84:12
189:3 270:12
328:6 370:2
**rechecked**
111:20
**recognize** 33:1
55:3 192:12
282:17
**recognized**
94:10 191:9
**recollection**
395:12
**recommendat...**
84:7
**recommended**
78:2,19 79:4
91:21 94:17
273:3 274:16
275:14 302:21
303:1 343:25

402:25
**recommending**
274:7
**reconsider**
287:15
**reconstruct**
104:7,10,12,17
**reconstructed**
104:16,17
**reconstruction**
101:14,19
102:14
**recontacted**
68:24
**record** 5:4,9
6:2,22 35:10
35:24 49:17
52:22 71:14
84:5,11,14
161:10 182:25
189:2,5 192:2
232:6 270:11
270:14 272:7
276:20 303:9
315:3 316:6
328:2,5,8
370:1,4 406:7
406:12,13
408:20
**recorded** 5:10
34:1,6 65:14
165:11,19,21
168:13,21
180:10 181:8
183:11 192:17

259:22

**recording** 5:8
160:22 312:17
313:9

**recordings**
36:1

**records** 20:24
21:2 25:1
62:22 66:17
194:2,10
203:13

**recover** 309:1

**recreating**
101:20

**rectangular**
119:12 223:11
241:20 245:22
277:10 318:13
320:1,24

**recurred** 351:6

**red** 155:12
158:9 322:1
332:7 336:25
342:15 344:5,7
365:20

**redirect** 3:6
399:10

**reduce** 88:3

**reduced** 408:18

**refer** 81:7
95:12 98:4
118:11 122:12
148:17 200:9
207:11 236:10
261:18 269:15

270:24 309:6

**reference** 8:23
15:24 19:6,23
22:22 23:16
28:6 45:24
49:10 55:17
67:14 92:14
94:12,19,23,24
116:2 122:18
162:23 170:5
172:4 183:6
205:13 243:19
279:9 283:10
295:7 307:9
335:5,8 350:9
357:17 358:17
361:6 386:23
388:10 394:17
394:20

**referenced**
25:10 373:23
395:15,16,20
410:6

**references**
302:12 321:22
331:25

**referencing**
55:1 74:14
118:22 129:5
133:22 144:6
265:13 290:22
358:5 398:7

**referred** 120:14
124:2 175:6
184:7,11 251:6

266:7 272:19
281:19 304:11
351:4

**referring** 22:21
42:21 50:19
90:3 149:8
163:19 199:12
234:18 255:10
258:24 294:7
323:21 328:10
331:3 352:8
371:18 374:15
388:10

**refers** 304:9

**refine** 19:8

**reflective**
363:21

**reflector** 306:6
306:24 347:12
361:8,17
362:19 364:23

**reflectors**
307:1 347:12
347:13 372:6
372:22 379:6
380:7 382:11

**refute** 375:11

**regard** 183:24
394:25

**regarding**
114:6 117:19
125:9 205:6
281:18 283:13
341:21 351:9

**regardless**
372:5

**regards** 30:19
81:9

**regular** 7:12
84:7 89:23
120:7 228:24

**related** 5:22
66:21 106:19
142:15 189:11
189:25 305:3
403:14

**relating** 6:17

**relation** 348:14

**relationship**
347:11

**relative** 174:22
402:18 409:2

**relayed** 31:13

**release** 99:25
100:1 183:23

**released** 397:7

**relevance**
88:21 132:1,3
139:4 141:16
142:13 144:10
144:18 158:12

**relevancy**
144:13

**reliable** 157:14

**relied** 180:11
196:14 253:9
283:5 313:5
350:14

**rely** 150:10
  276:23 312:19
  313:23 341:22
  350:16
**relying** 191:19
  307:21
**remain** 124:4
  127:13
**remaining**
  167:3
**remains** 96:4,7
  128:1 156:2
  166:5 173:4,6
  173:7
**remember** 16:7
  16:11 17:17
  18:2 24:2
  43:12 53:21
  55:12 109:17
  147:20 287:2
  297:11 335:5
  356:17 370:21
  385:4 396:12
  398:2,23
  402:13,22
**remnants**
  121:21 122:23
  142:2 376:11
**remodeling**
  273:11
**removal** 101:22
  279:18
**remove** 274:4
  373:18

**removed**
  221:20
**removing**
  272:9 273:1
**ren** 15:17
**render** 260:21
**rendered** 14:25
  15:17
**rendering**
  15:18
**reorder** 98:9
**repaint** 57:24
  58:1
**repair** 54:15
  55:22 57:22
  58:1,23 126:18
  128:4
**repairing** 59:19
  106:8
**repairs** 57:25
  58:11,16
  226:25
**repeatedly**
  351:6
**rephrase** 13:9
  307:16
**replaced** 196:9
  196:20
**report** 10:24,24
  14:9,11 15:3,5
  15:18,22 16:1
  22:1,10,11
  23:4 29:2,12
  29:23,25 30:1
  30:17 31:1

35:9,21 39:17
39:20 40:2,4
42:6,9 65:21
67:14,18,19
68:6 71:18,19
71:23 72:17,23
73:2,6,8,9,24
74:2,7,7,14
76:22 80:6,7,7
81:1 90:4,5,13
90:23 91:3
92:9,10,18
93:4,7 95:1
104:21 116:3,8
117:17 126:6
126:15,23
127:1,13 128:1
136:2 137:13
137:14 167:11
178:15 181:17
189:7 201:18
202:3,4,5
203:6,7,12,15
204:16 205:1,5
210:11 232:4
232:11,17,24
233:19 243:9
243:18 244:10
244:13,17
249:8,10
253:23 259:8
261:15 275:6
275:13,16,19
280:18,21
282:23,24

283:1,5,7
288:17 310:5
314:13 339:17
341:13,20
350:9 355:19
356:10 361:2,3
362:1,10,10,16
364:5 366:11
366:13 368:24
368:24 369:10
374:1,7,14
376:5 390:15
390:18 397:6
397:22
**report's** 83:1
**reported** 44:14
**reporter** 5:20
  6:11,13 12:24
  82:14 84:18
  139:13 188:23
  192:10 366:5
  406:14,17,20
  407:6
**reports** 10:18
  10:21 21:24,24
  22:8,20,25
  25:17,21 33:5
  35:22,23 36:12
  37:6 49:11
  60:3 67:16
  73:7,13,18
  92:15,19 94:13
  94:19,22 95:3
  104:18 181:12
  204:4,18,21,24

205:4 231:25
232:7 243:7
253:21 254:12
255:21 260:1
261:14,18
270:24 275:4
283:8 289:22
358:20 360:19
360:24 373:24
401:16,18
403:6,18
**represent**
214:14 219:25
324:8 384:5
**representation**
114:2
**representations**
114:1 396:16
**representatives**
221:17
**represented**
398:12 408:23
**representing**
5:19 30:10
**republic**  1:4
5:12 24:4
26:12,14 27:4
33:11 42:18,22
43:7 52:8 64:5
66:3,6,15,20
74:25 75:1,1
120:13 129:19
130:9 134:6
141:7 142:7
147:2 160:3

182:25 197:22
212:20 215:1
225:4,19
264:21 272:25
273:8 274:24
277:16 279:17
280:25 281:7
285:25 303:8
304:4 305:9,12
305:13,17
306:1,20 307:9
307:10,10,16
309:1,22
310:14 313:11
345:24 346:2
346:18 347:2
347:20 349:21
410:4 411:1
412:1
**republic's**
121:4 264:24
315:15
**request**  106:23
187:20 284:2
285:16,23
287:9 317:9
323:13 325:11
340:11,16,19
340:21 390:21
**requested**
39:12 41:7
83:8 84:17
137:15 192:9
210:25 223:13
250:6 284:21

315:19 390:13
404:14
**requesting**
20:19
**require**  159:13
159:15 221:19
229:2
**required**  70:1
252:19 392:21
412:13
**requirement**
91:16 144:14
180:22 181:5
**requirements**
70:2 181:4
402:15
**res**  372:20
377:7
**research**  196:8
196:11 210:16
**researching**
251:4
**reserve**  19:25
20:2,3
**residence**
409:18
**residential**
31:21
**residue**  106:6
151:3,10 167:7
285:5 371:3,14
371:16,19
377:7 380:8
397:25 398:7
398:16

**resistor**  195:3
**resolved**
145:16 206:2
**respect**  107:22
**responded**
19:19 21:11
53:15
**response**  21:13
218:20 220:18
**responsive**  25:9
279:15
**rest**  178:21
217:23 287:4
295:12 299:7
357:6 372:15
377:15
**restaurant**
14:23
**restricted**
225:16
**rests**  124:17
**result**  110:21
117:10 166:20
166:23 210:8
237:2 288:14
359:4 383:5
**resulting**  400:1
**results**  142:18
307:22 382:3,8
**resumed**
135:17
**resumé**  81:13
**retained**  4:9
14:17 16:19
74:18 205:25

| | | | |
|---|---|---|---|
| 223:13 312:16 | 32:17,24 33:16 | 144:16 146:25 | 222:9 223:5,25 |
| 349:20 | 33:21,22 34:24 | 148:7 149:19 | 224:8 225:5,9 |
| **retention** | 36:3 37:3,8,12 | 150:23 154:7 | 226:12,21 |
| 205:16 | 37:22 44:22 | 158:7 159:15 | 228:6,20 |
| **retirement** | 46:15,18,18 | 159:16,16,21 | 229:23 230:2 |
| 86:20 | 47:22,24,24 | 160:4,6,18 | 230:20,24 |
| **retract** 112:25 | 48:1,2,14 | 161:24 163:21 | 234:19 235:5,5 |
| **retrieval** 386:4 | 49:15 50:10,23 | 164:4 165:4,20 | 236:5,7 238:19 |
| **retrieve** 386:10 | 51:2,23 52:2 | 167:19 169:19 | 241:20,23 |
| **retrieving** | 55:6,9,14 56:1 | 171:22 172:7 | 242:18 243:22 |
| 385:10 | 56:6,13,15,16 | 172:20,22,23 | 248:14 249:15 |
| **return** 410:13 | 58:11 59:15 | 172:25 173:2 | 253:14,17 |
| 410:17 | 62:25 67:20 | 174:7,9 175:12 | 255:13,18 |
| **returned** | 69:13 70:6,12 | 175:14,19 | 261:23 266:18 |
| 299:23 339:20 | 72:10,25 73:4 | 176:18 177:15 | 266:19 272:14 |
| **returning** | 74:12,19 75:6 | 177:17,24 | 273:23 275:22 |
| 344:21 | 78:17 79:10 | 182:14,16,24 | 276:8,14 277:4 |
| **review** 21:22 | 80:14 81:25 | 183:15 184:5,8 | 278:1,21 279:7 |
| 24:17 72:3 | 82:8 85:3 | 184:10,13,19 | 279:11 280:3 |
| 90:15,15,23 | 87:14 89:5,21 | 185:19,23 | 280:13,16 |
| 91:17 410:7 | 90:25 91:2 | 189:22 190:23 | 281:14,18 |
| **reviewed** 21:24 | 92:10 93:3,8 | 190:24 193:12 | 282:8,17,25 |
| 21:24 22:1 | 95:18 97:4 | 193:14,18 | 283:3 288:19 |
| 23:10,18 24:19 | 98:5 100:16 | 194:1,15,19 | 289:21 290:21 |
| 25:22 26:19 | 109:21 116:4 | 195:14,16 | 291:6,12 293:4 |
| 27:16 90:6 | 116:18,24 | 197:13,20 | 293:4 294:12 |
| 91:4 | 117:7,13 | 200:19 202:9 | 294:14,15 |
| **right** 6:14 7:12 | 118:16 120:19 | 207:16 208:2 | 295:17 298:1,5 |
| 7:25 9:18,22 | 125:9 126:19 | 208:12,15,18 | 298:18 299:14 |
| 10:17 11:3 | 126:20 128:6 | 210:3 212:2,22 | 299:17 301:3 |
| 13:7,12,19 | 129:7,9 130:13 | 212:25 214:8 | 303:13 304:18 |
| 14:6 18:13 | 130:17 135:1,4 | 214:13,19 | 308:12 310:8 |
| 19:1,3 21:17 | 135:6,7,9,18 | 215:17 216:6 | 311:23 312:4 |
| 25:7,19 27:7 | 136:7 137:21 | 218:11 219:14 | 312:13 313:19 |
| 29:11,22 31:4 | 139:7,18,19 | 219:25 220:22 | 314:1 317:18 |

317:18 318:4
318:20 319:5
319:17,18,19
319:20 322:6
323:11 324:22
325:16 326:4
326:11 327:16
330:4,10 331:5
331:16 335:2
335:21 336:22
336:24 338:5
338:14 339:5
340:9,22 342:6
343:5,13
345:10,24
346:16 351:10
352:2,18 353:5
353:7,22
354:17,22
355:9 356:20
358:25 362:15
362:23 364:2
365:9,11,12,21
367:2 373:3,21
374:8,22
376:25 378:9
378:12,14,20
380:3 385:24
386:1,5 387:10
388:9,14,24
392:7 394:18
399:5 400:23
401:16 405:20
**rim**   142:7

**rimkus**   8:24
9:9,14,24,24
10:1,6,9,14,17
10:23,25 11:21
12:1,7 14:14
15:11 21:5,11
21:12 24:7,8
24:10 25:23
26:3,24 27:12
28:2,7,11,16
29:6,13,19
32:7,13,16
33:25 34:4
35:8,14 36:8
38:10,17,21,24
39:1,23 40:4,8
40:14 42:16,22
43:6 53:5
62:23 64:1,4
66:12,18 74:17
80:24 84:23
85:2,5,14,18,21
85:22 87:4,11
87:14,23 90:13
90:20 91:14,16
95:1 113:23
118:16 134:4
137:7,8,11
138:4 159:21
183:16 185:10
187:15 236:5
242:18 265:13
265:18 266:24
276:7 290:8
297:20 299:23

317:10 322:6
323:12 325:19
336:23 339:21
341:4,15
344:19,21
345:8,8 366:18
368:22 370:8
370:15 371:21
372:9 383:15
398:22 404:2
**rimkus's**   62:22
**rise**   128:9
**rl**   316:11,12
**road**   7:18 27:4
121:5
**role**   33:10
186:19,21
389:23
**ron**   34:8 83:20
**roof**   165:20
167:5 222:1
262:15 263:2,4
264:6 373:22
**room**   66:25
106:25 120:20
129:11 132:23
133:12,12,19
134:22 138:5
141:11 143:6
146:6 156:17
167:15 169:19
169:24,24,25
170:1,6 171:5
173:2,5,8
176:1,20 177:1

178:3 193:24
194:18 196:2
196:10 197:9
197:16 198:16
209:9 214:18
214:22 220:2
223:19 231:3
237:2 240:7
249:23 295:14
302:4 314:5,6
315:8 317:14
355:23 368:6
377:15 378:3
379:24 404:3
**rough**   136:25
278:10,19
**roughly**   46:12
62:24 89:13
146:6 173:19
189:8 203:3,5
213:12 214:25
280:10 401:13
**routine**   111:16
234:14
**rubble**   59:10
**rule**   109:14,14
156:24,24
207:25 247:25
248:3 250:9,12
250:12 405:9
**ruled**   187:5
**rules**   1:20
11:16 12:20
408:15

**run** 89:13
162:2 308:21
**running** 112:17
393:15
**runs** 146:21
234:7
**rupture** 96:24
343:18
**rust** 320:14,15
**rusted** 268:10
269:8 319:5
320:1,13
**rusty** 320:23

**s**

**s** 2:1 4:14 48:6
48:12 266:18
271:8 301:1
411:3
**safe** 223:4
**safety** 209:13
210:17
**saith** 407:11
**salamander**
146:13,21
147:3,11 156:2
156:7,25
157:11 170:16
170:21,24
173:11
**salamanders**
171:15,19
**samir** 43:25
44:1 45:2
46:10,14 47:18
48:3,3,13,20

49:14 51:16
52:8 152:4
257:20 263:16
264:11
**samir's** 261:25
263:8
**samp** 309:10,18
**sample** 132:17
132:18,20,21
133:2 135:14
167:12,12
224:16 237:24
284:17,19
285:13 294:17
294:21 295:1,8
303:24 308:21
309:23 310:2,9
310:11,15
324:11,21
331:25 338:6
346:3 350:19
352:18 353:4
367:23 386:19
**samples** 77:21
126:9 142:19
238:17 281:19
284:14 285:4
285:11 286:7
290:15 291:14
291:17 292:20
295:11,18
296:8 308:11
309:17 310:3
310:20 311:16
326:4,7 329:3

334:17 341:16
341:21 355:1
367:15,23,25
373:14 385:8
391:1
**sampling**
386:24
**samplings**
307:22
**sand** 57:24
**saran** 318:2
**sat** 15:10
**saturation**
364:8
**saturday** 28:17
**save** 287:12
**saw** 34:20
118:14 121:20
132:9,9 142:2
148:23 152:13
152:13,14,16
152:19 154:8
154:16 177:25
178:12 199:21
207:17 237:8,9
250:18 255:16
264:5 288:9
289:6,7 317:21
330:6 364:13
372:4 375:4
382:5
**saying** 37:5
49:25 69:18
105:17 112:11
112:13 121:3

123:20 151:14
154:15 176:21
176:23,25
179:21 181:20
181:21 200:20
217:10 223:14
228:7 229:14
232:25 234:16
256:23 372:18
372:19 377:24
380:2 381:18
388:18 398:13
**says** 12:3 90:23
96:3 126:6
160:3 162:1,3
162:21,21
163:5 164:8
169:19 171:8
171:15 172:14
172:15,22
173:1,13,19
174:2 177:5
178:22 183:6
189:11 206:4
210:11 227:9
252:18,23
253:2 265:15
265:17,19
266:4,13,14
277:5 282:8
288:1 291:5
296:11 298:7
316:2,11
324:23 326:25
338:4,6,11

352:17 356:3
358:7,9 374:19
390:13
**scene**   26:3 27:3
31:6,8,19 45:1
50:9 51:16
61:9,13,17
62:12,18 63:13
64:15 77:15
81:14 96:5
101:14,19,20
101:21 102:7
104:7,10,12
113:20 114:12
115:17 118:15
206:8 216:17
238:22 249:16
255:16 257:25
259:12 286:6
286:12 321:6
382:6 390:7
401:12 404:13
**scene's**   102:6
391:2
**scenes**   389:15
**schematic**
136:14,21
**schematics**
135:25 206:21
**science**   397:1
**scientific**   15:6
15:25 31:3
108:5,5,7,11,21
109:20,21,23
187:4 260:23

289:14 393:22
393:25
**scott**   34:9
314:20,21,24
315:5
**scottsdale**
68:14
**scrape**   296:20
**scraped**   335:25
**scraping**
295:11 296:12
296:13,16
386:24 387:2
**scrapings**
78:15 295:17
307:18 308:7
309:9 323:7
355:1
**screen**   47:9
50:23 138:8
**seal**   409:6
**sealed**   117:16
119:3,14 121:2
121:25 199:16
323:3 330:8
358:11,12,14
**sealing**   311:9
322:13,15
**searched**
209:24
**sec**   293:13
**second**   4:6,7
20:9 28:25
29:1 39:20
54:17 62:23

63:20,21 74:16
75:5 90:4
105:22 111:20
113:11,13
144:12 149:10
187:8 191:6
210:22 211:13
211:18 232:17
244:13 251:13
292:21 301:16
316:2 341:13
355:20 361:1
362:10,16
364:4 369:10
373:1 374:7
376:5,9,9
377:21
**section**   56:18
56:22 58:5,6
94:19 97:23,24
99:21 101:7,13
101:18,19
105:1 206:11
243:2 251:24
254:21 255:10
260:18 266:1,6
266:6 277:23
304:16 305:16
374:19
**sections**   41:22
82:21 94:23
95:4 331:18
335:25 395:17
**secured**   344:6
344:18,20

**security**   8:20
86:21 153:5
405:25
**see**   34:22 55:8
56:9 62:18
73:3 81:8 90:9
107:12 109:9
116:5 118:6
121:8,17 122:7
127:15 131:21
138:19 139:5
139:16 140:4
140:15,22
142:23 146:11
149:18 155:13
160:1 161:14
162:3 163:6
164:10 165:15
165:20 166:5
168:25 171:10
171:16 173:14
174:3,6 177:6
183:6,13
185:15,19
189:12 198:23
204:25 209:20
211:22 212:18
213:6,10,12,17
214:16 216:2
217:15,17
218:16 221:2,4
231:11 234:15
234:19 236:14
236:18,21
238:6 240:19

241:17 244:19
244:21 246:19
249:20,21
255:17 257:24
257:25,25
258:22 260:1,2
262:8,9,11,13
262:16 263:19
265:10 266:6
267:5 268:1,9
270:21 271:11
272:2 274:22
277:6,12
278:15,19,25
279:23 282:10
283:19 289:3
295:13,22
300:18 302:10
303:10,13
305:25 306:2
306:18 309:1
312:1 313:19
316:8 319:21
319:23 320:8
320:23 322:12
325:20 331:8
337:19 341:8
350:20 356:8
357:9,22,23,24
358:3 362:15
363:25 364:3
365:11,14
366:3 375:14
383:17,17,19
387:13,15,17

387:18,22
388:3,6,7,8,18
388:20,22,22
397:25 398:7
398:15
seeing  335:5
397:6 402:13
seek  155:9
seeks  154:23
155:8
seemed  236:24
seemingly
110:19
seen  20:11,13
20:21 21:12
34:18 49:10
67:19 118:14
118:18 137:6
148:7,11,14,16
165:5 174:18
178:10 179:19
180:4 182:11
185:15,16
188:7,13,18
211:10 212:2
218:17 238:12
265:12 271:13
272:12 276:3
277:1 278:13
278:17 302:19
312:6,8 321:12
330:5
select  394:13
selected  83:11

self  75:2
semicolon
105:3
send  90:14
132:20 285:2,2
285:4 309:19
325:11 334:9
340:22
sends  195:1
sensitive  5:5
sent  71:19
126:9 137:11
137:12 166:21
167:11 213:1
218:20 284:17
284:18,20
285:10,11,15
292:21 296:23
297:10,12
299:20 300:9
312:23 324:10
334:17 337:11
338:23 339:2
340:9,10
341:21 354:18
354:25 382:24
383:1,3,7
410:14
sentence  76:24
90:5 126:16
127:11,16,17
162:12,21
178:21 180:9
357:3

separate  260:8
285:11 292:16
separated
170:1 217:13
217:22 339:19
379:24
separately
260:9 293:15
separating
213:14
separation
55:20 346:16
sequence
194:15 372:7
374:22 376:2
376:22 377:23
378:2,5,7
380:4,21,22,25
381:1,2 382:8
sequential
371:1 374:19
sequentially
338:16
service  4:13
160:3 270:19
services  1:4
5:12 26:12,14
75:2 274:24
410:4 411:1
412:1
servpro  183:11
183:16,19
set  105:2
134:13 172:18
233:15 234:11

409:5
**sets**  316:15
**setting**  25:19
  25:20 36:3
  75:7 89:16
  314:4,7
**settled**  18:9
**seven**  19:1
  34:17 102:18
  157:18 164:25
  325:22,22,23
  326:2 327:16
  327:18,23
  328:12 329:4
  329:12 330:13
  331:22 366:12
  389:9
**seventeen**
  190:18 399:21
**several**  40:23
  54:11,11 70:23
  82:21 93:15
  107:20 111:9
  113:24 154:4
  162:19 208:24
  208:25 239:8
  369:4 372:21
  373:17 389:19
  390:7 394:23
  398:20,21
  403:11
**shadow**  33:16
  34:7 83:10,25
  84:19 154:1

**shamir**  152:4
  153:20 257:20
**shape**  119:12
  150:11 241:21
  271:5 321:16
  382:15
**shaped**  118:12
  320:24
**sharee**  123:22
  166:20 210:7
  223:22 282:14
  284:2 285:16
  288:12 296:25
  299:21,23
  300:9 307:23
  322:4 334:9,16
  335:24 337:11
  338:21 339:19
  341:1,14
  342:14,23
  343:23 344:24
  351:12 352:1
  354:14 382:15
  382:20 383:7
**sharefield**  34:9
**sheboygan**
  106:15 123:16
  123:23 124:9
  124:19,20
  125:8,13 126:1
  130:10 135:8
  141:10 142:8
  199:23 214:19
  229:2 284:4,9
  285:18 286:1

287:16 288:14
  315:14 351:9
  396:12
**sheet**  4:13
  106:14 124:9
  159:23 209:14
  218:5,6,7
  282:20 396:17
  410:11
**sheets**  124:3
  125:20 126:6
  210:17,17
  216:19 248:19
  248:22 341:11
  396:8,10
**shelf**  79:16,18
  257:24 394:7
**sheriff**  19:22
**sherwin**  178:20
  178:20
**shield**  305:18
  305:20,22
  363:16
**shields**  402:19
**shift**  8:5 390:1
**shingle**  165:20
**shingles**  165:24
  166:2,6,18
  167:2,3
**shipped**  335:23
  338:20,21
  339:21 341:1,2
  341:15 342:22
  343:22 344:23
  354:13

**shipping**  135:5
  322:5 342:13
**shop**  57:23
  61:1 184:7
  188:7 220:21
  273:2
**shops**  121:16
**short**  29:7 30:1
  30:25 43:22
  45:13 69:2,5
  133:2 160:8
**shorter**  74:18
**show**  48:6
  103:8 145:13
  145:14 156:1
  203:12 268:25
  287:18 307:10
  307:12 324:3,6
  328:11 333:3
  336:21 338:17
  347:14,14
  348:16 362:6
  365:15,19,21
  365:24 367:6
  368:2,4,17
  369:15,15
  370:11 371:22
**showed**  134:14
  223:23 224:3
  328:12 370:13
  371:3 372:21
  390:5 398:4
**showing**  142:25
  178:7 238:12
  268:21 299:20

310:5 311:15
345:9 347:7
365:3
**shown**   50:19
52:2 179:18
221:8 245:22
267:15 278:5
310:12 327:14
327:23 331:14
333:12,17,20
334:18 337:10
345:14,15
346:5,9 397:18
404:5
**shows**   268:25
278:19 300:1
305:18 318:2
321:4 322:1
324:5 331:22
336:23 345:19
346:3,16
352:20 353:16
365:2 368:19
385:9 394:24
**shred**   35:12
**shut**   111:16,17
111:25 112:3
**sic**   6:9 42:16
55:3 62:23
64:1 101:13
136:3 145:3
153:20 177:25
249:3 351:6
353:1 400:16

**side**   15:12
41:24 42:1
47:6 50:23,23
52:2 56:8
139:10 143:24
158:7,17 164:9
164:13 176:19
217:24 218:23
219:2,25
243:12,13
251:16 262:13
262:18 263:20
264:9 269:14
278:21 304:17
316:12 319:18
336:21 362:24
402:20
**sides**   331:1,1
**sign**   410:12
**signature**
406:15 408:22
409:12
**signed**   312:1
410:20
**significant**
93:11 103:19
**silicone**   119:14
**silver**   246:21
247:3
**silvery**   241:3
**similar**   124:7
141:23 145:15
150:22 151:6
198:12 227:11
229:7,24 247:5

321:16 323:2
372:2 387:9,12
390:9
**similarly**
406:21
**single**   95:5
102:8,9 201:17
205:1 307:14
**sinus**   312:10
**sir**   7:2 12:19
13:24 15:4,8
15:23 16:2,23
18:16,23 60:7
60:10,14 63:24
65:16 68:11,13
74:10,13 75:10
81:16 85:4
87:13 91:24
92:2 93:6
98:12 99:2
101:11 117:6
120:9 130:20
131:11,22
157:21 160:10
210:6 211:8
215:11 218:4
219:4,6 221:5
222:4 234:20
235:11 241:19
244:22 249:19
263:22 264:16
264:16 265:23
277:7 281:8
291:8 315:23
316:1 318:5

319:12 320:19
342:2 355:25
370:20 383:9
398:10 399:14
404:21
**sit**   100:19
190:14 304:14
**site**   31:25 35:5
41:9 46:3,21
53:23 62:20
63:20 75:23
87:10,20 113:6
113:24 115:25
136:3 142:17
160:3 161:21
163:13 182:14
215:1 250:6
259:18 288:9
344:18 390:21
390:22
**sites**   257:25
385:11
**sitting**   281:17
332:9
**situation**   95:8
121:21 133:1
193:9,11
196:14 207:19
224:23 226:1
226:10 227:25
234:10 235:4
237:22 254:6
257:24 258:12
286:9 288:8
309:15 344:16

392:17
**situations**
390:9
**six**  10:11,13,15
10:19 12:15,16
18:25 44:19
58:4 123:3,5
211:8 220:11
325:23 339:21
341:16 370:3
406:10
**size**  106:18
245:12 300:9
**sketch**  136:25
**skip**  57:4 72:22
76:23 281:12
311:25 325:1
325:14 345:7
**skipping**  76:22
277:10,11
351:4
**slab**  174:3
**slash**  298:4,20
298:25
**slightly**  384:21
**slow**  13:2
**small**  122:1
138:23 208:6
265:19
**smaller**  208:10
**smelled**  183:12
**smoke**  152:13
152:16,18
183:12 375:19
375:19

**social**  8:20
86:21
**soliciting**  281:1
**solid**  388:19
**solidified**  321:1
**solutions**
410:23
**somebody**
45:25 75:3
149:21 175:4
299:1 300:25
328:20 366:21
391:18
**somebody's**
65:20
**soon**  46:1,1
262:11 340:10
364:12
**sooner**  364:12
**sor**  406:23
**sorry**  9:17 10:8
12:4 14:18
22:7 23:2
32:10 37:23
39:10 43:6,21
57:20 59:17
60:15 64:5
66:20 77:24
79:5 82:13
95:15 111:4
112:25 115:19
116:6 120:13
123:13 124:10
127:21 137:21
137:22 148:4

161:5 168:3
197:23 198:6
204:20 206:1
215:3 220:8
223:24 227:18
229:1 234:24
235:18 242:3
252:14 254:9
260:16 264:14
283:19 294:20
295:2 300:2
310:22 325:22
332:23 334:7
340:10 341:24
350:10 354:13
364:25 366:11
369:16 377:21
**sort**  41:3 46:6
56:9 80:19
116:16 158:7
236:12 240:15
241:20 283:24
318:12
**sou**  295:9
**sound**  33:17
62:25 65:22,24
85:3 90:25
133:24 329:21
**sounded**  79:2
**sounds**  33:18
65:25 91:2
155:2 329:22
**source**  32:13
97:9,10 166:19
196:1 197:3

209:5 224:8,18
229:21 285:6
289:10 377:25
380:23 394:10
399:25 403:10
**sources**  8:18
**south**  15:12
56:8 86:6
116:22 154:18
164:13 169:25
169:25 185:20
202:7 208:22
209:4,6 217:24
217:25 218:2
220:2 243:2,3
243:6,12,22,24
244:1,5 246:3
246:5,13,14
262:13,18
264:9,15,16
277:21 294:18
295:13 298:4
304:8,9,10
342:4,5 345:17
345:18 346:10
352:18 353:5
366:14 368:17
368:18,22
370:23 377:18
377:18 404:4
**southeast**
161:12 173:13
173:20 174:8
**southern**  154:9
170:8 220:21

263:20
**soyk** 75:7 90:6
90:23
**space** 1:8 6:10
21:9,13 47:10
73:9 79:5,25
120:12 121:7
147:3 170:7,10
170:14,22
189:20 190:7
194:16 199:10
199:13 200:16
216:25 222:6
230:11 249:8
251:2 263:18
270:1 273:24
273:25 279:4
279:17 287:12
314:13 315:5
316:7 347:1
348:9,13,21,22
349:15,22
350:7 356:15
357:11 358:18
359:6,13 360:3
360:11 367:8
369:19 378:4
384:6 387:11
388:2 402:14
402:17,18
404:11
**spacings**
402:25
**speak** 42:11,14
46:9,14 48:20

50:17 51:10,15
51:20 52:7
64:7,12 67:5
70:19 79:16
104:19 150:3
150:25 180:22
183:16 200:11
207:8 251:5,10
257:3 259:16
391:1 394:7
402:1
**speaking** 48:3
**speaks** 81:13
183:3 186:6
201:23 251:24
277:19 357:12
357:15
**specific** 46:22
110:14 116:24
**specifically**
57:15 255:3
327:4
**specification**
4:12
**specifications**
351:8
**specified** 101:8
**specul** 258:9
**speculate**
191:22
**speculating**
155:2,4 258:10
**speculation**
155:5 163:2
169:22 170:20

184:24 230:14
339:25
**speculative**
258:19
**spell** 96:20
**spend** 103:19
**spilled** 353:16
**split** 331:20
**spoke** 31:7 41:9
42:24 43:6
44:25 45:4
46:12 48:24
50:11,15 51:17
51:20,22 57:19
63:17 65:12
68:20,21 75:11
147:19,22
161:5,6 250:4
392:6
**spoken** 51:13
65:13 66:11
184:25 360:17
**spontaneous**
14:23
**spot** 155:9
305:4,5,6
**spray** 128:10
158:20,24
171:5 178:22
181:6,16,20
182:5 190:18
198:21 199:20
214:1 219:20
220:21 222:15
248:12,12

258:4,11,25
268:11,14
**sprayed** 181:21
181:23 214:2,5
214:5 226:10
226:11,14
**sprayer** 141:10
159:6,10
178:19 179:2
182:5 259:22
**spraying** 182:6
214:10 280:5
**spread** 236:21
376:19 396:2
403:15
**square** 1:17 2:4
118:23 277:5
278:23 408:13
**ss** 4:6 20:10
408:2
**stacked** 218:23
**stage** 284:9
285:19,19,19
375:4
**stages** 317:12
**stamp** 23:15
303:10 309:22
**stamped** 23:15
23:23 24:7
41:8 326:10
345:24 346:2
**stamps** 24:3
**stand** 74:21
95:22 142:3
175:11

standalone
  197:7
standard  70:5
  70:8 71:4 92:3
  95:3
standards
  293:8,9
standing  47:5
  47:18 48:13,18
  48:24 147:22
standpoint
  35:14
start  9:22
  12:25 13:5
  49:4 62:17
started  10:4
  12:3 36:20,21
  38:24 45:10
  62:6 85:2,23
  129:20 130:9
  182:10 187:7
  251:3
starting  55:8
starts  78:23
  119:17 178:17
  356:13
state  1:16 5:24
  6:1,22 7:18
  15:5 18:5
  30:25 70:15
  71:7 86:4
  117:9 128:16
  192:18 261:4
  284:25 286:1
  310:25 408:1,6

stated  75:23
  79:22 81:21
  125:18 126:14
  186:23 202:13
  350:18 382:2,3
statement  18:8
  34:1,6 49:23
  65:15 69:23
  111:3 115:6,7
  115:9 156:24
  157:5 177:16
  200:4 205:16
  206:7,24
  254:25 256:2
  257:19 258:4
  258:23,24
  390:18,20
  391:23 397:8
statements
  31:14 52:23,25
  66:24 98:23
  109:4 142:17
  148:15 157:13
  207:4 255:15
  257:6,13,13,15
  257:16,21
  258:19 259:5,5
  259:12,17
  375:11,15
  377:12 403:24
states  1:1 90:5
  144:13 204:7
  252:2,6 260:19
stating  261:5

station  121:14
  388:13
stations  387:7
  387:8
status  85:10
  86:2
statute  348:24
stayed  201:5,10
steel  58:25
  217:11,13
  228:13,22
stenographic
  6:13 188:23
  406:14,17,20
  407:6 408:18
step  394:2,3
stepping  82:13
steps  108:23
  394:2
sterile  284:18
  311:4 324:13
stick  354:12
sticker  276:14
  322:2 343:5
sticking  278:23
stipulate
  232:10,12
stir  176:19
stoner  301:23
  301:23
stopped  61:18
  61:18
storage  169:25
  217:22,25
  220:2 377:20

379:24 404:3
store  404:3
stored  107:10
  111:24 170:2
storing  107:22
street  2:15
strength
  255:23,24
  256:10
strike  65:4
  102:16 168:3
  197:21 199:22
  238:21 264:10
  287:4 391:11
  392:12 396:24
strong  286:24
strongly  252:3
structural
  101:23
structure
  165:19 217:8
  266:10 380:14
structures  55:1
stuff  55:23 83:4
  118:7 143:4
  219:11 241:3,5
  247:3 269:19
  393:4
style  76:9 78:3
  141:11 271:9
  273:25 274:2,8
styled  402:4
subject  29:16
  29:21 370:6

**subjected**
239:14 319:4
**submitted**
23:20,21
**subpoena** 4:7
20:18,23 21:10
21:14 25:9
136:7 218:20
220:18 279:15
**subscribed**
412:14
**subsequent**
28:1 382:9
399:4 400:12
**subtract** 258:1
**subtracted**
258:3
**sudden** 99:22
**suddenly** 96:23
**sued** 348:22
**sufficient** 86:4
97:10 157:12
**suggest** 314:8
**suggested**
129:12,14
**suggesting**
112:8
**suggestion**
115:24
**suggests** 232:17
261:19
**suitable** 275:7
**suite** 1:17 2:5
2:11 408:13

**summarization**
315:4
**summarize**
17:6
**summary** 95:21
**supervisor**
262:12
**suppically**
105:25
**supplemental**
73:6,11
**supplied** 196:6
220:18 387:22
**supplies** 227:9
**supply** 112:2
**support** 257:12
349:17 360:7
375:11
**supported**
217:9
**supposed**
286:10
**suppressing**
44:18
**suppression**
122:8
**sure** 13:4 24:9
26:1 35:17,18
39:25 43:23
46:11 49:25
63:9 72:21
75:3 80:4
97:24 112:14
115:4 136:15
139:9,22

140:25 149:7
158:13 171:17
184:12 187:23
214:2,22
218:10 219:9
224:14 225:11
228:23 231:16
240:6 242:1
249:18 270:5,6
284:6 292:7
306:12 318:9
320:15 335:3
336:7,8 350:24
368:9 386:21
392:22,24
393:2,4 394:16
395:8 399:16
**surely** 80:18
**surface** 124:6
124:15
**surfaces** 122:25
124:5 125:4,4
**surpassed**
286:14
**surprise** 197:1
**surprised**
115:8,23
**surveillance**
405:25
**suspect** 358:23
384:17,25
394:12
**suspected**
254:23

**sustain** 125:14
287:19 377:3
**sustains** 126:2
**swab** 132:21
135:10 237:23
284:13,13,18
308:16 323:19
324:3,11
326:12 327:8
331:2 334:1,2
335:15 338:4
346:5,11
386:24
**swabbed** 241:1
335:7
**swabbing**
311:1 386:24
**swabs** 78:14
207:15 208:14
286:22 290:22
298:4,20,25
307:11,12,18
308:6 310:25
311:4,7,16
323:7 325:20
327:16,17,20
328:12,17,21
329:3,5,9,9,19
330:13,18,24
331:12,22
334:22 335:6,7
335:9 336:1,5
336:10 337:12
337:12,14,17
338:12,19

339:3,3,6,20
342:3 345:5,9
345:14 346:9
346:21,25
347:20 353:14
353:22,25
354:4,5,7,7,17
355:1
**swallow** 45:12
**swear** 6:12
**sweep** 392:22
**sweeping** 354:5
**swept** 32:1
**swiggle** 294:24
**swiggles** 294:24
**swirly** 158:9
**switch** 185:22
347:25
**switched**
122:17
**sworn** 1:14
6:16 408:9
412:14
**synonymous**
116:9 227:15
**sys** 210:22
**syst** 231:3
**system** 42:5
111:7 119:2,3
145:1 162:16
190:3 199:4,7
200:14,15
201:3,5 234:5
358:11

**systematic**
91:21
**systematically**
98:8
**systems** 113:3
145:3 167:16
181:22 186:16
187:16

**t**

**t** 78:24 266:18
409:13 411:3,3
**table** 353:17
**tabs** 328:13
**tagged** 312:18
**take** 5:8 13:14
13:16 17:13
20:20 41:14,15
48:22 53:11
57:14 70:25
79:18 84:6
131:10 134:1
140:24 185:10
188:22,24
200:10 226:5
235:24 242:6
256:15,16
269:2,4,10
308:6 309:9,13
309:23 310:3
310:15,24
311:3,14
322:14 328:23
334:21 345:14
345:16 346:21
347:7 362:13

363:13 365:17
366:4 391:1
**taken** 1:16 5:11
11:14 18:21
25:22,25 26:14
26:22 27:2,5
27:10,22 32:6
36:14 55:4
84:12 137:16
145:16 148:15
155:25 178:6,7
184:4 189:3
207:24 212:9
236:4 242:14
258:4 261:25
263:16 267:11
267:13 270:12
286:8 307:15
308:11,16
310:20 323:12
325:19 326:7
326:12 328:6
330:13,18
336:1,16 345:8
345:20 353:4
364:12 368:15
370:2 385:8
399:1 408:11
408:17
**takers** 185:11
**takes** 226:4
340:23
**talk** 12:21,22
51:3 53:8
57:10 62:14

67:10 74:17
79:18,20 80:16
113:21 156:16
156:23 172:6
233:19
**talked** 49:14
66:10 69:8
83:23 84:1
88:6 113:6,9
150:13 156:22
172:9 173:5
212:13,13
221:15 233:24
385:4
**talking** 14:21
24:20 28:6
42:14 43:24
47:18 55:11
78:18 87:21
92:7 96:17
106:5,15
107:21,22
112:10 116:21
117:18 119:5
119:16 120:22
123:11 129:5
129:20 132:5
140:11 147:6
149:2,5 161:18
169:20,24
171:8 178:17
179:1 180:10
182:4,6 184:4
185:6 189:19
190:3,4 200:15

207:12 217:1
219:5,11 223:3
224:4 226:1,13
226:16 229:5
229:22 251:8
258:16 260:2
273:23 315:7
323:6 346:13
346:18 351:1
356:5 361:24
373:4 378:8
381:2 388:12
391:24 402:4
**talks** 323:18
**tall** 175:4 280:1
**taller** 135:22
**tamper** 343:12
**tampered**
  343:11
**tampering**
  344:9
**tape** 268:3
  322:13,15
  323:1 343:10
  343:12,14,19
  343:21 344:5,8
  344:17,23
  347:14
**taped** 344:8
**tar** 166:10,10
  166:18
**taught** 81:17
**te** 329:2
**teaching** 81:13

**team** 115:24
**technical** 90:24
  248:19 328:2
**technicality**
  124:25
**technically**
  91:3 121:18
  124:13 273:12
  328:17
**technician**
  317:15
**techniques**
  81:15 98:8
**tecum** 4:7
  20:18 21:11
**tell** 6:16 9:1
  21:16 47:17
  54:8 57:1,18
  58:20 59:3,16
  63:2 64:20
  69:23 76:6
  83:10 94:2
  99:3,7 123:22
  124:1 125:12
  127:11 138:9
  139:9,20,22
  154:5 160:21
  177:8,8 183:15
  189:9 191:1
  212:8 215:8
  221:11 258:7
  259:20 265:15
  265:17 267:19
  288:15 318:10
  320:16 325:2

326:9 327:4
330:13 333:4
337:8 341:5
359:25 363:18
363:22 365:18
376:1 386:6
392:9,13
399:22 408:9
**telling** 43:5
  53:21 58:12
  93:25 305:11
  368:21 370:7
  371:22
**tells** 154:21,22
**temp** 194:3
  303:17
**temper** 234:17
**temperature**
  97:13 194:17
  194:25 228:12
  228:21,23
  229:1,2 230:7
  230:8,17 232:6
**temperatures**
  193:23 230:10
  232:11 233:1
  234:3,6,11
**ten** 48:21 51:12
  53:10 57:18
  235:21 256:24
  280:12 302:13
  330:20 390:2
**tent** 331:5,13
  347:19

**tenths** 90:24
**term** 70:7
  109:18 204:6,6
  204:25 246:25
  374:20
**terminated**
  162:3
**terminology**
  30:16,19
  118:21 243:15
  246:24 351:24
  387:24
**terms** 12:17
  14:20 56:1
  58:11 59:19
  120:18 144:5
  253:8 351:10
  351:10 376:1
  386:25
**terry** 32:24
  33:2 34:1,6
  65:6,15 107:13
  108:2 172:6
  213:20 226:19
  234:22
**test** 70:25 71:3
  71:4,5 223:1
  241:13 247:11
  251:14 283:11
  283:21 284:4,9
  284:24 285:1,3
  287:9 288:14
  299:6 334:20
  334:23

**tested** 110:15
125:25 126:4
163:24 223:23
224:17 245:3
284:20 285:3,5
288:22,22
324:10 334:17
340:15
**testified** 6:18
19:5,9 86:14
88:13 107:13
130:9 192:23
213:20 214:24
218:21 220:19
221:17 226:22
**testify** 112:1
**testifying** 87:22
**testimony** 38:6
107:18 124:22
130:19 174:19
191:5 196:18
196:19 234:21
258:21 309:12
390:17 396:23
398:11 408:21
410:9,18 412:8
**testing** 135:6
164:1 166:21
210:8 252:12
284:3 299:3
325:11 340:17
350:20 354:15
**testings** 307:22
**tests** 125:12,16
284:24 285:12

286:7 287:5
400:6
**text** 84:17
192:9
**thank** 53:11
67:25 71:6,6,9
85:20 108:19
123:13 132:4,7
140:9 235:19
254:19 265:24
295:6 300:3
337:4 355:15
384:2 389:1,10
392:4 406:2
**thanks** 17:10
25:12 47:8
48:19 70:22
84:15 134:10
162:18 220:12
291:3 298:22
313:19 314:21
324:12 366:7,7
**theories** 199:22
**theory** 348:23
**thereof** 1:22
**thermal** 185:20
195:3
**thermostat**
172:23 194:17
194:25
**thermostat's**
234:17
**thermostats**
233:6,15

**thin** 343:15
**thing** 53:6
71:16 102:8
108:20 112:5
120:14,23
121:20 124:2
126:5 128:21
129:16 136:2
142:15 143:19
143:23 148:1
154:20 167:10
169:25 182:3
228:8 230:22
231:11 232:11
242:23 250:22
251:13,16
258:3 259:11
259:20 267:19
269:17 273:8
290:17 297:6
309:24 323:2
328:15 333:9
336:20 341:19
374:17 376:8,9
377:10 379:23
382:19 383:6
393:14 398:19
405:24
**things** 9:8 21:4
22:15 24:17
27:15 38:19
41:10 42:3,9
53:15 54:11
55:22 56:21,23
57:3 58:1

69:21 74:4
75:24 79:24
83:3 85:23
89:10,25 109:5
109:7 111:23
112:14,17
118:4,8 124:5
124:19,24
134:16 145:15
185:4 187:1
190:24 193:2
202:10,12,25
208:10 209:25
210:7,16 230:6
245:13,16,17
248:13 251:19
255:19 257:23
273:10 322:22
350:20 358:10
364:17 379:10
379:11 389:20
392:19,25
393:18,20
395:18,20
401:6 405:22
406:1
**think** 9:20
10:21 11:5,24
12:10 22:8
23:23 25:10
26:1 30:18
32:23 34:20
38:5 40:1,12
43:24 45:7
47:11 50:22

| | | | |
|---|---|---|---|
| 51:18 52:11 | 275:13 276:17 | **thinners** | 382:24 384:19 |
| 53:24 54:1,21 | 278:10 281:24 | 106:11 151:18 | 386:18 |
| 65:19 66:25 | 287:7,11 291:2 | 229:13,16 | **thousand**   27:7 |
| 71:16 73:25,25 | 292:4 296:17 | **third**   161:17 | 361:22 |
| 75:22 80:24 | 296:21 299:14 | 167:10 189:16 | **thousands** |
| 81:5,14 82:24 | 301:21,22,24 | 202:5 267:25 | 37:17 81:10,10 |
| 86:13 91:8 | 312:8 313:20 | 295:6 304:16 | 362:3 |
| 94:1 95:17 | 315:17 317:10 | 312:1 377:22 | **three**   11:7,14 |
| 100:18 102:19 | 317:15 318:11 | 379:23 | 11:15 14:1,16 |
| 113:2 115:12 | 320:14 329:15 | **thirdly**   298:22 | 16:6,12 28:4 |
| 118:2 121:9 | 335:14 337:10 | **thirds**   189:8 | 28:10,17 31:1 |
| 124:23,23 | 338:15,20 | 215:16 | 31:15,16 52:12 |
| 126:7 130:1 | 339:2 344:3 | **thomas**   2:3 3:5 | 83:12 116:12 |
| 133:5 134:11 | 348:20 358:5 | 6:6 21:1 44:24 | 117:18 118:14 |
| 143:17 145:25 | 364:6 365:2,5 | 47:12 100:17 | 118:18 127:20 |
| 147:17 149:10 | 365:8 370:13 | 103:1,21 | 130:11 142:10 |
| 149:15,17,20 | 371:6,14,20 | 130:16 134:9 | 147:14 164:8 |
| 149:25 152:17 | 372:14 375:13 | 140:16 191:9 | 175:1 189:4,19 |
| 152:25 153:1 | 377:21 380:23 | 211:4 279:7 | 191:18 196:10 |
| 154:1 155:11 | 381:10 382:13 | 281:17,22 | 196:15,19 |
| 162:2,21 165:3 | 384:8 389:3 | 290:25 326:17 | 197:4 200:16 |
| 172:14 174:25 | 390:14 396:2 | 326:19,20 | 203:5,18 |
| 178:11,11 | 398:22 401:5 | 370:19 380:3 | 208:19,20 |
| 181:3 182:3 | 401:12 404:1 | 403:25 410:1 | 209:2 222:5 |
| 185:1 192:23 | 405:18 | **thomas's** | 230:1,10 |
| 195:15 198:5 | **think's**   50:15 | 279:11 | 254:12 270:10 |
| 199:11,15 | **thinking** | **thorough**   375:9 | 274:6 293:2 |
| 200:5 201:12 | 243:12 | **thoroughly** | 294:8 311:25 |
| 209:5,5 219:7 | **thinks**   172:22 | 207:20 | 317:21 325:23 |
| 222:18 227:23 | **thinned**   229:13 | **thought**   60:20 | 335:23 336:5 |
| 229:11 230:10 | **thinner**   222:20 | 75:19,20 87:25 | 338:23 339:10 |
| 232:18 233:5,7 | 224:21 229:8 | 126:23 157:13 | 339:22 341:2 |
| 237:17 253:16 | 229:11 242:21 | 178:12 191:23 | 341:16 343:22 |
| 256:14 259:21 | 321:10,15,18 | 212:13 237:15 | 343:22 354:12 |
| 268:20 272:23 | 381:14 | 245:9 361:25 | 354:13,18,23 |

359:12 360:3
360:10 361:7
369:10 370:14
370:16 371:20
380:6 383:14
394:3,3 397:23
397:24 398:8
398:12 402:16
**threshold**
260:20
**threw** 14:6
**thrown** 35:11
**thumb** 319:19
319:20
**ties** 293:23
**tig** 59:3,9
**tight** 199:16
**tightly** 117:16
119:3
**tile** 273:25
**till** 72:20 82:6
**time** 1:21 5:7
5:25 7:25 8:1,2
8:13 9:2,23
11:13 12:22
21:8,10 23:6
23:10 26:18
28:14,16 31:6
35:5,7 38:21
39:6 41:8,23
43:14 45:21
46:9,12 48:18
49:14,24 51:2
51:7,22 52:10
52:13,17 53:14

53:24 60:5
61:6,16 62:11
62:19,23 63:7
63:11,14,17,18
64:7 65:2,4
67:3 69:2,5
77:7,13 78:6
83:9 84:10,14
85:9,10,13,19
86:2,3,7,16,16
86:23 88:3,4
92:17,18
102:18 103:5
103:21 113:5
113:11,13,17
119:21 129:2
130:2 133:3,4
133:5,18,20
134:1,17 137:6
138:18 146:10
147:13 152:11
152:14 156:12
166:2 178:5
183:7 185:7,15
186:9,24
188:21,24
189:5 190:24
191:7 192:6
193:18,21,25
194:4 200:10
202:24 204:24
207:24 210:22
212:12 218:12
221:6,12
224:16 226:5

227:2,24
229:15,18
231:10,12,24
234:24 235:5
237:22 238:21
238:22 241:16
242:9,21 243:9
244:5,12,18,23
249:23 254:7
260:3 262:9
268:20 269:24
270:7,11,14
272:20,21,22
277:1 287:12
292:22,25
302:18 303:7
308:17 309:18
311:15 312:12
313:13 328:4,8
329:7 330:6
334:5 340:18
344:17,21
348:18 363:13
364:16 365:17
370:1 373:1,2
374:1,11,11
378:4 380:24
389:4,5,6,6
402:2,4 405:15
405:16,19
406:11 410:19
**time's** 189:2
**timeframe**
134:12 297:11
340:18 392:16

410:8
**times** 6:24 19:5
19:6,8 27:6
41:23 64:9
68:20 194:14
216:17 250:20
250:24 399:16
**timing** 374:22
**tip** 262:14
**tipped** 246:18
**title** 20:4
**tjones** 2:7
410:2
**today** 7:1 13:14
13:15,21,23
18:24 20:14,20
21:10 24:23
43:12 54:24,25
57:11 83:18
87:18 89:16
136:4,6 144:15
165:17 188:18
211:11 212:2
218:17 262:20
264:2,19
266:22 271:14
271:16 276:3
277:2 278:13
278:17 280:9
306:21 312:7
317:23 351:9
369:16
**today's** 21:23
32:18

**together**  12:21
  121:4 198:18
  235:5 256:17
  293:23 326:1
  328:21 338:21
  390:23 394:14
**told**  18:24
  31:12 43:7
  44:9 48:22
  53:10,12 54:6
  55:12,19,20
  56:11 57:14,22
  58:8,9 59:22
  60:18,22 63:12
  63:15 75:1
  77:18 78:5
  106:10 107:2,5
  107:7,19
  122:15 129:3
  133:4 136:11
  141:7,7 147:12
  147:16 149:22
  156:9 157:8
  162:14 167:24
  172:19 176:10
  190:18 196:11
  196:24 209:17
  212:12,20
  221:14 224:20
  229:17 233:2
  233:21,22
  234:2,12
  250:17 251:1
  272:11 273:13
  273:19 274:16

  274:20,23,23
  274:24 275:10
  275:11 277:15
  279:17 280:3
  280:11 281:7
  287:8 288:13
  367:9 378:10
  386:14 392:9
  392:15 398:21
  401:5
**toling**  34:7
**tolle**  130:8
**tom**  192:14
**tonight**  287:12
**took**  15:9 16:12
  17:18,22 26:20
  26:21 34:5
  49:5,21 50:7
  93:18 115:12
  130:23 132:14
  132:16 134:19
  138:4 142:19
  145:11,14
  165:1 181:20
  183:12 212:4
  212:23,24
  214:24 220:17
  223:8,9 303:15
  307:15 308:8
  309:17,17
  310:1,9 311:16
  312:12 317:11
  321:6 322:12
  326:4 327:16
  327:16,17

  328:20 329:18
  344:19 345:9,9
  346:3,22,25
  347:12,20
  358:18 361:23
  367:15 369:5
  370:7,13
  371:20 372:8
  373:6,14,17
  395:22 398:1
  398:16,22
**tool**  169:19
  170:6 173:2,5
  173:8
**tools**  170:2
**top**  12:22 17:15
  116:5,13 127:8
  143:6 144:21
  158:17 160:1
  160:18 161:16
  166:2 167:6
  169:19 219:20
  222:9 239:20
  241:3 247:6,17
  262:14 265:18
  267:18 277:4
  278:14,20,24
  279:23 282:4,8
  282:9 290:20
  291:5,5 303:1
  303:17,17
  306:5,5,22
  319:3 326:11
  327:3 332:21
  332:22 343:1

  353:17 356:3
  361:6 369:9
  373:18 402:19
**topic**  34:16
  348:11
**tops**  307:6
**torch**  225:7
  227:23 228:13
  228:20,21
**torches**  59:18
  59:21 60:4
  225:16,20
  226:24 234:23
**total**  12:10,15
  12:16 27:8
  28:2 32:6
  221:25 377:23
**totally**  121:1,25
  239:16 258:11
  358:14 359:1
  399:17 401:23
**touching**
  280:22
**towards**  171:2
  289:19
**track**  389:20
**tracking**  41:12
  43:5
**trade**  137:24
  157:24 311:22
**trailer**  7:12,14
  7:17 8:11,19
  88:11 89:6,18
**trailers**  8:13

| | | | |
|---|---|---|---|
| **training** 394:24 | **trucked** 118:15 | **tube** 79:6 83:13 | 132:13 167:9 |
| **transcribed** | **trucks** 46:20 | 117:11,20 | 177:20 201:1 |
| 18:22 | 55:23 56:24 | 120:1,5,12 | 208:16,17,19 |
| **transcript** | 262:12 | 126:19 127:4 | 251:15 308:22 |
| 115:14 408:20 | **true** 23:9 33:24 | 128:5,8 129:12 | 310:21,22 |
| 410:6,20 412:5 | 34:2,3,10 | 139:8,10 | 371:23 372:22 |
| 412:8 | 67:11 101:4,4 | 170:13 190:7 | 380:6,7 382:10 |
| **transcription** | 110:11 117:1 | 195:15,19 | 382:11 388:19 |
| 18:14 | 253:11,13 | 196:7 199:24 | **tuck** 394:6 |
| **transfer** 42:3 | 256:25 257:2,4 | 201:2 208:9 | **turn** 144:22 |
| 236:25 | 257:22 258:12 | 212:21 244:14 | 172:21 278:10 |
| **transferred** | 383:6 408:20 | 272:10,16 | 290:19 392:25 |
| 162:15 | 412:8 | 273:3 274:7 | **turned** 38:20 |
| **transferring** | **truth** 6:16,17 | 298:5,20,21,25 | 40:3 45:10 |
| 97:11 | 6:17 408:9,9 | 304:15 305:15 | 113:4 144:22 |
| **transpired** 31:9 | 408:10 | 305:16 306:4 | 171:9,10,18 |
| **trash** 126:18 | **try** 13:2,4 | 306:19,24 | 233:21 234:17 |
| 128:4 236:1,7 | 62:13 64:10 | 310:16,21 | 302:13 391:2 |
| 239:11 | 67:2,6 102:11 | 318:8,11,23 | 392:23 393:19 |
| **travel** 88:3,4 | 104:9 109:9,12 | 321:7 327:5,11 | **turpentine** |
| **treat** 102:6 | 109:14 114:19 | 327:19 330:25 | 321:9 |
| **treated** 79:13 | 245:15 250:22 | 331:1,2 333:6 | **twelve** 4:5 |
| **trevor** 34:8 | 278:2 284:12 | 333:12,24,25 | 138:2 305:9 |
| 213:1 214:24 | 284:22 285:17 | 334:7,8 336:1 | 320:21 |
| 218:19 220:17 | 286:11 308:1 | 353:4 361:16 | **twenty** 228:19 |
| 272:4,23 | 365:20,22,24 | 371:9 378:15 | **twice** 69:8 |
| 279:16 | **trying** 90:1 | 378:18,22,24 | 243:20 315:15 |
| **trial** 19:11 | 94:8 109:17 | 379:1,3,4 | 366:18,21 |
| 87:22 144:15 | 127:15 134:19 | 383:8 384:15 | **two** 4:4 7:15 |
| **tried** 123:22 | 269:7 287:3 | 384:23 387:9 | 10:12 15:10,10 |
| 312:25 | 289:14 303:21 | 388:7 401:20 | 22:24 25:19,21 |
| **trouble** 210:2 | 308:9 319:9 | 402:7,8 | 32:9,11,12 |
| 246:7 | 347:10 | **tubes** 105:24 | 36:7 43:11 |
| **truck** 130:17 | **tt** 4:7 20:20,25 | 121:22 122:3 | 56:2,9 60:2 |
| | | 122:20,25 | 62:24 63:22 |

66:15 72:2
73:18 84:13
86:2 108:22,23
109:1 111:21
116:21 122:4
124:24,24
127:20 130:11
131:8,14 132:9
133:21 152:2
154:11 157:10
160:8 164:15
165:14 167:4
189:1,8 191:13
214:25 215:16
217:1 221:16
230:1 243:20
252:20 253:5
253:21 254:2,2
254:12 258:8
268:25 269:11
272:2 275:17
292:15,16
304:1 310:21
316:15 317:21
325:23 330:14
338:10 339:10
341:13 353:7
354:14,17
356:25 357:1
360:19,23
361:7 364:22
371:6,8 376:24
378:13 380:5
394:2

**type** 40:5 59:5
76:10 77:3
79:25 81:6
86:20 87:24
88:1 105:4
109:3,5 110:8
117:25 121:14
133:8 142:4
151:19,20
158:18,24
173:6 180:22
190:13 199:6
209:25 214:12
230:1,1 232:10
247:6 273:14
273:16,22,23
275:1,1,7,11,12
285:5 306:13
320:25 378:25
387:12
**typed** 71:23
82:17 188:5,10
188:17 254:7
283:1 356:10
356:22
**types** 8:12
19:23 251:18
**typewriting**
408:19
**typewritten**
408:20
**typical** 283:7
**typically**
151:22 225:13
269:11 284:14

340:21
**typing** 12:24,25
72:16

| u |
|---|

**u** 333:1 409:13
**uh** 47:21 54:23
55:7 75:8 90:7
116:14 132:19
165:13 182:21
183:10 184:2,9
189:10 214:17
219:18,22
227:21 234:20
268:2,6 270:20
278:12 303:12
303:14 312:3
318:21 319:6
324:18 331:24
332:16 345:11
352:22 364:21
373:25 384:12
399:14
**uncertain**
139:24,24
**unchanged**
127:14 128:1
**uncover** 390:25
**uncovering**
308:3
**undated** 272:4
**under** 63:8
85:16,16 99:25
100:1 101:8
159:12 193:1
193:10 196:13

222:8 223:18
232:14,14
332:24 333:2
348:22,23
352:21 395:23
398:20 408:19
**undergoing**
97:6
**underlined**
160:19 161:2
**underneath**
165:23 305:23
306:4 318:23
394:11
**understand**
13:8 29:14
56:5 72:23
108:16 116:16
123:10 168:11
170:6 179:14
200:15 208:10
216:14,16
220:24 228:25
277:20 307:20
348:20 349:10
384:8
**understanding**
40:14 81:8
109:22 164:12
186:15 214:14
265:6 276:19
329:17 334:16
393:5
**understands**
136:15

| | | | |
|---|---|---|---|
| **understood** | 368:14 | 395:3 400:25 | 363:20 395:11 |
| 13:11 | **unreliable** | **used** 54:15 | 395:21 410:20 |
| **undetermined** | 109:12 | 58:20,21 59:17 | **useful** 374:23 |
| 405:11 | **unresponsive** | 59:21 60:5 | **uses** 358:8 |
| **unfortunately** | 391:11 | 76:11 91:20 | **using** 79:4 |
| 7:23 | **updated** 37:10 | 93:12 106:7,21 | 98:16 107:21 |
| **unheated** | **upgrade** | 106:24 107:1,3 | 118:22 130:10 |
| 170:10,13 | 165:14 | 107:20 120:12 | 187:4 225:16 |
| **unidentified** | **upside** 211:16 | 126:17 128:4 | 227:15,19,23 |
| 76:8 77:2 | 211:23 355:22 | 129:21 130:15 | 290:15 294:24 |
| **unified** 85:6 | **upwards** | 130:16 131:1 | 296:14 386:25 |
| **unintelligible** | 250:13 | 135:12 142:9 | 387:4 |
| 125:19 182:18 | **use** 15:2 27:12 | 147:13 156:7 | **usually** 42:12 |
| 363:24 | 30:16,18 42:5 | 156:11 157:6 | 42:13 58:14 |
| **unit** 5:10 56:12 | 60:9 74:17 | 158:25 162:1 | 72:4 94:22 |
| 59:12 117:16 | 92:25 94:24 | 162:16 171:15 | 96:6 234:7 |
| 119:9,10 121:7 | 95:3 97:3 | 171:18 172:1 | 245:15 248:12 |
| 123:6,9,10 | 98:22 103:21 | 172:12 176:11 | 401:2 |
| 156:2 195:1 | 106:10,21 | 196:12 204:4,6 | **uti** 225:12 |
| 217:22 271:10 | 108:7 109:17 | 204:6,13 205:1 | **utilize** 15:21 |
| 273:1 293:23 | 117:15 119:7 | 209:17,18 | 93:24 95:5,5,7 |
| 298:20,21 | 120:18 123:9 | 210:20,23 | 98:24 102:8,14 |
| 332:4 358:12 | 123:10 124:11 | 224:15,19 | 108:5,8 109:9 |
| 361:8 362:20 | 126:21,22 | 225:7 226:23 | 148:17 150:1 |
| 364:24 365:8 | 133:19 142:7,8 | 229:15 243:15 | 157:11 312:25 |
| 365:10 377:20 | 156:25 176:15 | 252:21 253:22 | **utilized** 94:1,4 |
| 395:3 | 207:4 214:11 | 253:25 254:3 | 95:8 98:18 |
| **united** 1:1 | 228:24 234:22 | 261:8 283:24 | 106:11 108:12 |
| **units** 59:9 | 243:23 246:25 | 292:4,5 293:2 | 109:23 165:6 |
| 120:24 121:18 | 290:4 296:20 | 293:2 324:11 | 211:1 225:12 |
| 121:22 122:12 | 303:10 307:9 | 327:9 329:4,9 | 275:12 313:10 |
| 123:7 190:4 | 322:15 323:1 | 329:12 335:7 | 405:12 |
| 199:20 200:17 | 329:2,11 344:5 | 335:15 346:11 | **utilizing** 98:8 |
| 272:9 289:7 | 351:13 375:22 | 349:13 350:2 | 147:3 185:7 |
| 312:18 363:2 | 391:20 394:8 | 351:19,24 | |

| v | | | |
|---|---|---|---|
| **v**  4:14 45:3 90:8 271:22,24 271:25 272:25 274:18 275:20 275:20 410:4 411:1 412:1 **vague**  51:24 379:18 **valve**  195:7 **vantage**  146:7 **vapor**  358:14 **vapors**  121:25 179:5 199:19 358:10 **var**  166:10 **variation**  89:9 **variations** 208:25 **various**  70:17 87:4 313:11 **vary**  235:6 **varying**  235:6 **vast**  205:3 **vehicle**  48:24 **vehicles**  153:5 153:6 **vein**  151:20 **vent**  154:16 **vented**  271:10 **ventila**  144:11 **ventilation** 144:8 145:1 167:15 168:1 175:25 176:4 | 179:6 181:22 231:2 **ventilization** 145:3 **vents**  197:8 **veracity**  257:5 **verbal**  263:1 **verbally**  288:13 **verbatim**  95:20 127:11 356:22 **vergon**  21:25 21:25 25:18 114:23 115:18 **vergon's**  22:10 23:4 49:11 115:11 **verify**  375:15 410:9 **veritext**  5:19,21 410:14,23 **veritext.com** 410:15 **version**  167:13 **versus**  5:13 226:10 256:17 394:3,3 **victory**  272:1 **vid**  49:7 **video**  1:12 4:6 5:8,10 20:10 26:8 33:25 34:5 36:5 43:18 49:9 50:8 52:22 65:14 239:5,9 | 405:24 406:23 408:11,17 **videographer** 2:19 5:3,20 6:11 84:10,13 189:1,4 270:10 270:13 328:4,7 369:25 370:3 389:8 406:10 406:21 407:1,4 **videos**  26:13 183:13 385:9 386:1 405:22 405:25 406:1 406:22 **videotape** 49:19 **view**  118:5,5 **violate**  293:8 **visible**  365:17 371:17 **visit**  250:21 **visited**  215:1 **visual**  186:8 **vitae**  8:22 9:13 12:3 **void**  216:25 **volunteer** 70:17 389:25 **vs**  1:6 | **wacker**  16:10 **wait**  13:3 72:20 73:3 149:10 171:9 186:15 187:12 316:2 373:23 378:7 383:3 **walk**  393:6 **walks**  393:2 **walkthrough** 392:10 393:12 **wall**  131:6 143:24 170:1 213:13,21 214:4 215:17 216:18 217:18 217:20,25 218:7 220:2 223:17 268:24 269:20 377:18 377:18,20 379:23 **walls**  128:25 139:2 141:25 143:13 222:2 402:20 **want**  17:5 43:1 43:7 50:4,6 67:5 86:21 100:22,24 110:10 126:17 245:15 246:25 269:14 270:1 273:13 274:25 308:23 328:15 |
| | | **w** | |
| | | **w**  2:14 3:4,7 4:15 276:1,21 278:9 279:14 | |

376:22 384:10
389:5 390:25
390:25 391:21
406:14,23
407:6
**wanted**  45:25
61:14 68:22
69:3,5 114:17
114:20 132:20
134:16 187:9
245:11,24
246:2 259:16
284:11 308:20
322:18 347:7
386:6,11
**wanting**  257:18
**wants**  285:12
390:24 406:22
**warmer**  234:8
**warning**
191:15
**wash**  129:22
130:16,17
131:9,15
138:15
**washer**  158:14
**waste**  160:3
**watch**  140:15
**water**  124:10
125:1,3 146:3
176:15 199:24
200:3 403:6,12
403:14,20
**water's**  227:10

**way**  13:22
31:23 38:7
44:11 59:2
69:1 70:12
86:3 95:9
121:24 128:16
133:19 144:23
145:17 150:11
168:10 175:11
175:19 189:8
194:10 207:10
218:11 230:9
238:18 248:2
258:1 271:4
277:20,24
293:7 299:15
301:15 325:9
325:14 329:15
334:20 344:12
348:14 354:22
355:22 360:17
371:2 382:14
384:10,21
392:11 398:14
**wayne**  1:2 5:16
27:4 45:1 86:5
233:3 260:13
**we've**  20:7
152:22 173:5
351:8 365:15
393:6 396:9,9
**weather**  194:1
194:3,9 233:3
**week**  23:3,12
29:9 88:18

89:14 160:8
**weeks**  11:7,14
11:15 14:1,17
16:6,13 28:17
31:1 130:11
160:8 398:23
399:5
**weigh**  175:23
**weighs**  175:22
**weight**  175:22
175:24
**weird**  269:8
**weld**  58:24
225:14
**welded**  225:3
**welder**  173:1,4
173:7
**welders**  234:23
**welding**  58:21
59:2,3,3,9,12
60:16,18,20,23
61:20 62:5
63:5 64:17
65:1,18 76:11
173:13 224:22
224:23,24
225:1,13,13
228:9 280:5
392:18
**wells**  123:22
166:20 210:7
223:22 282:15
284:2 285:16
288:12 296:25
299:21 300:9

307:23 322:4
334:9,17
335:24 337:11
338:21 339:19
341:1,14
342:14,23
343:23 344:24
351:12 352:1
354:15 382:15
382:20 383:7
**went**  46:3,11
50:18,25 51:5
62:19,23 86:16
86:25 113:11
113:12 125:17
128:19 132:21
134:6 152:10
152:21 153:4,5
194:7 210:22
246:7 279:17
286:17,24
291:16 313:4
322:25 329:10
344:18 392:16
393:3
**weres**  137:16
**west**  269:14
**wet**  125:9
284:9,25
285:19 286:1
**when's**  11:13
28:14 137:6
**whereof**  409:5
**whispering**  5:6

| | | | |
|---|---|---|---|
| **white**  56:8 | 95:25 96:2,13 | 150:22,24 | 196:18,22 |
| 154:9,19 | 96:17 97:15,18 | 151:6,14,16,18 | 197:7,12,14 |
| 164:12 170:8 | 97:21 98:12,22 | 152:16,25 | 199:1 200:24 |
| 213:14 215:19 | 101:2,11,16,25 | 153:12,16,22 | 201:17,21,24 |
| 215:20 216:8,8 | 102:2 104:2,21 | 154:4,14,20 | 202:1,22 |
| 219:12 | 104:24 105:8 | 155:3,5,7,19 | 203:17,20,23 |
| **williams** | 105:19 107:19 | 156:4,11 | 204:23 206:4 |
| 178:20 | 107:23 108:20 | 157:16,23,25 | 206:12 210:10 |
| **willing**  287:15 | 109:4 110:23 | 158:13,22 | 210:14 211:7 |
| **wind**  231:12 | 111:3 114:14 | 159:3,12 | 213:4,9,17 |
| **winter**  193:25 | 115:2,13,22 | 160:25 161:14 | 215:7,20,25 |
| **wintertime** | 117:4,6 119:1 | 161:17 162:8 | 216:25 219:2,5 |
| 194:12 | 119:18,20 | 162:14,19 | 219:7 220:8 |
| **wipes**  265:19 | 121:11 123:12 | 163:1,3 164:1 | 221:23 222:14 |
| **wiring**  112:19 | 124:1,13,23 | 164:20 166:5 | 222:18,21 |
| 112:22 206:21 | 125:16,20,23 | 166:13,16 | 225:11,24 |
| **wise**  130:5 | 126:4,11 127:3 | 167:1,24 168:9 | 227:6,19,22 |
| 389:25 | 127:21,23 | 168:18 169:10 | 228:15 230:15 |
| **wit**  98:24 | 128:14,16 | 169:23 170:12 | 230:22 231:15 |
| 122:10 | 129:25 130:5 | 170:19,21 | 231:20 232:2,4 |
| **withdraw** | 130:20 131:17 | 171:2,13,24 | 232:10 233:12 |
| 69:21 94:3 | 134:11 136:11 | 172:1,9,11 | 235:3,13 237:8 |
| **witness**  1:13 | 137:22,25 | 174:5,10,15,25 | 238:8 242:11 |
| 6:12,19 21:20 | 139:5,18,21 | 175:14,21 | 247:5 248:5 |
| 31:14 34:12 | 140:4,8,13,21 | 176:7,9,23,25 | 249:2 250:1,17 |
| 38:13 40:11,19 | 141:1,17 | 179:1,24 | 253:16 256:1,7 |
| 42:15 44:1,25 | 142:14,25 | 180:17 181:3 | 256:14 257:5,8 |
| 45:13 54:23 | 143:3,10,12,15 | 181:19 182:3 | 257:15,16 |
| 57:7,13 62:8 | 143:19 144:11 | 183:4,19 | 258:7,14,16,18 |
| 64:6,25 66:8 | 144:19 145:11 | 184:16,25 | 258:22,22,23 |
| 71:7 72:12 | 146:9,23 | 185:13 186:5,7 | 259:2,5,11 |
| 80:10 82:10,15 | 148:11,21 | 186:13 188:4 | 260:1 261:8 |
| 86:15 89:9 | 149:7,14,15,17 | 188:12,14 | 262:25 263:12 |
| 91:11 92:24 | 149:20,25 | 189:16,18,22 | 266:1,4,6,10,24 |
| 93:15,22 95:12 | 150:5,7,14,16 | 190:13 192:25 | 267:3,18 |

| | | | |
|---|---|---|---|
| 269:10 273:6 | 343:9,14,17 | **wood** 217:8,14 | 254:2 256:4 |
| 273:19 276:12 | 344:3,11 346:7 | 217:19,19,19 | 261:8,16 |
| 277:1,20 278:2 | 346:9,15 347:5 | 219:7 379:16 | 276:21 277:12 |
| 279:6,8 280:21 | 347:10 348:7 | 379:20,20,23 | 290:2,3,3 |
| 281:5,10 | 349:5,24 | 380:13,15 | 356:25 357:1 |
| 283:13 286:4 | 352:15 354:3 | 401:2,4 | 386:23 402:15 |
| 287:6,8,22 | 355:7,17,24 | **wooden** 377:19 | 403:16 |
| 291:1,10,12,22 | 356:1 357:17 | 377:20 | **work** 7:11,13 |
| 292:18,25 | 358:1,22 359:1 | **word** 15:2,21 | 8:3,12,24 9:23 |
| 296:7 297:6 | 359:18,25 | 24:4,7 27:12 | 10:12,13 27:25 |
| 300:3 301:5,13 | 362:5,22 365:8 | 30:16 95:7,16 | 55:21,22 88:1 |
| 302:3,6,17,25 | 365:23 366:2,6 | 96:3,3,15 97:5 | 89:12,17,22 |
| 305:22 306:10 | 367:14,21 | 104:16 116:8,9 | 99:8 111:15 |
| 307:25 309:13 | 368:1,4,7 | 117:15 119:7 | 130:1,2 232:21 |
| 310:20 311:3 | 369:2 375:3 | 120:18,18 | 394:17 |
| 311:11,23 | 377:6,11 | 122:17 124:11 | **worked** 7:14 |
| 312:22 314:19 | 378:24 379:20 | 126:21,22 | 12:8 16:4 |
| 314:22,24 | 380:2,8 381:16 | 202:19 203:13 | 28:15 29:17 |
| 316:21,23,25 | 381:18 382:2,5 | 204:13 227:20 | 36:7 64:2 |
| 317:2 319:1,16 | 382:19 384:3 | 243:24 253:22 | 70:16 86:25 |
| 319:21 320:4 | 391:17 396:1 | 254:1 275:13 | 91:14 120:4 |
| 320:21 322:8 | 404:12 409:5 | 276:15 277:8 | 184:10 282:14 |
| 322:17 323:21 | 410:8,10,12,19 | 295:4,15,25 | 350:2,3 387:9 |
| 325:6,16 | **witnessed** | 296:2 298:8 | **worker** 88:14 |
| 326:15,18 | 122:10 | 351:13,19 | 88:17 |
| 327:7 328:3 | **witnesses** 27:23 | 357:9,22,23,24 | **workers** 60:24 |
| 330:17 331:10 | 31:10 64:1 | 358:3,8,17,19 | **working** 8:18 |
| 332:10 333:23 | 66:24 67:3,5,9 | 362:13 391:20 | 9:22 17:3,25 |
| 335:13 336:20 | 87:21 148:14 | **word's** 126:10 | 18:1 28:9,12 |
| 337:3,5,17,19 | 149:4 152:3 | **wording** 97:2 | 30:8 62:4 63:4 |
| 338:2,9,11,23 | 259:6 374:25 | **words** 30:13 | 81:3 88:25 |
| 339:12,16 | 375:11 377:8 | 92:15 104:17 | 156:17 179:25 |
| 340:1,14 | 382:2 | 177:8 191:14 | 232:19 348:17 |
| 341:10,19 | **wondering** | 200:13 205:13 | 392:18 |
| 342:18,20 | 76:1 | 217:6 253:20 | |

| | | | |
|---|---|---|---|
| **worksheet** | 204:20 276:22 | 299:19,25 | 179:1 184:11 |
| 282:10 283:20 | 292:13 401:15 | 300:12,12,16 | 186:5 188:24 |
| 335:6,10 | **wrong**  64:20,21 | 303:6 304:5 | 189:21 193:25 |
| **workshop** | 71:25 90:16 | 305:9 306:21 | 196:8 198:9 |
| 402:1 | 130:8 232:18 | 331:4,14 | 202:10,22 |
| **world**  206:12 | 232:24 244:1,2 | 333:14,18,21 | 203:8,17 207:2 |
| 395:10 | 256:4,5,8 | 345:23 346:1 | 211:25 212:1 |
| **worse**  209:10 | 272:7 276:20 | 409:13 | 216:2,25 220:9 |
| **would've**  61:21 | 313:22 315:3 | **yea**  116:5 | 222:17,21 |
| 82:10 197:9 | 349:22 355:22 | **yeah**  9:19 10:7 | 228:18 230:15 |
| 288:21 297:8 | **wrongly**  204:6 | 11:13 12:4 | 236:2,13,14,25 |
| 322:10 333:1 | **wrote**  53:13 | 16:10 25:5,25 | 240:8 242:2,4 |
| **wouldn't've** | 76:22,25 93:3 | 26:11 27:5 | 242:7 243:4,23 |
| 383:19 | 93:7 149:11 | 29:16 36:4 | 254:4 256:10 |
| **wrap**  158:2 | 189:24 191:24 | 37:21 42:23 | 261:21 265:17 |
| 318:2 | 202:6,19 203:5 | 46:7 48:19 | 266:1,3,14,17 |
| **wrapped**  318:8 | 283:20 292:2 | 57:8,8 62:22 | 270:9 274:19 |
| **wraps**  390:22 | 295:7 297:23 | 67:24 72:1 | 278:13 282:6 |
| **write**  41:23 | 298:1,3,19 | 73:10 79:1 | 282:25 291:2,5 |
| 140:20 149:17 | 299:1,3 300:22 | 80:7,24 91:6 | 291:9 292:12 |
| 149:20 160:24 | 351:12 361:6,9 | 96:13 98:1 | 293:4 302:5 |
| 292:9 294:17 | 364:22 374:1,7 | 103:15 110:7 | 305:17 306:2 |
| 296:2 298:24 | **x** | 113:11 116:7,8 | 307:25 309:15 |
| **writes**  279:23 | **x**  281:9 | 116:21 117:5 | 311:21 315:25 |
| **writing**  117:17 | **xylene**  209:21 | 119:11 120:23 | 317:16 318:13 |
| 185:16 265:9 | 210:5,11 | 122:23 126:11 | 318:18 319:14 |
| 265:10 268:5 | 248:24 | 128:24 134:1,9 | 319:24 320:21 |
| 299:2 324:25 | **y** | 134:11 137:7 | 320:25 322:9 |
| **written**  1:21 | **y**  4:15 96:20,20 | 138:17 143:8 | 324:3 325:21 |
| 29:12,23 35:21 | 281:13 282:3 | 146:2 147:8 | 325:23 326:10 |
| 35:22 40:2,4 | 290:6 292:10 | 154:14 161:17 | 326:15 327:19 |
| 82:16,17 83:1 | 292:11,11 | 161:19 163:19 | 329:7 332:12 |
| 83:3,4 85:12 | 294:7,10 296:1 | 165:24 166:13 | 332:13 333:8 |
| 99:13 148:7 | 297:16 298:19 | 166:15 169:23 | 337:3 343:16 |
| 178:16 204:18 | | 175:17 178:14 | 350:4 353:19 |

**[yeah - zoom]**                                              Page 101

355:13 359:18
360:6 361:4,20
361:20 362:5
362:22 364:25
369:23 371:18
373:12 374:3,4
374:5 375:13
375:13 380:21
381:4 382:25
387:2 388:18
390:7 397:11
397:21 406:8
407:2
**year**  7:15 8:16
9:11,16 12:6
17:12 70:20
80:12 85:15
92:7 135:15
141:9 146:6
147:21 160:8
237:5 297:10
313:17 371:21
372:9 401:25
**years**  11:17,18
12:14 40:23
58:4 107:2,3
107:20 142:10
184:10 202:17
203:5,18
209:18 211:2
254:12 286:5
389:19,20
390:2
**yellow**  158:8,9
220:14 332:17

336:25 342:13
342:22 352:25
353:2
**yep**  125:23
157:24
**yesterday**
54:21

| z |
|---|

**z**  4:4,5 45:3
47:8 48:11
50:20 52:3
54:19,24 96:20
152:23 164:14
167:16,22
170:5 179:18
218:1 278:5
404:5,5
**z's**  84:6
**zionsville**  7:9
**zoccola**  2:3 6:6
6:8 21:1 91:7
94:5 99:5,9,13
99:16,18 100:7
103:12,15
189:13 191:16
191:18 211:13
211:17 220:10
220:12 235:15
263:9 270:9
348:2 352:11
352:13 355:23
**zoom**  363:17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.