IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| REPUBLIC SERVICES OF INDIANA LIMITED PARTNERSHIP, )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>COE HEATING & AIR CONDITIONING, )<br>INC. )<br>)<br>Defendants. ) | Case No. 1:21-cv-108-HAB-SLC |

**DEFENDANT COE HEATING & AIR CONDITIONING, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO
EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT JAMES FOSTER**

COMES NOW Defendant, Coe Heating & Air Conditioning, Inc. ("Coe"), by counsel, Christopher J. Uyhelji and Martin J. Gardner of Gardner & Rans P.C., and respectfully submits the following Reply to Plaintiff's Response to Defendant's Motion to Exclude Testimony of Plaintiff's Expert James Foster.

**I.    Introduction**

James Foster is not an electrical engineer. In its Response, Plaintiff asserts that Rule 702 does not require that Foster be an electrical engineer to offer cause and origin opinions. [Doc. 58, pp. 14-15]. This is a mischaracterization of Coe's position relative to Foster's qualifications. While Foster's experience and training is in fire investigation, this does not qualify him to offer expert opinions on everything tangential to investigating a fire. Foster is also not an architect, professional surveyor, construction manager, chemist, mechanical engineer, or professional appraiser. Foster being qualified as a fire investigator does not allow him to opine as to areas outside his expertise and qualifications as Plaintiff's Response implies. This is why Plaintiff also

1

retained/paid experts in the fields of electrical engineering (later discarded by Plaintiff), mechanical engineering (later discarded by Plaintiff), construction management, and chemistry.

Fire cause and origin opinions do not need to have absolute, or 100 %, certainty. Plaintiff's Response again misconstrues Coe's position relative to the probable cause and origin of the fire. [Doc. 58, p. 18]. It is not Coe's position that all potential ignition sources must be definitively ruled out with absolute, or 100 %, certainty before a fire investigator can reliably establish a cause and origin opinion. Coe's position is that Foster's methodology in arriving at his opinions as to the origin and cause of the fire does not comply with the systematic approach under NFPA 921 guidelines and is deficient under reliability requirements for expert testimony in the 7th Circuit. Foster's causation conclusion rests entirely upon his unproven assumptions—as opposed to scientifically reliable methodology—that Sheboygan Blue Aqua Enamel Paint accumulated on the infrared tube heaters before the fire (as opposed to during or after the fire) and that the water-based Paint is flammable or combustible.

Plaintiff's Response further argues that Coe should not be allowed to utilize Space Ray's experts' reports or deposition testimonies. Plaintiff fails to cite to any controlling or persuasive authority from the 7th Circuit in support of its position. Plaintiff also fails to provide any language in the settlement agreement with Space Ray that supports its position or any filings or correspondences in this case whereby Space Ray withdrew its testifying experts as part of the settlement. In the interest of ascertaining the truth and in compliance with 7th Circuit controlling and persuasive authority, Coe is allowed to utilize the deposition testimonies and expert reports of Space Ray's disclosed and deposed experts.

## II.     Argument

Plaintiff's Response takes issue with Coe stating that John Diggle of Rimkus was a retained expert and equates being a retained/paid expert with being a testifying expert. [Doc 58, p. 8, fn.

3]. It is undisputed that John Diggle of Rimkus, an electrical engineer and then co-worker of Foster, was retained/paid by Republic for his work during the fire investigation. Diggle stated during the joint scene investigation to the fire investigators that electrical could not be ruled out as a cause of the fire. The fire investigators are allowed to rely on Diggle's statement as an electrical engineer. Diggle also testified that electrical could not be ruled out as a cause of the fire. Foster does not even mention Diggle in his two (2) Reports relative to Foster's methodology for ruling out electrical as a cause of the fire. Foster not only did not rely on the statement of Diggle but completely failed to even mention Diggle's statement in his Reports, which is understandable given that it undermines Foster's exclusion of electrical. This is not a "red hearing" as Plaintiff's Response claims and underscores the fundamentally flawed nature of Foster's methodology. Instead, Foster simply opines that all electrical devices were off at the time of the fire, other than the heaters, and ruled out electrical as a cause of the fire. This is no different than stating that because the lights were off at the time of the fire, the electrical system did not cause the fire. This also does not even properly address the fact that electricity was still running to Building 1 or that the heaters themselves require electricity, including the heaters' thermostat.

As a fire investigator, Foster lacks the credentials to properly rule out an electrical cause of the fire and did not methodically eliminate electrical components as a likely cause to the fire.[1] Fire investigators routinely, when necessary, rely on the expertise and opinions of electrical engineers or other specialists in determining their cause and origin opinions. Foster, a fire investigator, is not qualified to author opinions as to ruling out an electrical cause of the fire in this

---

[1] Plaintiff cites to *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) in support of its position that Foster as a fire investigator is qualified to render opinions on the electrical system and components. Notably, the challenge in *Tuf Racing* was that a certified public account was not qualified to offer evidence as to the discounted present value of the lost future earnings that Tuf would have had if not terminated. The *Tuf Racing* Court correctly determined that this was a "calculation well within the competence of a C.P.A."

case. Even assuming that the origin of the fire was at or near the infrared heaters in Building 1 as Foster opines, Foster would need to rely on an electrical engineer to determine whether any of the electrical components that connected to the heaters failed. Plaintiff, in its Response, simply asserts that Foster noted that there was zero evidence on scene suggesting that any electrical components had malfunctioned or caused an emission. [Doc. P. 58, p. 17]. Foster did not collect the electrical components at the scene, let alone have them tested, and does not have the qualifications to properly test any of the electrical components if he did collect them from the scene. Presumably, if the electrical components were collected, Foster would have relied on the testing performed by Diggle.

Despite Plaintiff's assertion otherwise, a fire investigator is not required in every circumstance to be an electrical engineer or rely on an electrical engineer to determine the cause and origin of a fire. [Doc. 58 p. 18]. However, when electrical components are implicated as a potential ignition source or cause and origin of a fire, including structural fire, an electrical engineer would be necessary to determine or rule out electrical causes of the fire.[2] This is confirmed throughout the expert reports and deposition testimonies of the two (2) other fire investigators, Michael Vergon and Michael Agosti, involved in this case. This type of reliance on an electrical engineer was discussed in *Citizens Ins. Co. of the Midwest v. LG Elecs. USA, Inc.* relative to a *Daubert* challenge to both the fire investigator and electrical engineer.

In *Citizens Ins.*, both the fire cause and origin expert and the relied upon electrical engineer's opinions relative to a home fire were challenged under Rule 702 and *Daubert*. *Citizens Ins. Co. of the Midwest v. LG Elecs. USA, Inc.*, No. 3:11-CV-40-RLY-WGH, 2012 WL 3294962,

---

[2] This is especially true in this case as there was an electrical engineer (John Diggle) specifically paid by Plaintiff to examine potential electrical causes of the fire. Foster is also not a qualified expert relative to the internal workings of the infrared tube heaters.

at *2 (S.D. Ind. Aug. 10, 2012). The fire investigator determined that the probable location of origin of the fire was in the kitchen, but there were numerous kitchen appliances powered by electricity. The fire investigator in *Citizens Ins.* relied on his electrical engineer for the determination that there was an "internal electrical anomaly associated with energized electrical activity" located near the center of the refrigerator. *Id.* at *5. In reliance on the opinion of his electrical engineer, the fire investigator concluded that the cause and origin of the home fire was the refrigerator located in the kitchen. *Id.* at *7. The Court denied the motion to exclude and determined that the fire investigator reasonably relied on the opinions of the engineer. *Id.*

Fire cause and origin opinions do not need to have 100 % certainty. Coe simply does not assert that all potential ignition sources must be definitively ruled out with 100 % certainty before a fire investigator can reliably establish a cause and origin opinion. However, fire cause and origin opinions must be based on a sufficient level of certainty, which according to the required evidentiary standard and NFPA 921 is "probable" and not "possible". Possible can mean a 0.000001% likelihood while probable means over 50% likelihood. Foster's disclosed expert opinions, through his two (2) expert reports, was simply that his area of origin was possible. After the expert disclosure deadline, and during his deposition testimony on January 24, 2023, Foster stated that his area of origin opinion was <u>probable</u> and that the use of the word <u>possible</u> was a "typo". Plaintiff's Response is equally dismissive of the fact that Foster's disclosed area of origin opinion was merely possible as nothing but a meaningless "typo" that can be use on cross-examination. [Doc. 58, p. 25]. A purported cause and origin expert asserting a possible area of origin instead of a probable area of origin is not a typographical error[3] that can be dismissed as such for the first time by Foster during a deposition that occurred years after his initial Report.

---

[3] Typographical error is defined as a mistake such as a misspelled word in typed or printed text. See https://www.merriam-webster.com/dictionary/typographical%20error

This distinction between possible and probable area of origin is substantive and substantial as it is fatal to any resulting causation opinion. Overall, Foster's methodology for determining the point of origin for the fire at Republic's Building 1 is unreliable. The primary factor for Foster determining the "possible" origin of the fire in the paint area ceiling is that the infrared tube heaters were installed near the ceiling of the paint area.

In the context of Foster's cause and origin opinions, Plaintiff's Response relies primarily on the *Ball Corp. v. Air Tech of Michigan, Inc.*, No. 4:16-CV-42-TLS, 2022 WL 1801120 (N.D. Ind. June 2, 2022). *Ball Corp.*, however, is factually distinct and distinguishable from the building fire at Republic. *Ball Corp.* involved a fire that occurred at a Ball manufacturing plant that manufactures aluminum cans for beverage companies. *Id.* at *1-2. During the manufacturing process, the cans are sprayed with various liquids to treat the cans and sent through an "internal bake oven" (IBO) to be cured through the IBO's four heat zones. *Id.* The IBOs are heated by natural gas flames and have various fans that assist with airflow both within the burner boxes and the body of the oven. *Id.*

Numerous Ball employees witnessed the start of the fire at IBO 2, including from a "hot smell", witnessing smoke near the exhaust blower, observing smoke in the duct work, checking the control panel for irregularities, and taking thermal images to check the temperature of various components of the oven. *Id.* at *1-3. Two employees even used a scissor lift to get a better view of the exhaust blower and nearby smoke, which is when sparks and embers where discovered flowing through the ductwork. *Id.* Ball employees also witnessed more smoke from the exhaust blower and noticed that the paint on the outside had started to bubble. Ball employees shut down IBO 2's burners and some of the fans, and used a heat gun to discover that the temperature started rising fast to 500–700 degrees Fahrenheit. *Id.* Two employees then attempted to spray a fire

6

extinguisher into the pitot hole of the oven, but that was not effective at controlling the fire. The Ball employees then evacuated the plant and called the fire department. *Id.*

In *Ball*, the general area of origin of the fire was undisputed and witnessed by numerous Ball employees. The dispute was about the specific point of origin being in the ductwork connecting to the oven versus the internal body of the oven. The challenged experts ruled out competing theories for the fire's cause and origin, including the possibility of an oven malfunction, friction caused by the blower motor, or the ductwork being the specific location of origin. *Id.* at *2-6. Ball employees collected data throughout the process, including using heat guns and collecting data through the control panel for the subject oven. *Id.* The Ball employees monitored the conditions from the beginning—first observing smoke—to when they were unable to suppress the fire and evacuated the building.

In addition, the challenged experts examined the following: the flammability of residue in the oven and ductwork; the temperature of the burners; the hardened deposit in the exhaust fan; the fact the residue buildup had not previously caused a fire; and the conditions not being hot enough for autoignition. *Id.* One of the challenges to the cause and origin experts was that they engaged in negative *corpus*. *Id.* at *6-7. Negative *corpus* is "determining an ignition source by eliminating sources when having 'no supporting evidence'" *Id.* (internal citations omitted). The Court concluded that the "negative *corpus*" argument did not merit exclusion because while the experts used the process of elimination in reaching their conclusion, they had supporting evidence and, therefore, did not engage in "negative corpus." *Id.*

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017)[4] and *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927 (N.D. Ind. 1999)[5] are more factually on point and instructive than *Ball*. For *Ball* to be factually similar to this case, the entire factual background for the fire at Republic's Building 1 would need to be different. First, the general area of origin for the fire, around the infrared heaters, would need to be undisputed. Second, numerous Republic employees would have needed to be in Building 1 at the time of the fire (from initial issues to the evacuation). The Republic employees would need to have: witnessed the heaters turn on, observed sparks fly on the surface of the heaters, observed smoke coming from the heaters, taken heat measurements from the heaters as the fire occurred from beginning to when the fire department was called, observed water based paint combusting (which is not possible), and witnessed the fire spread from the heaters to the structure.

None of which occurred in this case. The first Republic employee, Samir Dizdarevic, to witness the fire from the exterior of the building noticed flames in a location that is not consistent with Foster's opinions. No Republic employees were inside Building 1 to observe the fire start and progress to when the fire department was called to the scene. There is no preserved data regarding the operation of the heaters (or thermostat) at or around the time of the fire. In fact, there is no evidence that the heaters were even on at the time of the fire. Additionally, Foster, unlike the experts in *Ball,* eliminated ignition sources without any supporting evidence, including the elimination of an electrical cause of the fire. Foster's methodology for determining the cause of the fire at Republic's Building 1 is unreliable. Foster's causation opinion is nothing more than

---

[4] The 7th Circuit Court of Appeals determined that the battery safety expert failed to "bridge the analytical gap" between the accepted differential appearance of the laptop battery cells and his contested conclusion that such differential appearance was caused by an internal fault in Cell A. *Id.* at 776, 786-787.

[5] Plaintiff's Response summarily dismisses the application of *Comer* to this case based on its assertion that *Comer* involved a textbook "jukebox witness". [Doc. 58, p. 21]. However, like the expert in *Comer*, Foster's conclusion rested entirely upon his unproven assumptions that Sheboygan Blue Aqua Enamel Paint collected on the infrared tube heaters before the fire (as opposed to during or after the fire) and that the Paint is flammable or combustible.

dry Sheboygan Blue Aqua Enamel Paint got on the infrared tub heaters and ignited. Foster was unable to identify the sequence of combustibles past the dry Sheboygan Blue Aqua Enamel Paint on the infrared tube heaters. Plus, the infrared tube heaters operate on propane, so if blue paint dust somehow got inside the heaters nothing would even happen.[6]

Foster never even tested the flammability or combustibility of the Sheboygan Blue Aqua Enamel Paint in the Paint's wet, dry, liquid, or solid form. Presumably, Foster did not test the flammability or combustibility of the Paint because a negative result would have required him to retract his entire causation opinion. One of experts that Foster relied on in this case, Sheree Wells, did test the flammability of the Paint. The flammability test was negative. However, the negative result of the test is not mentioned in Foster's Reports or Wells' Report. In this case, there is not a single expert that was able to ignite or combust the water-based Sheboygan Blue Aqua Enamel Paint, yet the flammability and combustibility of the Paint is the crux of Foster's entire causation opinion. [Doc. 55, p. 9]. Terry Reader, Republic's own former employee that worked in the paint area of Building 1, testified that he was unable to get the Paint to burn or combust in either the Paint's wet or dry form. [Doc. 55, pp. 9-10].

Plaintiff argues that Foster made a permissible inferential leap by determining the paint samples he allegedly scraped from inside the heaters were more likely than not accumulated inside the heaters before the fire.[7] [Doc. 58, p. 21]. The purported collection of the paint samples from the heaters in the fire debris was not properly documented and not in compliance with evidence

---

[6] This was addressed by Michael Vergon in his deposition. (Vergon Deposition, pp. 103-104). Also, once again, Plaintiff cites to a warning in the installation manual that is not applicable to this case as it is undisputed that Building 1 did not have a "paint booth". [Doc. 58, p. 7]. Further, Korte, Coe's competitor and despite Foster's incorrect statement otherwise, quoted the same infrared heating system for Building 1. [Doc. 55, p. 5, fn. 19].

[7] Plaintiff also asserts that "[i]t is not an inferential leap to conclude that paint particles detected 'deep' inside the tube heaters were more likely than not a result overspray from Republic's spraying operations." This amounts to nothing more than pure speculation. Further, given the design of the closed infrared heating tubes, it is difficult to understand how Foster could even obtain samples from "deep" inside the heaters without disassembly.

collection under NFPA 921. Remarkably, the paint samples allegedly collected by Foster after the fire were still bright blue without any indication that they were impacted by the fire.[8] During Foster's deposition, Foster was unable to testify as to the location of any paint on the photographs of the heaters or the locations where he removed paint from the heaters during his investigation. Seemingly, the only factual support cited in Plaintiff's Response is as follows: "[b]ut it is undisputed that the heaters 'were starting to turn blue like everything else' shortly after they were installed".[9] [Doc. 58, p. 21]. Plaintiff cites to Fred Jones deposition testimony. Fred Jones testified Dale [Caley] told him once that the heat shields "look like they was starting to turn blue like everything else." (Fred Jones Deposition, p. 64). Dale Caley was never even interviewed by Foster.[10] During their investigations, Michael Vergon, Michael Agosti, and Steve Jones did not see any paint on any of the heaters. In sum, Foster failed to "bridge the analytical gap" between the data and his contested conclusion, and Foster's conclusion rested entirely upon his unproven assumptions that Sheboygan Blue Aqua Enamel Paint accumulated on the infrared tube heaters before the fire (as opposed to during or after the fire) and that the water-based Paint is flammable or combustible.

For its final argument in opposition to Coe's Motion, Plaintiff argues that Coe should not be allowed to utilize Space Ray's experts' reports or deposition testimonies. Plaintiff fails to cite to any controlling or persuasive authority from the 7th Circuit in support of its position. Plaintiff only cites to one 1993 case from Utah, *Wolt v. Sherwood, a Div. of Harsco Corp.,* 828 F. Supp.

---

[8] "His [Foster] report does not reconcile how 'paint and other flammable products' survived on the very object he claims to have been the cause of the fire while other painted surfaces were consumed." (Report of Laurel Mason, p. 15).

[9] Plaintiff also asserts that prior heaters were routinely clogged up with blue paint dust. [Doc. 58, p. 21, fn. 13]. The prior heaters were open flame heaters that sucked up room air and nothing like the closed infrared heaters that are the subject of this lawsuit, which used external air. Of note, the prior heaters that sucked in room air and paint particles clogged but never started a fire. (Deposition of Terry Reader, pp. 50-51, 59-60, 62, 64).

[10] Dale was also not deposed in this case and the statement is inadmissible hearsay under Federal Rules of Evidence.

10

1562 (D. Utah 1993)[11]. The *Wolt* decision is factually distinguishable and not persuasive. In *Wolt*, the plaintiff (who was injured in a motor vehicle collision) settled with a defendant relative to a product liability claim. *Id.* at 1563. The main issue that the District Court analyzed was whether the attorney who represented the settling products liability defendant could then be hired to represent a non-settling defendant in the same litigation. *Id.* In *Wolt*, although not in the written settlement agreement, parole evidence was allowed that demonstrated that the plaintiff secured the agreement from the settling products liability defendant relative to not disclosing the settling defendant's experts to the non-settling defendants. *Id.* at 1565–66. The plaintiff thought that this agreement had been violated when the same attorney that represented the settling defendant became the attorney for the non-settling defendant. *Id.* at 1563.

In *Wolt*, there is no mention that the settling defendant's experts had ever been disclosed to the non-settling defendants, and no indication that the non-settling defendant's experts had issued any reports—let alone had their depositions taken under oath. Here, the exact opposite is true. Space Ray released the reports of its two (2) experts, Michael Vergon and Scott Jones, to all parties, and their depositions were taken by Plaintiff's attorney. At no time has Space Ray ever withdrawn those two (2) experts as testifying experts. Further, Plaintiff failed to disclose any of the terms of the alleged confidential settlement agreement between Plaintiff and Space Ray or any parole evidence that supports Plaintiff's implicit contention that it allegedly "bought" Space Ray's experts through settlement.

This Court need not rely on a case from a District Court in Utah to find persuasive case law as two (2) decisions from the Southern District of Indiana address similar issues. See *Meharg v. I-Flow Corp.*, No. 1:08-CV-00184-DFH-TA, 2009 WL 1867696 (S.D. Ind. June 26, 2009); *see*

---

[11] *C.f. Rocky Mountain Nat. Gas Co. v. Cooper Indus., Inc.*, 166 F.R.D. 481, 483 (D. Colo. 1996) (allowing defendant to discover any facts and opinions plaintiff's consultative experts acquired before being retained by plaintiff).

*also Davis v. Carmel Clay Sch.*, No. 1:11-CV-00771-SEB, 2013 WL 2159476 (S.D. Ind. May 17, 2013). Also, a decision from the 7th Circuit Court of Appeals addresses a similar issue as the one asserted by Plaintiff. See *S.E.C. v. Koenig*, 557 F.3d 736 (7th Cir. 2009)[12].

In *Meharg v. I-Flow Corp.*, as part of a settlement reached between a plaintiff and a settling defendant, it was agreed that the settling defendant would withdraw all experts that it identified against I-Flow. 2009 WL 1867696 at *1-2. A dispute arose after the settlement when the plaintiff refused to present a settling defendant's expert for deposition. *Id.* The expert had already been disclosed and had already submitted her expert report to all defendants. In deciding the matter, the Court determined that "[o]nce an expert has been designated to testify at trial, that expert is taken out of the purview of Rule 26(b)(4)(B)." *Id.* The Court went on to note that it does not always follow that a party seeking the withdrawn expert's deposition or seeking to use the expert at trial is necessarily entitled to do so. *Id.* The Court can use its discretion to decide whether that expert could be deposed or used at trial.[13] *Id.* The Court in *I-Flow* concluded that the probative value of the expert's testimony outweighed any prejudice to the plaintiffs and thereby allowed defendants to depose the expert. *Id.* at *2. The Court further noted its "interest in ascertaining the truth". *Id.* The Court also posited that "while public policy encourages settlement, **it does not do so at the**

---

[12] Koenig hired Frederick C. Dunbar, an economist on the staff of National Economic Research Associate, and he prepared a report and was subject to a deposition. Koenig did not present his report or testimony at trial. SEC included Dunbar in its witness list for the pretrial order but not on an earlier list as an expert witness it might call at trial. SEC found Dunbar's conclusions helpful, so the SEC introduced Dunbar's testimony via the video of his deposition at trial. The 7th Circuit determined that the district court properly allowed SEC to introduce Dunbar's testimony at trial and that there was "nothing Koenig could have done would have blocked the SEC" from using Dunbar's conclusions. *S.E.C. v. Koenig*, 557 F.3d 736, 743–44 (7th Cir. 2009).

[13] The Court noted that there are four factors that should be considered when determining whether to allow a party to depose or use at trial an opposing party's withdrawn expert, including (1) the unfairness of allowing an opposing party to reap benefits from another party's expense; (2) the substantial risk of prejudice arising from the fact of the prior retention of an expert by an opposing party; (3) the desire to allow counsel to obtain expert advice without fear that that every consultation will yield discovery to the opponent; (4) and the fear of discouraging experts from serving as consultants if their testimony could be compelled. *Id.* at *1.

**expense of truth and fairness**, which the testimony of Doctor Pence has the potential to provide." *Id.* (emphasis added).

In this case, Space Ray's experts, including Michael Vergon and Steve Jones, <u>have not been withdrawn</u> as testifying experts.[14] Further, Michael Vergon and Steve Jones expert reports were disclosed to all parties and both Vergon and Jones were deposed by Plaintiff's attorney, so there is no prejudice or unfair advantage. Plaintiff never retained Vergon or Jones or secured any agreement to Coe's knowledge that required Space Ray to withdraw the experts before being dismissed from this litigation. Space Ray never withdrew its experts or informed Coe's counsel that the settlement with Plaintiff prevents Coe in any way from using Vergon or Jones. There has been no documentary evidence, or even an allegation, from Plaintiff that such an agreement exists between Plaintiff and Space Ray. Plaintiff cannot simply mention the existence of a confidential settlement agreement and imply by silence that the agreement somehow prohibits Coe's use of Vergon and Jones' disclosed expert reports or deposition testimonies.

Plaintiff also argues that it would be unfair to allow Coe to "freeride" on Space Ray's expert witnesses and that Coe never entered into any shared use agreement with Space Ray. Despite Plaintiff's contention, Coe and Space Ray have been communicating and coordinating experts since the beginning of this case. This included discussions between Coe and Space Ray on what types of experts needed to be retained and which experts to retain. This also included Coe and Space Ray both hiring experts in this case in furtherance of a unified defense.[15] There is no freeride here. Further, Plaintiff's concern about a freeride would not outweigh the "interest in ascertaining

---

[14] All of Co-Defendant's witnesses were identified as witnesses in Coe's Initial Disclosures. There is no Final Pretrial Order in this case.
[15] The infrared tube heaters <u>did not</u> cause the fire.

13

the truth" through experts that have already been deposed under oath in this case by Plaintiff's own attorney.

### III. Conclusion

In this case, Plaintiff's Fire Investigator James Foster started with a predetermined conclusion that the closed infrared tube heaters caused the fire. Foster then ruled out other potential ignition sources inconsistent with that conclusion with no supporting evidence (including electrical), failed to test the flammability or combustibility of the Paint (as a negative test would be fatal to his conclusion), ignored contrary evidence (including the negative flame test from Sheree Wells and statement from John Diggle), failed to collect components not consistent with his conclusion (including electrical), and failed to properly document his purported evidence collection regarding the Paint.

For the reasons set forth above, Defendant, Coe Heating & Air Conditioning, Inc., by counsel, respectfully requests that the Court grant its Motion to Exclude Testimony of Plaintiff's Expert James Foster, exclude the testimony of Plaintiff's Expert James Foster, and for all other just and appropriate relief.

Respectfully submitted,

  /s/ Christopher J. Uyhelji
Christopher J. Uyhelji, Attorney No.: 28814-53
Martin J. Gardner, Attorney No.: 11557-49
Gardner & Rans P.C.
117 Perspective Drive Suite 2
Granger, Indiana 46601
Phone: (574) 233-6035
cuyhelji@gardnerandrans.com
mgardner@gardnerandrans.com
Attorneys for Defendant Coe Heating & Air Conditioning, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of May, 2023 a true and complete copy of the above and foregoing pleading or paper was made upon each party or attorney of record herein by depositing same in the United States Mail in envelopes properly addressed and with sufficient postage affixed, electronic mail or the CM/ECF system thereto:

Thomas Jones<br>
James E. Zoccola<br>
Lewis & Kappes<br>
One American Square, Suite 2500<br>
Indianapolis, Indiana 46282-0003<br>
TJones@lewis-kappes.com<br>
JZoccola@lewis-kappes.com

Date: May 19, 2023

<i>/s/ Christopher J. Uyhelji</i><br>
Christopher J. Uyhelji, #28814-53