UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **REPUBLIC SERVICES OF INDIANA LIMITED PARTNERSHIP** | ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| v. | ) CASE NO.: 1:21-cv-108-HAB-SLC <br> ) |
| **COE HEATING & AIR CONDITIONING, INC.** | ) <br> ) <br> ) |
| **Defendant,** | ) <br> ) <br> ) |

**OPINION AND ORDER**

Plaintiff, Republic Services of Indiana Limited Partnership ("Republic"), sued Defendant, Coe Heating & Air Conditioning, Inc. ("Coe"), alleging that Coe's installation of a Space-Ray[1] heater caused a fire in one of Republic's structures. The structure was completely burned down. Coe, doing their best Billy Joel impression cries, "[w]e didn't start the fire."[2] Indeed, in their Motion for Summary Judgment (ECF No. 56), Coe claims their heater could not have started the fire.[3] Presently before the Court is Coe's Motion to Exclude the Testimony of Republic's expert fire investigator, James Foster ("Foster"), who opined to the contrary. (ECF No. 54). Coe alleges that Foster, a fire investigator of 44 years, is unqualified and presents unreliable testimony under the landmark decision *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579 (1993). For the reasons below, Defendant's *Daubert* Motion will be DENIED.

I.   **Factual Background**

---

[1] Space-Ray, Inc. was initially named as a defendant in this lawsuit, but settled Republic's claims informally and has been terminated pursuant to Plaintiff's Amended Complaint. (ECF No. 52).
[2] https://en.wikipedia.org/wiki/We_Didn%27t_Start_the_Fire
[3] Defendant's Motion for Summary Judgment will be addressed in a separate order by this Court.

### a. The Facility and The Fire

Republic owns and operates a waste management facility located in Fort Wayne, IN ("Facility"). The Operations Building at the Facility is divided into four section—one for office spaces and three for maintenance operations. (ECF No. 58 at 5). The section where Republic alleges the fire started is known as "Building 1." (*Id.*). In the adjacent sections, Republic performed heavy container repairs. (*Id.*). The repaired containers were then sent to Building 1 where painting, welding, and additional repairs took place. (*Id.* at 6-7). Republic employees commonly referred to Building 1 as the "Paint Bay" or "Paint Room." (*Id.* at 6).

Aptly named, 17-19 containers were painted each day in Building 1 using Blue Enamel Sheboygan Paint. (*Id.*). According to Republic employees, Building 1 was covered with paint from the ceiling to the floor. (*Id.*). Indeed, their interviews revealed that blue paint "was everywhere in the facility." (*Id.*). With time, the blue paint dried into a dust-like substance. (*Id.*). So immersive was the dust that collected inside Building 1's heaters, it caused the heaters to clog up and malfunction. (*Id*). In early 2019, Republic, to help solve the problem, contacted multiple HVAC companies to obtain quotes for a new type of heater that could survive the harsh spraying conditions in Building 1. (*Id.*)

Without trudging through the entirety of the parties' relationship, Republic consulted Coe to inspect the facility and get a quote. (*Id.*) After a Coe salesman inspected the facility, he recommended that Republic purchase three Space-Ray, Inc. infrared gas tube heaters for Building 1.[4] (*Id.*) Coe provided their quote and Republic accepted.

Coe employees removed the old malfunctioning heaters and installed the new heaters in January 2019. (*Id.* at 8). Shortly after the installation, paint operations resumed in Building 1. (*Id.*).

---

[4] Notably, Coe's salesman was aware of the commercial spray painting activities that regularly occurred in the facility. (ECF No. 58 at 6).

Employees began noticing blue paint accumulating on the new heaters and the heaters started "to turn blue like everything else in the facility." (*Id.*). In March 2019, just 6 weeks after installation, Republic employees saw flames breaking out from Building 1. (*Id.* at 9). It was first reported at 11:03 p.m. (*Id.).* Despite efforts to combat the fire, the Operations Building—not just Building 1—was a total loss.

### b. Foster's Investigation

Foster was engaged to investigate the following day, less than 12 hours after the fire was extinguished. Being that Foster is the focus of Coe's motion to exclude, it seems best to start with his credentials. He is a Certified Fire Investigator ("CFI"), a Certified Fire and Explosion Investigator ("CFEI"), and a Certified Vehicle Fire Investigator ("CVFI"). (ECF No. 55-1 at 12-15). Foster holds certifications from several governing associations[5] in fire investigation and has been involved in over 2000 fire investigations, authoring more than 1400 cause and origin reports. (*Id.*). On top of his extensive employment history[6] as a fire investigator, Foster has been a certified instructor teaching courses on fire investigation to fire and police departments for decades. (*Id.*). Foster also has completed hundreds of hours of classroom training which includes courses specific to arc mapping and structural electrical systems to help determine areas of origin. (*Id.* at 16).

Upon arrival at the scene, Foster began interviewing witnesses. The witnesses informed Foster that all work had concluded in Building 1 by 4:00 p.m. the day of the fire. (ECF No. 58 at 9). Foster was also told that, at the time of the fire, everything in the operations facility was turned off except for the heaters. *(Id.* at 10). Witnesses informed Foster that the heaters were set to run

---

[5] Foster holds certifications from the National Fire Protection Association ("NFPA"), the International Association of Arson Investigators ("IAAI"), and the National Association of Fire Investigators ("NAFI"). (ECF No. 55-1 at 12-15).
[6] Foster's employment history includes roles such as Fire/Arson Investigator for the Carmel Fire Department and Chief Fire Investigator for Madison County Emergency Management. (ECF NO. 55-1 at 12-15).

overnight—likely at 70 degrees (F)—as the overnight low was 28 degrees (F) on the night of the fire. (*Id.*). The witnesses suggested that the flames started somewhere "high" in Building 1 before spreading to the rest of the Operations Building. (*Id.* at 9).

Upon receiving word that another HVAC company that Republic consulted advised them against using infrared gas tube heaters in Building 1, Foster returned to the scene to retrieve samples of debris from inside the heaters. (*Id.* at 11). Foster took photographs of the areas where he obtained gauze samples by scraping the inside the gas tube heaters. (*Id.*). Along with a control gauze sample, Foster sent the samples to Forensic & Scientific Testing, Inc. ("FAST") to test for the presence of flammable, combustible, or ignitable liquids. (*Id.*). A liquid sample of the paint was sent as well. (*Id.*).

Sharee Wells, MS ABC-FD ("Wells") is the forensic scientist who conducted the testing. In Wells' laboratory testing, the gauze samples from inside the heaters tested positive for petroleum distillate—xylol—consistent with ignitable materials. (*Id.* at 12). She confirmed that xylol was found in a sample of Sheboygan Paint that Foster sent. (*Id.*). Wells stated that xylol is "highly flammable" and there was a "very significant amount" in the samples. (*Id.* at 12-13).

Foster also facilitated multiple joint scene examinations at Republic's facility and two joint lab examinations at a Rimkus laboratory in Indianapolis. (*Id.* at 13). During these joint scene examinations which Coe's expert participated in, Foster asked all attendees if there was any evidence that they thought was important and wished to be collected. (*Id.*). Although Coe's expert was interested in evaluating electrical components at the scene, he did not pursue collection of the material and Foster did not prohibit him from doing so. (*Id.* at 13-14). Ultimately, the three heaters that Coe installed and some other debris was collected and tested. (*Id.*).

   c. **Foster's Final Report and Conclusions**

Foster issued his final report and conclusions in November 2022. In his report, he states that he "applied the methodology of fire investigation using a systematic approach as recommended by the National Fire Protection Association ("NFPA") 921—'Guide for Fire and Explosion Investigations' and NFPA 1033 'Standard for Professional Qualifications for Fire Investigator.'" (ECF 55-1 at 21). From the vast evidence, other expert reports, site inspections, and witness interviews, Foster determined the "probable"[7] origin and cause of the fire.

Foster concluded that "[t]he cause and origin of the fire is a direct result of the open infrared tube heaters in the area where painting and other procedures were performed." (*Id.* at 19).

## II.     Standard of Review

Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert* governs the admissibility of expert testimony. *Daubert,* 509 U.S. 579; *See also Lees v. Carthage*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining that Rule 702 has superseded *Daubert*, but that its standard of review still applies). Rule 702 and *Daubert* require the district court to engage in a three-part analysis. *Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010). The Court must determine "whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Experts can be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

"The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*,

---

[7] Coe attacks Foster's reliability because he used "possible" instead of "probable" in his reports when commenting on the point or origin and cause of the fire. (ECF No. 55). Foster corrected himself in his deposition where he claims that his use of "possible" was a typographical error and should have stated "probable." (*Id*. at 15-16).

689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). Whether to admit the expert testimony lies within the discretion of the district court. *See Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "[T]he party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 784 (7th Cir. 2017).

Relevant here, where a party's challenges to the proposed expert testimony, "do not go to admissibility but to the appropriate weight that should be accorded to the evidence[,] '[d]etermination on admissibility should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross-examination.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir.2010)).

**III.  Discussion**

Coe advances three arguments in support of its contention that Republic's expert fire investigator's testimony should be excluded under Rule 702. First, they posit that Foster is unqualified to rule out electrical causes of fire because he is not an electrical engineer. Second, Coe attacks Foster's opinion that the fire's point of origin started with a heater installed by Coe. And lastly, Coe attacks the reliability of Foster's opinion that the Space Ray heaters caused the fire. The vast amount of Coe's attack focuses on the testimony of other experts in this case, albeit with some emphasis on the way Foster applied the NFPA's standards. In overwhelming part, these arguments are actually criticisms that go to the weight and credibility of Foster's testimony rather

6

than admissibility.

Almost all of Coe's contentions boil down to this: Foster's opinions are inadmissible because they are wrong. That may well be true and there is testimony from other experts which supports that notion. But the Court's gatekeeping role is not reserved for it to determine which parties' expert is more right. In their briefing, Coe has assembled a stockpile of fodder for the battle of the experts. In this case, that battle will take place on cross-examination where both sides can test the weight of their evidence in front of the jury.

### a. Foster is Not Unqualified.

The first step for the gatekeeper under *Daubert* is to determine whether the expert is qualified and to evaluate the proffered expert's qualifications. Coe believes that because Foster is a fire investigator and not an electrical engineer, he is unqualified to rule out electrical as the cause of the fire. (ECF No. 55 at 11-12). Yet Coe cites no authority in support of that argument. Meanwhile, Republic correctly points out that "[e]xperts can take many forms" and an expert's qualifications may be based on their "skill, experience, and training." *See Blue Book Servs. v. Amerihua Produce, Inc.*, 337 F. Supp. 3d 802, 816 (N.D. Ill. 2018) (quoting Fed. R. Evid. 702).

"The notion that [*Daubert*] requires a particular credentials for an expert witness is radically unsound." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585 (7th Cir. 2000). "[A]nyone with relevant expertise enabling him to offer responsible testimony helpful to judge or jury may qualify as an expert witness." *United States v. Thomas*, 2022 WL 36098, at *7 (N.D. Ind. Jan. 3, 2022) (citing *Tuf Racing Prod., Inc.*, 223 F.3d at 591). "When determining if an individual has the expertise necessary to render an opinion in a given area, the Court 'should consider a proposed expert's full range of practical experience as well as academic or technical training....' *Thomas,* 2022 WL 36098, at *7 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718

(7th Cir. 2000)).

Foster has ample experience as a fire investigator. What he lacks in academic training as an electrical engineer, Foster more than accounts for in his technical training. He has conducted more than 2000 fire investigations and is extremely well-versed in collection and forensic analysis of evidence at fire scenes. Fire and police departments throughout the state seek his expertise to teach their personnel to perform fire investigations in accordance with national fire investigation standards. And Foster has completed hundreds of hours of classroom training including courses specific to structural electrical systems to assist in determining areas of origin. Coe contends that Foster must rely on the opinion of an electrical engineer in making his conclusions, which he did not here. This alone is not enough.[8] Foster's 44 years of experience as a fire investigator give him ample qualification to opine as to the point of origin and cause of the fire. The fact that electrical components may have been involved does not change that.

**b. Foster's Method for Determining the Point of Origin and Cause is Sufficiently Reliable.**

The meat of Coe's brief focuses on Foster's methodology in determining the point of origin and the cause of the fire. Coe, citing several other experts involved in this case, claims that Foster's testimony was not in compliance with NFPA 921. Simply because Foster did not reach the same conclusion as those other experts does not mean his testimony is unreliable. To the contrary, Foster testified that his investigations are always guided by NFPA 921. Despite Coe's dissatisfaction with Foster's ultimate conclusions, the methods he employed complied with NFPA 921 and are reliable.

---

[8] *See Castagna v. Newmar Corp.*, 2020 WL 13659743, at *9 (N.D. Ind. Mar. 4, 2020) ("The defendants object to Mr. Powell's opinions on similar grounds to the previous experts. They argue that because he is not an electrical engineer, Mr. Powell is not qualified to offer opinions relating to an inverter. Again, however, the defendants have failed to establish why such a narrow specialization is required for these opinions. Mr. Powell is a qualified fire investigator with extensive experience and training, including thousands of fire investigations over his decades of work. His investigation led him to conclude that the fire began inside the inverter, but that was the product of his expertise as a fire investigator, and Mr. Powell is suitably qualified in that respect.").

8

Coe is still free to test those conclusions on cross-examination.

The methods embodied in NFPA 921 are reliable:

> NFPA 921 is "a comprehensive, peer-reviewed, and detailed guide for fire investigation, and [courts] have held that its methodology is reliable for purposes of Rule 702." *United States v. Thomas*, No. 3:18-CR-45, 2022 WL 36098, at *9 (N.D. Ind. Jan. 3, 2022) (quoting *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, No. 3:08-CV-436, 2013 WL 3013531, at *17 (N.D. Ind. June 17, 2013)); *see Abu-Hashish v. Scottsdale Ins. Co.*, 88 F. Supp. 2d 906, 908 (N.D. Ill. 2000) (stating that NFPA 921 is "a recognized guide for use by fire investigators in the fire investigation process"). NFPA 921 recommends that fire investigators use a "systematic approach" that is based on the scientific method used in the physical sciences. NFPA 921 § 4.2; *Abu-Hashish*, 88 F. Supp. 2d at 908. That approach tells fire investigators to follow several steps, which are: "(1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) following any repeated rounds of refining and testing the hypothesis, select the final conclusion." *Electrolux Home Prods.*, 2013 WL 3013531, at *18 (quoting *United States v. Aman*, 748 F. Supp. 2d 531, 535 (E.D. Va. 2010)). With that said, a failure to strictly follow the NFPA guidelines, does not automatically make the methodology unreliable. *See Thomas*, 2022 WL 36098, at *9.

*Ball Corp. v. Air Tech of Michigan, Inc.*, 2022 WL 1801120, at *5 (N.D. Ind. June 2, 2022). "For an expert opinion to have a proper foundation, there must be a 'link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.'" *Bezingue v. Steuben Lakes Reg. Waste Dist.*, 507 F. Supp. 3d 1021, 1030 (N.D. Ind. 2020) (quoting *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003)). The question of reliability under Rule 702 "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.,* 732 F.3d 796, 806 (7th Cir. 2013). To pass Rule 702 scrutiny, there need only be a "rational connection between the data and the opinions." *Id*. at 809.

Foster's conclusions flowed from an immense amount of data.[9] He conducted multiple

---

[9] See NFPA 921 § 14.1.1: *Purpose of Obtaining Information*. ("The scientific method requires the collection and analysis of data. … Examining the fire scene or evaluating prior documentation of the fire scene, interviewing witnesses, and conducting research and analysis of information from other sources all provide the fire investigator

inspections of the scene, both individually and as a facilitator for other parties. He took over a thousand photographs and potential evidence while there. Foster conducted multiple interviews. These interviews included the statements of those who personally observed the fire and those with personal knowledge of the conditions and operations of Building 1 just before the fire. He carefully collected forensic samples from deep within the gas tube heaters. Foster took those samples and shipped them to a certified fire debris analyst for laboratory testing. Using his decades of training and expertise, Foster also analyzed the electrical components and burn patterns on the scene.

Along with the fire debris analyst, Foster considered the opinions of Nicholas Ozog ("Ozog"), an engineer with expertise in ignitable liquids. Ozog noted that, although the blue paint was not flammable or combustible as packaged by the manufacturer, it did contain some flammable solvents. (ECF No. 58-3 at 6) ("Although the specific identified paint is not flammable or combustible as packaged by the manufacturer, the paint does contain liquids when considered individually are classified as combustible liquids in water."). Orzog also noted the manufacture's warning suggested that if the water was removed, the paint could exhibit the properties of a combustible liquid. (*Id.*) ("Furthermore, as identified by the paint manufacturer that once the water is removed the paint may exhibit properties of a combustible liquid.").

With all this information in mind (and additional information which the Court declines to walk through), Foster began developing, testing, and eliminating various hypothesis. *See Ball Corp.*, 2022 WL 1801120, at *5. Of note, Foster considered electrical as a cause of the fire.[10] Yet Foster found zero evidence on scene indicating that electrical components had malfunctioned or

---

with additional data to establish origin and cause of a particular fire.").

[10] Coe highlights that electrical engineer John Diggle could not "definitively" rule out electrical as the cause of the fire. (ECF No. 55). Diggle's statement was as follows: "I don't think I would have said with certainty that I could not rule [electrical causes] out or - - I don't think I would have given definitive conclusions." (ECF No. 55-1). These inconsistencies between Diggle and Foster go to the "soundness of the factual underpinnings of [Foster's] analysis[,]" not his methodology. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

caused an ignition. Indeed, Foster explained in his deposition that the electrical wiring in the Operations Building were in conduit which significantly reduces the likelihood of loose wires as ignition sources. (ECF No. 58-2). Foster accounted for the testimony of the Republic employee who inspected Building 1 the night before the fire. The employee testified that all electrical appliances and devices were shut down at the time of the fire. (ECF No. 58-2). Based on this information, Foster ruled out electrical as the cause of the fire in his report.

On the other hand, Foster considered the fact the heaters routinely ran over night. This is all the more likely considering the overnight low on the night of the fire was 28 degrees (F) and the heaters' thermostat was set to 70 degrees (F). The heaters bore a warning: "[t]his heater must not be installed in a spray booth where the heater can operate during the spraying process. Consult your local fire marshal or insurance company." (ECF No. 58-6). Ozog found that the "operations in the paint room of Building 1…are similar to those operations that would be conducted in a paint booth." (ECF No. 58-3 at 6). Partnered with the presence of flammable components in the paint used in Building 1, Foster determined that the gas tube heaters were the "probable" point or origin and cause of the fire.[11]

Coe's arguments against the reliability of the aforementioned conclusions come from the testimony of other experts: two other fire investigators and another fire debris specialist.[12] (ECF No. 55 at 6-9). Fire investigators Michael Vernon ("Vernon") and Michael Agosti ("Agosti")

---

[11] Coe attacks Foster's reliability on the basis that he used "possible" instead of "probable" in his reports when commenting on the point of origin and cause of the fire. (ECF No. 55). Foster went on to correct himself in his deposition where he claims that his use of "possible" was a typographical error and should have stated "probable." (*Id*. at 15-16). A typo such as this only impacts the weight of Foster's testimony and his credibility, not its admissibility. *See Comput. Associates Intern v. Quest Software, Inc.,* 333 F. Supp. 2d 688, 695 (N.D. Ill 2004) (holding that expert's material typos in his expert report, which he acknowledged and corrected at his deposition, went "to the weight that we give his [opinions] rather than to the admissibility.").

[12] Some experts Coe uses in their Motion to Exclude are from Space-Ray, Inc. who was formerly a Defendant in this lawsuit. Republic and Space-Ray have since settled their dispute. Republic urges this Court to find that Coe cannot use a former parties' retained experts to support their Motion to Exclude. This Court need not address this issue in reaching its conclusion and declines to do so.

questioned Foster's use of burn patterns to determine origin in his analysis because the Operations Building was completely destroyed by the fire. (ECF No. 55 at 16). They argue that where the structure is completely destroyed, burn patterns are largely irrelevant. Fire debris specialist Laurel Mason ("Mason"), as well as Agosti and Vernon, were critical of Foster's opinion that Sheboygan Blue Aqua Enamel Paint could ignite in its solid or liquid form. (ECF No. 55 at 7).

Although Agosti and Mason may have a different opinion about the point or origin of the fire, that does not render Foster's methodology unreliable. From the vast amounts of data in this highly complicated case, Foster found a "rational connection" between the data and his opinions. *See Manpower, Inc,* 732 F.3d at 806. As for the cause—whether the paint in Building 1 could combust—Foster employed the scientific method and deductive reasoning to determine that the paint in the heater probably caused the fire. Although Coe claims this was impossible, there is testimony that the paint contained xylol—a highly flammable material. It is not an inferential leap to find that paint might become flammable when the water is removed as in the drying process.[13] *See Russell v. Whirlpool Corp.*, 702 F.3d 450, 457 (8th Cir. 2012) (explaining there is "nothing unreliable" about a fire expert's methodology when they "considered burn patterns, identified a point of origin, and eliminated as many alternative causes of the fire as possible."; "In the context of fire investigations, we have held expert opinions formed on the basis of observations and experience may meet this reliability threshold."). This is all the more possible considering no expert Coe uses in its Motion to Exclude performed a flame test with the paint in its dry form. (ECF No. 58 at 12).

This Court is sympathetic to Coe because they have managed to point out several potential

---

[13] NFPA 921 §19.6.5: *Appropriate Use* provides: "Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence) must be based on the analysis of facts and logical inferences that flow from those facts. Those facts and logical inferences are derived from data, observations, calculations, experiments, and the laws of science."

weaknesses in Foster's testimony. But these arguments are nothing more than "questioning the underlying facts or the correctness of [Foster's] opinion." *See Ball Corp.*, 2022 WL 1801120, at *7. But denying this Motion to exclude will not deprive Coe of the opportunity to expose those weaknesses; Rather, "these are potential lines for cross examination." *Id.*

### IV.     Conclusion

For the reasons set forth above, Coe's Motion to Exclude the Testimony of Plaintiff's Expert James Foster (ECF No. 54) is DENIED.

SO ORDERED on September 27, 2023.

        s/ *Holly A. Brady*
        CHIEF JUDGE HOLLY A. BRADY
        UNITED STATES DISTRICT COURT