UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| REPUBLIC SERVICES OF INDIANA LIMITED PARTNERSHIP | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO.: 1:21-cv-108-HAB-SLC ) |
| COE HEATING & AIR CONDITIONING, INC. | ) ) ) ) |
| Defendant, | ) ) ) |

**OPINION AND ORDER**

Plaintiff, Republic Services of Indiana Limited Partnership ("Republic"), sued Defendant, Coe Heating & Air Conditioning, Inc. ("Coe"), alleging that Coe's installation of a Space-Ray[1] heater caused a fire in one of Republic's structures. The structure was a total loss. Coe disputes Republic's claims and moved for summary judgment (ECF No. 56). That motion is now fully briefed (ECF Nos. 60, 63) and ready for ruling.

I. **Factual Background**

   a. **The Facility and The Fire**

Republic owns and operates a waste management facility located in Fort Wayne, IN ("Facility"). The Operations Building at the Facility was divided into four section—one for office spaces and three for maintenance operations. (ECF No. 60-1, ¶ 24). The section where Republic alleges the fire started is known as Building 1. In Buildings 3 and 4—adjacent to Building 1— Republic performed heavy container repairs. (*Id.* at ¶ 25). The repaired containers would be

---

[1] Space-Ray, Inc. was initially named as a defendant in this lawsuit, but settled Republic's claims informally and has been terminated under Plaintiff's Amended Complaint. (ECF No. 52).

1

transported to Building 1 where painting, welding, and additional repairs took place. (*Id.* at ¶ 28). Republic employees commonly referred to Building 1 as the "Paint Bay" or "Paint Room." (*Id.* at ¶ 29).

This was no misnomer as 17 to 19 containers were painted each day in Building 1 using Blue Enamel Sheboygan Paint. (*Id.* at ¶ 30). Republic employees conveyed that Building 1 was covered with the paint from the ceiling to the floor. (*Id.* at ¶ 34). Indeed, one employee stated that "[t]here probably wasn't anything in that paint room that didn't have some blue spray on it." (*Id.*). With time, the blue paint dried into a dust-like substance. (*Id.* at ¶ 33). The dust was so immersive that it collected inside Building 1's heaters causing the heaters to clog up and malfunction. (*Id.* at ¶ 36). In early 2019, Republic sought to fix the problem by contacting multiple HVAC companies to obtain quotes for a new type of heater that could survive the harsh spraying conditions in Building 1. (*Id.* at ¶ 37).

Republic consulted Coe to inspect Building 1 and get a quote. Coe salesman Ron Dantzer ("Dantzer") inspected the facility and took measurements of the enclosed space. (*Id.* at ¶ 40). Notably, Republic employees informed Dantzer of the continuous painting activities which regularly occurred inside Building 1. (*Id.* at ¶ 41). After the inspection, Dantzer recommended that Republic purchase three Space-Ray, Inc. infrared gas tube heaters for installation in Building 1. (*Id.* at ¶ 42). Coe provided their quote and Republic accepted.

In January 2019, two Coe employees removed the old malfunctioning heaters and installed the new heaters. (*Id.* at ¶ 49). When the employees did the installation, they were unaware that spraying activities regularly took place there. (*Id.* at ¶ 55). One of Coe's employees, Charles Golden ("Golden"), stated this was the first time he had "ever installed heaters, in any commercial

2

facilities, in a room where any kind of spraying or painting took place."[2] (*Id.* at ¶ 54).

The heaters contained a warning from its manufacturer: "This heater must not be installed in a spray booth where the heater can operate during the spraying process. Consult your local fire marshal or insurance company." (*Id.* at ¶ 46). Neither Dantzer nor Golden were aware of the warning before the heaters' installation. *(Id.* at ¶ 47, 56). After being shown the warning at his deposition, Golden stated that it would be "common sense" for Dantzer to not ask Coe's installation team to install the heaters in a room where spray painting operations took place. (*Id.* at ¶ 58-59).

Shortly after the installation, spray painting operations resumed. (*Id.* at ¶ 63). Republic employees soon began noticing blue paint accumulating on the new heaters and they started "to turn blue like everything else" in Building 1. (*Id.*). In March 2019, just 6 weeks after installation, Republic employees saw flames breaking out from the Operations Building. (*Id.* at ¶ 65). It was first reported at 11:03 p.m. (*Id.* at ¶ 1). Despite efforts to combat the fire, the Operations Building—not just Building 1—was completely burned down.

   b. **The Investigation**

Extensive investigations followed the fire. According to witness interviews, all work had concluded in the Operations Building by 3:00 p.m. the day of the fire. (*Id.* at ¶ 2). The first witness to the fire noted that the flames came from the "very tip top" of the Operations Building. (*Id.* at ¶ 13). The last person to walk through the Operations Building before its destruction said that, at the time of the fire, everything was turned off except for the heaters. (ECF No. 58 at 10). The heaters were set to run overnight—likely at 70 degrees (F)—as the overnight low was 28 degrees (F) on

---

[2] The other Coe employee who participated in the installation was Jason Stuckey ("Stuckey"). (ECF No. 60-1, ¶ 50). Golden worked as an assistant under the direction of Stuckey. (*Id.* at ¶52). Stuckey is now deceased and could not be deposed. (*Id.* at ¶ 51).

the night of the fire. (*Id.*)

Apparently, another HVAC company that Republic consulted with advised against using infrared gas tube heaters in Building 1. (*Id.* at 11). As a result, samples were taken from inside the heaters and tested for the presence of flammable, combustible, or ignitable liquids. (*Id.*). The testing, conducted by Sharon Wells, MS ABC-FD ("Wells"), revealed that the samples contained a "very significant amount" of petroleum distillate, also known as "xylol." (*Id.*). Xylol is "highly" flammable. (*Id.*).

Even with the xylol's presence, Wells and fire debris forensic scientist Laurel Mason ("Mason") both concluded that the Sheboygan paint used in Building 1 was not flammable or combustible. (ECF No. 60-1, ¶ 9). Yet no testing was conducted of the paint in its dry form. And the Material Safety Data Sheet ("MSDS") for the paint states that "[i[f water has boiled off, this product may exhibit properties of a [combustible] liquid." (*Id.* at ¶ 19).

Indeed, Nicholas Ozog ("Ozog"), fire prevention expert and engineer, found that although the Sheboygan paint was not flammable or combustible as packaged by the manufacturer, it did contain some flammable solvents. (ECF No. 58-3 at 6) ("Although the specific identified paint is not flammable or combustible as packaged by the manufacturer, the paint does contain liquids when considered individually are classified as combustible liquids in water."). In his expert opinion, the manufacturer's warning suggested that if the water was removed, the paint could exhibit the properties of a combustible liquid. (*Id.*) ("Furthermore, as identified by the paint manufacturer that once the water is removed the paint may exhibit properties of a combustible liquid."). And, in reference to the warning, Ozog found that the "operations in the paint room of Building 1…are similar to those operations that would be conducted in a paint booth." (*Id.*)

    **c.**    **Battle of the Experts**

4

Apart from the competing opinions of the expert forensic scientists and engineers, three opinions of expert fire investigators are at odds. Republic's expert, James Foster ("Foster"), concluded that the probable cause and origin of the fire was the gas tube heaters. (ECF No. 60-1, ¶ 15). Coe's expert, Michael Agosti ("Agosti"), found the cause and point of origin undetermined based on the sheer destruction of the Operations Building. (*Id.* at ¶ 11). Space Ray's expert, Michael Vergon ("Vergon"), concluded that the gas tube heaters did not cause the fire, but could not come to a specific conclusion about causation. (*Id.* at ¶ 12).

The final battle pertains to damages. Both sides hired experts to assess the damages to Republic's Operations Building. Coe's damages expert, David Abraham ("Abraham"), found the Operations Building's fair market value before the fire was $550,000. (*Id.* at ¶ 21) Republic's damages expert, Kenneth Itles ("Itles"), determined that the replacement cost of the Operations Building is $2,761,899. (*Id.* at ¶ 22).

### d. Procedural History

In its Complaint, Republic alleges negligence and several other causes of action[3]—all of which require Republic to prove that Coe's installation of the gas tube heaters caused the fire. (ECF No. 52). After extensive discovery, Coe moved for summary judgment on four grounds: (1) Republic can provide no admissible evidence that the gas tube heaters caused the fire; (2) the Sheboygan paint is not combustible and could not cause the fire; (3) Coe properly installed the heaters; and (4) the proper calculation of damages is the Operations Building's value before its destruction. (ECF No. 57). The first two arguments can be filed under causation, the third argument concerns breach, and the fourth argument concerns damages.

---

[3] In particular, Republic brings claims of Negligence, Breach of Express Warranty, Negligent Misrepresentation, Breach of Implied Warranty of Merchantability, and Breach of Implied Warranty of Fitness for a Particular Purpose. (ECF No. 52).

Contemporaneous with Coe's motion, they moved to exclude the testimony of Republic's expert fire investigator, Foster. (ECF No. 54). Coe's Motion to Exclude was denied in a separate opinion by this Court. (ECF No. 64). Foster's testimony is admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579 (1993). (ECF No. 64)

## II. Standard of Review

Although state law provides the substantive law in diversity cases, federal law governs the summary judgment standard. *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making its determination a court must construe all facts "in a light most favorable to the non-moving party" and "draw all legitimate inferences in favor of that party." *Williams v. Norfolk S. Corp.*, 322 F. Supp. 3d 896, 899 (N.D. Ind. 2018) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

The non-movant "need only produce evidence sufficient to *potentially* persuade *any* reasonable jury." *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (citing *Anderson*, 477 U.S. at 248) (emphasis in original). "A dispute about a material fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rose v. Birch Tree Holdings, LLC*, No. 2:18 CV 197, 2022 WL 3656986, at *2 (N.D. Ind. Aug. 25, 2022) (quoting *Anderson*, 477 U.S. at 248).

"At the end of the day, a court's role 'is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that

6

requires a trial.'" *Ball Corp. v. Air Tech of Mi., Inc.*, 2022 WL 1801120, at *1 (N.D. Ind. June 2, 2022) (quoting *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994)).

**III. Discussion**

Republic filed suit for negligence, among other claims. To prevail on a negligence claim, Republic must prove that (1) Coe owed a duty to Republic; (2) Coe breached that duty; and (3) Republic suffered an injury proximately caused by Coe's breach. *Leal v. TSA Stores, Inc.*, 2019 WL 142348, at *2 (N.D. Ind. Jan. 9, 2019) (quoting *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007)).

Coe's motion attacks Republic's claim from three fronts. First, Coe claims that "there is no admissible evidence that the [heaters] and [Sheboygan paint] caused the fire at Building 1." (ECF No. 57 at 11). Second, Coe argues that the "heaters were properly installed by Coe at Republic's Building 1." (*Id.* at 17). Lastly, Coe contends that "[t]he proper measure of damages…is the fair market value of the structure pre-destruction plus demolition costs." (*Id.* at 18). Therefore, even if summary judgment is unwarranted on their other arguments, Coe urges the Court to adopt its experts findings and determine that the damages here are $550,000 as a matter of law. (*Id.* at 20).

Republic counters by arguing that there are genuine disputes of material fact on all fronts: (1) causation, (2) breach, and (3) damages. The Court agrees. "[B]ased on the evidence in the record," there is a "material dispute of fact" at each level. *See Ball Corp,* 2022 WL 1801120, at *1.

   **a. Causation**

Although Coe contends there is no admissible evidence showing that the heaters and the Sheboygan paint caused the fire, they put the cart a nudge past the horse. In their contemporaneously filed Motion to Exclude (ECF No. 54), Coe contends that James Foster's

7

testimony is unreliable under Fed. R. Evid. 702 and *Daubert.* Indeed, both of Coe's causation arguments hinge on whether Foster's testimony is admissible. That issue was extensively briefed (ECF Nos. 54, 58, 59). In a separate order, this Court determined that Foster is a qualified expert and his methods are reliable. (ECF No. 64). Foster concluded that "[t]he cause and origin of the fire is a direct result of the open infrared tube heaters in the area where painting and other procedures were performed." (ECF No. 60-3). Foster's testimony is admissible and creates a question of fact sufficient to survive summary judgment.

"Under Indiana law, 'proximate cause' has two aspects: (1) whether the injury would not have occurred without the defendant's negligent act or omission (also referred to as 'causation in fact'); and (2) whether the injury 'is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Trask-Morton v. Motel 6 Operating L.P.,* 534, F3d 672, 677 (7th Cir. 2008) (quoting City *of Gary v. Smith & Wesson Corp.,* 801 N.E.2d 1222, 1243-44 (Ind. 2003)). "[P]roximate cause must be based upon provable facts and cannot be based upon mere guess, conjecture, surmise, possibility or speculation." *Collins v. Am. Optometric Ass'n,* 693 F.2d 636, 640 (7th Cir. 1982) (applying Indiana law). That said, proximate cause is almost always a question of fact. *Smith v. Walsh Const. Co. II, LLC,* 95 N.E.3d 78, 86 (Ind. Ct. App. 2018) (citing *Megenity v. Dunn,* 66 N.E.3d 1080, 1083 (Ind. 2017)).

The Court need not walk through the entirety of Foster's findings a second time and presumes familiarity with its previous evidentiary ruling. (ECF No. 64). In short, Foster determined that the heaters and Sheboygan paint caused the fire. Shortly after their installation, the heaters became covered in blue paint like everything else in Building 1. The Operations Building caught fire just six weeks later. Although Coe claims that it was impossible for the paint to catch fire, Wells determined that it contained xylol—a highly flammable material. It is not an

inferential leap to find that the paint might become flammable when the water is removed as in the drying process. *See Kincaid v. Mac Corp.,* 773 N.E.2d 909, 912 (Ind. Ct. App. 2002) ("[A]ll of the elements of a negligence action must be supported by specific facts designated to the trial court or reasonable inferences that might be drawn from those facts.").

Indeed, Republic's fire prevention expert noted that although the Sheboygan paint was not flammable or combustible as packaged by the manufacturer, it did contain some flammable solvents. And the manufacture's warning suggested that if the water was removed, the paint could exhibit the properties of a combustible liquid. This is all the more possible considering neither party performed a flame test with the paint in its dry form. Republic supplied enough evidence "to *potentially* persuade *any* reasonable jury" that the gas tube heaters and Sheboygan paint caused the fire in Building 1. *See Blasius,* 839 F.3d at 648. With the inclusion of Foster's testimony, a question of fact exists.

### b. Breach

Second, Coe asserts that they properly installed the gas tube heaters in Building 1, and therefore they did not breach their duty to Republic. The testimony of Dantzer, Agosti, and Jones—all of which concluded the heaters were properly installed—supports that notion. Additional support comes from Coe's competitor, Korte, who recommended the same heater for installation in Building 1. In response, Republic points to the manufacturer's warning, Coe's neglect of the warning, and their own experts' testimony. Although Coe's evidence may well be stronger, Republic came forward with evidence that the heaters should not be installed in areas where painting operations take place. This too is enough to survive summary judgment and a reasonable jury could find in Republic's favor.

To succeed on a claim of negligence, Republic must prove that Coe breached its duty to

exercise reasonable care in recommending, selling, and installing the heaters. *Leal*, 2019 WL 142348, at *2. While it "can be a question of law where the facts are undisputed and only a single inference can be drawn from those facts[,]" "[w]hether a particular act or omission is a breach of duty is generally a question of fact for the jury." *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind. 2003).

Republic's evidence of breach largely focuses on the manufacturer's warning that accompanied the heaters: "This heater must not be installed in a spray booth where the heater can operate during the spraying process." (ECF No. 60-1, ¶ 54). Essentially, Republic argues that the conditions of Building 1 resembled that of a spray booth. And their assertion is not bare. Ozog found that the "operations in the paint room of Building 1…are similar to those operations that would be conducted in a paint booth." (ECF No. 58-3 at 6). Their fire prevention expert also concluded that if spray painting was being conducted in Building 1, "the Space-Ray heaters should not be installed without further review of the [warnings]…[and] [d]iscussions with the manufacturer regarding hazards." (*Id.*)

The warning also required the installer to consult a "fire marshal and insurance company." (ECF No. 60-1, ¶ 54). The manufacturer, Space-Ray, stated that this directive applied when "somebody's spraying parts." (ECF No. 60-22). Dantzer knew of the painting operation that occurred in Building 1. And Dantzer was unaware that the warning even existed before he recommended the heaters and offered a quote. (ECF No. 60-1, ¶ 54). Nor did any Coe employee review the warning prior to the heaters' installation.

Coe contends that the warning is inconsequential because Building 1 is not a spray booth. And they are correct in a technical sense. Under the National Fire Protection Association

("NFPA") 33[4] and OSHA Code § 910.107(a)(3)[5], Building 1 is not a "spray booth." But it is undisputed that Building 1 was an enclosed, ventilated, indoor area primarily used to spray paint Republic's large commercial containers. (ECF No. 60 at 15). The Court is not bound by these technical definitions and, in many ways, Building 1 is a near-miss from the definitions which Coe proffers. So much so that a fire prevention expert concluded that Building 1 resembled a spray booth. (ECF No. 58-3 at 6). Even Coe's own employee stated that it would be "common sense" not to install the heaters where spray painting operations occurred. (ECF No. 60-1, ¶ 58-59). A jury could find that Coe failed to exercise reasonable care in recommending, selling, and installing the heaters given the conditions and operations in Building 1. Viewing the evidence in the light most favorable to Republic, there is a dispute of material fact.

   c. **Damages**

Lastly, Coe moves for summary judgment on damages. There is no dispute that the Operations Building was completely destroyed by the fire. And Indiana law provides: "where such property is permanently damaged, the proper measure of damages would be the market value before the injury." *Gen. Outdoor Advert. Co. v. La Salle Realty Corp.,* 218 N.E.2d 141, 151 (Ind. Ct. App. 1966). Thus, Coe claims that the damages here are limited to $550,000 based on the opinion of their damages expert. (ECF No. 57 at 20). Coe has garnered 57 years of Indiana precedent supporting the notion that the fair-market value before destruction is the proper calculation for damages when the injury is permanent. *City of Marion v. Taylor,* 785 N.E.2d 663, 665 (Ind. Ct. App. 2003); *Warrick Cnty. v. Waste Mgmt. of Evansville,* 732 N.E.2d 1255, 1258

---

[4] NFPA 33 defines spray booth as "[a] power-ventilated enclosure for a spray application operation or process that confines and limits the escape of material being sprayed, including vapors, mists, dusts, and residues that are produced by the spraying operation and conducts or directs these materials to an exhaust system.
[5] OSHA Code § 910.107(a)(3) defines spray booth as "[a] power-ventilated structure provided to enclose or accommodate a spraying operation to confine and limit escape of spray, vapor, and residue, and to safely conduct or direct them to an exhaust system."

(Ind. Ct. App. 2000); *Sanborn Elec. Co. v. Bloomington Athletic Club,* 433 N.E.2d 81, 88 (Ind. Ct. App. 1982); *Neal v. Bullock,* 538 N.E.2d 308, 309 (Ind. Ct. App. 1989).

Republic urges the Court to move away from this precedent because "Indiana tort law seeks to make injured parties whole." *Patchett v. Lee,* 60 N.E.3d 1025, 1028 (Ind. 2016). Indeed, the Indiana Supreme Court has held that it "is a well-established principle that damages are to fairly and adequately compensate an injured party for her loss, and the proper measure of damages must be flexible enough to fit the circumstances." *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind. 2000). Republic's Operations Building was uniquely placed adjacent to the rest of their business operations. And they claim that the Operations Building was an atypical commercial structure for which a replacement facility would have a number of specific and expensive requirements. (ECF No. 60-28). Republic believes that there is no reliable fair market value for the Operations Building such that the circumstances justify walking away from *General Outdoor* and its progeny.

Republic's contentions are well taken. Under the circumstances, it seems unlikely that $550,000 will make them whole. Republic's damages expert, Itle, determined that the replacement cost for the Operations Building would be $2,761,899. (ECF No. 60-5 at 7). Coe does not dispute Itle's qualifications or the methods he employed in reaching that figure. Nor does Coe dispute that the replacement costs of the Operations Building "far exceeds the fair market value of Building 1 pre-fire." (ECF No. 57 at 20). But that is just the situation *General Outdoor* sought to account for. *See Gen. Outdoor,* 218 N.E.2d at 267 ("In the facts at bar, it would seem reasonable to define permanent injury as being one wherein the cost of restoration exceeds the market value of the building prior to the injury."). The injury here is permanent.

Yet the *General Outdoor* court stated, "[t]he measure of damages which we are following

12

in this case will [not] be equally applicable in all possible fact situations…Any measure of damages must be flexible enough to vary with the necessities of the situation." *Gen. Outdoor.,* 218 N.E.2d at 152. Republic relies on *Warrick Cnty. V. Wast Mgmt. of Evansville* to highlight this limitation. 732 N.E.2d 1255 (Ind. Ct. App. 2000). There, a waste management company negligently caused "permanent" damage to a bridge. *Id.* at 1257. The Court began by stating the general principle: "In the case of a permanent injury to property, that is where the costs of restoration exceeds the value of the property before injury, the measure of damages is the value of the property before the injury." *Id.* at 1258. Even so, the court concluded that the "measures of damages developed by Indiana law are ill equipped to handle situations involving bridges because there is no market for determining the fair market value of the bridge." *Id.* Republic views the Operations Building just as the bridge in *Warrick County*—there is no fair market value for their unique structure.

The Court agrees that it would be difficult, if not impossible, for Republic to simply purchase a new facility elsewhere.[6] The Operations Building was strategically placed for Republic's benefit. And just last year the Supreme Court almost faced the exact question[7] Republic poses in *Nordin v. Town of Syracuse,* 192 N.E.3d 205, 210 (Ind. Ct. App. 2022), *trans. granted,* 201 N.E.3d 601 (Ind. 2023). In *Nordin,* the appellate court stated "that *General Outdoor* established a **'proper' measure of damages, not a 'mandatory' measure**." *Id.* at 210. (emphasis added).

There, Plaintiffs bought a lakefront cottage within walking distance of their farm. *Nordin,*

---

[6] A Republic employee reviewed the six comparable properties suggested by Coe's damages expert and determined that none would be a suitable feasible alternative to the Operations Building. (ECF No. 60-28).

[7] The question presented on transfer in *Nordin* was "[w]hether the Court of Appeals improperly applied Indiana summary judgment procedure and contravened public policy that damages should fairly and adequately compensate an injured party for her loss and be flexible enough to fit the circumstances of the case when it determined the Nordins' were only entitled to their cottage's property tax assessed value of $14,700.00 in property damages as a matter of law."

192 N.E.2d at 207. An employee for Defendant negligently turned on the cottage's water supply and the cottage flooded with 6,000 gallons of water. *Id.* The cottage was a total loss. *Id.* Plaintiffs' only option—apart from purchasing a new cottage elsewhere—was to completely rebuild it. *Id.* The cottage's fair market value was $14,700 while the cost of replacement exceeded $200,000. *Id.* at 208. To "safeguard against a windfall" and "adhering to *General Outdoor*," the court determined that the appropriate measure was the cottage's fair market value before the flood. *Id.* at 209. The court held this way, at least in part, because "[Plaintiffs] fail[ed] to specify an alternative measure of damages. They merely assert[ed] that all the evidence should be presented to a jury and the jury should determine the appropriate amount of damages." *Id.*

Notably, the Indiana Supreme Court granted transfer on the issue of whether the Court of Appeals erred and "damages should fairly and adequately compensate an injured party for her loss and be flexible enough to fit the circumstances." Yet on the eve of oral argument, the parties settled. The petition to transfer was dismissed and *Nordin* was vacated.

We cannot see into the minds of the Indiana Supreme Court. It is possible that if they had the opportunity on transfer (they did not), the Indiana Supreme Court might have modified or changed the standard laid out in *General Outdoor*. Still, federal district courts must act as a prognosticator of what a state court would decide when a state's Supreme Court is silent. *See Allstate Ins. Co. v. Menards, Inc.,* 285 F.3d 630, 637 (7th Cir. 2002) ("[F]ederal courts have, under Article III, the authority and, indeed, the duty to ascertain the content of state substantive law when called upon to do so in the exercise of the diversity jurisdiction of the federal courts."); *See also Kimbrell Realty/Jeth Court, LLC v. Fannie Mae*, 483 B.R. 679 (Bankr. C.D. Ill. 2012) ("Of course, the [Indiana] Supreme Court has the final say on issues of state law and federal courts are mere prognosticators until then. This Court's ruling constitutes its prediction as

to how the [Indiana] Supreme Court, silent so far on the issue of [calculating damages], would view [the Operations Building.]").

*General Outdoors* presents the Court with at least two options. While it provides a strict damages rule when real estate is permanently destroyed, it also states that "[t]he measure of damages which we are following in this case will [not] be equally applicable in all possible fact situations" and "[a]ny measure of damages must be flexible enough to vary with the necessities of the situation." *Gen. Outdoor,* 218 N.E.2d at 267. While the Court is charged with an obligation to make an educated guess as to what an Indiana state court might do under these circumstances, a federal court also has a competing obligation not to opine on matters of state law where it is unnecessary. *See Lindenberg v. Jackson Nat'l Life Ins. Co*., 919 F.3d 992, 999 (6th Cir. 2019) (Bush, J., dissenting) ("To the extent that a federal court applies different legal rules than the state court would have, the state's sovereignty is diminished [because] the federal court has made state law. Such an impact on state sovereignty is no small matter, especially since a federal court's error may perpetuate itself in state courts until the state's highest court corrects it.").

This concern leads the Court to the conclusion that it is premature for the Court to rule on an unsettled damages question absent a finding of liability. To facilitate the case, this Court "may order a separate trial of one or more separate issues." Fed. R. Civ. P. 42(b). Bifurcation of liability and damages makes sense in the situation the Court has in this case. Bifurcation is permitted when it is "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy[.]" *Id*. And only one of these criteria need be satisfied in order for the Court to order bifurcation. *Smith-Walker v. Zielinski,* 2003 WL 21254221 at *1 (S.D. Ind. Apr. 29, 2003) (citing *Berry v. Deloney,* 28 F.3d 604, 610 (7th Cir. 1994)). "The court has a wide range of discretion in evaluating whether to bifurcate issues and claims for trial, as

long as the right of trial by jury is preserved." *Id.* With Indiana law unsettled regarding damages in this case, bifurcation is warranted.

If the jury determines that Coe is liable, then the Court will consider certifying the damages question to the Indiana Supreme Court.[8] *See* Ind. R. App. P. 64 ("[A]ny federal district court may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent."). For now, the Court denies the motion for summary judgment as to damages.

## IV. Conclusion

For the reasons set forth above, Coe's Motion for Summary Judgment (ECF No. 56) is DENIED.

SO ORDERED on October 26, 2023.

s/ *Holly A. Brady*<br>
CHIEF JUDGE HOLLY A. BRADY<br>
UNITED STATES DISTRICT COURT

---

[8] The Court cannot currently certify the damages question because it is not determinative of the case until there is a liability finding.